## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
)
JOHN J. AQUINO,                                          )
CHAPTER 7 TRUSTEE                                    )     Case #1:21-cv-01355-JSR
By Its Assignee,                                            )
Convergent Distributors of Texas, LLC            )
                                                                 )
                    Plaintiff,                                 )     **AMENDED COMPLAINT**
                                                                 )     **For Breach Of Contract,**
                    v.                                          )     **Breach Of Fiduciary Duty,**
                                                                 )     **and Fraud**
                                                                 )     **&**
ALEXANDER CAPITAL, LP                          )     **Demand For Jury Trial**
                    &                                           )
Its Managing Partners:                                  )
JOESEPH AMATO,                                       )
ROCCO GUIDICIPIETRO, and,                    )
NESA MANAGEMENT, LLC                         )
                                                                 )
                    Defendants                             )
_____)


John J. Aquino, in his capacity as Chapter 7 trustee ("Trustee") of the bankruptcy estate

of Inpellis, Inc. ("Inpellis"), USBC DMa CA #18-12844-CJP ("*Inpellis* Bankr."), by its assignee

Convergent Distributors of Texas, LLC  ("Convergent") (the Trustee and Convergent are

collectively referred to as "Plaintiff") brings this action to recover damages against Alexander

Capital, LP ("Alexander Capital" or "AC") and its managing partners: Joeseph Amato; Rocco

Guidicipietro; and NESA Management, LLC (Alexander Capital and its managing partners are

referred to collectively as "Defendants").

Plaintiff avers, alleges, and asserts as follows:

## JURISDICTION AND VENUE

1.        This Court has jurisdiction pursuant to 28 U.S.C. §1332, there being diversity of citizenship between Plaintiff and the Defendants and the amount in controversy substantially exceeds the minimum jurisdictional requirement.  Venue in this district is proper pursuant to 28 U.S.C. § 1404(a), the United States Bankruptcy Court having transferred the action to this Court on the motion, and at the request, of the Plaintiff and Alexander Capital, and this Court being the venue in which the action could have originally been brought.   In addition, The Trustee had standing to originally bring this action on October 30, 2020 as an adversary action pursuant to 11 U.S.C. §323(b) and to assign all of the Trustee's rights in this action to Convergent Distributors of Texas, LLC pursuant to an assignment duly approved by the Massachusetts Bankruptcy Court.

## PARTIES

2.        **Plaintiff.**  John J. Aquino, was the duly appointed Trustee of the Chapter 7 bankruptcy estate of Inpellis ("Trustee") in *In Re Inpellis*, USBC DMa CA #18-12844-CJP ("*Inpellis* Bankr.").  Inpellis, formerly named Alterix, Inc., was a Delaware corporation whose principal place of business was 100 Cummings Center, Suite 243-C, Beverly, Massachusetts 01915 (See, *Inpellis* Bankr. Docket).  At all times relevant to this action, Inpellis was a development stage pharmaceutical company.   A petition of involuntary bankruptcy was filed against Inpellis on July 26, 2018 (*Inpellis* Bankr. Doc. #1); an order for relief under Chapter 7 of the Bankruptcy Code was entered November 1, 2018 (*Inpellis* Bankr. Doc. #35); and an order appointing the Trustee was entered  on November 5, 2018 (*Inpellis* Bankr. Doc. #44).  All of the Trustee's rights in this action were assigned to Convergent Distributors of Texas, LLC pursuant

to an assignment duly approved by the Massachusetts Bankruptcy Court by order dated November 18, 2020 (*Inpellis* Bankr. Doc. #358).

3. **Defendant Alexander Capital.** Alexander Capital is a limited partnership formed under the laws of the State of Delaware with a principal place of business at 17 State Street, New York, NY 10004. At all times relevant to this action, Alexander Capital held itself out as a duly licensed investment bank.

4. **Defendant Amato.** Joeseph Amato is a resident of the State of New York and at all relevant times has had a partnership interest in and been the Chief Executive Officer of Alexander Capital, and has directed the management and policies of the firm.

5. **Defendant Guidicipietro.** Rocco Guidicipietro is a resident of the State of New York and at all relevant times has had a partnership interest in and been the Chief Operations Officer of Alexander Capital, and has directed the management and policies of the firm.

6. **Defendant NESA Management LLC.** NESA Management LLC is a State of New York Limited Liability Company with a principal place of business at 17 State Street, New York, NY 10004. At all relevant times NESA Management LLC: has been co-owned by Defendants Amato and Guidicipietro; has had a super-majority partnership interest in; and, has been a managing partner of Alexander Capital.

7. Under Delaware law, Defendants Amato, Guidicipietro, and NESA Management LLC as managing partners of Alexander Capital are liable for the wrongful acts of the Limited Partnership alleged herein and financially responsible for the debts of, and any judgment that is not satisfied by the Limited Partnership, arising out of this action. Delaware Uniform Limited Partnership Act, 6 Del. Code §17-403(b) and (d).

## SUMMARY OF CLAIMS

8.      Plaintiff's action arises out of a July 29, 2014 and October 5, 2015 "Engagement Agreement" between Inpellis and Alexander Capital.[1]  Under the "exclusive engagement agreement" Alexander Capital agreed to act as Inpellis' "managing underwriter" in preparing and submitting "appropriate Registration Statement[s]" and act as its "exclusive financial advisor" in obtaining seed capital regarding an initial public offering.  Such engagement was premised on Alexander Capital's stated "intent … to enter into an exclusive underwriting agreement" "immediately prior to the [Registration Statement's] effective date" for an offering "of up to $20,000,000" on a "Firm Commitment" basis.  Contrary to the representation in the Agreement, Alexander Capital was not financially able to undertake or legally permitted to participate in a guaranteed underwriting.  See, ¶**9-30** below.  Despite its lack of ability or authority, Alexander Capital induced Inpellis to enter into the exclusive relationship on the false premise that it could guarantee an offering and, over an extended period of time, engaged in concerted fraudulent conduct concealing the truth about its ability and authority from the Inpellis Board of Directors. The conduct involved: multiple filings with the regulators of inappropriate draft Registration Statements that expressly mis-represented that the offering would be underwritten by Alexander Capital on a "Firm Commitment" basis and a NASDAQ listing would be applied for, and inappropriately excised material disclosures that had previously been made in prior draft Registration Statements and failed to restore them despite repeated directions from the regulators to do so (See, ¶**31-35, 40** below**)**; fraudulently induced Inpellis to take on substantial debt to a

_____

[1] July 29, 2014 "Engagement Agreement" (EA) between Alexander Capital and Alterix, Inc. (later named Inpellis) at **Exhibit 1**; and, October 5, 2015 EA between Alexander Capital and Inpellis, Inc. at **Exhibit 2**.

seed capital investor placed by AC (See, **¶36-39** below**)**; and, purposefully concealed from the Inpellis Board of Directors AC's inability to guarantee the underwriting (See, **¶42-49** below). The conduct culminated in the November 10, 2015 public filing of the Inpellis S-1 with fraudulently obtained Board signatures that declared, for the first time, that the Alexander Capital underwriting was not guaranteed but only a "best efforts" offering. See, **¶41** below. Alexander Capital's fraudulent conduct rendered the offering a "penny stock;" led to an extensive and ruinous SEC investigation; withdrawal of the offering; and, ultimately Inpellis' involuntary bankruptcy by the seed capital investor placed by AC. See, **¶50-55** below. Plaintiff asserts that Defendants are liable in contract and tort (**¶56**) and seeks damages for: Fraudulent Inducement (**¶57-64**); Breach Of Contract (**¶65-71**); Breach Of Fiduciary Duty (**¶72-76**); and, Fraud (**¶77-86**). Plaintiff also asserts its right to a Jury Trial (**¶87**).

## ALLEGATIONS

### A.  Engagement Agreement Between Alexander Capital And Inpellis

9.      By a signed writing, dated July 29, 2014, Alexander Capital entered into an "exclusive engagement agreement" with Alterix, Inc.. A true copy of the July 29, 2014 Engagement Agreement is attached hereto as **Exhibit 1**.

10.     On April 6, 2015 and August 17, 2015, Alexander Capital and Alterix, Inc. amended, by written agreements, the Engagement Agreement entered into on July 29, 2014.

11.     Alterix, Inc. changed its corporate name to Inpellis, Inc. ("Inpellis") in September, 2015.

12.     By a signed writing, dated October 5, 2015, Alexander Capital and Inpellis "amended and re-stated in its entirety" the "Engagement" agreement. A true copy of the October 5, 2015 Engagement Agreement is attached hereto as **Exhibit 2**.

13.     Both Engagement Agreements "submit[ed]" a "proposal with respect to an initial public offering … by [Alexander Capital] of up to $20,000,000 … the price and terms of which shall be determined by the market price prior to the Effective Date of the offering closing" and that the agreements "state[d] certain conditions and assumptions upon the proposed offering by Alexander Capital."  The two agreements stated: "It is [Alexander Capital's] intent, immediately prior to the Effective Date, to enter into an exclusive underwriting agreement (the 'Underwriting Agreement') with [Inpellis]" and that "[t]he underwriter/broker will act as agent on a 'Firm Commitment' basis," which "shall contain such terms and conditions as are customarily contained in agreements of such character and among other things, provide for the following" terms detailed in the two agreements.  See, **Ex. 1** p.1; **Ex. 2** p.1.

14.     Pursuant to the written terms of the two agreements, the "exclusive engagement agreement" and the "engagement of Alexander Capital as managing underwriter shall commence at the signing of this document and continue for three (3) months after the SEC provides a Notice of Effectiveness on the registration statement"; and, that "during this Engagement" "Alexander Capital shall also be the exclusive financial advisor on all financings and advisory."  See, **Ex. 1** p.1; **Ex. 2** p.1.

15.     Alexander Capital and Inpellis agreed that Alexander Capital was engaged as of the execution dates as: a) the  "managing underwriter" in preparing and submitting "appropriate Registration Statement[s]" and "the Underwriting Agreement and related documents so as to expedite the successful consummation of the public offering," the enumerated expenses of which would be covered by Inpellis; and, b) as the "exclusive financial advisor on all financings … during this Engagement" regarding "any bridge or private financings completed by [Inpellis] during the terms of this agreement," for which Alexander Capital would receive a "cash

placement fee," originally set at "8%" and later increased to "10%." See, **Ex. 1** p. 1-3; **Ex. 2** p. 1-3.

16.     The July 29, 2015 agreement required Inpellis "[u]pon execution of this Agreement … will pay to Alexander Capital $25,000 and another $25,000 upon the satisfactory completion of due diligence, which shall be netted against the payment of future expenses associated with the offering." see, **Ex. 1** p. 3.

17.     Inpellis paid Alexander Capital $25,000 upon execution of the July 29, 2014 agreement and an additional $30,000 "upon the satisfactory completion of [Alexander Capital's] due diligence." See, **Ex. 1** p. 3.

18.     The October 5, 2015 agreement stated that the "total aggregate amount of accountable expenses to be reimbursed by [Inpellis] will not exceed $175,000" and that as of October 2, 2015 [Inpellis] has paid $55,000 of such $175,000 for actually incurred accountable expenses associated with the Offering." See, **Ex. 2** p. 3.

19.     Pursuant to the terms of the Engagement Agreements, Inpellis was obligated to "retain as its accountants a firm of independent certified public accountants acceptable to Alexander Capital" to "prepare all certified financial statements and schedules to be included in the Registration Statement" and "retain as its lawyers a firm acceptable to Alexander Capital, which is expert in securities law matters and in the regulatory aspects of" Inpellis' business. See, **Ex. 1** p. 3; **Ex. 2** p. 4.

20.     Inpellis complied with the Engagement Agreements' requirement that it retain the appropriate accounting and law firms.

21.     Subsequent to the execution of the two agreements, Inpellis incurred and expended substantial sums in order to cover the enumerated expenses that Inpellis was required to cover during the offering process.

22.     The Engagement Agreements represented that it was AC's "intention to enter into the Underwriting Agreement on or immediately prior to the Effective Date" of the "offering closing" and "reserve[d] the right not to proceed with the offering if, in its sole judgment" certain specified conditions occurred.  See, **Ex. 1** p. 4; **Ex. 2** p. 5.

23.     Inpellis entered into the Engagement Agreements based on its belief that Alexander Capital was in good faith regarding its representation that: Alexander Capital would act as the "managing underwriter" and cooperate in the preparation of the appropriate Registration Statements to be submitted for regulatory review and the preparation of an appropriate Underwriting Agreement and related documents so as to "expedite the successful consummation of the public offering"; Alexander Capital would act as the "exclusive financial advisor" and provide appropriate advice regarding any financing of the offering; and, that Alexander Capital had the ability and authority to carry out it's stated "intent" to "expedit[iously]" "cooperate in the preparation of … appropriate Registration Statement[s]" in order to obtain regulatory approval of an "effective Registration Statement" so that the parties could "expedit[ously]" "enter into an exclusive underwriting agreement" in which Alexander Capital would "act as agent on a 'Firm Commitment' basis".

24.     From execution of the Engagement Agreements through November 10, 2015 when the Inpellis S-1 Registration Statement was publicly filed, none of the conditions stated in the Engagement Agreements which would have excused Alexander Capital's obligation to

undertake the Inpellis offering on a "firm commitment" basis had occurred or were in existence that were not the direct result of Alexander Capital's wrongful conduct.

25.     Subsequent to the execution of the Engagement Agreements, Inpellis fulfilled its agreed upon undertakings including: engaging the professional and administrative services and bearing the substantial "fees, disbursements and expenses" detailed in the Engagement Agreements; and incurring the substantial expense of retaining an accounting firm and a law firm acceptable to Alexander Capital to perform the services required of Inpellis pursuant to the Engagement Agreements.

26.     Subsequent to the execution of the Engagement Agreements, Inpellis paid Alexander Capital substantial cash placement fees for the bridge financing for the intended public offering.  The first tranche of the bridge financing was consummated in August, 2015, and the additional financing debt was incurred over the next two months.

**B.     Alexander Capital Knew The Importance Of Its "Firm Commitment" Representation To Inpellis**

27.     At the time that Alexander Capital entered into the Engagement Agreements, Alexander Capital knew the substantial value to Inpellis of an investment bank undertaking a public offering on a "firm commitment" basis.  Alexander Capital  knew, and it was well-understood in the marketplace, that a "firm commitment" offering, as opposed to a "best efforts" offering, would have a substantial impact on the potential success of a public offering. Alexander Capital knew that a "firm commitment" underwriting, unlike a "best efforts" offering, the underwriter bears the risk of loss on the unsold portion of the offering.    In a firm commitment underwriting, the underwriter agrees to purchase an agreed upon percentage of the offering irrespective of whether the securities can be sold in the public market, therefore the

underwriter bears the risk if the offering is undersubscribed.  Alexander Capital knew that it is the purpose of a "firm commitment" offering to place the risk of loss onto the underwriter.

### C. Alexander Capital Knew It Could Not/Would Not Conduct A Firm Commitment Offering

28.     At the time Alexander Capital entered into the Engagement Agreements, and through November 10, 2015 when the Inpellis S-1 was publicly filed, Alexander Capital (i) knew it did not have the financial capacity and did not qualify under applicable regulatory regulations to underwrite a "Firm Commitment" offering, and as a consequence, (ii) it would, and in fact did, engage throughout this period in conduct to conceal its inability and lack of authorization from the Inpellis Board of Directors, and would, and in fact did, engage in purposeful conduct to substitute at the last moment a draft of the S-1 for public filing that stated that the Inpellis offering was _not_ being underwritten by Alexander Capital on a "Firm Commitment" basis but that the Inpellis offering was being underwritten by Alexander Capital on a "Best Efforts" basis.

29.     From the outset and throughout the relevant period, Alexander Capital misrepresented to Inpellis that it had the financial ability and legal authority to undertake an offering on a "firm commitment" ie underwriter guaranteed basis.  In fact, during the relevant period, Alexander Capital held itself out to Inpellis that it could participate in "firm commitment" offerings when, in fact, Alexander Capital had neither the financial ability or legal authority to underwrite such a guaranteed offering.  Alexander Capital during all relevant times, had not received the approval from FINRA to participate in a "Firm Commitment" offering and that Alexander Capital's FINRA membership did not permit the firm to participate in firm commitment offerings.  Alexander Capital throughout the relevant period purposely concealed these facts from the Inpellis Board of Directors.

30.     As a result of Alexander Capital's pattern, during the relevant period, of wrongly

holding itself out to others as qualified to participate in guaranteed offerings, FINRA initiated an

investigation and the firm was charged with wrongfully making a "material change in its

business operations" by wrongfully participating in "Firm Commitment" offerings.  On October

31, 2019, Alexander Capital agreed to "acceptance" of the findings by FINRA of its wrongful

conduct; "waived" its rights to contest the charges; and, "consent[ed]" to being "Censured and

fined $45,000."[2]

**D.     Based On Alexander Capital's Misrepresentations Inpellis Subjected
        Itself To The Regulatory & Financial Risk Of A Public Offering**

31.     Based on Alexander Capital's misrepresentations detailed above, Inpellis devoted

substantial resources and undertook significant financial and regulatory risk by engaging in the

rigorous public offering registration process.  Pursuant to the Engagement Agreements, Inpellis

hired a highly regarded certified public accounting firm, major experienced law firms, and other

qualified professionals acceptable to Alexander Capital, to work with Alexander Capital and its

law firm, to undertake and navigate the complex public offering registration process.

32.     Beginning in April, 2015 Inpellis (then named Alterix) filed a series of draft

registration statements ("DRS") with the Corporate Finance Division of the Securities &

Exchange Commission ("CorpFin") on a confidential basis for review and comment.  There were

five private DRS filings on April 8, 2015, June 30, 2015, August 5, 2015, October 6, 2015 and

October 28, 2015.

33.     Each of the confidential DRS filings submitted to CorpFin by Inpellis were

followed promptly with review comments by CorpFin.  The CorpFin Comment letters

---

[2] FINRA BrokerCheck Report Re Alexander Capital, LP,  Disclosure Event #2 (public
document).

concerning each confidential filing were dated: May 6, 2015, July 10, 2015, August 14, 2015, October 20, 2015, and November 10, 2015.

34.     All five DRS's filed with CorpFin Represented that Alexander Capital was undertaking the intended public offering on a "Firm Commitment" basis, *i.e.*, it was an underwriter-guaranteed offering.

35.     The April 8 through August 5, 2015 submissions also contained  extensive disclosures regarding the regulatory history of Inpellis's parent corporation BioChemics and BioChemics' founder John Masiz, as well as the purported security interests of certain debt holders in BioChemics' intellectual property that was then being licensed to Inpellis, all of which could have substantial impact on Inpellis' business.

**E.     Based On Alexander Capital's Misrepresentations Inpellis Assumed Substantial Debt In Order To Finance The Intended Offering**

36.     As Inpellis' "exclusive financial advisor," and based on Alexander Capital's misrepresentations, Alexander Capital secured, and Inpellis agreed to assume, $5.25 Million in bridge loans in the form of 20% original issue discount notes totaling approximately $6.25 Million face amount debt.  This bridge financing commenced with a $3 Million loan on August 17, 2015 and $2.25 Million in additional loans during the following two months.

37.     Alexander Capital obtained the bridge loans by providing the bridge lenders a copy of the August 5, 2015 DRS that contained the representation that Alexander Capital was undertaking the offering on a "firm commitment" basis and included the extensive disclosures regarding Inpellis' parent company BioChemics and the asserted security interests of certain BioChemics' debt holders.

38.     Based on the misrepresentations that the anticipated public offering raise was to be guaranteed by the underwriter up to $20 Million, the bridge loan was entered into between

Inpellis and the bridge lenders based on a pre-offering valuation of $75 Million and an anticipated post-offering valuation of $100 Million. The bridge loans provided that, in the event that the offering did not proceed as anticipated, Inpellis was obligated to discharge the debt by August 17, 2016.

39. As a result of the placement of the bridge loans, Alexander Capital received approximately $500,000 as a "10%" "placement fee."

**F.    Alexander Capital Caused Inappropriate DRS Filings That Misrepresented It Intended To Undertake A "Firm Commitment" Offering And Omitted The Previously Made Material Disclosures**

40. In addition to causing Inpellis to file inappropriate DRS's regarding Alexander Capital's purported underwriting of the intended public offering on a "firm commitment" basis, Alexander Capital caused Inpellis to file inappropriate DRS statements with CorpFin regarding other material information. Alexander Capital achieved this by engaging in the following conduct:

a. Alexander Capital induced Inpellis to hire its employee, Patrick Mooney, as its chief executive officer. Subsequent to the filing of the April, 2015 DRS, Alexander Capital's Christopher Carlin induced Inpellis to replace its CEO, Dr. Harry McCoy, with Alexander Capital's analyst and long-time Carlin associate, Dr. Patrick Mooney. Alexander Capital represented to Inpellis that the CEO replacement was supported by an interested lender who was prepared to make a substantial loan to finance the offering.

b. In August, 2015, after the August 5, 2015 DRS had been filed with its comprehensive disclosures detailed in ¶ 35 above, Mooney was installed as Inpellis' new CEO, and the bridge lender identified by Alexander Capital consummated its $3 Million loan in

anticipation of the IPO and the lender encouraged other parties affiliated with it to provide additional funds.

c.      Alexander Capital and Mooney filed additional Inpellis draft registration statements on October 6 and October 28, 2015 for confidential review by CorpFin.  The two October, 2015 DRS submissions were notable for their substantial deletions of previously included material disclosures regarding Inpellis' parent company, BioChemics' and BioChemics' founder's regulatory history and the purported security interests held by the BioChemics' creditors in the intellectual property that Inpellis depended upon for its business.

d.      In the Corpfin comment letter dated October 20, 2015 regarding the October 6, 2015 DRS filing, the SEC reviewers noted the deletions of previous disclosures regarding the history of BioChemics and related risks and disclosures.  The SEC reviewers directed that the prior disclosures regarding these matters be reinserted.

e.      The October 6, 2015 disclosure deletions became even more problematic due to the fact that between the October 6 and October 28, 2015 DRS submissions, Inpellis and BioChemics entered into a sale of the intellectual property that granted Inpellis ownership interests in the intellectual property that it had previously licensed from BioChemics.  An important feature of the sale transaction was the payment of $750,000 by Inpellis to BioChemics, which was then used by BioChemics to pay a $750,000 fine due to the SEC for past BioChemics' regulatory issues that had resulted in an $18 Million judgment against BioChemics.

f.      Despite the fact that the October 20th 2015 CorpFin comment letter demanded that Inpellis reinstate the October 6th deletions, the SEC reviewers in their November 10, 2015 comment letter noted that the deleted information was not fully reinstated in the October 28,

2015 DRS submission, including the disclosures regarding BioChemics and, material information regarding the creditors of BioChemics and the amount owed to these creditors.

g.      The failure of Alexander Capital and Mooney to reinstate previous disclosures deleted from the October 6 and 28, 2015 DRS despite demand to do so by CorpFin, was compounded when Alexander Capital and Mooney thereafter submitted the S-1 *public* filing on November 10, 2015 *immediately after* receiving the November 10, 2015 CorpFin comment letter that detailed the deficiency in the October 28, 2015 DRS disclosures.  The SEC pointed out in CorpFin's November 23, 2015 comment letter to the November 10, 2015 S-1 filing, that Inpellis would have to address the fact that the publicly filed S-1 again failed to re-instate the previously made disclosures and reminded the filer of its responsibility to make complete and accurate disclosures.

41.      Unlike all five previously filed confidential draft registration statements, the publicly filed S-1 stated for the *first* time that the offering was *not* being made on a "firm commitment", but rather on a "best efforts" basis.

**G.      Alexander Capital Concealed Its Inability/Lack of Authority To Undertake A "Firm Commitment" Offering And Other Material Information From Inpellis**

42.   Alexander Capital, in concert with Mooney, purposefully concealed from Inpellis' Board of Directors the core material fact that Alexander Capital was financially unable and without the legal authority to undertake the Inpellis offering on a "firm commitment" basis, and Alexander Capital, in concert with Mooney, purposely concealed from the Board of Directors that AC and Mooney had fraudulently obtained the Board's statutorily required signatures purportedly approving the filing of the S-1.

43.     On November 9, 2015 at 4:39 P.M. EST, Alexander Capital, in concert with Mooney, caused the Board to receive by email "the current draft of the S-1" for an 8:00 P.M. EST Board conference call regarding the public filing of the S-1 scheduled to take place the next day, November 10, 2015.  The "S-1 Proof" dated November 9, 2015 ("Nov. 9 2015 S-1 Draft") that was provided the Board, stated that: "This is a firm commitment initial public offering."

44.     The November 9, 2015 S-1 Draft had a signature page for the Board and officers to sign.  The signature page, as required by law, stated: "Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement on Form S-1 has been signed by the following persons in the capacities and on the dates indicated below."

45.     The next day, on November 10, 2015 at 5:02 P.M. EST, Alexander Capital, in concert with Mooney, caused the Board to receive by email just "the two signature pages" contained in the November 9, 2015 S-1 Draft provided the previous night.  The Board was instructed to "sign" or indicate in an email that they had "signed" the S-1.  Board members did as they were instructed.

46.     On November 10, 2015 at 5:39 P.M. EST, a revised draft of the S-1 was created ("Nov. 10 2015 S-1 Draft").  The November 10, 2015 S-1 Draft was reviewed by Alexander Capital and Mooney, but was _not_ provided to the Board.  The Nov. 10 2015 S-1 Draft changed the "Preliminary Prospectus" statement from "This is a firm commitment initial public offering" to "This is an initial public offering …".  It then added the following statement to the "Preliminary Prospectus":

> The underwriters are selling the shares of common stock in this offering on a "best efforts" basis.  The underwriters are not required to sell any specific number or dollar amount of common stock, but will use their best efforts to sell the securities offered. Because this is a best efforts offering, the underwriters do not have an obligation to purchase any shares of common stock, and, as a result, there is a possibility that we may not receive any proceeds from the offering.

November 10, 2015 S-1 Draft, "Preliminary Prospectus".

47.     Alexander Capital, in concert with Mooney, caused the Board of Directors' signature pages in the November 10, 2015 S-1 Draft, to be filled in as electronic signatures *ie* "/s/ [name]," *without* the Board's knowledge or approval,

48.     Soon after reviewing the November 10, 2015 S-1 Draft, Alexander Capital, in concert with Mooney, without the knowledge or approval of the Inpellis Board of Directors, publicly filed the Inpellis S-1 with the change from a "firm commitment" offering to "best efforts", and the signature spaces for the Board indicated as electronic signatures.

49.     Prior to the public filing of the S-1 Registration Statement, Alexander Capital concealed from the Board of Directors material information including (i) its inability and lack of authority to undertake the offering on a "firm commitment" basis and, (ii) the efforts, in concert with Mooney, to cause the filing of inappropriate registration statements - including the excising of previously disclosed material information from the DRS's and the failure and refusal, despite CorpFin's demands, to re-instate the material, and the last minute change in the publicly filed S-1 from a "firm commitment" to a "best efforts" offering.

**H.      Alexander Capital's Conduct Rendered The Inpellis Offering A "Penny Stock"**

50.     The profound fundamental change from an underwriter-guaranteed "firm commitment" transaction of up to $20 million to a speculative "best efforts" offering rendered the Inpellis offering a "penny stock" that could not meet the listing requirements of NASDAQ.

51.     The last-minute change from "firm commitment" to "best efforts" prompted the SEC reviewers in their November 23, 2015 comment letter to require Inpellis to explain why the

offering did not now meet the definition of a penny stock and how the offering was expected to

meet the NASDAQ listing requirements:

> We note that you have changed the IPO transaction from a firm commitment to a best
> efforts offering.  Please revise the prospectus throughout accordingly, including the
> following: … Include risk factors disclosing how the issuance of penny stock may affect
> the liquidity and price of your shares.  Alternatively, tell us why you believe your shares
> do not meet the definition of penny stock under Exchange Act Rule 3a51-1.  Revise the
> market on which you intend to apply to have the prices of your common stock quoted or
> tell us how you expect to meet the Nasdaq listing standards. …

November 23, 2015 CorpFin comment letter (emphasis added).

**I.**     **Alexander Capital's Conduct Caused The Failure Of The
Offering; An SEC Investigation; The "Bridge Loan" Default; And
Inpellis's Bankruptcy**

52.     After the S-1 filing, the SEC notified Inpellis on November 30, 2015 that it had

issued a "Stop Order" and initiated an investigation of the IPO offering and the disclosures

contained in its registration statements.

53.     After months of an extensive open-ended investigation by the SEC that posed an

existential threat to the company, Inpellis was able to resolve the matter with the SEC without

penalty or finding by, among other things, voluntarily withdrawing the Inpellis IPO.

54.     As a direct result of the failed offering, the $6.25 Million "Bridge Loan" debt was

not able to be converted as anticipated, and went into default.

55.     Eventually, the bridge lenders filed an involuntary Chapter 7 bankruptcy petition

against Inpellis, on July 26, 2018, and an Order for Relief under Chapter 7 of the Bankruptcy

Code was entered by the Massachusetts U.S. Bankruptcy Court on November 1, 2018 in *In Re

Inpellis* USBC DMa CA #18-12844-CJP.

## CLAIMS

## Defendants Are Liable To Inpellis In Contract & Tort

56. Defendant Alexander Capital, and its Managing Partners, Defendants Amato, Guidicipietro, and NESA Management LLC, are liable to Plaintiff in contract and tort for Alexander Capital's wrongful conduct that included its: material misrepresentations that induced Inpellis to enter into the Engagement Agreements; breach of the terms of the Engagement Agreements; misrepresentations regarding its ability and authority to undertake a "firm commitment" offering; and fraudulent concealment of material information regarding Alexander Capital's wrongful conduct in detriment of Inpellis' interests and rights that violated Alexander Capital's contractual and fiduciary obligations as Inpellis' managing underwriter and exclusive financial advisor. In addition, Defendants Amato, Guidicipietro, and NESA Management LLC as managing partners of Alexander Capital, are liable for any judgment that cannot be satisfied from the assets of the Limited Partnership.

## COUNT I
## Fraudulent Inducement

57. The Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-56 above as if fully set forth herein.

58. Alexander Capital's stated intent that it would undertake the offering on a "firm commitment" basis misrepresented Alexander Capital's inability and lack of authority to undertake the offering on a "firm commitment" basis. At the time that Alexander Capital made the misrepresentations to Inpellis, it knew: it did not have the financial capacity; did not qualify under the applicable rules and regulations; and did not intend to undertake the offering on a "firm commitment" basis.

19

59.     Alexander Capital's ability, authority and intent to undertake the offering on a "firm commitment" basis were central to Inpellis' decision to enter into the Engagement Agreements because they fundamentally affected whether the risk of the offering was on Inpellis or assumed by Alexander Capital as the putative "firm commitment" underwriter.

60.     At the time it made the misrepresentations to Inpellis, Alexander Capital knew the central importance of its ability, authority and intent to undertake the offering on a "firm commitment" basis to any potential client, including Inpellis.  As an experienced investment bank, Alexander Capital knew the impact of such a commitment on the financial success of a potential client's public offering.  Such impact was well known and understood by the industry and was the subject of important industry standards, rules and regulations.

61.     Despite its knowledge of the importance of it's ability, authority and intent to undertake the offering on a "firm commitment" basis to Inpellis's decision to enter into the Engagement Agreements, Alexander Capital misrepresented its ability, authority and intent to undertake a "firm commitment" offering in order to induce Inpellis to become a client, enter into the Engagement Agreements, and pay Alexander Capital substantial fees while covering Alexander Capital's expenses.

62.     At all relevant times, Inpellis was not in a position to know that the representations by Alexander Capital that it had the ability, authority and intent to undertake the offering on a "firm commitment" basis were, in fact, false.

63.     Inpellis in good faith relied on Alexander Capital's representations about its ability, authority and intent to undertake the offering on a "firm commitment" basis, and on that basis entered into the Engagement Agreements.

64.     As a direct result of its good faith reliance on Alexander Capital's misrepresentations that it had the ability, authority and intent to undertake the offering on a "firm commitment" basis, Inpellis incurred substantial financial and monetary loss and detrimental regulatory action that further compromised its ability to function as a business and honor its debts, and led to its bankruptcy.

**COUNT II**
**Breach Of Contract**

65.     The Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-64 above as if fully set forth herein.

66.     Inpellis and Alexander Capital entered into the Engagement Agreements with the intent to be legally bound by mutual undertakings and promises which conferred good and valuable consideration on each.

67.     Inpellis performed its undertakings and obligations in good faith.

68.     Despite Inpellis's good faith performance of its undertakings and obligations, Alexander Capital breached its obligations under the Engagement Agreements: (i) to carry out its undertakings as managing underwriter in good faith including its promise to cooperate in the preparation of "appropriate registration statement[s]" "so as to expedite the successful consummation of the public offering" that Alexander Capital represented it would underwrite on a "firm commitment" basis; (ii) to provide Inpellis, as the "exclusive financial advisor", with independent professional advice regarding the financing of the offering, including informing Inpellis of Alexander Capital's inability, lack of authority and lack of intent to undertake the offering on a "firm commitment" basis; and, (iii) to inform Inpellis, pursuant to its obligations as managing underwriter and "exclusive financial advisor" of the material facts, of which it was uniquely aware regarding the fact that Alexander Capital was engaging in conduct in concert

with its former employee Mooney, who became Inpellis' CEO at Alexander Capital's insistence, that was against the interests of Inpellis and undermined the integrity of the offering

69.     As a direct result of its breach of its contractual obligations under the Engagement Agreements, Alexander Capital caused Inpellis to undertake substantial debt to finance the intended "firm commitment" offering that it would not have undertaken had it known the truth about Alexander Capital's inability, lack of authority and lack of intent to undertake the "firm commitment" offering.  Additionally, as a result of the foregoing, Inpellis suffered  substantial financial and monetary loss, and detrimental regulatory action, that further compromised its ability to function as a business and honor its debts, and which led to its bankruptcy.

70.     Had Alexander Capital performed as it had represented it intended to under the Engagement Agreements, Inpellis would have received the benefit of a "firm commitment" offering that would have guaranteed to Inpellis up to a $20 Million raise and given Inpellis a post-IPO valuation estimated by Alexander Capital to be approximately $100 Million.

71.     Had Alexander Capital not engaged in its conduct in violation of its obligations under the Engagement Agreements detailed above, Inpellis would not have been subjected to the financially and commercially ruinous events described above, and Inpellis would have maintained its pre-IPO valuation that Alexander Capital estimated to be approximately $75 Million.

## COUNT III
## Breach Of Fiduciary Duty

72.     The Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-71 above as if fully set forth herein.

73.     Under the Engagement Agreements, Alexander Capital and Inpellis entered into a fiduciary relationship, or relationship of trust and confidence, whereby Alexander Capital was

under a duty, as Inpellis's "exclusive financial advisor" regarding financing of the intended "firm commitment" offering, to provide Inpellis with independent professional advice for Inpellis's benefit upon matters within the scope of that relationship. The obligation to provide such independent professional advice included providing advice, in accordance with the ordinary and reasonable standards of the investment banking industry, that was independent of Alexander Capital's business self-interest, and in the interest of, and for the benefit of Inpellis. This advisory relationship created a relationship of higher trust than would arise from a business agreement alone. Such an advisory relationship imposed on Alexander Capital a fiduciary obligation to disclose any conflict of interest and to promptly reveal with candor, and not conceal from Inpellis, facts within its knowledge that was material to the subject matter of the relationship.

74.     Alexander Capital violated its fiduciary obligation to Inpellis by not disclosing the truth regarding: (i) its inability, lack of authority and lack of intent to undertake the "firm commitment" offering and therefore the inadvisability of undertaking substantial debt to finance the offering or incurring other substantial financial obligations based on Alexander Capital's misrepresentation of its stated intent to undertake the offering on a "firm commitment" as opposed to "best efforts" basis; (ii) the conflict of interest and divided loyalty of Alexander Capital and Mooney and their actions in concert that resulted in the excising of material disclosures in the draft registration statements, and failing to re-instate them despite regulatory directives to do otherwise; and (iii) the concealment from the Board of Directors regarding the fact that Alexander Capital could not and would not be carrying out its stated intent to underwrite the offering on a "firm commitment" basis and that the Board was being misled into believing that they were approving for filing a "firm commitment" offering and that the publicly filed S-1

would be changed at the last-minute from a "firm commitment" to a "best efforts" offering with the Board's fraudulently obtained electronic signatures (ie "/s/ [name]") purportedly approving the filing.

75.     Had Alexander Capital properly fulfilled its fiduciary obligations to Inpellis, Inpellis would not have: (i) continued the relationship with Alexander Capital as its investment banker; (ii) undertaken the substantial debt to finance the offering or incurred the substantial financial obligations, cost and expense in anticipation of the intended "firm commitment" offering; (iii) not have subjected itself to the regulatory risk of a shutdown of the offering and regulatory investigation; (iv) not have been financially weakened and compromised by the actions it took in ignorance, and in good faith reliance on Alexander Capital's representations being true and that Alexander Capital would fulfill its professional obligations; and (v) not have been the subject of a Chapter 7 bankruptcy action by the lender placed by Alexander Captial whose loan Inpellis would not have undertaken.

76.     As a result of Alexander Capital's violation of its fiduciary obligations, Inpellis suffered substantial financial and monetary loss, and detrimental regulatory action, that compromised its ability to function as a business and honor its debts, and which led to its bankruptcy.

## COUNT IV
## Fraud

77.     The Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-76 above as if fully set forth herein.

78.     Alexander Capital engaged in conduct to the detriment of Inpellis in which it made use of intentional misrepresentations of material facts and the intentional concealment of material facts that were peculiarly within Alexander Capital's knowledge and which Alexander

Capital had a fiduciary obligation to reveal to Inpellis. This intentional misconduct was engaged in for the purpose of inducing Inpellis to enter into an exclusive agreement and fiduciary relationship with Alexander Capital to the financial benefit of Alexander Capital and to the substantial financial and business detriment of Inpellis.

79.     Alexander Capital engaged in a persistent course of fraudulent conduct over an extended period of time that caused Inpellis to: (i) enter into an exclusive relationship with Alexander Capital that forestalled Inpellis from entering into business relationships with reputable investment banks; (ii) hire Alexander Capital's compromised employee as Inpellis' CEO; (iii) incur substantial financial obligations and costs including undertaking $6.25 Million of debt to finance the intended offering and incur the substantial expense of accounting and legal professionals; and (iv) to undertake and be exposed to the substantial financial and regulatory risk of the intended public offering and regulatory filings that were compromised and rendered inappropriate by Alexander Capital's wrongful and unprofessional conduct.

80.     Alexander Capital's fraudulent conduct resulted in substantial financial benefit to Alexander Capital including its receiving a substantial 10% "placement fee" regarding the financing of the intended offering.

81.     Alexander Capital's conduct in concert with Mooney that excised material information from the October, 2015 DRS's and the publicly filed S-1, and its failure to correct the aforesaid excisions despite the regulators' repeated admonitions to do so, was reckless and wanton, and unnecessarily and wrongfully subjected Inpellis to regulatory action that was an existential threat to its business.

82.     Alexander Capital's conduct in concert with Mooney that implemented an elaborate scheme to deceive the Board of Directors into believing that they were signing off on a

"firm commitment" offering instead of a "best efforts" offering and involved the fraudulent filing of the S-1 with the fraudulently obtained signatures of the Board of Directors is evidence of Alexander Capital's fraudulent intent to benefit itself to the detriment of Inpellis and its complete indifference to its civil obligations that evidenced a high degree of moral turpitude.

83.　　Alexander Capital's wrongful conduct was persistent, reckless, willful and wanton, and such conduct demonstrates that Alexander Capital purposefully intended to benefit from its wrongful conduct at the expense of Inpellis and engaged in the misconduct with a conscious disregard for the rights and interests of its client.

84.　　Alexander Capital intended that Inpellis rely on Alexander Capital's fraudulent misrepresentations to Alexander Capital's benefit and to Inpellis's detriment.

85.　Alexander Capital's intentional willful and wanton fraud against Inpellis resulted in Inpellis's reliance on its fraudulent misrepresentations and Inpellis undertaking obligations and entering into agreements that it would not have undertaken or entered into had Alexander Capital not fraudulently misrepresented and concealed from Inpellis the truth about material facts within the knowledge of Alexander Capital.

86.　　As a result of Alexander Capital's persistent, reckless, wilful and wanton misconduct and conscious disregard for the rights and interests of its client, Inpellis suffered substantial financial and monetary loss, and detrimental regulatory action, that compromised its ability to function as a business and honor its debts, and which led to its bankruptcy.

## DEMAND FOR JURY TRIAL

87.　　Inpellis demands trial by jury regarding any and all issues triable by jury, as of right, under law and the Constitution.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff respectfully requests that the Court upon due consideration and resolution of Plaintiff's claims:

1.      Enter judgments in favor of the Plaintiff and against Defendants on Counts I through IV set forth herein;

2.      Enter judgment for all compensatory and consequential damages, costs and expenses caused by Defendants' wrongful conduct as may be allowed by law and proved at trial;

3.      Enter judgment for all of Inpellis' lost expectation damages caused by Defendants' wrongful conduct as may be allowed by law and proved at trial;

4.      Enter judgment against Defendants in the form of exemplary or punitive damages for Defendants' intentional fraudulent conduct that Defendants engaged in in a persistent, reckless, wilful and wanton manner and with a conscious disregard for the rights of its client, as may be allowed by law; and

5.   Grant such other and further relief as may be just and proper.


Dated: April 19, 2021.

 Respectfully Submitted By:

***Convergent Distributors of Texas, LLC, Assignee by way of Assignment from Plaintiff John J. Aquino, Chapter 7 Trustee, by its attorney:***

/s/ Jan Schlichtmann
 Jan Schlichtmann, Esq.
 PO Box 233
 Prides Crossing, MA 01965
 Tel: 978-804-2553
 Email: jan@schlichtmannlaw.com