## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
JOHN J. AQUINO,                            :     Case No.: 1:21-cv-01355-JSR
CHAPTER 7 TRUSTEE,                         :
By Its Assignee,                           :
Convergent Distributors of Texas, LLC,     :
                                           :
          Plaintiff,                       :
                                           :     MEMORANDUM OF LAW
          vs.                              :     IN SUPPORT OF
                                           :     DEFENDANTS' MOTION TO
ALEXANDER CAPITAL, LP,                     :     DISQUALIFY COUNSEL
and Its Managing Partners:                 :
JOSEPH AMATO,                              :
ROCCO GUIDICIPIETRO, and                   :
NESA MANAGEMENT, LLC,                      :
                                           :
          Defendants.                      :
                                           :
-------------------------------------------------------------x
```

1

## TABLE OF CONTENTS

*I.*    *Introduction.* .................................................................................................................4

*II.*   *Standard.* ......................................................................................................................5

*III.*  *Facts.* ...........................................................................................................................7

  a. Mr. Schlichtmann's Initial Involvement and the Creation of the Trust. ..................8

  b. The SEC Investigation...............................................................................................9

  c. The SEC Settlement. ...............................................................................................12

  d. The Fallout of the IPO's Abandonment. .................................................................14

  e. Factual Summary.....................................................................................................16

*IV.*   *Analysis.*.....................................................................................................................17

  a. Mr. Schlichtmann Is a Necessary Witness. ............................................................18

  b. Mr. Schlichtmann's Testimony Could Be Significantly Useful to His Client. .......21

  c. Mr. Schlichtmann's Testimony Would Contradict and Undermine His Client's Factual Assertions. ..................................................................................................22

*V.*    *Conclusion.* ................................................................................................................25

## TABLE OF AUTHORITIES

**CASES**

*Finkel v. Frattarelli Bros*., 740 F. Supp. 2d 368 (E.D.N.Y. 2010) ................................................6

*Kubin v. Miller*, 801 F. Supp. 1101 (S.D.N.Y. 1992).......................................................................6

*Lamborn v. Dittmer*, 873 F.2d 522 (2d Cir. 1989) ..................................................................6, 18

*Sea Trade Mar. Corp. v. Coutsodontis*, 2011 U.S. Dist. LEXIS 80668 (S.D.N.Y July 25, 2011) 6, 7, 26

*SEC v. Biochemics, Inc*., 435 F. Supp. 3d 281 (D. Mass. 2020) ................................................8, 9

*SEC v. Masiz*, No. 19-2206, No. 20-1177, No. 20-1729, 2020 U.S. App. LEXIS 41594 (D. Mass. Sep. 11, 2020).....................................................................................................................8

**RULES**

22 NYCRR § 1200.0 ........................................................................................................................6

Defendants Alexander Capital, LP ("Alexander Capital"), NESA Management, LLC, Joseph Amato, and Rocco Guidicipietro (Collectively "Defendants") hereby file the following memorandum of law in support of their Motion to Disqualify Counsel.

## I.   Introduction.

This case is one of many related disputes that can be traced back to the SEC's bringing charges against the parent company of Inpellis, Inc.[1] ("Inpellis"), BioChemics, Inc., in 2012.[2] From that time BioChemics and, to a lesser extent, Inpellis have been embroiled in various court actions, including the bankruptcy matter from which this case arose.[3]

At the center of this case is the failure of the Inpellis IPO. (*See* Compl., Dkt. 40, ¶ 8.c.) Plaintiff seeks to place the blame for the failure of the Inpellis IPO on Alexander Capital. (*Id*.) Alexander Capital will argue that, among other reasons, the Inpellis IPO failed because Inpellis and the Shareholder Resolution Trust (the "Trust") concealed the relationship between Inpellis and John Masiz—BioChemics's CEO, then facing federal securities fraud charges for the second time—and because Inpellis voluntarily withdrew the IPO. (Compl., Dkt. 40, ¶ 53.)

What caused the failure of the Inpellis IPO will be in dispute, but what will not be in dispute is that Plaintiff's counsel, Jan Schlichtmann, has been involved at each step of that process, acting in various capacities and representing different entities. Mr. Schlichtmann has, at various times, acted as the attorney for BioChemics; Inpellis; the Trust, which was the largest

---

[1] Inpellis was, at that time, known as Alterix, Inc. (Compl., Dkt. 40, ¶11.) For convenience, Defendants will refer to both Inpellis, Inc. and Alterix, Inc. as "Inpellis."
[2] 1:12-cv-12324
[3] Ch. 7 18-12844-CJP

shareholder of Inpellis; SeaChange Pharma, LLC ("SeaChange"), which was, at one time, the

largest shareholder of BioChemics; and John Masiz, who was the CEO of BioChemics. In

addition, Mr. Schlichtmann has been a trustee of the Trust, the managing member of SeaChange,

and a board member of BioChemics. Mr. Schlichtmann is both the lawyer representing the

Plaintiff today and the person who took many of the actions that will be at issue in this case. Mr.

Schlichtmann will be a necessary witness in this matter. As such, he cannot represent Plaintiff.

Defendants recognize that, in asking this Court to disqualify Mr. Schlichtmann as

Plaintiff's counsel, they are asking the Court to take an extraordinary step. They would not do so

but for the extraordinary facts in this case.

## II.      Standard.

This Court has held that:

> A motion to disqualify an attorney is committed to the discretion of the
> District Court. While New York law governs the professional conduct of
> attorneys in this state, the authority of federal courts to disqualify attorneys
> derives from their inherent power to preserve the integrity of the adversary
> process. The Second Circuit has held that although our decisions on
> disqualification motions often benefit from guidance offered by the American
> Bar Association (ABA) and state disciplinary rules . . . such rules merely
> provide general guidance and not every violation of a disciplinary rule will
> necessarily lead to disqualification. Disqualification is only warranted in the
> rare circumstance where an attorney's conduct poses a significant risk of trial
> taint. However, in the disqualification situation, any doubt is to be resolved
> in favor of disqualification.
>
> In view of their potential for abuse as a tactical device, motions to disqualify
> opposing counsel are subject to particularly strict scrutiny. Courts are also
> reluctant to grant motions to disqualify because they inevitably result in delay
> and added expense. For all these reasons, the Second Circuit requires a high

> standard of proof on the part of the party seeking to disqualify an opposing party's counsel.
>
> It is the duty of the Court to preserve, to the greatest extent possible, both the individual's right to be represented by counsel of his or her choice and the public's interest in maintaining the highest standards of professional conduct and the scrupulous administration of justice. The conclusion in a particular case can be reached only after a painstaking analysis of the facts and precise application of precedent."

*Sea Trade Mar. Corp. v. Coutsodontis*, 2011 U.S. Dist. LEXIS 80668 at *16 – 20 (S.D.N.Y July 25, 2011) (Rakoff, J.S.) (Internal citations, quotations, and brackets omitted).

There are very limited situations in which a court will find it proper to disqualify an attorney. Taking guidance from Rule of Professional Conduct[4] 3.7 and from its predecessor, Disciplinary Rule 5-102(A) of the Code of Professional Responsibility, the Second Circuit has recognized that disqualification may be appropriate when an attorney is also likely to appear as a witness in a case. *Sea Trade Mar. Corp.* 2001 U.S. Dist. LEXIS 80668 at *20 - * 21.

When an attorney is expected to testify on behalf of a client, the test for disqualification "is whether the attorney's testimony could be significantly useful to his client. If so, he should be disqualified regardless of whether he will actually be called." *Sea Trade Mar. Corp.* 2001 U.S. Dist. LEXIS 80668 at *22 (quoting *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989) (citation omitted)). "When considering the necessity of testimony, '[a] court should examine factors such as the significance of the matters, weight of the testimony, and availability of other evidence.'" *Finkel v. Frattarelli Bros.*, 740 F. Supp. 2d 368, 373 (E.D.N.Y. 2010) (quoting *Kubin*

---

[4] 22 NYCRR § 1200.0

*v. Miller*, 801 F. Supp. 1101, 1113 (S.D.N.Y. 1992)) (internal quotation marks and citation omitted).

A stricter test is applied when it appears an attorney may be called by a party other than that attorney's client. *See Sea Trade Mar. Corp.* 2001 U.S. Dist. LEXIS 80668 at *22 - *25. In such a case this Court has held:

> A party bringing a motion under this subsection carries the burden to show both the necessity of the testimony and the substantial likelihood of prejudice. Testimony is deemed prejudicial where it is sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony. The Second Circuit explained that DR 5-102(B) is implicated "where a lawyer's testimony would contradict or undermine his client's factual assertions."

*Id*. at *24-*25.

### III.   Facts.

This case began as an adversarial proceeding in the United States Bankruptcy Court for the District of Massachusetts, Case No. 18-12844 (the "Inpellis Bankruptcy Case"). As part of that proceeding, Mr. Schlichtmann gave sworn testimony, pursuant to Federal Rule of Bankruptcy Procedure 2004, on October 28, 2019 and on February 20, 2020. Defendants recently received the transcripts of this testimony, with several exhibits withheld on confidentiality grounds, by permission of Mr. Schlichtmann. Copies of the transcripts, without their exhibits, are attached as "Exhibit 1" and "Exhibit 2," respectively.

### a.  Mr. Schlichtmann's Initial Involvement and the Creation of the Trust.

The underlying facts in this case predate the Inpellis Bankruptcy Case by many years.

The relevant facts trace back to the SEC indictment of BioChemics and BioChemics's CEO John

Masiz for securities fraud in 2012. *See SEC v. Biochemics, Inc*., 435 F. Supp. 3d 281, 285

(D. Mass. 2020) (appeal dismissed as moot at *SEC v. Masiz*, No. 19-2206, No. 20-1177, No. 20-

1729, 2020 U.S. App. LEXIS 41594 (D. Mass. Sep. 11, 2020). In 2014, BioChemics reached an

agreement with the SEC to plead no contest to the charges and to allow Judge Wolf, who was

overseeing the case, to set the terms of the judgment. (*See* Ex. 1, p. 278:10-15.) Around that

time, in May 2014, Mr. Schlichtmann was introduced to Mr. Masiz and began representing him.

(*See id*., p. 78:1-15.) In the course of this representation, Mr. Schlichtmann, who did not

represent BioChemics as a lawyer until January of 2016, became an advisor to and board

member of BioChemics. (*See id.*, pp. 49:22-50:1 (representation of BioChemics); and Ex. 2,

pp. 24:19-25:1 (role at BioChemics).)

When Mr. Schlichtmann began this work for Mr. Masiz, Inpellis was a wholly owned

subsidiary of BioChemics. (*See* Ex. 1, p. 70:8-14.) But, in September of 2014, while Judge

Wolf's decision concerning the terms of the judgment against BioChemics was pending, Mr.

Schlichtmann developed a plan, which BioChemics later implemented, to transfer all of

BioChemics's shares in Inpellis to the newly created Trust. (*See id*., p. 70:12-14, p. 277: 20-23,

and p. 278:3-4 and 18-22; Ex. 2, p. 20:10-13.) The SEC took the position that this was a

fraudulent transfer or, at the very least, a transfer without consideration. *SEC v. Biochemics, Inc*.,

435 F. Supp. 3d at 286. Nonetheless, Mr. Schlichtmann formed the Trust in September of 2014,

and, in January of 2015, the transfer was made. (*See* Ex. 1, p. 70:12-14 and p. 278:3-4.) When

the Trust was formed, at all relevant times thereafter, Mr. Schlichtmann was a trustee of the

Trust. (*See id*., p. 26:10-15 and p. 71:3-7.)

By the time that the Trust was formed, Mr. Schlichtmann was providing legal services to

Mr. Masiz, was serving on the board of BioChemics, was the managing member of the largest

shareholder of BioChemics (SeaChange), and was "indirectly representing" other members of

the Masiz family and the business interests of the Masiz family. (Ex. 1, p. 78:1-15 (Mr. Masiz);

Ex. 2, pp. 24:19-25:1 (BioChemics); Ex. 1, p. 14:4-11 and Ex.2, p:24:7-9 (SeaChange); Ex.1,

p. 79:7-13 (Masiz family).)

When the Trust was given BioChemics's shares of Inpellis, the Trust hired a board that

was intended to separate Inpellis from BioChemics (*See* Ex. 1, p.71:3-14 and p. 72:11-13.)

Around that same time Judge Wolf issued a nearly $18,000,000 judgment against BioChemics.

*SEC v. Biochemics, Inc*., 435 F. Supp. 3d at 285.

> **b.  The SEC Investigation.**

In late November of 2015, the SEC began an investigation into the Inpellis IPO. (*See*

Ex. 2, p. 107:7-17.) In the Complaint, Plaintiff lays the blame for this investigation at the feet of

Alexander Capital, writing that "Alexander Capital's Conduct Caused The Failure Of The

Offering; An SEC Investigation; The 'Bridge Loan' Default; And Inpellis's Bankruptcy."

(Compl., Dkt. 40, subheading "I.") This, however, does not align with Mr. Schlichtmann's sworn

testimony. At various points of his testimony, Mr. Schlichtmann placed the blame, in whole or in

part, explicitly or implicitly on a substantial number of factors, individuals, and/or entities other than Alexander Capital.

Mr. Schlichtmann suggested that the SEC's investigation was caused by the actions of Mr. Boosalis, the then-owner of NEBO[5], a major owner of BioChemics's debt. (*See* Ex. 2, p. 107:7-17.) Mr. Schlichtmann described the actions of Mr. Boosalis as "destructive." (*Id.*) Elsewhere in his testimony, Mr. Schlichtmann stated that NEBO had "caused the problem" of the SEC investigation. (*Id.*, p. 77:16.) And shortly thereafter he stated that NEBO had required the expenditure of "huge amounts of resources and time solving the problem [NEBO] caused - - helped cause." (*Id.*, p. 77:17-19.) Mr. Schlichtmann also testified that NEBO had threatened to disrupt the IPO and that he had "no doubt" that its activities "contributed to part of the problems [Inpellis] was having with the SEC." (Ex.1, p. 225:8-13.)

At other times Mr. Schlichtmann indicated that the SEC's investigation was about the judgment owed by BioChemics. Mr. Schlichtmann testified that the key to the eventual settlement among BioChemics, Inpellis, and the SEC was that publicly raised funds (such as the aborted IPO at issue here) could not be used to pay off BioChemics's judgment debt. (Ex. 1, p. 31:18-24.)

During a January 27, 2016 hearing before Judge Wolf, at which Mr. Schlichtmann was present and representing BioChemics, his co-counsel for BioChemics represented that they

---

[5] The record currently in Defendants' possession does not make clear which particular NEBO entity this was. At various times NEBO, LLC, NEBO, Inc., and NEBO BioStrategies have been involved in this matter. For present purposes, Defendants will simply refer to these various entities, as Mr. Schlichtmann did, as "NEBO."

believed the real issue underlying the SEC investigation was the SEC's belief that Mr. Masiz was an undisclosed control person of Inpellis. (*See* Case 1:12-cv-12324, Dkt. 174, p. 20:7-13, a true and accurate copy of this docket item is attached as "Exhibit 3.")

At still other times, Mr. Schlichtmann testified that "one of the issues" the SEC had was with the disclosure, or lack thereof, of the various allegedly secured creditors of Inpellis. (Ex. 1, pp. 237:3-239:3.) Mr. Schlichtmann described the SEC's concerns about the disclosures as "a major issue." (*Id.*, p. 240:13-14.) Elsewhere, Mr. Schlichtmann testified that the disclosures in the S-1 caused "all the problems," later clarifying that the disclosures "and a whole bunch of other things contributed" to the problems Inpellis had with the SEC. (*Id.*, p. 237:20-24.) Importantly, Mr. Schlichtmann also testified that disclosures in the S-1 were made by Inpellis's lawyer, Tom Barrette of Holland & Knight, and Mr. Mooney, the CEO of Inpellis, along with counsel for Alexander Capital. (*See id.*, p. 46:3-7.) In his second day of testimony Mr. Schlichtmann described the role of Inpellis's attorney, Tom Barrette, as taking the "laboring oar" with regard to drafting the S-1 statements and that those registration statements were his "obligation and responsibility." (Ex. 2, p. 81:22-24.)

For all that, at no point during his two days of sworn testimony did Mr. Schlichtmann indicate that the SEC Investigation was due to the change from "firm commitment" to "best efforts," as Plaintiff now alleges. (*See* Ex. 1 and Ex. 2, *passim*.) In fact, all Mr. Schlichtmann had to say on that issue was that "Alexander was saying they would take it out at $125 million valuation because they were doing it on a firm commitment basis of $25 million, I believe it was, that they were going to raise." (Ex. 1, p. 284:2-5.)

11

c.  **The SEC Settlement.**

Whatever the cause, it is Mr. Schlichtmann's contention that this SEC investigation resulted in a settlement that required the withdrawal of the Inpellis IPO, and it did, in fact, result in that withdrawal. (*See* Ex. 1, p. 32:10-18.) This settlement agreement also, according to Mr. Schlichtmann, necessitated Inpellis's granting a security interest in its intellectual property to the SEC. (*See id*., p. 40:2-11.)

Defendants have not seen the alleged settlement agreement because they had no part in the negotiation of it. In fact, to the best of their knowledge and belief, no person who had any official role at Inpellis was involved in negotiating the settlement. Rather, Inpellis's settlement was negotiated by Mr. Schlichtmann. (*See* Ex. 1, p. 228:12-18.) He did so even though Mr. Schlichtmann was, at the same time, representing BioChemics, his client and a company on which he served as a board member. (*See id.*, p. 18:11-14.)

The settlement was conceived of and implemented in February and March of 2106. (*See* Ex. 1, pp. 32:10-34:21.) Mr. Schlichtmann testified that he was personally present at the meeting at which the "breakthrough" was made that resulted in the settlement. (*Id*., p. 198:7-12.) During this time Mr. Schlichtmann was the lawyer for Mr. Masiz and "indirectly represented" the interests of the Masiz family. (*Id.*, p. 78:1-15 and p. 79:10-22.) During this time Mr. Schlichtmann was also the lawyer for BioChemics. (*See id.*, p. 48:10-11.) During this time Mr. Schlichtmann was a member of the BioChemics board. (*See* Ex. 2, pp. 24:24-25:1.) During this time Mr. Schlichtmann was the managing member of SeaChange, BioChemics's largest shareholder. (*See* Ex. 1, p. 14:4-11.) Mr. Schlichtmann understood his work for SeaChange to

involve representing the interests of the Masiz family as it was the "managing member of the Masiz family interest in BioChemics." (*Id*., p. 87:6-8 and 79:2-20.) This included representing the interests of Chester and Carol Masiz, JMS Sylvan Realty Trust, Perry Realty Trust, Masiz Nominee Trust, Endicott Nominee Trust, and Davensport Limited Partnership, all of which he understood to be part of the Masiz family interest. (*See id*., p. 233:6-22.)

Yet, during this time, Mr. Schlichtmann was not a lawyer for Inpellis. (*See* Ex. 1, p. 71:17-23.) During this time Mr. Schlichtmann was not a member of the Inpellis board. During this time Mr. Schlichtmann was not a control person for Inpellis. Nonetheless, it was Mr. Schlichtmann who negotiated Inpellis's role in the settlement agreement that resulted in the withdrawal of Inpellis's IPO. (*See* Ex. 1, p. 228:12-18.)

Having negotiated the settlement agreement with the SEC, Mr. Schlichtmann asserts that he made Mr. Mooney, then the CEO, and the Inpellis board aware of the settlement. (*See* Ex. 1, p. 32:19-22.) Mr. Schlichtmann has testified that Mr. Mooney and the board of Inpellis knew that official action had to be taken by Inpellis for the settlement that he had negotiated to take effect. (*See id*.) But they did not do so. (*See id*., p. 31:4.) Mr. Schlichtmann believed that they were "dragging their feet" on the issue. (*Id*., p. 31:10-11.) This refusal to agree to the settlement negotiated by Mr. Schlichtmann resulted in Mr. Schlichtmann's and the Trust's terminating Mr. Mooney's employment and firing the entirety of the Inpellis board. (*See id.*, pp. 30:18-31:14.)

Neither the independent board nor the CEO of Inpellis approved the settlement, but Mr. Schlichtmann and the Trust, with Mr. Schlichtmann as trustee, made the decision to approve the settlement. (*See* Ex. 1, p. 27:10-17.) Despite the lack of formal approval, Mr. Schlichtmann

testified that "we"—presumably the Trust—had already "agreed" with the SEC on behalf of Inpellis that Inpellis would not conduct an IPO. (*Id.*, p. 169:9-15.) Again, Defendants note that Mr. Schlichtmann lacked any authority to agree to anything on behalf of Inpellis at that time.

Once the independent board and the CEO were terminated, Mr. Schlichtmann and the Trust appointed a Mr. McGonagle as the sole director and officer of Inpellis. (See Ex.1, p. 28:1-7.) On March 11, 2016, the same day that the old board was fired, which was also the same day that Mr. McGonagle was appointed, Mr. McGonagle approved the settlement that Mr. Schlichtmann negotiated and that Mr. Schlichtmann had already agreed to on behalf of Inpellis. (*See id*.)

### d. The Fallout of the IPO's Abandonment.

Form the day that Mr. Schlichtmann and the Trust fired the independent board, the Inpellis IPO was functionally dead. (*See* Ex. 1, pp. 168:3-169:18.)

From that day, Mr. Schlichtmann began acting, *de facto* though not *de jure*, as if he were a senior executive at Inpellis. Mr. Schlichtmann became a part of what he described as a "small little group" composed of himself, Mr. Masiz, Mr. McGonagle, the two other trustees of the Trust, and two additional individuals. (Ex. 1, p. 66:3-19.) This group made some decisions on behalf of Inpellis. (*See id*.) At the same time, a subset of that group, also including Mr. Schlichtmann, was making other decisions for Inpellis. (*See id*., pp. 67:15-68:3.) These actions included making decisions for which Mr. Schlichtmann took "full responsibility." (*Id*., p. 67:7-8.)

In addition, Mr. Schlichtmann began personally "soliciting money from rich people" on behalf of Inpellis. (Ex. 1, pp. 93:13-95:14.) This included traveling to the U.K. to meet with investment bankers about the possibility of their investing in Inpellis. (*See id*., p. 96:4-14.) Eventually this also included entering into an agreement by which Inpellis would sell its intellectual property. (*See id*., p. 97:5-13.)

While all this was occurring, Mr. Schlichtmann developed a plan to collapse Inpellis and BioChemics back together. (*See* Ex.1, p. 228:5-8; *see also id.*, pp. 166:4-170:12). Mr. Schlichtmann described himself as the "author" and "implementor" of that plan. (*Id.*, p. 228:12-18.) In sum and substance, despite there being no formal connection between BioChemics and Inpellis, Mr. Schlichtmann and others decided that "[t]here was no[t] going to be any artificial or even technical differences between them for the purposes of attracting capital, monetizing the assets and dealing with these problems." (*Id.*, p. 218:17-20.) The decision was made, though never recorded or formalized (to the best of Defendants' knowledge), by Mr. Schlichtmann and his "small little group" that there would be no barriers between BioChemics and Inpellis and that the property of one would be treated as the property of the other. (*Id.*, p. 65:1-19.) This is, in fact, what occurred. Inpellis spent, with Mr. Schlichtmann's approval, $1 million of its money to pay off a debt that BioChemics owed to NEBO. (Ex. 2, p. 105:12-23.)

Once that $1 million was sent, according to Mr. Schlichtmann's testimony, Vic Lattimore, who is now the owner of Convergent Distributors of Texas, LLC, was able to have his entity, BioStrategies, buy out the debt between NEBO and BioChemics. (*See* Ex. 2, p. 35:6-15.)

This consolidated the debt owed by BioChemics to just two entities: BioStrategies and the Masiz family interests held by SeaChange. (*See id.*).

In December of 2017, Mr. Schlichtmann became involved with the formation of SeaChange Transdermal, LLC. (*See* Ex. 1, p. 91:4-6 and pp. 86:18-87:10.) This company was intended to monetize the intellectual property held by Inpellis. (*See id.*, pp. 87:17-88:20.) In the end this did not occur because BioPhysics LLC, of which Mr. Schlichtmann was the managing member, ended up taking on that role. (*See id.*, p. 88:11-20.) When BioPhysics LLC was unable to sell the intellectual property, a different entity, BioPhysics Pharma, Inc. a company started by Mr. Masiz and his family in August of 2017, purchased lab equipment from Inpellis, took over the Inpellis lease, hired the chief scientist for Inpellis, and began working on directly monetizing the intellectual property in question. (*See id.*, p. 90:7-20 and p. 182:2-9.) In 2018, BioPhysics Pharma began seeking to raise funds to bring the Inpellis intellectual property to market. (*Id.*, pp. 90:21-91:3.) Mr. Schlichtmann has served "at various times" as the attorney for BioPhysics Pharma. (*Id.*, p. 76:8-12.)

In July of 2018, creditors of Inpellis filed a bankruptcy petition against Inpellis and Mr. Schlichtmann began acting as Inpellis's lawyer. (*See* Ex. 1, p. 71:17-24.)

**e.   Factual Summary.**

From the beginning of his involvement in this matter until the present, Mr. Schlichtmann has held the following positions:

-   Lawyer for John Masiz (starting in 2014)
-   Managing member of SeaChange (starting in 2014)
-   "Indirect" representation of Masiz family members (starting in 2014)

- Member of the BioChemics board (starting in 2014)
- Trustee for the Trust (starting in 2014)
- Lawyer for BioChemics (starting in 2016)
- *de facto* corporate management of Inpellis (starting in 2016)
- Managing Member of BioPhysics, LLC (starting in 2017)
- Lawyer for Inpellis (starting in 2018)
- Lawyer for BioPhysics Pharma, Inc. (start date unknown)

In addition, he has been involved in several key decisions, including:

- Originating the idea of the Trust
- Forming the Trust
- Negotiating the settlement among the SEC, BioChemics, and Inpellis on behalf of BioChemics
- Negotiating the settlement among the SEC, BioChemics, and Inpellis on behalf of Inpellis
- Firing the independent board and CEO of Inpellis
- Choosing the sole director and manager who replaced the independent board
- Approving the settlement among the SEC, BioChemics, and Inpellis on behalf of Inpellis
- Approving the discontinuation of the Inpellis IPO
- Conceptualizing the plan to operate BioChemics and Inpellis as one company
- Implementing the plan to operate BioChemics and Inpellis as one company

In short, at almost every stage, Mr. Schlichtmann represented at least one of the relevant parties. And, at almost every key decision point, Mr. Schlichtmann was one of the people involved in the process, if not the only person. He was, at many times, the originator of the decisions that are in dispute in this case. And, as noted, he often was involved, not in his capacity as a lawyer, but in his capacity as a businessperson in charge of the entities at issue.

## IV.    Analysis.

As noted above, the analysis required when determining whether an attorney should be disqualified depends on whether that attorney would be expected to testify for his client or for another party. Here, given the number of roles Mr. Schlichtmann has played and the extent of his

involvement, Defendants argue that this Court can, and should, disqualify Mr. Schlichtmann on either or both grounds.

      a.   **Mr. Schlichtmann Is a Necessary Witness.**

In the present case, Mr. Schlichtmann will be a necessary witness on a number of key issues.

First, Mr. Schlichtmann, as the person who originated the idea for and as creator of the Trust will be a necessary witness regarding the nature and origins of the Trust, its purposes, and how it was presented to others, including Alexander Capital. The Second Circuit has found that an attorney who created a corporate entity may be a necessary witness as to the meaning of that entity. *See Lamborn v. Dittmer*, 873 F.2d 522, 531-532 (S.D.N.Y. 1989). Here, it is particularly reasonable to call Mr. Schlichtmann on this issue as he has already testified that the purpose of the Trust was to allow BioChemics to provide assurance to the "interest holders and creditors" that Inpellis would be used to take care of BioChemics's obligations to those parties. (Ex. 1, p.70:12-22.) That is, the Trust was formed for the benefit of BioChemics. This is important as Mr. Schlichtmann has testified that he was not representing BioChemics as counsel at the time the Trust was formed. (*Compare id.* (trust formed in September of 2014) with *id*. at 48:10-11 (began representing BioChemics in January of 2016).) Only Mr. Schlichtmann can testify as to the purpose of the formation of the trust. It was his idea, the testimony of others would be hearsay, and this testimony will not require a violation of attorney client privilege or revelation of attorney work-product as the work was done for BioChemics at a time pre-dating Mr.

Schlichtmann's representation of that entity. In other words, he was acting as a businessperson at this time.

Mr. Schlichtmann also negotiated on behalf of BioChemics – again in advance of becoming counsel for BioChemics – with Mr. Lattimore. (*See* Ex. 2, pp. 26:5-31:6.) This is relevant as Plaintiff claims the involuntary bankruptcy of Inpellis as a part of its damages. (Compl., Dkt. 40, ¶ 64.) Defendants will argue that the bankruptcy was, in fact, caused by the decision of the Trustees, including Mr. Schlichtmann, to pay $1 million of Inpellis's money to Mr. Lattimore pursuant to an agreement that Mr. Schlichtmann negotiated on behalf of BioChemics. (*See* Ex. 2, pp. 41:8-42:21.) This too will be relevant testimony on the issue of causation and, if necessary, the calculation of damages.

Second, Mr. Schlichtmann, as a trustee of the Trust, is one of only three individuals, himself and the other two trustees, who can testify to the activities of the Trust and the reasoning behind them. Defendants will need to inquire into the Trust's decision to enter into the settlement with the SEC, to fire the board of Inpellis, to fire Dr. Mooney, to create and hire the new single-person board, and to hire the new CEO. Each of these decisions will bear both on Plaintiff's argument that Defendant Alexander Capital caused the failure of the IPO and on Defendants' arguments that much of the damages that Plaintiff asserts were caused by actions other than those of Defendants. In short, each of these decisions will be relevant to causation and damages. Again, here Mr. Schlichtmann was not acting as an attorney; he did not represent the Trust in that capacity until July 2018. (Ex. 1, p. 71:17-24.) Mr. Schlichtmann took these actions and made these decisions as a trustee only. These actions and decisions will be relevant to causation and

19

damages. While the other two trustees did, according to Mr. Schlichtmann, approve of these decisions, it is unclear that they had any involvement in the deliberative process. Mr. Schlichtmann, however, has previously given testimony on this very matter and was clear that he was involved in making them. As such, he will be a necessary witness.

In addition, Mr. Schlichtmann took other actions on behalf of the Trust. For example, he provided Mr. Barrette, the lawyer for Inpellis, with information about the Trust to be included in the S-1. (*See* Ex. 1, pp. 189:21-190:5.) He also traveled, in his capacity as a trustee of the Trust, to the U.K. to have meetings with an investment bank about capitalizing on Inpellis's intellectual property. (*See id.,* p. 96:4-14.) He also attempted to raise funds from "rich people" to capitalize on the Inpellis IP. (*Id.* pp. 94:1-95:23.) These actions will be relevant to issues of causation and damages, and Mr. Schlichtmann is the only person, to Defendants' knowledge, who can testify to the actions taken by and on behalf of Inpellis in relation to these activities. Here, too, his testimony is necessary.

Mr. Schlichtmann is also, crucially, one of the people who negotiated the global resolution with the SEC. He credits the idea for the resolution to himself and Mr. Glosband, another member of the Trust. (Ex. 1, p. 38:6-39:21.) Mr. Schlichtmann, in fact, wrote a memo to Dr. Mooney and counsel for Inpellis arguing for the resolution. (*Id.*, pp. 38:11-16, 39:7-8, and 198:17-19.) Mr. Schlichtmann, in negotiating this settlement, was, at least in part, acting on behalf of Inpellis and, at least in part, acting on behalf of the Trust, neither of which he represented as a lawyer at the time. Mr. Schlichtmann, one half of the team who was the architect for the settlement and the author of a key memo in support of that settlement, will be a necessary

witness on that crucial event. This will go to one of the central facts at issue: why the Inpellis

IPO was withdrawn or why it failed. A full picture of these events cannot be made without Mr.

Schlichtmann's testimony.

In short, Mr. Schlichtmann's activities, in capacities other than his capacity as a lawyer,

are relevant. Testimony about those activities will be necessary to this case. And Mr.

Schlichtmann is one of, at most, three people who can testify to any of these facts, and the only

person who can testify as to some of them.

> b. **Mr. Schlichtmann's Testimony Could Be Significantly Useful to His Client.**

Mr. Schlichtmann's testimony could help his client.

Mr. Schlichtmann will be uniquely able to testify to the negotiations with the SEC that

led to the withdrawal of the IPO. Defendants believe that Mr. Schlichtmann would testify that

the SEC investigation was triggered, at least in part, by the issues identified in Plaintiff's

complaint. Mr. Schlichtmann has previously testified that the SEC's investigation was related to

the disclosures in the S-1, which is consistent with Plaintiff's case. (Ex. 1, p. 35:10-12.) Such

testimony could be significant for Plaintiff's case.

Mr. Schlichtmann will be uniquely able to testify to the interaction between Inpellis and

various potential investment banking groups following the failure of the IPO. Defendants do not

know what Mr. Schlichtmann's testimony would be were he called to testify on this matter, but

his testimony could be significant in undermining defenses to the Plaintiff's case. Defendants,

for example, will argue that the harms allegedly caused by Defendants were, in fact, a result of

incompetent management of Inpellis following the failed IPO, including the failure to secure an

investment banking firm to assist Inpellis in capitalizing on the company's intellectual property. Mr. Schlichtmann's testimony, which only he can give, as to what steps he did or did not take when meeting with investment banking companies in the U.K. will either contradict the factual assertions made by his client, *see infra.,* or would be invaluable in refuting the Defendants' claims. In the latter case, such testimony would be significant for his client.

It is apparent that Mr. Schlichtmann is the only person who can provide some testimony that may benefit his client. Based on this fact alone, he ought to be disqualified from this case.

### c.   **Mr. Schlichtmann's Testimony Would Contradict and Undermine His Client's Factual Assertions.**

In addition to Mr. Schlichtmann's testimony's being helpful to his client in some regards, much of his testimony would contradict and undermine his client's factual assertions.

Plaintiff has asserted that Alexander Capital and Dr. Mooney were responsible for the failure to reinsert various disclosures into the S-1 filing, which resulted in the SEC's investigation. (Compl., Dkt. 40, ¶ 40 and Subheading "I.") However, Mr. Schlichtmann has previously testified that it was neither Alexander Capital nor Dr. Mooney who was responsible for drafting the S-1 but Mr. Barrette, counsel for Inpellis, who took the "laboring oar" on those drafts. (Ex. 2, p. 81:22-24.) This testimony undermines Plaintiff's argument that the alleged defects in the S-1 filings were caused by Alexander Capital or Dr. Mooney. And, to the extent that Plaintiff is able to prove that those defects caused the damages alleged, Mr. Schlichtmann's previous testimony suggests that Mr. Barrette, not Defendants, ought to be held accountable for the damages, undermining Plaintiff's claims.

On this point, Mr. Schlichtmann's testimony is even more detrimental to his client. While Plaintiff asserts that the SEC investigation was caused by the improper disclosures in the S-1, Mr. Schlichtmann, who directly negotiated the settlement of the SEC's investigation, has previously testified that the investigation had other causes. Mr. Schlichtmann has testified that the disclosures and "a whole bunch of other things" caused Inpellis's problems with the SEC. (Ex.1, p. 237:20-24.) At the very least, this undermines the Plaintiff's contention that it was the disclosures that caused the investigation. Defendants will, if necessary, want to point to this testimony by Mr. Schlichtmann to show that, if damages are to be awarded, they ought to be reduced by the percentage that the "whole bunch of other things" contributed to the harm. Elsewhere Mr. Schlichtmann has testified that Mr. Boosalis and/or NEBO caused the investigation. (Ex.2, p.77:16-19 and p. 107:7-17.) Mr. Schlichtmann was clear that that he had "no doubt" that NEBO's activities "contributed to part of the problems [Inpellis] was having with the SEC." (Ex.1, p. 225:8-13.) This contradicts Plaintiff's position that Alexander Capital and Dr. Mooney caused the investigation. At other times Mr. Schlichtmann indicated that the SEC's investigation was about the judgment owed by BioChemics. (*See id*., p. 31:18-24.) At yet other times, Mr. Schlichtmann allowed co-counsel to represent that they believed the real issue underlying the SEC investigation was the SEC's belief that Mr. Masiz was an undisclosed control person of Inpellis. (*See* Ex. 3, p. 20:7-13.) Any of this testimony would be grounds to disqualify Mr. Schlichtmann. Collectively, they make it clear that his participation as counsel would taint the hearing. Accordingly, his disqualification is necessary.

Defendants will also want to call Mr. Schlichtmann to testify regarding various actions he took or that the Trust took with his approval. Each of these, Defendants will argue, break any alleged causal link between the damages alleged and the actions that Defendants allegedly took. This will include, but not be limited to, the decision to fire Dr. Mooney and the Board, the decision to install a one-person-board-*cum*-CEO, the plan to collapse Inpellis back into BioChemics, the use of Inpellis's funds to pay off BioChemics's creditor, the decision to voluntarily withdraw the IPO, and the decision to commit to not attempting another IPO. Each of these decisions was made, at least in part, by Mr. Schlichtmann, and his testimony on those decisions will be proper because they were made on behalf of either the Trust or Inpellis at a time when he was counsel for neither. Testimony on any one of these factual matters would be sufficient reason for Mr. Schlichtmann's disqualification. Together, they make the disqualification a necessity.

Finally, Defendants will argue that at the heart of this case is a failed scheme conceived and executed by Mr. Schlichtmann himself. Mr. Schlichtmann, working as a member of the BioChemics board and as managing member of SeaChange, designed and implemented a strategy for BioChemics to capitalize on its assets. (*See* Ex. 1, pp. 14:4-15:9.) This strategy was to create the Trust to make Inpellis appear independent from BioChemics. (*See id.*, p. 30:1-14.) This is exactly what Mr. Schlichtmann and, later, the Trust did, making multiple statements that Inpellis was independent from BioChemics. (*See id.*) But, in fact, Inpellis was not independent but was, to quote Mr. Schlichtmann, going to "transition to independence." (*Id.*, p. 160:12; *see*

*also id.*, p. 167:6-12.) Defendants believe that, but for this failed scheme, none of the harms alleged by Plaintiff would have occurred.

For that reason, Defendants will want to call Mr. Schlichtmann to testify about his plan in originating the idea of the Trust. They will want to call Mr. Schlichtmann to testify to his intent in creating the trust. They will want to call Mr. Schlichtmann to testify to his knowledge that Inpellis was held out as independent from BioChemics. They will want to call Mr. Schlichtmann to testify to what he understood the reality of Inpellis's independence to be. And they will want to call Mr. Schlichtmann to testify to his plan, which he and his "little group" effected, to start operating Inpellis and BioChemics as one company despite his representations of independence. (*See* Ex.1, p. 228:5-8; *see also id.*, pp. 166:4-170:12.)

Such testimony will be vital to Defendant's defenses. Some portions of this testimony can be given only by Mr. Schlichtmann, who, by his own testimony, was the originator of several of the component parts of this scheme. And such testimony will undermine and contradict Plaintiff's factual assertions. Certainly, Defendants' position—which they believe the facts require them to take—that Mr. Schlichtmann was the prime instigator of this failed scheme would taint the trial were he to also serve as counsel for the Plaintiff.

## V.    Conclusion.

Defendants realize that, in asking this Court to disqualify Mr. Schlichtmann as Plaintiff's counsel, they are asking the Court to take an extraordinary step. Defendants would not do so were it not for the extraordinary facts of this case. Mr. Schlichtmann, due to his involvement in the occurrences at issue, particularly his involvement on behalf of various entities when not

representing those entities as legal counsel, will be not merely a witness, but in many ways will be *the* key fact witness. Mr. Schlichtmann's testimony, much of which he has already given under oath, will be absolutely necessary for Defendants' defenses. The breadth and depth of the testimony that Mr. Schlichtmann might be called on to give for his client and which Defendants will seek to call on him to give on their behalf make seeking Mr. Schlichtmann's disqualification a necessity. This Court has noted that, "in the disqualification situation, any doubt is to be resolved in favor of disqualification." *Sea Trade Mar. Corp.* 2001 U.S. Dist. LEXIS 80668 at *18. Here, Defendants urge this Court to disqualify Mr. Schlichtmann since Mr. Schlichtmann cannot be involved as counsel without "significant risk of trial taint." *Id.*

      Respectfully submitted this 8th day of July 2021.

/s/ *Bryan Ward*
Bryan Ward (*Pro Hac Vice*)
Aaron Wright (*Pro Hac Vice*)
Holcomb + Ward, LLP
3455 Peachtree Road NE
Suite 500
Atlanta, Georgia 30326
404-601-2803
Bryan.Ward@holcombward.com
Aaron@holcombward.com
*Counsel for Defendants Alexander Capital L.P.,*
*Joseph Amato, Rocco Guidicipietro, and NESA*
*Management, LLC*