UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------
| JOHN J. AQUINO,              |
| Chapter 7 Trustee,           |
| by its assignee, Convergent  |
| Distributors of Texas, LLC,  |
|                              |
|         Plaintiff,           |
|                              |
|    -against-                 |
|                              |
| ALEXANDER CAPITAL, LP, and   |
| its Managing Partners:       |
| JOSEPH AMATO,                |
| ROCCO GUIDICIPIETRO, and     |
| NESA MANAGEMENT, LLC,        |
|                              |
|         Defendants.          |
------------------------------
```

1:21-cv-1355 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.:

Inpellis, Inc. (formerly Alterix, Inc., but always referred to here as "Inpellis") was a developmental stage pharmaceutical company that was forced into bankruptcy following a failed initial public offering (IPO) in 2015.[1] John Aquino is the Chapter 7 trustee of the Inpellis bankruptcy estate, and he has sued Alexander Capital, LC (ACLP) and its three managing partners, Joseph Amato, Rocco Guidicipietro, and NESA Management, LLC (NESA Defendants). Aquino alleges that ACLP fraudulently misrepresented its capacities and intentions as part of a scheme to induce Inpellis to engage ACLP as

---

[1] Aquino has assigned his claims as Chapter 7 trustee of Inpellis' bankruptcy estate to Convergent Distributors of Texas, LLC. The Court refers to Aquino and Convergent collectively as "Aquino" or "Plaintiff."

its managing underwriter and exclusive financial advisor during the leadup to the IPO; that ACLP forced a change of management at Inpellis and installed a disloyal CEO, who then colluded with ACLP in mismanaging the IPO process; that ACLP and the CEO deliberately misled the Inpellis board about the terms on which ACLP would conduct the IPO; and that ACLP breached other contractual obligations and fiduciary duties owed to Inpellis.

Aquino brings four claims against all Defendants: fraudulent inducement, breach of contract, breach of fiduciary duty, and fraud. ECF 40 ¶¶ 8(d), 57-86. Aquino brings these claims against ACLP directly and against the NESA Defendants in their capacities as managing partners of ACLP. Aquino argues that the NESA Defendants are liable as general partners because ACLP has lost its status as a limited partnership under Delaware law after failing to observe the necessary formalities required by statute. Id. at ¶¶ 4-7.

Before the Court are the Defendants' two motions to dismiss Aquino's Fourth Amended Complaint, ECF 40 (Compl.), which was filed shortly after Aquino's opposition brief.[2] ACLP argues in its motion, ECF 44 (ACLP Mot.), that the Fourth Amended Complaint is pled with insufficient particularity under Fed. R. Civ. P. 9(b); that neither enforceable obligations nor fiduciary duties arose from Inpellis'

---

[2] While the Third Amended Complaint, ECF 32, was the operative pleading when the motions to dismiss and Aquino's opposition were filed, Aquino subsequently filed the Fourth Amended Complaint, ECF 40, as permitted by the Case Management Plan. As discussed further below, the Court assesses the motions with reference to the facts alleged in the Fourth Amended Complaint. See infra at 11.

engagement of ACLP; and that the acts and knowledge of the CEO that ACLP allegedly installed should be imputed to Inpellis, thereby vitiating ACLP's alleged misrepresentations. In their motion, ECF 46 (NESA Mot.), the NESA Defendants incorporate ACLP's arguments by reference and add two others: that they are improper defendants because they fall outside the scope of the Bankruptcy Court's assignment of claims to Convergent and that they are not liable for ACLP's contract and tort obligations as a matter of Delaware partnership law.

For the reasons set forth below, the Court denies the motions to dismiss in their entirety.

## I.  **Factual Background[3]**

This action arises out of agreements between ACLP and Inpellis regarding a proposed IPO of Inpellis stock. Aquino contends that Inpellis was fraudulently induced to engage ACLP, which allegedly misrepresented its ability and intention to conduct a "firm commitment" offering.[4]  Aquino further alleges that ACLP mismanaged the IPO

---

[3] All allegations are drawn from the Fourth Amended Complaint, ECF 40. When adjudicating a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

[4] Offering an IPO on a "firm commitment" basis means that the underwriter "agrees to purchase an agreed-upon percentage of the offering irrespective of whether the securities can be sold in the public market." Compl. ¶ 27. For an underwriter to offer a firm commitment IPO, as opposed to a "best efforts" offering where the underwriter assumes no risk on the unsold portion of the offering,

preparation process, tricked Inpellis into installing an ACLP confederate as CEO, and fraudulently obtained signatures from Inpellis' board on a registration statement that secretly changed the offering to a "best-efforts" basis at the last moment. Aquino blames ACLP's conduct, particularly its last-minute switch to a best-efforts offering, for rendering Inpellis' securities a penny stock, which caused the capital offering to fail, invited regulatory scrutiny, and culminated in Inpellis' bankruptcy.

### A. **Engagement Agreements**

In 2014 and 2015, ACLP and Inpellis executed two substantially identical "Engagement Agreements" premised on ACLP's stated intent to enter into an "exclusive underwriting agreement immediately prior to obtaining an 'effective' Registration Statement, for an offering 'of up to $20,000,000' that [ACLP] would undertake on a 'Firm Commitment,' i.e., guaranteed, basis." Compl. ¶ 8.[5] Through the Engagement Agreements, Inpellis allegedly retained ACLP as the "Managing Underwriter" for Inpellis' IPO and as Inpellis' "Exclusive Financial

---

signals to the market the underwriter's confidence in the offering. Id.; see also id. ¶ 46.

[5] The first Engagement Agreement was dated July 29, 2014. Id. ¶ 9. The parties amended this Engagement Agreement on two occasions and then, on October 5, 2015, "amended and re-stated [it] in its entirety." Id. ¶ 12. The parties treat the Engagement Agreements, which are attached to the Fourth Amended Complaint, as interchangeable. For convenience, so does the Court. The Court quotes always from the second Engagement Agreement, dated October 5, 2015, ECF 40-2, unless otherwise specified.

Adviser," thereby preventing Inpellis from employing other, reputable investment banks. Id. ¶ 8(a).

Both Agreements concern ACLP's "proposal with respect to an initial public offering ... of up to $20,000,000." ACLP stated that it was its intent, "immediately prior to the Effective Date, to enter into an exclusive underwriting agreement.... The underwriter/broker will act as agent on a 'Firm Commitment' basis." Id. ¶ 13; ECF 40-1 at 1; ECF 40-2 at 1. Pursuant to the Agreements, the parties entered into an "exclusive engagement" in which the "engagement of [ACLP] as managing underwriter shall commence at the signing of this document and continue for (3) months after the SEC provides a Notice of Effectiveness on the registration statement." Compl. ¶ 14; ECF 40-1 at 1; ECF 40-2 at 1. The parties agreed that ACLP would be "managing underwriter" and "exclusive financial advisor" for the IPO. Compl. ¶¶ 14-15; ECF 40-1 at 1-3; ECF 40-2 at 1-3. The Agreements also laid out a fee structure, see Compl. ¶¶ 15-18; ECF 40-1 at 1-3; ECF 40-2 at 1-3, and required Inpellis to retain both an accounting firm and a law firm acceptable to ACLP, see Compl. ¶ 19; ECF 40-1 at 3; ECF 40-2 at 4. Inpellis retained accounting and law firms and expended substantial sums in connection with other obligations under the Agreements. Compl. ¶¶ 20-21, 25-26, 31.

In the Agreements, ACLP stated its "intention to enter into the Underwriting Agreement on or immediately prior to the Effective Date" but reserved the right not to proceed if, in its sole judgment, any one or more of nine stated conditions occurred. ECF 40-1 at 4; ECF 40-

2 at 5. However, ACLP did not notify Inpellis it believed any of these conditions occurred during the period from the execution of the first engagement agreement through the filing of Inpellis' S-1 Registration Statement on November 10, 2015. Compl. ¶ 24.

Aquino alleges that ACLP fraudulently induced Inpellis to enter into these Engagement Agreements. Specifically, ACLP held itself out to Inpellis as capable of and intending to conduct a firm commitment offering, both in the Engagement Agreements and in communications with Inpellis management. Id. ¶ 29. However, ACLP knowingly concealed that it lacked both the financial capacity and the authority from its regulator, the Financial Industry Regulatory Authority (FINRA), to underwrite firm commitment offerings. Id. ¶¶ 8(a), 28-29. In fact, because ACLP had a pattern of wrongfully conducting guaranteed offerings, FINRA would later investigate and charge the firm with regulatory violations. Id. ¶ 30. On October 31, 2019, ACLP waived its right to contest the charges and consented to being censured and fined $45,000. Id. ACLP also allegedly knew the value to Inpellis of proceeding with a "firm commitment," as opposed to a "best efforts," IPO, and Inpellis relied on these representations in engaging ACLP rather than another underwriter. Id. ¶ 27. Still, ACLP concealed these facts from Inpellis' board of directors. Id. ¶ 28.

**B. Path to IPO**

Beginning in April 2015, Inpellis took steps toward an initial public offering, advised by ACLP. It filed five draft registration statements with the Corporate Finance Division (CorpFin) of the

Securities and Exchange Commission (SEC) on a confidential basis, and CorpFin responded to each draft. Id. ¶¶ 31-33. Each of the five draft registration statements indicated that ACLP was undertaking the IPO on a firm commitment basis. Id. ¶ 34. Inpellis also assumed $5.25 million in bridge loans arranged by ACLP in its role as financial advisor, and Inpellis provided the lenders with a copy of one of the draft registration statements. Id. ¶¶ 36-37. The terms of the bridge loan provided that, if the IPO did not proceed as anticipated, Inpellis was obliged to discharge its debt by August 17, 2016. Id. ¶ 38. ACLP, in its role as exclusive financial advisor and pursuant to the Engagement Agreements' terms, received approximately $500,000 as a "placement fee" for arranging the bridge loans. Id. at ¶ 39.

In or around July 2015, ACLP induced Inpellis to terminate its CEO, Dr. Harry McCoy, and replace him with Dr. Patrick Mooney, an ACLP pharmaceutical industry analyst and longtime friend of ACLP's head of capital markets. Id. ¶¶ 29(c), 40(a). ACLP's stated rationale for the required leadership change was that ACLP "had given [Inpellis] a firm commitment offering and ... wanted to make sure they had management in place that they felt would be attractive to capital." Id. ¶ 40(a). Inpellis appointed Mooney as CEO in August 2015. Id. ¶ 40(b). Two of the draft registration statements filed after Mooney joined Inpellis omitted previously included material disclosures regarding Inpellis' parent company, BioChemics. Id. ¶ 40(c). The SEC commented on these deletions and directed that the prior disclosures be reinserted, including disclosures of risks related to purported security interests

held by BioChemics' creditors in the intellectual property upon which Inpellis' business depended. Id. ¶¶ 40(c)-(d). Between the dates of these two draft registration statements, Inpellis purchased from BioChemics the intellectual property that was the subject of these disclosures, and BioChemics used the $750,000 purchase price to pay an SEC fine. Id. ¶ 40(e). Still, ACLP and Mooney did not fully restore the disclosures demanded by CorpFin reviewers. Id. ¶¶ 40(f)-(g).

On November 9, 2015, ACLP and Mooney caused members of the Inpellis board to receive by email "the current draft of the S-1" for an 8:00 p.m. conference call regarding the public filing that was scheduled to take place the next day, November 10. Id. ¶ 43. This draft contained signature pages for the board and officers. Id. ¶ 44. On November 10, ACLP and Mooney caused the board to receive by email "the two signature pages." Board members were instructed to "sign" or indicate by email that they had "signed," and the board members did as instructed. Id. ¶ 45. On the same date, ACLP and Mooney reviewed a revised draft of the S-1, which was not provided to the board. The revised draft changed the "Preliminary Prospectus" statement from "This is a firm commitment initial public offering" to "This is an initial public offering," and also characterized the IPO as a "best efforts offering." Id. ¶¶ 41, 46. ACLP and Mooney caused the signature pages to be filled in with the board members' electronic signatures without the board members' knowledge or approval. Id. ¶ 47. ACLP and Mooney publicly filed the revised S-1 with the board members' unauthorized electronic signatures. Id. ¶ 48. The revised S-1 did not

include the disclosures the SEC had previously directed Inpellis and ACLP to restore. Id. ¶ 40(g).

**C. <u>The Aftermath</u>**

The change from a "firm commitment" to a "best efforts" offering rendered the Inpellis IPO a "penny stock" that could not meet NASDAQ's listing requirements. Id. ¶ 50. On November 23, 2015, CorpFin required Inpellis to explain why the offering did not now meet the definition of a penny stock and how it was expected to meet the NASDAQ listing standards. Id. ¶ 51. Then, on November 30, 2015, the SEC notified Inpellis that it had issued a "Stop Order" and initiated an investigation of the IPO, focusing on the missing disclosures in the registration statements. Id. ¶ 52. Inpellis resolved the matter without penalty or an adverse finding by voluntarily withdrawing the IPO, among other steps. Id. ¶ 53. As a result of the failed IPO, Inpellis could not convert the bridge loan as anticipated and defaulted. Id. ¶ 54. The bridge lenders filed an involuntary Chapter 7 bankruptcy petition against Inpellis on July 26, 2018, and an Order for Relief was entered by the Massachusetts U.S. Bankruptcy Court on November 1, 2018. Id. ¶ 55.

Aquino alleges a variety of ways in which the failed IPO harmed Inpellis. ACLP estimated that Inpellis' pre-IPO value was $75 million, and Aquino alleges that ACLP's conduct cost Inpellis an intended $20 million guaranteed capital raise and impaired Inpellis' ability to continue as a going concern. Id. ¶ 8(c). ACLP, in concert with Mooney, caused Inpellis to take on substantial financial obligations,

including $6.25 million in new debt to finance the IPO; to incur expenses, including for attorneys and accountants acceptable to ACLP; and to pay financial advisory fees to ACLP, as the Engagement Agreements required. Inpellis also took on significant financial and regulatory risks associated with the IPO, risks that were exacerbated by ACLP's wrongful conduct. Id. ¶ 8(b). The failed IPO then led to an extensive and ruinous SEC investigation, resulted in the withdrawal of the offering, and, ultimately led Inpellis into an involuntary bankruptcy petitioned by the seed capital investor placed by ACLP. Id. ¶ 8(c).

## II.   Procedural History

Aquino serves as Chapter 7 trustee of Inpellis' bankruptcy estate and commenced this action as an adversary proceeding on October 30, 2020, in the U.S. Bankruptcy Court for the District of Massachusetts. Aquino, ch. 7 Trustee v. Alexander Capital LP, USBC D.Mass. Adversary Proceeding Case No. 20-011227. The Bankruptcy Court then approved the assignment of all of the trustee's rights in this action to Covergent Distributors of Texas, LLC (Convergent). See ECF 46-1. The Bankruptcy Court then granted a joint motion by Aquino and ACLP to transfer the case to the Southern District of New York on February 3, 2021. See Compl. ¶ 1(d).

Defendants filed the pending motions to dismiss with reference to the Third Amended Complaint. ECF 32. But, in accordance with the case management plan, ECF 38, Aquino filed the Fourth Amended Complaint

on June 18, 2021, two days after filing his opposition brief.[6] In
Pettaway v. Nat'l Recovery Sols., LLC, 955 F.3d 299, 303-304 (2d Cir.
2020), the Second Circuit held that in this situation, "the district
court has the option of either denying the pending motion as moot or
evaluating the motion in light of the facts alleged in the amended
complaint." Defendants have asked that the Court not find the motions
to dismiss moot, and the Court agrees.

The Court's subject matter jurisdiction sounds in diversity and
under 28 U.S.C. § 1334(b) (giving "district courts ... original but
not exclusive jurisdiction of all civil proceedings arising under"
bankruptcy law). ACLP expressly consented to the personal jurisdiction
of this Court and to venue, both in its underlying Engagement
Agreements with Inpellis and in a joint motion for transfer before the
Bankruptcy Court for the District of Massachusetts. Compl. ¶¶ 1(c)-
(d); ECF 1 at 97-100. The NESA Defendants do not challenge the Court's
personal jurisdiction, nor do they object to venue in the Southern
District of New York.

---

[6] Aquino filed his First Amended Complaint on April 19, 2021. ECF
15. The First Amended Complaint added the NESA Defendants. Discovering
that he had misspelled the name of one of the new defendants, Aquino
filed a Second Amended Complaint on April 26, 2021. ECF 21. Defendants
did not object. At a telephonic status conference held May 19, 2021,
the Court granted Aquino leave to file the Third Amended Complaint,
which Aquino filed on May 24, 2021. ECF 32.

### III.   <u>Standard of Review</u>

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> When adjudicating a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007). Any claim rooted in fraud is subject to the heighted pleading standard of Fed. R. Civ. P. 9(b) (Rule 9(b)).

### IV.   <u>Threshold Issues</u>

The motions to dismiss raise three cross-cutting issues that Defendants believe to be dispositive of at least some of Aquino's claims. First, the NESA Defendants argue that Aquino may not sue them because they fall outside the scope of the Bankruptcy Court's assignment of Inpellis' claims to Aquino. Second, the NESA Defendants argue that even if they fall within the scope of the Bankruptcy Court's assignment, Delaware law does not make them amenable to suit for ACLP's torts. Third, all Defendants argue that the actions and knowledge of Dr. Patrick Mooney, Inpellis' CEO during the majority of the period of time covered by the Fourth Amended Complaint, should be imputed to Inpellis, and therefore that at least some of Inpellis' claims must fail. Because the disposition of each of these matters affects more

than one cause of action, the Court addresses these arguments before turning to Defendants' specific objections to each of Aquino's four claims.

**A. <u>Aquino's Standing to Sue the NESA Defendants</u>**

The NESA Defendants argue that Aquino has failed to plead facts sufficient to establish that he is entitled to sue them. The parties agree that Aquino's authority to bring claims against the NESA Defendants depends on the scope of the Bankruptcy Court's Order Approving Assignment of Claims Free and Clear of Liens, Claims, and Encumbrances, ECF 46-1 (Assignment Order). Aquino pled that the Bankruptcy Court's assignment to Convergent of the Inpellis estate's claims against ACLP included all claims "that [Inpellis] may have against [ACLP] and any of its predecessors, successors, assigns and affiliates arising out of the [IPO]." Compl. ¶ 1(a)(iii). The NESA Defendants argue, however, that Aquino failed to plead that they fall into any of these categories. Aquino responds that the NESA Defendants are "affiliates" of ACLP and, consequently, that the Assignment Order included any claims that Inpellis had against the NESA Defendants. ECF 39 at 23–27 (Opp.).

The Court agrees with Aquino that he pled an adequate basis to establish that the NESA Defendants are "affiliates" of ACLP, and so they are proper parties to this action.

The Assignment Order states in relevant part that it pertains to "certain claims ... held by the [Bankruptcy] Estate against [ACLP]." Assignment Order at 2. By specifying that it provides for the

assignment of "all of the transactions contemplated" by a motion Aquino had made, id. at ¶ 4, the Assignment Order incorporated by reference the entire class of claims Aquino enumerated in his Motion of Chapter 7 Trustee for Entry of Order Authorizing Assignment of Claims Free and Clear of All Liens, Claims and Encumbrances, ECF 46-3 (Assignment Motion). In pertinent part, the Assignment Motion specified that "[f]or purposes of clarity, the assignment of the AC[LP] Claims shall include the assignment of all of the estate's right, title, and interest in and to any and all claims, causes, causes of action, and litigation rights of any nature whatsoever that the estate may have as against AC[LP], or any of its predecessors, successors, assigns and affiliates, arising in connection with," Inpellis' failed IPO. Id. ¶ 11 (emphasis added).

Aquino argues that NESA Defendants are "affiliates" of ACLP under general legal usage, federal statutes, and Delaware and New York caselaw, because they exerted control over ACLP as its managing partners. Opp. 23-27. "Under the plain meaning of the term, someone 'affiliated' with a person or organization is 'closely associated with' the person or organization." PWP Xerion Holdings III LLC v. Red Leaf Resources, Inc., 2019 WL 5424778 at *7 (Del. Ch. 2021) (citing Merriam-Webster Dictionary, "Affiliate"). Black's Law Dictionary has long defined an "affiliate" in terms of the exercise of control by one person or entity over another. Affiliate, Black's Law Dictionary (11th edn. 2019). Likewise, the Bankruptcy Code defines an "affiliate" as a person or corporate entity that "directly or indirectly owns, controls,

or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2). Other federal statutes and regulations also define affiliation in terms of control or management. See, e.g., 49 U.S.C. § 30106(d)(1) (defining "affiliate" as "a person other than the owner that directly or indirectly controls, is controlled by, or under common control with the owner"); 12 U.S.C. § 1841(k) (defining "affiliate" as "any company that controls, is controlled by, or is under common control with another company"). Finally, Second Circuit caselaw has described the "affiliate" relationship as turning on whether a person or entity had the "direct or indirect ... power to direct or cause the direction of the management and policies" of another. Rothstein v. American International Group, Inc., 837 F.3d 195, 206-07 (2d Cir. 2016).

The NESA Defendants are clearly affiliates of ACLP under these principles. Aquino alleged that Amato, Guidicipietro, and NESA Management LLC were managing partners of ACLP during the relevant period, and they controlled ACLP through their exercise of management authority and their ownership stakes. The NESA Defendants do not contest these facts.

The NESA Defendants instead rest their argument on the proposition that they were not served with notice of Aquino's Assignment Motion. NESA Mot. 6-7. The bankruptcy judge wrote that notice of the Assignment Motion and hearing was given to "the notice parties and all other interested parties." See Assignment Order ¶¶ D; see also id. at 2. But the NESA Defendants cite no authority for the proposition that they

are immune from suit solely because they were not named on the certificates of service associated with the assignment motion. See ECF 46-2. In any event, as plaintiff's counsel noted at argument, the NESA Defendants' counsel is among those listed on the Assignment Motion's certificate of service. See id. at 4; Tr. 33:17-25. So even if the service list were dispositive, the NESA Defendants could not escape suit.

## B. NESA Defendants' Liability for ACLP's Torts

That the Assignment Order covered claims against the NESA Defendants does not mean that Inpellis had any claims against them to assign. The NESA Defendants argue that they are improper defendants in relation to some or all of Aquino's claims against ACLP, for two reasons: (1) limited partners in a limited partnership are not subject to suit under Delaware law, and (2) even if, as Aquino contends, ACLP is no longer a limited partnership, general partners in Delaware partnerships are liable only for a partnership's contractual obligations, not its torts.

The Court rejects the NESA Defendants' positions on both issues. Under Delaware's Revised Uniform Partnership Act (DRUPA), ACLP ceased being a limited partnership prior to the events at issue because it failed to comply with certain statutory formalities. The Court therefore holds that ACLP operated as an ordinary partnership during the period at issue making its partners, including the NESA Defendants, liable for the partnership's "obligations," 6 Del. C. § 15-306(a), which the Court construes to include the partnership's torts.

16

a. ACLP Lost its Limited Partnership Status

Under Delaware law, the default form of association consisting of two or more persons to carry on business for profit is a partnership.[7] 6 Del. C. § 15-202. Because the partnership is Delaware's default business structure, parties must take certain steps to form and maintain any other partnership structure, such as a limited partnership.

Aquino alleges that because ACLP did not comply with Delaware's statutory requirements for maintaining a limited partnership, ACLP was a "defectively formed limited partnership" and therefore reverted to a Delaware partnership. Compl. ¶¶ 1(b)(iii), 3, 7. While Aquino's position is not quite right -- ACLP appears not to have been "defectively formed" -- the Court agrees with his broader point that ACLP lost its status as a Delaware limited partnership and has thus become a Delaware partnership by default.

ACLP was properly formed as a limited partnership in 1995. See ECF 40-3 at 4-5. Delaware law requires that a certificate of limited partnership contain the "name and the business, residence or mailing address of each general partner." 6 Del. C. § 17-201. ACLP's initial certificate named Alexander Partners, Inc., as the sole general

_____

[7] Delaware refers to this form of business association simply as a partnership. See 6 Del. C. § 15-101(13). The Delaware Division of Corporations sometimes uses the term "general partnership." For clarity, the Court will refer to this form of business association as a "partnership" or a "Delaware partnership."

partner. ECF 40-3 at 4-5. Delaware law requires that a certificate of amendment must be filed within 90 days after the admission of a new general partner, the withdrawal of a general partner, a change in the name of the limited partnership, or certain changes with regard to the limited partnership's managing agent. See 6 Del. C. § 17-202.

ACLP filed a certificate to restore ACLP to good standing in 1998. This 1998 certificate identified Alexander Capital Holdings, Inc., as the sole general partner. ECF 40-3 at 6-7. Then, on April 23, 2012, ACLP filed a certificate of revival. This 2012 certificate also listed Alexander Capital Holdings, Inc., as the sole general partner. Id. at 8-9. But one week later, on April 30, 2012, Alexander Capital Holdings, Inc. filed a certificate of dissolution.[8] ECF 40-4 at 8. The Office of the Secretary of State of Delaware has confirmed that it has no further records concerning the partnership status of ACLP. ECF 40-3 at 2-3.

DRUPA provides that the occurrence of any one of five specified events triggers the nonjudicial dissolution of a limited partnership. One of these events, subject to certain inapplicable exceptions, is

---

[8] Under Delaware law, a corporation continues in existence for three years after filing a certificate of dissolution. 8 Del. C. § 278. This period, which may be extended by court order, provides time for the "winding up" of the corporation's business but prohibits the corporation from "continuing the business for which the corporation was organized." For Alexander Holdings, Inc., the three-year period concluded April 30, 2015. Alexander Holdings, Inc., filed Delaware tax returns in 2013, 2014, and 2015, each time reporting zero assets. See ECF 40-4 at 10-18.

the "withdrawal of a general partner unless at the time there is at least 1 other general partner." 6 Del. C. § 17-801. Because Defendants have not asserted that ACLP ever filed a certificate naming any other individual or entity as its general partner, the Court concludes that the dissolution of Alexander Capital Holdings, Inc. triggered ACLP's nonjudicial dissolution as a limited partnership as of April 30, 2012.

A limited partnership may continue after its dissolution for winding-up purposes only. 6 Del. C. § 17-803. But ACLP did not stop operations following its legal dissolution as a limited partnership on April 30, 2012. Aquino has submitted a FINRA BrokerCheck report dated 2020, and it indicates that ACLP was active through at least 2019. See ECF 40-6. The report lists nine partners of ACLP, including NESA Management, and certain officers, including Amato and Guidicipietro. Id. at 3-6.[9] The FINRA report also indicates that Amato and Guidicipietro are the beneficial owners of NESA Management. Id. at 11. Because ACLP has continued to operate as an association of two or more persons to conduct business for profit after its dissolution as a limited partnership, and Defendants have presented no records reflecting that ACLP has taken the steps necessary to re-register itself as a Delaware limited partnership, the Court concludes that

_____

[9] The FINRA report therefore raises the question whether Amato and Guidicipietro are in fact partners of ACLP. However, the Fourth Amended Complaint states that they are, and on a motion to dismiss, the Court must the complaint's allegations as true. Compl. ¶¶ 4-5. The NESA Defendants acknowledge as much. See NESA Mot. 8.

ACLP has operated since May 1, 2012, as a Delaware partnership rather than a limited partnership.

> b. <u>Delaware Partners' Liability in Tort</u>

DRUPA's provision on a "[p]artner's liability" provides that "all partners are liable jointly and severally for <u>all obligations</u> of the partnership." 6 Del. C. § 15-306(a) (emphasis added).

Defendants argue that even if the NESA Defendants are partners in a Delaware partnership rather than a limited partnership, Delaware law does not hold partners liable for the partnership's torts. <u>See</u> ECF 52. They contend (incorrectly) that Aquino may not sue them directly in this action but must first prevail against ACLP and then seek to collect against the NESA Defendants in a separate action if the partnership does not satisfy the judgment. <u>See id.</u> at 2.[10] Aquino responds that Delaware law holds partners liable for all obligations of a Delaware partnership, whether incurred in contract, tort, or otherwise. <u>See</u> ECF 51.

Surprisingly, whether partners are liable for the torts of a Delaware partnership is an unsettled question, with no definitive

---

[10] Aquino convincingly disputes Defendants' suggestion that Delaware law requires partners to be joined after a litigant obtains a judgment against the partnership. <u>See</u> ECF 51. The DRUPA provision governing judgment creditors provides that a tort plaintiff may only recover from the assets of a partner after having received a judgment against the partner for that obligation, <u>see</u> 6 Del. C. § 307(c), but the same section permits plaintiffs to bring an action "against the partnership and, to the extent not inconsistent with § 15-306 of this title, any or all of the partners in the same action," <u>see id.</u> § 15-307(b).

answer in the case law or leading treatises. See McEssy v. Gray, 2019 WL 6829053, *12 (N.D.N.Y. Dec. 13, 2019) ("Delaware courts are oddly silent as to what precisely 'partnership obligations' mean, and whether they reach tort liability."). McEssy recognized that "the common scheme and principle across the nation is that general partners will be held liable for every act, tortious or otherwise, committed by other partners or by the partnership itself." Id. at *14. Yet McEssy focused on the textual change that resulted from Delaware's adoption of DRUPA, its version of the Revised Uniform Partnership Act (RUPA) in 1999. Prior to 1999, the relevant provision, 6 Del. C. § 1515(a), held that "a general partner [would] be jointly and severally liable for everything chargeable to the partnership." Id. (citation omitted). McEssy interpreted the change from "everything chargeable" to "obligations" as evidence that the scope of a partner's liability had become "narrower ... by limiting liability to the monetary obligations of the partnership." Id. at 13. This change, combined with other provisions regulating vicarious liability, led Judge Hurd to conclude that "the legislature of [Delaware] made a conscious choice not to include" tort liability." Id.

However, after reviewing the parties' supplemental briefing on this issue, the Court has concluded that the 1999 change did not eliminate partners' liability for a Delaware partnership's torts.

First, while section 15-306(a), which concerns general partnerships, does not define "obligations of a partnership," the neighboring subsection concerning limited liability partnerships, 15-

306(c), addresses "an obligation of a partnership ... whether arising in contract, tort, or otherwise." Since terms are presumed to have consistent meanings within a statute, this weighs in favor of the broader interpretation of "obligation." See Env't Def. v. Duke Energy Corp., 549 U.S. 561, 574 (2007), ("[W]e presume that the same term has the same meaning when it occurs here and there in a single statute.").

Second, the official comments to RUPA explain that the 1999 revision "changes the UPA rule by imposing joint and several liability on the partners for all partnership obligations." Official Comment 1, § 306 - Partner's Liability, Rev. Uniform Partnership Act (2020-2021 ed.). Under RUPA's predecessor, "partners' liability for torts is joint and several, while their liability for contracts is joint but not several." Id. This comment explains why RUPA § 306(a) (which has identical wording to 6 Del. C. § 15-306(a)) uses only the word "obligations": RUPA sought to eliminate its predecessor's distinction between tort and contract liability. Contra McEssy, 2019 WL 6829053 at *13.[11] Indeed, courts in other jurisdictions that have adopted RUPA § 306(a) have concluded that it provides for "provides for joint and

---

[11] The Official Comment also undercuts McEssy's key textual inference from the revision, by stating that "[t]he UPA reference to 'debts and obligations,' is redundant, and no change is intended by RUPA's reference solely to 'obligations.'" Official Comment 1, § 306 - Partner's Liability, Rev. Uniform Partnership Act.

several liability for obligations arising out of contract and tort."
Segars v. McCormick, 55 P.3d 470, 472 (Okla. Civ. App. 2002).[12]

The Court therefore finds no reason in the text or legislative history of 6 Del. C. § 15-306 to depart from traditional rule that partners are liable for their partnership's torts. Accordingly, the Court will not dismiss otherwise well-pled tort claims against the NESA Defendants.

## C. Imputation of CEO Mooney's Knowledge

Aquino alleges that ACLP induced Inpellis to replace its CEO with an ACLP confederate, Dr. Patrick Mooney, who acted "in concert" with ACLP to misrepresent the investment bank's capability and intention of conducting a firm commitment offering, to mismanage the IPO process, and to fraudulently obtain signatures from the Inpellis board members on the final registration statement. Compl. ¶ 8(b). Defendants argue that under these allegations, Inpellis was never deceived, since Mooney knew about ACLP's scheme. Under New York law, courts presumptively impute a corporation's authorized agent's knowledge and actions to the

---

[12] Defendants, for their part, argue that the Court should take into account the fact that the Delaware legislature did not adopt a subsequent model partnership statute, the Uniform Partnership Act of 2015 ("UPA 2015"), which would have provided that partners are liable for "all debts, obligations, and other liabilities of the partnership," rather than merely "obligations of the partnership" as under RUPA. See ECF 52. Such arguments from silence are relatively weak evidence of legislative intent, even when they address a rejected proposal considered by the relevant legislature. But Defendants bring forward no evidence that the Delaware legislature even considered adopting any provision of UPA 2015.

corporation where the agent acts within the scope of her authority. Kirschner v. KPMG LLP, 938 N.E.2d 941, 950-51 (N.Y. 2010). In other words, Defendants argue that ACLP could not have defrauded Inpellis in concert with Mooney, because imputing Mooney's knowledge to Inpellis vitiates certain elements of Aquino's causes of action, notably the deception elements of fraud counts.

Aquino responds by asking the Court to apply the so-called "adverse interest exception," a narrow exception to the presumption of imputation:

> To come within the exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes .... [The exception] cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal. This rule avoids ambiguity where there is a benefit to both the insider and the corporation and reserves this most narrow of exceptions for those cases ... where the insider's misconduct benefits only himself or a third party, i.e., where the fraud is committed against a corporation rather than on its behalf.

Id. at 952 (citation omitted). Imputation is inappropriate in this case, Aquino argues, because in carrying out his part in the alleged scheme to defraud Inpellis, Mooney abandoned Inpellis' interests and acted, to Inpellis' detriment, to further ACLP's fraudulent scheme. While all allegations and inferences must be drawn in Aquino's favor at the motion to dismiss stage, he also bears the burden of establishing the exception. See id. at 951 ("Agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud.").

This Court has refused to impute executives' acts and knowledge to their corporations on a motion to dismiss where the executive was engaged in a scheme to defraud the employer. In In re Refco Sec. Litig., for instance, this Court held that the adverse interest exception applied where a corporate president and his accomplices corruptly induced directors of a family of hedge funds to transfer funds from protected, customer-segregated accounts at a regulated entity to unprotected, unsegregated accounts at an unregulated entity, from which the funds were misappropriated. 779 F. Supp. 2d 372, 374–75 (S.D.N.Y. 2011). The plaintiffs alleged that the hedge funds "did not benefit in any way" from the fraudulent activity. Id. at 375–76. Any ancillary benefits that grew out of the overall relationship between the corporation and the hedge funds "had nothing to do with the corruptly procured transfers that are the gravamen of the instant claims" and therefore did not render the adverse interest exception inapplicable, especially on a motion to dismiss where the "complaint must be read most favorably to the plaintiffs." Id. at 376–77.

Defendants correctly point out that the Fourth Amended Complaint never squarely alleges that Mooney acted entirely for ACLP's purposes. ECF 47 at 6 (Reply). And one might plausibly infer that Mooney sought to navigate Inpellis toward a quick IPO for the benefit of Inpellis. But that is not the only plausible inference, and in this posture, the Court must draw all plausible inferences in Aquino's favor. After careful consideration, the Court concludes that the Fourth Amended Complaint's allegations give rise to the inference that Mooney fully

abandoned Inpellis' interests and served ACLP's instead. Therefore, the Court finds that, at this stage at least, the adverse interest exception applies, and the Court therefore declines to impute Mooney's knowledge to Inpellis.

Among other things, the Fourth Amended Complaint alleges that ACLP effectively demanded that Inpellis replace its former CEO with Mooney. Compl. ¶ 40(a). ACLP deceived Inpellis into agreeing to this by claiming that it was necessary to replace Inpellis' former CEO because Inpellis' management needed to be attractive to investors, including the eventual bridge lender, with whom Mooney had a good relationship. Id. Moreover, Aquino alleges that Mooney was a pharmaceutical analyst for ACLP, id. ¶ 29(c), as well as a "long-time ... friend and associate" of ACLP's head of capital markets, Chris Carlin, id. ¶ 40(a). These allegations give rise to an inference that Mooney would not have become CEO but for ACLP's demand and that he was more likely to be loyal to ACLP than to Inpellis.

Within weeks of Mooney's installation as CEO, Inpellis consummated a $3 million bridge loan and conducted other fundraising activity in anticipation of the IPO. Id. ¶ 40(b). This, combined with the fact that the Fourth Amended Complaint alleges no other business relationship between ACLP and Inpellis, gives rise to an inference that ACLP induced Inpellis to hire Mooney solely to further ACLP's purpose of retaining Inpellis' underwriting business.

Perhaps most importantly, the complaint repeatedly alleges that Mooney undertook all his fraudulent actions in concert with ACLP,

especially with its executive Carlin. Id. ¶¶ 8(b)-(c), 40(c)-(g), 42-43, 45-48, 49(ii). Aquino alleges, for instance, that Mooney and ACLP together concealed from Inpellis' board ACLP's inability to underwrite a firm commitment offering, deleted disclosures from various SEC filings and did not reinstate those disclosures when the SEC directed them to do so, replaced the "firm commitment" S-1 draft with a "best efforts" draft after fraudulently obtaining the signatures of Inpellis' board members, and publicly filed the "best efforts" draft without the board members' knowledge or approval. Id. ¶¶ 8(c), 40(c)-(g), 42-43, 45-48, 49(ii); see also id. ¶¶ 68(iii), 74(ii), 81, 82. These allegations, combined with the absence of allegations that any other Inpellis employee was involved in the fraudulent activity, give rise to an inference that Mooney, colluding with ACLP, sought to conceal his actions from Inpellis's board and employees.

This all collectively gives rise to a further inference: that Mooney's concerted actions with ACLP were intended to aid ACLP's scheme to effectuate Inpellis' IPO on a fraudulent basis.[13] The Court must take as true the allegations that ACLP intended to deceive Inpellis about its ability and intent to conduct a firm commitment offering,

---

[13] Together, these allegations show both that Mooney "had both motive and opportunity to commit fraud," and that there is "strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-291 (2d Cir. 2006) (internal quotation marks and citations omitted). Either showing satisfies Rule 9(b)'s pleading requirements in relation to allegations of "[m]alice, intent, knowledge, and other conditions of a person's mind" for claims sounding in fraud, Fed. R. Civ. P. 9(b).

and that ACLP was all along intending to switch to a "best efforts" offering at the last moment. The Court therefore concludes it is plausible to infer that Mooney intended not to aid Inpellis' business but to further ACLP's scheme. Stated another way, it is plausible that Mooney acted with intent to commit a fraud against Inpellis, a conclusion that suffices to establish the adverse interest exception. See Kirschner, 15 N.Y.3d at 466-67 (The doctrine "reserves this ... exception[] for those cases ... where the insider's misconduct benefits only himself or a third party, i.e., where the fraud is committed against a corporation rather than on its behalf.").

That the Fourth Amended Complaint contains no allegations concerning actions Mooney took that advanced Inpellis' interests outside the context of the planned IPO enhances the plausibility of these inferences. Assuming that Mooney carried out other duties as CEO, they were likely to be only "tangentially related" to Aquino's allegations of fraudulent conduct, In re Refco, 770 F. Supp. 2d at 376, or they may have served as "cover" by concealing Mooney's true loyalties. Even to the extent that Mooney made decisions that sped along the IPO or created short-term benefits for Inpellis, proof of such facts would not necessarily defeat the adverse interest exception.[14]

---

[14] See In re Refco, 779 F. Supp. 2d at 377 ("More generally, the attempts by defendants to find somewhere in the 300-page Amended Complaint a snippet or two that suggests that [plaintiffs] somehow received some tangentially-related benefit from the illicit transfers that are the heart of the instant claims is utterly inconsistent with the fundamental principle that, on a motion to dismiss, a complaint

Defendants propose a different chain of inferences, suggesting at oral argument that ACLP and Mooney proceeded as they did because they hoped circumstances would materialize before Inpellis' registration statement became effective that would enable ACLP to conduct the "firm commitment" offering it promised. <u>See</u> Tr. 7:18-8:6. This could explain why ACLP and Mooney initially took steps to offer a "firm commitment" IPO and switched at the last minute to a "best efforts" offering. However, while Defendants may present evidence supporting this and other alternatives later in the litigation, at this stage the Court must draw all inferences in Aquino's favor.

Thus, while the Fourth Amended Complaint does not plead the adverse interest exception <u>in</u> <u>haec</u> <u>verba</u>, crediting all of the complaint's allegations and drawing all plausible inferences in plaintiff's favor, the Court finds the allegations sufficient to rebut the presumptive imputation of Mooney's acts and knowledge to Inpellis.

## V.   <u>Aquino's Four Claims</u>

Since none of Defendants' overall arguments compels dismissal, the Court now turns to Defendants' more particularized objections to each of Aquino's four claims: (i) fraudulent inducement, (ii) breach of contract, (iii) breach of fiduciary duty, and (iv) fraud.

---

must be read most favorably to the plaintiffs. A motion to dismiss is not designed to be a game of 'gotcha,' that ignores the clear thrust of hundreds of pages of specific allegations in favor of a line or two here or there that is arguably inconsistent with that thrust.").

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The Second Circuit has explained that to satisfy Rule 9(b), a "complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). However, Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This, in turn, requires plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent," which "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner, 459 F.3d at 290–291 (internal quotation marks and citations omitted).

## A. Count I: Fraudulent Inducement

Under New York law,[15] "[t]he elements of fraudulent inducement are: a false representation of a material fact and with scienter;

_____

[15] Since "'the parties' briefs assume that New York substantive law governs'" the fraud-related claims in the first and fourth causes of action, "'such implied consent is, of course, sufficient to establish the applicable choice of law.'" PetEdge, Inc. v. Garg, 234

reliance thereon by defendant to its detriment." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Worley, 690 N.Y.S.2d 57, 61 (1st Dep't 1999) (citing Channel Master Corp. v. Aluminum Limited Sales, Inc., 151 N.E.2d 833 (N.Y. 1958)).

The Fourth Amended Complaint alleges that Inpellis relied on ACLP's "stated intent ... to enter into an exclusive underwriting agreement ... immediately prior to the [registration statement's] effective date" for an offering "of up to $20,000,0000" on a "Firm Commitment" basis. Compl. ¶ 8. The complaint alleges this was a misrepresentation because ACLP "held itself out to Inpellis that it could participate in 'firm commitment' offerings," when "in fact," ACLP "had neither the financial ability nor the legal authority to underwrite such a guaranteed offering." Id. ¶ 29. This was because ACLP's "FINRA membership did not permit the firm to participate in firm commitment offerings." Id. ¶ 29(d). Aquino avers that ACLP's "ability, authority, and intent to undertake the offering on a 'firm commitment' basis were central to Inpellis' decision to enter into the Engagement Agreements because they fundamentally affected whether Inpellis bore the risk of the offering or whether the risk was assumed by [ACLP] as the putative 'firm commitment underwriter.'" Id. ¶ 59.

---

F. Supp. 3d 477, 486 (S.D.N.Y. 2017) (quoting Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009)).

Aquino further alleges that ACLP intended for Inpellis to rely on these representations because ACLP sought to win and retain Inpellis' investment banking business. Id. ¶ 84.

Defendants offer four arguments why the fraudulent inducement claim should be dismissed.

First, Defendants dispute falsity with respect to ACLP's representation that it intended to conduct a firm commitment offering. Defendants argue that a statement of intent to take future action is not "a valid basis for fraud." ACLP Mot. 12. But this Court has emphasized that "[w]hile it is true that 'a mere promissory statement as to what will be done in the future does not constitute a material misrepresentation of fact, a promise made with a preconceived and undisclosed intention of not performing it does.'" Senior Health Ins. Co. of Penn. v. Beechwood Re. Ltd., 345 F. Supp. 3d 515, 527 (S.D.N.Y. 2018) (quoting Spinelli v. Nat'l Football League, 903 F.3d 185, 210 (2d Cir. 2018)). Aquino has specifically alleged that ACLP was not capable of performing a legitimate "firm commitment" IPO, which lends plausibility to the allegation that ACLP lacked the intent to perform such an offering. Compl. ¶ 58. Aquino has also adequately alleged that the Engagement Agreement contained an implied statement of present fact -- that ACLP had the capacity and authority to underwrite the contemplated IPO -- and ACLP knew this representation to be false at the time it was made. This suffices as an independent basis for a fraudulent inducement claim. See Senior Health Ins. Co., 345 F. Supp. 3d at 528.

Second, Defendants argue that there was no misrepresentation because ACLP had a "pattern" of participating in firm commitment offerings during the relevant time period, thereby undermining the inference that ACLP "did not 'intend' to engage in a firm commitment offering." Indeed, Defendants contend that the fraudulent inducement allegation is inconsistent with ACLP's having performed firm commitment offerings "on a regular enough basis to be a pattern, and with such frequency as to merit a censure and a $45,000 fine." ACLP Mot. 8. But this argument misconstrues the alleged misrepresentation. The potentially actionable representation is not that ACLP had performed firm commitment offerings but, instead, that it had the financial ability and legal authority to do so. FINRA's disciplinary action demonstrates the falsity of that latter representation. Defendants' argument that ACLP intended to underwrite a firm commitment offering notwithstanding its incapacity to do so fails in part because it would require the Court to construe the Engagement Agreement as hiring an underwriter to perform an unlicensed financial transaction. Moreover, it would violate basic equitable principles to dismiss a fraudulent inducement claim on the ground that a firm's disciplinary record of unauthorized underwriting insulates it from liability for the false assertion that it was authorized to conduct such underwriting.

Third, Defendants argue that the complaint inadequately pleads scienter. The centerpiece of this argument is a disclaimer contained in the Engagement Agreements:

> Except as otherwise set forth herein, nether the Company nor
> Alexander Capital will be under any obligation to the other,
> until both the Company and Alexander Capital have executed and
> delivered the Underwriting Agreement. It is understood that <u>this
> Engagement Agreement is merely a statement of intent and while
> the parties agree in principle to the contents hereof any legal
> obligations between the parties shall be only as set forth in a
> duly negotiated and executed Underwriting Agreement</u>, which
> Underwriting Agreement shall be in form and content satisfactory
> to Alexander Capital, the Company and their respective counsel.
> This Engagement Agreement shall, nevertheless, constitute a
> binding agreement relative to the reimbursement of Alexander
> Capital's expenses. ECF 40-1 at 5; ECF 40-2 at 5-6 (emphasis
> added).

This passage, Defendants argue, "shows that [ACLP] was telling Inpellis <u>not to rely on that language</u> since it was expressly subject to change." ACLP Mot. 14. But Defendants misread this language. While it does preserve flexibility for the parties to determine the content of the later Underwriting Agreement, this provision says nothing about the terms of the Engagement Agreement itself. As explained further below, the Court concludes, on the present record, that the Engagement Agreements created enforceable obligations in contract. <u>See</u> <u>infra</u> at 36-41. Nowhere does this provision purport to make the Engagement Agreements' terms subject to change or otherwise discourage Inpellis' reliance on the alleged misrepresentation at issue: ACLP's stated intention and implied capacity to underwrite a firm commitment offering.

Here, the Engagement Agreements drafted by ACLP and transmitted to Inpellis represent that ACLP had the intention (and, impliedly, the ability) to conduct an IPO of "up to $20,000,000 ... on a 'Firm Commitment' basis." ECF 40-2 at 1. In this way, the Agreements

allegedly misrepresented both ACLP's capacities and intentions, since the firm was unable to conduct a legitimate IPO on a firm commitment basis. Aquino further alleges that Inpellis reasonably relied on that representation in deciding to enter the Engagement Agreements, Compl. ¶ 23, that ACLP knew that Inpellis would reasonably rely on that representation, id. ¶ 27, and that ACLP knew it could not and would not conduct the IPO on a firm commitment basis, id. ¶ 28. The Engagement Agreement's caveat -- that the offering's final terms would not be settled until the execution of an Underwriting Agreement -- does not undermine the straightforward inferences of scienter and reliance. The allegations, taken as true, provide a strong basis to infer that ACLP made these misrepresentations with the intention of winning Inpellis' investment banking business. For these reasons, Aquino's allegations meet Rule 9(b)'s particularized pleading requirement under Lerner. See 459 F.3d at 290-91.

Fourth, Defendants dispute that Aquino has adequately alleged that Inpellis justifiably relied on ACLP's representations. Defendants invoke several reasons, some of which are duplicative of points the Court has already addressed, but their most forceful argument is that Inpellis should have investigated ACLP's FINRA registration status and therefore should have known that ACLP was unable to conduct a firm commitment offering. However, because for the reasons given below the Court finds that the special facts doctrine applies to Aquino's fraud-related claims, Aquino has adequately pled justifiable reliance.

For all these reasons, the Court finds that Aquino has adequately pled a cause of action for fraudulent inducement against Defendants.

**B. <u>Count II: Breach of Contract</u>**

"To prevail on a breach of contract claim under New York law, a plaintiff must prove [i] a contract; [ii] performance of the contract by one party; [iii] breach by the other party; and [iv] damages." <u>Terwilliger v. Terwilliger</u>, 206 F.3d 240, 245–246 (2d Cir. 2000) Defendants dispute the first, third, and fourth of these elements. While the Engagement Agreements' drafting creates some ambiguity about the scope of the parties' commitments, the Court finds that they created enforceable obligations for ACLP, and that Aquino has adequately pled ACLP's breach and consequent damages.

a. <u>Contract Formation</u>

Defendants argue that the Engagement Agreements did not form an enforceable contract, at least not with respect to any of ACLP's alleged breaches, because the Agreements expressly disclaim the creation of enforceable duties. Defendants maintain that the Engagement Agreements only signify an intent to execute a subsequent Underwriting Agreement and Inpellis' promise to reimburse ACLP's reasonable expenses. But this position ignores both the Agreements' overall meaning and the parties' subsequent conduct. With respect to the contemplated, final Underwriting Agreement for the IPO itself, Defendants are correct: the Engagement Agreements only amount to an agreement to agree. But, at least in a motion to dismiss posture,

Defendants are wrong that the Engagement Agreements created none of the obligations ACLP allegedly breached.

The key passage provides that "neither the Company nor Alexander Capital will be under any obligation to the other, until both the Company and Alexander Capital have executed and delivered the Underwriting Agreement." ECF 40-1 at 5; ECF 40-2 at 5-6. It also characterizes the Engagement Agreements as "merely a statement of intent" and specifies that the Engagement Agreement "shall, nevertheless, constitute a binding agreement relative to the reimbursement of [ACLP's] expenses." Id.

The Engagement Agreements certainly did not oblige ACLP to sign a final Underwriting Agreement. In New York, a "preliminary, non-binding proposal to agree" does not create a contract. See, e.g., Aksman v. Xiongwei Ju, 799 N.Y.S.2d 493, 495 (1st Dep't 2005). When "expressly conditioned on the 'execution of a definitive agreement satisfactory in form and substance' to both sides," an "agreement to agree" is not an enforceable contract. Prospect Street Ventures I, LLC v. Eclipsys Solutions Corp., 804 N.Y.S.2d 301, 302 (1st Dep't 2005). While the law generally enforces "letters of intent or term sheets" when they "contain all material terms of the contemplated contract, or when the remaining acts to arrive at a contract ... are merely ministerial," this is not the rule when, as here, material terms are left for future negotiations. Local Union 813, Intern. Broth. of Teamsters v. Waste Management of N.Y., LLC, 469 F. Supp. 2d 80, 86-87 (E.D.N.Y. 2007). Nor are enforceable contracts formed "when the parties

include a term ... that shows the intent not to be bound prior to the implementation of what otherwise would be a ministerial step." <u>Local Union 813</u>, 469 F. Supp. 2d at 87.

Defendants therefore are correct that the Engagement Agreements are not enforceable agreements to agree to a future Underwriting Agreement with regard to the IPO. The Engagement Agreements explicitly envision future "Underwriting Agreements" that will be "duly negotiated and executed" by the parties and that will "be in form and content satisfactory to" ACLP, Inpellis, and their respective counsel. ECF 40-2 at 5–6. Neither Engagement Agreement includes all the material terms of the Underwriting Agreement. Each Engagement Agreement expressly states it is "merely a statement of intent" and that neither party "will be under any obligation to the other one" until the Underwriting Agreement is executed. <u>Id.</u> at 5. Aquino argues that the Engagement Agreements cabin ACLP's discretion not to execute the future Underwriting Agreement, because they specify a series of conditions that ACLP could invoke in its sole discretion if ACLP chose not to proceed. <u>Id.</u> at 5. But New York law is clear that the Engagement Agreements cannot bind ACLP to sign any particular Underwriting Agreement, even though it allegedly never invoked any of the specified conditions. Compl. ¶ 24.

Nonetheless, other passages of the Engagement Agreements are reasonably read to create immediate duties on ACLP's part, and Aquino's claims do not turn on whether ACLP was bound to execute an Underwriting Agreement. Two paragraphs within the first section ("Term of

Retention") are best construed to refer to the Engagement Agreements themselves, rather than to the contemplated Underwriting Agreement. The first paragraph provides that "This exclusive engagement agreement ... and the Company's engagement of Alexander Capital as managing underwriter shall commence at the signing of this document" ECF 40-2 at 1 (emphasis added). The second paragraph provides that "Alexander Capital shall also be the exclusive financial advisor on all financings and advisory (including M&A) during this Engagement." Id. (emphasis added). Aquino argues, and the Court agrees, that these constitute present promises created by the Engagement Agreements themselves, rather than statements about a relationship governed by the contemplated Underwriting Agreement. The Engagement Agreements are best construed as Inpellis engaging ACLP to advise it with regard to the preliminary steps leading up to the IPO, with ACLP's duties beginning immediately and running through the execution of the Underwriting Agreement. The Engagement Agreements require Inpellis to pay ACLP various fees for its work as financial advisor, including a "cash Placement Fee of ten percent ... on any bridge or private financings completed by [Inpellis] during the terms of this agreement."[16] ECF 40-2 at 4. Aquino alleges that Inpellis paid ACLP

---

[16] Among the differences between the two Engagement Agreements is the amount of this "Placement Fee," which was only eight percent in the first agreement. See ECF 40-1 at 4. The Engagement Agreements provide for ACLP to receive other fees before any underwriting agreement was executed, in relation to ACLP's role as managing underwriter and exclusive financial advisor. These include the issuance to ACLP of "non-callable warrants of [Inpellis stock] ... equal to eight percent ... of the aggregate number of share of common

approximately $500,000 pursuant to this provision. Compl. ¶ 39. The Agreements also oblige Inpellis to engage accountants and attorneys acceptable to ACLP, which Aquino avers Inpellis did at substantial expense. Compl. ¶¶ 15-20, 25. These actions taken by Inpellis in detrimental reliance on the Engagement Agreements buttress the conclusion that the Agreements gave rise to immediate, enforceable duties flowing from ACLP to Inpellis.

The difficulty is that the paragraphs specifying these obligations follow one which concludes with the statement that "The Underwriting Agreement and related agreements shall contain such terms and conditions as are customarily contained in agreements of such character and among other things, provide for the following:" ECF 40-2 at 1. One could construe this sentence to render the balance of the Engagement Agreements, including the "Term of Retention" section, a statement of terms that will appear in the Underwriting Agreement. ACLP's ambiguous drafting therefore leaves the Court with a choice between two awkward readings: (1) that the Engagement Agreements' sloppy drafting inadequately distinguishes between present promises binding during the IPO preparation period and agreements to agree about the terms of the Underwriting Agreement that will in future

_____

stock ... sold to investors" in any bridge or private financing, and a "cash M&A Transaction Fee of 3% of the Total Transaction Value ... on any merger or acquisition ... during the term of this agreement." ECF 40-2 at 4. The Agreements also specify other fees that ACLP will earn from the underwriting itself, which depends in part on execution of the Underwriting Agreement. See id. at 3 (¶¶ II(a)-(b)).

govern the offering itself; or (2) that the Engagement Agreements are almost entirely agreements to agree, with the exception of the "binding agreement relative to the reimbursement of [ACLP's] expenses." For present purposes, the Court concludes that the former construction is more reasonable, especially in light of the Fourth Amended Complaint's allegations, which must be taken as true in this posture. The parties' behavior, as alleged, reflects a mutual understanding that Inpellis had engaged ACLP to start advisory and preliminary underwriting work immediately, and Inpellis paid ACLP for that work. Therefore, the Court holds that ACLP made enforceable promises in the Engagement Agreements to serve as Inpellis' managing underwriter and exclusive financial advisor.

b. <u>Breach</u>

Aquino alleges that Defendants breached their obligations under the Engagement Agreements in three, interrelated ways: first, that ACLP did not carry out its undertakings as managing underwriter in good faith; second, that ACLP did not provide Inpellis with independent financial advice in its role as Inpellis' exclusive financial advisor; and third, that ACLP failed to inform Inpellis of material facts of which it was uniquely aware, especially that ACLP lacked the capacity and intent to conduct a firm commitment offering, and that ACLP and Inpellis' CEO, Dr. Mooney, were working in concert to conduct the IPO in a manner that harmed Inpellis' interests and undermined the integrity of the IPO. Compl. ¶ 68.

Defendants argue that Aquino has inadequately pled each of these theories of breach, that imputing Dr. Mooney's knowledge to Inpellis undermines these allegations, and that ACLP could not have breached as alleged because that would require ACLP to have taken on fiduciary duties to ACLP, which Defendants deny. ACLP Mot. at 23–26. The Court finds Defendants' arguments unconvincing.

First, the Court concludes that Aquino pled ACLP's breach with adequate particularity. The Fourth Amended Complaint is replete with allegations of ACLP's failure to conduct its underwriting and advisory duties in good faith, including by failing to follow SEC directives regarding inclusion of certain disclosures in the registration statement; by making a secret, last-minute switch to a "best efforts" offering; and by fraudulently obtaining board members' signatures on the public S-1 filing.

Second, as explained above, the Court will not impute Dr. Mooney's knowledge and acts to Inpellis, because Aquino has (just barely) alleged a sufficient basis to invoke the adverse interest exception.

Third, the Court rejects Defendants' contention regarding fiduciary duties. As explained below, at this juncture, the Court rejects Defendants' position that ACLP did not owe Inpellis any fiduciary duties. But even if no fiduciary duties had arisen, Aquino has pled adequately that ACLP withheld material facts regarding its performance and that this amounted to a breach.

c. Damages

Defendants also argue that Aquino has inadequately pled that Inpellis suffered damages from ACLP's breach of the Engagement Agreements. According to ACLP, Aquino has failed to aver facts that render plausible the inference that Inpellis would have received benefits and avoided losses but for ACLP's breach. Defendants are incorrect: The Fourth Amended Complaint contains numerous plausible allegations of harm resulting from ACLP's breach of its duties under the Engagement Agreements.

For the reasons set forth above, the Court finds that Aquino has stated a claim for breach of contract against Defendants. While the Engagement Agreements are poorly drafted and Defendants' arguments are not frivolous, the Engagement Agreements may plausibly be read as creating obligations enforceable against ACLP. The other three elements are adequately pled. Therefore, the Court denies Defendants' motions to dismiss Count II.

**C. Count III: Breach of Fiduciary Duty**

Under New York law, "the elements of a breach of fiduciary duty claim are '(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach.'" Senior Health Ins. Co. of Penn., 345 F. Supp. 3d at 523 (quoting Meisel v. Grunberg, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009)). Defendants do not dispute damages, and the Court concludes that Aquino has adequately pled the other two elements.

43

a. Duty

Aquino alleges that ACLP established a fiduciary duty to Inpellis by committing, through the Engagement Agreements, to serve as the managing underwriter and exclusive financial advisor. Compl. ¶ 73. Where "a valid contract governs the dispute between the parties, 'a cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand.'" Senior Health Ins. Co. of Penn., 345 F. Supp. 3d at 523 (quoting William Kaufman Org., Ltd. v. Graham & James LLP, 703 N.Y.S.2d 439, 442 (1st Dep't 2000)). But "'conduct amounting to breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract which is nonetheless independent of such contract.'" Id. (quoting Bullmore v. Ernst & Young Cayman Islands, 846 N.Y.S.2d 145, 148 (1st Dep't 2007)). "In determining whether a fiduciary duty exists, the focus is on whether one person has reposed 'trust or confidence in another' and whether the second person accepts the trust and confidence and 'thereby gains a resulting superiority or influence over the first.'" Indep. Asset Mgmt. LLC v. Zanger, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008) (quoting Regions Bank v. Wieder & Mastroianni, P.C., 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006)).

Defendants argue that Aquino failed to properly allege that the Engagement Agreements created a fiduciary duty flowing from ACLP to Inpellis. Defendants cite a New York Court of Appeals case for the proposition that an underwriting contract does not impose a fiduciary duty on an underwriter. See ACLP Mot. 26, citing EBC I, Inc. v.

Goldman, Sachs & Co., 5 N.Y.3d 11 (2005). But Defendants misstate the court's holding. EBC I does not stand for the proposition that underwriters owe no fiduciary duties to issuer clients; rather, the court holds that even if fiduciary duties are not automatically created by a standard underwriting contract (an assumption, not a holding) then "a cause of action for breach of fiduciary duty may survive" where "the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone." Id. at 20. EBC I in fact held that the investment bank defendant had taken on limited fiduciary duties, in light of the nature of the "advisory relationship that was independent of the underwriting agreement." Id.

Aquino has similarly alleged that ACLP accepted a fiduciary duty to Inpellis in its capacity as financial advisor under the Engagement Agreements. The Court will follow EBC I in finding that this gave rise to a fiduciary duty. At the pleading stage, it is plausible to infer that this duty required ACLP to disclose its inability and lack of intent to undertake a "firm commitment" offering, because this implicated the wisdom of Inpellis' assuming a multimillion-dollar debt in the form of the bridge loan. This duty could also plausibly have required disclosure of Mooney's divided loyalty and ACLP's conduct in its management of the IPO. Contrary to Defendants' unsupported assertion, the Engagement Agreements' provisions requiring Inpellis to retain its own attorneys and its implication that Inpellis will exercise independent judgment on certain IPO-related matters do not preclude formation of the alleged fiduciary duty.

b. <u>Breach</u>

Defendants argue that ACLP could not have breached any fiduciary duties it owed to Inpellis through the alleged failures to disclose because Dr. Mooney knew all the relevant facts, and his knowledge should be imputed to Inpellis. But as explained above, the Court holds that the adverse interest exception to the usual agency rule of imputation applies to Dr. Mooney. Therefore, the Court finds that Aquino has adequately alleged that ACLP breached its fiduciary duties by failing to disclose its inability and lack of intent to underwrite a firm commitment offering, by concealing Mooney's conflicts of interest and divided loyalties, and by concealing from Inpellis' board the last-minute switch in the S-1 form.

For these reasons, Aquino has stated a claim for breach of fiduciary duty and the Court denies the motions to dismiss Count III.

D. **Count IV: Fraud**

In New York, "[t]he elements of a cause of action for fraud [are] a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." <u>Eurycleia Partners, LP v. Seward & Kissel, LLP</u>, 12 N.Y.3d 553, 559 (2009). Rule 9(b) applies, the elements must be pled with particularity. <u>See</u> <u>supra</u> at 30.

Beyond arguing unpersuasively that the Fourth Amended Complaint fails to satisfy Rule 9(b)'s pleading standards, Defendants contend Aquino's pleading is defective for three reasons, none of which requires dismissal.

46

First, Defendants argue that the Court should impute to Inpellis Dr. Mooney's knowledge of ACLP's scheme to conduct a best-efforts offering, and that this knowledge vitiates the misrepresentation element. As explained, the Court holds that Aquino has rebutted the presumption that Mooney's knowledge should be imputed to Inpellis, so this argument fails.

Second, Defendants dispute that Inpellis justifiably relied on ACLP's representations. Defendants assert that Inpellis should have investigated ACLP's licensure by requesting ACLP's financial statements and FINRA membership agreement and thereby discovered that FINRA did not authorize ACLP to underwrite firm commitment offerings. Mot. 16, 31. But ACLP cannot affirmatively misrepresent its capabilities to a client, as it is alleged to have done, and then argue that it is immune from fraud liability because the truth lay dormant in a regulator's records. This Court has accordingly held that "the duty of the victim to investigate is ... obviated by the 'special facts doctrine,'" which "provides that a duty to disclose arises if one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" Senior Health Ins. Co., 345 F. Supp. 3d at 526. The special facts doctrine applies here because ACLP knew about Dr. Mooney's conflict of interest and, further, knew that Inpellis agents other than Mooney were acting on the basis of mistaken knowledge. Aquino has therefore adequately pled justifiable reliance.

Finally, Defendants cite decades-old Appellate Division precedent that it may constitute breach, but not fraud, for a party to form a contract without the intent to perform. See Gordon v. Dino De Laurentiis Corp., 529 N.Y.2d 777, 779 (1st Dep't 1988). As discussed above in connection with the Count I, a false statement of intent is actionable "'if [the] promise was actually made with a preconceived and undisclosed intention of not performing it," because "it constitutes a misrepresentation of material existing fact upon which an action [for fraudulent inducement] may be predicated.'" Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992) (quoting Sabo v. Delman, 143 N.E.2d 906, 908 (N.Y. 1957)). This latter rule applies, as explained above. But in any event, Aquino has alleged numerous misrepresentations by ACLP following execution of the Engagement Agreements, not least ACLP and Mooney presenting false registration statements to the Inpellis board members to fraudulently obtain their signatures.

For these reasons, the Court holds that Aquino has adequately stated a claim for fraud and so denies the motions to dismiss with respect to Count IV.

## VI.  **Conclusion**

For the reasons set forth above, the Court DENIES Defendants' motions to dismiss with respect to all of Aquino's causes of action.

SO ORDERED.

Dated:    New York, NY

July 𝒥𝟑, 2021                                    JED S. RAKOFF, U.S.D.J.