UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN J. AQUINO, <br> CHAPTER 7 TRUSTEE <br> By Its Assignee, <br> Convergent Distributors of Texas, LLC <br><br> Plaintiff, <br><br> v. <br><br> ALEXANDER CAPITAL, LP <br> & <br> Its Managing Partners: <br> JOSEPH AMATO, <br> ROCCO GUIDICIPIETRO, and <br> NESA MANAGEMENT, LLC <br><br> Defendants | Case #1:21-cv-01355-JSR |

**DECLARATION OF WILLIAM C. RAND, ESQ.
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 13B

# 9-29-15 Submission by Atty. Holcomb & Wright to FINRA Re 9-1-15 "Wells Notice"

Before the

Financial Industry Regulatory Authority

---------------------------------------------------------x
:
:
:
In the matter of Alexander Capital, L.P.     :     Examination/Investigation Number
:                    2012034858401
:
:
---------------------------------------------------------x

**Submission on Behalf of Alexander Capital, L.P.**

Scott Holcomb
Aaron Wright
The Holcomb Law Firm, LLC
2306 Briarcliff Commons NE
Atlanta, Georgia 30345

*Attorneys for Alexander Capital L.P.*

Before the

Financial Industry Regulatory Authority

-------------------------------------------------------x
:
:
In the matter of Alexander Capital, L.P.      :           Examination/Investigation Number
:                           2012034858401
:
:
-------------------------------------------------------x

**Submission on Behalf of Alexander Capital, L.P.**

Alexander Capital, L.P. ("Alexander Capital", "ACLP" or "the Firm") makes this submission in response to the Staff's recommendation that an enforcement action be brought against the Firm.[1] No such action is warranted.

**Preliminary Statement**

Alexander Capital is a New York brokerage firm which has conducted business for nearly twenty years without significant regulatory discipline. The Staff's recommendation that an enforcement action be brought against the Firm stems primarily from a single transaction which occurred over four and a half years ago.

In March of 2011, Alexander Capital facilitated a transaction in which a single accredited investor invested $100,000 by way of a private placement in a company called DRTV. The Firm made $2,000 in commission from that transaction and the broker, Mark Hotton, made $8,000.

At some point thereafter, FINRA began investigating the transaction and requested documents, conducted on the record interviews,[2] and performed its own research into DRTV. The Staff interviewed Glenn Lanaia, who was one of the then owner/partners of Alexander Capital, on April 20, 2012. *See* Transcript of Testimony of Glenn Lanaia, In the Matter of

---

[1] This submission is provided solely in connection with the Staff's consideration of possible action against Alexander Capital, and is made without any admission that the conduct under investigation violated any laws, rules, or regulations. Should the Staff decide to make any recommendation that varies in any respect from the issues and positions Alexander Capital has addressed, we expressly reserve the right to revise this submission. Alexander Capital also expressly reserves the right to object to the admissibility of this submission and those submitted by any other person in any subsequent proceeding. Finally, Alexander Capital hereby asserts that this submission constitutes attorney work product and requests that it be treated confidentially and not as a waiver of any privilege or immunity from production.

[2] Despite the Firm's request, the Staff has refused to produce any of the transcripts to the Firm.

2

Alexander Capital, L.P. Matter Number 20120316517 (hereinafter "Lanaia Transcript") at Page 1 Line 11.

By December of 2013, the Staff had neither taken any action nor indicated that it would take action. At that time, Alexander Capital was sold to new ownership. At no time during that process-which entailed FINRA's review-did FINRA ever state its intent to bring a regulatory action. That process, pursuant to NASD Rule 1017, took approximately eighteen months. Moreover, during the 1017 interview in approximately October 2013 FINRA never mentioned anything about the possibility of an enforcement action. One would think that the decision to pursue an enforcement action would have been made by 2013 or at least by December 2013 since the on the record exams were completed more than a year earlier.

By 2015, *every* person who was in any way associated with the DRTV transaction had departed Alexander Capital-and FINRA was aware of these personnel changes.

FINRA first notified the Firm in March 2015 that it intended to bring an enforcement action. By then, ownership in the company had changed and no-one who worked on the DRTV transaction remained with the Firm. Initially, the Staff only mentioned the DRTV issue as being of concern. It was not until later that the Staff brought forth the other potential charges. It is clear that these minor, technical charges were only included to put pressure on the Firm.

Each of the actions that form the basis of the allegations unrelated to DRTV occurred in the 2010-2012 timeframe, before Alexander Capital was sold to the current owners and under the supervision and guidance of persons who are no longer employed by the Firm.

As we will demonstrate below, none of the allegations made by the Staff warrant an enforcement action.

**The Record**

A. *Alexander Capital, L.P.*

Alexander Capital, L.P. (CRD #40077) (hereinafter "ACLP" or "the Firm") is a New York based brokerage firm founded in 1995. It has been a member of FINRA since 1996. Alexander Capital was suspended from FINRA on September 27, 2011 for failure to pay assessment fees and reinstated on October 6, 2011 when those fees were paid in full. Otherwise, Alexander Capital has no history of regulatory discipline.

During the time period covered by the Staff's investigation, the Firm was owned by, among others, Allen Boxer (CRD# 27567) and H.K. Landis Capital LLC. In 2012, Exitus, LLC, which is owned by Joseph Figliolo (CRD# 6116157) became a silent partner in the Firm. In December 2013, two years after the period covered by the Staff's investigation, NESA Management, LLC, which is owned by Joseph Amato (CRD# 2751635) and Rocco Guidicipietro

3

(CRD# 2489732), purchased an interest in the Firm. Messrs. Amato and Guidicipietro, neither of whom were at the Firm in 2010-2011, are now active owners and partners in the Firm.

### B. Mark Hotton

Mark Hotton (CRD #2346843) was a broker registered with Alexander Capital from September 2010 through March 2012. During his time at Alexander Capital, Mr. Hotton was subject to substantial limitations and heightened supervision. He was barred from participating in the Firm's retail business and subjected to a heightened supervision agreement. Lanaia Transcript at Pages 39-40. After he departed Alexander Capital, Mr. Hotton was arrested and charged with various crimes. He subsequently plead guilty to federal fraud charges and money laundering charges. *Man Sentenced to Nearly Three Years for Defrauding 'Rebecca" Producers*, N.Y. Times, October 10, 2014.

Unknown to the Firm, the Staff had opened a disciplinary probe into Mr. Hotton at some point in 2009 following a customer complaint. *See Fraud Claims Dog 'Rebecca' Broker*, Wall Street Journal, October 21, 2012 (attached as "Exhibit A"). Alexander Capital was not informed of this investigation at the time it hired Mr. Hotton, or at any time while Mr. Hotton was employed by the Firm. FINRA failed to notify the Firm about this investigation despite the fact that it was the Staff's "practice to regularly contact firms with problematic brokers to make sure the firms are aware of individuals with ongoing issues and to make sure they have adequate supervision in place." *Id*.

### C. DRTV Partners

DRTV Partners (hereinafter "DRTV") is or was a marketing company, incorporated in Delaware in 2011. Mr. Hotton introduced the Firm to DRTV and set up a meeting between DRTV's President Chris Giordano, representatives of ACLP, and a consultant hired by DRTV. Lanaia Transcript at Pages 61-62. Following that meeting ACLP entered into an agreement with DRTV to introduce the company to one of the Firm's clients. *Id*. at Page 152. ACLP introduced DRTV to a single accredited client, Glen Nelson, who invested $100,000.

### D. Glen Nelson

Glen Nelson is the co-founder, chairman, and CEO of The Matrix Group, "a vertically integrated real estate company with over 200 employees providing full service for its own accounts, including but not limited to, property management, asset management, commercial leasing, acquisition, disposition, and construction." The Matrix Group, "Home", http://www.matrixrealtygrp.com/. Mr. Lanaia personally spoke to Mr. Nelson prior to his investment in DRTV as part of the Firm's oversight and supervision of customer accounts. Lanaia Transcript at Page 168. Mr. Nelson was an accredited investor and is and was both wealthy and sophisticated. *Id*. at Page 79. Mr. Nelson had done deals like DRTV prior to his investment in DRTV and he understood the nature of such transactions. *Id*. at Pages 80-81. At

4

no point in time has Mr. Nelson ever made a complaint about the DRTV transaction or any other activity which occurred while he was a customer of the Firm. *Id.* at Page 167.

### The Staff's Investigation and Allegations

The Staff began its investigation into Mr. Hotton at some point in 2009. *See* Exhibit A. The exact timing and nature of this investigation is unknown to the Firm as, contrary to FINRA policy, the Staff never informed the Firm of its investigation into Mr. Hotton. *See Id.* At some point in 2011 the investigation into Mr. Hotton appears to have lead the Staff to examine the DRTV deal that he sold at ACLP.

The Staff requested documents from ACLP relating to the DRTV transaction and conducted an on the record interview with Mr. Lanaia on that subject in 2012.[3] The Staff also apparently conducted an additional investigation into DRTV unrelated to the Firm at or around the same time.

The Firm was not informed of the outcomes, if any, of the Staff's other investigations into DRTV and the matter appeared to have been dropped until early 2015 when the Staff raised the issue with the Firm. The Firm is unaware of any reason for the nearly three year gap between Mr. Lanaia's interview and the Staff's renewed interest in this matter.

The potential charges that are not related to DRTV stem from findings of the Staff during the normal annual audits of the Firm from 2010-2012. As with the DRTV matter, the Firm is unaware of any reason for the three to five year gap between those audits and the present proposed enforcement action.

Nonetheless, whatever the reasons, the Staff has proposed to bring four charges against the Firm.

The first charge alleges, "Contravention of Section 17(a) of the Securities Act of 1933, Violation of NASD Conduct Rule 2310, 3010(a), 3010(b) and FINRA Rule 201" (hereinafter "First Charge"). Letter from Artur M. Wlazlo, Principal Regional Counsel, to Alexander Capital, L.P. (September 1, 2015) (Hereinafter "Notice Letter"). The Staff contends that, "In connection with a private placement offering for DRTV Partners, LLC ("DRTV"), Alexander Capital, L.P. (through registered representative MH) sold interests in DRTV by means of untrue statements and omissions of material fact, failed to conduct adequate due diligence on DRTV, and failed to establish, maintain and enforce an adequate supervisory system and written supervisory procedures with regards to its private placement business activities." *Id.*

---

[3] The transcript of this interview is the only one the Firm has been able to obtain. As noted above, the Firm requested copies of the transcripts but the Staff refused to provide them. In this letter the Firm relies heavily on the transcript of the interview with Mr. Lanaia (which was not provided by FINRA). Should the action proceed, the Firm may find additional support for its defenses in other transcripts.

5

The second charge alleges, "Violation of NASD Conduct Rule 3010(a)(7) and FINRA Rule 2010" (hereinafter "Second Charge"). Notice Letter. Specifically the Staff contends, "Alexander Capital failed to ensure and evidence that each of its registered representatives and registered principals participated in the Firm's 2010 annual compliance meeting and failed to evidence that it held any annual compliance meetings in 2011." *Id.*

The third charge alleges, "Violations of NASD Conduct Rules 3012(a)(1), 3012(a)(2) and FINRA Rules 3130(b), 3130(c) and 2010" (hereinafter "Third Charge"). Notice Letter. In particular, "Alexander Capital failed to prepare adequate reports to its senior management for 2010 and 2011 calendar years and failed to prepare a report to its senior management for 2012 calendar year. In addition, Alexander Capital failed to prepare adequate annual certifications for 2010, 2011, and 2012 calendar years." *Id.*

The fourth charge alleges, "Violations of Sections 15 and 17 of the Securities Exchange Act of 1934 and Rules 15c3-1, 17a-3(a)(11), 17a-11 promulgated thereunder and FINRA Rule 2010" (hereinafter "Fourth Charge"). Notice Letter. The Staff believes that, "Alexander Capital conducted a securities business while failing to maintain its required minimum net capital, failed to prepare and maintain an accurate general ledger, trial balances and net capital computations and failed to notify the Securities and Exchange Commission of its net capital deficiencies." *Id.*

Each of these charges is without merit. As we will show below, there are issues of fairness and process with each potential charge as well as facts that should prevent the Staff from bringing charges.

## Discussion

### I. FINRA's Delay in Bringing Charges Violates Fundamental Principles of Fairness

FINRA, as a securities self-regulatory organization ("SRO"), is obligated under the 1938 Maloney Act Amendments to the Securities Exchange Act of 1934 ("Exchange Act") to "provide a *fair* procedure for the disciplining of members and persons associated with members[.]" *In the Matter of Department of Enforcement, Complainant Morgan Stanley DW Inc. et al., Respondents,* Disciplinary Proceeding No. CAF000045, 2002 WL 1840813 at *4, (National Adjudicatory Counsel NASD Regulation, Inc., 2002) citing Section 15A(b)(8) of the Exchange Act, 15 U.S.C. §78o-3(b)(8) (emphasis added). A SRO violates this obligation when it delays in bringing an action resulting in unfairness to the defendant. "Delay in bringing an action at some point becomes unfair. When it does, the case must be dismissed." *Id.* at *11.

The SEC first laid down this principle in the *Hayden* case where it found that NYSE's action against Mr. Hayden had to be dismissed as the delay in bringing an action against him was unfair. *Morgan Stanley* at *1. In *Hayden*, the SEC looked at four areas of delay: "the elapsed time between (1) the first alleged occurrence of misconduct and the date that the SRO filed the complaint; (2) the last alleged occurrence of misconduct and the date that the SRO filed the complaint; (3) the date that the SRO received notice of the alleged misconduct and the date

6

that it filed the complaint; and (4) the date that the SRO commenced its investigation and the date that it filed the complaint." *Id.* at 11. In *Hayden* the alleged misconduct began in February 1982 and ended in April 1990; the NYSE was notified of the alleged misconduct in 1991; the NYSE began its investigation in May 1993 and brought charges in November 1996. *Jeffrey Ainley Hayden*, Exchange Act Rel. No. 42772, 2000 SEC LEXIS 946 at *2 (May 11, 2000). That is, there were delays of 14 years, 6 years, 5 years, and 3 years respectively.

Compare the delays in *Hayden* to those of the proposed enforcement action. The alleged misconduct in the First Charge occurred in early 2011. The Staff, which was conducting an ongoing investigation into Mr. Hotton at that time, likely became aware of the alleged misconduct at around the same time-and, as stated earlier, did not notify the Firm about its investigation. When you include the other potential charges the timeframe becomes even longer as the alleged misconduct for those charges dates back to 2010. Therefore, like *Hayden*, this case raises serious questions as to the fairness of the process. This is especially true because FINRA was aware that the individuals who would be the fact witnesses for each and every charge departed the Firm and the Firm was sold to new owners who had _nothing_ to do with any of the potential charges.

"The test is not a mechanical one, however, as adjudicators also must look to traditional equitable concepts for guidance on whether the proceeding is fair under the circumstances." *Morgan Stanley* at *11. In *Morgan Stanley*, the Adjudicatory Council considered not just the time frame but the prejudice to the defendant that Enforcement's delay caused. *Id.* In the present case the Staff has waited years to consider bringing an action and this will undoubtedly result in memory failures and an inability to recall key details which may support a defense. Further, while the Staff delayed its pursuit of this enforcement proceeding, FINRA allowed the Firm to be sold to new owners. Throughout the change of ownership process, FINRA never raised the issue of a potential enforcement action concerning the charges at issue here. This too unfairly hampers the Firm's ability to defend itself, and does so in a manner above and beyond the factors considered in *Morgan Stanley*. *Id.* at *10. Finally, during the delay, documents related to the allegations have likely been lost or destroyed through no fault of the Firm, hampering the Firm's ability to defend itself. This factor, too, weighed against Enforcement in *Morgan Stanley*. *Id.*

In short, the Staff was obligated to bring these allegations in a timely manner and failed to do so. Instead, the Staff waited years. Moreover, during this delay, FINRA approved a transfer of ownership but failed to mention anything about a potential enforcement action. The delays caused harm to the Firm. Because of this, any enforcement action against the Firm would violate well-established principles of fairness. As fairness would dictate dismissing charges, the Staff ought not bring any charges against the Firm.

## II. The Change in Ownership Makes Proceeding with Charges Punitive Rather than Remedial

FINRA's Sanction Guidelines state, "Sanctions in disciplinary proceedings are intended

7

to be remedial and to prevent the recurrence of misconduct." Sanction Guidelines, March 2015 at page 3.

At the time the alleged misconduct occurred, the Firm was owned by H.K. Landis Capital LLC and Mr. Boxer. If any misconduct occurred, it occurred under the former owners' watch.

In December of 2013, a full year after the last misconduct alleged by the Staff, active control of the Firm was sold to Messrs. Amato and Guidicipietro.[4] Neither of them were owners of the Firm, managers at the Firm, or in any way in control of any aspect of the Firm's business at the time of the alleged misconduct.[5]

Not only did the current ownership have no part in the alleged misconduct, they received no financial benefit from it. The DRTV transaction reflected in Charge One netted the Firm only $2,000. Lanaia Transcript pages 119-120. This revenue was long gone by the time the new owners walked in the door. Now, FINRA wants to hold them responsible instead of the individuals who actually were responsible. That is absolutely unfair.

As the current owners neither benefited from the alleged misconduct nor had any responsibility for it, bringing an action against the Firm at this point in time would be punitive rather than remedial. Therefore, no action is warranted against the Firm for any of the charges.

### III. An Enforcement Action is not Warranted Because the Firm has Taken Preventative Action

As noted above, FINRA's Sanction Guidelines state that any sanctions should be "intended to be remedial and prevent the recurrence of misconduct." Sanction Guidelines at page 3. Here the Firm has already taken concrete steps to ensure that behavior of the sort alleged by the Staff will not recur.

#### A. The Individuals who were responsible for the activities at issue are no longer with the Firm

The alleged misconduct contained in each of the charges rests on individuals who have long since departed the Firm. If any of the alleged misdeeds occurred, then FINRA should pursue cases against the individuals who were actually responsible.

---

[4] A share having been previously sold to Mr. Figliolo, who has never had active control of any aspect of the Firm.

[5] It is worth noting that FINRA approved the sale to new ownership and the change in management. The Firm further notes that Mr. Lanaia informed the Staff of his and Ms. Lanaia's intent to sell the Firm during the interview he gave on this matter. Lanaia Transcript page 171. Given this, the delay in bringing this action is especially prejudicial and violative of concepts of fairness. The change in ownership, in addition to providing a reason to refuse to bring charges on the grounds that such action would be punitive rather than remedial, is, in this light, also a reason to refuse to bring charges on the fairness grounds discussed above.

8

At this point in time, action against the firm would not "prevent the recurrence of misconduct" as no one responsible for the alleged misconduct will be punished by an action against the Firm. As a result, any enforcement action against the firm would be merely punitive and would be at cross purposes with FINRA's Sanction Guidelines.

### B. Alexander has taken preventative action.

Since 2013, the Firm has taken several steps to prevent violations of the type raised in the Notice Letter. As the most recent annual audit shows, these steps have worked. The Firm has replaced personnel and strengthened its policies and procedures. And these efforts have worked--the Firm has not had any repeat issues of any of the potential charges under the new ownership and management.

#### 1. New policies and procedures

The new owners of the Firm have made several substantial improvements to the Firm's policies and procedures. They have updated the Firm's Written Supervisory Policies and Procedures ("WSPs"). Among other improvements, they have revised policies on supervisory oversight and on pre-hire background checks which work to prevent behaviors like those alleged in the First Charge. They have purchased and implemented new monitoring software. This helps improve monitoring and supervision of the Firm's registered representatives. They have hired new supervisory personnel. In particular, they now have a dedicated CCO compared to the Firm's previous practice of having a CEO/CCO. As a result, they have personnel dedicated to supervision and compliance who will ensure that the events alleged in the Second and Third Charges do not recur. The Firm also has hired a dedicated CFO/FinOp who was a former regulator. This personnel change addresses any potential net capital issues like those alleged in the Fourth Charge. Each of these changes alone would work to improve compliance and demonstrate that the Firm has taken strong action to improve its compliance culture and systems.

#### 2. The Firm has not had any repeat occurrences of any of the issues raised in the Wells notice since the sale of the Firm.

The Staff recently sent their preliminary report on the 2014 audit cycle to the Firm. None of the issues raised in the Wells notice are present in this preliminary audit report. The Staff did not identify any issues related to the Firm's supervision of private placements, compliance meetings, annual compliance audits, or net capital. This demonstrates that the Firm has made the necessary improvements to address all of the items identified in the Wells notice.

The absence of any repeat issues since the sale of the Firm shows that the preventative actions taken by the Firm, along with the personnel changes discussed above, are working and there is no need for remedial action. Today, the Firm is in full compliance in each area of concern. As such, no enforcement action is warranted.

9

## IV. First Charge

The Staff alleges that, "In connection with a private placement offering for DRTV Partners, LLC ("DRTV"), Alexander Capital, L.P. (through registered representative MH) sold interests in DRTV by means of untrue statements and omissions of material fact, failed to conduct adequate due diligence on DRTV, and failed to establish, maintain and enforce an adequate supervisory system and written supervisory procedures with regards to its private placement business activities." Notice Letter. This allegation is false and demonstrably so.

The Firm, through registered representative Hotton, sold an interest in DRTV to a single accredited investor, Mr. Nelson. By virtue of his status as an accredited investor, Mr. Nelson is deemed to have relied on his own due diligence. Nonetheless, the Firm conducted due diligence on this offering and adequately supervised its private placement activities. For these reasons no action should be brought by the staff on the First Charge.

### A. Glen Nelson is an Accredited Investor and Deemed Capable of Evaluating his Own Risk

The SEC defines an "accredited investor" as "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000" or who the issuer reasonably believes has such a net worth. 17 C.F.R. § 230.501(a)(5). When Mr. Nelson opened his account with the Firm he listed his net worth as $30,000,000. Glen Nelson Account Application page 3 (Attached as "Exhibit B"). This makes Mr. Nelson an accredited investor. Further Mr. Nelson is a sophisticated investor, with extensive investment knowledge. *Id.* Mr. Nelson founded the Matrix Group in 1993 and had been successfully running the company and managing its holdings across the US for nearly two decades when he was offered the DRTV investment. *See* The Matrix Group "Home" at http://www.matrixrealtygrp.com/. That is, Mr. Nelson is exactly the kind of investor who the securities laws presume to be able to "fend for themselves." *Sec. & Exch. Comm'n v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953).

In *Ralston Purina*, the Supreme Court examined the Securities Act of 1933 and found that the purpose of the Act was "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *Ralston Purina* at 124. The Court found the preamble to the Act to be especially informative on this point. *Id.* at fn. 10. Because the Act is designed to protect investors, the Court found "[t]he natural way to interpret the private offering exemption is in light of the statutory purpose." *Id.* at 124-125. Meaning that where an offering is made only to a person who is able to "fend for themselves" the offering is, by definition, not a public offering. *Id.* at 125. That is, as an accredited investor, Mr. Nelson is statutorily able to conduct his own due diligence and to determine if an investment risk is right for him.

Statute aside, Mr. Nelson is factually quite sophisticated and capable of evaluating his own risks. In fact, one of the reasons why Mr. Lanaia authorized Mr. Hotton to offer this private placement to Mr. Nelson is because Mr. Nelson had previously participated in similar

10

transactions and he knew how they worked as well as the risks and opportunities they presented. Lanaia Transcript at pages 80-81. Private placements, as the SEC warns accredited investors, "*involve unique risks and you should be aware that you could lose your entire investment.*" SEC Investor Bulletin: Accredited Investors, September 23, 2013 (emphasis in original).

Mr. Nelson has not complained about this investment, or any other investment made through the Firm, in the nearly five years since he made his investments. Lanaia Transcript at page 167. This remains true despite him being made aware of the present investigation into his DRTV investment. Mr. Nelson was fully capable of evaluating his investment and he understood the risks of his choice.

The foregoing leads to the conclusion that if the Firm made any errors in its due diligence, those errors were harmless as Mr. Nelson was responsible for and capable of conducting his own due diligence.

### B. The Firm Conducted Due Diligence on DRTV

The Firm conducted substantial due diligence on DRTV. As a preliminary matter, the Firm relied on the work and assessment done by Mr. Hotton who knew the people behind DRTV from previous transactions and assured the Firm that his past work with them gave him valuable insight into their ability to make DRTV profitable. Lanaia Transcript at page 98-99. At the time, the Firm's reliance on Mr. Hotton's work was reasonable.

In addition to Mr. Hotton's due diligence, Mr. Lanaia conducted his own due diligence prior to approving DRTV. He reviewed the offering documents and discussed the investment with Mr. Hotton. While he had concerns about the offering, he addressed those concerns and limited the offering to be presented only to Mr. Nelson.[6] Lanaia Transcript at pages 78-79. Mr. Lanaia investigated the president of DRTV and found that he was "a veteran" of this kind of work with a long history of turning companies around and raising funds for startups. *Id.* He conducted various Google searches. He performed OFAC searches on Richard Greene, and DRTV Partners. Mr. Lanaia also reviewed Mr. Giordano's CRD. *Id.* at page 145. As DRTV was a startup, it was Mr. Lanaia's opinion that the most important information for evaluating it was who was leading the company. *Id.* at page 98. In addition to Mr. Lanaia's research into Mr. Giordano, he researched the various products DRTV was proposing to test market. *Id.* at pages 95-96.

---

[6] The Firm notes that, having been able to review the transcript in full, that opportunity being denied the Firm during settlement negotiations, this passage is substantially less damning than the Staff represented it to be. Mr. Lanaia did not, contrary to what the Staff claimed, admit the investment was "quote 'a piece of shit.'" as the Staff claimed. Rather Mr. Lanaia indicated his initial read of the investment was negative but that he later dug deeper into the matter to reach a different conclusion. Taken out of context, Mr. Lanaia's initial observation may seem damming, but only if one ignores the remainder of his answer where he describes, in detail, the further research he did to become comfortable with the investment.

11

Because Mr. Lanaia had concerns about the investment, he limited it to being offered to a single, accredited investor. Lanaia Transcript at pages 78-79. Of course this did not mean that that single investor would decide to purchase a stake in the offering, but he would be presented with the materials to review and consider. Mr. Lanaia made this decision was based on reading the offering documents, speaking with Mr. Hotton about his interactions with Mr. Giordano and his take on the company, researching Mr. Giordano, and researching the various products DRTV was proposing to test market. The foregoing would be adequate due diligence for most investments. In the case of an investment offered to a single, sophisticated, accredited investor, Mr. Lanaia conducted a reasonable inquiry. Therefore no action should be brought against the Firm for failure to conduct adequate due diligence.

### C. The Firm Supervised Mark Hotton

When Mark Hotton came to the Firm, ACLP knew that he had disclosures on his license. Lanaia Transcript at page 33. The Firm reviewed Mr. Hotton's CRD and knew that he had been the subject of customer complaints. *Id.* Each of the complaints against Mr. Hotton stemmed from his retail work, so the Firm restricted him to non-retail work. *Id.* at pages 36 and 39-40.

The Firm believed that preventing Mr. Hotton from the type of interactions that led to the complaints on his CRD would prevent further issues from occurring. Moreover, the Firm placed Mr. Hotton on heightened supervision and restricted the type of business he was allowed to conduct. *Id.* at page 33. This heightened supervision included the Firm reviewing the bank statements of Mr. Hotton's corporation on a monthly basis and making random calls to people with whom he conducted business. *Id.* at 40. This was in addition to the Firm's normal heightened supervision procedure which included reviewing additional information on new accounts beyond what was required on new account forms and reviewing account activity. *Id.* at 36.

The Firm developed a supervision plan for Mr. Hotton that was tailored to address issues raised by Mr. Hotton's CRD. At every step, the Firm was reasonable in supervising Mr. Hotton, given the information it had. To describe this as a failure to adequately supervise is simply factually inaccurate and no such charges should issue against the Firm.

### D. FINRA Failed to Inform Alexander Capital that Mark Hotton was Under Investigation

Mark Hotton was responsible for selling the single investment at issue - Mr. Nelson's investment in DRTV. Mr. Hotton introduced the investment to the Firm. Lanaia Transcript at page 62. Mr. Hotton performed, or purported to perform due diligence on DRTV. *Id.* at pages 98-99. Mr. Hotton suggested the single investor to whom the investment was offered. *Id.* at pages 78-79. *Id.* In short, Mr. Hotton was responsible for each step of the transaction.

Throughout this process, he was on heightened supervision. The Firm required Mr. Hotton to provide his bank statements and those of his corporations. *See* Lanaia Transcript at

12

page 36. The Firm limited Mr. Hotton's retail activities and only permitted him to participate in investment banking activities. *Id.* The Firm supervised Mr. Hotton reasonably, given what it knew at the time.

It is important to know that, should this case move forward, testimony will be provided concerning FINRA's failure to notify the Firm about its investigation into Mr. Hotton. As FINRA announced via its spokesperson Nancy Condon (who would also be called as a witness), FINRA was investigating Mr. Hotton. *See* Exhibit A. This investigation was ongoing when the Firm hired Mr. Hotton and was ongoing when the Firm filed the paperwork with FINRA to register Mr. Hotton as a representative of ACLP. At that time it was FINRA's "practice to regularly contact firms with problematic brokers to make sure the firms are aware of individuals with ongoing issues and to make sure they have adequate supervision in place." *Id.* Despite FINRA being aware that the Firm had hired Mr. Hotton, and despite having a policy to inform Firms of individuals with ongoing issues so that the Firm can be sure to have adequate supervision in place, no one from FINRA notified the Firm of the ongoing investigation into Mr. Hotton. Witnesses for the Firm will testify that had FINRA notified the Firm of this investigation, the Firm would not have hired Mr. Hotton. In turn, that means that the DRTV transaction would not have occurred.

The existence of the notification policy shows that FINRA knew that affirmatively making firms aware of potential issues was a necessary part of ensuring adequate supervision and protecting the investing public. A firm cannot monitor or make decisions about unknown problems. By failing to notify the Firm of the investigation into Mr. Hotton, FINRA deprived the Firm of the information necessary to make an informed decision about hiring Mr. Hotton--which it would not have done had FINRA disclosed that it was conducting an investigation. Accordingly it would be wholly inappropriate for FINRA to bring charges of improper due diligence and supervision regarding Mr. Hotton.

### E. The Firm did not make any Untrue Statements or Omissions of Material Fact

Alexander Capital did not have ultimate authority over DRTV's private placement memorandum. In *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), the Supreme Court held that an investment advisor could not be held primarily liable under Section 10(b) of the Securities Exchange Act for statements in the fund's prospectus because the advisor did not have "ultimate authority" over the statements. The same logic applies for this charge. The Firm neither drafted, edited, nor revised the private placement memorandum. If untrue statements or omissions of material fact are present in DRTV's private placement memorandum, they were put there (or left out) by the issuer and not by the Firm.

### V. Remaining Charges are Minor Technical Issues

The remaining charges contained in the Notice Letter amount to minor technical issues that do not merit an enforcement action. They are claims that the Firm failed to maintain paperwork, prepare internal reports and certifications, and properly calculate net capital. The

13

Firm takes each of these issues seriously, which is why the changes discussed above in section III were made and why the Firm has not had any repeat issues since the change of ownership and personnel. These potential charges should not be addressed by an enforcement action. Instead, FINRA should issue a letter of caution.

## VI.  Second Charge

The Staff alleges that, "Alexander Capital failed to ensure and evidence that each of its registered representatives and registered principals participated in the Firm's 2010 annual compliance meeting and failed to evidence that it held any annual compliance meetings in 2011." Notice Letter.

This alleged misconduct is a failure of bookkeeping. The Staff does not allege that the Firm failed to conduct either the 2010 or the 2011 compliance meetings, nor does it allege that the Firm's registered representatives did not attend these meetings. The Staff merely alleges that the Firm's record keeping related to those meetings was inadequate.

As the Firm explained to the Staff at the time, the Firm maintained its 2011 records, as required, but they were misfiled or misplaced during the Firm's forced move out of its offices at the end of 2011. Letter from Alan Boxer, CEO, Alexander Capital to Christopher Colletti, Examination Manager, FINRA (February 13, 2012) (hereinafter "2011 Audit Reply"). The Firm is confident that it maintained the records as required but unfortunately, as discussed above, all personnel from that time period have moved on and the Firm is unable presently to locate the records. The same, unfortunately, appears to be true for the 2010 compliance meeting records.

The Firm believes it was compliant with the relevant rules, and should this matter proceed to a hearing there will be witnesses who will testify accordingly. However, FINRA's delay in bringing this matter has unfairly prejudiced the Firm from being able to mount a full defense. In addition, it is clear that the violation, if any, is a minor and technical one and not one well served by an enforcement action, especially as the Firm's recordkeeping has clearly improved. Any action taken at this time would be punitive and not serve to remediate any harm. For all of these reasons, an enforcement action on the Second Charge is unwarranted.

## VII.  Third Charge

The Staff alleges that, "Alexander Capital failed to prepare adequate reports to its senior management for 2010 and 2011 calendar years and failed to prepare a report to its senior management for 2012 calendar year. In addition, Alexander Capital failed to prepare adequate annual certifications for 2010, 2011, and 2012 calendar years." Notice Letter.

As with the Second Charge, the Third Charge asserts a minor violation. It is not that the Firm failed to produce the required reports and certification, save the 2012 report which is

14

discussed more fully below, it is that the reports produced were not "adequate."[7] In this instance the reports were made in good faith as were the certifications; they simply failed to include some of the language that FINRA believes should have been included. This minor error in drafting was inadvertent and the Firm complied with the spirit of the rules.

At any rate, all of the people who produced the documents in question have departed the Firm and been replaced. The Firm has taken corrective action and it has not had any repeat instances. As discussed previously, the principle of fairness and the goal of remediation over punishment in sanctions support the conclusion that this charge should not proceed forward.

With particular regard to the 2012 report to senior management, the report was produced. A copy of the 2012 report to senior management has previously been produced to the Staff and is attached again as "Exhibit C". The Firm notes the report in question was apparently prepared later than required, but it was made.

Therefore, the Third Charge amounts to minor, technical violations. The Firm clearly was attempting to comply with the rule. Regardless, the Firm has appropriately addressed the issue and this should not proceed to an enforcement action.

### VIII. Fourth Charge

The Staff alleges that, "Alexander Capital conducted a securities business while failing to maintain its required minimum net capital, failed to prepare and maintain an accurate general ledger, trial balances and net capital computations and failed to notify the Securities and Exchange Commission of its net capital deficiencies." Notice Letter. The Firm disputes this finding.

As a threshold matter, FINRA has not provided precise details as to this charge. The Firm asked more than once for the Staff to provide its calculations that support the Fourth Charge. To date, the Staff has refused to provide this obviously relevant information.[8]

The Firm believes that the Staff made errors in the relevant calculations. For example, in the 2011 audit, the Staff erroneously claimed that for the period ending January 31, 2011, "The Firm incorrectly recorded the balance in its Smithtown Bank Operating Account as $112 when, in fact, the account was overdrawn by $287. The staff re-classified this balance as aggregate indebtedness." Letter from Christopher Colletti, Examination Manager, FINRA to Alan Boxer, CEO, Alexander Capital (March 20, 2012) (hereinafter "2011 Audit"). Yet, as the attached bank statement clearly shows the balance of the Smithtown Bank Operating Account on January 31,

---

[7] The Firm notes that when asked for details on the various allegations in the charges, the Staff directed the Firm to review the audit reports for clarification and declined to provide additional detail. The 2012 audit notes that the Firm "failed to provide the Staff with reports prepared in calendar years 2011 and 2012". Letter from Edward T. Chan, Associate Director, FINRA to Francine Lanaia, CEO, Alexander Capital (March 26, 2013). The final report does not note what made the 2011 report inadequate and so, as the Staff has refused to explain, the Firm is unable to respond in full to this claim.

[8] The Firm believes that it will be able to bolster its defense to this charge if it receives these calculations.

15

2011 was $112 as the Firm Reported. Letter from Bank of Smithtown to Alexander Capital (January 31, 2011) attached as "Exhibit D".

To take another example, the Staff alleges that, "The Firm understated its riskless principal account by $1,423." 2011 Audit. While the Firm cannot be sure how the Staff arrived at this conclusion, the Firm believes that the Staff calculated riskless principal on a trade date basis rather than on the settlement date basis--which the Firm used. Had the Firm used a trade date basis for this calculation, the riskless principal would have been understated, but as that is not the basis for the calculation the Firm used (or claimed to use), the account was properly stated.

As has been the case for every charge addressed so far, the people involved with this alleged charge have long since departed the Firm. In 2014, the Firm hired Tom Sullivan (CRD# 1145000) as its CFO in and has not had any repeat issues concerning net capital since his installation in that role. Among other things, Mr. Sullivan is a CPA and a former regulator with the NASD.

Mr. Sullivan has reviewed each of the allegations and has recalculated the Firm's net capital for the time periods at issue. His conclusion is that the Firm did not fail to maintain sufficient net capital. Accordingly, FINRA should not move forward with an enforcement action for this charge.

### IX.  Conduct of the Investigation

While it is atypical to comment on the investigation, the Firm feels compelled to do so in this case. Unfortunately, it seems that this investigation has been mismanaged from the start, and continues to be mismanaged to the present day.

As noted previously, FINRA failed to notify the Firm of its investigation into Mr. Hotton years ago. By FINRA's own words to the *Wall Street Journal*, this went counter to its policy of notifying firms. See Exhibit A. Had FINRA notified ACLP about its investigation, the Firm would not have hired Mr. Hotton. Ergo, the issues related to DRTV would not have happened.

And, even more troubling, as the investigation reached its end, a customer of Alexander Capital was notified by a FINRA employee this summer that FINRA was about to issue a Wells call to Alexander Capital. This occurred in advance of the actual Wells call and we provided the name of the customer to the Staff. It is unclear if any investigation was conducted into FINRA's phone records. It is hard to imagine a customer obtaining this information from any other source.

16

## Conclusion

FINRA should not proceed with an enforcement action against Alexander Capital. The proposed enforcement action against Alexander Capital stems primarily from a single investment that was offered to a single accredited investor who performed his own review of the transaction before making the investment. The Firm has taken significant and substantial actions to address each and every potential charge. For example, every person involved with the potential charges has departed the Firm. Moreover, the Firm has enhanced its policies and procedures and has not had any repeat violations.

The Firm is committed to fostering a culture of compliance and following the rules. It clearly understands the message that FINRA is sending with this Wells Notice and it has addressed every item.

For the foregoing reasons, no enforcement action is warranted.

Dated: Atlanta, Georgia
September 29, 2015

Respectfully Submitted:

Scott Holcomb
Aaron Wright
The Holcomb Law Firm
2306 Briarcliff Commons NE
Atlanta, Georgia 30345
(404) 387-0373

*Attorneys for Alexander Capital L.P.*

17