**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| JOHN J. AQUINO, | ) | |
| CHAPTER 7 TRUSTEE | ) | Case #1:21-cv-01355-JSR |
| By Its Assignee, | ) | |
| Convergent Distributors of Texas, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALEXANDER CAPITAL, LP | ) | |
| & | ) | |
| Its Managing Partners: | ) | |
| JOSEPH AMATO, | ) | |
| ROCCO GUIDICIPIETRO, and | ) | |
| NESA MANAGEMENT, LLC | ) | |
| | ) | |
| Defendants | ) | |

---

**DECLARATION OF WILLIAM C. RAND, ESQ.**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


# EXHIBIT 14

# 9-30-21 Dep. Testimony of J. Amato

**Page 1**

```
1
2        UNITED STATES DISTRICT COURT
3      SOUTHERN DISTRICT OF NEW YORK
4    ----------------------------------------------x
5  JOHN J. AQUINO, CHAPTER 7 TRUSTEE
6  By Its Assignee,
7  Convergent Distributors of Texas, LLC,
8              Plaintiff,
9  -against-      Case #1:21-cv-01355-JSR
10 ALEXANDER CAPITAL, LP & Its Managing
11 Partners:
12 JOSEPH AMATO, ROCCO GUIDICIPIETRO, and
13 NESA MANAGEMENT, LLC,
14              Defendants.
15 ----------------------------------------------x
16      VIDEOTELECONFERENCED DEPOSITION OF:
17            JOSEPH AMATO
18          Hamburg, New Jersey
19        Thursday, September 30, 2021
20
21
22
23
   Reported by:
24  Aydil M. Torres, CSR
   JOB NO. J7462962
25
```

**Page 2**

```
1
2
3
4          September 30, 2021
5            10:08 a.m.
6
7
8        VTC deposition of JOSEPH
9  AMATO, held at 21 Country Lane,
10 Hamburg, New Jersey, pursuant to
11 Notice, before Aydil M. Torres, a
12 Notary Public of the State of
13 New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2
3  A P P E A R A N C E S :
4
5
6  SCHLICHTMANN LAW
7  Attorney for Plaintiff
8    359 Hale Street
9    Beverly, Massachusetts 01915
10 BY: JAN SCHLICHTMANN, ESQ.
11
12
13 HOLCOMB & WARD, LLP
14 Attorneys for Defendants
15   3455 Peachtree Road, NE, Suite 500
16   Atlanta, Georgia 30326
17 BY: BRYAN M. WARD, ESQ.
18
19
20 ALSO PRESENT:
21   Matthew Leiva, Videographer
22   Holly Cole, Esq.
23   Aaron Wright, Esq.
24
25
```

**Page 4**

```
1
2
3    S T I P U L A T I O N S
4
5    IT IS HEREBY STIPULATED AND AGREED
6  by and between the attorneys for the
7  respective parties herein, that filing,
8  sealing and certification be and the
9  same are hereby waived.
10
11    IT IS FURTHER STIPULATED AND AGREED
12 that all objections, except as to the
13 form of the question shall be reserved
14 to the time of the trial.
15
16    IT IS FURTHER STIPULATED AND AGREED
17 that the within deposition may be signed
18 and sworn to before any officer authorized
19 to administer an oath, with the same force
20 and effect as if signed and sworn to before
21 the Court.
22
23
24
25
```

Page 5

1
2          THE VIDEOGRAPHER:  Good
3    morning, we are on video record.
4    Time is 10:08 a.m. in the video
5    deposition of Joseph Amato, in the
6    matter of John J. Aquino, CH 7,
7    versus Alexander Capital.
8          Will counsel please
9    introduce yourselves and upon which
10   the witness will be sworn in?
11         MR. SCHLICHTMANN:  Yes, Jan
12   Schlichtmann, for the Plaintiff.
13         MR. WARD:  Bryan Ward of
14   Holcomb Ward, for the Defendants,
15   and with me is Holly Cole and Aaron
16   Wright, also counsel for
17   Defendants.
18   J O S E P H   A M A T O,
19        called as a witness, having been
20        duly sworn by a Notary Public, was
21        examined and testified as follows:
22         THE REPORTER:  Will you
23    please state your full name for the
24    record.
25         THE WITNESS:  Joseph Amato.

Page 6

1
2          THE REPORTER:  Please state
3    your address for the record.
4          THE WITNESS:  21 Country
5    Lane, Hamburg, New Jersey 07419.
6          THE REPORTER:  Thank you.
7    I will have the first two on
8    the record.  Counsel can proceed.
9          MR. SCHLICHTMANN:  Thank you
10   very much.
11   EXAMINATION BY
12   MR. SCHLICHTMANN:
13         Q.   And thank you, Mr. Amato, for
14   agreeing to sit through this deposition.  I
15   appreciate it.  We may experience some
16   technical difficulties.  Technology is still
17   a little balky, a little bit, but hopefully
18   with your patience and understanding, we will
19   get through this short order, and I will try
20   and be as efficient as I can with the
21   technology.
22         Mr. Amato, you're an owner, through
23   Nesa Management, LLC, of Alexander Capital,
24   LP; is that correct?
25         A.   I own Nesa Management, correct.

Page 7

1               Joseph Amato
2         Q.   And Nesa -- and what's Nesa -- what
3    is Nesa Management, LLC's relationship with
4    Alexander Capital, LP?
5         A.   Nesa Management owns a piece of
6    Alexander Capital, LP.
7         Q.   Can you tell us the percentage?
8         A.   I believe it's 55 percent.  I am
9    not certain.
10        Q.   And could you tell us who owns the
11   other 45 percent?
12        A.   Of the -- of Alexander Capital
13   or --
14        Q.   Correct.
15        A.   Oh, it is -- you know what, I don't
16   know the entities exactly off the top of my
17   head.  I would have to look at CRD.
18        Q.   You would you have to look at --
19   I'm sorry, you'd have to look at what?
20        A.   CRD.
21        Q.   Okay.  What's "CRD"?
22        A.   The center site that shows the
23   ownership.
24        Q.   Okay, so if I showed you the --
25   like the broker-check report for Alexander

Page 8

1               Joseph Amato
2    Capital, LP, would that help you?
3         A.   Yes, it should.
4         Q.   Okay.  All right.  So give me a
5    moment and if all goes well, I will be able
6    to call it up.  Bear with me.
7              Okay.  All right.  If all went
8    well, hopefully, on your screen is the
9    broker-check report for Alexander Capital,
10   LP.
11             Do you see that, Mr. Amato?
12        A.   I do.
13        Q.   Okay.  Does that look familiar to
14   you as something you have seen before, the
15   broker-check report that FINRA has on file
16   for Alexander Capital, LP.
17        A.   Somewhat familiar.  They change, so
18   I don't know the particular one this is from.
19        Q.   All right.  But this was recently
20   taken off the public site of FINRA.  Is this
21   in keeping with what you are familiar with as
22   a broker-check report regarding Alexander
23   Capital, LP, in general?
24        A.   Yes, I haven't seen this recently,
25   but, yes.

JOSEPH AMATO                                          September 30, 2021
AQUINO vs ALEXANDER CAPITAL                                        9–12

Page 9
Joseph Amato

2     Q.  All right.  I will flip through it,
3  and so on the firm profile you have the firm
4  name and location.  That's all familiar to
5  you.  Alexander Capital at 17 State Street,
6  5th Floor, New York, correct?
7     A.  Correct.
8     Q.  All right.  And now it says, "firm
9  profile."  Is that what you were referring to
10  that would help you figure out who are the
11  owners of Alexander Capital, LP?
12     A.  Yes.
13     Q.  All right.  Now, I'm particularly
14  interested in the period 2014 to 2015.  So I
15  may be asking you questions from where we are
16  now to -- to that period of time, all right?
17  We may be switching back, all right?
18     A.  All right.
19     Q.  So this -- this is a profile of the
20  firm that FINRA is -- has in their
21  broker-check report regarding the firm, you
22  know, as of 2021, all right?  So the first
23  one is Nesa Management.  Do you see it's
24  listed as a "partner."  Its position is
25  "partner."  Do you see that?

Page 10
Joseph Amato

2     A.  Yes.
3     Q.  Okay.  And is that consistent with
4  your understanding of Nesa Management's
5  relationship to Alexander Capital, LP?
6     A.  I believe it's an owner.
7     Q.  Okay.  Well, they use the word
8  "partner."
9        Is that also an owner and partner?
10     A.  I would assume so, but it says it
11  as position "partner," then, yes.
12     Q.  Okay.  And it says, "position start
13  date, 12/20/2013."  Do you see that?
14     A.  I do.
15     Q.  Okay.  And is that consistent with
16  your understanding, that Nesa Management
17  became an owner/partner on -- in December 20
18  -- on December -- beginning December 20,
19  2013?
20     A.  I am uncertain as to the date, but
21  it seems about right.
22     Q.  Okay.  It says, "percentage
23  ownership, 50 percent, but less than 75
24  percent."  I take it that with FINRA, they
25  ask for ranges.  They don't ask for specific

Page 11
Joseph Amato

2  percentages.  Is that your understanding?
3     A.  I believe so, yes.
4     Q.  All right.  Now this says, 50, but
5  less then 75 percent.  I believe you just
6  testified that it was -- has 55 percent
7  ownership of Alexander Capital, LP; is that
8  your understanding?
9     A.  I believe so.
10     Q.  Okay.  And it says, "Does this
11  owner direct the management or policies of
12  the firm?"  And it says, "yes."  Do you see
13  that?
14     A.  I see that.
15     Q.  And is that consistent with your
16  understanding?
17     A.  No, I don't believe so.
18     Q.  Okay.  Who directs the management
19  or policies of the firm, Alexander Capital,
20  LP?
21     A.  That would be the Compliance Team
22  and Department, and chief compliance officer.
23     Q.  Okay.  Does Mr. -- do you have any
24  management responsibilities at Alexander
25  Capital, LP?

Page 12
Joseph Amato

2     A.  Currently, no.
3     Q.  Did you in the past?
4     A.  No.  No, I -- I apologize.  I have
5  at one point, yes.
6     Q.  Okay.  And do you know when your
7  management responsibilities began at
8  Alexander Capital, LP?
9     A.  I don't recall the dates.  It was
10  many years back.
11     Q.  All right.  Was this -- did you
12  take on -- do you know what position you took
13  on with Alexander Capital in the beginning?
14     A.  In the beginning, I was a
15  representative.
16     Q.  Okay.  And when did you begin --
17  what's your best estimate of when you became
18  a representative?
19     A.  When I joined the firm I was a
20  registered rep; the day I joined the firm.
21     Q.  Okay.  And in reference to Nesa
22  Management's start date, as on this report of
23  December 2013, did you become a registered
24  representative at Alexander Capital prior to
25  that time?

JOSEPH AMATO                                    September 30, 2021
AQUINO vs ALEXANDER CAPITAL                              13–16

Page 13

1          Joseph Amato
2      A.  I believe so.
3      Q.  Do you know how long you were a
4  registered representative prior to that date?
5      A.  It may have been 2012 sometime.
6  I'm uncertain as to the start date.
7      Q.  Okay.  And after December of 2013,
8  did you take a different position?  Was there
9  a change from representative to another
10  position with Alexander Capital, LP?
11     A.  No.
12     Q.  Did you ever become an executive at
13  Alexander Capital, LP, after December 2013?
14     A.  I was an account executive from the
15  day I started.
16     Q.  Right, but did you ever become an
17  executive, like a CEO, a president, or any
18  other level of, you know, as an officer of
19  any kind?
20     A.  I held other titles at the firm
21  throughout, so I just don't know what dates
22  they started and ended because there were
23  many starting and endings.
24     Q.  Okay.  Can you tell us as best you
25  can, from your memory, roughly --

Page 14

1          Joseph Amato
2      A.  I cannot.
3      Q.  -- the order?  I'm sorry?
4      A.  I couldn't.
5      Q.  Okay.  Can you tell us at least, if
6  you don't know the -- if you can't quite
7  remember the order, can you remember the
8  position?
9      A.  I held title of CROP, DROP and
10  STROP at some point, and I held the title of
11  CEO.
12     Q.  Okay.  But you can't tell us the
13  period of time you were CEO?
14     A.  No, because there was a time I was
15  on, then I was no longer with the company,
16  and then I was back with the company, but I
17  wasn't the CEO.  So it's -- I would have to
18  -- you would have to go through CRD for the
19  firm filings.  I would assume.  I don't even
20  know how to go about getting that.  I am not
21  familiar with the CRD system as much.  I was
22  just familiar with some aspect of it.
23     Q.  Okay.  Before you said about your
24  -- that Nesa owns, presently, 55 percent of
25  Alexander Capital, LP; is that correct?  Do

Page 15

1          Joseph Amato
2  you remember that?
3      A.  I believe so.
4      Q.  Okay.  And then as an -- as to Nesa
5  Management, is it true that you and
6  Mr. Guidicipietro are the two co-owners of
7  Nesa?
8      A.  That is correct.
9      Q.  And there are no other owners,
10  other than you and Mr. Guidicipietro?
11     A.  That is correct.
12     Q.  Okay.  And that has always been the
13  case --
14     A.  Yes.
15     Q.  -- regarding Nesa?  Is that right?
16     A.  Yes.
17     Q.  Now -- so going to the next --
18  well, let me just go back to Nesa.  Did Nesa
19  Management always have 55 percent during the
20  period of time it became -- its position
21  start date is listed here as December 2013.
22  December 20, 2013.
23          Did Nesa Management always have 55
24  percent of Alexander Capital, LP?
25     A.  No.

Page 16

1          Joseph Amato
2      Q.  Okay, what -- do you remember what
3  it began at, what figure?
4      A.  Zero.
5      Q.  Okay.  And then when did -- and at
6  some point it got a percentage of Alexander
7  Capital, LP?
8      A.  Correct.
9      Q.  Do you know what the initial
10  ownership interest was?
11     A.  I believe it was 24.9 percent.
12     Q.   And is that true -- is it true that
13  it received that percentage as of December of
14  2013?
15     A.  It may be that time frame.  I
16  believe that's what it represents, but I am
17  not exact on the time.
18     Q.  And then it changed from 24.9
19  percent at some point to 55 percent; is that
20  correct?
21     A.  I don't believe so, no.
22     Q.  Well, it's now 55 percent, and
23  before it was 24.9, so I guess at some point
24  between those two, right?  That's what I
25  meant to ask.

Page 17

1              Joseph Amato
2      A.  Yes.
3      Q.  That may have been a confusing
4  question.  I'm sorry.
5      A.  Yes.
6      Q.  Let me just ask it again so the
7  record is clear.  When Nesa Management became
8  a twenty -- in December of 2013, it became a
9  24.9 percent owner of Alexander Capital.
10  There came a point where it acquired 55
11  percent.  It went from 24.9 percent to 55
12  percent; is that correct?
13     A.  Yes.
14     Q.  All right.  And is it -- is it
15  consistent with your memory that the change
16  from 24.9 percent occurred in 2017, where
17  there was a change in percentage from 24.9
18  percent to a higher percentage?
19     A.  I -- I don't recall the exact dates
20  on when it took place.
21     Q.  Does that sound -- does that seem
22  consistent with your memory?
23     A.  Again, I couldn't give exact dates
24  or years, but -- I don't know.
25     Q.  Okay.  Is it your memory, though,

Page 18

1              Joseph Amato
2  that when it went from 24.9 percent, the next
3  percentage change was 55 percent.  There was
4  not an interim step where it had a lower --
5  somewhere between 24.9 and 55 percent.  It
6  went to 55 percent; is that correct?
7      A.  Rephrase the question.
8      Q.  Okay.  I'm just trying to --
9      A.  Right.
10     Q.  -- you know, trying to shorten up
11  the questioning but --
12     A.  Right.
13     Q.  Again, I don't -- if you don't
14  understand, please feel free to ask me to
15  restate or rephrase.
16         What I am trying to get at is:
17  Nesa Management started out at 24.9 percent
18  in December 2013, and at some point it
19  changed to 55 percent, and I am just asking,
20  there was no interim percentage change
21  between 24.9 percent and 55 percent; is that
22  correct?
23     A.  No.
24     Q.  Okay.  Did it -- did it go from
25  24.9 percent to another percentage less than

Page 19

1              Joseph Amato
2  55 percent?
3      A.  I don't believe so.  Greater.
4      Q.  Okay.  What did it go to?
5      A.  I -- I don't recall the whole
6  trilogy of how we ended up with the 55, but I
7  believe it was higher, and then ended up at
8  55.
9      Q.  What's your memory of the highest
10  percentage?
11     A.  Off the top of my head, I don't
12  recall.  It may have been 100.
13     Q.  All right.  So -- and did you go to
14  100 percent in 2017?
15     A.  Again, I don't recall the timing of
16  it.
17     Q.  Is it your understanding that if
18  there's any change in ownership at Alexander
19  Capital, LP, because it's a member of FINRA,
20  it has to seek FINRA's approval for any
21  ownership change greater than 25 percent?  Is
22  that your understanding?
23     A.  Greater than -- any ownership
24  change greater than 25 percent?  That's what
25  you are asking?

Page 20

1              Joseph Amato
2      Q.  Yes, that if there's an ownership
3  change 25 percent or greater, that Alexander
4  Capital has to seek approval from FINRA to
5  approve that ownership change?  Is that your
6  understanding?
7      A.  I believe it is, yes.
8      Q.  All right.  And at some point
9  Alexander Capital asked to change from 24.9
10  percent to a higher percentage; is that
11  right?
12     A.  Yes.
13     Q.  And then it went to -- may have
14  gone as high as 100 percent; is that correct?
15     A.  I believe so, yes.
16     Q.  All right.  And that would have
17  been part of -- before that could occur,
18  however, they would have had to have sought
19  approval and obtain approval of FINRA for
20  there to be such a change; is that correct?
21     A.  No.
22     Q.  Okay.  Why is that incorrect?
23     A.  I believe there are stipulations
24  that you could put in for it, if it's not
25  done properly, answered in a certain time

Page 21

1                   Joseph Amato
2   frame, you could effect the transition.
3         Q.   Your understanding is that you can
4   -- you can alert FINRA that there's going to
5   be a change, and then during a certain period
6   of time you can effect the change, unless
7   they object; is that what you are saying?
8         A.   If they don't reply under a certain
9   amount of time, you can become effective
10  under what it was asked for if it wasn't
11  done, is my understanding, yes.
12        Q.   Okay.  All right.  Now, I am
13  specifically asking the period 2013 through
14  2015.  Are you -- do you have any -- what's
15  your understanding as to who owned -- who had
16  an ownership interest in Alexander Capital
17  between 2013 and 2015?
18            Do you have any understanding of
19  that?
20        A.   I know who we purchased it from.
21  Is that the question?
22        Q.   I will take that.  What's that?
23  What --
24        A.   I believe we purchased it from
25  Exitus.

Page 22

1                   Joseph Amato
2         Q.   All right.  The 24.9 percent
3   ownership?
4         A.   Yes.
5         Q.   All right.  Did you then later
6   purchase more ownership from Exitus at some
7   point?
8         A.   Yes.
9         Q.   And is that the ownership interest
10  that may have been as high as 100 percent?
11        A.   Yes.
12        Q.   Okay.  Now, after the purchase of
13  Exitus -- after the purchase from Exitus of
14  its interest to Nesa, did Exitus have any
15  relationship with Alexander Capital, LP,
16  after that purchase by Nesa of its interest
17  of Exitus' interest in Alexander Capital, LP?
18        A.   Which purchase?
19        Q.   The one that went to 100 percent?
20        A.   No.  After we purchased it, they --
21  no.
22        Q.   Okay.  And do you have any idea how
23  long ago that acquired?  Was that a month, a
24  year, two years, three years?  What's your
25  best estimate as to how long ago Nesa

Page 23

1                   Joseph Amato
2   purchased all of the interest that Exitus
3   had?
4         A.   I don't recall.  It would be a
5   couple of years ago.
6         Q.   All right.  And do you know Mr.
7   Figliolo?
8         A.   Yes.
9         Q.   And did you -- was it your
10  understanding that Mr. Figliolo owned Exitus?
11        A.   Yes.
12        Q.   And after the acquisition by Nesa
13  of Exitus' interest, did Mr. Figliolo have
14  any relationship with Alexander Capital, LP
15  after that?
16        A.   I don't recall because he was an
17  attorney, so I can't recall.
18        Q.   Well, what's your understanding as
19  to whether Mr. Figliolo had any involvement
20  with Alexander Capital, LP, after Nesa
21  purchased Exitus' interest?
22        A.   I don't know if he ever represented
23  us on anything.  That's the only thing we
24  would have done.
25        Q.   Okay.  May have represented you as

Page 24

1                   Joseph Amato
2   an attorney.  But other than that, I am
3   asking about whether he was involved in
4   management or whether he was a capital
5   contributor, or had any other, you know,
6   investment in Alexander Capital, LP, or
7   management responsibilities at Alexander
8   Capital, LP?
9         A.   No.
10        Q.   All right.  All right.  I am going
11  to show you another document.  All right.  I
12  am going to -- all right, hopefully you can
13  see on the screen, "Delaware the First
14  State."
15            Do you see that document?
16        A.   I do.
17        Q.   Okay.  By the way, the document
18  before that I was referring to, the
19  broker-check report, I have this habit of --
20  bad habit of not saying what the exhibit was,
21  but I will say what it was, if you give me
22  just a moment.
23            MR. WARD:  Exhibit 29.
24            MR. SCHLICHTMANN:  Thank you
25  very much, Attorney Ward.

Page 25

1              Joseph Amato
2         So for the record, Aydil,
3    that was Exhibit 29, previous
4    exhibit, and feel free, anyone,
5    Bryan, please, if I don't mention
6    the exhibit number, please remind
7    me.  It's a bad habit.  I'm sorry.
8         Q.  I am now showing you an exhibit
9    that we have marked as 182, all right.  It
10   doesn't have a sticker on it, but this is an
11   exhibit that was, yesterday, marked as 182,
12   and this is a filing with the Delaware
13   secretary of state's office that occurred on
14   the 28th day of September, so just a couple
15   of days ago.
16        Are you aware of the fact that
17   there was a filing with the secretary of
18   state's office a couple of days ago involving
19   Nesa Management?
20        A.  I was -- I am aware Nesa was going
21   to file something.  I didn't know if it was
22   officially done yet.
23        Q.  Okay.  Well, I will show you that
24   this is a filing that was provided to us that
25   was filed -- you see the date there,

Page 26

1              Joseph Amato
2    September 28, '21?
3         A.  I do.
4         Q.  Okay.  And it's with the state of
5    Delaware.  It's an amendment to the
6    certificate of limited partnership.  Do you
7    see that?
8         A.  I do.
9         Q.  And it's -- it says that "The
10   undersigned desiring to amend the certificate
11   of limited partnership pursuant to Delaware
12   law, does hereby certify as follows."  The
13   name of the limited partnership is "Alexander
14   Capital, LP."
15        Do you see that?
16        A.  Yes.
17        Q.  Then it says, "Article 3, second
18   article three of the certificate of limited
19   partnership shall be amended as follows:  The
20   name and mailing address of each general
21   partner is as follows:"  And it has only one
22   named, and that's "Nesa Management, LLC, 17
23   State Street, 5th Floor, New York, New York."
24   Do you see that?
25        A.  I do.

Page 27

1              Joseph Amato
2         Q.  Do you recognize 17 State Street,
3    5th Floor, New York, New York, as the
4    business address of Alexander Capital, LP; is
5    that correct?
6         A.  Correct.
7         Q.  All right.  And the -- it says,
8    "the amendment is effective December 14,
9    2017, for accounting purposes only."  Do you
10   see that?
11        A.  I do.
12        Q.  Does the date December 14, 2017,
13   mean anything to you?
14        A.  Off the top of my head, no.
15        Q.  Could the date be the date that
16   approval was given for Nesa Management to
17   acquire additional interest from Exitus?
18        A.  It is very possible.
19        Q.  Okay.  And this is signed by
20   Mr. Guidicipietro.  Do you see that?
21        A.  I do.
22        Q.  And he says under Nesa Management,
23   LLC, he says, "general partner."  Do you see
24   that?
25        A.  Yes.

Page 28

1              Joseph Amato
2         Q.  Is it your understanding that Nesa
3    Management LLC, considers itself to be the
4    general partner of Alexander Capital, LP?
5         A.  I do not.
6         Q.  You "do not," what?
7         A.  I do not, no.
8         Q.  Okay.  You see that Nesa
9    Management, LLC, has "general partner" under
10   its name.
11        Do you see that?
12        A.  It says he is a general partner of
13   Nesa Management.
14        Q.  Okay.  And here it says, "The name
15   and mailing address of each general partner
16   of Alexander Capital, LP, is Nesa
17   Management."
18        Do you see that?  "Of each general
19   partner."
20        A.  Yes, Nesa Management is a general
21   partner.
22        Q.  Of Alexander Capital, LP?
23        A.  It says, Nesa Management is a
24   general partner.  I see that, correct.
25        Q.  So let me just make sure we're

Page 29

1                Joseph Amato
2  talking about the same things here.  On this
3  document filed with the secretary of state's
4  office, it concerns an amending the
5  certificate of limited partnership regarding
6  Alexander Capital, LP, okay?
7      A.  Yes.
8      Q.  Okay.  Okay.  Is that your
9  understanding, that this document is
10  purporting to do that?
11      A.  Yes.
12      Q.  Okay.  And then it says, "The name
13  of the limited partnership is Alexander
14  Capital, LP."
15          Do you see that?
16      A.  Yes.
17      Q.  Okay.  And then it says that, "The
18  certificate of limited partnership, referring
19  to Alexander Capital, LP, shall be amended as
20  follows:  The name and mailing address of
21  each general partner, referring to Alexander
22  Capital, LP, is as follows, Nesa Management
23  LLC," at the Alexander Capital, LP office
24  address.
25          Is that your understanding of what

Page 30

1                Joseph Amato
2  this document --
3      A.  My -- my -- if legal prepared and
4  Nesa Management is considered with the
5  document, then, yes.
6      Q.  Okay.  Do you have any reason to
7  disagree with the designation of Nesa
8  Management as the general partner of
9  Alexander Capital, LP?
10      A.  No.
11      Q.  In your -- is it your
12  understanding, as to whether there are any
13  other general partners of Alexander Capital,
14  LP, as of this date?
15      A.  I don't believe so.  I would be
16  uncertain 100 percent, though.
17      Q.  Okay.  But you don't believe there
18  are other general partners of Alexander
19  Capital, LP, as we sit here today?
20      A.  Again, I'm uncertain what they're
21  designated as.  I know there's other partners
22  who have ownership interest.  I don't know
23  how they legally are designated, so I can't
24  answer properly.  I would be uncertain.
25      Q.  Okay.  Are any of those partners

Page 31

1                Joseph Amato
2  that you just referred to, does that include
3  Exitus, LLC, now?
4      A.  Currently, no.
5      Q.  Yeah.  Does it include Mr.
6  Figliolo?
7      A.  No.
8      Q.  Okay.  Now, I said that this was
9  182, and let me just show you another
10  document.  All right, I am now putting up on
11  the screen another filing with the Delaware
12  secretary of state's office.  Do you see,
13  "Delaware the First State" on the screen?
14      A.  I do.
15      Q.  Okay.  And this is a filing that
16  was also made just a couple of days ago with
17  the secretary of state's office, regarding
18  Alexander Capital, LP.  And it states,
19  similar to the one previously, that "The
20  undersigned to this document desires to amend
21  their certificate of limited partnership
22  pursuant to Delaware law and certifies that
23  the name of the limited partnership is
24  Alexander Capital, LP."  And similar to the
25  other one, it says, "Article 3 of the

Page 32

1                Joseph Amato
2  certificate of limited partnership shall be
3  amended as follows."  However, in this
4  document, filed at the same time as the one
5  as Exhibit 182, this is Exhibit 181, "the
6  name and mailing address of each general
7  partner is as follows:  Exitus, LLC," at the
8  Alexander Capital, LP address.  Do you see
9  that?
10      A.  I do.
11      Q.  And it says, "This amendment is
12  effective December 19, 2013, for accounting
13  purposes only."
14          Do you see that?
15      A.  I do.
16      Q.  Okay.  Now, is it your
17  understanding that, as we sit here today,
18  that Exitus, LLC, is a general partner in
19  Alexander Capital, LP?
20      A.  No, I'd be uncertain.
21      Q.  Do you have any reason to believe
22  that it is the general partner of Alexander
23  Capital, LP, right now?
24      A.  Today, no, not today.
25      Q.  Okay.  Now, this document is signed

Page 33

1                    Joseph Amato
2     "Exitus, LLC, general partner," and this is
3     signed by Mr. Joseph Figliolo, as the
4     authorized person for Exitus, which is
5     calling itself "the general partner," and is
6     naming itself in this filing as a "general
7     partner of Alexander Capital, LP."
8           Do you see that?
9        A.   Exitus, LLC, December 19, 2013,
10    yes, I see that.
11       Q.   The amendment is effective, then?
12       A.   Correct.
13       Q.   Okay, but the -- it's saying "the
14    general partner is as of this date."  So it's
15    effective from December 19, 2013, all the way
16    through today.
17              MR. WARD:  Objection.
18              Misstates the record.
19              MR. SCHLICHTMANN:  All
20         right.
21       Q.   Well, in reading this document, it
22    uses the word "is" when talking about "the
23    name and mailing address of each general
24    partner is as follows."  Meaning, presently
25    is, using the present tense, Exitus LLC.  You

Page 34

1                    Joseph Amato
2     disagree with that; is that correct?  That's
3     not your understanding?  Is that right?  That
4     Exitus is not presently the general partner
5     of Alexander Capital, LP; is that correct?
6              MR. WARD:  Objection.
7              Misstating.
8        Q.   If you understand the question --
9     if you don't, let me know and I will rephrase
10    it.
11          You can answer, if you understand
12    the question.
13       A.   Is this for me?
14       Q.   Yes, it is, I'm sorry.
15       A.   You and Bryan were talking so --
16              MR. WARD:  You can answer,
17         Joe.  I will be making objections
18         today, and after I object, you can
19         still respond, to the extent you --
20       A.   I don't understand them to be
21    general partner today.  I don't agree with
22    what you are stating.
23       Q.   Okay.  Or what this document is
24    purporting to represent?
25       A.   Yes, I don't believe that.

Page 35

1                    Joseph Amato
2        Q.   What it's purporting to represent?
3        A.   How you are representing it, I
4     don't believe.  I believe it's stating for
5     December 19, 2013.  That's my opinion.
6     That's how I feel.
7        Q.   Okay.
8        A.   I don't agree with you.
9        Q.   Okay.  So is it your understanding,
10    then, that Exitus was a general partner, as
11    of December 2013?
12       A.   They may have been.  I don't know
13    the dates.  I was an employee of the firm at
14    the time, and I was shortly thereafter not
15    working at that time at the firm.  So, again,
16    I believe that that's when he -- he was
17    effective general partner.
18       Q.   Okay.  And what's your
19    understanding as to when Exitus, owned by Mr.
20    Figliolo, stopped being a general partner of
21    Alexander Capital, LP, as best you can tell
22    us?
23       A.   I don't recall the exact date.  It
24    may have been in that 2017 time frame, from
25    what the other document, the other disclosure

Page 36

1                    Joseph Amato
2     you showed me earlier.  But, again, I still
3     couldn't give you 100 percent on the date, as
4     I stated earlier.
5        Q.   Is it your understanding that
6     there's any disagreement between Nesa
7     Management, LLC, and yourself, and Mr.
8     Guidicipietro, on one side, and Exitus and
9     Mr. Figliolo, on the other side?
10          Is it your understanding that
11    there's some disagreement between the two
12    entities and the owners of those entities
13    regarding who are the general partner -- who
14    is the general partner or who are the general
15    partners of Alexander Capital, LP?
16       A.   I don't -- I don't believe so.
17       Q.   Has Mr. Figliolo or anyone
18    associated with Exitus indicated to you that
19    they believe that they are the general
20    partner of Alexander Capital, LP, as of
21    today?
22       A.   No, they have not.
23       Q.   Have they indicated -- has anyone
24    from -- representing Exitus, LLC, or Mr.
25    Figliolo, at any time in the past indicated

JOSEPH AMATO                                          September 30, 2021
AQUINO vs ALEXANDER CAPITAL                                      37–40

Page 37

1              Joseph Amato
2  to you that they are no longer -- they no
3  longer consider themselves the general
4  partner of Alexander Capital, LP?
5      A.  I don't recall.
6      Q.  And do you recall any
7  communications with anyone representing
8  Exitus, LLC, or Mr. Figliolo in the past, in
9  which Nesa Management or anyone representing
10 Nesa Management or yourself, or
11 Mr. Guidicipietro informed Exitus, LLC, or
12 anyone representing Exitus, LLC, including
13 Mr. Figliolo, that you did not -- that your
14 group, the Nesa -- including yourself and Mr.
15 Guidicipietro, did not consider Exitus a
16 general partner of Alexander Capital, LP, as
17 of a certain date?
18     A.  I don't recall.
19     Q.  Okay.  Can you explain at all why
20 there have been two filings in the last two
21 days, one by Mr. Figliolo, regarding Exitus,
22 and one by Mr. Guidicipietro, regarding Nesa
23 Management, why there were two separate
24 filings in the last couple of days?  Do you
25 have any understanding or explanation

Page 38

1              Joseph Amato
2  regarding that?
3      A.  I do not.
4      Q.  All right.  I am going to show you
5  a -- can you see a chart on there with a lot
6  of blue boxes?
7      A.  I do.
8      Q.  Can you read it clearly, the names
9  in there and all that?  Do I have to blow it
10 up at all or can you see it clearly?
11     A.  I can see it clearly.
12     Q.  All right.  Now, I am going to
13 represent to you that this is a chart that
14 was submitted by Alexander Capital, LP, to
15 FINRA, in 2015, as part of their application
16 for -- as part of their continuing membership
17 application that they filed in 2015, all
18 right?  I want you to assume that that's
19 true, all right?
20        Now, having looked at the chart, is
21 this chart familiar to you?  Is it something
22 you have seen before, before I showed it to
23 you right now?
24     A.  Just in preparation for this trial.
25     Q.  You saw this for the deposition,

Page 39

1              Joseph Amato
2  you mean?
3      A.  Yes.
4      Q.  Okay.  Is that -- so recently you
5  saw this chart?
6      A.  Yes.
7      Q.  All right.  Now, in looking it over
8  recently and looking it over today, do you
9  recognize it at all as something you have
10 seen before, or was it the first time you saw
11 it, in preparation for the deposition?
12     A.  I believe it was the first time I
13 may have seen it, in preparation for the
14 deposition.
15     Q.  All right.  Now, are you familiar
16 with charts like this?
17     A.  Somewhat, sure.
18     Q.  What's your understanding of what
19 charts like this are depicting?
20     A.  It -- many different things it
21 could depict in this case.  I am uncertain
22 what this is used for or how it's used.
23     Q.  All right.  Is it consistent with
24 your understanding that a chart like this is
25 showing a corporate hierarchy of who is

Page 40

1              Joseph Amato
2  subordinate to who in the corporation, who is
3  superior to who in the corporation, who was
4  on equal par with who in the corporation?  Is
5  that consistent with your understanding that
6  a chart like this is trying to depict that
7  relationship in diagrammatic form?
8      A.  Possibly.
9      Q.  All right.  So assuming that that's
10 what it's trying to do, do you see at the top
11 of the chart, there's Mr. Guidicipietro at
12 the top left, and then there's your name on
13 the top right?
14        Do you see that?
15     A.  I do.
16     Q.  All right.  And you will notice
17 that you and Mr. Guidicipietro are at the top
18 of the chart, right?  Do you see that?
19     A.  I do.
20     Q.  Okay.  Is it your understanding
21 that the placement -- is it consistent with
22 your understanding of charts like this, that
23 the placement of these two blocks containing
24 your name and Mr. Guidicipietro's name, is an
25 indication that they are at the -- that they

Page 41

1                    Joseph Amato
2   are at the highest level of management in the
3   -- in -- in the corporation being or the
4   entity being depicted here, in this case,
5   Alexander Capital, LP?
6        A.   Not necessarily.
7        Q.   It's not?
8        A.   No.
9        Q.   All right.  Do you see that Mr. --
10  in Mr. Guidicipietro's box it says, "COO"?
11       A.   I do.
12       Q.   All right.  Do you know what that
13  stands for?
14       A.   Chief operating officer.
15       Q.   All right.  And was it your
16  understanding that Mr. Guidicipietro was the
17  chief operating officer in 2015?
18       A.   I believe he was.
19       Q.   And over to the right it says,
20  "Joseph Amato," and it says, "president."  Do
21  you see that?
22       A.   I do.
23       Q.   Was it your understanding, in 2015,
24  you were the president of Alexander Capital,
25  LP?

Page 42

1                    Joseph Amato
2        A.   No.
3        Q.   What did you consider your position
4   to be at Alexander Capital, LP, in 2015?
5        A.   I was possibly, and I can't say
6   with certainty, I might have either been the
7   CROP or ROP, at that time, representative.
8   We don't use the title "president" here at
9   the firm.
10       Q.   Okay.  How about -- all right, and
11  you used the phrase "CROP," is that C-R-O-P?
12       A.   Yes, CROP or ROP, which would
13  represent the floor, but, again, I couldn't
14  tell you if I was on the floor at that time.
15       Q.   Okay, but just to be clear, because
16  you are using some terminology, I want to
17  make sure that everybody understands the
18  terminology.  You used the term C-R-O-P,
19  CROP; is that right?
20       A.   Yes.
21       Q.   And then you used the phrase R-O-P,
22  ROP; is that right?
23       A.   Yes.
24       Q.   Okay.  Now, what's your
25  understanding that "CROP" stands for?

Page 43

1                    Joseph Amato
2        A.   The -- it was an options, principal
3   role that it could -- that it could mean I
4   had -- but there are other Series 4s on the
5   chart who may have been doing that role.  I
6   don't recall at the time.
7        Q.   So under your name there's a
8   number.  Do you see that; 2751635?
9        A.   I do.
10       Q.   Does that have -- does that number
11  have any meaning to you?
12       A.   I believe that's my CRD number.
13       Q.   When you say, "CRD," what's your
14  understanding of what "CRD" is?
15       A.   That's my identification code for
16  FINRA.
17       Q.   Now, when you say your
18  "identification code for FINRA," what's the
19  nature of that -- how did you obtain that
20  code?
21       A.   I believe it was given to me when I
22  passed my Series 7, but I am uncertain how
23  they derived of that and that number.
24       Q.   Okay, but you're a -- is it your
25  understanding that you have certain -- you

Page 44

1                    Joseph Amato
2   have certain licenses from FINRA?
3        A.   Yes.
4        Q.   F-I-N-R-A.
5        A.   I apologize, what was that?
6        Q.   I just want to make sure, for the
7   stenographer's standpoint, when we refer to
8   "FINRA," it's F-I-N-R-A, and that's the
9   initials of an organization -- is that your
10  understanding -- that regulates companies
11  like Alexander Capital, LP, in the securities
12  business?
13            Is that correct?
14       A.   Well, we're a member of FINRA.
15       Q.   All right.  And do you understand
16  FINRA is a regulatory authority regarding the
17  selling of securities by various companies
18  like Alexander Capital, LP?
19       A.   I do.
20       Q.   All right.  And is it your
21  understanding that in order for anyone --
22  company or person -- to be involved in the
23  selling of securities in the United States,
24  that they have to receive that authority from
25  FINRA?

Page 45

Joseph Amato

1
2     A.   Yes.
3     Q.   And they receive that authority by
4  becoming a member of FINRA?
5     A.   A registered representative working
6  for a member firm, I believe, yes.
7     Q.   Okay.  So if it's a company, it has
8  to be a member, and if you are an individual,
9  you have to be working for a member?
10    A.   I believe so, yes.
11    Q.   Okay.  Now, it says, "24 and 4."
12         What does that mean?
13         What's your understanding of those
14  two designations?
15    A.   Two of my licenses.
16    Q.   And does that have to do with the
17  C-R-O-P and the R-O-P?
18    A.   Again, possibly.  I hold the
19  license, not necessarily means it's being
20  used, so I don't know why -- I can't depict,
21  from this chart, what this all represents.
22    Q.   Okay.  In 2015, is it -- was it
23  fair -- was it accurate to inform FINRA, in
24  2015, that you held an executive position
25  with Alexander Capital, LP, or that would

Page 46

Joseph Amato

1
2  have been inaccurate to represent to FINRA,
3  that you held an executive position with
4  Alexander Capital, LP, at that time?
5     A.   Inform them through this chart, no.
6     Q.   All right.  Well, I mean, inform
7  them in any way, any representation to FINRA
8  in 2015, okay, from Alexander Capital, LP,
9  for whatever reason, if they represented to
10  -- would it have been appropriate for anyone
11  at Alexander Capital, LP, to represent to
12  FINRA, for any reason, that you, in 2015,
13  held an executive position with Alexander
14  Capital, LP?
15    A.   Not necessarily.
16    Q.   When you say, "not necessarily,"
17  what circumstances would make it necessary?
18    A.   If they were ordered or if we were
19  going through something, but it would be
20  registered in their system already, so I
21  wouldn't have to tell them.  They know my
22  license.  I may have licenses and not being
23  used.
24    Q.   What I am specifically asking, not
25  about licenses, but about the actual position

Page 47

Joseph Amato

1
2  that you held in Alexander Capital in 2015,
3  and what I am specifically asking is, is --
4  was it your understanding that you held an
5  executive position at Alexander Capital, in
6  2015, of any kind?
7     A.   Again, I stated earlier I am
8  uncertain as to what role I had.  I would
9  have to look at CRD, at the time.
10    Q.   Okay.  And this chart, which was
11  submitted to FINRA, I represent to you, with
12  a -- with your name on it on a corporate
13  hierarchy chart, with "president" underneath
14  it, would that have been accurate for --
15    A.   Again --
16    Q.   Wait until I finish.  Would that
17  have been accurate to represent to FINRA, by
18  anyone at Alexander Capital, that in fact the
19  office that you held in 2015 was president?
20    A.   Possibly.  I am uncertain.
21    Q.   All right.  And looking at this
22  chart and with the understanding that -- that
23  this was submitted in 2015, that doesn't help
24  you at all in refreshing your recollection as
25  to the executive position you held at

Page 48

Joseph Amato

1
2  Alexander Capital, in 2015?
3     A.   Absolutely not.  It was not a title
4  we used.
5     Q.   Was there another executive -- were
6  there another executive titles that were used
7  in Alexander Capital, in 2015, other than
8  president?
9         If president wasn't used, were
10  there other executive titles?
11    A.   Yes.
12    Q.   What were they?
13    A.   COO, CEO, CCO, branch manager, MSRB
14  representative.  Things such as that.
15    Q.   Okay.  I'm sorry, I don't mean to
16  interrupt.
17    A.   FINOP.  Yes, there were other
18  titles.
19    Q.   All right.  So underneath is Mr.
20  Feinman, and he is -- it has "CEO" under his
21  name.
22         Do you see that?
23    A.   I do.
24    Q.   Okay.  CEO, your understanding was
25  it stands for chief executive officer,

Page 49

1              Joseph Amato
2  correct?
3       A.   Correct.
4       Q.   All right.  And was it your
5  understanding, in 2015, Mr. Feinman was the
6  CEO of Alexander Capital, LP?
7       A.   I would be uncertain.  I would have
8  to see CRD, at the time.
9       Q.   All right.  Does this chart that
10 was submitted in 2015 to FINRA help you in
11 any way refresh your recollection?
12      A.   No.
13      Q.   Okay.  Do you see Timothy Stack's
14 name underneath the CEO, Mr. Feinman?
15      A.   I do.
16      Q.   And that has CCO -- CCO.  Do you
17 see that?
18      A.   I do.
19      Q.   And what's your understanding of
20 what CCO stood for?
21      A.   Chief compliance officer.
22      Q.   Was it your understanding, in 2015,
23 that Mr. Stack was the chief compliance
24 officer at Alexander Capital, LP?
25      A.   No, I would have to see CRD for the

Page 50

1              Joseph Amato
2  time frame.
3       Q.   And do you see down below further,
4  Jonathan Gazdak?
5       A.   I do.
6       Q.   You see it says, "investment
7  banking"?
8       A.   I do.
9       Q.   Do you know Mr. Gazdak?
10      A.   I do.
11      Q.   And do you know what position he
12 held at Alexander Capital, LP?
13      A.   At the time, I do not.
14      Q.   All right.  Do you know when Mr.
15 Gazdak started to work for Alexander Capital,
16 LP?
17      A.   I would have to see CRD.
18      Q.   But you don't have any memory?
19      A.   I do not.
20      Q.   Okay.  If Mr. Gazdak testified that
21 he began his employment relationship with
22 Alexander Capital in 2014, does that help
23 refresh your recollection at all?
24      A.   If -- if that's what he stated -- I
25 couldn't tell you.  I still can't answer

Page 51

1              Joseph Amato
2  without seeing the CRD myself.
3       Q.   Okay.  To your knowledge, how long
4  has Mr. Gazdak -- is Mr. Gazdak head of
5  investment banking right now?
6       A.   Today, he is, correct.
7       Q.   So if he said that he was -- began
8  in 2014 as head of investment banking, and
9  you know that he is head of investment
10 banking now, is it your understanding that he
11 has maintained that position throughout the
12 entire time from when he began, to his
13 present position now?
14      A.   I couldn't answer that.
15      Q.   Do you have any reason to believe
16 that Mr. Gazdak was not head of investment
17 banking at any time from when he started in
18 2014 to the present?
19      A.   Again, I don't know what the exact
20 title was then.
21      Q.   All right.  Well, Mr. Gazdak
22 testified that the position he holds now is
23 the position he held when he began in 2014
24 and hasn't changed.
25      A.   Then I believe him to be truthful.

Page 52

1              Joseph Amato
2       Q.   Okay.  You have no independent
3  memory of that?
4       A.   I can't answer for what I don't
5  know wholeheartedly, no.
6       Q.   Do you know a Mr. Steven Walsh?
7       A.   I know the name, yes.
8       Q.   And what's your -- and does he --
9  has he held any position at Alexander
10 Capital, LP, in your -- to your memory?
11      A.   I believe he may have.
12      Q.   Do you know what position?
13      A.   Which Steven Walsh, I'm sorry?
14      Q.   Is there more than one at Alexander
15 Capital, LP?
16      A.   No.  But I know the name and, no,
17 so he -- I don't recall what his title was.
18      Q.   Do you know what he was involved
19 in?
20      A.   He worked, I believe, with Mr.
21 Gazdak.
22      Q.   In investment banking?
23      A.   I believe so, yes.
24      Q.   Okay.  And now do you know Mr.
25 Carlin?

Page 53

1              Joseph Amato
2      A.  I do.
3      Q.  What's your understanding of Mr.
4  Carlin's position at Alexander Capital, LP?
5      A.  At the time, I don't know.  I don't
6  see him on the chart, and I don't know when
7  he started either.
8      Q.  Okay.  What is your understanding
9  of his present position?
10     A.  Capital Markets.
11     Q.  Is he -- is there anyone else
12  involved with Capital Markets, other than Mr.
13  Carlin?
14     A.  I believe there is.
15     Q.  What's your understanding of the
16  position that Mr. Carlin has in Capital
17  Markets?
18         Is he the head of that -- of
19  Capital Markets or just does he report to
20  somebody at Capital Markets?
21     A.  I believe he is the head of Capital
22  Markets today.
23     Q.  And who reports to Mr. Carlin, in
24  accordance with your understanding?
25     A.  Today?

Page 54

1              Joseph Amato
2      Q.  Yes.
3      A.  I believe, Mr. Messina.
4      Q.  Anyone else?
5      A.  I believe, I don't know Marc's last
6  name off the top of my head.  I would have to
7  see an active CRD.
8      Q.  Okay.  And as -- now, is that --
9  has that always been the case, that those two
10  gentlemen that you just named reported to Mr.
11  Carlin, or was that something that happened
12  either recently or sometime in the past?
13     A.  Not always.
14     Q.  Okay.  And in 2014 and 2015, was it
15  your understanding that Mr. Carlin was
16  employed at Alexander Capital, LP?
17     A.  I don't know the start date, but I
18  know he was employed at the firm prior to
19  2018.
20     Q.  And if he testified that he did
21  begin his association with Alexander Capital
22  in 2014, is that consistent with your
23  understanding?
24     A.  Again, it may be.  I just don't
25  know his exact start date.

Page 55

1              Joseph Amato
2      Q.  What was your understanding of the
3  relationship between Capital Markets and
4  Investment Banking at Alexander Capital, LP?
5      A.  I believe they worked together.
6      Q.  And were they considered on the
7  same level of -- in the corporate hierarchy,
8  or did Capital Markets -- was it subordinate
9  to Investment Banking?
10     A.  I couldn't answer that.  I don't
11  know.
12     Q.  You see on this chart you have
13  financial -- FINOP, right, which you
14  understand to be "financial operations"; is
15  that right?
16     A.  Correct.
17     Q.  And you see that it's alongside the
18  block for Mr. Gazdak, Investment Banking, do
19  you see that?
20     A.  I do.
21     Q.  And is it -- is your -- is it
22  consistent with your understanding, as of
23  2015, that financial operations was
24  considered on the same par in the corporate
25  hierarchy as Investment Banking?

Page 56

1              Joseph Amato
2      A.  I would be unaware.  I couldn't
3  answer that.
4      Q.  Was it your understanding that
5  Financial Operations was superior to
6  Investment Banking or subordinate to it?
7      A.  I couldn't answer that.  I don't
8  know.
9      Q.  Based on your understanding of the
10  corporate hierarchy of Alexander Capital, LP,
11  then and now, you're not able to help us?
12     A.  No.
13     Q.  If a chart -- if a corporate chart
14  was to be submitted to FINRA in 2015,
15  depicting the corporate hierarchy of
16  Alexander Capital, LP, would you consider
17  this chart, Exhibit 132, to fairly and
18  accurately represent that corporate
19  hierarchy, as of 2015, or you can't -- you
20  can't help us?
21     A.  I can't help you with that.
22     Q.  Cannot help, okay.
23         Mr. Amato, we talked about FINRA
24  and membership in FINRA, and you testified
25  that you're aware that Alexander Capital was

Page 57

Joseph Amato

1  required to be a member of FINRA in order to
2  be involved in the offer of sales of
3  securities; is that correct?
4      A.  I believe so, yes.
5      Q.  All right.  And is it your
6  understanding that as -- the membership in
7  FINRA required Alexander Capital to have an
8  agreement, an actual written agreement with
9  FINRA?
10      Is that your understanding?
11      A.  I believe so, yes.
12      Q.  All right.  And is it that -- in
13  fact, you know, that Alexander Capital and
14  FINRA have a written agreement between them
15  regarding Alexander Capital's membership in
16  FINRA; is that correct?
17      A.  I believe so, yes.
18      Q.  And this is a document that you're
19  familiar with?
20      A.  Not so much, but I know what it is.
21      Q.  All right.  And is it your -- and
22  was that -- were you familiar with that
23  agreement soon after you became associated
24  with Alexander Capital, LP?

Page 58

Joseph Amato

1      A.  Not necessarily.
2      Q.  When is your memory of become --
3  what is your memory of becoming aware of the
4  agreement between Alexander Capital and
5  FINRA, regarding its membership?
6      A.  I couldn't tell you.
7      Q.  When you...in December of 2013,
8  after Nesa Management -- is it fair to say
9  that after -- that in December 2013, that
10  Nesa Management, LLC, and yourself, and Mr.
11  Guidicipietro, became the managing partner of
12  Alexander Capital, LP, as of December 2013?
13      A.  I don't recall the exact date.
14      Q.  Does that sound right?
15      A.  I don't recall the exact date.  I
16  know we discussed it.  I just don't recall
17  the exact date as to when we were involved
18  with the company.
19      Q.  Okay, but I believe previously we
20  established that in December 2013, Alexander
21  -- Nesa received a 24.9 percent interest in
22  Alexander Capital, LP.  You remember that?
23      A.  Yes.
24      Q.  Okay.  And is it your memory that

Page 59

Joseph Amato

1  after acquiring the 24.9 percent interest,
2  that yourself and Mr. Guidicipietro, through
3  Nesa Management, exercised management control
4  over Alexander Capital, LP?  Is that your
5  understanding?
6      A.  There was people in place that ran
7  the company, yes, but we did run and manage
8  the company, correct.
9      Q.  All right.  But those people that
10  you just mentioned that managed the company,
11  they were subordinate to you and Mr.
12  Guidicipietro; is that correct?
13      A.  No.
14      Q.  Did you believe that you and
15  Mr. Guidicipietro -- Guidicipietro had any
16  management control over the people at
17  Alexander Capital, LP, or you thought you did
18  not have management control over them?
19      A.  Don't believe so.
20      Q.  You don't believe you had
21  management control over the people at
22  Alexander Capital, LP; is that correct?
23      A.  That is correct.
24      Q.  And for how long -- and has that

Page 60

Joseph Amato

1  been your belief from December 2013, to the
2  present?
3      A.  Yes.
4      Q.  So it's your testimony that at no
5  time did you or Mr. Guidicipietro exercise
6  management control over the people at
7  Alexander Capital, LP?
8      Is that what you are saying?
9      A.  We had chief operating officers,
10  you know, compliance officers and others who
11  managed the everyday of the firm.
12      Q.  Right, but did you consider
13  yourself and Mr. Guidicipietro as having
14  management authority over those people?
15      A.  I -- I don't understand the
16  question fully.
17      Q.  Okay.  I want to be very clear.
18  What I am asking is, if -- did I understand
19  your testimony correctly that you did not
20  consider, from December 2013 to the present,
21  that you and Mr. Guidicipietro could exercise
22  management control over everyone else at
23  Alexander Capital, LP?
24      A.  I cannot over everyone, no.  I

Page 61

Joseph Amato

1 agree with that.
2    Q.   Who could you exercise management
3 control over?
4    A.   I don't know.  Directly, I don't
5 believe anyone.
6    Q.   Okay.
7    A.   Unless I hold the role for the firm
8 titled to do so and I don't believe I do.
9    Q.   "Unless," I'm sorry?
10    A.   Unless I'm the chief compliance
11 officer and had a different role in the firm.
12 As of now, I do not.
13    Q.   Is it your opinion that the person
14 who has ultimate management -- was it your
15 understanding, during -- from December 2013
16 to the present, that the -- that the officer
17 who had ultimate management control over
18 Alexander Capital, LP, was the chief
19 compliance officer, or someone else?
20    A.   It would be the chief compliance
21 officer, in my estimation.
22    Q.   How about the CEO?
23    A.   No.
24    Q.   Okay.  And who -- did anyone have

Page 62

Joseph Amato

1 management control over the chief compliance
2 over?
3    A.   The chief compliance officer does
4 an annual report -- I guess, replies to the
5 CEO, but I -- the CEO cannot control the
6 chief compliance officer independently.  They
7 have control.
8    Q.   Okay, but the chief compliance
9 officer reports to the CEO?
10    A.   On an annual basis, yes, but they
11 run the company.
12    Q.   Your understanding, from December
13 2013 to the present, is that it's the chief
14 compliance officer who runs the company on a
15 day-to-day basis?  Is that what you are
16 saying?
17    A.   Dictates the rules and -- correct,
18 yes.
19    Q.   What's your understanding as to the
20 role of the CEO at Alexander Capital, from
21 December 2013 to the president -- to the
22 present?
23       What is -- what was his management
24 responsibilities, if any?

Page 63

Joseph Amato

1    A.   No management responsibilities for
2 the everyday running of the company, no.
3    Q.   And what was your understanding,
4 from December 2013 to the present, as to
5 whether Guidicipietro had any management
6 responsibilities over the CEO?
7    A.   I -- I don't know.
8    Q.   What was your understanding as to
9 whether you, in the various positions that
10 you held from December 2013 to the present,
11 had any management responsibilities over the
12 CEO?
13    A.   I -- at the time, I did not, I
14 don't believe so, no.
15    Q.   Are you talking about December 2013
16 to the present?
17    A.   That's what you stated.  I don't
18 believe so.  From December '13, you asked,
19 correct.
20    Q.   December of 2013, just a month,
21 December 2013 to the present, is that what
22 you are saying?
23    A.   If I had control over the CEO?  I
24 was the CEO.  Is that what you are asking?

Page 64

Joseph Amato

1    Q.   Did you have control over the CEO?
2    A.   Can you reask that question?
3    Q.   Of course.  From December 2013 to
4 the present, did you have an understanding,
5 at any time, that you exercised management
6 responsibilities -- that you could exercise
7 management responsibilities over Alexander
8 Capital's CEO, during that period of time?
9    A.   I can't answer that question.
10    Q.   Why is that?
11    A.   I'm being asked if I can manage
12 myself.
13    Q.   Well, I'm -- all right.  Because at
14 some point you were the CEO at Alexander
15 Capital, LP; is that what you are saying?
16    A.   I am the CEO of the company,
17 correct.
18    Q.   Okay.  Do you know the period of
19 time that you were the CEO of Alexander
20 Capital, LP?
21    A.   I do not.  We'd have to go to CRD.
22    Q.   Was it the -- before Mr. Feinman
23 assumed that position or after?
24    A.   I don't recall the exact dates.

Page 65

Joseph Amato

2  Q.  Do you have your best memory as to
3  whether it was before Mr. Feinman became CEO
4  or after he stopped being CEO?
5  A.  I don't recall because the role
6  changed so many times over the years.
7  Q.  All right.  Now, you mentioned you
8  do have a memory of being CEO at some point?
9  A.  Yes.
10  Q.  Okay.  And -- but you don't
11  remember the period of time; is that correct?
12  A.  That is correct.
13  Q.  Okay.  Other than CEO, do you
14  remember ever occupying an executive position
15  at Alexander Capital, LP, other than CEO?
16  A.  Yes.
17  Q.  What positions?  Executive
18  positions?
19  A.  The CROP, ROP, and SROP, I believe.
20  Q.  So now we have added another one,
21  SROP.  What's the acronym?  What are the
22  initials?
23  A.  S-R-O-P.
24  Q.  What does that stand for?
25  A.  I don't know the desig- -- the,

Page 66

Joseph Amato

2  exactly how it reads out in the definition,
3  so I apologize.
4  Q.  What's your understanding of the
5  executive position responsibilities of either
6  CROP, or ROP, or SROP.  C-R-O-P or S-R-O-P.
7  What is your understanding as to
8  whether they had any executive responsibility
9  at Alexander Capital, LP, at any time, while
10  you were occupying those positions?
11  A.  Options related.
12  Q.  So the selling of options?
13  A.  Yes.  The business of options at
14  the firm.
15  Q.  And nothing else?
16  A.  That's -- no, I don't believe
17  anything else, no.
18  Q.  Okay, so is it fair to summarize
19  your testimony, then, that the -- the -- that
20  at some point you exercised the role of
21  CEO -- you don't know when -- is that
22  correct?
23  A.  I don't know the exact dates,
24  correct.
25  Q.  Okay.  You don't know if it was

Page 67

Joseph Amato

2  before Mr. Feinman or after, correct?
3  A.  It may have been both.  I am
4  uncertain as to the dates, correct.
5  Q.  It may have been both, before and
6  after?
7  A.  Possibly.  I don't know the dates.
8  Q.  Okay.  And other than the times you
9  were CEO, the only other position you
10  remember holding at Alexander Capital is the
11  -- whether it was SROP, ROP, or -- I think it
12  was the three there.  C-R-O-P, S-R-O-P, or
13  R-O-P; is that correct?
14  A.  I believe so.
15  Q.  And those three acronyms, the
16  S-R-O-P, R-O-P, C-R-O-P, they are solely
17  related to the selling of options, correct?
18  A.  To options.  Not necessarily
19  selling, but options.
20  Q.  Solely regarding options and
21  nothing else?
22  A.  Yes.
23  Q.  Okay.
24  MR. WARD:  It's been a
25  little over an hour.  I just want

Page 68

Joseph Amato

2  to check -- do you want to take a
3  break or not?
4  MR. SCHLICHTMANN:  Yes,
5  let's take a break, then for five
6  minutes.  It's been a while.  Let's
7  do it.  We will get into the habit
8  of taking these breaks.  I think
9  it's good.
10  THE VIDEOGRAPHER:  Going off
11  video record.  The time is 11:11
12  a.m.
13  (Whereupon, a recess was
14  taken at this time.)
15  THE VIDEOGRAPHER:  Going
16  back on the video record.  The time
17  is now 11:21 a.m.
18  BY MR. SCHLICHTMANN:
19  Q.  Mr. Amato, before we talked about
20  membership in FINRA; is that correct?  Do you
21  remember that?
22  A.  Yes.
23  Q.  Okay.  Now, do you understand that
24  you have been designated, and Attorney Ward
25  will correct me if my understanding is wrong,

Page 69

1           Joseph Amato
2    that you have been designated as the
3    representative of Alexander Capital who can
4    speak to issues regarding FINRA?
5           Is that your understanding?
6           MR. SCHLICHTMANN:  And,
7       Attorney Ward, if I am wrong about
8       that, let me know.
9           MR. WARD:  We have been, in
10       terms of the 30(b)(6) designee?
11           MR. SCHLICHTMANN:  Yes,
12       right.
13           MR. WARD:  Yeah, that was
14       for the person designated by
15       Alexander Capital "pursuant to
16       30(b)(6) regarding financial
17       ability and legal authority of
18       Alexander Capital, LP, to undertake
19       underwriting, whether characterized
20       as best efforts or firm commitments
21       during the period 2014, 2016."
22    Q.  Mr. Amato, were you able to hear
23    Attorney Ward, the area that you have been
24    designated to speak on behalf of Alexander
25    Capital, LP?

Page 70

1           Joseph Amato
2    A.  Yes.
3    Q.  All right.  And do you feel like
4    you have knowledge regarding those matters
5    that were described by Attorney Ward in the
6    -- in his rendition of it?
7    A.  Sure.
8    Q.  Okay.  Great.  Now --
9           MR. WARD:  Sorry, Jan, I
10       just want to be clear of when he
11       will be testifying on that -- as
12       that position and when he is not.
13           MR. SCHLICHTMANN:  I'm
14       sorry?
15           MR. WARD:  I just want to
16       know that we are clear when he will
17       be testifying as that designee and
18       when he is testifying in his
19       personal capacity.
20           MR. SCHLICHTMANN:  Okay,
21       well, very good.
22    Q.  So let's now, for this series of
23    questions, until I say otherwise, I will be
24    asking you a series of questions, in
25    accordance with your designation, the

Page 71

1           Joseph Amato
2    designation we just read to you, all right?
3    A.  Okay.
4           MR. SCHLICHTMANN:  Is that
5       okay with you, Attorney Ward?
6           MR. WARD:  Yes, that is.
7           MR. SCHLICHTMANN:  Okay,
8       great.
9    Q.  Now, did the membership agreement
10    with FINRA that Alexander Capital had in 2013
11    through 2015, is it true that that membership
12    agreement restricted Alexander Capital from
13    engaging in firm commitment offerings?
14    A.  I am uncertain.  I would have to
15    see it.
16    Q.  Okay, but now you are -- okay.  Is
17    that -- are you -- is it -- is the membership
18    agreement readily available to you?  Or let
19    me ask you this way:  Did you look at the
20    agreement prior to your testimony today?
21    A.  I don't believe so.
22    Q.  Is it readily available to you?
23    A.  No.
24    Q.  So let me just stop there.
25           MR. SCHLICHTMANN:  Attorney

Page 72

1           Joseph Amato
2    Ward, how -- do you have any
3    thoughts here about how we might be
4    able -- maybe you can give him the
5    agreement later during today and we
6    can go back to it.
7           MR. WARD:  Yeah, I guess as
8    a preliminary matter, it's okay if
9    you call me Bryan.  I hope it's
10    okay if I call you Jan.
11           MR. SCHLICHTMANN:  It's all
12    right.  Just for purposes of the
13    record, but that's fine.
14           MR. WARD:  Are you okay --
15    okay.
16           MR. SCHLICHTMANN:  Sure.
17           MR. WARD:  And for --
18           MR. SCHLICHTMANN:  We are
19    off the record here, by the way.
20    Can we go off the record so we can
21    just talk?
22           THE VIDEOGRAPHER:  Going off
23    video record.  Time is 11:24 a.m.
24           (Whereupon, a recess was
25    taken at this time.)

Page 73

1           Joseph Amato
2           THE VIDEOGRAPHER: Back on
3   video record. The time is 11:32
4   a.m.
5   BY MR. SCHLICHTMANN:
6       Q. Okay, Mr. Amato, can you tell us
7   whether or not the agreement between
8   Alexander Capital, LP and FINRA, whether that
9   membership agreement from 2014 through 2016
10  had certain restrictions on it?
11      A. I believe there may have been
12  restrictions. I am not certain.
13      Q. All right. Is it your
14  understanding that from 2014 through 2016,
15  that Alexander Capital membership in FINRA,
16  did not allow it to participate as a firm
17  commitment underwriter?
18      A. As a firm -- participate in firm
19  commitments?
20      Q. Yes.
21      A. Or as a firm commitment
22  underwriter? Can you rephrase the question?
23      Q. Okay. Is it your understanding
24  that from twenty -- is it -- what is your
25  understanding, from 2014 through 2016, as to

Page 74

1           Joseph Amato
2   whether or not the -- Alexander Capital's
3   membership in FINRA allowed it to participate
4   in firm commitment offerings?
5       A. We were allowed to.
6       Q. And under what circumstances?
7       A. We were allowed to participate
8   under any circumstance.
9       Q. All right. Is it your
10  understanding from 2014 to 2015, that
11  Alexander Capital's restrictive agreement
12  allowed it to be the sole book running
13  manager of a firm commitment offering?
14      A. No.
15      Q. It did not allow that?
16      A. I don't believe we could do firm
17  commitment underwriting.
18      Q. Okay. So is it your testimony,
19  then, to be clear here, it was your
20  understanding from -- it's your understanding
21  that between 2014 and 2016, Alexander Capital
22  was not allowed to conduct firm commitment
23  offerings as an underwriter; is that correct?
24      A. As the lead underwriter.
25      Q. Right. So --

Page 75

1           Joseph Amato
2       A. So sole underwriter.
3       Q. Correct, sole underwriter, okay.
4   Could they be part of a firm
5   commitment selling group?
6       A. I believe so, yes.
7       Q. All right. That's your
8   understanding. All right. I am going to
9   show you...all right. Are you -- let me just
10  see if I have this.
11      Are you aware of the fact, in 2015,
12  that Alexander Capital received a so-called
13  unreasonable letter from FINRA, regarding its
14  participation in an intended offering by
15  Alterix, also known as, Inpellis?
16      A. Yes.
17      Q. Were you aware of it in -- at the
18  time, or is that something you became aware
19  of after these events?
20      A. I don't recall the exact timing of
21  it.
22      Q. All right. I am going to show
23  you...all right, I am going to show you an
24  e-mail that's been marked as Plaintiff's
25  Exhibit 142, 1-4-2. It's dated April 10,

Page 76

1           Joseph Amato
2   2015, and it's from Mr. Kleinman at Greenberg
3   to Mr. Gazdak, Mr. Mooney at Alexander
4   Capital, and Mr. Carlin. Do you see that?
5       A. I do.
6       Q. And with a cc to Mr. Marsico at
7   Greenberg. Do you see that?
8       A. Uh-huh.
9       Q. Do you know who Mr. Marsico --
10  Attorney Marsico is at Greenberg Traurig?
11      A. I do not.
12      Q. Do you know the firm Greenberg
13  Traurig?
14      A. I have heard the name, yes.
15      Q. Were you aware, in 2015, that
16  Alexander Capital was represented by
17  Greenberg Traurig, the law firm, regarding
18  Alexander Capital's intended -- or Alexander
19  Capital's involvement with an offering --
20  intended offering by Alterix, Inc., also
21  known as, Inpellis, Inc.?
22      Were you ware of that in 2015?
23      A. No, I was made aware through the
24  prep for this trial.
25      Q. But you didn't know it beforehand?

Page 77

1          Joseph Amato
2      A.   No, not off the top of my head, no.
3      Q.   This is an e-mail, April 10, 2015,
4  in which Mr. -- lawyers from Greenberg
5  Traurig are letting -- are providing a copy
6  of the FINRA filing that was made on April
7  10, 2015, regarding the intended fee that
8  Alexander Capital intended to charge for its
9  participation in the intended offering by
10  Alterix and Inpellis, Inc., all right?  I
11  represent to you that that's what this is,
12  and are you familiar with the fact that
13  Alexander Capital, LP, had any kind of
14  obligation, in 2015, that if it was
15  participating in an offering, that it had to
16  -- after a filing was made, to -- regarding
17  the offering, that it had to notify FINRA of
18  any fees it intended to charge for its
19  participation in such an offering?  Were you
20  aware of that?
21      A.   I was not, no.
22      Q.   Are you aware now that there's such
23  a requirement?
24      A.   Yes.
25      Q.   All right.  But you weren't aware

Page 78

1          Joseph Amato
2  that there was a requirement, then?
3      A.   Correct.
4      Q.   Okay.  I will represent --
5          MR. WARD:  Just so the
6      record is clear, Jan, when you say
7      "you," this is Mr. Amato not as a
8      -- you are not referring to
9      Alexander Capital as a whole,
10      correct?
11          MR. SCHLICHTMANN:  Okay, so
12      thank you for -- so maybe I have to
13      -- let me ask it, then.
14      Q.   Regarding Alexander Capital as a
15  whole, all right, were you -- was Alexander
16  Capital aware that they had to file with
17  FINRA, approval -- review of their intended
18  fee and seek FINRA's approval for the
19  reasonableness of the fee?
20          Was Alexander Capital aware of
21  that, at the time, to your knowledge?
22      A.   Yes, they were.
23      Q.   Okay.  All right.  Great.
24          MR. SCHLICHTMANN:  Thank
25      you, Bryan, for that.

Page 79

1          Joseph Amato
2      Q.   In your designated role, is it true
3  that Alexander Capital was aware that FINRA
4  responded to the application with a letter,
5  dated May 15, 2015, which was referred to by
6  Alexander Capital people as an "unreasonable
7  letter"?  Is that true?
8      A.   Alexander was aware.
9      Q.   Yeah.  All right.  Were you
10  personally aware?
11      A.   No.  At the time?
12      Q.   Yes.
13      A.   The day of, no.  I don't recall
14  when I was.
15      Q.   How about the weeks or months
16  after, any time?
17      A.   I don't recall the exact timing of
18  when I was aware, but I know the day of, I
19  was not.
20      Q.   I am going to show you what has
21  previously been marked -- hopefully it's on
22  your screen.
23          Do you see the --
24      A.   Yes.
25      Q.   Okay.  Now this is a letter from

Page 80

1          Joseph Amato
2  FINRA, dated May 15, 2015, and this is the
3  so-called "unreasonable letter."  You see
4  it's right there, "re: Unreasonable letter"?
5  Do you see that?
6      A.   Sure.
7      Q.   Okay.  And as designee, you have
8  testified that Alexander Capital received it
9  soon after it was received by Alexander
10  Capital's counsel; is that correct?
11      A.   That's my understanding.
12      Q.   All right.  Now, as for you,
13  yourself personally, in looking at this
14  letter, does this refresh your recollection
15  at all as to when you first saw this
16  unreasonable letter dated May 15, 2015?
17      A.   I don't know the exact date, no.
18      Q.   Do you have any memory of seeing it
19  in 2015 at any time?
20      A.   I don't recall.
21      Q.   Do you have any memory of
22  discussing it with anybody at Alexander
23  Capital, in 2015?
24      A.   I don't recall the timing.
25      Q.   Okay.  Was Alexander Capital aware,

Page 81

1              Joseph Amato
2  as indicated in this letter, where it states
3  in -- now I am asking you as the designated
4  person. This is page two, under six it says,
5  "In connection with the filing received for
6  Alexander Capital, LP, the sole book running
7  manager identified in the offering documents,
8  the department suggests that the firm contact
9  their district office to discuss their
10  participation in this offering and obtain
11  approval to underwrite this offering on a
12  firm commitment basis."
13         Do you see that?
14     A.  I do see that.
15     Q.  As designated officer, is it true
16  that Alexander Capital, through this
17  unreasonable letter, was informed by FINRA
18  that it did not have approval to underwrite
19  this offering on a firm -- Alterix offering
20  on a firm commitment basis?
21     A.  I believe the firm went for
22  approval with this.
23     Q.  Because they were informed -- they
24  went for approval because they were informed
25  that they did not have the approval for such

Page 82

1              Joseph Amato
2  an authority; is that correct?
3     A.  No, because we were asked -- it
4  suggested that we contact them and I believe
5  that's what prompted the firm to contact.
6     Q.  To obtain approval?
7     A.  We -- we contacted them as it was
8  suggested here, and I believe that's what we
9  did as a firm.
10     Q.  Well, is it -- was it Alexander
11  Capital's understanding, and I am asking you
12  now as your designated -- in your designated
13  role, is it true that Alexander Capital knew,
14  at the time that it received this letter,
15  that it did not have the authority from FINRA
16  to conduct a firm commitment offering, but it
17  had to obtain such authority?
18     A.  I believe -- yes, we had to -- let
19  me rephrase. We had to contact to do a firm
20  commitment offering. I don't know what -- if
21  we were -- what the offering was or how it
22  was going to be done, but to underwrite, we
23  had to contact our department, and I believe
24  we did that for an approval.
25     Q.  Was it Alexander Capital's

Page 83

1              Joseph Amato
2  understanding that the reason why approval
3  had to be obtained is because Alexander
4  Capital, as of the receipt of this letter of
5  May 15, 2015, did not have the authority
6  under its membership agreement to undertake a
7  firm commitment offering?
8     A.  Well, we did -- we did work with
9  firm commitment offers, but -- so we
10  contacted at the time, and that's the
11  approval we were going for, to underwrite it.
12     Q.  Right, but I am asking to be the
13  underwriter of a firm commitment offering,
14  that it was Alexander Capital -- and I am
15  asking you now as a designated official.
16     A.  Right.
17     Q.  That Alexander Capital knew at the
18  time that it received this letter on May 15,
19  2015, that it did not have, under its
20  membership agreement, the authority to
21  underwrite a firm commitment offering; is
22  that correct?
23     A.  Yes, could not underwrite at this
24  current time without obtaining...
25     Q.  Okay. All right. Now, were you

Page 84

1              Joseph Amato
2  aware that FINRA was -- that, in fact,
3  Alexander Capital made an application, a
4  so-called continuing membership application?
5  Were you aware at the time that it was made,
6  this continuing -- well, first of all, were
7  you aware that, in 2015, Alexander Capital
8  made a continuing membership application to
9  FINRA?
10     A.  Yes, I just don't know the exact
11  dates, but yes.
12     Q.  Now, I am asking in your personal
13  knowledge.
14         Were you aware personally at that
15  time frame?
16     A.  Yes.
17     Q.  Okay. And how did you become aware
18  of it?
19     A.  I don't recall. It's part of the
20  process.
21     Q.  Okay. And what was -- what were
22  you made aware of, to the extent you can
23  remember?
24     A.  That we were going to put in other
25  -- put in a CMA.

Page 85

1              Joseph Amato
2      Q.  Do you know what a "CMA" is?
3      A.  Continuing membership application.
4      Q.  And you understood it then?
5      A.  Yes.
6      Q.  And -- okay.  All right.  I am
7  going to show you a document.  All right.  I
8  am going to show you what's been marked as --
9  by the way, did I say the exhibit of the last
10  one we just did?  Did I give the number to
11  the stenographer?  Did I reference that May
12  15th letter?  I don't know if I did.  The May
13  15th letter we just said, I will give you the
14  number.
15              MR. WARD:  143A.
16              MR. SCHLICHTMANN:  Thank
17      you.  Thank you, Bryan.  Appreciate
18      it.
19              MR. WARD:  Sure.
20              MR. SCHLICHTMANN:  You have
21      to watch me.  I am telling you, I
22      have to break this habit before I
23      retire.
24      Q.  All right, Plaintiff's Exhibit 135,
25  all right, is now on the screen.  Do you see

Page 86

1              Joseph Amato
2  that, Mr. Amato?
3      A.  I do.
4      Q.  Okay.  This is a continuing member
5  application.  Do you see that?
6      A.  I do.
7      Q.  Do you recognize this format as
8  something you are familiar with?  A
9  continuing membership application form, you
10  are familiar with?
11      A.  No.
12      Q.  Okay.  Do you remember seeing this
13  continuing membership application at the time
14  it was made in June 3 of 2015?
15      A.  No.
16      Q.  But you were made aware that an
17  application was being made?
18      A.  Correct.
19      Q.  And did you know what -- who was
20  making the application?
21      A.  I believe it was our attorney at
22  the time.
23      Q.  And was -- were you aware that --
24  of the -- the firm that was doing it was the
25  Sichenzia Ross firm?

Page 87

1              Joseph Amato
2      A.  Correct.
3      Q.  Okay.  Did you approve that, or
4  were you involved in the approval of that
5  decision to go for filing an application?
6      A.  I don't recall how the process came
7  about.
8      Q.  And on Exhibit 135, the continuing
9  membership application, it says in page four,
10  it states, the -- the -- Alexander Capital's
11  making a statement to FINRA regarding its
12  application that "Nesa Management seeks to
13  purchase an additional 75.1 percent of
14  Alexander Capital, LP, the firm, from Exitus
15  LLC, resulting in Nesa owning 100 percent of
16  Alexander Capital, LP."
17          Do you see that?
18      A.  I do.
19      Q.  Was it your understanding, at the
20  time, that Alexander Capital had 25. -- 24.9
21  percent, and that Nesa -- and that Exitus had
22  75.1 percent ownership of Alexander Capital?
23          Was that your understanding at the
24  time?
25      A.  I believe so.  I'm...

Page 88

1              Joseph Amato
2      Q.  Was it your understanding that Nesa
3  Management, LLC, wished to purchase, from
4  Exitus, its 75.1 percent ownership share, as
5  indicated in this statement?
6      A.  Yes.
7      Q.  It then in the statement says,
8  further on, the -- right here.  I will
9  highlight it in yellow.  "The firm intends to
10  develop investment banking as a major
11  business line and will devote substantial
12  resources towards that end.  In that regard,
13  the firm is requesting that it be permitted
14  by its restrictive agreement to act as
15  managing underwriter and selling group member
16  in firm commitment underwritings."  Do you
17  see that?
18      A.  I do.
19      Q.  And is that consistent now as -- I
20  am asking now as designee of Alexander
21  Capital.  Is it true, as of that time, that
22  the restrictive agreement of Alexander
23  Capital did not allow it to act as managing
24  underwriter of a firm commitment
25  underwriting; is that correct?

Page 89

Joseph Amato

1
2      A.   I don't know if we were restricted.
3   I don't know if we were granted.
4      Q.   No, I'm asking you as the designee.
5      A.   Correct.  So I don't believe we had
6   a restriction on the broker-dealer.  I don't
7   believe we had approval.
8      Q.   Okay.  Well, if you don't have the
9   approval, was it Alexander Capital -- now I
10  am asking as designee.  Was it true that if
11  Alexander Capital didn't have the approval,
12  then, it was restricted from engaging in that
13  activity; namely, firm commitment
14  underwriting?
15     A.   Approvals and restrictions are two
16  different, I would say.
17     Q.   Okay, but if your -- was it
18  Alexander -- again, I am asking as designee.
19     A.   Sure.
20     Q.   Was it Alexander Capital's
21  understanding that if it did not have the
22  approval of FINRA to be the managing
23  underwriter in a firm commitment
24  underwriting, okay, if it didn't have such
25  approval, that it was, therefore, restricted

Page 90

Joseph Amato

1
2   from engaging in that activity, unless it had
3   the approval of FINRA to do so?  Is that
4   correct?
5      A.   I would say FINRA wouldn't approve
6   us to underwrite it, at the time.
7      Q.   Okay.  Was it not Alexander
8   Capital -- then, is it true, then, Alexander
9   Capital did not understand -- and I am asking
10  again as designee.
11         Did Alexander Capital -- was it
12  Alexander Capital's understanding, in 2015,
13  that it was not restricted from engaging in
14  firm commitment offerings, only that it
15  didn't have the approval, or because it
16  didn't have the approval, it was restricted?
17  Which of those fairly characterizes Alexander
18  Capital's understanding at that time?
19     A.   As you stated, we only could
20  participate in firm commitment underwriting.
21     Q.   When you say, "participate," in
22  what form did Alexander Capital believe it
23  could participate?
24     A.   Participate in investment selling
25  group.

Page 91

Joseph Amato

1
2      Q.   Okay, but now participate as the
3   managing underwriter?
4      A.   No, you asked "participate."  So I
5   answered as participate.
6      Q.   Okay, I am asking:  Participate as
7   managing underwriter?
8      A.   No, we couldn't.
9      Q.   Participate in the selling group?
10     A.   We could participate in the seller
11  group, was our understanding at the time.
12     Q.   Okay.  Now, did that understanding
13  change?  And I am asking, again, as designee.
14     A.   Yes.
15     Q.   In what way did that change?
16     A.   We applied for -- to be the
17  underwriter at this point, based upon the
18  letter.
19     Q.   No, no, my question is:  You --
20  your understanding was you could participate
21  as a member of a selling group, regarding a
22  firm commitment offering; is that correct?
23     A.   Correct.
24     Q.   All right.  Did your -- that
25  understanding change?  In other words, were

Page 92

Joseph Amato

1
2   you -- was Alexander Capital -- again, I am
3   asking as designee -- were they later
4   corrected by anyone, regulatory authority or
5   otherwise, that they couldn't participate as
6   a selling group member of a firm commitment
7   offering?
8      A.   Yes.  I don't recall when that was.
9      Q.   But at some point they -- Alexander
10  Capital learned that they could not be a
11  selling group member of a firm committing
12  offering; is that correct?
13     A.   At some point, yes.
14     Q.   Okay.  All right.  Now, it states
15  later on in here that "The firm understands"
16  -- it says here -- I will highlight it in
17  yellow.
18         It says, "To satisfy the net
19  capital" -- "to satisfy the net capital
20  requirements and to fund firm commitment
21  underwritings, the firm may employ temporary
22  subordinated loans and/or subordinated loans,
23  and has identified potential lenders for this
24  purpose."  And then it goes on to say that,
25  "The firm understands it can employ temporary

Page 93

                    Joseph Amato
1
2    subordinated loans only three times per year
3    for purposes of satisfying net capital
4    requirements for firm commitment
5    underwriting," and then further -- did you
6    see that, what I just read?
7        A.  I do.
8        Q.  All right.  Did -- now I am asking
9    you personally.  Did you understand that
10   there were certain net capital requirements
11   for Alexander Capital to meet in order to
12   qualify to do under -- firm commitment
13   underwriting?
14       A.  Yes.
15       Q.  And I am now asking you as
16   designee.
17           Was it Alexander Capital's
18   understanding, in 2015, that it had to
19   satisfy certain net capital requirements, in
20   order to qualify for firm commitment
21   underwritings?
22       A.  Yes.
23       Q.  Okay.  And as of 2015, what was
24   your understanding of the net capital
25   requirements that Alexander Capital had to

Page 94

                    Joseph Amato
1
2    meet for its underwriting?
3        A.  It would vary.
4        Q.  Okay.  In what way?
5        A.  Depending on the deal, the size of
6    the deal.
7        Q.  Right.  But, now, was it your
8    understanding -- I am asking you personally,
9    that the -- that -- whether the net capital
10   requirements for a firm commitment offering
11   were different than the net capital
12   requirements for a best efforts offering?
13       A.  Not necessarily.
14       Q.  Was it your understanding -- and
15   now I am asking you personally.  Yesterday,
16   Mr. Guidicipietro said that Alexander Capital
17   -- he used the phrase -- was a "nickel
18   broker."
19       A.  Nickel broker-dealer.
20       Q.  That's right, okay.  And are you
21   familiar with the term, colloquial
22   expression, "nickel broker-dealer?
23       A.  I am.
24       Q.  What does it mean?  What was your
25   understanding, as of 2014, 2015?

Page 95

                    Joseph Amato
1
2        A.  It's just a qualification level you
3    need to keep on as an excess net capital.
4        Q.  Okay.  And as a nickel
5    broker-dealer, was it your understanding that
6    a nickle broker-dealer was not authorized to
7    conduct a firm commitment offering?
8        A.  Correct, you cannot.
9        Q.  Now, it says here, "Additionally,
10   the current equity holders of the firm, as
11   well as Messrs. Guidicipietro, Amato, O'
12   Brian, Carlin, Gazdak, and Feinman, have the
13   capital and have agreed to make additional
14   capital contributions in the future if
15   necessary."  Do you see that?
16       A.  Oh, sure.
17       Q.  To your knowledge, in 2015, was
18   there an agreement between Mr. Guidicipietro,
19   yourself, Mr. O'Brian, Mr. Carlin, Mr.
20   Gazdak, and Mr. Feinman, that -- that they
21   agreed to make additional capital
22   contributions in order to qualify for firm
23   commitment offerings?
24       A.  We could have done so if needed.
25       Q.  Yes, but I am asking specifically,

Page 96

                    Joseph Amato
1
2    were you aware that there was such an
3    agreement?
4           MR. WARD:  Objection.
5        Ambiguous.
6           MR. SCHLICHTMANN:  All
7        right, I withdraw the question.
8        Q.  What I am asking specifically is:
9    To your knowledge, in 2015, all right, was
10   there an agreement of any kind between Mr.
11   Guidicipietro, yourself, Mr. O' Brian, Mr.
12   Carlin, Mr. Gazdak and Mr. Feinman, about
13   making capital contributions to Alexander
14   Capital, LP, regarding a firm commitment
15   offering?
16       A.  We could have made contributions,
17   if necessary.
18       Q.  Yes, but I am asking specifically:
19   Was there an agreement between -- were you
20   aware of an agreement among yourself and the
21   others listed, or you have no memory of an
22   agreement?
23       A.  We were able and discussed putting
24   capital up.
25       Q.  You do remember having a discussion

Page 97

1          Joseph Amato
2 with these gentlemen?
3     A.  Not necessarily all.  I may have.
4 But, yes, we had an agreement that we would
5 put capital up if necessary.
6     Q.  And, okay, when you say, "we," who
7 is included in the "we," to your memory?
8     A.  I -- I don't recall, exactly, who I
9 spoke to at the time, but it is a true
10 statement that we had the ability to put the
11 capital up if necessary.
12     Q.  And you say, "we."  Who -- who's
13 the "we" you're referring to?
14     A.  Myself, Mr. Guidicipietro, Mr.
15 O'Brian, Mr. Carlin, Mr. Gazdak, and Mr.
16 Feinman.
17     Q.  Okay.  And...now, all right.  Now I
18 am going to show you a document that's been
19 marked Plaintiff's Exhibit 127.  It's a
20 black-and-white copy, with a FINRA letterhead
21 at the top.  Do you see that?
22     A.  I do.
23     Q.  And it's dated June 11, 2015.  Do
24 you see that?
25     A.  Yeah.

Page 98

1          Joseph Amato
2     Q.  And it's a FINRA letter to Mr.
3 Carmel at Sichenzia, Ross, Freidman and
4 Ference, concerning the continuing membership
5 application of Alexander Capital.  Do you see
6 that?
7     A.  I do.
8     Q.  Now I am asking you personally.
9 Were you aware, in 2015, that FINRA issued a
10 letter response to the CMA, the continuing
11 membership application that we just went
12 over?
13          Were you aware of that in 2015?
14     A.  I don't recall the timing.
15     Q.  All right.  As designee of
16 Alexander Capital, did Alexander Capital know
17 that there was a letter issued by FINRA dated
18 June 11, 2015, in response to its June 3,
19 2015, continuing membership application to
20 FINRA?
21     A.  I don't recall the date I was
22 aware, no.
23     Q.  No, I am not asking you personally
24 now.  I am asking you as the designee of
25 Alexander Capital.

Page 99

1          Joseph Amato
2     A.  I am not aware of what -- the date
3 we knew.
4     Q.  The company?
5     A.  Correct.
6     Q.  Okay.  And I am showing you this
7 letter from FINRA dated June 11, 2015, and I
8 showed you the -- which is Exhibit 127, and I
9 showed you the previous exhibit, the June 3,
10 2015, application.
11          Is the fact that this letter is
12 dated to Mr. Carmel at Sichenzia, on June 11,
13 2015, does that help you, as the designee of
14 Alexander Capital, that Alexander Capital did
15 know that a letter from FINRA was issued on
16 -- date June 11, 2015, regarding its
17 application or soon thereafter its receipt?
18     A.  Soon thereafter, yes.  I don't know
19 the date we actually received it, is what I
20 am saying.
21     Q.  Okay, all right.  You don't have
22 personal knowledge or memory of that; is that
23 correct, receipt of such a letter?
24     A.  Correct.
25     Q.  All right.  As you sit here today,

Page 100

1          Joseph Amato
2 did you become aware that on June 11, 2015,
3 FINRA issued a letter in response to the June
4 3, 2015, application?
5     A.  Yes.
6     Q.  And is that something you recently
7 became aware of?
8     A.  No.
9     Q.  When do you think you first became
10 aware that FINRA issued a June 11, 2015,
11 letter, in response to the June 3, 2015,
12 application to FINRA?
13     A.  Sometime, approximately, when the
14 firm received it in short term, I would
15 believe.
16     Q.  Okay.  Do you remember reading the
17 letter?
18     A.  I don't recall.
19     Q.  Do you remember having someone
20 discuss the letter with you?
21     A.  Yes.
22     Q.  Now, I am not asking for
23 attorney-client privileged communications at
24 all.  Please understand that.  At no time am
25 I asking for those.

Page 101

Joseph Amato

1
2      Did you have any discussions with
3  someone other -- you know, I will not say
4  even that.
5      I will just say:  Did you have
6  anyone -- any discussions with someone about
7  the letter, and I am not asking for any
8  attorney-client communications or
9  discussions, okay?
10     A.  So, then, I can't answer.
11     Q.  Okay, fine.  Thank you.
12     Now, in this letter, it talks about
13  the membership application for ownership
14  change to engage in firm commitment
15  underwriting, and to increase its statutory
16  net capital requirements to 100,000.  Do you
17  see all that?  It's all listed there, the
18  different requests.
19     A.  I do.
20     Q.  Okay.  Now, it says in the second
21  paragraph, "While NASD Rule 1017" -- and let
22  me just ask you:  Were you personally aware
23  of the NASD Rule 1017, or the FINRA Rule
24  1017, regarding continuing membership
25  applications, that they are commonly referred

Page 102

Joseph Amato

1
2  to as a 1017 application?
3      Was that -- did you know that
4  personally, in 2015?
5      A.  I don't recall when, but I do know
6  it now.
7      Q.  All right.  This says, "While NASD
8  Rule 1017C1 provides that a member may effect
9  a change in ownership or control prior to the
10  conclusion of the proceeding, the rule also
11  specifies that the staff may place interim
12  restrictions on the member based upon the
13  standards and NASD Rule 1014 pending final
14  action.  Therefore, the staff hereby imposes
15  the following interim restrictions pursuant
16  to Rule 1017C."  Do you see that?
17     A.  I do.
18     Q.  Okay.  "Number 1, the firm is
19  prohibited from effecting any portion of the
20  aforementioned ownership change.  The firm is
21  also prohibited from effecting any additional
22  changes in ownership, regardless of
23  percentage amount."
24     Do you see that?
25     A.  Yes.

Page 103

Joseph Amato

1
2      Q.  Okay.  Were you personally aware
3  that -- that the -- in their letter, FINRA
4  was placing restrictions on what Alexander
5  Capital could and could not do in response to
6  the application of June 3, 2015?
7      A.  Yes.
8      Q.  And were you aware of the fact that
9  the firm was -- one of the restrictions was,
10  the firm is prohibited -- was prohibited from
11  effecting any additional changes in ownership
12  until they were told they could?
13     A.  Correct.
14     Q.  It says, "Number 2, the firm is
15  prohibited from making any changes or
16  expansions to its business activities."  Do
17  you see that?
18     A.  I do.
19     Q.  Were you aware, you personally,
20  were you aware that in their letter of June
21  11, 2015, in response to the 20 -- to the
22  June 3, 2015, continuing membership
23  application, that the firm was prohibited by
24  FINRA from making any changes in its business
25  activities?

Page 104

Joseph Amato

1
2      A.  For the process of the CMA.  During
3  the process, correct.
4      Q.  During the process, correct.
5      You were personally aware of that?
6      A.  Yes.
7      Q.  Okay.  And now I am asking you as
8  designee.
9      Was Alexander Capital, LP, aware of
10  the fact that in -- by letter of June 11,
11  2015, the -- FINRA was prohibiting the firm
12  from making any changes to its business
13  activities while its application was pending,
14  regarding changing its authority to engage in
15  firm commitment underwritings?
16     A.  From my understanding, we had to
17  wait for final approval.
18     Q.  And were prohibited and it was --
19  now you say your understanding.  I am asking
20  now as designee.
21     A.  Correct.
22     Q.  Was it Alexander Capital's
23  understanding that it could not engage in
24  firm commitment underwriting activities,
25  pending its application for approval to

Page 105

1              Joseph Amato
2   engage in firm commitment underwritings?
3       A.  Yes.
4       Q.  Now I am asking you personally.  To
5   your knowledge, did Alexander Capital, okay,
6   did Alexander Capital's management, all
7   right, at any time, take any steps to inform
8   people working for Alexander Capital on
9   offerings that it was participating in or
10  intended to participate, about the
11  restrictions that FINRA had imposed on the
12  company?
13      A.  I don't recall on the timing.
14      Q.  All right.  Are you aware -- now I
15  am asking you personally.  Are you aware of
16  any steps that the company took to inform
17  people who worked at Alexander Capital, and
18  whose job would have them participate in
19  potential underwritings that Alexander
20  Capital was participating in, were there any
21  steps to inform them of the FINRA
22  restrictions we've just gone over?
23      A.  I don't recall if we had, no.
24      Q.  Did you take any steps?
25      A.  No, I don't recall.

Page 106

1              Joseph Amato
2       Q.  Did -- are you aware -- does
3   Mr. Guidicipietro take any steps?
4       A.  You would have to ask him.
5       Q.  All right.  You're not aware of
6   any?
7       A.  I am not aware.
8       Q.  How about Mr. Feinman, the CEO, are
9   you aware of him taking any steps?
10      A.  I don't know.
11      Q.  Are you aware of Mr. Stack taking
12  any steps?
13      A.  I don't know who informed.  I do
14  not know.
15      Q.  Okay, I am asking specifically as
16  to these people.  So you don't know whether
17  Mr. Feinman did, correct?
18      A.  Correct.
19      Q.  You don't know if Mr. Stack did,
20  correct?
21      A.  Correct.
22      Q.  You don't know if Mr. Gazdak did,
23  correct?
24      A.  Correct.
25      Q.  You don't know if Mr. Carlin did,

Page 107

1              Joseph Amato
2   correct?
3       A.  Correct.
4       Q.  Based on your understanding of the
5   practices and procedures in place at
6   Alexander Capital, LP, as of 2015, what was
7   your understanding as to whether or not the
8   firm would, as a matter of course, inform
9   people at Alexander Capital of these
10  restrictions that are in this June 11, 2015,
11  letter?
12      A.  Can you repeat that question?
13      Q.  Yes.  Based on your understanding
14  of -- let me ask you this way:  Were you
15  aware of any practices or procedures in place
16  at Alexander Capital, in 2015, that would
17  have required the people -- required that
18  people involved in any offering that
19  Alexander Capital intended to participate in,
20  to be made aware of these restrictions we
21  just went over?
22      A.  I'm uncertain.
23      Q.  You're not aware of any?
24      A.  I'm uncertain.
25      Q.  Okay, when you say, "uncertain,"

Page 108

1              Joseph Amato
2   does that mean you are aware or not aware of
3   any such practices or procedures?
4       A.  I am unaware.  I don't know.
5       Q.  I am asking you personally now.
6           Mr. Amato, are you aware as to
7   whether or not Alexander Capital, LP, during
8   2015, had any involvement in any offerings in
9   which it intended to be the underwriter on a
10  firm commitment basis, in 2015?
11      A.  I don't recall.
12      Q.  As you sit here today, do you have
13  any reason to believe that Alexander Capital,
14  in 2015, was involved in any offerings in
15  which it intended to be the underwriter on a
16  firm commitment basis?
17      A.  I don't recall the dates, no.
18      Q.  All right.  So even as you sit here
19  today?
20      A.  I don't recall the exact dates, no.
21      Q.  All right.  Do you recall any -- do
22  you have any recollection as to whether or
23  not, in 2015, as you sit here -- let me ask
24  you this way:  Are you aware of anything, as
25  of today, regarding whether or not Alexander

Page 109

1              Joseph Amato
2   Capital, in 2015, was involved in an offering
3   where it intended to be the underwriter on a
4   firm commitment basis?
5       A.   I don't recall the exact dates.
6       Q.   Of when you became aware of that?
7       A.   I don't recall the dates of -- or
8   the deals.  I don't recall if there were any
9   or there weren't any.
10      Q.   All right.  You are -- in 2015,
11  were you aware of the Alterix/Inpellis
12  offering that Alexander Capital was intending
13  to be the underwriter in?
14      A.   I don't recall the date.
15      Q.   Well, do you have any memory, in
16  2015, being made aware or becoming aware,
17  personally, of the Alterix, also known as,
18  Inpellis, offering that Alexander Capital was
19  intending to be the underwriter in?
20      A.   I know why we're here.  I don't
21  remember the date, the exact date.
22      Q.   I understand the exact date.  But I
23  am asking in general, do you have any memory,
24  in 2015, of becoming aware of it?
25      A.   I -- I don't recall.

Page 110

1              Joseph Amato
2       Q.   How about since 2015?
3       A.   Don't recall the date today, even,
4   for this.  The exact date, I don't recall.
5       Q.   All right.  Do you have any memory
6   of when you first became aware as to whether
7   or not Alexander Capital was involved in
8   underwritings in 2015 in which it intended to
9   be the underwriter on a firm commitment
10  basis, or you have no -- even as you sit here
11  today, you have no reason to believe that
12  Alexander Capital was involved in any such
13  underwriting?
14      A.   I know we put in an application.  I
15  don't know the exact dates of the deal, the
16  dates.  Don't know exactly as we sit this
17  second.  I don't know the exact date.
18      Q.   Okay.  But you do know that from
19  the application and from the FINRA
20  application letter we went over, that the --
21  that FINRA issued its unreasonable letter
22  notifying the company that it had to obtain
23  approval, was in reaction to the offering
24  that Alexander Capital was involved with that
25  had been filed in April of 2015 regarding the

Page 111

1              Joseph Amato
2   Alterix/Inpellis offering; is that right?
3       A.   Yes.
4       Q.   Okay.  What's your understanding of
5   the Alterix/Inpellis offering, as to whether
6   or not it involved Alexander Capital's
7   intention to be the firm commitment
8   underwriter of that offering?
9       A.   It was proposed.
10      Q.   Okay.  That's your understanding?
11      A.   Yes.
12      Q.   And who proposed it?
13      A.   I believe it was proposed by
14  Alexander.
15      Q.   To be the -- an underwriter on a
16  firm commitment basis of the Alterix/Inpellis
17  offering; is that what you are saying?
18      A.   I believe so.  I am not 100 percent
19  on the date, but yes.
20      Q.   Now, in light of these restrictions
21  that we just went over, as of June 2015, is
22  it -- what is your understanding as to
23  whether or not Alexander Capital, after
24  receipt of that June 11, 2015, letter, could
25  or could not continue to participate in

Page 112

1              Joseph Amato
2   filings regarding the Alterix/Inpellis
3   offering, in which it intended to be the
4   underwriter on a firm commitment basis?
5       A.   I would be unaware.  It would be
6   more of legal.  I don't know.
7       Q.   Did you have an understanding, in
8   2015, as to whether or not Alexander Capital,
9   in the face of this letter, could continue to
10  be part of filings regarding the
11  Alterix/Inpellis offering, in which it was
12  the intended underwriter on a firm commitment
13  basis?
14      A.   I don't know the legal process.
15  The CMA was in as well, so I don't know.  I
16  don't know.
17      Q.   Okay.  As you sit here today, do
18  you have an understanding as to whether, in
19  light of the restriction letter of June 11,
20  2015, that Alexander Capital could or could
21  not continue to be the intended underwriter
22  on a firm commitment basis in the
23  Alterix/Inpellis offering?
24      A.   I don't know the legal process as
25  to the timing because of how this went down.

Page 113

1            Joseph Amato
2  I don't know.
3      Q.   When you say, "legal process and
4  timing of how this went down," could you help
5  us out a little bit more about what exactly
6  you mean by your answer?
7      A.   Sure.  The initial filing and the
8  CMA being in.
9      Q.   Okay.
10     A.   I don't know.  I can't answer.
11     Q.   And just to be clear, your -- said
12 -- there was an initial filing in April, a
13 private confidential filing for
14 Alterix/Inpellis, correct?
15     A.   I don't know the exact dates.  I
16 don't do this typically for the firm, so I
17 can't answer to the processes behind it, and
18 that's why we rely on Banking and Legal to do
19 so.  I don't know.  I don't know the process.
20     Q.   Okay.  So now I am asking as
21 designee of Alexander Capital, regarding
22 FINRA issues, as expressed by Attorney Ward
23 previously, in accordance with the notice,
24 all right?  Remember that?  Okay.
25     A.   Yes.

Page 114

1            Joseph Amato
2      Q.   Now I am asking you as designee.
3      Is it true that Alexander Capital
4  knew, as of the receipt of the June 11, 2015,
5  letter that we have just gone over, that --
6  exhibit -- make sure I have -- Exhibit 127,
7  that Alexander Capital could or could not be
8  involved in any further filings in which --
9  with -- on a confidential basis or on a
10 public basis, in which it was listed as the
11 underwriter that intended to conduct the
12 underwriting on a firm commitment basis?
13     A.   Future filing for another company,
14 I don't think so.  This was already in.  I
15 don't know the process.  I don't understand
16 or know the process, even for Alexander
17 Capital.
18     Q.   Okay.  Now I want to make sure I
19 understand the answer.  Is -- what I am
20 asking now as designee of Alexander Capital,
21 LP, regarding FINRA issues, did Alexander
22 Capital know, or what did Alexander Capital
23 know as to whether or not, okay, it could
24 participate in additional filings, after June
25 11, 2015, regarding the Alterix/Inpellis

Page 115

1            Joseph Amato
2  offering, in which it was listed as the
3  underwriter that intended to conduct the
4  underwriting on a firm commitment basis?
5      What was the understanding of
6  Alexander Capital at that time, with respect
7  to that?
8      A.   I would be unaware.
9      Q.   Now I am asking you to speak for
10 Alexander Capital, now, not yourself.
11           MR. WARD:  And, Jan, I will
12     object --
13           MR. SCHLICHTMANN:  Please,
14     go ahead.
15           MR. WARD:  Just in terms of
16     the scope -- I have given you a lot
17     of leeway, in terms of the scope.
18     The designation was for somebody
19     regarding the financial ability and
20     legal authority to undertake
21     underwriting, whether characterized
22     as best effort or firm commitment
23     during 2014, 2016.
24           MR. SCHLICHTMANN:  Correct.
25           MR. WARD:  In terms of the

Page 116

1            Joseph Amato
2  filings, what was filed there in
3  participating in as filings
4  themselves, that wasn't designated
5  here.  I can give you some leeway
6  here, but in terms of preparation
7  for something on that particular
8  issue is not something --
9            MR. SCHLICHTMANN:  Okay, I
10     will just ask it generally, as
11     opposed to specifically.
12           MR. WARD:  Generally in
13     terms of?
14           MR. SCHLICHTMANN:  Alexander
15     Capital's understanding of what it
16     could or couldn't do, and I will
17     just ask it in general sense
18     rather --
19           MR. WARD:  Maybe in terms of
20     acting as a lead underwriter or
21     participating in filings --
22           MR. SCHLICHTMANN:  After the
23     June 11 -- we can go --
24           THE VIDEOGRAPHER:  Did you
25     say, "go off record"?

Page 117

1          Joseph Amato
2          MR. SCHLICHTMANN: Yeah,
3   let's go off record.
4          THE VIDEOGRAPHER: Going off
5   video record. The time is 12:22
6   p.m.
7          (Whereupon, a recess was
8   taken at this time.)
9          THE VIDEOGRAPHER: Back on
10  video record. Time is 12:34 p.m.
11  BY MR. SCHLICHTMANN:
12     Q.   And just to -- Mr. Amato, I think
13  you have to move over just a little bit to be
14  centered in the frame, that's all. Yeah,
15  great. Yeah, great. All right. We're
16  ready?
17         THE VIDEOGRAPHER: Yes.
18         MR. SCHLICHTMANN: All
19  right, great.
20     Q.   Mr. Amato, I am asking you now as
21  the designee for Alexander Capital. What was
22  Alexander Capital's understanding after its
23  receipt of the June 11, 2015, letter, from
24  FINRA, regarding the restrictions that we
25  have previously went over, as to whether or

Page 118

1          Joseph Amato
2   not Alexander Capital could continue to be
3   part of any filings, whether private or
4   public, regarding an offering in which it was
5   intended to be the underwriter on a firm
6   commitment basis?
7          MR. WARD: Objection; vague.
8      Q.   And in light of the objection
9   there, is there -- do you understand the
10  question? If not, I will rephrase it. I
11  want to make sure you understand my question.
12     A.   Can you rephrase it?
13     Q.   Okay. Again, Mr. Amato, I know
14  it's --
15     A.   Can you hold on. Let me fix my
16  video.
17     Q.   Yeah, sure, sure, absolutely. Take
18  your time. Now we are obstructed by your
19  keyboard.
20         MR. WARD: Jan, if it's
21  helpful, I can tell you what the
22  vague part is. Otherwise, I won't
23  interfere.
24         MR. SCHLICHTMANN: Yeah,
25  yeah, sure, go ahead.

Page 119

1          Joseph Amato
2          MR. WARD: "Part of" is --
3          MR. SCHLICHTMANN: Don't use
4   the phrase "part of"?
5          MR. WARD: Yeah, "part of
6   it."
7          MR. SCHLICHTMANN: Got it.
8   Okay, I will not use that. Got it.
9      Q.   Okay. Great. Are we okay?
10     A.   Sure.
11     Q.   Great. All right. Now I am asking
12  you, Mr. Amato, in your position as the
13  designee for Alexander Capital, what was
14  Alexander Capital's understanding after
15  receipt of the June 11, 2015, FINRA letter
16  that we have previously gone over, in which
17  it imposed certain restrictions that we've
18  gone over, regarding whether or not Alexander
19  Capital could be listed as the underwriter
20  who intended to do a -- the underwriting on a
21  firm commitment basis, as to whether or not
22  Alexander Capital could be listed as the
23  underwriter who intended to do an offering on
24  a firm commitment basis, after receipt of
25  that letter?

Page 120

1          Joseph Amato
2      A.   It's my understanding Alexander
3   Capital don't do the filing.
4      Q.   "Don't do the filing"?
5      A.   We don't file it.
6      Q.   Okay. Could they be listed in any
7   filing? Alexander Capital -- what was
8   Alexander Capital's understanding as to
9   whether it could be listed in any such
10  filing, as the underwriter who intended to
11  underwrite the offering on a firm commitment
12  basis? Could it be listed or not be listed?
13     A.   We don't file. The issuer does the
14  filing and lists what they choose to.
15     Q.   Okay. And -- okay. But what I am
16  asking is: What was Alexander Capital's
17  understanding as to whether it was -- it
18  could be listed, not whether somebody is
19  listing them, but whether it was appropriate
20  to list them in such a filing, after receipt
21  of the June 11, 2015, letter?
22     A.   I believe they were -- we were in
23  good order.
24     Q.   What does that mean, "in good
25  order"?

Page 121

1           Joseph Amato
2       A.  Alexander was -- I believe they
3   were allowed to file it.  We don't do the
4   filings, so it's -- I can't control the issue
5   of filing.
6       Q.  Okay.  Right now you are saying --
7   let me ask it this way:  Was it Alexander
8   Capital's understanding, in 2015, that --
9   whether or not it had any responsibilities
10  regarding review and approval of any filing
11  intended to be made by an issuing company in
12  which Alexander Capital was intending to be
13  the underwriter?
14      A.  No.
15      Q.  No such responsibilities?
16      A.  No.
17      Q.  And are you now -- again, you are
18  saying this as designee of Alexander Capital,
19  LP, and I want to be very clear here that as
20  designee of Alexander Capital, LP, it is your
21  testimony that Alexander Capital, in 2015,
22  did not understand that it had a requirement,
23  all right, to review, and I will say,
24  "requirement," under the rules and
25  regulations of FINRA or the SEC, okay, that

Page 122

1           Joseph Amato
2   such requirements required Alexander Capital
3   to review and approve any offering being
4   filed in which it intended to be the
5   underwriter?
6       MR. WARD:  Objection.
7           Just outside of the scope of
8       his role as --
9           MR. SCHLICHTMANN:  No, I am
10      asking personally now.
11          MR. WARD:  Okay.
12          MR. SCHLICHTMANN:  Yeah.
13          MR. WARD:  I thought you
14      prefaced that with --
15          MR. SCHLICHTMANN:  I did.  I
16      did.  All right.  Well, you think
17      it's outside of the scope?  Well,
18      isn't -- let me see if I can make
19      it a little more scope-y.
20      Q.  All right, well, let me just ask
21  you personally, were you aware, in 2015, as
22  to whether or not Alexander Capital was
23  required under FINRA to review and approve
24  any filing that was being made by an issuing
25  company, in which Alexander Capital was

Page 123

1           Joseph Amato
2   listed as the underwriter?
3       A.  I was unaware.  It wasn't my role
4   with the firm.
5       Q.  All right.  Now, I am asking you as
6   designee.  What was Alexander Capital's
7   understanding as to the rules and regulations
8   of FINRA regarding whether or not it had to
9   review and approve any filing in which -- by
10  an issuing company, in which it was listed as
11  the underwriter?
12          MR. WARD:  I will object,
13      again, to outside of the scope.
14          MR. SCHLICHTMANN:  Will you
15      let me have it or not?
16          MR. WARD:  I will object to
17      it.  You can, I mean --
18          MR. SCHLICHTMANN:  Well,
19      it's up to you, if you are, you
20      know, I don't want to overstep
21      myself here.  Can I have the
22      question or not?
23          MR. WARD:  You can ask him
24      on a personal --
25          MR. SCHLICHTMANN:  Okay, but

Page 124

1       Joseph Amato
2   you are -- not on a -- as a
3   designee?
4       MR. WARD:  No, because it's
5   outside of the scope.
6       MR. SCHLICHTMANN:  Okay,
7   what I am -- okay, but doesn't it
8   come under the, you know, his, you
9   know, the knowledge of FINRA, you
10  know, underwriting authority under
11  it?  Can't --
12      MR. WARD:  Regarding the
13  financial ability and legal
14  authority of Alexander Capital to
15  undertake underwriting?
16      MR. SCHLICHTMANN:  Yes.
17      MR. WARD:  Whether it
18  characterizes as best efforts or
19  firm commitment during 2014, 2016.
20      MR. SCHLICHTMANN:  Okay, you
21  don't think that question comes
22  under that?
23      MR. WARD:  Just whether they
24  had the authority to undertake best
25  efforts or firm commitment

Page 125

Joseph Amato

1 underwriting. That's what he's
2 designated as in that various
3 responsibilities of a broker-dealer
4 with or underwriter with respect to
5 a --
6
7          MR. SCHLICHTMANN:  All
8    right, fine.
9          MR. WARD:  I have given you
10    -- I have allowed a lot of
11    questions outside of the scope
12    already but --
13          MR. SCHLICHTMANN:  It's
14    fine.  Let me just ask him
15    personally and I'll move on, okay.
16    Q.   Was it your understanding, in 2015,
17 as to -- that Alexander Capital, as an
18 underwriter, had any kind of obligation,
19 under the rules and regulations of FINRA or
20 the SEC, that before a filing in which it was
21 the intended underwriter, that it had to
22 review and approve the filing before it was
23 filed, or you had no such understanding?
24    A.   I'm unaware.  It wasn't my role at
25 the firm.

Page 126

Joseph Amato

1
2    Q.   Okay.  Was it your understanding,
3 in 2015, that Alexander Capital had an
4 obligation, regarding its CMA application, to
5 make any requests for information or
6 explanation to respond in an accurate and
7 truthful fashion, to the best of its ability?
8    A.   I didn't handle the CMA.  The
9 attorneys did.  So, I don't know.
10    Q.   I am asking now your personal
11 knowledge.
12          Was it your understanding that if
13 FINRA asked Alexander Capital -- whether it's
14 their counsel or anyone else associated with
15 Alexander Capital -- for information,
16 regarding its CMA application, that Alexander
17 Capital had an obligation to answer honestly
18 and accurately, to the best of its ability,
19 to any such request for information?
20    A.   In the CMA?  Did we have to answer
21 accurately in the CMA?  Yes, we have to
22 answer accurately, to the best of our
23 ability, if we know something.
24    Q.   Okay.  And if there are additional
25 requests for information regarding an

Page 127

Joseph Amato

1
2 application, it was your understanding that
3 Alexander Capital had an obligation to make
4 sure that any responses to requests for
5 information, regarding an application, had to
6 be as accurate and truthful as Alexander
7 Capital could do to its ability?
8    A.   Normally to our ability.
9    Q.   Okay, now...
10          MR. WARD:  Is there a
11    question?
12          MR. SCHLICHTMANN:  Very
13    good.
14    Q.   I will show you a letter and -- all
15 right, I am showing you a letter dated
16 October 27, 2015, from Sichenzia Ross to
17 FINRA.  Do you see that?
18    A.   I do.
19    Q.   Are you -- were you aware of the
20 fact that -- well, let me ask you this:  In
21 looking at this letter, which is Plaintiff's
22 Exhibit 129, is this letter at all familiar
23 to you?
24          Is it something you saw prior to
25    your testimony today?

Page 128

Joseph Amato

1
2    A.   I don't believe so.  I am unaware.
3    Q.   In preparation for the deposition,
4 do you remember reviewing it at all?
5    A.   I don't recall off the top of my
6 head.  All I see is the title letter from the
7 lawyer.
8    Q.   Okay, dated October 27, 2015.  It's
9 to the examiner, Mr. Francois, at FINRA, and
10 it's "continuing membership application
11 regarding Alexander Capital, LP."  Do you see
12 that?
13    A.   I do.
14    Q.   Okay.  In this letter, which was
15 sent by Mr. Carmel of Sichenzia Ross, to
16 FINRA, in response to their requests, it
17 states at the beginning, "As you know, this
18 firm represents Alexander Capital, LP,
19 Alexander, or the firm, we are in receipt of
20 this staff's request to Alexander pursuant to
21 Rule 1017, dated October 19, 2015, the
22 request, we trust the foregoing responses
23 will satisfy in full the request, such that
24 Alexander's application to amend its
25 membership agreement to increase the number

Page 129

1                Joseph Amato
2   of associated persons, approval to engage in
3   firm commitment underwriting activity,
4   approval to engage in proprietary trading,
5   and change of ownership is approved by
6   FINRA."  Do you see that?
7       A.  Yes.
8       Q.  Okay.  Now, it's -- then lists
9   "number 1, request from FINRA, provide
10  documentation of Nesa Management, LLC's,
11  Nesa, assumption of the role of general
12  partner of the firm, draft or executed."
13          Do you see that?
14      A.  Yes.
15      Q.  It appears this item may have been
16  Exhibit J and or K, but appears it was
17  omitted, and then it says, "response."
18  "Responsive documents are enclosed herewith
19  as Exhibit A."  Do you see that?
20      A.  I do.
21      Q.  Okay.  And when we go to Exhibit A
22  in Plaintiff's Exhibit 129, all right, this
23  is Exhibit A.  It's a document entitled
24  "assignment and assumption agreement."  Do
25  you see that?

Page 130

1                Joseph Amato
2       A.  I do.
3       Q.  All right.  Now, it says, "The
4   assignment and assumption agreement, this
5   agreement, dated as of," blank, blank, "is
6   made by and between Alexander Capital
7   Holdings, Inc., a Delaware corporation, the
8   company, and Nesa Management, LLC, a New York
9   limited liability company."  And referred to
10  in this agreement as "New GP."
11          Do you see that?
12      A.  I do.
13      Q.  Now, in looking at this document,
14  does this refresh your recollection at all as
15  to whether there was ever a proposed
16  assignment and assumption agreement between
17  Alexander Capital Holdings, Inc., and Nesa
18  Management, to your knowledge?
19      A.  Absolutely not.
20      Q.  You are saying, "absolutely not,"
21  there was no such agreement?
22      A.  No, it doesn't refresh my memory.
23      Q.  Okay, all right.  Do you know
24  Alexander Capital Holdings, Inc.?  Do you
25  know of that corporation?

Page 131

1                Joseph Amato
2       A.  I am not too familiar with it.
3       Q.  Did you -- are you aware as to
4   whether you had any involvement with
5   Alexander Capital Holdings, Inc., of any
6   kind?
7       A.  I don't recall the structure of the
8   company that -- back then.
9       Q.  Do you recall whether you or
10  Mr. Guidicipietro had any involvement with
11  Alexander Capital Holdings, Inc.?
12      A.  I don't recall.
13      Q.  Okay.  In this agreement, it states
14  there was not -- it's not executed and not
15  dated, but it was given to FINRA in the
16  October 2015 time frame as part of -- in
17  response to the question that we just went
18  over, all right.  I want you to assume that
19  that's correct, all right?
20          Do you have any reason to believe
21  that, in 2015, there was a proposed agreement
22  between Alexander Capital Holdings, Inc., and
23  Nesa, regarding GP interest in Alexander
24  Capital, LP?
25      A.  You mean, this unexecuted document?

Page 132

1                Joseph Amato
2   I don't recall it, no.  I don't recall.  I
3   don't know.
4       Q.  Does the unexecuted document
5   refresh your recollection as to whether there
6   was a proposed agreement of any kind between
7   Alexander Capital Holdings, Inc., and Nesa
8   Management, regarding the GP interest in
9   Alexander Capital, LP?
10      A.  I don't recall.
11      Q.  Okay.  And it states, "Whereas the
12  company, referring to Alexander Capital
13  Holdings, Inc., holds 100 percent of the
14  general partnership interest, the GP interest
15  of Alexander Capital, LP, a Delaware limited
16  partnership, and serves as the sole general
17  partner thereof."  Do you see that?
18      A.  Yeah.
19      Q.  Was it your understanding, in 2015,
20  that Alexander Capital Holdings, Inc., held a
21  100 percent of the general partnership
22  interest of Alexander Capital, LP, and served
23  as its sole general partner in that time?
24      A.  I don't know.  I am uncertain.
25      Q.  And reading that doesn't help

Page 133

1              Joseph Amato
2  refresh your recollection regarding that?
3      A.  Regarding a document that's not
4  executed -- I don't know.
5      Q.  Then it says, "Whereas, Alexander
6  Capital Holdings, Inc., desires to transfer
7  the GP interest to New GP, referring to Nesa
8  Management, and New GP, referring to Nesa
9  Management, deserves to" -- "desires to
10 assume the role of general partner of the
11 partnership, dated as of the date hereof."
12         Do you see that?
13     A.  I do.
14     Q.  Now, this is undated.  However,
15 it's being presented to FINRA in October of
16 2015, all right.
17         Correct?
18     A.  If you say so.
19     Q.  All right.  And it's -- it states,
20 so as of that time, according to this
21 document, in reference to the fact that it's
22 being presented by Alexander Capital to FINRA
23 in October of 2015, it's stating that "Nesa
24 desires to assume role of general partner as
25 of that date."

Page 134

1              Joseph Amato
2         Was it your understanding, in 2015,
3  that Nesa was not the general partner of
4  Alexander Capital, LP, at that time?
5      A.  I don't recall.
6      Q.  Was it your understanding that
7  Alexander Capital -- that Nesa Management was
8  trying to become the general partner of
9  Alexander Capital at that time?
10     A.  I don't recall the dates of it.  I
11 don't recall.
12     Q.  This doesn't help you at all?
13     A.  Absolutely not.  This document
14 doesn't help me.  I don't recall ever seeing
15 it.
16     Q.  Okay.  To your mind, was an
17 agreement ever entered into between Alexander
18 Capital Holdings, Inc., and Nesa Management,
19 regarding the general partnership interest in
20 Alexander Capital, at any time?
21     A.  I don't recall.
22     Q.  In this letter, it states on page
23 3, "In December of 2013, a full year after
24 the misconduct alleged by the staff," and
25 it's referring to a notification from FINRA

Page 135

1              Joseph Amato
2  that it intended to enter to or have an
3  examination investigation of Alexander
4  Capital regarding certain activities in 2011,
5  all right, and this -- and FINRA was asking
6  for a response as to whether that should be
7  taken into account regarding the application
8  for approval, with that as background, it
9  says, "In December of 2013, a full year after
10 the last misconduct alleged by the staff,
11 active control of the firm was sold to
12 Messrs. Amato and Guidicipietro."  Do you see
13 that?
14     A.  I do.
15     Q.  Okay.  Now, this is a statement
16 made by Sichenzia Ross to FINRA in October of
17 2015.  Is that statement, to your knowledge,
18 correct?
19         Was that a correct statement?
20     A.  I don't believe so.
21     Q.  What about it is incorrect?
22     A.  I -- I didn't purchase -- I don't
23 -- the firm was sold to myself and Rocco.  I
24 don't believe that to be correct.
25     Q.  So the statement "active control of

Page 136

1              Joseph Amato
2  the firm being sold to Messrs. Amato and
3  Guidicipietro in December of 2013," you do
4  not believe is an accurate statement?
5      A.  Correct.
6      Q.  And was not accurate at the time?
7      A.  I don't believe it to be.
8      Q.  Now, if -- if the -- if the active
9  control -- if the letter was meant to convey
10 -- or would it be accurate to say that in
11 December of 2013 -- no.  Well, let's just
12 stick with control of the firm.
13         You don't think it's accurate to
14 say, "control of the firm" or "sold" to
15 yourself and Mr. Guidicipietro; is that what
16 you are saying?
17     A.  Yes.  I don't believe -- I don't
18 believe we bought control over the firm in
19 2013, whatsoever.
20     Q.  Okay.  At some point did you?
21     A.  No.
22     Q.  So your testimony is that at no
23 time did you or Mr. Guidicipietro purchase
24 the active control of the firm; is that what
25 you are saying?

Page 137

Joseph Amato

2   A.   We never purchased the firm, Rocco
3   and myself.
4   Q.   Right, but Nesa Management did; is
5   that right?
6   A.   Nesa purchased a portion of the
7   firm that we went through over the years in a
8   chronological order of it, but I did not
9   purchase the firm.
10  Q.   Okay.
11  A.   Nor did Rocco.
12  Q.   Okay.  If -- if -- okay, and if the
13  -- so -- but after Nesa purchased its
14  percentage interest of 24.9 percent, at that
15  point, is it accurate to say that you and Mr.
16  Amato -- excuse me -- you and Mr.
17  Guidicipietro got active control of Alexander
18  Capital, LP?  Would that be accurate?
19  A.   No, there was staff in charge of
20  the firm at the time.
21  Q.   Okay.  All right.  Well, would it
22  be accurate to say that you and Mr.
23  Guidicipietro had control of that staff --
24  ultimate control of that staff, or that would
25  not be accurate?

Page 138

Joseph Amato

2   A.   No, they were hired to run the firm
3   and to make decisions on behalf of the firm.
4   Q.   Were they hired to make decisions,
5   independent of you and Mr. Guidicipietro?
6   A.   That is correct.
7   Q.   And as far as you and Mr.
8   Guidicipietro were concerned, you -- they
9   were to conduct their business without your
10  acting -- exercising any supervisory control
11  over their activities; is that what you are
12  saying?
13  A.   Correct.
14       MR. WARD:  Objection.
15       Calls for speculation.
16  Q.   Okay.  Okay.  But I just want to
17  make sure.
18       Are you satisfied with your answer
19  to my question?  You understood my question?
20  A.   No.  Can you repeat it?
21  Q.   Okay, all right.  Was it your
22  understanding that neither you or Mr.
23  Guidicipietro exercised any control over the
24  activity -- supervisory control over any of
25  the activities of anyone else at the -- at

Page 139

Joseph Amato

2   Alexander Capital, LP, after December 2013?
3   A.   It would depend on what the roles
4   were at the firm at the time.
5   Q.   Okay.  Here it's saying, in
6   December 2013, you -- you and Mr.
7   Guidicipietro exercised active control of the
8   firm.  Do you see that?  If we just focus on
9   that part of the sentence and not about
10  whether you acquired it, all right, just as
11  to in December of 2013 and afterwards, is it
12  truthful to say that you and Mr.
13  Guidicipietro exercised active control of the
14  firm?
15  A.   No.
16  Q.   Okay.  Is it accurate to say that
17  you and Mr. Guidicipietro at some point after
18  December 2013, exercised active control over
19  the firm?
20  A.   It would only depend if our roles
21  called for it, as far as a CROP, a ROP, only
22  in that aspect, if we were hired for that
23  job.
24  Q.   All right.  Well, how about as Mr.
25  -- well, was your understanding that Mr.

Page 140

Joseph Amato

2   Guidicipietro as chief operations officer
3   exercised active control of the firm?
4   A.   That's not a managerial role of
5   managing -- managing the personnel.
6   Q.   Okay.  You -- and at -- and, okay,
7   and just to be clear here, after December
8   2013, is there any period of time in which
9   you exercised active control of the firm?
10  A.   Only if I was in that role at the
11  time, of the CROP or ROP or something to that
12  effect.
13  Q.   And you are saying the CROP and
14  ROP.  But that only deals with options,
15  right?
16  A.   Correct.
17  Q.   Okay, so I am -- I am going to
18  exclude options, anything having to do with
19  options, all right?  I want to take that off
20  of the table and ask you about anything else
21  other than options.
22       Did you exercise active control of
23  the firm after December of 2013?
24  A.   I don't recall at that time.
25  Q.   Okay.  And I am saying after --

Page 141

1              Joseph Amato
2       A.   I don't believe so.
3       Q.   Okay.  From 2013 onward; is that
4    the same answer?
5       A.   Yeah, I don't believe so.
6       Q.   All right.  It says in a footnote
7    here, "A share having been previously sold to
8    Mr. Figliola," and obviously misspelling,
9    it's Mr. Figliola -- -lo, with an "O," "who
10   has never had active control of any aspect of
11   Alexander Capital."  Do you see that
12   footnote?
13      A.   I do.
14      Q.   So in -- that's a footnote to the
15   statement.  "In December 2013, a full year
16   after the last misconduct alleged by the
17   staff, active control of the firm was sold to
18   Mr. Amato and Guidicipietro," and the
19   footnote is, "A share having been previously
20   sold to Mr. Figliolo, who has never had
21   active control of any aspect of Alexander
22   Capital."
23           Now, just referring to that
24   footnote, is it your understanding that Mr.
25   Figliolo has never had active control of any

Page 142

1              Joseph Amato
2    aspect of Alexander Capital?
3       A.   It's my understanding he was a
4    passive owner.
5       Q.   Now, later on in this letter
6    there's an additional exhibit.
7           MR. WARD:  Just -- it's 1
8       o'clock now.  Do you want to finish
9       up with the document first?  We can
10      do that.
11          MR. SCHLICHTMANN:  No, take
12      the lunch.  It's fine.  It's a late
13      lunch, so that's fine.  Let's do
14      that.  I will be very efficient
15      after lunch.
16          MR. WARD:  Okay, and we're
17      trying -- I don't know if we can
18      move this more quickly, maybe
19      forty-minute lunch.  Does that work
20      for you?
21          MR. SCHLICHTMANN:  Forty
22      minutes is fine.  Absolutely.  It
23      will not be like yesterday.  I
24      should be able to get everything
25      all done fairly efficiently after

Page 143

1              Joseph Amato
2    our lunch break and get us all out
3    of here at an earlier time.
4           THE VIDEOGRAPHER:  Go off
5       record now?
6           MR. SCHLICHTMANN:  Yeah,
7       yeah, of course, because then I
8       will be held to what I just said,
9       right?
10          THE VIDEOGRAPHER:  Off the
11      record.  Time is 1:02 p.m.
12          (Whereupon, a lunch recess
13      was taken at this time.)
14          THE VIDEOGRAPHER:  Back on
15      video record.  Time is 1:42 p.m.
16   BY MR. SCHLICHTMANN:
17      Q.   I am going to show you a document.
18   Now, this is the document that we were
19   referring to previously.  This is exhibit --
20   it's Exhibit 129, and attached to it is, just
21   by way of preface, is a letter from FINRA
22   dated June -- dated September 1st, 2015, as
23   part of the same exhibit that we -- 129, and
24   it's an attachment to it, and it's a letter
25   from FINRA -- this is a black-and-white copy

Page 144

1              Joseph Amato
2    of it -- dated September 1st, 2015, to
3    Alexander Capital, and it's about an
4    examination investigation number, and -- an
5    examination investigation by FINRA.  Do you
6    see that?
7       A.   Yes.
8       Q.   Okay.  And -- and it's about -- it
9    says, "On September 1, 2015, a staff of
10   FINRA's Department of Enforcement advised
11   you" -- meaning Alexander Capital -- "that it
12   made a preliminary determination to recommend
13   that disciplinary action be brought against
14   Alexander Capital."
15           Do you see that?
16      A.   I do.
17      Q.   And without going into the details
18   of this particular event, were you aware, in
19   2015, that FINRA notified Alexander Capital
20   that there was a past conduct in which they
21   considered was a potential violation of its
22   rules?
23      A.   At some point, I believe so, yes.
24      Q.   All right.  And were you aware of
25   the fact that counsel for the firm responded

Page 145

1          Joseph Amato
2   to that investigation or allegation, and
3   responded in what was referred to as a "wells
4   response," a "wells document," a "wells
5   answer."
6          Are you familiar with the term
7   "wells answer"?
8      A.   A little bit, but I recall the
9   reply.
10     Q.   Okay.  All right.  Were you aware
11  of it at the time that it occurred, in 2015?
12     A.   No.
13     Q.   Did you become aware of it later?
14     A.   Later at some point.
15     Q.   Was it after 2015?
16     A.   I don't recall, exactly.
17     Q.   Okay.  All right.  Now, this is the
18  submission on behalf of Alexander Capital
19  regarding this particular allegation, and --
20  about a past event.  And in the response to
21  it, Alexander Capital -- these statements
22  were made on behalf of Alexander Capital
23  regarding the record.  This is part of the
24  response that was made to FINRA about this
25  particular allegation, but general statements

Page 146

1          Joseph Amato
2   were made about the past, and that's what I
3   want to refer to here, all right?  I am not
4   interested so much in going into details
5   about that past event.  I am -- I want to
6   direct your attention to statements that were
7   made in response to it about things in
8   general, all right?
9          So on this page three it -- it
10  states -- the statement that was made on
11  behalf of Alexander Capital, it talks about
12  the history, and it says that, "In 2012" --
13  do you see I have highlighted in yellow?  Now
14  this is my highlighting in yellow.  This was
15  not part of the original document, all right?
16  It says, "In 2012, Exitus, LLC, which is
17  owned by Joseph Figliolo," CRD number,
18  "became a silent partner in the firm."
19         Do you see that sentence?
20     A.   Yes.
21     Q.   Okay, is it consistent with your
22  memory that in 2012, Exitus, which was owned
23  by Joseph Figliolo became a silent partner in
24  Alexander Capital, LP, in 2012?
25     A.   I -- I -- I recall -- I believe he

Page 147

1          Joseph Amato
2   was a passive owner.
3      Q.   All right.  Does that sound right,
4   in 2012?
5      A.   Approximate.
6      Q.   Okay.  "In December 2013, two years
7   after the period covered by the staff's
8   investigation, Nesa Management, LLC, which is
9   owned by Joseph Amato," CRD number, "and
10  Rocco Guidicipietro," CRD number, "purchased
11  an interest in the firm."
12         Is that consistent with your
13  memory?
14     A.   Yes.
15     Q.   And then it says, "Messrs. Amato
16  and Guidicipietro, neither of whom were at
17  the firm in 2010, 2011, are now active owners
18  and partners in the firm."  Do you see that
19  statement?
20     A.   Yeah, we're partners in Nesa
21  Management which the firm -- not the firm
22  directly.
23     Q.   Okay.  And -- but so is the
24  statement correct that, either directly or
25  through Nesa Management, both you and Mr.

Page 148

1          Joseph Amato
2   Guidicipietro became the active owners and
3   partners in the firm, either directly or
4   indirectly through Nesa?
5      A.   Through Nesa we would be indirect
6   owners of the firm.
7      Q.   How about partners?
8      A.   No, we're indirect owners of the
9   firm through Nesa at all times.
10     Q.   Okay.  And who was a partner?
11         Was Nesa a partner in the firm?
12     A.   Nesa would be the direct owner of
13  the firm.
14     Q.   All right.  And in that way, is it
15  consistent with your understanding that they
16  should be characterized that either you or
17  Mr. Guidicipietro and/or Nesa either
18  individually or together should be described
19  as "partners in the firm"?
20     A.   I can't answer to that.
21     Q.   How about you, yourself?
22     A.   I would have to look at my filings
23  and stuff, but I believe we were -- through
24  Nesa, we had ownership, and that's -- that's
25  what I would stick to.

JOSEPH AMATO
AQUINO vs ALEXANDER CAPITAL

September 30, 2021
149–152

Page 149

1              Joseph Amato
2      Q.   Are you familiar with the term
3  "partner"?
4            Does that mean something to you?
5      A.   No, not familiar in how it's being
6  used here, so, no.
7      Q.   But are you, in general, aware of
8  the term "partner"?
9      A.   It depends how it's used.
10     Q.   All right.  Well, what's your
11  understanding of "partner," as you sit here
12  today?
13     A.   My wife is my partner.
14     Q.   Okay.  Good.  Good answer.  How
15  about in a business sense, do you have an
16  understanding of what it means to be a
17  partner in a business organization?
18     A.   I don't have confidence in this
19  use, so I am not certain how it would be used
20  in this instance.
21     Q.   Okay, but I am just asking in
22  general.
23          Do you have an understanding, as
24  you sit here today, of how the word "partner"
25  is used to describe a business relationship

Page 150

1              Joseph Amato
2  between two or more people who are in
3  business together?
4      A.   I can't answer.  I don't know.  I
5  don't know the situation, so, no, I couldn't
6  answer that.  It's too vague.
7      Q.   Not even in general?
8      A.   It's too vague for me.
9      Q.   Okay.  You are familiar with the
10  term "partner," however; is that right?
11     A.   My wife is my partner.
12     Q.   Okay.  And have you ever described
13  yourself, at any time of your association in
14  Alexander Capital, LP, as a "partner in that
15  firm," at any time?
16     A.   I don't recall.
17     Q.   Do you know if Mr. Guidicipietro
18  ever referred to himself at any time during
19  the time he was involved with Alexander
20  Capital, LP, referred to himself as a
21  "partner in the firm"?
22     A.   I am uncertain.
23     Q.   And at any time, are you aware as
24  to whether anyone associated with Nesa
25  Management referred to Nesa Management, LLC,

Page 151

1              Joseph Amato
2  as a partner in the firm of the Alexander
3  Capital, LP?
4      A.   I don't know how others may have --
5  what they may have said, but I don't believe
6  I have.  I don't -- I don't recall.
7      Q.   Later on in the letter, it states,
8  "In December of 2013, a full year after the
9  last misconduct alleged by the staff, active
10  control of the firm was sold to Messrs. Amato
11  and Guidicipietro."  Do you see that?
12     A.   I do.
13     Q.   Now, is that statement contained in
14  that letter, which was submitted to FINRA on
15  behalf of Alexander Capital, is that, in your
16  mind, a true statement as of that time?
17     A.   I don't -- I don't believe so.  I
18  don't think so, no.
19     Q.   What about it, in your mind, is not
20  true or accurate, as of that time?
21     A.   The statement.
22     Q.   Okay.  What part of it?  Or all of
23  it?
24     A.   I do believe we owned a portion
25  after, but I don't believe we had active

Page 152

1              Joseph Amato
2  control of the firm.
3      Q.   Okay.  And at any time did you --
4  is it your understanding that you and Mr.
5  Guidicipietro took active control of the firm
6  at sometime after?
7      A.   No.
8      Q.   Now, the footnote says, "A share
9  having been previously sold to Mr. Figliolo,
10  who has never had active control of any
11  aspect of the firm" -- do you see that?
12     A.   I to.
13     Q.   Do you consider that to be a true
14  statement?
15     A.   I don't know.  I wasn't there when
16  he was first there.  I can't answer that.
17     Q.   How about during the time that you
18  were there, at Alexander Capital, LP?
19     A.   I believe he was a passive owner
20  all along.
21     Q.   Okay.  Did you have any indication
22  he was exercising any active control of
23  Alexander Capital, LP, during the time you
24  have been associated with Alexander Capital,
25  LP?

Page 153

Joseph Amato

1
2    A.   I don't recall him to be, no.
3    Q.   It says in another footnote here,
4  first sentence, "It is worth noting that
5  FINRA approved the sale to new ownership and
6  the change in management."  Do you see that?
7    A.   I do.
8    Q.   All right.  Now, there are two
9  things talked about, "the approval of the
10 sale to new ownership," and "the change in
11 management," all right?
12       Now, regarding the approval of sale
13 to new ownership, all right, is it your
14 understanding that between 2012 and 2013,
15 FINRA approved the sale of ownership to
16 Exitus, owned by Mr. Figliolo?  Is that your
17 memory, that that occurred somewhere between
18 2012 and 2013?
19   A.   I don't recall the exact dates.
20   Q.   But is that something that occurred
21 in the past, around that time?
22   A.   Approximately, yes.
23   Q.   Okay.  Now, it also talks about "a
24 change in management."  To your knowledge,
25 was there approval for the change in

Page 154

Joseph Amato

1
2  management at Alexander Capital, LP, during
3  the time that there was the approval of the
4  sale to Exitus regarding its ownership
5  interest?
6    A.   I wouldn't know.
7    Q.   Okay.  To your mind, was there
8  approval for the change in management between
9  2012 and 2013?
10   A.   I don't know.  I don't recall.
11   Q.   Are you aware as to whether as part
12 of the FINRA's approval for the change of
13 ownership from Exitus, owned by Mr. Figliolo,
14 from Mr. Lanaia [sic], that there was also an
15 approval for the change in management of
16 Alexander Capital, LP?
17       Are you not aware of that?
18   A.   I'm not aware.
19   Q.   Are you aware as to whether or not
20 Alexander Capital -- whether FINRA approved
21 yourself and Mr. Guidicipietro, either
22 directly or indirectly through Nesa
23 Management, to manage -- approve a change so
24 that you and Mr. Guidicipietro, either
25 directly or indirectly through Nesa, could

Page 155

Joseph Amato

1
2  manage Alexander Capital, LP?
3    A.   I don't recall.
4    Q.   Now in here it refers to Alexander
5  taking certain preventive actions since this
6  event that they are talking about.  It states
7  here, "Since 2013, the firm has taken several
8  steps to prevent violations of the type
9  raised in the notice letter."  And it says,
10 "As the most recent annual audits shows,
11 these steps has worked.  The firm has
12 replaced personnel and strengthened its
13 policies and procedures."  Do you see that?
14   A.   I do.
15   Q.   Is it consistent with your memory
16 that after this incident that was talked
17 about previous to 2013, that since December
18 2013, that in fact the firm replaced
19 personnel?  Were you aware of that?
20   A.   I don't recall.  Have to see CRD.
21   Q.   I'm sorry, what was that?
22   A.   We would have to go to CRD.  I
23 don't recall.
24   Q.   Okay.  How about the reference to
25 the fact that since 2013, Alexander Capital

Page 156

Joseph Amato

1
2  strengthened its policies and procedures?
3  Are you aware of the fact that since December
4  2013, that Alexander Capital strengthened the
5  policies and procedures that were in place
6  before 2013?
7    A.   I can't speak to before.  I wasn't
8  at the firm.  Only from when I was there.
9    Q.   Okay.  Do you have any memory or
10 understanding as to whether or not an attempt
11 was made, after December 2013, to strengthen
12 the policies and procedures at Alexander
13 Capital, LP, or you have no such --
14   A.   I believe there was always policies
15 and procedures.
16   Q.   You are aware that there was an
17 attempt to do that?
18   A.   I believe there was an attachment
19 to do so.
20   Q.   Okay.  And can you describe for us
21 what you understand to have been what was
22 done, regarding strengthening the policies
23 and procedures at Alexander Capital, after
24 December 2013?
25   A.   Working with their attorneys and

Page 157

1              Joseph Amato
2  regulatory to make sure to stay in line,
3  strengthen your policies and procedures.
4      Q.   Okay.  It then says "The new owners
5  of the firm" -- now, in this letter they are
6  referring to the new owners of the firm as
7  yourself and Mr. Guidicipietro, either
8  directly or indirectly through Nesa.  But
9  they are describing that group, you and Mr.
10  Guidicipietro, either directly or indirectly
11  through NESA, as the new owners of the firm,
12  all right?
13         Does that seem consistent with what
14  I have gone over in this letter so far; that
15  that's what they are saying?
16      A.   Possibly.
17      Q.   All right.  And they said, "The new
18  owners of the firm have made several
19  substantial improvements to the firm's
20  policies and procedures."  Do you see that?
21      A.   I do see that.
22      Q.   Okay.  Is it -- was it accurate to
23  -- for Alexander Capital to say to FINRA in
24  October of 2015, that the -- that yourself
25  and Mr. Guidicipietro, either directly or

Page 158

1              Joseph Amato
2  indirectly through Nesa, made several
3  substantial improvements to the firm's
4  policies and procedures since December of
5  2013?
6      A.   That's possible.
7      Q.   It says, "they," referring to the
8  -- yourself and Mr. Guidicipietro, either
9  directly or indirectly through Nesa, "They
10  have updated the firm's written supervisory
11  policies and procedures, WSPs."  Do you see
12  that?
13      A.   I do.
14      Q.   Did you understand what the term
15  "WSPs" to refer to the "supervisory policies
16  and procedures" at the firm?
17      A.   I do.
18      Q.   And were you aware, in 2014 and
19  2015, that there were written supervisory
20  policies and procedures at the firm?
21      A.   Yes.
22      Q.   Were you aware as to whether or not
23  any of those written supervisory policies and
24  procedures had any -- focused in any way on
25  what the firm should tell prospective clients

Page 159

1              Joseph Amato
2  regarding what authority Alexander Capital
3  had regarding the underwriting of an offering
4  that a potential customer was seeking
5  Alexander Capital to do?
6      A.   I would be unaware.  I don't
7  recall.
8      Q.   It says further here, "They have
9  hired new supervisory personnel."  "They"
10  referring to you and Mr. Guidicipietro, and
11  -- either directly or indirectly through
12  Nesa, that "They have hired new supervisory
13  personnel.  In particular, they now have a
14  dedicated CCO," and you understand "CCO" to
15  mean "chief compliance officer"; is that
16  correct?
17      A.   Yes.
18      Q.   "Compared to the firm's previous
19  practice of having a CEO, slash, CCO, as a
20  result they have personnel dedicated to
21  supervision and compliance who will ensure
22  that the events alleged in the charges does
23  not recur."  Do you see that?
24      A.   I do.
25      Q.   Okay.  Now, is it accurate, in your

Page 160

1              Joseph Amato
2  opinion, that in October 2015, was it
3  accurate to tell FINRA that you and Mr.
4  Guidicipietro, either directly or indirectly
5  through Nesa, were responsible for the hiring
6  of new supervisory personnel, including a
7  dedicated chief compliance officer, and that
8  as a result, that Alexander Capital has
9  personnel dedicated to supervision and
10  compliance that will ensure that there will
11  be no repeat of violations of rules and
12  regulations applying to the company?
13      A.   I don't recall at the time.
14      Q.   Would it -- well, based on your
15  understanding as of that time, is that an
16  accurate statement to make to FINRA, as of
17  October 2015?
18      A.   I don't recall.  It's many years
19  back.
20      Q.   So you don't know, as you sit here
21  today, whether that's an accurate statement
22  to be made, as of 2015, to FINRA?
23      A.   I don't know how they were hired or
24  the process of the hire.  I do not know,
25  correct.

Page 161

```
1              Joseph Amato
2    Q.   And you weren't involved in that?
3    A.   I don't recall.
4    Q.   Whether you were involved or not?
5    A.   I don't recall.
6    Q.   Okay.  When you say, you "don't
7  recall," just to be clear, you are saying you
8  don't recall being involved in any of these
9  activities we just went over regarding the
10 statement made in this letter on behalf of
11 Alexander Capital, in 2015; is that correct?
12   A.   That's correct.  I don't recall.
13   Q.   Okay.  All right.  It concludes by
14 saying, "The firm is committed to fostering a
15 culture of compliance and following the
16 rules."  Do you see that?
17   A.   I do.
18   Q.   And it says, "It clearly
19 understands the message that FINRA is sending
20 with this wells notice."  Do you see that?
21   A.   I do.
22   Q.   And it says, "It has addressed
23 every item."
24        Do you see that?
25   A.   I do.
```

Page 162

```
1              Joseph Amato
2    Q.   Okay.  Now, just regarding the
3  statement, "The firm is committed to
4  fostering a culture of compliance and
5  following the rules," is that an accurate
6  statement regarding what you understood the
7  practices and procedures to be at Alexander
8  Capital, in 2014 and 2015, that the --
9  Alexander Capital was committed, during 2014
10 and 2015, to foster a culture of compliance
11 and following the rules that apply to it?
12   A.   I don't recall the prior policies
13 and procedures or the changes made at this
14 time.  I don't recall.
15   Q.   Okay.  But how about knowing what
16 was in place in 2014 and 2015, do you -- can
17 you tell us whether your -- that the
18 statement that the firm, in 2015, was
19 committed to fostering a culture of
20 compliance and following the rules, was an
21 accurate statement about what the firm was
22 committed to at that time?
23   A.   I don't recall the rules at the
24 time, but I agree we like to have culture
25 compliance and follow the rules.
```

Page 163

```
1              Joseph Amato
2    Q.   And following the rules?
3    A.   Yes.
4    Q.   Now, I am going to show you -- all
5  right, I am going to show you what's
6  previously been marked as Plaintiff's Exhibit
7  60, and it's a draft of an engagement
8  agreement.  Do you recognize the Alexander
9  Capital, LP letterhead?
10   A.   I do.
11   Q.   All right.  And this is a draft of
12 an engagement agreement, a proposed
13 engagement agreement, that was taken from a
14 previous engagement agreement draft involving
15 Stream T.V. Networks, Inc.  Do you see it's
16 crossed out in this draft?
17   A.   I do.
18   Q.   Okay.  Were you familiar, in 2015
19 -- 2014, with Stream T.V. Networks, Inc.?
20   A.   I know the name.
21   Q.   Do you recognize that as a client
22 of Alexander Capital, in 2014?
23   A.   I am uncertain of the time, but I
24 believe they were an earlier client.
25   Q.   Do you have any memory or
```

Page 164

```
1              Joseph Amato
2  understanding as to what services Alexander
3  Capital provided Stream T.V. Networks?
4    A.   I don't recall, no.
5    Q.   Now, this is an engagement
6  agreement that was a draft for Stream T.V.
7  Networks.  It was taken by Mr. -- it was
8  given by Mr. Gazdak to Mr. Mooney, and then
9  Mr. Mooney changed it in the ways indicated
10 in red, in which he corrected the date to
11 July 29, 2014.  Do you see that?  Over here
12 in the right.
13   A.   I can only see July 29.
14   Q.   Okay.  Let me just -- how about
15 that?
16   A.   Yes.
17   Q.   Do you see July 29, 2014?
18   A.   Now I do, yes.
19   Q.   Okay.  You see it's addressed to
20 Marshal Sterman, CEO of Alterix, Inc.  Do you
21 see that?
22   A.   I do.
23   Q.   And did you know Mr. Sterman or
24 anyone associated with Alterix, Inc., at any
25 time in 2014 and 2015?
```

Page 165

Joseph Amato

1
2     A.  No.
3     Q.  Ever have any communications with
4  anyone representing Alexander -- excuse me,
5  representing Alterix, also known as, Inpellis
6  Inc. during 2014, 2015?
7     A.  I don't believe so.
8     Q.  Now, in this draft, this proposed
9  engagement agreement, to be sent to Mr.
10  Sterman, the "re" is "proposed initial public
11  offering."
12     Do you see that?
13     A.  I do.
14     Q.  And it says, "Dear" -- and the
15  previous person representing Stream T.V. is
16  crossed out and Marshal is put in.  Do you
17  see that?
18     A.  I do.
19     Q.  All right.  And, again, this is
20  Plaintiff's Exhibit 60, if I have not already
21  identified it.
22     It says, "Dear Marshal" -- are we
23  okay?  All right.
24     A.  Yes.
25     Q.  "Dear Marshal, we are pleased to

Page 166

Joseph Amato

1
2  submit the following proposal with respect to
3  an initial public offering, the public
4  offering, by Alterix Inc., the company, of up
5  to $20 million, consisting of the company's
6  common shares, the price and terms of which
7  will be determined by the market price prior
8  to the effective date of the offering
9  closing."  Do you see that?
10     A.  I do.
11     Q.  Okay.  This letter states certain
12  conditions and assumptions upon the proposed
13  offering by Alexander Capital, LP.  Do you
14  see that?
15     A.  Yes.
16     Q.  Now, it states, "It is our intent,"
17  referring to Alexander Capital, LP, "It is
18  Alexander Capital's intent, immediately prior
19  to the effective date, to enter into an
20  exclusive underwriting agreement, the
21  underwriting agreement, with the company, in
22  this case Alterix Inc., the underwriter
23  broker, referring to Alexander Capital, LP,
24  will act as agent on a, quote, 'firm
25  commitment', end quote, basis."

Page 167

Joseph Amato

1
2     Do you see that?
3     A.  I do.
4     Q.  All right.  And it says -- states
5  that "The underwriting agreement and related
6  agreement shall contain such terms and
7  conditions as are customarily contained in
8  agreements of such character, and among other
9  things, provide for the following:"  And then
10  it goes on.  Now, just specifically in
11  reference to this first paragraph, all right,
12  you see that the letter states that it is
13  Alexander Capital's intent, immediately prior
14  to the effective date of the proposed
15  offering for Alterix, to enter into an
16  exclusive underwriting agreement in which
17  Alexander Capital will act as the agent for
18  Alterix, Inc., also known as Inpellis, on a
19  firm commitment basis.  Is that a fair
20  description of what that paragraph is
21  stating?
22     A.  That's what the line reads.
23     Q.  Okay.  Now, as of July 2014, based
24  on your previous testimony, and I am asking
25  you now personally.

Page 168

Joseph Amato

1
2     A.  Sure.
3     Q.  Okay.  Was it your understanding
4  that the membership agreement between
5  Alexander Capital and FINRA, as of that time,
6  did not authorize Alexander Capital to act as
7  an underwriter broker on a firm commitment
8  basis in an offer?
9     A.  So this is a draft agreement.
10     Q.  That's right.
11     A.  Draft agreement.  I am confused
12  with the question.  You are asking about a
13  different document?
14     Q.  No, no, I am -- what I am asking
15  is:  As of the time that this proposed
16  document was drafted, is it true, according
17  to your personal knowledge, that at the time
18  of this draft, that the following was true:
19  That under the membership agreement with
20  FINRA, Alexander Capital was not authorized
21  to act as the underwriter broker on behalf of
22  a company on a firm commitment basis?
23     Is that true or not true?
24     A.  I don't recall the date on the firm
25  commitment portion, but please pull to the

Page 169

1            Joseph Amato
2  top of this document.
3      Q.  Of course.
4      A.  I would like to see -- so this was
5  Alterix writing to us?
6      Q.  No, no, no.
7      A.  This is us?
8      Q.  This is Alexander Capital writing
9  to proposed -- it's a proposed draft to be
10  provided to Alterix from Alexander Capital.
11     A.  This isn't an agreement.  It's a
12  draft that they are working on, a working
13  draft?
14     Q.  Correct.
15     A.  Okay.
16     Q.  So --
17     A.  So I don't recall the dates of when
18  we discussed earlier, the exact dates.
19     Q.  Well, those things that we
20  discussed occurred in 2015.  This is now
21  2014.
22     A.  Right, I don't -- I don't remember
23  the date of the letters and the discussion we
24  had prior.
25     Q.  Okay.  Those letters -- I'm sorry,

Page 170

1            Joseph Amato
2  were you going to say something?
3      A.  No.
4      Q.  I didn't mean to talk over you.  I
5  apologize.  The dates of the unreasonable
6  letter and the FINRA restriction letter that
7  we went over previously, was May of 2015 and
8  June of 2015, a year later, okay, after this.
9         So what I am asking, as of this --
10  the date of this proposed draft to be given
11  to Alterix, I am asking, as of that time
12  period, to your knowledge, in 2014, at this
13  time, is it true that under the membership
14  agreement with -- that Alexander Capital had
15  with FINRA, that under that agreement,
16  Alexander Capital was not authorized to act
17  as the underwriter, slash, broker for a
18  company on a firm commitment basis; is that
19  true?
20     A.  I don't recall at that time frame
21  in '14.
22     Q.  And -- well, you know that
23  Alexander Capital had a membership agreement
24  in 2014, correct?
25     A.  I do.

Page 171

1            Joseph Amato
2      Q.  And in 2015, correct?
3      A.  Sure.
4      Q.  Okay.  And in May of 2015, we've
5  already established that -- that FINRA
6  notified Alexander Capital that they would
7  have to get approval to be the underwriter in
8  a firm commitment offering; is that true?
9      A.  In 2015?  I don't recall.  This is
10  2014, so I don't recall.  I didn't read the
11  letters.  I don't recall.
12     Q.  No, okay.  But I want to be clear
13  here that what we went over previously --
14     A.  Yes.
15     Q.  -- the unreasonable letter from
16  FINRA occurred in May of 2015, and the
17  application to get approval to conduct firm
18  commitment offerings, the so-called CMA,
19  continuing membership application, was in
20  June 3, 2015, and the restriction letter of
21  June 11, 2015, regarding what Alexander
22  Capital could do and could not do while its
23  application was pending, was, approximately,
24  just shy of a year after this proposed draft
25  that we're talking about, okay?

Page 172

1            Joseph Amato
2         Does that help you put it, you
3  know, in your mind what we were talking about
4  previously, and where this letter appears in
5  time?  Does that help?
6      A.  Again, it's a proposed draft, so I
7  don't know.
8      Q.  Okay, but I am not asking about the
9  proposed draft right now.  What I am asking,
10  though, as of the time of this proposed
11  draft, which is July 2014, I am asking,
12  specifically, whether it is true that you
13  understood, as of that time, July of 2014,
14  that Alexander Capital, under its membership
15  agreement with FINRA, was not authorized to
16  act as an underwriter, slash, broker on an
17  offering on a firm commitment basis?
18     A.  In 2014, I don't recall.
19     Q.  What you knew or didn't know?
20     A.  I don't recall at the time,
21  correct.
22     Q.  All right.  In 2015, did you become
23  aware that that was true, that Alexander
24  Capital, under its membership agreement, was
25  not authorized to be the underwriter broker

Page 173

1              Joseph Amato
2   on a firm commitment basis?
3       A.   At some point, yes, with the
4   letter.
5       Q.   That we talked about previously,
6   the unreasonable letter, and the application,
7   and the restriction letter from FINRA; is
8   that what you are referring to?
9       A.   Correct.
10      Q.   All right.  Now, I am going to ask
11  you as the designee of Alexander Capital.  Is
12  it true, as of the date of this -- in the
13  time period of this proposed draft, that the
14  following was true.  And I am asking you now
15  as designee of Alexander Capital.  That
16  Alexander Capital was not authorized, under
17  its membership in FINRA, to act as an
18  underwriter broker on an offering on a firm
19  commitment basis?
20      A.   As to what time?
21      Q.   As of the time of this draft in
22  July 2014?
23      A.   I don't believe so, at that time.
24      Q.   That it was authorized to do so?
25      A.   I believe we did firm deals at that

Page 174

1              Joseph Amato
2   time, up until -- I don't know what year.
3       Q.   Okay, but I am not asking whether
4   you were doing them.  I am asking very
5   specifically as designee of Alexander
6   Capital, is it true that as of July 2014, all
7   right, that time frame, it was true that
8   Alexander Capital, under the terms of its
9   membership in FINRA, did not have the
10  authority to act as an underwriter, slash,
11  broker on a firm commitment basis?
12      A.   I don't know if we were
13  underwriter, we were able to participate as
14  broker.
15      Q.   Okay, I'm asking as an underwriter.
16      A.   You asked underwriter/broker.
17      Q.   Okay.  So now I am asking as an
18  underwriter.
19      A.   As an underwriter, I thought we
20  were able to participate.
21      Q.   Okay.  Now, remember, I am asking
22  you now as designee of Alexander Capital, LP,
23  all right?
24          So now you are -- I am asking as
25  designee.

Page 175

1              Joseph Amato
2       A.   Right.
3       Q.   Is it true that under the terms of
4   the membership that Alexander Capital, LP had
5   with FINRA, as of this time frame, July 2014,
6   that the terms of that membership did not
7   authorize Alexander Capital to act as an
8   underwriter on an offering on a firm
9   commitment basis; is that true?
10      A.   I don't believe so.
11      Q.   Now, when you say, "I don't believe
12  so," you don't believe that they were not --
13  do you not believe they were authorized?  Is
14  that what you are saying?
15      A.   No, I thought we were able to
16  participate.  I thought we couldn't be the
17  sole underwriter, after we found that out.
18      Q.   Okay, but again, I am asking you as
19  the Alexander Capital's designee, about what
20  Alexander Capital, the company, knew, not
21  what you personally knew, all right?
22      A.   Right.
23      Q.   Okay.  So I just want to be clear
24  on that, as designee of Alexander Capital,
25  LP, regarding the underwriting authority that

Page 176

1              Joseph Amato
2   Alexander Capital had during this period of
3   time, I am asking you this question:  Is it
4   true, as of July 2014, that under the terms
5   of the membership agreement between Alexander
6   Capital and FINRA, that Alexander Capital was
7   not authorized to act as the underwriter in
8   an offering on a firm commitment basis?
9       A.   As the sole underwriter, I don't
10  believe so.
11      Q.   All right.  And it was not
12  authorized as the sole underwriter?
13      A.   Correct.
14      Q.   Okay.  Did you believe, personally,
15  that Alexander Capital -- as of July 2014,
16  that Alexander Capital could act as the
17  underwriter on a firm commitment basis in an
18  offering as of that time under its FINRA
19  membership agreement?
20      A.   I thought we were able to
21  participate, yes.
22      Q.   As among one of several
23  underwriters?
24      A.   If we participate, we would be
25  considered, I guess, part of the underwriter.

Page 177

1              Joseph Amato
2   That was my assumption.
3        Q.   Right.  Okay.  But I want to be
4   very specific here.  Are you saying that you
5   understood they couldn't act as the sole
6   underwriter of an offering, but you thought
7   they could act as an -- a -- one of other
8   underwriters?  Is that --
9        A.   Right.
10       Q.   -- what you're saying?
11            Was it your understanding that the
12   -- as to whether or not the other
13   underwriters had to be qualified to do firm
14   commitment offerings?
15       A.   I don't -- I can't speak for
16   others.  I don't know.
17       Q.   All right.  Well, I want to be very
18   clear here.  Was it your understanding -- I
19   am asking you personally -- that Alexander
20   Capital, in 2014, could be one of -- of --
21   could be one underwriter, so long as there
22   was other underwriters involved in a firm
23   commitment offering?
24            Is that what you are saying?
25       A.   I thought we were able to

Page 178

1              Joseph Amato
2   participate as part of that.
3        Q.   Okay.  And was it your
4   understanding that that could happen if the
5   other underwriters were qualified to do firm
6   commitment underwritings?
7            Is that what you're saying?
8        A.   I don't know if they all would be.
9   I can't answer for others.  I know we -- I
10   thought we were allowed to as the entity.
11       Q.   You were allowed to, so long as
12   someone -- some other underwriter who was
13   involved had the authority to act as a firm
14   commitment -- on a firm commitment basis?  Is
15   that what you're saying?
16       A.   Yes.
17       Q.   Okay.  Now, as Alexander Capital's
18   designee, I just want to be clear here, was
19   it -- did -- was it -- is it true that
20   Alexander Capital, LP, as of July 2014, knew
21   that under its -- the terms of its membership
22   with FINRA, that it could not act as an
23   underwriter listed in an offering as the
24   underwriter, conducting the underwriting on a
25   firm commitment basis?

Page 179

1              Joseph Amato
2        A.   I don't recall if it was '14 or
3   '15.
4        Q.   Okay, again, I am asking -- what is
5   it that you don't recall whether it was '14
6   or '15?
7        A.   The answer to your question.  I
8   don't recall.
9        Q.   All right, again, I want to --
10       A.   As the firm, I don't recall.
11       Q.   As the firm, the firm does not --
12   you cannot answer as designee of the firm, as
13   to -- because you are saying, "I don't
14   recall," and I am asking you as the designee.
15            Are you saying that the company
16   cannot recall?
17       A.   I don't recall if it was '14 or
18   '15.  I don't recall.
19       Q.   Okay.  And so what occurred in
20   2015?
21       A.   The letter that came to the firm.
22       Q.   Okay.  As of July 2014, there was
23   in existence -- and I am asking you as a
24   designee, Alexander Capital had in existence
25   in July 2014, a membership agreement with

Page 180

1              Joseph Amato
2   FINRA; is that correct?
3        A.   Yes.
4        Q.   All right.  And is it true that
5   that membership agreement which it had in
6   place in 2014, all right, was the same
7   agreement that it had in place in 2015?
8        A.   I am not 100 percent certain.  It's
9   possible.  I don't recall.
10       Q.   Okay.  Now I am asking you as
11   designee.
12            Are you -- as designee, was there
13   -- was the underwriting agreement in place in
14   2014, the same underwriting agreement with
15   FINRA in 2015, or was there a change between
16   those two years?
17       A.   I don't recall when the change --
18   any -- the change came in.  That's what I am
19   saying.
20       Q.   Okay, but we just -- I believe we
21   went over this earlier and --
22            MR. WARD:  Can we take a
23   break right now?
24            MR. SCHLICHTMANN:  Sure.
25   Maybe that'll be helpful.  Sure.

Page 181

1          Joseph Amato
2     Let's take a break.  Let's take a
3  few minutes.  Take whatever.
4          MR. WARD:  Yeah.
5          MR. SCHLICHTMANN:  I will
6  stand by.  I appreciate that.
7          THE VIDEOGRAPHER:  Going off
8  video record.  The time is 2:23
9  p.m.
10          (Whereupon, a recess was
11     taken at this time.)
12          THE VIDEOGRAPHER:  Back on
13     video record.  The dime is 2:29
14     p.m.
15  BY MR. SCHLICHTMANN:
16     Q.  All right, I have been asking a
17  series of questions, Mr. Amato, and just to
18  be clear on the record, I have been referring
19  to a July 2014 draft of a letter, and just
20  for purposes of the record, I have been
21  referring to that as Plaintiff's previously
22  -- previously been marked as Plaintiff's
23  Exhibit 60, all right?  I know that sound
24  because --
25     A.  Someone has a pitbull.

Page 182

1          Joseph Amato
2     Q.  I recently -- we recently purchased
3  a puppy.  I know that sound.
4          The -- so I want to ask you --
5  again, to be clear, that -- and I am asking
6  you in your capacity as the designee of
7  Alexander Capital, is it true, as of July
8  2014, that the membership agreement with
9  FINRA, that Alexander Capital had, did not
10  authorize it to be the underwriter of an
11  offering on a firm commitment basis; is that
12  correct?  It could not be the underwriter on
13  a firm commitment offering as of that time in
14  July 2014; is that correct?
15     A.  I believe we couldn't be the sole
16  underwriter.
17     Q.  Okay.  Now, the -- as of July 2014,
18  and I am asking you personally, was it your
19  understanding, as to whether or not in
20  accordance with the procedures that were put
21  in place at Alexander Capital, as of 2014,
22  that we discussed previously -- let me just
23  preface it by saying, you remember previously
24  we discussed that there were -- that a
25  statement was made to FINRA in 2015, that

Page 183

1          Joseph Amato
2  after 2013, certain procedures were put in
3  place to ensure an appropriate compliance
4  environment, and that the rules were being
5  followed?
6          Do you remember that?
7     A.  Yes.
8     Q.  Okay.  And you said that you were
9  aware that there were procedures, if I
10  understood you correctly, that were put in
11  place to ensure an environment of compliance
12  in following the rules.
13          Did I understand you correctly?
14     A.  I said I just didn't recall what
15  they were, but there were procedures in
16  place, yes.
17     Q.  All right.  As of July 2014, and I
18  am asking you personally, as of July 2014,
19  were you aware as to whether the policies and
20  procedures that we talked about that were put
21  in place, required anyone from Alexander
22  Capital who is interacting with a potential
23  client of Alexander Capital, regarding
24  Alexander Capital's providing services to the
25  company as an underwriter in an anticipated

Page 184

1          Joseph Amato
2  offering, whether the policies and procedures
3  in place at that time would have required an
4  Alexander Capital employee to inform the
5  company, prior to entering into an engagement
6  agreement, as to the authority that Alexander
7  Capital had under its membership agreement,
8  and the authority it did not have under its
9  engagement agreement regarding firm
10  commitment underwriting?
11     A.  I don't recall.
12     Q.  When you say, "I don't recall," you
13  don't recall if there were any procedures
14  that would have required an employee of
15  Alexander Capital, under those circumstances,
16  to inform a potential client that -- what
17  Alexander Capital was allowed to do as
18  underwriter and what it was not allowed to do
19  as of that time?  Is that what you are
20  saying?
21     A.  Yes, I don't recall.
22     Q.  All right.  As the designee of
23  Alexander Capital, did Alexander Capital have
24  in place policies and procedures that would
25  have required an employee of Alexander

Page 185

1              Joseph Amato
2    Capital who was dealing with a proposed
3    client regarding an intended offering, to
4    inform that company, prior to entering into
5    any engagement agreement in which Alexander
6    Capital intended to be the underwriter on a
7    firm commitment basis, that the employee was
8    required to inform the company of the fact
9    that the -- that the authorization that
10   Alexander Capital had with FINRA did not
11   allow it to enter into such firm commitment
12   offerings?
13            MR. WARD: Object as outside
14        the scope. This -- we did not get
15        through procedures -- I am not --
16        that's not under the scope of what
17        he is here to testify.
18            MR. SCHLICHTMANN: Well, I
19        don't want to fight over it. You
20        don't think it goes to the -- the
21        underwriting -- well, what's the
22        phrase we used in the notice?
23            MR. WARD: "Financial
24        ability and legal authority to
25        undertake underwriting, whether

Page 186

1              Joseph Amato
2         characterized as best efforts or
3         firm commitment."
4             MR. SCHLICHTMANN: Okay, and
5         you don't want me to ask him if --
6         that it's outside of the scope to
7         ask him about whether Alexander
8         Capital employees had a requirement
9         to inform potential customers? Is
10        that what you are saying now?
11        Okay.
12            MR. WARD: Yeah, I mean, we
13        have not prepared him to go through
14        the procedures.
15            MR. SCHLICHTMANN: Okay, got
16        it. I will not -- that's fine.
17   Q.   Based on your -- as of July 2014,
18   is it fair to say that you had -- you were a
19   -- you had an ownership interest in Alexander
20   Capital, through your ownership of Nesa
21   Management, LLC; is that correct?
22   A.   Nesa had ownership in Alexander at
23   the time.
24   Q.   And you owned, with Mr.
25   Guidicipietro, Nesa Management?

Page 187

1              Joseph Amato
2    A.   Correct.
3    Q.   All right. Now, in your capacity
4    as the indirect owner of Alexander Capital
5    through Nesa Management LLC, did you -- was
6    it your understanding that Alexander Capital
7    employees who were interacting with potential
8    customers interested in Alexander Capital
9    providing underwriting services, that if the
10   intended underwriting was to involve an
11   Alexander Capital acting as the underwriter
12   on a firm commitment basis, that it was
13   required of those employees who were so
14   interacting with the company, to inform the
15   company that Alexander Capital's agreement
16   with FINRA did not authorize it to act as a
17   firm commitment underwriter?
18   A.   I don't recall.
19   Q.   When you say you don't recall, you
20   mean you don't recall whether you had an
21   understanding such as that?
22   A.   I don't recall what the procedures.
23   I said I don't recall.
24   Q.   All right, now what I am asking you
25   is your -- as the -- you don't recall what

Page 188

1              Joseph Amato
2    procedures were, in your capacity as indirect
3    owner through Nesa, did you believe or
4    understand that in fact Alexander Capital
5    employees were required to do that, or you
6    had no such understanding?
7    A.   I have no such understanding. I
8    didn't interact with that department. It's
9    not what I did. I don't know.
10   Q.   Okay. Now at some point you said
11   that you did become CEO of Alexander Capital
12   for some time; is that right?
13   A.   Correct.
14   Q.   And according to the -- bear with
15   me one second. All right, so I am going to
16   -- because I know we've had some questions
17   about it and you were unsure about your
18   memory, bear with me, I am going to put up on
19   the board a document I showed you previously.
20            I am now showing you the
21   broker-check report referred to previously,
22   Plaintiff's Exhibit 29.
23            You see that on the screen?
24   A.   Uh-huh.
25   Q.   All right.

Page 189

1                    Joseph Amato
2        A.   I do.
3        Q.   Okay.  And now I am going to go to
4   the page that refers to you, and this is page
5   six of the document, and down at the bottom
6   it goes onto the next page, you see it says,
7   "Joseph Anthony Amato," and it has CRD
8   number?
9        A.   I do.
10       Q.   Do you recognize that that's your
11  CRD number?
12       A.   I am sure it is.  I don't recognize
13  it, though.
14       Q.   Okay.  And it says, "Direct owners
15  and executive officers," right, it's in
16  answer to that question.  It says, "Is this
17  an individual?"  And it says, "Yes, this is
18  an individual."  And then it says,
19  "position," correct?
20       A.   Yes.
21       Q.   And it lists ROP and CROP and SROP.
22          Do you see that?
23       A.   I do.
24       Q.   But it also says "CEO."  Do you see
25  that?

Page 190

1                    Joseph Amato
2        A.   Yes.
3        Q.   Okay.  And -- and then it says,
4   "position start date," and it says, "March
5   20, 2013."
6          Do you see that?
7        A.   I do.
8        Q.   All right.  Is it -- was it -- is
9   it accurate that as of March 2013, that your
10  position at Alexander Capital, Inc., as
11  indicated in this broker-check report, that
12  you held a position of chief executive
13  officer?
14       A.   No.
15       Q.   You know for a fact you did not?
16       A.   At three -- 2013, it says my
17  position start date.  I don't believe that's
18  accurate and nor is the other --
19       Q.   The ROP, CROP, and SROP?
20       A.   I don't believe that to be correct
21  either today.
22       Q.   Okay.  But as of March 2013, was it
23  accurate that you were the CEO of Alexander
24  Capital, LP?
25       A.   I am not certain.  I can't say

Page 191

1                    Joseph Amato
2   that's the case.
3        Q.   It says, "Does this owner direct
4   the management or policies of the firm?"  And
5   the answer is "yes."  Do you see that?
6        A.   I do see that.
7        Q.   Okay.  Is that a -- to your mind,
8   is that an accurate statement as to the fact
9   that you direct the management or policies of
10  the firm?
11       A.   No.
12       Q.   Did you ever direct the policies
13  and management of the firm?
14       A.   I did.
15       Q.   In what period of time?
16       A.   I would have to go back to the full
17  CRD to let you know that, when I held the
18  titles and certain positions.
19       Q.   So when you held CEO, you did
20  exercise direct management over the policies,
21  management, or -- you did direct the
22  management and policies of the firm?
23       A.   I did not.
24       Q.   When you were CEO?
25       A.   I did not.

Page 192

1                    Joseph Amato
2        Q.   You didn't do it, even as CEO?
3        A.   No.
4        Q.   Okay.  During the time that you
5   were CEO, who directed the management or
6   policies of the firm?
7        A.   The chief compliance officer.
8        Q.   So are you saying that this
9   broker-check report is inaccurate, if one was
10  to take from this report that as of March
11  2013, you became the CEO of Alexander
12  Capital, LP?
13       A.   I believe it may be.
14       Q.   It may be inaccurate?
15       A.   Correct.
16       Q.   Does that mean it may be accurate?
17       A.   Possibly.  But I believe it to be
18  inaccurate.
19       Q.   Okay.  And during the time that you
20  were CEO of Alexander Capital, let me ask you
21  this:  Do you remember being that position
22  prior -- at any time between 2013, 2014, or
23  2015?
24       A.   I do.
25       Q.   Holding that position?

Page 193

1           Joseph Amato
2      A.   Holding a position as CEO at some
3   point, I do.
4      Q.   During that three-year period I
5   just went over?
6      A.   Possibly.  I don't know when and
7   what times and during.  We'd have to look
8   that up.
9      Q.   Okay.  During the time that you
10  were CEO, okay, which you believe could be
11  between 2013 and 2015; is that correct?
12     A.   Possibly.
13     Q.   All right.  Now, I am asking you
14  regarding that period of time, in your
15  understanding, CEO, was it your understanding
16  at that time and in that position, that
17  during the time that you were CEO, that it
18  was a requirement of any employee of
19  Alexander Capital who was interacting with a
20  potential customer who was seeking Alexander
21  Capital's services as an underwriter, to --
22  to undertake underwriting of an intended
23  offering on a firm commitment basis, that it
24  was the requirement of that employee to
25  inform the company that, in fact, Alexander

Page 194

1           Joseph Amato
2   Capital did not have under its membership
3   agreement with FINRA the authority to act as
4   an underwriter in an offering on a firm
5   commitment basis?
6      A.   I wouldn't be certain.
7      Q.   And why not?
8      A.   I didn't write the policies.
9      Q.   And you don't remember taking any
10  steps as CEO to implement policies that would
11  have required what I just said?
12     A.   I didn't work with the banking
13  department for the most part.  So, no, I
14  wouldn't -- I wouldn't have been the person,
15  no.
16     Q.   So you have -- okay.  So you
17  wouldn't have been -- all right.  So even as
18  CEO, you are not aware of any policies or
19  procedures that would have required that
20  disclosure by someone from Alexander, to a
21  company seeking its services on a firm
22  commitment basis?
23     A.   That's what I am saying, I wouldn't
24  -- I wasn't aware.
25     Q.   Okay.  Now, as the CEO, was it your

Page 195

1           Joseph Amato
2   understanding that it was appropriate or
3   inappropriate for someone from Alexander
4   Capital to tell a company seeking its service
5   as an underwriter during 2013, 2014 and 2015,
6   that Alexander Capital could act as the -- as
7   the underwriter of an offering on a firm
8   commitment basis?  Was that appropriate or
9   inappropriate, in accordance with your
10  understanding, during that period?
11     A.   I -- I -- I don't know.  I don't
12  have an opinion on it either way.
13     Q.   Now, as you sit here today, do you
14  have an opinion on it either way?
15     A.   Today, we could tell someone we can
16  do firm commitments.
17     Q.   Because you received that
18  authorization in 2017; is that right?
19     A.   I don't know the date of the firm
20  -- we were able to participate in it all
21  along.  So, again, how you present it, I have
22  whether sole or part of a group, I have
23  different feelings throughout the time frame
24  from then to now.
25     Q.   Okay.  So now specifically as to

Page 196

1           Joseph Amato
2   before you were given the authorization,
3   which I believe your prior testimony was
4   December -- was in 2017, all right, I think
5   we established that previously.
6           Does that sound right to you?
7      A.   I don't recall but...
8      Q.   Okay, it was definitely after 2013,
9   2014, and 2015; is that correct?
10     A.   To do what?
11     Q.   For Alexander Capital to have the
12  authorization to be the underwriter in a firm
13  commitment offering.
14     A.   I believe so.
15     Q.   All right.  Now, confining ourself
16  to 2013, 2014, and 2015, what was your
17  understanding, as CEO, as to whether it was
18  appropriate, during that period, for an
19  employee of Alexander Capital to tell a
20  potential customer that Alexander Capital
21  could act as the -- as the underwriter on a
22  firm commitment basis of an offering, at that
23  time?
24     A.   I wasn't necessarily the CEO for
25  those three years, so I can't answer that.

Page 197

1            Joseph Amato
2     Q.   During the period that you were?
3     A.   So I didn't -- what period was
4  that?
5     Q.   Well, you said it was likely you
6  were CEO during that three-year period at
7  some point?
8     A.   At some point, correct.
9     Q.   Okay.  So I am asking during the
10  period you were CEO, whatever that period
11  was.
12     A.   What's the question?
13     Q.   Okay.  Was it appropriate, during
14  that time, for an employee of Alexander
15  Capital to tell a potential customer who was
16  seeking its services as an underwriter, that
17  it -- and was seeking its services as an
18  underwriter on a firm commitment basis, that
19  Alexander Capital -- to inform that company
20  that Alexander Capital did not have, at that
21  time, the authorization under its FINRA
22  agreement to act as the underwriter on a firm
23  commitment basis?
24     A.   No.
25          MR. WARD:  Wait, hold on.

Page 198

1            Joseph Amato
2          Objection.  Vague.
3     Q.   Okay.  So let me ask that question
4  again.
5          During the time that you were CEO,
6  in whatever period it was, between 2013 and
7  2015, was it appropriate for an employee of
8  Alexander Capital to inform a potential
9  client of the company who was seeking
10  Alexander Capital's services as an
11  underwriter, for that employee to tell that
12  potential company that Alexander Capital had
13  the authority, under its membership, that it
14  had the legal authority to act as an
15  underwriter on a firm commitment basis?
16  Yeah, I will stop there.
17          MR. WARD:  Same objection.
18     Q.   Do you understand the question?
19     A.   You are asking me or Bryan?
20     Q.   No, no, no, I am asking you.
21     A.   You can repeat it again, then.
22     Q.   Not a problem.
23          During the time that you were CEO
24  between 2013 and 2015, was it appropriate for
25  an employee of Alexander Capital, who was

Page 199

1            Joseph Amato
2  dealing with a potential customer of the
3  firm, who was seeking its services as an
4  underwriter, was it appropriate for the
5  Alexander Capital person interacting with
6  that potential client to tell them that
7  Alexander Capital could act as the
8  underwriter on a firm commitment basis?
9          MR. WARD:  Objection; vague.
10     Q.   Was that appropriate or
11  inappropriate?
12          MR. WARD:  Same objection.
13     Q.   Did you understand the question?
14     A.   I do.
15     Q.   Can you answer it?
16     A.   I -- I don't believe we had to say
17  or not say.  I don't believe we had to
18  discuss it.
19     Q.   And as of now, do you believe that
20  you have an obligation to discuss it with the
21  -- what your authorization is?
22     A.   I don't believe we have to discuss
23  it.
24     Q.   Okay.  And now I believe in answer
25  to some previous questions you -- was it your

Page 200

1            Joseph Amato
2  -- well, let me ask you.
3          Was it your understanding in 2013
4  and 2014, 2015, that Alexander Capital was
5  acting or intending to act, excuse me,
6  intending to act as an underwriter on a firm
7  commitment basis in various offerings that it
8  was participating in during that period of
9  time?
10     A.   I don't recall saying that.
11     Q.   I am asking.
12     A.   Ask again.
13     Q.   Okay.  Do you have an understanding
14  as to whether Alexander Capital during 2013,
15  2014, and 2015, was intending to act as the
16  underwriter of offerings on a firm commitment
17  basis, during that period of time?
18     A.   I believe -- I am not certain as to
19  the time frame we participated.
20     Q.   You are saying you participated in
21  firm commitment offerings?
22     A.   Correct.
23     Q.   Did you participate as the
24  underwriter of that offering?
25     A.   I am uncertain as to what role we

Page 201

1              Joseph Amato
2    played by us participating, what that is
3    defined as.  I am not certain.
4        Q.   Okay.  And specifically as to
5    acting as underwriter of the offering or
6    intending to act as the underwriter, was it
7    your understanding that Alexander Capital was
8    -- had engagement agreements for offerings in
9    which it intended to act as the underwriter
10   for a firm commitment offering?
11       A.   I would be uncertain.  I don't
12   know.
13       Q.   Now, I showed you that previous
14   exhibit regarding -- regarding the proposed
15   engagement agreement.  Do you remember that?
16       A.   The draft?
17       Q.   Yes.
18       A.   Okay.
19       Q.   All right.  Are you aware of the
20   fact that, in fact, an engagement agreement,
21   similar to that, was entered into between
22   Alexander Capital and Alterix?  Are you aware
23   of that?
24       A.   I haven't seen it, I don't believe.
25   I may have during this, but I don't recall.

Page 202

1              Joseph Amato
2        Q.   Okay, I am going to...okay.  All
3    right, do you see on the screen a faded
4    letterhead of Alexander Capital?  It's a
5    black-and-white copy.
6        A.   I do.
7        Q.   And it's dated July 29, 2014, and
8    Marshal Sterman, CEO, of Alterix is over to
9    the left.
10           Do you see that?
11       A.   I do.
12       Q.   It says, "proposed initial public
13   offering."
14           Do you see that?
15       A.   I do.
16       Q.   In looking at this paragraph, it --
17   it is the -- let me read it to you.  "We are
18   pleased to submit the following proposal with
19   respect to an initial public offering.  The
20   public offering by Alterix, the company, of
21   up to $20 million, consisting of the
22   company's common shares, the price and terms
23   of which shall be determined by the market
24   price prior to the effective date of the
25   offering closing.  This letter states certain

Page 203

1              Joseph Amato
2    conditions and assumptions upon the proposed
3    offering by Alexander Capital, LP, Alexander
4    Capital.  It is our intent, immediately prior
5    to the effective date, to enter into an
6    exclusive underwriting agreement, the
7    underwriting agreement with the company.  The
8    underwriter, slash, broker will act as agent
9    on a firm commitment, quote, 'firm
10   commitment', end quote, basis.  The
11   underwriting agreement and related agreement
12   shall contain such terms and conditions as
13   are customarily contained in agreements of
14   such character, and among other things,
15   provide the following," and it goes on.
16           That paragraph appears to be very
17   similar in language to the one we went over
18   before, the proposed draft of an engagement
19   agreement to be submitted to Mr. Sterman?
20       A.   I see what's there.  I guess, I
21   don't know, but I see what's in front of me,
22   what you just read.
23       Q.   Does that appear -- we just went
24   over it a few minutes ago.  Does it appear to
25   be similar to the proposed draft that we went

Page 204

1              Joseph Amato
2    over previously?
3        A.   Possible.
4        Q.   All right.
5            MR. WARD:  This is Exhibit
6        154, just for the record.
7        Q.   Thank you very much.  For the
8    record, it's Exhibit 154.  And this is -- I
9    will just go to the signature page.  It's
10   signed by Timothy Stack, chief compliance
11   officer, and Mr. Sterman.
12       A.   Okay.
13       Q.   Okay.  So this was entered into by
14   Mr. Sterman and Mr. Stack, on behalf of
15   Alexander Capital, in late July 2014, all
16   right?  You can accept that as true.
17           Now, we've already established that
18   -- and tell me if this is not correct, that
19   as of the time that this engagement agreement
20   was actually entered into, in late July 2014,
21   the membership agreement with Alexander --
22   that Alexander Capital had with FINRA, did
23   not authorize Alexander Capital to be the
24   underwriter in a firm commitment offering; is
25   that correct?

Page 205

1              Joseph Amato
2      A.  I believe so.
3      Q.  All right.  Now, I am going to now
4  show you...okay, do you see on the screen,
5  "August 5, 2015, Inpellis, DRS"?  Do you see
6  that?
7      A.  I do.
8      Q.  All right.  And is it your
9  understanding that "DRS" is a term --
10  shorthand expression for "draft registration
11  statement"?
12     A.  I -- I guess so.  I didn't know,
13  no.
14     Q.  Is it new to you?
15     A.  It is.
16     Q.  Okay.  So I will show you
17  Plaintiff's Exhibit 30, which is -- do you
18  recognize the form of the Plaintiff's Exhibit
19  30, as a form of a registration statement?
20     A.  It's an S-1.
21     Q.  An S-1.  Okay.  Is that familiar to
22  you?
23     A.  Not -- a little bit.
24     Q.  In the course of your association
25  with Alexander Capital, LP, I am assuming

Page 206

1              Joseph Amato
2  that you frequently would review or see
3  registration statements for one reason or
4  another?
5      A.  No.  I wouldn't.
6      Q.  Okay.  From time to time, would
7  you?
8      A.  Not really.
9      Q.  But you are familiar with it?
10     A.  Not really.
11     Q.  All right.  Well, in looking at
12  this form, is that a form that you are in any
13  way familiar with?  That form, not the
14  specific one.
15     A.  Not really.
16     Q.  Okay.  Now, this is a registration
17  statement that was filed on August 5, 2015,
18  on a confidential basis with the SEC, all
19  right?  I want you to accept that that's
20  true.
21     A.  By whom?
22     Q.  All right.  It was by the issuer
23  and underwriter.
24     A.  I didn't see that.  I have to take
25  a break, guys.

Page 207

1              Joseph Amato
2      Q.  Okay, we will take a break.
3      A.  All right.  Thank you.  Five
4  minutes?  Bathroom break.
5          MR. SCHLICHTMANN:  When you
6      are back, that's fine, yes, of
7      course.
8          THE VIDEOGRAPHER:  Going off
9      video record.  The time is 3:02
10     p.m.
11         (Whereupon, a recess was
12     taken at this time.)
13         THE VIDEOGRAPHER:  Back on
14     video record.  Time is 3:07 p.m.
15 BY MR. SCHLICHTMANN:
16     Q.  Mr. Amato, I am showing you
17  Plaintiff's Exhibit 30, and it's a
18  registration statement filed on a
19  confidential basis on August 5, 2015,
20  involving the Alterix, also known as,
21  Inpellis offer, all right?  I represent to
22  you that that's what it is, okay?
23         Now, prior to today, were you
24  familiar with any of the offerings by
25  Alterix, also known as, Inpellis Inc., that

Page 208

1              Joseph Amato
2  were filed during the time that Alexander
3  Capital was the intended underwriter of the
4  offering?
5      A.  Not so much.
6      Q.  Do you have some memory of
7  reviewing them, for any reason?
8      A.  No, I never review them.
9      Q.  Now, in this offering, which was
10  filed in confidential basis on August 5,
11  2015, on the second page it says, "This is a
12  firm commitment initial public offering."  Do
13  you see that?
14     A.  I do.
15     Q.  Okay.  And if we go to -- if we go
16  to page 109 of the offering, all right, under
17  the "underwriting" section -- do you see that
18  on the screen?
19     A.  I do.
20     Q.  All right.  It says that,
21  "Alexander Capital is acting as the sole book
22  running manager of the offering and as
23  representative of the underwriters or the
24  representative."
25         Do you see that?

JOSEPH AMATO
AQUINO vs ALEXANDER CAPITAL

September 30, 2021
209–212

Page 209

1           Joseph Amato
2    A.  I do.
3    Q.  Okay.  And it then says in the
4  second paragraph -- it lists the
5  underwriters, Alexander Capital, LP, is the
6  sole underwriter; is that right?
7    A.  I don't see no dates on this, but
8  it says Alexander Capital, LP, yeah.
9    Q.  Okay, but no other underwriter is
10  listed; is that right?
11    A.  At this time, no.
12    Q.  It says, "The underwriters are
13  committed to purchase all the shares of
14  common stock offered by us, other than those
15  covered by the option to purchase additional
16  shares described below, if they purchase any
17  shares."  Do you see that?
18    A.  I do.
19    Q.  Okay.  Now, is this -- the language
20  that they are "committed to purchase all the
21  shares offered by us," consistent with a firm
22  commitment offering?
23    A.  I don't know.
24    Q.  You have no idea?
25    A.  I -- I -- I told you I have never

Page 210

1           Joseph Amato
2  really seen these before.
3    Q.  Okay.  You see where it says, "the
4  sole" -- "as acting as the sole book-running
5  manager of the offering"?
6    A.  I do.
7    Q.  And we saw at the beginning it said
8  this is a firm committing offering, correct?
9    A.  I did.
10    Q.  All right.  Now, based on your
11  previous testimony, I take it now as the
12  designee of Alexander Capital, I am asking
13  you that as of August 2015, that -- is it
14  true that under the FINRA terms of the
15  agreement that Alexander Capital had with
16  FINRA, that Alexander Capital was not
17  authorized to act as a sole book-running
18  manager of a firm commitment offering, as of
19  that time; is that correct?
20    A.  We couldn't be the lead on
21  underwriting.
22    Q.  But I am asking specific as to sole
23  book-running manager, using the language in
24  that offering.
25    A.  On a firm commitment underwriting,

Page 211

1           Joseph Amato
2  we would not be the sole.
3    Q.  Okay.  So -- so if Alexander
4  Capital acted as the sole book-running
5  manager of an offering, all right, that was a
6  firm commitment offering, that that would be
7  in violation of its term -- its agreement
8  with FINRA as to what underwriting it could
9  do or could not do as of 2015; is that
10  correct?
11    A.  If we did so.
12    Q.  That's right.
13    A.  Yes.  We did not do so, so...
14    Q.  If they intended to do so?
15    A.  You said if we did so, so the
16  answer is, yeah, no, we didn't.
17    Q.  Okay.  How about if they intended
18  to do so?
19    A.  Intending isn't doing, so we
20  wouldn't have been in violation.
21    Q.  So it's okay to have the intent to
22  do it, according to you?
23    A.  I don't know.  That would be up to
24  my legal.
25    Q.  Okay.  Well, you just gave us a --

Page 212

1           Joseph Amato
2  your belief, so I am asking your
3  understanding.  Let me ask:  As designee of
4  the Alexander Capital, it is true, just to
5  make it clear, as of August of 2015, that
6  Alexander Capital was not authorized to --
7  under its agreement with FINRA, to act as the
8  sole book running -- book-running manager of
9  a firm commitment offering?  That is true,
10  that they were not authorized to engage in
11  such underwriting, correct?
12    A.  No, we were not authorized to do
13  such, is my understanding.
14    Q.  To do -- to be the sole
15  book-running manager of a firm committing
16  offering, as of August of 2015?
17    A.  To do an offering.
18    Q.  That's right, a firm commitment
19  offering.
20    A.  To complete a firm commitment
21  offering.
22    Q.  All right.  Now, do you think that
23  Alexander Capital, as of August 2015 -- was
24  it your understanding that it had an
25  obligation to inform any company that thought

Page 213

```
 1            Joseph Amato
 2   that it was working for -- that thought that
 3   it was acting as the -- was under the
 4   impression that it was acting -- intended to
 5   act as the sole book-running manager of a
 6   firm commitment offering, that Alexander
 7   Capital should inform that company that
 8   Alexander Capital did not have the authority
 9   to so act?
10      A.  No, I don't believe so.  I don't
11   believe we had to -- we didn't put this book
12   together.  We didn't file this.  The company
13   filed this.
14      Q.  Okay.  And are you saying there
15   that because Alexander Capital, according to
16   you -- according to you, because this
17   offering was, according to you, made by the
18   company and its counsel, therefore, there was
19   no obligation on the part of Alexander
20   Capital to tell the company about its lack of
21   authority?
22            MR. WARD:  Just objection.
23            MR. SCHLICHTMANN:  Person --
24            MR. WARD:  His personal,
25       okay.
```

Page 214

```
 1            Joseph Amato
 2            MR. SCHLICHTMANN:  Personal.
 3            MR. WARD:  Calls for
 4       speculation.
 5      Q.  Can you answer the question?
 6      A.  You can repeat it again.
 7      Q.  Okay.  I am asking now as your
 8   personal understanding.  Did I understand
 9   correctly about your previous testimony, that
10   because your understanding is that the
11   company and its counsel were the ones who put
12   together this registration statement, that,
13   therefore, Alexander Capital did not have any
14   responsibility to inform the company that it
15   did not have the authority to act as a sole
16   book-running manner on a firm commitment
17   offering?  Is that what you are saying?
18      A.  I believe we didn't have to offer
19   that, correct.  We didn't have to say
20   anything.
21      Q.  You didn't have to say anything
22   because your understanding is the company and
23   its counsel were responsible for the
24   registration statement and Alexander Capital
25   was not?  Is that what you are saying?
```

Page 215

```
 1            Joseph Amato
 2      A.  No, I believe we don't have to say
 3   anything either way.
 4      Q.  Okay.  Well, if Alexander Capital
 5   was responsible for the reviewing and
 6   approving the contents of the registration
 7   statements such as this one, would your
 8   opinion -- would your belief change or --
 9      A.  I don't know.  That's not the case.
10   I am not responsible.
11      Q.  Okay.  Well, I am -- all right.  I
12   am going to show you an e-mail chain, and
13   this is Plaintiff's Exhibit -- bear with me
14   here -- 180 --
15      A.  Sure.
16      Q.  -- previously marked.  Now, this is
17   an e-mail chain between company's counsel,
18   Mr. Barrette, and counsel for Alexander
19   Capital, Greenberg Traurig, all right?
20      A.  Yes.
21      Q.  Okay.  Now, the beginning of the
22   chain, Greenberg counsel, Kleiman, with a
23   copy to Mr. Marsico at Greenberg, to Mr.
24   Barrette says -- regarding the Alterix S-1
25   filing.  Now, this is dated June 29, 2015,
```

Page 216

```
 1            Joseph Amato
 2   and I will represent to you that at that time
 3   period, a second confidential filing of the
 4   Alterix, as known as, Inpellis offering, was
 5   filed on a confidential basis with the SEC,
 6   all right?  And here is an e-mail dated
 7   Monday, June 29, 2015, from attorneys from
 8   Greenberg Traurig to Mr. Barrette, the
 9   attorney for Inpellis, regarding the Alterix
10   S-1 filing.  It says, "Tom," referring to Mr.
11   Barrette, company's counsel, "could you
12   please send a revised draft of the S-1 with
13   the changes we sent last week?  We need to
14   sign off before filing."
15          Do you see that?
16      A.  I do.
17      Q.  Was it your understanding, in -- as
18   of -- in 2015, that counsel for Alexander
19   Capital, quote, "needed to sign off" on the
20   registration before it was filed by company's
21   counsel"?
22      A.  I -- I would be unaware.
23      Q.  In seeing that, does that refresh
24   your recollection?
25      A.  I have never seen this before.
```

Page 217

Joseph Amato

2      Q.   All right.  Is this statement by
3   Alexander Capital's counsel at that time
4   consistent with your understanding, as of
5   June -- as of 2015, that there -- that before
6   there was a filing, counsel for Alexander
7   Capital needed to, quote, "sign off" before
8   the filing?
9      A.   Sorry.  I would be unaware.
10      Q.   It then says later in the chain --
11      A.   Can we go back a bit in the chain,
12   so I can see --
13      Q.   Sure.
14      A.   Again, from the first one.  Okay,
15   the next one.
16      Q.   The next one.  Yeah.
17      A.   That's from the company back to the
18   lawyers?
19      Q.   That's correct.
20      A.   Okay.
21      Q.   Okay, we're going through each one,
22   and then the lawyers for the company, same
23   date, regarding the Alterix, say "Tom,
24   attached please find our comments to the
25   revised draft of the S-1.  Thanks."  Do you

Page 218

Joseph Amato

2   see that?
3      A.   Uh-huh.
4      Q.   And then there is another e-mail
5   from Mr. Barrette, company's counsel, dated
6   the next day, to Anthony Marsico, Greenberg
7   counsel, regarding the Alterix S-1.  "Tony,
8   sorry," in all caps?
9      A.   Yeah.
10      Q.   "I thought this" --
11      A.   Okay.
12      Q.   This is Mr. Barrette now saying to
13   Mr. Marsico, attorney for Greenberg -- excuse
14   me, attorney with Greenberg, who was counsel
15   for Alexander Capital.  He says, "Sorry," one
16   word sentence, in all caps.  Do you see that?
17      A.   I do.
18      Q.   "I thought this e-mail string was
19   your sign off.  We did make all the changes
20   which you will see in the filed version.  I
21   will get you the banner list and black lined
22   copies right away.  Again, my apologies.  You
23   and your team have been great, and I did not
24   mean to file without your clearance."  Do you
25   see that?

Page 219

Joseph Amato

2      A.   I do.
3      Q.   Now, here's a statement from
4   counsel, in response to Greenberg Traurig
5   attorneys, counsel for Alexander, saying that
6   they had to have -- that -- that company's
7   counsel had to have the signoff of Greenberg,
8   and in response to that, company's counsel is
9   saying, "I am sorry," in all caps, and he
10   "did not mean to file without your" --
11   referring to Greenberg Traurig's "clearance."
12      Do you see that?
13      A.   I do.
14      Q.   Okay.  Now, is that exchange, in
15   that context, consistent with your
16   understanding of whether or not Alexander
17   Capital had to sign off, through its counsel,
18   on any filing of any registration statement
19   in which it was intended to be the
20   underwriter?
21      A.   No.
22      Q.   That doesn't change your testimony?
23      A.   No, I don't -- not at all.  I don't
24   see my guys on here, no.
25      Q.   You don't see your guys but how

Page 220

Joseph Amato

2   about the fact that this is attorney -- the
3   counsel for Alexander Capital believes this?
4      A.   I -- I -- I don't believe so.  You
5   asked my opinion.  I don't believe so.
6      Q.   You believe your counsel was
7   incorrect?
8      A.   I -- I don't know.  I didn't have a
9   sidebar with counsel, so I don't know.
10      Q.   And who do you think was more
11   knowledgeable as to the rules and regulations
12   regarding Alexander Capital's
13   responsibilities as to whether or not they
14   should review and approve the contents of a
15   registration statement in which Alexander
16   Capital was the intended underwriter?
17      Do you think Greenberg Traurig had
18   more understanding and knowledge about that
19   issue than you did at the time, or do you
20   think that he did?
21      A.   I have no idea.  Couldn't answer
22   that question.
23      Q.   So you don't think that Greenberg
24   Traurig, as counsel for Alexander Capital,
25   has any specialized knowledge about the rules

Page 221

1              Joseph Amato
2    and regulations that were applicable to
3    Alexander Capital's responsibility regarding
4    its -- regarding the review and approval of
5    registration statements being filed in which
6    Alexander Capital was the intended
7    underwriter?
8        A.  I would be unaware of what his
9    thoughts are.  I have no idea.
10       Q.  No, I am not asking -- just since
11   Alexander Capital's represented by Greenberg
12   at the time -- well, first of all, are you
13   aware of Greenberg Traurig as a law firm?
14       A.  Yes.
15       Q.  Do you consider them to be an
16   experienced law firm or -- any kind of
17   experience?
18       A.  I -- as we stated earlier, I have
19   no idea.
20       Q.  Okay.  Do you think that Alexander
21   Capital's chosen counsel of Greenberg Traurig
22   would be in an -- a better position than
23   yourself, in 2015, regarding what rules and
24   regulations were applicable to Alexander
25   Capital's responsibilities regarding the

Page 222

1              Joseph Amato
2    review and approval of filings -- offerings
3    being filed with Alexander Capital as the
4    intended underwriter, or you have no such
5    understanding or opinion?
6        A.  I have no such understanding or
7    opinion.
8        Q.  Okay.  Now I show you later on in
9    the train -- the chain, all right, it ends
10   with Mr. Marsico writing back to Mr. Barrette
11   regarding Alterix' S-1.  "No worries.  Please
12   in the future hold off on filing until you
13   get our express written approval on behalf of
14   both Greenberg Traurig and Alexander."  Ends
15   with "thanks," exclamation, "Tony," referring
16   to himself, Mr. Marsico, of Greenberg.
17           Now, having read and gone through
18   this e-mail chain and seeing the exchange of
19   what Mr. Barrette understood his
20   responsibilities were regarding giving
21   Alexander Capital the opportunity, as its
22   counsel, the opportunity to review and
23   approve, and Mr. Green -- the attorney for
24   Greenberg Traurig, Alexander Capital's
25   counsel regarding its opinion as to the

Page 223

1              Joseph Amato
2    necessity for Alexander Capital, and its
3    counsel to review and approve a filing in
4    which Alexander Capital's the intended
5    underwriter, that it received that review and
6    approval, prior to any filing, does that help
7    you in any way refresh your recollection as
8    to whether or not it was your understanding,
9    in 2015, that Alexander Capital had a
10   responsibility to review and approve any
11   filing that was being made of an offering in
12   which it was the intended underwriter?
13       A.  I would say, no, again, and they
14   filed without our approval, apparently, so,
15   no, it hasn't changed my opinion from then to
16   now.
17       Q.  When you say, "they filed it
18   without Alexander Capital's approval," you're
19   referring to this filing in June?
20       A.  Filings.  We don't control the
21   filings.
22       Q.  Okay.  But do you see -- you say
23   you don't control the filings, but do you --
24   is it your -- after reviewing this e-mail
25   chain, is it apparent to you in seeing this

Page 224

1              Joseph Amato
2    e-mail chain, that at that time that
3    Greenberg Traurig, on behalf of Alexander
4    Capital, sought its role to control the
5    filing, and make sure that it, at Alexander
6    Capital, had the opportunity to review and
7    approve the contents of the registration,
8    before it was filed?
9        A.  I don't see that at all being said
10   and would have to ask Greenberg Traurig.  I
11   don't know.
12       Q.  Give me a moment.  I will be
13   wrapping up shortly.  I stopped the sharing,
14   okay.  I am no longer sharing the screen,
15   right?
16       A.  You are not.
17       Q.  That's right.  Mr. Amato, did it
18   ever come to your attention that at some
19   point a -- that the board of directors of
20   Alterix or Inpellis approved the public
21   filing of the offering in which Alexander
22   Capital was intended to be the underwriter --
23   that they approved that filing to be filed
24   publicly?  Are you aware of that?
25       A.  I am not.

Page 225

Joseph Amato

2    Q.   I am going to --
3    A.   Can I ask you guys to hold a
4  second?  I just gotta grab a tissue.
5    Q.   Absolutely.
6    A.   Thank you, all.
7    Q.   Yeah.  Are you -- were you aware
8  that in 2015, Mr. Restrepo was hired by
9  Alexander Capital?
10   A.   Yes.
11   Q.   Were you aware that he was made
12 chief compliance officer?
13   A.   Yes.
14   Q.   Do you understand why -- the reason
15 why Mr. Restrepo was hired?
16   A.   To bring on a more experienced
17 compliance officer, hopefully, to grow the
18 firm.
19   Q.   Was it your understanding that Mr.
20 Restrepo was hired in order to help Alexander
21 Capital obtain the authorization that it was
22 applying for in 2015, that we've discussed
23 previously?
24   A.   I would assume that's part of it,
25 yes.

Page 226

Joseph Amato

2    Q.   All right.  Were you aware as to
3  whether Mr. Restrepo was successful in
4  getting such authorization?
5    A.   I don't recall which -- which one
6  was final approval, so I don't recall which.
7    Q.   All right.  Are you aware of the
8  fact that the application that Alexander
9  Capital filed was withdrawn by Alexander
10 Capital, without obtaining the approval that
11 we've discussed with -- the application we've
12 discussed previously?
13   A.   Yes, then, yes, then, he wasn't,
14 okay.  Thank you.
15   Q.   All right.  Are you aware of the
16 fact that the application was withdrawn, that
17 we've discussed previously, by Alexander
18 Capital, without getting the approval of
19 FINRA to -- for the things asked for?
20   A.   Yes.
21   Q.   Okay.  And I am going to show
22 you...I am going to show you a registration
23 statement involving Alterix, also known as
24 Inpellis.  Here the name changed.  Now it's
25 Inpellis, same company.

Page 227

Joseph Amato

2         And this is a registration
3  statement, okay, drafted November 9, 2015.  I
4  want you to accept that that is true, all
5  right?  And this is Plaintiff's Exhibit 34.
6  All right.
7    A.   Yeah.
8    Q.   Now, this is a draft registration
9  statement, November 9, 2015, that was
10 presented to the board of directors of
11 Inpellis, also known as, Alterix, on the
12 evening of November 9, all right?  I want you
13 to assume that that's true, all right?  And
14 the -- and the -- I want you also to assume
15 that it's true that the board of directors,
16 on the evening of November 9th, after
17 reviewing this draft, that they approved this
18 draft for filing the next day as a publicly
19 filed S-1, as opposed to a confidentially
20 filed S-1, all right?  I want you to assume
21 that that's true.
22   A.   Okay.
23   Q.   Was it your understanding, in 2015,
24 that there were certain -- that there was a
25 difference between a confidential filing and

Page 228

Joseph Amato

2  a public filing?
3    A.   Not so much.
4    Q.   Did you understand that in a
5  private filing, that was a so-called
6  confidential filing with the SEC about a
7  proposed registration statement, that, that
8  would give the opportunity for the SEC's
9  section of corporate finance to provide
10 comments regarding the contents of the
11 registration?
12        Was that your understanding?
13   A.   Okay, yes.
14   Q.   Okay.  And was it your
15 understanding, then, that when you file a
16 registration statement publicly, that, then,
17 that -- that registration statement is under
18 a different set of rules and regulations than
19 a confidential one?
20        Were you aware of that?
21   A.   No, I would be unaware.
22   Q.   Were you aware of the fact that
23 when you file a registration statement
24 publicly, that that publicly filed statement
25 now becomes subject to the rules and

Page 229

Joseph Amato

regulations of the SEC regarding whether there are any material misstatements or material omissions contained in the publicly filed document, as opposed to the filing of a confidential registration statement?

Are you -- were you aware of it at that time?

A. I didn't know if there was a difference between the two.

Q. Are you aware of it now?

A. No.

Q. Am I telling you -- if what I just said to you is true, is that coming to you as new information?

A. Yes, it would be.

Q. Okay. Now this November 9th draft registration statement that the board of directors approved for filing a public -- for a public filing the next day, all right, says on the second page, "This is a firm commitment initial public offering." Do you see that?

A. Yes.

Q. All right. And if we go to...the

Page 230

Joseph Amato

"underwriting" section of this draft, okay, it's the same as the underwriting section that we previously went over that was filed on August 5th regarding underwriting. And under the "underwriting" section it says, "Alexander Capital, LP, is acting as the sole book-running manager, book-running manager, of the offering." All right. Do you see that?

A. Yes.

Q. And that "Alexander Capital, LP is the only listed underwriter." Do you see that?

A. I do see that.

Q. And that the "underwriters are committed to purchase all the shares of common stock offered by us." Do you see that?

A. Yes.

Q. Okay. And if this document, all right, was filed as a publicly filed S-1, would this underwriting statement that Alexander Capital, okay, was acting as sole book-running manager of the offering when it

Page 231

Joseph Amato

was publicly filed, that that statement was in the publicly filed document, and the registration was a firm commitment offering, if that was publicly filed, is it your understanding that such a public filing would be in violation of the terms of the agreement between Alexander Capital and FINRA regarding what types of offerings Alexander Capital could undertake as an underwriter and which kind it could not undertake?

MR. WARD: Objection. Misleading and misstates the record.

Q. Can you understand the question?

A. Can you repeat it?

Q. Yes. Any time. And if you need me to restate, I will be happy to do so.

Did you have an understanding, in 2015, that if a registration statement was publicly filed in which Alexander Capital, LP was presented as the sole book-running manager of the offering, and the offering was a firm commitment offering, and Alexander Capital was the sole underwriter on that

Page 232

Joseph Amato

offering, and it was publicly filed, that that -- that the filing listing Alexander Capital as the sole book-running manager and the sole underwriter of an offering that was a firm commitment offering, that that would be in violation of Alexander Capital's terms of the agreement between it and FINRA about what types of underwriting it could participate in and what kind it could not?

A. I don't believe we would be in violation, no, because we didn't do the filing, and we didn't do the deal, so, no.

Q. You say you didn't do the deal. What do you mean by that?

A. We didn't file it. This is not our filing, and we didn't go into a firm commitment underwriting with this company at the time. It's not a done deal.

Q. All right. Now, the -- if, in fact, Alexander Capital had known about this firm commitment underwriting registration statement, all right -- well, let me ask you this: If Alexander Capital had known and approved of a firm of a registration

Page 233

Joseph Amato

1 statement that was filed in -- regarding the
2 things we've gone over regarding
3 underwriting, on October 28, all right, as a
4 confidentially filed registration statement,
5 would it have been in -- in accordance with
6 the terms of its agreement with FINRA
7 regarding the types of underwriting it could
8 or could not participate in?
9         MR. WARD:  Objection;
10        confusing.
11        MR. SCHLICHTMANN:  All
12        right, I don't want to be
13        confusing.
14    A.  Again, I don't believe it's
15 hearsay.  We didn't do this, so I don't -- I
16 don't get the question.  We didn't -- we
17 don't submit this.
18        Is there a question in that?
19        MR. WARD:  I don't think
20        there's one pending.
21        You are on "muted," Jan.
22        You are still on mute.
23        MR. SCHLICHTMANN:  No, I
24        just unmuted it.  I don't know what

Page 234

Joseph Amato

1        just happened here, but whatever.
2        I lost contact with earth here.  I
3        don't know, the mother ship.
4    Q.  What -- technology.
5        Well, I don't know how that all
6 occurred, but as we last left, the question
7 was:  Was it your understanding, in 2015,
8 that an offering -- that it was not -- was it
9 your understanding, as of 2015, that
10 Alexander Capital could not be listed as the
11 sole book-running manager and sole
12 underwriter in a firm commitment offering,
13 all right, because it did not have the
14 authority, under its membership with FINRA,
15 to be such an underwriter?  Is that true?
16    A.  I believe someone could list us.
17 We don't do -- we don't put the filings in,
18 so if they list us, we don't have control
19 over that.  So someone can list us.
20    Q.  Okay.  But if Alexander Capital did
21 have control, okay, as to whether a
22 particular registration statement was to be
23 filed, it's your testimony, I take it, that
24 it would not be appropriate for that

Page 235

Joseph Amato

1 filing -- for Alexander Capital to allow a
2 filing to be made in which it was listed as
3 sole book-running manager of a firm
4 commitment offering; is that true?
5        MR. WARD:  Objection.
6        Misstates testimony.
7        MR. SCHLICHTMANN:  I am
8        asking --
9    Q.  Do you understand the question?
10    A.  Repeat it again.  I believe I do,
11 but go ahead.
12    Q.  Okay.  Is it your -- was it your
13 understanding, in 2015, that if Alexander
14 Capital exercised any kind of control over a
15 filing that was to be made in which it was
16 listed as the sole book-running manager of a
17 firm commitment offering, all right, if it
18 had such control over whether such
19 registration statement should be filed, that
20 Alexander Capital should exercise its ability
21 to control that filing by refusing -- by
22 failing to approve its filing listing it as
23 the sole book-running manager of a firm
24 commitment offering, because such a listing

Page 236

Joseph Amato

1 would be in violation of its agreement with
2 FINRA regarding what underwritings it could
3 or could not participate in?
4    A.  No, I believe the violation would
5 be if we did the deal.  Nothing to do with
6 the filing.  Because we don't control the
7 filings.
8    Q.  Well, I am asking you if, in fact,
9 Alexander Capital had the opportunity to
10 control such a filing.  That's what I am
11 asking.
12    A.  I couldn't answer to that.  I don't
13 do the filings, so I don't know.
14    Q.  You have no understanding as to
15 whether if Alexander Capital, LP, in fact,
16 did have control over the filing, as to
17 whether or not Alexander Capital, in 2015,
18 should have exercised its control so that no
19 such filing would be made listing it as the
20 sole book-running manager of a firm
21 commitment offer?
22    A.  I don't believe we had control.  I
23 don't know.  I am not positive.  And I don't
24 believe we did -- we filed it anyway.  I

Page 237

1            Joseph Amato
2  don't believe so.
3       Q.  Okay.  Now, in -- and I will wrap
4  up here with -- we went over the fact that
5  the restriction agreement of -- the
6  restrictions that were imposed by FINRA in
7  June 11, 2015, we went over that previously,
8  and was it your understanding that in light
9  of those restrictions of June 11, 2015, that
10 Alexander Capital, in light of those
11 restrictions, in response to its application
12 for authorization regarding participation in
13 a firm commitment offering, all right, that
14 after June 11, 2015, it was not appropriate
15 for Alexander Capital to be listed in a
16 confidential filing with the SEC, as the sole
17 book-running manager, sole underwriter, of an
18 offering in which -- which was a firm
19 commitment offer?
20      A.  I can't say that to be the case.
21      Q.  Okay, why not?
22      A.  Because I don't believe it to be
23 the case.  We don't control the filings and I
24 don't believe that to be the case.
25      Q.  And --

Page 238

1            Joseph Amato
2       A.  We didn't do the deal.  The filing,
3  we didn't control.  So I don't believe it to
4  be the case.  Same question you asked me four
5  times.
6       Q.  Okay, but what I am asking, though,
7  is whether it would have been in accordance
8  with the restrictions outlined in the June
9  11, 2015, letter, for such a filing to take
10 place?
11         Would it have been in accordance
12 with those restrictions, regardless of
13 whether Alexander Capital approved it or
14 didn't approve it, would it have been in
15 accordance with the restrictions?
16      A.  I believe we would be fine.  We
17 didn't do nothing wrong.  I don't believe we
18 would have been in any harms way with that.
19      Q.  And why is that?
20      A.  Because that's my belief.  You
21 asked my belief.
22      Q.  I understand.  What's the basis of
23 your belief?
24      A.  We're not violating anything.
25      Q.  Okay.  If Alexander Capital could

Page 239

1            Joseph Amato
2  -- was -- did -- let me ask it this way:  Is
3  it your understanding that if Alexander
4  Capital, in light of those restrictions of
5  June 11, 2015, that Alexander Capital, in
6  light of those restrictions, could not
7  indicate to a company that it was working
8  with, that it was okay for that company to
9  file a registration statement with the SEC in
10 which Alexander Capital was listed as the
11 sole book-running manager for a firm
12 commitment offer?
13         Do you agree with that that's --
14 your understanding would be that it would be
15 wrong for Alexander Capital to inform a
16 company that it was okay, after the June 11,
17 2015, restriction letter from FINRA, to file
18 a registration statement in which Alexander
19 Capital was listed as the sole book-running
20 manager of a firm commitment offer?
21      A.  I believe the violation would be if
22 we did the deal not being listed in the deal,
23 so I don't believe we'd be in violation, is
24 my opinion.
25      Q.  Okay.  Regarding a filing with the

Page 240

1            Joseph Amato
2  SEC, a confidential filing with the SEC?
3       A.  I don't believe we would be in
4  violation.
5       Q.  That that's not a firm commitment
6  deal in the works to which Alexander Capital
7  is not allowed to participate; is that your
8  opinion?
9       A.  My opinion is, we didn't create it.
10 I don't believe we'd be in violation.
11      Q.  Would you consider -- would you
12 consider that Alexander Capital allowing the
13 filing of a registration statement, after the
14 restriction letter in which it's listed as
15 sole book-running manager, and intent to be
16 the sole book-running manager of that
17 offering, that, just to be clear, in your
18 understanding, that would have been not in
19 violation of the restrictions of the June 11,
20 2015, for Alexander Capital to be -- to say
21 that it's okay to file that registration
22 statement with their listing as such?
23      A.  Can you define "allows" for me?
24      Q.  Okay.  Know about it and approve
25 it.

Page 241

            Joseph Amato
1
2     A.   In what form?  A signed agreement?
3  Like what are we -- what's the allowed?  I
4  don't understand.
5     Q.   So, after June 11, 2015, I
6  represent to you that Alexander Capital filed
7  -- excuse me -- a registration statement was
8  filed at the end of June, after the
9  restriction letter was issued in 2015, in
10 which Alexander Capital was listed as the
11 sole book-running manager of a firm
12 commitment offering for Alterix, also known
13 as, Inpellis, and that was a confidential
14 filing.  All right.  In June, end of June,
15 after the restriction letter.
16    A.   By the company, correct?
17    Q.   Filed by the company, with the
18 knowledge and approval of Alexander Capital
19 and its counsel.
20    A.   By knowledge of Alexander or
21 counsel?  Hearsay.  I don't -- I haven't seen
22 that yet from what you have shown me.
23    Q.   Okay, well, I want you to assume,
24 based on the e-mail exchange that we went
25 over previously, that Greenberg had knowledge

Page 242

            Joseph Amato
1
2  and approved the filing at the end of June,
3  okay, a couple of weeks after June 11, 2015,
4  restriction letter, and that the filing that
5  was made in June had the knowledge and the
6  approval of Greenberg Traurig at the end of
7  June, Alexander Capital's counsel.  I want
8  you to assume that's true.  Go ahead.
9     A.   You noted "we had knowledge."
10 You're assuming we had knowledge.  You are
11 assuming what Greenberg has done on your
12 behalf.  I don't see that.  That's what you
13 assume from the e-mails.
14    Q.   Okay.  And is your testimony, then,
15 that if Alexander Capital had knowledge and
16 approved, okay, the filing of the
17 registration statement at the end of June on
18 a confidential basis, which listed Alexander
19 Capital as the sole book-running manager of a
20 firm committing offering, that that would
21 have been -- that would not have been in
22 violation of the restrictions that were
23 issued by FINRA on June 11, 2015?  Or that
24 would have been in violation of the
25 restriction?

Page 243

            Joseph Amato
1
2     A.   I don't think we'd be in violation
3  either way.  Because we didn't do the deal.
4  That's my opinion.
5     Q.   Yes, but I am now asking about the
6  knowledge and approval of the confidential
7  filing.
8     A.   You asked two questions, and I
9  believe either way, we wouldn't be in harm's
10 way.
11    Q.   Okay.  So just to be clear, then,
12 that in -- your understanding was that in --
13 after the June 11, 2015, restriction letter
14 that we went over previously, that it was
15 okay for Alexander Capital, with knowledge
16 and approval to -- with knowledge of the
17 contents of the offering, to give approval,
18 through its counsel, to the filing -- any
19 confidential filing of that offering in which
20 it's listed as sole book-running manager.
21         That's what I am asking.
22    A.   No, I didn't say we approved it.
23 No, I did not say that.
24    Q.   Okay.  And I am -- all right.  I
25 understand that.  What I am asking is --

Page 244

            Joseph Amato
1
2     A.   And I don't handle this for the
3  firm.  So, again, you are asking the wrong
4  question.
5         MR. WARD:  I will instruct
6      the witness, just wait for the
7      question, please.  And listen to
8      the question, okay?
9         MR. SCHLICHTMANN:  Yeah,
10     that's all right.  It's getting
11     late.  We are about to wrap up and
12     I know we all get tired at the and
13     anyway and I appreciate -- I am
14     trying to wrap this up --
15    Q.   The question I have is:  I want you
16 to assume that the filing at the end of June,
17 which occurred a couple weeks after the
18 restriction letter was done, I want you to
19 assume that it was done with the knowledge
20 and approval of Alexander Capital and its
21 counsel.  I want you to assume that as true,
22 all right?  I want you to assume that the
23 registration statement was then filed again
24 on August 5, 2015, with the full knowledge
25 and full approval of Alexander Capital and

Page 245

1            Joseph Amato
2    its counsel, and I want you to assume that
3    it's true, that the registration statement
4    was filed in a confidential basis on October
5    6, with the knowledge and approval of
6    Alexander Capital and its counsel, and I want
7    you to assume that it's true that on October
8    28, that the registration statement was filed
9    with the full knowledge and approval of
10   Alexander Capital on October 28, 2015, on a
11   confidential basis, and that on each of those
12   filings that I just went over, end of June,
13   August, and the two in October, that each one
14   of those listed Alexander Capital as the sole
15   book-running manager, okay, and the sole
16   underwriter of an offering that declared
17   itself to be a firm commitment offering, and
18   it was in the same -- and it was exactly in
19   the same form as the April filing, the
20   initial confidential filing of the
21   registration statement, in exactly the same
22   form, regarding the fact that it declared
23   itself to be a firm commitment underwriting,
24   and the same terms of underwriting that we
25   went over here were the same.  So from April

Page 246

1            Joseph Amato
2    to June to August, to two times in October on
3    a confidential basis.
4            Now I am asking -- I want you to
5    assume that that is true.  Was it your
6    understanding, in 2015, that -- that those
7    filings, after June 11th of 2015, after
8    receipt of the letter from FINRA that gave
9    the restrictions we went over previously,
10   that it was okay for Alexander Capital to
11   give its knowledge and approval to those post
12   June 11, 2015, filings that I just went over?
13       A.   So that's a lot of assumptions to
14   take place and I don't know if I am truly
15   qualified to answer this.  So I would have
16   deferred to my legal at the time, and I don't
17   know the answer.  I don't -- I can't make six
18   assumptions on something that I didn't have
19   control of the file, which I am unaware if
20   any of it was ever approved by anyone at my
21   firm.  So I can't make that assumption here
22   today.
23       Q.   And do you have any reason to
24   believe as of -- as you sit here today, that
25   Alexander Capital knew about and approved

Page 247

1            Joseph Amato
2    each of the filings I just went through?
3       A.   I have no reason to believe that we
4    did that.  So I can't -- I don't -- I don't
5    know of that.  So I can't answer to that,
6    saying that we did it.
7       Q.   What I am asking is:  Do you have
8    any reason to believe, as you sit here today,
9    that it was okay for Alexander Capital, if it
10   in fact had knowledge and approval of those
11   filings, that it was okay for them to -- with
12   that knowledge, to give that approval that I
13   just went over?
14       A.   I can't answer such a question.  I
15   don't know.  I can't speak to someone else
16   besides myself, so I don't know.
17       Q.   Okay.  I have no more questions.
18   Thank you.  I appreciate your patience.
19           MR. WARD:  We can take a
20           quick break.  Jan, if you want -- I
21           will not ask any questions but,
22           Jan, if you have an issue with the
23           last response, in terms of that you
24           want more of a response, I can talk
25           to the witness, if you are fine

Page 248

1            Joseph Amato
2    with that, then.
3           MR. SCHLICHTMANN:  Fine.
4    Let's do that.  That would be
5    great.  I would appreciate that.
6    Sure.  I want the witness to be
7    comfortable with the answer.  So
8    absolutely.  Sure, take the time
9    and then we can wrap up.
10           MR. WARD:  We will take a
11   quick break and we will be back.
12           MR. SCHLICHTMANN:  I
13   appreciate that.  Thank you.
14           THE VIDEOGRAPHER:  Going off
15   video record.  Time is 3:57 p.m.
16           (Whereupon, a recess was
17   taken at this time.)
18           THE VIDEOGRAPHER:  Back on
19   video record.  Time is 4:03 p.m.
20           MR. SCHLICHTMANN:  Can I
21   have the stenographer read the last
22   question that was pending for the
23   witness.
24           (Whereupon, the requested
25   portion was read by the reporter.)

Page 249

1       Joseph Amato
2       THE WITNESS:  With all the
3   assumptions we discussed that on
4   each filing we had knowledge of it,
5   and we approved of such, I don't
6   believe any violations occurred by
7   Alexander Capital for doing so with
8   that.
9       MR. SCHLICHTMANN:  Okay.  I
10  have got no more questions.
11      MR. WARD:  Nothing from me.
12      THE VIDEOGRAPHER:  Okay.
13      Counsel, right before we go
14  off video record, will you be
15  ordering transcript or video?
16      MR. SCHLICHTMANN:  I'm
17  sorry?
18      THE VIDEOGRAPHER:  Will you
19  be ordering transcript or video?
20      MR. SCHLICHTMANN:  Yes,
21  transcript keyed to the video and
22  also a rough.
23      THE VIDEOGRAPHER:  Mr. Ward?
24      MR. WARD:  I will just be
25  getting the transcript and a rough

Page 250

1           Joseph Amato
2       when you have it, please.
3       THE VIDEOGRAPHER:  Okay.
4   Wait, as far as the video?
5       MR. WARD:  No need for
6   video.
7       THE VIDEOGRAPHER:  Okay.
8   Going off video record.  Time is
9   4:05 p.m.
10          -oOo-
11      (Whereupon, the examination
12      of JOSEPH AMATO was adjourned at
13      4:05 p.m.)
14
15
16
17          JOSEPH AMATO
18
19
20  Subscribed and sworn to
21  before me this      day
22  of            , 2021.
23
24
25  NOTARY PUBLIC

Page 251

1
2   ----------------- I N D E X -----------------
3
4   WITNESS    EXAMINATION BY        PAGE
5   JOSEPH AMATO
6           MR. SCHLICHTMANN         6
7
8
9   ---------------------------------------------
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 252

1
2
3           C E R T I F I C A T E
4
5   STATE OF NEW YORK   )
                        : ss.
6   COUNTY OF NEW YORK  )
7
8       I, AYDIL M. TORRES, a Notary Public
9   within and for the State of New York, do
10  hereby certify:
11      That JOSEPH AMATO, the witness whose
12  deposition is hereinbefore set forth, was
13  duly sworn by me and that such deposition is
14  a true record of the testimony given by the
15  witness.
16      I further certify that I am not
17  related to any of the parties to this action
18  by blood or marriage, and that I am in no way
19  interested in the outcome of this matter.
20      IN WITNESS WHEREOF, I have hereunto
21  set my hand this 30th day of September, 2021.
22
23
24
25          AYDIL M. TORRES

Page 253

1
2           DEPOSITION ERRATA SHEET
3
4   Our Assignment No.  J7462962
5   Case Caption:  JOHN T. AQUINO, CH 7 vs.
6   ALEXANDER CAPITAL, LP, ET. AL
7       DECLARATION UNDER PENALTY OF PERJURY
8       I declare under penalty of perjury
9   That I have read the entire transcript of
10  My Deposition taken in the captioned matter
11  Or the same has been read to me, and
12  The same is true and accurate, save and
13  Except for changes and/or corrections, if
14  Any, as indicated by me on the DEPOSITION
15  ERRATA SHEET hereof, with the understanding
16  That I offer these changes as if still under
17  Oath.
18  _____
19          JOSEPH AMATO
20  Subscribed and sworn to on the _____ day of
21  _____, 20_____ before me,
22
23  _____
24  Notary Public,
25  In and for the State of _____

Page 254

1
2           DEPOSITION ERRATA SHEET
3   Page No._____Line No._____Change
4   to:_____
5   _____
6   Reason for
7   change:_____
8   Page No._____Line No._____Change
9   to:_____
10  _____
11  Reason for
12  change:_____
13  Page No._____Line No._____Change
14  to:_____
15  _____
16  Reason for
17  change:_____
18  Page No._____Line No._____Change
19  to:_____
20  _____
21  Reason for
22  change:_____
23  SIGNATURE:_____DATE:_____
24          JOSEPH AMATO
25

Page 255

1
2           DEPOSITION ERRATA SHEET
3   Page No._____Line No._____Change
4   to:_____
5   _____
6   Reason for
7   change:_____
8   Page No._____Line No._____Change
9   to:_____
10  _____
11  Reason for
12  change:_____
13  Page No._____Line No._____Change
14  to:_____
15  _____
16  Reason for
17  change:_____
18  Page No._____Line No._____Change
19  to:_____
20  _____
21  Reason for
22  change:_____
23  SIGNATURE:_____DATE:_____
24          JOSEPH AMATO
25