**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

JOHN J. AQUINO,                          )
CHAPTER 7 TRUSTEE                        )        Case #1:21-cv-01355-JSR
By Its Assignee,                         )
Convergent Distributors of Texas, LLC    )
                                         )
                    Plaintiff,           )
                                         )
              v.                         )
                                         )
ALEXANDER CAPITAL, LP                    )
           &                             )
Its Managing Partners:                   )
JOSEPH AMATO,                            )
ROCCO GUIDICIPIETRO, and                 )
NESA MANAGEMENT, LLC                     )
                                         )
                    Defendants           )
_____)

**DECLARATION OF WILLIAM C. RAND, ESQ.**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


# EXHIBIT 15


# 9-29-21 Dep. Testimony of R. Guidicipietro

**Page 1**

```
1
2        UNITED STATES DISTRICT COURT
3      SOUTHERN DISTRICT OF NEW YORK
4    -------------------------------------------x
5   JOHN J. AQUINO, CHAPTER 7 TRUSTEE
6   By Its Assignee,
7   Convergent Distributors of Texas, LLC,
8              Plaintiff,
9   -against-      Case #1:21-cv-01355-JSR
10  ALEXANDER CAPITAL, LP & Its Managing
11  Partners:
12  JOSEPH AMATO, ROCCO GUIDICIPIETRO, and
13  NESA MANAGEMENT, LLC,
14              Defendants.
15  -------------------------------------------x
16      VIDEOTELECONFERENCED DEPOSITION OF:
17          ROCCO GUIDICIPIETRO
18          New York, New York
19        Wednesday, September 29, 2021
20
21
22
23
     Reported by:
24  Aydil M. Torres, CSR
    JOB NO. J7461932
25
```

**Page 2**

```
1
2
3
4        September 29, 2021
5        10:07 a.m.
6
7
8        VTC deposition of
9   ROCCO GUIDICIPIETRO, held at 17
10  State Street, New York, New York,
11  pursuant to Notice, before Aydil M.
12  Torres, a Notary Public of the
13  State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2
3   A P P E A R A N C E S:
4
5
6   SCHLICHTMANN LAW
7   Attorney for Plaintiff
8      359 Hale Street
9      Beverly, Massachusetts 01915
10  BY: JAN SCHLICHTMANN, ESQ.
11
12
13  HOLCOMB & WARD, LLP
14  Attorneys for Defendants
15     3455 Peachtree Road, NE, Suite 500
16     Atlanta, Georgia 30326
17  BY: BRYAN M. WARD, ESQ.
18
19
20  ALSO PRESENT:
21    George B. Ellis, Videographer
22    Holly Cole,
23    Aaron Wright, Esq.
24
25
```

**Page 4**

```
1
2
3     S T I P U L A T I O N S
4
5     IT IS HEREBY STIPULATED AND AGREED
6   by and between the attorneys for the
7   respective parties herein, that filing,
8   sealing and certification be and the
9   same are hereby waived.
10
11     IT IS FURTHER STIPULATED AND AGREED
12  that all objections, except as to the
13  form of the question shall be reserved
14  to the time of the trial.
15
16     IT IS FURTHER STIPULATED AND AGREED
17  that the within deposition may be signed
18  and sworn to before any officer authorized
19  to administer an oath, with the same force
20  and effect as if signed and sworn to before
21  the Court.
22
23
24
25
```

Page 5

1
2          THE VIDEOGRAPHER:  We are
3   now on the record.  The time is
4   10:07 a.m., Eastern standard time,
5   on September 29, 2021.
6          This begins the video
7   conference deposition of Rocco
8   Guidicipietro, taken in the matter
9   of John J. Aquino, Chapter 7
10  Trustee versus Alexander Capital,
11  LP, and managing partners, Joseph
12  Amato, Rocco Guidicipietro, and
13  Nesa Management, LLC, filed in the
14  Southern District Court -- sorry,
15  filed in the United States District
16  Court, Southern District of New
17  York, case number is
18  1:21-cv-01355-JSR.
19         My name is George Ellis.  I
20  am your remote videographer.  The
21  court reporter is Aydil Torres.  We
22  are representing Esquire Deposition
23  Solutions.
24         As a courtesy, will everyone
25  that's not speaking mute

Page 6

1
2       yourselves, and please remember to
3       unmute your audio when you are
4       ready to speak.
5              Counsel, will you please
6       state your name and who you
7       represent, after which the court
8       reporter will swear in the witness.
9              MR. SCHLICHTMANN:  Jan
10      Schlichtmann.  I represent the
11      Plaintiff.
12             MR. WARD:  Bryan Ward of
13      Holcomb and Ward for Defendants,
14      and along with me are Aaron Wright
15      and Holly Cole, also of Holcomb and
16      Ward.
17  R O C C O   G U I D I C I P I E T R O,
18          called as a witness, having been
19          duly sworn by a Notary Public, was
20          examined and testified as follows:
21             THE REPORTER:  State your
22      full name for the record.
23             THE WITNESS:  Rocco
24      Guidicipietro.
25             THE REPORTER:  Please state

Page 7

1
2       your address for the record.
3              THE WITNESS:  6 Haven Hill
4       Road, Hamburg, New Jersey 07419.
5              MR. SCHLICHTMANN:  May I
6       begin?  Yes.  Thank you.
7   EXAMINATION BY
8   MR. SCHLICHTMANN:
9       Q.  Mr. Guidicipietro, first of all,
10  thank you very much for agreeing to attend
11  today's deposition, and we may experience
12  some technical difficulties, and I will ask
13  for your patience.  We will try and do as
14  best we can.  I guess we are unfamiliar with
15  the technology, or not familiar enough.
16  Also, Mr. Guidicipietro, I want you to know
17  that if at any time I ask you a question, you
18  don't understand anything about the question
19  or you need me to restate it, rephrase it,
20  whatever, feel free to do that, and I will
21  endeavor to try and do that, so that it's
22  completely understandable to you.
23         If you need to take a break, even
24  if a question is pending, you need to -- for
25  whatever reason, the reason is not really

Page 8

1          Rocco Guidicipietro
2   important.  If you have to talk to your
3   lawyer, if you just need to take a break, if
4   you need to think about things, whatever it
5   happens to be, please feel free to do it.
6   There will be no inferences taken by the
7   Plaintiff regarding that.  All we care about
8   is that you are comfortable with your answer.
9   So as far as the record is concerned, what
10  we're making reference to this record -- it's
11  going to be to the question and answer and
12  not whether there was a break or a time, you
13  know, asked by the witness, okay?  So I just
14  --
15      A.  Okay.
16      Q.  -- want you to feel comfortable
17  with your answer.
18      A.  Okay.
19      Q.  Do we have that understanding?
20         We have that understanding, then,
21  among us?
22      A.  Yes.
23      Q.  Okay, great.  All right.
24         Mr. Guidicipietro, you have a
25  present relationship with Alexander Capital;

ROCCO GUIDICIPIETRO                                    September 29, 2021
JOHN J. AQUINO -against- ALEXANDER CAPITAL          9-12

Page 9

1              Rocco Guidicipietro
2    is that correct?
3        A.   Yes.
4        Q.   What's that relationship?
5        A.   I am the chief operating officer.
6        Q.   And how long have you been the
7    chief operating officer?
8        A.   About 7 years.
9        Q.   And do you know was the -- do you
10   know the year, whether it was 2012 or 2013,
11   when you became the chief operating officer
12   of Alexander Capital?
13       A.   I believe it was 2013.
14       Q.   Do you remember the season?
15       A.   I don't.
16       Q.   Is it more likely the winter,
17   spring, as opposed to the summer, fall?
18       A.   More towards the end of the year.
19       Q.   Okay.  All right.
20            Now, your -- do you have an
21   interest, an ownership interest in Alexander
22   Capital at present?
23       A.   No, I do not.
24       Q.   Do you have an indirect ownership
25   interest in Alexander Capital, LP?

Page 10

1              Rocco Guidicipietro
2        A.   Yes, I do.
3        Q.   What --- and what is the -- how
4    would you characterize that independent
5    interest?
6        A.   Nesa Management, LLC.
7        Q.   All right.  And are you -- what's
8    your position in Nesa Management, LLC?
9    That's N-E-S-A, for the court reporter.
10       A.   It's a member.
11       Q.   All right.  Are you the only
12   member?
13       A.   No.  Joseph Amato.
14       Q.   Are the two of you the only two
15   members?
16       A.   Yes.
17       Q.   And when did -- when was Nesa
18   Management formed?
19       A.   Actually, don't know the actual
20   year when it was formed.
21       Q.   All right.  I will be showing you
22   some documents that may help, you know,
23   pinpoint the dates and everything.  I am now
24   just asking some general questions about your
25   memory but I will be showing you some

Page 11

1              Rocco Guidicipietro
2    documents that will be able to help your
3    recollection about the exact dates.  This is
4    not a quiz or a test.  I am just asking for
5    your general memory at this point.  The --
6    so, in fact, let me show you a document, all
7    right.
8        A.   Excuse me, I have a box on screen
9    that's telling me the meeting is being
10   recorded.  I am trying to see if I can get
11   that off there.  Oh, I got it.  Okay.
12       Q.   Now can you see -- hopefully, you
13   can see a document?
14       A.   Yes.
15       Q.   Okay.  Can you read it clearly in
16   its present size?
17       A.   Yes, I see it fine.
18       Q.   You can, okay, great.  If at any
19   time it's too small, too big, whatever,
20   please let us know, and we will do whatever
21   we can to make sure you can see it; is that
22   all right?
23       A.   It's on a 60-inch T.V., so I can
24   see it very clear.
25       Q.   Okay, very good.  You passed your

Page 12

1              Rocco Guidicipietro
2    eye test today.  Great.
3        A.   Yes.
4        Q.   Thank you.  I am showing you
5    Plaintiff's Exhibit 132.  And do you
6    recognize this document at all?  Before
7    today, were you familiar with it at all?
8            Does it look like something you
9    have seen before?
10       A.   No, not at all.
11       Q.   All right.  I will represent to you
12   that this was part of an application to FINRA
13   in 2015, and this was a corporate hierarchy
14   chart that was submitted along with the
15   application, all right?
16           Does that help you refresh your
17   recollection at all about this chart at all
18   or doesn't help?
19       A.   No, not at all.
20       Q.   All right.  Now, on that, you
21   recognize your name on the top block to the
22   left?
23       A.   Yes.
24       Q.   All right.  And it -- it has you
25   down as COO.  Does "COO" stand for "chief

Page 13

1          Rocco Guidicipietro
2    operating officer"?
3        A.   Yes, it does.
4        Q.   Okay.  And to the right is Joseph
5    Amato, and under his name it says,
6    "president."  Do you see that?
7        A.   Yes.
8        Q.   And in 2015, is it accurate to
9    depict yourself as the chief operating
10   officer and Mr. Amato as the president of
11   Alexander Capital, LP, as of August of 2015?
12       A.   I can answer for myself.  I can't
13   answer for Mr. Amato.  Yes, that's accurate,
14   as far as I am concerned.
15       Q.   But as to Mr. Amato, certainly, you
16   were familiar with him at the time and still
17   are, obviously, you are still in business
18   together; is that correct?
19       A.   Yes, I am just not sure about his
20   title at that time.
21       Q.   Okay.  Do you know what titles Mr.
22   Amato has had over the course of time you
23   have been involved with Alexander Capital,
24   LP, as best you can?
25       A.   No, I don't.  I don't want to

Page 14

1          Rocco Guidicipietro
2    speculate.
3        Q.   Was it your understanding that Mr.
4    Amato, as depicted in -- does this chart
5    depict the relationship to each other
6    vis-a-vis, that you were on the same level,
7    according to this chart, as opposed to you
8    being subordinate to Mr. Amato or Mr. Amato
9    being subordinate to you?
10       A.   I don't know what this chart
11   represents.
12       Q.   All right.  So -- but have you seen
13   corporate charts before like this?
14       A.   No, I have not.
15       Q.   All right.  I want you to assume
16   that this is -- the chart is trying to depict
17   a corporate hierarchy with those at the top
18   having supervisory responsibility to those
19   below them, and that those below are
20   reporting to the people above in that, you
21   know, kind of chain of command, as depicted
22   by the boxes in relationship to each other.
23       All right?  I want you to assume
24   that.  Is that all right?
25       A.   No, I'm not assuming.  I don't know

Page 15

1          Rocco Guidicipietro
2    what this chart -- who developed it, why it
3    was made.  I have no idea.
4        Q.   Okay.  Well, based on your
5    knowledge and experience with Alexander
6    Capital, in 2015, was it accurate that Mr. --
7    well, did you know Mr. Feinman?
8        A.   Yes, I know Mr. Feinman.
9        Q.   Okay.  And it has "CEO" under Mr.
10   Feinman's name, and that block is right under
11   your name and Mr. Amato's name.  Do you see
12   that?
13       A.   Yes.
14       Q.   Okay.  And it says, "CEO," chief --
15   is that your understanding, "CEO" stands for
16   "chief executive officer"?
17       A.   That would be my understanding,
18   yes.
19       Q.   Was it your understanding that Mr.
20   Feinman was the chief executive officer of
21   Alexander Capital, LP, in -- as of August of
22   2015?
23       A.   I know he was the CEO at a certain
24   time.  I believe it was 2015, but I am not
25   100 percent sure on the dates.

Page 16

1          Rocco Guidicipietro
2        Q.   All right.  Under his block is
3    Timothy Stack.  Did you know Mr. Stack?
4        A.   Yes.
5        Q.   All right.  And did -- were you
6    aware of the fact that Mr. -- it has under
7    his name "CCO."  Do you see that?
8        A.   Yes.
9        Q.   Do you know what "CCO" stands for?
10       A.   Yes.  Chief compliance officer.
11       Q.   And was it your understanding in
12   August of 2015, that Mr. Stack was the chief
13   compliance officer at Alexander Capital, LP?
14       A.   I am not sure of the dates, but I
15   know Mr. Stack was chief compliance officer
16   for a certain period of time.
17       Q.   Now, going down further, you have
18   Barry Eisenberg with the initial -- with the
19   "BOM" at the bottom of the block.  Do you see
20   that?
21       A.   Yes.
22       Q.   Do you know what that means?
23       A.   Branch manager.
24       Q.   All right.  And when referring to
25   the term "branch manager," what did that mean

Page 17

Rocco Guidicipietro

2 regarding Alexander Capital, as of August of
3 2015?
4     A.   Not sure which office he was branch
5 manager of.
6     Q.   Did Alexander Capital --
7     A.   Branch manager.
8     Q.   When you say, "branch manager," was
9 there more than one branch at Alexander
10 Capital in August of 2015?
11     A.   I believe so, yes.
12     Q.   And how many branches, to your
13 knowledge?
14     A.   Two or three.
15     Q.   And what did they -- were they
16 branches defined by geography or by
17 responsibilities or -- and/or both?
18     A.   Both.
19     Q.   Okay.  And Mr. -- you said there
20 were two or three branch managers as of
21 August of 2015?
22     A.   No, I said there was two or three
23 branches.
24     Q.   I'm sorry, two or three branches.
25     A.   I am not sure how many managers

Page 18

Rocco Guidicipietro

2 there were in 2015.
3     Q.   Well, other than Mr. Eisenberg, do
4 you have any memory of other branch managers
5 on par with Mr. Eisenberg?
6     A.   No, it could have been designated
7 by the chief compliance officer.  I don't
8 know who was designated.
9     Q.   And what was your understanding of
10 the responsibilities of a branch manager, as
11 of August of 2015?
12     A.   A branch manager in 2015 for
13 Alexander Capital or a branch manager in
14 general?
15     Q.   No, Alexander Capital, LP.  Thank
16 you.
17     A.   A branch manager would be
18 responsible for supervising the registered
19 reps.
20     Q.   And how many registered reps, to
21 your knowledge, did Alexander Capital have in
22 August of 2015?
23     A.   I don't know.
24     Q.   Roughly?
25     A.   I am not going to guess.  I have no

Page 19

Rocco Guidicipietro

2 idea.
3     Q.   Okay.  Mr. O'Brian you see is to
4 the right of Mr. Eisenberg.  Do you see that?
5     A.   Yes.
6     Q.   Do you know what his position was
7 in the company?
8     A.   He was an indirect owner, I
9 believe.  I don't even know why he would be
10 on this chart or whatever this is.
11     Q.   Okay.  So Mr. O' Brian, your
12 understanding, was an indirect owner of
13 Alexander Capital, LP, but there's no title
14 listed.  He is just on there next to Mr.
15 Eisenberg; is that correct?
16     A.   Yes.
17     Q.   All right.  And your understanding
18 is that Mr. O' Brian did not have a
19 responsibility to conduct certain duties or
20 services for Alexander Capital; is that
21 correct?
22     A.   To my knowledge, he never had any
23 -- any supervisory duties at all, so I have
24 no idea why he is on this chart.
25     Q.   Okay.  Now, going back to the next

Page 20

Rocco Guidicipietro

2 level, we see Jonathan Gazdak.  Do you see
3 that?
4     A.   Yes.
5     Q.   And it says, "investment banking."
6       Do you see that?
7     A.   Yes.
8     Q.   Was it your -- do you know who Mr.
9 Gazdak is?
10     A.   Yes, I do.
11     Q.   And were -- do you know when Mr.
12 Gazdak joined Alexander Capital, LP?
13     A.   Not sure exactly when he joined.  I
14 would say about six years ago, seven years
15 ago.
16     Q.   All right.  And he was -- did you
17 -- and he was associated with Alexander
18 Capital in 2015; is that correct?
19     A.   Yes.
20     Q.   Now, under his name it says
21 "investment banking."  Do you see that?
22     A.   Yes.
23     Q.   All right.  And what is your
24 understanding of the duties and
25 responsibilities of Mr. Gazdak, regarding

ROCCO GUIDICIPIETRO                                    September 29, 2021
JOHN J. AQUINO -against- ALEXANDER CAPITAL            21–24

Page 21

1           Rocco Guidicipietro
2    investment banking concerning Alexander
3    Capital, LP, in -- as of 2015?
4        A.   I will not speak for his duties.
5    He was the head of investment banking.  I am
6    not a banker.  I am not familiar with what he
7    would need to do.
8        Q.   All right, but you knew he was head
9    of investment banking; is that correct?
10       A.   Yes, he was head of investment
11   banking.
12       Q.   And who at Alexander Capital, LP
13   was responsible for hiring Mr. Gazdak and
14   putting him in that position?
15       A.   He was -- I am not sure who
16   officially hired him.
17       Q.   Did you and Mr. Amato have a hiring
18   -- or exercise any hiring responsibilities or
19   did you leave that to people below who --
20   below you, who you were supervising?
21       A.   We leave that most of the time to
22   the people below.
23       Q.   Regarding Mr. Gazdak, your best
24   memory, if you have one, of whether any of
25   the people on that block were involved in his

Page 22

1           Rocco Guidicipietro
2    hiring, or you just don't know?
3        A.   I -- I don't know.  I mean, I have
4    spoken to him when he was, you know, coming
5    in for an interview, but the official choices
6    -- there were a lot of other people there at
7    that time.
8        Q.   And who were the people who would
9    make hiring decisions by Alexander Capital at
10   that time, when Mr. Gazdak was hired, to your
11   knowledge?
12       A.   At that point it would be --
13   compliance would run a background check on
14   him, and he would go through the compliance
15   due diligence, and at that time the
16   compliance and CEO.
17       Q.   And you see Thomas Sullivan's name
18   next to Gazdak?
19       A.   Yes.
20       Q.   And it says, F-I-N-O-P.  Do you
21   know what that stands for?
22       A.   Yes, FINOP.
23       Q.   Yes.  What's FINOP stand for?
24       A.   He is the financial -- he keeps the
25   books and records for the firm.

Page 23

1           Rocco Guidicipietro
2        Q.   How long has Mr. Sullivan had that
3    position, to your knowledge?
4        A.   Been there quite a while.  I would
5    say from '14, '13, '14.
6        Q.   To the present?
7        A.   To the present.
8        Q.   And just briefly, what are the
9    responsibilities, in your understanding, of
10   the FINOP officer, the financial operations
11   officer?
12       A.   I am not an FINOP, so I don't know
13   exactly what he is supposed to do.
14       Q.   All right.  Next to his name is
15   Alfredo Cruz.  Do you see that?
16       A.   Yes.
17       Q.   It says, F-M-S-R-B.  Do those
18   initials mean anything to you?
19       A.   Yes, municipal bonds principal.
20       Q.   And David Spratt, do you see that
21   box next to Cruz?
22       A.   Yes.
23       Q.   And it says, "proprietary trading;"
24   is that right?
25       A.   Yes.

Page 24

1           Rocco Guidicipietro
2        Q.   What is your understanding of
3    proprietary trading, regarding Alexander
4    Capital, LP, at that time, August of 2015?
5        A.   He was on our trading desk, so he
6    would -- he would be our trader.
7        Q.   Now, below Mr. Gazdak is Bari
8    Latterman.  Were you familiar with Ms.
9    Latterman at any time in 2015?
10       A.   Yes.
11       Q.   What was your understanding of her
12   position at Alexander Capital at that time?
13       A.   She was administrative assistant.
14       Q.   Do you know who she reported to?
15       A.   She worked for anybody she needed
16   to work for.  She didn't report to anybody,
17   really.  Compliance.
18       Q.   Now, do you know Mr. Christopher
19   Carlin?
20       A.   Yes.
21       Q.   And how long -- has Mr. -- to your
22   knowledge, has Mr. Carlin been associated
23   with Alexander Capital, LP?
24       A.   Yes.
25       Q.   And what -- I'm sorry?

Page 25

1            Rocco Guidicipietro
2      A.  How long, I'm sorry?
3      Q.  Yeah.
4      A.  I believe he joined us in 2013,
5  '14.
6      Q.  And he has been with Alexander
7  Capital since that time, up to the present?
8      A.  Yes.
9      Q.  And what has -- did his position
10  change at all, or did he maintain the same
11  position as when he entered?
12      A.  Pretty much maintains the same
13  position since he entered.
14      Q.  What was your understanding of his
15  title, if he had one?
16      A.  He is in capital markets.  When we
17  have a project, he works on raising the
18  money.
19      Q.  All right.  And what -- could you
20  explain to us, what are -- what was Capital
21  Markets, in relation to Alexander Capital,
22  LP?  What did that entail?
23      A.  Capital Markets was -- internally
24  would be responsible for raising money for
25  companies when we engaged with them in

Page 26

1            Rocco Guidicipietro
2  banking.
3      Q.  All right.  And he has held that
4  position throughout the time he has been
5  associated with Alexander Capital; is that
6  correct?
7      A.  Yes.
8      Q.  Did Mr. Carlin, to your knowledge,
9  have anyone who reported to him regarding
10  Capital Markets, or was the only person
11  involved in the Capital Markets section of
12  Alexander Capital?
13      A.  He was pretty much the only
14  partner.  He would be the -- he would have a
15  couple of registered reps that would work
16  with him, but he is the only person.
17      Q.  Okay.  Mr. Carlin's name is not on
18  this chart as -- which was submitted to FINRA
19  in August of 2015.  Do you have any -- based
20  on your knowledge of the operations of
21  Alexander Capital, would Mr. Carlin's
22  position in the company be above Mr. Gazdak,
23  Mr. Sullivan -- and Mr. Sullivan, or would it
24  be below them, or would it be alongside them?
25            MR. WARD:  Objection.

Page 27

1            Rocco Guidicipietro
2  Confusing as to --
3            MR. SCHLICHTMANN:  Sorry, I
4      don't want --
5      A.  Yeah, I mean --
6      Q.  It's okay.  I withdraw the
7  question.
8      A.  Okay.
9      Q.  I want to make sure that it's
10  clear.
11      If this is a chart showing the
12  corporate hierarchy and the relationship of
13  various people employed by Alexander Capital
14  to each other regarding who is superior to
15  who, who was on the same par, regarding
16  corporate responsibility, who was supervising
17  who, okay, I want you to assume that that's
18  what this is showing, would -- where would
19  Mr. Carlin's block be, in relationship to
20  Mr. Gazdak?
21      A.  Not on this chart.
22      Q.  Okay.  Why is that?
23      A.  He is a registered rep.  It's not a
24  division or a supervisory title.
25      Q.  Okay.  And is -- would he then be

Page 28

1            Rocco Guidicipietro
2  under Mr. Eisenberg's supervision as branch
3  manager or someone else?
4      A.  He would be under compliance.  I am
5  not sure if he was under -- he would be
6  designated from the chief compliance officer
7  to a supervisor.
8      Q.  Okay.  When you say, "supervisor,"
9  are -- supervisors report to branch managers,
10  or who do they report to?
11      A.  Depends which supervisor and what
12  department it is.
13      Q.  All right.  So the person that
14  would supervise Capital Markets, who would
15  that supervisor report to?
16      A.  I wouldn't know at that time who
17  anybody was reporting to, 2015.
18      Q.  All right.  How about 2014, 2015,
19  2016, in that period of time, making a little
20  broader period of time, any understanding as
21  to who Capital Markets -- who Mr. Carlin
22  would have -- whose -- who the supervisor of
23  Mr. Carlin would have been?
24      A.  I don't recall.
25      Q.  I'm sorry?

Page 29

Rocco Guidicipietro

1          Rocco Guidicipietro
2          MR. WARD:  Objection.
3     Vague.
4          MR. SCHLICHTMANN:  Okay.
5     Q.  Between 2014 and 2016, do you have
6  any -- do you have any memory of who Mr.
7  Carlin -- whose -- who supervised Mr. Carlin,
8  if anyone did, at Alexander Capital?
9     A.  He definitely had a supervisor, but
10  I don't have no idea who.  It was a small
11  firm.  A lot of people had different hats.
12     Q.  Okay.  And the supervisor -- and
13  who -- and he would have had a supervisor,
14  you said, and to your knowledge, during this
15  period of time, 2014 to 2016, who would the
16  supervisor of Capital Markets report to, if
17  you have any knowledge or understanding of
18  that?
19     A.  I don't.  I don't know who was
20  reporting to anybody.
21     Q.  Okay.  You said that you were the
22  chief operations officer; is that correct?
23     A.  Correct.
24     Q.  And you've been the chief operating
25  officer since 2013, to the present?

Page 30

Rocco Guidicipietro

1          Rocco Guidicipietro
2     A.  Correct.
3     Q.  And could you describe for us, what
4  are the duties and responsibilities, as you
5  understood them, of a chief operating
6  officer?
7     A.  I handle mostly the finances.  I
8  work with the FINOP on net cap and I take
9  care of payroll.  That's majority of my --
10  what my business description is.
11     Q.  All right.  And so is it fair to
12  say that as regarding Alexander Capital, that
13  you are the person who would be at the
14  highest level regarding the financial
15  operations of the firm; is that fair?
16     A.  Yes.
17     Q.  And that the financial operations
18  officer would be reporting to you?
19     A.  No, he is independent.  He does his
20  own work.  We collaborate and we go over it,
21  but he is responsible for books and records
22  and the financials of the firm.
23     Q.  And -- but from time to time, his
24  responsibilities is to provide you
25  information at your request, in order for you

Page 31

Rocco Guidicipietro

1          Rocco Guidicipietro
2  to exercise your duties and responsibilities
3  as a chief operating officer; is that fair?
4     A.  If I request information from him,
5  yes.
6     Q.  All right.  I am -- okay.  I am
7  going to see if I will put up another
8  document here.  Okay, if all goes well, it
9  will appear.  All right, I am going to show
10  you a document.  Share screen.  Do you see a
11  document on the screen?
12     A.  Yes.
13     Q.  You see "Delaware, the First
14  State," at the top of the document?
15     A.  Yes.
16     Q.  Now, I will just scroll.  This
17  document is exhibit -- previously been marked
18  as Exhibit 28.  By the way, did I identify
19  the corporate chart?  I did, okay.  Thank you
20  very much.
21          So this is a document previously
22  marked as Plaintiff's Exhibit 28, and it's a
23  document from the Delaware Secretary of
24  State's office, as indicated in the
25  certification.

Page 32

Rocco Guidicipietro

1          Rocco Guidicipietro
2          Do you see that, the certification
3  on the top?
4     A.  Yes.
5     Q.  Okay.  And it says, "The following
6  documents have been filed, certificate of
7  limited partnership, filed in 1995," and this
8  has to do with Alexander Capital, LP, and
9  then it has a certificate of registration
10  filed in 1998.
11          Do you see that?
12     A.  Yes.
13          MR. WARD:  You just read
14     that -- "restoration."
15          MR. SCHLICHTMANN:  What did
16     I say?
17          MR. WARD:  "Registration."
18          MR. SCHLICHTMANN:  Oh, I'm
19     sorry.  I thought I said --
20     certificate of restoration in 1998.
21     Q.  And then a certificate of revival
22  in 2012.
23          Do you see that?
24     A.  Yes.
25     Q.  Okay.  And then it says, "I further

Page 33

Rocco Guidicipietro

1 certify that the aforesaid certificates are
2 the only certificates on record of Alexander
3 Capital, LP," and the date of this
4 certification is June 4, 2021. Do you see
5 that?
6 A. Yes.
7 Q. Okay. So this is a certification
8 from the state of Delaware about what was on
9 file at the secretary of state's office of
10 Delaware regarding Alexander Capital, LP, as
11 of June 4, 2021.
12        And now I am just going to briefly
13 go through these documents, all right, and
14 this is the certification regarding -- that
15 was filed in 1995. And it's a certificate of
16 limited partnership of Alexander Capital, LP,
17 and I am just going to slowly go through it,
18 have you have a chance to look at it. It's
19 signed by a Mr. McClean, assistant secretary,
20 and this is a 1995 document, saying that the
21 name of the limited partnership is Alexander
22 Capital, LP, giving its -- it says -- it says
23 the name and mailing address of each general
24 partner is Alexander Partners, Inc. Do you

Page 34

Rocco Guidicipietro

1 see that?
2 A. Yes.
3 Q. Now, in looking at this document,
4 is this a document you are familiar with at
5 all?
6        Have you seen it before?
7 A. Not this particular document, no.
8 Q. Were you aware of the facts that a
9 certificate of limited partnership was filed
10 on behalf of Alexander Capital, in 1995, at
11 the secretary of state's office in Delaware?
12        Is that, generally, consistent with
13 your memory or understanding?
14 A. I wasn't there in '95.
15 Q. Correct, but knowing -- but based
16 on your knowledge and experience and
17 understanding of Alexander Capital's history
18 of operations, did it come to your attention,
19 were you made aware in any way, for any
20 reason, that Alexander Capital, LP was --
21 filed in 1995 with the secretary of state's
22 office in Delaware, a certificate of limited
23 partnership?
24 A. I know it was formed in 1995, yes.

Page 35

Rocco Guidicipietro

1 Q. Okay. And then the next document
2 is a certificate to restore to good standing
3 a Delaware limited partnership, referring to
4 Alexander Capital, LP, and it says that, "I,
5 Alexander Capital Holdings, Inc., general
6 partner, or liquidating trustee of the above
7 hereby certify that this limited partnership
8 is paying all annual taxes, penalties and
9 interest due to the state of Delaware." Do
10 you see that?
11 A. Yes, the date is cut off with your
12 pictures.
13 Q. Okay. How about that?
14 A. I see November 27. I don't see the
15 year.
16 Q. This is -- this certificate says,
17 "23rd day of January, 1998," referring to
18 this document.
19        Do you see that?
20 A. Yes.
21 Q. Okay. So this was filed on that
22 date, according to the certificate of the
23 secretary of state of Delaware, January 23,
24 1998, and it's a certificate to restore to

Page 36

Rocco Guidicipietro

1 good standing a Delaware limited partnership,
2 referring to Alexander Capital, LP.
3        Now, it states Alexander Capital
4 Holdings, Inc., was the general partner at
5 that time. Now, were you -- are you familiar
6 at all or with Alexander Capital Holdings,
7 Inc., did it ever come to your attention that
8 particular company, Alexander Capital
9 Holdings, Inc.?
10 A. No, I am not.
11 Q. Did you know that Alexander Capital
12 Holdings, Inc., was listed as the general
13 partner?
14        Was that your understanding of --
15 that it was listed as the general partner of
16 Alexander Capital since, at least, 1998?
17 A. No, I am not. I don't even know
18 who Alexander Capital Holdings is.
19 Q. Okay. The -- the -- I can see that
20 the next certificate is the 23rd day of
21 April, 2012. Do you see that?
22 A. Yes.
23 Q. Okay. And that -- this certificate
24 filed April 23, 2012, with the secretary of

Page 37

Rocco Guidicipietro

1           Rocco Guidicipietro
2   state's office in Delaware says the name of
3   the limited -- it's a certificate of revival
4   of the Delaware limited partnership, and the
5   name is Alexander Capital, LP.  The date of
6   the original filing in the secretary of
7   state's office, it says, is November 27,
8   1995, and it says the name of the general
9   partner is Alexander Capital Holdings, Inc.
10          Do you see that?
11      A.  Yes.
12      Q.  It lists the address for Alexander
13  Capital Holdings, Inc., as 17 State Street,
14  5th Floor, New York, New York.  Do you see
15  that?
16      A.  Yes.
17      Q.  Do you recognize that address, 17
18  State Street?
19      A.  Yes.
20      Q.  What's that address of?
21      A.  That's our current address.
22      Q.  Alexander Capital LP's, that's
23  where their offices are, correct?
24      A.  Yes.
25      Q.  Now, this says that the general

Page 38

Rocco Guidicipietro

1           Rocco Guidicipietro
2   partner Alexander Capital Holdings, Inc., was
3   also at that address.  Were you aware, based
4   on your understanding of the history of
5   operations at Alexander Capital, that at some
6   point Alexander Capital Holdings, Inc.,
7   claimed its address as the same address as
8   Alexander Capital, LP, at least as of 2013?
9       A.  No, I did not.
10      Q.  This is signed by a Francine Lanaia
11  as president.  Do you see that?
12      A.  Yeah, she was the previous owner.
13      Q.  What was your understanding of who
14  Francine Lanaia was?
15      A.  The previous owner of Alexander
16  Capital, LP.
17      Q.  And do you know who -- was she the
18  actual owner, 100 percent, or did she share
19  ownership with anyone else, to your
20  knowledge?
21      A.  I don't know.
22      Q.  Do you know the entity under which
23  Ms. Lanaia held ownership of Alexander
24  Capital, LP?
25      A.  I do not.

Page 39

Rocco Guidicipietro

1           Rocco Guidicipietro
2       Q.  Do you know if she was holding it
3   as owner of Alexander Capital Holdings, Inc.?
4       A.  I do not.  I have no access to any
5   documents of hers.
6       Q.  All right.  Now, this is -- as of
7   June 20, 2021, this is the last document on
8   file as of that time with the secretary of
9   state's office of Delaware, according to this
10  certification.
11          Do you ever remember seeing this
12  document, the certificate of revival that we
13  just went over, at any time, for any reason?
14      A.  I do not.
15      Q.  Okay.  Again, I just -- to make
16  sure, were you aware that Alexander Capital
17  Holdings, Inc., as of 2013, was the general
18  partner of Alexander Capital, LP, or you were
19  not aware of that, even as you sit here
20  today?
21      A.  I wasn't aware of it then or now.
22      Q.  All right.  Okay, bear with me as I
23  bring up another document.  Bear with me here
24  as I bring it up.  Get that up there.
25          I am going to show you -- I am

Page 40

Rocco Guidicipietro

1           Rocco Guidicipietro
2   going to show you a document now.  Now, this
3   is a filing that was just filed on the 28th
4   day of September with the secretary of
5   state's office at Delaware, concerning
6   Alexander Capital, LP.
7           Do you see that on the screen or
8   have we not shared?  Yeah, do you see that on
9   the screen?
10      A.  Yes.
11      Q.  Okay.  And are you aware that a
12  filing was made at the secretary of state's
13  office in Delaware just two days ago,
14  regarding Alexander Capital, LP, or you did
15  not know?
16      A.  Yes, I am.
17      Q.  You are aware.  And were you
18  involved in the discussions regarding the
19  filing of that document, prior to its filing?
20      A.  Yes.
21      Q.  Do you know the reason it was
22  filed?
23          MR. WARD:  I will just
24          interject here.  To the extent that
25          this involves any attorney-client

Page 41

```
 1            Rocco Guidicipietro
 2     communications, including from me,
 3     then, I will instruct the witness
 4     not to answer.
 5         MR. SCHLICHTMANN:  Yes, I am
 6     not -- and thank you, Attorney
 7     Ward.
 8     Q.   I am not asking you to divulge any
 9  conversations or communications you had with
10  counsel, Mr. Guidicipietro.  I am asking your
11  understanding as to the reason why this was
12  filed, not communications with counsel, but
13  what your understanding was.
14     A.   Well, the -- to answer the
15  question, then, I would have to tell you what
16  I spoke with my counsel with, so it's
17  difficult to answer the question.
18     Q.   Okay, so you had an understanding,
19  but it's restricted to communications with
20  your counsel and not some other business
21  reason --
22     A.   Correct.
23     Q.   -- is that correct?
24     A.   Correct.
25     Q.   Okay.  It says that -- did you
```

Page 42

```
 1            Rocco Guidicipietro
 2  actually see this document, prior to its
 3  filing?
 4     A.   Yes.
 5     Q.   Okay.  It says -- did you approve
 6  the filing of the document?
 7     A.   Yes.
 8     Q.   All right.  It says the name of the
 9  limited partnership is Alexander Capital, LP.
10  Do you see that?
11     A.   Yes.
12     Q.   And it says, Article 3 of the
13  certificate of limited partnership shall be
14  amended as follows:  The name and mailing
15  address of each general partner is as
16  follows:  Exitus, LLC.
17         Do you see that?
18     A.   Yes.
19     Q.   And it's 17 State Street, 5th
20  Floor, New York, New York, correct?
21     A.   Yes.
22     Q.   And are you familiar with Exitus,
23  LLC?
24     A.   Yes.
25     Q.   Do you have an ownership interest
```

Page 43

```
 1            Rocco Guidicipietro
 2  in Exitus, LLC?
 3     A.   I do not.
 4     Q.   And Exitus, LLC is -- claims its
 5  address as the same address as Alexander
 6  Capital, LP, right, 17 Street -- 17 State
 7  Street, 5th Floor, New York New York; is that
 8  correct?
 9     A.   Yes.
10     Q.   It also says that the "amendment is
11  effective December 19, 2013, for accounting
12  purposes only."  Do you see that?
13     A.   I see that.
14     Q.   Okay.  And are you familiar with
15  who is the owner of Exitus, LLC?
16     A.   Yes.
17     Q.   Who is the owner, to your
18  knowledge?
19     A.   Joe Fib -- Fibiolo.
20     Q.   Now, because his name comes up
21  spelling with an A or O, do you know the
22  correct spelling?
23         Does his name end with an A or an
24  O?
25     A.   I don't know.
```

Page 44

```
 1            Rocco Guidicipietro
 2     Q.   Okay.  All right.  Well, how do you
 3  remember it best?  I don't want to, you know,
 4  insult Mr. Fibliolo.  Is it your
 5  understanding it's more likely Mr. Fibiolo or
 6  Fibiola?
 7     A.   -ola, I believe.
 8     Q.   With an "A," okay, so we will do
 9  that.  We will refer to the owner of Exitus
10  as Mr. Fibiola and -- oh, well, there we go
11  right there --
12     A.   Oh, yeah.
13     Q.   -- on the document.  There we go,
14  Mr. Figliolo is now showing us with that -olo
15  is with an "O" and not an "A."  So we will
16  properly refer to him as Figliolo.  He signed
17  this certificate.  Do you see that?
18     A.   Yes.
19     Q.   Now, is it your understanding that
20  as of December 19, 2013, that Exitus was the
21  general partner of Alexander Capital, LP,
22  from that time until the present?
23     A.   No, I do not know.
24     Q.   Do you know what Mr. -- Mr.
25  Figliolo, did he have a relationship with
```

Page 45

1          Rocco Guidicipietro
2  Alexander Capital from 2013, to the present,
3  to your knowledge?
4      A.   He did not.
5      Q.   He himself did not?
6      A.   Correct.
7      Q.   Okay.  And do you know if he
8  exercised any interest in Alexander Capital,
9  LP, through another entity?
10     A.   Through Exitus.
11     Q.   Okay.  And what is your
12 understanding, if you have one, as to Mr.
13 Figliolo's ownership interest of Exitus?
14     A.   I -- he own -- he was a partner.
15 That's all I know.
16     Q.   You don't know if his interest is
17 100 percent or whether he shares ownership
18 with someone else?
19     A.   I don't remember.
20     Q.   All right.  Now, again, referring
21 to Exitus, LLC, were you aware, at any time,
22 you know, up to the present, that Exitus had
23 a GP ownership or was claiming a GP ownership
24 in Alexander Capital, LP, from 2013 through
25 2015?

Page 46

1          Rocco Guidicipietro
2      A.   I do not know what Exitus' position
3  was.
4      Q.   Okay.  Or that -- all right.  As of
5  that time?
6      A.   Correct.
7      Q.   Okay.  Now, it's claiming that it's
8  a general partner, according to the
9  certificate.
10         Is that true, to your knowledge,
11 based on what you know about --
12
13         MR. WARD:  I will --
14 objection.  Misleading.
15         MR. SCHLICHTMANN:  I don't
16 want to be misleading.
17     Q.   As of today, is it your
18 understanding that Exitus, LLC, is a general
19 partner of Alexander Capital, LP?
20     A.   I do not know.
21     Q.   Even as of today?
22     A.   Oh, as of today, Exitus has no
23 involvement in Alexander Capital, LP.
24     Q.   Okay.  Well, as of today, do you
25 consider Exitus as a general partner of

Page 47

1          Rocco Guidicipietro
2  Alexander Capital, LP, as of today?
3      A.   No, Exitus has nothing to do with
4  Alexander Capital, LP.
5      Q.   I'm sorry?
6      A.   He was a previous owner.
7      Q.   Okay.  And do you know when he was
8  a previous owner?
9      A.   In '13, '14.
10     Q.   And then after '14, he stopped
11 being an owner?
12     A.   We bought his ownership in '14, I
13 believe.
14     Q.   All right.  And when you say, "we,"
15 who's the "we"?
16     A.   Nesa Management.
17     Q.   And owned by yourself and Mr.
18 Amato?
19     A.   Yes.
20     Q.   All right.  You say you -- did you
21 purchase 100 percent of his interest or a
22 lesser percent than 100 percent, at that
23 time?
24     A.   At that time, I believe it was 24.9
25 percent.

Page 48

1          Rocco Guidicipietro
2      Q.   All right.  You remember that,
3  okay.
4         And did you later purchase more of
5  Exitus' interest, beyond 24.9 percent, or you
6  have -- the only interest that you purchased
7  was 24.9 percent, and that didn't change from
8  then until now, to your knowledge?
9      A.   It did change.  We bought 100
10 percent at -- in 2017, I believe.
11     Q.   All right.  And is it your
12 understanding that you have to -- that
13 whenever there's a change of ownership of
14 Alexander Capital, LP, that it was necessary
15 for it to have that approved by an
16 organization known as FINRA, F-I-N-R-A?
17     A.   Yes.
18     Q.   And is it your testimony today that
19 as of sometime in 2017, FINRA gave that
20 approval to the change in ownership, or they
21 did not give that approval?
22     A.   They gave that approval.
23     Q.   All right.  And so from 2017 -- and
24 do you remember, approximately, when that
25 approval was given?  I think you did say a

Page 49

1              Rocco Guidicipietro
2    season or month or I am not sure.
3         A.  No, that was a previous question.
4    No, I do not know.
5         Q.  Sometime in 2017?
6         A.  I believe so, yes.
7         Q.  Okay.  And so from 2017 onward,
8    it's your understanding that Nesa owned 100
9    percent of Exitus' interest in Alexander
10   Capital; is that correct?
11        A.  No, not the present.
12        Q.  Okay.  You are saying, "no, that's
13   not present," may be -- I am not quite sure I
14   understand the answer, in relation to my
15   question.  So, let me ask the question again.
16            Is it your understanding that, as
17   of the time that the ownership change was
18   approved by FINRA in 2017, that Alexander
19   Capital owned 100 percent of any interest
20   that Exitus had in Alexander Capital, LP; is
21   that correct?
22        A.  Yes.
23        Q.  To the present?
24        A.  It was correct in 2017, but not the
25   present.

Page 50

1              Rocco Guidicipietro
2         Q.  Okay.  Did something happen between
3    2017 and the present?
4         A.  Yes, we took in partners.
5         Q.  When you say, "we," who are you
6    referring to?
7         A.  Nesa Management sold interest in
8    Alexander Capital, LP.
9         Q.  Okay.  To other partners?
10        A.  Correct.
11        Q.  When was that?
12        A.  I don't know the exact dates.
13        Q.  Is it recently?
14        A.  No.
15        Q.  All right.  And so just to be
16   clear, as of 20- -- in 2017, FINRA gave
17   approval for Alexander -- for Nesa
18   Management, LLC, to acquire all of the
19   interest of Exitus, that Exitus had in
20   Alexander Capital, LP; that's correct?
21        A.  Yes.
22        Q.  All right.  And was that true that
23   -- and, therefore, in 2017, after that
24   approval, Alexander Capital had that 100
25   percent interest of that Exitus previously

Page 51

1              Rocco Guidicipietro
2    had in Alexander Capital, LP, correct?
3         A.  Yes, for a certain period of time.
4         Q.  Okay.  In 2018, did that change?
5         A.  I am not sure when it changed, but
6    I believe in 2018, it changed.
7         Q.  Okay.  What is your understanding
8    of the nature of the change?
9         A.  That Nesa sold off part of its
10   ownership.
11        Q.  To who?
12        A.  I am not sure which partner came
13   first.  There's multiple partners.
14        Q.  Okay.  Could you list the multiple
15   partners, and then we will try and figure as
16   best we can, based on your memory as who --
17   what order it was.
18            Who are all the partners, in
19   whatever order.
20        A.  Ed O'Brian.
21        Q.  Okay, yes.
22        A.  Jean Solkine.
23        Q.  Yeah.
24        A.  Regere Partners, and Jay Sack, Inc.
25        Q.  All right.  None of those people

Page 52

1              Rocco Guidicipietro
2    who took an interest back were Mr. Figliolo
3    or any company that he controlled?
4         A.  No.
5         Q.  So as far as your understanding is
6    that even though there was an ownership
7    change in 2018, in which Nesa brought in
8    additional partners, those additional
9    partners had no involvement with
10   Mr. Figliolo, or any company that he owned or
11   controlled; is that correct?
12        A.  Correct.
13        Q.  So that as of 2017, when FINRA
14   approved the ownership change, and Alexander
15   Capital, LP acquired the remaining interest
16   of Exitus and Alexander Capital, LP, as far
17   as your understanding is, Exitus, LP, and Mr.
18   Figliolo or any company he owned and
19   controlled never reacquired an interest in
20   Alexander Capital, LP, to this day; is that
21   correct?
22            MR. WARD:  Objection.
23            Confusing and misleading.
24            MR. SCHLICHTMANN:  I don't
25        want it to be confusing or

Page 53

1          Rocco Guidicipietro
2      misleading.
3      A.   Correct.
4      Q.   And as of -- is it your
5  understanding that since the time that
6  Exitus, LLC sold its interest, upon approval
7  of FINRA, to -- to Nesa Management, LLC,
8  that, to your knowledge, Exitus never
9  acquired an interest in Alexander Capital,
10  LP, since that transaction in 2017; is that
11  correct?
12      A.   Correct.
13      Q.   And to your knowledge, since that
14  time in 2017, when Exitus was approved to
15  sell its interest to Nesa Management, LLC,
16  that, to your knowledge, Mr. Figliolo never
17  acquired an interest in Alexander Capital,
18  from that time to the present, either
19  directly or indirectly, through any company
20  he owned or controlled; is that correct?
21      A.   Correct.
22      Q.   Do you know the nature -- do you
23  know the factual grounds on which Exitus, LLC
24  is stating to the secretary of state's office
25  just two days ago that it considers itself

Page 54

1          Rocco Guidicipietro
2  the general partner -- a general partner of
3  Alexander Capital, LP, or you have no
4  understanding of the factual basis of that
5  claim?
6          MR. WARD:  Objection.
7      Misstates the record.
8          MR. SCHLICHTMANN:  Okay, I
9      don't want it to misstate the
10      record.
11      Q.   Do you have any basis -- do you
12  have any understanding as to why Exitus, LLC
13  considers itself, as of two days ago, to be a
14  general partner of Alexander Capital, LP?
15          MR. WARD:  Objection.
16      Misstates the record.
17      Q.   Do you --
18          MR. WARD:  Jan, do you mind
19      if I --
20          MR. SCHLICHTMANN:  Go ahead.
21      Go ahead.
22          MR. WARD:  There's another
23      document filed.  We produced that
24      as well.  Just making sure.
25          MR. SCHLICHTMANN:  I will

Page 55

1      Rocco Guidicipietro
2  get to --
3          MR. WARD:  Okay.
4          MR. SCHLICHTMANN:  I got it.
5  I did get it.  Thank you for that.
6          All right.  Well, I will
7  mark this, Bryan -- Mr. Ward,
8  Attorney Ward, with your
9  permission, for the record, we are
10  going to have this marked as -- I
11  believe 181.  For the record, for
12  the court reporter, is that all
13  right, Attorney Ward?
14          I believe 180 was the last
15  one.  Do you agree with me?
16          MR. WARD:  Yes, I agree.
17          MR. SCHLICHTMANN:  Okay, so
18  this will be 181, and now I will
19  put in the next document, which we
20  will have marked as Plaintiff's
21  Exhibit 182.
22          MR. WARD:  And, Rocco, how
23  are you doing?  Do you want to
24  break or keep going?  We've been
25  going over an hour.

Page 56

1      Rocco Guidicipietro
2          THE WITNESS:  Yeah, we will
3      take a break for a couple of
4      minutes.
5          MR. SCHLICHTMANN:  Yeah,
6      okay.  Any time.
7          MR. WARD:  Okay.
8          MR. SCHLICHTMANN:  Bryan, if
9      you want, I can finish this one,
10      and then we can take a break after
11      we discuss the second one.
12          MR. WARD:  It's okay with
13      me.  Is that okay with you, Rocco?
14      Q.   Is it okay with you?
15      A.   Yeah, continue with this one.
16      Q.   Sure.  If you do want a break, it's
17  not a problem, but let me just go through
18  with this one, if you are okay with it.  If
19  you are okay?
20      A.   You know what, let me take a break
21  and then --
22      Q.   Okay.
23          THE VIDEOGRAPHER:  We are
24      going off the record.  The time is
25      11:04 a.m.

Page 57

1            Rocco Guidicipietro
2            (Whereupon, a recess was
3       taken at this time.)
4            THE VIDEOGRAPHER:  We are
5       now back on the record.  The time
6       is 11:14.
7  BY MR. SCHLICHTMANN:
8       Q.  Okay, I am going to show you a
9  document that we're now marking as
10 Plaintiff's Exhibit 182.
11           Do you see it on your screen?
12      A.  Yes.
13      Q.  And it's a state of Delaware
14 amendment to the certificate of limited
15 partnership referring to Alexander Capital,
16 LP, that was filed on September 28, 2021,
17 just a couple of days ago.
18           Do you see that?
19      A.  Yes.
20      Q.  It says the name of the limited
21 partnership is Alexander Capital, LP.  Do you
22 see that?
23      A.  Yes.
24      Q.  It says, "The Article 3 of the
25 certificate of limited partnership shall be

Page 58

1            Rocco Guidicipietro
2  amended as follows."  It says, "The name and
3  mailing address of each general partner is as
4  follows:  Nesa Management, LLC, 17 State
5  Street, 5th Floor, New York, New York."  Do
6  you see that?
7       A.  Yes.
8       Q.  And it says, "This amendment is
9  effective as of December 14, 2017."  Do you
10 see that?
11      A.  Yes.
12      Q.  Okay.  Had you seen this document
13 prior to today?
14      A.  Yes.
15      Q.  All right.  Now, you remember that
16 the 180 -- Exhibit 181 had similar language
17 in it that said the name and mailing address
18 of each general partner is as follows, and it
19 named Exitus, LLC, with the Alexander
20 Capital, LP office address, and this one, a
21 separate filing on the same date, says that
22 -- names each general partner and lists Nesa
23 Management, LLC, at the Alexander Capital, LP
24 office address.  Do you see that?
25      A.  Yes.

Page 59

1            Rocco Guidicipietro
2       Q.  Is it your understanding that
3  there's more than one general partner of
4  Alexander Capital, LP, as of today?
5       A.  I don't believe so.
6       Q.  It's your understanding there's
7  only one general partner of Alexander
8  Capital, LP?
9       A.  I don't know, to be honest.
10      Q.  Well, do you have any reason to
11 believe there's another general partner of
12 Alexander Capital, LP, other than Nesa
13 Management, LLC?
14      A.  I am not sure what the other
15 partners are considered...
16      Q.  Whether they are considered general
17 partners or not?
18      A.  That's what I am saying, I am not
19 sure if they are considered general partners.
20 I don't believe so.
21      Q.  Okay.  But the other --- when you
22 say, "the other partners," is that the list
23 of names that you gave previously of other
24 people, that did not include Mr. Figliolo or
25 Exitus, LLC?

Page 60

1            Rocco Guidicipietro
2       A.  Yes.
3       Q.  Okay.  To your knowledge, do you
4  have any reason to believe that Nesa
5  Management, LLC, and Exitus, LLC have, at
6  present, any kind of disagreement regarding
7  who the general partner or partner -- general
8  partners of Alexander Capital, LP are?
9       A.  Can you repeat that question?  I'm
10 sorry.
11      Q.  Yes.  As you sit here today, do you
12 have any reason to believe that Nesa
13 Management, LLC, and Alexander Capital, and
14 Exitus, LLC, have a disagreement as to who is
15 the general partner of Alexander Capital, LP,
16 or whether there's more than one general
17 partner?
18      A.  That's two questions.
19      Q.  Okay.
20      A.  As far as the first question,
21 Exitus and Nesa, there's no disagreement.
22 Exitus has nothing to do with Alexander
23 Capital, LP.
24      Q.  Okay.  And that's been the case
25 since 2017, as you previously testified,

Page 61

```
1              Rocco Guidicipietro
2    correct?
3       A.   Yes.
4       Q.   All right.  Now, as chief operating
5    officer -- yes, as chief operating officer,
6    do you see that in each of these -- one --
7    Exhibit 181 and Exhibit 182, they refer to
8    different times for accounting purposes, it
9    says the -- this amendment is effective.  Do
10   you remember that?
11      A.   Yes.
12      Q.   And this one says that Nesa
13   Management's depiction as the general partner
14   is effective as of December 14, 2017.  Do you
15   see that?
16      A.   Yes.
17      Q.   It says, "for accounting purposes
18   only."
19           Do you see that?
20      A.   Yes, I see that.
21      Q.   Do you have any understanding as to
22   why that limitation for accounting purposes
23   only was put on this certificate or you have
24   no understanding?
25      A.   I have no understanding.
```

Page 62

```
1              Rocco Guidicipietro
2       Q.   As the chief operating officer, is
3    it appropriate, in your opinion, for the
4    amendment of this certificate that was
5    amended -- the amended certificate that was
6    filed two days ago, that it's appropriate for
7    it to say that Alexander Capital is the
8    general partner and has been since December
9    14, 2017, for accounting purposes only?
10           MR. WARD:  Objection.
11           Calls for speculation.
12           Legal conclusion.
13           MR. SCHLICHTMANN:  Okay, I
14       don't want any speculation and I
15       don't want any legal conclusions.
16      Q.   I am only asking, based on your
17   understanding as the chief operating officer
18   of Alexander Capital, LP, regarding the
19   operations and ownership of Alexander
20   Capital, LP, is it consistent with your
21   understanding that this certificate regarding
22   Alexander Capital, LP, its statement that
23   Nesa Management is the general partner,
24   effective as of December 14, 2017, for
25   accounting purposes only, is correct, in your
```

Page 63

```
1              Rocco Guidicipietro
2    opinion, is an accurate description of
3    things, in your opinion?
4            MR. WARD:  Objection.
5        Vague.
6            MR. SCHLICHTMANN:  I'm
7        sorry?
8            MR. WARD:  Objection.
9            Confusing and vague.
10           MR. SCHLICHTMANN:  No, yeah,
11       I understand the objection.
12      Q.   You can answer.
13      A.   This would be with conversations
14   with my counsel, the reason why it was put on
15   there.
16      Q.   But you don't have any
17   understanding independent of that, as to why
18   this was put on there; is that fair?
19      A.   I do not.  I am not a lawyer or an
20   accountant.
21      Q.   Okay.  All right.  Are you --
22   Mr. Guidicipietro, do you have any licenses
23   from FINRA regarding any aspect of the
24   business of -- business of Alexander Capital,
25   LP?
```

Page 64

```
1              Rocco Guidicipietro
2        A.   Yes, I have licenses.
3        Q.   What are they?
4        A.   Twenty-four, seven, sixty-three,
5    and the four.
6        Q.   And can you tell us, briefly --
7    describe what are the -- what do those
8    licenses cover that you mentioned?
9        A.   The Series 7 is a general
10   securities representative.  63 is a state
11   registration.  The 24 is a supervisor
12   license, and the 4 is an option principal.
13      Q.   And during the time that you have
14   been with Alexander Capital, LP, did you have
15   any responsibilities or were involved in any
16   way in dealing with initial public offerings
17   that Alexander Capital was considering for a
18   company?
19      A.   No.
20      Q.   During -- prior to your joining
21   with Alexander Capital, can you briefly
22   describe what your experience has been
23   regarding broker-dealer or investment banking
24   or capital market business?
25      A.   My experience before Alexander
```

Page 65

1             Rocco Guidicipietro
2    Capital is all retail business with
3    individual investors. Little to no business
4    with banking. Never been involved in capital
5    markets.
6        Q.   As of -- during the time that you
7    -- well, from the time you joined Alexander
8    Capital, and -- the time that you joined
9    Alexander Capital, through 2015, did you
10   understand that Alexander Capital, in order
11   to be involved with the sale or offer of
12   securities, had to have a membership in
13   FINRA, the organization we talked about
14   before?
15       A.   Yes.
16       Q.   And did you understand that as part
17   of that membership, that there was an
18   agreement between Alexander Capital and
19   FINRA, regarding the activities it could do
20   and couldn't do as a member of FINRA; is that
21   correct?
22       A.   Yes, it's a membership agreement,
23   yes.
24       Q.   Are you familiar with Alexander
25   Capital's membership agreement?

Page 66

1             Rocco Guidicipietro
2        A.   Pretty familiar with it. Yes.
3        Q.   And has that membership agreement,
4    did it -- when you became the chief operating
5    officer in 2013, you were aware that there
6    was a -- that Alexander Capital had a
7    membership agreement with FINRA, as of the
8    time that you became the chief operating
9    officer in 2013?
10       A.   Yes.
11       Q.   You were familiar with it?
12       A.   Don't recall what it was in 2013,
13   '14.
14       Q.   All right. Well, do you remember
15   that -- after you became chief operating
16   officer, do you have any memory or
17   understanding that at the time you became
18   chief operating officer, through the end of
19   2015, whether or not the membership --
20   Alexander Capital's membership agreement in
21   FINRA changed in any way?
22       A.   Yes.
23       Q.   What's your understanding?
24       A.   That we filed CMAs for expansion
25   ownership change.

Page 67

1             Rocco Guidicipietro
2        Q.   And you used the phrase "CMA."
3    What's a CMA?
4        A.   Continuing membership application.
5        Q.   And you are familiar with that term
6    and what it considers?
7        A.   I'm familiar with the term.
8        Q.   Okay. Now, what I am asking
9    specifically is: Did -- from 2013 through
10   2015, all right, through the end of 2015, did
11   -- not whether there was an application
12   filed, but did the membership agreement
13   change during that period of time, not
14   whether it was an attempt to change it, but
15   whether it actually changed during that time?
16       A.   I am not sure when the changes took
17   effect.
18       Q.   And are you familiar with the
19   changes?
20       A.   I didn't file the CMA; our
21   attorneys did.
22       Q.   All right, but did you have a
23   general understanding of the changes that
24   occurred at some time?
25       A.   Over a period of time, yes.

Page 68

1             Rocco Guidicipietro
2        Q.   Okay. And could you describe, as
3    best you can, what was your understanding of
4    how the membership agreement was at the
5    beginning, when you were involved, when you
6    first became involved with Alexander Capital,
7    LP, and how it changed over time, as best you
8    can?
9        A.   We changed ownership. We asked for
10   expansion to hire more personnel. We also
11   filed for -- to do underwriting in firm
12   commitment underwriting, and I believe that's
13   most of the changes.
14       Q.   All right. And you said you
15   understood that you asked for a change in
16   firm commitment underwriting authority; is
17   that correct?
18       A.   Yes.
19       Q.   And do you know -- well, do you
20   know if FINRA ever granted Alexander Capital
21   the authority to engage in firm commitment
22   offerings?
23       A.   Yes.
24       Q.   Do you know when that occurred?
25       A.   I don't know the exact date.

Page 69

1              Rocco Guidicipietro
2      Q.   Was it any time between 2013 and
3  end of 2015, or was it after 2015?
4      A.   I believe it was after 2015.
5      Q.   Is it your best memory that it was
6  a year or two ago or three?
7      A.   I don't know.
8      Q.   Is it most likely it occurred in
9  the last three years?
10     A.   Yes.
11     Q.   Okay.  Was it your understanding
12 from when you first began with Alexander
13 Capital in 2013, through 2015, that Alexander
14 Capital was only authorized to conduct best
15 efforts underwriting, as opposed to a firm
16 commitment underwriting?
17     A.   I am not sure what the official
18 restrictions were.
19     Q.   But you do know that there was a
20 change in the last three years, to Alexander
21 Capital being approved by FINRA to conduct
22 firm commitment offerings; is that correct?
23     A.   Yes.
24     Q.   All right.  So, therefore, prior to
25 that approval by FINRA, it was your

Page 70

1              Rocco Guidicipietro
2  understanding that Alexander Capital was not
3  authorized to conduct firm commitment
4  offerings; is that correct?
5      A.   Underwritings, I believe, yes.
6      Q.   Underwritings?
7      A.   Yes.
8      Q.   All right.  So is it fair to say
9  that from 2013 through 2015, that you -- it
10 was your understanding that Alexander Capital
11 was authorized -- was not authorized to do
12 firm commitment offerings; is that correct?
13     A.   Yes.
14     Q.   Do you know what a "best efforts
15 offering" is?
16     A.   Yes.
17     Q.   And do you know whether best
18 efforts offering is different than a firm
19 commitment offering?
20     A.   Yes.
21     Q.   Could you explain, as best you can,
22 what your understanding is of the difference?
23     A.   Firm commitment, the firm is
24 committing to raise the money, and best
25 efforts, it's a -- what it's -- the title

Page 71

1              Rocco Guidicipietro
2  says, best efforts to raise the money.
3  That's my simple definition.
4      Q.   As chief operating officer, were
5  you aware, from 2013 to 2015, as to whether
6  or not companies who were inquiring of the
7  services of Alexander Capital, that it would
8  be important to them to know whether or not
9  Alexander Capital could conduct an offering
10 that they were considering to do with
11 Alexander Capital, as to whether Alexander
12 Capital had the authority to do a firm
13 commitment offering?
14     A.   That's not my area, the
15 underwriting or the banking, so...
16     Q.   Based on your understanding that
17 firm commitment offerings are guaranteed by
18 the underwriter, is that fair to say --
19 basically, is that a shorthand to say that
20 firm commitment offering is a guarantee by
21 the underwriter regarding a certain portion
22 of the company shares of the company being
23 offered?
24          MR. WARD:  Objection.
25          Calls for speculation and

Page 72

1              Rocco Guidicipietro
2  legal conclusion.
3          MR. SCHLICHTMANN:  Okay, I
4  don't want to do that.  So I
5  withdraw the question.
6      Q.   Is it fair to characterize your
7  understanding of what a firm commitment
8  underwriting is, is that the underwriter
9  guaranteed to purchase a certain amount of
10 shares, whether or not there's interest in
11 the market for those shares?
12     A.   It's hard to answer that question
13 because there's a lot more that goes into
14 that before you get to that point.
15     Q.   Okay.  What do you mean by,
16 "there's a lot that goes into that"?
17     A.   Well, I am saying if it's cleared
18 by the SEC, and it's ready to trade, and that
19 would -- at that point, the firm would be
20 obligated to take the shares.
21     Q.   Yes, and I am just asking -- but I
22 am just asking whether -- well, let me ask it
23 this way:  Is it consistent with your
24 understanding, now, as you sit here, that a
25 company seeking to be a potential customer of

Page 73

1               Rocco Guidicipietro
2    Alexander Capital, LP, regarding an intended
3    initial public offering, whether they would
4    -- it would be important to them to know
5    whether Alexander Capital was -- had the
6    authority to do a firm commitment offering,
7    as opposed to a best effort offering, as you
8    sit here today?
9        A.  We've done both in, you know, our
10   intent to raise the money is the same, best
11   efforts or firm commitment.
12       Q.  Right, but I am asking specifically
13   as to your understanding as to whether a
14   company that is seeking Alexander Capital's
15   services for an initial public offering,
16   whether it would be important to them, as you
17   sit here today, as your understanding, that
18   it would be important to them to know whether
19   Alexander Capital could do a firm commitment
20   offering, or whether they were restricted to
21   doing just best efforts offerings?
22       A.  That would be up to the particular
23   company.
24       Q.  Do you have an understanding as to
25   why a company might consider that to be

Page 74

1               Rocco Guidicipietro
2    important or you don't?
3        A.  I don't.
4        Q.  Okay.  Did you -- as you sit here
5    today, do you consider that it's important
6    for Alexander Capital, LP, in its dealings
7    with a company that is seeking Alexander
8    Capital to help them with an initial public
9    offering, an intended one, that as you sit
10   here today, do you consider it to be a
11   responsibility or obligation of Alexander
12   Capital to let that company know whether or
13   not Alexander Capital has the authority to do
14   a firm commitment offering?
15       A.  No, and the company should do their
16   own due diligence and they would know what
17   Alexander's capable of doing and not.
18       Q.  And is it your understanding that
19   the -- that a company that's seeking the
20   services of Alexander Capital, LP, has a way
21   of determining whether Alexander Capital has
22   the authority to do a firm commitment
23   offering?
24           Do you have an understanding --
25           MR. WARD:  Objection.

Page 75

1               Rocco Guidicipietro
2            MR. SCHLICHTMANN:  Let me
3        finish the question.  Let me
4        withdraw the question.
5        Q.  Do you have an understanding as to
6    how a company that was interested in knowing
7    whether Alexander Capital, LP, had the
8    authority to conduct a firm commitment
9    offering, where it could go to find out that
10   information?
11       A.  I do not.
12       Q.  Do you know if that's available
13   information from FINRA, to people in the
14   public making inquiries about such a thing?
15       A.  I have never tried to get the
16   information, so I don't know.
17       Q.  During 2013 to 2015, is it fair to
18   say that you were not aware, during that
19   time, whether companies that were interested
20   in the services of Alexander Capital, LP, as
21   to how they could obtain the information as
22   to whether or not Alexander Capital, LP,
23   during that time, was authorized by FINRA to
24   conduct firm commitment offerings?
25       A.  I don't.

Page 76

1               Rocco Guidicipietro
2        Q.  You didn't have an understanding at
3    that time; is that what you're saying?
4        A.  No, what I am saying is the -- at
5    that time, I don't know how they could find
6    out, if they could or not.
7        Q.  All right.  Okay.  Now, are you
8    familiar with the name Alterix, Inc. or
9    Inpellis, Inc.?
10           Does that name come to your
11   attention?
12       A.  Yes, somewhat familiar.
13       Q.  Do you -- is it -- what's your --
14   well, did it come to your attention at some
15   point that Alterix, Inc., also known as,
16   Inpellis, Inc., had come to Alexander
17   Capital, LP at some time regarding their
18   desire to conduct an initial public offering?
19       A.  Yes.
20       Q.  And what's your understanding as to
21   when they came to the company, Alexander
22   Capital, LP?
23       A.  I don't know.  I wasn't involved in
24   any of the conversations or -- with the
25   company.

Page 77

```
1              Rocco Guidicipietro
2      Q.  I took that off, right, the
3  document?  Right?  There's no document on the
4  screen; is that correct?
5      A.  Right.
6      Q.  That's right, okay.  Do you have
7  any memory, at any time, that Mr. Gazdak, or
8  anyone else at Alexander Capital brought to
9  your attention that Alexander -- that
10  Alterix, Inc., also known as Inpellis, Inc.,
11  wished to be a customer or wished to talk to
12  Alexander Capital about the services that it
13  provided?
14      A.  I did not.
15      Q.  And I will show you a document, all
16  right, and this is an e-mail from Chris
17  Carlin to Patrick Mooney, dated July 24,
18  2014.  Do you see that?
19      A.  Yes.
20          MR. WARD:  What's the
21      exhibit number?
22          MR. SCHLICHTMANN:  Sorry,
23      very good.  It is 54.
24          Thank you.  Exhibit 54.
25      Q.  All right, now we talked about
```

Page 78

```
1              Rocco Guidicipietro
2  Mr. Carlin and your knowledge of him.  Do you
3  see the name Patrick Mooney?
4      A.  Yes.
5      Q.  All right.  Is that name familiar
6  to you?
7      A.  Somewhat familiar, yes.
8      Q.  What is your understanding -- did
9  you have an understanding between 2014 and
10  2015, as to whether or not Mr. Mooney had any
11  kind of relationship with Alexander Capital,
12  LP, in any form?
13      A.  Yes, I believe he was a registered
14  rep.
15      Q.  That Mr. Mooney was a registered
16  rep?
17      A.  Yes.
18      Q.  And are you familiar with whether
19  Mr. Mooney was providing consulting services
20  to Alexander Capital, or whether he was an
21  actual employee of Alexander Capital at that
22  time?
23      A.  I am not sure.
24      Q.  As chief operating officer, would
25  that be something that would come to your
```

Page 79

```
1              Rocco Guidicipietro
2  attention, or be part of your duties and
3  responsibilities to know or not?
4      A.  No, absolutely not.
5      Q.  Okay.  Were you familiar -- were
6  you aware that Mr. Carlin and Mr. Mooney were
7  contacted or -- excuse me.
8          Were you aware that Mr. Carlin was
9  contacted in 2014, by representatives of
10  Alterix, Inc., also known as Inpellis, Inc.,
11  at that time?
12      A.  No, I did not.
13      Q.  This Exhibit 54, it mentions Greg
14  Kroning.  Do you see this in the e-mail
15  thread at the beginning?  It's dated July 23,
16  to Chris Carlin, from a Peyton Jackson.  Do
17  you see that?
18      A.  Yes.
19      Q.  Do you know who Peyton Jackson is?
20      A.  I know the name, yes.
21      Q.  How do you know the name?
22      A.  He worked for Alexander Capital for
23  a period of time.
24      Q.  Were you aware of the fact that Mr.
25  Jackson -- is it Mr. or Mrs.?
```

Page 80

```
1              Rocco Guidicipietro
2      A.  Mr.
3      Q.  Mr. Jackson contacted Mr. Carlin
4  about an interest -- about Biochemics or
5  anyone associated with Alterix Inc.?
6      A.  No, I did not.
7      Q.  And it says later on, on July 24th,
8  in this e-mail thread, Peyton Jackson to
9  Chris Carlin, subject, Biochemics, slash,
10  Alterix.  It says, "On the phone with Marvin
11  Rosen right now."
12          Do you see that?
13      A.  Yes.
14      Q.  "He really wants to cultivate our
15  shop."
16          Do you see that?
17      A.  Yes.
18      Q.  Do you know who Marvin Rosen is?
19      A.  I do not.
20      Q.  Did you know that Marvin Rosen was
21  an attorney for Greenberg Traurig?
22      A.  I did not.
23      Q.  Were you familiar with the firm
24  Greenberg Traurig in 2013 to 2015?
25      A.  I know the name.  I know the firm
```

Page 81

1              Rocco Guidicipietro
2  but...
3      Q.  Are you aware whether or not
4  Greenberg Traurig became counsel to Alexander
5  Capital in the 2014/2015 period, regarding
6  the intended offering of Alterix, Inc., also
7  known as, Inpellis, Inc.?
8      A.  I did not.
9      Q.  Is that news to you today, as we
10  sit here?
11      A.  Yes, I didn't -- I don't remember
12  who our accountant -- we used a lot of
13  attorneys.
14      Q.  All right.  I am putting on the
15  screen Plaintiff's Exhibit 59.  Do you see
16  that?  It's an e-mail from Patrick Mooney to
17  Jonathan Gazdak, dated July 29, 2014.  Do you
18  see that?
19      A.  Yes.
20      Q.  The attachment is "Alterix EA
21  document."
22          Do you see that?  Yes?
23      A.  Yes.
24      Q.  And did you understand that "EA"
25  was often used as a shorthand expression for

Page 82

1              Rocco Guidicipietro
2  "engagement agreement"?
3      A.  No, but it makes sense to me.
4      Q.  All right.  And you see that Mr.
5  Mooney is saying, "Can you quickly eyeball
6  this"? to Mr. Gazdak?  Do you see that?
7      A.  Yes.
8      Q.  And was it your understanding that
9  Mr. Gazdak, as head of investment banking,
10  would be -- had the supervisory
11  responsibility at Alexander Capital regarding
12  any offering or intended offering by a
13  company in which Alexander Capital was
14  intended to be the underwriter?
15      A.  I'm not sure what his supervisory
16  was at the point.
17      Q.  Was it your understanding that Mr.
18  Gazdak, as head of investment banking, would
19  be the person responsible for that particular
20  engagement with a company where Alexander
21  Capital's intended to be the underwriter
22  regarding an initial public offering?
23      A.  He would be the contact person, and
24  from that point on, I'm not sure what his
25  procedures were.

Page 83

1              Rocco Guidicipietro
2      Q.  I am now going to show you the
3  attachment to that e-mail that Mr. Mooney
4  asked Mr. Gazdak to eyeball.  Do you
5  recognize the Alexander Capital, LP
6  letterhead?
7      A.  Yes.
8      Q.  And you see that the -- the date is
9  July 2014.  Do you see that?
10      A.  No, it's blocked by you, your
11  picture.
12      Q.  Okay.  Do you see it over here
13  where the pointer is?
14      A.  Yeah, no, it's covered.  I see July
15  2.  That's all I can see.
16      Q.  Really, okay.
17          MR. WARD:  It's screen
18          dependent.  I can see it on my end.
19          MR. SCHLICHTMANN:  Let me
20          shrink it a little bit here.
21      Q.  Did that help?
22      A.  Yes.
23      Q.  Can you now see July 29, 2014?
24      A.  Yes.
25      Q.  All right.  And you see it's made

Page 84

1              Rocco Guidicipietro
2  out to Marshal Sterman, CEO of Alterix, Inc.?
3          Do you see that?
4      A.  Yes.
5      Q.  And are you familiar with the name
6  Marshal Sterman at all?
7      A.  I am not.
8      Q.  Okay.  You were familiar with the
9  name Alterix, Inc., at some point; is that
10  correct?
11      A.  I heard the name.  Not familiar
12  with the company.
13      Q.  Is it your understanding or is it
14  your memory that at some point Alterix, Inc.,
15  also known as Inpellis, Inc., entered into an
16  engagement agreement with Alexander Capital
17  regarding an intended offering?
18      A.  At this point, I know that.
19      Q.  Okay.  During 2014, 2015, did you
20  know that?
21      A.  I did not.
22      Q.  Okay.  Now, you will see that this
23  is -- Mr. Mooney is making corrections to
24  another draft to that -- for another company.
25  Do you see that company's been crossed out

Page 85

1               Rocco Guidicipietro
2  and replaced with Alterix, Inc.?  Do you see
3  that?
4      A.   Yes.
5      Q.   You see the other company was
6  Stream T.V. Networks, Inc.?  Do you see that?
7      A.   Yes.
8      Q.   Are you familiar with the name
9  Stream T.V. Networks, Inc., as being a
10  potential or former customer of Alexander
11  Capital?
12     A.   Yes, I am.
13     Q.   What are you familiar with?
14     A.   We've done some private raises for
15  them.
16     Q.   Do you know if Alexander Capital
17  and Stream T.V. Networks, Inc., ever entered
18  into an engagement agreement, in 2014,
19  regarding an intended offering by Stream
20  T.V.?
21     A.   I do not know.
22     Q.   Now, this is an agreement -- are
23  you familiar with the engagement
24  agreements -- for whatever reason, did you
25  become familiar during 2014 and 2015, with

Page 86

1               Rocco Guidicipietro
2  the engagement agreement that Alexander
3  Capital, LP was entering into with companies
4  that intended to conduct an offering?
5      A.   I do not.  I was not familiar with
6  it.
7      Q.   Now, just looking at this first
8  paragraph, "We are pleased to submit the
9  following proposal with respect to an initial
10  public offering, the public offering, by
11  Alterix Inc."  Do you see that?
12     A.   Yes.
13     Q.   "Of up to $20 million, consisting
14  of the company's common shares."  Do you see
15  that?
16     A.   Yes.
17     Q.   "The price and term of which shall
18  be determined by the market price to the
19  effective date of the offering closing."
20     A.   Yes.
21     Q.   "This letter states certain
22  conditions and assumptions upon the proposed
23  offering by Alexander Capital, LP, Alexander
24  Capital."
25          Do you see that?

Page 87

1               Rocco Guidicipietro
2      A.   Yes.
3      Q.   And it states, "It is our intent
4  immediately prior to the effective date to
5  enter into an exclusive underwriting
6  agreement, the underwriting agreement, with
7  the company," referring to Alterix Inc., "the
8  underwriter, slash, broker will act as agent
9  on a firm commitment basis."
10          Do you see that?
11     A.   Yes.
12     Q.   "And the underwriting agreement and
13  related agreements shall contain such terms
14  and conditions as are customarily contained
15  in agreements of such character and among
16  other things provided for the following."  Do
17  you see that?
18     A.   Yes.
19     Q.   Now, is this consistent -- is that
20  paragraph consistent with your understanding
21  of the types of engagement agreements that
22  Alexander Capital was offering potential
23  customers of Alexander Capital, in 2014?
24     A.   No, I have never seen any of the
25  engagement letters.

Page 88

1               Rocco Guidicipietro
2      Q.   And, in 2014, you have previously
3  testified, correct, that as of that time, as
4  of the date of this draft, proposed draft,
5  July 2014, it is true, according your
6  knowledge, that Alexander Capital did not
7  have authorization from FINRA to participate
8  in any firm commitment offering; is that
9  correct?
10     A.   Yes.
11     Q.   Now, as chief operating officer,
12  and based on your knowledge and understanding
13  of the operations of Alexander Capital, are
14  you aware as to whether or not Alexander
15  Capital, LP, its management, its supervisors,
16  its owners, ever took any steps to inform the
17  investment banking section of Alexander
18  Capital, as to the fact that Alexander
19  Capital did not have the -- FINRA's authority
20  to conduct a firm commitment offering?
21          MR. WARD:  Objection.
22      Misleading and misstates prior
23      testimony.
24          MR. SCHLICHTMANN:  Okay, I
25      want to be very clear.

Page 89

1            Rocco Guidicipietro
2            MR. WARD:  And assumes facts
3    not in the record.
4            MR. SCHLICHTMANN:  Okay.
5        Q.  So, Mr. Guidicipietro, are you
6    aware as to whether or not Alexander Capital
7    took any steps of any kind, in 2014 -- 2013,
8    2014, or 2015, to inform the investment
9    banking head of Alexander Capital, as to
10   whether or -- as to the fact that Alexander
11   Capital did not have authorization from FINRA
12   to conduct firm commitment offerings?
13           MR. WARD:  Objection.
14       Ambiguous and misstates prior
15       testimony.
16           MR. SCHLICHTMANN:  All
17       right, I am not referring to any
18       prior testimony and I don't want to
19       be ambiguous.
20       Q.  Mr. Guidicipietro -- so I withdraw
21   the question.
22       Mr. Guidicipietro, are you aware of
23   anything that Alexander Capital did, during
24   2013, 2014, and 2015, to inform Mr. Gazdak,
25   the head of investment banking at Alexander

Page 90

1            Rocco Guidicipietro
2    Capital, that Alexander Capital did not have
3    the authority from FINRA to conduct firm
4    commitment offerings at that time?
5            MR. WARD:  Objection.
6        Ambiguous and assumes facts
7        not in evidence.
8        Q.  You may answer.
9        A.  Not what we did, specifically, to
10   let him know, but he should know.
11       Q.  All right.  Why should he know?
12       A.  Because he is the head of banking.
13       Q.  Okay.  And how would Mr. Gazdak,
14   based on your knowledge and understanding of
15   the operations of Alexander Capital, LP, in
16   2014 and 2015, how could Mr. Gazdak become
17   aware that Alexander Capital, at that time,
18   did not have authority from FINRA to conduct
19   a firm commitment offering?
20       A.  I don't want to speculate.
21           MR. WARD:  Objection.
22       Yeah, calls for speculation.
23       A.  I don't want to speculate.
24       Q.  All right.  Well, I don't want you
25   to speculate, but based on your understanding

Page 91

1            Rocco Guidicipietro
2    of Alexander Capital and its operations and
3    procedures, can you tell us how Mr. Gazdak
4    could have been made aware of the fact that
5    Alexander Capital, in 2014 and 2015, did not
6    have the authority from FINRA to conduct a
7    firm commitment offering at that time?
8        A.  I -- again, I don't want to
9    speculate.  It could have been from multiple
10   sources.  Compliance, FINRA.
11       Q.  All right.  So one of the things
12   that Mr. Gazdak could have done is to have a
13   communication with the chief compliance
14   officer at Alexander Capital?
15       A.  Correct.
16       Q.  To your knowledge, during 2014 and
17   2015, did the chief compliance officer -- to
18   your knowledge, was Tim Stack, who was chief
19   compliance officer at that time, did Mr.
20   Stack have the knowledge that Alexander
21   Capital did not have FINRA's authority to
22   conduct firm commitment offerings?
23           MR. WARD:  Objection.
24       Misstates prior testimony.
25       A.  I don't know if he had knowledge.

Page 92

1            Rocco Guidicipietro
2        Q.  All right.  So, is it fair to say
3    that you, as you sit here today, you do not
4    know whether Mr. Stack, in 20- -- the chief
5    compliance officer at Alexander Capital, in
6    2014 and 2015, was aware that Alexander
7    Capital did not have the authority from FINRA
8    to conduct a firm commitment offering at that
9    time?
10           MR. WARD:  Objection.
11       Misstates the record.
12       A.  Sorry, Bryan.  I was going to say,
13   I can't answer for Mr. Stack.  I don't know
14   what he knew or didn't know in 2014.
15       Q.  Do you have any reason to believe,
16   as you sit here today, that Mr. Stack, during
17   2014 to 2015, was aware that FINRA -- that
18   Alexander Capital did not have the authority
19   from FINRA to conduct firm commitment
20   offerings at that time?
21       A.  I don't know.
22       Q.  All right.  Okay.  During 2014 and
23   2015, Mr. Guidicipietro, did you become aware
24   as to whether or not registration statements
25   were being filed on behalf of Alterix and

Page 93

1          Rocco Guidicipietro
2    Inpellis, in which Alexander Capital was the
3    intended underwriter, whether they were
4    confidential filings or public filings?  Were
5    you aware of that during any time during 2014
6    to 2015?
7        A.  Not to my knowledge.  Not to my
8    memory.
9        Q.  Are you -- during 2014, '15 --
10   during 2014/2015, did you have an
11   understanding as to whether or not Alexander
12   Capital had an obligation to inform FINRA
13   about a registration statement filing, if it
14   had filed, that had been filed on a company
15   regarding a company in which it was the
16   intended underwriter?
17       A.  I do not know.
18       Q.  Are you aware of the fact that
19   there's an application process that FINRA has
20   for intended underwriters to inform FINRA of
21   registrations that it was intending to file
22   or had filed?
23       A.  No, that is not my area.
24       Q.  All right.  All right.  I am going
25   to show you an Exhibit 142.  All right.  And

Page 94

1          Rocco Guidicipietro
2    share screen on that document.  All right.
3    Do you see on the screen an e-mail?  Do you
4    see that?
5        A.  Yes.
6        Q.  Okay.  It's from a lawyer from
7    Greenberg Traurig, dated April 10, 2015, to a
8    Mr. Gazdak -- to Mr. Gazdak at Alexander
9    Capital, and Mr. Mooney, and Mr. Carlin.  Do
10   you see that?
11       A.  Yes.
12       Q.  In 2015, were you aware of the fact
13   that Mr. Mooney, Mr. Carlin, and Mr. Gazdak
14   were involved in communications with
15   Greenberg Traurig regarding the Alterix
16   offering in which Alexander Capital was the
17   intended underwriter, or you were not aware?
18       A.  No, I wasn't aware.  I don't
19   remember.
20       Q.  Now, in this e-mail dated April 10,
21   2015, the subject is "Alterix FINRA filing."
22   It has an attachment of that filing, dated
23   April 10, 2015.
24          Do you see that?
25       A.  Yes.

Page 95

1          Rocco Guidicipietro
2        Q.  Okay.  Previously you mentioned
3    that you were aware of a CMA, right, a
4    continuing membership application; is that
5    correct?
6        A.  Yes.
7        Q.  Now, I am showing you Plaintiff's
8    Exhibit -- hopefully, you can see it on the
9    screen -- Plaintiff's Exhibit 142A, the
10   attachment to the e-mail we just went over.
11   Do you see this?
12       A.  Yes, I see it.
13       Q.  It's dated April 10, 2015, and it's
14   on FINRA letterhead, and it's an electronic
15   application.  Do you recognize that as a form
16   of application you are familiar with, a FINRA
17   application that underwriters, from time to
18   time, file with FINRA, or you don't recognize
19   it as such?
20       A.  I don't recognize it.  I have never
21   seen this form.
22       Q.  All right, well, this is a filing
23   that was filed by Greenberg on behalf of
24   Alexander Capital, regarding the Alterix,
25   Inc., also known as, Inpellis, Inc., intended

Page 96

1          Rocco Guidicipietro
2    offering, all right, and it's dated April 10,
3    2015.  And it describes the -- it fills out
4    various information requested by Alexander --
5    excuse me -- by FINRA, regarding the
6    offering.
7          Were you aware -- are you aware
8    now, as you sit here today, that Alexander
9    Capital has an obligation to file with FINRA
10   some sort of an application to determine the
11   reasonableness of its fee regarding an
12   intended fee it accepts -- it expects to
13   charge for an intended offering that it's
14   conducting or intended as the underwriter?
15       A.  No, I -- I -- I don't know.  I am
16   not familiar with the banking procedures.
17       Q.  All right.  Okay.  Okay.  I am now
18   showing you another document.  This is
19   Plaintiff's Exhibit 143.  And this is dated
20   May 15, 2015.  Do you see that?
21       A.  Yes.
22       Q.  And it's from a Mr. Marsico at
23   Greenberg.
24          Do you see that?
25       A.  Yes.

Page 97

Rocco Guidicipietro

Q. Okay. Now, are you familiar with the fact that Mr. Marsico is an attorney at Greenberg, in 2015?

A. No, I am not.

Q. Were you familiar with the fact that Mr. Marsico is an attorney with Greenberg -- was representing Alexander Capital as the intended underwriter on the intended Alterix/Inpellis offering at that time?

A. No, I am not.

Q. You see this is to Mr. Gazdak, Mooney, and Mr. Carlin? Do you see that?

A. Yes.

Q. The subject is "unreasonable letter," with a filing ID, and then it has an attachment, "Alterix-FINRA, unreasonable letter, May 15, 2015."

Do you see that?

A. Yes.

Q. Okay. Does looking at this e-mail refresh your recollection in any way as to whether or not you were made aware, in 2015, that there was an unreasonable letter issued

Page 98

Rocco Guidicipietro

by FINRA on May 15, 2015, regarding the Alterix, also known as, Inpellis, Inc., intended offering?

A. Not that I recall, no.

Q. All right. Okay, I am now going to show you a document. This is Exhibit 143A. All right, this is the attachment to the previous e-mail that we just looked at. And it's on FINRA letterhead.

Do you see that?

A. Yes.

Q. Dated May 15, 2015. Do you see that?

A. Yes.

Q. And it's addressed to Greenberg Traurig, attention Anthony Marsico. Do you see that?

A. Yes.

Q. It says, "re, unreasonable letter, FINRA filing," with ID number, and then the name Alterix, Inc. Do you see that?

A. Yes.

Q. Okay. And it states, "Dear sir/madam, in connection with the

Page 99

Rocco Guidicipietro

above-referenced filing, the corporate financing department, department, has reviewed the information and documents submitted through FINRA's public offering filing system."

Do you see that?

A. Yes.

Q. Are you familiar with the fact that FINRA has a public offering filing system?

A. No, I am not.

Q. Were you aware of it in 2015?

A. No.

Q. Okay. And it says, "Based on the information provided, the proposed compensation accruing to the, quote, "underwriter and related persons," end quote, as defined in FINRA Rule 1510 is in the aggregate excessive on an offering of this size and nature, and therefore, must be modified to ensure compliance." Do you see that?

A. Yes.

Q. And it then lists various components of the intended compensation

Page 100

Rocco Guidicipietro

package. Later on in this letter -- first of all, in looking at this letter, beginning part of the letter, does that refresh your recollection at all as to whether you ever saw an unreasonable letter regarding the Alterix offering that Alexander Capital intended to be the underwriter, or you have no such memory?

A. No such memory.

Q. You see later on in this letter, a number 6. It says, "In connection with the filing received for Alexander Capital, LP, the sole book-running manager identified in the offering documents, the department suggests the firm contact their district office to discuss their participation in this offering and obtain approval to underwrite this offering on a firm commitment basis."

Do you see that?

A. Yes, I see that.

Q. Do you -- were you ever made aware, in 2015, that FINRA notified Alexander Capital that it did not have the approval to underwrite the Alterix, Inc., also known as,

Rocco Guidicipietro

1  Inpellis, Inc., offering on a firm commitment
2  basis?
3
4      A.  No.
5      Q.  As you sit here today, do you have
6  any reason to believe that that occurred?
7      A.  I see the letter.
8      Q.  Is this the first indication that
9  you remember receiving regarding this matter?
10     A.  Yes.
11     Q.  Based on your understanding of the
12 practices and procedures of Alexander
13 Capital, if FINRA had informed Alexander
14 Capital, in 2015, that it did not have the
15 authority to commit a firm commitment
16 offering regarding the Alterix, also known
17 as, Inpellis, Inc., offering, that that is a
18 matter, based on the practices and procedures
19 of Alexander Capital in place at that time,
20 that should have been brought to your
21 attention?
22     A.  That's handled by our banking team
23 and lawyers.  As you see, the letter is
24 addressed to our attorney.
25     Q.  And was not a matter that under the

Rocco Guidicipietro

1
2  practices and procedures of Alexander
3  Capital, in existence at that time, that was
4  not a matter that should have been brought to
5  your attention at that time?
6      A.  It seems like it was an ongoing
7  negotiation, so I don't know what was stated
8  to FINRA at that time.
9      Q.  Right.  But my question is:  Is it
10 your -- based on your understanding of the
11 practices and procedures at that time, in
12 2015, that it was not -- it was not a matter
13 that needed to be brought to your attention
14 for any reason?
15     A.  Correct.
16     MR. WARD:  It's been another
17     hour since the last break.  It's
18     past twelve.  What are you thinking
19     about lunch?
20     MR. SCHLICHTMANN:  You tell
21     me what you and the witness would
22     prefer, and I will do whatever you
23     think is appropriate.
24     MR. WARD:  How much, just as
25     an estimate, do you think you have

Rocco Guidicipietro

1
2  left?
3      MR. SCHLICHTMANN:  It's -- I
4  mean, I think we're getting through
5  it, but, you know, I think it -- I
6  think you are pretty familiar with
7  the stuff I go through, so, yeah,
8  hopefully, it will go as fast as we
9  can, but, you know, I have --
10     THE WITNESS:  You wanted to
11 go to 12:30.  12:30?
12     MR. SCHLICHTMANN:  You tell
13 me whatever is comfortable.  I
14 don't want you to, you know, I want
15 you to be comfortable to have a
16 lunch break, and your attorney to
17 be comfortable.
18     MR. WARD:  Let's take a
19 break for lunch and then come back.
20     MR. SCHLICHTMANN:  The
21 length, though, Bryan, how long?
22     MR. WARD:  An hour.
23     MR. SCHLICHTMANN:  That's
24 fine with me, if that's what you
25 wish to do.  Yeah, so, 1 o'clock.

Rocco Guidicipietro

1
2  That's a little shy of an hour.
3      MR. WARD:  1:10.
4      MR. SCHLICHTMANN:  Oh, 1:10,
5  then.  Fine.  That's what it will
6  be.  1:10, we will come back.
7      THE VIDEOGRAPHER:  Off the
8  record.  The time is 12:09.
9      (Whereupon, a lunch recess
10     was taken at 12:09 p.m.)
11     THE VIDEOGRAPHER:  We are
12     now back on the record.  The time
13     is 1:11 p.m.
14 BY MR. SCHLICHTMANN:
15     Q.  Mr. Guidicipietro, I -- do you see
16 on your screen a document, FINRA application
17 document with a title "continuing member
18 application"?
19     A.  Yes.
20     Q.  And, previously, you said you were
21 familiar with the CMA or the continuing
22 membership application; is that correct?
23     A.  I was -- I'm familiar with the term
24 "continuing member application."
25     Q.  That's right.  And in looking at

Page 105

1            Rocco Guidicipietro
2   this document, which has been marked as 1- --
3   135, Plaintiff's Exhibit 135, does that front
4   page of it -- is that familiar to you as an
5   electronic continuing member application form
6   that FINRA has available to applicants?
7       A.  No.
8       Q.  In June, in 2015, do you have any
9   memory of being involved in any effort to
10  file a continuing member application with
11  FINRA, in 2015?
12      A.  I wasn't involved in the filing.
13  Our attorneys did it.
14      Q.  Okay.  Were you involved in any way
15  in the preparation of it?
16      A.  No.
17      Q.  Were you involved in any
18  discussions at Alexander Capital regarding
19  the contents of it?
20      A.  No.
21      Q.  Now, going to now -- this is dated
22  June 3, 2015.  And I am going to go to page
23  four, in which there's a narrative.  You see
24  this block here?  It's an answer to a
25  question, "Provided a complete description of

Page 106

1            Rocco Guidicipietro
2   the proposed change."
3           Do you see that?
4       A.  Yes.
5       Q.  Okay.
6           MR. WARD:  What's the
7       exhibit number?
8           MR. SCHLICHTMANN:  I'm
9       sorry, 135.
10          MR. WARD:  Okay.
11          MR. SCHLICHTMANN:  All
12      right.  We agree, Bryan?  There's
13      no issue about that?
14          MR. WARD:  135, yeah, okay.
15          MR. SCHLICHTMANN:  Got it,
16      okay.
17      Q.  All right.  Now, there's a
18  narrative given, and first of all, are you
19  familiar with the law firm Sichenzia Ross?
20      A.  I know the name.
21      Q.  Okay.  Ross Carmel, does that mean
22  anything to you?
23      A.  Yes, one of their attorneys.
24      Q.  Were you aware of the fact that in
25  2015, Sichenzia Ross, the law firm,

Page 107

1            Rocco Guidicipietro
2   represented Alexander Capital regarding its
3   1017 application to FINRA, in 2015?
4       A.  Yes.
5       Q.  And -- all right.  Now, in this
6   narrative it says, in response to the
7   application question about providing a
8   description of the proposed change, it
9   states, "Nesa Management, LLC, Nesa, seeks to
10  purchase an additional 71" -- "75.1 percent
11  of Alexander Capital, LP, the firm, from
12  Exitus, LLC, resulting in Nesa owning 100
13  percent of Alexander Capital, LP."  Do you
14  see that?
15      A.  Yes.
16      Q.  Now, based on your knowledge and
17  understanding, is that a true statement, as
18  of that time?
19      A.  Yes, at that time.
20      Q.  "The transaction is expected to be
21  completed thirty days after FINRA approval of
22  the CMA, with Nesa paying $50,000 to Exitus,
23  LLC."
24          Was that your understanding at the
25  time?

Page 108

1            Rocco Guidicipietro
2           Is that consistent with your
3   understanding at the time?
4       A.  Yes.
5       Q.  "A copy of the purchase agreement
6   is annexed hereto.  The source of the funding
7   will be Nesa with Joseph Amato and Rocco
8   Guidicipietro as the sole members."  And the
9   source of funding is the purchase of the
10  interest; is that your understanding?
11      A.  Yes.
12      Q.  All right.  "There will be no
13  change in financial, operational, managerial,
14  or supervisory control as a result of the
15  change of ownership."
16          Is that consistent with your
17  understanding as of that time?
18      A.  That's what's stated there.
19      Q.  Do you have any reason to -- is
20  that -- do you consider that to be an
21  accurate statement, based on your
22  understanding of -- at the time?
23      A.  Yes.
24      Q.  It then says, "Nesa's bank
25  statements are attached hereto as evidence of

Page 109

Rocco Guidicipietro

1    the source of funding.  In addition, the firm
2    intends to develop investment banking as a
3    major business line and will devote
4    substantial resources toward that end."  Do
5    you see that statement?
6        A.  Yes.
7        Q.  And then it says, "In that regard,
8    the firm is requesting that it be permitted
9    by its restrictive agreement to act as
10   managing underwriter and selling group member
11   in firm commitment underwritings."  Do you
12   see that?
13       A.  Yes.
14       Q.  All right.  Now, it refers to the
15   "restrictive agreement."  Do you see that?
16       A.  Yes.
17       Q.  And previously I asked you some
18   questions about the agreement.  Do you
19   understand that the restrictive agreement
20   being referenced there is the restrictive
21   agreement between Alexander Capital and FINRA
22   that was in existence at that time, in 2015?
23       A.  I don't know if that's what -- I
24   don't know if that's what they mean there.

Page 110

Rocco Guidicipietro

1        Q.  Well, it says the firm is
2    requesting it will be permitted by its
3    restrictive agreement to act as managing
4    underwriter in selling group member and firm
5    commitment underwriting.  Do you see that?
6        A.  Right.
7        Q.  Okay.  And did you understand that
8    Alexander Capital had a restrictive agreement
9    with FINRA, in 2015?
10       A.  I would call it a "membership
11   agreement."  The attorneys put that together,
12   so I don't know what they're pertaining to.
13       Q.  All right.  But you understood at
14   the time that Alexander Capital had a
15   membership agreement with FINRA?
16       A.  Yes.
17       Q.  And you understood at the time that
18   there were certain things that the agreement
19   allowed Alexander Capital to do under the
20   rules and regulations of FINRA, and things
21   that it was not allowed to do; is that
22   correct, at that time?
23       A.  Well, it's -- at that time -- it
24   depends what time frame.  It's a changing

Page 111

Rocco Guidicipietro

1    document, as you could see.
2        Q.  That's right, but I am talking
3    specifically in 2015?
4        A.  There's always restrictions.
5        Q.  Okay.  And you can see here that
6    it's requesting that it be permitted by its
7    restrictive agreement to act as managing
8    underwriter in selling group member in firm
9    commitment underwritings.  Do you see that?
10       A.  I see that.
11       Q.  Okay.  Is that -- is it your
12   understanding that the agreement with FINRA
13   -- and I think you testified previously about
14   this, but just to make sure, that the
15   restrictive agreement -- that the agreement
16   with FINRA did not allow Alexander Capital,
17   at that time, to be the managing underwriter
18   and selling group member in firm commitment
19   underwritings, without obtaining the approval
20   of FINRA?  Is that true?
21           MR. WARD:  Objection.
22           Vague.
23           MR. SCHLICHTMANN:  All
24           right, I don't want to have it be

Page 112

Rocco Guidicipietro

1    vague.
2        Q.  Is it true, as of that time, it was
3    your understanding that under the agreement
4    with FINRA, Alexander Capital could not act
5    as the underwriter in a firm commitment
6    underwriting, at that time?
7        A.  In 2015, yes.
8        Q.  Okay.  It then says "The firm
9    anticipates that it will participate in two
10   or more public offerings per year in the
11   three and a half to $10 million range.  In
12   addition, the firm intends to proprietary
13   trade in these underwritings, so it can
14   exercise the greenshoe option."
15       Do you see that?
16       A.  Yes.
17       Q.  Do you know what a "greenshoe
18   option" is?
19       A.  Yeah, I am familiar with it.
20       Q.  What is your -- what was your
21   understanding, then, of a greenshoe option?
22       A.  My understanding now is that --
23   that it's an additional option to purchase
24   more shares.

Page 113

1           Rocco Guidicipietro
2      Q.   Now, it connects the greenshoe
3   option with proprietary trade.  Do you see
4   that?
5      A.   Yes.
6      Q.   What's your understanding of the
7   connection between exercising the greenshoe
8   option, and the proprietary trade?
9      A.   Don't know.  I'm not a trader.  I
10  don't know.
11     Q.   What's your understanding of
12  proprietary trade?
13     A.   Firm trading its own funds, which
14  we don't do.
15     Q.   Okay.  And you didn't do that in
16  2015?
17     A.   No.
18     Q.   It's talking about a "future
19  intention" to do that, to proprietarily trade
20  in the underwriting, so it can exercise a
21  greenshoe option; is that correct?
22     A.   That's a future perspective on what
23  we might do.
24     Q.   Okay.  Was it your understanding
25  that Alexander Capital could exercise a

Page 114

1           Rocco Guidicipietro
2   greenshoe option in underwritings it was
3   authorized to undertake in 2015 or that it
4   could not?
5      A.   Don't know.
6      Q.   It then says later, it says, "To
7   satisfy net capital requirements, and to fund
8   firm commitment underwritings, the firm may
9   employ temporary subordinated loans and/or
10  subordinated loans, and has identified
11  potential lenders for this purpose."  Do you
12  see that?
13     A.   Yes.
14     Q.   Was it your understanding, in 2015,
15  that in order for Alexander Capital to
16  satisfy the net capital requirements for firm
17  commitment underwritings, that the firm may
18  have to employ temporary subordinated loans
19  and/or subordinated loans, for that purpose?
20     A.   No.
21     Q.   Did you think the firm had -- did
22  you understand, in 2015, that the -- that the
23  -- in order to undertake a firm commitment
24  offering, that the firm would have to take
25  out subordinated loans of any kind to do that

Page 115

1           Rocco Guidicipietro
2   in 2015?
3      A.   No, it says, "may."  That's not the
4   only way to do it.
5      Q.   Okay.  Are there other ways to do
6   it?
7      A.   Yeah, I could write a check.
8      Q.   Okay.  It says that "The firm
9   understands that it can employ temporary
10  subordinated loans only three times per year
11  for purposes of satisfying net capital
12  requirements for firm commitment
13  underwritings."  Do you see that?
14     A.   Yes.
15     Q.   Okay.  And was that your
16  understanding, in 2015, that there was only a
17  certain amount of subordinated loans that
18  Alexander Capital could take out, if it was
19  given authorization for firm commitment
20  underwritings, in order to come up with the
21  money necessary to fulfill the firm
22  commitment undertaking?
23     A.   No.
24     Q.   "Additionally, the current equity
25  holders of the firm, as well as Messrs.

Page 116

1           Rocco Guidicipietro
2   Guidicipietro, Amato, O'Brian, Carlin,
3   Gazdak, and Feinman, have the capital and
4   have agreed to make additional capital
5   contributions in the future if necessary."
6          Do you see that?
7      A.   Yes.
8      Q.   Was it your understanding that
9   yourself, Mr. Amato, Mr. O'Brian, Mr. Carlin,
10  Mr. Gazdak, and Mr. Feinman had any kind of
11  an agreement regarding making additional
12  capital contributions in the firm?
13     A.   No.
14          MR. WARD:  Objection.
15          Vague.
16     Q.   In 2015, to your knowledge, did you
17  have any communications of any kind with Mr.
18  Amato, Mr. O'Brian, Mr. Carlin, Mr. Gazdak,
19  and Mr. Feinman, about whether or not those
20  parties would have -- could come to an
21  agreement regarding making additional capital
22  contributions in the firm?
23     A.   Not that I recall.
24     Q.   To your knowledge, in 2015, had any
25  of those people named, yourself, Mr. Amato,

ROCCO GUIDICIPIETRO
JOHN J. AQUINO -against- ALEXANDER CAPITAL

September 29, 2021
117—120

Page 117

1           Rocco Guidicipietro
2  Mr. O'Brian, Mr. Carlin, Mr. Gazdak, and Mr.
3  Feinman, had they made any capital
4  contributions to Alexander Capital, as of
5  June 2015?
6      A.   Not that I know of.
7      Q.   The -- it also says, "Additionally,
8  the current equity holders of the firm," all
9  right.  Were you aware that there were other
10 equity holders of the firm, other than
11 yourself and Mr. Amato?
12     A.   There wasn't.
13     Q.   All right.  Here -- later it --
14 right below, actually, it lists -- it says,
15 "Below is" -- so this is in answer to the
16 question, "For any persons or entities
17 including other broker-dealers and investment
18 advisory firms that will be become associated
19 or affiliated with the applicant through
20 ownership, employment or otherwise, as a
21 result of the proposed transaction, please
22 provide the name of the person or entity,
23 describe the relationship such person or
24 entity will have with the applicant, and for
25 any entity, describe the business conducted

Page 118

1           Rocco Guidicipietro
2  by such entity, and identify whether the
3  applicant will be conducting business with or
4  on behalf of the person or entity."  It
5  states, "The firm intends to hire a part-time
6  FINOP, Thomas Hopkins, to assist its current
7  full-time in-house FINOP, Thomas Sullivan, as
8  needed, and with respect to the firm
9  commitment underwritings."
10         Was it your understanding that to
11 do a firm commitment underwritings, it would
12 have been necessary, at that time, to hire
13 another FINOP person on a part-time basis to
14 work with Mr. Hopkins?  Was that your
15 understanding at that time?
16     A.   No.
17     Q.   Did you understand that Mr. Hopkins
18 would need some assistance in financial
19 operations, in order to -- for the firm to
20 conduct firm commitment underwritings at that
21 time?
22     A.   I don't even know who Mr. Hopkins
23 is.
24     Q.   You don't know who Mr. Hopkins is.
25 All right.  Do you know who Mr. Sullivan was?

Page 119

1           Rocco Guidicipietro
2      A.   Yes.
3      Q.   All right.  And was it your
4  understanding that Mr. Sullivan would need
5  assistance from another person skilled in
6  financial operations, with respect -- if the
7  firm was to conduct firm commitment
8  underwritings at that time?
9      A.   No, I do not.
10     Q.   Did you know that he was qualified
11 and did not require any assistance -- well,
12 let me ask:  Did you have an understanding as
13 to whether Mr. Sullivan did not need
14 assistance in order for the firm to conduct
15 firm commitment underwritings, if it was so
16 authorized, in 2015?
17     A.   Can you repeat that question?
18     Q.   Yes.  Did you have an understanding
19 as to whether Mr. Sullivan could conduct, or
20 do his responsibilities as a financial -- as
21 -- as -- in financial operations, with
22 respect to firm commitment underwritings, if
23 the firm had been authorized, in 2015, to
24 conduct such offerings?
25     A.   That wasn't my judgment call.  That

Page 120

1           Rocco Guidicipietro
2  was left up to legal.
3      Q.   That would be a legal decision, in
4  your mind?
5      A.   The lawyers would know what was
6  needed for the application.
7      Q.   Okay.  "Specify changes in direct
8  ownership."  Do you see that in the
9  application?
10     A.   Yes.
11     Q.   All right.  It then has a list of
12 names, identity of the entity, the roles that
13 they -- role acquired, the ownership
14 percentage, and whether they are a control
15 person.  Do you see that banner?
16     A.   I can't see the last one.
17     Q.   I'm sorry.  Okay.
18     A.   The last column.
19     Q.   All right.  We want to make sure
20 you --
21     A.   It's a little small.
22     Q.   How is that?
23     A.   Yes, I can see it now.
24     Q.   Okay.  Now, the first name is your
25 name.

Page 121

Rocco Guidicipietro

2     Do you see that?
3     A.  Yes.
4     Q.  And that you are an individual; do
5  you see that?
6     A.  Yes.
7     Q.  Okay.  And the role it says is COO,
8  and we've already -- you have already
9  testified that stands for chief operations --
10  chief operating officer, correct?
11     A.  Yes.
12     Q.  And then it says, "ROP."  Do you
13  have an understanding of what that stands
14  for?
15     A.  Yes, it's a ROP.
16     Q.  What's that?
17     A.  Options principal.
18     Q.  I'm sorry?
19     A.  Options principal.
20     Q.  What's an "options principal"?
21     A.  A supervisor for option trading.
22     Q.  And what's the "R"?  Is that
23  "registered options principal"?
24     A.  Yes, registered options principal.
25     Q.  Yeah, registered, got it.  And

Page 122

Rocco Guidicipietro

2  "SROP"?
3     A.  Senior registered options
4  principal.
5     Q.  That has to do with the selling of
6  options and securities?
7     A.  That's my licensing that I am able
8  to do that.
9     Q.  Okay, all right.  It says the date
10  your role was acquired was April 1st, 2012.
11  Does that help refresh your recollection as
12  to when you acquired the role of chief
13  operating officer at Alexander Capital, LP?
14     A.  I am not sure.  I would have to
15  look at all the filings.
16     Q.  Okay.  Is there any reason to doubt
17  that the application is correct as to when
18  you acquired your role?
19     A.  Again, I would have to look at the
20  filings.  That could be a date for the ROP,
21  could be before COO.
22     Q.  Okay.  How about ownership
23  percentage, it says, less than 5 percent.
24  Did you understand that you had an ownership
25  percentage yourself individually in Alexander

Page 123

Rocco Guidicipietro

2  Capital, LP, in 2015?
3     A.  Yeah, zero.  That's zero to five.
4     Q.  Okay.  You understood you had zero?
5     A.  Yes.
6     Q.  Did you understand you were a
7  control person?
8     A.  Yes.
9     Q.  And then as to Mr. Feinman, it
10  states that he took over his role in June of
11  2014.  Does that sound right to you?
12     A.  Again, I would have to look at the
13  filings.  That's what's there.
14     Q.  Any reason to doubt it?
15     A.  I -- I don't remember when he
16  started.
17     Q.  Okay.  It has Mr. Sullivan, Thomas
18  Sullivan, as the chief financial officer,
19  FINOP.  Do you see that?
20     A.  Yes.
21     Q.  Starting on May 1st, 2014.  Any
22  reason to doubt that's when he started?
23     A.  I can't confirm the exact date, but
24  around that time frame.
25     Q.  And then it says, Nesa Management,

Page 124

Rocco Guidicipietro

2  LLC, which you testified previously.  It's
3  listed as "partner," all right, and this is
4  June of 2015.
5     Is it consistent with your
6  understanding that Nesa Management, LLC, was
7  a partner in Alexander Capital, LP, in 2015?
8     A.  '15 or '13?
9     Q.  2015.
10     A.  '15, yes.
11     Q.  Now it says, "date role acquired,"
12  it says, December 1st, 2013.  Is that
13  consistent with your understanding that Nesa
14  Management became a partner in Alexander
15  Capital, as of December 1st, 2013?
16     A.  Again, I would have to confirm the
17  date, but it was about that time.
18     Q.  And that it's listed as, yes, a
19  control person, that Nesa Management was
20  considered a control person.  Is that -- at
21  that time.
22     Is that considered -- is that
23  consistent with your understanding at that
24  time?
25     A.  Yes.

Page 125

1          Rocco Guidicipietro
2     Q.   And then it has Timothy Stack,
3  chief compliance officer, role acquired
4  September 1st, 2013.  Is that your
5  understanding of when Mr. Stack acquired that
6  position?
7     A.   Again, I would have to look and see
8  what -- these have been known to not be
9  correct.
10     Q.   All right, but this is an
11  application put in by the law firm,
12  Sichenzia, representing Alexander Capital.
13  Any reason to believe that's incorrect or
14  not?
15     A.   I can't confirm if it's correct or
16  not, without looking.
17     Q.   Okay.  It has Exitus, LLC.  Do you
18  see that?
19     A.   Yes.
20     Q.   They're listed as a "partner."
21          Do you see that?
22     A.   Yes.
23     Q.   Is it consistent with your
24  understanding that as of that time, Exitus,
25  E-X-I-T-U-S, LLC, was a partner in Alexander

Page 126

1          Rocco Guidicipietro
2  Capital, LP?
3     A.   Yes.
4     Q.   And it says that the role was
5  acquired on May 1st, 2012.  Is that
6  consistent with your understanding?
7     A.   I would have to check.
8     Q.   Is it your understanding that
9  Exitus had a partnership interest in
10  Alexander Capital, LP, before Nesa Management
11  acquired a partnership interest?
12     A.   Yes.
13     Q.   Okay.  And it says, "ownership
14  interest, 75 percent or more."  Do you see
15  that?
16     A.   Yes.
17     Q.   Okay.  And is it your understanding
18  -- is that consistent with your understanding
19  that Exitus had a -- as of 2015, had a 75
20  percent or more interest in Alexander
21  Capital, LP?
22     A.   Yes.
23     Q.   And it says about Nesa Management,
24  it says, "10 percent but less than 25
25  percent."  Do you see that?

Page 127

1          Rocco Guidicipietro
2     A.   Yes.
3     Q.   Was it your understanding that Nesa
4  Management -- or do you remember what Nesa
5  Management had, as of 2015, regarding its
6  percentage interest?
7     A.   Yes.
8     Q.   How much?
9     A.   24.9.
10     Q.   Okay.  And, in fact, in the
11  statement up here it says, Nesa Management
12  wants to purchase 75.1 percent from Exitus,
13  okay, indicating that, therefore, Exitus,
14  according to the statement, had 75.1 percent
15  -- had 75.1 interest in Alexander Capital; is
16  that correct?
17     A.   Yes.
18     Q.   And that if it had purchased -- if
19  it was approved to purchase the 71 -- 75.1
20  percent interest in -- that Exitus had, that
21  that would result in Nesa owning 100 percent
22  of Alexander Capital, LP; is that correct?
23     A.   Yes.
24     Q.   And was it your understanding, in
25  2015, that there really were only two -- not

Page 128

1          Rocco Guidicipietro
2  "really" --  there were only two owners of
3  Alexander Capital -- Exitus with 75.1 percent
4  ownership and Nesa with 25 -- 24.9 percent
5  interest?
6          Is that consistent with your
7  understanding at that time?
8     A.   Yes.
9          MR. WARD:  Jeff, I have a
10       request from our videographer for
11       Rocco, if you can move closer to
12       the microphone or move the
13       microphone closer to where you are.
14       Thanks.
15          THE WITNESS:  Is that
16       better?
17          MR. WARD:  Sounds good to
18       me.
19          MR. SCHLICHTMANN:  All
20       right, great, thank you.
21     Q.   Okay.  I am going to go to -- yeah,
22  hold one second, and I will bring up another
23  exhibit here.  Bear with me for one second.
24  All right.
25          Mr. Guidicipietro, did you

ROCCO GUIDICIPIETRO
JOHN J. AQUINO -against- ALEXANDER CAPITAL

September 29, 2021
129–132

---

Page 129

Rocco Guidicipietro

1  understand in -- did you have an
2  understanding of what a limited partnership
3  was, as of from 2013 to 2015?
4          Did you have an understanding of
5  that kind of a corporate entity?
6      A.  LLC.
7      Q.  No, a limited partnership.
8      A.  Limited partnership, not too
9  familiar with that.
10     Q.  Did you have any understanding what
11 a "limited partnership" was?
12     A.  Not -- not that much of an
13 understanding.
14     Q.  Did you have an understanding of
15 what a "business partnership" was?
16     A.  Yes.
17     Q.  What was your understanding?
18     A.  Well, there's more than one partner
19 in the partnership.
20     Q.  That there could be limited
21 partners in a partnership?
22     A.  Yes.
23     Q.  What was your understanding,
24 between 2013 and 2015, as to the difference

*(Line numbers above begin at 1; corrected below)*

---

Page 130

Rocco Guidicipietro

1  between a "limited partner" and a "partner"?
2      A.  Depends what you are referring
3  to --
4      Q.  Well --
5      A.  -- in the question.
6      Q.  Did you have any understanding that
7  the -- there was a difference in roles
8  between a limited partner and a partner in a
9  limited partnership?
10     A.  No.
11     Q.  Did you understand whether there
12 was any liability exposure that was different
13 for a partner, as opposed to a limited
14 partner?
15     A.  No.
16     Q.  Do you have one now?
17     A.  No.
18     Q.  Did you have any understanding
19 between 2013 and 2015, that it was necessary
20 that if a partnership wished to have the
21 protections of a limited partnership, that it
22 had to file in -- if it wanted to be a
23 limited partnership under the laws of
24 Delaware, that it had to file with the

---

Page 131

Rocco Guidicipietro

1  secretary of state's office, in order to be
2  declared a Delaware limited partnership?
3      A.  No.
4      Q.  Were you aware of that between 2013
5  and 2015?
6      A.  No.
7      Q.  Okay.  In 20- -- between 2013 and
8  2015, did you have an understanding of what a
9  "general partner" was in a partnership?
10     A.  No.
11     Q.  Do you have one now?
12     A.  General.
13     Q.  Could you tell us as best you can,
14 what's your understanding now?
15     A.  In general partners, a general
16 partner.  Limited partner is a limited
17 partner.
18     Q.  What accounts for the fact that
19 they have two different names, one prefaced
20 with "general" and the other with "limited"?
21         Was there a difference in their
22 roles?  Was that your understanding, or they
23 had the same roles, and they were
24 interchangeable?

---

Page 132

Rocco Guidicipietro

1      A.  I am not an expert in corporate
2  structure, but my experience would be a
3  general partner has more rights than a
4  limited partner.
5      Q.  What kind of rights?
6      A.  Not sure.  Just by the name.
7      Q.  All right.  Was it your
8  understanding that a limited partner role was
9  to -- was to invest money, but not to take
10 part in any management of the partnership?
11         Was that your understanding or not,
12 at that time?
13     A.  No, no.
14     Q.  It was not your understanding?
15     A.  No.
16     Q.  Was it your understanding that --
17 at that time, that a general partner was
18 someone who had management responsibilities
19 in the partnership or you had no such
20 understanding, at that time?
21     A.  No, no understanding at that time.
22     Q.  Okay.  Are you aware -- you are the
23 coowner with Mr. Amato of Nesa Management; is
24 that correct?

Page 133

Rocco Guidicipietro

2    A.   Yes.
3    Q.   And you have been coowner with Mr.
4  Amato since Nesa Management was formed as an
5  LLC; is that correct?
6    A.   Yes.
7    Q.   And that has been the case from
8  when it was first formed, until the present;
9  is that the case?
10   A.   Yes.
11   Q.   It's just the two of you who own
12 Nesa?
13   A.   Yes.
14   Q.   Okay.  I am going to show you -- I
15 am going to show you a document, and I -- and
16 this document is Plaintiff's Exhibit 129, and
17 it's a letter from -- with the letterhead of
18 Sichenzia, Ross, Freidman, and Ference.  Do
19 you see that over to the left?
20   A.   Yes.
21   Q.   And it's dated October 27, 2015.
22 Do you see that?
23   A.   Yes.
24   Q.   And it's -- it's to a Mr. Francois
25 at FINRA, who's the principal investigator --

Page 134

Rocco Guidicipietro

2  examiner, excuse me.  Do you see that?
3    A.   Yes.
4    Q.   And it says, "Re, continuing
5  membership application, firm, Alexander
6  Capital, LP," and it gives the application
7  number.  Do you see that?
8    A.   Yes.
9    Q.   Okay.  Now, it states in the first
10 paragraph, "Dear Mr. Francois, as you know,
11 this firm represents Alexander Capital, LP,
12 Alexander, or the firm.  We are in receipt of
13 the staff's request of Alexander pursuant to
14 Rule 1017, dated October 19, 2015, the
15 request.  We trust the foregoing responses
16 will satisfy in full the request, such that
17 Alexander's application to amend its
18 membership agreement to increase the number
19 of associated persons, approval to engage in
20 firm commitment underwriting activity, and
21 approval to engage in proprietary trading,
22 trading, and change of ownership is approved
23 by FINRA."  Do you see that?
24   A.   Yes.
25   Q.   And is -- were you aware, in 2015,

Page 135

Rocco Guidicipietro

2  that Mr. -- that the firm of Sichenzia, Ross,
3  Freidman and Ference was representing
4  Alexander Capital regarding its application a
5  change in membership application?
6    A.   Yes.
7    Q.   Okay.  And did you know that the
8  attorney for Sichenzia Ross who's taking on
9  the responsibilities on behalf of the firm
10 representing Alexander Capital was Mr. Ross
11 Carmel?
12   A.   Not sure.  There was multiple
13 attorneys.
14   Q.   Are you familiar with Mr. Carmel?
15   A.   Yes.
16   Q.   And someone you recognize as a
17 member of the firm of Sichenzia?
18   A.   Yes.
19   Q.   Someone who has taken up
20 representation of Alexander Capital as a
21 member of the firm of Sichenzia Ross?
22   A.   They've used multiple attorneys at
23 that law firm, but he is one of them, yes.
24   Q.   Okay.  Now, you see it says number
25 one, "Provide documentation of Nesa" -- the

Page 136

Rocco Guidicipietro

2  question that FINRA asked was "provide
3  documentation of Nesa Management, LLC's,
4  Nesa, assumption of the role of general
5  partner of the firm, draft, or executed."  Do
6  you see that?
7    A.   Yes.
8    Q.   And the response is, "responsive
9  documents are enclosed herewith as Exhibit
10 A."
11       Do you see that?
12   A.   Yes.
13   Q.   All right.  Now, when we go to
14 Exhibit A in this document, here is Exhibit A
15 of the same exhibit, it's an assignment and
16 assumption agreement.  Do you see that?
17   A.   Yes.
18   Q.   It says, "This assignment and
19 assumption agreement, agreement, dated as of
20 blank" -- it's undated -- "is made by and
21 between Alexander Capital Holdings, Inc., a
22 Delaware corporation, referred to herein as
23 'the company,'" right?  You see that?
24   A.   Yes.
25   Q.   "And Nesa Management, LLC, a New

Page 137

1           Rocco Guidicipietro
2   York limited liability company, to be
3   referred to as 'new GP' in this agreement."
4   Do you see that?
5       A.  Yes.
6       Q.  Okay.  Now, in looking at this
7   document, is this document familiar to you at
8   all --
9       A.  Absolutely.
10      Q.  -- as an assignment and assumption
11  agreement?
12      A.  No.
13      Q.  Do you remember at any time that
14  there was an assignment and assumption
15  agreement proposed between Alexander Capital
16  Holdings, Inc., and Nesa Management, LLC, at
17  any time, in the past?
18      A.  No, I don't.
19      Q.  To your knowledge, has Alexander --
20  to your knowledge, has Nesa Management and
21  Alexander Capital Holdings, Inc., ever
22  entered into an assignment and assumption
23  agreement in the past?
24      A.  Not to my knowledge.
25      Q.  To your knowledge, has Nesa

Page 138

1           Rocco Guidicipietro
2   Management ever entered into any kind of
3   agreement with Alexander Capital Holdings,
4   Inc., in the past?
5       A.  Not that I'm aware of.
6       Q.  All right.  It says, "witnesses" --
7   "Witnesseth."  It says, "whereas," several
8   clauses here.  "Whereas, the company holds,"
9   referring to Alexander Capital, Holdings,
10  Inc., "holds 100 percent of the general
11  partnership interest, the GP interest, of
12  Alexander Capital, LP, a Delaware limited
13  partnership, and serves as the sole general
14  partner thereof" -- let's just stop there.
15          Was it your understanding, in 2015,
16  that Alexander Capital Holdings, Inc., held
17  100 percent of the general partnership
18  interest of Alexander Capital, LP, and served
19  as the sole general partner as of that date,
20  2015?
21      A.  No, I believe that to be incorrect.
22      Q.  It then says, "whereas, Alexander
23  Capital Holdings, Inc., desires to transfer
24  the GP interest to Nesa, the new GP, and
25  Nesa, new GP, deserves to" -- "desires to

Page 139

1           Rocco Guidicipietro
2   assume the role of general partner of the
3   partnership, dated as of the date hereof."
4   Now, this is undated.  Okay.
5           Was it your understanding, in 2015,
6   that Alexander Capital Holdings, Inc.,
7   desired to transfer its GP interest to Nesa,
8   and that Nesa desired to assume the role of
9   general partnership, that that was their
10  intention in 2015?
11      A.  No.
12      Q.  And in looking at this agreement
13  and knowing what you know now as you sit
14  here, is that, in your mind, a true statement
15  or not true?
16          MR. WARD:  Objection.
17          Objection.  Vague.
18      Q.  All right.  So as of -- as you sit
19  here today, based on what you know, was it --
20  is it your understanding that in 2015,
21  Alexander Capital Holdings, Inc., wished to
22  transfer its GP interest to Nesa, and Nesa
23  wished to assume it and become the general
24  partner of Alexander Capital, LP, or that's
25  not consistent with your understanding, as

Page 140

1           Rocco Guidicipietro
2   you sit here today?
3       A.  That's not consistent.
4       Q.  Okay.  It says, "whereas, the
5   company proposed to transfer the general
6   partnership interest to Nesa," and that,
7   again, "whereas, Alexander Capital Holdings,
8   Inc., proposed to transfer the GP interest to
9   Nesa, and Nesa be admitted immediately
10  prior to such transfer as general partner of
11  the partnership."
12          Do you see that?
13      A.  Yes.
14      Q.  Again, is that consistent with your
15  understanding, in 2015, that that's -- that
16  -- that Alexander Capital Holdings, Inc., was
17  proposing a transfer of the GP interest to
18  Nesa and that Nesa be admitted immediately
19  prior to such a transfer as general partner
20  of the partnership?
21      A.  No.
22      Q.  Is it your understanding now, based
23  on what you know, that that was true as of
24  that time?
25      A.  No, that's not true.

ROCCO GUIDICIPIETRO                                    September 29, 2021
JOHN J. AQUINO -against- ALEXANDER CAPITAL              141–144

Page 141

1                Rocco Guidicipietro
2        Q.   In reading this proposed agreement
3    that was submitted to FINRA in 2015, as part
4    of Alexander Capital, LP's application for
5    approval in the change of ownership, and
6    approval to get the authority to do firm
7    commitment underwritings, does that help
8    refresh your recollection at all that, in
9    fact, the statements in the assignment and
10   assumption agreement were true, that we'd
11   just gone over?
12       A.   No, it does not.
13       Q.   And to be clear, as far as you
14   know, up to today, that Nesa and Alexander
15   Capital Holdings, Inc., never entered into an
16   agreement of any kind?
17       A.   Exactly.
18       Q.   At any time, right, okay.  Thank
19   you.
20       A.   Any time.
21       Q.   Yeah.  All right.  Now, I
22   previously asked you some questions about
23   Alexander Capital Holdings, Inc., earlier
24   today.  Do you remember that?
25       A.   Yes.

Page 142

1                Rocco Guidicipietro
2        Q.   Okay.  And, of course, I have asked
3    you some more questions just now.  Now, since
4    the time I asked you those questions, since
5    the time you had a chance to think about
6    things, to the extent you had a chance to
7    think about things, do you have -- do you
8    have any memory at all of having any
9    relationship with Alexander Capital Holdings,
10   Inc., in any way or --
11       A.   No.
12       Q.   -- as you sit here today, you don't
13   have any such memory of having any
14   involvement with Alexander Capital Holdings,
15   Inc.?
16       A.   No, I do not.
17       Q.   As you sit here today, remember
18   having any such involvement with Alexander
19   Capital Holdings, Inc.?
20       A.   Correct, none.
21       Q.   Okay, now, this is Exhibit 161,
22   Plaintiff's Exhibit 161.  It's with the
23   Delaware secretary of state's office, and
24   it's a certification regarding the documents
25   on file regarding Alexander Capital Holdings,

Page 143

1                Rocco Guidicipietro
2    Inc., and it talks about a certificate of
3    incorporation in 1995, a certificate of
4    revival in 2009 --
5            MR. WARD:  We are not seeing
6        the document, Jan.
7            MR. SCHLICHTMANN:  You are
8        not seeing the document?  I am just
9        reading certification -- are you
10       not seeing anything on the screen?
11           MR. WARD:  Are you not
12       trying to show the document,
13       because we don't see anything?
14           MR. SCHLICHTMANN:  Oh, I am
15       so sorry.  Sorry about that.  Thank
16       you for telling me.
17       Q.   All right, I will go back again.
18   This is Plaintiff's Exhibit 161.  You can see
19   that now, right?
20       A.   Yes.
21       Q.   Okay.
22           MR. WARD:  It's 161?
23           MR. SCHLICHTMANN:  Yes, 161,
24       Plaintiff's Exhibit 161.
25           MR. WARD:  That was the last

Page 144

1                Rocco Guidicipietro
2    one.  Oh, okay.
3            MR. SCHLICHTMANN:  Am I
4        right or has there been competing
5        markings?
6            MR. WARD:  I had it as the
7        same one but maybe I heard it wrong
8        then.
9            MR. SCHLICHTMANN:  Sorry, we
10       will figure it out, if there's a
11       conflict with another exhibit.  I
12       don't think so.  We will work it
13       out if there is.  For the purposes
14       of right now, this is being
15       referred to as Plaintiff's Exhibit
16       161, and, hopefully, it's properly
17       marked.
18           MR. WARD:  All right.
19       Q.   All right.  And I was reading
20   before, I apologize, I thought it was up on
21   the screen, it wasn't, so I will just repeat
22   myself.  This document that's marked as
23   Plaintiff's Exhibit 161 is from the secretary
24   of state's office, and the certification that
25   I was going through, I will just repeat it.

Page 145

Rocco Guidicipietro

1      It says that it is a "certification regarding
2  a 1995 filing of incorporation, a certificate
3  of revival filed in 2009, a certificate of
4  revival filed in 2012, and a certificate of
5  dissolution filed the 12th day of February
6  2015." Do you see that?
7      A.   Uh-huh.
8      Q.   Okay.  Now, having to do with
9  articles of incorporation that was filed on
10  November 16, 1995, it's the Alexander Capital
11  Holdings, Inc., articles of organization, and
12  I am just flipping through it quickly.  My --
13  based on your answers before, I assume you
14  have not seen this document before, you are
15  not familiar with the articles of
16  incorporation of Alexander Capital Holdings,
17  Inc.; is that correct?
18      A.   That's correct.
19      Q.   Okay.  And this is signed by a
20  Felix Flores?
21      Do you know Felix Flores?
22      A.   I do not.
23      Q.   Okay.  Okay, then on April 6, 2009,
24  there's a certificate for renewal and

Page 146

Rocco Guidicipietro

1  revival, and it says "the name of this
2  corporation is Alexander Capital Holdings,
3  Inc." It gives a street address -- no need to
4  do that.  The date of filing of the original
5  certificate, 1995.  And the certificate of
6  revival is signed by a CEO, Mr. Boxer; is
7  that name familiar to you, Mr. Boxer, Allan
8  Boxer?
9      A.   Yes.
10      Q.   What's your -- how do you know Mr.
11  Boxer?
12      A.   He was one of the old owners of
13  Alexander Capital.
14      Q.   Did you understand Mr. Boxer had a
15  relationship with Alexander Capital Holdings,
16  Inc., at all?
17      A.   I did not.
18      Q.   That he was an authorized officer
19  of it?
20      A.   I did not.
21      Q.   Or that he was the CEO of that?
22      A.   Did not.
23      Q.   Okay.  And looking at that
24  document, does that refresh your recollection

Page 147

Rocco Guidicipietro

1  at all about --
2      A.   It doesn't.  It does not.
3      Q.   Okay, I will go to April 11, 2012.
4  And this is a certificate for renewal and
5  revival of charter.  The name of the
6  corporation is Alexander Capital Holdings,
7  Inc., and it states that the date of the
8  filing of the corporation's original
9  certificate was 1995.  And it's signed --
10  this revival is signed by Francine Lanaia.
11      Do you see that?
12      A.   Yes.
13      Q.   Did you understand that Mrs. --
14  that Ms. Lanaia was an authorized officer at
15  some time in the past of Alexander Capital
16  Holdings, Inc.?
17      A.   I did not.
18      Q.   Does this help refresh your
19  recollection at all about that?
20      A.   No.
21      Q.   Then it has February 12, 2015, is a
22  filing.  A certificate -- a short form
23  certificate of dissolution.  Do you see that?
24      A.   Yes.

Page 148

Rocco Guidicipietro

1      Q.   And it says, "the dissolution" --
2  it says it "concerns the dissolution of
3  Alexander Capital Holdings, Inc."  Do you see
4  that?
5      A.   Yes.
6      Q.   And that dissolution was authorized
7  by the board of directors and stockholders,
8  in accordance with Delaware law.  Do you see
9  that?
10      A.   Yes.
11      Q.   It says the date of dissolution was
12  authorized on April 30, 2012.  Do you see
13  that?
14      A.   Yes.
15      Q.   All right.  And it says, "The name
16  and address of the directors and officers of
17  the corporation are Joseph Figliolo, vice
18  president," with 17 State Street, 5th Floor,
19  New York," as his address.  Do you see that?
20      A.   Yes.
21      Q.   And as you previously testified,
22  that's the address of Alexander Capital, LP;
23  is that correct?
24      A.   Yes.

Page 149

1              Rocco Guidicipietro
2      Q.   And it was such an address in 2015?
3      A.   Yes.
4      Q.   Okay.  And do you -- did you have
5   an understanding at any time that Mr.
6   Figliolo was an officer or director or owned
7   in any way Alexander Capital Holdings, Inc.?
8      A.   No.
9      Q.   It also mentions -- it has your
10  name listed.
11          Do you see that?
12     A.   Yes.
13     Q.   "Rocco Guidicipietro, vice
14  president, slash, director," with the
15  Alexander Capital, LP, address.  Now, in
16  looking at this document and seeing your name
17  on there, does that help refresh your
18  recollection that you were a vice president
19  and director of Alexander Capital Holdings,
20  Inc., in the past?
21     A.   It does not, and I never was, no.
22  I don't know why my name is on there.
23     Q.   All right.  And, Mr. Guidicipietro,
24  I will be showing you more documents with
25  your name regarding this, so if at any time

Page 150

1              Rocco Guidicipietro
2   your memory is refreshed at all, please let
3   me know, all right, because I will show you
4   some more documents here.  I'm sorry?
5      A.   I definitely will, but never seen
6   this document.  I don't know why my name is
7   there.
8      Q.   Okay.  It does have a signature on
9   it.  Now it's impossible to read it.  Does
10  that -- it says the -- Rocco -- your name is
11  on there and it has the signature line.  Do
12  you recognize that as some form of your
13  signature, or you don't believe that's your
14  signature?
15     A.   I do.  I don't recall that
16  document.
17     Q.   Okay.  Does this help -- I will be
18  asking you several times, sir, and if it
19  doesn't, it doesn't.  Does this help refresh
20  your recollection that you did sign such a
21  document in the past as vice president,
22  slash, director of Alexander Capital
23  Holdings, Inc.?
24     A.   Not sure.  Is that Alexander
25  Capital Holdings, Inc.?

Page 151

1              Rocco Guidicipietro
2      A.   Yes, this is Alexander --  yes,
3   this has Alexander Capital Holdings, Inc.,
4   right?
5      A.   Yeah, well, that -- that means that
6   the company is being dissolved.
7      Q.   Yes, but the corporation that it's
8   -- that's right, but the corporation -- this
9   is referring to Alexander Capital Holdings,
10  Inc., all right, and it's naming who the vice
11  president and the vice president and director
12  are of Alexander Capital Holdings, Inc.
13     A.   And that is -- that is my
14  signature.  I don't remember the document,
15  and that -- I have no -- nothing -- nothing
16  to do with Alexander Capital Holdings, as I
17  remember.
18     Q.   Okay.  Did you have -- do you -- do
19  you have any memory that you had any
20  involvement with the dissolution of Alexander
21  Capital Holdings, Inc., at any time in the
22  past?
23     A.   No, I don't.
24     Q.   Okay.  All right.  I will show you
25  another certificate from this -- regarding

Page 152

1              Rocco Guidicipietro
2   Alexander Capital Holdings, Inc., filed with
3   the secretary of state.  Now, these
4   certificates were issued by the secretary of
5   state June 7, 2021, regarding the records
6   that are on file with the state of Delaware.
7   Now, this is -- I will start at the bottom
8   here.  This is a tax filing regarding
9   Alexander Capital Holdings, Inc., for the tax
10  year 2013.  And on the page preceding it, for
11  2013, it refers to Alexander Capital
12  Holdings, Inc., it has the 17 State Street,
13  5th Floor, address we referred to previously.
14  And it says under "shares," the owner of
15  shares, it lists "Joseph Figliolo" at "17
16  State Street."  Do you see that?
17     A.   Yes.
18     Q.   Okay.  And then it -- under
19  "directors" it lists Joseph Amato at the
20  Alexander Capital, LP address, and you,
21  yourself, Rocco Guidicipietro, at the
22  Alexander Capital, LP address.
23          In looking at that filing that was
24  made in 2013 with the secretary of state's
25  office in Delaware, regarding the paying of

Page 153

Rocco Guidicipietro

1          Rocco Guidicipietro
2    the taxes for Alexander Capital Holdings,
3    Inc., does that refresh your recollection at
4    all of your involvement with Alexander
5    Capital Holdings, Inc.?
6        A.  No, it doesn't, actually.
7        Q.  Okay.
8        A.  Confusing me, actually.
9        Q.  Okay.  Now, I am showing you for
10   2014, again, it's showing Mr. Figliolo with
11   the Alexander Capital, LP address for the tax
12   year ending in 2014, '14, and again, Mr.
13   Amato with the -- is listed as director with
14   the Alexander Capital, LP address, and
15   yourself, Rocco Guidicipietro, at the
16   Alexander Capital address, and this is for
17   the tax year ending in 2014.  In looking at
18   that document, does that help refresh your
19   recollection at all as to whether you had
20   involvement, such as indicated in this
21   document, you know, at that time, or at any
22   time?
23       A.  No, it doesn't, actually.
24       Q.  Okay.  I am now showing you the
25   same type of document, but this time it's for

Page 154

1          Rocco Guidicipietro
2    2015, and, again, it shows Mr. Figliolo
3    having ownership of the shares, and it shows
4    Joseph Amato and yourself with the Alexander
5    Capital, LP address being the directors.
6    Does that help refresh your recollection at
7    all as to your involvement with Alexander
8    Capital Holdings, Inc., in between the years
9    2013, 2014, and 2015?
10       A.  No, it doesn't.
11       Q.  Now, this one, in 2015, has a
12   signature.  It says "vice president."  Is
13   that your -- do you recognize that as your
14   signature?
15       A.  That's not my signature.
16       Q.  Do you recognize that as Mr.
17   Figliolo's signature?
18       A.  I couldn't be 100 percent sure.
19       Q.  Okay.  Again, in 2014, same answer,
20   and in 2013, I take it your answer is the
21   same regarding Mr. Figliolo's signature?
22       A.  Yes, it looks like his, but I can't
23   be 100 percent sure.
24       Q.  Okay, all right.  And...there we
25   go.  All right.  Share screen.

Page 155

Rocco Guidicipietro

1          Rocco Guidicipietro
2        All right, I put another document
3    on the screen.  Do you see this document?
4    It's a black-and-white copy with FINRA
5    letterhead on the top.  Do you see that?
6        A.  Yes.
7        Q.  All right.  It's dated June 11,
8    2015, and it's a FINRA letter to Mr. Carmel,
9    associate to Sichenzia, Ross, Freidman,
10   Ference, LLP.
11       Do you see that?
12       A.  Yes.
13       Q.  And it's "re, continuing membership
14   application of Alexander Capital, LP."
15       Do you see that?
16       A.  Yes.
17       Q.  Okay.  Were you aware of the fact
18   in that -- that after the continuing
19   membership application was filed in June 3 of
20   2015, that FINRA made a response soon
21   thereafter regarding the application?  Are
22   you aware of that?
23       A.  That's what they normally do.
24       Q.  Okay, you understand that they
25   normally do that?

Page 156

1          Rocco Guidicipietro
2        A.  Yeah, that's they -- I didn't see
3    the response, though.  I don't know if I saw
4    this.
5        Q.  Okay, I will show it to you.  This
6    is Plaintiff's Exhibit 127.  It's a letter
7    from FINRA dated June 11, 2015.  The
8    application had been filed on June 3, 2015.
9    And it states, "Dear Mr. Carmel," in the
10   first paragraph, "on June 3, 2015, FINRA's
11   membership application programs staff
12   received a continuing membership application,
13   application, for Alexander Capital, LP, the
14   firm, which requested approval, A, for an
15   ownership change, B, to engage in firm
16   commitment underwriting, C, to engage in
17   proprietary trading, D, in connection with
18   its business expansion, increase its
19   statutory net capital requirement to
20   $100,000, E, to increase the number of
21   associated persons from 50 to 100, and in
22   connection therewith, F, modify the
23   restriction in its membership agreement
24   limiting the firm to fifty associated
25   persons."  Do you see that?

Page 157

1          Rocco Guidicipietro
2     A.   Yes.
3     Q.   Now, it says that -- now, is that
4  consistent, that paragraph's description of
5  the application, is that in any way -- is
6  that consistent with your understanding that
7  Alexander Capital, in 2015, had applied to
8  FINRA for those -- for approval for those
9  changes that we just went over listed in the
10 FINRA letter of June 11, 2015?
11         MR. SCHLICHTMANN:  I'm
12    sorry?
13         MR. WARD:  My objection?
14    Vague.
15    Q.   Let me ask it again.  In looking
16 over that paragraph that I just read from the
17 FINRA letter dated June 11, 2015, does that
18 refresh your recollection at all regarding
19 the fact that in 2015, Alexander Capital
20 sought approval for the -- for the items
21 listed in the first paragraph of that letter?
22    A.   Yes, in 2015, yes.
23    Q.   Yes, it does help refresh your
24 recollection about that?
25    A.   Yes, in 2015, we requested that.

Page 158

1          Rocco Guidicipietro
2     Q.   Okay.  And this is exhibit -- I
3  have not said it before, is 127.  It's --
4  this exhibit that we've been referring to is
5  127.
6          Now, it states in the second
7  paragraph, while NASD Rule 1017C1, provides
8  that a member may affect a change in
9  ownership or control prior to the conclusion
10 of the proceeding, the rule also specifies
11 that the staff may place interim restrictions
12 on the member based upon the standards and
13 NASD Rule 1014 pending final action."
14         Now, just as a matter -- are you
15 familiar with NASD Rule 1017, or also known
16 as, FINRA Rule 1017?  Does that mean anything
17 to you?
18    A.   I would have to look at the rules.
19    Q.   Is it your understanding that the
20 continuing membership application is pursuant
21 to either -- is NASD Rule 1017, also known as
22 FINRA Rule 1017?
23    A.   It's part of the 1017 rule.
24    Q.   All right.  You are familiar that
25 there's a so-called application process, and

Page 159

1          Rocco Guidicipietro
2  the rule number is 1017; is that correct?
3     A.   Yes.
4     Q.   Now, it says, "therefore, the staff
5  hereby imposed the following interim
6  restrictions pursuant to Rule 1017,
7  subsection C, one, the firm is prohibited
8  from effecting any portion of the
9  aforementioned ownership change, the firm is
10 also prohibiting from effecting any
11 additional changes in ownership, regardless
12 of percentage amount."
13         Do you see that?
14    A.   Yes.
15    Q.   And then it says, number 2, "the
16 firm is prohibited from making any changes or
17 expansion to its business activities,
18 including the addition of any associated
19 persons and/or offices."
20         Do you see that?
21    A.   Yes.
22    Q.   Okay.  Now, is it -- was it your
23 understanding, in 2015, that FINRA at some
24 point issued a letter to Alexander Capital's
25 counsel, which imposed certain restrictions

Page 160

1  on it, as we just went over?  In other words
2  -- and I will summarize, a prohibition
3  regarding effecting any portion -- any
4  portion of the aforementioned ownership
5  change, and prohibiting the firm from making
6  any changes or expansions to its business
7  activities?
8          Was that your understanding, that
9  at some point in 2015, FINRA issued such
10 restrictions?
11    A.   That's my understanding, yes.
12    Q.   It is your understanding.  Okay.
13         Was it your understanding in 2015?
14    A.   I don't know the exact date.  When
15 we received the letter, I guess, that's when
16 it was enforced.
17    Q.   All right.  Is it your
18 understanding that soon after FINRA issued
19 this order, that those restrictions were
20 enforced?
21    A.   Yes.
22    Q.   Okay.  Have you completed your
23 answer?
24    A.   Yes.

Page 161

Rocco Guidicipietro

2    Q.   All right.  To your knowledge, to
3  your knowledge, did Alexander Capital take
4  any steps as a company to make anyone
5  employed at Alexander Capital aware of any
6  restrictions that FINRA had issued at that
7  time, in 2015?
8    A.   No, not aware of it.
9    Q.   That it took any steps?
10    A.   Correct.
11    Q.   Okay.  Based on your understanding
12  of the practices and procedures of Alexander
13  Capital, LP, in 2015, was it consistent with
14  those practices and procedures in existence
15  at that time, that if the company's counsel
16  received a letter from FINRA regarding
17  certain restrictions or activities, that the
18  firm was prohibited from engaging in, at that
19  time, that that would be a matter which
20  should be brought to the attention of certain
21  employees or people within officer or
22  director relationship with Alexander Capital,
23  LP?
24         MR. WARD:  Objection.
25         Confusing and ambiguous.

Page 162

Rocco Guidicipietro

2         MR. SCHLICHTMANN:  All
3         right, I don't want to be confusing
4         and ambiguous.
5    Q.   Based on your understanding of the
6  practices and procedures in existence in 2015
7  and Alexander Capital, LP, was it consistent
8  with the practices and procedures at that
9  time for the -- for any restrictions by FINRA
10  that were issued prohibiting the firm from
11  engaging in certain activities, that that was
12  something that should be brought to the
13  attention of particular people at Alexander
14  Capital, LP?
15    A.   Policy and procedure, not that I am
16  aware of, no.
17    Q.   Would it have been appropriate
18  based on your understanding of the practice
19  and procedures of Alexander Capital in 2015
20  for the attorney for Sichenzia Ross as the
21  law firm representing Alexander Capital not
22  to inform someone at Alexander Capital of the
23  firm's receipt of a letter like this at that
24  time?
25         MR. WARD:  Objection to

Page 163

Rocco Guidicipietro

2  speculation.
3         MR. SCHLICHTMANN:  Okay, I
4         don't want any speculation.
5    Q.   Is it -- was it consistent with the
6  practices and procedures of Alexander
7  Capital, LP, for a lawyer representing
8  Alexander Capital to provide the firm
9  information that -- to provide the --
10  Alexander Capital information that the law
11  firm had received regarding any prohibitions
12  or restrictions issued by FINRA regarding
13  Alexander Capital's business activities?
14         MR. WARD:  Objection.
15         Ambiguous.
16         MR. SCHLICHTMANN:  Okay, I
17         will withdraw the question.
18    Q.   To your knowledge, did Mr. Ross or
19  anyone associated with Sichenzia, Ross,
20  Freidman, Ference, to your knowledge, did
21  they ever communicate to any person at
22  Alexander Capital, LP that they had received
23  this letter dated June 11, 2015, Plaintiff's
24  Exhibit 127?
25    A.   Not that I recall.

Page 164

Rocco Guidicipietro

2    Q.   Would that have been appropriate?
3  Would it have been appropriate, based on your
4  understanding of the practices and procedures
5  at Alexander Capital, LP, at that time, for
6  Mr. Ross or anyone associated with Sichenzia
7  Ross not to have forwarded on to someone at
8  Alexander Capital, LP their receipt of a
9  letter like this dated June 11, 2015,
10  Plaintiff's Exhibit 127?
11    A.   I lost track of your question.
12  Sorry, what was the question?
13    Q.   Sorry.  That's all right.  I
14  appreciate that.
15         Based on your understanding of the
16  Alexander Capital practices and procedures as
17  of 2015, would it have been appropriate for
18  Mr. Carmel not to have forwarded on to
19  someone at Alexander Capital, LP the fact
20  that the firm Sichenzia, Ross, Ference had
21  received from FINRA a letter such as the one
22  depicted in Plaintiff's 127, dated June 11,
23  2015?
24         MR. WARD:  Objection.
25         Confusing.

Page 165

Rocco Guidicipietro

2  Q.  Well, let me ask: Mr.
3  Guidicipietro, are you confused by that
4  question?  If you are, I will rephrase it.
5  If you do understand it, you are free to
6  answer.
7     A.  No, I don't understand --
8     Q.  Okay.
9     A.  -- the question.
10    Q.  Is there a particular part of the
11  question that bothers you or just too
12  confusing?
13    A.  No, just too long.
14    Q.  Too long, okay.  Okay.  I
15  appreciate that.  Was it -- was it
16  appropriate, in 2015, for Mr. Carmel not to
17  have forwarded to someone at Alexander
18  Capital, LP this letter dated June 11, 2015,
19  that he received from FINRA, Plaintiff's
20  Exhibit 127?
21          MR. WARD:  Objection.
22     Vague.  Calls for speculation.
23    Q.  Do you understand the question,
24  Mr. Guidicipietro?
25    A.  I understand the question but it's

Page 166

Rocco Guidicipietro

2  difficult to answer.
3    Q.  Okay.  Is there some part of it
4  that's giving you difficulty?
5    A.  I can't speculate on what the
6  lawyer's intentions were in this legal
7  back-and-forth confidentiality on what the
8  lawyer deals with FINRA.
9    Q.  Okay.  But was it your
10  understanding, in 2015, that it was
11  appropriate for any lawyer representing
12  Alexander Capital not to forward on to
13  someone at Alexander Capital, LP, an official
14  action or letter indicating an official
15  action regarding Alexander Capital, LP?
16          MR. WARD:  Objection.
17     Vague.
18    Q.  Do you understand the question?
19    A.  Yes, but it's impossible to answer
20  it.
21    Q.  It's impossible; why is that?
22    A.  Because it's the lawyer's decision
23  on what to do with the letter.  I leave it up
24  to his opinion.
25    Q.  All right.  And to your knowledge,

Page 167

Rocco Guidicipietro

2  did Mr. Carmel or anyone from Sichenzia,
3  Ross, Freidman, and Ference send anyone at
4  Alexander Capital, LP, the law firm's receipt
5  of this letter, dated June 11, 2015,
6  Plaintiff's Exhibit 127?
7    A.  Not to my knowledge.
8    Q.  And this is -- is this the first
9  time you are seeing this letter?
10    A.  I believe I saw it, but I can't
11  give you a time frame when.
12    Q.  Was it recently?
13    A.  I don't recall.
14    Q.  Was it at any time during 2013,
15  2015?
16    A.  I don't know.
17    Q.  Could it have been?
18    A.  I don't know.
19    Q.  Okay.  So it could have been
20  sometime in 2015 or it could be sometime
21  recently or sometime in between?
22    A.  It could have been any time between
23  then and now.
24    Q.  All right.  And nothing in seeing
25  this letter helps you refresh your

Page 168

Rocco Guidicipietro

2  recollection at all as to when you were made
3  aware of this letter?
4    A.  Not -- not exactly when I was made
5  aware of it.
6    Q.  Okay.  If in -- based on your
7  understanding of the practices and procedures
8  of Alexander Capital in 2015, is there
9  someone at Alexander Capital who should have
10  received a copy of this letter soon after the
11  law firm received it?
12    A.  There's -- no, there's nothing on
13  procedures that would address this letter.
14    Q.  Or who at Alexander Capital should
15  be given a copy of it once it's received by
16  the law firm?
17    A.  No, there's nothing that would
18  receive it.
19    Q.  Is it up to the lawyer, was that
20  your understanding at that time?
21    A.  Yes.
22    Q.  And to your knowledge, you don't
23  know if anyone at Sichenzia actually
24  forwarded this letter after its receipt in
25  June 11, 2015, correct?

Page 169

Rocco Guidicipietro

1           Rocco Guidicipietro
2    A.  I can't confirm they did.
3    Q.  You can't confirm that they did, is
4    that what you are saying?
5    A.  I can't confirm that they did.
6    Q.  Okay.  All right.
7           MR. WARD:  It's about an
8    hour and fifteen.  Wonder if we can
9    take a break.
10          MR. SCHLICHTMANN:
11   Absolutely.  How long?
12          MR. WARD:  Five minutes.
13   Rocco, if you want more time.
14          THE WITNESS:  No, it's fine.
15   I will get a bottle of water.
16          MR. WARD:  We will take ten
17   minutes.  We will try to make it
18   shorter than that.
19          MR. SCHLICHTMANN:  That's
20   fine.  Ten minutes is fine.
21          THE VIDEOGRAPHER:  Off the
22   record.  The time is 2:25.
23          (Whereupon, the requested
24   portion was read by the reporter.)
25          THE VIDEOGRAPHER:  We are

Page 170

1           Rocco Guidicipietro
2    now back on the record.  The time
3    is 2:37.
4    Q.  All right.  I am going to show you
5    what I have previously shown you okay.  This
6    is Plaintiff's Exhibit 129.  This is a letter
7    dated October 27, 2015.  Do you remember we
8    went over that previously?
9    A.  Yes I am assuming.
10   Q.  Okay, again, this a letter from
11   Sichenzia Ross to Mr. Francois at FINRA,
12   dated October 27, 2015, and in this letter, I
13   want to refer to a particular section.  It
14   says that in -- that the -- one of the items
15   that FINRA was requesting information about
16   regarding the continuing membership
17   application was, as shown here, "As
18   discussed, the firm was issued a wells
19   notification as of September 1st, 2015, and
20   please provide a detailed statement as to why
21   the matters noted should not impact the
22   application."
23          First of all, do you know what a
24   "wells notification" is, Mr. Guidicipietro?
25   A.  Yes.

Page 171

1           Rocco Guidicipietro
2    Q.  Can you describe your understanding
3    of it?
4    A.  Just some allegations that was put
5    against the firm.
6    Q.  Okay.  Were you aware in 2015 that
7    FINRA had notified the firm that it was
8    starting an examination or investigation of
9    previous conduct that had occurred at the
10   firm Alexander Capital, LP?
11   A.  I know -- I don't know specific
12   dates but yes.
13   Q.  Okay.  And in answering the
14   question about why that matter should not
15   impact the application, the CMA, the
16   continuing membership application, the lawyer
17   for Sichenzia made this statement:  "In
18   December of 2013" -- this is on page three.
19   "In December of 2013, a full year after the
20   last misconduct alleged by the staff, active
21   control of the firm was sold to Mr. Amato and
22   Guidicipietro."
23          Do you see that?
24   A.  Yes.
25   Q.  Okay.  Now, first of all, is that

Page 172

1           Rocco Guidicipietro
2    consistent with your understanding that in
3    December of 2013, both you and Mr. Amato took
4    over active control of Alexander Capital, LP?
5    A.  Control, not ownership.
6    Q.  But control, correct?
7    A.  Control, part control.  There was
8    still people there.
9    Q.  When you say, "people there," what
10   do you mean "people there"?
11   A.  Previous owners, they had control.
12   Q.  Also?  Was it shared control?
13   A.  We had certain control, but they
14   had the ultimate control.
15   Q.  When you say, "they," who's the
16   "they"?
17   A.  Fran Lanaia.
18   Q.  Who now?
19   A.  Fran Lanaia.
20   Q.  Oh, Fran Lanaia.  Ms. Lanaia, in
21   December of 2013?
22   A.  I believe that's when she left.
23   Q.  Okay.  And then who -- anybody take
24   over her ownership interest?
25   A.  Mr. Fig, Figliolo.

Page 173

1              Rocco Guidicipietro
2    Q.  Figliolo, correct?
3    A.  Yes.
4    Q.  Okay.  And did Mr. Figliolo then in
5  taking over Ms. Lanaia's interest, which you
6  said had ultimate control, does that mean
7  that Figliolo, when he took over, he also
8  took over that interest, that control
9  interest?
10   A.  He wasn't registered, so he
11 couldn't operate the firm.
12   Q.  Okay.  So did he have any control
13 over the firm?
14   A.  He had -- he was the owner.
15   Q.  He was the owner.  Okay.  Did he
16 exercise control?
17   A.  He did not.
18   Q.  It says in this footnote, "a share
19 having been previously sold to Mr. Figliola"
20 -- I am sure that's a misspelling, it's
21 Figliola -- -olo, "who has never had active
22 control of any aspect of Alexander Capital"
23 -- do you see that footnote?
24   A.  Yes.
25   Q.  Is that consistent with your

Page 174

1              Rocco Guidicipietro
2  understanding as to what Mr. Figliolo had in
3  the nature of control over Alexander Capital
4  after he took over his interest from Ms.
5  Lanaia?
6    A.  Yes.
7    Q.  Was it your understanding that Mr.
8  Figliolo had become the general partner of
9  Alexander Capital when he took over Ms.
10 Lanaia's interest as you described it?
11   A.  I don't know what he took over at
12 that time.
13   Q.  All right.  As of the time that he
14 took over Ms. Lanaia's interest, do you know
15 whether or not Alexander Capital had a
16 general partner?
17   A.  I don't.
18   Q.  When Nesa Management, owned by you
19 and Mr. Amato -- well, let me ask you this:
20 When you and Mr. Amato, okay, took over,
21 quote, active control of the firm, do you
22 know who the general partner of Alexander
23 Capital, LP was at the time?
24        MR. WARD:  Objection.
25        Misstates prior testimony.

Page 175

1              Rocco Guidicipietro
2        MR. SCHLICHTMANN:  Let me
3  withdraw the testimony.
4    Q.  In December of 2013, when you and
5  Mr. Amato took over, quote, active control of
6  the firm, were you aware as to who or what
7  entity was the general partner of Alexander
8  Capital, LP?
9        MR. WARD:  Objection.
10       Confusing and misstates testimony.
11       MR. SCHLICHTMANN:  All
12 right.
13   Q.  Are you confused by my question,
14 Mr. Guidicipietro?  If you are, I will
15 restate it.
16   A.  No, I am not confused.  I was just
17 going to tell you, I didn't know.  I don't
18 know in those time frames.
19   Q.  As you sit here today, do you have
20 any reason to believe that some person or
21 entity was the general partner of Alexander
22 Capital, LP at the time that you and the Mr.
23 Amato took over active control of the firm in
24 December of 2013?
25       MR. WARD:  Objection.

Page 176

1              Rocco Guidicipietro
2        Misstates prior testimony.
3    Q.  Do you understand my question?
4    A.  Yes.  No.
5    Q.  Sorry, "yes," what?
6    A.  I heard your question, yes, and,
7  no, I don't believe there was any other
8  general partner.
9    Q.  You say any other general partner.
10 Does that mean you were aware of some general
11 partner?
12   A.  No, I am not aware of who the
13 general partner was.
14   Q.  Okay.  And at some point did you
15 become aware that Alexander Capital, LP had a
16 general partner at some time after you became
17 chief operating officer?
18   A.  No, I didn't -- I don't know what
19 the structure was of the corporate structure.
20   Q.  Okay.  Now, throughout the entire
21 time you have been chief operating officer,
22 are you aware as to whether or not any person
23 or entity became the general partner of
24 Alexander Capital, LP, during the time that
25 you were -- have been chief operating

Page 177

1            Rocco Guidicipietro
2  officer?
3      A.   No, I am not aware of anybody else.
4      Q.   When you say, "anybody else," does
5  that mean you are aware of somebody or some
6  entity?
7      A.   I am not sure who the general
8  partner was at the time.
9      Q.   Okay.  Are you sure who the general
10 partner is now?
11     A.   Actually I am not.  I am not.
12     Q.   All right.  You are still confused
13 about that?  Is that what you are saying?
14     A.   Yes, on the corporate structure I
15 am not sure who's considered a general
16 partner.
17     Q.   Okay.  Are you aware of the fact
18 that there was a decision in this case by
19 Judge Raycoff in this matter that you are
20 being deposed in?
21          Are you aware that there was a
22 decision issued by him regarding Defendant's
23 motions to dismiss?
24     A.   I do.
25     Q.   Okay.  Did you ever have a chance

Page 178

1            Rocco Guidicipietro
2  to read the opinion?
3      A.   I don't believe so.
4      Q.   All right.  In that opinion, Judge
5  Raycoff makes the following statement:  That
6  "on April 30, 2012, Alexander Capital
7  Holdings, Inc., filed a certificate of
8  dissolution," and then he states, "The office
9  of the secretary of state of Delaware has
10 confirmed that it has no further records
11 concerning the partnership status of
12 Alexander Capital, LP," and this opinion was
13 issued in -- on -- in July of this year,
14 2021, all right.  And then he states that
15 "Delaware law provides that the occurrence of
16 anyone of five specified events triggers the
17 non-judicial dissolution of a limited
18 partnership," and one of those events is
19 "withdrawal of a general partner, unless at
20 the time there's at least one other general
21 partner," and then Judge Raycoff states,
22 "because Defendants have not asserted that
23 Alexander Capital, LP ever filed a
24 certificate naming any other individual or
25 entity as its general partner, the Court

Page 179

1            Rocco Guidicipietro
2  concludes that the dissolution of Alexander
3  Capital Holdings, Inc., triggered Alexander
4  Capital, LP's non-judicial dissolution as a
5  limited partnership as of April 30, 2012."
6          Are you aware that the judge
7  concluded that way in his opinion regarding
8  that issue, or are you learning it for the
9  first time from my reading it to you?
10         MR. WARD:  Objection.
11         Instruct the witness not to answer
12         to the extent it includes
13         communication with counsel.
14         MR. SCHLICHTMANN:  Yes.
15     Q.   I do not want you to divulge any
16 communication with counsel.  I am just asking
17 about your awareness.
18         Were you aware, prior to today,
19 that that was a conclusion that the judge
20 made?
21     A.   Again, it was conversations with
22 counsel.  I am aware there was a decision
23 made.
24     Q.   Okay.  Thank you.  It then says, a
25 "Limited partnership may continue after its

Page 180

1            Rocco Guidicipietro
2  dissolution for winding up purposes only.
3  But Alexander Capital, LP did not stop
4  operations following its legal dissolution as
5  a limited partnership on April 30, 2012."
6  And it -- it -- the judge says it -- the
7  records that he saw "indicates that Alexander
8  Capital, LP was active through at least
9  2019," based on the records that were
10 presented, and that "the report lists nine
11 partners of Alexander Capital, LP, including
12 Nesa Management, and certain officers,
13 including Amato and Guidicipietro," all
14 right?
15         And he then states, "Defendants
16 have presented no records reflecting that
17 Alexander Capital is taking -- has taken the
18 steps necessary to reregister itself as a
19 Delaware limited partnership.  The Court
20 concludes that Alexander Capital, LP has
21 operated since May 1, 2012, as a Delaware
22 partnership, rather than a limited
23 partnership."
24         Now, having -- my having read that
25 opinion to you, what the judge concluded, do

Page 181

1           Rocco Guidicipietro
2   you have any -- can you provide any
3   explanation as to why, after the certificate
4   of dissolution was made of Alexander Capital
5   Holdings, Inc., which was the entity -- the
6   last entity in -- that the Delaware secretary
7   of state was informed was the general partner
8   of Alexander Capital, LP, that no other
9   designation was made from that date, after
10  dissolution of April 30, 2012, through the
11  date of the judge's opinion?
12          Do you have any explanation as to
13  why that was the case?
14      A.  No.
15      Q.  Was it your understanding at any
16  time that the general partner of Alexander
17  Capital, LP had the obligation, under
18  Delaware state law, if Alexander Capital, LP
19  wished to maintain its status as a limited
20  partnership, that it had the obligation to
21  inform the secretary of state's office in
22  Delaware within ninety days regarding any
23  change regarding the status of the general
24  partner?  Were you aware of that at any time?
25      A.  No.

Page 182

1           Rocco Guidicipietro
2       Q.  Are you aware of any financial or
3   business interest that -- that either you or
4   Mr. Amato, as owners of Nesa Management, and
5   those who have been described as having
6   active control of Alexander Capital, LP,
7   since December of 2013 -- can you explain at
8   all why neither Nesa, Mr. Amato, or yourself
9   ever took any steps to inform the secretary
10  of state of Delaware regarding the change in
11  general partnership of Alexander Capital, LP?
12          MR. WARD:  Objection.
13          Calls for speculation.
14      Q.  I don't want you to speculate.
15          Did you understand my question?
16      A.  Yes.
17      Q.  Okay.  Do you have an explanation
18  you can offer as to why no further
19  designation was made by either yourself, Mr.
20  Guidicipietro, or Nesa Management --
21      A.  Do not.
22          MR. WARD:  Objection.  Calls
23          for speculation.
24      Q.  -- to the state of Delaware?
25          You can answer.

Page 183

1           Rocco Guidicipietro
2       A.  Do not, do not have an explanation.
3       Q.  Have you -- are you aware of any
4   communications of any kind between yourself,
5   Mr. Amato, or Nesa Management, LLC, the
6   entity, and Mr. Figliolo, and/or Exitus, LLC,
7   regarding whether or not communications
8   needed to be made to the secretary of state's
9   office of Delaware regarding who was, at any
10  time, the general partner of Alexander
11  Capital, LP?
12      A.  No, I am not aware of.
13      Q.  To this day?
14      A.  Well, up until the filing a couple
15  of days ago.
16      Q.  Okay.
17      A.  No.
18      Q.  Are you aware of any
19  communications, not covered -- not asking for
20  any attorney-client privileged
21  communications.  I am asking communications
22  between yourself, Mr. Guidicipietro --
23  yourself, Mr. Amato, Nesa Management, the
24  entity, Mr. -- and Mr. Figliolo, and/or
25  Exitus, LLC -- are you aware of any

Page 184

1           Rocco Guidicipietro
2   communications between or among those people
3   and entities, regarding whether or not a
4   filing should be made with the secretary of
5   state's office of Delaware, regarding
6   informing the secretary of state as to who
7   the general partner of Alexander Capital, LP
8   was?
9       A.  What time frame?
10      Q.  From 2013 through the present.  And
11  I am not asking for any communications with
12  counsel regarding this.  I am asking for
13  communications that were made between and
14  among yourself, Mr. Amato, Nesa Management,
15  the entity, Exitus LLC, and/or Mr. Figliolo,
16  regarding designating the general partner.
17      A.  No, I am not.
18      Q.  I know you were interrupted, so let
19  me restate the question again, I'm sorry.  I
20  appreciate you had an interruption there.
21      A.  Yes.
22      Q.  Again, I am not asking for any
23  communications covered by the attorney-client
24  privilege, all right?
25          What I am asking is:  Are you aware

Page 185

Rocco Guidicipietro

1    Rocco Guidicipietro
2  of any communications between yourself, Mr.
3  Amato, Nesa Management, LLC, the entity, and
4  Mr. Figliolo, and/or Exitus, LLC, the entity,
5  regarding making a communication to the state
6  of Delaware, secretary of state's office,
7  regarding who the general partner of
8  Alexander Capital, LP was at any particular
9  time?
10     A.  No, I do not.  I don't remember any
11  communications between us.
12     Q.  Okay.  And did you -- and just to
13  be clear, do you remember any communications
14  between -- and that means, you know, oral,
15  written, e-mail, you know, nonverbal.  It
16  doesn't matter.  Any communications between
17  yourself and Mr. Amato concerning whether or
18  not to make a communication to the secretary
19  of state's office of Delaware, regarding who
20  the general partner is of Alexander Capital,
21  LP, at any time?
22     A.  Up until a couple of days ago, that
23  was it.  Nothing prior.
24     Q.  And so until a couple days ago,
25  that's the first time you had discussion with

Page 186

1       Rocco Guidicipietro
2  Mr. Amato; is that correct?
3     A.  Yes.
4     Q.  Okay.  And did you also have
5  discussions a couple of days ago, either
6  yourself or Mr. Amato, with Mr. Figliolo, or
7  anyone else representing Exitus, and I am not
8  including attorneys?
9     A.  Well, Mr. Figliolo is an attorney,
10  so that's privileged.
11        MR. SCHLICHTMANN:  Well,
12     Bryan, are we asserting a privilege
13     with Mr. Figliolo?
14        MR. WARD:  No.  You can
15     discuss anything you had -- any
16     discussions you had with Mr.
17     Figliolo.
18     Q.  Okay, so I want to be very clear
19  and, again, I want to be very sensitive to
20  the attorney-client communications, all
21  right?  I am not in any way asking for those.
22  What I am asking is:  Do you -- you said you
23  had communications with Mr. Amato just a
24  couple of days ago.  Now I am asking:  Are
25  you aware that -- that either you or Mr.

Page 187

1       Rocco Guidicipietro
2  Amato, together or alone, had any
3  communications with Mr. Figliolo, regarding
4  informing the secretary of state's office,
5  concerning the -- who the general partner of
6  Alexander Capital, LP was?
7        MR. WARD:  Objection.
8        Calls for speculation.
9     A.  I can't answer for Mr. Amato.  I
10  can answer for myself.  I did not.
11     Q.  Okay.  Are you aware as to whether
12  anyone else, other than yourself, had any
13  such communications with Mr. Figliolo, and I
14  am not including communications with
15  attorneys?
16     A.  Then the answer is no.
17     Q.  Okay.  I am just going to -- I
18  still have this Exhibit 129 on the screen,
19  right?  You can see it, Mr. Amato?  Mr.
20  Guidicipietro, excuse me.
21        Is that correct?
22     A.  Yes.
23     Q.  Okay.  All right.  Now I will just
24  go to a different portion of the letter.
25  It's long.  It has several exhibits attached

Page 188

1       Rocco Guidicipietro
2  to it.  I am going to just show you a FINRA
3  letter dated September 1, 2015, that was
4  attached to this letter, this exhibit, and in
5  it, FINRA, in a letter dated September 1,
6  2015, to Alexander Capital, care of a law
7  firm, is -- states that "On September 1st,
8  the staff of FINRA's Department of
9  Enforcement advised you that it made a
10  preliminary determination to recommend that
11  disciplinary action be brought against
12  Alexander Capital, LP."  Do you see that?
13     A.  Yes.
14     Q.  Okay.  And I believe you did say
15  you were aware, in 2015, that FINRA did
16  notify Alexander Capital that it was
17  intending to bring an investigatory action
18  against the firm in 2015.
19        Did I understand your testimony
20  correctly?
21     A.  Yes.
22     Q.  Okay.  Now, in -- a response was
23  made by counsel for Alexander Capital, which
24  is attached to this exhibit, and I just want
25  to draw your attention to one part of it.

Page 189

1                Rocco Guidicipietro
2  Are you aware of the fact that in between
3  2012 and 2013, that you and Mr. Amato wished
4  to acquire an interest in Alexander Capital,
5  LP?  Are you aware of that?
6       A.  I don't remember the exact dates
7  but --
8       Q.  That sound right?
9       A.  Yes.
10      Q.  And do you remember that that
11  process -- do you have any memory that that
12  process took a long period of time, in order
13  to get approval from FINRA for a change in
14  ownership of Alexander Capital, LP?
15      A.  CMAs take a lot of time, yes.
16      Q.  You remember that particular one
17  did; is that right?
18      A.  Yes, that one took a long time.
19      Q.  Was it your understanding that the
20  change in ownership approval that was being
21  sought at that time was Mr. Figliolo, through
22  Exitus, was seeking approval for his
23  purchasing 75.1 percent -- or excuse me --
24  purchasing 100 percent ownership from Ms.
25  Lanaia?

Page 190

1                Rocco Guidicipietro
2       A.  I -- I don't remember which one was
3  filed when.
4       Q.  All right.  Do you -- do you have a
5  memory that in order for Exitus or Mr.
6  Figliolo -- owned by Mr. Figliolo, in order
7  for it to acquire ownership interest from Ms.
8  Lanaia, which was greater than 25 percent,
9  that it had to obtain the approval from FINRA
10  for that change?
11      Are you aware of that at that time?
12      A.  Yes.
13      Q.  Were you aware -- okay.  And did
14  you -- to your knowledge, did you and Mr.
15  Amato and/or the entity Nesa, either one of
16  you individually or together or in
17  combination, were you part of the FINRA
18  approval process regarding the change in
19  ownership from Mr. Lanaia at that time?
20      A.  I don't recall.  We were at the
21  firm, so we were probably in there somewhere,
22  but I don't -- I don't know in what capacity.
23      Q.  All right.  Now, this is before
24  December 2013.  This is between 2012 and
25  before December 2013, when you and Mr. Amato

Page 191

1                Rocco Guidicipietro
2  took over active control of the firm, as we
3  previously discussed.  I am asking that
4  particular period.
5       Do you have a memory as to whether
6  you, Mr. Amato, Nesa Management, together, in
7  combination, were in any way involved with
8  Mr. Figliolo and Exitus in trying to obtain
9  approval by FINRA for a change in ownership
10  from Ms. Lanaia?
11      A.  I don't understand your question.
12  It's two questions in one.
13      Q.  Okay.  From 2012, before you and
14  Mr. Amato took over active control of the
15  firm, were you aware that there was an
16  application made to FINRA for approval of
17  change of ownership from Ms. Lanaia?
18      A.  Yes.
19      Q.  And who, to your knowledge, was
20  involved in seeking that change in ownership?
21      A.  Exitus.
22      Q.  Was it only Exitus?
23      A.  He was the one taking -- looking to
24  own 100 percent, yes.
25      Q.  All right.  It was not you and Mr.

Page 192

1                Rocco Guidicipietro
2  Amato and/or Nesa?
3       A.  Not involved in taking ownership.
4       Q.  Okay.  Or seeking approval from
5  FINRA during that period?
6       A.  Correct.
7       Q.  All right.  Now, after -- now, at
8  some point Mr. -- Exitus was approved to take
9  over some portion of ownership from Ms.
10  Lanaia; is that correct?
11      A.  Yes.
12      Q.  All right.  And do you remember the
13  percentage?  Was it 100 percent?
14      A.  At the end of the application, he
15  owned 100 percent.
16      Q.  Now, did he -- did Mr. Figliolo, to
17  your memory, either directly or through
18  Exitus, receive all of the ownership interest
19  -- was approved to receive all of the
20  ownership from Ms. Lanaia?
21      A.  Yes, he was approved to receive all
22  of it.
23      Q.  And it was after he received that
24  approval and received that ownership -- was
25  there then an agreement entered into between

ROCCO GUIDICIPIETRO                                    September 29, 2021
JOHN J. AQUINO -against- ALEXANDER CAPITAL              193-196

Page 193

1           Rocco Guidicipietro
2   yourself, Mr. Amato, and/or involving Nesa,
3   regarding purchasing some portion of the
4   ownership interest that Mr. Figliolo had just
5   acquired from Ms. Lanaia?
6       A.  Yes, Nesa acquired a portion.
7       Q.  Okay.  And is that the 24.9 percent
8   interest that it acquired at that time?
9       A.  Yes.
10      Q.  Okay.  And after the acquisition of
11  that interest by Nesa, the 24.9 percent, it's
12  fair to say that you and Mr. Amato took over
13  active control of Alexander Capital, LP; is
14  that correct?
15      A.  Yes.
16      Q.  All right.  Now, it says in this
17  letter from counsel for Alexander Capital, it
18  says, "During the time period" -- you see
19  this full paragraph here?  It's on page 3 of
20  the letter.  Subsection is titled "Alexander
21  Capital, LP."
22          Do you see that?
23      A.  Yes.
24      Q.  Okay.  It says, "Alexander Capital,
25  LP, is a New York-based brokerage firm

Page 194

1           Rocco Guidicipietro
2   founded in 1995.  It has been a member of
3   FINRA since 1996."  Do you see that?
4       A.  Yes.
5       Q.  Okay.  And then it says that
6   "During the time period covered by the
7   staff's investigation," and that time period
8   was before 2012, "the firm was owned by,
9   among others, Allan Boxer, and HK Landis
10  Capital, LLC."  Do you see that?
11      A.  Yes.
12      Q.  Is that your understanding?
13      A.  Yes.
14      Q.  Okay.  It says, "In 2012, Exitus,
15  LLC, which is owned by Joseph Figliolo,
16  became a silent partner in the firm."  Do you
17  see that?
18      A.  Yes.
19      Q.  Is that consistent with your
20  understanding of what occurred in 2012?
21      A.  Yes.
22      Q.  And is that in -- regarding his
23  purchasing from Ms. Lanaia, after gaining
24  FINRA approval, the -- Ms. Lanaia's ownership
25  interest in Alexander Capital, LP?

Page 195

1           Rocco Guidicipietro
2       A.  I am not sure if that's before or
3   after.
4       Q.  "Before or after what" now?
5       A.  Before or after he had 100 percent
6   control.
7       Q.  That in 2012 he became a silent
8   partner in the firm?  Is that what you are
9   saying?
10      A.  Yes.
11      Q.  In other words -- Well, what's your
12  understanding of when he became a silent
13  partner in regards to his purchase or
14  acquisition of an ownership interest?
15          Was he a silent partner before an
16  acquisition of ownership interest?
17      A.  He had a small percentage.
18      Q.  Of Alexander Capital, LP?
19      A.  Of Alexander Capital, LP.
20      Q.  Okay.  Before he acquired Ms.
21  Lanaia's 100 percent ownership; is that what
22  you are saying?
23      A.  Yes.
24      Q.  Okay.  "In December 2013, two years
25  after the period covered by the staffs's

Page 196

1           Rocco Guidicipietro
2   investigation, Nesa management, LLC, which is
3   owned by Joseph Amato and Rocco
4   Guidicipietro, purchased an interest in the
5   firm."
6           Is that your understanding, that
7   that occurred?
8       A.  Yes.
9       Q.  And it says, "Mr. Amato and
10  Guidicipietro, neither of whom were at the
11  firm in 2010, 2011, are now active owners and
12  partners in the firm."
13          Do you see that statement?
14      A.  I see the statement.
15      Q.  Okay.  As of 2015 -- and this is
16  dated September, this letter from counsel for
17  Alexander Capital, it states -- it make a
18  statement that they are -- that you both, Mr.
19  Amato and yourself, are, quote, "now active
20  owners and partners in the firm."  Do you see
21  that?
22      A.  Yes, I see that.
23      Q.  Is it your understanding that that
24  was a true statement at the time?
25      A.  No, it's not a true statement.

Page 197

Rocco Guidicipietro

2    Q.    What about it is not true?
3    A.    We are not owners of the firm.  We
4  were indirect owners through Nesa.  That
5  sentence is out of context.
6    Q.    I'm sorry?
7    A.    The sentence is out of context.
8  Nesa was --
9    Q.    All right, so if we -- so is it
10  fair to say that the statement is true, that
11  you and Mr. Amato, through your ownership of
12  Nesa, became the active owners and partners
13  in the firm?
14        Is that what you are saying?
15    A.    Correct.
16    Q.    All right.  Okay.  Now, to your
17  knowledge, once you and Mr. Amato, through
18  Nesa, became the active owners and partners
19  of Alexander Capital, LP, Mr. Figliolo,
20  through Exitus, had the greater share of
21  ownership than the two of you; is that
22  correct?
23    A.    That's correct.
24    Q.    All right.  And after you took over
25  the active ownership and partnership in the

Page 198

Rocco Guidicipietro

2  firm, did Mr. Figliolo either individually or
3  through Exitus or some other way, contribute
4  capital to Alexander Capital, LP, at any
5  time, after December -- you and Mr. Amato,
6  through Nesa, became the active owners and
7  partners in the firm?
8        MR. WARD:  Objection.
9        Misleading and misstates the
10        record.
11        MR. SCHLICHTMANN:  I don't
12        want to do either one of those
13        things.
14    Q.    After December of 2013, or after
15  you and Mr. Amato, through Nesa, became
16  active owners and partners in the firm, to
17  your knowledge, did Mr. Figliolo, either as
18  an individual, through Exitus, or any other
19  person or entity, did he contribute capital
20  directly or indirectly to Alexander Capital,
21  LP?
22    A.    Not that I --
23        MR. WARD:  Objection.
24        Calls for speculation.
25    Q.    You can answer.

Page 199

Rocco Guidicipietro

2    A.    Not that I recall.
3    Q.    All right.  And is that your
4  understanding from that moment until now,
5  that Mr. Figliolo either directly or
6  indirectly has not made any capital
7  contributions to Alexander Capital, LP?
8    A.    Not that I remember.
9    Q.    Okay.  Now, do you, Mr.
10  Guidicipietro, do you have an understanding
11  as to whether Alexander Capital, after you
12  became chief operating officer, okay, after
13  you became chief operating officer, which
14  occurred in, I believe, 2012, all right, are
15  you -- did you have an understanding as to
16  whether Alexander Capital, LP, at the time
17  you became chief operating officer, through
18  2012 and 2013, now just that period of time,
19  it undertook a firm commitment offering for
20  any company, to your knowledge?
21    A.    To my knowledge, no.
22    Q.    In 2014, to your knowledge, did
23  Alexander Capital, LP undertake any firm
24  commitment offering for any company during
25  2014?

Page 200

Rocco Guidicipietro

2    A.    Not that I recall, no.
3    Q.    2015, to your knowledge, did
4  Alexander Capital, LP undertake any firm
5  commitment offering for any company during
6  2015?
7    A.    Not that I recall.
8    Q.    In 2016?
9    A.    Not that I recall.
10    Q.    What's the first time that you
11  recall Alexander Capital undertaking any firm
12  commitment offering for any company?
13    A.    I couldn't tell you.  I don't know.
14    Q.    Was it after 2016?
15    A.    I don't know.
16    Q.    Was it after receiving authority
17  from FINRA to conduct firm commitment
18  offerings?
19    A.    I don't know when the first one
20  was.
21    Q.    All right.  But you testified
22  earlier that you received approval from FINRA
23  in 2017; is that correct, approval to
24  conduct -- let me just make sure.
25        Did I understand your testimony

Page 201

Rocco Guidicipietro

1 previously that in 2017, Alexander Capital
2 did receive approval from FINRA to conduct
3 firm commitment offerings?  Is that correct?
4    A.  Yes, to do firm commitment
5 underwriting.
6    Q.  Okay.  And is it -- okay.  And to
7 your knowledge, did Alexander Capital, LP,
8 undertake any firm commitment offerings,
9 prior to its receiving that approval in 2017
10 from FINRA?
11    A.  To my recollection, no, we didn't
12 take any on.
13    Q.  And in -- based on your knowledge
14 of the practices and procedures of Alexander
15 Capital, LP, would it have been appropriate
16 for Alexander Capital, LP, prior to receiving
17 its authorization in December of 2017, from
18 FINRA, to have participated in a firm
19 commitment offering?
20    A.  We always use best practices.  We
21 -- we wouldn't have took any on, I believe.
22    Q.  Would not have taken on any firm
23 commitment offering?
24    A.  Not while we were in the process --
25

Page 202

Rocco Guidicipietro

1 not until we were approved.
2    Q.  Now, in -- that was -- chief
3 operating officer, in that position, which
4 you have held since 2012, does that position
5 allow you to become familiar with the
6 financial operations of the company?
7    A.  Financial operations, yes.
8    Q.  Okay.  And are you familiar with
9 focus reports?
10    A.  Yes.
11    Q.  All right.  And could you say what
12 -- could you describe for us what a "focus
13 report" is?
14    A.  A monthly report on the financial
15 status of the firm.
16    Q.  And is the firm, to your knowledge,
17 required to file monthly focus reports
18 regarding the status -- financial status of
19 the firm?
20    A.  Some are monthly, some are
21 quarterly, yes.
22    Q.  Is it also required to file an
23 annual one?
24    A.  Yes.
25

Page 203

Rocco Guidicipietro

1    Q.  To your knowledge, are the annual
2 focus reports made available publicly?
3    A.  I am not sure.
4    Q.  All right.  In -- were you involved
5 -- did you have any involvement or
6 responsibilities or duties, regarding the
7 creation of those focus reports you just
8 described?
9    A.  No.
10    Q.  Not at all?
11    A.  Not at all.
12    Q.  Okay.  Would you have any...were
13 you -- to your knowledge, were you the person
14 that was supposed to be contacted regarding
15 the focus reports, at any time?
16    A.  They would contact FINRA, if there
17 were any questions.
18    Q.  But not you?
19    A.  Not me.
20    Q.  Based on your knowledge of the
21 financial operations or financial status of
22 the firm in 2014, and 2015, what was your
23 understanding as to whether Alexander
24 Capital, LP, based on the state of its
25

Page 204

Rocco Guidicipietro

1 finances, was financially able to undertake a
2 firm commitment underwriting of up to $20
3 million?
4    A.  What's the question?
5    Q.  What was your understanding as to
6 whether Alexander Capital, LP had the
7 financial ability to underwrite a firm
8 commitment up to $20 million during 2014 and
9 2015?
10    A.  Did it have such a financial
11 ability or it did not have such a financial
12 ability?
13    Q.  That's a double-edged question.
14 Because did it have it in the firm, or could
15 it have the ability to do it?
16    Q.  I am talking about the firm itself,
17 Alexander Capital, LP.
18    A.  Capital could be added at any time.
19    Q.  By Alexander Capital, LP?
20    A.  By any of its owners.
21    Q.  That includes yourself and Amato?
22    A.  Myself.
23    Q.  And Amato?
24    A.  Amato, or you can get approval from
25

Page 205

1              Rocco Guidicipietro
2    FINRA to add capital from anybody.
3        Q.   Okay.  But I am specifically asking
4    regarding the finances of Alexander Capital,
5    LP, in 2014 and 2015.  Did you have -- what
6    was your understanding as to whether
7    Alexander Capital, LP, regarding its finances
8    during that period of time, had the financial
9    ability -- I am not asking about legal
10   authority.  I am asking only the financial
11   ability.
12         Did it have the financial ability
13   during that time to guarantee a firm
14   commitment offering up to $20 million?
15       A.   You could add the capital, so, yes.
16       Q.   And were you -- did you have an
17   understanding as to the source -- the
18   potential sources of such capital to
19   Alexander Capital, LP during 2014 and 2015?
20       A.   I will not speculate on who would
21   put capital in the firm, but we had the
22   ability.
23       Q.   Did you and Mr. Amato, by
24   yourselves, have such capacity at that time?
25       A.   Not personally, no.

Page 206

1              Rocco Guidicipietro
2        Q.   Did Nesa Management, as an entity,
3    have that capacity?
4        A.   No.
5        Q.   Did Mr. Figliolo, individually or
6    through Exitus, have such capacity?
7        A.   I will not answer for him.
8        Q.   Did you have any understanding as
9    to whether he could?
10       A.   Again, there's multiple sources of
11   financial -- the brokers do it -- the
12   broker-dealers do it all the time.
13       Q.   I appreciate that, but specifically
14   I am just asking your understanding as to
15   whether or not Mr. Figliolo, as an individual
16   or through Exitus, did you have an
17   understanding as to whether he could provide
18   such capital?
19         Did you have such an understanding?
20       A.   I didn't have an understanding.  We
21   had no agreements or anything in place at
22   that time.
23       Q.   Now, in the application it
24   mentioned Mr. Gazdak, Mr. Carlin, and Mr.
25   Feinman as people who could potentially make

Page 207

1              Rocco Guidicipietro
2    capital contributions to the firm.  Do you
3    remember that?
4        A.   Yes.
5        Q.   Was it your understanding, in 2015,
6    that Mr. Carlin had the capacity to provide
7    such capital to underwrite a firm commitment
8    offering up to $20 million, in 2014, 2015?
9        A.   Again, you are putting it on one
10   person.  You can have twenty --
11       Q.   I understand, but I am asking --
12       A.   Yes.
13       Q.   I am asking specifically.  I know
14   we are talking over each other.  I apologize.
15   I am asking --
16       A.   I do as well.
17       Q.   It's all right.  It's late in the
18   day.  I appreciate it.
19         Referring to Mr. Carlin, himself,
20   did you have an understanding as to whether
21   he had the capacity to guarantee a firm
22   commitment offering up to $20 million --
23            MR. WARD:  Objection.
24       Vague.
25       Q.   -- in 2015?

Page 208

1              Rocco Guidicipietro
2            MR. WARD:  I thought you
3    were done with the question.
4            MR. SCHLICHTMANN:  That's
5    all right.  No problem.
6        A.   Yes.
7        Q.   You can answer.  He did have the
8    capacity?
9        A.   Yes.
10       Q.   Mr. Carlin himself?
11       A.   Yes.
12       Q.   Okay.  And how about Mr. Feinman?
13       A.   Yes.
14       Q.   And how about Mr. Gazdak?
15            MR. WARD:  Objection as to
16       vague.
17       Q.   I want to be very clear.  I am
18   trying to shorten it a little bit, but I have
19   to be complete.
20         I am asking your understanding in
21   2014, 2015, as to whether or not each of
22   these individuals I am going to name, had the
23   financial capacity, on their own, to
24   underwrite a -- to provide the capital for a
25   firm commitment offering up to $20 million,

Page 209

Rocco Guidicipietro

1    all right? That's what I am going to be
2    asking. And I will be asking the
3    individuals, all right? So I don't have to
4    keep repeating the question.
5           MR. WARD: Just an objection
6       as to vague for each of those.
7           MR. SCHLICHTMANN: I don't
8       want to be vague. Then, I will
9       repeat it.
10          MR. WARD: No, no, no, it's
11      not that you have to repeat it.
12      It's vague as to the overall
13      question.
14          MR. SCHLICHTMANN: Okay,
15      well, I will try and --
16          MR. WARD: You can use just
17      the names, but understand that
18      objection as to vague.
19          MR. SCHLICHTMANN: Okay, all
20      right.
21   Q.  Did you have an understanding, in
22   2014 and 2015, as to whether or not Mr.
23   Carlin had the financial capacity to
24   contribute capital to guarantee a firm

Page 210

Rocco Guidicipietro

1    commitment offering up to $20 million?
2           MR. WARD: Objection.
3       Vague.
4    Q.  Any kind of capital?
5           MR. WARD: Same objection.
6    A.  Part capital, yes.
7    Q.  He couldn't do all the capital, but
8    he could do some of it? Is that what you are
9    saying?
10   A.  I don't know. I don't know his
11   complete financial ability.
12   Q.  Okay. How about for Mr. Feinman --
13   same answer?
14   A.  Same thing. Same answer.
15          MR. WARD: Same objection.
16   Q.  How about Mr. Gazdak?
17   A.  Same answer.
18   Q.  All right. I asked you about Mr.
19   Gazdak, right?
20   A.  Yes.
21   Q.  Okay. Very good. And it's the
22   same answer, correct?
23   A.  Yes.
24   Q.  Now, between yourself, Mr. Amato,

Page 211

Rocco Guidicipietro

1    Mr. Carlin, Mr. Feinman, and Mr. Gazdak, did
2    you have an understanding whether all of you
3    together could provide the capital to
4    guarantee a firm to provide the capital, so
5    that a firm commitment offering up to $20
6    million could occur?
7    A.  Yes.
8    Q.  Together you did; that was your
9    understanding?
10   A.  If we needed to, we could.
11   Q.  Okay. And to your knowledge,
12   during 2014 and 2015, was there any agreement
13   among yourself, Mr. Amato, Mr. Carlin, Mr.
14   Gazdak, and Mr. Feinman, that you would
15   contribute to a firm commitment -- that you
16   would -- would contribute capital, up to $20
17   million, to -- so that Alexander Capital, LP
18   could underwrite a firm commitment offering
19   up to $20 million?
20          Was that your understanding during
21   that time?
22   A.  You don't need $20 million, but
23   there was no understanding on a dollar
24   amount.

Page 212

Rocco Guidicipietro

1    Q.  Now, when you say, "you don't need
2    $20 million," what do you mean by that?
3    A.  You don't need $20 million to write
4    a $20 million dollar IPO.
5    Q.  Okay. Can you explain why that's
6    the case?
7           What's your understanding as to why
8    that's the case?
9    A.  It's 30 percent of the 20 million
10   is 6 million, minus fees. So you would need
11   about $5 million to do a $20 million deal.
12   And that's if you did it alone. If you
13   brought another broker-dealer on, then, you
14   would have to only underwrite 10 million. If
15   you brought four broker-dealers on, you only
16   underwrite 5 million. So there's other ways
17   to get the deal done.
18   Q.  Okay.
19   A.  You -- we can come up with no
20   capital and get the deal done. Even though I
21   am not supposed to explain things but --
22   Q.  I appreciate very much your
23   explaining that to us. Okay. Now, I am
24   going to show you --

Page 213

1              Rocco Guidicipietro
2          MR. WARD:  It's been another
3   hour.  Should we maybe take another
4   break?
5          MR. SCHLICHTMANN:  Yes,
6   absolutely.
7          MR. WARD:  Rocco, five
8   minutes?
9          MR. SCHLICHTMANN:
10   Absolutely.
11          THE VIDEOGRAPHER:  Off the
12   record?  Off the record.  The time
13   is 3:27 p.m.
14          (Whereupon, a recess was
15   taken at this time.)
16          THE VIDEOGRAPHER:  Time is
17   now -- we are now back on record.
18   The time is 3:38.
19   BY MR. SCHLICHTMANN:
20      Q.  I am going to show you a document,
21   all right.  Share screen.  All right.  Share.
22   All right.  Do you see on the screen an
23   annual audited report?  Do you see that?
24      A.  Yes.
25      Q.  Okay.  And this is a report for the

Page 214

1              Rocco Guidicipietro
2   period beginning January, 1, 2013 and ending
3   in December, 31, 2013.  Do you see that?
4      A.  Yes.
5      Q.  And the name of the broker-dealer
6   is Alexander Capital, LP.  Do you see that?
7      A.  Yes.
8      Q.  With a principal address of 17
9   State Street.
10          Now, is this a document that you
11   recognize as an annual focus report that was
12   filed on behalf of the company?
13      A.  That's at -- audit financials.
14   Annual audited financials.
15      Q.  Yes.  And do you recognize that as
16   the type of document you're familiar with of
17   being filed on a regular basis by Alexander
18   Capital?
19      A.  No, this is done once a year.
20      Q.  Okay.  As a document that's filed
21   once a year, is it familiar to you, by
22   looking at it?
23      A.  Yes.
24      Q.  Okay.  Now, it says here, "name and
25   telephone number of person to contact in

Page 215

1              Rocco Guidicipietro
2   regard to this report," as yourself.  Do you
3   see that?
4      A.  Yes, that's -- that's a tax audited
5   report, not a focus report.
6      Q.  Okay.  So you had involvement in
7   these -- these annual tax audit reports?
8      A.  No, we had a CPA firm that does
9   them, but if there's any problems, they
10   contact me because I'm the COO.
11      Q.  Okay.  And -- and it's submitted to
12   the United States Securities and Exchange
13   Commission, correct?
14      A.  Yes.
15      Q.  So it's part of their regulatory
16   requirements of your membership in FINRA to
17   file these on an annual basis; is that
18   correct?
19      A.  It's an SEC requirement.
20      Q.  An SEC requirement, yes?
21      A.  Yes.
22      Q.  Okay.  Now, and this particular
23   document, which is Plaintiff's Exhibit 147,
24   you were the one who made an oath or
25   affirmation concerning it.  Do you see that

Page 216

1              Rocco Guidicipietro
2   here?
3      A.  Yes.
4      Q.  "To the best of your knowledge and
5   belief, the accompanying financial statement
6   and supporting schedules pertaining to the
7   firm of Alexander Capital, LP, as of December
8   31, 2013, are true and correct."  Do you see
9   that?
10      A.  Yes.
11      Q.  And that's something you signed.
12   You recognize your signature?
13      A.  Yes.
14      Q.  All right.  And it says what this
15   report contains, and it checks various
16   things.  The "facing page," "statement of
17   financial conditions," "statement of income
18   loss," "statement of changes in financial
19   condition," "statement of changes in
20   stockholders equity or partners or sole
21   proprietors capital."
22          Do you see that?
23      A.  Yes.
24      Q.  Okay.  "Computation of net
25   capital."  Do you see that?

Page 217

                    Rocco Guidicipietro
1
2    A.  Yes.
3    Q.  Okay.  And in this report, it
4  contains a statement of financial condition
5  as of December 31, do you see that, 2013?
6    A.  Yes.
7    Q.  And it has "notes to financial
8  statements."
9        Do you see that?
10   A.  Yes.
11   Q.  Okay.  And it has -- the statement
12 of financial condition shows cash on hand in
13 December 31, of 2013, of $20,000.  Do you see
14 that?
15   A.  Yes.
16   Q.  And a receivable from and deposit
17 with clearing broker of $1,205,931; is that
18 right?
19   A.  I see the number.
20   Q.  My question is:  Do you see that
21 the cash that it estimates for December 31,
22 2013, is $1,205,931?
23   A.  Yes.
24   Q.  And it says that the partners --
25 the liabilities are accounts payable of

Page 218

                    Rocco Guidicipietro
1
2  1,027,779, for a total liabilities of
3  $1,027,779.
4        Do you see that?
5    A.  Yes.
6    Q.  And partners equity of $329,537; do
7  you see that?
8    A.  Yes.
9    Q.  Is that in accordance with your
10 understanding of the financial condition of
11 Alexander Capital, LP at the end of 2013?
12   A.  If it's on that report, yes.
13   Q.  Okay.  And then it just -- it makes
14 some statements in here.  It says, "Alexander
15 Capital, LP is a New York Limited partnership
16 formed in March 1996."  Do you understand
17 that that is not true, that, in fact,
18 Alexander Capital, LP is a Delaware -- was
19 registered as a Delaware limited partnership
20 in 1995 or -6?
21       Is that your understanding?
22   A.  That's my understanding now, yes.
23   Q.  Okay.  All right.  It says, "It's a
24 registered broker-dealer with the SEC, and is
25 a member of Financial Industry Regulatory

Page 219

                    Rocco Guidicipietro
1
2  Authority, FINRA."  And it states that -- it
3  says, "The company has a verbal agreement for
4  a sublease of office space located at 17
5  State Street."
6        Do you see that?
7    A.  Yes.
8    Q.  "Is on a month-to-month basis with
9  Vestus Asset Management, a company controlled
10 by one of the partners."  Do you see that?
11   A.  Yes.
12   Q.  Who is your understanding is --
13 which partner, in 2013, controlled Vestus
14 Asset Management?
15   A.  Vestus Asset Management, it wasn't
16 a partner at Alexander Capital.
17   Q.  Go ahead.
18   A.  Yeah, Vestus was an old company
19 that had the lease at 17 State Street.
20   Q.  Okay.  And was one of the partners
21 Alexander Capital, LP in any way involved
22 with Vestus at that time?
23   A.  No.
24   Q.  Okay.  It also states under
25 "regulatory net capital requirements" -- do

Page 220

                    Rocco Guidicipietro
1
2  you see that?
3    A.  Yes.
4    Q.  That "the company is subject to the
5  SEC uniform net capital rule."  Do you see
6  that?
7    A.  Yes.
8    Q.  And that "requires the company to
9  maintain minimum net capital."  Do you see
10 that?
11   A.  Yes.
12   Q.  And were you familiar with the net
13 capital requirements of -- that pertained to
14 Alexander Capital, LP?
15   A.  At that time?
16   Q.  Yes.
17   A.  Yes.
18   Q.  All right.  And what was your
19 understanding as to why it had to have net
20 capital requirements?
21   A.  It's an SEC and FINRA requirement.
22   Q.  Did you have an understanding, at
23 that time, as to why the SEC would require
24 Alexander Capital, LP to have certain levels
25 of net capital available?

Page 221

1              Rocco Guidicipietro
2      A.   It depends on what type of
3   broker-dealer it is.
4      Q.   All right.  And when you say, "what
5   type," what is that referring to?  What types
6   are there?
7      A.   We -- Alexander Capital, LP was a
8   $5,000 broker-dealer.
9      Q.   Okay.  And what's a five -- what
10  was your understand of $5,000 broker-dealer,
11  in 2013?
12     A.   It needed capital of 5,000, plus
13  any aggregated debt.  So it usually -- it
14  needed about 15-, $20,000.
15     Q.   All right.  And was that -- and as
16  a $5,000 broker-dealer, what was your
17  understanding as to the type of underwriting
18  activities it could engage in as a $5,000
19  broker-dealer, in 2013?
20     A.   It could participate in syndicate
21  selling group.
22     Q.   For what types of underwriting?
23     A.   For most types of underwriting.
24     Q.   Did that involve firm commitment
25  underwriting?

Page 222

1              Rocco Guidicipietro
2      A.   At a $5,000 BD, you couldn't
3   underwrite, you could participate.
4      Q.   And how could you participate?
5      A.   You would get stock from -- another
6   broker-dealer would be the lead underwriter
7   and then you would participate.
8      Q.   Participate in what way?  What
9   would be -- what was your understanding of
10  the type of participation you could have in
11  such an underwriting?
12     A.   You can, you know, buy stock and
13  sell it to customers.
14     Q.   Could you be part of the -- could
15  you be an underwriter that could underwrite
16  the firm commitment offering?
17         Was it your understanding that you
18  could or couldn't?
19     A.   You couldn't underwrite.
20     Q.   I'm sorry?
21     A.   You could not underwrite.
22     Q.   A firm commitment offering?
23     A.   Right.
24     Q.   Is that correct?  I am just making
25  clear I understand the answer.  Is that --

Page 223

1              Rocco Guidicipietro
2      A.   You could not underwrite a firm
3   commitment offering.
4      Q.   Okay, thank you.  All right.  Now,
5   I will stop share.  All right.  Okay.  Now,
6   share.  Share.  Share.  All right.  I am now
7   putting on -- and I did identify that last
8   exhibit, correct?  Is that right?  Yes.
9   Thank you.
10         And this is now Plaintiff's Exhibit
11  148 that's on the screen, and this is the
12  same type of report for the year ending --
13  from January 1, 2014, to 12/31/2014.  Do you
14  see that?
15     A.   Yes.
16     Q.   Okay.  And it's -- it says, "the
17  name and telephone number of the contact
18  person regarding this report" is yourself.
19  Do you see that?
20     A.   Yes.
21     Q.   Okay.  And again it has an oath or
22  affirmation -- oath or affirmation by
23  yourself, that "the company financial
24  statement and supporting schedules pertaining
25  to the firm of Alexander Capital, LP, as of

Page 224

1              Rocco Guidicipietro
2   December 31, 2014, are true and correct."  Do
3   you see that?
4      A.   Yes.
5      Q.   And you recognize your signature on
6   this document?
7      A.   Yes.
8      Q.   And this one says that it has -- in
9   2014, it has a "statement of financial
10  conditions," "statement of income loss,"
11  "statement of cash flows," "statement of
12  changes in stockholders equity or partners
13  sole proprietors capital," "computation of
14  net capital," "computation for determination
15  of reserve requirements pursuant to a rule."
16  Do you see all of that?
17     A.   Yes.
18     Q.   Okay.  And -- and this report, it
19  states, "As of the end of 2014, the cash on
20  hand was $45,142.  Do you see that?
21     A.   Yes.
22     Q.   The receivable from and deposit
23  with clearing broker is listed as $487,200,
24  right?
25         Do you see that?

Page 225

1              Rocco Guidicipietro
2      A.  Yes.
3      Q.  It says the total assets as of that
4  time was $675,361.  Do you see that?
5      A.  Yes.
6      Q.  It then talks about accounts
7  payable of $458,572.  Do you see that?
8      A.  Yes.
9      Q.  And total liabilities of $458,572.
10       Do you see that?
11     A.  Yes.
12     Q.  Members equity of $216,789.  Do you
13  see that?
14     A.  Yes.
15     Q.  And is that your understanding,
16  that fairly and accurately depicts the
17  condition of the Alexander Capital, LP at the
18  end of 2014?
19     A.  Yes.
20     Q.  And in this document, this 2014
21  filing, it states, "The company has a verbal
22  agreement for the sublease of office space
23  located at 17 State Street, which is on a
24  month-to-month basis with Nesa Management,
25  LLC, a company controlled by one of the

Page 226

1              Rocco Guidicipietro
2  partners."  Do you see that?
3      A.  Yes.
4      Q.  And it says, "The sublease provides
5  for payment of, approximately, $60,000 a
6  month."
7          Do you see that?
8      A.  Yes.
9      Q.  Okay.  Now, was it your
10  understanding that in 2014, that there was a
11  change in the company that was providing the
12  lease, leasing the space to Alexander
13  Capital, LP?
14     A.  Yes.
15     Q.  And Nesa Management, as of 2014,
16  became the lessor of that space at 17 State
17  Street, 5th Floor, in New York, New York?
18     A.  Yes.
19     Q.  Okay.  And that is -- that this
20  occurred after you and Mr. Amato, through
21  Nesa, became the controlling -- the
22  controlling partners of Alexander Capital, as
23  of December 23rd, 2014; is that correct?
24     A.  No, we weren't controlling
25  partners.  We were indirect owners through

Page 227

1              Rocco Guidicipietro
2  Nesa and we were operational officers of the
3  firm.
4      Q.  Okay.  And Nesa Management was the
5  lessor to Alexander Capital, LP, in 2014?
6      A.  Yes.
7      Q.  And Nesa Management also had a
8  partnership interest in Alexander Capital, LP
9  at that time, correct?
10     A.  At that time, yes, I believe so.
11     Q.  And that's the 24.9 percent we
12  previously discussed; is that correct?
13     A.  Yes.
14     Q.  And the other 75.1 percent was
15  owned through -- by Mr. Figliolo, through
16  Exitus, LLC; is that your understanding as of
17  that time?
18     A.  Yes.
19     Q.  Now it says, "controlled by one of
20  the partners," right, a company -- that Nesa
21  is controlled by one of the partners.  Do you
22  see that?
23     A.  Yes.
24     Q.  Now, who's that referring to?
25         What was your understanding of who

Page 228

1              Rocco Guidicipietro
2  was one of the partners of Nesa Management
3  that controlled Nesa Management?
4          MR. WARD:  Objection.
5          Calls for speculation.
6      Q.  Let me say it -- bad question.
7          What was your understanding of who
8  was referred to here as one of the partners
9  of Alexander Capital, LP, who controlled Nesa
10  Management, LLC?  Who is that referring to?
11  What's your understanding?
12     A.  It's referring -- it's a
13  misstatement, and it's referring to Joe or I
14  as Nesa's partners.  We're not partners in
15  Alexander Capital, LP.
16     Q.  Okay.  Nesa Management, LLC, was a
17  partner, correct?
18     A.  Yes.
19     Q.  Okay.  But the statement in this
20  document says, "Nesa Management, a company
21  controlled by one of the partners."  So, is
22  it your understanding that that was a --
23  well --
24     A.  That's incorrect.  The way they
25  wrote it, it's incorrect.

Page 229

1              Rocco Guidicipietro
2     Q.  It's incorrect, the way it's
3  written, because it suggests that either you
4  or Mr. Amato were partners in Alexander
5  Capital, LP; is that what you are saying?
6  That's why it's incorrect?
7              MR. WARD:  Objection.
8     Objection.  Calls for speculation.
9     Q.  I just want to understand why you
10  say the statement is incorrect, that the
11  reference to one of the partners of the
12  Alexander Capital, LP controlling Nesa
13  Management was incorrect.
14     A.  It should be Nesa is the partner,
15  not one of the partners.
16     Q.  Not either you or Mr. Amato as
17  being a partner of Alexander Capital, LP; is
18  that what you are saying?
19     A.  Yes, correct.
20     Q.  Okay.  Is it true that you and Mr.
21  Amato were -- managed the -- had the ultimate
22  management control of Alexander Capital, LP,
23  in 2014; is that correct?
24     A.  In 2014, yes, beginning.
25     Q.  Okay.  So as of July 2014, is it

Page 230

1              Rocco Guidicipietro
2  fair to say that you and Mr. Amato exercised
3  ultimate management control over the
4  Alexander Capital, LP, as of that time?  Is
5  that fair?
6     A.  No, that's not correct.
7     Q.  What is incorrect about that?
8     A.  After we took over operational
9  control, we hired people.  We hired
10  compliance CFOs.  We hired -- those people
11  had control over management.
12     Q.  Yes, but I am saying, ultimate
13  control.  The highest level of control was
14  exercised by you and Mr. Amato as of that
15  time; is that right?
16          There was no one above you
17  exercising control; is that correct?
18     A.  Chief compliance officer has
19  managerial control.
20     Q.  Right, but regarding you and Mr.
21  Amato, you and Mr. Amato were -- there was no
22  one above either you or Mr. Amato who
23  exercised management control over Alexander
24  Capital, LP, in 2014; is that correct?
25     A.  There was nobody on top of us,

Page 231

1              Rocco Guidicipietro
2  that's correct.
3     Q.  Okay.  It says, "Regulatory net
4  capital requirements."  It, again, repeats
5  that there's a requirement to have net
6  capital, and as of December 31, 2014, the
7  company had regulatory net capital of
8  $73,770, which exceeded its minimum
9  requirement of $30,571.  Do you see that?
10     A.  Yes.
11     Q.  What was your understanding of the
12  net capital requirements for Alexander
13  Capital, LP, in 2014?
14     A.  It was a nickel BD.
15     Q.  It was, Im sorry?
16     A.  $5,000 BD.
17     Q.  Same as what was the case in 2013?
18     A.  Correct.
19     Q.  And your answers to my questions
20  regarding the net capital requirements and
21  activities it can engage in are the same for
22  2014, as you said for 2013?
23     A.  Yes.
24     Q.  All right.  Mr. Guidicipietro, can
25  you see on the screen another report, this

Page 232

1              Rocco Guidicipietro
2  one for the period January 1, 2015 to
3  December 31st, 2015?
4     A.  Yes.
5     Q.  And this has previously been marked
6  as Plaintiff's Exhibit 149.  Now, this is
7  similar to the report for 2013 and 2014 that
8  we went over, similar type of report?
9     A.  Yes.
10     Q.  Again, it says that "the name of
11  the person you should contact regarding the
12  report" is yourself, correct?
13     A.  Yes.
14     Q.  And it has an oath or affirmation,
15  as you had previously given in 2013 and 2014;
16  is that correct?
17     A.  Yes.
18     Q.  And that's your signature, you
19  recognize, on that oath or affirmation?
20     A.  Yes.
21     Q.  And this one says, "The report
22  contains facing page, and statement of
23  financial condition."  Do you see that?
24     A.  Yes.
25     Q.  And "an oath or affirmation."  Do



Page 233

1              Rocco Guidicipietro
2    you see that?
3        A.   Yes.
4        Q.   But none of the other things that
5    we went over for 2013 and 2014 is checked, as
6    this report containing, such as it's not
7    checked that it contains statement of
8    operations, statement of cash flows,
9    statement of changes in stockholders equity,
10   statement of changes in liabilities,
11   computation of net capital, computation for
12   determination of reserve requirements.  None
13   of those things are checked; is that correct?
14       A.   I don't see them checked, no.
15       Q.   Okay.  And this report has three
16   pages.
17            Do you see that?
18       A.   Yes.
19       Q.   It's got a facing page, an
20   affirmation, and a statement of financial
21   condition, as of December 31, 2015.  Do you
22   see that?
23       A.   Yes.
24       Q.   Okay.  And at the end of December
25   31, 2015, it states, "cash, 42,695."  Do you

Page 234

1              Rocco Guidicipietro
2    see that?
3        A.   Yes.
4        Q.   "Receivable from and deposit with
5    clearing broker, $434,736."  Do you see that?
6        A.   Yes.
7        Q.   For "total assets, as of December
8    31, 2015, of $621,573."  Do you see that?
9        A.   Yes.
10       Q.   It shows, "accounts payable,
11   $429,791, for total liabilities of $429,791."
12            Do you see that?
13       A.   Yes.
14       Q.   It has "members equity at
15   $191,782."
16            Do you see that?
17       A.   Yes.
18       Q.   Now, that's the end of the report.
19   There are no statements, as we had previously
20   gone over, no statement about net capital
21   requirements at all attached to this report.
22   Now, do you have any understanding -- is it
23   consistent with your understanding that in
24   2015, that the annual report filed did not
25   contain those things?

Page 235

1              Rocco Guidicipietro
2        A.   They should have everything.  It
3    should have everything like the previous
4    ones.
5        Q.   Okay.  But you can see that not --
6    the -- none of the boxes -- there's no X next
7    to all of the things that the other ones we
8    went over had, but here, there's no X
9    compared to those.  There's just a statement
10   of financing condition at the end of the
11   year.  Do you see that?
12       A.   Yes.
13       Q.   Do you have any understanding as to
14   why that was the case for this filing at the
15   end of 2015; that it didn't contain the other
16   types of information we went over for 2013
17   and 2014?
18       A.   I do not.
19       Q.   Any understanding as to why it
20   doesn't have any statement about the net
21   capital requirements and whether the firm met
22   them or not?
23       A.   I don't believe this is the full
24   report.
25       Q.   All right.  But you see it's not --

Page 236

1              Rocco Guidicipietro
2    the computation of net capital is not
3    checked.  There's no X there; is that right?
4        A.   Yes, but that would not be what we
5    filed with the SEC, those three pages.
6        Q.   Okay.  But this report, Exhibit
7    149, indicates on its own terms that all it
8    contains is a statement of financial
9    condition and doesn't contain a statement of
10   a computation of net capital.  Do you see
11   that?
12       A.   Yes.
13       Q.   So is that not an indication that
14   the report is stating that it did not include
15   a computation of net capital?
16       A.   I don't know.  The accountants made
17   the report, so I don't --
18       Q.   Do you have any memory that in
19   2015, that the report that was filed, unlike
20   2013 and 2014, did not contain things that
21   the 2013 and 2014 report contained, including
22   computation of net capital?
23       A.   I do not.
24       Q.   You do not have --
25       A.   Any knowledge of why it is not the

Page 237

1                    Rocco Guidicipietro
2    same.
3        Q.   Okay.  Should it have -- with your
4    understanding of the practices and procedures
5    of Alexander Capital, LP, should it have
6    contained the things that we discussed
7    previously that were in the 2013 and 2014
8    report, including the computation of net
9    capital?
10       A.   It's a certified public accountant,
11   and he is registered with the SEC, so he
12   files whatever he needed to file.  I am not a
13   certified public accountant.  I don't know.
14       Q.   Based on your review of the 2013
15   and '14 report that did have those things,
16   and your understanding of the practices and
17   procedures of Alexander Capital, should the
18   report, to your knowledge, based on the
19   practices and procedures of Alexander
20   Capital, and based on your review of the 2013
21   and 2014 reports, should it have included
22   those things we discussed previously that
23   were in those two other reports, including
24   the computation of net capital, or you have
25   no understanding as to whether the practices

Page 238

1                    Rocco Guidicipietro
2    and procedures of Alexander Capital, LP,
3    required such inclusion of such information?
4        A.   It's SEC requirements, not the
5    requirements of Alexander Capital, and I
6    don't know.  Whatever needed to be filed,
7    would be filed.
8        Q.   Was it your understanding, in 2015,
9    that Alexander Capital, LP had an obligation
10   to file with the SEC a statement of --
11   concerning the computation of net capital for
12   2015, or you don't know?
13       A.   I don't know what the requirements
14   are, but I am sure we met them or else we
15   wouldn't know.
16       Q.   And so just to -- in summary, you
17   don't have an explanation as to why this
18   document that was filed at the end of 2015
19   with the SEC did not contain the things we
20   discussed previously that were contained in
21   the 2013 and 2014 reports, including a
22   computation of net capital; is that correct?
23       A.   That's correct.
24       Q.   Mr. Guidicipietro, are you aware --
25   were you aware of the fact, in 2014 and 2015,

Page 239

1                    Rocco Guidicipietro
2    that Alexander Capital, as an underwriter or
3    intended to be an underwriter of a company's
4    offering, had any -- did you have any
5    understanding that Alexander Capital, as such
6    intended underwriter, had an obligation or
7    requirement under the rules or regulations of
8    FINRA, regarding any disclosures that are
9    made in a registration statement in which it
10   was the intended underwriter?
11       A.   I do not.  It's not my area.
12       Q.   And as you sit here today, are you
13   aware as to whether or not Alexander Capital,
14   as an intended underwriter of an offering,
15   had an obligation under the rules and
16   regulations of FINRA, to -- regarding
17   disclosures, and any such registration
18   statement?
19       A.   I am not aware of any.
20       Q.   All right.  I am going to show you,
21   again, and hopefully on the screen you see a
22   continuing member application that we went
23   over previously that was filed on June 3,
24   2015.
25            Do you see that?

Page 240

1                    Rocco Guidicipietro
2        A.   Yes.
3        Q.   Okay.  And I am going to go to -- I
4    am going to go to page 13 of the report, and
5    it states in the question from FINRA,
6    "Provide a written narrative describing the
7    scope of activities to be conducted, as well
8    as describing each step of a typical
9    transaction to be conducted by the applicant,
10   beginning with any initial customer contact."
11   Do you see that?
12       A.   Yes.
13       Q.   All right.  Now, in the narrative
14   that follows, the firm -- Alexander Capital
15   makes this following statement:  "The firm,
16   referring to Alexander Capital, LP, and its
17   counsel will undertake vigorous due diligence
18   to verify the accuracy of information
19   contained in all registration statements in
20   which it participates," and I will highlight
21   that in yellow, all right, that statement I
22   just read.
23            Do you see that there?
24       A.   Yes.
25       Q.   Okay.  Was it your understanding,

ROCCO GUIDICIPIETRO
JOHN J. AQUINO -against- ALEXANDER CAPITAL

September 29, 2021
241–244

Page 241

1          Rocco Guidicipietro
2 in 2014 and 2015, that Alexander Capital and
3 its counsel had any kind of obligation or
4 responsibility to conduct due diligence to
5 verify the accuracy of information contained
6 in any registration statement in which it was
7 the intended underwriter?
8     A. No, I do not.
9     Q. Do you know that now?
10     A. Well, on our side, we need to
11 verify the accuracy of the company's
12 information. That's what I know now.
13     Q. Okay. And is it also your
14 understanding now that any disclosure
15 statements made in the registration
16 statement, that it was the responsibility of
17 Alexander Capital, LP and its counsel, to
18 conduct due diligence to verify the accuracy
19 of information contained in the registration
20 statement in which it was the intended
21 underwriter?
22     A. The counsel wrote the statement, so
23 I don't know.
24     Q. Is that consistent with your
25 understanding now?

Page 242

1          Rocco Guidicipietro
2        MR. WARD: Objection; vague.
3     Q. All right. Do you have an
4 understanding now as to whether Alexander
5 Capital had -- has any obligation, as a
6 member of FINRA, to verify the accuracy of
7 information contained in any registration
8 statement in which it participated, Alexander
9 Capital, LP participated?
10     A. We do our best to verify all the
11 information.
12     Q. Do you understand that Alexander
13 Capital has a requirement, as part of its
14 membership in FINRA, to do that?
15     A. I don't know of any requirement
16 from FINRA to do that.
17     Q. And you didn't know of any such
18 requirement in 2014 and 2015?
19     A. No. We do best business practices
20 and we do the best we can.
21     Q. All right. Are you saying that in
22 accordance with -- that it was your
23 understanding in 2014 and 2015, that in
24 accordance with best business practices, that
25 Alexander Capital and its counsel should

Page 243

1          Rocco Guidicipietro
2 have, in 2014 and 2015, conducted due
3 diligence to verify the accuracy of
4 information contained in any registration
5 statements in which it participated in 2014
6 and 2015?
7        MR. WARD: Objection; vague.
8     Q. Do you understand the question?
9     A. I do. I think I answered it. I
10 said we try to verify everything as much as
11 we can.
12     Q. Right. I just want to make sure I
13 understand correctly that it's your testimony
14 that in 2014 and 2015, you understood that it
15 was best practices for Alexander Capital, LP
16 to conduct due diligence, during that period
17 of time, to verify the accuracy of
18 information contained in any registration
19 statements during that period of time in
20 which it was participating; is that correct?
21     A. Yes, and our counsel also.
22     Q. Yeah, firm and its counsel, both,
23 had the same requirement, in accordance with
24 best practices, as you understood it in 2014
25 and 2015; is that correct?

Page 244

1          Rocco Guidicipietro
2        MR. WARD: Objection; vague.
3     Q. Is that correct? You can answer.
4     A. Yes, all the time.
5     Q. All right. I am getting to the end
6 here, and will soon be there, so I appreciate
7 your patience.
8       Mr. Guidicipietro, did you have an
9 understanding, in 2015, as to whether or not
10 Alterix, Inc., also known as, Inpellis Inc.,
11 filed registration statements with the SEC on
12 a private confidential basis?
13       Did you have that understanding?
14 Were you aware of it during that time?
15     A. No, I was not.
16     Q. Were you aware, during 2015, that
17 Alexander -- excuse me -- that Alterix Inc.,
18 also known as, Inpellis Inc., publicly filed
19 a registration statement known as an "S-1,"
20 publicly filed it in November of 2015? Did
21 you become aware of that at any time in 2015?
22     A. No, I did not.
23     Q. Did it ever come to your attention,
24 in 2015, that Alexander -- that -- well, let
25 me ask you this: You were aware, in 2015, or

Page 245

1           Rocco Guidicipietro
2   you are not aware that Alexander Capital, LP
3   was intended to be an underwriter in an
4   offering on behalf of -- on behalf of
5   Alterix, Inc., also known as, Inpellis Inc.?
6   You were aware of that or you were not?
7       A.  I don't remember, exactly, when I
8   was made aware of it, but I was aware of it
9   at some point in '15.
10      Q.  All right.  Do you remember what --
11  the circumstances under which you became
12  aware of it?
13      A.  I do not.
14      Q.  Do you know if it was before there
15  was any public filing of the Alterix/Inpellis
16  registration statement, or after there was a
17  public filing?
18      A.  I do not.
19      Q.  Are you aware of the fact that
20  FINRA conducted an investigation about the
21  publicly filed S-1 that was filed on behalf
22  of Alexander -- Alterix, Inc., also known as,
23  Inpellis Inc.?
24          Are you aware that FINRA conducted
25  an investigation of that S-1 public filing?

Page 246

1           Rocco Guidicipietro
2       A.  An inquiry, not an investigation,
3   yes, I was aware.
4       Q.  Okay.  And you became aware of
5   that -- it's your best memory you became
6   aware of that after the public filing?
7       A.  I don't know when that happened,
8   before or after the filing.
9       Q.  Okay.  And are you aware of the
10  fact -- did you become aware of the fact that
11  -- after the public filing of the Alterix,
12  also known as, Inpellis offering was filed,
13  publicly filed, that the SEC issued a stop
14  order regarding the offering, and undertook
15  an investigation regarding the public filing
16  of that S-1?  Are you aware of that?
17      A.  Yes, I am aware of that.
18      Q.  Were you aware of that in 2015?
19      A.  After it happened, yes.
20      Q.  And were you made aware of it soon
21  after?
22          Is it your understanding you were
23  made aware of it soon after the SEC issued
24  its stop order and conducted -- undertook its
25  investigation?

Page 247

1           Rocco Guidicipietro
2       A.  I don't remember how long after or
3   when it started and when I knew.
4       Q.  But you do remember becoming aware
5   of the stop order and the SEC investigation?
6       A.  Yes.
7       Q.  And during the time that you were
8   at Alexander Capital, LP, had you ever
9   experienced the SEC issuing a stop order
10  regarding any offering that Alexander Capital
11  was involved with?
12      A.  No, not that I recall.
13      Q.  During the time that you were with
14  Alexander Capital as a chief operating
15  officer, up through the issuance of the SEC
16  stop order and investigation, were you ever
17  aware of Alexander Capital being the subject
18  of an SEC -- excuse me -- of an offering in
19  which Alexander Capital was the intended
20  underwriter, being the subject of an SEC
21  investigation concerning a registration
22  statement filing on behalf of the issuer
23  company?
24      A.  Not that I'm aware of.
25      Q.  Is it fair to say that the stop

Page 248

1           Rocco Guidicipietro
2   order and investigation that the SEC
3   undertook after the filing of the Alterix
4   Inc., also knows as, Inpellis, Inc., public
5   filing, that that was an unusual event, to
6   you?
7       A.  To me personally, yes.
8       Q.  All right.  Are you aware of the
9   fact -- did you become aware of the fact that
10  after the SEC conducted the stop order and
11  the investigation, that it issued a subpoena
12  to various parties?
13          Were you aware of that?
14      A.  Not that I remember.
15      Q.  Were you aware of the fact that one
16  of the parties that was issued a request for
17  information regarding the public filing of
18  the Alterix, also known as, Inpellis
19  offering, was Alexander Capital, LP?
20      A.  I do remember that we got asked for
21  information.
22      Q.  And based on your experience with
23  the company, was that the first time that
24  Alexander Capital, during the time that you
25  were chief operating officer, had ever

Page 249

Rocco Guidicipietro

1  received a request for information by the SEC
2  regarding an offering in which Alexander
3  Capital was the intended underwriter?
4      A.  We get them pretty often.  They
5  always request information.
6      Q.  How about an SEC investigation
7  pursuant to a stop order, were there any such
8  stop order investigations that you were aware
9  of, prior to this one, regarding the
10  Alterix/Inpellis filing?
11      A.  Not stop orders.
12      Q.  Okay.  And stop orders followed by
13  an SEC investigation, were you ware of any
14  such thing occurring, prior to the -- this
15  stop order and the investigation that
16  followed?
17      A.  No.
18      Q.  Okay.
19      A.  No.
20      Q.  Based on your understanding of the
21  industry, and how the industry looks at such
22  things, would you consider the fact that a
23  stop order and an investigation by the SEC
24  regarding the public filing of a company's

Page 250

Rocco Guidicipietro

1  S-1 was a -- was something that the industry
2  considered to be a very serious matter?
3      A.  Yes.
4      Q.  And was it your understanding that
5  if a company, which had filed a -- publicly
6  filed an S-1 receives a stop order by the SEC
7  followed by an investigation, that your
8  understanding in the industry that that would
9  -- that that company would be tainted in the
10  marketplace in some way?
11      A.  Depends the reason on the
12  investigation.
13      Q.  If the investigation was concerning
14  the concern by the SEC that the disclosures
15  in the statement were fraudulent, would that
16  be, in your -- with your understanding of the
17  industry at that time, be considered to be
18  something that would taint the issuing
19  company?
20      A.  If the company made fraudulent
21  statements, yes.
22      Q.  Why would it taint the company in
23  the marketplace?
24      A.  If the company was giving false

Page 251

Rocco Guidicipietro

1  information, nobody would go near it.
2      Q.  And if the company made material
3  omissions in its disclosure statements,
4  omissions that the SEC considered to be
5  material, is your answer the same for how the
6  industry would look at that company -- how
7  the marketplace would look at that company?
8      A.  Yes.
9      Q.  And is your testimony the same,
10  that they would not want to go near it?
11          MR. WARD:  Objection; calls
12      for speculation.
13      A.  They would go to other companies to
14  do business.
15      Q.  There would be other companies
16  they'd rather do business with, than that
17  company that had such a problem regarding
18  material omissions in its disclosure
19  statement; is that what you are saying?
20          MR. WARD:  Objection; calls
21      for speculation.
22      Q.  I'm sorry?
23          MR. WARD:  Objection; calls
24      for speculation.

Page 252

Rocco Guidicipietro

1          MR. SCHLICHTMANN:  No, I
2      appreciate that.
3      Q.  The answer, you have to be audible.
4  I'm sorry, I don't think I heard the answer.
5      A.  I didn't give an answer.
6      Q.  Okay, all right.
7      A.  If a company, in generalization,
8  had issues with the SEC, yes, wouldn't go
9  near the company.
10      Q.  And specifically as to material
11  omissions in the registration statement that
12  was filed publicly, that the SEC considered
13  to be material omissions, is your answer the
14  same, that the marketplace would not want to
15  go near that company because there are other
16  companies they could deal with that don't
17  have such problems?
18      A.  I would need to read the SEC
19  investigation complaint before I make that
20  decision.
21      Q.  All right, but you did say that if
22  there were material omissions on a
23  registration, publicly filed registration
24  statement, that the SEC considered material

Page 253

Rocco Guidicipietro

1
2  omissions, that would taint the company in
3  the marketplace; is that your --
4        MR. WARD:  Objection;
5        speculation.
6     Q.  Is your testimony changing in any
7  way or do you adhere to the same testimony
8  that you previously gave, that it would taint
9  the company in the marketplace?
10    A.  If the company --
11       MR. WARD:  Objection.  Calls
12       for speculation.  Rocco, one
13       second.  Objection.  Calls for
14       speculation.
15    Q.  You can answer.
16    A.  If I would -- yes.
17    Q.  That your testimony is the same as
18  previously?
19    A.  Yes.
20    Q.  Do you know Mr. Restrepo?
21    A.  Excuse me, who?
22    Q.  Do you know a man named Luis
23  Restrepo?
24    A.  Luis Lastrepo?
25    Q.  R-E-S-T-R-E-P-O.

Page 254

Rocco Guidicipietro

1
2     A.  Yes, I believe he was -- he worked
3  for Alexander at one point.
4     Q.  Okay.  Are you aware of the fact
5  that in October 2015, that Mr. Restrepo was
6  employed by Alexander Capital as a chief
7  compliance officer?
8     A.  Yes.
9     Q.  Okay.  Do you have any
10  understanding of the circumstances under
11  which Mr. Restrepo was employed by Alexander
12  Capital as a chief compliance officer in
13  October of 2015?
14    A.  I'm sorry, repeat the question,
15  I --
16    Q.  Are you aware of any of the
17  circumstances surrounding the hiring of Mr.
18  Restrepo in October 2015 as chief compliance
19  officer at Alexander Capital, LP?
20    A.  Not that I recall.  Compliance
21  officer.
22    Q.  Were you involved in any way, to
23  your knowledge, with the hiring of Mr.
24  Restrepo as chief compliance officer at
25  Alexander Capital, LP, in 2015?

Page 255

Rocco Guidicipietro

1
2     A.  I don't remember, exactly, how he
3  came to the firm, but, I mean, I know him.  I
4  know he was there, yes.
5     Q.  Were you aware of the fact that
6  Mr. Restrepo was involved with the -- was
7  hired to deal with the continuing membership
8  application that Alexander Capital had filed
9  in 2015?
10       Were you aware of that in 2015?
11    A.  I am sure he helped out with the
12  CMA.
13    Q.  Okay.  And are you aware of the
14  fact as to Mr. -- that Mr. Stack, who had
15  been the chief compliance officer, as to what
16  happened to his position with the company,
17  after Mr. Restrepo was hired?  Do you have
18  any understanding as to what happed to Mr.
19  Stack?
20    A.  I believe he was made senior
21  compliance officer.
22    Q.  All right.  Mr. Stack previously
23  testified that after Mr. Restrepo became
24  chief compliance officer, that his
25  understanding was that he was now junior to

Page 256

Rocco Guidicipietro

1
2  Mr. Restrepo and reported to him, and not
3  that he was senior.
4        Is that your understanding?  Is
5  that consistent with your understanding of
6  what happened in 2015?
7     A.  Yes.
8     Q.  And are you aware -- were you made
9  aware of what -- what Mr. Restrepo tried to
10  do in 2015, regarding the continuing
11  membership application that Alexander Capital
12  had filed in 2015?
13    A.  I know he was trying to help the
14  attorneys get it approved.
15    Q.  And was it your understanding Mr.
16  Restrepo was working with Mr. Ross, Carmel
17  Ross, at the Sichenzia firm?  Is that your
18  understanding?
19    A.  Yes, they would be working with
20  Compliance.
21    Q.  What was your understanding as to
22  whether or not Mr. Restrepo was successful in
23  his working with FINRA, regarding the
24  continuing membership application?
25    A.  I don't recall what happened, which

ROCCO GUIDICIPIETRO                    September 29, 2021
JOHN J. AQUINO -against- ALEXANDER CAPITAL          257–260

Page 257

Rocco Guidicipietro

1    one he was working on, and what happened with
2    it.
3       Q.   All right.  Are you aware of the
4    fact that in -- that the continuing
5    membership application that Alexander Capital
6    had filed in 2015, that it subsequently was
7    withdrawn by Alexander Capital, LP?  Were you
8    aware of that?
9       A.   Yeah, I remember withdrawing one or
10   two of them, yes.
11      Q.   Okay.  Now, when you say, "one or
12   two of them," was there more than one that
13   you remember, a continuing membership
14   application?
15      A.   Over the years.
16      Q.   Over the years.  All right.  Is the
17   -- prior to 2015, had Alexander Capital filed
18   any continuing membership applications with
19   FINRA, to your knowledge?
20      A.   Before 2015, yes, to change
21   ownership.
22      Q.   To change ownership.  Other than we
23   discussed that previously; is that correct?
24      A.   Yes.
25

Page 258

Rocco Guidicipietro

1       Q.   Okay.  And there was only about
2    changing ownership; is that correct?
3       A.   From what I recall.  Expanding the
4    firm, changing ownership.
5       Q.   Okay.  It was not seeking to get
6    firm commitment authorization; is that
7    correct, the one we previously discussed in
8    2012 to 2013?  Is that correct?
9       A.   I would have to look at the
10   application.  I don't remember what we
11   requested.
12      Q.   Do you have any memory that it
13   included a request for firm commitment
14   authorization or you have no memory?
15      A.   I have no memory.  I would have to
16   look at it.
17      Q.   Okay.  And -- but you are aware
18   that the application that was filed in 2015
19   that we've been discussing today was
20   withdrawn by Alexander Capital, LP; is that
21   correct?
22      A.   I recall that now, yes.
23      Q.   And do you recall that that
24   occurred in 2016?
25

Page 259

Rocco Guidicipietro

1       A.   I don't know, exactly, when it
2    happened.
3       Q.   Do you recall that it happened
4    after the stop order and the SEC
5    investigation --
6       A.   I don't.
7       Q.   -- we've been talking about?
8       A.   I don't know when it happened.
9       Q.   And do you have an understanding as
10   to the reason why Alexander Capital, LP
11   withdrew the continuing membership
12   application that we previously discussed
13   today?
14      A.   Yes.
15      Q.   What is your understanding?
16      A.   FINRA gives you an opportunity to
17   pull it, so that you can go back in to
18   refile.  So, they gave us the opportunity.
19      Q.   To withdraw it?
20      A.   To withdraw it.
21      Q.   Okay.  And when is your -- did you
22   have an understanding that it was refiled at
23   some time?
24      A.   Yes.
25

Page 260

Rocco Guidicipietro

1       Q.   And when -- what is your
2    understanding as to when it was refiled?
3       A.   I don't know, exactly, when it was
4    refiled.
5       Q.   Was it refiled in 2016?
6       A.   I don't know.
7       Q.   But you understand that a
8    continuing membership application was
9    subsequently refiled, correct?
10      A.   Yes.
11      Q.   And in December 2017, at some
12   point, Alexander Capital was given
13   authorization by FINRA to conduct firm
14   commitment offerings; is that correct?
15      A.   Yes.
16      Q.   Are you aware of the fact as to
17   whether or not Alexander Capital was ever the
18   subject of an investigation by FINRA
19   concerning its participation in firm
20   commitment offerings, to which it did not
21   have authority?
22           Are you aware of that occurring?
23      A.   Yes.
24      Q.   I will show you...
25

ROCCO GUIDICIPIETRO                    September 29, 2021
JOHN J. AQUINO -against- ALEXANDER CAPITAL                261–264

Page 261

1     Rocco Guidicipietro
2        MR. WARD:  Jan, how much
3   longer do you think you will be
4   going?
5        MR. SCHLICHTMANN:  I will be
6   wrapping up here, so, you know, if
7   you want to take a break, we can,
8   but I am -- really am at the end
9   here, near the end here, all right?
10        MR. WARD:  Okay.
11        MR. SCHLICHTMANN:  If you
12   want to go through or take a
13   break -- what's your pleasure?
14        MR. WARD:  Maybe we can take
15   a break, I will need a break anyway
16   before I come back.
17        MR. SCHLICHTMANN:  Sure,
18   let's do that.  Regular break.
19   Five minutes or what?
20        MR. WARD:  Yeah, actually,
21   let's take a ten, and then I should
22   be ready to go directly after you
23   are done, if you will be done
24   pretty soon.
25        MR. SCHLICHTMANN:  Great, I

Page 262

1     Rocco Guidicipietro
2   will.  Thank you.
3        THE VIDEOGRAPHER:  Off the
4   record.  The time is 4:33 p.m.
5        (Whereupon, a recess was
6   taken at this time.)
7        THE VIDEOGRAPHER:  We are
8   back on the record.  Time is 4:49.
9   BY MR. SCHLICHTMANN:
10   Q.   All right.  Mr. Guidicipietro, I am
11   going to show you a document.  And this is a
12   filing by the SEC against Alexander Capital,
13   dated June 29, 2018.  Do you see that?
14   A.   Yes.
15   Q.   And it concerns an order -- now,
16   this is Plaintiff's Exhibit 32.  It's an
17   "order instituting administrative proceedings
18   pursuant to section 15B of the Securities
19   Exchange Act of 1934, making findings and
20   imposing remedial sanctions."
21        Do you see that?
22   A.   Yes.
23   Q.   Are you aware of the fact that the
24   SEC instituted proceedings against Alexander
25   Capital that resulted in 2018, in an order?

Page 263

1     Rocco Guidicipietro
2        Were you aware of that?
3   A.   Yes.
4   Q.   And in this order of 2018, it
5   states that "Respondent, Alexander Capital,
6   is a Delaware limited partnership with its
7   main office in New York, New York, and from
8   2012 until 2014, had a branch office on
9   Staten Island, New York."
10        Do you see that?
11   A.   Yes.
12   Q.   And "It has been registered as a
13   broker-dealer since 1996."  Do you see that?
14   A.   Yes.
15   Q.   It also states that "broker-dealers
16   have a responsibility to supervise their
17   employees through procedures and systems to
18   implement the procedures that are reasonably
19   designed to prevent and detect violations of
20   the federal securities laws."  Do you see
21   that?
22   A.   Yes.
23   Q.   Was it your understanding, in 2014
24   and 2015, that Alexander Capital, as a
25   broker-dealer, with a membership in FINRA,

Page 264

1     Rocco Guidicipietro
2   had a responsibility to supervise their
3   employees through procedures and systems to
4   implement the procedures that are reasonably
5   designed to prevent and detect violations of
6   the federal securities law?
7   A.   Yes.
8   Q.   Was it your understanding, in 2014
9   and 2015, that this was a key component of
10   investor protection?
11   A.   For retail investors, yes.
12   Q.   Okay.  Now, it states here,
13   paragraph number 3, "From 2012 through 2014."
14   Now, during that period of time -- you became
15   the chief operating officer sometime in 2012;
16   is that correct?
17   A.   Yes.
18   Q.   And that -- and you were a chief
19   operating officer through 20- -- through the
20   time you assumed that position in 2012,
21   through 2013, and through 2014; is that
22   correct?
23   A.   Yes.
24   Q.   And it states here that "from 2012
25   to 2014, Alexander Capital failed reasonably

Page 265

1          Rocco Guidicipietro
2    to implement certain policies and procedures
3    and permitted a laxed compliance environment
4    in which these registered representatives
5    were not reasonably monitored or disciplined,
6    procedures were not followed, and indications
7    of potential misconduct were not acted upon
8    by the supervisors of the three registered
9    representatives referred to in this report."
10   Do you see that?
11        A.   Yes.
12        Q.   Okay.  Now, are you familiar with
13   the events that the SEC is referring to in
14   this order?
15        A.   Yes, for the most part.
16        Q.   And is it fair to -- is it -- based
17   on your understanding of the practices and
18   procedures in place in Alexander Capital
19   between 2012 and 2014, do you think it is
20   accurate to state that Alexander Capital,
21   during that period of time, permitted a laxed
22   compliance environment?
23        A.   No.
24        Q.   Do you take issue with the finding
25   by the SEC that Alexander Capital, between

Page 266

1          Rocco Guidicipietro
2    2012 and 2014, permitted a laxed compliance
3    environment?
4         A.   Yes.
5         Q.   Okay.  And how would you describe
6    the compliance environment at Alexander
7    Capital between 2012 and 2014?
8         A.   Fran Lanaia was in control of the
9    firm those two years.
10        Q.   Francine Lanaia?
11        A.   Yes.
12        Q.   After you became -- after this --
13   December 2013?
14        A.   Yes.
15        Q.   Well, Francine Lanaia took a
16   position with Alexander Capital, LP?
17        A.   Fran Lanaia was the chief
18   compliance officer, the CEO, and president.
19        Q.   Okay.  Until what time?
20        A.   Until we took control over in '14.
21        Q.   Okay.  December of 2013, right, and
22   onward; is that correct?
23        A.   January '14.
24        Q.   All right.  So as of January '14,
25   Ms. Lanaia was no longer managing Alexander

Page 267

1          Rocco Guidicipietro
2    Capital, LP; is that what you are saying?
3         A.   Correct.
4         Q.   Okay.  But from January '14,
5    following, the management of Alexander
6    Capital was under the -- was under you and
7    Mr. Amato as the ultimate manager of the firm
8    at that point in time; is that correct?
9         A.   Yes.
10        Q.   Okay.  From January '14, onward,
11   did -- are you aware as to what steps you or
12   Mr. Amato took as the ultimate managers of
13   Alexander Capital at that time, regarding the
14   compliance environment at Alexander Capital,
15   LP, from January 2014, onward?
16        A.   Yes.
17        Q.   What did you do?
18        A.   We got rid of every rep that was in
19   this case, we closed the Staten Island
20   office, and we hired new compliance
21   personnel.
22        Q.   Does that include Mr. Stack?
23        A.   Yes.
24        Q.   And did you put in place policies
25   and procedures to ensure a compliance

Page 268

1          Rocco Guidicipietro
2    environment that would ensure that the rules
3    and regulations applicable to Alexander
4    Capital, LP were followed?
5         A.   Yes, we had to.
6         Q.   Okay.  And is it your understanding
7    that you did do that as -- you and Mr. Amato,
8    as the ultimate managers of the firm at that
9    time?
10        A.   Yes, with the people that we hired,
11   we put procedures in place.
12        Q.   And does that include Mr. Gazdak as
13   the head of Investment Banking?
14        A.   He came on a little later, I
15   believe.
16        Q.   All right, and he -- is it your
17   understanding that Mr. Gazdak, as part of his
18   job responsibilities, was responsible for
19   becoming familiar with the policies and
20   procedures of Alexander Capital, to ensure a
21   compliance environment that would ensure that
22   the firm followed the rules and regulations
23   of FINRA and the SEC that were applicable to
24   it?
25        A.   Yes, the rules of FINRA and the

Page 269

1              Rocco Guidicipietro
2   SEC.
3       Q.   All right.  That it was Mr.
4   Gazdak's responsibility to become familiar
5   with the policies and procedures of the firm
6   regarding compliance with the rules and
7   regulations of FINRA, and the SEC, applicable
8   to Alexander Capital, LP; is that correct?
9       A.   The Compliance would oversee Mr.
10  Gazdak.
11      Q.   But I am specifically referring to
12  Mr. Gazdak.  Is it your understanding that
13  Mr. Gazdak, once he became head of Investment
14  Banking, had a responsibility to be familiar
15  with the policies and procedures at Alexander
16  Capital that were meant to ensure a
17  compliance environment in which Alexander
18  Capital, LP was following the rules and
19  regulations of FINRA and the SEC, applicable
20  to its business?
21      A.   Yes.
22      Q.   And was it your understanding that
23  Mr. Stack, once he was employed by Alexander
24  Capital, LP, had the same responsibility as
25  Mr. Gazdak, to be familiar with the policies

Page 270

1              Rocco Guidicipietro
2   and procedures in place at Alexander Capital
3   that were meant to ensure a compliance
4   environment in which the rules and
5   regulations of FINRA and the SEC were
6   followed by Alexander Capital, LP?
7       A.   Yes.
8       Q.   All right.  I will show you what's
9   going to -- did I give the number, by the
10  way?  Sorry, did I give the number, the
11  exhibit number for that exhibit?
12           MR. WARD:  32, yes.
13           MR. SCHLICHTMANN:  I did.
14           Court reporter satisfied that I did
15           there?  That's a "yes," all right.
16           Thank you.
17      Q.   I am now showing you -- can you see
18  I put on the board Plaintiff's Exhibit 29.
19  You see this?
20      A.   Yes.
21      Q.   Okay.  Now, this has FINRA's
22  letterhead at the top, and it says, "broker
23  check report, Alexander Capital, LP."  Do you
24  see that?
25      A.   Yes.

Page 271

1              Rocco Guidicipietro
2       Q.   Are you familiar with the term
3   "broker check report"?
4       A.   Yes.
5       Q.   What's your understanding of what a
6   broker check report is?
7       A.   It's the history of the firm.
8   Regulatory history.
9       Q.   That's available to the public?
10      A.   Yes.
11      Q.   Put out by FINRA?
12      A.   Yes.
13      Q.   Now, in this report it says
14  "disclosure events starting on page 21."  And
15  is it your understanding or was it your
16  understanding -- or is it your understanding
17  that the broker check report includes any
18  events in which the company, in this case
19  Alexander Capital, LP, was involved from
20  a regulatory standpoint?
21           Is that what you understood would
22  be some of the information contained in a
23  broker check report about Alexander Capital,
24  LP?
25      A.   Yes.

Page 272

1              Rocco Guidicipietro
2       Q.   Now, turning to page 21, is when
3   the disclosures are included and if I go to
4   disclosure number 2, do you see that?
5       A.   Yes.
6       Q.   All right.  And -- all right.  Now,
7   can you read the bottom here, disclosure 2?
8   Can you see the -- is it big enough?  Do I
9   need to blow it up or can you see it?
10      A.   I can't see the bottom of it.  I
11  see the top.
12      Q.   Okay.  All right.  I am going to
13  try and -- can you read that bottom paragraph
14  there under "disclosure 2"?
15      A.   "Without admitting or denying the
16  findings"?
17      Q.   Yes.
18      A.   "The firm consented to the
19  sanctions to the findings in the -- conducted
20  a security business while below its net cap
21  requirement."
22      Q.   Yes, and now let me read it, what
23  you just read.  Thank you.  It says under
24  disclosure 2 on this document, it says,
25  "Without admitting or denying the findings,

Page 273

Rocco Guidicipietro

1 the firm, referring to Alexander Capital, LP,
2 consented to the sanctions and to the entry
3 of findings that it conducted a security
4 business while below its net capital
5 requirement."  Do you see that?
6     A.  Yes.
7     Q.  Okay.  Is it your understanding
8 that Alexander Capital, LP at some point
9 consented to the sanctions and to the entry
10 of findings that it conducted a securities
11 business while below its net capital
12 requirements?
13     A.  We didn't agree with the findings
14 but we...
15     Q.  Okay.  And you didn't contest the
16 findings; is that correct?
17     A.  It's hard to contest the SEC.
18     Q.  Okay.
19     A.  We contested them as far as we
20 could.
21     Q.  All right.  And at the end, you
22 agreed to the entry of findings and a
23 sancture and a fine; is that correct?
24     A.  We both came to an agreement

Page 274

Rocco Guidicipietro

1 without admitting any wrongdoing.  We paid
2 the fine, yes.
3     Q.  Okay.  Now, in this it talks about
4 the fact that the -- "while conducting a
5 securities business, it did so below its net
6 capital requirements."  Are you aware of the
7 fact as to whether, in 2014 and 2015,
8 Alexander Capital operated its business below
9 its net capital requirements?
10     A.  No, I don't know.
11     Q.  You're not aware of that?
12     A.  Not at all.
13     Q.  It states on the second page, very
14 long paragraph, all in caps, conducive to the
15 best reading, but at the bottom -- all right.
16 I am going to -- all right, now directing
17 your attention to the bottom of this long
18 paragraph, it said, "The firm maintained an
19 inaccurate general ledger and failed to
20 prepare accurate net capital computations due
21 to its failure to properly record liability
22 arising from the SEC administrative
23 proceeding."  Do you see it says that?
24     A.  Yes.

Page 275

Rocco Guidicipietro

1     Q.  All right.  Were you aware of the
2 fact that that was part of the findings?
3     A.  I didn't recall that, no.
4     Q.  Okay.  It says, "The findings also
5 included that the firm made a material change
6 in its business operations by participating
7 in firm commitment offerings without
8 receiving approval from FINRA to do so."
9         Is it your understanding that --
10 that Alexander Capital, in a period of time,
11 made a material change in its business
12 operations by participating in firm
13 commitment offerings without receiving
14 approval from FINRA to do so?
15     A.  We were participating in selling
16 group offerings that we believed we were
17 allowed to do.
18     Q.  That were firm commitment
19 offerings?
20     A.  Yes.
21     Q.  Do you know the period of time that
22 you engaged in such selling group?
23     A.  I don't know the exact period of
24 time, no.

Page 276

Rocco Guidicipietro

1     Q.  Was it in 2015?
2     A.  I -- I -- I don't remember when it
3 was.
4     Q.  Okay.  And you see it says here
5 that the "Firm's membership agreement,
6 however, did not permit the firm to
7 participate in the firm commitment offering."
8 Do you see that?
9     A.  Yes.
10    Q.  Okay.  And is that consistent with
11 your understanding, that the firm's
12 membership agreement did not permit the firm
13 to participate in firm commitment offerings?
14    A.  After -- after the findings.  But
15 before that, we thought we could participate.
16    Q.  Prior to these findings in this --
17 talked about in this disclosure 2?
18    A.  Yes, prior to the SEC final
19 determination.
20    Q.  You thought you -- are you saying
21 that Alexander Capital thought it could
22 participate in firm commitment offerings,
23 prior to this SEC finding?
24    A.  Yes, in the selling group --

Page 277

```
1            Rocco Guidicipietro
2   selling group.  Not the direct underwriter,
3   selling group participant.
4       Q.   Okay.  Was it your understanding
5   that it couldn't be the sole book runner on a
6   firm commitment offering?
7       A.   After -- after this point, yes.
8       Q.   All right.  Well, I showed you
9   previously the unreasonable letter, right,
10  that was issued in May 15 of 2015.  Does that
11  refresh your recollection that the -- that
12  FINRA made the company aware that its
13  membership did not allow it to be the sole
14  book running member of a firm commitment
15  offering, at that time?
16      A.   Yes, correct, yes, it -- after that
17  letter.
18      Q.   Okay.  Of May 15, 2015?
19      A.   Yes.
20      Q.   Okay.  Alexander Capital, it's your
21  testimony, that after May 15, 2015, Alexander
22  Capital knew that its membership in FINRA did
23  not allow it to be the sole book running
24  manager of a firm commitment offering; is
25  that correct?
```

Page 278

```
1            Rocco Guidicipietro
2            MR. WARD:  Objection; calls
3       for speculation.  Outside of
4       personal knowledge.
5       Q.   Do you understand my question?
6       A.   No.  Rephrase it again.
7       Q.   Sure.  Is it your understanding
8   that after May 15, 2015, Alexander Capital
9   knew that it could not participate in a firm
10  commitment offering as the sole book running
11  manager?
12      A.   I knew.  I can't testify to what
13  everybody at Alexander Capital knew.
14      Q.   But you knew?
15      A.   I knew after we received the letter
16  in '15, yes.
17      Q.   The unreasonable letter?
18      A.   Yes, after I was made aware of it.
19  I am not sure when in '15, but I was made
20  aware of it.
21      Q.   All right.  And did you -- do you
22  remember taking any steps, after you became
23  aware of this, to make sure that other people
24  at Alexander Capital were aware of it?
25      A.   No, I do not remember.
```

Page 279

```
1            Rocco Guidicipietro
2       Q.   Do you know if Mr. Amato took any
3   steps, after you became aware of it?
4       A.   I don't know what anybody else did.
5   I don't know.
6       Q.   Does that mean that you don't know
7   whether Mr. Stack did anything regarding it?
8       A.   I don't know.
9       Q.   Or Mr. Gazdak?
10      A.   No, I don't know.
11      Q.   Or Mr. Carlin?
12      A.   Don't know.
13      Q.   Okay.  Do you have any reason to
14  believe, understanding the practices and
15  procedures of Alexander Capital at the time,
16  as to whether in the ordinary course of
17  Alexander Capital's business, that Mr. Stack
18  should have been made aware of the
19  unreasonable letter of May 15, 2015?
20      A.   No, I don't think we have any
21  procedures that would make him aware of it.
22      Q.   Is that the same answer for Mr.
23  Gazdak?
24      A.   Yes.
25      Q.   Is that the same answer for Mr.
```

Page 280

```
1            Rocco Guidicipietro
2   Carlin?
3       A.   Yes.
4       Q.   Now, previously you talked about
5   best practices; is that correct?  You
6   remember discussing best practices?
7       A.   Yes.
8       Q.   All right.  And could you just --
9   what's your understanding of the phrase "best
10  practices"?
11      A.   I was referring to -- there's
12  really no rules on it, but best practices of
13  doing our best to look through some due
14  diligence and make sure that what we present
15  to our clients, we try to -- our retail
16  clients, try to check and make sure that it's
17  as accurate as we can verify.
18      Q.   All right.  Is it -- is it your
19  understanding, in 2014 and 2015, that best
20  practices included a responsibility of
21  Alexander Capital to make sure that potential
22  clients of the company know what Alexander
23  Capital can do and cannot do as an
24  underwriter?
25      A.   There's no rules to -- no, I don't
```

Page 281

Rocco Guidicipietro

1    see any obligation for us to do that.
2        Q.   All right.  Well, just to make sure
3    I understand, is it your understanding in --
4    as of 2014 and 2015, that best practices, as
5    you have defined it, would have required
6    Alexander Capital, if it was following best
7    practices, to inform any company that was
8    seeking its services, to make sure they
9    understood what activities Alexander Capital
10   could undertake as an underwriter and what
11   activities it could not undertake as an
12   underwriter?
13       A.   I was referring to our retail
14   customers.
15       Q.   Okay.  I am talking about best
16   practices regarding Alexander Capital's
17   qualifications to do underwriting, all right?
18       A.   Right, there's no rules or
19   regulations that we need to make sure --
20       Q.   Okay, well, so I am asking
21   regarding best practices, did you have an
22   understanding as to whether there were any
23   best practices, in 2014 and 2015, that would
24   have been applicable to Alexander Capital
25

Page 282

Rocco Guidicipietro

1    conducting itself as a potential underwriter
2    for a company seeking its services?
3        A.   I wasn't involved in anything.
4            MR. WARD:  Objection.  One
5    second.  Objection; vague.
6        Q.   Okay, let me withdraw the question.
7            You talked about best practices,
8    correct?
9        A.   Yes.
10       Q.   All right.  Did you understand that
11   there were any best practices regarding the
12   underwriting activities of Alexander Capital,
13   during 2014 and 2015, or you were not -- did
14   not have an understanding of best practices
15   regarding the underwriting activities of
16   Alexander Capital, LP during 2014 and 2015?
17       A.   I do not.  In 2014, '15, investment
18   banking, I wasn't involved in.
19       Q.   All right.  As you sit here today,
20   are you aware of best practices regarding
21   Alexander Capital's underwriting activities?
22       A.   Still the same.  There's no rules
23   or regulation that we are obligated to do so.
24       Q.   In 2014 and 2015, did you have an
25

Page 283

Rocco Guidicipietro

1    understanding as to whether or not Alexander
2    Capital should have disclosed to a company
3    seeking its underwriting services, as to the
4    fact that it was not capable -- at that time
5    was not authorized, in 2014 and 2015, to
6    conduct a firm commitment underwriting?
7        A.   As far as I know, there's no
8    obligation to -- for us to do anything, any
9    disclosures.
10       Q.   Regarding its -- Alexander
11   Capital's lack of authorization during 2014
12   and 2015, to conduct a firm commitment
13   offering?  Is that what you're saying?
14       A.   That's what I'm saying, yes.
15       Q.   And are you aware of the fact that
16   the engagement agreements that Alexander
17   Capital entered into with Alterix, also known
18   as, Inpellis, as we previously went over, had
19   a stated intent in the engagement agreement
20   that Alexander Capital, when the offering got
21   near to or became effective, that it had a
22   stated intent to undertake the offering
23   regarding Alterix, Inc., also known as
24   Inpellis, on a firm commitment basis?  Are
25

Page 284

Rocco Guidicipietro

1    you aware of that?
2            MR. WARD:  Objection.
3    Confusing.
4        Q.   Okay.  Let me bring it up.  Okay.
5    All right.  I am showing what has previously
6    been marked as the July 29, 2014, agreement,
7    which has previously been marked as 154, all
8    right.  This Exhibit 154 is the July 29,
9    2014, engagement agreement entered into
10   between Alterix and Alexander Capital, LP.
11   Are you familiar with that engagement
12   agreement at all?
13       A.   No, I -- recently, but I have never
14   seen it.
15       Q.   Okay.  And just to show you that it
16   was -- has a signature line here with Mr.
17   Timothy Stack and Mr. Sterman.  Do you see
18   that?
19       A.   Yes.
20       Q.   Now, just drawing your attention to
21   the first paragraph, it states, "We are
22   pleased to submit the following proposal with
23   respect to an initial public offering, the
24   public offering, by Alterix, Inc., the
25

Page 285

Rocco Guidicipietro

1  company, or Alterix of up to $20 million,
2  consisting of the company's common shares,
3  the price and terms of which shall be
4  determined by the market price prior to the
5  effective date of the offering closing."
6      Do you see that?
7  A.  Yes.
8  Q.  "This letter states certain
9  conditions and assumptions upon the proposed
10 offering by Alexander Capital, LP, Alexander
11 Capital.  It is our intent, immediately prior
12 to the effective date, to enter into an
13 exclusive underwriting agreement, the
14 underwriting agreement, with the company.
15 The underwriter broker will act as agent on
16 a, quote, 'firm commitment,' end quote,
17 basis."
18     Do you see that?
19 A.  Yes.
20 Q.  All right.  Is it fair to say that
21 this engagement agreement is a statement of
22 Alexander Capital's intent, immediately prior
23 to the effective date of the offering, to
24 enter into an exclusive underwriting

Page 286

Rocco Guidicipietro

1  agreement in which Alexander Capital intended
2  to act as the agent on a firm commitment
3  basis?  Do you see that?
4      MR. WARD:  Objection.  Lack
5      of personal knowledge and calls for
6      speculation.
7  Q.  Do you think that's a -- what I
8  just said is a fair statement of what we just
9  read?
10 A.  I'm sorry, Bryan.
11     I am not familiar with any of the
12 underwriting or banking agreements.
13 Q.  Right, but I am now showing you
14 this one and drawing your attention to the
15 language that states that prior to the
16 effective date, that Alexander Capital has an
17 intent to enter into an exclusive
18 underwriting agreement with Alterix.
19     Do you see that?
20 A.  Yes.
21 Q.  Okay.  And that the "underwriter
22 broker, referring to Alexander Capital, will
23 act as agent on a, quote, 'firm commitment,'
24 end quote, basis."

Page 287

Rocco Guidicipietro

1      Do you see that?
2  A.  Yes.
3  Q.  Okay.  Now, as of the time that
4  this engagement agreement was entered into,
5  you have already testified Alexander Capital
6  did not have authority from FINRA to operate
7  -- to be the manager of a firm commitment
8  offering; is that correct?
9  A.  Correct.
10 Q.  Okay.  Now, in this engagement
11 agreement, it's stating Alexander Capital's
12 intent to be the underwriter broker of a firm
13 commitment offering on behalf of Alterix; is
14 that fair?
15 A.  In the agreement, yes.
16 Q.  Okay.  Now, do you think that prior
17 to Alexander Capital entering into this
18 engagement agreement with Alterix dated July
19 29, 2014, that it had an obligation or
20 responsibility, in accordance with the
21 policies and practices of Alexander Capital,
22 LP, at that time, to have informed Alterix,
23 also known as, Inpellis, that at the time
24 that it entered into the engagement -- or at

Page 288

Rocco Guidicipietro

1  the time that it was to enter into the
2  engagement agreement, it did not have the
3  legal authority from FINRA to conduct a firm
4  commitment offering as the underwriter
5  broker?
6  A.  I wasn't involved in any of these
7  communications.  I don't know what they spoke
8  about, and I can't testify around who did
9  what at that time.
10 Q.  I appreciate that, but what my
11 question is:  Was it your understanding that
12 Alexander -- that the people associated with
13 Alexander Capital who were interacting and
14 communicating with the representatives of
15 Alterix, that prior to entering into the
16 engagement agreement in July of 2014, that
17 Alexander Capital, if it was to be in -- if
18 those employees of Alexander Capital who were
19 so interacting with the representatives of
20 Alterix, also known as Inpellis, that they
21 had an obligation or responsibility or a
22 requirement, in accordance with the Alexander
23 Capital policies and procedures at that time,
24 to inform the representatives of Alterix,

Page 289

1             Rocco Guidicipietro
2  also known as, Inpellis, that at that time,
3  Alexander Capital did not have the authority
4  from FINRA to be the underwriter broker on a
5  firm commitment basis?
6             MR. WARD:  Objection.
7             Confusing and vague and
8         speculation.
9      Q.  Does the question confuse you at
10 all, Mr. Guidicipietro?
11     A.  The whole question, my answer would
12 be, no, I don't believe they had any
13 obligation.
14     Q.  As you sit here today, do you
15 believe that Alexander Capital -- that people
16 working for Alexander Capital that are
17 interacting or communicating with companies
18 seeking Alexander Capital's services
19 regarding an intended offering, whether
20 Alexander Capital had -- has an obligation or
21 responsibility or requirement, in accordance
22 with Alexander Capital's policies and
23 procedures, to inform any such company that
24 Alexander Capital has or does not have
25 authorization from FINRA to conduct a firm

Page 290

1             Rocco Guidicipietro
2  commitment offer?
3             MR. WARD:  Objection; vague
4         and calls for legal conclusion.
5         You can answer, if you can.
6      A.  No.  Same thing.  Same answer.
7      Q.  All right.  So from 2014 to 2015,
8  and throughout to this present period, is it
9  your testimony that the policies and
10 procedures of Alexander Capital that were in
11 place at the time, 2014 and 2015, did not
12 require anyone working for Alexander Capital
13 to inform a company seeking its services as
14 to what kind of authority it had under FINRA,
15 regarding conducting an underwriting offering
16 -- conducting an offering?
17             MR. WARD:  Objection.  Calls
18         for a legal conclusion.  You may
19         answer.
20     A.  I am not aware of any rules or
21 obligations for us to disclose that, no.
22     Q.  All right.  As you -- during 2014
23 and 2015, did you -- was it your
24 understanding that companies that were
25 seeking Alexander Capital's underwriting

Page 291

1             Rocco Guidicipietro
2  services, that the information as to whether
3  in 2014 and 2015, that Alexander Capital did
4  not have the authority from FINRA to conduct
5  a firm commitment offering, whether that was
6  information that should have been -- excuse
7  me -- that that was information that such a
8  company would be -- would want to know, prior
9  to entering into an engagement agreement,
10 such as the one depicted in Exhibit 154?
11             MR. WARD:  Objection;
12         confusing and calls for
13         speculation.
14     Q.  Are you confused by my question?
15     A.  I don't -- I can't testify what
16 Alterix knew about Alexander.
17     Q.  Right, I am just asking in general,
18 based on your understanding, if a company
19 like Alterix, in 2014 and 2015, did you have
20 an understanding if a company like Alterix,
21 entered into -- was thinking about entering
22 into an engagement agreement, such as the one
23 we just read, similar to Exhibit 154, that
24 was it your understanding that a company like
25 that, intending to enter into a relationship

Page 292

1             Rocco Guidicipietro
2  with Alexander Capital, on the terms
3  discussed in that first paragraph, was it
4  your understanding that such a company would
5  want to know whether or not Alexander Capital
6  at that time had the authority from FINRA to
7  conduct a firm commitment offering as an
8  underwriter?
9      A.  Same answer; no obligation to tell
10 them.  Can't answer what they would want to
11 know.
12     Q.  And you have no -- as you're
13 sitting here today, do you have any reason to
14 believe that a company at that time would
15 want to know such information?
16     A.  They would just want to know that
17 we could raise the money.
18     Q.  And you do not believe it would be
19 important to a company, during 2014 and 2015,
20 to know that Alexander Capital did not have
21 the authority from FINRA to conduct firm
22 commitment offerings?
23     A.  I don't think it's our obligation
24 to -- there's no rules or regulations to tell
25 them we were intent in raising the money.

Page 293

1           Rocco Guidicipietro
2      Q.   To your knowledge, do you have any
3  reason to believe that anyone at Alexander
4  Capital ever informed anyone from Alterix or
5  Inpellis, from 2014 to 2015, ever informed
6  them that they did not have -- that Alexander
7  Capital did not have, throughout that period
8  of time, the authorization from FINRA to
9  conduct a firm commitment offering, or you're
10  not aware as to anyone at Alexander Capital,
11  during that time, that informed anyone from
12  Alterix or Inpellis about that?
13           MR. WARD:  Objection;
14      compound and confusing.
15           MR. SCHLICHTMANN:  I don't
16      want to be compound and confusing.
17           MR. WARD:  Misleading.
18           MR. SCHLICHTMANN:  I don't
19      want to be misleading.
20      Q.   Do you have any reason to believe,
21  during 2014 and 2015, that anyone from
22  Alexander Capital ever informed anyone from
23  Alterix or Inpellis, that Alexander Capital,
24  during that period of time, 2014 through
25  2015, did not have the authorization from

Page 294

1           Rocco Guidicipietro
2  FINRA to conduct a firm commitment offering
3  as the underwriter of that offering?
4      A.   I have no knowledge of anybody --
5  any conversation anybody had with the
6  company.
7      Q.   About that matter?
8      A.   About that matter.
9      Q.   Now, did you -- are you aware of
10  the fact that the board of directors of
11  Alterix/Inpellis -- excuse me.
12           Are you aware of the fact that a
13  registration statement was filed
14  confidentially regarding the Alterix/Inpellis
15  offering, in which Alexander Capital was the
16  intended underwriter, in April of 2015, and
17  as well as June of 2015, as well as August of
18  2015, as well as two more times, in October
19  of 2015, on a confidential basis?
20           Are you aware of that?
21      A.   No, I am not.  At that time, I
22  wasn't aware of.
23      Q.   I'm sorry?
24      A.   At that time I wasn't aware of it,
25  no.

Page 295

1           Rocco Guidicipietro
2      Q.   Are you aware -- were you aware of
3  the fact, in 2014 and 2015, that the
4  confidential filings that were made on those
5  -- on those times, June -- excuse me, April,
6  June, August, and twice in October, on a
7  confidential basis, that each time those
8  offerings stated that they were firm
9  commitment offerings that Alexander Capital
10  intended to underwrite on that basis?
11           Were you aware of that?
12      A.   No, I am not.  I wasn't.
13      Q.   Were you aware during that -- in
14  2015, that on -- at some point a public
15  filing was made regarding the Alterix
16  offering, I think previously you said you
17  were not aware until later, until after the
18  filing; is that correct?
19      A.   That's correct.
20      Q.   Okay.  Are you aware -- were you
21  aware in 2015, that on November 9, 2015, that
22  the board of directors reviewed a November
23  9th draft of the registration statement for
24  the Alterix/Inpellis offering, and that the
25  draft that they reviewed on November 9th was

Page 296

1           Rocco Guidicipietro
2  an offering which stated it was a firm
3  commitment offering that Alexander Capital
4  intended to underwrite as the sole book
5  running manager?  Were you aware of that?
6           MR. WARD:  Objection;
7      assumes facts not in the record.
8           MR. SCHLICHTMANN:  All
9      right.  Well, let me show you -- in
10      light of the objection, let me show
11      you something.
12           MR. WARD:  Do you have any
13      idea how much longer you will be
14      going?
15           MR. SCHLICHTMANN:  Yes, I am
16      definitely wrapping it up here.
17      This is my last -- I mean, we're
18      talking minutes.  Okay, I just got
19      to get the document up here, all
20      right.
21           MR. WARD:  Okay.
22      Q.   So...all right.  I am putting on
23  the screen what's previously been marked as
24  exhibit -- Plaintiff's Exhibit 34.  Do you
25  see it on the screen?

ROCCO GUIDICIPIETRO September 29, 2021
JOHN J. AQUINO -against- ALEXANDER CAPITAL 297–300

Page 297

1          Rocco Guidicipietro
2     A.  Yes.
3     Q.  Okay.  Do you recognize this as a
4  registration statement you're familiar with?
5  Not this particular one, but in general, the
6  form.
7     A.  In general, I have seen them, but
8  not familiar with them.
9     Q.  Okay.  I will represent to you that
10  this is the November 9th draft of the
11  registration statement that was submitted to
12  the board on the evening of November 9th for
13  their review and approval for filing the next
14  day, all right.  I represent to you that that
15  is true, okay?
16     A.  Okay.
17     Q.  This registration statement, with a
18  date of November 9th, states on page 2, "This
19  is a firm commitment initial public
20  offering."  Do you see that?
21     A.  Yes.
22     Q.  Okay.  And that this registration
23  statement, this draft, was approved by the
24  board for filing the next day, publicly.  I
25  want you to assume that that is true, what I

Page 298

1          Rocco Guidicipietro
2  just said, all right?
3     A.  Okay.
4     Q.  All right.  All right.  Now, I am
5  now going to put on the board -- on the
6  screen, excuse me, this is Exhibit 31, and
7  this is the public filing of the S-1
8  regarding the Inpellis offering, okay, dated
9  November -- that was filed on the evening of
10  November 10th.  All right.  I want you to
11  assume that that is true, all right?
12     A.  Okay.
13     Q.  Okay.  And this publicly filed
14  document -- this publicly filed registration
15  statement, Exhibit 31, states on the second
16  page, "This is an initial public offering of
17  shares of stock."
18        Do you see that?
19     A.  Yes.
20     Q.  And that this language is now
21  different than the one I just showed you that
22  was approved by the board on the evening of
23  November 9th, all right?
24        MR. WARD:  Objection.
25        MR. SCHLICHTMANN:  I'm

Page 299

1          Rocco Guidicipietro
2  sorry?
3     A.  There's no way of knowing that.
4        MR. WARD:  Assumes facts not
5        in evidence.
6     Q.  Well, I want you to assume what I
7  showed you was November 9th draft that we
8  just reviewed, and this -- that the board
9  approved for filing the next day, November
10  10th, and this is the registration statement
11  that was actually filed on the evening of
12  November 10th, all right?  I want you to
13  assume that that's true, okay?  And is it
14  fair to say that when you compare the one
15  that was approved on November 9th, on the
16  second page, it's different than the second
17  page of the one that was actually filed on
18  November -- the evening of November 10th?  Is
19  that true, comparing the two documents that I
20  represented to you what they are?
21     A.  What you are showing me --
22     Q.  Yes.
23     A.  -- are different, yes, looks
24  different.
25     Q.  And further down on this page, on

Page 300

1          Rocco Guidicipietro
2  the November 10th filing that was actually
3  made, it says, "The underwriters are selling
4  the shares of common stock, common stock, in
5  this offering on a best efforts basis."  Do
6  you see that?
7     A.  Yes.
8     Q.  "The underwriters are not required
9  to sell any specific number or dollar amount
10  of common stock, but will use their best
11  efforts to sell the securities offered.
12  Because this is a best efforts offering, the
13  underwriters do not have an obligation to
14  purchase any shares of common stock, and as a
15  result, there's a possibility that we may not
16  receive any proceeds from the offering."
17        Do you see that?
18     A.  Yes.
19     Q.  And was it your understanding, in
20  2014 and 2015, that a best efforts offering
21  was materially different than a firm
22  commitment offering, regarding the fact that
23  there was no guarantee by the underwriter, in
24  a best efforts offering, that any of the
25  shares would be sold?

Page 301

Rocco Guidicipietro

2  Is that fair to say; that was your
3  understanding?
4          MR. WARD:  Objection; lacks
5      personal knowledge.
6      Q.  Do you understand my question?
7      A.  I was going to say, no, can you
8  rephrase your question?
9      Q.  Okay.  All right.  You see the
10  statement in this registration statement that
11  was actually filed, and it explains what a
12  "best efforts offering" is; is that right?
13      A.  For the most part, yes.
14      Q.  Okay.  And was that consistent with
15  your understanding of what a best efforts
16  offering in 2015?
17      A.  Best efforts, any time, offering,
18  is consistent.
19      Q.  That statement in the actually
20  filed S-1, that statement is consistent about
21  what a best efforts offering is?
22      A.  Correct.
23      Q.  All right.  Now -- and based on
24  that statement of what a best efforts
25  offering is, did you have an understanding

Page 302

Rocco Guidicipietro

2  that that was materially different than a
3  firm commitment offering underwritten by an
4  underwriter?
5          MR. WARD:  Objection;
6      confusing.
7          MR. SCHLICHTMANN:  Okay, I
8      don't want to be confusing.
9      Q.  Is the statement that we just went
10  over about what a best efforts offering is,
11  is that a materially different -- is it
12  materially different in any way, in
13  accordance with your understanding, as to
14  what a firm commitment offering entailed?
15      A.  I don't believe it's materially
16  different.  It's a different way of raising
17  money for a company.
18      Q.  Okay, and what's the difference?
19      A.  The difference is in firm
20  commitment, you are obligated to buy the
21  shares.  In best efforts, you do your best
22  efforts to sell the shares.
23      Q.  Who was obligated to buy the
24  shares?
25      A.  In which one?

Page 303

Rocco Guidicipietro

2      Q.  Firm commitment.
3      A.  The firm is obligated to buy the
4  firm -- the shares.
5      Q.  When you say, "firm," you mean
6  Alexander Capital, LP?
7      A.  Alexander or, yes, any other firm
8  that was on the cover.
9      Q.  Okay.  So, on the November 9th
10  draft that I represented to you was approved
11  by the board that said it was a firm
12  commitment basis, is it fair to say that
13  under that registration statement that
14  purported to be a firm commitment offering,
15  that Alexander Capital, LP, that was intended
16  to be the underwriter of that offering, that
17  that -- under the terms of the firm
18  commitment offering, Alexander Capital had
19  the obligation to purchase a certain amount
20  of shares of that offering; is that correct?
21      A.  In a firm commitment offering, yes.
22      Q.  And as opposed to the one that was
23  actually filed the next day, Alexander
24  Capital had, as the intended underwriter, had
25  no obligation to purchase any shares of stock

Page 304

Rocco Guidicipietro

2  being offered; is that correct?
3      A.  That's correct.
4      Q.  And from the standpoint of the
5  company, Alterix or Inpellis, did you have
6  any understanding, as of that time, that a
7  company like Alterix and Inpellis, okay, that
8  had a best efforts offering as -- whether it
9  would have a preference as to whether it
10  would want a firm commitment or best efforts
11  offering, because of that that difference we
12  just talked about, or you had no such
13  understanding?
14      A.  No such understanding.  Would just
15  want the money raised.
16      Q.  Was it -- is it your testimony that
17  you did not understand that a company such as
18  Alterix or Inpellis, that was going to have
19  an initial public offering underwritten by
20  Alexander Capital, would have any reason to
21  prefer a firm commitment offering
22  underwritten by Alexander Capital, as opposed
23  to a best efforts offering where Alexander
24  Capital was the underwriter?
25      A.  The company would prefer a firm

Page 305

1              Rocco Guidicipietro
2    commitment.
3         Q.   Okay.  Why?
4         A.   Because then the firm is obligated
5    to raise the money.
6         Q.   Okay.  And when you use the word
7    "company," you are referring to issuer as the
8    company.  In other words, Alterix or
9    Inpellis, in this instance, would be the
10   issuing company, correct?
11        A.   Correct.
12        Q.   And the firm you are referring to
13   as the "underwriter," Alexander Capital, the
14   intended underwriter of the offering; is that
15   correct?
16        A.   Correct.
17        Q.   And so it is your testimony that
18   your understanding was that a company like
19   Alterix or Inpellis would prefer a firm
20   commitment offering underwritten by Alexander
21   Capital, as opposed to a best efforts
22   offering in which Alexander Capital was the
23   underwriter; is that correct?
24             MR. WARD:  Objection; calls
25        for speculation.

Page 306

1              Rocco Guidicipietro
2         Q.   Is that correct?
3         A.   I will not speculate what they
4    wanted.  Firm commitment would probably be
5    what they wanted.
6         Q.   Okay.  Why would it probably be
7    what they wanted?  And when you say, "what
8    they wanted," you're referring to the
9    company; is that correct?
10        A.   Yes.
11        Q.   Okay.  Why would -- why did you
12   just say that they would prefer -- the
13   company would prefer the firm commitment
14   offering?
15        A.   It's more likely that a firm
16   commitment would be raising the money for the
17   company.
18        Q.   As opposed to a best efforts
19   offering?
20        A.   Right, but that doesn't mean it
21   can't raise the money best efforts.
22        Q.   Right.  But firm commitment, from a
23   company standpoint, has a guarantee to it
24   that the best efforts offering does not; is
25   that correct?

Page 307

1              Rocco Guidicipietro
2         A.   It -- actually, I have seen firm
3    commitment deals pulled at six o'clock at
4    night because they can't raise the money.
5    You can still cancel the deal.  So it doesn't
6    really matter.
7         Q.   All right.  But there are -- under
8    the underwriting agreements, it's usually the
9    circumstances under which that occur are
10   spelled out; is that correct?
11        A.   "Spelled out" as far as what?
12        Q.   In the engagement agreement or the
13   underwriting agreement, excuse me.
14             MR. WARD:  Objection; calls
15        for speculation.
16        A.   Again, I am not familiar with
17   banking that much.  I am just giving you some
18   experience I have had.
19        Q.   Yeah.
20        A.   I have seen firm commitment deals
21   cancels just as much as best efforts deals
22   cancel.
23        Q.   Okay, but despite that, is it still
24   your testimony, unless you want to change it,
25   that a company like Alterix or Inpellis, if

Page 308

1              Rocco Guidicipietro
2    given a choice between Alexander Capital as a
3    firm commitment underwriter, as opposed to a
4    best efforts underwriter, that the company,
5    for the reasons you have expressed, would
6    prefer to have the firm commitment offering
7    because there's a greater chance they are
8    actually going to see money, as opposed to a
9    best efforts, which is a maybe?
10             MR. WARD:  Objection; calls
11        for speculation.
12        Q.   Is that fair?
13        A.   Yes.
14        Q.   All right.  Previously -- just want
15   to make sure that I am clear.  Previously you
16   talked about best practices regarding
17   disclosures on a registration statement; is
18   that correct?
19             Do you remember that?
20        A.   Yes.
21        Q.   Okay.  I am going to show you a
22   document and I am done here.  Okay.  All
23   right, I am going to show you -- I am going
24   to show you what's previously been marked as
25   Exhibit 130, Plaintiff's Exhibit 130.  It's

Page 309

Rocco Guidicipietro

1 an e-mail from Mr. Marsico dated November 10,
2 2015, to Mr. Carlin, and Mr. Gazdak. Do you
3 see that?
4     A.  Yes.
5     Q.  And its subject is "SEC comment
6 letter, confidential Inpellis, Inc., S-1."
7       Do you see that?
8     A.  Yes.
9     Q.  And it's an 11/10/2015 letter. Do
10 you see that?
11    A.  Yes.
12    Q.  The attachment to it is that
13 letter. Do you see that? It says that.
14    A.  Yes.
15    Q.  Okay. And then it has
16 attorney-client privileged communication
17 which has been blacked out, and now I want to
18 show you the attachment that went to Mr.
19 Carlin and Mr. Gazdak on November 10th that
20 was attached to Exhibit 130. In 2015, were
21 you familiar with the fact that when
22 registration statements were filed on a
23 confidential basis, that -- that the Division
24 of Corporate Finance at the SEC would provide

Page 310

Rocco Guidicipietro

1 comments to the issuing company and the
2 underwriter regarding the disclosures made in
3 the registration statement as to whether they
4 were satisfactory or not, or required more
5 information?
6       Were you aware that that was the
7 practice regarding registration --
8 confidential registration statement filings?
9     A.  No, I was not.
10    Q.  Okay. Were you aware of the fact
11 that -- were you aware of the Division of
12 Corporate Finance of the SEC, that that
13 existed, there was a Division of Corporate
14 Finance?
15    A.  I know there's a Division of
16 Corporate Finance, but I am not familiar with
17 their procedures.
18    Q.  Were you aware, in 2015, that the
19 Division of Corporate Finance would, as a
20 matter of practice, respond to confidential
21 filings by companies and their underwriter
22 regarding the disclosures that were made, and
23 that they would provide comments regarding
24 those disclosures, or you were not aware at

Page 311

Rocco Guidicipietro

1 that time?
2     A.  Not aware of it at that time.
3     Q.  Are you aware of it now?
4     A.  I know that comments go back and
5 forth, but I am not familiar with the
6 process.
7     Q.  All right. I represent to you that
8 this is -- Exhibit 131 is a comment letter by
9 the Division of Corporate Finance, and that
10 they had made a comment in response to each
11 of the filings I previously talked about,
12 each of the confidential filings. This is a
13 response dated November 10, 2015, from Corp.
14 Fin. that went to Mr. Mooney, as president
15 and CEO of Inpellis, regarding the Inpellis,
16 Inc., draft registration statement that was
17 filed on October 28th on a confidential
18 basis.
19       Do you see that?
20    A.  Yes.
21    Q.  Okay. And in this it states,
22 general, number 1, "We note your response to
23 comment one that they had previously given.
24 However, you continue to omit the disclosure

Page 312

Rocco Guidicipietro

1 contained in your previous submissions.
2 Please add back disclosure regarding
3 Biochemics, as it appears material to an
4 understanding of your business." Do you see
5 that?
6     A.  Yes.
7     Q.  All right. And then it goes on.
8 But was it -- now, this comment letter, as
9 you can see from the e-mail from Mr. Marsico,
10 went to Mr. Carlin and Mr. Gazdak on November
11 10th, the day that the comment letter was
12 received; is that correct?
13       That's your understanding from the
14 e-mail I just showed you, Exhibit 130, that
15 this was attached to?
16    A.  From the e-mail, yes.
17    Q.  I'm sorry?
18    A.  From the e-mail you showed me.
19    Q.  Yes, correct. All right. Was it
20 your understanding that Alexander Capital, as
21 the intended underwriter of an offering --
22 intended underwriter of an offering of a
23 company who was representing, that it would
24 review, as a matter of regular routine, the

Page 313

1              Rocco Guidicipietro
2  comment letters that were being made by Corp.
3  Fin. at the SEC, in relationship to
4  registration statements that were being
5  confidentiality filed in which Alexander
6  Capital had involvement?
7          MR. WARD:  Objection;
8      confusing.
9          MR. SCHLICHTMANN:  All
10     right, I don't want to be
11     confusing.
12     Q.  Is it your understanding that
13  Alexander Capital, LP, as indicated by this
14  e-mail containing this attachment of the
15  comment letter, that it was part of the
16  ordinary course for Alexander Capital, as the
17  intended underwriter of an offering involving
18  itself, that it would review any comment
19  letters made by the SEC in regard to any
20  confidential filings that were made in an
21  offering that they were involved in, or you
22  had no such understanding?
23     A.  I don't know what their procedures
24  are during a transaction.
25     Q.  All right.  And as you sit here

Page 314

1              Rocco Guidicipietro
2  today, are you aware that Alexander Capital,
3  during 2014 and 2015, would review comment
4  letters made by the SEC regarding the filing
5  of confidential registration statements
6  regarding offerings in which Alexander
7  Capital was involved?
8      A.  I don't know.
9          MR. WARD:  Objection; vague.
10     Q.  Even as you sit here today?
11     A.  I don't know what -- how banking
12  interacts with the counsel for the company or
13  the company itself.
14     Q.  Previously I showed you the
15  application -- the continuing membership
16  application which talked about what it stated
17  was the -- that Alexander Capital would do
18  concerning disclosures and registration
19  statements in which it participated, and I
20  also -- and we discussed best practices
21  regarding that.  Now, in regards to this
22  comment letter of November 10th, which is
23  noting that there's a continuation of an
24  omission of disclosure from previous
25  submissions, and a direction to add back the

Page 315

1              Rocco Guidicipietro
2  disclosures that had been omitted that were
3  contained in previous commissions, is it your
4  understanding as of 20- -- is it your
5  understanding that best practices in 2015
6  would have been for any such omitted
7  disclosures to be fully reinstated, if the
8  SEC was directing that they be added back?
9          MR. WARD:  Objection; vague
10     and confusing.
11     Q.  Did you understand my question?
12     A.  My answer would be, it's not our
13  belief -- it's not our obligation.  There's
14  no rules or FINRA SEC rules that we are
15  obligated to.  I believe that's the company's
16  obligation to make sure it's correct.
17     Q.  Okay.  And no obligation -- you're
18  not aware of any requirement or obligation on
19  the part of Alexander Capital, regarding the
20  integrity of the disclosures made in a
21  registration statement in which it was the
22  intended underwriter?  Is that what you are
23  saying?
24     A.  That's what I am saying, correct.
25     Q.  Now, how about regarding best

Page 316

1              Rocco Guidicipietro
2  practices?
3      A.  When I was referring to "best
4  practices," it was for us, for our customers,
5  retail customers, not -- I didn't include the
6  registration statement or the issue
7  information.  It's information that we
8  provide to our customers.  Our best practice
9  is to try to make sure it's as accurate as
10  possible, but no obligation or rules to do
11  that.
12     Q.  Okay.  Well, you said as to your
13  retail customers, you mean selling of
14  securities for retail customers?  Is that
15  what you are saying?
16     A.  Yes, after we can sell, after it's
17  effective.
18     Q.  Okay.  You understood that best
19  practices meant you should be honest with the
20  customer on whose behalf you are selling
21  these securities; is that correct?
22     A.  Yes.
23     Q.  Regarding the underwriting of an
24  offering by Alexander Capital, did you
25  understand that there were any best practices

Page 317

Rocco Guidicipietro

1       regarding Alexander Capital's conduct
2   regarding checking to see if the disclosures
3   were full and complete and truthful?
4       A.  No.
5       Q.  So you believed -- you had an
6   understanding in 2015 that Alexander Capital
7   -- that best practices required Alexander
8   Capital to be honest after an offering went
9   public, but that you had no understanding
10  that Alexander Capital, in accordance with
11  best practices, had any requirement to tell
12  -- to ensure the integrity of any disclosures
13  in a registration statement in which it was
14  the intended underwriter?  Is that what you
15  are saying?
16          MR. WARD:  Objection;
17      compound, misleading, and
18      argumentative.
19          MR. SCHLICHTMANN:  I don't
20      think it's any of those things.
21      Q.  But did you understand the
22  question, Mr. Guidicipietro?  I will repeat
23  it or restate it, if you don't.
24      A.  Sure, restate the question, so I

Page 318

Rocco Guidicipietro

1   can make sure I answer it correctly.
2       Q.  Okay.  All right.  If I understand
3   your testimony correctly, you understood, in
4   2015, that there was best practices that
5   required Alexander Capital to deal honestly
6   with customers in a -- who were involved in a
7   public offering, after it went public; is
8   that correct?
9       A.  Yes, after it goes public.
10      Q.  Okay.  Did you have any
11  understanding of any kind as to whether there
12  were any best practices, as of July 15th,
13  that required Alexander Capital to ensure
14  that the disclosures in a registration
15  statement, in which it was the intended
16  underwriter, prior to its going effective,
17  were complete, honest, truthful?
18      A.  I don't believe it's any obligation
19  on Alexander.  The obligation is on the
20  issuer and its counsel.
21      Q.  Now, regarding the filing -- the
22  public filing of a registration statement, is
23  your answer the same, that it was not your
24  understanding that Alexander Capital had any

Page 319

Rocco Guidicipietro

1       requirement, either under the rules and
2   regulations of the SEC or FINRA, or in
3   accordance with best practices, that it had
4   any requirement regarding any of those things
5   -- rules and regulations of FINRA, rules and
6   regulations of the SEC, or in accordance with
7   best practices, as of 2015, that Alexander
8   Capital had any requirement to review and
9   determine -- make a determination that the
10  disclosures in that registration statement
11  that were intend to be publicly filed, were
12  accurate, complete, and truthful?
13      A.  I am not aware of any regulations
14  or requirements that is on Alexander to make
15  sure that they are correct.
16      Q.  And is that also true about best
17  practices, you are not aware of any best
18  practices that would have required Alexander
19  Capital to ensure the integrity of any
20  disclosures in a registration statement that
21  was being intended to be filed publicly in
22  which Alexander Capital was the intended
23  underwriter?
24      A.  I don't know of -- I am not aware

Page 320

Rocco Guidicipietro

1       of any requirements to do that.
2       Q.  In accordance with best practices?
3       A.  Yes.  Again, I believe it's on the
4   issuer that files it with the SEC, they
5   require to be accurate and true.
6       Q.  And are you aware of the fact that
7   between November 9th and November 10th of
8   2015, that, in fact, there was a switch from
9   a firm commitment offering to a best efforts
10  offering, and that a best efforts offering
11  was actually filed on November 10th, as
12  opposed to a firm commitment offering,
13  regarding the Alterix/Inpellis offering?
14      A.  No, I was not.
15      Q.  And is -- was it your understanding
16  that if Alexander Capital -- that -- was it
17  your understanding, in 2015, as to whether or
18  not a last minute switch over a 24-hour
19  period was in -- from a firm commitment to a
20  best efforts filing, was in accordance with
21  the best practices, as you understood them to
22  be in 2015?
23      A.  Yes, I don't see any issue with
24  that.

Page 321

Rocco Guidicipietro

Q. Was it your understanding that if an offering that was a firm commitment offering is switched to a best efforts offering, that that would require a -- changes to the offering that would be throughout the offering?

Was that your understanding or you didn't have such an understanding?

A. I am not familiar with the procedure. I don't know if it's just in one spot or anywhere else, no.

Q. All right. I have no further questions. Thank you very much.

THE VIDEOGRAPHER: Can you unshare your screen, sir?

MR. SCHLICHTMANN: I am sorry, I will.

THE VIDEOGRAPHER: Thank you.

THE REPORTER: Can we take a short break before you start, Mr. Ward?

MR. WARD: Sure.

THE VIDEOGRAPHER: Going off

Page 322

Rocco Guidicipietro

the record. The time is 6:01.

(Whereupon, a recess was taken at this time.)

THE VIDEOGRAPHER: We are now back on the record. The time is 6:10.

EXAMINATION BY
MR. WARD:

Q. Thank you. Mr. Guidicipietro, you had testified earlier about the need for FINRA approval when a member firm has a change in ownership. Is it true for every change in ownership that FINRA approval was required?

A. No, it's not required for every change in ownership.

Q. Okay. So that would apply only to certain changes of ownership of member firms?

A. That's correct.

Q. You had testified earlier about not remembering or knowing where Alterix could have gone to get information about Alexander Capital's ability to handle firm commitment underwriting.

Page 323

Rocco Guidicipietro

Do you recall that?

A. Yes, I do.

Q. Have you had a chance to think that over? Has anything occurred to you in that regard?

A. Yes.

Q. What is that?

A. If they were to ask somebody at Alexander Capital if we could do it, if they didn't have the knowledge, they could find out if we were able to, if we were approved to do it or not.

Q. When you are saying, "they would have found out," to whom are you referring?

A. I am saying if the company would have asked one of the Alexander employees, if we were able to do firm commitment underwriting, that they would be able to -- if they didn't know the answer, they would be able to find out from us.

Q. Are you saying the person at Alexander Capital they would contact would be able to get that information?

A. Yes, they would be able to get that

Page 324

Rocco Guidicipietro

information.

Q. You had referred -- well, we've seen references to you and Mr. Amato as owners of Alexander Capital. Are you now or have you ever been an owner of Alexander Capital?

A. No, I have not.

Q. When we see references to you as somehow an owner of Alexander Capital, to your understanding, what is that referring to?

A. Indirect ownership through Nesa Management.

Q. That is the sole way in which you could be considered to have any ownership of Alexander Capital; is that right?

A. That's correct.

Q. Are you now or have you ever been a partner in Alexander Capital?

A. No, I have not.

Q. I have nothing further.

BY MR. SCHLICHTMANN:

Q. Mr. Guidicipietro, regarding the need for FINRA approval, is it -- was it your

Page 325

Rocco Guidicipietro

1  understanding in 2014 and 2015, and to this
2  day, that FINRA approval was necessary if
3  there was a change in ownership greater than
4  25 percent?  Is that your understanding?
5      A.  Yes, greater than 25 percent.
6      Q.  Change in ownership less than 25
7  percent did not require FINRA approval; is
8  that your understanding then and now?
9      A.  Yes, correct.
10     Q.  You were asked some questions about
11 the fact that if somebody wanted to know if
12 Alexander Capital had firm commitment
13 authority in 2014 and 2015, that they could
14 find out by talking to someone at Alexander
15 Capital; is that correct?
16     A.  Yes.
17     Q.  To your knowledge, who at Alexander
18 Capital, in 2014 and 2015, would have the
19 knowledge as to whether or not Alexander
20 Capital had the authority under its FINRA
21 membership to conduct a firm commitment
22 offering?
23     A.  I can only speak for myself.  I had
24 the knowledge.

Page 326

Rocco Guidicipietro

1      Q.  Okay.  Do you know if Mr. Stack had
2  the knowledge?
3      A.  I don't know.
4      Q.  Do you know if Mr. Gazdak had the
5  knowledge?
6      A.  I don't know.
7      Q.  Do you know if Mr. Carlin had the
8  knowledge?
9      A.  I don't.
10     Q.  And during the entire period 2014
11 to 2015, did you have any communications
12 directly or indirectly with anyone
13 representing Alterix or Inpellis about
14 whether Alexander Capital had firm commitment
15 authority from FINRA or not?
16     A.  I did not.
17     Q.  And are you aware as to whether Mr.
18 Gazdak, Mr. Carlin, or Mr. Stack had any
19 communications with anyone from Alterix or
20 Inpellis, regarding whether Alexander Capital
21 had authorization from FINRA to conduct a
22 firm commitment offering?
23     A.  I do not.
24     Q.  And you were asked some questions

Page 327

Rocco Guidicipietro

1  of ownership of Alterix.  Your ownership and
2  Mr. Amato's ownership, your testimony is,
3  comes through --
4          MR. WARD:  You just said
5      "Alterix."  I think you meant
6      "Alexander Capital."
7          MR. SCHLICHTMANN:  Sorry.
8      Thank you.  It's late in the day.
9      Thank you for correcting me.
10     Q.  You were asked some questions about
11 the ownership of Alexander Capital; is that
12 correct?
13     A.  Yes.
14     Q.  And is it your testimony that the
15 ownership of Alexander Capital that you have
16 comes through your ownership of Nesa,
17 N-E-S-A, Management, LLC; is that correct?
18     A.  Yes, that's correct.
19     Q.  And during 2014 and 2015, is the
20 same answer true as of 2014 and 2015, that
21 any ownership interest that you had in
22 Alexander Capital was through your ownership
23 interest in Nesa Management, LLC?
24     A.  Yes, correct.

Page 328

Rocco Guidicipietro

1      Q.  And during that period it was your
2  understanding that Nesa Management, LLC was a
3  managing partner of Alexander Capital, LP; is
4  that correct?
5      A.  It was a -- it was a minority
6  partner.
7      Q.  Right, it was -- but a minority
8  partner that was engaged in the management of
9  Alexander Capital, LP; is that correct,
10 during 2014 and 2015?
11     A.  It was operating as Alexander
12 Capital.
13     Q.  Right, but were you aware during
14 2014 and 2015, as to whether any other
15 partner in Alexander Capital was conducting
16 management of the -- of Alexander Capital,
17 LP, other than Nesa Management, LLC?
18     A.  No, no other partner was.
19     Q.  And were you aware -- what was your
20 understanding as to how Nesa Management, LLC
21 performed its management responsibilities?
22     Q.  Through whom did it do that?
23     A.  Well, I was going to clarify that a
24 little bit.  Nesa Management can't operate a

Page 329

1          Rocco Guidicipietro
2  broker-dealer.  You have to be licensed.  So
3  Joe -- myself and Joseph Amato were operating
4  the broker-dealer with our FINRA licenses.
5  Has nothing to do with the ownership that
6  Nesa had with Alexander Capital.
7      Q.  Okay, and but -- but you consider
8  that Nesa Management was the managing partner
9  of Alexander Capital during 2014 and 2015; is
10 that correct?
11     A.  No, it wasn't managing the firm.
12 The corporation can't manage it.  It was an
13 owner of the firm.
14     Q.  The people who were managing, the
15 ultimate managers were yourself and Mr. Amato
16 during 2014 and 2015; is that correct?
17     A.  We had other individuals under us
18 that were managing the firm also.
19     Q.  Yeah, under you.  But you were the
20 two at the top, you and Mr. Amato?
21     A.  Right, but we designated all the
22 duties to other personnel.
23     Q.  Correct, and we discussed that.
24 Thank you.
25          So is it fair to say that any

Page 330

1          Rocco Guidicipietro
2  management of Alexander Capital that occurred
3  in 2014 to 2015, was through you and Mr.
4  Amato, as the ultimate managers of the firm
5  during that period; is that correct?
6      A.  Not completely.  The chief
7  compliance officer has a large responsibility
8  for operating the firm.
9      Q.  Right, but he is superior -- he is
10 inferior to you, is that correct, was during
11 that time?
12     A.  In certain aspects he is not.
13 We're not allowed to deter him, we are not
14 allowed to do certain things with a chief
15 compliance officer.
16     Q.  All right.  I have no further
17 questions.  Thank you very much.  I
18 appreciate it.
19          MR. WARD:  Nothing further
20     from me.
21          THE VIDEOGRAPHER:  Okay,
22     let's go off the record one moment.
23     The time is 6:19.  Please stand by.
24          (Whereupon, a recess was
25     taken at this time.)

Page 331

1          Rocco Guidicipietro
2          THE VIDEOGRAPHER:  The time
3  is 6:20.  This now concludes the
4  video conference deposition of
5  Rocco Guidicipietro.  At this time
6  we ask that all parties stay
7  connected briefly to provide your
8  transcript and/or video order to
9  the court reporter.
10          Mr. SCHLICHTMANN, would you
11 like to order video?
12          MR. SCHLICHTMANN:  I do, and
13 I also want a rough.
14          THE VIDEOGRAPHER:  Would you
15 like that synched with the
16 transcript?
17          MR. SCHLICHTMANN:  Yes.
18          THE VIDEOGRAPHER:  Thank
19 you.  Mr. Ward?
20          MR. WARD:  Same thing,
21 please.
22          MR. SCHLICHTMANN:
23 Transcript and synched video?
24          MR. WARD:  I don't need the
25 synched video, but the transcript,

Page 332

1          Rocco Guidicipietro
2  and the rough.
3          THE VIDEOGRAPHER:  Okay,
4  thank you.  We are now going off
5  the record on September 29, 2021,
6  at 6:21 p.m.
7               -oOo-
8          (Whereupon, the examination
9  of ROCCO GUIDICIPIETRO was
10 adjourned at 6:21 p.m.)
11
12
13
14
15          ROCCO GUIDICIPIETRO
16
17
18 Subscribed and sworn to
19 before me this      day
20 of          , 2021.
21
22
23 NOTARY PUBLIC
24
25

ROCCO GUIDICIPIETRO
JOHN J. AQUINO -against- ALEXANDER CAPITAL

September 29, 2021
333—336

Page 333

1

2 ----------------- I N D E X -----------------

3

4 WITNESS    EXAMINATION BY        PAGE

5 ROCCO GUIDICIPIETRO

6        MR. SCHLICHTMANN    7, 324

7        MR. WARD            322

8

9 ----------------- EXHIBITS ------------------

10 PLAINTIFF'S              FOR ID.

11 EXHIBIT 132    Chart    premarked

12 EXHIBIT 28    Certification  premarked

13 EXHIBIT 182    Amended Cert.  premarked

14 EXHIBIT 181    Document    premarked

15 EXHIBIT 54    E-mails    premarked

16 EXHIBIT 59    E-mail    premarked

17 EXHIBIT 142    E-mail    premarked

18 EXHIBIT 142A    Application  premarked

19 EXHIBIT 143    E-mail    premarked

20 EXHIBIT 143A    FINRA Letter  premarked

21 EXHIBIT 135    Application  premarked

22 EXHIBIT 129    Letter    premarked

23 EXHIBIT 161    Certification  premarked

24 EXHIBIT 127    FINRA Letter  premarked

25 (Exhibits continued.)

Page 334

1

2 ----------------- EXHIBITS ------------------

3 PLAINTIFF'S              FOR ID.

4 EXHIBIT 147    Report    premarked

5 EXHIBIT 148    Report    premarked

6 EXHIBIT 149    Report    premarked

7 EXHIBIT 32    Order    premarked

8 EXHIBIT 29    Report    premarked

9 EXHIBIT 154    Agreement    premarked

10 EXHIBIT 34    Statement    premarked

11 EXHIBIT 31    S-1    premarked

12 EXHIBIT 130    E-mail    premarked

13 EXHIBIT 131    Letter    premarked

14    (Exhibits retained by attorney.)

15 -----------------------------------------------

16

17

18

19

20

21

22

23

24

25

Page 335

1

2        C E R T I F I C A T E

3

4 STATE OF NEW YORK    )

                      : ss.

5 COUNTY OF NEW YORK  )

6

7    I, AYDIL M. TORRES, a Notary Public

8 within and for the State of New York, do

9 hereby certify:

10    That ROCCO GUIDICIPIETRO, the witness

11 whose deposition is hereinbefore set forth,

12 was duly sworn by me and that such deposition

13 is a true record of the testimony given by

14 the witness.

15    I further certify that I am not

16 related to any of the parties to this action

17 by blood or marriage, and that I am in no way

18 interested in the outcome of this matter.

19    IN WITNESS WHEREOF, I have hereunto

20 set my hand this 29th day of September, 2021.

21

22

23

24        AYDIL M. TORRES

25

Page 336

1

2        DEPOSITION ERRATA SHEET

3

4 Our Assignment No.  J7461932

5 Case Caption:  JOHN T. AQUINO, CH 7 vs.

6 ALEXANDER CAPITAL, LP, ET. AL

7    DECLARATION UNDER PENALTY OF PERJURY

8    I declare under penalty of perjury

9 That I have read the entire transcript of

10 My Deposition taken in the captioned matter

11 Or the same has been read to me, and

12 The same is true and accurate, save and

13 Except for changes and/or corrections, if

14 Any, as indicated by me on the DEPOSITION

15 ERRATA SHEET hereof, with the understanding

16 That I offer these changes as if still under

17 Oath.

18 _____

19        ROCCO GUIDICIPIETRO

20 Subscribed and sworn to on the _____ day of

21 _____, 20_____ before me,

22

23 _____

24 Notary Public,

25 In and for the State of _____

Page 337

```
1
2        DEPOSITION ERRATA SHEET
3    Page No._____Line No._____Change
4    to:_____
5    _____
6    Reason for
7    change:_____
8    Page No._____Line No._____Change
9    to:_____
10   _____
11   Reason for
12   change:_____
13   Page No._____Line No._____Change
14   to:_____
15   _____
16   Reason for
17   change:_____
18   Page No._____Line No._____Change
19   to:_____
20   _____
21   Reason for
22   change:_____
23   SIGNATURE:_____DATE:_____
24        ROCCO GUIDICIPIETRO
25
```

Page 338

```
1
2        DEPOSITION ERRATA SHEET
3    Page No._____Line No._____Change
4    to:_____
5    _____
6    Reason for
7    change:_____
8    Page No._____Line No._____Change
9    to:_____
10   _____
11   Reason for
12   change:_____
13   Page No._____Line No._____Change
14   to:_____
15   _____
16   Reason for
17   change:_____
18   Page No._____Line No._____Change
19   to:_____
20   _____
21   Reason for
22   change:_____
23   SIGNATURE:_____DATE:_____
24        ROCCO GUIDICIPIETRO
25
```