**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN J. AQUINO, ) | |
| CHAPTER 7 TRUSTEE ) | Case #1:21-cv-01355-JSR |
| By Its Assignee, ) | |
| Convergent Distributors of Texas, LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ALEXANDER CAPITAL, LP ) | |
| & ) | |
| Its Managing Partners: ) | |
| JOSEPH AMATO, ) | |
| ROCCO GUIDICIPIETRO, and ) | |
| NESA MANAGEMENT, LLC ) | |
| ) | |
| Defendants ) | |

**DECLARATION OF WILLIAM C. RAND, ESQ.**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


# EXHIBIT 17

# 9-21-21 Dep. Testimony of J. Gazdak

```
 1    UNITED STATES DISTRICT COURT

 2    SOUTHERN DISTRICT OF NEW YORK
      --------------------------------------------X
 3    JOHN J. AQUINO,
      CHAPTER 7 TRUSTEE,
 4    By Its Assignee,
      Convergent Distributors of Texas, LLC,

 5
                                       Plaintiff,
 6
               -against-              Case No.
 7                                    1:21-cv-01355-JSR

 8    ALEXANDER CAPITAL, LP.,
                    &
 9    Its Managing Partners:
      JOSEPH AMATO,
10    ROCCO GUIDICIPIETRO, and
      NESA MANAGEMENT, LLC,

11
                                       Defendants.
12    --------------------------------------------X
                                     Held Remotely Via
13                                   Zoom Videocommunications

14                                   September 21, 2021
                                     10:13 a.m.
15

16

17              VIDEOTAPED DEPOSITION of the defendant,

18       Alexander Capital, LP, by JONATHAN GAZDAK, taken

19       pursuant to Order, before Kari L. Reed, a Notary

20       Public within and for the State of New York.

21

22

23

24              Job Number. 798432

25
```

JONATHAN GAZDAK - 09/21/2021

Page 2

1  A P P E A R A N C E S :

2

3      JAN SCHLICHTMANN, ESQ.
       Attorney for Plaintiff
4         P.O. Box 233
          Prides Crossing, Massachusetts 01965
5      978.804.2553
       jan@schlichtmannlaw.com
6

7  HOLCOMB & WARD, LLP
   Attorneys for Defendants
8      3455 Peachtree Road, NE, Suite 500
       Atlanta, Georgia 30326
9
   BY:  BRYAN WARD, ESQ.
10          -and-
         HOLLY COLE, ESQ.
11          -and-
         AARON WRIGHT, ESQ.
12     404.601.2803
13
14
   ALSO PRESENT:
15
       AMELIA SCHNEIDER, Videographer
16
       JACK ALTSCHULLER, ESQ.
17
18                    *     *     *
19
20
21
22
23
24
25

Page 3

1  F E D E R A L   S T I P U L A T I O N S

2

3

4      IT IS HEREBY STIPULATED AND AGREED by

5  and between the counsel for the respective

6  parties herein that the sealing, filing and

7  certification of the within deposition be

8  waived; that the original of the deposition

9  may be signed and sworn to by the witness

10  before anyone authorized to administer an

11  oath, with the same effect as if signed

12  before a Judge of the Court; that an

13  unsigned copy of the deposition may be used

14  with the same force and effect as if signed

15  by the witness, 30 days after service of the

16  original & 1 copy of same upon counsel for

17  the witness.

18

19      IT IS FURTHER STIPULATED AND AGREED

20  that all objections except as to form, are

21  reserved to the time of trial.

22

23          *     *     *     *

24

25

Page 4

1      THE VIDEOGRAPHER:  Okay, we are on the

2  record.  The date is September 21st, 2021.  The

3  time is 10:13 a.m.  This is the beginning of the

4  deposition of Jonathan Gazdak in the matter of

5  John J. Aquino, Chapter 7 Trustee, versus

6  Alexander Capital, LP, et al.  This deposition is

7  being held via Zoom.  The court reporter is Kari

8  Reed.  I am Amelia Schneider, a videographer on

9  behalf of Litigation Services.  This deposition

10  is being videotaped at all times unless specified

11  to go off the record.

12      Would all present please identify

13  themselves, beginning with the witness.

14      THE WITNESS:  Yes.  Jonathan Gazdak.

15      MR. SCHLICHTMANN:  Jan Schlichtmann,

16  attorney for the plaintiff.

17      MR. WARD:  The people with you, Jack?

18  The people in the room with you, Jack, can you

19  introduce Jack, please?

20      THE VIDEOGRAPHER:  They can hear you.

21      MR. SCHLICHTMANN:  Oh, they can?

22      THE VIDEOGRAPHER:  Yes.

23      MR. SCHLICHTMANN:  Yeah, yeah, I'm sorry.

24  And with me participating, excuse me, observing,

25  in the room is Jack Altschuller.  He will not be

26  participating, he is, however, observing.  Jack

Page 5

1  Altschuller, who's an attorney, yeah.

2      MR. WARD:  And Bryan Ward of Holcomb &

3  Ward, and I represent the defendants.  With me,

4  I'll just go ahead and introduce them, remotely,

5  are Aaron Wright and Holly Cole, also of Holcomb

6  & Ward.

7      THE VIDEOGRAPHER:  Okay.  Could the court

8  reporter please swear in the witness and then we

9  can proceed.

10  JONATHAN GAZDAK, having been first duly sworn or

11  affirmed, by the notary public, was examined and

12  testified as follows:

13  EXAMINATION BY

14  MR. SCHLICHTMANN:

15      Q.    Good morning, Mr. Gazdak.  I appreciate

16  very much your agreeing to sit for this deposition.

17  And, as you know, my name is Jan Schlichtmann, and I'll

18  be obviously asking questions of you this morning.

19          We're -- the agreement between counsel is

20  that if there's any objections to any of my questions,

21  your attorney will be making an objection and

22  indicating the basis as necessary.  In the event that

23  we need to have a conversation between the attorneys,

24  we're in agreement that we'll go off the record, have

25  that conversation as it's needed, and if something

JONATHAN GAZDAK - 09/21/2021

Page 6

1  needs to be said on the record we'll then put it on the
2  record.
3          Also I have said to you earlier and I
4  want to now reaffirm it, is that at any time if I ask a
5  question and for any reason you would like to take a
6  break or you want to discuss it with your attorney,
7  feel free to do so and the plaintiff is not going to
8  make any inferences or make any references to the fact
9  that there was a break between the question and the
10  answer.  The plaintiff is only interested that you're
11  comfortable with the answer.  And as far as plaintiff
12  is concerned, the record need not even show the break
13  between the question and the answer.  But I just want
14  you to know from our purposes we will not make any
15  reference to that break.  I want you to feel very
16  comfortable with the answer that you give.
17          If I ask anything that's, you don't, you
18  know, that you don't understand or isn't clear to you,
19  obviously feel free the ask me to clear it up, or if
20  you need to talk to counsel regarding it, again, feel
21  free to do that.  No inferences will be taken regarding
22  that.  All right, is that okay --
23      A.      Yes.
24      Q.      -- is that understood?  Great.
25              And we're going to have some technical

Page 7

1  glitches here as we go through this thing.  We'll all
2  be patient with each other.
3          I want to make sure that you can see the
4  exhibit and you know exactly what we're pointing to.
5  If I point something out in an exhibit --
6          MR. WARD:  Ken, your audio has conked out
7      a little bit.
8          MR. SCHLICHTMANN:  All right.  Let me
9      make sure this audio is good here.  Sorry, is
10      that -- please let me know at any time, right,
11      that it dips at all.  And Kari, right, are you
12      hearing me okay for every word?
13          THE COURT REPORTER:  I was -- I am.  I
14      was about to --
15          I'm not hearing your --
16          THE COURT REPORTER:  Yes, I'm good.
17      Thank you, Mr. Ward, for saying that.  I was
18      about to chime in.
19          MR. SCHLICHTMANN:  Okay, all right.  So
20      any time, please.  I don't want one golden word
21      to be missed, all right.  All right, anyway, so
22      Kari has sworn in the witness and so we can start
23      the deposition.
24      Q.      Mr. Gazdak, could you state your name for
25  the record?

Page 8

1      A.      Yes.  Jonathan Gazdak.
2      Q.      And are you presently employed?
3      A.      Yes.
4      Q.      And who's your employer?
5      A.      Alexander Capital.
6      Q.      And how long have you been employed by
7  them?
8      A.      Seven years.
9      Q.      So what year did you begin?
10      A.      2014.
11      Q.      And do you know the month?
12      A.      May.
13      Q.      Or part of the year?
14      A.      May.
15      Q.      Okay.  And what is your present position
16  with the firm?
17      A.      Managing director in investment banking.
18      Q.      And between May of 2014 when you first
19  started to now, has your position changed?
20      A.      No.
21      Q.      So you've been managing director
22  throughout the period of time that you've been
23  associated with Alexander Capital?
24      A.      Yes.
25      Q.      Could you describe for us briefly what

Page 9

1  are the duties of a managing director, what were your
2  duties as you understood them as managing director?
3      A.      My duties are to find clients, companies
4  who are looking for investment banking services, and
5  then perform those services.  Services include
6  financial advisory and/or sourcing companies that are
7  looking to raise capital.
8      Q.      And in order to perform those services do
9  you have to be licensed by any authority?
10      A.      I don't know.
11      Q.      Are you presently licensed by any
12  authority?
13      A.      Yes.
14      Q.      And what's that authority?
15      A.      FINRA.
16      Q.      All right.  And what is the nature, is it
17  actually called a license or does it have some other
18  term of art or do you -- is it a license?
19      A.      I don't, I don't know.
20      Q.      Okay.  And FINRA, you have -- you are
21  qualified -- are you qualified to do certain things
22  under FINRA's rules?
23      A.      Can you be more specific?
24      Q.      Well, regarding investment banking.  Are
25  you authorized to do certain things as an investment

JONATHAN GAZDAK - 09/21/2021

Page 10

1  banker under FINRA rules by getting this authorization
2  from FINRA?
3      A.    Yes.
4            MR. WARD:  Objection.  Compound.
5      Q.    Okay.  All right.  So why don't you tell
6  me, what's the nature of your authorization from FINRA
7  to conduct investment banking business.
8      A.    I have a Series 79 that handles the
9  investment banking FINRA requirements.
10     Q.    Okay.  And what is your understanding of
11 those, in brief?
12     A.    A general understanding of investment
13 banking services and financial advisory.
14     Q.    And you've referred to investment banking
15 and you've referred to financial advisory.  Are those
16 considered two separate types of services?
17     A.    I don't -- I don't know.
18     Q.    Well, what's your understanding of
19 financial advisory services?
20     A.    My understanding of financial advisory
21 services are -- is advice given to clients about
22 financial questions or concerns that they have.
23     Q.    And what's your understanding of
24 investment banking services?
25     A.    Investment banking would be potentially a

Page 11

1  more overarching theme of -- could include capital
2  raising as well as just financial advice or advisory.
3      Q.    All right.  And you referred, you used
4  the term capital raising.  What's your understanding of
5  the different methods to raise capital for someone in
6  your position as an investment banker?
7      A.    An investment banker doesn't necessarily
8  raise capital.
9      Q.    All right.  What are your services
10 regarding the raising of capital as you understand
11 them?
12     A.    An investment banker would liaise with
13 the company and help determine strategies on going to
14 raise capital, and how to exactly market and present
15 the issuer, when I say issuer it could be a company, to
16 potential investors.
17     Q.    All right.  And is that both, is it your
18 understanding that those capital raise activities could
19 be considered private and public, that there's a
20 difference between a private capital raise activities
21 and public raise activities?
22     A.    Define different.
23     Q.    Well, do you consider that raising
24 capital in the private markets as opposed to public
25 markets, that there's, there's a difference between

Page 12

1  them?
2      A.    Beyond -- there are different,
3  potentially different investors, and there can be a
4  different process.
5      Q.    Okay.  So in regarding the public raise,
6  what's your understanding of the different ways that
7  money can be raised publicly?
8      A.    Can you specify, be more specific on
9  different ways?
10     Q.    Okay.  Well, do you have an understanding
11 of the different ways a investment banker can help an
12 issuer raise capital in the public markets, or you
13 don't have an understanding?
14     A.    There are, yes, there are various ways to
15 raise money publicly.  However, there are similarities
16 that I think -- you know, I'm trying to, trying to
17 think here.  So the answer to your question is yes, I'm
18 aware of different ways to raise capital publicly.
19     Q.    Okay, fine.  And could you describe them
20 in brief, what's your understanding?
21     A.    So can you be more specific on the --
22 defining different ways?
23     Q.    Okay.  Well, I guess what I'm trying to
24 do is get your understanding between -- well, let's
25 just take a particular time from, I -- well, let me ask

Page 13

1  you this.  Is your understanding of your duties and
2  responsibilities and the services that you were helping
3  Alexander Capital provide were the same between 2014
4  and presently, or they have changed, your understanding
5  has changed?
6      A.    They're the same.
7      Q.    They're the same, all right.
8            So what I'd like to do now is, we've
9  talked about raising money in the public markets.  What
10 -- do you have an understanding of when the term public
11 markets is used, does it -- what does it mean to you,
12 if anything, does it mean something to you when we talk
13 about raising capital in the public markets?
14     A.    Yes.
15     Q.    Okay.  Could you tell us what does it
16 mean to you?
17     A.    It means that you're raising capital for
18 a company that is a public reporting entity to the SEC.
19     Q.    All right.  So, all right.  And if the --
20 you're familiar with the term of art "initial public
21 offering" or "IPO"?
22     A.    Yes.
23     Q.    What's your understanding of what an
24 initial public offering or an IPO refers to?
25     A.    My understanding is that is the first

JONATHAN GAZDAK - 09/21/2021

Page 14

1  time a security for an issuer is, is publicly
2  registered.
3      Q.    And it's registered with what agency
4  or --
5      A.    The SEC.
6      Q.    The Securities and Exchange Commission
7  when you say SEC --
8      A.    Yes.
9      Q.    -- is that correct?
10          And what -- what does -- what's your
11  understanding of the services that Alexander Capital
12  provides, can provide to a company regarding the
13  raising of money through an initial public offering or
14  an IPO, what are the services, what's your
15  understanding of the services that Alexander Capital
16  can provide such a company that wishes to have an
17  initial public offering?
18      A.    The services can include helping the
19  company strategize on size, timing, valuations,
20  preparing strategies to target certain investors,
21  certain industry groups or types of investors.  And
22  then on the capital raise side can introduce the
23  company to those said investors.
24      Q.    And are you familiar with the term of art
25  "firm commitment"?

Page 15

1      A.    Yes.
2      Q.    Are you familiar with the term of art
3  "best efforts"?
4      A.    Yes.
5      Q.    Were you familiar with these terms
6  throughout the period of time that you've been
7  associated with Alexander Capital?
8      A.    Yes.
9      Q.    What was and is your understanding of
10  what "firm commitment" refers to regarding an IPO?
11      A.    Can you be more specific on what part of
12  firm commitment?
13      Q.    Well, do you have an, well, when I use
14  the term of art "firm commitment" in reference to an
15  initial public offering, do you have an understanding
16  of what that means in your industry in investment
17  banking?
18      A.    Yes.
19      Q.    What is your understanding?
20      A.    "Firm commitment" is a term that is used
21  when an underwriting agreement is executed with an
22  investment bank or investment banks and an issuer that
23  the firm or firms, upon signing that underwriting
24  agreement, take the responsibility of purchasing the
25  shares directly from the issuer, and then potentially

Page 16

1  reselling those shares to investors, public investors.
2      Q.    And what is your understanding of best
3  efforts underwriting in reference to an initial public
4  offering?
5      A.    Best efforts is the situation where
6  investors purchase the securities not from the
7  investment bankers or investment banks in the
8  transaction, but directly from the issuer.
9      Q.    And from a standpoint of risk, or what is
10  your, what was -- what is your understanding, between
11  2014 and the present what has been your understanding
12  as to whether or not a company seeking your services to
13  assist it in an initial public offering, how it views
14  whether the underwriting is a firm commitment or a best
15  efforts underwriting?
16      A.    I don't know.
17      Q.    Does a firm -- was it your understanding,
18  has it been your understanding that a firm commitment
19  underwriting from a company standpoint has less risk to
20  it if the underwriter is guaranteeing the raise, as
21  opposed to a best efforts offering in which the risk is
22  the offering may not be sold?
23      A.    No.
24      Q.    You don't see a difference?
25          MR. WARD: Objection.  That's misstates

Page 17

1  his testimony.
2      Q.    Okay.  Well, do you see a different
3  difference?
4      A.    I don't see a difference in the risk.
5      Q.    So if a -- so you do not believe there's
6  a difference in risk between a company that Alexander
7  Capital undertakes a firm commitment offering in which
8  it agrees to purchase a certain amount of stock at a
9  certain price is different than the risk to the company
10  if Alexander Capital is undertaking the underwriting on
11  a best efforts basis in which it has to sell in the
12  public markets the stock?
13      A.    Can you define the term "risk" and whose
14  risk?
15      Q.    Okay.  Well, let me ask this.  In the
16  investment banking world, in your -- what is your
17  understanding as to -- well, do you have an
18  understanding from an investment banker's standpoint
19  when we talk about the risk of an offering?
20      A.    Yes.  But please define whose risk.
21      Q.    Okay.  How about the risk of Alexander
22  Capital as the underwriter?
23      A.    Again, can you please go, which risk,
24  define what risk to Alexander Capital.
25      Q.    All right.  So do you have a -- did you,

JONATHAN GAZDAK - 09/21/2021

Page 18

1  do you have an understanding or do you have an
2  understanding from 2014 to the present as to whether an
3  underwriter like Alexander Capital has to be authorized
4  by FINRA in order for it to participate in a firm
5  commitment offering, do you have such an understanding?
6       A.    Yes.
7       Q.    What is your understanding?
8       A.    My understanding is that FINRA authorizes
9  a company, an investment bank to, or broker-dealer I
10  should say, to be able to participate in firm
11  commitment underwritings.
12      Q.    And does FINRA -- and if a underwriter
13  such as Alexander Capital is not authorized to do a
14  firm commitment offering, are there still other, is
15  there, can it still do a best efforts offering?
16      A.    I don't know that specific FINRA logic.
17      Q.    All right.  Well, if, is it your
18  understanding that a, that a firm such as Alexander
19  Capital has to have authorization from FINRA to do a
20  best efforts offering?
21      A.    Yes.
22      Q.    And is it your understanding that
23  FINRA's, the factors that FINRA takes into account
24  regarding whether to authorize an underwriter to do a
25  firm commitment as opposed to a best efforts offering,

Page 19

1  are different or are they the same, what is your
2  understanding?
3       A.    I don't know.
4       Q.    To this day you don't know?
5       A.    I don't know.
6       Q.    And prior to your getting -- you talked
7  about the fact that you have a series, you described a
8  Series 79, is that a license, how do you describe the
9  Series 79, is it a license?
10      A.    I don't know.
11      Q.    A Series 79 authority, what's the word
12  you used to describe it?
13      A.    The word I used?
14      Q.    Yes.  What's your understanding of what a
15  series -- you used the phrase Series 79 referring to
16  what, your authority to be able to do something in the
17  -- as an investment banker that unless you had a --
18      A.    A requirement by FINRA.
19      Q.    Okay, that's -- okay.  So a Series 79
20  allows you to do certain things that you could not do
21  unless you had Series 79 authority; is that correct?
22      A.    I don't know.
23      Q.    In order to qualify for Series 79
24  authority what -- did you have to undergo any training,
25  education?

Page 20

1       A.    I don't know.
2       Q.    You don't know if you did?
3       A.    No, that's not what I said.  I don't know
4  if you need training or education.
5       Q.    Okay.  What did you do to obtain Series
6  79 authority, if you did anything?
7       A.    I took an exam, a FINRA exam.
8       Q.    And did you have to study for the FINRA
9  exam, learn some specialized knowledge?
10      A.    Yes, I did.
11      Q.    Could you describe that?
12      A.    It -- concepts in financial modeling and
13  general FINRA, SEC rules.
14      Q.    In July of 2014 had you, as of May of
15  2014, excuse me, had you been previously employed as an
16  investment banker?
17      A.    Yes.
18      Q.    And could you just briefly tell us what
19  experience did you have prior to joining Alexander
20  Capital as of May of 2014 as an investment banker, just
21  briefly?
22      A.    I was an investment banker at another
23  broker-dealer.  And we were and I was responsible for
24  bringing in companies to -- that needed investment
25  banking services.

Page 21

1       Q.    As of May of 2014 when you joined
2  Alexander Capital, had you ever been involved in a firm
3  commitment underwriting of any kind?
4       A.    Yes.
5       Q.    How many?
6       A.    I don't recall.
7       Q.    Any idea how many?
8       A.    I'd have to, you know, look it up
9  exactly.
10      Q.    How many, how about best efforts
11  offerings as of May of 2014, were you involved in
12  those?
13      A.    Again, yes.  And again, I don't recall.
14      Q.    And since May of 2014 when you joined
15  Alexander Capital, from May of 2014 until November of
16  2015, how many firm commitment offerings did you
17  participate as a managing director at Alexander
18  Capital?
19      A.    Zero, to my knowledge.
20      Q.    As of May of 2014, from May of 2014
21  through November of 2015, what was your understanding
22  as to whether Alexander Capital had the authorization
23  from FINRA to conduct firm commitment offerings?
24      A.    Can you be more specific?
25      Q.    Okay.  Did you understand from May of

JONATHAN GAZDAK - 09/21/2021

Page 22

1  2014 through November of 2015 that Alexander Capital,
2  in order for it to participate in a firm commitment
3  offering, needed the authorization of FINRA or you did
4  not have that understanding?
5       A.    I did not have that --
6             MR. WARD:  Objection, compound.
7       A.    Yeah
8       Q.    Sorry.
9       A.    I did not have that understanding.
10      Q.    All right.  What was your understanding
11  as to whether Alexander Capital from May of 2014
12  through November 2015 could participate in a firm
13  commitment offering?
14      A.    Can you be more specific with the time
15  frames?
16      Q.    May 2014, when you first joined Alexander
17  Capital, through November of 2015.
18      A.    And can you just repeat the question
19  again?  Sorry.
20      Q.    I will, sure.
21            MR. SCHLICHTMANN:  Well, maybe Kari,
22      could you read that back.
23            (Record read)
24      A.    Can you be more specific on
25  understanding?

Page 23

1       Q.    All right.  Well, did you, did -- was it
2  your understanding that from May of 2014 to November of
3  2015 whether under the FINRA rules and regulations
4  Alexander Capital had the legal authority to conduct a
5  firm commitment offering as an underwriter, or you had
6  no such understanding?
7       A.    I had what?  Again, you didn't define
8  understanding.
9       Q.    All right.  What was your understanding,
10  what did you believe regarding whether Alexander
11  Capital had the legal authority to conduct a firm
12  commitment offering pursuant to the rules and
13  regulations of the -- of FINRA?
14      A.    It -- I believed that, I understood and
15  believed that Alexander Capital had the authority to do
16  firm commitment underwritings when I joined the firm.
17      Q.    Okay.  When you joined the firm --
18      A.    In --
19      Q.    -- in May?
20      A.    In May of 2014.
21      Q.    Okay.  And did you learn, did that
22  understanding change or that belief change from May of
23  2014 over time for some reason?
24      A.    Yes.
25      Q.    When?

Page 24

1       A.    I don't recall.
2       Q.    What was the change?
3       A.    I was notified that FINRA had not
4  approved the firm for firm commitment underwriting.
5       Q.    And when were you notified, as best as
6  you can remember?
7       A.    I don't, I really don't recall.
8       Q.    And was it in relationship -- do you know
9  what company it was in relationship to?  Was it a
10  particular offering that it was in relationship to or
11  in general?
12      A.    I don't, I don't remember the specific
13  offering, no, it was --
14      Q.    Was it in general?
15      A.    I don't think it was in -- no, it wasn't
16  in general, it was a specific offering, but I don't
17  recall the specific offerings.
18      Q.    Okay.  Now, by the way, Brian or
19  Mr. Gazdak, at any time you need to take a break for
20  any reason, you know, bathroom breaks, likewise the
21  stenographer, Amelia, myself, whatever, feel free, all
22  right?  I'm just going to go through, but I don't want
23  to, you know.
24      A.    Yes.
25      Q.    If you feel that you'd like to take a

Page 25

1  break or something, you know, a couple of minutes,
2  whatever, just let, just let us know, okay?  Otherwise
3  I'm going to continue any asking the questions.
4             MR. SCHLICHTMANN:  Right, Bryan, again
5      feel free to at any time as well.
6             MR. WARD:  No, we'll maybe carry another
7      thirty minutes, another thirty minutes or so, and
8      Jonathan, just let us know if you have a need to
9      take a break.
10            MR. SCHLICHTMANN:  Yeah, sure.
11      A.    Okay.
12            MR. SCHLICHTMANN:  It's not a -- okay.
13      Q.    The -- all right.  Mr. Gazdak, are you
14  aware as to whether Alexander Capital has received the
15  authority of FINRA to conduct firm commitment offering,
16  offerings?
17      A.    Yes.
18      Q.    And when did that occur?
19      A.    I'm not -- I don't recall the specific
20  dates.
21      Q.    Was it after 2016?
22      A.    I don't recall.
23      Q.    Well, was it before 2016?
24      A.    Again, I don't recall.
25      Q.    Okay, all right.  I'm going to show you,

JONATHAN GAZDAK - 09/21/2021

Page 26

1  I'm going to show you what's been marked as Plaintiff's
2  Exhibit 143.  Well, no, actually let me start with
3  this.  Okay.
4           What's been marked as Plaintiff's Exhibit
5  143 A, okay.  And I'm going to ask that you be turned
6  over control of the documents so you can flip through
7  it.  It's three pages.  And it was previously provided,
8  I don't know if you had an opportunity to look it over,
9  but could you scroll through it and see if it's
10 familiar to you?  And this is PBE Exhibit 143 A.
11          (Witness perusing documents)
12     A.    I apologize, it's slow.
13          (Witness perusing documents)
14     A.    Okay, I've reviewed it or looked at it.
15     Q.    Are you familiar -- is this letter
16 familiar to you, something you've seen before today?
17     A.    I don't recall.
18     Q.    Well, isn't it a fact, Mr. Gazdak, that
19 this letter was issued to Alexander Capital on May 15th
20 of 2015 and you received a copy of this letter after it
21 was issued and discussed the matter with your attorney
22 at Greenberg Traurig; isn't that true?
23     A.    I don't recall.
24     Q.    All right.  I'm going to show you
25 Plaintiff's Exhibit 143.  I'm sorry, that was 143,

Page 27

1  right?  No, I'm showing you 144.  Yeah.  Here's
2  Plaintiff's Exhibit 144.  Okay.  And do you recognize,
3  would you scroll through this, it's an email, could you
4  scroll through that and tell me if you recognize that?
5          (Witness perusing documents)
6     A.    I'm just confirming that most of it's
7  black.
8     Q.    Yes.  That was an assertion of
9  attorney-client privileges.  Okay.  Do you recognize
10 the email?
11     A.    No.
12     Q.    All right.  This is an email from
13 Jonathan Gazdak at Alexander Capital to Stephen Walsh,
14 and the subject is "unreasonable letter."  Do you see
15 the subject matter there?
16     A.    Yes.
17     Q.    Okay.  And the attachment is a, it's
18 described as "FINRA unreasonable letter," May 15, 2015,
19 which is the attachment we just went over.  Now, after
20 reviewing the email and the attachment, does that help
21 refresh your recollection about receiving such a
22 letter?
23     A.    No.
24     Q.    Do you ever remember received, that
25 Alexander Capital received a letter from FINRA

Page 28

1  regarding whether or not it had the authority to
2  conduct a firm commitment offering?
3     A.    No.
4     Q.    Do you ever remember, do you have any
5  memory of Alexander Capital receiving an
6  unreasonable -- a letter from FINRA regarding the fact
7  that it may not have the, it did not have the authority
8  to conduct firm commitment offerings regarding the
9  Alterix Inc. offering that Alexander Capital was
10 undertaking?
11     A.    No, I don't recall.
12     Q.    And this doesn't help refresh your
13 recollection?
14     A.    No.
15          MR. WARD:  Jan, we will stipulate to the
16 authenticity of this letter.
17          MR. SCHLICHTMANN:  I'm sorry, yes?
18          MR. WARD:  We'll stipulate to the
19 authenticity of the letter.
20          MR. SCHLICHTMANN:  Okay, I appreciate
21 that.
22     Q.    I'm going to also show you 143, okay,
23 which is an email dated May 15th, that has the same
24 attachment to it.  That's 143, right?  And again, could
25 you take a look at it?  It's an email dated May 15th

Page 29

1  from an attorney at Greenberg, Mr. Marsico, and then,
2  and the to line is to yourself, do you see that, as
3  well as Mr. Mooney and Mr. Carlin.  Do you see that in
4  the email?
5     A.    Yes.
6     Q.    Okay.  And again, there is
7  attorney-client information which has been blacked out.
8  But do you see in the part that was not blacked out it
9  says, it's from CorpFin at FINRA, do you see that, down
10 further on 143, down below, right there, yeah.
11     A.    Yes.
12     Q.    Okay.  And that's from CorpFin to Mr.
13 Marsico, the subject "unreasonable letter filing" and
14 it has a number, do you see that?
15     A.    Yes.
16     Q.    And then it has issuer name, "Alterix
17 Inc.," do you see that?
18     A.    Yes.
19     Q.    "This is to advise you that an
20 unreasonable letter has been issued.  Go to the public
21 offering system to view the letter."
22          Now, do you remember receiving this
23 email?
24     A.    Not -- no, I don't recall.
25     Q.    Do you ever, do you have any memory of

JONATHAN GAZDAK - 09/21/2021

Page 30

1    Alexander Capital receiving a communication from FINRA
2    that FINRA described that they had issued an
3    unreasonable letter regarding the Alterix, Inc.
4    offering?
5        A.    No.  I, again, I'm sorry, I just don't
6    recall.
7        Q.    Do you know what an unreasonable letter
8    is?
9        A.    Yes.
10       Q.    What is it?
11       A.    It's a correspondence from FINRA to
12   attorneys regarding certain comp -- certain
13   compensation issues with financings.
14       Q.    Being done by the underwriter?
15       A.    Well, the financing being done by the
16   issuer.  But the --
17       Q.    Okay.  And is an unreasonable letter, is
18   it your understanding that the unreasonableness refers
19   to the fee or the potential fee that the underwriter is
20   seeking to charge for its services in the offering, was
21   that your understanding?
22       A.    I don't know.  I don't know.  I mean --
23       Q.    I'm going to go back to 143 A, which is a
24   letter from FINRA dated May 15th, 2015 that was
25   attached to these emails.  And it has your name on it.

Page 31

1    And do you see in the re line there, do you see that,
2    right, unreasonable letter?
3        A.    Yes.
4        Q.    Okay.  And then it says in the second
5    paragraph there, "Based on the information provided,
6    the proposed -- the proposed compensation accruing to
7    the underwriter and related persons as defined in FINRA
8    rule 5110 is in the aggregate excessive for an offering
9    of this size and nature; and therefore, must have must
10   be modified to ensure compliance."  Do you see that?
11       A.    Yes.
12       Q.    And is that your understanding, was that
13   consistent with your understanding that the
14   unreasonable letter was referring to the fee that the
15   underwriter was seeking to charge in a particular
16   offering, was that your understanding?
17       A.    I -- I don't recall.
18       Q.    Well, how about now?
19       A.    I don't know.
20       Q.    Are you saying, Mr. Gazdak, that as of
21   that period and now, even up to now, you don't have an
22   understanding of what it means to receive an
23   unreasonable letter from FINRA regarding an offering
24   that Alexander Capital is participating in?
25       A.    No, that's not what I'm saying.

Page 32

1        Q.    Okay.  What are you saying?
2        A.    You're asking, sorry, you're asking
3    specific to compensation.
4        Q.    Yes.
5        A.    There's more to this letter when I
6    reviewed it than just compensation.
7        Q.    No, I understand.  But regarding
8    unreasonableness, in that sentence it says, "the
9    compensation accruing to the underwriter is excessive
10   for an offering of this size and nature", do you see
11   that?
12       A.    Correct.  But it doesn't use the term
13   unreasonable, so I don't know FINRA's rules for or -- I
14   don't know FINRA's definition of unreasonable, if it's
15   just -- I don't know if it applies just to
16   compensation.  That's what I'm saying.
17       Q.    Oh, okay, all right.  Well, further on in
18   this letter it does refer to compensation, okay, and
19   then it has "other", do you see that "other", number
20   six?
21       A.    Yes.
22       Q.    It says, "in connection with the filing,
23   in connection with the filing received for Alexander
24   Capital, the sole book running manager identified in
25   the offering documents, the department suggests that

Page 33

1    the firm contact their district office to discuss their
2    participation in this offering and obtain approval to
3    underwrite this offering on a firm commitment basis."
4    Do you see that?
5        A.    Yes.
6        Q.    And when they refer to the district
7    office in this letter, does that mean anything to you,
8    the district office of FINRA?
9        A.    No.
10       Q.    Okay.  As of May 15th, 2015, was it your
11   understanding that Alexander Capital did have the
12   approval from FINRA or did not have the approval from
13   FINRA in general to undertake a firm commitment
14   offering?
15       A.    I don't recall the specific timing of, as
16   previously mentioned, of when I learned of the, to
17   answer your question, you know, what you asked, firm
18   commitment underwriting approval or not.
19       Q.    Okay.  Mr. Gazdak, as of, did you have an
20   understanding as to whether or not as managing director
21   of Alexander Capital, during the time that you've been
22   managing director, that Alexander Capital and its
23   managing director had an obligation to its clients to
24   be honest and forthright with them regarding the
25   services that they were providing, did you have that

JONATHAN GAZDAK - 09/21/2021

Page 34

1  understanding?
2      A.    Yes.
3      Q.    And what was your understanding?
4      A.    Exactly what you just said.
5      Q.    That they should be, that the managing
6  director and Alexander Capital should be honest and
7  forthright with their clients about the services that
8  Alexander Capital was providing?
9      A.    To the best of our knowledge, yes.
10     Q.    And is, what was -- and did you, what was
11 your understanding as to whether you as managing
12 director and Alexander Capital had an obligation to be
13 knowledgeable about the services as an investment
14 banker that you were authorized to perform or were not
15 authorized to perform on behalf of clients who were
16 seeking your services?
17     A.    I'm sorry, there was a long sentence.
18     Q.    It was.
19     A.    I just want to know what the question
20 was.
21     Q.    Sure.
22           MR. SCHLICHTMANN:  Could I have the
23     question read back, Kari.
24           (Record read)
25     A.    So the answer is, to the best of my

Page 35

1  knowledge, I would answer that yes.
2      Q.    That you would, it was your understanding
3  that you as managing director and Alexander Capital
4  should be knowledgeable about the services that
5  Alexander Capital as an investment bank can provide its
6  clients or cannot provide, it had to be knowledgeable
7  about both; is that correct?
8      A.    I can only answer that for me, and the
9  answer is yes.
10     Q.    Okay.  And did you believe from May of
11 2014 to November of 2015, that you had -- that you were
12 knowledgeable about the services that Alexander Capital
13 under the rules and regulations of FINRA could provide
14 a client or could not provide a client, were you
15 knowledgeable of both of those during that period of
16 time?
17     A.    I was knowledgeable about what I knew
18 about.  I can't say I was knowledgeable about other
19 things that I don't know about.
20     Q.    Okay.  And regarding what you did know,
21 having seen this letter, dated May 15th, 2015, which is
22 in this period of time we just discussed, does that
23 refresh your recollection as to whether or not during
24 this period of time, May 2014 to November of 2015, that
25 Alexander -- that whether or not you knew whether

Page 36

1  Alexander Capital had the legal authority to conduct a
2  firm commitment offering to any company, including
3  Alterix, Inc.?
4      A.    Again, I just don't know the specific
5  timing.  I can't recall the specific timing.
6      Q.    And this, looking at this letter doesn't
7  help you, this May 15th, 2015 letter?
8      A.    No.  No.
9      Q.    All right.  I'm going to now show you
10 Plaintiff's Exhibit 135, okay.  And I'm going to
11 represent to you that this is a application by
12 Alexander Capital to FINRA dated June 3, 2015, which
13 was a continuing member application under FINRA's Rule
14 1017.  I'm going to represent to you that that's what
15 this is, all right?  Now, first of all, do you know
16 what a 1017 application is?
17     A.    Yes.
18     Q.    What's your, what was your understanding
19 in 2014 to November of 2015 as to what a 1017
20 application was?
21     A.    I did not know what it was at that time.
22     Q.    Do you know now?
23     A.    At an extremely high level, yes.
24     Q.    Okay.  What's that, what's that
25 understanding?

Page 37

1      A.    It's my understanding now that a 1017 is
2  the application to change certain FINRA capabilities,
3  FINRA -- FINRA -- I don't know how to say it, FINRA
4  capabilities.
5      Q.    Okay.
6      A.    Firms capabilities.
7      Q.    And what was your understanding, what's
8  your understanding as to whether those capabilities
9  refer to the ability to do a firm commitment as opposed
10 to a best efforts underwriting?
11     A.    Now?
12     Q.    Yes.
13     A.    So again, the question, can you repeat
14 that?
15     Q.    Yeah.  What's your understanding as to
16 what, that a 1017 application, all right, what's your
17 understanding as to whether or not a 1017 application
18 is required to, for an underwriter who was doing best
19 efforts underwriting but wishes to conduct firm
20 commitment underwriting?
21     A.    I don't know.
22     Q.    To this day?
23     A.    No, I don't know.
24     Q.    Even now?
25     A.    To this day, yes.

JONATHAN GAZDAK - 09/21/2021

Page 38

1    Q.    And you're managing director of Alexander
2    Capital to this day; is that right?
3    A.    I'm a managing director at Alexander
4    Capital.
5    Q.    For the investment banking business?
6    A.    Yes.
7    Q.    And did I -- I'm going to put up the,
8    this chart right here, PDE 132.
9          I'm going to ask, Mr. Gazdak, that you
10   look at Exhibit PDE 132, all right?  This is chart I'm
11   going to represent to you that was the part of the 1017
12   application by Alexander Capital in June of 2015, all
13   right?
14   A.    Okay.
15   Q.    Now, do you recognize Exhibit 132 at all,
16   are you familiar with it at all?
17   A.    No.
18   Q.    Okay.  In looking it over, does that
19   fairly and accurately depict the corporate structure as
20   depicted in it as of the May of 2015 --
21   A.    I don't know.
22   Q.    -- or June of 2015?
23   A.    I don't know.
24   Q.    Well, it shows your name is on there at
25   the lower left corner.  Do you see that?

Page 39

1    A.    Yes.
2    Q.    Okay.  Does that depict or is that, is
3    that consistent with your understanding of where you
4    were in the corporate hierarchy of Alexander Capital in
5    June of 2015?
6    A.    No.
7    Q.    Okay.  What is inaccurate about the
8    chart?
9    A.    I don't know.
10   Q.    Okay.  Well, you're saying it's not
11   accurate, right?
12   A.    I don't know what this chart is.
13   Q.    Okay.  All I'm asking is, I want you to
14   assume that this is a corporate chart showing the
15   relationship between the different corporate hierarchy,
16   right, of Alexander Capital in June of 2015.  All
17   right?  And your name is on there in reference to other
18   people that you were subordinate to or that you
19   supervised.  Do you see that?
20   A.    No.  I -- I don't assume that that's what
21   this is, I'm sorry.  I don't know what this document
22   is.
23   Q.    Okay.  Well, I'm asking you, if one
24   wanted to depict as of June of 2015 the corporate
25   hierarchy of Alexander Capital, and showing where you

Page 40

1    were in reference to the other people that you reported
2    to or who reported to you, is this chart in your mind
3    accurate for that period of time?
4    A.    It's hard to tell from this chart, no,
5    there's no lines on it.  Sorry, I apologize.
6    Q.    Well, do you see that at the top it's
7    Mr. Rocco Guidicipietro and Joseph Amato, do you see
8    that?
9    A.    Yes.
10   Q.    Do you know those people?
11   A.    Yes.
12   Q.    Okay.  Who are they?
13   A.    They're the principals of the firm.
14   Q.    Okay.  And so do you see them at the top?
15   A.    Yes.
16   Q.    Okay.  I want you to assume that they're
17   put at the top to indicate that they're superior to the
18   people below them.  Do you see that?  I want you to
19   have that, I want you to have that, that, I'm going to
20   -- I want you to have that understanding as you look at
21   this chart that they were placed at the top to show the
22   people who were subordinate to them, all right?  With
23   that understanding, is it true that you down below were
24   subordinate to Mr. -- to the principals?
25   A.    I just want to clarify.  You've saying,

Page 41

1    you're saying that this is how I should interpret that
2    chart if I was to interpret?
3    Q.    That's right.  I'm going to ask you to
4    assume that this chart is indicating who is superior
5    and who is subordinate to the various officers of the
6    company.  I want you to make that assumption, all
7    right?  So with that assumption, okay, is it accurate
8    to place the principals at the top and you down,
9    several layers down there at investment banking; is
10   that accurate, as of June of 2015?
11   A.    Again, you're asking me to assume a lot,
12   but I don't know -- the answer is I don't know, but --
13   Q.    All right.  Well, let me ask you this.
14   In June of 2015 were you the head of investment
15   banking --
16   A.    Yes.
17   Q.    -- at Alexander Capital?
18   A.    Yes.
19   Q.    So it indicates that your, in your block
20   you're investment banking; is that right?
21   A.    Yes.
22   Q.    Okay.  And it indicates that there are,
23   Ms. Barry Latterman, right, that's a woman, right,
24   Barry Latterman?
25   A.    Yes.

JONATHAN GAZDAK - 09/21/2021

1    Q.    Do you know her?

2    A.    Yes.

3    Q.    What was her responsibilities?

4    A.    I don't know.

5    Q.    Well, under, in this chart she is shown

6  just directly below, below you, your block that has

7  your name on it.  Is that an indication that she was

8  subordinate to you in some way or reported to you in

9  some way?

10    A.    No.

11    Q.    Mr. Mooney and Mr. Carlin, do you know

12  who they are?

13    A.    Yes.

14    Q.    Okay.  Is Chris Carlin somebody that

15  you're familiar with?

16    A.    Yes.

17    Q.    And during the time from May 2014 to the

18  present has Mr. Carlin been associated with Alexander

19  Capital?

20    A.    Yes.

21    Q.    And what's your understanding as to

22  whether Mr. Carlin is -- reports to you or you report

23  to him?

24    A.    That's not my understanding.

25    Q.    There's no reporting responsibility.

1  Where is Mr. Carlin in reference to you in the

2  corporate of Alexander Capital?

3    A.    I don't know.

4    Q.    Do you know the position that Mr. Carlin

5  has held, has held from 2014 to the present at

6  Alexander Capital?

7    A.    Yes.

8    Q.    What's that?

9    A.    He's the head of our capital markets.

10    Q.    And is the capital markets different than

11  investment banking?

12    A.    Yes.

13    Q.    What's capital markets?

14    A.    Capital markets interacts with clients,

15  issuer clients as well as investor clients.

16    Q.    And is his position then, did you

17  consider his position on the same par as yours?

18    A.    I don't know.

19    Q.    And how about Pat Mooney, do you know who

20  Pat Mooney is?

21    A.    Yes.

22    Q.    And did you -- for how long has, to your

23  knowledge how long has Mr., was Mr. Mooney associated

24  with Alexander Capital?

25    A.    I don't, I don't recall specific dates.

1    Q.    Do you remember if he was associated with

2  them in the, in July of 2014, a few months after you

3  started work at Alexander Capital?

4    A.    I'd have to look up specific dates,

5  but --

6    Q.    Did Mr. -- what was your understanding of

7  Mr., whether Mr. Mooney reported to you or not or you

8  supervised him or not?

9    A.    Mr. Mooney, so no.  Mr. Mooney was a

10  consultant for Alexander Capital to assist with certain

11  functions that he was charged with.

12    Q.    Was he a W-2 employee?

13    A.    I don't know.

14    Q.    Was he paid as a consultant?

15    A.    I don't -- I don't recall.

16    Q.    Was he an officer or director?

17    A.    Could you be more specific?

18    Q.    Did you consider yourself to be an

19  officer of Alexander Capital at any time?

20    A.    No.  No.

21    Q.    Do you know what an officer of a company

22  is?

23    A.    Be more specific?  No.

24    Q.    Someone who has executive authority.

25    A.    No.

1    Q.    You do not consider yourself to be an

2  officer or director of Alexander Capital; is that

3  correct?

4    A.    Correct.

5    Q.    Do consider yourself to be a W-2

6  employee?

7    A.    No.

8    Q.    What do you consider your employment

9  relationship with Alexander Capital?

10    A.    I'm a affiliated with Alexander Capital.

11    Q.    Yes, but are you affiliated as a W-2

12  employee?

13    A.    No.

14    Q.    Okay.  Then if you're not a W-2 employee

15  do you have some other financial relationship with the

16  firm, as in you are employed in some other fashion?

17    A.    I -- I'm not a W-2 employee.

18    Q.    Okay.  Are you a 1099 employee or a

19  consultant?

20    A.    I receive a 1099.

21    Q.    You receive a 1099.

22    And as far as you're concerned, you do

23  not consider yourself to be an officer of Alexander

24  Capital; is that correct?

25    A.    Correct.

Page 46

1    Q.    And that's been true from May of 2014 to
2 the present?
3    A.    Correct.
4    Q.    And Mr. Mooney, do you know whether he's
5 an officer?
6    A.    No.
7    Q.    All right, I'm going to now show you,
8 this is Exhibit 128.  It's a letter from the Sichenzia
9 firm dated August 6th, 2015.
10   A.    Yup.
11   Q.    You can scroll through it.  Yes, you are
12 free to scroll through it.  And --
13   A.    This is 20 pages, so I didn't know, do
14 you want me to scroll --
15   Q.    Just scroll through the letter part,
16 which is just the six pages, and most of it is blacked
17 out.
18         (Witness perusing documents)
19   Q.    Okay, I'd like you to go through, most of
20 it is blacked out, most of the pages, but it ends on
21 page 20, but most of the pages are blacked out so you
22 should be able to flip through it really quickly.
23         In looking at that letter is this the
24 first time you've seen this letter or have you seen it
25 before?

Page 47

1    A.    Yes, first time I've seen it.
2    Q.    Okay.  This is a letter, I'm going to
3 represent to you this is a letter from the Sichenzia
4 firm, a firm that was working for Alexander Capital,
5 and they are responding to questions by FINRA regarding
6 Alexander Capital's 1017 application that we've
7 previously showed you.  All right?  I want you, I
8 represent to you that that's what this is, okay?
9    A.    Okay.
10   Q.    All right.  And it's dated August 6th,
11 2015.  Do you see that?
12   A.    Yes.
13   Q.    Okay.  And if you go to page four.
14   A.    Can you go to page, sorry, I don't mean
15 to start --
16   Q.    I'm sorry.
17   A.    No, it's just easier, it's faster if you
18 go.
19   Q.    Yeah, sure, absolutely.  Thank you for
20 that.  Okay.
21         Now, do you see the un-blacked out part
22 talks about firm commitment underwriting?
23   A.    Yes.
24   Q.    And you see that it's, these are
25 questions from FINRA that it's asking Alexander Capital

Page 48

1 to answer.  Do you see that?
2    A.    Yes.
3    Q.    Okay.  And it asks in A, "Please state
4 the anticipated industries in which the firm will
5 engage in firm commitment offerings."  In B, "State the
6 intended customers the firm will engage."  C, "Staff
7 has received information that indicates the firm has
8 already entered into engagements for firm commitment
9 underwriting.  Please provide a detailed explanation
10 regarding these engagements, including copies of any
11 such engagement/engagements executed."  Do you see
12 that?
13   A.    I do see that.
14   Q.    Okay.  And the next question is, "In
15 addition to the above, state whether there are any
16 other deals currently in the works, and provide
17 detailed descriptions and any documentation (engagement
18 letters, et cetera) for each."  Do you see that?
19   A.    Yes.
20   Q.    Now, as of August of 2015, all right, did
21 you --
22   A.    That's the date of this letter?
23   Q.    That's right, this is August 6th, 2015.
24 So you started to work in May of 2014.  Now we're a
25 year later, right, and a couple of months, August of

Page 49

1 2015.  During that period of time did you consider as
2 managing director that Alexander Capital had any deals
3 currently in the works regarding a firm commitment
4 offering?
5    A.    I can't recall specific dates, but, but
6 yes.
7    Q.    Okay.  And what were they?
8    A.    I don't recall specific --
9    Q.    How about the Alterix offering?
10   A.    I'd have to check the specific dates.
11   Q.    Well, the, I can represent to you that
12 the Alterix registration -- you signed the engagement,
13 sorry, the Alexander Capital and Alterix signed the
14 engagement agreement in July of 2014.  And this is now
15 August of 2015.  And on April of 2015 the first
16 underwriting, the first registration, private
17 registration was filed.  Then another one in June.  And
18 then the day before this letter a third private
19 registration statement was filed on behalf of Al -- on
20 behalf of Alterix with Alexander Capital as the
21 underwriter, all right?  And each of these stated that
22 they were firm commitment offerings, all right?  Now,
23 with that, first of all, does that refresh your
24 recollection that occurred during this period of
25 time?

JONATHAN GAZDAK - 09/21/2021

1    A.    I can't be specific on those dates, but
2  generally.
3    Q.    That sounds right?
4    A.    Again, not specific date.  I don't recall
5  specific dates, but generally, yes.
6    Q.    Okay.  So would you consider that was one
7  of the deals in the works?
8    A.    Yes.
9    Q.    Okay.  Now, I want to show you the next
10  page.  These, this is the response.  Now, the response
11  to the, the third question regarding the, in response
12  to whether the staff -- the fact that the staff has
13  received information that indicates the firm has
14  already entered engagements for firm commitment
15  underwriting, and asks for a detailed explanation
16  regarding these engagements, the response that was made
17  in C, page five, says "enclosed herewith as Exhibit G
18  is a copy of the engagement between Alexander and
19  blank", you know, or blacked out, excuse me, "regarding
20  firm commitment underwriting.  It is important to note
21  that this agreement was entered into in error, and
22  Alexander never performed any firm commitment
23  underwriting services for", blacked out, "instead, the
24  parties entered into a subsequent placement agent
25  agreement for a private placement offering.  A copy of

1  the placement agent agreement is annexed hereto as
2  Exhibit H."  Do you see that?
3    A.    Yes, I see that.
4    Q.    Okay.  Are you aware of what company is
5  being referred to there?
6    A.    No.
7    Q.    Okay.  And all right, let's go to D.  The
8  question was asked, "In addition to the above, state
9  whether there are any other deals currently in the
10  works and provide detailed descriptions and any
11  documentation (engagement letters, et cetera) for
12  each."  And do you see that the answer to D is "none"?
13    A.    Yes.
14    Q.    And that's an indication, the lawyer on
15  behalf of Alexander Capital is telling FINRA in regards
16  to their question as to what other deals in the works
17  does Alexander Capital have regarding firm commitment
18  offering, and they're saying none as of August 6th,
19  2015.  Do you see that?
20    A.    Yes.
21    Q.    Okay.  Do you consider that response to
22  be truthful or untruthful?
23    A.    I don't know.  And I didn't write this
24  letter, so.
25    Q.    No, I understand.  But based on what you

1  have just testified to, that you considered Alterix to
2  be a deal in the works regarding a firm commitment
3  offering, would you consider this answer, if that's
4  true, that this is a false answer, not a truthful
5  answer to the regulators?
6          MR. WARD:  Objection.  It's confusing
7      because you said, Jan, you said --
8          MR. SCHLICHTMANN:  All right, I withdraw
9      it.
10          MR. WARD:  -- false or -- false and
11      truthful are not --
12          MR. SCHLICHTMANN:  Got you, I appreciate
13      it.  I'll withdraw the question.
14    Q.    Do consider, since you just previously
15  testified that you considered Alterix a deal in the
16  works regarding a firm commitment offering, and do you
17  consider that this answer given in the August 6th, 2015
18  letter to a question about other deals in the works,
19  referring to firm commitment offerings, do consider,
20  based on your testimony that you just gave us a couple,
21  a minute ago, whether or not this answer of August 6th,
22  2015 is factually correct or factually incorrect?
23    A.    So --
24          MR. WARD:  Again object as confusing,
25      vague and --

1          MR. SCHLICHTMANN:  All right.
2          MR. WARD:  -- misleading.
3          MR. SCHLICHTMANN:  I don't want to
4      confuse him, I appreciate that, all right.
5      You're -- so let me not confuse him.
6    Q.    Based on your previous testimony, do you
7  consider this answer "none" to the question as to
8  whether there were other deals in the works regarding
9  firm commitment offerings to be a truthful answer?
10    A.    I'm --
11          MR. WARD:  I'm going to object just
12      because it calls for speculation as to the intent
13      of the writer.
14    A.    I'm, again, I didn't -- I'm not a lawyer,
15  nor am I a regulator, so the definition of "in the
16  works" may be -- I can't comment on whether it's
17  factual or not factual based on what was discussed when
18  writing this letter, since I wasn't involved in writing
19  this letter.
20    Q.    All right.  Well, do you still, is the
21  answer that you gave a minute ago, do you still adhere
22  to that answer or do you want to change that answer?
23          MR. WARD:  Objection.  Vague.
24    Q.    All right.  Do you, just a minute ago I
25  asked you a question whether you considered the Alterix

JONATHAN GAZDAK - 09/21/2021

Page 54

1  offering to be a deal in the works regarding a firm
2  commitment offering, and you answered yes, you did.
3  I'm now asking, after seeing your, this letter on
4  behalf of Alexander Capital and its response, do you
5  wish to change that testimony or not change that
6  testimony?
7      A.    I'd like to ask for a definition of "in
8  the works."
9      Q.    Okay.  But when you answered the
10  question, what was your -- what did you believe "in the
11  works" meant?
12      A.    I believed that "in the works" would mean
13  working with a client.
14      Q.    On a firm commitment offering?
15      A.    No, not --
16      Q.    Okay.
17      A.    Working with a client.
18      Q.    Okay.  In what way working with a client?
19      A.    As the scope of the mutually agreed, you
20  know, terms or, or services.
21      Q.    All right.
22          MR. SCHLICHTMANN:  Now, Bryan, did you
23      say before you wanted to take a break at a
24      certain time or not?  Because I'm ready to keep
25      going unless you want to break.

Page 55

1          MR. WARD:  Yeah, maybe it would be
2      helpful to take a quick break.  And then what are
3      you, what are you thinking about lunch or how do
4      you want to handle that?
5          MR. SCHLICHTMANN:  I leave it to
6      everybody, you know.  Let's see how I go and then
7      how much time I've used, and, you know, if people
8      want to take a break, you know, I'll just, why
9      don't we just leave it to how we all feel.  Maybe
10      we'll get through and not have to get a lunch.
11          MR. WARD:  All right.  I'm not holding
12      you to anything but how are you --
13          MR. SCHLICHTMANN:  No, no.  I'll leave
14      that to you.  Bryan, I'll leave that to you and
15      the witness as to whether, you know, as we go on,
16      I'll leave that decision solely to you.  It's
17      not -- I, you know, I'll defer to your wishes on
18      there.
19          MR. WARD:  I'm just asking you how long
20      you think that we'll have today with Mr. Gazdak.
21          MR. SCHLICHTMANN:  Well, I'm restricted
22      to my half, right, as far as I understand, three
23      and a half hours, right, of actual testimony
24      time.  So I'm definitely going to stay within
25      that block, so.

Page 56

1          MR. WARD:  Okay.  And I'm not planning on
2  having any questions.
3          MR. SCHLICHTMANN:  No, and I understand
4  that, that's all right.  But we, let's see if I,
5  you know, I appreciate that very much.  I want to
6  try and get everything done within the three and
7  a half block, all right.
8          MR. WARD:  Okay.
9          MR. SCHLICHTMANN:  Okay.  Let's see how
10  we go.  And I appreciate what you're saying, so.
11  All right, so you said let's take a five minute
12  break or whatever you want to do?
13          MR. WARD:  Yeah, let's take five minutes
14  and then, and then come back.
15          MR. SCHLICHTMANN:  Yeah, let's --
16          THE WITNESS:  And just to confirm,
17  everybody, we're going on mute and off video or
18  just disconnecting from the Zoom, or does, I just
19  --
20          MR. SCHLICHTMANN:  Oh, yeah, explain to
21  him, yeah, go ahead.
22          THE VIDEOGRAPHER:  So --
23          MR. WARD:  It's best to stay on, right?
24          THE VIDEOGRAPHER:  We're going off the
25  record, the time is 11:27 a.m.

Page 57

1          (Recess taken)
2          THE VIDEOGRAPHER:  We're back on the
3      record.  The time is 11:41 a.m.
4  BY MR. SCHLICHTMANN:
5      Q.    I'd like to show you, Mr. Gazdak, this
6  Exhibit 127, and it's short letter there.  Could you
7  scroll through that and see if you recognize that?
8      A.    I'm just, Jessica, I don't know if that's
9  you, I'm just going to scroll back up through it.  I do
10  not recognize this letter.
11      Q.    All right.  I'm going to represent to you
12  that Plaintiff's Exhibit 127 is a letter from FINRA
13  dated June 11th, 2015 in response to the Alexander
14  Capital's 1017 application that we previously
15  discussed.  And in this letter of June 11 to Mr.
16  Carmel, the lawyer for Alexander Capital, it states, if
17  you look at the second paragraph, it says, "While NASD
18  Rule 1017(c)(1) provides that a member may effect a
19  change in ownership or control prior to the conclusion
20  of the proceeding --
21      A.    Wait, Jan, I'm sorry to interrupt you.
22      Q.    Yeah.
23      A.    I don't have the control.  Okay, there
24  you go.  Thank you.
25      Q.    Yup, sorry.  Amelia, thank you for doing

JONATHAN GAZDAK - 09/21/2021

Page 58

1    that.  All right, so it's this one right here.
2        A.    Yeah, okay, continue.
3        Q.    "While NASD Rule 1017(c)(1) provides that
4    a member may effect a change in ownership or control
5    prior to the conclusion of the proceeding, the rule
6    also specifies that the staff may place interim
7    restrictions on a member based upon the standards of
8    NASD Rule 1014 pending final action.  Therefore, the
9    staff hereby imposes the following interim restrictions
10   pursuant to Rule 1017(c).  One, the firm is prohibited
11   from effecting any portion of the aforementioned
12   ownership change.  The firm is also prohibited from
13   effecting any additional changes in ownership,
14   regardless of percentage amount."  And then number two,
15   "the firm is prohibited from making any changes or
16   expansions to its business activities, including the
17   addition of any associated persons and/or officers.
18   And the above interim restrictions are effective
19   immediately and shall remain in full force and effect
20   until the earlier of approval of the application or a
21   staff determines in its sole discretion to lift the
22   interim restrictions and lifts the interim restrictions
23   in writing."
24               To your knowledge, first of all, did you
25   know at any time that FINRA had sent a letter to

Page 59

1    Alexander Capital through its lawyer informing it that
2    in response to its 1017 application filed in early June
3    of 2015 that it was not -- it was restricted from
4    making any changes or expansions in its business
5    activities, were you aware of that at any time?
6        A.    No.
7        Q.    Are you aware of it today that that
8    occurred in June of 2015?
9        A.    Other than you showing me this letter,
10   no.
11       Q.    Okay.  So before I showed you this letter
12   you did not know that?
13       A.    Correct.
14       Q.    Now, I'm going to show you a series of
15   emails that were either from or to you.  And I'm going
16   to be showing those to you and asking you some
17   questions about them.  So let's start with right here,
18   see that.  No, sorry, this one.  There it is, okay.
19   All right.
20               Now, they're short emails, so we will do
21   the scrolling just to, you know, for convenience here.
22   Do you see in this email dated -- Plaintiff's Exhibit
23   54, it's from Chris Carlin to Pat Mooney, right, do you
24   see that?
25       A.    Yes.

Page 60

1        Q.    Okay.  And it concerns Alterix's business
2    plan.  Do you see that?
3        A.    Yes.
4        Q.    Okay.  And it's a part of a thread.  And
5    if you go to the beginning of the thread, it says, it's
6    from Peyton Jackson to Chris Carlin with a cc to Greg
7    Croning, subject, BioChemics/Alterix, do you see that?
8        A.    Yes.
9        Q.    And it's, it says Chris, referring to
10   Chris Carlin, "thank you again for your time today.
11   Please expect Greg Croning and the executive leadership
12   team at BioChemics at your office tomorrow to 1:30 to
13   introduce and discuss.  I have copied Greg for mutual
14   confirmation.  He will forward to you preliminary due
15   diligence materials."
16               Now, do you have any memory that in July
17   of 2014 that folks from, representing BioChemics or
18   Alterix came to the Alexander Capital offices or were
19   introduced to the Alexander Capital offices, in
20   particular Mr. Carlin, concerning seeking their
21   services?
22       A.    I'm sorry, I don't recall, no.
23       Q.    Do you know who Peyton Jackson is, does
24   that name mean anything to you?
25       A.    No.

Page 61

1        Q.    And going to the next one here.  This is
2    Plaintiff's Exhibit 56.  Again, it's a short email.
3    And do you see it says on, referring to Thursday, July
4    24, "on the phone with Marvin Rosen right now.  He
5    really wants to cultivate our shop.  I will have
6    materials coming now separate email.  Will call you as
7    well."  And this is to Chris Carlin from Peyton
8    Jackson.  Do you see that?
9        A.    Yes.
10       Q.    Do you know who Marvin Rosen is?
11       A.    No.  I don't recall, no.
12       Q.    Did you know that Marvin Rosen was a
13   lawyer with Greenberg Traurig?
14       A.    I, sorry, I don't recall, no.
15       Q.    Are you familiar with the name, with the
16   law firm Greenberg Traurig?
17       A.    Yes.
18       Q.    And were you aware that Greenberg Traurig
19   did provide services as counsel to Alexander Capital in
20   the 2014-2015 period regarding the Alterix IPO
21   offering?
22       A.    I can't be specific on the dates, whether
23   it was 2014 or 2015, but yes.
24       Q.    All right.  And was there a particular
25   lawyer you were familiar with at Greenberg Traurig that

JONATHAN GAZDAK - 09/21/2021

Page 62

1  you had any interactions with regarding the Alterix
2  offering?
3        A.      I don't recall, you know, all, all the
4  attorneys but as been discussed on this call, Anthony
5  Marsico was the attorney we worked with most
6  frequently, that I recall working with most frequently.
7        Q.      Now at the top of this email it has it's
8  from Pat Mooney, right?  And it's in response to
9  something from Chris Carlin.  Do you see that?
10       A.      Yes.  Yes.
11       Q.      Okay.  All right.  And you were aware of
12 the fact that Chris Carlin and Patrick Mooney had a,
13 you know, a long time friendship from when they were,
14 you know, earlier in their teens or as children, were
15 you aware of any long time relationship between
16 Mr. Carlin and Mr. Mooney of any kind?
17       A.      No, not -- no.  I was aware that they'd
18 known each other for some time, but --
19       Q.      All right.
20       A.      -- not specifics.
21       Q.      Was Mr. Mooney become -- do you refer to
22 him as a consultant?
23       A.      Yes.
24       Q.      Okay.  Did he become, a consultant
25 regarding what, he consulted on what?

Page 63

1        A.      As mentioned, he would consult with
2  Alexander Capital in the capacity of doing analysis and
3  making introductions to potential clients.
4        Q.      And did Mr. Mooney come in after you or
5  was he already working there when you came on in May of
6  2014?
7        A.      I don't recall specifically, but I
8  believe after.
9        Q.      He came on after you, that's your
10 testimony,
11       A.      To my knowledge.
12       Q.      All right.
13       A.      You're breaking up again.
14       Q.      I'm sorry, yeah, please --
15       A.      It's still happening.
16       Q.      Actually there.
17       A.      There it is.
18       Q.      Still breaking up?
19               MR. WARD:  No, you're good now.
20               MR. SCHLICHTMANN:  Okay, great.  All
21       right.
22       Q.      So now let's go to this one.  Okay, now
23 I'm showing you Plaintiff's Exhibit 57, all right.  And
24 it's from, it says from Jonathan Gazdak to Pat Mooney,
25 and this attachment, and the subject is EA.  Do you see

Page 64

1  that?
2        A.      Yes.
3        Q.      Is it your understanding that EA refers
4  to engagement agreement?
5        A.      Yes.
6        Q.      And the attachment is Alexander-Alterix
7  EA, engagement agreement, public offering engagement,
8  7/29/14, doc.  Do you see that?
9        A.      Yes.
10       Q.      And this is from you to Mr. Mooney.  Do
11 you remember sending Mr. Mooney a proposed engagement
12 agreement to Mr. Mooney?
13       A.      No.  I don't recall.
14       Q.      All right.  Does this help refresh your
15 recollection?
16       A.      No, but I see the email, I see that.
17       Q.      You have no reason to doubt that that
18 happened?
19       A.      No.
20       Q.      I'm going to show you the attachment,
21 which is Exhibit 58, all right, and ask that you look
22 at that.  Now, it's highlighted in yellow, and the
23 highlighting is part of the original document, all
24 right.  And if you could just, are you familiar with
25 that document at all, whether the form of the document

Page 65

1  or that particular document, referring to a particular
2  company?
3        A.      Yes.
4        Q.      In what way?
5        A.      It looks familiar.
6        Q.      Okay.  And what about it is familiar, if
7  you could be, give us a little more information.
8        A.      It looks like a form of engagement
9  agreement that, that Alexander Capital would utilize.
10       Q.      And was using at that time?
11       A.      I, I don't, I don't recall specifically,
12 but it appears that way.
13       Q.      Okay.  And this has to do with, so this
14 is, so from the email from you to Mr. Mooney you're
15 providing an attachment, which is this July 15, 2014
16 dated document involving this Stream TV Networks, Inc.
17 Is that familiar to you, Stream TV Networks, Inc. as a
18 client or was it a client of Alexander Capital at that
19 time?
20       A.      I don't recall if they were a client or
21 not, but they're familiar to me.
22       Q.      And you're giving this to Mr. Mooney.
23 And do you have any memory at all that you were
24 providing this to Mr. Mooney so that he could make use
25 of it as a form for a engagement agreement, proposed

JONATHAN GAZDAK - 09/21/2021

Page 66

1  engagement agreement for Alterix?
2       A.    No, I'm sorry, I don't recall, but --
3       Q.    Does that appear to be the case?
4       A.    Again, I don't recall, but if that's what
5  the -- the email was blank on what to do, but.
6       Q.    Right.  But in looking at the email and
7  the attachment, does that seem right?
8       A.    Again, I can't be specific, but it
9  doesn't not seem right.
10      Q.    Okay.  Now, in this, it says in the first
11  paragraph, "We are pleased to submit the following
12  proposal with respect to an initial public offering
13  (the public offering) by Stream TV Networks, Inc. (the
14  Company) or Stream TV of $20 million, consisting of the
15  company's common shares."  Do you see that?
16      A.    Yes.
17      Q.    And it says further down, "it is our
18  intent," do you see that, "it is our intent"?
19      A.    Yes.
20      Q.    "It is our intent immediately prior to
21  the effective date to enter into an exclusive
22  underwriting agreement (the underwriting agreement)
23  with the company.  The underwriting --
24  underwriter/broker will act as agent on a firm
25  commitment basis."  Do you see that?

Page 67

1       A.    Yes.
2       Q.    Okay.  Now, is that consistent with your
3  memory of the types of engagement agreements that
4  Alexander Capital was entering into with clients at
5  that period of time?
6            MR. WARD:  Objection, calls for
7       speculation.
8            MR. SCHLICHTMANN:  All right, well, okay,
9       let me withdraw it then.
10      Q.    Do you have a memory as to whether this
11  is consistent or with the type of engagement agreements
12  Alexander was entering into at this time?
13      A.    I don't -- don't recall.  I don't know.
14  I don't recall all the engagement engagements.
15      Q.    Did you -- but when you first referred to
16  these you said it was like a form.  Is this, is it your
17  memory that this was the general form that was followed
18  at that time?
19      A.    Again, I can't be certain without seeing
20  those previous engagement agreements.
21      Q.    All right.  Well, you see this one, well,
22  with one of the -- one company on Alexander Capital
23  letterhead, do you see that?
24      A.    Yes.
25      Q.    Okay.  So let's go to Plaintiff's Exhibit

Page 68

1  59.  Okay, and you see this is Pat Mooney to you dated
2  July 29, 2014, do you see that?
3       A.    Yes.
4       Q.    Subject, "Engagement Agreement"
5  attachment, Alterix underscore engagement agreement?
6       A.    Yes.
7       Q.    Okay.  And Pat, Mr. Mooney is saying "can
8  you quickly eyeball this"?
9       A.    Yes.
10      Q.    Do you remember receiving an email from
11  Mr. Mooney or Mr. Mooney requesting from you at this
12  time that I, you know, I took your, the form you gave
13  me or I took the letter that you gave me and here's how
14  I have changed it to make a proposal to Alterix.  Does
15  this refresh your recollection in any way that that
16  occurred?
17      A.    No.  I just don't recall any.
18      Q.    Any reason to doubt that that occurred
19  after seeing these emails?
20      A.    No, I can't -- no.  But he says "can you
21  quickly eyeball this," he didn't say I'll do it.
22      Q.    All right.  And I'm going to show you the
23  attachment to that email that he was asking you to
24  eyeball.  Do you see it's now in red, it indicates the
25  changes he made to the letter that you had given him

Page 69

1  that we just previously talked about, do you see that?
2       A.    Yes.
3       Q.    Okay.  And he changes the date to July
4  29, he makes it to Marshall Sterman, CEO of Alterix
5  with their address, he crosses out Stream TV and their
6  address.  Do you see that?
7       A.    Yes.
8            MR. WARD:  And just for the record,
9       you're referring to Exhibit 60.  I'm not sure if
10      you --
11           MR. SCHLICHTMANN:  I'm sorry, very good.
12      Thank you, Bryan, you're right.  I'm referring to
13      Plaintiff's Exhibit 60.  Okay, thank you for
14      that.
15      Q.    And then it says he replaces Stream TV
16  with Alterix and he puts in the word "up to" $20
17  million.  Do you see that?
18      A.    Yes.
19      Q.    "So we pleased to submit the following
20  proposal with respect to an initial public (the public
21  offering) by Alterix, Inc., (the company) of up to $20
22  million."  Do you see that?
23      A.    Yes.
24      Q.    Okay.  And the language you'll see, none
25  of the other language in that letter that you had

Page 70

1  provided Mr. Mooney has been changed, it's all the
2  same.  Do you see that?
3      A.    Yes.
4      Q.    And then the only other changes are about
5  the, on page three, is rather than in the previous one
6  it asks for $50,000, on signing this one split it, 25
7  on signing and another 25 upon satisfying completion of
8  due diligence.  Do you see that?
9      A.    Yes.
10      Q.    Okay.  Otherwise they're the same except
11  for that change in the order of payment; correct?
12      A.    Yes.
13      Q.    Okay.
14      A.    It seems so.
15      Q.    Okay.  And then the cash in subparagraph
16  F, a cash M&A transaction fee, rather than two percent
17  it's bumped up to three percent.  Do you see that?
18      A.    Yes.
19      Q.    Okay.  Otherwise there's no other changes
20  noted, except that the, and it changes, you know,
21  Stream TV signature line to Alterix --
22      A.    Yes.
23      Q.    -- correct?  All right.
24          Then I'm going to show you on Plaintiff's
25  Exhibit 61, there's an email from Pat Mooney sent on

Page 71

1  July 29th to Marshall Sterman, subject, "IPO engagement
2  agreement," attachment, Alterix underscore IPO
3  underscore engagement agreement.  Do you see that?
4      A.    Yes.
5      Q.    Okay.  And then it says, "Hi guys,
6  please find attached the engagement agreement for the
7  contemplated IPO.  Please review and if acceptable sign
8  and return.  If you have any questions, please let me
9  know.  We are excited to get started.  All the best,
10  PM," referring to Pat Mooney.  Do you see that?
11      A.    Yes.
12      Q.    Okay.  And do you have a memory at all
13  that Mr. Mooney took this letter of another company
14  that you gave him, another company's deal, potential
15  deal, and that he then changed it to refer to Alterix,
16  kept almost all the other changes except as we've
17  indicated, and then he sent it to Mr. Sterman on behalf
18  of Alterix.  Do you have any memory of that at all, is
19  that your understanding of that or do you have any
20  reason, let me ask, or do you have any reason to doubt
21  that that occurred?
22      A.    I don't, I don't have memory of it other
23  than it being shown here.
24      Q.    But you don't doubt, you have no reason
25  to doubt that that occurred?

Page 72

1      A.    I have no -- you, you made a long
2  statement there, so you know, I'm just trying to -- I
3  don't know what you were asking.  What specifically am
4  I doubting?
5      Q.    Well, that the chain of events I just
6  described, you know, occurred roughly, you know,
7  approximately how I described them?
8      A.    Can you just repeat, I just want to make
9  sure I --
10      Q.    Absolutely, of course.  That what
11  happened here is that Mr., that Alterix was introduced
12  to Alexander Capital, and then to Mr. Carlin.  And
13  Mr. Carlin brought in Mr. Mooney.  Mr. Mooney then
14  asked you for a form that he could use regarding a
15  potential engagement agreement.  You provided him a
16  form of an engagement agreement of another company with
17  Alexander Capital, and he then changed it to refer to
18  Alterix Inc.  And then he provided that draft
19  engagement agreement to Mr. Sterman, who was
20  representing Alterix Inc. as a potential engagement
21  agreement between Alterix and Alexander Capital.  Is
22  that --
23          MR. WARD:  Object, sorry, I didn't mean
24      to interrupt, but you can complete your question,
25      Jan.

Page 73

1          MR. SCHLICHTMANN:  Yeah, I was just
2      trying to summarize, because if you're finding it
3      objectionable I'll withdraw it, okay.
4      Q.    Let me ask it this way.  Of the emails
5  that we just referred to from July of 24 through July
6  29, do you have any reason to believe that the events
7  depicted in those emails in which you are indicated
8  received or sent, do you have any reason to believe
9  that they do not accurately depict what occurred during
10  that period as the emails depict?
11      A.    I can only speak to the emails that I'm
12  on, and I generally -- I don't recall, but no, I don't
13  have a reason to not see that those are the emails that
14  went back and forth.
15      Q.    Okay.  Okay.  And the -- and in fact,
16  here is Plaintiff's Exhibit 63, between Pat, from Pat
17  Mooney to you, subject, "forward IPO engagement
18  agreement, attachment, Alterix IPO engagement
19  agreement."  And he is forwarding you the email we just
20  went over that he had sent to Mr. Sterman, with the
21  engagement agreement, the proposed engagement agreement
22  attached.  And I'm, okay, I'm going to, that's on
23  Exhibit 63.  And the -- here is the attachment to that
24  email, which is dated July 29th to Marshall Sterman.
25  All right.  This is the attachment to the email that

JONATHAN GAZDAK - 09/21/2021

Page 74

1 Mr. Mooney sent to you about what he had sent to
2 Mr. Sterman.  Do you see that, is that what the emails
3 indicate?
4         MR. WARD:  Just for the record, this is
5     63, yeah, Plaintiff's 64.
6         MR. SCHLICHTMANN:  Right, Bryan, thank
7     you, thank you.
8     Q.     This is Plaintiff's Exhibit 64.  It's the
9 attachment to the email from Mr. Mooney to you.
10    A.     Okay.  You just said, so this is the
11 email, the second email from -- well, can you scroll
12 down?
13    Q.     Absolutely?
14    A.     To the end.
15    Q.     Oh, absolutely, yeah, yes, yes.  It's
16 unsigned, yeah.
17    A.     Oh, it's unsigned, okay.
18    Q.     I'm saying this is the proposed
19 engagement agreement.
20    A.     Okay.
21    Q.     All right.  Again, these emails that show
22 Mr. Mooney sending to you what he had sent to
23 Mr. Sterman about the proposed engagement agreement for
24 Alterix, does that help refresh your recollection at
25 all that that occurred?

Page 76

1 Thursday night.  If not, I understand - as we start the
2 first public process from scratch, we need to make sure
3 we do things in a polished customer straightforward
4 manner.  We need internally -- we need internally
5 strategize on amount, structure, is there a bridge,
6 timing, counsel, (Chris mentioned Cozen, have they done
7 other phase two public deals) auditors, et cetera, all
8 leading to a formal kick off meeting.  I'm happy to hop
9 on a call this weekend to discuss.  Don't call me as
10 I'm upstate and have no cell service, but have WiFi, so
11 emails work.  I can then drive to location that has
12 cell service.  Thanks, am excited to start the first
13 public Alexander deal from scratch!  JGG."
14         Now, in going over that email, does that
15 refresh your recollection about how you felt or what
16 you thought concerning this opportunity as of that
17 date?
18    A.     No.  And I -- define how I felt or --
19    Q.     All right, well --
20    A.     And all that.
21    Q.     Okay, fair enough.
22    A.     But I see this email, yes.
23    Q.     Okay.  This email, is this email
24 consistent with your understanding or remembrance,
25 excuse me, your memory of how, what your reaction was

Page 75

1    A.     No, not necessarily, but, you know.
2    Q.     You don't doubt it?
3    A.     Correct.
4    Q.     Okay.  Now, now, we talked about
5 Greenberg Traurig, you are familiar with them, you said
6 you remember Mr. Marsico in particular.  You do
7 remember that, it's your memory that Greenberg was
8 retained by Alexander Capital to represent it as an
9 underwriter regarding this, the Alterix offering, you
10 do remember that?
11    A.     I don't recall the specific services
12 Greenberg Traurig was, I -- but, but they were
13 our -- they were retained by Alexander for the IPO.
14    Q.     Okay.  Now, regarding this engagement
15 agreement with Alterix, I'm going to show you an email,
16 it's Plaintiff's Exhibit 65, okay.  And we'll start at
17 the bottom of the thread.  It's just two combined.  So
18 it's from you, dated August 9th, 2014 to Chris Carlin
19 and Pat Mooney, subject, Alterix, all right.  It says
20 "Chris/Pat, I think Chris mentioned that Alterix is
21 coming in this Wednesday to potentially kick off the
22 IPO process and deliver a check.  Hope they're not just
23 coming in to do that.  A couple of things - is there
24 any way to have that meeting on Monday?  Tuesday I'm
25 traveling to Oregon for a DD meeting on Wednesday, back

Page 77

1 to the engagement agreement with Alterix and Alexander?
2    A.     I don't recall specifically, but
3 generally yes.
4    Q.     Is it, now, this email is saying that
5 it's "the first public Alexander deal from scratch."
6 Do you see that?
7    A.     Yes, I see that, yes.
8    Q.     Was it your understanding at that time
9 that Alexander Capital as of that time had not engaged
10 in a public offering from scratch?
11    A.     No.  I was only speaking in -- only
12 speaking as of my time at Alexander Capital.
13    Q.     All right.  So this is in reference to
14 since you've been at Alexander Capital the firm had not
15 done a public offering from scratch?
16    A.     I don't recall, but it would appear from
17 my email, yes.
18    Q.     Okay.  And is it, from this email, well,
19 is it fair to characterize, and tell me if it is or
20 isn't, that you're indicating that you want to be
21 involved to the degree discussed in the email with this
22 particular engagement agreement opportunity; is that
23 fair?
24    A.     I -- and I don't mean to say -- when you
25 way I want to be involved, you're speaking interest

JONATHAN GAZDAK - 09/21/2021

1   Jonathan Gazdak?
2       Q.     Precisely.
3       A.     Not Alexander Capital.
4       Q.     That's correct, right.
5       A.     I don't recall, but yes.
6       Q.     And is it, is it true that, consistent
7   with this email, you were involved on the major events
8   that occurred regarding Alexander Capital's services
9   provided regarding the Inpellis offering, the Alterix
10  offering?
11               MR. WARD:  Objection, vague.
12               MR. SCHLICHTMANN:  I'm sorry, okay, I
13          will withdraw it.
14      Q.     Is it true that you were involved after
15  this email dated August 9th, 2014, in the, in the major
16  events having to do with the all -- the Alterix
17  offering in which Alexander Capital was involved?
18               MR. WARD:  Objection, vague.
19               MR. SCHLICHTMANN:  I'm sorry?
20               MR. WARD:  Objection, vague.  He can
21          answer.
22               MR. SCHLICHTMANN:  Well, I don't -- but
23          let me just make it better then if it's too
24          vague.
25               MR. WARD:  It's just the major events

1   part.
2               MR. SCHLICHTMANN:  I got you, okay, fine.
3       Q.     Is it true that after August 9th, 2014
4   you were involved, okay, to some degree with the
5   Alexander Capital services provided regarding the
6   Alterix offering?
7       A.     To some degree.  I don't recall
8   specifically, but to some degree, yes.
9       Q.     Okay.  All right.  Now, I'm going to show
10  you what's been marked, all right, this is Exhibit 96.
11  And it's a short little thread.  It starts with
12  Mr. Marsico from Greenberg Traurig on March 18th to
13  Mooney, Olympia, other Greenberg lawyers, subject
14  Alterix, and it's a, attached is a draft of the
15  underwriting section to be included in the Form S-1 for
16  Alterix.  Do you see that?
17      A.     Yes.
18      Q.     And "please review and let us have your
19  comments."  Do you see that?
20      A.     Yes.
21      Q.     And it later says that, you know, he's,
22  that he's got certain footnotes in brackets where we
23  need to either discuss the arrangement either because
24  the engagement letter is silent, or discuss
25  modifications to the engagement letter due to potential

1   issues we see under FINRA rules.  Do you see that?
2       A.     Yes.
3       Q.     "Please let us know when you'd like to
4   discuss."  Now, this is sent March 18th to Mr. Mooney
5   and other Greenberg lawyers.  And then you see
6   Mr. Mooney on March 18th, the same day, sends to you,
7   forwards you this email from Mr. Marsico.  Do you see
8   that.
9       A.     Yes.
10      Q.     And first of all, do you remember that at
11  all?
12      A.     No, I'm sorry, I don't recall.
13      Q.     But is that, the fact that, that
14  Mr. Green -- that Mark -- that Mr. Mooney has forwarded
15  to you Mr. Marsico's email regarding the underwriting
16  section to be included in the Form S-1, is that
17  consistent with your understanding of your involvement
18  with the Alterix offering at that time?  Was this
19  unusual or this is, was normal for you to receive from
20  Mr. Mooney Mr. Marsico's draft of the underwriting
21  section to be included in the Alterix offering?
22      A.     Again, I don't mean -- but define normal,
23  when you said is this normal?
24      Q.     Okay.  Well, is this consistent with your
25  duties at that time at Alexander Capital?

1       A.     I don't know about being my duties.  But
2   this -- so I can't speak to my duties then as opposed
3   to, you know, as with regards to this email.  But in
4   general I would say no, that this is, this is not
5   abnormal that I would see this email.
6       Q.     Okay.  And the attachment that it's
7   referring to is, is this, is, Plaintiff's Exhibit 97,
8   all right, and do you see it's a underwriting, it says
9   underwriting?
10      A.     Yes.
11      Q.     Okay.  And it's a, I could represent to
12  you that this is for insertion into the Alterix
13  offering at that time, the draft, all right, I could
14  represent that to you.  But in looking it over, is this
15  familiar to you at all, this underwriting section for
16  inclusion into the Alterix draft at that time?
17      A.     No.  I mean, it's not familiar to me, but
18  I, but I -- I see it here.
19      Q.     All right.  Do you see on this
20  Plaintiff's Exhibit 97 it says, "Alexander Capital is
21  acting as the sole book running manager of the
22  offering."  All right?
23      A.     Yes.
24      Q.     So they're the only one listed is
25  Alexander Capital LP.  Do you see that in blue?

Page 82

```
1    A.    Yes.
2    Q.    Okay.  And then it says, "The
3  underwriters are committed to purchase all the shares
4  of common stock offered by us other than those covered
5  by the option to purchase additional shares described
6  below."  Do you see that?
7    A.    Yes.
8    Q.    Okay.  And is it your understanding that
9  the, that at that time Alexander Capital was intending
10 to be the underwriter on this offering committed to
11 purchase all the shares of the common stock offered in
12 the initial public offering?
13   A.    No, not from this document.
14   Q.    From something else?
15   A.    If you scroll up.
16   Q.    Yeah.
17   A.    This is a document in, that's written in
18 the future for something that's done in the past.  And,
19 and the paragraph you read is dependent on us doing
20 sentence number two of the first paragraph.
21   Q.    Of the first paragraph.  "We have entered
22 into an underwriting agreement dated blank 2015."
23   A.    And once we enter into that underwriting
24 agreement, then the second paragraph would be what we
25 intended to do.
```

Page 83

```
1    Q.    Okay.  All right.
2    A.    But we haven't entered into an
3  underwriting agreement.
4    Q.    All right.  Is it, and, and is it fair to
5  say that this is a statement of Alexander Capital's
6  intent?
7          MR. SCHLICHTMANN:  Let me withdraw that.
8    Q.    Is it fair -- I'm going to withdraw the
9  question.  Is it fair to say that this underwriting
10 insertion as you have described it is consistent with
11 the Alexander Capital's stated intent in the engagement
12 agreement to undertake a firm commitment offering?
13   A.    Yes, only after entering into an
14 underwriting agreement.
15   Q.    Okay.  All right.  At the time that this,
16 that the engagement agreement was written and this
17 underwriting insertion was proposed, did Alexander
18 Capital have the legal authority to engage in a firm
19 commitment offering?
20   A.    I'm not sure of the dates.  So can you
21 qualify, qualify what the date?
22   Q.    This date is March --
23   A.    I apologize.
24   Q.    -- this is March of 2015.  And the letter
25 that we, the 1017 application, the unreasonable letter
```

Page 84

```
1  is dated May 15th.
2    A.    Are you asking, and I apologize for this,
3  are you asking me as I know now or as I know then at
4  that time?
5    Q.    Well, let's start now and then go back.
6          MR. WARD:  And let me just interject with
7  a quick objection to it's calling for a legal
8  conclusion.
9          MR. SCHLICHTMANN:  Okay.
10   A.    So as of now given the date, I think you
11 said March?
12   Q.    Yes, of 2015.
13   A.    I understand it now that Alexander
14 Capital didn't have the authority.
15   Q.    All right.  Okay.  You did not understand
16 it then?
17   A.    I did not understand it then, correct.
18 Not to my -- yeah, not to my recollection or not, yeah,
19 I didn't.
20   Q.    All right.  I'm just going to show you
21 this briefly.  Here's March 30th, 2015, Plaintiff's
22 Exhibit 98.  Again, it's a, it's an email from
23 Greenberg lawyers, I guess a Mr. Guzman, and to many
24 people, including yourself.  Do you see you're in the
25 middle of it there, do you see your --
```

Page 85

```
1    A.    Yes, yeah.  There's a lot here, yeah.
2    Q.    Okay.  Got you.
3          And this has to do with the Alterix S-1
4  comments and it's a red line, do you see that?  And
5  he's just saying, "attached please find our comments
6  with the latest draft of the S-1?
7    A.    Yes, I see that, yeah.
8    Q.    Okay.  And I'm just going to go from that
9  to the attachment, which is this one here, Plaintiff's
10 Exhibit 99.  Do you see this, 99?
11   A.    Yeah, it's got blue and red on it, yeah.
12   Q.    That's right, blue and red.  And you'll
13 see that in this one on the third page, all right, it's
14 blue and red, all right, do you see this?
15   A.    Yes.
16   Q.    There's an assertion that Alex -- that
17 Greenberg has made to the third page of the draft, and
18 it's, this is, rather than before it said "this is an
19 initial public offering", it says, "this is a firm
20 commitment initial public offering."  Do you see that?
21   A.    I do see that, yes.
22   Q.    Okay, all right.  And this came from
23 Greenberg, and this is right after they sent the
24 underwriting agreement proposed insertion, and they
25 followed it up with this change to the draft that was
```

JONATHAN GAZDAK - 09/21/2021

Page 86

1  intended to be filed in April.  And were you aware of
2  the fact that, that the -- that the -- that Greenberg
3  was -- well, forget that question.  Yeah, let me just
4  ask the question.  There's not one in front of you
5  there, sorry.  Your lawyer, your counsel will tell you
6  don't answer, don't say anything, don't answer, ask the
7  question.
8          Were you aware of the fact that
9  Greenberg's responsibilities during this period of time
10 was to assist Alexander Capital in determining
11 its -- determining the description of the services that
12 it was providing regarding the Alterix offering, was
13 that your understanding?
14     A.     Again, I apologize.
15            MR. WARD:  Objection, vague and misstates
16     the record.
17            MR. SCHLICHTMANN:  Okay, I don't want it
18     say it then, all right.
19     Q.     Were you aware that Greenberg Traurig was
20 providing services to Alexander Capital to assist it
21 regarding providing its underwriting services to the
22 Alterix offering?
23            MR. WARD:  Objection, confusing.
24            MR. SCHLICHTMANN:  Okay, then forget it.
25     Q.     Did you understand that Alexander -- that

Page 87

1  Greenberg Traurig, I think you've already said this,
2  Greenberg Traurig was Alexander Capital's counsel at
3  this time, right, regarding the Alterix offering?
4     A.     It's my recollection, yes.
5     Q.     All right.  Well, that's good, thank you.
6     A.     Just, can you scroll up to the first
7  page?
8     Q.     Oh, I'm sorry, sure.
9     A.     No, no, no, that's fine.  I just wanted
10 to see the date at the top.  Okay, yeah.
11     Q.     Yeah, but it's actually March, can you go
12 to the --
13     A.     That's --
14     Q.     Okay.  It's March 30th, 2015, the
15 attachment.
16            MR. SCHLICHTMANN:  Okay.  All right.  All
17     right.
18     A.     Thank you.
19     Q.     Yup, yup, no problem.
20            MR. SCHLICHTMANN:  Go to -- all right.
21     Q.     Now, now, yeah, good, all right.
22            Now, were you aware that the first
23 confidential filing of the Alterix offering was made in
24 early April of 2015, were you aware of that?
25     A.     I don't recall, but --

Page 88

1     Q.     I want you to assume that that's the
2  case.
3     A.     Okay.
4     Q.     And I'm going to show you an exhibit.
5  This is Exhibit 142, and it's from Greenberg to you and
6  Mr. Mooney and Mr. Carlin, with a cc to other Greenberg
7  lawyers.  Do you see that?
8     A.     Yes.
9     Q.     And it says, "Alterix FINRA filing.
10 Attachments FINRA filing 4/10/15."  Do you see that?
11     A.     Yeah.
12     Q.     Now, it's all blacked out because it
13 involves attorney-client conversations, right?  But the
14 attachment to it is a, dated April 10th, 2015, and it's
15 the, an application to FINRA.  Do you see that?
16     A.     Yes.
17     Q.     Okay.  Now, could you just, we're going
18 to just scroll through it, it's 12 pages, but just
19 generally scroll through it.
20            All right, does this refresh your
21 recollection at all, do you recognize this document at
22 all?
23            MR. WARD:  Just for the --
24     A.     No.
25            MR. WARD:  I'm sorry to interrupt, just

Page 89

1  for the record it's 142 A, Plaintiff's Exhibit
2  142 A.
3            MR. SCHLICHTMANN:  I'm sorry, did I not
4     say that?  I'm sorry, very good.  Thank you,
5     Bryan.  142 A.
6     A.     No, I don't recall this document.
7     Q.     Okay.  Are you familiar with the fact or
8  that at some point when you -- that Alexander Capital
9  had the obligation if it is seeking to underwrite an
10 offering, that when the offering is first filed
11 confidentially, that they have an obligation to notify
12 FINRA, did you have any understanding regarding that?
13     A.     I don't -- I don't know or recall, but.
14     Q.     Do you know now that that's a
15 requirement?
16     A.     No, I don't know that it's a requirement.
17     Q.     Okay.  Do you, you saw that this
18 attachment, which is the April 10th, 2015 application
19 to FINRA, was attached to an email that was sent to
20 you.  Does this in any way refresh your recollection
21 that after the filing of the April draft Alterix
22 offering that Alexander Capital through Greenberg
23 submitted an application to FINRA, are you aware of
24 that at all?
25     A.     I don't recall.  But you showing me the

JONATHAN GAZDAK - 09/21/2021

Page 90

1  email --
2       Q.    Yes.
3       A.    -- shows me that yes.
4       Q.    Okay.  Do you remember having any
5  involvement or any discussions regarding the filing of
6  this FINRA application?
7       A.    No.  I don't recall.
8       Q.    Do you know the, do you know now the
9  purpose of such an application?
10      A.    No.  No.  No now implies that I didn't
11 know then.
12      Q.    Well, is your understanding then the same
13 as now or is it different?
14      A.    No, it's the same.
15      Q.    Okay.  And do, so maybe you said this,
16 but what is your understanding, if any, as to the
17 purpose of this filing by Greenberg on behalf of
18 Alexander Capital at the time on April 10th, 2015?
19      A.    It's my understanding that our attorneys
20 notified FINRA of a potential offering.
21      Q.    All right.  And the terms of it?
22      A.    I don't know.
23      Q.    All right, do you see -- all right, at
24 the end of this exhibit if we just scroll down, it
25 talks about the issuer, do you see at the top Alterix?

Page 91

1       A.    Yes.
2       Q.    Okay.  It says the anticipated effective
3  date is as soon as May 29th, 2015.  Do you see that?
4       A.    Yes.
5       Q.    And it tells them about the filing of the
6  confidential filing in April, right, do you see that,
7  April 9th?
8       A.    Yes.
9       Q.    And its proposed maximum aggregate
10 offering price of 19,744,000?
11      A.    Yes.
12      Q.    And it also on the next page it says,
13 under "distribution method" it says "firm commitment."
14      A.    Yes, I see that.
15      Q.    Okay.  All right.
16            And that it was filed by Mr. Marsico, all
17 right, that's the next page, do you see that,
18 Mr. Marsico at Greenberg?
19      A.    Yes.
20      Q.    Okay.  All right, now we've already gone
21 over that on May 15th, 2015 FINRA sent in response to
22 this application the so-called unreasonable letter,
23 we've gone through that.  And then an application was
24 made for a so-called 1017, we went through that.  And
25 then there was the FINRA restriction letter of June

Page 92

1  11th, we went through that.  Are you -- and that we
2  also went, I told you that there was a June 2015 filing
3  similar to the April filing.  And then there was an
4  August 5th filing similar to the April filing regarding
5  the Alterix offering in 2015.  I mentioned that to you
6  before.  Shall I, is that, is that, are you --
7       A.    What, what, sorry, and I don't mean to
8  interrupt.
9       Q.    Yeah.
10      A.    When you say filing, what are you talking
11 about?
12      Q.    Yeah, let me be clear, yeah, very good.
13 That there was an April filing of the draft
14 registration statement, right, and then there was the
15 application to FINRA that we just went over.  There was
16 then the restriction letter.  There was the 1017 in
17 early June to get firm commitment authorization.
18 Right?
19            MR. WARD:  Is this a question?  I'm
20      sorry, just to --
21            MR. SCHLICHTMANN:  I'm just, I'm, yes,
22      it's a question.  I'm just giving the reminding
23      about the events we went through, right.
24            MR. WARD:  So you're not asking, are you
25      asking whether you, you had asked about whether

Page 93

1       you discussed it or whether he --
2            MR. SCHLICHTMANN:  No, I did, no, I'm not
3      asking a question, I'm just giving the premise to
4      my question, all right, because he asked about
5      the filing.
6       Q.    So we have an April 2015 first draft
7  registration filing followed by the application that we
8  just went over, which was followed in May 15th, 2015
9  with the unreasonable letter that we went over, which
10 was followed on June 3, 2015 with the 1017 application
11 that we went over.  And then it was followed on June
12 11th with the FINRA letter restricting, imposing
13 restrictions on the business activities of Alexander
14 that we went over.  And then there was the filing in
15 June, late June of a second private registration
16 statement regarding the Alterix offering.  Does that
17 help refresh your recollection as to those events?
18      A.    I don't --
19            MR. WARD:  Objection, vague.
20      A.    I don't, I don't recall specific timing.
21 And I don't think we've discussed the last thing you
22 mentioned.
23      Q.    The June filing?
24      A.    Yeah.  And I apologize if --
25      Q.    Okay, that's fine.

JONATHAN GAZDAK - 09/21/2021

Page 94

1    A.    Yeah.
2    Q.    All right, great, all right, I appreciate
3    that, thank you.  So let's go to --
4    A.    But, but to --
5    Q.    Yeah, go ahead.  Go ahead.
6    A.    Was there a question?
7    Q.    No.  I'm going to now go to what you just
8    --
9    A.    Okay.
10    Q.    -- that you said about not -- that we
11    haven't really gone over this.  So let me show you this
12    email, which is Exhibit 102, which is Greenberg to a
13    whole bunch of people, including you in there.  Do you
14    see that?
15    A.    I see it, yeah.
16    Q.    Okay.  Subject, "Alterix DRS comment
17    letter response."  Do you see that?
18    A.    I see that.
19    Q.    "Attachment, Greenberg Traurig comments
20    to Form S-1 June 11th," referring to the latest draft
21    that Greenberg put together.  Okay?  And it says, "Here
22    is Greenberg's comments to the revived S-1."  And it
23    was sent to you on June 11th.  That's Exhibit 102.  And
24    the attachment has got Greenberg's handwritings on it,
25    it says "GT comments", do you see that?

Page 95

1    A.    Yes.
2    Q.    And it's the revisions to the
3    April 8th draft.  Do you see that up there?
4    A.    Yes.
5    Q.    Okay.  And in this you see the second
6    draft on the second page has, "this is a firm
7    commitment initial public offering."  Do you see that?
8    A.    Yeah.  Yes.
9    Q.    Okay.  That, so between the April draft
10    and this Greenberg's proposed second draft, the June,
11    this is a firm commitment offering is still there, that
12    hasn't been changed, that statement; correct?
13    A.    Yes.
14         MR. WARD:  I'm going to just object to
15         the misstating the record.
16         MR. SCHLICHTMANN:  All right, I don't
17         want to do that.
18    Q.    So on this exhibit, right, Exhibit 103,
19    which is the attachment to the June 11th email to
20    Greenberg, to everybody including yourself, indicating
21    their comments on the revisions to the April 8th draft,
22    this is a firm commitment initial public offering, that
23    there's no comments about this.  Do you see that?
24    A.    I see that.
25    Q.    Okay.  All right.  All right.  Then but

Page 96

1    you have no memory of getting anything from anyone
2    about the second proposed filing of the Alterix
3    offering in June, you don't remember that at all?
4    A.    No, I don't recall that email.
5    Q.    All right.  And do you have any reason to
6    believe that it didn't come to you, that you didn't
7    have an opportunity to review it or one part of it?
8    A.    I, I don't recall, but no.  I see that, I
9    see the email.
10    Q.    Okay.  So let's go to five.  All right,
11    I'm just going to, yeah.  Exhibit 30 is the August 5th,
12    2015 third draft of the registration statement, all
13    right?  Just going through that front page there, is
14    that familiar to you at all, the Alterix, you know, as
15    one of the Alterix private registration filings?
16    A.    No, not specifically, but I'll say that
17    this looks like a registration statement.
18    Q.    Okay, all right.  And you see on August
19    5th, this is dated August 5th, 2015, do you see that at
20    the top?
21    A.    Yes.
22    Q.    Okay.  And on the second page it says,
23    "this is the firm commitment initial public offering."
24    Do you see that?
25    A.    Yes.

Page 97

1    Q.    All right.  Do you remember that on
2    August 5th or that in August there was a third filing
3    of a draft registration statement of the -- that
4    Alexander Capital was involved with?
5    A.    No, I'm sorry, I just don't recall.
6    Q.    Okay.
7    A.    Specific dates.
8    Q.    Now, we already went over, so I will now
9    show you Plaintiff's, yeah, this is Plaintiff's Exhibit
10    145, all right.  It's from you, it's dated September
11    5th -- 15th, 2015 to Greenberg, to Mr. Marsico,
12    "subject Alterix, attachment, Alterix Alexander
13    amendment to engagement, fully executed 8/18/15."  Do
14    you see that?
15    A.    Yes.
16    Q.    Now, it's blacked out because it covers
17    attorney-client discussions, right, but it's to you,
18    all right.  And the attachment, this is Exhibit 145,
19    and the attachment is Exhibit 145 A, which is a letter
20    dated August 17th, Pat Mooney, CEO of Alterix, re
21    second amendment engagement letter, "Dear Dr. Mooney,
22    this letter serves as an amendment to that certain
23    engagement letter of July 29, 2014."  And then it says,
24    under paragraph number one, "the change is a cash
25    placement fee of ten percent on any bridge or private

JONATHAN GAZDAK - 09/21/2021

Page 98

1  financing completed by the company during the term of
2  this agreement." Do you see that?
3      A.    I see that.
4      Q.    Okay. Do you remember that, that there
5  was a placement done by Alexander Capital in August for
6  bridge capital funding for the Alterix offering?
7      A.    I don't. I would have to check to
8  specific dates. I don't recall specific dates.
9      Q.    Do you have a general memory that there
10 was, again August, that there was a cap -- a bridge
11 lend -- loan secured by Alexander Capital for the
12 Alterix offering?
13     A.    Again, I don't know about specific August
14 time frame.
15     Q.    In the general time frame, it doesn't
16 have to be August, September, whatever?
17     A.    I don't recall specifically. I know the
18 company raised capital privately.
19     Q.    And do you know that the, do you have any
20 memory that the company, that actually they closed the
21 first part of that on August 17th, 2015, the same time
22 as this letter is dated, do you know that?
23     A.    No.
24     Q.    Okay. Do you have any memory that the,
25 that the company increased its placement fee from eight

Page 99

1  percent to ten percent regarding bridge lending for the
2  Alterix offering?
3      A.    No, I don't recall that.
4      Q.    Okay. But you do note that this email
5  has this attachment regarding that very thing, is that
6  right, that was to you?
7      A.    I see, I see the, the, yeah, the letter
8  or the email.
9      Q.    Okay. I'm going to show you also Exhibit
10 146. And this is from Mr. Marsico on September 15th,
11 2015 to you, concerning the same thing, again blacked
12 out because it involves attorney-client conversations.
13 And, and again, it has Exhibit 146 A again is the
14 August 17th, 2015 amended to the engagement letter.
15 Now, you have no memory -- does this help refresh your
16 recollection at all as to any of this?
17     A.    No.
18     Q.    Okay.
19     A.    But --
20     Q.    No reason to doubt it happened?
21     A.    No. I see the emails.
22     Q.    No doubt that you received these emails
23 as indicated?
24     A.    No doubt.
25     Q.    All right. Are you aware of the fact

Page 100

1  that the bridge lenders received certain disclosures as
2  part of the package of information sent to them
3  regarding providing a bridge loan to the Alterix
4  offering?
5      A.    I don't recall specifically, no.
6      Q.    Do you remember ever receiving
7  information from anyone from Alexander Capital
8  indicating the information that was being given to the
9  bridge lenders?
10     A.    I don't recall specifically, but --
11     Q.    All right, I'm going to show you what's
12 been marked as Exhibit 9.
13          MR. SCHLICHTMANN: Oh, yeah, right, I'm
14 sorry.
15          MR. WARD: And Jan, just while we're --
16          MR. SCHLICHTMANN: Yeah, yeah.
17          MR. WARD: -- so it's clear, we had, we
18 had talked with Mr. Gazdak and discussed
19 potentially taking a break at one for lunch.
20          MR. SCHLICHTMANN: Okay.
21          MR. WARD: But let me know what are you
22 thinking in terms of how much time you have left?
23          MR. SCHLICHTMANN: I'm going to try and,
24 I think the total time I've used so far is what?
25          THE VIDEOGRAPHER: Two hours, roughly.

Page 101

1          MR. SCHLICHTMANN: It probably would be
2  best to take a lunch, a short lunch.
3          MR. WARD: Sure.
4          MR. SCHLICHTMANN: But I will try and be
5  very quick after the lunch. Well, I guess we've
6  got 15 minutes left here, right? So, you know,
7  what kind of lunch do you want to take, like 30
8  minutes or what's your comfort level for lunch?
9  Because I'm going to try and, you know, keep it
10 to an hour afterwards after lunch or so.
11          MR. WARD: Yeah. Just to be clear,
12 you've got seven hours obviously, so.
13          MR. SCHLICHTMANN: No, and I appreciate
14 that. I'm going to, what I'm trying to engage
15 you that I'm going to try and keep it on the
16 short rather than the longer.
17          MR. WARD: Yeah. And I'm not holding you
18 to anything, just --
19          MR. SCHLICHTMANN: No, no, I -- so if you
20 want to take a longer lunch that's fine too, you
21 tell me, whatever. What's --
22          MR. WARD: Jonathan, what do you, what do
23 you want? It's up to you.
24          THE WITNESS: A half hour is fine, I
25 mean.

JONATHAN GAZDAK - 09/21/2021

1    MR. SCHLICHTMANN: As opposed to 45
2    minutes or an hour, right?
3         THE WITNESS: Yeah.
4         MR. SCHLICHTMANN: I don't want you to --
5         MR. WARD: Let's say, let's say 45,
6    because maybe --
7         MR. SCHLICHTMANN: That's right, it's
8    always 45, I agree. All right, great, 45. All
9    right, so we'll do 15 minutes and then take 45?
10        MR. WARD: If that works for you.
11        MR. SCHLICHTMANN: Yeah, yeah, let me
12   just, fine. Okay.
13        So did I get you off track there? It's
14   this one down here, right, over, right?
15   Q.    So I'm going to show you Plaintiff's
16   Exhibit 9, right, and it's from Bari Latterman to
17   Mooney and to yourself. Do you see that? We --
18   A.    I see it, yes.
19   Q.    okay. And it's an Alterix securities
20   purchase agreement, it's several attachments, including
21   disclosure schedules and securities purchase agreement,
22   8/14/15. Do you see that?
23   A.    Yes.
24   Q.    Okay. And it's, Bari Latterman says,
25   "currently here are all the attachments I sent for

1    Alterix. I'll revise the wiring instructions", right?
2    Do you --
3    A.    Yes.
4    Q.    Was, I know I asked you this before but
5    just to be clear, was it your understanding that Bari
6    Latterman, that Bari Latterman reported to you about
7    her activities?
8    A.    No.
9    Q.    Was it your understanding that Bari
10   Latterman was under your supervision regarding her
11   activities?
12   A.    No.
13   Q.    Do you have, can you explain why Bari
14   Latterman is sending this email to you as well as
15   Mr. Mooney about the package of information that's
16   going to the Alterix bridge lenders, why would it, do
17   you have any explanation as to why it would be coming
18   to you?
19   A.    Not from this email, no.
20   Q.    Do you have any, based on your experience
21   of the operations by Alexander Capital and your
22   responsibilities as managing director, any explanation
23   as to why you would receive it?
24   A.    What was the question?
25   Q.    Well, let me ask it this way. Is it

1    consistent with your understanding of your
2    responsibilities of Alexander Capital during this time
3    that you would receive an email from Ms. Latterman as
4    indicated here, including, which included the, all the
5    attachments that are sent to potential bridge lenders
6    regarding Alterix?
7    A.    No. But again, I don't, I don't know
8    what the specific -- specificity of her forwarding
9    those to me is.
10   Q.    Is it consistent with your duties and
11   responsibilities as a managing director?
12   A.    To receive email from Bari Latterman?
13   Again, I don't know what your question is.
14   Q.    Well, to receive an email like this from
15   Bari Latterman at that time with that kind of
16   information?
17   A.    No. I don't recall and no, it's not.
18   Again, this is, this is a very small -- I can't opine
19   on why she sent this, I don't know.
20   Q.    But I'm asking a little differently.
21   Based on how you know Alexander Capital was working at
22   the time and what you were supposed to be doing in your
23   job, and how Ms. Latterman's activities, you know,
24   interconnected with what you were doing, is this
25   consistent with her sending it or this is something

1    that you think is unusual?
2    A.    I don't think it's consistent nor
3    unusual. I don't know the reason, the specific reason
4    for her sending that.
5    Q.    And you have no memory of interacting
6    with Ms. Latterman about the Alterix offering?
7    A.    I, I don't recall specifics about
8    interactions with, with Bari Latterman.
9    Q.    How about generally?
10   A.    But --
11   Q.    How about generally?
12   A.    Generally I -- I -- yes.
13   Q.    You would interact with Ms. Latterman
14   regarding the Alterix offering?
15   A.    I could interact.
16   Q.    Okay. Okay.
17        Did you, did you have any understanding
18   that you had any responsibilities as managing director
19   to review any materials that were intended to be sent
20   to the bridge lenders regarding the Alterix offering?
21   A.    Responsibility, define responsibility to
22   whom.
23   Q.    Okay. Did you have a, what was your
24   understanding as to whether or not as managing director
25   of Alexander Capital during 2015, whether any of your

JONATHAN GAZDAK - 09/21/2021

Page 106

1  responsibilities included reviewing any materials that
2  were proposed to be sent to bridge lenders regarding
3  the Alterix offering?
4          MR. WARD: Objection. Confusing,
5      compound.
6          MR. SCHLICHTMANN: Confusing, all right,
7      I'll withdraw it.
8      Q.      In 2015 did you have an understanding, or
9  yeah, what was your understanding as of 2015 as to
10 whether or not as managing director you had any
11 responsibilities regarding any materials that were
12 intended to be sent to bridge lenders regarding the
13 Alterix offering?
14     A.      Again, and I don't -- define
15 responsibilities to whom.
16     Q.      As part of your job.
17     A.      To whom?
18     Q.      To the company.
19     A.      Which company?
20     Q.      Alexander Capital.
21     A.      No.
22     Q.      So is it your testimony that as managing
23 director you had no responsibilities regarding
24 materials that were intended to be sent to potential
25 bridge lenders regarding the Alterix offering?

Page 107

1      A.      Responsibilities to Alexander Capital?
2      Q.      Yes. Your responsibilities as managing
3  director of Alexander Capital.
4      A.      To Alexander Capital? No.
5      Q.      To anyone else?
6      A.      Potentially, if, if someone asked me to
7  review things.
8      Q.      Okay. You see from this email we just
9  went over you were sent stuff from Ms. Latterman
10 regarding the package of information that was going to
11 potential bridge lenders regarding the Alterix IPO; is
12 that right?
13     A.      I see that she sent them.
14     Q.      Okay. So the fact that she sent them,
15 does that not, does that not trigger or, let me say is
16 that not an indication that you had some kind of
17 responsibility regarding that material?
18     A.      No.
19     Q.      To your knowledge did you ever, do you
20 have any memory of ever reviewing material that was
21 intended to be sent to bridge lenders regarding the
22 Alterix offering?
23     A.      I don't recall specifically.
24     Q.      Generally?
25     A.      I just don't recall. I apologize.

Page 108

1      Q.      That's all right. So I showed you the
2  Exhibit 9. And I'm going to just show you some of the
3  attachments. This is Exhibit 9 D, disclosure schedules
4  for stock purchase agreement between Alterix and each
5  purchaser identified on the signature pages, dated
6  August 13th, 2015. The first page.
7      A.      Yup.
8      Q.      Yeah. Oh, that's the wrong one. That's
9  it. Oh. Sorry, we were looking at different things.
10 Disclosure schedules, it's 9 D, disclosure schedules to
11 stock purchase agreement, okay, between Alterix and
12 each purchaser, right, dated August 13th, 2015. Do you
13 see that?
14     A.      Yes.
15     Q.      Okay. And I'm just going to scroll
16 slowly through it here. "In connection with that
17 certain purchase agreement dated as of August 13th
18 between Alterix and each purchaser identified on the
19 signature pages, the company delivers these disclosure
20 schedules." Do you see that?
21     A.      Yes.
22     Q.      And then it has a schedule, 3.1 A, that
23 doesn't have anything. Schedule 3.1 G talks about
24 capitalization. Do you see that?
25     A.      Yes.

Page 109

1      Q.      Okay. And then under 3.1 I do you see in
2  paragraph two it says, "the company filed with the
3  Securities and Exchange Commission a draft registration
4  statement on Form S-1 on April 9th, amendment number
5  one, a draft on June 30th, and a draft on August 5th,
6  collectively draft registration statements." Do you
7  see that?
8      A.      Yes.
9      Q.      And in each case the company requested
10 confidential treatment.
11         Was it your understanding at any time
12 that the bridge lenders were being, that the -- that
13 potential bridge lenders, who were considering being
14 bridge lenders on the Alterix offering, were being
15 provided information about the filing of the
16 registration statements referred to in this paragraph,
17 were you aware of that?
18     A.      I'm sorry, and I apologize.
19     Q.      That's all right.
20     A.      That was a long statement.
21     Q.      All right, I want to make sure you --
22 I'll say it again. Were you aware at any time that
23 the, that potential bridge lenders on the Alterix
24 offering were being notified about the fact that draft
25 registration statements were being filed in April and

JONATHAN GAZDAK - 09/21/2021

1  June and August of 2015 regarding the Alterix offering,
2  were you aware of that at any time?
3      A.      I don't, I don't recall.  I mean, I
4  really don't.
5      Q.      Do you have any reason to, well, you have
6  no reason -- you don't know whether you knew or you
7  didn't know, or you know you didn't know?
8      A.      No, I just don't recall whether I,
9  whether I was aware or not.
10     Q.      Okay.  And this email to you at the time
11 of November, indicating what is being sent to the
12 potential bridge lenders, including this disclosure
13 schedule we just went over, that doesn't help refresh
14 your recollection at all --
15     A.      No.
16     Q.      -- about what you knew --
17     A.      No.
18     Q.      -- that they were being informed about
19 these filings?
20     A.      No, I -- it doesn't, it doesn't mean that
21 now I recall, no.
22     Q.      Okay.
23             MR. SCHLICHTMANN:  Here we go, here.
24     Q.      I'm going to show you Exhibit 117.  And
25 this is from Pat Mooney to an Adam Cichetti.  Do you

1  know an Adam Cichetti?
2      A.      Yes.
3      Q.      Who is he?
4      A.      He's a former employee of Alexander
5  Capital.
6      Q.      And would you know in 2015 what his
7  responsibilities were?
8      A.      I don't know what his responsibilities
9  were.
10     Q.      Okay.  Do you see in this Pat Mooney is
11 saying, "we just raised about $5 million at a $75
12 million valuation."  Do you see that?
13     A.      I see that.
14     Q.      Okay.  And then he talks about the money
15 that was raised, do you see that, one, two, three?
16     A.      Yes, I see that.
17     Q.      Okay.  Were you aware at any time as to
18 what valuation Alexander Capital was placing on the
19 Alterix offering on a pre-IPO basis?
20     A.      No, I don't recall specific -- I don't
21 recall.
22     Q.      If I represent to you that in emails like
23 this they were referring to a $75 million valuation,
24 Alexander Capital people were referring, like this one,
25 referring to a $75 million valuation used to do the

1  bridge capital raise, is that consistent with your
2  memory?
3      A.      I, I don't recollect any specific
4  valuations.
5      Q.      Do you have any reason to not, to believe
6  that that was not the valuation that Alexander Capital
7  was placing?
8      A.      I have no reason to believe it or not
9  believe it.  I just don't know.
10     Q.      Okay.  All right.  All right.
11             MR. SCHLICHTMANN:  Now we are at one
12     o'clock.  So we should break now and have the 45
13     minute lunch?
14             MR. WARD:  Sounds good.  Off the record?
15             MR. SCHLICHTMANN:  Yes, go ahead.
16             THE VIDEOGRAPHER:  Okay, we're going off
17     the record.  The time is 1:01 p.m.
18             (Recess taken)
19             THE VIDEOGRAPHER:  okay.  We are back on
20     the record.  The time is 1:48 p.m.
21 BY MR. SCHLICHTMANN:
22     Q.      Okay, Mr. Gazdak, can you hear me all
23 right?
24     A.      Can you move a little closer or --
25     Q.      Okay.  Can you hear me all right?

1              MR. WARD:  Middling.
2              MR. SCHLICHTMANN:  Middling, all right.
3      Q.      Hello, how's that?  No?
4      A.      That's better.
5      Q.      Sound is clear, am I clear?
6      A.      Yes
7      Q.      Okay, great, all right.  At any time,
8  please, I know you won't be shy.  All right.  So are we
9  ready to go, everybody is ready?  All right.
10             Mr. Gazdak, are you familiar with the, as
11 between 20 -- May of 2014 and November of 2015, were
12 you familiar with the, a process by which issuing
13 companies can file so-called confidential registration
14 statements and then get comments back from Fincorp
15 before they actually file or decide to file a S-1
16 publicly?  Are you, were you familiar with that process
17 between 2014 and November 2015?
18     A.      No.  Define finish core?
19     Q.      All right, so what did I say.  CorpFin,
20 CorpFin, corporate finance, SEC's corporate finance.
21 You're familiar with corp, yeah, corporate finance of
22 the SEC, right, that looks over filings of registration
23 filings and makes comments?
24     A.      I'm familiar with the SEC making comments
25 to registration letters.

JONATHAN GAZDAK - 09/21/2021

Page 114

1    Q.    Are you --
2    A.    Registration letters.
3    Q.    And you --
4    A.    Statements.
5    Q.    And you -- statements.  And you're
6  corporate with CorpFin as the reviewing part of the SEC
7  that does that, the corporate finance division of the
8  SEC?
9    A.    No, but I'm not sure what the division is
10  called, but I'm not going to say it's not.
11    Q.    Okay.  Does, are you aware of the fact
12  that it's often, the corporate finance division of the
13  SEC is often abbreviated as CorpFin or spoken of by
14  people in your industry as CorpFin as opposed to the
15  corporate finance division of the SEC, or you're
16  unfamiliar with that?
17    A.    Not to me, no.
18    Q.    All right.  In May -- prior to May of
19  2014 had you participated in the filing of a, or been
20  involved in any way in the filing of private, the
21  so-called confidential registration statements seeking
22  comments from the corporate finance division of the
23  sec?
24    A.    I don't recall specifically prior to
25  2014.  I'd have to check.

Page 115

1    Q.    During May of 2014 to November of 2015 do
2  you have any memory of being involved in any way with
3  the filing of registration, private confidential
4  registration statements on behalf of an issuing company
5  involving Alexander Capital and receiving back comments
6  from those filings from the corporate finance division
7  of the SEC?
8    A.    I don't recall specific dates.  I'd need
9  to look them up.
10    Q.    Do you remember, regardless of the dates
11  do you remember being aware or involved in any way with
12  that process as a managing director of Alexander
13  Capital?
14    A.    In any company under any time frame, is
15  that, sorry I'm just trying to clarify.
16    Q.    While you're managing director with
17  Corp. -- with Alexander Capital from May 2014 to
18  November of 2015.
19    A.    Yeah.  I'd have to, I'd have to look at,
20  you know, specific dates and just to double check
21  dates.
22    Q.    Okay.  And but do you have a memory,
23  between May 2014 and the present as managing director,
24  of being involved in that process?
25    A.    Involved, define involved.  The SEC --

Page 116

1    Q.    Having some responsibility regarding it,
2  like reviewing registration statements, the disclosures
3  and registration statements, reviewing the comments.
4    A.    Okay.  And I apologize, I'm not trying to
5  be, but I thought you were asking if I'd been in --
6  seeing comments letters from the SEC.  Now you're
7  asking about, I just want to make sure you're --
8    Q.    All right, well, let's start with that,
9  that's fine.  Are you aware, do you have any memory of
10  seeing comment letters from the corporate finance
11  division of the SEC regarding the filing of
12  confidential registration statements at any time while
13  working with Alexander Capital?
14    A.    Yes.  But I'd have to check specific time
15  frames and specific instances, but yes.
16    Q.    Do you have any memory of being aware of
17  comment letters that the corporate finance office gave
18  to any Alterix filings, private confidential
19  registration filings?
20    A.    I don't recall, but -- yeah, I don't
21  recall specifically.
22    Q.    All right.  So let me show you
23  Plaintiff's Exhibit 130, and this is an email from --
24  okay.
25          MR. SCHLICHTMANN: There it is.  Is it

Page 117

1  sharing now?
2          THE VIDEOGRAPHER:  There we go.
3          MR. SCHLICHTMANN:  Okay.
4    Q.    Do you see an exhibit, the exhibit 130,
5  Plaintiff's Exhibit 130 on the screen?
6    A.    Yes.
7    Q.    And you see that this is from
8  Mr. Marsico at Greenberg dated November 10th, and it's
9  to Chris Carlin and to yourself.  Do you see that?
10    A.    Yes.
11    Q.    And the subject is "SEC comment letter,
12  Confidential Inpellis, Inc. S-1 2015 11/10 letter.  Do
13  you see that?
14    A.    Yes.
15    Q.    And the attachment is the Confidential
16  Inpellis, Inc. S-1 2015 11/10 letter.  Do you see that?
17    A.    Yes.
18    Q.    Okay.  And then it's blacked out because
19  it contains attorney-client privileged communications.
20  And the attachment to this email is Plaintiff's Exhibit
21  131, and if you take a moment to look at that, a letter
22  from the division of corporate finance of the SEC dated
23  November 10th, 2015.  Do you see that?
24    A.    Yes.  I see that.
25    Q.    Okay.  And just first of all, is that

JONATHAN GAZDAK - 09/21/2021

Page 118

1  the, do you recognize that as the usual form of the
2  so-called corporate finance comment letters to
3  registrations that have been filed?
4       A.    I haven't, I apologize, I haven't seen
5  the rest of the letter.
6       Q.    Oh, okay, fine,
7       A.    Yeah.
8       Q.    Sure, go ahead, take your time.
9       A.    I, I, can't -- yeah, that's good.
10      Q.    You can give control, if you wouldn't
11  mind.  We are going to give you control.
12            (Witness perusing documents)
13      A.    Yes, this looks like a comment letter
14  from the SEC on the, on the filing.
15      Q.    Do you have any memory of receiving a
16  copy of any comment letters from corporate finance,
17  SEC's corporate finance division regarding the
18  Alexander -- the Alterix filings, does this help
19  refresh your recollection in any way?
20      A.    I don't recall, but I see that this email
21  was sent to me.
22      Q.    Okay.  And if you look, if we go to, on
23  the first page it says general, that do you see that?
24      A.    You can control.  You can control.
25      Q.    Yeah, yeah, thank you.

Page 119

1            Do you see it says, "we note your
2  response, comment one"?
3       A.    Yes.
4       Q.    Okay.  And that's an indication that in
5  fact on October 20th the corporate finance office made
6  a response to the filing of the October 6th
7  registration statement, private registration --
8  confidential registration statement filing regarding
9  Alterix.  And it says, "we note your response to
10  comment one; however, you continue to omit disclosure
11  containing your previous submissions."  Do you see
12  that?
13      A.    Yes.
14      Q.    First of all, were you aware, do you have
15  any memory of what corporate finance, whether there was
16  any corporate finance responses to Alterix filings in
17  which the regulators were discussing the omission of
18  certain disclosure that needed to be put back in?
19      A.    No.  I don't recall any of these comment
20  letters.
21      Q.    Okay.  Okay.  You do see here that the,
22  they are saying that "you continue to omit disclosure
23  containing your previous submissions."  Do you see
24  that?
25      A.    Yes, I see that.

Page 120

1       Q.    Okay.  What was your understanding as of
2  in 2015, I will say, you know, from May 2014 to
3  November 2015 what was your understanding as to the
4  requirement or, excuse me, the responsibility of
5  Alexander Capital regarding any disclosures that are
6  made in registration statements regarding offerings
7  that they're involved in --
8            MR. WARD:  Objection.  Vague.
9       Q.    -- or were involved in?  I'm sorry, let
10  me do it again.  What was your understanding from May
11  of 2014 to November 2015 regarding whether or not
12  Alexander Capital had any responsibility regarding
13  disclosures made in offerings in which they were listed
14  as the underwriter?
15      A.    And I apologize, I'm just going to ask
16  for two, two clarifications.
17      Q.    Sure.
18      A.    Responsibilities to whom, and disclosures
19  by whom?
20      Q.    The responsibilities of Alexander Capital
21  to regarding disclosures that could, in registration
22  statements that could then, well, let me take it this
23  way.  The responsibility, whether or not all -- what
24  I'm asking is, did you have an understanding as to
25  whether or not Alexander Capital had a responsibility

Page 121

1  to review and ensure the accuracy of any disclosures in
2  a registration statement involving them as an
3  underwriter?
4            MR. WARD:  Objection, vague.
5            MR. SCHLICHTMANN:  Too vague?  Is that an
6       objection there, Bryan?
7            MR. WARD:  Yeah, it's vague, yeah.
8            MR. SCHLICHTMANN:  Okay.
9       Q.    So what, did you have an understanding
10  between May of 2014 to November of 2015 as to whether
11  or not Alexander Capital had any responsibility
12  regarding ensuring the accuracy of any disclosures in
13  registration statements in which they were listed as an
14  underwriter?
15            MR. WARD:  Objection, vague.
16      A.    So --
17            MR. WARD:  You can answer.
18      Q.    I'm sorry?
19            MR. WARD:  Yes, you can.
20            MR. SCHLICHTMANN:  Do you want me to --
21       let me change it again.  Because I don't -- if
22       it's -- if you're having trouble with the
23       question then I'm going to assume the witness is
24       as well.
25            MR. WARD:  I'm just saying it's the

JONATHAN GAZDAK - 09/21/2021

Page 122

1    responsibility part --
2              MR. SCHLICHTMANN:  Yes.
3              MR. WARD:  -- that's vague.
4              MR. SCHLICHTMANN:  Okay.
5         Q.    So let me do it this way here.  I'm going
6    to bring up again, so I'm going to bring up Exhibit 135
7    that we went over previously, the 1017 application,
8    okay.  Remember going over this previously?
9         A.    If that's the same, yeah.
10        Q.    Yes.
11        A.    Yes.
12        Q.    And this is Exhibit 135.  And I'm
13   going to go to, yeah, I'm going to go to, okay, here it
14   is, page 13.  I'm going to direct your attention to
15   page, what is it, what is it listed as, 13 of this
16   document, okay, do you see it's page 13?
17        A.    Yes.
18        Q.    Yeah, okay.  And in the part that the
19   applicant is filling in, I'm going to read the first
20   sentence.  "The firm and its counsel will undertake
21   vigorous due diligence to verify the accuracy of
22   information contained in all registration statements in
23   which it participates."  Do you see that?
24        A.    Yes.
25        Q.    Was it your understanding that Alexander

Page 123

1    Capital, between May of 2014 through November of 2015,
2    that it had a responsibility to vigorous -- to do
3    vigorous due diligence to verify the accuracy of
4    information contained in all registration statements in
5    which it participated?
6         A.    Again, I -- responsibility to whom?
7         Q.    To anyone.
8         A.    Well, no, not to anybody.
9         Q.    Well, I mean to any, any particular
10   individual or entity.
11        A.    I, I don't specifically recall generally
12   from that time frame.  But you're, you're saying that
13   the firm has written this.  I didn't write this so I
14   don't know.
15        Q.    All right.  Well, I'm asking your
16   understanding as managing director during this period
17   of time whether you understood as managing director of
18   Alexander Capital that whether Alexander Capital had
19   an, a obligation to use due diligence, vigorous due
20   diligence to verify the accuracy of information
21   contained in all registration statements in which it
22   participated?
23              MR. WARD:  Objection, vague.
24              MR. SCHLICHTMANN:  Vague?  Okay, all
25        right, let me withdraw.

Page 124

1         Q.    Is this sentence in the 1017 application
2    dated June 3, 2015, is that consistent or inconsistent
3    with your understanding between May 2014 and November
4    2015 regarding the responsibility of Alexander Capital
5    regarding verifying the accuracy of information
6    contained in registration statements in which Alexander
7    participated?
8              MR. WARD:  Objection, vague and
9         confusing.
10             MR. SCHLICHTMANN:  Really?  Okay, all
11        right.
12        Q.    Let me ask you this.  Is there anything
13   in that statement, looking at it now as managing
14   director, with which you disagree?
15             MR. WARD:  Objection, vague.
16             MR. SCHLICHTMANN:  Mr. Gazdak, I'm going
17        to withdraw the question.
18        Q.    Did you believe, between May 2014 did
19   November 2015, did you believe that Alexander Capital
20   had a legal obligation to use vigorous due diligence to
21   verify the accuracy of information contained in any of
22   the registration statements in which it participated?
23             MR. WARD:  Objection, calls for a legal
24        conclusion.
25        A.    I was going to say, ask define legal.

Page 125

1         Q.    Okay.  Did you, you, at the time you
2    understood that FINRA -- that Alexander Capital had
3    certain obligations as an entity under the authority of
4    FINRA, did you have such an understanding during May
5    2014 to November 2015?
6         A.    No.  I, I don't, I don't, I wasn't
7    involved in those responsibilities with FINRA.  I don't
8    know.
9         Q.    Well, let me, did you understand between
10   May 2014 and 2015 as managing director that FINRA had
11   certain rules or requirements regarding the conduct of
12   any member of FINRA?
13        A.    I don't know.  I -- FINRA has thousands
14   of rules.  I don't --
15        Q.    Okay.
16        A.    I apologize, but I just don't know
17   specific rules or what, what they were.
18        Q.    Do you know what a restrictive agreement
19   is?
20        A.    No.
21        Q.    Let me show you, I'm going to go back up
22   here.  See, that page is four.
23             All right.  I've highlighted, all right,
24   and I am going to read this paragraph on the
25   application of June 3, 2015.  "The firm intends to

JONATHAN GAZDAK - 09/21/2021

Page 126

1  develop investment banking as a major business line,
2  and will devote substantial resources toward that end.
3  In that regard, the firm is requesting that it be
4  permitted by its restrictive agreement to act as
5  managing underwriter and selling group member in firm
6  commitment underwritings." Do you see that?
7      A.    Yes.
8      Q.    Okay.  Now, it uses the term "by its
9  restrictive agreement to act as managing underwriter."
10 Do you see that --
11     A.    Yes.
12     Q.    -- its restrictive agreement?
13           Does the phrase "restrictive agreement"
14 mean anything to you?
15     A.    No.
16     Q.    Is your understanding now, or let me say
17 do you have the, an understanding as to whether or not
18 Alexander Capital has a membership agreement with
19 FINRA?
20     A.    I understand that Alexander Capital has a
21 membership agreement with FINRA.
22     Q.    Okay.  And what is your understanding of
23 what that membership agreement entails?
24     A.    I don't know.
25     Q.    Is it your understanding that if

Page 127

1  Alexander Capital does not have, is not a member of
2  FINRA, do you have an understanding as to whether it
3  can conduct investment banking business?
4      A.    No.  I don't.  I don't.
5      Q.    You don't know whether it has to be a
6  member of FINRA or not?
7      A.    Correct.  I don't know.
8      Q.    Is Alexander Capital a member of FINRA?
9      A.    I -- I don't -- I don't know.  But I, I
10 have to assume we are.
11     Q.    Okay.  And did you make that assumption
12 that Alexander Capital was a member of FINRA, FINRA
13 between May 2014 and November 2015?
14     A.    I don't ever recall making the assumption
15 or not making the assumption.
16     Q.    Are you a member of FINRA?
17     A.    Yes.  I'm a member of FINRA.
18     Q.    And what does it mean to be a member of
19 FINRA, your understanding?
20     A.    I am, my understanding is I, being a
21 member of FINRA, am registered with FINRA for certain
22 activities.
23     Q.    Regarding investment banking?
24     A.    Yes.  And other things.
25     Q.    And is it the same, is that the same

Page 128

1  answer that your understanding for Alexander Capital as
2  well?
3      A.    Again, I don't know Alexander Capital's
4  qualifications or not qualifications with FINRA.
5      Q.    Did you consider that one of the
6  responsibilities of you as managing director of
7  Alexander Capital between 2014 and November 2015 as to
8  whether or not it was part of your responsibilities to
9  be knowledgeable about the membership requirements of
10 Alexander Capital in FINRA?
11     A.    No.
12     Q.    And is it your testimony that you were
13 not aware during that period of time of Alexander
14 Capital's membership requirements in FINRA?
15     A.    That is correct.  I was not aware of
16 their memberships or not membership.
17     Q.    Or what the requirements of that
18 membership were?
19     A.    Correct.  I did not know the requirements
20 of that membership.
21     Q.    And in looking at this, do you understand
22 now that Alexander Capital had a restrictive agreement
23 as a managing underwriter that prevented it from
24 undertaking firm commitment underwritings?
25     A.    No.

Page 129

1      Q.    Do you understand that now, having read
2  this application?
3      A.    No.  Again, I don't know what a
4  restrictive agreement is.  I've never heard of it or
5  seen it.
6      Q.    Even as now, even as we sit, stand here
7  and sit here now?
8      A.    Yes.  I haven't seen a restrictive.  It
9  says the words, I'm sorry, it just says the words but I
10 don't know.
11     Q.    Okay.  Do you have, all right.  And do
12 you have a, as we sit here today do you have an
13 understanding that the FINRA agreement that Alexander
14 Capital had during the period of time covered by this
15 1017 application, June of 2015, that Alexander
16 Capital's agreement with FINRA did not allow it to
17 participate in firm commitment underwritings?
18     A.    Yeah, I apologize again, can you just
19 repeat it?  I don't need clarity, I just want to make
20 -- it seemed like it was a long --
21     Q.    Okay.
22           MR. SCHLICHTMANN:  So let me have that
23     one repeated if I could.
24           (Record read)
25     A.    I don't recall.  I never -- I don't

JONATHAN GAZDAK - 09/21/2021

Page 130

1  believe I -- I don't recall seeing an agreement or
2  reading an agreement or -- so I, I don't know.  I don't
3  recall seeing it.  You're asking if I knew it back
4  then, I --
5      Q.      You didn't know it back then; correct?
6      A.      Correct.
7      Q.      I'm asking now, having now seen this ten
8  seven -- 1017 application dated June 3, 2015, and
9  seeing what Alexander Capital has stated in its
10 application at that time, is it your understanding now
11 that at that time Alexander Capital's membership
12 agreement did not allow it to be, to participate in
13 firm commitment underwritings?
14     A.      I, again, I, I never saw, and I didn't --
15 wasn't involved in the preparation of this document, so
16 I don't know what they had or didn't have.  I didn't
17 have specific knowledge to that.
18     Q.      Okay.  But the question I'm asking is,
19 now, having seen what they said, all right, what
20 Alexander Capital said in June, in its June 3, 2015
21 application, that the firm is requesting that it be
22 permitted by its restrictive agreement to act as
23 managing underwriter and selling group member in firm
24 commitment underwritings, having seen that in that
25 application now, does that just, does that indicate to

Page 131

1  you that as of that time Alexander Capital did not have
2  such permission?
3              MR. WARD:  Objection, to confusing.
4              MR. SCHLICHTMANN:  Confusing, all right.
5  Let me take it back and then I'll move on here.
6      Q.      Is it, this 1017 application dated June
7  3, 2015, your first memory of seeing it is during this
8  deposition, is that what you're testifying to?
9      A.      Yes.  Through this process, yes.
10     Q.      Now, reading this particular sentence
11 that we have highlighted, is it in any way surprising
12 to you that Alexander Capital in June 3, 2015 is making
13 this statement?
14     A.      Is it surprising to me now?
15     Q.      Yes.
16     A.      A statement made back then.
17     Q.      Yes.
18     A.      Not by me, and I don't know who made it.
19 I don't want to say I can't -- I don't know, I mean.  I
20 apologize, I'm not trying to -- when I, by, by way of
21 just clarity, this document is 33 pages long, and I
22 couldn't comment whether what's surprising in it or
23 not.  You could ask me something else in there that may
24 be surprising or, or not, I --
25     Q.      All right.

Page 132

1      A.      I don't know, I don't know, again, let me
2  repeat what I said earlier.  I don't know what the firm
3  had or didn't have.  So the implication, they could be
4  reiterating something, they could be -- this language
5  could be, I'm saying -- I'm not saying it is, I just
6  don't know that, you know, that just because they, they
7  reiterate it doesn't mean that they did have it, didn't
8  have it.  There's an "and", there's an uncapitalized
9  selling group member, you know, uncapitalized managing
10 underwriter.  I just don't mow.
11     Q.      Earlier I had asked you a question about
12 what your understanding was when you first started in
13 May of 2014.  And I want to just ask you, in light of
14 your testimony now, did you believe in, when you
15 started with Alexander Capital in May of 2014, that
16 Alexander Capital had whatever authority was required
17 from FINRA to conduct firm commitment underwritings?
18     A.      I don't recall specifically believing or
19 not believing, but it was my general understanding that
20 yes.
21     Q.      That they had such authority?
22     A.      Or that they did not not have the
23 authority.
24     Q.      Now I'm confused.  Try to please explain
25 to me just what you mean.

Page 133

1      A.      I'm just saying that I had no reason to
2  believe that they didn't have the authority.
3      Q.      All right.  And had you been told
4  anything by anyone or seen anything while you were
5  managing director that indicated that Alexander Capital
6  had such authority?
7      A.      No.  I had not been given or told by
8  anyone that they had such authority.
9      Q.      Were you told that they didn't have such
10 authority?
11     A.      No.
12     Q.      So you assumed that they did?
13     A.      Again, I didn't -- I didn't assume or
14 not.  I just, I apologize, it just didn't come up.
15     Q.      All right.  But you -- so we can -- all
16 right.  But it was your belief that they had, for
17 whatever reason?
18     A.      Yes.
19     Q.      All right.  And then I believe you said
20 that at some point you learned that they did not have
21 such authority; correct?
22     A.      That's what -- yes, that's correct.
23     Q.      Okay.  And having now seen this June 3,
24 2015 application in which in particular we have
25 highlighted this statement regarding Alexander

JONATHAN GAZDAK - 09/21/2021

Page 134

1  Capital's request to be given permission regarding firm
2  commitment underwritings, does that in any way help you
3  figure out as to whether it was this particular event
4  in which you first became aware that they didn't have
5  the authority?
6       A.     And I don't recall if this was -- I don't
7  recall if this was, because I hadn't seen this before,
8  I don't -- so I can't say if this was the event back
9  then.  I don't recall exactly what the event was,
10 excuse me.
11      Q.     And --
12             MR. SCHLICHTMANN:  Oh, I'm sorry.  Let's
13      just go back to the one here.
14      Q.     And showing you again 143 A.  And this is
15 again a May 15, 2015 letter, and just again directing
16 your attention to "other" in that letter of May 15th.
17 Now, this is, you know, a month previous to what we had
18 just discussed, the 1017 application; correct?  Just
19 from a time we're now dealing a little earlier in time.
20 And you see on the sixth, and we went over this before,
21 but it says "the department suggests that the firm
22 contact their district office to discuss their
23 participation", referring to Alexander Capital, "in
24 this offering", referring to the Alterix offering, "and
25 obtain approval to underwrite this offerings on a firm

Page 135

1  commitment basis."  Do you see that?
2       A.     Yes.
3       Q.     Okay.  Now, having read that and seeing
4  that in this letter from FINRA they are saying that
5  Alexander Capital should obtain approval to underwrite
6  this offering on a firm commitment basis, or that they
7  have to obtain approval, does that help you in any way
8  refresh your recollection as to when you first learned
9  that in fact Alexander Capital did not have such
10 authority to do firm commitment offerings?
11      A.     No, it doesn't help to narrow down the
12 time frame.
13      Q.     And is there anything, was there -- do
14 you have any -- do you have a -- is it -- do you have
15 any reason to believe, after having gone through these
16 document that we've done today, as to whether or not
17 this under -- this understanding that they didn't have
18 authority came during the Alterix offering that
19 Alexander Capital was participating in, or was it some
20 other company's offering, or you just can't remember?
21      A.     As previously I think stated, I don't
22 recall.
23      Q.     That you don't know if it was, that this,
24 this, that you learned that they didn't have the
25 authority, you don't know whether it was during the

Page 136

1  course of the Alterix offering or some other company
2  that Alexander Capital was representing during this
3  time?
4       A.     I don't recall the specific timing, nor
5  the specific company that, as you, as you said, whether
6  it was this company or that company.
7       Q.     And seeing these documents doesn't help
8  you?
9       A.     It doesn't help me, no.
10      Q.     Okay.  Now, do you have -- what was your
11 understanding -- did you have an understanding as to
12 whether or not during the time that you've been
13 managing director of Alexander Capital, as to whether
14 or not Alexander Capital as an underwriter had, had a
15 duty, okay, as part of its membership requirements in
16 FINRA, to ensure the accuracy of any disclosures in
17 registration statements in which it was the
18 underwriter?
19      A.     You're asking, just to clarify, a duty
20 and that duty to FINRA?
21      Q.     A duty arising out of its FINRA
22 membership.
23      A.     So, okay.  I don't know.  I don't know
24 what the duties were.  I hadn't seen our membership
25 agreement with FINRA.  I still haven't seen it, so.

Page 137

1       Q.     So --
2       A.     I can't speak to our specific duties or,
3  I just can't.
4       Q.     Even now?
5       A.     I, I still haven't seen our membership
6  agreement with FINRA, so I --
7       Q.     All right.  Do you -- well, is it fair to
8  say then as of between May of 2014 and November 2015
9  that you did not believe during that period that
10 Alexander Capital had any particular duty regarding the
11 disclosures made in registration statements in which
12 Alexander Capital was participating?
13      A.     Disclosure statements --
14      Q.     In a registration statement.
15      A.     Made by whom?
16      Q.     Made by the, in the registration
17 statement that is being filed on behalf of the issuing
18 company and being underwritten by Alexander Capital.
19      A.     I -- I can't speak to the disclosures
20 made by the company.
21      Q.     Right.  But I'm asking particularly
22 whether that, that -- is it fair to say that you did
23 not have a, an understanding from May 2014 to November
24 2015 that Alexander Capital as an underwriter had a
25 duty as a requirement of its membership in FINRA to

JONATHAN GAZDAK - 09/21/2021

Page 138

1  ensure the accuracy of disclosures made in registration
2  statements in which Alexander Capital was the
3  underwriter?
4       A.    I don't -- I don't recall or know the
5  specific FINRA, as you'll say, duties charged to a
6  broker-dealer in regards to your question.
7       Q.    During that period and up to now?
8       A.    Up to now.
9       Q.    Did it ever -- I think I asked this
10  before, and forgive me if I did, but did it ever come
11  to your attention at any time, including up to now, as
12  to whether or not certain -- that CorpFin brought to
13  Alexander Capital's attention that there were certain
14  disclosures in the Alterix registration statements that
15  had been made previously but then been taken out and
16  the CorpFin reviewers directed that they be put back
17  in, did it ever come to your attention between that
18  period and now that that took place?
19       A.    Just to be clear, you're talking about
20  something other than what you just showed me on this
21  document on the first page or some other document?
22       Q.    You're talking about the CorpFin, the
23  November --
24       A.    Yeah.
25       Q.    -- the November 10th, 2015 CorpFin

Page 139

1  response?
2       A.    Yes.  I -- if that's what it was.  That's
3  my --
4       Q.    Yes.
5       A.    You're not referring to that?
6       Q.    I am.  I'm using that as well, yes.  Or
7  anything else.
8       A.    Then no, I don't recall any of that.  But
9  I saw it, you know, an hour ago or whatever, however
10  long ago it was.
11       Q.    Okay.  And therefore it's -- and but you
12  have no other memory other -- of that actually, of such
13  a thing coming to your attention except what you saw
14  today in today's deposition?
15       A.    Correct.  I do not recall, that's
16  correct.
17       Q.    Okay.  I'm going to show you what's been
18  marked Plaintiff's Exhibit 129, and it's, the letter
19  itself is just, just five pages almost, they're really
20  basically four.  So I'm going to give you control of
21  the document, if you could look through the first five
22  pages and tell me whether you're, are you familiar with
23  it or remember reviewing it prior to today.
24            (Witness perusing documents)
25       A.    Is that the end?

Page 140

1       Q.    Yes, of the letter, yes.  It has
2  attachments, but I'll -- I'm just asking about the
3  letter.
4       A.    Yup, yes, I reviewed it.  But no, I've
5  never seen this.  I, I don't, I don't recall seeing
6  this at all.
7       Q.    Okay.  Just in this letter it mentions in
8  paragraph number one on the first page, it said,
9  "FINRA's saying to provide documentation of NESA
10  Management LLC's assumption of the role of general
11  partner of the firm draft or executed."  Do you see
12  that?
13       A.    Yes.
14       Q.    Okay.  And then they, they give a, they
15  say go see exhibit A.  But first of all, do you know,
16  is NESA Management, LLC an entity that you're familiar
17  with?
18       A.    Not specifically, no.
19       Q.    Does NESA Management LLC mean anything to
20  you as you sit here today?
21       A.    Not, not that I can specifically
22  recollect.  I mean, I've heard the names, but I'm not
23  really sure of any specifics about it.
24       Q.    All right.  In, from May of 2014 through
25  November of 2015, what was your understanding as to the

Page 141

1  corporate, what kind of a corporate entity Alexander
2  Capital was?
3       A.    Other than it being a limited partnership
4  because it's in our name?
5       Q.    Yes.
6       A.    Nothing.
7       Q.    Was it your understanding --
8       A.    I don't know.
9       Q.    Was it your understanding during that
10  period that it was a limited partnership?
11       A.    Yes.  That was my understanding.
12       Q.    Okay.
13       A.    I don't know if it was.
14       Q.    All right.  And do you have a, based on
15  your education, your training, your experience, your
16  knowledge in the business, are you familiar with the
17  term "general partner"?
18       A.    Yes.
19       Q.    What's your understanding of a general
20  partner?
21       A.    My understanding --
22            MR. WARD:  Objection, legal conclusion.
23            MR. SCHLICHTMANN:  I'm sorry, Bryan, you
24       don't like that?
25            MR. WARD:  I just said, yeah, just

Page 142

1    objection for a legal conclusion.
2        MR. SCHLICHTMANN: Okay, okay. Well --
3        MR. WARD: But he can answer it.
4        MR. SCHLICHTMANN: All right, so let me
5        just make it clear. Thank you for the objection.
6        Q.    Did you have an understanding from May
7    2014 to November 2015 as to what a general partner's
8    role was in a limited partnership, did you have any
9    understanding during that period?
10       A.    Generally in corporate structures?
11       Q.    Yes.
12       A.    Generally, yes, but not specifically.
13       Q.    And could you describe it?
14       A.    It's my understanding, and I've never
15    been a partner of a limited partnership, but my
16    understanding is that the general partner or a general
17    partner would be, for lack of a better term, not a
18    legal term, manage the partnership.
19       Q.    All right. And do limited partners?
20       A.    Actually I don't know that. I don't
21    know. Do they, I don't know.
22       Q.    Okay. But your understanding was that a
23    general partner had the responsibility of managing the
24    partnership, a general partnership?
25       A.    Yes. In general, in general corporate

Page 143

1    structures, not specific to Alexander. I didn't know
2    anything about that.
3        Q.    Okay. All right. What was your
4    understanding between May of 2014 and November 2015 as
5    to who was the general, who was the general partner of
6    Alexander Capital LP during that period?
7        A.    I don't know.
8        Q.    Do you have an understanding now?
9        A.    No. I don't know now either.
10       Q.    Do you know whether NESA Management LLC
11    ever became the general partner at any time of
12    Alexander Capital LP?
13       A.    No, I do not recall or know.
14       Q.    Okay. This refers to Exhibit A. I'm
15    just going to go to Exhibit A.
16       MR. SCHLICHTMANN: I'm sorry, sorry about
17       that, okay, I'm getting familiar with the
18       documents now.
19       Q.    All right, here is Exhibit A. And it's
20    an assignment and assumption agreement, it's undated
21    and it's not executed, but it's between Alexander
22    Capital Holdings Inc., a Delaware corporation. All
23    right, does Alexander Capital Holdings Inc. mean
24    anything to you, is that a --
25       A.    No.

Page 144

1        Q.    -- corporation you're familiar with at
2    all?
3        A.    No, I'm sorry, no.
4        Q.    And NESA Management LLC we've already
5    established you're not familiar with them either?
6        A.    I've heard the name but I'm not familiar
7    with them, no.
8        Q.    Okay. In this undated, unexecuted
9    document that is part of the October 27, 2015 response
10    to FINRA, it says, "Whereas, Alexander Capital Holdings
11    Inc. holds a hundred percent of the general partnership
12    interest of Alexander Capital LP and serves at the
13    general partner", do you see that?
14       A.    Yes, I see that.
15       Q.    Okay. Is that, did you know that at the
16    time --
17       A.    No.
18       Q.    -- whether that was true or not?
19       A.    No.
20       Q.    Do you know now?
21       A.    No.
22       Q.    Okay. So to this day you don't know who
23    or whether Alexander Capital has a general partner?
24       A.    No, no.
25       Q.    No, you don't know?

Page 145

1        A.    No, I don't know.
2        MR. SCHLICHTMANN: Okay, all right, we'll
3        take that off.
4        Q.    I'm going to show you, this is a
5    document, Plaintiff's Exhibit 120. I'm sorry, you know
6    what, before I just do that, let me just quickly go
7    back to the and finish with it. I apologize, I'm going
8    to back to the Exhibit 129, and just direct your
9    attention to number six on page two. And it says, "As
10   discussed, the firm was issued a Wells Notification on
11   September 1st, 2015. Please provide a detailed
12   statement as to why the matter as noted should not
13   impact the application, this 1017 application." Do you
14   see that?
15       A.    Yes.
16       Q.    Do you know what a Wells Notification is?
17       A.    Not specifically.
18       Q.    Generally?
19       A.    Not in a legal sense, no.
20       Q.    In any kind of general sense?
21       A.    I believe it's a notification -- yes.
22       Q.    What is it, what's your understanding?
23       A.    I don't -- it's a notification, it's some
24   level, I believe the SEC to, to somebody.
25       Q.    All right. And were you aware during

JONATHAN GAZDAK - 09/21/2021

Page 146

1  between as 2015 as to whether or not FINRA or the SEC
2  had put Alexander Capital on notice that it had a
3  regulatory issue that required Alexander Capital to
4  reply regarding the allegations that FINRA, the SEC
5  were considering?
6      A.    No.
7      Q.    Is it new -- is it news to you that on
8  September 1st, 2015 the firm was issued a so-called
9  Wells Notification and required to give a detailed
10 statement as to why Alexander Capital should not be the
11 subject of some sort of an action by the regulators?
12     A.    Again, I -- don't take it wrong, news to
13 me meaning?
14     Q.    Now, I mean, you didn't know it before
15 and now you're just learning it now.
16     A.    Yes, I'm just learning it now.
17     Q.    Is this true?
18     A.    Yes.
19     Q.    This letter of October 27, 2015.
20     A.    So yes, this is the first I've learned of
21 it.
22     Q.    So you -- so it's fair to say that you
23 are not aware during 2015 that Al -- as managing
24 director that Alexander Capital had been put on notice
25 by FINRA that it had a or could be the subject of a

Page 147

1  investigation or enforcement action of some kind?
2          MR. WARD:  Objection, misstates the
3  testimony.
4          MR. SCHLICHTMANN:  All right, so, all
5  right, so I'm specifically asking.
6      Q.    Did you in 2015, did it ever come to your
7  attention that Alexander Capital in 2015 was put on
8  notice by FINRA or the SEC, one or both, regarding the
9  fact that it may be the subject of either an
10 investigatory -- an investigation or an enforcement
11 action of any kind?
12     A.    Not to my recollection, no.
13     Q.    Okay.  And if in fact it was, if that
14 was, if that did happen, you're learning about that for
15 the first time right now; is that correct?
16     A.    To my knowledge, yes, that's correct.
17     Q.    All right.  Okay, all right.  Now, I'm
18 going to now show, all right, now I'm going to show you
19 Plaintiff's Exhibit 120, all right.  And could you,
20 it's short, but could you read it over, and you can
21 have control.  You have control, he has control, yes,
22 thank you.
23          (Witness perusing documents)
24     A.    Okay.
25     Q.    All right.  Have you ever seen this email

Page 148

1  before --
2      A.    No.
3      Q.    -- Plaintiff's Exhibit 120?
4          Now, having read it, does this refresh
5  your recollection about any of the things discussed in
6  that email, is your memory refreshed in any way about
7  any of the events discussed in that email of November
8  2nd?
9      A.    No.
10     Q.    Okay.  Now, this is an email from
11 Mr. Restrepo to an official at FINRA.  Do you see that?
12     A.    Yes.
13     Q.    Okay.  It's dated November 2nd, 2015.
14 The subject is "Alexander Capital LP, CMA/1017."  Do
15 you see that?
16     A.    Yes.
17     Q.    I'm going to represent to you that this
18 is part of the 1017 application process we previously
19 discussed.
20     A.    Okay.
21     Q.    All right.  And in this letter it states
22 in the first sentence, "As you are aware, I officially
23 joined Alexander Capital as the chief compliance
24 office", I'm assuming they meant officer, "/managing
25 director last week.  FINRA approved the firm's

Page 149

1  registration on Friday, making me official."
2          Now, are will more than one managing
3  directors at Alexander Capital?
4      A.    I -- you mean right now?
5      Q.    Well, during 2014 to 2015 were there
6  different, were there managing directors of different
7  divisions of Alexander Capital or sections of Alexander
8  Capital?
9      A.    I, I don't know everyone's specific
10 title, sorry.
11     Q.    All right.  Did, when in describing in
12 Mr., this is by Mr. Restrepo, first of all, are you
13 familiar with Mr. Restrepo, is that name familiar to
14 you?
15     A.    Yes.
16     Q.    Were you aware of the fact that in
17 October of, in this time period, October, early
18 November 2015 Mr. Restrepo was brought in to Alexander
19 Capital as the chief compliance officer/managing
20 director?
21     A.    I don't recall the specific dates and I
22 certainly don't recall his specific titles, but --
23     Q.    Do you remember Mr. Restrepo's, what
24 position he took over when he did come in to Alexander
25 Capital?

JONATHAN GAZDAK - 09/21/2021

1    A.    I, I don't recall.  But again, I'm not
2  saying that what here -- what is here is false, I have
3  no reason to say it's false or know whether it's true.
4    Q.    Do you know what a chief compliance
5  office, did you have an understanding of the duties of
6  a chief compliance office at Alexander Capital?
7    A.    Not specifically, no.
8    Q.    Generally?
9    A.    Potentially, but I -- you know, again, I
10 don't know the specific roles or responsibilities of a
11 chief compliance officer.
12   Q.    Do you know them now as you sit here
13 today?
14   A.    No.
15   Q.    You were aware that Mr. -- did you have
16 any understanding of what Mr. Restrepo's role was at
17 Alexander Capital when he was employed by Alexander
18 Capital in 2015?
19   A.    Again, I don't recall the specific roles
20 and responsibilities.  I do recall him being in the
21 compliance department.
22   Q.    All right.  And Alexander Capital has a
23 compliance department?
24   A.    Yes.  I don't know specifically, but yes.
25   Q.    And what was your, what's your

1  understanding, well, what was your understanding
2  between 2014 and November 2015 as to what the
3  compliance office at Alexander Capital was responsible
4  for?
5    A.    I, I don't recall, nor do I know.
6    Q.    Even now?
7    A.    Even now.
8    Q.    All right.  Do you see in the third
9  paragraph, it says, second sentence, "In particular,
10 the firm is anxiously awaiting approval to be able to
11 conduct an underwriting business on a firm commitment
12 basis."  Do you see that?
13   A.    Yes.
14   Q.    And then it says in parentheses, "the
15 firm is approved and has been conducting such a
16 business on a best efforts basis for a while now", end
17 parentheses.
18   A.    Yes.
19   Q.    Do you see that?
20   A.    Yes.
21   Q.    "And to increase its head count."  Do you
22 see that?
23   A.    Yes.
24   Q.    Okay.  Were you aware of the fact that
25 one of the things that Mr. Restrepo was doing in this

1  time period was, was trying to get Alexander Capital
2  approved to do underwriting business on a firm
3  commitment basis?
4    A.    No, I don't recall being aware of that,
5  that he was trying to do that.
6    Q.    Is the first time you became aware of
7  that as we sit here today?
8    A.    Again, I don't recall, but -- I don't
9  recall being unaware or aware.  I don't recall knowing
10 specifics of Mr. Restrepo's -- what he was doing.
11   Q.    And having now viewed this email, does
12 that help refresh your recollection in any way?
13   A.    No.
14   Q.    All right.  Do you have any reason --
15 well, that's -- all right.
16       Are you -- let's go to this one.  I'm
17 going to show you what's been marked as Plaintiff's
18 Exhibit 122.  And this is a, an email dated January 14,
19 2016 between Mr. Carmel, the law firm representing
20 Alexander Capital regarding its 1017 application, and
21 Mr. Francois, the official at FINRA, and Mr. Restrepo.
22 Do you see that?
23   A.    Yes.
24   Q.    Okay.  And this email indicates that the
25 1017 application is still pending with FINRA as of

1  January 2016.  Do you see that?
2    A.    No.
3    Q.    Well, it says subject --
4    A.    I'm sorry, I'm just -- it says Alexander
5  Application, so --
6    Q.    I'm going to represent to you that
7  they're referring to the 10/7 application.
8    A.    Okay.
9    Q.    Records of Alexander Capital also
10 indicate that the application was withdrawn in February
11 of 2016.  Are you aware that in fact the 1017
12 application that we have been discussing was withdrawn
13 by Alexander Capital in February 2016?
14   A.    No, I don't recall that, no.
15   Q.    Is that news to you today?
16   A.    Again, define news to me.
17   Q.    You said I --
18   A.    The first I recall being made aware of
19 it.
20   Q.    Is as you sit here today?
21   A.    Yes.  As I can recall, yes.
22   Q.    Okay.  Are you aware at any time between
23 May 2014 and November 2015, were you aware at any time
24 during that period whether or not Alterix or anyone
25 associated with Alterix, also named Inpellis, ever --

JONATHAN GAZDAK - 09/21/2021

Page 154

1  it was ever brought to your attention that anyone
2  associated with Alterix or Inpellis was concerned as to
3  whether or not Alexander Capital could undertake a firm
4  commitment offering?  Do you want me to repeat the
5  question?
6      A.      Yes, or shorten it, yes.
7      Q.      Okay.  So let me state it again.  Did it
8  ever come to your attention between May of 2014 and
9  November of 2015 that anyone associated with Alterix,
10  also known as Inpellis, ever brought to Alexander
11  Capital's attention the concern that Alexander Capital
12  was, was not able to undertake a firm commitment
13  offerings.
14      A.      I do not recall that concern ever being
15  brought.
16      Q.      If I told that you such a concern was
17  brought, if I tell you that that was true, would that
18  be news to you as you sit here today?
19      A.      By definition I don't -- I didn't recall
20  it happening, so.
21      Q.      So would be news to you now if that's
22  true?
23      A.      I don't know.  I mean, if -- yes, I
24  guess.  I mean, I never -- I don't recall being made
25  aware of any concern.

Page 155

1      Q.      Okay.  Did you have an understanding, was
2  it your understanding while you were managing director
3  from May of 2014 to November 2015 that if anyone
4  associated with Alterix or Inpellis had a concern about
5  Alexander Capital's ability to do a firm commitment
6  offering, that that is something that should have been
7  brought to your attention?
8      A.      I -- I don't -- I don't know.  I
9  can't -- I wasn't involved in those conversations and I
10  don't know.  So I don't know.
11      Q.      Is it, well, is it something that should
12  have been brought based on the responsibilities that
13  you had at Alexander Capital, or it didn't matter
14  whether it was brought to your attention or not?
15      A.      I -- I'm not saying it mattered or didn't
16  matter.  I'm saying I don't know whose responsibility,
17  not defining responsibilities, if someone, if you're
18  saying that happened, what they should or should not
19  have done, I don't know.
20      Q.      Well, let me ask it this way.  From May
21  2014 to November of 2015 did you have an understanding
22  that if someone at Alexander Capital became aware
23  during that period that someone associated with Alterix
24  a/k also known as Inpellis, was concerned about
25  Alexander Capital's ability to do a firm commitment

Page 156

1  offering, that such person, such Alexander Capital
2  person should have brought that information to your
3  attention during that period of time, or you don't have
4  an understanding or --
5      A.      Again, I'll --
6      Q.      -- don't believe they had to do that?
7      A.      I'm not saying you have a reason or my
8  expectation.  So I don't know what their
9  responsibilities were, whoever they is, that you're
10  referring to, I don't know.
11      Q.      All right.  From May of 2014 to November
12  of 2015, did you say or do anything, orally or in
13  writing, that would lead anyone to believe at, who was
14  associated with Alexander Capital, that if anyone
15  associated with any company in which Alexander Capital
16  was the underwriter, where they expressed a concern
17  that Alexander Capital did not have the ability to
18  undertake the offering that was the -- to undertake the
19  offering for that company, that that is information
20  that should have been brought to your attention, or you
21  did not, you have no memory of taking any action orally
22  or in writing that would lead any Alexander Capital
23  employee to believe they should do such a thing?
24      A.      No.  I --
25      MR. WARD:  Objection, confusing grounds.

Page 157

1      MR. SCHLICHTMANN:  All right, take it
2  away, all right, take it back.
3      Q.      Did you, between May 2014 and November
4  2015 did you say anything orally, put anything in
5  writing, or by your conduct indicate in any way to any
6  employee of Alexander Capital that during that period
7  of time if anybody associated with Alexander Capital
8  became aware that Alterix/Inpellis was concerned that
9  Alexander Capital did not have the ability to do the
10  firm commitment offering, that it was that person
11  should have brought, that Alexander Capital person
12  should have brought that to your attention?
13      A.      I -- I don't recall making such
14  statement.
15      Q.      Or any, engaging in any behavior that
16  would lead someone to believe that?
17      A.      Agreed.  I just don't recall.  I'm not
18  saying I did or didn't.  I just don't recall.
19      Q.      Okay.  Are you aware of the fact that,
20  let me show you, all right.  I'm going to show you
21  Plaintiff's Exhibit 39.  It's a, 39, which is an email
22  from Mr. Barrette to the Inpellis board of directors.
23  Now, were you of a, that there was a person, Thomas
24  Barrette, who was a lawyer working as counsel to
25  Inpellis during this period?

JONATHAN GAZDAK - 09/21/2021

Page 158

1    A.    Yes.
2    Q.    Did you have any, do you have any memory
3 of interacting with Mr. Barrette for any reason about
4 anything during this period?
5    A.    Yes.  In the course of the relationship
6 or the, you know, the time together, yes.  Not
7 specifics, but yeah in general, yes.
8    Q.    Okay.  Are you aware of the fact that on
9 November, that in this email, right, indicates that
10 Mr. Barrette notified the board of a board meeting on
11 the evening of November 9th regarding the filing of the
12 S-1 the next day, the public filing of the S-1 the next
13 day on November 10th.  Are you aware of the fact, were
14 you aware of the fact at the time that Mr. -- that the
15 Inpellis board of directors were having a meeting or
16 had a meeting on November 9th, 2015 to consider the
17 public filing of the S-1 the next day?
18    A.    No, I don't recall being aware of that.
19    Q.    And were you in any way familiar with or
20 have any interaction at all with any of the board
21 members of the Inpellis board of directors at any time
22 during this period?
23    A.    I don't recall specifically.  I don't
24 recall.
25    Q.    Do you have, do you have any memory of

Page 159

1 interacting with Jack Clark, the chairman of the board?
2    A.    No, not, not specifically, not directly,
3 no.
4    Q.    Okay.  Generally?
5    A.    I just don't recall.  I just don't
6 recall.
7    Q.    Do you have any memory of interacting
8 with Mr. Mooney during this period of time?
9    A.    Yes.
10    Q.    Okay.  And are you aware of the fact that
11 Mr. Mooney became CEO of Inpellis on June 11th of 2015,
12 are you aware of that?
13    A.    I'm not -- I don't recall the specific
14 date but generally, yes.
15    Q.    All right.  Are you, were you aware in
16 November 2015 that, that the board of board of
17 directors of Inpellis approved the filing of the
18 Inpellis S-1 the next day, are you aware of that?
19    A.    Not that I can relect, no.  Re --
20 recollect, recollect.
21    Q.    I'm going to show you, that's Plaintiff's
22 Exhibit 34.  Now, it's 151 pages, and I'm just showing
23 you really the front cover here.  It's a Form S-1.
24 It's, do you see at the top it's dated November 9th,
25 2015?

Page 160

1    A.    Yes.
2    Q.    And on the second page it says, under the
3 name "Inpellis", "this is a firm commitment initial
4 public offering."  Do you see that?
5    A.    Yes.
6    Q.    Okay.  Do you remember seeing at any time
7 any of the draft registration statements that were
8 filed between April and October 28th, 2015 that were
9 filed regarding the Inpellis offering, do you remember
10 ever seeing them?
11    A.    No, I don't.  I don't recall seeing them
12 or not seeing them, but --
13    Q.    All right.  When I, looking at this one
14 dated November 9th, 2015, which says on the second page
15 it's a firm commitment offering, does this refresh your
16 recollection at all or is this consistent with any
17 memory you may have of looking at an Inpellis
18 registration statement?
19    A.    No, I don't recall.  I mean, I see it
20 here, but it doesn't help me recollect.
21    Q.    All right.  Okay.  And is it, did you in,
22 from May 2014 to November 2015 did you have an
23 understanding as the managing director as to whether or
24 not the CEO of a company and its board of directors had
25 any obligations to sign a registration statement that's

Page 161

1 going to be filed publicly?
2    A.    I don't know the specific legal bylaws by
3 each company, no.
4    Q.    No, I mean, as a matter of securities
5 laws, did you have an understanding during this period,
6 May 2014 to November 2015, that the CEO and the board
7 of directors of a company wishing to undertake an
8 initial public offering had an obligation to sign the
9 registration statement when it's being filed publicly?
10    A.    No.  I don't, I don't know the
11 regulations.
12    Q.    As we sit here today are you aware of
13 that requirement?
14    A.    No.  No.
15    Q.    Well, I'm going to show you --
16    MR. SCHLICHTMANN:  Let's go back to,
17 okay, and that is page 146.
18    Q.    Okay, I'm showing you page 146 of
19 Plaintiff's Exhibit, Plaintiff's Exhibit 34, the
20 November 9th draft that we just went over.  I'm now
21 showing you page one, actually it's, it's Roman numeral
22 II-V, but on this document, which is, it's page 146,
23 the physical page, all right?  You can see it on the
24 screen?
25    A.    No.  I still, I still show the -- oh,

JONATHAN GAZDAK - 09/21/2021

Page 162

1  yeah, there's some change there.
2        Q.      Okay.  So you can see it now?
3        A.      Yes.
4        Q.      Okay.  Do you see at the top it has
5  November 9th, 2015 there, do you see?
6        A.      Yes.
7        Q.      And it has the Bates stamp of 1041 EST.
8  Do you see that?
9        A.      Yes.
10       Q.      Okay.  And this is the signature page
11 from that multipage document?
12       A.      Okay.
13       Q.      Which is the November 9th draft that we
14 just showed you, which is Exhibit 34.
15       A.      Okay.
16       Q.      And you see it says signatures, right, on
17 this page?
18       A.      Yes.
19       Q.      It says, "Pursuant to the requirements of
20 the Securities Act of 1933 as amended, the registrant
21 has duly caused this registration statement on Form S-1
22 to be signed on its behalf by the undersigned there,
23 and two, duly authorized in the Town of Beverly,
24 Commonwealth Mass, on the blank date", and it says
25 "Inpellis Inc. by."  Do you see that?

Page 163

1        A.      Yes.
2        Q.      Then it talks about the power of
3  attorney, right?  And it says, second paragraph,
4  "Pursuant to the requirements of the Securities Act of
5  1933 as amended, this registration statement on Form
6  S-1 has been signed by the following persons in the
7  capacities on the dates indicated below."  Do you see
8  that?
9        A.      Yes.
10       Q.      And do you see it says, it's got a space
11 for Patrick Mooney with a date of November 10th, and it
12 says president, CEO and director, principal executive
13 officer.  Do you see that?
14       A.      Yup.
15       Q.      Then it has Frank Manguso, chief
16 financial officer.
17       A.      Yup.
18       Q.      Then it has David Staskin, chief strategy
19 officer, secretary and director?
20       A.      Yup.
21       Q.      Then it's Jack Clark, director.
22       A.      Yup.
23       Q.      Then the next page, Fred DeBeer,
24 director, and Harry McCoy, director.
25       A.      Yes.

Page 164

1        Q.      Okay.  Now, having looked at that
2  signature page and its reference to the requirements
3  regarding signatures, does that help refresh your
4  recollection as to whether or not a publicly filed
5  registration statement of a company wishing to
6  undertake an initial public offering, that it's
7  required to be signed by the officer and the director
8  of the company?
9        A.      Wait, and I apologize, I don't mean to --
10 it doesn't refresh my knowledge.  I'm not familiar with
11 the specific code of Securities Act of 1933 that says
12 this has to be done, so.
13       Q.      Did you have an understanding -- go
14 ahead, I'm sorry.
15       A.      Nothing.  I mean, if you're saying that's
16 what the law is, that's what the law is.  I'm not
17 saying it is or isn't.  I don't know it.
18       Q.      And you didn't know it then?
19       A.      I didn't know it then and I still don't
20 know the --
21       Q.      Are you, were you aware of the fact that
22 in November 2015 as to, the fact that the board of
23 directors of Inpellis approved the filing of that
24 November 9th draft for the next day on November 10th,
25 are you aware, were you aware of it then?

Page 165

1        A.      I don't recall, no.
2        Q.      Are you aware of it now?
3        A.      No.
4        Q.      I'm going to show you Plaintiff's Exhibit
5  31.  Do you see that?  Okay.  And the front page, dated
6  November 10th, 2015, do you see that?
7        A.      Yes.
8        Q.      And I'm going to go to the, this is what
9  was actually filed on November 10th, and I'm going to
10 show you this page three of it.  Do you say -- do you
11 see where it says, "this is an initial public offering
12 of blank shares"?
13       A.      Yes.
14       Q.      And do you see down below it says, "The
15 underwriters are selling the shares of common stock in
16 this offering on a best efforts basis."  Do you see
17 that?
18       A.      Yes.
19       Q.      So between November 9th, 2015, when the
20 board of directors approved the filing of the November
21 9th draft that we've just gone over, which said it was
22 a firm commitment offering, and November 10th, the
23 actual document that was filed was actually not a firm
24 commitment offering but a best efforts offering, do you
25 see that?

JONATHAN GAZDAK - 09/21/2021

Page 166

1    A.        I, I see the difference in the documents,
2    yes.
3    Q.        Okay.  Did you know at that period of
4    time that in fact at the last minute the Inpellis
5    registration statement that was filed as a publicly
6    filed S-1 had gone from, was changed from a firm
7    commitment to a best efforts offering, did you have
8    that understanding at any time in November of 2015?
9    A.        I don't recall.
10             MR. WARD:  Objection, it assumes facts
11   not in the record.
12             MR. SCHLICHTMANN:  I'm sorry, there,
13   Bryan?
14             MR. WARD:  It assumes facts not in the
15   record.
16             MR. SCHLICHTMANN:  Okay.  All right.
17   Q.        Well, you see that there's a difference
18   between the November 9th draft that the board approved
19   on November 9th, which said it was filed, for a firm
20   commitment, and you see this that was actually filed,
21   this registration statement actually publicly filed on
22   November 10th, you see they are different, right?
23   A.        I just want to clarify.
24   Q.        Yeah.
25   A.        You're telling me the board approved

Page 167

1    that.  You haven't -- I haven't seen -- I don't know or
2    haven't seen -- I'm just --
3    Q.        All right.  I'm going to represent to you
4    that the board minutes for November 9th show that the
5    board approved, was presented the November 9th draft
6    that we -- that was Exhibit 34, which was a firm
7    commitment draft, that they, the minutes show it was
8    approved by the board on November 9th for filing the
9    next day.  I want you to assume that that's true.
10   A.        Okay.
11   Q.        The document that was filed on November
12   10th is this document, Exhibit 31, 31, all right.  And
13   this is not a firm commitment, this is a best efforts
14   filing.  Do you see that?
15   A.        Yes.
16   Q.        Did you know at any time in November that
17   the filing that was actually made on November 10th
18   regarding the Inpellis offering was filed as a best
19   efforts offer, did you ever, did that ever come to your
20   attention then?
21   A.        In November?
22   Q.        Of 2015.
23   A.        The whole month?
24   Q.        Yes.  Any time during that month.
25   A.        I don't recall specifically knowing when,

Page 168

1    but it was publicly filed.
2    Q.        Okay.  But do you have some memory of it
3    coming to your attention that it was filed as a best
4    efforts offering?
5    A.        I don't recall if I knew it was filed on
6    a best efforts basis or not.
7    Q.        Is it news to you as you sit here today
8    that it was filed on November 10th as a best efforts
9    offering?
10   A.        No.
11   Q.        It's not news to you?
12   A.        No.  Because I -- subsequent to
13   September -- November 10th it was public and I saw it.
14   Q.        Okay.  So you remember seeing it somehow,
15   under some circumstances?
16   A.        Yes.  Publicly on the -- as I recall,
17   publicly on the SEC website.
18   Q.        You have a memory of actually seeing it
19   on the public, on the EDGAR, on the public system --
20   A.        I don't recall.  I don't recall --
21   Q.        -- the SEC public system?
22   A.        -- specifically when, but yes.
23   Q.        Do you have any memory of being surprised
24   by that when you saw it or not being surprised?
25   A.        I have no recollection of being surprised

Page 169

1    or not surprised.
2    Q.        Do you have any reason to believe that
3    you, before seeing it on the SEC system as a publicly
4    filed document, do you have any memory of knowing
5    beforehand, before you saw it, that it was filed as a
6    best efforts offer?
7    A.        I don't have a recollection specifically
8    knowing or not knowing.
9    Q.        Your first memory is seeing it on the SEC
10   system publicly after it was filed?
11   A.        No, that's not what I -- I apologize,
12   that's not what I said.  I don't have a recollection of
13   seeing it, necessarily seeing it before or after.  But
14   I do have a recollection of seeing it after it was
15   filed.
16   Q.        On the SEC system as a publicly filed
17   document?
18   A.        Correct.
19   Q.        All right.  But my question, and my
20   question now is, do you have any memory of the, that
21   you knew before you saw it on the SEC public system,
22   any memory of knowing that it was -- had been filed as
23   a best efforts, or is that your first memory of knowing
24   that it was filed as best efforts?
25   A.        I don't recall.  As I said, I don't

JONATHAN GAZDAK - 09/21/2021

Page 170

```
1   recall.
2        Q.      Do you have any memory of being told or
3   informed in any way other than your seeing it on the
4   SEC public system?
5        A.      Again, I don't recall whether it was
6   before or after it was filed publicly.
7        Q.      Right, but I'm asking do you have any
8   memory at all of any kind?
9        A.      I don't recall.  I don't recall the
10  specific -- you're asking for a, I apologize, you're
11  asking for a very specific date a very long time ago
12  and I can't tell you if it was this day or that today.
13       Q.      Now, I understand, but I, because it's
14  important let me just --
15       A.      Yes, yeah.
16       Q.      Again, you know, I don't mean to press
17  you on it, but I do want us to be clear.  You do have a
18  memory of seeing it on the public system, which means
19  you, when you saw it, it had already been filed;
20  correct?
21       A.      Correct.
22       Q.      All right.  And in fact there's a lag
23  time, isn't there, between actually filing it
24  physically and it showing up on the public system; is
25  that true?
```

Page 171

```
1        A.      I don't --
2        Q.      -- Is that your --
3        A.      I don't know specific lag times or not.
4        Q.      Okay.  But you do remember, you do have a
5   memory of seeing it on the system?
6        A.      Yes.  But I don't recall when I saw it
7   the first time on the system.
8        Q.      Okay.  But any, but the, but any time you
9   see it on the public system it had already, it had to
10  have already been filed or it wouldn't be on the public
11  system; correct?
12       A.      Yes.  By definition I, I believe that to
13  be correct.  I don't know how it can get on a public
14  system without being filed on the public system.
15       Q.      Okay.  And what I'm asking now is, do you
16  have any memory as you're here today, any memory of
17  ever knowing for any reason that the filing that was
18  made of the Inpellis registration S-1 was a best
19  efforts filing, any memory of knowing that prior to
20  your seeing it on the public system?
21       A.      Again, I apologize, I just don't have a
22  specific memory or not specific memory, I just don't
23  recall.
24       Q.      Well, so is it fair to say when you say
25  you don't have a specific memory, you don't have any
```

Page 172

```
1   memory, right, general or otherwise?
2        A.      Correct.  However, I just can't recall
3   specifically.
4        Q.      Right.
5        A.      Specifically seven years ago.
6        Q.      I'm asking for your memory.  I'm asking
7   for your memory.  Okay, I want to be very clear.  I'm
8   asking for your memory.  You either have some memory or
9   you don't.  And what you have told us, and I want to be
10  fair here, is that you do have a memory of seeing it on
11  the public system, which means you saw it, when you saw
12  it on the public system it was after it was filed, you
13  do have a memory of that --
14       A.      Yes.
15       Q.      -- correct?
16               But you don't have any memory of knowing
17  beforehand, that you don't have, you don't have such a
18  memory?
19       A.      I don't recall seeing it beforehand.
20       Q.      Right.  But I want to, and I understand
21  recall, but when we say recall you mean you don't have
22  any memory of it; is that right?
23       A.      I don't, as of right now I don't have a
24  memory of seeing it.
25       Q.      Prior to seeing it on the public system?
```

Page 173

```
1        A.      Correct.  I just don't have a memory of
2   it.
3        Q.      All right.  Now, we said seeing.  I want
4   to be very clear here.  You had no indication -- you
5   have no memory of having any indication, you don't have
6   a memory now of having any indication prior to your
7   seeing it, I just want to be very clear here; is that
8   right?
9        A.      I --
10              MR. WARD:  Just objection, vague.
11              MR. SCHLICHTMANN:  Al right, so I don't
12       want to be vague.
13       Q.      And I'll move on, but I just want to be
14  clear here, is that as you sit here today you do
15  remember seeing it on the public system, but you don't
16  have any memory, general or specific, of having, of
17  knowing or having an inclination or an indication of
18  any kind that it had been filed as a best efforts; is
19  that true?
20       A.      I, I don't recall seeing it, but I'm not
21  saying I didn't.  All right, and I apologize.  It -- so
22  like earlier when you showed me an email that I got and
23  you said do you remember this email, I said no, I don't
24  recognize -- that doesn't mean -- and then I, I can't
25  remember, but to give an example I said well, it looks
```

JONATHAN GAZDAK - 09/21/2021

1  like I got that email, right?
2      Q.      That's right.  But right now I'm only,
3  and I appreciate that.
4      A.      So again, I'm not trying to be evasive
5  or, you know, I just don't recall.  It's not saying I
6  didn't see it.  I just don't recall as we sit right now
7  seeing it before it was whatever you asked, yeah.
8      Q.      Okay.  As we sit, as you sit here today
9  have you seen anything, any document or received any
10  information from any person indicating to you that you
11  were aware prior to seeing it on the public system that
12  the Inpellis S-1 was filed as a best efforts?
13     A.      I do not recall seeing it.
14     Q.      Okay, you say seeing.  I want to be very
15  specific here.
16     A.      I don't recall your whatever you just
17  said.
18     Q.      All right.  Well, let me state it again,
19  because it's important, all right, because the word
20  "seeing".  And I'm not about seeing because you've made
21  clear you didn't see it, you only saw it on the public
22  system.  What I'm asking is a different question.  Have
23  you, up until now, seen any document or received
24  information from anyone, okay, some factual piece of
25  information that indicates to you or indicates that you

1  were aware at the time that it was filed or previously
2  that the Inpellis S-1 was going to be filed or at the
3  time of filing was filed as a best efforts?
4              MR. WARD:  I'm going to object.
5              MR. SCHLICHTMANN:  All right, again.
6  It's a terrible question.  All right, again.
7              MR. WARD:  Hey, Jan, do you want to, I
8  don't know.
9              MR. SCHLICHTMANN:  Yeah, go ahead.
10             MR. WARD:  Do you want to keep going or
11  stop, I just want to see sort of, it's been an
12  hour and a half, I guess an hour and forty since
13  lunch, I just wanted to see how much longer you
14  had.
15             MR. SCHLICHTMANN:  I'm going to be
16  wrapping up.  I'm wrapping up, I'm in the wrap up
17  stage here, it's not going to be much longer, all
18  right?
19             MR. WARD:  Okay.
20             MR. SCHLICHTMANN:  Yeah.
21     Q.      So again just trying, have you seen
22  anything or received any factual information, orally or
23  in writing, that indicates to you that you were made
24  aware as of the filing of this document, prior to its
25  actual filing on November 10th, this S-1, that you were

1  made aware that it was going to be filed as a best
2  efforts as opposed to a firm commitment offering, or
3  you have not seen any factual information orally, in
4  writing or prior to today?
5      A.      I have not --
6              MR. WARD:  Objection.  Excuse me.
7      Q.      -- specifically -- sorry.
8              MR. SCHLICHTMANN:  Sorry, what?
9              MR. WARD:  Objection, but you can go
10  ahead, you can answer if you --
11     A.      So no, I just don't recall.  I apologize,
12  I don't recall.
13     Q.      Okay.  It's not a recall question, all
14  right?  It's very specific.  I'm asking if you were
15  shown a piece of paper, saw a piece of paper, all
16  right, or you received orally information from someone,
17  some fact that indicates that you were made aware prior
18  to the Inpellis S-1 filing on November 10th that the
19  Inpellis S-1 filing was going to be filed as a best
20  efforts filing as opposed to a firm commitment
21  offering.
22     A.      Again, I literally don't recall.
23     Q.      Again, I'm not --
24             MR. WARD:  Could we have, maybe have a
25  five minute break, and --

1              MR. SCHLICHTMANN:  Sure, go ahead, yup,
2  great.
3              THE VIDEOGRAPHER:  We're going of the
4  record.  The time is 3:27 p.m.
5              (Recess taken)
6              THE VIDEOGRAPHER:  We're back on the
7  record.  The time is 3:39 p.m.
8              MR. SCHLICHTMANN:  Okay.
9  BY MR. SCHLICHTMANN:
10     Q.      Let me ask the question one last time,
11  all right.  You, have you prior to today, as of up to
12  today have you received any factual information or seen
13  any kind of record, when it's in paper or electronic,
14  that would indicate that you were aware prior to the
15  filing of the Inpellis S-1 that it was being filed as a
16  best efforts offering as opposed to a firm commitment
17  offering?
18     A.      No.
19     Q.      Okay.  Now, I'm going to show you, this
20  is Exhibit 46.  Okay.  Okay.  And we're almost done,
21  Mr. Gazdak, I appreciate your patience.  I'm showing
22  now you Plaintiff's Exhibit 46, all right, and ask if
23  you examine that.  Have you, prior to today have you
24  seen this document dated November 30th from the SEC
25  regarding the Inpellis offering?

JONATHAN GAZDAK - 09/21/2021

Page 178

1   A.      I, I don't recall.  I just have to look
2   through it.
3   Q.      Yeah, look it through, please.
4           THE VIDEOGRAPHER:  Yeah, you can take
5   control now.
6           (Witness perusing documents)
7   A.      Okay, thank you.  Can you repeat your
8   question?
9   Q.      Yes.  Have you, have you ever recall
10  seeing this document prior, Plaintiff's Exhibit 46,
11  prior to today?
12  A.      I, I don't recall seeing it, no, but,
13  like other emails, I don't recall it, seeing this --
14  Q.      All right.
15  A.      -- specific document.
16  Q.      Okay.  Now, this is not an email, just to
17  be clear, this is an official letter from the SEC dated
18  November 30th, 2015, and it goes to Inpellis's lawyer,
19  it says "care of Anthony Marsico", and it says on
20  direct.  And it is a letter that says, "To whom it may
21  concern, please be advised that the Securities and
22  Exchange Commission has issued an order directing a
23  private investigation and examination, and designated
24  officers to take testimony, issued pursuant to Sections
25  20(a) and 8(e) of the Securities Act of 1933, and

Page 179

1   Section 21(a) of the Securities Exchange Act of 1934,
2   with respect to the Form S-1 registration statement
3   (S-1) filed by Inpellis Inc."  Do you see that?
4   A.      Yes.
5   Q.      And it says, "While the Section 8(e)
6   examination is pending, the Division of Corporate
7   Finance will not take any further action on the S-1,
8   and all communication should be made to the
9   Commission's Office of Enforcement in its Boston
10  Regional office at the address above, to the attention
11  of Michael C. Moran."  Do you see that?
12  A.      Yes.
13  Q.      And then it says that, "Please be advised
14  that Section 5(c) of the Securities Act provides that
15  it shall be unlawful for any person, directly or
16  indirectly, to make use of any means or instruments of
17  transportation or communication in interstate
18  commerce", et cetera, to offer sell or offer to buy
19  through the use or medium of any prospectus or
20  otherwise any security, unless a registration statement
21  has been filed as to such security, or while the
22  registration statement is the subject of a refusal
23  order or stop order, prior to the effective date of the
24  registration statement."
25          So now having had an opportunity to look

Page 180

1   at that, do you remember, is it your memory that at
2   some point after the public filing of the Inpellis S-1
3   that the SEC issued a stop order and undertook an
4   investigation of the filing of the S -- of the Inpellis
5   S-1?
6   A.      I don't know the timing of any such SEC
7   investigations being before or after.
8   Q.      Do you remember it happening after the
9   filing of the S-1 on November 10th?
10  A.      That there -- your question is?
11  Q.      Do you have any memory that the SEC
12  instituted a stop order on the Inpellis S-1 and, and
13  ordered an investigation of its filing in the, after
14  the S-1 was filed on November 10th, do you have any
15  memory of that happening?
16  A.      I have -- I don't recall when, but I, at
17  some point I was made aware of the substance of this,
18  what appears to be this, this communication.
19  Q.      Which is Plaintiff's Exhibit 46, the
20  November 30, 2015 SEC notice of a stop order and
21  investigation?
22  A.      Correct, I was made aware of that.  I was
23  not aware or don't know the other part of your
24  question.
25  Q.      Which is?

Page 181

1   A.      I think you referenced that an SEC
2   investigation or something to that effect happened
3   after the public filing.
4   Q.      Okay.  So let me make sure.
5   A.      I just want to, if you want to, yeah, if
6   you want to clarify or --
7   Q.      Okay.  So let me just make sure I
8   understand.  Do you have a memory that after November
9   10th, 2015 when this Inpellis S-1 was filed publicly,
10  that at some point after that filing on November 10th,
11  2015, that the SEC issued a stop order and an
12  investigation, as indicated on Plaintiff's Exhibit 46,
13  this November 30th, 2015 letter from the SEC?
14  A.      Sorry, I'm rereading the letter.
15          (Witness perusing documents)
16  A.      As mentioned, I am aware of this after
17  the public filing that the SEC had, had these concerns.
18  I don't recall if it was this certain letter I was
19  shown or, I don't recall, but I became aware.  I can't
20  say whether -- when the SEC started their
21  investigation.  I don't know that.
22  Q.      Oh, I see, prior to this date you mean,
23  is that what you mean?
24  A.      I don't -- yeah, you're -- I apologize.
25  I took the question to say I'm saying I remember the

JONATHAN GAZDAK - 09/21/2021

Page 182

1  SEC starting an investigation after the public filing.
2  What I'm saying is, I don't know when the SEC started
3  their investigation of Inpellis or whatever this letter
4  is.  But I am aware after the public filing that these,
5  the contents of this letter, whether I saw this letter
6  specifically or not, was made aware to me at some other
7  time.  Does that make sense?  I apologize if that's --
8      Q.      No, no, I appreciate the -- so do you
9  have any reason to believe that the SEC started the
10 investigation that culminated in this stop order and
11 investigation letter prior to the November 10th, 2015
12 filing of the S-1, any reason to believe that that
13 happened?
14     A.      No.
15     Q.      All right.  So as far as you know, it
16 happened after the filing on November 10th, 2015?
17     A.      I don't know when it happened, before or
18 after.
19     Q.      Okay.  But you don't, you didn't receive
20 any information, you haven't received any information
21 indicating whether it was before November 10th, 2015?
22            MR. WARD:  You dropped out, your audio
23         dropped out.
24            MR. SCHLICHTMANN:  Yup, yup, okay.  We're
25         almost there, by the way.

Page 183

1      Q.      I just want to be clear here.  Do you
2  have any information, okay, as you sit here today that
3  the SEC investigation regarding the S-1, regarding the
4  Inpellis registration statement that is referenced in
5  this Exhibit 46 began sometime before the filing of the
6  November 10th S-1?
7      A.      No, I don't know.
8      Q.      All right.  You have no such information?
9      A.      Correct.
10     Q.      I'm going to show you, and this is, this
11 is, we really are near the end here, and I appreciate
12 your patience.
13            MR. SCHLICHTMANN:  I'm not quite sure how
14         this exhibit is going to present itself, but I'm
15         going to, we have created PDFs of the
16         attorney-client privilege log that has been
17         produced.  And can we bring up the first one?
18         Now, it's really tiny.  Can we blow it up so he's
19         going to be able to, can we blow it up a little
20         bit more, we can always scroll.  Okay, that's
21         better, all right.
22     Q.      This is the --
23            MR. WARD:  Jan, before you get into this
24         I just want to say that we are, I'm going to
25         instruct my client not to reveal any privileged

Page 184

1         information, and that's --
2            MR. SCHLICHTMANN:  Yes.  And I'm not
3         going to be asking him to, okay?  So I appreciate
4         that, I respect that.  I'm not going to be asking
5         him questions about what happened during these
6         meetings, that's -- okay?  So if that's what
7         you're asking, I'm not going to be doing that.
8            MR. WARD:  Okay.
9            MR. SCHLICHTMANN:  Okay?
10     Q.      So these, this is one of two
11 attorney-client privilege logs.  So you know what an
12 attorney-client privilege log is, right?
13     A.      No.
14     Q.      Okay.  Well, I'm going to represent to
15 you that it's a log of any communications that occurred
16 between attorney and client that are privileged and
17 therefore are not to be shared, you know, outside the
18 attorney-client relationship, okay?  And I'm not going
19 to be asking you any questions about any
20 attorney-client privileges, any attorney-client or
21 privileged attorney-client conversations or
22 discussions, all right?  But I am, I do want you to
23 look at the log, if you can see it.
24            MR. SCHLICHTMANN:  I move it like that?
25            THE VIDEOGRAPHER:  Mm-hmm.

Page 185

1      Q.      All right.  And I'm going to, I'm going
2  to show you that on this log that there are
3  communications that occurred that are listing -- that
4  identify yourself and Mr. Mooney, for instance, this is
5  March 19th, 2015, do you see that?  And it's between,
6  and it involves Greenberg Traurig and Mr. Mooney and
7  yourself.  And it says form of -- the subject matter is
8  the form of the underwriting agreement.  Do you see
9  that?
10     A.      Yes.
11     Q.      Okay.  All right.  So here's another one
12 on April 8th.  Your name is there with Mr. Mooney and
13 Mr. Carlin.  Do you see that?
14     A.      Yes.
15     Q.      Okay, all right.  And it's about the
16 FINRA, the subject is the FINRA public offering filing.
17 Do you see that?
18     A.      Yes.
19     Q.      Okay.  And then we have additional ones
20 here, this is communications having to do with May
21 15th, 2015 involving yourself, Mr. Mooney and
22 Mr. Carlin and Greenberg, and the subject is the
23 unreasonable letter filing.  Do you see that?
24     A.      Yes.
25     Q.      Okay.  And then, I'm going to go to the

JONATHAN GAZDAK - 09/21/2021

Page 186

1  next one now.  Well, let me just, let me just ask it
2  this way.  Does -- do you recall any meetings,
3  conferences that you attended or telephone conference
4  calls that you had, not emails, okay, where you were
5  named on, but do you have any memory of any telephone
6  conference calls or meetings, physical meetings in
7  which the -- that are -- that were involving Alexander
8  Capital people that were not -- that did not involve
9  your attorneys in any way, these are Capital, Alexander
10 Capital conference -- conferences either on the phone
11 or meetings that Alexander Capital people had regarding
12 the filing of the, the Alexander Capital application
13 that resulted in the unreasonable letter that we went
14 over, or the filing of the fee, excuse me, the filing
15 of the 1017 application, do you remember having any
16 conference, conferences on the phone or in meetings
17 with Alexander Capital people that did not involve your
18 lawyers, Greenberg Traurig, or other lawyers
19 representing Alexander Capital during this period?
20        A.     I apologize, I -- I -- I don't recall,
21 you know, at all specifics or -- or generally.  I mean,
22 I -- such a -- I don't remember.
23        Q.     Okay.  And just to be clear, you don't
24 have any recollection of attending a meeting involving
25 Alexander Capital people or having a telephone

Page 187

1  conference call involving Alexander Capital people
2  which did not involve attorneys, okay, so I'm just
3  asking for Alexander Capital conference calls involving
4  Alexander Capital people or meetings involving
5  Alexander Capital people which involved yourself, in
6  which the application to FINRA for the approval
7  of -- for the approval of its intended fee for the
8  Inpellis offering was discussed; is that true?  Did I
9  lose you?
10       A.     No, no, you didn't lose me.
11       Q.     Oh, okay.
12       A.     No, no.
13              I don't, I mean, it's such a large
14 swath of statement, I don't recall specifically having
15 them or not having them.
16       Q.     Well, I'm asking what you recall.
17       A.     Yeah.  I, I don't recall.  I mean, I
18 don't know and I don't -- I don't recall.  If you would
19 show me that a call happened, okay, yeah.  But I don't
20 recall.
21       Q.     All right.  Well, I'm asking about your
22 memory, all right.  And, and I'm just going to ask you
23 a series and the -- do you have any memory of any
24 telephone conference calls or telephone calls or
25 meetings involving yourself and Alexander Capital

Page 188

1  people, not involving attorneys, just involving
2  Alexander Capital people and yourself, either on the
3  phone or in a physical meeting in which the, the
4  FINRA's unreasonable letter was discussed?
5        A.     Just internally --
6        Q.     Yes.
7        A.     -- you're saying, without any --
8        Q.     Lawyers.
9        A.     Lawyers.
10       Q.     Correct.
11       A.     I mean, I don't recall -- I don't recall.
12 I mean, I really, I don't recall a -- I can't in my
13 memory, say oh, yeah, I clearly remember this
14 conversation happening without attorneys.  I apologize,
15 I just don't.
16       Q.     Okay.  You have no memory of any, of any
17 calls or conferences, meetings that you had with
18 Alexander, internally meeting with Alexander Capital
19 people in which the unreasonable letter was discussed;
20 correct?
21       A.     Correct.
22       Q.     Okay.  And do you have any memory of any
23 telephone calls or physical meetings with Alexander
24 Capital people in which the application for a firm
25 commitment authorization from FINRA was discussed?

Page 189

1        A.     With or without lawyers?
2        Q.     Not lawyers.  I want to be very clear.
3  The series of questions I'm asking you are involving
4  Alexander Capital people, you used the phrase
5  "internally", meaning not involving lawyers outside the
6  company.  I don't think you have a general counsel.
7  But let me be very clear.  I'm only asking about
8  meetings or telephone calls that involved you and other
9  Alexander Capital people regarding the subject matters,
10 that's what I'm asking.  Not involving the lawyers.
11       A.     Okay.  I don't recall you had asked
12 specifically about, I believe, firm commitment
13 underwritings.
14       Q.     Yes.
15       A.     I don't recall having conversations
16 internally without counsels on the phone about that.
17       Q.     Okay.  All right.  And Mr. Gazdak, having
18 had the opportunity now over these last several hours,
19 and I appreciate the time that you have spent, you
20 know, doing this, in going over this information today
21 that we went over, does having gone over that
22 information, do you now have a, an understanding that
23 you did not have previously regarding the Alexander
24 Capital's underwriting of the Inpellis offering that
25 you did not have previously?

JONATHAN GAZDAK - 09/21/2021

Page 190

1    A.    No.
2    Q.    Okay.  And as you sit here today and
3  having gone over all this information, do you believe
4  that, do you have a belief as to whether or not
5  Alexander Capital comported itself, conducted itself
6  regarding the Inpellis, the Alterix/Inpellis offering,
7  in a manner that is consistent with its obligations as
8  an investment bank?
9    A.    Obligations --
10          MR. WARD:  Objection.  Calls for
11    information outside of personal knowledge.
12          MR. SCHLICHTMANN:  I'm sorry, Bryan?
13          MR. WARD:  Just objection, it's
14    confidential information outside of personal
15    knowledge.
16          MR. SCHLICHTMANN:  Outside his personal
17    knowledge.  Okay.
18    Q.    All right.  Having gone through all this
19  information today that we did over these last several
20  hours, let me ask you this.  Prior to today did you
21  have a belief as to whether or not Alexander Capital
22  conducted itself regarding the Inpellis offering in
23  accordance with the rules and regulations applying to
24  it under FINRA's membership requirements?
25    A.    I -- I -- I don't know what, as

Page 191

1  previously stated, I don't know what those requirements
2  are from FINRA.
3    Q.    As you, after -- okay.  Having gone
4  through all this material and information today, do you
5  have a belief as to whether or not Alexander Capital
6  during this period of time conducted itself as an
7  investment bank in accordance with the rules and
8  regulations of its membership in FINRA?
9    A.    Again, and I'm not Trying to be
10  difficult, I don't know the rules and regulations of
11  its membership agreement with FINRA, so I can't say
12  whether we did or didn't.
13    Q.    After going through this information
14  today, do you have a belief as to whether Alexander
15  Capital conducted itself in a honest manner regarding
16  the Inpellis offering?
17    A.    I don't know about the rest of Alexander
18  Capital.  I only know about my -- what I know.
19    Q.    Okay.  Based on what you know.
20    A.    From my recollection, my answer would be
21  yes, from what I know.
22    Q.    Regarding your own conduct?
23    A.    Correct.
24    Q.    And not regarding you don't --
25    A.    I just can't speak to -- I don't, I don't

Page 192

1  know what other people at the firm did or didn't do.
2    Q.    And based on the information that we went
3  over today, do you have a belief as to whether the
4  other people involved with Alexander Capital conducted
5  themselves in an honest manner regarding the Inpellis
6  offering or not?
7    A.    I can't say.  I don't know.
8    Q.    All right, thank you.
9          MR. SCHLICHTMANN:  Bryan, that completes
10    my examination.  I really appreciate, Mr. Gazdak,
11    the time you spent today.  You were very patient
12    and I appreciate your answering the questions
13    today.
14          Bryan, is that, did you have anything
15    else you wanted to say?
16          MR. WARD:  I have no questions.
17          MR. SCHLICHTMANN:  Okay.  Thank you very
18    much.  And do we have, now, Bryan, do I have to
19    make any kind of incantation about the exhibits
20    here to make them part of the record?  They are
21    part of the record, right, do you agree with
22    that?
23          MR. WARD:  Are we talking about the
24    exhibits that were referenced or --
25          MR. SCHLICHTMANN:  Yes, yeah, the ones

Page 193

1  that I referenced, yes.  Not the ones --
2          MR. WARD:  I have no issue with those
3    being part of the record, no.
4          MR. SCHLICHTMANN:  They're part of the
5    record, I don't have to say something special
6    about it, right, we agree that the exhibits that
7    were referenced are part of this record
8    examination of the witness?
9          MR. WARD:  Sure, that works for me.
10          MR. SCHLICHTMANN:  Okay.
11          MR. WARD:  We don't need anything else.
12          MR. SCHLICHTMANN:  Okay, great, I
13    appreciate that.
14          Any, any other comments?  All right, I am
15    completed my examination of the witness.  And
16    again, thank you very much for being patient.
17          THE VIDEOGRAPHER:  Okay, we are going off
18    the record, and the time is 4:06 p.m.
19          (Time noted:  4:06 p.m.)
20
21
22
23
24
25

JONATHAN GAZDAK - 09/21/2021

Page 194

A C K N O W L E D G M E N T

1
2
3  STATE OF NEW YORK        )
                           ) ss:
4  COUNTY OF _____        )
5
6
7          I, JONATHAN GAZDAK, hereby certify I

   have read the transcript of my testimony taken
8
   under oath in my deposition of 21 September,
9
   2021; that the transcript is a true, complete and
10
   correct record of what was asked, answered and
11
   said during this deposition, and that the answers
12
   on the record as given by me are true and
13
   correct.
14
15
16
17          _____
                JONATHAN GAZDAK
18
19
   Subscribed and sworn to before me
20
   this _____ day of _____, 20__.
21
   _____
22        NOTARY PUBLIC
23
24
25

Page 195

I N D E X

1
2  EXAMINATION BY                              PAGE
3  MR. SCHLICHTMANN                            5
4
5  EXHIBITS:
6  (Exhibits were previously marked, and retained by
      counsel)
7
8
   INFORMATION TO BE SUPPLIED:  (None)
9
10
   QUESTIONS MARKED FOR A RULING:  (None)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 196

C E R T I F I C A T E

1
2
3  STATE OF NEW YORK        )
                           ) SS:
4  COUNTY OF ORANGE        )
5
6          I, KARI L. REED, a Shorthand Reporter
7  (Stenotype) and Notary Public with and for the
8  State of New York, do hereby certify:
9          I reported the proceedings in the
10  within-entitled matter and that the within
11  transcript is a true record of such proceedings.
12          I further certify that I am not related,
13  by blood or marriage, to any of the parties in
14  this matter and that I am in no way interested in
15  the outcome of this matter.
16          IN WITNESS WHEREOF, I have hereunto set
17  my hand this 3rd day of November 2021.
18
19
20
21
22          _____
                KARI L. REED
23
24
25

Page 197

1   Errata Sheet
2   Page _____ Line _____ Reason _____
3   Change From _____
4   Change To _____
5   Page _____ Line _____ Reason _____
6   Change From _____
7   Change To _____
8   Page _____ Line _____ Reason _____
9   Change From _____
10  Change To _____
11  Page _____ Line _____ Reason _____
12  Change From _____
13  Change To _____
14  Page _____ Line _____ Reason _____
15  Change From _____
16  Change To _____
17  Page _____ Line _____ Reason _____
18  Change From _____
19  Change To _____
20  Page _____ Line _____ Reason _____
21  Change From _____
22  Change To _____
23
24  Signature_____Date_____
25           Jonathan Gazdak  |  09/21/2021

JONATHAN GAZDAK – 09/21/2021

Page 198

1    Errata Sheet

2    Page _____ Line _____ Reason _____

3    Change From _____

4    Change To _____

5    Page _____ Line _____ Reason _____

6    Change From _____

7    Change To _____

8    Page _____ Line _____ Reason _____

9    Change From _____

10   Change To _____

11   Page _____ Line _____ Reason _____

12   Change From _____

13   Change To _____

14   Page _____ Line _____ Reason _____

15   Change From _____

16   Change To _____

17   Page _____ Line _____ Reason _____

18   Change From _____

19   Change To _____

20   Page _____ Line _____ Reason _____

21   Change From _____

22   Change To _____

23

24   Signature_____Date_____

25           Jonathan Gazdak  |  09/21/2021

Page 199

1        HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE

2    Litigation Services is committed to compliance with applicable federal

3    and state laws and regulations ("Privacy Laws") governing the

4    protection andsecurity of patient health information.Notice is

5    herebygiven to all parties that transcripts of depositions and legal

6    proceedings, and transcript exhibits, may contain patient health

7    information that is protected from unauthorized access, use and

8    disclosure by Privacy Laws. Litigation Services requires that access,

9    maintenance, use, and disclosure (including but not limited to

10   electronic database maintenance and access, storage, distribution/

11   dissemination and communication) of transcripts/exhibits containing

12   patient information be performed in compliance with Privacy Laws.

13   No transcript or exhibit containing protected patient health

14   information may be further disclosed except as permitted by Privacy

15   Laws. Litigation Services expects that all parties, parties'

16   attorneys, and their HIPAA Business Associates and Subcontractors will

17   make every reasonable effort to protect and secure patient health

18   information, and to comply with applicable Privacy Law mandates,

19   including but not limited to restrictions on access, storage, use, and

20   disclosure (sharing) of transcripts and transcript exhibits, and

21   applying "minimum necessary" standards where appropriate. It is

22   recommended that your office review its policies regarding sharing of

23   transcripts and exhibits - including access, storage, use, and

24   disclosure - for compliance with Privacy Laws.

25        © All Rights Reserved. Litigation Services (rev. 6/1/2019)