## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOHN J. AQUINO,                                    )
CHAPTER 7 TRUSTEE                                  )      Case #1:21-cv-01355-JSR
By Its Assignee,                                   )
Convergent Distributors of Texas, LLC             )
                                                   )
           Plaintiff,                  )
                                                   )
           v.                          )
                                                   )
ALEXANDER CAPITAL, LP                              )
          &amp;                           )
Its Managing Partners:                             )
JOSEPH AMATO,                                      )
ROCCO GUIDICIPIETRO, and                           )
NESA MANAGEMENT, LLC                               )
                                                   )
           Defendants                  )
                                                   )

## DECLARATION
## OF JOSEPH AMATO

I, Joseph Amato, make the following statement under the pains and penalties of perjury:

1.     I submit this Declaration pursuant to 28 U.S.C. § 1746, in connection with Defendants' Response to Plaintiff's Motion for Summary Judgment and Defendants' Reply in Support of their Motions for Summary Judgment.

2.     I have personal knowledge of the facts in this Declaration, am competent to testify to these matters, and, if called to testify as a witness, I would testify under oath to these facts. I declare under penalty of perjury that the foregoing is true and correct.

3.     I am currently the Chief Executive Officer ("CEO") of Alexander Capital, L.P. and am a 50% owner of NESA Management, LLC.

4.     In the course of the above captioned litigation, I was designated as the Federal Rule of Civil Procedure 30(b)(6) representative for Alexander Capital, L.P.

5.      I make this declaration on behalf of Alexander in my capacity as CEO and its Rule 30(b)(6) designee.

6.      This declaration is based on my personal knowledge as CEO of Alexander and my 24 years of experience as a licensed broker.

7.      Alexander Capital, L.P. has never created a BrokerCheck Report.

8.      BrokerCheck Reports are created by FINRA.

9.      BrokerCheck Reports are compilations of information that FINRA has obtained from different sources.

10.      Alexander Capital, L.P. has some ability to influence the content of a BrokerCheck report (e.g. by making required filings with FINRA), but cannot control the ultimate content of such a report.

11.      A BrokerCheck Report is a statement by FINRA, and not by the firm which is the subject of such a report.

12.      Between July 29, 2014 and August 1, 2016 Alexander Capital, L.P. understood that it was allowed to participate in firm commitment underwritings, as a member of a selling syndicate.

13.      Between January 1, 2016 and August 1, 2016 Alexander Capital, L.P., on the basis of that understanding, did participate in firm commitment underwritings, as a member of a selling syndicate.

14.      At no time between July 29, 2014 and August 1, 2016 did Alexander Capital, L.P. understand that its membership agreement with FINRA prevented it from participating in firm commitment underwritings, as a member of a selling syndicate.

2

15.     On May 15, 2015 Alexander Capital, L.P. was sent an "Unreasonable Letter" by FINRA.

16.     This May 15, 2015 letter indicated to the firm that Alexander Capital, L.P. lacked the authority to act as lead underwriter on a firm commitment public offering.

17.     As of May 15, 2015 Alexander Capital, L.P. understood it lacked the authority to act as lead underwriter on a firm commitment public offering.

18.     This May 15, 2015 letter caused Alexander Capital, L.P. to begin the process of obtaining the requisite approval.

19.     On June 3, 2015 Alexander Capital, L.P. filed a Continuing Membership Application with FINRA seeking, among other things, to obtain approval to act as lead underwriter for public offerings on a firm commitment basis.

20.     Between June 3, 2015 and February 10, 2016 Alexander Capital, L.P. made multiple attempts to obtain approval to act as lead underwriter for public offerings on a firm commitment basis.

21.     Alexander Capital, L.P. filed at least six amendments to its Continuing Membership Application between June 3, 2015 and February 10, 2016.

22.     Alexander Capital, L.P. incurred substantial costs in association with its attempt to obtain approval to act as lead underwriter for public offerings on a firm commitment basis.

23.     These costs included paying for the services of attorney Ross Carmel to assist in preparing the relevant filings and navigating the FINRA approval process.

24.     These costs included hiring a new chief compliance officer, Luis Restrepo, to provide FINRA with additional assurances believed to be necessary to obtain the sought approval.

25.     At all times between June 3, 2015 and February 10, 2016, Alexander Capital, L.P. was actively attempting to obtain the necessary approval to act as lead underwriter of public offerings on a firm commitment basis.

26.     On February 10, 2016, Alexander Capital, L.P. formally withdrew its Continuing Membership Application.

27.     At all times, from when Alexander Capital L.P. entered into the July 29, 2014 Engagement Agreement with Inpellis to when Inpellis informed Alexander it had withdrawn its IPO, Alexander Capital intended to act as lead underwriter on a firm commitment basis.

28.     From the beginning of the engagement with Inpellis, Alexander was tasked with obtaining bridge loans.

29.     Alexander Capital, L.P. was pressured, regularly, by Inpellis to work to obtain bridge loans.

30.     In the course of the above-captioned litigation I have been made aware that in addition to the bridge loans Alexander eventually helped secure for Inpellis, Inpellis took bridge loans from an entity named Montserrat Partners.

31.     At no time during the engagement with Inpellis was Alexander Capital ever informed of these loans.

32.     At no time during the engagement with Inpellis was Alexander Capital ever informed that Inpellis was taking loans from investors solicited by Montserrat Partners.

33.     At no time during the engagement with Inpellis was Alexander Capital ever consulted about the advisability of undertaking the loans from Montserrat Partners.

34.     At the end of the engagement with Inpellis, Alexander Capital owed $176,985.34 to its legal counsel on the IPO.

35.    Under the terms of the Engagement Agreement with Inpellis, Alexander understood Inpellis was obligated to pay that debt, or, at the very least $120,000 of that debt.

36.    Inpellis never paid any of that debt.

37.    Alexander Capital and Inpellis entered into a Settlement Agreement on November 14, 2016 under which Inpellis was obligated to pay $125,000 in full satisfaction of that debt by December 15, 2016.

38.    Inpellis never paid the $125,000 owed under the Settlement Agreement.

39.    Between the termination of the engagement agreement and today, Inpellis has not paid Alexander any amount of money.

40.    Between the termination of the engagement agreement and today, Inpellis has owed Alexander between $120,000 and $176,985.34 for expenses incurred in the course of representing Inpellis.

I so swear and affirm, this 4/1/22 day of April 2022.

Alexander Capital, L.P., by
Joseph Amato its CEO

5