UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
JOHN J. AQUINO,
Chapter 7 Trustee,
by his assignee, Convergent         21-cv-1355 (JSR)
Distributors of Texas, LLC,

      Plaintiff-Counter-Defendant,   OPINION AND ORDER

      -v-

ALEXANDER CAPITAL, LP, and its
Managing Partners:
JOSEPH AMATO,
ROCCO GUIDICIPIETRO, and
NESA MANAGEMENT, LLC,

      Defendants-Counter-Claimants.
```

JED S. RAKOFF, U.S.D.J.:

This is a civil fraud case concerning the failed 2015 initial public offering ("IPO") of a now-bankrupt development-stage pharmaceutical company called Inpellis. The fraudulent inducement, fraud, breach of contract, and fiduciary duty claims at issue here have been brought against Alexander Capital L.P. ("ACLP"), the investment bank that Inpellis hired to underwrite the IPO, and three alleged "Managing Partners" of ACLP. The plaintiff, Convergent Distributors of Texas, LLC ("Convergent"), which purchased the claims at bar from the Inpellis bankruptcy trustee, John J. Aquino, accuses ACLP of having fraudulently induced Inpellis to hire it to provide financial advisory services and to underwrite the IPO by falsely representing that it could conduct the IPO transaction on a "firm commitment" basis, even though the Financial Industry Regulatory

Authority ("FINRA") prohibited it from underwriting IPOs on a "firm commitment" basis. The operative complaint alleges that Inpellis incurred substantial costs at ACLP's direction to prepare for the IPO, that ACLP advised Inpellis to take on a $6.5 million bridge loan, that ACLP compelled Inpellis to hire a consultant as its new CEO to secretly work in concert with ACLP to conceal ACLP's fraud from Inpellis, and that ACLP ultimately switched the IPO to a less favorable "best efforts" transaction on the eve of the IPO without authority. All this, the complaint alleges, led the IPO to fail and, ultimately, led to Inpellis's bankruptcy.

The Court denied the defendants' motion to dismiss last summer, holding that the complaint contained allegations that, just barely, supported the inferences necessary for all four of its claims to continue to discovery. See ECF 54 ("MTD Op."). Now before the Court are the parties' cross-motions for summary judgment. The Court evaluates these motions with the benefit of the factual record developed in discovery and after resolving extensive motion practice over the last year regarding discovery and disqualification of counsel.

Much of the factual record remains disputed. However, certain pertinent facts are not contested. Moreover, the Court has determined, after carefully reviewing the underlying record, that certain asserted disputes lack an evidentiary basis and so are not genuine. As a result, the Court is able to grant certain aspects of both the plaintiff's and the defendants' summary judgment motions and, in the process, significantly simplify the case that will ultimately reach a jury.

The Court's analysis of the factual record and its legal reasoning are set forth at length below, but the following summary briefly describes the Court's main conclusions. First, the Court grants summary judgment in defendants' favor on the issue of whether the allegedly conflicted CEO's acts and knowledge can be imputed to Inpellis, finding that even viewing the factual record in the plaintiff's favor, there is no evidence that could meet the high bar for applying the "adverse interest exception" to the normal rule of principal-agent law. Second, the Court denies the defendants' attempt to have the alleged Managing Partners dismissed from the lawsuit, finding that it is unclear whether ACLP's filing deficiencies have been retroactively cured under Delaware's limited partnership law. Third, the Court grants summary judgment in plaintiff's favor on the issue of whether ACLP made material misrepresentations and omissions to Inpellis in connection with the initial engagement agreement, which was signed in July 2014, finding that there is no genuine dispute that the engagement agreement misled Inpellis about ACLP's ability to conduct the contemplated "firm commitment" underwriting. Fourth, the Court finds that there is no genuine dispute that Inpellis eventually learned that ACLP had an issue with FINRA that prohibited it from underwriting IPOs on a firm commitment basis, but the Court nonetheless rejects the defendants' contention that they can escape liability for any fraudulent inducement arising from ACLP's misrepresentations because Inpellis supposedly "ratified" the fraud in various ways. Fifth, the Court dismisses the fiduciary duty claim as duplicative of the breach of contract claim.

And sixth, the Court dismisses most aspects of the fraud claim, except insofar as it relates to the bridge loan that Inpellis took on in August 2015.

Further, and perhaps most significantly, the Court finds that the plaintiff has failed to adduce facts sufficient to blame the failure of the Inpellis IPO on ACLP's alleged last-minute switch to a "best efforts" transaction. As explained further below, there is no genuine dispute that Inpellis learned approximately two months before the IPO that ACLP had a FINRA issue and that unless the FINRA issue were resolved, ACLP would only be able to conduct the IPO on a "best efforts basis." Inpellis nonetheless decided to proceed with the planned IPO, and the Inpellis board ultimately authorized the company's counsel to switch the S-1 registration statement to a "best efforts" offering. The record also reflects that the regulatory scrutiny of the IPO that came from U.S. Securities and Exchange Commission ("SEC") almost immediately after the IPO did not arise because of the switch to best efforts. Rather, the SEC stopped the IPO because of concerns that the S-1 did not adequately disclose Inpellis's relationship to its founder and its original parent company, both of which then faced pending judgments and penalties from unrelated SEC securities fraud claims. The IPO was ultimately withdrawn as part of a global settlement with the SEC brokered by representatives of those controlling entities. The Court therefore concludes that ACLP's alleged fraud, fraudulent inducement, and breaches of the engagement agreements did not

4

proximately cause the IPO's failure. Accordingly, the plaintiff is precluded from seeking damages arising from the IPO.

The plaintiff therefore has three remaining, if trimmed, claims for relief. These claims should now proceed expeditiously to trial.

## I.    Legal Standard

"[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998).[1] Where, as here, "cross-motions for summary judgment are filed, a court must evaluate each party's own motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Cayuga Nation v. Tanner, 6 F.4th 361, 373 (2d Cir. 2021).

Summary judgment is not precluded by a litigant's mere insistence that a fact asserted by an opposing part is subject to dispute. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The determination of relevance and materiality therefore follows from

---

[1] Unless otherwise stated, all internal quotation marks, citations, omissions, emphases, and alterations are omitted from all sources cited herein.

the Court's analysis of the substantive law setting forth the "legal elements of the claim[s]" and defenses at issue in the motion. Id.

Furthermore, Fed. R. Civ. P. 56 requires that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Id. "[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-289 (1968). The court is barred at summary judgment from weighing conflicting evidence, making credibility findings, or attempting to determine the truth. Rather, in assessing whether a dispute is genuine, the court must only ascertain whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Liberty Lobby, 477 U.S. at 249. However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010).

## II.  **Background**

Inpellis (formerly known as Alterix) was a development-stage pharmaceutical company created to commercialize intellectual property ("IP") rights developed by a company called BioChemics. ECF 140-1

¶¶ 1-4. This case concerns Inpellis's attempt to conduct an IPO, underwritten by ACLP. The IPO failed when it triggered an SEC "stop order" and investigation, though the parties dispute why. A lender from whom Inpellis received bridge financing, as arranged by ACLP, ultimately forced Inpellis into involuntary bankruptcy proceedings in the District of Massachusetts. That bankruptcy proceeding resulted in the appointment of the titular plaintiff John J. Aquino as bankruptcy trustee, who then assigned these claims to Convergent with the approval of the Bankruptcy Court. The Bankruptcy Court then transferred this litigation to this Court on consent. See MTD Op. at 10.

### A. Factual Background

As explained above, the Court must assess each party's motion on its own merits, drawing all reasonable factual inferences in the favor of the nonmovant. See Cayuga Nation, 6 F.4th at 373. But for simplicity of presentation, and since most of the instances in which the Court can grant an aspect of a party's motion results in entry of summary judgment in the defendants' favor, the following statement of facts reflects the Court's assessment of the factual record in the light most favorable to the plaintiff. The parties have asserted many other facts relevant to subsidiary issues in this lawsuit, and to the extent those facts are undisputed and material to the issues considered in this Opinion, the Court discusses them as they are. All other factual assertions made by the parties but not discussed herein are either immaterial to the issues resolved or remain subject to genuine dispute.

**1. Inpellis, BioChemics, and the Shareholder Resolution Trust**

Inpellis was created in 2012 as a wholly owned subsidiary of BioChemics as part of a BioChemics's strategy to commercialize transdermal technology in which it held IP rights. ECF 140-1 ¶¶ 1-3. Inpellis was trying to create products to address pain and neuropathy. Id. ¶ 4. John Masiz, the founder and CEO of BioChemics, was initially the sole officer and director of Inpellis, but he resigned those positions in June 2014, shortly before the IPO preparation process began in earnest. Id. ¶¶ 5-6.

In 2004, Masiz had settled an enforcement action with the SEC, which alleged that he had falsely represented in an S-1 filed for an earlier pharmaceutical company that the company had received FDA approval. Id. ¶¶ 7-15. Then, in 2012, the SEC filed a complaint against BioChemics and Masiz in Massachusetts, and the case was ultimately settled in March 2015 with BioChemics agreeing to pay an $18 million judgment in disgorgement and penalties. Id. ¶¶ 16-23. Masiz settled in 2017 and agreed not to solicit any investor money or provide information to any investor in connection with securities issued by any entity that Masiz directly or indirectly owns, controls, consults for, or is employed by without first providing written disclosures. Id. ¶¶ 23-24

Inpellis remained a wholly owned subsidiary of BioChemics until January 2015, when 100% of the ownership interest was transferred to the Shareholder Resolution Trust ("SRT"), an irrevocable trust created for the benefit of Masiz and his family members and which had ownership

interests in BioChemics and in Inpellis. Id. ¶¶ 26-28, 56-58. According to Jan Schlichtmann -- who developed the plan for the SRT, drafted all court filings for its creation, and implemented the plan to transfer ownership – the alleged purpose of this arrangement was to create confidence that Inpellis was managed for the interests of all shareholders, not just Masiz and his family.[2] Id. ¶¶ 29-38. The SRT's trustees were Schlichtmann, Jack Altshuler (selected by Schlichtmann, Masiz, and others), and Daniel Glosband (selected by the probate court). Id. ¶¶ 42-51. SRT management required unanimous decisions from the trustees, though Masiz's opinion carried weight with the SRT, and Masiz continued to work as a consultant to Inpellis. Id. ¶¶ 52, 74, 98.

From June 2014 through January 2015, Marshall Sterman (who had been the CEO of BioChemics and Inpellis) was the sole director of Inpellis and took input on management from the SRT. Id. ¶¶ 60-62. Dr. David Staskin became President and CEO of Inpellis in July 2014 and remained in that position until Dr. Harry McCoy became CEO in January 2015, though Staskin remained in his role as president until June

---

[2] Schlichtmann represented the Masiz family during this period, and they ultimately transferred 11% of their ownership share in BioChemics to Schlichtmann as compensation for work he did as a managing member of another company, SeaChange Pharma, which was BioChemics' largest shareholder and similarly designed to create a barrier between Masiz and BioChemics. ECF 140-1 ¶¶ 30, 34, 55. Schlichtmann also served as a member of the Inpellis Board from January through March 2015, and at various times he served as a member of the BioChemics board, counsel to Masiz, and counsel to the Masiz family. Id. ¶¶ 40, 55. Sterman, CEO of BioChemics, also considered Schlichtmann to be part of the management team of BioChemics. Id. ¶ 81.

2015, when Dr. Patrick Mooney took over as CEO and president. Id. ¶¶ 63-68.

From March 2015 through August 2015, Inpellis representatives made use of marketing and investor materials that represented that the SRT was the sole stockholder of Inpellis. Id. ¶¶ 89-90. After August 2015, Inpellis changed this representation, but it continued to hold itself out as independent of BioChemics and to state that it was not an affiliate of BioChemics and that it operated independently of BioChemics. Id. ¶¶ 91-96. Frank Manguso, who concurrently served as CFO of Inpellis and CFO of BioChemics and took direction from Masiz, was tasked with segregating Inpellis's financial operations from BioChemics and to prevent assets from being commingled. Id. ¶¶ 99-103.

## 2. Inpellis's Relationship with ACLP

Inpellis and ACLP entered two engagement agreements. First, on July 29, 2014, ACLP entered an engagement agreement with Inpellis related to a planned IPO. Id. ¶ 107; ECF 119-3 ("First Engagement Agreement"). Sterman, acting as CEO, signed the First Engagement Agreement on Inpellis's behalf. ECF 140-1 ¶ 110. He knew that not all investment banks did firm commitment IPOs, and he testified that ACLP told him that it had done a firm commitment IPO and could raise $20 million for Inpellis through a firm commitment IPO. Id. ¶¶ 113-116; ECF 136-33 at 38. The relationship arose after a recommendation from an attorney at the law firm known as Greenberg Traurig. ECF 140-1 ¶¶ 117-118. Before executing the First Engagement Agreement, Sterman and Masiz had spoken with several other investment banks. Id. ¶ 125.

Amendments to the First Engagement Agreement were signed April 6, 2015 and August 17, 2015. Id. ¶ 130, 136. Then, on or about October 5, 2015, ACLP and Inpellis entered into an "Amended and Restated Engagement Agreement" ("Second Engagement Agreement"). Id. ¶ 138; ECF 120-4.

The First and Second Engagement Agreements include the following language, which is central to this dispute and so is quoted at length:

> We are pleased to submit the following proposal with respect to an initial public offering (the "Public Offering") by the Company of up to $20,000,000 consisting of the shares of the Company's common stock ("Common Stock"), the price and terms of which shall be determined by the market price prior to the Effective Date of the offering closing. This letter states certain conditions and assumptions upon the proposed offering by Alexander Capital. It is our intent, immediately prior to the Effective Date, to enter into an exclusive underwriting agreement (the "Underwriting Agreement") with the Company. The underwriter/broker will act as agent on a "Firm Commitment" basis. The Underwriting Agreement and related agreements shall contain such terms and conditions as are customarily contained in agreements of such character....
>
> Alexander Capital shall also be the exclusive financial advisor on all financings and advisory (including M&A) during this Engagement....
>
> Alexander Capital shall be compensated as follows:
>
>> Upon execution of this Agreement the Company will pay to Alexander Capital $25,000 and another $25,000 upon the satisfactory completion of due diligence, which shall be netted against the payment of future expenses associated with the offering....
>>
>> d) In order to reimburse Alexander Capital expenses customarily incurred by an underwriter during the process, the Company shall pay to Alexander Capital a success-based non-accountable expense allowance in the amount of one percent (1%) of the gross proceeds of the offering (including the over-allotment option). In addition to the non-accountable expenses, the Company shall reimburse Alexander Capital for incurred expenses.... In addition, the Company agrees to be responsible for the legal fees of counsel that Alexander Capital will incur.

e) A cash Placement Fee of 8% on any bridge or private financings completed by the Company during the terms of this agreement.[3]

f) A cash M&A Transaction Fee of 3% of the Total Transaction Value (attributed Enterprise Value) on any merger or acquisition (or similar transaction) during the term of this agreement.

Except as otherwise set forth herein, neither the Company nor Alexander Capital will be under any obligation to the other, until both the Company and Alexander Capital have executed and delivered the Underwriting Agreement. It is understood that this Engagement Agreement is merely a statement of intent and while the parties agree in principle to the contents hereof any legal obligations between the parties shall be only as set forth in a duly negotiated and executed Underwriting Agreement, which Underwriting Agreement shall be in form and content satisfactory to Alexander Capital, the Company and their respective counsel. This Engagement Agreement shall, nevertheless, constitute a binding agreement relative to the reimbursement of Alexander Capital's expenses.

ECF 119-3 (Second Engagement Agreement); see also ECF 140-1 ¶¶ 140-141.

As stated in the last paragraph quoted above, neither engagement agreement was an underwriting agreement. Id. ¶¶ 144-145. It is standard in the investment banking industry for firm commitment underwriting agreements to be preceded by an engagement agreement, with the underwriting agreement setting the terms of the offering executed close in time to the IPO. Id. ¶¶ 144-153. Here, however, ACLP and Inpellis never exchanged drafts or entered into an underwriting agreement, and it is undisputed that the engagement agreements did not

---

[3] The amount of the cash placement fee changed between the two versions of the engagement agreement, as explained below.

guarantee that ACLP would undertake any specific IPO activity or pricing on Inpellis's behalf. Id. ¶¶ 158-165.

Notwithstanding the above-quoted representations from ACLP, it is undisputed that at all times relevant to this lawsuit, ACLP lacked authority from FINRA to underwrite IPOs on a firm commitment basis. See ECF 128-1 ¶ 12.

Chris Carlin, ACLP's head of capital markets, was involved in raising funds for the Inpellis IPO. At the time he started, he was unaware whether ACLP was authorized to underwrite firm commitment IPOs. Id. ¶ 131. The plaintiff insists that Carlin was the ACLP person who most closely managed the Inpellis account, but defendants dispute this point. See id. ¶¶ 132-134.

Throughout the IPO process, and with the knowledge of ACLP, Inpellis was continually looking to bring another bank into the underwriting process. Its CEO met with other investment banks, and Inpellis's executives did not view the ACLP engagement agreement as an impediment to that search for other banks. Id. ¶¶ 179-186. These search efforts continued after Mooney took over as CEO. Id. ¶¶ 188-192. Masiz was also meeting with at least one other investment bank. Id. ¶¶ 194-199. Throughout this period, Inpellis executives were aware that ACLP had limited experience with underwriting IPOs, and they were concerned about whether ACLP had the capacity to conduct the contemplated IPO as sole underwriter. Id. ¶¶ 192-193, 203-212. But Inpellis was ultimately unsuccessful in securing another underwriter, either to join or to replace ACLP. Id. ¶ 235. In his deposition, Mooney

attributed this to concern about equivocal clinical trial results and Inpellis's legal entanglements with Masiz, BioChemics, and other Masiz entities. Id. ¶ 236.

ACLP took various steps to try to amend its FINRA registration to obtain authorization to underwrite the Inpellis IPO on a firm commitment basis, including submitting various applications. ECF 147-1 ¶¶ 938-942. For instance, ACLP filed a Rule 1017 Application with FINRA on June 3, 2015 seeking authorization to underwrite IPOs on a firm commitment basis. Id. ¶ 940.

### 3. Mooney & the Bridge Loan

At the start of the relevant period, Mooney, who had been a friend of Carlin's since high school, was working as a scientific consultant to ACLP's investment banking practice, because he had training and experience in both finance and biotechnology. Id. ¶¶ 646-654. Mooney and Carlin were the ACLP representatives who met with Inpellis at the start of their business relationship in July 2014, and Mooney was the person who put together the First Engagement Agreement, using an engagement agreement from a prior deal as a template. ECF 139 at 9-11. There is no genuine dispute that, at the time the First Engagement Agreement was signed, Mooney and Carlin were unaware that ACLP lacked firm commitment underwriting authority from FINRA. Id. ¶¶ 251.

Mooney became Inpellis's CEO and a member of the board on or about June 11, 2015. ECF 126-7 at 52. Mooney was brought in to help raise investor interest, since Staskin and McCoy had not succeeded on that front, and the decision was supported by Sterman, Masiz, and

Clarke. Id. ¶¶ 660-678. Mooney was not aware of ACLP's licensure limitations, including its lack of authority to underwrite a firm commitment IPO, until late summer or September 2015. Id. ¶¶ 655-657.

Several witnesses, including Clarke, McCoy, and Barrette testified that they were not aware of Mooney ever abandoning Inpellis's interests or acting to deliberately hurt Inpellis. Id. ¶¶ 748-752. Clarke also testified that Mooney was pursuing alternative underwriters to replace ACLP and doing so in good faith. ECF 106-5 at 36.[4]

Masiz testified that ACLP had suggested that Inpellis hire Mooney in part for assistance in securing bridge financing ahead of the IPO. ECF 147-1 ¶¶ 686-689. Mooney ultimately assisted Inpellis in obtaining $6.5 million in bridge financing from a private equity investor. Id. ¶ 688. This bridge loan was authorized by the Inpellis board at an August 13, 2015 meeting, ECF 125-5 (Ex. 5) which was before Inpellis was aware that ACLP's problem with FINRA prevented it from underwriting firm commitment IPOs. ACLP received a $500,000 placement fee for facilitating this investment, an amount that was subject to a 25% increase pursuant to the August 17, 2015 amendment to the First Engagement Agreement, signed by Moody. ECF 139 at 21-22. The plaintiff suggests that this increase in the placement fee from 8% to 10% was

---

[4] Plaintiff asserts that Inpellis records show that Mooney directed a $4,389 payment to his longtime friend, Chris Carlin, with a notation that it was for "Alexander Capital Expense Reimb[ursement.]" Pl. Opp. 22. There is no explanation why this payment went to Carlin directly, rather than to ACLP.

improper because it does not align with investment banking standards, citing an expert report, and that Mooney's agreement to it suggests he was acting in concert with ACLP to Inpellis's detriment.

### 4. Inpellis Learns About ACLP's Problem with FINRA

On May 15, 2015, FINRA issued an "Unreasonable Letter" to ACLP stating inter alia that ACLP required additional authorization to underwrite the Inpellis IPO on a firm commitment basis. Inpellis did not learn about this letter, and although it was sent on to Mooney at his ACLP email address, he does not recall receiving it and testified that he would not have been familiar with the matters discussed therein. Id. ¶¶ 253-256, 258.

Clarke, Mooney, and Barrette were aware by early September 2015 that ACLP had a regulatory problem with FINRA that prevented the firm from underwriting an IPO on a firm commitment basis. On September 10, 2015, a meeting was held with Mooney, Barrette, Sterman, Schlichtmann, Altshuler, Glosband, and Clarke (i.e., the SRT trustees and representatives of Inpellis, its board, its corporate counsel, and BioChemics) in which ACLP's inability to underwrite a firm commitment IPO was discussed. Id. ¶¶ 265-279. The plaintiff maintains that the Inpellis board members were never told that ACLP's lacked a necessary license from FINRA, and the plaintiff further argues that ACLP minimized the significance of the problem. See id. ¶ 270. But the record reflects that, during the meeting, the participants discussed the option of switching to a best efforts IPO if ACLP was unable to resolve the issue and obtain FINRA's authorization to do a firm

commitment IPO. Id. ¶ 270, 284; ECF 136-18. Clarke, chairman of Inpellis's board, had worked for a broker-dealer in the past and testified that he believed that ACLP lacked a capital structure to support a $20 million firm commitment offering, and he concluded that any related regulatory holdup with FINRA was not within ACLP's control and so would not be quickly resolved. Id. ¶¶ 293-295. Inpellis monitored the situation by asking for updates, and it was never subsequently told that ACLP had obtained FINRA authorization. Id. ¶¶ 303-307. Therefore, it is not reasonably disputed that Inpellis was on notice at least by September 10, 2015 that ACLP had an issue with FINRA that left it unable to underwrite an IPO on a firm commitment basis. Id. ¶¶ 364-365.

During the fall of 2015, both before and after September 10, 2015, Inpellis was meeting with other investment banks for the purpose of either supplementing or replacing ACLP on the IPO. Id. ¶¶ 184, 189, 234. This effort intensified after the September 10, 2015 meeting, because Inpellis had concerns about whether ACLP would be able to resolve its FINRA issues in time to conduct a firm commitment offering. Id. ¶¶ 307, 320-324. These issues, specifically including ACLP's inability to underwrite on a firm commitment basis and potential alternative strategies including retention of another investment bank, were also discussed at an October 26, 2015 meeting with Barrette, Masiz, Schlichtmann, Glosband, and Clarke. Id. ¶¶ 323-335. On October 31, 2015, Schlichtmann and Glosband again discussed replacing or supplementing ACLP with another investment bank or moving forward with

ACLP on a best efforts basis. Id. ¶¶ 336-340. And during a November 3, 2015 phone call (memorialized in Glosband's notes), Schlichtmann asked Mooney to commit to a public S-1 filing by November 10, 2015 so the SRT could sell some of its Inpellis shares and thereby obtain money to pay BioChemics's debts. Id. ¶¶ 441-447, 462-465.

### 5. Financial Pressure to Move Forward

BioChemics, Masiz, and the SRT were under significant financial pressure during October and November 2015, and it appears this pressure pushed them to move forward with the Inpellis IPO notwithstanding ACLP's weakness. See, e.g., Id. ¶ 445.

In October 2015, Masiz and Schlichtmann came to Inpellis for a $750,000 loan to BioChemics, which it would use to pay a portion of the penalty owed to the SEC. Id. ¶ 366, 386. This money was ultimately provided, but Mooney and Clarke restructured the arrangement as a purchase from BioChemics of the IP rights underlying Inpellis's proposed business, since those had previously been licensed from BioChemics.[5] Id. ¶¶ 367-383. This deal was ultimately consummated in

---

[5] In December 2014-January 2015, Thonas Barrette of Holland & Knight, operating as Inpellis's counsel, created backdated documents (dated as far back as 11/30/2012) for Masiz to sign and that purport to formalize a royalty-free license for the IP from BioChemics to Inpellis. See ECF 140-1 ¶¶ 408-434. He testified that he did this to "clean up the record" when he realized there was no written license agreement during the process of answering Greenberg Traurig/ACLP's due diligence questions, though he did not inform them that the documents were recent creations and backdated. Id. ¶¶ 417, 430. Even after Inpellis purchased these assets, Glosband testified that Inpellis was still vulnerable because BioChemics's creditors could challenge the royalty-free license and IP transfer as fraudulent transfers. Id. ¶ 450.

an IP purchase agreement dated October 24, 2015, and the $750,000 was used to satisfy a portion of the SEC penalty. Id. ¶¶ 384-386. This provided a benefit to Inpellis, in part because McCoy and others believed it allowed Inpellis's S-1 not to disclose risks associated with its ability to license the IP from BioChemics, including in relation to BioChemics's problems with the SEC and other creditors. Id. ¶¶ 380.

BioChemics had warranted as part of that IP purchase agreement that it owned the IP assets free and clear. Id. ¶ 387. However, it turned out that several creditors had secured interests in those assets. Id. ¶¶ 388-390. For instance, in October 2015, another entity was pressuring Masiz for a $104,000 payment secured by the IP assets; since BioChemics lacked the funds to make the payment, Clarke and Mooney each made $52,000 personal loans to the SRT to fund the payment and protect Inpellis's interests in the encumbered IP assets. Id. ¶¶ 402-404.

During the October 26, 2015 meeting, the participants discussed various pressures to conduct the IPO before the end of a fiscal quarter on November 12, 2015, including that Inpellis's audited financial statements would go stale after that point. Id. ¶¶ 455-456. Several BioChemics creditors were also applying financial pressure via the SRT that the Inpellis IPO would help alleviate. Id. ¶ 457.

Mooney, however, advocated delaying the IPO to determine whether the SEC would require additional disclosures about Inpellis's relationship with BioChemics and Masiz. For instance, on October 23,

19

2015, when Manguso proposed to "file publicly as early as possible, because our Q2 financials go stale on Nov 12," Mooney responded by email:

> I hear you regarding the risk that the Q3 numbers are not complete by then. But, it is a greater risk to have no disclosure about Biochemics in a public filing only to find that the SEC wants some, or all, of it back in. That timing (a clean doc that then has to include, at SEC's request, ugly disclosure back in for the first time from the public's perspective) is a disaster and could very likely foreclose on the ability to get an IPO done -- possibly ever.

ECF 118-3.

### 6. Drafting and Filing the S-1

Inpellis filed five draft registration statements ("DRSs") with the SEC on April 8, 2015; June 30, 2015; August 5, 2015; October 6, 2015; and October 28, 2015. Id. ¶ 560. Thomas Barrette, as Inpellis's corporate counsel, and his firm, Holland & Knight, were primarily responsible for drafting these DRSs and revising them in response to SEC comments. Id. ¶¶ 510-511, 534-536. Barrette and Holland & Knight were also responsible for filing the S-1 on Inpellis's behalf. Id. ¶ 512. Greenberg Traurig represented ACLP as underwriter's counsel, and they propounded due diligence requests and participated in the revisions to the S-1 drafts. Id. ¶¶ 515,520-522.

Barrette and his firm drafted the initial risk disclosures related to BioChemics and Masiz and made subsequent revisions. Id. ¶¶ 523-524. Greenberg and ACLP recommended more complete disclosures about the SEC's prior enforcement actions against Masiz and BioChemics. Id. ¶¶ 530-532. On March 30, 2015, Greenberg Traurig sent a markup of the

DRS that inserted firm commitment language. See ECF 136-13 at 5. In this same markup, Greenberg added multiple paragraphs to a section entitled "Risks related to our former parent corporation," describing the SEC enforcement action against BioChemics and the risks associated with Inpellis licensing the IP for its core product from BioChemics. See id. at 19-20. After the IP transfer from BioChemics to Inpellis, Barrette and Manguso substantially revised the risk disclosures to downplay Inpellis's connections to BioChemics. ECF 140-1 ¶ 537. Masiz, Sterman, and Schlichtmann, among others, also had input into the drafting of these disclosures. Id. ¶¶ 546-551. These disclosures ultimately became the central focus of the SEC's order stopping the IPO and its subsequent investigation, and the plaintiff admits that the decisions on the scope of these disclosures were made by Inpellis in reliance on Barrette, not by ACLP. Id. ¶¶ 787-788, 791.

Ahead of the planned IPO, the Inpellis board met on November 9, 2015 at 8:00 p.m. to authorize the S-1's filing. Id. ¶ 563. At the time of the meeting, Barrette and the board members knew that ACLP had not resolved its issue with FINRA that prevented ACLP from underwriting the IPO on a firm commitment basis. Id. ¶¶ 579-583. This issue was discussed, but the Inpellis participants were still holding out hope that ACLP would obtain FINRA's sign-off before the public filing. Id. Before the meeting, Barrette circulated a draft of the S-1 that still contained "firm commitment" language. Id. ¶¶ 556-557. Barrette drafted a "best efforts" insert during the November 9 meeting, and he revised the S-1 to change the "firm commitment" language to best efforts

language on November 10, 2015. Id. ¶ 569. At the November 9, 2015 meeting, inter alia, the board voted to authorize CEO Mooney to publicly file the S-1 on November 10, 2015 "in substantially the form of the [DRS provided]" and to approve any necessary edits without going back to the board for an additional approval. Id. ¶¶ 571-575; ECF 120-4. On November 10, 2015, Barrette emailed the Inpellis board members to obtain signatures for the S-1, but Barrette did not send the latest DRS at that time, because he understood the board's prior vote of approval was sufficient. Id. ¶¶ 602-608. Barrette sent Mooney a "proof" of the S-1, substantially similar to the filed version, around 6:09 pm on November 10, 2015. Id. ¶¶ 611-612. Holland & Knight filed the S-1 on Inpellis's behalf sometime before 7:37 p.m., after obtaining written approvals from ACLP's counsel and from the auditor. Id. ¶¶ 613-618.[6]

### 7. Post-IPO Events

On or about November 30, 2015, the SEC issued a "Stop Order" in relation to the S-1 filed on November 10, 2015 and began an investigation, which focused largely on the disclosures concerning Inpellis's relationship with BioChemics and Masiz. Id. ¶¶ 756-758. Mooney retained separate counsel to represent Inpellis in this investigation. Id. ¶¶ 765-768. The plaintiff admits that the SEC's concern was not the switch to a best efforts IPO. Id. ¶¶ 770, 790.

---

[6] Approximately 7.5 hours before the S-1 was filed, Inpellis received an SEC comment letter on the October 28, 2015 DRS. Id. ¶ 621.

Rather, the SEC's stop order and investigation were focused on the whether the disclosures concerning Inpellis's connections to BioChemics and Masiz were incomplete or misleading. Id. ¶¶ 787-792. Even after this SEC action, however, Inpellis continued to try to conduct an IPO, and it sent a revised draft S-1 to the SEC for consideration on January 27, 2016. Id. ¶¶ 781-783.

Schlichtmann was representing BioChemics in connection with its SEC issues, and he was also participating as a trustee of the SRT. Id. ¶ 799. Although the parties' dispute the extent to which Inpellis was involved in the settlement discussions, since it was not a party to the SEC's pending action against BioChemics, see id. ¶¶ 802-806, it is undisputed that Inpellis ultimately withdrew its S-1 and agreed not to further pursue an IPO as part of a global settlement that emerged from the SEC action against BioChemics and Masiz. Id. ¶¶ 799-810. Specifically, at a February 10, 2016 meeting with the SEC, Schlichtmann proposed that as part of the settlement, Inpellis would withdraw its S-1 and the SEC would drop its investigation into the Inpellis IPO. Id. ¶¶ 810-816. Although Inpellis was represented at the meeting, its counsel was not aware going into the meeting that Schlichtmann would propose terminating Inpellis's attempt to go public. Id. ¶ 811. At the time, the Inpellis Board was still interested in moving forward with the IPO. Id. ¶ 843. But since the proposal to withdraw the IPO came from Schlichtmann, who was the primary negotiator, and the settlement was supported by the other trustees of the SRT, which controlled Inpellis, the Inpellis Board approved the decision not to proceed with

the IPO. Id. ¶¶ 839, 848-855. Ultimately, the settlement also granted the SEC a security interest in the intellectual property that was Inpellis's principal asset, although the Board was not fully informed of this aspect of the settlement until later. Id. ¶ 841, 859-862. The plaintiff admits that this security interest in the intellectual property, which served as a backstop to the SEC judgment against BioChemics, negated any consideration of a public offering. Id. ¶ 927.

Then, on or about March 13, 2016, Schlichtmann, on behalf of the SRT, informed the Inpellis board members that they had been removed from the board and that Mooney was removed as CEO. Id. ¶¶ 903-907. No reasons were given to the Board members at the time, though the SRT was motivated to act because Mooney and Clarke, in particular, were trying to resuscitate the IPO effort, while the SRT opposed that effort, which threatened to disrupt its global settlement with the SEC. Id. A neighbor of Sterman's was then installed as the sole Inpellis director. Id. ¶ 921-922.

On March 18, 2016, Manguso wrote to the SEC requesting withdrawal of the S-1. Id. ¶¶ 831-833. As a result of the S-1's withdrawal, the SEC dropped its investigation in connection with the Stop Order, and there was an understanding in agreements between the SRT and the SEC that Inpellis would not seek to raise investment from public markets so long as the BioChemics judgment remained unsatisfied. Id. ¶ 834-835. The SEC closed its Inpellis investigation on April 5, 2016. Id. ¶ 836. A settlement agreement was signed between the SEC, SRT, and

BioChemics on April 14, 2016, granting the SEC a security interest in the intellectual property assets owned by Inpellis. Id. ¶¶ 880-883.[7]

Inpellis failed to repay the $6.5 million bridge financing, and one of the private equity investors consequently filed a Chapter 7 involuntary bankruptcy petition. Id. ¶¶ 936-937. ACLP purported to terminate the Second Engagement Agreement on June 29, 2016. Id. ¶ 143.

B. **Procedural Background**

Aquino filed the original complaint in this action on October 30, 2020 in the U.S. Bankruptcy Court for the District of Massachusetts. The bankruptcy court granted a joint motion to transfer the case to the Southern District of New York on February 3, 2021. The current operative complaint, the Fourth Amended Complaint ("Complaint" or "Compl."), was filed on June 18, 2021, and it brings four claims against all defendants. Claim I alleges that ACLP fraudulently induced Inpellis to enter the engagement agreements by falsely representing that it could and would underwrite Inpellis's IPO on a "firm commitment" basis. See Compl. ¶¶ 57-64. Claim II alleges that ACLP breached the engagement agreements by failing to carry out its role as managing underwriter in good faith, failing to provide independent financial advice in its role as exclusive financial advisor, and failing to inform Inpellis of material facts concerning Mooney's

---

[7] The apparent rationale for this settlement term was that the SEC was threatening to challenge the transfer of BioChemics stock to the SRT and the IP assets to Inpellis as fraudulent transfers. Id. ¶ 886.

alleged divided loyalty. See id. ¶¶ 65-71. Count III alleges that ACLP breached a fiduciary duty it took on in its role as "exclusive financial advisor" by failing to disclose its regulatory limitations and Mooney's alleged divided loyalty. See id. ¶¶ 72-76. Finally, Count IV alleges that ACLP defrauded Inpellis, among other ways, by fraudulently obtaining Board members' signatures to file a "best efforts" S-1 by presenting them with a draft purporting suggesting that the IPO would occur on a "firm commitment" basis. See id. ¶¶ 77-86. On July 28, 2021, the Court denied defendants' motions to dismiss the complaint for failure to state a claim. See MTD Op. The Court also denied as premature defendants' motion to disqualify plaintiff's counsel, Jan Schlichtmann, on August 6, 2021. See Minute Entry 11/9/2021.

Discovery proceeded through the fall of 2021. After the close of discovery, defendants moved to compel various discovery and renewed their motion to disqualify Schlichtmann. During briefing on that motion, it became apparent that a declaration from attorney Daniel Glosband that Schlichtmann had filed in opposition to the first motion to disqualify contained materially false statements upon which the Court had relied in denying the first disqualification motion. See ECF 53-2 (Glosband Decl.). After holding an evidentiary hearing on November 18, 2022, the Court granted defendants' motion and disqualified Schlichtmann because he was a necessary witness. See ECF 72.[8] Following

---

[8] The Court has reserved judgment on whether to refer Glosband and Schlichtmann to the Grievance Committee of the Southern District

several more rounds of briefing and argument on discovery issues, including a motion to compel the deposition of Schlichtmann, the Court ultimately granted certain aspects of the defendants' multifaceted motions to compel on January 11, 2022. Ultimately, the parties settled various outstanding discovery disputes and motions for sanctions, and the case finally moved on to cross-motions for summary judgment.

Each side moved for summary judgment on all four claims in the Complaint, and defendants also moved for summary judgment on several of their affirmative defenses and on certain issues related to ACLP's partnership structure and the NESA defendants' individual liability. See ECF 101 ("ACLP Mot."); ECF 107-1 ("NESA Mot."); 124 ("Pl. Mot.").[9] Defendants' counsel, in an act of obvious gamesmanship, also filed a 137-page Rule 56.1 statement of 1,049 supposedly "undisputed" material facts. ECF 101-2. Although the Court granted plaintiff's motion for an extension of time to respond to ACLP's Rule 56.1 statement -- a statement that was plainly excessive in length, repetitive in content, and, upon further inspection, contained numerous statements of opinion and of legal conclusions that were wholly inappropriate for a statement of material facts -- in the end plaintiff's counsel compounded the

_____

of New York for possible discipline in connection with their respective roles in providing the Court with knowingly false statements. See ECF 72 at 2.

[9] Defendants filed two motions for summary judgment, though the second was a transparent attempt to circumvent the Court's order setting a page limit. See NESA Mot.; Minute Entries 2/14/2022 & 3/25/2022. As a result, defendants were restricted to only one reply brief and denied extra pages.

confusion by initially responding only to the first 236 of ACLP's 1,049 statements. See generally ECF 140-1 at 1-74. This was not an appropriate response. Plaintiff's counsel neither sought additional time to respond nor moved to strike ACLP's submission. Either course could have been acceptable. Instead, plaintiff's counsel simply included a brief preface to his response, stating that ACLP's statement was excessive and suggesting (without formally moving) that it should be stricken. See ECF 140-1 at 1-2. Moreover, the few cases upon which this preface relied were largely inapposite, and none compelled the Court to strike ACLP's submission or excused the waste of judicial resources that resulted from having the Court trawl through the record to discern the accuracy of defendants' contentions.

As the Court explained at oral argument, the principal function of Local Civil Rule 56.1 is to conserve judicial resources at summary judgment by providing a "separate, short and concise statement" cataloging the material facts that are truly undisputed. S.D.N.Y. Local Civil Rule 56.1(a). At oral argument, the Court could have "deemed to be admitted for the purposes of the motion" all 813 of ACLP's unanswered paragraphs that were not "specifically controverted" by plaintiff. Id. Rule 56.1(c). However, having already spent many hours analyzing the flurry of allegations in this litigation, the Court provided plaintiff's counsel with one additional week to complete his response to ACLP's Rule 56.1 statement. Plaintiff's counsel met that deadline, so the Court has considered plaintiff's amended responses to ¶¶ 237-1,049 of the defendants' Rule 56.1 statement. See

ECF 147-1. Nevertheless, this episode, as well as much of the conduct of counsel for both sides throughout this litigation, leaves the Court with the distinct impression that sanctions would need to be imposed if such unprofessional conduct were to continue in the future.

### III.  Cross-Cutting Issues

As with the motion to dismiss, the Court begins its analysis of the legal issues in this case with a discussion of those issues that cut across the four claims raised in the Complaint.

The first issue is whether the Court should impute Mooney's knowledge and actions as CEO to Inpellis, as is presumed under the New York agency law, or whether to apply the so-called adverse interest exception. On the motion to dismiss, the Court held that "it [wa]s plausible that Mooney acted with intent to commit a fraud against Inpellis, a conclusion that suffices to establish the adverse interest exception." MTD Op. 28. Specifically, that opinion concluded that the plaintiff had "just barely[] alleged a sufficient basis to invoke the adverse interest exception." Id. at 42. The Court has now reassessed this issue with the benefit of the full factual record developed in discovery and concluded that there is no evidentiary basis for applying the adverse interest exception to the relationship between Mooney and Inpellis. Accordingly, the Court grants summary judgment in the defendants' favor on this issue.

The second issue concerns ACLP's partnership structure and thus whether alleged "Managing Partners" Guidicipietro, Amato, and NESA Management LLC (collectively the "NESA defendants"), may be held liable

for ACLP's torts as partners in ACLP. On the motion to dismiss, the NESA defendants insisted that ACLP was a limited partnership and that none of them was a general partner of ACLP. However, the Court held that ACLP had failed to adhere to required formalities of Delaware's limited partnership statute ("DRULPA"), leading to the non-judicial dissolution of the limited partnership and the automatic transformation into a Delaware partnership on May 1, 2012. The motion to dismiss opinion further held that plaintiffs had sufficiently alleged that the NESA defendants were general partners potentially liable for ACLP's torts, based on the plaintiff's allegations about Amato and Guidicipietro holding themselves out as partners or owners of ACLP. Since that decision, defendants have apparently taken steps to remedy ACLP's dissolution, and the NESA defendants again contend they should be dismissed from this lawsuit. However, for reasons explained below, the Court finds that there are factual disputes and legal uncertainties that continue to dog ACLP and prevent entry of summary judgment on the issue of whether the NESA defendants are susceptible to individual liability.

The third issue is causation. Fraudulent inducement, fraud, and breach of contract claims all require proof that the damages sought were proximately caused by the conduct complained about. The thrust of plaintiff's suit is that ACLP's concealment of its inability to underwrite the Inpellis IPO on a firm commitment basis and the consequent switch to a best efforts underwriting caused the IPO to fail. However, after carefully reviewing the parties' Rule 56.1

statements and responses and examining the underlying record cited therein, the Court concludes that there is no genuine dispute that the Inpellis IPO's failure was not proximately caused by ACLP's alleged misconduct. Accordingly, the Court grants the prong of defendants' motion concerning causation and holds that the plaintiff is barred from pursuing damages related to the failure of the IPO.

A. **Imputation of CEO Mooney's Knowledge and Acts to Inpellis**

Central to the Complaint's theory of the case is the allegation that Dr. Patrick Mooney was ACLP's inside man at Inpellis, and that he worked in concert with ACLP to keep Inpellis in the dark about ACLP's inability to conduct a firm commitment IPO. But this theory requires that Mooney's knowledge and actions taken as CEO of Inpellis not be imputed to the company. Now, reviewing the full factual record, the Court finds that there is no evidentiary basis from which a reasonable jury could conclude that Mooney had so completely abandoned Inpellis's interests that his actions and knowledge should not be imputed to the company. Accordingly, the Court grants summary judgment for defendants on this issue.

Under New York law, courts presumptively impute a corporation's authorized agent's knowledge and actions to the corporation where the agent acts within the scope of her authority. Kirschner v. KPMG LLP, 938 N.E.2d 941, 950-51 (N.Y. 2010). The "adverse interest exception" is a narrow exception to that presumptive imputation:

> To come within the exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes .... [The exception] cannot be

31

> invoked merely because he has a conflict of interest or because
> he is not acting primarily for his principal. This rule avoids
> ambiguity where there is a benefit to both the insider and the
> corporation and reserves this most narrow of exceptions for those
> cases ... where the insider's misconduct benefits only himself
> or a third party, i.e., where the fraud is committed against a
> corporation rather than on its behalf.

Id. at 952. Plaintiff bears the burden of establishing that the adverse

interest exception applies. MTD Op. 24; Kirschner, 938 N.E.2d at 951.

Even viewing the evidence in the light most favorable to the

plaintiff, there is no affirmative evidence that Mooney completely

abandoned Inpellis's interests or was perpetrating a fraud on Inpellis

in concert with ACLP to conceal ACLP's lack of firm commitment

underwriting authority. Rather, the record shows that Mooney was

recruited by Masiz and others associated with Inpellis, that he was

qualified for the job, and that his presence facilitated the IPO

preparation process. Nor is it genuinely disputed that Mooney was

initially unaware of the limitations in ACLP's FINRA registration, and

the record reflects that when he became aware of that limitation, he

informed the Inpellis board and other relevant stakeholders (e.g., the

SRT) of what he knew. See ECF 130-1 ¶¶ 35-36, 39. To the extent that

disclosure did not contain all relevant details about the FINRA issue,

the plaintiff has not identified any evidence tending to prove that

Mooney withheld information he knew.

Mooney also took various actions that undermine the inference

that he was acting in concert with ACLP to perpetrate a fraud on

Inpellis for the benefit of ACLP. For instance, during an August 13,

2015 meeting, when other potential underwriters were discussed, Mooney

said he thought it would not look strong to move forward with a financing with ACLP listed on the S-1's cover as the only underwriter. See ECF 140-1 ¶¶ 215, 217-222, 224. Indeed, Mooney repeatedly met with other investment banks, seeking to replace or supplement ACLP, but was unable to secure another business relationship.

Plaintiff emphasizes that viewing the evidence in its favor, there are actions Mooney took as CEO that appear to have benefitted ACLP, and the record is unclear why he did those things. For instance, on August 17, 2015, Mooney signed an amendment to the First Engagement Agreement that increased ACLP's placement fee on the bridge loan by 25% from 8% to 10%. Mooney also made an unexplained payment of $4,389 directly to Carlin, rather than to ACLP, purporting to be an expense reimbursement.

But even considering these and other similar allegations the plaintiff levies against Mooney, plaintiff has failed to raise a genuine dispute about Mooney's actions that served Inpellis's interests and disserved ACLP's that would support the allegation that he acted in concert to defraud Inpellis by concealing ACLP's regulatory problems. And crucially, the undisputed facts about when Mooney learned about the FINRA issue and when he disclosed that information to others at Inpellis are inconsistent with plaintiff's theory that Mooney perpetrated a long-running fraud against Inpellis. Against this record, no reasonable juror could find that Mooney entirely abandoned Inpellis's interests or was perpetrating a fraud against Inpellis. The Court must therefore conclude that there is no jury question concerning

the application of the adverse interest exception and so it is appropriate to grant summary judgment in defendants' favor on this issue. The Court will therefore impute Mooney's knowledge and actions to Inpellis according to New York's usual principal-agent rules.

### B. **Whether the NESA Defendants are Susceptible to Personal Liability**

Defendants Amato and Guidicipietro, along with the entity they control, NESA Management LLC, (collectively the "NESA defendants") are alleged to be liable for ACLP's torts as partners in ACLP. On the motion to dismiss, the NESA defendants insisted that ACLP was a limited partnership and none of them were general partners of ACLP. However, the Court held that ACLP had failed to adhere to required formalities of Delaware partnership law ("DRULPA"), leading to the non-judicial dissolution of the limited partnership and the automatic transformation into a Delaware partnership on May 1, 2012. MTD Op. 17-20. The Court further held that Complaint had sufficiently alleged that the NESA defendants were general partners potentially liable for ACLP's torts, based on the allegations about Amato and Guidicipietro holding themselves out as partners and/or owners of ACLP.

Now, defendants move for summary judgment on the issue of the NESA defendants' liability, arguing that ACLP's filing deficiencies have been cured nunc pro tunc, as permitted under Delaware law, that Amato and Guidicipietro are not and have never been partners in ACLP, and that NESA Management was not a general partner of ACLP at the relevant time. The plaintiff opposes these arguments, contending that

it would be adversely affected by the <u>nunc pro tunc</u> correction and so a statutory exception applies, and that Amato and Guidicipietro have held themselves out as owners and partners of ACLP in official documents and FINRA filings.[10] While the NESA defendants may well succeed on this issue at trial, they have not established entitlement to summary judgment, principally because they have not established that the supposed retroactive correction of ACLP's status is effective.

**1. ACLP's Form**

To begin with, it is unclear whether ACLP's limited partnership status was properly corrected. The NESA defendants do not dispute the effect of the filing failures that the Court previously identified, but they now argue that ACLP has cured its filing deficiencies <u>nunc pro tunc</u> pursuant to DRULPA, 6 Del. C. § 17-213. Specifically, they contend that two corrected certificates naming general partners were filed with Delaware on September 27, 2021, which became effective the following day, and the Delaware Secretary of States issued a certificate of good standing for ACLP on October 4, 2021, declaring ACLP to be a limited partnership. <u>See</u> ECF 137-1 ¶¶ 18-20. The first certificate names EXITUS LLC as ACLP's sole general partner as of December 19, 2013, and the second names NESA Management as ACLP's sole

---

[10] The plaintiff also affirmatively moves for judicial estoppel against Amato and Guidicipietro, arguing that they should be bound by their representations to FINRA in disciplinary proceedings. The Court can easily deny this prong of the plaintiff's motion. Even assuming the relevant statements were dispositive, the plaintiff provides no adequate authority for the proposition that a submission to a FINRA investigation is a basis for estoppel here.

general partner as of December 14, 2017. See ECF 109-3. If valid, the NESA defendants contend that these certificates retroactively restore ACLP to limited partnership status throughout the relevant period.

This argument of course depends on whether the certificates satisfied DRULPA's requirements, which provide, in relevant part:

> [A] certificate may be corrected by filing with the Secretary of State a corrected certificate which shall be executed and filed as if the corrected certificate were the certificate being corrected.... The corrected certificate shall be specifically designated as such in its heading, shall specify the inaccuracy or defect to be corrected and shall set forth the entire certificate in corrected form. A certificate corrected in accordance with this section shall be effective as of the date the original certificate was filed except as to those persons who are substantially and adversely affected by the correction and, as to those persons, the certificate as corrected shall be effective from the filing date.

6 Del. C. § 17-213. The NESA defendants admit that they can find no caselaw interpreting this provision or confirming their position that the filing of their purported corrected certificates retroactively revives the limitation of liability upon which they rely. But even assuming that the retroactive limitation of liability were possible, dismissal of the NESA defendants would still be inappropriate now.[11]

_____

[11] The Court notes plaintiff's argument that the corrected certificates cannot be retroactively effective as to them, contending that they would be "substantially and adversely affected by the correction," 6 Del. C. § 17-213, because it would prevent their recovery in this suit, and so they contend they qualify for the statutory exception to the general rule of retroactive effect. ECF 139 at 49. Defendants, for their part, argue that Convergent Distributors of Texas, the current owner of these claims, purchased them from the Inpellis bankruptcy trustee when the claims made no reference to the NESA defendants, and these defendants were only added as supposed partners when the complaint was amended. See ECF 142 at 13. The defendants also argue that all parties operated during the relevant time under the assumption that ACLP was a limited partnership, so

Plaintiff disputes that the certificates are effective in the manner the NESA defendants propose for reasons of both form and substance. Substantively, the plaintiff argues that the timeline represented by the corrected certificates conflicts with contemporaneous representations that ACLP made in FINRA filings. For instance, ACLP filed a September 29, 2015 written submission in connection with a FINRA investigation into alleged misconduct by ACLP, and that filing states that Amato and Guidicipietro purchased an interest in ACLP via NESA Management in 2013 and, as of the date of the submission, were acting as "active owners and partners in the firm." ECF 126-4 at 4-5; see also ECF 126-11 at 11 (FINRA filing regarding NESA Management's proposed acquisition of Exitus's partnership share that describes Amato and Guidicipietro as "control persons"). The 2015 FINRA submission further describes Exitus LLC and its controlling member as "a silent partner in the firm" during the relevant period. ECF 126-4 at 4. The Court concludes that these documents raise genuine disputes of fact regarding the accuracy, and thus effectiveness, of the certificates of correction. And Delaware courts have previously declined to give effect to certificates of correction concerning an organization's structure that were filed during pending litigation where there was reason to doubt the factual basis for the certificate of correction. See, e.g., Laster v. Waggoner,

---

plaintiff is not unfairly prejudiced by permitting retroactive effect. Since summary judgment for defendants is inappropriate for other reasons, the Court need not now decide this issue.

1989 WL 126670 (Del. Ch. Oct. 13, 1989), aff'd, 581 A.2d 1127 (Del. 1990). The Court therefore concludes that these factual disputes are material to whether the certificates of correction were effective.

The plaintiff also correctly points out that the certificates of correction lack the features expressly required by the statute pursuant to which ACLP purports to have filed. The certificates lack headings that specifically designate them as corrected certificates, and they do not "specify the inaccuracy or defect to be corrected." 6 Del. C. § 17-213. No party presents any case law indicating the legal import of these deficiencies. The plaintiff conclusively asserts that the certificates are flat out invalid, a position that the Court will not endorse without authority. On the other hand, the NESA defendants argue that the Secretary of State's acceptance of the certificates and certificate of good standing demonstrate that they were effective. But the certificate clearly cannot be dispositive, because the Delaware courts will vacate a Secretary of State's determination that an entity was returned to good standing where the actions taken to purportedly return the entity to good standing was contrary to law. See, e.g., In re Grupo Dos Chiles, LLC, 2006 WL 668443, at *3 (Del. Ch. Mar. 10, 2006).

Granting defendants' motion for summary judgment on the issue of ACLP's legal form is precluded by these legal and factual disputes. The Court will therefore continue to consider ACLP to be a Delaware partnership, rather than a limited partnership for the purpose of assessing the remainder of this motion.

## 2. The NESA Defendants' Liability

The NESA defendants argue that Amato and Guidicipietro are not and have never been partners of ACLP and so they cannot be held liable for ACLP's torts. NESA Mot. 3. While the Complaint relies on lists of officers and owners of the firm from FINRA BrokerCheck reports, the NESA defendants argue these reports are misleading, because the lowest available ownership percentage option on the form reflects "less than five percent" ownership, and they insist that Amato and Guidicipietro have no direct ownership of ACLP. See ECF 137-1 ¶ 13. Indeed, the plaintiff identifies no other evidence that Amato and Guidicipietro directly own any share of ACLP. However, it is undisputed that these two individuals are indirect owners of ACLP through their beneficial ownership of NESA Management LLC, which owned 24.9% of ACLP from December 20, 2013 through December 14, 2017, when it acquired the remaining 75.1% of the ACLP ownership stake. ECF 137-1 ¶¶ 16-17.

Assuming that ACLP's certificates of correction did not retroactively restore the firm to limited partnership status, the Court's previous conclusion that Amato, Guidicipietro, and NESA Management LLC have general partnership status by default, and thus are potentially liable for the claims at issue here, would still apply. Defendants offer no argument to the contrary. The Court therefore declines to dismiss the NESA defendants from the suit at this juncture.

## C. Causation and Damages

The third cross-cutting issue to address is that prong of defendants' motion seeking summary judgment on the issue of proximate

causation, since all four claims in the Complaint seek to recover damages associated with the failure of the IPO. The defendants argue that any damages Inpellis suffered from the failure of the IPO were not proximately caused by ACLP's alleged misconduct, both because Inpellis decided to move forward with the IPO while on notice that it would need to be underwritten on a best efforts basis and because the last-minute switch to a best-efforts underwriting did not cause the IPO to fail and ultimately to be withdrawn. See ECF 101-1 at 36-39. The Court agrees that the undisputed facts bar the plaintiff from recovering damages associated with the IPO's failure, because that failure was not proximately caused by ACLP's alleged fraud and breach of contract. However, as explained further in the claim-specific sections below, granting summary judgment in favor of defendants on this affirmative defense does not fully resolve the case, because there are other categories of damages that are still in play.

A plaintiff alleging a fraud or fraudulent inducement claim under here-applicable New York law must "must demonstrate that a defendant's misrepresentations were the direct and proximate cause of the claimed losses." Vandashield Ltd. v. Isaacson, 146 A.D.3d 552, 553 (1st Dep't 2017); see also Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 106 N.E.3d 1176, 1183 (N.Y. 2018) ("Loss causation is a well-established requirement of a common-law fraudulent inducement claim for damages."). And to succeed on a New York breach of contract claim, a plaintiff must similarly "prove that a defendant's breach directly and proximately caused his or her damages." Nat'l Mkt. Share, Inc. v.

Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004). "To establish causation, plaintiff must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." Laub v. Faessel, 297 A.D.2d 28, 31 (1st Dep't 2002); see also First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994). "Loss causation is the fundamental core of the common-law concept of proximate cause and an essential element of a fraud claim. Ambac Assur. Corp. v. Countrywide Home Loans, Inc., 151 A.D.3d 83, 86 (1st Dep't 2017). Damages are therefore not recoverable if they are "so remote as not to be directly traceable to the breach [or fraud], or they may be the result of other intervening causes." Nat'l Mkt. Share, 392 F.3d at 525. "Furthermore, when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." First Nationwide Bank, 27 F.3d at 769. In short, "[i]f the fraud causes no loss, then the plaintiff has suffered no damages," and the claim must be dismissed. Sager v. Friedman, 1 N.E.2d 971, 973 (N.Y. 1936).

There are two reasons that together illustrate why the failure of Inpellis's IPO was not proximately caused by ACLP's alleged fraud regarding its ability to conduct a firm commitment underwriting and the last-minute switch to a best-efforts basis.

First, the record reflects that the Inpellis board and the other relevant decision makers, including Masiz and the SRT trustees, decided

to proceed with the Inpellis IPO on November 10, 2015 while on notice that the transaction would likely proceed on a best-efforts basis. They also made this decision after an intensive but failed effort to replace ACLP with another investment bank. Contrary to the Complaint's allegation that Inpellis first learned about the switch to best efforts after the S-1 was publicly filed, the record indicates that Inpellis and the decision makers associated with the company were aware since at least September 10, 2015 that ACLP had an issue with FINRA that left it unable to underwrite a firm commitment IPO. The record indicates that Inpellis nonetheless decided to move forward with the offering for reasons other than reliance on misleading representations by ACLP, namely the need for the SRT, BioChemics, and Masiz -- which indisputably exercised significant control over Inpellis -- to raise cash to pay debts imminently coming due.

Viewing the record in the light most favorable to the plaintiff, this decision by those with control over Inpellis might not, on its own, constitute a sufficient intervening act to "constitute a superseding cause, and be sufficient to relieve defendants of liability." Designer Limousine, Inc. v. Authority Transportation, Inc. 176 A.D.3d 670, 671 (2d Dep't 2019). That is because "the issue [of an intervening cause] may be decided as a matter of law where only one conclusion may be drawn from the established facts." Id. at 672. That, in turn, is because the original wrongdoing "can be found to have proximately caused the injury if the intervening act was normal or foreseeable." Woodling v. Garrett Corp., 813 F.2d 543, 555 (2d Cir.

1987). Here, the Court cannot exclude the possibility that a rational jury could find that it was unforeseeable that ACLP's alleged fraudulent inducement and failure to timely disclose its inability to conduct a firm commitment transaction would ultimately cause Inpellis to knowingly proceed with a best efforts transaction because no alternative underwriter was then available.

However, the record does permit the Court to conclude as a matter of law that the switch to best efforts underwriting did not proximately cause the IPO to fail. It is undisputed that that the IPO failed because the SEC instituted a stop order and then started an investigation into material misstatements and omissions in the S-1 and that Inpellis's efforts to resuscitate the IPO were ultimately abandoned as a condition of the global settlement reached among the SEC, BioChemics, the SRT, and Inpellis. See, e.g., ECF 147-1 ¶ 926.

Crucially, the plaintiff concedes that the last-minute switch to a best efforts underwriting was not the focus of the SEC's stop order and investigation. All indications of the SEC's focus in November 2015 and thereafter reflected that the SEC was concerned with whether the S-1 sufficiently disclosed the relationships and history among Inpellis, BioChemics, Masiz, the SRT, and the IP purchase. See, e.g., ECF 147-1 ¶¶ 758, 760. The plaintiff further admits that the decision to include or omit these disclosures of interest to the SEC were made by Inpellis in reliance on Barrette, its counsel. Id. ¶ 787. And the SEC neither indicated that the investigation had anything to do with

43

the change to a best efforts underwriting nor requested information from Inpellis on that issue. Id. ¶ 790, 762-763, 770.

Nor does the plaintiff meaningfully dispute defendants' key points about the post-IPO events that led Inpellis to agree to withdraw the IPO and allow the SEC to obtain a security interest in its IP assets. These decisions were spearheaded by Schlichtmann in his role as SRT trustee at the February 10, 2016 settlement conference with the SEC. Id. ¶¶ 809-821. There is no genuine dispute that the settlement proposed at that meeting and ultimately entered provided that Inpellis would withdraw the S-1 and cease its ongoing efforts to resuscitate the IPO. The final settlement also granted the SEC the security interest in its core assets. The SRT subsequently fired the Inpellis board and Mooney and pushed through the settlement on its way to finalizing the settlement. Id. ¶ 831. Even viewing the evidence in the light most favorable to the plaintiff, there is no genuine dispute that these actions were taken primarily for the benefit of BioChemics, Masiz, the SRT, and the other entities controlled by Masiz and Schlichtmann. Nor is there any doubt that the settlement conclusively ended Inpellis's bid to raise funds on the public securities markets through an IPO. See id. ¶¶ 834-837.

In sum, the S-1's inadequate disclosures of Inpellis's relationship to BioChemics and Masiz attracted the SEC's scrutiny, leading to the stop order and investigation, and Inpellis was ultimately responsible for the content of those disclosures and the related omissions. But Inpellis's IPO was ultimately abandoned because

of decisions made by the SRT, Schlichtmann, and Masiz, who were among the key drivers of the decision to proceed with the IPO notwithstanding ACLP's inability to underwrite the transaction on a firm commitment basis. These facts that are not genuinely disputed. Together, they establish that factors other than ACLP's alleged fraud and breaches of contract caused any damages to Inpellis resulting from the failure of its IPO. Those damages were therefore not proximately caused by the conduct at issue in this lawsuit, and the defendants may not be held liable for those damages resulting from the IPO. See First Nationwide Bank, 27 F.3d at 769.

## IV.   **The Claims**

Having addressed these cross-cutting issues, the Court now turns to those prongs of the parties' motions concerning the four claims brought in the Complaint: claims for fraudulent inducement, fraud, breach of contract, and breach of fiduciary duty.

### A. **Fraudulent Inducement**

The Complaint alleges that ACLP fraudulently induced Inpellis to enter the First and Second Engagement Agreements based on the false representation that ACLP had the capacity, authority, and intent to underwrite Inpellis's IPO on a firm commitment basis when, in fact, ACLP was prohibited by FINRA from conducting such a transaction. Both parties have moved for summary judgment on this claim, and the Court determines that it can grant plaintiff's motion in part but must otherwise deny the prongs of the dueling motions that relate to the fraudulent inducement claim.

Under New York law, "[t]he elements of fraudulent inducement are: a false representation of a material fact and with scienter; reliance thereon by defendant to its detriment." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Worley, 690 N.Y.S.2d 57, 61 (1st Dep't 1999); see also Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006). "While it is true that 'a mere promissory statement as to what will be done in the future does not constitute a material misrepresentation of fact, a promise made with a preconceived and undisclosed intention of not performing it does.'" Senior Health Ins. Co. of Penn. v. Beechwood Re. Ltd., 345 F. Supp. 3d 515, 527 (S.D.N.Y. 2018) (quoting Spinelli v. Nat'l Football League, 903 F.3d 185, 210 (2d Cir. 2018)).

We begin with plaintiff's motion. ACLP admits that it lacked authority to underwrite firm commitment IPOs during the relevant period. ECF 130-1 ¶¶ 12-13. And it is undisputed that before the First Engagement Agreement was signed in July 2014, ACLP never disclosed to Inpellis that its FINRA membership restricted it from conducting a firm commitment IPO. See id. ¶ 16. While the First Engagement Agreement does not expressly state that ACLP has the capacity to undertake the transaction for which it was hired, the Court concludes that the document unmistakably implies that ACLP was capable of and authorized to undertake the transaction for which it was hired.[12] Omitting to

---

[12] Even if one were to conclude that there was no implicit representation of capacity, ACLP's failure to disclose this fact was a clearly material omission that rendered the rest of the First Engagement Agreement misleading.

disclose that ACLP was not yet authorized to conduct the transaction therefore rendered the discussion of firm commitment underwriting in the First Engagement Agreement materially misleading. Viewing the record in the light most favorable to defendants, no reasonable jury could find that ACLP disclosed its inability to conduct the transaction for which it was hired until summer 2015 at the earliest. See ECF 147-1 ¶ 262. This earliest conceivable disclosure was well after the First Engagement Agreement was consummated. It is also undisputed that ACLP's capacity and authority to underwrite Inpellis's IPO on a firm commitment basis was material to Inpellis's decision to enter the First Engagement Agreement. Accordingly, the Court can easily conclude that there is no genuine dispute that the First Engagement Agreement contained false representations of material facts.[13]

---

[13] This same language, and thus the same implicit representation, was present in the Second Engagement Agreement. However, viewing the record most favorably to defendants, there is no basis to conclude that, by the time of the Second Engagement Agreement, Inpellis could have reasonably relied on ACLP's implied representation that it could underwrite the IPO on a firm commitment basis, because Inpellis was already "on notice of the existence of [the] material fact[]" that FINRA was prohibiting ACLP from conducting such a transaction, and, as a sophisticated commercial party, Inpellis should have either "secur[ed] the available documentation or insert[ed] appropriate language in the agreement for [its] protection." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997) (quoting Rodas v. Manitaras, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)). Having failed to do so, Inpellis "willingly assumed the business risk that the facts may not be as represented." Id. Therefore, Inpellis's "failure to insert such language into the [Second Engagement Agreement] -- by itself -- renders [further] reliance on the misrepresentation unreasonable as a matter of law." Id.

However, the prong of the plaintiff's motion addressing this fraudulent inducement claim cannot be granted in its entirety, because, inter alia, the current record does not support finding that ACLP made the misrepresentations with intent to defraud. it is undisputed that key ACLP employees were unaware that ACLP lacked firm commitment underwriting authority at the time the First Engagement Agreement was consummated. Id. ¶ 18. And on the present record, Mooney and Carlin, the people who presented Inpellis with the First Engagement Agreement, did not know at the time that ACLP lacked firm commitment capability. See, e.g., ECF 130-1 ¶¶ 35-38. Accordingly, there is a genuine dispute that prevents the plaintiff from prevailing on the scienter element of the fraudulent inducement claim.

Turning next to the defendants' motion, the Court again concludes that the prong concerning the fraudulent inducement claim must be granted in part and denied in part. This portion of the defendants' motion is premised on the idea that they cannot be found liable because ACLP eventually disclosed that it had an issue with FINRA that made it unable to underwrite a firm commitment offering, a disclosure that defendants contend was conveyed to the Inpellis board during the September 10, 2015 meeting. Defendants point out that this meeting took place before the Second Engagement Agreement was signed on October 5, 2015, so Inpellis was then on notice that ACLP had a regulatory issue that prohibited it from conducting the transaction contemplated

in the Second Engagement Agreement.[14] The Court agrees that this notice means that that Inpellis could not have justifiably relied on the implied, false statement of fact about ACLP's capabilities when it signed the Second Engagement Agreement. See e.g., Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 182 (2d Cir. 2007) (A "plaintiff cannot show it justifiably relied on statements it had reason to know were false."). And, as discussed further above, Inpellis's awareness of ACLP's problems affects the causal relationship between the fraudulent inducement and the alleged damages arising from the IPO's failure. Accordingly, the Court grants summary judgment in defendants' favor on the fraudulent inducement claim to the extent it alleges that Inpellis was fraudulently induced to enter the Second Engagement Agreement.

However, the defendants misstate the law when they argue that Inpellis's decision to sign the Second Engagement Agreement, or in the alternative Inpellis's ultimate decision to conduct the IPO with ACLP as the sole underwriter, ratifies the First Engagement Agreement and thereby eliminates all of their liability for fraudulent inducement.

---

[14] The parties dispute whether ACLP sufficiently disclosed the extent of the problem and whether the firm tried to minimize its regulatory problems. But the record, particularly contemporaneous notes taken by participants in the September 10 meeting, confirm that the Board was told that ACLP's FINRA issue prevented it from underwriting firm commitment IPOs. See, e.g., ECF 136-18. Even viewing the record in the plaintiff's favor, that fact alone suffices to establish that Inpellis was on notice that ACLP would not be able to perform the transaction contemplated in the First and Second Engagement Agreements.

See ECF 102 at 29-30 n. 17. "While an act ratifying a contract after the discovery of fraud in the inducement may defeat the right to challenge that contract, a plaintiff may still bring an action for damages for the fraud unless such a claim has been waived. Ratification of a contract after knowledge of fraud in the inducement thereof is no defense to an action for fraud and deceit unless there has been a waiver of the cause of action for damages itself." Braddock v. Braddock, 60 A.D.3d 84, 94 (N.Y. 1st Dep't 2009). "Proof of a waiver ... requires establishing an intentional relinquishment of a known right and should not be lightly presumed." Id. at 92. Here, as in Braddock, defendants adduce no evidence sufficient to prove that in signing the Second Engagement Agreement, Inpellis waived its claim for fraudulent inducement of the First Engagement Agreement. Indeed, the defendants do not even acknowledge this rule, and their cited cases concern attempts to rescind contracts allegedly induced by fraud, not attempts to recover on fraudulent inducement claims. Inpellis's awareness of ACLP's inability to conduct a firm commitment offering on and after September 10, 2015 therefore does not ratify any fraudulent inducement ACLP committed affecting the First Engagement Agreement or any pre-disclosure amendment thereto.

In sum, the fraudulent inducement claim remains alive, but in limited form. The plaintiff has established that the First Engagement Agreement contained misrepresentations of material fact regarding ACLP's ability to conduct the firm commitment IPO expressly contemplated in the engagement letter. Although Inpellis learned on

September 10, 2015 that ACLP had an issue with FINRA that left it unable to conduct the transaction, so the company could no longer justifiably rely on the same language restated in the Second Engagement Agreement, see Lazard Freres & Co., 108 F.3d 1543, neither Inpellis's decision to sign the Second Engagement Agreement nor its later decision to move forward with the November 10, 2015 IPO acts as ratification of any earlier alleged fraudulent inducement. Finally, the plaintiff is precluded from recovering any damages arising from the failure of the IPO, because it has failed to establish that there is a triable issue as to whether the IPO's failure was proximately caused by ACLP's alleged fraudulent inducement. The plaintiff may, however, seek damages associated with alleged legal, accounting, and other costs incurred in connection with Inpellis's collaboration with ACLP under the First Engagement Agreement and Inpellis's decision to enter into the $6.25 million bridge financing arrangement.

### B. **Fraud**

In addition to the fraudulent inducement claim, which alleges that ACLP tricked Inpellis into hiring it in the first place, the Complaint alleges that ACLP defrauded Inpellis in various ways during the two companies' working relationship. Under New York law, "[t]he elements of a cause of action for fraud [are] a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559

(2009). As explained above, the damages element requires proof of proximate causation. <u>See</u> <u>Vandashield Ltd.</u>, 146 A.D.3d at 553.

The fraud claim includes several theories of liability. Both the plaintiff and the defendants move for summary judgment on this claim. For the reasons explained below, the Court denies in full this prong of the plaintiff's motion and grants in part and denies in part this prong of the defendants' motion.

<u>First</u>, the plaintiff contends that ACLP engaged in a "persistent course of fraudulent conduct" that induced Inpellis to enter into an exclusive relationship with ACLP that forestalled Inpellis from retaining a more reputable investment bank. Compl. ¶ 79. To the extent any of this aspect of the claim is distinguishable from the fraudulent inducement claim, it lacks a factual basis. As explained above, it is undisputed that after signing the First Engagement Agreement, Inpellis continued to seek another investment bank to underwrite its IPO, either as an addition to or a replacement for ACLP. Inpellis therefore never treated its engagement with ACLP as exclusive, and it is clear from the record of its actions that Inpellis would have replaced ACLP with a superior investment bank if it could have, notwithstanding the contract's nod to exclusivity. The plaintiff thus has not established that there is a triable fact regarding the allegation that ACLP's misrepresentations caused Inpellis to miss out on opportunities to obtain superior financial services, so this theory of damages is precluded.

Second, the Complaint claims that ACLP's allegedly fraudulent course of conduct "caused Inpellis ... to hire [ACLP]'s compromised employee as Inpellis'[s] CEO." Compl. ¶ 79. The Court notes that this claim is premised on a proposition contradicted by the undisputed record: Dr. Patrick Mooney was not an employee of ACLP but rather a scientific consultant who was retained to assist ACLP's investment banking department's health care practice on a deal-by-deal basis. ECF 147-1 ¶ 648-650. It is also undisputed that Mooney had relevant training and experience for the role: he was trained as a medical doctor, had a background in medical technology financing, and had previously served as the CEO of a medical technology company. Id. ¶¶ 652-654. But even taking the record in the light most favorable to the plaintiff, the Court discerns no factual basis for the allegation that ACLP compelled or fraudulently induced Inpellis to hire Mooney. The most the plaintiff asserts is that Carlin made it clear it was "very important for him that ... [Inpellis] hire [Mooney]," because Carlin told Inpellis that he believed Mooney would be a more effective leader than McCoy when Inpellis was trying to raise interim financing, and that Mooney had helpful preexisting relationships with potential bridge lenders. See, e.g., id. ¶ 662. And while Carlin may have encouraged his friend Mooney's hiring, the plaintiff nowhere adduces any evidence whatsoever to support the allegation that Carlin and ACLP coerced or tricked Inpellis into hiring Mooney. See, e.g., id. ¶ 669.[15]

_____
[15] The plaintiff repeatedly suggests, without outright asserting, that Carlin implied to Inpellis that Mooney needed to be hired as CEO

Moreover, the plaintiff nowhere disputes that Masiz, Sterman, and others associated with Inpellis were seeking new leadership for the company after a series of investor roadshows in early 2015 failed to raise additional capital, and investor feedback indicated that the management team was an impediment to fundraising. Id. ¶¶ 664, 661. The plaintiff also admits that Sterman, who was impressed with Mooney's performance during the roadshow meetings, initially pitched Mooney on the idea of becoming CEO of Inpellis and that, after Mooney expressed interest, Sterman (with Carlin's encouragement) set up a meeting between Mooney and Masiz in New York in early 2015 to discuss the opportunity. Id. ¶¶ 662-663, 670-673. After the meeting, Masiz decided to support hiring Mooney, and Masiz negotiated an employment agreement with Mooney that led to his hiring as CEO in June 2015. Id. ¶¶ 664-665. These facts collectively undermine the aspect of the fraud claim concerning Mooney's hiring, and the plaintiff offers no facts that create a triable issue on this theory of liability.

Third, the Complaint alleges that ACLP's failure to disclose its regulatory limitations caused ACLP "to undertake and be exposed to the

_____

for the company to obtain the bridge loan it needed to prepare for the IPO. See, e.g., ECF 147-1 ¶ 684. But even if the Court were to construe the plaintiff's position as arguing that Carlin told Inpellis that its ability to secure bridge financing was conditional on Mooney's hiring, that would still not amount to coercion, because, as explained, the undisputed factual record indicates that the existing leadership team was an impediment to fundraising and that all concerned believed that Mooney would be an improvement on this score. There is no suggestion from the plaintiff that Carlin threatened Inpellis, misrepresented Mooney's credentials, or extorted the relevant decision makers by withholding access to financing unless Mooney was hired.

substantial financial and regulatory risk of the intended public offering and regulatory filings that were compromised and rendered inappropriate by [ACLP's] wrongful and unprofessional conduct." Compl. ¶ 79. This allegation is not without some force, because ACLP's failure to earlier disclose its inability to conduct the firm commitment transaction contemplated in the engagement agreements and referenced in the draft registration statements submitted to the SEC may have wrongly subjected Inpellis to financial and regulatory risk. But there are nevertheless several problems with this theory of liability, any of which would independently require dismissal of this aspect of the claim. As the Court explained above, Inpellis, through its Board, made the decision to move forward with the IPO and publicly file the S-1 while on notice that ACLP would only be able to conduct the transaction on a best efforts basis, so there is no triable fact as to whether the alleged fraud proximately caused the damages asserted on this theory of liability. In addition, after Mooney authorized the filing of the S-1, Mooney supervised Barette's edits to the S-1 that inserted the best efforts language, and, as explained above, Mooney's actions are imputed to the company.[16] And with respect to the regulatory risk taken on by the removal of complete disclosures concerning the relationship between Inpellis, BioChemics, and Masiz, even on the plaintiff's version of the facts, those changes were made with Mooney's

---

[16] These facts also fatally undermine the allegations that ACLP fraudulently obtained the Inpellis Board members' signatures for the S-1 filing and then switched the offering to a best efforts basis at the last minute. See Compl. ¶¶ 42-49.

authorization, acts which again may be imputed to the company. This aspect of the fraud claim is therefore not viable.

Fourth and finally, the Complaint claims that ACLP's allegedly fraudulent concealment of facts about its inability to conduct the planned IPO caused Inpellis to "incur substantial financial obligations and costs." Compl. ¶ 79. This allegation specifically includes the bridge loan, for which Inpellis paid ACLP a $500,000 placement fee, and which Inpellis took on before it learned on September 10, 2015 that ACLP had a FINRA problem. Reviewing the record in the light most favorable to the plaintiff's claim, the Court concludes that this theory remains viable. ACLP advised Inpellis to take on the bridge loan in significant part in preparation for the IPO. And ACLP did so in its capacity as Inpellis's "exclusive financial advisor." But since ACLP appears to have been aware that Inpellis was relying on the false representation that ACLP could conduct a firm commitment underwriting, a jury must determine whether ACLP fraudulently convinced Inpellis to take on the loan and thereby obtained the $500,000 placement fee.

Because all but one of the theories of liability undergirding the fraud claim lack triable issues, the Court grants in part the defendants' motion for summary judgment, denying that motion only

insofar as it relates to the theory that ACLP defrauded Inpellis in connection with the bridge loan.[17]

### C. **Breach of Contract**

The Complaint also brings one breach of contract claim, which alleges that defendants breached their obligations under the engagement agreements in three, interrelated ways. First, the Complaint claims that ACLP failed "to carry out its undertakings as managing underwriter in good faith," including by failing "to cooperate in the preparation of 'appropriate registration statement[s]' so as to expedite the successful consummation of the public offering' that Alexander Capital represented it would underwrite on a 'firm commitment' basis." Compl. ¶ 68. Second, the Complaint claims that ACLP, in its contractually defined role as Inpellis's "exclusive financial advisor," failed "to provide Inpellis ... with independent professional advice regarding the financing of the offering, including informing Inpellis of [ACLP]'s inability, lack of authority and lack of intent to undertake the offering on a 'firm commitment' basis." Id. Finally, the Complaint claims that ACLP breached its implied duties of good faith and honest dealing by not informing Inpellis that ACLP was allegedly "engaging in conduct in concert with its former employee Mooney ... that was against the interests of Inpellis and undermined the integrity of the offering." Id.

---

[17] The Court denies in full the prong of the plaintiff's motion concerning the fraud claim because of the factual issues described above.

"To prevail on a breach of contract claim under New York law, a plaintiff must prove [i] a contract; [ii] performance of the contract by one party; [iii] breach by the other party; and [iv] damages." Terwilliger v. Terwilliger, 206 F.3d 240, 245-246 (2d Cir. 2000). Defendants move for summary judgment on the breach of contract claim, arguing first that the engagement agreements were just agreements to agree, not enforceable contracts, and then, in the alternative, that ACLP did not breach any promises that the Court finds were enforceable.[18] The plaintiff also cross-moves for summary judgment on this claim.

Turning first to the defendants' argument that the engagement agreements were not enforceable contracts, the Court must begin with the conclusions it reached in denying defendants' motion to dismiss, which made a substantially similar argument. In denying the motion to dismiss, the Court held that the engagement agreements were, as a matter of law, merely unenforceable agreements to agree with respect to the details of a contemplated underwriting agreement and the

---

[18] The defendants also move for summary judgment on their affirmative defense that Inpellis first breached the engagement agreements when it obtained outside financing from an investment vehicle called Montserrat Partners, created by Schlichtmann, ECF 147-1 ¶ 952, and routed via BioChemics, allegedly in circumvention of ALCP's right as "exclusive financial advisor" to receive a cash placement fee. However, there are numerous factual disputes material to this Montserrat Partners affirmative defense, see, e.g., id. ¶ 961, and viewing the record in the light most favorable to plaintiffs, it is unclear whether ACLP would have been entitled to a fee on the Montserrat Partners financing. The Court therefore denies this prong of defendants' motion.

consequent IPO. MTD Op. 36. That is, the engagement agreements did not require ACLP to actually underwrite an IPO, nor did they require ACLP to underwrite an IPO on any specific terms, since ACLP's commitment to underwrite the IPO was "expressly conditioned on the execution of a definitive agreement satisfactory ... to both sides. Prospect Street Ventures I, LLC v. Eclipsys Solutions Corp., 804 N.Y.S.2d 301, 302 (1st Dep't 2005); MTD Op. 37-38. The Court reaffirms its earlier conclusion that ACLP was not obligated under the engagement agreements to sign an underwriting agreement or to actually underwrite Inpellis's IPO.[19]

But the engagement agreements cover various aspects of the Inpellis-ACLP relationship IPO other than the IPO itself. Therefore, the Court denied the motion to dismiss the breach of contract claim in part because, while the engagement agreements were somewhat ambiguous, they created an enforceable contract as related to ACLP's role as "exclusive financial advisor" and as "managing underwriter" assisting in preparation for the contemplated IPO. MTD Op. 38-39. This

---

[19] As explained above, the plaintiff is precluded from seeking damages arising from the failure of the IPO because it has failed to establish a triable question of fact as to whether that failure was proximately caused by ACLP's alleged fraudulent acts and breaches of contract. However, the plaintiff is independently precluded from seeking these damages on its breach of contract claim because, as explained here, Inpellis was not contractually entitled to have ACLP execute an underwriting agreement or to underwrite the contemplated IPO. Indeed, the plaintiff does not dispute the Court's holding from the motion to dismiss stage that the engagement agreements did not oblige ACLP ultimately to enter an underwriting agreement. See ECF 129 at 17-18.

conclusion relied in part on the allegations that Inpellis acted in detrimental reliance on the contract terms by hiring attorneys and accountants acceptable to ACLP and by paying ACLP a placement fee for its assistance in arranging the August 2015 bridge loan. Id. The defendants reprise their arguments that ACLP had no enforceable duties in these regards because the engagement agreements state that "any legal obligations between the parties shall be only as set forth in a duly negotiated and executed underwriting agreement," ECF 140-1 ¶ 141, and so the parties' "legal obligations shall arise solely from the Underwriting Agreement," ECF 102 at 18-21. But the Court already rejected these same arguments at the motion to dismiss stage, and the defendants have not identified any reason, either arising from the factual record developed in discovery or in the case law, for the Court now to reverse its earlier construction of the engagement agreements. The conclusions set forth in the Court's opinion on the motion to dismiss on this point are thus adopted and reaffirmed. Therefore, even viewing the record in the light most favorable to defendants, the Court concludes that the engagement agreements formed enforceable contracts to the limited extent described above.

The Court now turns to the issue of whether ACLP breached the enforceable aspects of the engagement agreements. The defendants' arguments on this issue are thin and consist mostly of insistence that there was nothing more for ACLP to disclose, either about Mooney or about its ability to conduct a firm commitment underwriting. See ECF

102 at 22. And the Complaint's three theories of breach cannot now be dismissed, because myriad disputes of material fact remain.

For instance, with respect to the allegation that ACLP did not act in good faith in its role preparing for the planned IPO as managing underwriter, the plaintiff contends that ACLP should have disclosed earlier and more fully that it was not yet approved by FINRA to conduct the transaction as contemplated in the engagement agreement. ACLP's failure to make a full and timely disclosure, the plaintiff argues, led Inpellis to retain (at significant expense) attorneys and accountants suitable to ACLP and induced Inpellis to approve the filing of draft registration statements with the SEC that relevant decision makers assert they would not have approved had they known the truth. See, e.g., ECF 147-1 ¶ 270.

Factual disputes also preclude dismissal of the aspect of the claim alleging that ACLP failed to act in good faith in its role as "exclusive financial advisor." For instance, viewing the record in the light most favorable to the plaintiff, ACLP had not made any disclosure whatsoever of its inability to do firm commitment underwriting before it advised Inpellis to take on the bridge loan debt in preparation for the IPO (and for which Inpellis paid ACLP a $500,000 placement fee). Accordingly, there is a triable issue whether ACLP breached its duty to provide independent and appropriate financial advice.

Finally, the Court is also unwilling to dismiss the aspect of the claim concerning nondisclosure of Mooney's alleged divided loyalty. This is a different issue from the adverse interest, since it is

conceivable that Mooney could have had a divided loyalty, whether the ACLP or to Carlin individually, but that this divided loyalty did not rise to the level of fraud or complete abandonment of Inpellis's interests. At this juncture, the factual record is too murky and the defendants' arguments too conclusory for the Court to determine that ACLP was under no duty whatsoever to disclose information about its former contractor, Mooney.

In sum, the Court grants the plaintiff's motion and denies the defendants' motion for summary judgment only insofar as they concern the issue of whether ACLP's entry into the engagement agreements created enforceable promises to serve as "exclusive financial advisor" and "managing underwriter" in the initial phases of the IPO preparation process, and that Inpellis took on corresponding obligations to pay fees and expenses to ACLP and to retain professional services suitable to ACLP. However, the engagement agreements did not require ACLP to actually perform the contemplated IPO or to sign a final underwriting agreement. The Court further denies both the plaintiff's and the defendant's motions with respect to the issue of whether either side breached the contracts, and so the claim remains alive, though the plaintiff is precluded from seeking damages arising from the failure of the IPO itself. To the extent the parties have moved for summary judgment on other aspects of this claim or on related affirmative defenses, the Court has considered those arguments and denied those aspects of the motions.

### D. **Breach of Fiduciary Duty**

Under New York law, a fiduciary duty claim that is entirely derivative of a contract claim ought to be dismissed as duplicative. Where "a valid contract governs the dispute between the parties, 'a cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand.'" Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd., 345 F. Supp. 3d 515 (S.D.N.Y. 2018) (quoting William Kaufman Org., Ltd. v. Graham & James LLP, 703 N.Y.S.2d 439, 442 (1st Dep't 2000)). But "'conduct amounting to breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract which is nonetheless independent of such contract.'" Id. (quoting Bullmore v. Ernst & Young Cayman Islands, 846 N.Y.S.2d 145, 148 (1st Dep't 2007)). The Court therefore previously declined to dismiss the fiduciary duty claim as duplicative, finding that it was plausible to infer from the Complaint's allegations that the parties' conduct gave rise to a fiduciary duty that was independent of ACLP's contractual duty to serve as an exclusive financial advisor. See MTD Op. at 44. Now, with the benefit of the factual record developed in discovery, ACLP renews its argument that the fiduciary duty claim is duplicative of the breach of contract claim, and so the fiduciary duty claim must be dismissed. The Court agrees.

It is true that "[p]rofessionals such as investment advisors, who owe fiduciary duties to their clients, may be subject to tort liability for failure to exercise reasonable care, irrespective of their

contractual duties, since in these instances, it is policy, not the parties' contract, that gives rise to a duty of care" Bullmore 45 A.D.3d at 463. However, here the plaintiff's claim for breach of fiduciary duty is entirely derivative of the claim for breach of the contract that gave rise to any fiduciary duties in the first place. Therefore, dismissal is appropriate because "[t]he allegations underlying plaintiff's fiduciary duty claim -- based upon defendants' self-dealing, conflict of interests, and failure to advise plaintiff ... and encouraging improper loans to plaintiff -- are either expressly raised in plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith." Brooks v. Key Tr. Co. Nat. Ass'n, 26 A.D.3d 628, 630 (3d Dep't 2006). Even viewed in the light most favorable to the plaintiff, the record does not contain a factual basis to find that, "apart from the terms of the contract the parties created a relationship of higher trust than would arise from their contracts alone so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties." Id. at 630. Contrary to the Complaint's implication that Inpellis exclusively relied on ACLP during the relevant period, and thus that Inpellis might have entrusted ACLP with the discretionary authority to manage its affairs in a manner that would give rise to a "relationship of higher trust" than that which arose from the engagement agreement alone, EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31 (N.Y. 2005); Senior Health Ins. Co. of Penn., 345 F. Supp. 3d at 524, the

record demonstrates that Inpellis continually sought to supplement or replace ACLP with another, higher-caliber investment bank and arranged financing through BioChemics and apart from ACLP.[20] The plaintiff has not identified any fact or legal theory that is not raised in its breach of contract claim, so the Court can now conclude that the fiduciary duty claim "merely restate[s] [the] contract claim[]" and so "must be dismissed." <u>Bullmore</u>, 45 A.D. 3d at 463.

## V.   <u>Conclusion</u>

For the reasons set forth above, the Court denies in full the NESA defendants' motion for summary judgment and grants in part and denies in part the plaintiff's motion and the defendants' principal motion. The three remaining claims for fraudulent inducement, fraud, and breach of contract should now proceed expeditiously to trial, temporally and substantively limited as explained above. To the extent the parties moved for summary judgment on any other issues, the Court has considered those arguments and denied those prongs of their motions.

The parties are therefore directed to meet and confer regarding the estimated length of the trial in this matter and their mutually available dates. The parties must then initiate a joint phone

---

[20] While there are factual disputes concerning the defendants' allegations that Inpellis obtained undisclosed financing through Montserrat Partners in breach of the engagement agreement, <u>see</u> n. 18 <u>supra</u>, the plaintiff does not dispute that Inpellis did receive some financing from Montserrat via BioChemics and that this financing was arranged without ACLP's involvement. <u>See</u> ECF 147-1 ¶ 961.

conference with Chambers no later than two weeks from the date of this

Opinion so that the Court may set a firm trial date.

SO ORDERED.

New York, NY
July 8, 2022

JED S. RAKOFF, U.S.D.J.