**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JOHN J. AQUINO, | ) | |
| CHAPTER 7 TRUSTEE | ) | Case #1:21-cv-01355-JSR |
| By Its Assignee, | ) | |
| Convergent Distributors of Texas, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALEXANDER CAPITAL, LP | ) | |
| & | ) | |
| Its Managing Partners: | ) | |
| JOSEPH AMATO, | ) | |
| ROCCO GUIDICIPIETRO, and | ) | |
| NESA MANAGEMENT, LLC | ) | |
| | ) | |
| Defendants | ) | |

**PLAINTIFF'S MEMORANDUM**
**In Support Of Plaintiff's Opposition**
**To Defendants' FRCP Rule 37(e) Spoliation Motion**


Dated: September 12, 2022

Respectfully submitted by:

/s/ William C. Rand
William C. Rand, Esq.
501 Fifth Ave. 15th Floor
New York, N.Y 10017
Tel: 212-286-1425
Email: wcrand@wcrand.com
Attorney for Plaintiff Convergent Distributors of Texas, LLC

# TABLE OF CONTENTS

**Section**                                                                                  **Page**

**I.    SUMMARY**

Defendants' Motion Is Procedurally & Substantively Deficient …………………..1

**II.    RELEVANT HISTORY REGARDING DISCOVERY**……………………….…...4

A.    Claim At Issue: Defendants Misrepresented ACLP Could Underwrite
Inpellis IPO As A Firm Commitment By Concealing ACLP's License
Prohibited That Activity Causing Inpellis Expenses & Loss Of The
Company………………………………………………………………………4

B.    Plaintiff Produced Inpellis's Extensive ESI Record Of The Key Periods
& The ESI Record & Documents Kept By The Witnesses It Facilitated…..5

C.    In Contrast To Plaintiff & The Facilitated Witnesses, Defendants Failed
To Provide The Record They Possessed & Had Access To Regarding
Their Representations To Inpellis Decision Makers………………………..8

D.    Post-Discovery, Defendants Attacked Plaintiff's Production &
Questioned Plaintiff's Preservation Of ESI Based On Speculation………..10

E.    Court's 1-11-22 Conference Resolved "Outstanding Discovery Disputes"..11

F.    Despite Resolution Of The Disputes By The 1-11-22 Conference
Defendants Continued Their Attack On Plaintiff's Production &
Preservation Of ESI……………………………………………………………13

G.    *Sterman et al* Notified Defendants They Would Redress Continued
Abuse……………………………………………………………………………..14

H.    On 2-4-22 Parties/*Sterman et al* Settled Their "Pending Discovery
Disputes"…………………………………………………………………………15

I.    Despite The Parties 2-11-22 Settlement Defendants Re-newed Their
Request For Rule 37 Sanctions For Spoliation Which Was Denied
With Prejudice…………………………………………………………………16

J.    Defendants Rule 37 Motion Is Based On The Previously Resolved Issues...17

**TABLE OF CONTENTS (Cont.)**

**Section**                                                                                      **Page**

III.    **APPLICABLE RULE 37(e) STANDARDS**

       **Rule 37(e) Requires: 1) *Specific* Threshold Showing Material ESI Was
       "Lost" & Not Available From Other Sources & 2) An Adverse Inference
       Sanction Requires A *Specific* Showing Of Intent To Deprive Use Of The
       Information In The Litigation**……………………………………………………..18

       ESI Information That Is Available From Other Sources Is Not "Lost"……………...19

       Must Show With Specificity – Not Speculation – Significant Information "Lost"….20

       "Intent To Deprive" Requires Showing Intent To Deprive Other Party Of
       The *Use Of The "Lost" Evidence In The Litigation*…………………………………21

       Courts Have Required The Showing Should Be By Clear And Convincing
       Evidence……………………………………………………………………………21

IV.    **REASONS WHY DEFENDANTS' MOTION SHOULD BE DENIED**

       A.    Defendants Should Not Be Allowed To Re-Contest Assertions
             Resolved By Court Conference and Order & Settlement By The Parties……22

       B.    Defendants Cannot Make The Threshold Showing That They Were
             Deprived Of Material Information Intentionally Or Otherwise………………23

             1.    ACLP's Misrepresentations Were Fully Documented By
                  Plaintiff……………….................................................................24

             2.    Inpellis Debt Was Fully Accounted For By Independent Audit……...25

             3.    IPO Incurred Expenses Were Fully Accounted For By Inpellis's
                  Records………………………………………………………………..25

V.    **CONCLUSION**…………………………………………………………………25

# TABLE OF AUTHORITIES

**Page**

**Circuit**

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2nd Cir. 2002)….19fn50

**District**

*Alter v. Rocky Point School Dist.,* WL 4966119 (EDNY 2014)……………………………….20

*CAT3, LLC v. Black Lineage, Inc.,* 164 F.Supp.3d 488 (SDNY 2016)……………………...21

*Dilworth v. Goldberg*, 3 F.Supp.3d 198 (SDNY 2014)…………………………………………...20

*Doubleline Capital LP v. Odebrecht Finance, Ltd.,* WL 1191527 (SDNY 2021)…………..20

*Europe v. Equinox Holdings, Inc.*, WL 832027 (SDNY 2022)……………………………...21

*GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc*., 282 F.R.D. 346 (SDNY 2012)……….20

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474
(SDNY 2022)……………………………………………………………………………...19,20,21

*Johnson v. L'Oreal USA*, WL 5530022 (SDNY 2020)……………………………………..21

*Karsch v. Blink Health Ltd*. WL 2708125 (SDNY, 2019)…………………………………….19

*Leidig v. Buzzfeed, Inc.*, WL 6512353 (SDNY 2017)……………………………………….21

*Lokai Holdings LLC v. Twin Tiger USA LLC* WL 1512055 (SDNY, 2018)…………….19fn49,21

*Morgan Art Foundation Limited v. McKenzie*, WL 5836438 (SDNY 2020)…………………20

*Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429 (SDNY 2010)………...20

*Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284 (SDNY 2009)……………..20

*Treppel v. Biovail Corp.*, 249 F.R.D. 111 (SDNY 2008)……………………………………..20

*Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161 (EDNY 2007)…...20

*Ungar v. City of New York*, 329 F.R.D. 8 (EDNY 2018)…………………………………...19fn50

**TABLE OF AUTHORITIES (Cont.)**

**Page**

**Rules**

FRCP Rule 26(b)(1)…………………………………………………………………………22

FRCP Rule 37(e)……………………………………………………………………18,19fn49,20

FRCP Rule 37(e)(1)…………………………………………………………………………19fn49

FRCP Rule 37(e)(2)………………………………………………………………………2,18,19

**Comments To Rules**

1983 Comments to FRCP Rule
26(b)(1)……………………………………………………………………………22fn51

2015 Comments to FRCP Rule 37(e)(2) Amendments……………………………………...19fn50

**Official Reports**

2015 "Year-End Report On The Federal Judiciary," Chief Justice Roberts (US Public
Information Office 2015)…………………………………………………………………….22

I.      **SUMMARY**

**Defendants' Motion Is Procedurally & Substantively Deficient**

Defendants' "Spoliation Motion" is without merit and should be denied.  The motion is

both procedurally and substantively deficient.  It is Defendants' fourth attempt seeking sanctions

based on their unjustified assertions that the discarding of the Inpellis server *after* the contents of

its electronically stored information (ESI) were copied onto a hard-drive – the relevant contents

of which were produced in discovery – somehow deprived Defendants of  material information,

the exact nature of which Defendants cannot specify.

**Procedurally Defective**.  Defendants first raised the spoliation claim in their *post-*

*Discovery* 11-26-21 Discovery Motion (Doc. #73-1 p. 13-16) and continued to raise the issue

despite: the Court's 1-11-22 specially convened conference that "was designed to resolve, in one

session, the various discovery disputes previously raised;"[1] and the subsequent 2-11-22

Settlement[2] of the discovery disputes between the parties and the *Sterman et al* non-party

witnesses.[3]  The Court in its 2-14-22 Order denying Defendants leave to file their Rule 37(e)

motion for spoliation "conclude[d]" the "preservation of the data contained in the Inpellis server

… *[was a] dispute [that] was resolved*" by the parties.[4]  In violation of the clear terms of the 2-

14-22 Order and the Settlement, Defendants now seek monetary sanctions under FRCP Rule

37(e)(1).  Although the Court allowed Defendants to "rais[e] the issue again to seek an adverse

interest" instruction, presumably on grounds not previously raised and resolved, Defendants

---

[1] Clerk's 1-10-22 Email to the Parties and the *Sterman et al* non-party witnesses.

[2] Defendants filed a 1-11-22 "Notice" the Parties and the *Sterman et al* non-party witnesses
resolved their Discovery disputes by an exchange of executed documents on February 4, 2022
(Doc, #98; See, 2-4-22 "Stipulation" at **Exhibit 5**).  For ease of reference, Plaintiff refers to the
Discovery Settlement as the 2-11-22 Settlement.

[3] 2-11-22 "Notice" (Doc. #98); 2-4-22 "Stipulation Re Discovery Disputes" at **Exhibit 5**.

[4] 2-14-22 Minute Entry (emphasis added).

merely repeat their original unfounded assertions – disputed assertions that were resolved by both the Court's 1-11-22 Conference and the 2-11-22 Settlement between the parties. In addition, Defendants premise their motion on the facially deficient claim that the purported deprivation was due to Plaintiff's alleged "gross negligence." Rule 37(e)(2), as amended in 2015, explicitly "reject[ed]" a "negligence or gross negligence" standard and imposed the strict culpability standard of demonstrating, an "intent to deprive another party of the information's use in the litigation" – a strict standard that Defendants have not and cannot meet. See **Section II** & **Section III** below.

**Substantively Defective**. Most importantly Defendants' motion has no substantive basis. Defendants point to three issues regarding Plaintiff's claim that the record and common sense demonstrates they were neither deprived of information nor were they prejudiced in any way: 1) ACLP's "representations to Inpellis" about "underwriting of the IPO";[5] 2) "Debt taken on by Inpellis";[6] and, 3) "Inpellis's expenses incurred [from] the IPO" detailed in the 8-20-21 report of Plaintiff's expert:[7]

**ACLP's Underwriting Representations**. Despite Defendants' unique position as the one making the representations, regarding the entire period before and during the Engagement Agreements (summer 2014 through November 2015), it is undisputed Defendants did *not* provide documentary information about their underwriting representations to Inpellis and its decision makers and Defendants' personnel denied knowing about such representations except as contained in the Engagement Agreements. The dearth of production on this issue by Defendants was in stark contrast to the voluminous contemporaneous record of email communications and

---

[5] 8-5-22 Defendants' Spoliation Motion p. 16.
[6] 8-5-22 Defendants' Spoliation Motion p. 16.
[7] 8-5-22 Defendants' Spoliation Motion p. 17.

notes as well as the witness testimony provided by Plaintiff and the witnesses facilitated by Plaintiff – a record that was *undisputed* by Defendants. See **Section IVB(1)** below;

**Debt Taken On By Inpellis**. Defendants were provided all the audited and detailed financials of BioChemics and Inpellis during the entire period relevant to this action. Defendants as Inpellis's "managing underwriter" shepherding Inpellis through the IPO registration process and "exclusive financial advisor" charged with securing "bridge loan" debt were in a unique position to observe and be knowledgeable about the audited financials of Inpellis compiled by Marcum, a licensed premier accounting and financial services firm – a record that Defendants also received directly from Marcum. The record provided by Plaintiff – uncontradicted by the record provided directly from Marcum - documented that the only debt carried by Inpellis, after its parent BioChemics in August, 2015 absolved Inpellis of the royalty obligations, and the previous advances to cover Inpellis's expenses, owed BioChemics, was the debt that ACLP secured. Defendants have no credible basis to suggest otherwise. See **Section IVB(2)** below; and,

**Inpellis IPO Incurred Expenses**. There is no basis for Defendants to assert that they were somehow deprived of information regarding the expenses. Defendants were provided the detailed financials and spreadsheets compiled by Inpellis's CFO Manguso as well as the detailed audited financials by Marcum regarding BioChemics and Inpellis that were compiled in preparation for the IPO, as well as the extensive record regarding the services that were performed by various service providers and Inpellis's Tax returns and bank statements for the entire relevant period. In addition, at the beginning of the Discovery period, Defendants were provided the 8-20-21 Report of Plaintiff's Expert William Purcell that detailed the expenses he attributed to the IPO engagement. Defendants, after receiving Purcell's Report and the detailed

financial analysis, informed Plaintiff that they did not wish to depose Purcell on any matter covered by his report. See, **Section IVB(3)** below.

## II.    RELEVANT HISTORY REGARDING DISCOVERY

### A.    Claim At Issue: Defendants Misrepresented ACLP Could Underwrite Inpellis IPO As A Firm Commitment By Concealing ACLP's License Prohibited That Activity Causing Inpellis Expenses & Loss Of The Company

The touchstone for any analysis of the parties' conduct during Discovery, is the claim at issue. Here, the gravamen of Plaintiff's claim is: ACLP as Inpellis's "managing underwriter" and "exclusive financial advisor," fraudulently concealed that it was prohibited by its license from firm commitment underwriting. This was in derogation of the representations in its Engagement Agreement that at the conclusion of the IPO registration process, ACLP intended to enter into an underwriting agreement on a "firm commitment" basis "up to $20 Million." Further, it concealed it was under a FINRA Directive not to engage in unlicensed activity. Defendants' fraud and breach of contract wrongfully caused Inpellis to incur substantial expense related to the rigorous IPO registration process and loss of the company through default on the IPO "Bridge Loan" debt secured by ACLP and the subsequent bankruptcy on the petition of the Bridge lender.[8] Plaintiff's claim covered three distinct periods regarding liability, causation, and damages:[9]

> 1) July 2014-November 10, 2015: Defendants' fraudulent concealment of its unlicensed status before and during the IPO registration process;
>
> 2) November 10, 2015 through April, 2016: post-S-1 filing and SEC Investigation period that culminated in the executed April 14, 2016 Settlement with the SEC; and,
>
> 3) April 2016 through November, 2018: post-Settlement monetization effort conducted under judicial, regulatory, and creditor supervision that ended with entry of Bankruptcy.

---

[8] Plaintiff's 4th Am. Complaint (Doc. #40); 7-8-22 SJ Decision (Doc. #150 p. 1-2).
[9] *Sterman et al* 1-7-22 FRCP R. 26(b)(2)(C) Motion (Doc. #84 p. 8).

### B.    Plaintiff Produced Inpellis's Extensive ESI Record Of The Key Periods & The ESI Record & Documents Kept By The Witnesses It Facilitated

The record documents that Plaintiff and the *Sterman et al* non-party witnesses, [10] unlike Defendants, provided a complete record regarding each material event at issue. This record of good faith compliance is detailed in the numerous filings by Plaintiff and the *Sterman et al* non-party witnesses responding to and attempting to protect themselves from Defendants' unjustified post-discovery requests for compulsory orders and sanctions based on unfounded accusations that Plaintiff and the witnesses had failed to provide requested discovery material to the claims and defenses at issue.[11] As indicated in the filings, the vast bulk of the production was from the "voluminous Inpellis electronic record that contained the company's email accounts and Inpellis documents regarding all three of the key periods."[12] This record shows:

In accordance with the original Case Management Plan (CMPI) (Doc. #38) the Plaintiff began a rolling extensive production from Inpellis records of information material to Plaintiff's claims beginning June 4, 2021 and continuing, and responded August 4, 2021 and continuing to Defendants' detailed production requests with a voluminous production from those records. This production included the email files of Inpellis officers and directors Mooney, McCoy, Staskin, and McGonagle, and their counsel Barrette throughout the relevant period which included the

---

[10] *Sterman et al* witnesses include: the three SRT Trustees, Altshuler, Glosband and Schlichtmann; Inpellis Officers and Directors, McCoy, Staskin, and Manguso; Inpellis Counsel Barrette; BioChemics Chairman and former Inpellis CEO, Sterman; and BioChemics founder Masiz.

[11] Plaintiff's 11-10-21 Letter Response To Court's Inquiry regarding Discovery (Doc. #64, Ex. A 64-1); Plaintiff's 12-10-21 Memorandum In Opposition To Defendant's Motion to Compel (Doc. #79); *Sterman et al* FRCP R. 26(b)(2)(C) Motion to Limit Discovery (Doc. #84, Ex. 1-13 at #85-1-#85-13); and, 1-24-22 Email from *Sterman et al* to Defendants' Counsel re "Additional Evidence In Support Of Non-Party Witnesses'1-7-22 FRCP Rule 26(b)(2)(C) Motion & Request For Relief From Continuing Harassment," served on Defendants January 24, 2022 at **Exhibit 2**.

[12] *Sterman et al* FRCP R. 26(b)(2)(C) Motion to Limit Discovery (Doc. #84) p. 12.

day to day email communications between these officers and directors and others including Masiz, Sterman, Inpellis CFO Manguso, BioChemics/Inpellis administrative assistants, Inpellis's specially retained independent auditor Marcum, Inpellis's public/investor relations firm, and others, as well as the extensive financial and business records generated by Inpellis personnel including the extensive financial and accounting records generated by Inpellis CFO Manguso, all of which was kept by Inpellis as electronically stored information (ESI) – ESI that was preserved when it was copied onto a hard-drive from the Inpellis Server.[13]  Pursuant to the original CMP, on 8-20-21 Plaintiff submitted to Defendants a detailed report of Plaintiff's Expert, William Purcell, that based on the voluminous production made up to that point included a detailed analysis of both Plaintiff's liability claims and damages.[14]

Pursuant to the 8-27-21 Amended Case Management Plain (CMPII) (Doc. #61), Discovery, including all depositions, was to close November 5, 2021.  Pursuant to that Plan, Plaintiff agreed to and did facilitate the scheduling and depositions of the witnesses who were formerly associated with BioChemics or Inpellis including Masiz, Sterman, Manguso, McCoy, Staskin, Altshuler and Glosband and the production of each witnesses' records sought by Defendants' subpoenas [15]  Each witness stood for a deposition and was exhaustively examined by Defendants until the Deposition was terminated by Defendants – day-long depositions, that some, like the deposition of Masiz, extended late into the evening.[16]

---

[13] 1-18-22 "Joint Letter Regarding The Inpellis Server" submitted by Plaintiff's Counsel and the Aquino Bankruptcy Trustee's Counsel (Doc. #90 with Exhibits 1-3, Doc. #90-1 to #90-3) at **Exhibit 1**.
[14] 8-20-21 Purcell Report at **RDII Ex. 35** (Doc. #136-12 p. 100-189).
[15] CMPII p. 7 (Doc. #61).
[16] The deposition of Trustee Altshuler, who was recovering from a Covid infection, was terminated by Defendants before the lunch break because Defendants believed he was showing signs of fatigue.

In addition, Plaintiff agreed to and did facilitate the deposition of McGonagle and the deposition and production of documents of Inpellis's former counsel Thomas Barrette.  Pursuant to that agreement, in September 2021, Plaintiff obtained from Barrette and produced to Defendants Barrette's extensive record that he had kept of Inpellis's corporate records and the extensive documents regarding the services rendered by Barrette and his firm during the relevant period.  In addition, Plaintiff Noticed the Keeper of Records of Barrette's former law firm Holland & Knight for all the records kept by the firm and worked diligently to overcome the administrative challenges and technical problems in obtaining that extensive record, which was eventually produced by Holland & Knight in December, 2021.  Barrette agreed to and was the subject of a two-day deposition, one day by Plaintiff and the following day by Defendants.

In addition to facilitating Glosband's deposition, Plaintiff, at its expense, both facilitated Glosband's exhaustive production of the relevant email communication record he kept on his personal email account and the extensive record kept by his law firm, but also copied and produced the thousands of hard copy records of relevant events kept by Glosband including the over two hundred pages of contemporaneously generated notes Glosband kept of each significant event he was knowledgeable about.  This included a detailed September to November, 2015 record of ACLP's misrepresentations to Inpellis and its decision makers that the unexplained FINRA problem first disclosed on September 10, 2015 was a "minor" issue and "sign-off" was imminent.[17]  As of November 10, 2021, the documentary and email communication production provided by Plaintiff and the facilitated witnesses exceeded "60,000 records numbering in the hundreds of thousands of pages"[18] (what Defendants derisively and inaccurately referred to as a

---

[17] See, Glosband Notes at **RDII Ex. 41** (Doc. #136-18 p. 1-18)); 4-9-22 Plaintiff's Opposition To Defendants' SJ Motion (Doc. 139 p. 34-35).
[18] 11-10-21 Plaintiff's Letter Response To Court's Inquiry (Doc. #64 p. 1).

"document dump" (Doc. #73-1 p. 4))[19] – a detailed ESI and documentary record covering all

three of the relevant periods.[20]

### C.    In Contrast To Plaintiff & The Facilitated Witnesses, Defendants Failed To Provide The Record They Possessed & Had Access To Regarding Their Representations To Inpellis Decision Makers

Although Defendants professed then and now their keen interest in what they termed the

"vital" issue of "what representations Alexander Capital's representatives made to Inpellis about

the potential underwriting of the IPO on either a firm commitment or a best efforts basis,"[21] and

despite being provided: Sterman's 8-12-21 Declaration (Doc. #84-2) detailing what efforts were

made with other investment banks before the July, 2014 Engagement and what was represented

to him by ACLP's Carlin, Mooney, and ACLP counsel Rosen; and, the emails of Barrette and

Masiz regarding the brief period pre-dating the Engagement Agreement,[22] Defendants showed no

interest in questioning Masiz or Sterman at their depositions regarding either the pre-engagement

efforts to find an investment bank or what Masiz or Sterman were told by ACLP (Doc. #84 p.

10-11).  More telling, is the fact that other than producing their counsel's draft registration

statements regarding ACLP acting as "sole" "firm commitment" underwriter and ACLP's boiler

plate "firm commitment" draft that was used by ACLP's then consultant Mooney as the template

for the July 2014 Engagement Agreement proposed to Inpellis,[23] Defendants did not produce any

---

[19] The emails and records were provided as they were generated and kept in the ordinary course.
[20] Emails re the following witnesses produced by the parties (11-10-21) (Doc. #64-1 p. 3):

| Witness | Number | Witness | Number | Witness | Number | Witness | Number |
|---|---|---|---|---|---|---|---|
| Schlichtmann | 9,600 | Masiz | 8,381 | McCoy | 2,563 | Altshuler | 493 |
| Barrette | 9,448 | McGonagle | 5,999 | Staskin | 2,275 | | |
| Glosband | 8,796 | Sterman | 2,908 | Manguso | 2,907 | | |

[21] 11-26-21 Defendants' "Discovery Motion" (Doc. #73-1 p. 14-15); 8-5-22 Defendants' Rule 37(e) Spoliation Motion (Doc. #155 p. 18).
[22] 11-26-21 Defendants' "Discovery Motion" (Doc. #73-1 p. 14-15).
[23] See, 4-9-22 Plaintiff's Opposition to Defendants' SJ Motion (Doc. #139 p. 21).

record of their communications to Inpellis and its decision makers about ACLP's ability to conduct firm commitment underwriting.  In addition, the ACLP owners and the personnel who dealt with Inpellis such as Carlin, who testified he did "not recall" over 142 times in his deposition regarding every key event involving the Inpellis IPO,[24] and ACLP Investment Banking Head Gazdak,[25] professed complete ignorance regarding what was or was not told to Inpellis representatives.  Although Mooney and Clarke were central figures regarding both the liability and causation periods, and Defendants had access to and did communicate with the two witnesses in preparation for their depositions, *unlike all the other witnesses they had subpoenaed, Defendants did not question either witness during their examination regarding the subpoenas, and failed to produce any documents that were the subject of their subpoenas to Mooney and Clarke*.[26]  Most revealing is the fact that, although Mooney testified that after being informed by Carlin "later on in the summer [2015]" that ACLP "do[es]n't have firm commitment capabilities," a statement Mooney testified "I, quite frankly, didn't even know what he meant by that," and Mooney arranged an "important" meeting in New York City with Carlin and Inpellis Chairman Clarke "to understand what was going on" – a meeting Carlin couldn't remember and Clarke testified was "just social" – Defendants *did not produce any records* regarding the meeting or communications about the meeting except a November 19, 2015 email (*nine days after the best efforts S-1 filing*) from Carlin to ACLP's principals Amato and Guidicipietro that a New York City meeting with some "Inpellis Board members" would take place that morning.[27]

---

[24] 4-18-22 Plaintiff's Reply to Defendants' Opposition to Plaintiff's SJ Motion (Doc. #144 p. 16 and 4-18-22 Plaintiff's Response To Defendants' Supp R. 56.1 Statement (Doc. 143-1 p. 22-33).
[25] 9-21-21 Gazdak Dep. (Doc. #126-8 p. 154-155)("I wasn't involved in those conversations and I don't know").
[26] 1-7-21 *Sterman et al* non-party witnesses FRCP R. 26(b)(2)(C) Motion (Doc. #84 p. 9); See, Defendants' subpoenas to non-parties and Mooney and Clarke (Doc. #85-6 and #85-7).
[27] See, 4-9-22 Plaintiff's Opposition To Defendants' SJ Motion (Doc. #139 p. 35-41).

### D.    Post-Discovery, Defendants Attacked Plaintiff's Production & Questioned Plaintiff's Preservation Of ESI Based On Speculation

After Discovery closed, beginning with its November 10, 2021 Letter to the Court (Doc. #63 p. 4) and continuing with its November 26, 2021 "Motion To Compel Discovery" (Doc. #73-1 p. 16), Defendants attacked Plaintiff's production as missing "the email accounts of Messrs. Masiz, Manguso, and Sterman" and questioned whether Plaintiff took "reasonable steps to preserve such vital documents" (Doc. #73-1 p. 16). Defendants based their assertions that the email accounts "exist and have not been produced or they existed and were not retained" on nothing more than speculation and without any specific showing that they were deprived of any particular information material to the claims and defenses at issue except the issue "why Inpellis selected [ACLP] … and what promises or statements were made to Inpellis by [ACLP] prior to the execution of the intial Engagement Agreement" (Doc. #73-1 p. 14).

Plaintiff and the *Sterman et al* non-party witnesses pointed out that, despite Sterman's 8-12-21 Declaration detailing those efforts (Doc. #84-2), Defendants showed no interest in questioning Masiz or Sterman at their depositions regarding the pre-engagement efforts to find an investment bank (Doc. #84 p. 11-12). In addition, Defendants noted in their 11-26-21 Motion, Defendants were provided the email communications of Barrette regarding this brief pre-engagement period (Doc. #73-1 p. 14). Further, Plaintiff affirmed that Masiz "has produced the emails from May, 2014 when control of BioChemics returned to the Masiz family to August, 2014 when the Engagement Agreement with ACLP was entered into in order to provide Defendants with additional information about the efforts that were made to find an investment bank regarding the intended spinoff of BioChemics subsidiary … Inpellis" (Doc. #79 p. 6-7).

Plaintiff also affirmed that that it had "produced all emails in that [hard]drive to or from an Inpellis address and additional emails responsive to the discovery requests from BioChemics'

email addresses that were used for Inpellis business" and "produced all documents on that hard drive that related in any way to Inpellis and this litigation"; "produced 31,736 emails;" and "produced all documents in any way related to Inpellis from the hard drive it received from the Trustee."[28]

### E.    Court's 1-11-22 Conference Resolved "Outstanding Discovery Disputes"

The dispute between the parties regarding Plaintiff's Discovery production culminated in the Court convening a Conference on January 11, 2021 at which Plaintiff and the *Sterman et al* non-party witnesses voluntarily participated along with the Inpellis Trustee's Counsel and a representative of Marcum.  The "conference," in the words of the Court, "was *designed to resolve, in one session, the various discovery disputes previously raised.*"[29]  At the Conference the Court inquired about the Server and whether it still existed and requested that Plaintiff and the Trustee's Counsel provide the Court with a letter reporting on the preservation efforts regarding the contents of the Server.

The letter Report regarding the Server was filed by Plaintiff and the Trustee on January 18, 2022 (Doc. #90 at **Ex. 1**).  The 1-18-22 Report affirmed that "a copy of the information on the server was put on a hard drive;" a copy was given to the Bankruptcy Trustee and the Receiver; "the information mirrored that server;" and that "after the records were downloaded onto a hard drive … after being copied, the server was either discarded or placed in storage …

---

[28] 12-10-21 Plaintiff's Opposition to Defendants' "Discovery Motion" (Doc. #79 p. 10-11).
[29] January 10, 2022 Email from Clerk Werle to the Parties and the non-party witnesses ("The telephonic conference set for January 11, 2022 is *… simply designed to resolve, in one session, the various <u>discovery disputes</u> previously raised*") (emphasis added).  This communication is consistent with the Court's statement to the *Sterman et al* non-party witnesses on January 6, 2022, that the "conference" was, in the words of the Court, "to try to resolve, through a telephone conference of everyone who's relevant, *all the <u>outstanding discovery disputes</u> in this case*" 1-6-22 Transcript of *Aquino* conference p. 2.

along with other property of the Inpellis, Inc. Bankruptcy estate … [and after the] Trustee issued a notice of intent to abandon the … property … no one objected … and the property … was … disposed of … " (Doc. #90 p. 1-2 at **Exhibit 1**).

The Court also inquired of each of the *Sterman et al* witnesses regarding their productions and requested that they file certifications that their productions were complete.  Each of the *Sterman et al* non-party witnesses filed detailed certifications affirming that they complied with their obligations to be examined and give testimony and to produce relevant documents (Doc. #91 and #91-1 to #91-8).  Sterman, Manguso, and Masiz each testified to the document production that was made either by them or by Plaintiff on their behalf from Inpellis's ESI records.  Masiz testified that during the three periods at issue, he used his personal email account and that in addition to the voluminous email communications involving Masiz that was produced by others, Masiz produced thousands of emails from his email account (Doc. #91-5 p. 5).  Sterman and Manguso affirmed that although the Plaintiff's records did not contain a "segregated stand-alone  [email] account, Plaintiff produced the email record that Inpellis had regarding the three relevant periods that was captured by the people Sterman and Manguso communicated with about the relevant events (Doc. #91-1 p. 5-6; and, Doc. #91-2 p. 5-6).  Manguso further testified that Plaintiff produced the "extensive accounting, financial and tax analysis work that [Manguso] performed in conjunction with others regarding the operations of Inpellis and the audits that were performed as part of the IPO process" (Doc. #91-2 p. 5-6).  All three witnesses affirmed that based on their review of the record produced that "I do not believe that there is any event of any significance that I was involved in that is not covered by the email communications and the contemporaneous documents that have been produced" (Doc. #91-1 p. 6; Doc. #91-2 p. 6; and #91-5 p. 6).

At the Conference, the Court re-affirmed the purpose of the conference: "The purpose of this call is to try to quickly and definitively respond to various document requests that have been made by the defendants," and concluded the telephone conference by "thank[ing] everyone, and I'm glad we were able to get this *all resolved* expeditiously."[30]

### F.    Despite Resolution Of The Disputes By The 1-11-22 Conference Defendants Continued Their Attack On Plaintiff's Production & Preservation Of ESI

Despite the Court's 1-11-22 Conference that was "*designed to resolve, in one session, the various discovery disputes previously raised*," Defendants continued unabated their campaign of harassment of Plaintiff and the *Sterman et al* non-party witnesses, as well as the *Aquino* Trustee, with more excessive and duplicative demands for Discovery and threats of punitive action in violation of the Rules.[31]   Although Defendants informed the Court at the 1-11-22 Conference that they could not identify any further requests of Mr. Masiz and his Declaration would be sufficient, Defendants nevertheless immediately followed up the Conference with an inappropriate demand for Mr. Masiz to undertake further discovery.[32]   The demand for Mr. Masiz to respond to further discovery requests was followed by an email on January 21, 2022 to *Sterman et al's* counsel regarding additional demands by Defendants accompanied by threats to seek sanctions.[33]   *Sterman et al's* counsel was informed by Plaintiff's counsel that the January 21, 2022 email from Defendants had been preceded by a telephone conference with the Clerk on

---

[30] 1-11-22 Transcript of *Aquino* Telephone Conference (Doc. #93 p. 2 and 20).

[31] See, 1-25-22 *Sterman et al* non-party witnesses proposed motion served on Defendants 1-24-22 (with attached Exhibits 1-4) at **Exhibit 2** p. 6-7.

[32] 1-13-22 Email to Masiz's counsel with attached letter at Exhibit 1 to Plaintiff's 1-25-22 proposed motion at **Exhibit 2**.

[33] 1-21-22 Email to *Sterman et al's* counsel at Exhibit 2 to Plaintiff's 1-25-22 proposed motion at **Exhibit 2** coupled with discussions with the Clerk, without the presence of *Sterman et al's* counsel, that Defendants intended to "seek an order" against the non-party witnesses "for contempt."

January 20, 2022 at which Defendants discussed with the Clerk their intention to "sue" the non-party witnesses "for contempt." These discussions took place despite the repeated admonition by Plaintiff's counsel that such discussions in the absence of *Sterman et al's* counsel were inappropriate. Defendants' bad faith and dishonest dealings were not confined solely to *Sterman et al*. Despite the Plaintiff's and the Inpellis Trustee's attendance at the January 11, 2022 Conference that was supposed to "resolve" all "discovery disputes," and the fact that Plaintiff and the Trustee, as agreed, provided the Court with a report about the preservation of the information contained on the Inpellis Server and whether the Server was still in existence, Defendants nevertheless, followed the Conference by issuing detailed additional demands for discovery to both the Trustee[34] and the Plaintiff[35] and on January 21, 2022 filed motions to depose the Trustee and contest responses to Defendants' requests for admissions coupled with request for sanctions (Doc. #94, #96 and #97). In particular, the Defendants once again raised the issue of the preservation of the contents of the Server and the production of the Sterman and Manguso emails (Doc. #96 p. 6 and #96-1 p. 5-6).

### G. *Sterman et al* Notified Defendants They Would Redress Continued Abuse

On January 24, 2022 the *Sterman et al* non-party witnesses served on Defendants a copy of the motion they intended to file the next day with a demand that Defendants immediately cease their inappropriate conduct in violation of the Rules and the 1-11-22 Conference.[36] Plaintiff's proposed filing detailed the history of Defendants' Discovery misconduct and

---

[34] 1-13-21 Defendants' email with attachment to counsel for the Inpellis Trustee at Exhibit 3 to Plaintiff's 1-25-22 proposed motion at **Exhibit 2**.

[35] 1-13-21 Defendants' email with attachment to counsel for Plaintiff at Exhibit 4 to Plaintiff's 1-25-22 proposed motion at **Exhibit 2**.

[36] 1-24-22 Email from *Sterman et al* to Defendants' Counsel re "Additional Evidence In Support Of Non-Party Witnesses's 1-7-22 FRCP Rule 26(b)(2)(C) Motion & Request For Relief From Continuing Harassment," served on Defendants January 24, 2022 at **Exhibit 2**.

included a request for an "order prohibiting Defendants from engaging in any further discovery demands or proceedings against *Sterman et al* or, in the alternative … allow the non-party witnesses to intervene in the *Aquino* matter for the purpose of asserting appropriate claims for abuse of process against Defendants and their counsel."[37]

### H.    On 2-4-22 Parties/*Sterman et al* Settled Their "Pending Discovery Disputes"

In response to the *Sterman et al* non-party witnesses intention to bring to the attention of the Court the Defendants' continued abuse of the Rules, the Parties and the *Sterman et al* non-party witnesses entered into settlement discussions to resolve their dispute.  The Settlement involved Plaintiffs providing Defendants additional clarifications about its Production including: a 2-3-22 letter from Plaintiff's Counsel supplementing the 1-18-22 Report to the Court regarding the preservation of the contents of the Server;[38] 2-4-22 "Revised Responses" to "Inpellis's 30(b)(6) Representative";[39] and other undertakings including Responses to Admissions and assisting in obtaining from Inpellis's former counsel Nelson Mullins and Nutter McClennen & Fish, the extensive production Inpellis made to the SEC during the investigation.

The additional clarifications provided by Plaintiff and the *Sterman et al* non-party witnesses included among other things the issues regarding: 1) the preservation of the contents of the server ("This letter is intended to supplement and clarify, not replace, the statements made … in the Joint Letter Regarding the Inpellis, Inc. Server dated 1-18-22 (Dkt. 90) … Files from the server were copied on to the hard drive … and then the server was either disposed of

---

[37] "Additional Evidence In Support Of Non-Party Witnesses'1-7-22 FRCP Rule 26(b)(2)(C) Motion & Request For Relief From Continuing Harassment," served on Defendants January 24, 2022 at **Exhibit 2** p. 11.
[38] 2-3-22 "Letter Regarding The Inpellis, Inc. Server" from Plaintiff's Counsel to Defendants' Counsel at **Exhibit 3**.
[39] 2-4-22 "Revised Responses" to "Inpellis's 30(b)(6) Representative" at **Exhibit 4**.

immediately or put in the Trustee's storage and disposed of after the December 2020 notice of abandonment";[40] 2) Debt taken on by Inpellis ("There were no loans or capital contributions made to Inpellis by any outside financial source … except the seed capital investors obtained by [ACLP]," "The only funds received by Inpellis from July 2014 until it ceased operations in December 2017 were the payments made by BioChemics to cover Inpellis's expenses as detailed in the audits done by Marcum … and by Mr. Manguso done when Marcum's tenure ended in 2016," and "There were no loans or capital contributions made to Inpellis by or through Montserrat Partners";[41] and, 3) Expenses incurred by Inpellis in the IPO process.[42]

Pursuant to the terms of the Settlement, on January 11, 2022 Defendants withdrew their pending discovery motions and filed a "Notice" affirming that: "Counsel for the parties have conferred and *agreed to resolve the pending discovery disputes between the Plaintiff, the Defendants, the Chapter 7 Bankruptcy Trustee, and the non-party witnesses [sic] have been resolved ..."* (See **Exhibit 5** 2-4-22 "Stipulation": "*all pending discovery disputes … have been resolved* …").[43]

I.    **Despite The Parties 2-11-22 Settlement Defendants Re-newed Their Request For Rule 37 Sanctions For Spoliation Which Was Denied With Prejudice**

Immediately after Defendants filed their "Notice" regarding the "resol[ution of] the [parties'] pending discovery disputes," Defendants once again sought leave to file a Rule 37(e)

---

[40] 2-3-22 Letter from Plaintiff's Counsel to Defendants' Counsel re the Server at **Exhibit 3**; 2-4-22 Plaintiff's Revised Responses to Defendants' Questions to Inpellis 30(b)(6) Representative at Response 8 ("Plaintiff … adopts as true, accurate, and complete the report to the Court by the Plaintiff and the Trustee, and their subsequent supplements, regarding the Inpellis server") at **Exhibit 4**.

[41] 2-4-22 Plaintiff's Revised Responses to Defendants' Questions to Inpellis 30(b)(6) Representative at Responses 26, 27, and 28 at **Exhibit 4**.

[42] See Revised Responses 26, 28, 29, 30, 32, and 33 at **Exhibit 4**.

[43] 2-4-22 "Stipulation Regarding Discovery Disputes" at **Exhibit 5**; Compare with Doc. #98 (emphasis added).

Spoliation motion regarding the preservation of the ESI on the Server.  Leave was summarily denied with prejudice because the issue had been "*resolved*" by the parties.[44]  The Court, however, stated that its Order was "without prejudice" to Defendants "raising the issue again to seek an adverse interest or jury instruction."  In light of the Court's finding that the issue repeatedly raised by Defendants regarding "preservation of the data contained in the Inpellis server," "*was resolved*" by the parties' Settlement, any future motion for a Rule 37(e)(2) adverse inference instruction would necessarily have to be based on grounds that had not been previously raised and resolved.

### J.    Defendants Rule 37 Motion Is Based On The Previously Resolved Issues

Despite the Court's 2-14-22 ruling that the issue had been resolved, Defendants on 8-5-22, for the fourth time, brought their Rule 37(e) motion for monetary sanctions and an adverse inference instruction regarding the preservation of Inpellis's ESI on the same grounds previously raised and resolved:

> Defendants seek sanctions *for the loss of electronically stored information ("ESI") which was on the corporate server for Inpellis* … Inpellis's corporate server was lost or destroyed … and with it were lost emails and other documents essential to Defendants' defense of the claims at issue. Because Plaintiff had a duty to preserve documents and ESI relevant to this litigation, was <u>*grossly negligent*</u> *in allowing documents and ESI to be destroyed*, and those documents were relevant to the parties' claims and defenses, Defendants *seek sanctions for Plaintiff's spoliation of evidence, including adverse inference instructions under Rule 37(e)(2), as well as monetary sanctions under Rule 37(e)(1).*

---

[44]    The Court denies Defendants motion for leave to file a motion under Fed. R. Civ. P. 37(e) for spoliation of evidence, *in connection with preservation of the data contained in the Inpellis server*, see ECF 73-1 at 13-16, because *the Court concludes this dispute was resolved by the stipulation recently entered by counsel for the parties*.  See ECF 98 at 1-2.  *This denial is with prejudice* as to leave to file any Rule 37(e) motion seeking dismissal for spoliation of the server, but *it is without prejudice* to Defendants raising the issue again *to seek an adverse interest or jury instruction*

2-14-22 *Aquino* Docket "Minute Entry" (emphasis added).

8-5-22 "Defendants' Motion For Sanctions For Spoliation" (Doc. #154) (emphasis added).

Defendants' motion seeks Rule 37(e)(1) monetary sanctions even though the Court restricted

Defendants to raising a Rule 37(e)(2) adverse inference instruction.  Defendants' motion is also

premised on the demonstrably false re-assertion that they were denied unspecified information

regarding: 1) ACLP's representations; 2) Inpellis debt; and 3) IPO incurred expenses. [45]

Further, Defendants' motion is premised on the facially insufficient assertion that Inpellis ESI

was "lost or destroyed" as a result of  Plaintiff's purported "*gross negligence*" and therefore

does not meet the strict culpability standard imposed by the 2015 Amendments requiring a

specific demonstration of "intent to deprive the use of the information in litigation."[46]

### III.    APPLICABLE RULE 37(e) STANDARDS

**Rule 37(e) Requires: 1) *Specific* Threshold Showing Material ESI Was "*Lost*" & Not Available From Other Sources & 2) An Adverse Inference Sanction Requires A *Specific* Showing Of Intent To Deprive Use Of The Information In The Litigation**

Rule 37(e) was amended in 2015 in order to specifically deal with issues regarding the

production of ESI.  In determining whether a party asserting ESI spoliation is entitled to an

adverse inference instruction, Rule 37(e), by its express terms, requires a rigorous two step

analysis.  First, "The rule applies only when such information is lost" because of a "failure to

take reasonable steps to preserve it" *and* the information is not available from other sources. [47]

This stems from the recognition that "electronically stored information often exists in multiple

locations" and "loss from one source may often be harmless when substitute information can be

found elsewhere."[48]  Second, because an "adverse inference" instruction is considered a "very

---

[45] 8-5-22 Defendants' Rule 37(e) Spoliation Motion (Doc. #155 p. 18).
[46] Rule 37(e)(2) and 2015 Comments (2015 changes "reject[ed]" "gross negligence" standard).
[47] 2015 Comments to Rule 37(e) Amendments.
[48] 2015 Comments to Rule 37(e).

severe measure[],'' there must be a specific demonstration there was an "*intent to deprive another party of the information's use in the litigation*" - a culpability standard <u>*not*</u> met by assertions of *negligence or gross negligence*.[49]  "Adverse inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence [and] [n]egligent or even grossly negligent behavior does not logically support that inference."  FRCP Rule 37(e)(2)[50] and 2015 Comments.[51]

### ESI Information That Is Available From Other Sources Is Not "Lost"

If the ESI information, such as emails, are able to be obtained "from another source" they cannot be considered to have been "lost."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 495–96 (SDNY 2022) citing: *Karsch v. Blink Health Ltd.* WL

---

[49] 2015 Comments to Rule 37(e)(2); *Lokai Holdings LLC v. Twin Tiger USA LLC*, WL 1512055 p. 8 (SDNY 2018) (Rule 37(e)(2) sanctions considered to be "particularly harsh").
[50] Rule 37(e) in its entirety provides:

> **FRCP Rule 37**
> **(e) Failure to Preserve Electronically Stored Information.**
> If electronically stored information that should have been preserved in the anticipation or conduct of litigation *is lost* because *a party failed to take reasonable steps to preserve it*, and *it cannot be restored or replaced through additional discovery*, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) *only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation* may:
>> (A) presume that the lost information was unfavorable to the party;
>> (B) *instruct the jury that it may or must presume the information was unfavorable to the party*; or
>> (C) dismiss the action or enter a default judgment.

FRCP Rule 37(e) (emphasis added).
[51] 2015 Comments to Amendments to Rule 37(e)(2) ("It rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2nd Cir. 2002), that authorize the giving of adverse inference instructions on a finding of *negligence or gross negligence*") (emphasis added); *Ungar v. City of New York*, 329 FRD 8, 12 (EDNY 2018) (cites Comments).

2708125 p. 17 n.21 (SDNY 2019) (Emails sent to or from a custodian are not "permanently lost

or unrecoverable" if they are replaceable through other custodians); *Morgan Art Foundation

Limited v. McKenzie*, WL 5836438 p. 19 (SDNY 2020) (holding that deleted emails obtainable

from other parties and non-parties were not "permanently lost"); *GenOn Mid-Atlantic, LLC v.

Stone & Webster, Inc*., 282 F.R.D. 346, 359 (SDNY 2012) (explaining that spoliation sanctions

are not warranted if "the information was preserved in other locations") (citing *Orbit One

Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 442 (SDNY 2010).

**Must Show With Specificity – Not Speculation – Significant Information "Lost"**

A movant under Rule 37(e) must demonstrate with specificity, not speculation, that

information that was material to the claim at issue was lost.  *In Re Keurig*, *supra* at 497

("speculative assertions as to the existence of documents do not suffice to sustain a motion for

spoliation of evidence") (citing *Dilworth v. Goldberg*, 3 F.Supp. 3d 198, 202 (SDNY 2014)

 (quoting *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 177 (EDNY

2007).  The movant must "set forth, with ... specificity, the materials which would have been

helpful in prosecuting [their] claims."  Id. (citing *Alter v. Rocky Point School Dist.,* WL 4966119

p. 12 (EDNY 2014) ("Relevance cannot be established solely on the basis of conjecture. Nor can

a finding of relevance be grounded solely on the basis that *some* evidence in the custody of key

witnesses no longer exists. Each movant has the burden of articulating what that evidence is with

some degree of factual detail).  "In short, sanctions are not warranted unless there is proof that

some information of significance has actually been lost." Id. (citing *Orbit One Communications,

Inc. v. Numerex Corp.*, 271 F.R.D. 429, 431 (SDNY 2010).  "An adverse inference instruction is

an extreme sanction and should not, be imposed lightly." *In Re Keurig*, *supra* at 498 (citing

*Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (SDNY 2008); and, *Richard Green (Fine*

*Paintings) v. McClendon*, 262 F.R.D. 284, 291 (SDNY 2009) ("[W]ithout some proof that the [spoliating party]'s actions created an unfair evidentiary imbalance, an adverse inference is not appropriate").

### "Intent To Deprive" Requires Showing Intent To Deprive Other Party Of The *Use Of The "Lost" Evidence In The Litigation*

The intent to deprive standard embodied in Rule 37(e)(2) is "stringent and specific," "it contemplates not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *In re Keurig, supra* at 496 (citing *Leidig v. Buzzfeed, Inc.*, WL 6512353 p. 11 (SDNY 2017). "The moving party bears the burden of showing that the spoliating party acted with the intent to deprive, not merely the intent to destroy*." Id.* citing *Doubleline Capital LP v. Odebrecht Finance, Ltd.,* WL 1191527 p. 8 (SDNY 2021)*.* "The moving party must show that the spoliating party had the intent of depriving its adversary in [the] litigation of that evidence." Id. citing *Doubleline*, *supra* p. 8*; and, Johnson v. L'Oreal USA*, WL 5530022 p. 4 (SDNY 2020) (denying request for adverse inference in absence of "evidentiary basis for Plaintiff's allegations that [the defendant] acted with an intent to deprive Plaintiff of relevant ESI in [the] litigation").

### Courts Have Required The Showing Should Be By Clear And Convincing Evidence

Several courts in this Circuit have ruled that the "appropriate standard of proof" regarding the "intent to deprive" under Rule 37(e)(2) is by "clear and convincing evidence." *In Re Keurig, supra* at 496 ("Bad faith and intent to deprive must be shown by clear and convincing evidence" citing *Lokai Holdings LLC v. Twin Tiger USA LLC* WL 1512055 p. 8 (SDNY 2018); *Europe v. Equinox Holdings, Inc.*, WL 832027 p. 4 (SDNY 2022) (requiring clear and convincing evidence of intent to deprive to support award of sanctions under Rule 37(e)(2)); and, *CAT3, LLC v. Black Lineage, Inc.,* 164 F.Supp.3d 488, 499 (SDNY 2016) (same).

## IV.    REASONS WHY DEFENDANTS' MOTION SHOULD BE DENIED

### A.    Defendants Should Not Be Allowed To Re-Contest Assertions Resolved By Court Conference and Order & Settlement By The Parties

Defendants' fourth attempt to contest the preservation of the contents of the Inpellis Server despite the fact that this issue was raised and resolved by the 1-11-22 Court Conference, the 2-11-22 Settlement of the parties; and the Court's 2-14-22 Order is wholly contrary to the intent and purpose of the Rules and the express obligations of every litigant and its counsel to refrain from using the Rules as "tactical weapons in a war of attrition."[52]  As Justice Roberts made clear to bench and bar, the 2015 changes to the Rules were the "the product of … intense study, debate, and drafting to address the most serious impediments to just, speedy, and efficient resolution of civil disputes" that included recognition of the fact that "civil litigation has become too expensive, time-consuming, and contentious, inhibiting effective access to the courts," and that "procedural reforms" were needed that would:

> (1) encourage greater cooperation among counsel; 2) *focus discovery* – the process of obtaining information within the control of the opposing party – *on what is truly necessary to resolve the case*; (3) engage judges in early and active case management; and, (4) address serious new problems associated with vast amounts of electronically stored information.

Roberts, "2015 Year-End Report" p. 5 (emphasis added).  Defendants' re-contesting raised and resolved Discovery issues is in keeping with Defendants' express denial that they were under the Rule 26(b)(1) obligation to limit their discovery requests to that which is "proportional to the needs of the case";[53] and also, their rejection of Justice Roberts admonition that the 2015

---

[52] 1983 Comments to the FRCP Rule 26(b)(1).

[53] 1-10-22 Defendants' Opposition to Sterman et al 1-7-22 FRCP R. 26(b)(2)(C) Motion (Doc. #88 p. 13)(Defendants stated that *Sterman et al* "*They are mistaken*" "Defendants bear the burden of justifying their requests are proportional … to the needs of the case").

amendments to the Rules made it clear that discovery should "focus … on what is truly necessary to resolve the case."[54]

Apparently, Defendants saw Court Conferences to resolve "discovery disputes previously raised" and party settlements to resolve "pending Discovery disputes" as mere contrivances to bind their opponents while they were free to continue to wield the Rules as weapons to harass, distract and delay.  As disturbing is Defendants' blithe refusal to: acknowledge facts in favor of argument based on invective and distortion; comply with Orders; or honor agreements.  It is time for Defendants to deal with the merits based on the record of facts as they happened rather than attempting to foment satellite litigation over assertions regarding things that never were.

### B. Defendants Cannot Make The Threshold Showing That They Were Deprived Of Material Information Intentionally Or Otherwise

Defendants have not and cannot make a threshold showing that they were deprived of any specific information material to the claims and defenses at issue as a result of the fact that the Inpellis Server was discarded after its contents were copied onto the hard-drive, let alone a showing that Plaintiff "intended to deprive" Defendants of the use of such purportedly "lost" information in this litigation.  As detailed in **Section IIB** above, the record demonstrates that Defendants received a wealth of information covering each key area of liability, causation, and damages supplemented by an exhaustive production by the witnesses the Plaintiff facilitated.

---

[54] 1-10-22 Defendants' Opposition to *Sterman et al* 1-7-22 FRCP R. 26(b)(2)(C) Motion (Doc. #88 p. 4)(Defendants' responded to *Sterman et al's* "argu[ment] that Defendants are obligated to limit their Discovery requests to that which is truly necessary to resolve the case" by stating: "*To the contrary*, Rule 26 … authorizes parties to obtain discovery regarding any matter … relevant …") (emphasis added).

The three items proffered by Defendants as information that was "lost" and about which they were "deprived": ACLP's representations; Inpellis debt; and IPO incurred expenses, all concern events that were the subject of a voluminous production both ESI and documentary, and the facilitated availability for examination of every material witness associated with Inpellis and its parent BioChemics:

### 1.    ACLP's Misrepresentations Were Fully Documented By Plaintiff

As detailed in **Section IIB** above, Inpellis produced and facilitated the production of the contemporaneous record of ACLP's communications with Inpellis and its decision makers including the extensive email and documentary record of communications with Masiz, Manguso, and Sterman, the three SRT Trustees, and Inpellis's Counsel Barrette.  This included the contemporaneous detailed notes of Trustee Glosband regarding each significant conference from September 10, 2015 through the public filing of the S-1 on November 10, 2015 regarding what ACLP's Carlin and its Counsel Greenberg Traurig were telling, and not telling, Inpellis's representatives.  This is in stark contrast to the paucity of information provided by Defendants who were in the best position to provide information through documents and testimony of their personnel and, their former consultant Mooney and Inpellis Chairman Clarke who Defendants had access to and prepared for their respective depositions, regarding what information they were providing Inpellis and its representatives about ACLP's firm commitment ability before and during the Engagement Period.  Despite that unique vantage point, Defendants left it to Plaintiff and the witnesses Plaintiff facilitated to provide that record.

**2.      Inpellis Debt Was Fully Accounted For By Independent Audit**

As detailed in **Section IIB and IIH** above, ACLP, as the exclusive financial

advisor, worked with and was provided all the work and information that was used by

Marcum, a premier independent licensed accounting firm, as well as the data

generated by Inpellis's CFO Manguso.  Marcum's "audited financials" detailed all the

financial transactions of BioChemics and Inpellis that documented that debt owed

Inpellis's parent was absolved in August, 2015 and the only debt taken on by Inpellis

was the debt secured by ACLP.

**3.      IPO Incurred Expenses Were Fully Accounted For By Inpellis's Records**

As detailed in **Sections IIB and IIH** above, Defendants were provided both the

expert Report of Purcell detailing the IPO incurred expenses as well as all the

underlying data from which Purcell did his analysis.  This included the expenses

detailed by the Marcum audit and recorded in the Inpellis financials which included

not only all the audited spreadsheets and financials, but the contemporaneous record

of the services provided Inpellis by the professionals, as well as, all the Inpellis Bank

statements and Tax Returns for the relevant period.  The fact that Defendants chose

not to depose Purcell on any aspect of his Report should be all that is needed to

dispense with this issue.

**V.      CONCLUSION**

For these reasons, Defendants' fourth attempt to bring a Rule 37(e) Spoliation

motion on grounds that were raised and resolved should be denied.

Dated: September 12, 2022

Respectfully submitted by:

/s/ William C. Rand
William C. Rand, Esq.
501 Fifth Ave. 15th Floor
New York, N.Y 10017
Tel: 212-286-1425
Email: wcrand@wcrand.com
Attorney for Plaintiff Convergent Distributors of Texas, LLC