UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN J. AQUINO,
Chapter 7 Trustee,
by his assignee, CONVERGENT                 21-cv-1355 (JSR)
DISTRIBUTORS OF TEXAS, LLC,

     Plaintiff-Counter-Defendant,              <u>MEMORANDUM ORDER</u>

     -v-

ALEXANDER CAPITAL, LP, and its
Managing Partners:
JOSEPH AMATO,
ROCCO GUIDICIPIETRO, and
NESA MANAGEMENT, LLC,

     Defendants-Counter-Claimants.

JED S. RAKOFF, U.S.D.J.:

    This is a civil fraud case concerning the failed 2015 initial public offering ("IPO") of a now-bankrupt development-stage pharmaceutical company called Inpellis. The bankruptcy trustee assigned the claims at issue in this case to plaintiff Convergent Distributors, who has alleged breach of contract and various fraud and fraudulent inducement claims against defendant Alexander Capital LP and various of its partners in connection with their work on Inpellis' failed IPO. This Court previously denied in part and granted in part both parties' motions for summary judgment. See Opinion and Order dated 7/8/22 ("SJ Opinion"), Dkt. 150.[1] Trial as to the remaining

---

[1] The facts underlying this case, including as relevant to the instant motions, are laid out exhaustively in the Court's summary judgment opinion. See SJ Opinion at 6-25. All capitalized terms here used refer to the definitions set forth in that Opinion, unless otherwise specified. Also, all internal quotation marks,

claims is set to commence on June 26, 2023. Plaintiff has since moved for the Court to reconsider several aspects of its summary judgment opinion (Dkt. 150), and defendants have moved for an adverse inference instruction based on plaintiff's alleged spoilation of evidence and to strike plaintiff's jury demand.

For the reasons that follow, the Court denies plaintiff's motion for reconsideration in its entirety. It likewise denies defendants' motion for an adverse inference instruction, although this denial is without prejudice to defendants' requesting other appropriate relief under Fed. R. Civ. P 37(e)(1) in their motions in limine or at trial. Finally, the Court grants defendants' motion to strike plaintiff's jury demand, such that the June 26 trial will proceed as a bench trial.

The Court takes each motion in turn:

## I.   **Plaintiffs' Motion for Reconsideration**

"The standard for granting a motion for reconsideration is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Great Am. Ins. Co. v. Zelik, 439 F. Supp. 3d 284, 286 (S.D.N.Y. 2020) (citing Shrader v. CSX Transp. Inc., 70 F.3d 255, 257 (2nd Cir. 1995)). "This strict standard is intended to ensure the finality of decisions and to prevent the

alterations, omissions, emphases, and citations have been omitted from all cited sources.

practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." Id. A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012).

## A. Plaintiffs' request to assert "loss of business" damages

The Court easily dispenses with plaintiff's first argument: that, putting aside the merits of this Court's determination that the failure of Inpellis's IPO was caused, not by ACLP, but by the SEC's stop order, by the subsequent investigation, and by the settlement that gave the SEC a security interest in Inpellis's IP assets, SJ Opinion at 43-45,[2] plaintiff should nonetheless be entitled to obtain up to $75 million "lost business" damages based on the diminution of Inpellis's expected value from when it first considered an IPO to when it was forced into involuntary bankruptcy. Pl. Mem. at 5-15. Plaintiff's core argument on this score is that a trier of fact could reasonably find that Inpellis's loan default, bankruptcy, and loss of previously expected future profits were not caused by Inpellis's failed IPO and the associated SEC investigation and settlement but rather by its failure to make good on the bridge loan ACLP allegedly induced Inpellis into

---

[2] Plaintiff also asks the Court to reconsider this determination, a point addressed in section I.B, infra.

incurring and one of its lender's subsequently filing a petition for Inpellis's involuntary bankruptcy. Id. at 14-15.

There are at least three independent problems with this argument, any of which is individually sufficient to deny reconsideration. First, in making the argument, plaintiff identifies no controlling case law or facts in the record that this Court overlooked in its prior Opinion. In fact, that Opinion exhaustively catalogued the facts regarding the genesis of the bridge loan, Inpellis's failed IPO, and its ultimate bankruptcy, SJ Opinion at 6-25, applied the same legal standards regarding proximate causation and intervening causes that plaintiff now recites, and reached the conclusion that there was no genuine dispute of fact that Inpellis's failed IPO and subsequent business failure were caused not by any conduct alleged against ACLP, but rather by the SEC stop order, subsequent investigation, and settlement, id. at 39-45. Plaintiff's argument for reconsideration on this score reads almost identically to what might have been included in its summary judgment briefing, rather than as a genuine basis for reconsideration.

This leads to the second problem with plaintiff's argument for reconsideration of the Court's proximate causation holding, which also is a sufficient basis for denying it. Plaintiff did not in fact make the argument it now makes at the summary judgment stage. Defendants devoted substantial portions of their briefing both in support of their own summary judgment motion and in opposition to plaintiff's to the proximate causation argument that this Court ultimately accepted in part. See Def's Mem. Supp. Mot. SJ at 36-39, Dkt. 102 (stating, for

instance, that "there is simply no evidence that Alexander's switch to best efforts in the S-1 subjected Inpellis to the regulatory risk of a shutdown of its IPO or that it subjected Inpellis to the Chapter 7 bankruptcy initiated by Inpellis's lenders" and that "Alexander is [therefore] entitled to summary judgment on all counts of the Fourth Amended Complaint, as Plaintiff cannot prove Alexander proximately caused the alleged harm to Inpellis"); Defs. Mem. Opp Pls. Mot. SJ at 37-40 (similar), Dkt. 130. And yet plaintiff made no responsive proximate causation argument, whether in its brief in opposition to defendants' motion or in its reply in support of its own. See generally Pls. Reply Supp. SJ Mot., Dkt. 144; Pl. Mem. Opp. Defs' Mot. SJ, Dkt. 139. Allowing parties to seek reconsideration based on arguments they chose not to make in the first instance would render the Court's initial consideration of parties' arguments merely advisory. That is not the purpose of motions for reconsideration.

Finally, plaintiff's argument for reconsideration fails on the merits. As detailed in both this Court's Summary Judgment Opinion (at 40-41) and plaintiff's memorandum in support of its motion for reconsideration (at 8-9), there is no proximate causation where a plaintiff's injury is not directly caused by the defendant's conduct but rather by some intervening event not traceable to or flowing foreseeably from that conduct. See, e.g., Hain v. Jamison, 28 NY 3d 524, 529-530 (Ct. App. NY 2016). And, as described in the Court's Summary Judgment opinion, "[i]t is undisputed that that the IPO failed because the SEC instituted a stop order and then started an

investigation into material misstatements and omissions in the S-1 and that Inpellis's efforts to resuscitate the IPO were ultimately abandoned as a condition of the global settlement reached among the SEC, BioChemics, the SRT, and Inpellis." SJ Opinion at 43.

Plaintiff vaguely speculates that even if the failure of Inpellis's IPO owed not to any action by ACLP but rather was due to the SEC's stop order, investigation, and subsequent settlement -- a settlement that, plaintiff concedes, "precluded Inpellis from raising funds in the public markets and granted the SEC a lien on Inpellis's intellectual property," Pl. Mem. At 10 -- Inpellis could perhaps have obtained private financing or "s[old], license[d], or otherwise monetize[d] or commercialize[d] Inpellis's valuable intellectual property." Id. at 9-10. But plaintiff cites absolutely no evidence that any such alternative financing or licensing options were in fact available. The SEC settlement that plaintiff acknowledges prevented Inpellis from going public also gave the SEC a secured interest in Inpellis's sole substantial asset -- its IP -- which now collateralized Biochemics' and SRT's substantial debt to the SEC. Summary Judgment Opinion at 44-45; Pl. Amended Response to Defs. Rule 56.1 Statement ("Pl. Rule 56.1 Response") ¶¶ 831-37, Dkt. 147-1. And while plaintiff highlights that "the SEC did not use its security interest to place Inpellis into involuntary Bankruptcy" and "that [instead] was the result of the Bridge Loan lender's petition," Pl. Mem. at 11, the bankruptcy petition filed by the bridge loan lender makes it abundantly clear that the reason Inpellis became bankrupt was because the SEC

settlement made Inpellis largely worthless to other potential investors. <u>See</u> Involuntary Petition Against Inpellis at 4-8, Dkt. 125-9 (explaining that the SEC's security interest in Inpellis rendered the company insolvent). Further, Inpellis ultimately determined not to contest the involuntary bankruptcy petition, and, in its motion explaining that decision, it represented that the reason it was not contesting its insolvency is because the SEC had acted to take over the IP in which it had acquired a security interest following BioChemics' default on its obligations to the SEC. <u>See</u> Inpellis Mot. to Convert Involuntary Petition to Voluntary Petition ¶¶ 2-10, <u>In re Inpellis</u>, No. 18-bk-12844 (10/15/18) (explaining that Inpellis's sole assets consist of its intellectual property, that the SEC obtained a security interest in that property to back up BioChemics' $17.2 million dollar settlement with the SEC, and that, after BioChemics defaulted on its obligations, the SEC successfully petitioned a district court to take control of the Inpellis IP in which the SEC had a security interest); <u>id.</u> ¶ 10 ("Accordingly, Inpellis no longer wishes to contest whether it should be in bankruptcy . . . ."). <u>See also</u> Order Granting Bankruptcy Petition, <u>In re Inpellis</u>, No. 18-bk-12844, Dkt. 35 (11/1/18).

### B. **Plaintiff's other proximate causation arguments do not merit reconsideration**

Plaintiff next asks the Court to reconsider its determination that the SEC's shut-down of Inpellis's IPO related to "whether the S-1 sufficiently disclosed the relationships and history among Inpellis,

BioChemics, Masiz, the SRT, and the IP purchase" -- omissions "made
by Inpellis in reliance on Barrette, its counsel" and "not by ACLP."
Summary Judgment Order at 21, 43; see Pl. Mem. at 15-18. Plaintiff
concedes that it previously admitted that Inpellis's omissions were
"made by Inpellis in reliance on its counsel. . . ." Pl. Rule 56.1
Response ¶ 787. But plaintiff contends that this admission was an
"obvious mistake" contradicted by plaintiff's other responses to
defendants' Rule 56.1 statement and the underlying record evidence.
Pls. Mem. 16-17. Like plaintiff's "lost business" argument, this
argument for reconsideration fails for several reasons.

     For one thing, as discussed above, plaintiff entirely failed to
address defendants' proximate causation arguments in either its
opposition to defendants' motion or its reply in support of its own,
notwithstanding defendants' extended discussion of these issues in its
affirmative and opposing briefing. Plaintiff cannot cure that failure
now by making arguments that should have been raised then.

     Second, the Court sees no reason to disregard plaintiff's
admission that Inpellis's omissions were made in reliance on its
counsel. Plaintiffs contend this was an "obvious" error in light of
the record evidence, but it is not the Court's responsibility to "hunt
through voluminous records without guidance from the parties." Holtz
v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001). Plaintiff is
bound by its admission.

     Third, even assuming plaintiff had not waived its proximate
causation arguments twice over as discussed above, the evidence it now

cites to undermine its own admission simply does not suffice to create a triable issue of material fact as to any aspect of the Court's previous proximate causation ruling. For instance, plaintiff cites deposition testimony from Inpellis's former lawyer Barrette in which Barrette claims that while he would have preferred to make a fuller disclosure of potential claims by Inpellis's owners and affiliates on its intellectual property, he "understood from [Inpellis CEO] Doctor Mooney, who had heard it from [ACLP employee] Mr. Carlin . . . that Mr. Carlin was concerned that the detailed disclosure [about Inpellis's IP and relationship with its owners and affiliates] might make the [IPO] deal difficult to sell. . . ." 11/1/21 Barette Dep. 169:10-17, Dkt. 136-35.

The Court doubts that this extremely vague suggestion embedded in two layers of hearsay would suffice to create a triable issue of fact as to whether ACLP encouraged Inpellis to make the omissions in its S-1 statement that ultimately led the SEC to shut down Inpellis's IPO. But even assuming it did, plaintiff's claim against ACLP has never been that ACLP encouraged Inpellis to make fraudulent misrepresentations or omissions in its S-1 statement; rather, plaintiff's claim has always been that ACLP fraudulently induced (and breached contractual and other duties to) Inpellis based on its representations about its ability to conduct a firm commitment IPO, or other facts about the expected IPO.[3] As such, the Court declines to

---

[3] It is true, as plaintiff points out, that in the portion of its Summary Judgment Opinion recounting the facts the Court

reconsider its determination that the failure of Inepllis's IPO was not proximately caused by defendants.

Plaintiff makes one final argument in favor of reconsideration of this Court's summary judgment ruling with respect to proximate causation and damages: that the "Court clearly erred in finding that Plaintiff did not 'meaningfully dispute' . . . that Inpellis's participation in the 'Global Settlement' was 'primarily for the benefit of' Inpellis's parent BioChemics and its owner the SRT." Pl. Mem. 18. In fact, plaintiff contends, Inpellis derived substantial benefit from its agreement with the SEC because the agreement -- which required Inpellis to withdraw its S-1 statement, stop seeking funds from public markets, and grant the SEC a security interest in its IP -- "allowed the SEC *securities fraud investigation* that exposed Inpellis and its officers and directors to substantial liability, to be closed *without a finding*" of liability. Id. at 18-19 (emphasis in original); see also Pl. Reply at 7-9.

---

understood to be undisputed, it stated that "the plaintiff admits that the decisions on the scope of these disclosures were made by Inpellis in reliance on [Inpellis's legal counsel] Barrette, *not by ACLP*." SJ Opinion at 21 (emphasis added). But that brief aside "not by ACLP" was not crucial to the Court's analysis and indeed did not come up in the portion of the opinion substantively discussing proximate causation. Id. at 39-45. The point is that Inpellis's failed IPO was caused by its failure to disclose information about its relationship to BioChemics, Masiz, and the SRT, the liabilities of those persons and entities, and their reliance on Inpellis to satisfy those liabilities -- facts that are totally independent of ACLP. Plaintiff has offered no explanation for how ACLP's statements with respect to what Inpellis included in its S-1 could support any of its causes of action.

Notwithstanding the several pages plaintiff devotes to this argument in both its initial and reply papers, the Court fails to understand its relevance. Assuming plaintiff is correct that there is some dispute of fact as to whether the settlement reached with the SEC conferred a benefit to Inpellis and not just to Inpellis's parent BioChemics and its owner the SRT,[4] there is no reason why that dispute would unsettle the Court's conclusion that the failure of Ineplis's IPO and its subsequent losses were not proximately caused by any fraud or breach by ACLP, but were instead the result of the SEC settlement. See SJ Opinion at 39-45. Indeed, in arguing that Inpellis received a substantial benefit from assenting to the SEC settlement without any finding of liability, plaintiff emphasizes just how desperate Inpellis's situation became as a result of the SEC's investigation into misstatements or omissions in its S-1 statement, noting a letter from Inpellis's then general counsel stating that a Stop Order requiring it to withdraw its S-1 statement (as ultimately happened) "would be a death knell for the company as it would not be able to raise money on the public market with the taint associated with a Stop Order." 2/3/16 Letter from Jonathan Kottlier, Dkt. 153-2; Pl. Mem. 19;

---

[4] The Court is far from convinced that there can be any genuine dispute of fact over this. It is essentially undisputed that the SEC settlement benefitted SRT, that, in order to consummate it, SRT pushed out Inpellis's board and CEO, and that the settlement resulted in Inpellis's losing all ability to raise funds on public markets and SEC's taking a security interest in Inpellis's only real asset (its IP) in order to collateralize Biochemics and the SRT's obligations. SJ Opinion at 24-25, 44-45.

<u>see also</u> Pl. Reply at 8 ("One does not need to go any further than Kottlier's February 3, 2016 letter to Levinson the head of the SEC's Boston Office to understand the perilous dilemma confronting Inpellis, and its underwriter."). In other words, whether Inpellis itself received a benefit from its ultimate SEC settlement or whether any benefit accrued entirely to Inpellis's parent and its owner, what is abundantly clear is that the SEC investigation and settlement – and not ACLP's inability to underwrite an IPO on a firm commitment basis or any other alleged fraud or breach by ACLP -- caused the failure of Inpellis's IPO and subsequent descent into bankruptcy.

For these reasons, the Court declines to reconsider any aspect of its holding at the Summary Judgment stage that plaintiff cannot seek damages based on the failure of Inpellis's IPO because any such damages were not proximately caused by ACLP's alleged torts or breaches. SJ Opinion at 39-45.

**C. The Court's fraudulent inducement holding with respect to the Second Engagement Agreement**

Notwithstanding the Court's proximate causation holding, the Court nonetheless allowed plaintiff's fraudulent inducement claim to proceed with respect to other possible damages and in fact granted summary judgment in plaintiff's favor as to the issue of whether the First Engagement Agreement between Inpellis and ACLP was materially misleading because it implied that ACLP "was capable of and authorized to undertake the transaction [a firm commitment IPO] for which it was hired." SJ Opinion at 46. However, the Court also granted summary

judgment in defendant's favor as to the issue of whether Inpellis was
fraudulently induced to enter the Second Engagement Agreement because
it is undisputed that by the time Inpellis entered that agreement,
"Inpellis was then on notice that ACLP had a regulatory issue that
prohibited it from conducting the transaction contemplated to proceed
with respect to in the Second Engagement Agreement." SJ Opinion at 48-
49.

Plaintiff asks the Court to reconsider that conclusion, arguing
both that the Court "misapprehended: 1) the material difference between
ACLP's partial disclosure that there was an unexplained FINRA problem
that was misrepresented as a temporary 'minor' issue and FINRA 'sign-
off" was imminent and the truth that ACLP had been concealing about
its engagement in illegal unlicensed activity; and, 2) that a victim
of misrepresentation by a party with superior knowledge who has sole
access to the 'critical information' 'obviates' a 'duty to investigate'
by the victim and imposes a duty of full disclosure on the superior
knowledge party." Pl. Mem. at 25.

Once again, it would suffice to deny plaintiff's motion to note
that plaintiff largely failed to offer either of these arguments in
its papers in support of its own summary judgment motion or in
opposition to defendants'. Even putting aside that waiver, plaintiff's
two arguments also fail on the merits. Plaintiff's first argument --
that there is a "material difference" between whatever notice it may
have received prior to the second engagement of ACLP's FINRA issue and
the full extent of ACLP's licensing issues that plaintiff alleges ACLP

concealed -- is simply asserted without record citation or any analysis. This Court acknowledged that "[t]he parties dispute whether ACLP sufficiently disclosed the extent of [its FINRA licensing] problem and whether the firm tried to minimize its regulatory problems," but nonetheless noted that the undisputed record -- including "contemporaneous notes taken by participants in [Inpellis's 9/10/15 board] meeting, confirm that the Board was told that ACLP's FINRA issue prevented it from underwriting firm commitment IPOs." SJ Opinion at 49 n.14. Further, at that meeting, Inpellis's board actively "discussed the option of switching to a best efforts IPO if ACLP was unable to resolve the issue and obtain FINRA's authorization to do a firm commitment IPO." Id. at 16-17. While plaintiff insists that Inpellis was not on notice by that board meeting of the full extent of ACLP's FINRA licensing issues, plaintiff does not and cannot dispute the point this Court found critical: that Inpellis was plainly on notice by the date of the Second Engagement Agreement that ACLP could not at that point in time conduct a firm commitment IPO, meaning that there is no way the language in the Second Engagement Agreement suggesting that ACLP could conduct such an IPO fraudulently induced Inpellis to enter into it. SJ Opinion at 48-49.

Plaintiff also argues that this Court applied the wrong legal standard, because it supposedly relied on "the inapposite line of cases that imposed a duty to investigate in circumstances involving 'sophisticated businessmen' . . . [and alleged misrepresentations] 'that are _not peculiarly within the other party's knowledge and both_

*have available the means of ascertaining the truth*.'" Pl. Mem. 21 (emphasis in original)(quoting <u>Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.</u>, 500 F 3d 171, 181 (2nd Cir. 2007)). Because ACLP obviously had much more ability to know its own licensing issues than Inpellis, plaintiff argues that Inpellis had no duty to further investigate ACLP's supposedly incomplete disclosures.

Putting aside plaintiff's failure to make this argument earlier, as well as the question of the correctness of plaintiff's interpretation of New York law, plaintiff's argument fails for a very simple reason that this Court did not hold that Inpellis failed to investigate ACLP's partial disclosures. Instead, as just discussed, the Court held that the critical material fact on which plaintiff claims Inpellis relied -- ACLP's inability to conduct a firm commitment IPO, which the text of the Second Engagement Agreement arguably obscured -- was in fact disclosed to and known by Inpellis. SJ Opinion at 47 n.13, 48-49. Because Inpellis <u>knew</u> as of the 9/10/15 board meeting that regulatory issues prevented ACLP at that time from conducting a firm commitment IPO and Inpellis's board was in fact already discussing the possibility of proceeding with a "best efforts" IPO, Inpellis could not possibly have relied on language in the Second Engagement Agreement at the time it was signed implying that ACLP <u>could</u> conduct a "firm commitment" IPO at that time without further regulatory changes. <u>Id.</u> As such, this is not a case involving the duty to investigate with respect to partial disclosures or half-known facts; rather, whatever additional facts plaintiff contends defendants should

15

have disclosed, the relevant fact that ACLP could not at the time of the Second Engagement Agreement conduct a firm commitment IPO was known, and so any alleged representation to the contrary was plainly not relied on. Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997).

**D. Whether an issue of fact exists as to scienter**

With respect to the *first* engagement agreement -- which the Court held was materially misleading as a matter of law in that it implied ACLP had the ability without further regulatory changes to conduct a firm commitment IPO -- plaintiff finally asks the Court to reconsider its determination that "there is a genuine dispute that prevents the plaintiff from prevailing on the scienter element" because it was unclear whether defendants knew ACLP lacked the capability to conduct a firm commitment IPO and included contrary statements in the First Engagement agreement with the intent to defraud Inpellis. SJ Opinion at 47-48. In this regard, plaintiff recites evidence tending to show that two ACLP managing principals knew that ACLP was not licensed to conduct a firm commitment IPO and failed to take steps to inform other ACLP personnel responsible for interfacing with Inpellis. Pl. Mem. 23-25. The Court certainly agrees that this and other evidence could allow a reasonable fact finder to determine both that ACLP and other defendants were in fact aware that ACLP lacked the ability to conduct a "firm commitment" IPO and that they nonetheless intended to induce Inpellis into believing ACLP could conduct such an IPO. But plaintiffs cite nothing demonstrating that a reasonable factfinder could not

16

determine that there was no intention to defraud, given the evidence that many ACLP employees, including those interacting directly with Inpellis, may not have known ACLP was barred from conducting a firm commitment IPO. SJ Opinion at 48.

Indeed, it appears at times from plaintiff's motion for reconsideration that plaintiff understood this Court's denial of summary judgment <u>in plaintiff's favor</u> as to the issue of scienter amounted to a finding in favor of defendants on that issue. <u>See</u> Pl. Mem. 23 (referring to the Court's supposed "finding of no 'intent to defraud'"); <u>id.</u> 25 ("Such damning evidence of Defendants' persistent and knowing engagement in unlawful conduct is more than sufficient evidence to satisfy the scienter element of Plaintiff's fraud claim that Defendants misrepresented ACLP's firm commitment ability with fraudulent intent and hold the principals directly liable."). Indeed, while defendants suggest in their opposition that plaintiff may have so misunderstood this Court's summary judgment order, Defs. Opp. at 23-25, plaintiff does not respond to that suggestion in its reply, Pl. Reply at 10. To be clear (although the Court's prior opinion was already amply clear on this point), while a dispute of material fact exists as to whether scienter exists, plaintiff may of course seek to prove defendants' fraudulent intent at trial.

For the foregoing reasons, plaintiff's motion for reconsideration of the Court's Summary Judgment Opinion and Order is denied in its entirety.

## II.   **<u>Defendants' Motion for Spoilation Sanctions</u>**

Defendants move for an adverse inference instruction under Fed. R. Civ. P 37(e)(2) based on plaintiff's failure to preserve Inpellis's server and the electronic records contained on it after first suing defendants. See Defs. Mem Supp. Spoilation Mot. ("Defs. Spoilation Mem."), Dkt. 155. The Court agrees with defendants that plaintiff failed to take even basic steps to preserve the server, which almost certainly contained relevant evidence the destruction of which may well have prejudiced defendants. As such, defendants may well be entitled to appropriate relief under Rule 37(e)(1), and the Court will consider any such requests before and at trial in resolving motions in limine or otherwise making evidentiary decisions and in terms of jury instructions. However, because Rule 37(e)(2) as amended in 2015 limits courts' power to issue adverse inference instructions based on a party's failure to preserve electronically stored information to situations where a court finds "that the party acted with the intent to deprive another party of the information's use in the litigation," and defendants have at most shown that plaintiff was grossly negligent, the Court denies defendants' motion for an adverse inference instruction.[5]

---

[5] The Court also denies as premature defendants' request that the Court award fees and costs associated with defendants' having to seek information that would have been contained on the Inpellis server from alternate sources, given the Court's previous statement that "all . . . costs and fees issues" would be decided "at the end of the case." 12/21/21 Order at 3, Dkt. 82. Also, in light of the parties' extremely brief treatment of the subject in their papers, the Court denies at the present juncture defendant's request to

Some background is required. No one disputes that Inpellis'
computer server became the property of Bankruptcy Trustee John Aquino
as part of Inpellis' bankruptcy proceedings. See Joint Letter dated
1/18/22 ("1/18/22 Letter") at 1, Dkt. 90. Neither the trustee nor
plaintiff (to whom the trustee assigned the claims at issue in this
case) ever accessed or reviewed that server, notwithstanding the
obvious likelihood it might contain information relevant to the
bankruptcy process, including to any of several anticipated adversary
proceedings. See Letter from William Rand dated 2/3/22 ("Rand Letter")
at 1, Dkt. 155-3. What is unclear from the parties' briefs is the
extent to which the bankruptcy trustee -- notwithstanding his clear
legal ownership of the Inpellis trustee -- ever had any actual,
physical control or access to the Inpellis server at this point in
time. Defendants contend that "Plaintiff permitted [former BioChemics
CEO] John Masiz to access the Inpellis Server and to copy a subset of
the documents contained on the Inpellis server onto a hard drive (the
'Hard Drive') in response to a subpoena issued . . . in August of 2019
in connection with the bankruptcy proceeding," Defs. Spoilation Mem.
at 6, but it is not clear whether by this defendants mean that Masiz
continued to have physical control over Inpellis's server after its

---

exclude certain damages calculations of plaintiff's expert on the
basis that insufficient supporting data was produced in discovery
and would likely have been contained on the Inpellis server, without
prejudice to defendants' making a motion in limine or otherwise
seeking to challenge the admission of specific evidence plaintiff
seeks to proffer at trial.

bankruptcy notwithstanding the Trustee's ownership of it, or that the Trustee actually turned it over to Masiz. A letter from plaintiff's counsel represents that neither plaintiff nor the trustee "ever accessed the server" or, at the present moment, "have possession of the server," although it does not explain whether the Trustee did in fact have possession over it following Inpellis's bankruptcy before Masiz copied some subset of it in response to a subpoena. Rand Letter at 2.

What is clear is that while many files were copied from Inpellis' server and placed onto a hard drive, the decisions over what to copy where made by Masiz (whose own liability to the SEC and efforts to make good on his settlement is what ultimately led to the settlement giving the SEC a security interest in Inpellis's property and leading to its failure, SJ Opinion at 8, 39-45), supposedly based on the assessments of his lawyer Jan Schlichtmann (whom this Court earlier disqualified in this litigation) of what was responsive to the BioPhysics subpoena. See Masiz Dep. 268:1-269:1, 270:21-71:1, Dkt. 155-6. That hard drive copy was ultimately turned over to the bankruptcy trustee and its assignee, the plaintiff in this litigation, who has made productions from it. Rand Letter at 3. The underlying server was then either somehow disposed of by Masiz or placed into a storage unit controlled by the bankruptcy trustee. Rand Letter at 2. The Trustee -- apparently without any firm knowledge as to whether the storage unit contained Inpellis' former server or not -- ultimately abandoned the storage unit after representing to the bankruptcy court

that the unit only contained "miscellaneous outdated records not necessary to the administration of the case, and used office and laboratory furniture and equipment, including a small number of chairs, desks, and obsolete computers and monitors." Joint Letter at 4.

What this history makes clear is that the Trustee,[6] including after it filed a notice with the Bankruptcy Court indicating its intent to bring a potential claim against Alexander Capital, Dkt. 60-1, made zero effort to access, copy, preserve, or otherwise review Inpellis's computer server, notwithstanding the obvious likelihood that the debtor's server would contain material highly relevant to claims the Trustee was contemplating as early as December 2018, including against one or more of the current defendants. Instead, the Trustee entirely abdicated that duty and contented itself with incomplete copies of the server made by a third party, Masiz, whose underlying conduct had already led to significant liability to the SEC and contributed significantly to Inpellis' bankruptcy in the first place. As defendants point out, Inpellis's server -- which also contained "data from [Inpellis parent] Biochemics," 1/18/22 Letter at 1 -- would likely have contained the email accounts of Masiz, sometimes Inpellis and

---

[6] The plaintiff in this case is, of course, an assignee of the Trustee. Neither party has made any argument as to whether the Trustee's assignment of the claims at issue in this case affect the spoliation analysis, and the Court concludes that it does not, based on the general principle that "that an assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment. . . ." Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 55 (2d Cir. 2011).

sometimes BioChemics CEO Marshall Sterman, and sometimes Inpellis and sometimes BioChemics CFO Frank Manguso, Pl. Mem. 6; Rand Letter at 3, not to mention Inpellis's financial records and scores of other potentially relevant records -- many of which were not included in any production plaintiff ultimately made based on the incomplete hard drive.

Plaintiff disputes essentially none of this history, instead devoting most of its opposition brief to an entirely irrelevant discussion of plaintiff's supposedly otherwise extensive production and defendants' supposedly improper discovery behavior with respect to other aspects of the litigation.[7] See Pl. Mem. Opp. Spoilation Mot. ("Pl. Spoilation Opp.") at 4-18, Dkt. 158. Based on this history, the Court easily concludes that the Trustee "failed to take reasonable steps to preserve" apparently irreplaceable electronically stored information, the destruction of which has likely prejudiced defendants. Fed. R. Civ. P. 37(e).

The finding that plaintiff is responsible for spoilation does not, however, decide which measures are needed to cure any resulting

---

[7] Plaintiff also makes the nonsensical argument that defendants' motion is procedurally improper because defendants have previously raised arguments involving the server and requested discovery sanctions and entered into various stipulations meant to resolve remaining discovery disputes. Pl. Spoilation Opp. at 17-18. But the upshot of all those disputes was the Court's 2/14/22 denial of defendants' spoilation motion "with prejudice as to leave to file any Rule 37(e) motion seeking dismissal [of the case] for spoilation of the server, but . . . *without prejudice to Defendants raising the issue again to seek an adverse interest or jury instruction*." See 2/14/22 Minute Entry (emphasis added).

prejudice. Courts are empowered under Fed. R. Civ. P. 37(e)(1) to, upon a finding of prejudice, "order measures no greater than necessary to cure the prejudice." The Advisory Committee's notes to the 2015 amendment which created the present version of Rule 37(e) list as examples of the sort of measures courts should consider under Rule 37(e)(1) "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than" adverse inference instructions which are instead governed by Rule 37(e)(2). See Fed. R. Civ. P. 37, advisory committee's notes to the 2015 amendment. The Court is open to considering these or other appropriate manners of relief as the case progresses toward trial, including in deciding motions in limine or otherwise determining what evidence to allow at trial.

However, what defendants primarily request is an adverse inference instruction, which is governed by Rule 37(e)(2). That rule explicitly limits a court's power to issue adverse inference instructions based on the failure to preserve electronically stored information to situations where the Court finds "that the party acted with the intent to deprive another party of the information's use in the litigation. . . ." Fed. R. Civ. P. 37(e)(2).

While defendants at times seem to suggest the Trustee may have so intended, they primarily argue that the Trustee's behavior was grossly negligent. Defs. Spoliation Mem. at 3, 10-15; Defs. Spoliation

Reply at 9. And the record does not support any inference that the Trustee or plaintiff intentionally allowed the Inpellis server to be lost or destroyed so as to deprive defendants of evidence contained on it, since the Trustee appears never to have accessed or reviewed the server or to have any knowledge of what information may be contained on it separate and apart from the information copied by Masiz (a copy which the Trustee and plaintiff have, at least, preserved and made productions from).

While the Trustee's behavior was clearly negligent and arguably grossly negligent, a finding of gross negligence does not permit the Court to give an adverse inference instruction under the present version of Rule 37(e)(2) as amended in 2015. Defendants cite the Second Circuit's decision in Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 (2d Cir. 2002) and a series of subsequent cases all indicating that adverse inference instructions may be given upon a mere finding that the spoliating party acted with "culpable state of mind." Id. at 108 (reasoning that even mere negligence could support an adverse inference instruction under the circumstances). However, as the Advisory Committee's notes to the 2015 amendment to Rule 37(e) make clear, Rule 37(e)(2)'s requirement since 2015 of an intent to deprive another party of information in specific litigation is meant to "reject[] cases such as Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence *or gross negligence*." Fed. R. Civ. P. 37, advisory committee's notes to the

2015 amendment (emphasis added). And, even independent of the Advisory Committee's explicit rejection of a "gross negligence," standard, this Court independently concludes based on the plain text of Rule 37(e)(2) that actual intent -- rather than gross negligence -- is required. See also In re Bridge Constr. Svcs. Of Fl., Inc., 185 F. Supp. 3d 459, 472-73 (S.D.N.Y. 2016) (describing how the 2015 amendments abrogated Residential Funding's holding with respect to state of mind requirements).

Because defendants have demonstrated at most gross negligence, this Court therefore lacks the power to impose an adverse inference instruction, although it is open to imposing other appropriate spoilation sanctions with respect to plaintiff's ability to introduce specific evidence, defendants' ability to refer to the loss of evidence, or with respect to other aspects of jury instructions. The Court therefore denies defendants' spoilation motion, without prejudice to defendants seeking other relief in their motions in limine or at trial.[8]

---

[8] As discussed in note 6, supra, the Court declines at this point to rule on the admissibility of plaintiff's expert's analysis, the data underlying which may have been preserved on the Inpellis's server, given the parties' very brief treatment of this issue. The Court also declines to award fees or costs at this time, given its previous holding that all such issues will be decided at the end of trial.

### III.   <u>Defendants' Motion to Strike Plaintiffs' Jury Demand</u>

Finally, defendants move to strike plaintiff's jury demand in light of a provision included in a 2016 agreement between Inpellis and Alexander Capital that states in relevant part:

> WAIVER OF JURY TRIAL. IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE PARTIES EACH KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY . . . .

Settlement Agreement ¶ 17, Dkt. 151-4. This agreement (dated 11/14/16) resulted from Inpellis's settlement of Alexander Capital's claims for reimbursement of expenses under the parties' engagement agreements with respect to Inpellis's anticipated IPO, after that IPO was subsequently halted. <u>See</u> SJ Opinion at 7-29.

"Although the right [to a jury trial] is fundamental and a presumption exists against its waiver, a contractual waiver is enforceable if it is made knowingly, intentionally, and voluntarily." <u>Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 188 (2d Cir. 2007); <u>see also</u> <u>Coraud LLC v. Kidville Franchise Co., LLC</u>, 109 F. Supp. 3d 615, 624 (S.D.N.Y. 2015) (Rakoff, J.) (striking a jury demand where the parties' agreement stated each party "irrevocably waive[s] trial by jury").

Plaintiff's primary argument against striking the jury demand is that the scope of the settlement's jury waiver should be construed as limited by Section 5 of the settlement agreement, which contains a "mutual general release" of claims but which also states that if

26

Inpellis does not make certain payments by 12/31/16 that Inpellis apparently did not make, "this Section 5 shall be null and void and all rights, obligations, claims, counterclaims, crossclaims and defenses which the parties have as of the date of this Agreement with respect to each other shall remain in effect." Settlement Agreement ¶ 5.

This argument misapprehends the scope of Section 5. That section provides for a release of claims in the event the parties perform the agreement and the revocation of that release in the event the parties fail to perform. Id. ¶ 5. To construe that clause as restoring a party's right to a trial by jury in the event one or another party fails to perform would render the jury waiver contained in Section 17 utterly meaningless, as the only situation in which any party would ever litigate -- when one or the other party has arguably failed to perform -- would be precisely the situation where, under plaintiff's theory, Section 5 would then override Section 17. In other words, the jury waiver would only apply in situations where there would be no litigation to begin with, rather than in the situations when it is plainly meant to apply: in litigation between the parties relating to the agreement. That interpretation makes no sense.

Plaintiff next argues that Section 17's jury waiver clause should be construed only to apply to disputes relating to the specific obligations dealt with by the settlement agreement -- namely, Inpellis's anticipated reimbursement of specific expenses by Alexander Capital. But the agreement plainly evinces an intent that the scope

of the agreement as well as the jury waiver provision should be read more broadly. For instance, as just discussed, Section 5 purports to extinguish "all rights, obligations, claims, counterclaims, crossclaims and defenses which the parties have as of the date of this Agreement with respect to each other . . . ." without limitation to one specific subject. Settlement Agreement ¶ 5. And the jury waiver provision likewise speaks broadly purporting to waive jury trial rights "in any action, suit or proceeding in any jurisdiction brought by any party against any other party. . . ." Settlement Agreement ¶ 17.

The Court notes that -- in the context of arbitration agreements -- some courts have declined to enforce so-called "infinite arbitration" agreements that purport to require arbitration of all potential past and future disputes between parties, even if those disputes are totally unconnected to the underlying agreement containing the arbitration clause. See, e.g., McFarlane v. Altice USA, Inc., 524 F. Supp. 3d 264, 276-77 (S.D.N.Y. 2021) (declining to enforce as unconscionable a so-called infinite arbitration clause contained in users' cellphone agreements as applied to employment disputes between the cellphone carrier and its employees, when the employees in questions happened to also be customers who had executed the standard user agreement). But this is not such a case; the claims governed by the settlement agreement between plaintiff and defendants clearly arise out of the same facts at issue in this litigation. This is also not a case involving a contract of adhesion, as both Inpellis and Alexander Capital were sophisticated and represented business

parties. As such, the Court agrees with defendants and strikes plaintiff's jury demand. The trial currently set for June 26 will therefore be a bench trial.

## IV.   Conclusion

For the foregoing reasons, the Court denies plaintiff's motion for reconsideration and defendants' motion for an adverse inference instruction, although the latter denial is without prejudice to defendants' seeking other appropriate spoilation instructions in their motions in limine or at trial. The Court grants defendants' motion to strike plaintiff's jury demand. The Clerk is directed to close all three motions (entries 151, 152, and 154) on the docket.

SO ORDERED.

New York, NY
March 3), 2022

JED S. RAKOFF, U.S.D.J.

29