**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

JOHN J. AQUINO, CHAPTER 7 TRUSTEE,     :
By Its Assignee, Convergent Distributors of    :
Texas, LLC,     :
     :
     Plaintiff,     :
     :
     vs.     :     Case No.: 1:21-cv-01355-JSR
     :
ALEXANDER CAPITAL, LP, JOSEPH     :
AMATO, ROCCO GUIDICIPIETRO, and    :
NESA MANAGEMENT, LLC,     :
     :
     Defendants.     :
     :

---------------------------------------------------------------

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR DIRECTED VERDICT**

**Table of Authorities**

## Cases

*Brayer v. John Hancock Mut. Life Ins. Co.*, 179 F.2d 925, 928 (2d Cir. 1950) ..............................2

*Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F.Supp.2d 206, 219 (S.D.N.Y. 2007) ...............2, 3

*Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989) ......................................................................3

*Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) .................................................19

*In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997)...........................................................................12

*Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132-33 (2nd Cir. 1993) ......................16

*Maggio v Becca Constr. Co.*, 229 AD2d 426, 427, 644 N.Y.S.2d 802 (1996) .............................20

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).....................12

*Mfrs. & Traders Trust Co. v. Sapowitch*, 296 N.Y. 226, 72 N.E.2d 166, 168 (N.Y. 1947)...........3

*Prospect Street Ventures I, LLC v. Eclipsys Solutions Corp.*, 804 N.Y.S.2d 301, 302 (1st Dep't 2005)..................................................................................................................................................1

*Schwartz v. Newsweek, Inc.*, 653 F. Supp. 384, 390 (S.D.N.Y. 1986) ...........................................2

*Spanish Tiles, Ltd. v. Hensey*, 2009 Del. Super. LEXIS 553, at *2 (Del. Super. Jan. 7, 2009) ....19

*Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992)...........................................................2

*Tanzman v. La Pietra*, 8 A.D.3d 706, 778 N.Y.S.2d 199, 201 (App. Div. 2004) ...........................2

*Trustco Bank v. S/N Precision Enters.*, 234 A.D.2d 665, 668, 650 N.Y.S.2d 846, 850 (1996)....19

*TVT Records v. Island Def Jam Music Group*, 262 F. Supp. 2d 188, 194 (S.D.N.Y. 2003)...........9

*Walk-IN Medical Centers, Inc. v. Breuer Capital Corp.*, 651 F.Supp. 1009 (S.D.N.Y. 1986).......4

## Statutes

6 Del. C. § 15-101(12)....................................................................................................................17

6 Del. C. § 15-101(14)....................................................................................................................17

6 Del. C. § 15-306(a) ......................................................................................................................17

6 Del. C. § 17-202 ..........................................................................................................................17

6 Del. C. § 17-403(c) ................................................................................................................17, 19

6 Del. C. § 18-303(a) ......................................................................................................................19

NY CLS LLC § 609 ........................................................................................................................19

## Treatises

Restatement (Second) of Torts § 530(1) ...........................................................................................2

I.  **COURT'S SUMMARY JUDGMENT RULINGS APPLICABLE TO DIRECTED VERDICT ON PLAINTIFF'S CLAIMS**

This Court found on summary judgment that the Engagement Agreement did not bind

ACLP to underwrite Inpellis's IPO absent the execution of an underwriting agreement:

> [T]he Court held that the engagement agreements were, as a matter of law, merely unenforceable agreements to agree with respect to the details of a contemplated underwriting agreement and the consequent IPO. MTD Op. 36. That is, the engagement agreements did not require ACLP to actually underwrite an IPO, nor did they require ACLP to underwrite an IPO on any specific terms, since ACLP's commitment to underwrite the IPO was "expressly conditioned on the execution of a definitive agreement satisfactory ... to both sides." *Prospect Street Ventures I, LLC v. Eclipsys Solutions Corp.*, 804 N.Y.S.2d 301, 302 (1st Dep't 2005); MTD Op. 37-38. The Court reaffirms its earlier conclusion that ACLP was not obligated under the engagement agreements to sign an underwriting agreement or to actually underwrite Inpellis's IPO . . . [P]laintiff is independently precluded from seeking damages [arising from the failure of the IPO] on its breach of contract claim because, as explained here, Inpellis was not contractually entitled to have ACLP execute an underwriting agreement or to underwrite the contemplated IPO.

(MSJ Order at 58-59; *id.* at 59, n19.) In discussing the facts underpinning this finding, the Court

noted:

> [N]either engagement agreement was an underwriting agreement. It is standard in the investment banking industry for firm commitment underwriting agreements to be preceded by an engagement agreement, with the underwriting agreement setting the terms of the offering executed close in time to the IPO. *Id.* ¶¶ 144-153. Here, however, ACLP and Inpellis never exchanged drafts or entered into an underwriting agreement, and it is undisputed that the engagement agreements did not guarantee that ACLP would undertake any specific IPO activity or pricing on Inpellis's behalf. *Id.* ¶¶ 158-165.

(*Id.* at 12-13.)

Finally, this Court found that although Plaintiff disputes "whether ACLP sufficiently

disclosed the extent of the [FINRA] problem and whether the firm tried to minimize its regulatory

problems," the "contemporaneous notes taken by participants in the September 10 meeting,

confirm that the Board was told that ACLP's FINRA issue prevented it from underwriting firm

commitment IPOs. *See, e.g.*, ECF 136-18. . . [T]hat fact alone suffices to establish that Inpellis

1

was on notice that ACLP would not be able to perform the transaction contemplated in the First and Second Engagement Agreements." (*Id.* at 49, n.14.)

## II.    PLAINTIFF HAS FAILED TO PROVE ITS FRAUDULENT INDUCEMENT AND FRAUD CLAIMS

The sole remaining issue in dispute on Count I for fraudulent inducement is whether ACLP made "misrepresentations of material fact regarding ACLP's ability to conduct the firm commitment IPO expressly contemplated" in the July 2014 Engagement Letter with "intent to defraud" Inpellis. (*See* MSJ Order at 48, 50.) Similarly, the sole remaining issue in dispute on Count IV for fraud is: "whether ACLP fraudulently convinced Inpellis to take on the [bridge] loan and thereby obtained the $500,000 placement fee." (*Id.* at 56.)

Plaintiff must prove intent to defraud by clear and convincing evidence and may not be assumed on doubtful evidence or circumstances of mere suspicion. *Brayer v. John Hancock Mut. Life Ins. Co.*, 179 F.2d 925, 928 (2d Cir. 1950); *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F.Supp.2d 206, 219 (S.D.N.Y. 2007) (stating that evidence on fraud claim "must be enough to make 'any inference of fraud unequivocal'"). A "representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." *Century Pac., Inc.*, 528 F.Supp.2d at 220-21 (quoting Restatement (Second) of Torts § 530(1)). Only when "a promise [is] made with a preconceived and undisclosed intention of not performing it" does it "give[] rise to a claim for fraudulent inducement. *Id.* at 221, 222 (quoting *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992)); *Tanzman v. La Pietra*, 8 A.D.3d 706, 778 N.Y.S.2d 199, 201 (App. Div. 2004) ("A present expression of the intent to perform a future act is actionable as fraud only if actually made with a preconceived and undisclosed intention of not performing it.") Intent to deceive must be shown by evidence of "guilty knowledge or willful ignorance." *Schwartz v. Newsweek, Inc.*, 653 F. Supp. 384, 390 (S.D.N.Y. 1986) (quoting *Mfrs. & Traders Trust Co. v.*

*Sapowitch*, 296 N.Y. 226, 72 N.E.2d 166, 168 (N.Y. 1947)). Absent direct evidence, fraudulent intent "must ordinarily be established by circumstantial evidence and the ***legitimate*** inference arising therefrom." *Century Pac, Inc.*, 528 F.Supp.2d at 222 (emphasis added). Plaintiff must provide evidence of facts that support a "strong inference that the defendants possessed the requisite fraudulent intent." *Id.* at 222-23 (quoting *Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989)).

Plaintiff has failed to prove ACLP had a present intent to deceive Inpellis when it entered into the Engagement Agreement.

The relevant timeframe for Plaintiff's fraud claims is July 29, 2014, the date the parties entered into the Engagement Agreement. *Century Pac, Inc.*, 528 F.Supp.2d at 224 ("The relevant period for determining whether a person had a "present intent" to defraud is the time the allegedly false statements in question were made; here, that is during the franchise negotiations"); *Tanzman*, 778 N.Y.S.2d at 201 (dismissing claim where plaintiff failed to provide evidence of fraudulent intent "at the time [the promise] was made"). Plaintiff has failed to offer any evidence that ACLP intentionally misrepresented its ability to underwrite the Inpellis IPO on a firm commitment basis on July 29, 2014, when the Engagement Agreement was executed. Plaintiff relied on the testimony of only three witnesses in its case in chief. Defendants Amato and Guidicipietro both credibly testified that they thought ACLP could underwrite offerings on a firm commitment basis in 2014 and 2015. (Amato, Tr. Day 2 at 291, 294, 313-314, 323, Tr. Day 3 at 373:25-374:7; Guidicipietro, Tr. Day 3 at 430:2-15.) This understanding is not inconsistent with the information reflected in the FINRA BrokerCheck Report for ACLP that one type of business included "underwriter or selling group participant." (P11.) They both testified that ACLP had no knowledge that it needed approval from FINRA for firm commitment offering until sometime after ACLP received a letter from

FINRA on May 15, 2015. (Amato, Tr. Day 3 at 374:8-376:24; 396:8-398:4; Guidicipietro, Tr. Day 3 at 431:4, 432:25-433:3, 433:6-434:2, 435:17-436:25, 437:4-14.) Mr. Amato testified that in 2014 and 2015, he understood that as long as ACLP maintained a sufficient level of net capital, it could participate in firm commitment underwritings. (Tr. Day 2 at 340-341, 347.) Defendants testified that ACLP immediately hired legal counsel to assist them in obtaining approval and within a matter of weeks submitted an application for approval on June 3, 2015. (Guidicipietro, Tr. Day 3 at 443:17-444:7; 466:11-14; Defs' Ex. 23.)

Mindful of the court's MSJ ruling on the implied representation of present underwriting ability, the letter of intent was not a guarantee that Alexander would in fact purchase the shares. It did not guarantee a $20 million public offering. It did not guarantee a price at which the shares would be set. The Engagement Agreement was a letter of intent that did not commit ACLP to underwrite the Proposed IPO on a firm commitment basis absent execution of a subsequent underwriting agreement. (Defs' Ex. 1.) *See Walk-IN Medical Centers, Inc. v. Breuer Capital Corp.*, 651 F.Supp. 1009 (S.D.N.Y. 1986) (noting that it is the underwriting agreement that sets the terms for the offering). In fact, ACLP did not act as underwriter on any basis for the Inpellis proposed offering because the S-1 was withdrawn meaning there was no public offering for Inpellis. (Tr. Day 3 at 366:1-3; 365:16-18.) ACLP's filings and communications with FINRA demonstrate ACLP's intent throughout the entire engagement with Inpellis that it intended to underwrite the proposed IPO on a firm commitment basis and was seeking approval to do just that. (*See* Defs' Exs. 23-34.) FINRA was on notice as of May 15, 2015 that Alexander had been engaged by Inpellis to underwrite the IPO on a firm commitment basis. (Amato, Tr. Day 3 at 377:2-14.) That was because ACLP affirmatively brought to FINRA's attention its intent to underwrite the Inpellis IPO as a firm commitment offering. (Guidicipietro, Tr. Day 3 at 467:12-15.) The Court can reasonably

infer from this evidence that ACLP did not intentionally misrepresent its intent as stated in the Engagement Agreement to underwrite the proposed IPO on a firm commitment basis. Because the IPO was withdrawn and Inpellis and ACLP never entered into an underwriting agreement, there was no enforceable **promise** by ACLP to underwrite the **proposed** Inpellis IPO as a firm commitment offering.

Defendants Amato and Guidicipietro testified that neither of them had any role in the Inpellis engagement or the proposed IPO. (Amato, Tr. Day 2 at 314, Guidicipietro, Tr. Day 3 at 448:1-5.) They were not involved in the discussions with anyone at Inpellis about the engagement of ACLP as underwriter for the proposed IPO, they did not prepare the Engagement Agreement, did not have any input into its terms, and were not even aware of the Engagement letter at the time it was executed. (Amato, Tr. Day 3 at 372:8-373:373, Guidicipietro at 465:820, 466:15-25.) Defendant Amato testified that he did not have any idea in July 2014 that anyone at ACLP had made representations to Inpellis regarding ACLP's ability to handle firm commitment underwriting. (Amato, Tr. Day 3 at 373:17-20; Guidicipietro at 466:5-8, 466:22-25.) Defendant Amato testified that, prior to the Inpellis engagement in July 2014, ACLP had not conducted any business in underwriting while he was at the firm. (Tr. Day 3 at 362.) Mr. Amato testified that the proposed Inpellis IPO was going to be ACLP's first IPO as underwriter. (Id. at 365.) Defendants Amato and Guidicipietro testified that they had no involvement with ACLP's underwriting business or its Investment Banking or Capital Markets departments, and they had no role in reviewing or supervising the deals handled by those departments. (*Id*. at 363-365, 371:22-372:1, Guidicipietro, Tr. Day 3 at 464:14-465:7.) Defendants Amato and Guidicipietro had no experience in underwriting IPOs as of July 29, 2014, and neither of them had ever directly participated in an

IPO or any other investment banking business when ACLP entered into the Inpellis engagement. (Amato, Tr. Day 2 at 327, 329, Tr. Day 3 at 371:5-15, 372:2-3.)

Thomas Barrette, the outside counsel for Inpellis in 2014 and 2015, offered no testimony in support of Plaintiff's allegation that ACLP intentionally misled Inpellis into believing it had the ability to do a firm commitment offering and was guaranteeing Inpellis it would underwrite the IPO on a firm commitment basis to induce Inpellis to enter into the Engagement Agreement.[1] Mr. Barrette was not present and has no knowledge of what happened at the initial meeting with ACLP prior to Inpellis entering into the Engagement Agreement with ACLP. (Tr. Day 2 at 197:16-23.) Mr. Barrette's testimony was limited to the fact that Inpellis learned no later than September 2015 that ACLP lacked firm commitment capability and the documents he saw after the Complaint was filed in this case in 2021 showing that ACLP was advised by FINRA on May 15, 2015 and June 11, 2015 (nearly one year after the engagement) that ACLP needed to obtain approval for firm commitment underwriting. These documents are insufficient to establish that ACLP knowingly and intentionally misrepresented its ability to participate as managing underwriter in a firm commitment offering. Nor are these documents sufficient to give rise to the inference that ACLP willfully disregarded knowledge that it lacked such ability as of July 29, 2014.

Plaintiff has likewise failed to offer any evidence that ACLP, with fraudulent intent, convinced Inpellis to take on bridge funding. The only evidence that Plaintiff offered about the

---

[1] Plaintiff has likewise failed to offer any evidence that ACLP, with fraudulent intent, convinced Inpellis to take on bridge funding. The only evidence Plaintiff offered about the bridge loans was Mr. Barrette's statement that he would have advised Inpellis not to take bridge loan money unless they had an underwriter who could do a firm commitment underwriter. (Barrette, Tr. Day 1 at 68:9-12.) But the evidence confirms that Inpellis was *already* looking for a different underwriter in June 2015 and never found an underwriter willing to take on the IPO other than ACLP. (Barrette, Tr. Day 2 at 245:20-25.) Therefore, Plaintiff has failed to prove its fraud claim and Defendants are entitled to directed verdict in their favor on Count IV.

bridge loans was Mr. Barrette's statement that he would have advised Inpellis not to take bridge loan money unless they had an underwriter who could do a firm commitment underwriting. (Barrette, Tr. Day 1 at 68:9-12.) To begin with, Mr. Barrette was simply not credible. He admitted to all the elements of a substantial fraud—creating and deliberately passing off to ACLP meaningless, backdated intellectual property licenses for Inpellis that had been executed by someone (Mr. Masiz) who had no authority to act on behalf of Inpellis at the time of execution— (*see* Tr. Day 2 at 210:7-222:14) and he testified multiples times in direct contradiction to his deposition testimony. (Tr. Day 2 at 192:9-17, 194:11-17, 202:7-203:3, 212:17-213:13.) The hypothetical advice he claims he would have given Inpellis to look for another underwriter is directly contradicted by his *actual* behavior after he admittedly learned of ACLP's firm commitment issue by September 10, 2015: (1) advising Dr. Mooney to sign amended engagement letter with ACLP with the same firm commitment language, (Tr. Day 2 at 277:9-278:5) and (2) filing multiple draft registration statements that continued to represent that the IPO was be on a firm commitment basis. (Tr. Day 1 at 119:23-120:1, 124:3-8.)

Regardless, even if Mr. Barrette were to be believed, his advice to look "hard" for another underwriter could not have proximately caused Inpellis to take on the bridge loan because the evidence confirms that Inpellis was *already* looking for a different underwriter in June 2015 and never found an underwriter willing to take on the IPO other than ACLP. (Barrette, Tr. Day 2 at 245:20-25.) Therefore, Plaintiff has failed to prove its fraud claim and Defendants are entitled to directed verdict in their favor on Count IV.

The Court is not required to draw all inferences in favor of Plaintiff. To the extent the Court views these documents as circumstantial evidence of intent, they do not warrant drawing the

inference that Defendants were consciously indifferent.[2] Plaintiff has provided no evidence from which this Court could conclude by clear and convincing evidence that Defendants intended to defraud the Plaintiffs at the time the Engagement Agreement was executed with the implied material false representation that ACLP had the ability to conduct a firm commitment underwriting.

For these reasons, Defendants are entitled to directed verdict on Plaintiff's fraud claims.

## III.   PLAINTIFF HAS FAILED TO PROVE ITS BREACH OF CONTRACT CLAIM

In connection with Plaintiff's claim in Count II for breach of contract, the Court found the following issues remained in dispute following summary judgment:

(1)      Whether ACLP failed to act in good faith in its role as managing underwriter by (a) failing to make a full and timely disclosure that it was not yet approved by FINRA to conduct a firm commitment underwriting leading Inpellis to retain (at significant expense) attorneys and accountants suitable to ACLP and (b) inducing Inpellis to approve the filing of draft registration statements with the SEC that relevant decision makers assert they would not have approved had they known the truth.

(2)      Whether ACLP failed to act in good faith in its role as "exclusive financial advisor" by failing to disclose its inability to do firm commitment underwriting before it advised Inpellis to take on the bridge loan debt in preparation for the IPO (and for which Inpellis paid ACLP a $500,000 placement fee).

---

[2] The Court preliminarily sustained Defendants' objections to P33 and P55 as improper evidence under FRE 404(b). (Tr. Day 2 at 335-36.) Plaintiff's Exhibit 33, a June 29, 2018 Order Instituting Administrative Procedures alleging that ACLP "from 2012 to 2014 failed reasonably to implement certain policies and procedures and permitted a lax compliance environment," is insufficient to establish Defendants' intent as the complaints were unrelated to underwriting and the alleged conduct occurred prior to the relevant period at issue in this case and prior to Defendants Amato and Guidicipietro having any management authority at ACLP. Plaintiff's Exhibit P55, the 2019 Acceptance Waiver and Consent settlement with FINRA dealing with alleged conduct in 2016, is insufficient evidence to prove that Defendants had knowledge and intent with respect to their ability to conduct firm commitment underwritings in July 2014. (Tr. Day 3 at 469:16-20.) In fact, the emails Mr. Guidicipietro sent FINRA in June 2016, immediately after the time period at issue in the AWC, only confirms his good faith belief since he was affirmatively raising the issue it FINRA's attention and asking FINRA to confirm that ACLP could participate in such syndicates. [[Defs. Exs. 143 and 144]]

(3)     Whether ACLP breached its duty of good faith and fair dealing by failing to disclose Dr. Mooney's alleged divided loyalty.

(*See* MSJ Order at 61-62.) Evidence sufficient to prove "bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract." *TVT Records v. Island Def Jam Music Group*, 262 F. Supp. 2d 188, 194 (S.D.N.Y. 2003).

Defendants are entitled to directed verdict on Plaintiff's first breach of contract theory for the same reasons stated above regarding the fraud claims. Plaintiff failed to offer evidence sufficient to show that ACLP acted with a disingenuous or dishonest purpose in entering into the engagement with Inpellis.

Defendants are entitled to directed verdict on Plaintiff's second breach of contract theory as Plaintiff has simply failed to introduce any evidence that Alexander Capital advised Inpellis to take on the bridge loans at all. The evidence before the Court shows that Inpellis was pursuing the goal of obtaining bridge funding from other potential investors and investment banks outside of the engagement with ACLP. Inpellis began to commit to engage in bridge lending, without consulting ACLP, as early as September 27, 2014. By that date Inpellis was soliciting investments from investors and promising those investors that they would be allowed to convert their early investment into a bridge lending round of investment. (Defs.' Ex. 51 at 3; Tr. Day 1 at 232:8-12.) Inpellis was soliciting investments through Montserrat Partners, and Mr. Barrette, its attorney, was facilitating that solicitation, premised at least in part on the promise it would engage in a bridge lending round of funding. (*See id., see also* Tr. Day 1 at 235:6-24.) The loss or destruction of Inpellis's corporate records means that there will be no direct evidence of the exact amount Montserrat raised for Inpellis as potential bridge funding. However, the evidence that still exists

shows that at least some funds were raised on that promise. Plaintiff has offered no evidence that ACLP was informed this was happening, let alone that it advised it.

Before ACLP had any knowledge of the firm commitment issue (by virtue of the May 15, 2015 FINRA "Unreasonable Letter"), Inpellis was pursuing bridge lending on its own, sometimes with ACLP's knowledge and assistance – but not on Alexander's advice. (Dkt. 198-3, McCoy Dep. Tr. 39:14-40:1.) Dr. McCoy, Inpellis's former CEO and board member, testified that the "exclusive" Engagement Agreement did not restrict Inpellis from bringing in other underwriters and investment banks. (*Id.* at 92:3-19.) In fact, the employment agreement Inpellis negotiated with Dr. Mooney substantially incentivized his obtaining bridge lending. (Tr. Day 1 at 47:13-16.)

Plaintiff has offered no evidence at trial that undertaking the bridge loans caused it damage. What Plaintiff has shown is that it received approximately $5,000,000 in bridge loans plus forgiveness in approximately $3,400,000 in debt when it took on the bridge loans. (Tr. Day 1 at 171:12-23, *id.* at 76:5-25; P61.)

The evidence admitted at trial shows that Inpellis did not rely on ACLP as its "exclusive" financial advisor and therefore breached its contractual obligation that ACLP would be its exclusive financial advisor. (*See* Defs' Ex. 136, Plaintiff's Revised Response to Defendants' Requests for Admission, RFAs 237, 243, and 246.) For example, while he was CEO of Inpellis, Patrick Mooney met with potential underwriters other than Alexander. (*Id.* at RFA 237.) On July 10, 2015, Patrick Mooney approved an investment banker not affiliated with Alexander to share the current version of Inpellis's sales presentation with potential investors. (*Id.* at RFA 243.) On July 29, 2015, Patrick Mooney sent an engagement agreement "for execution" to CRT Capital Group, LLC. (*Id.* at RFA 246.)

As a result, Plaintiff is not entitled to recover on this theory of breach of contract. In 2014, after signing the Engagement Agreement with ACLP, Inpellis's leadership – including Mr. Sterman and Dr. Staskin (along with Mr. Masiz and Mr. Schlichtmann) were soliciting bridge loan capital for Inpellis, including funneling investment proceeds through Montserrat Partners. (Tr. Day 2 at 229:12-19.) At least some of these efforts were funneled through Montserrat Partners. (Defs. Ex. 51 at 3, *see also* Trial Tr. 229:2 – 236:10) Counsel for Inpellis drafted at least one subscription agreement for an investment in Inpellis through Montserrat. (Defs. Ex. 48, and 240:12-18.) Mr. Barrette also described himself as "facilitating" others in their efforts to solicit investments in Inpellis. (Trial Tr. 235:6 – 24). These activitis both breached the Engagement Agreement and show that there was no reliance by Inpellis on Alexander Capital – taken together or alone these facts prevent recovery on this claim.

For these reasons Defendants are entitled to a directed verdict on the claim that Alexander breached its contractual obligation to act in good faith as Inpellis's exclusive financial advisor when it allegedly advised that Inpellis undertake the bridge loans.

As to its third breach of contract theory, Plaintiff has failed to offer any evidence to support their contention that ACLP failed to disclose some unidentified divided loyalty by Dr. Mooney. The claim fails for several reasons. First, Plaintiff identified offered no testimony or documentary evidence that there was even a divided loyalty to disclose. Although Plaintiff alleged that the increase of ACLP's placement fee from 8% to 10% on August 17, 2015 amendment to the Engagement Agreement, Plaintiff did not offer any evidence that Dr. Mooney was the impetus for this increase or that he personally agreed to increase the fee out of unsubstantiated loyalty to ACLP. As Mr. Barrette testified, ACLP used its leverage to obtain the increase and "Inpellis agreed

to it." (Tr. Day 1 at 78:23-25.) The increase by 2%, according to Mr. Barrette, was "needed to keep Alexander motivated." (*Id.* at 78:17-20.)

Second, the evidence presented at trial shows that Dr. Mooney's friendship with Carlin and his prior consulting relationship with ACLP was fully known and disclosed by ACLP. Mr. Barrette testified that Dr. Mooney told him about his work on the Inpellis proposed IPO while at ACLP and that he was part of the team that evaluated Inpellis's technology. (*Id.* at 46:8-13.) In addition, Mr. Barrette had discussions with ACLP's counsel at Greenberg Traurig on June 24, 2015 about what Dr. Mooney's precise role at ACLP had been. (*Id.* at 50:23- 51:17; P97.) Dr. Mooney's prior position with and work done on behalf of ACLP were known at the time of his hire as Inpellis's CEO. (Tr. Day 2 at 243:3-21.)

For these reasons, Defendants are entitled to directed verdict on each and every theory of Plaintiff's breach of contract claim.

## IV. DEFENDANTS ARE ENTITLED TO DIRECTED VERDICT ON THEIR AFFIRMATIVE DEFENSES TEN AND ELEVEN

By the close of Plaintiff's case, facts sufficient to establish Defendants' tenth and eleventh affirmative defenses.

### a. Breach of Contract – Investments from Montserrat Partners

Under New York law, "a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. v. Allegheny Energy, Inc*., 500 F.3d 171, 186 (2d Cir. 2007). A breach is material when "it substantially defeats the purpose of that contract." *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997) (holding that a material breach goes "to the root of the agreement between the parties").

A key component of the Engagement Agreement was Inpellis's agreement that ACLP would be its "exclusive financial advisor." As demonstrated above, ACLP did not breach the Engagement Agreement in bad faith, but Inpellis breached it almost immediately. Less than one month after the July 29, 2014 Engagement Agreement, Inpellis began working with Montserrat Partners to solicit capital investments. (*See* Defs.' Ex. 48.) Montserrat was founded and controlled by Mr. Schlichtmann, who, the evidence shows, "essentially controlled the decision-making of BioChemics." (Stps. 30, 33, Tr. Day 1 at 12:23-24.) In 2014, Inpellis was held out as a wholly owned subsidiary of BioChemcis. (Stp. 13.) Mr. Schlichtmann and Dr. Staskin, who was holding himself out as President and CEO of Inpellis, used Montserrat to raise funds for Inpellis and accepted funds from investors on Inpellis's behalf on terms highly beneficial to the investors. (Stp. 5, *see* Defs.' Exs. 48, 51; *see also* Tr. Day 2 at 232:20-23.)

On or about August 23, 2014 a still-unknown-to-Alexander investor was given a subscription agreement for Inpellis and instructed to wire funds to Montserrat. (Defs.' Ex. 48.) Mr. Barrette testified that he likely drafted that subscription agreement. (Tr. Day 2 at 240:12-18.) The evidence also shows that the Montserrat LLC agreement was drafted by Mr. Barrette at the time he was working solely for Inpellis. (Tr. Day 2 at 190:2-4) Mr. Barrette testified he didn't really think about who he was representing when he drew up documents for Montserrat. (Tr. Day 2 at 190:25 – 192:8.) Coming from an attorney with substantial experience doing business transactional work at Hale and Dorr, the Court need not credit this testimony that he was not representing Inpellis and Montserrat simultaneously at this time. (Tr. Day 1 at 7:6-10.) Further, this testimony is directly contradicted by his previous sworn testimony where he admitted the drafting of the Montserrat documents was part of his work for Inpellis. (Tr. Day 2 at 192:12-17 and 194:11-17.)

Within two months of the July 29, 2014 Engagement Agreement, Montserrat was given "options" – which appear to have been passed on to the Montserrat investors – to purchase shares of Inpellis. (Defs.' Ex. 51 at 2-4.) While Mr. Barrette did not testify he was involved in the proffer of these terms, the documents in evidence suggest he was. The loan reflected in Defs.' Ex. 51 was discussed in emails from September 27-29, 2014, between Dr. Staskin and an individual identified as Dr. Kay. (*Id.*) On September 28, 2014, Mr. Barrette billed Inpellis for 1.5 hours of legal work he described as "Follow up with all parties regarding Alterix financing; drafting S-1; call with Jan and David." (P99 at 3.) Jan Schlichtmann and David Staskin were the two individuals on the email chain with Mr. Barrette discussing the investment by Dr. Kay into Inpellis through Montserrat and the Court can reasonably conclude from the fact that Mr. Barrette billed Inpellis for work related to "Alterix financing" and a "call with Jan and David," during the time this transaction was under discussion that the transaction at issue was with Inpellis and managed by Inpellis.

In short, the evidence shows that Inpellis, acting through its counsel, was facilitating the solicitation of investments in Inpellis through Montserrat. (Tr. Day 2 at 235:6-24.) As a result, the evidence shows that Inpellis promptly breached its contractual agreement that ACLP was to be its "exclusive financial advisor" and, in so doing, negated its ability to claim damages stemming from any subsequent alleged breach by ACLP. Accordingly, directed verdict should be granted in Defendants' favor on Plaintiff's breach of contract claim.

### b. Plaintiff's Unclean Hands/Fraud with regard to the purported 2012 IP license from BioChemics

Mr. Barrette's testimony is indisputably clear that Inpellis perpetrated a fraud against ACLP related to the authenticity of its IP license from BioChemics. As a part of the IPO due diligence process, a process Mr. Barrette concedes is intended to help underwriters evaluate a company and ensure that disclosures to the SEC are accurate, Mr. Barrette created and had Mr.

14

Masiz sign backdated documents memorializing the IP license. (Tr. Day 2 at 208:19-25; Defs.'
Ex. 57; Tr. Day 2 at 210:7-211:3; Defs.' Ex. 58; Tr. Day 2 at 216:2-217:1.) Mr. Barrette fully knew
the importance of due diligence process to ACLP, likening it to the due diligence an investor would
do before making a $20 million loan. (Tr. Day 1 at 23:3-17.) He also knew that this was an
important document and Alexander would rely on the accuracy of the document in its decision to
proceed with any underwriting of the IPO. (Tr. Day 2 at 217:16-218:2.) Despite the fact that the
license bore no indication that it was backdated, Mr. Barrette provided it to ACLP's counsel
without disclosing it was a "recreated" backdated document. (Tr. Day 2 at 222:11-14 and 218:10-
14.)

  Not only did Mr. Barrette backdate the authorization for Inpellis to enter into the key IP
licensing agreement with BioChemcis, he backdated the license itself. (Tr. Day 2 at 223:1-21,
224:21-24.) While Mr. Barrette insists that he was personally confident that the license existed at
some point, there is not a scrap of evidence – aside from his own blind confidence – that it ever
existed prior to 2015. Nor is there any reason to believe that the license was entered into on
November 30, 2012. This date is important as it falls just two weeks before December 14, 2012,
when the SEC filed its complaint for securities fraud against BioChemics and Mr. Masiz. (Stip.
41.) Absent any contemporaneous documentation from November 2012 reflecting the IP license
between BioChemcis and Inpellis, and in light of the admitted backdating of key documents, the
Court can conclude that Inpellis fraudulently misrepresented the existence of a November 30, 2012
IP license to Inpellis's core asset. Such fraud would void any agreement between ACLP and
Inpellis. The evidence clearly proves that that Inpellis created documents that were false and then
provided those documents to ACLP with the intent that those false documents be relied upon in
proceeding with the IPO. By perpetrating this fraud, Inpellis is not entitled to prevail on its claims

15

asserted in this action. *See Lumbermens Mut. Cas. Ins. Co. v. Darel Grp. U.S.A. Inc.*, 253 F. Supp. 2d 578, 582 (S.D.N.Y. 2003) ("[W]here a party is fraudulently induced to enter into a contract, the contract is voidable at the instance of the defrauded party.") (*citing Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001)).

## V.   PLAINTIFF HAS FAILED TO PROVE DEFENDANTS AMATO AND GUIDICIPIETRO ARE INDIVIDUALLY LIABLE AS PARTNERS OF ACLP

Plaintiff has failed to establish that Defendants Amato and Guidicipietro are partners of ACLP.

Because ACLP is a Delaware partnership, the liability of its partners is governed by Delaware law.[3] NESA Management, LLC, Alexander's general partner, is a New York limited liability company. Therefore, the Court must apply New York law in determining whether to disregard the liability protections afforded to LLC members and hold its managing member, Joseph Amato, individually liable as a general partner of ACLP. Regardless of whether ACLP is a limited partnership, as its Amended Certificates filed with the Delaware Secretary of State indicate, or whether it is deemed a general partnership for the reasons the Court has previously stated, one fact remains true. There is no evidence that proves that Defendants Amato and Guidicipietro are partners — of any sort — of ACLP because the evidence at trial establishes that they are not and have never been partners of ACLP. Because they are not partners, they cannot be held liable for the ACLP's "obligations" under 6 Del. C. § 15-306(a).

The relevant provisions of the Delaware Revised Uniform Partnership Act state:

---

[3] *Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132-33 (2nd Cir. 1993) ("Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away.").

- "Partner" means a person who is admitted to a partnership as a partner of the partnership. 6 Del. C. § 15-101(12).[4]

- A partnership is not required to execute its partnership agreement. A partnership is bound by its partnership agreement whether or not the partnership executes the partnership agreement. A partnership agreement is not subject to any statute of frauds (including § 2714 of this title). 6 Del. C. § 15-101(14).

- A partnership agreement may provide rights to any person, including a person who is not a party to the partnership agreement, to the extent set forth therein. 6 Del. C. § 15-101(14).

- [A] general partner of a limited partnership has the power and authority to delegate to 1 or more other persons any or all of the general partner's rights, powers and duties to manage and control the business and affairs of the limited partnership . . . Any such delegation may be to agents, officers, and employees of the general partner or the limited partnership … such delegation by a general partner of a limited partnership shall not cause the general partner to cease to be a general partner of the limited partnership or cause the person to whom any such rights, powers and duties have been delegated to be a general partner of the limited partnership. 6 Del. C. § 17-403(c).

Under Delaware law, while a Partner may be held liable for the obligations of the Partnership, there is no authority for holding an officer of the partnership who is not also a partner liable when he has not directly participated in the alleged tortious conduct. *See* 6 Del. C. § 15-306(a) ("All partners are liable jointly and severally for all obligations of the partnership.")

Plaintiff has failed to prove that Defendants Amato and Guidicipietro were partners of ACLP. The January 2020 Second Amended and Restated Limited Partnership Agreement of ACLP establishes that neither Mr. Amato nor Mr. Guidicipietro are partners of ACLP. (P104.) According to the Partnership Agreement, the General Partner of ACLP is NESA Management, LLC, and Defendants Amato and Guidicipietro are not identified as Limited Partners in Schedule A of the Agreement. (P104 at 1; *id.* at Schedule A.) The fact that neither Defendant Amato nor Defendant

---

[4] As the Court noted in its Order on the Motion to Dismiss, Delaware law requires that a certificate of amendment must be filed within 90 days after the admission of a new general partner or the withdrawal of a general partner. *See* 6 Del. C. § 17-202. Certificates of Amendment may be obtained from the Delaware Secretary of State. Plaintiff has not offered Certificates showing that Defendants Amato or Guidicipietro were admitted as general partners of ACLP.

Guidicipietro are partners of ACLP was substantiated by their trial testimony. (Amato, Tr. Day 3 at 355-56; Guidicipietro, *id.* at 462.) It is further substantiated by the January 20, 2015 FINRA BrokerCheck Report for ACLP. (P11 at 6 of 23; *id.* at 8 of 23; Tr. Day 3 at 357-58.)

The evidence Plaintiff points to is insufficient to prove that Defendants Amato and Guidicipietro were partners of ACLP. Rather, Plaintiff relies on (i) a written statement by an attorney in a submission to FINRA dated September 29, 2015 in connection with events unrelated to the present case, inaccurately stating that Defendants Amato and Guidicipietro were partners of the firm, (P13B; Tr. Day 2 at 299); and (ii) a written statement by an attorney in a letter to FINRA dated October 27, 2015 stating active control of firm was sold to Amato and Guidicipietro in December 2013. (P13A.) These unsworn statements drafted and prepared by attorneys on behalf of ACLP do not suffice to make Defendants Amato and Guidicipietro partners of ACLP when they are not and have not been admitted as partners to the partnership. See 6 Del. C. § 15-101(12); 6 Del. C. § 17-202.

The Court asked the parties to address in this briefing the question of whether Defendant Amato as managing member of NESA was effectively the equivalent under Delaware law of a managing partner of ACLP. (Tr. Day 3 at 369:19-23.) He is not. This question was sparked by (i) the fact that Defendant Amato signed the 2018 version of the Partnership Agreement on behalf of ACLP's General Partner, NESA Management, LLC, in his capacity as managing member of NESA and (ii) the language of Section 7.1 of ACLP's Partnership Agreement providing that:

> Due to the nature and highly regulated industry ACLP operates within, its executive officers Joseph Amato, CEO, and Rocco Guidicipietro, COO, shall serve as the exclusive managers of the partnership and shall have all of the rights of the general partner in this regard.

(P104.) But Delaware law unequivocally states that the delegation of the managerial rights of the general partners to another does not make that person a partner:

> [A] general partner of a limited partnership has the power and authority to delegate to 1 or more other persons any or all of the general partner's rights, powers and duties to manage and control the business and affairs of the limited partnership . . . Any such delegation may be to agents, officers, and employees of the general partner or the limited partnership … such delegation by a general partner of a limited partnership **shall not** cause the general partner to cease to be a general partner of the limited partnership or cause **the person to whom any such rights, powers and duties have been delegated to be a general partner** of the limited partnership.

6 Del. C. § 17-403(c) (emphasis added).[5]

Plaintiff incorrectly argued at trial that Mr. Amato "is indirectly a partner through NESA, and I don't think he gets protection because he is an active manager of the firm." (Tr. Day 3 at 369:15-17.) Both Delaware[6] and New York law provide that an officer of a limited liability company is normally not liable for the conduct of the company unless he participated in, directed, ordered, ratified, approved or consented to a tort committed by the company. *Trustco Bank v. S/N Precision Enters.*, 234 A.D.2d 665, 668, 650 N.Y.S.2d 846, 850 (1996); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) ("Actual participation in wrongful acts is [a] 'crucial predicate' to imposition of individual liability."); *Spanish Tiles, Ltd. v. Hensey*, 2009 Del. Super. LEXIS 553, at *2 (Del. Super. Jan. 7, 2009). Plaintiff bears the burden of showing the need to pierce the corporate veil. *Trustco Bank v.*, 234 A.D.2d at 668 (citing *Maggio v Becca Constr. Co.*,

---

[5] As Mr. Guidicipietro testified, he and Mr. Amato, in turn, delegated the capacity to manage the partnership to other employees at ACLP including the Chief Compliance Officer, the Head of Investment Banking, the Chief Financial Officer, and their support staff. (Tr. Day 3 at 470:16-22.)

[6] "[T]he debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company." 6 Del. C. § 18-303(a). Likewise, NY CLS LLC § 609 shields a member or managing member of a limited liability company from personal liability for debts, obligations, or liabilities of an LLC, whether arising in tort, contract or otherwise.

229 AD2d 426, 427, 644 N.Y.S.2d 802 (1996)). The Complaint does not allege that Mr. Amato or Mr. Guidicipietro directly participated in the alleged conduct, only that they are liable "as managing partners of Alexander Capital" "for the wrongful acts of the defectively formed Limited Partnership alleged herein and are financially responsible for the debts of, and any judgment that is not satisfied by the defectively formed Limited Partnership, arising out of this action." (4th Am. Compl. ¶ 7.) Plaintiff has not offered any evidence at trial that Defendants Amato and Guidicipietro directly participated in any alleged fraud or breach of contract

For all of the reasons, Mr. Amato and Mr. Guidicipietro are entitled to directed verdict in their favor on Plaintiff's claims against them for individual liability.

Respectfully submitted, this 30th day of June 2023.

/s/ *Bryan Ward*
Bryan Ward (*Pro Hac Vice*)
Aaron Wright (*Pro Hac Vice*)
Holly Cole (*Pro Hac Vice*)
Holcomb + Ward, LLP
3455 Peachtree Road NE
Suite 500
Atlanta, Georgia 30326
404-601-2803
Bryan.Ward@holcombward.com
Aaron@holcombward.com
*Counsel for Defendants Alexander Capital LP,*
*Joseph Amato, Rocco Guidicipietro, and NESA*
*Management, LLC*