N6QQaqu1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JOHN J. AQUINO, CHAPTER 7
     TRUSTEE, By Its Assignee,
 4   Convergent Distributors of
     Texas, LLC
 5
                    Plaintiff
 6
            v.                            21 Civ. 1355 (JSR)
 7                                          Bench Trial

 8   ALEXANDER CAPITA, LP, JOSEPH
     AMATO, ROCCO GUIDICIPIETRO,
 9   and NESA MANAGEMENT, LLC

10                   Defendants

11   ------------------------------x
                                          New York, N.Y.
12                                        June 26, 2023
                                          9:40 a.m.
13
     Before:
14
                          HON. JED S. RAKOFF
15
                                          District Judge
16
                            APPEARANCES
17
     LAW OFFICE OF WILLIAM COUDERT RAND
18        Attorneys for Plaintiff
     WILLIAM C. RAND
19   GLENN GOODMAN

20

21   HOLCOMB WARD LLP
          Attorneys for Defendants
22   BRYAN WARD
     HOLLY COLE
23

24

25
```

N6QQaqu1

```
 1                (In open court; case called)

 2                DEPUTY CLERK:  Will everyone please be seated, and

 3     will the parties please identify themselves for the record.

 4                MR. RAND:  William Rand for the plaintiff.

 5                Good morning, your Honor.

 6                THE COURT:  Good morning.

 7                MR. GOODMAN:  Your Honor, my name is Glenn Goodman.  I

 8     will not be acting as counsel.  I will be assisting Mr. Rand.

 9                THE COURT:  Okay.

10                MR. WARD:  Good morning.

11                Bryan Ward for defendant.  With me is Holly Cole.  And

12     two of our clients here, Joseph Amato and Rocco Guidicipietro.

13                THE COURT:  Good morning.

14                All right.  The defendants have filed three motions in

15     limine.

16                The first is to exclude certain evidence; namely,

17     evidence related to Inpellis's alleged $75 million lost

18     business value.

19                Second, evidence related to the costs associated with

20     hiring Dr. Mooney and establishing the New York-Jersey office

21     and that allegedly totals 732,000 some odd dollars.

22                Third, evidence related to the costs associated with

23     terminating Dr. Mooney in closing the New York office, and that

24     allegedly totals $317,500.

25                And, fourth, evidence related to the legal expenses
```

N6QQaqu1

1    associated with Inpellis's response to the SEC's stop order and

2    subsequent investigation of Inpellis, and that allegedly totals

3    $91,500.

4              I am going to grant the motion in part and deny it in

5    part.

6              As to the first item, the $75 million in lost business

7    value, I really dealt with that in my summary judgment order

8    holding that the undisputed evidence shows that Inpellis's

9    failure was due to the SEC's stop order preventing the IPO from

10   going forward as well as the SEC's taking a security interest

11   in Inpellis's intellectual property rather than ACLP's

12   allegedly fraudulent conduct.

13             As to the fourth item, the evidence related to

14   Inpellis's in costs having to do with Inpellis's response to

15   the SEC's stop order, I had already concluded as a matter of

16   law that the stop order was not caused by ACLP.  So, those two

17   items are excluded.

18             The other two remain in the case.

19             The defendant's second motion is to preclude

20   plaintiffs from introducing various evidence related to the

21   alleged spoliation relating to the loss of Inpellis's computer

22   service.  Now, I previously held that plaintiffs failed to take

23   reasonable steps to preserve Inpellis's computer server,

24   notwithstanding the likelihood that it contained relevant

25   evidence.  I think there is the possibility therefore under

N6QQaqu1

1    Rule 37(e)(1) of sanctions if there is a finding of prejudice

2    caused from the loss of information.  So I think that I am then

3    going to deny the motion seeking to preclude that evidence

4    which is related to actions taken by, decisions made by, or

5    statements of, intentions of, or the understanding of or other

6    thoughts and behavior relating to that.  But I think I may

7    revisit that later in the case depending what that evidence

8    shows.

9             Finally, the third of defendant's motions is seeking

10   an order precluding plaintiffs from introducing evidence of

11   various alleged bad acts, specifically the acceptance waiver

12   and consent letter entered into between ACLP and FINRA in 2019

13   that found that between January 2016 and June 2016 the firm

14   engaged in 16 firm commitment offerings, even though the

15   membership agreement did not permit the firm to participate in

16   firm commitment offers.  I think that is still -- I have

17   already held that the statements in the first engagement

18   agreement were materially misleading but the question of

19   scienter remains open.  So that motion is denied.

20            Please call your first witness.

21            MR. RAND:  Good morning, your Honor.  Before we call

22   the first witness, we would jointly request that we could enter

23   into evidence all the evidence that we had stipulated to that

24   nobody has objections to.

25            THE COURT:  Go ahead.

N6QQaqu1

 1              MR. RAND:  So how should we --

 2              THE COURT:  Just read the numbers for the record.

 3              MR. RAND:  We would like to enter -- the exhibits that

 4     were not objected to by defendants of plaintiffs, we would like

 5     to enter into evidence are Exhibits P1, P2, P4, P5, P5-A, P6,

 6     P9, P10, P11, P12, P12-A, P13-A, P19, P20, P21, P22, P23, P27,

 7     P28, P29, P30, P32, P36, P37, P38, P39, P40, P41, P42, P45,

 8     P48, P59, P60, P61, P62, P63, P64, P65, P70-A, P70-B, P73-A,

 9     P73-B, P73-C, P73-D, P74, P75, P76, P81, P83, P84, P85, P86,

10     P87, P88, P89, P97, P98, and that's all your Honor.

11              THE COURT:  Any objection?

12              MR. WARD:  No objection, your Honor.

13              THE COURT:  Received.

14              (Plaintiff's Exhibits P1, P2, P4, P5, P5-A, P6, P9,

15     P10, P11, P12, P12-A, P13-A, P19, P20, P21, P22, P23, P27, P28,

16     P29, P30, P32, P36, P37, P38, P39, P40, P41, P42, P45, P48,

17     P59, P60, P61, P62, P63, P64, P65, P70-A, P70-B, P73-A, P73-B,

18     P73-C, P73-D, P74, P75, P76, P81, P83, P84, P85, P86, P87, P88,

19     P89, P97, P98 received in evidence)

20              MR. WARD:  We would like to go ahead and offer all of

21     our exhibits which have not been objected to.

22              THE COURT:  You have to read the numbers into the

23     record.

24              MR. WARD:  That is Defendant's Exhibits 1 through 142,

25     your Honor.

1              THE COURT:  All right.  Any objection?

2              MR. RAND:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibits 1-142 received in evidence)

5              MR. RAND:  We would like to call Mr. Thomas Barrette.

6              THE COURT:  By the way, for future reference, since

7    the witness was in the courtroom, that's okay because I hadn't

8    stated yet, but I now will state all witnesses are hereby

9    excluded from the courtroom except when they're testifying.

10             DEPUTY CLERK:  Please take the witness stand.

11    THOMAS L. BARRETTE,

12         called as a witness by the Plaintiff,

13         having been duly sworn, testified as follows:

14             DEPUTY CLERK:  State your name and spell it slowly for

15    the record.

16             THE WITNESS:  My name is Thomas L. Barrette.

17    B-A-R-R-E-T-T-E.

18             THE COURT:  Counsel.

19    DIRECT EXAMINATION

20    BY MR. RAND:

21    Q.  Mr. Barrette, could you please give us a summary of your

22    educational background.

23    A.  Yes.  I graduated from Harvard College in 1977, worked for

24    a couple of years as a paralegal at a Boston law firm, and then

25    went to law school at Boston College Law School in Newton,

N6QQaqu1                          Barrette - Direct

1    Massachusetts, graduated from there in 1982.

2    Q.  Can you give us a summary of your professional background?

3    A.  Sure.  After I graduated from BC Law, I took the bar exam

4    and went directly to work in the corporate department of a

5    large Boston law firm that was then known as Hale & Dorr.  The

6    firm still exists; it's called Wilmer Hale now.  I spent the

7    next 20 years working at Hale & Dorr in the corporate

8    department, which means that I was doing business deals,

9    venture capital financings, initial public offerings drafting

10   partnership agreements, and that sort of thing.

11              From there, I left to pursue a business venture with a

12   former client and another friend in the telecommunications

13   space.  After that, I went back to the world of big law firms

14   and spent four years at the Boston office of another large law

15   firm called Holland & Knight.  I was there from about 2012

16   through 2016.

17              Then I left there, did some work with some of the

18   companies involved in this lawsuit; also consulted with other

19   companies, and I consulted both in a legal capacity and a

20   business capacity for a number of years.  And then in January

21   of 2021, one of my consulting clients, a company called

22   BioSurfaces, which is a life science company outside of Boston,

23   asked me to join them.  So that's where I work now.  My current

24   title is vice-president of strategy and chief legal officer at

25   that company.  So that's my full-time job now.

N6QQaqu1                        Barrette - Direct

1    Q.   Did there come a time when you did work for BioChemics?

2    A.   Yes.   When I was at Holland & Knight in the May, early June

3    timeframe of 2014, I was engaged by BioChemics to give them

4    legal advice in corporate matters.

5    Q.   Did there come a time that you started to work for

6    Inpellis?

7    A.   Yes.   During the course of my work for Biochemics,

8    Inpellis, which at that time was called Alterix, was a

9    subsidiary of BioChemics.   During the summer of 2014, some of

10   the people involved in managing BioChemics identified an

11   opportunity for Alterix to raise funds through a public

12   offering, and they asked me if I would be interested in taking

13   on that task since I did have experience in public offerings

14   from my years at Hale & Dorr.

15          I said yes, that would be a good piece of legal work,

16   and I undertook to then represent Alterix.   The name was later

17   changed to Inpellis, just a name change in the process of

18   conducting the public offering as company counsel in initial

19   public offering for Alterix.

20   Q.   Are you familiar with the history of the corporate

21   structure of BioChemics?

22   A.   Yes, I am quite familiar with it.   Yes.

23   Q.   Can you explain the corporate history of BioChemics at this

24   time?

25   A.   Yes.   When I -- BioChemics was founded by a gentleman named

John Masiz, M-A-S-I-Z.  This is years before I was involved,

but he had, with the help of scientists, developed some

technology involving delivering drugs through your skin called

transdermal delivery and had done a lot of work to develop that

technology and finance it.

          When I came on the scene, BioChemics and Mr. Masiz had

issues with the SEC about some of their private fundraising and

some of their earlier public companies.  And the structure of

BioChemics at that time was that it was owned and -- majority

owned and majority controlled by Mr. Masiz and members of his

family but was really his company effectively.

Q.  And did that change?

A.  Yes.  A couple of things were going on.  Actually, I should

say that when I first came in -- the immediate reason that they

hired me is that Mr. Masiz agreed to let one of his large

investors, a gentleman named Vick Lattimore, actually control

BioChemics as an effort to -- because of his problems with the

SEC to distance him, this is Mr. Masiz, from the company.

          Some things that Mr. Lattimore did Mr. Masiz thought

were not good decisions, and he decided that he wanted to try

to get control of BioChemics back.  So I was consulted on how

to do that.  I determined that it wasn't very difficult to do,

and we in fact did give voting control back to Mr. Masiz.  And

that was the immediate thing I did in kind of the May/June

timeframe of 2014.

1          At that point, when we realized there was the

2     opportunity for Alterix to conduct a public offering, we began

3     to look at ways to similarly distance that very good-looking

4     corporate opportunity or business opportunity from Mr. Masiz's

5     problems with the SEC.  And so --

6          THE COURT:  What were Mr. Masiz's problems with the

7     SEC?

8          THE WITNESS:  I was not deeply involved in working on

9     them.  There was some history there, but I -- he had had

10    another public company, and I must admit, your Honor, the name

11    of it escapes me right now.  It might have been Bioscriptives.

12    That's a little bit of an educated guess.  But it had been

13    publicly traded, and I believe that the SEC concluded that

14    Mr. Masiz had misrepresented, I think, the state of the

15    clinical approvals of the drug that it had.

16         Again, my job was not to, you know, get deeply

17    involved in that controversy with the SEC.  It was just that

18    Mr. Masiz had some issues with the SEC.  You know, whether they

19    were fair or not is a whole different question.

20         THE COURT:  Did he settle those?  Did they file a

21    complaint against him?

22         THE WITNESS:  Yes, I believe so.  Again, it's not an

23    area where I have a lot of detail.

24         THE COURT:  I understand.  And did he settle that?

25         THE WITNESS:  Yes, ultimately -- in fact, one of the

1   reasons that Mr. Masiz wanted to get control of BioChemics back

2   was that Mr. Lattimore settled it with the SEC.  He entered

3   into a settlement agreement with the SEC, and the party there

4   involved both Mr. Masiz and the corporate entity BioChemics.

5   So there was a settlement of that matter, and, quite frankly, I

6   think that Mr. Masiz felt that he might not have settled it on

7   the same terms as Mr. Lattimore, so he wanted to get control of

8   the company back, control of that situation.

9              So the -- at that point when we -- when the people

10  involved in running BioChemics concluded that the Alterix

11  opportunity was a significant one, we essentially kind of went

12  back at what can we do to demonstrate to investors and the SEC

13  that Mr. Masiz was not making all the decisions with respect to

14  this -- that was going to be a newer venture:  Alterix, later

15  Inpellis.

16             And I should say the people involved at this point

17  were a businessman named Marshall Sterman, who introduced me to

18  Mr. Masiz in the first place through just a mutual friend, and

19  an attorney in the greater Boston area named Jan Schlichtmann,

20  who was sort of advising Mr. Masiz and his family on

21  strategizing about how to address some of these issues and how

22  to take advantage of this promising technology.

23             THE COURT:  You're aware, I assume, that

24  Mr. Schlichtmann admitted to this Court that he had lied to me

25  under oath?

N6QQaqu1                         Barrette - Direct

1        THE WITNESS:  Yes.  I have not read the transcripts,

2   but I'm aware that he has -- that he has acknowledged

3   statements to you, yes, your Honor.

4        And so we then as a structural matter took a couple of

5   steps.  We set up an LLC, that's a limited liability company,

6   called SeaChange Pharma, and the Masiz family, John and various

7   members of his family, put all of their ownership of BioChemics

8   into SeaChange Pharma.

9        The structure of SeaChange Pharma was that it was

10  67 percent owned by the members of the Masiz family, and then

11  the other 33 percent was owned in equal eleven percent pieces

12  by Mr. Sterman, Mr. Schlichtmann, and I'm sorry I just blanked

13  on the third person who had the eleven percent -- I think it

14  was Oreostes Brown.  Can I ask to be refreshed about that, your

15  Honor?

16       THE COURT:  I don't think it's really material.  Thank

17  you anyway.

18       THE WITNESS:  No problem.  And so that was set up.

19  And Mr. Schlichtmann was the manager of that LLC, and in the

20  LLC business, we say that it had a powerful manager.  So he was

21  essentially a one-person board of directors for that LLC who

22  could make decisions.

23       So what that meant was that Mr. Schlichtmann

24  essentially controlled the decision-making of BioChemics.  And

25  he could not be removed from that for a period of time unless

1    both the 67 percent Masiz family addressed and one of the other

2    eleven percent owners could remove him.  So that sort of moved

3    BioChemics control away from Mr. Masiz.

4          And then during that summer, as I was essentially

5    transitioning to represent Alterix, an important development

6    was that Alterix signed an engagement letter with Alexander

7    Capital, and the engagement letter which was I believe in

8    July 2014 was a letter stating that Alexander Capital would

9    become their financial advisor for the purpose of conducting a

10   firm commitment initial public offering of Alterix.

11         And we then set about doing a few things:  One is that

12   to further insulate this now -- this company that was

13   essentially new at the time from the Masiz-SEC issues,

14   Mr. Schlichtmann and his team created a trust called the

15   Shareholder Resolution Trust.  That becomes relevant in

16   January 2015, but it was set up in the September timeframe of

17   2014.  So I will come to that in chronological order.

18         The other thing that was going on, because Alterix had

19   been a hundred percent subsidiary of BioChemics, it really did

20   not have its own management team.  What it had was a license

21   from BioChemics to use the BioChemics transdermal technology in

22   conjunction primarily with pain drugs, especially transdermal

23   ibuprofen, which is kind of a holy grail of the

24   over-the-counter pain industry.  Ibuprofen, as you know, has

25   side effects if you take it orally.  But if you can rub it

1      directly on the painful joint, it actually gets through your

2      skin, which is actually very hard to do, and then it could be a

3      very valuable product.  That was really the core opportunity.

4             So, when the decision was -- when the team made the

5      decision to pursue the initial public offering and engaged

6      Alexander, the next order of business was to recruit a

7      management team.  And so Marshall, who has a very good --

8      Marshall Sterman, who has a very good network, and others set

9      about finding officers and directors for Alterix, and that

10     process went on through the fall of 2014.

11            THE COURT:  When did Alterix change its name to

12     Inpellis?

13            THE WITNESS:  Fairly late in the story, your Honor.

14     I'm quite sure of the general area.  I know that we did a

15     filing of a draft registration statement on October 5.  I think

16     that might have reflected the name change, and the name change

17     occurred shortly before that.  So we're talking the

18     September/October 2015 timeframe is when it happened, and it

19     was purely a marketing idea.

20            THE COURT:  Let's go back then to --

21            THE WITNESS:  To the kind of fall of 2014.

22            So during the fall of 2014, you were asking about the

23     corporate structure of BioChemics.  This is relevant to that

24     because, again, BioChemics itself was owned by SeaChange --

25     sorry controlled by SeaChange.  Marshall Sterman was

1   functioning as the CEO of BioChemics, and I think may also have

2   been the CEO of Alterix for awhile, but we then went about

3   finding a new CEO for Alterix which ended up being a Ph.D.

4   pharmacist Harry McCoy.

5          There was a prominent doctor in town who

6   Mr. Schlichtmann knew, named David Staskin, who was brought in

7   as the sort of president of the company.  They recruited board

8   members.  And so in terms of corporate structure, just to recap

9   quickly, went from BioChemics and who controlled BioChemics to

10  then -- and then focusing on Alterix, and having Alterix

11  recruit a management team and a board of directors.  And so

12  this -- and this was all -- this all started because of the

13  plan to conduct the initial public offering.

14         So that went on through the fall of 2014.  And the

15  last sort of major corporate structure event was that in, I'm

16  quite sure of this, it's January of 2015 BioChemics put --

17  BioChemics at that point owned one hundred percent of Alterix,

18  and it transferred those shares to the trust.

19         The trustees of the trust were Mr. Schlichtmann, a

20  prominent Boston attorney named Dan Glosband, G-L-O-S-B-A-N-D.

21  Jan had been a partner at Goodwin Procter & Hoar, a large

22  Boston law firm.  Again, the third trustee was a gentleman

23  named Jack Altshuler.  I'm pretty sure the record, the evidence

24  will show, and Jack was a well-known attorney in Beverly,

25  Massachusetts.

N6QQaqu1                        Barrette - Direct

1          So what that did was it showed that these trustees now

2     controlled Alterix, not BioChemics, not the company who had

3     settled with the SEC.  And so it was just further insulation of

4     the, you know, difficult SEC history that BioChemics and

5     Mr. Masiz had.

6          So just to stop there for a second.  That is the

7     corporate structure that was in place when the public offering

8     got, you know, seriously under way.  So, again, Alterix now was

9     a Delaware corporation, all of whose shares were owned by the

10    Shareholder Resolution Trust.  It had a management team and a

11    board of directors in place.  And we were ready to proceed with

12    the public offering.

13             MR. RAND:  Plaintiffs mark for identification P72.

14             THE COURT:  This is in evidence?

15             MR. RAND:  No.

16    Q.  Mr. Barrette, I would ask that you look at P72 marked for

17    identification.  My question will be:  Are the facts in P72 an

18    accurate representation of the corporate history of BioChemics?

19    A.  Let me take one minute to flip through.  I have seen this

20    before, but ... yes, they're accurate.

21             MR. RAND:  Plaintiffs move for admission into evidence

22    of Plaintiff's Exhibit P72.

23             MR. WARD:  I would object, your Honor, simply to the

24    authenticity of the document.  This maybe reflects an accurate

25    representation of the corporate structure according to the

1   witness, but the document itself was created, we believe --

2          THE COURT:  Yes.  So what I think plaintiff wants to

3   do is offer this not as evidence but as an aid to the Court in

4   following the testimony that was just given by the witness,

5   and.  So the Court will receive it as an aid to the Court, but

6   not as evidence itself.

7          MR. WARD:  Thank you, your Honor.

8          MR. RAND:  Could we move for it to be admitted as a

9   demonstrative?

10         THE COURT:  That's what I just described.

11         MR. RAND:  Thank you your Honor.

12         (Plaintiff's Exhibit 72 received as a demonstrative)

13  Q.  I'd like to show you Exhibit P1, which is the engagement

14  agreement --

15         THE COURT:  I'm sorry, before we get there, so there

16  is a reference here to SeaChange Pharma LLC.  Is that just

17  another name for the trust?

18         THE WITNESS:  No, it was -- the ownership interest in

19  two different entities was moved to two different insulating

20  entities, if you will, your Honor.  So starting with the parent

21  corporation BioChemics, BioChemics, you will recall, was

22  majority owned by the Masiz family.  So SeaChange Pharma was

23  created to receive the majority ownership of BioChemics from

24  the Masiz family.  That is what SeaChange Pharma did.

25         THE COURT:  And what did the Masiz family get?

1          THE WITNESS:  They got the 67 percent ownership

2    interest in SeaChange Pharma.  So they essentially contributed

3    an asset which was a package of shares and debt from BioChemics

4    to a new LLC in exchange for 67 percent ownership in the LLC.

5          THE COURT:  Okay.

6          THE WITNESS:  And you'll see that was June 2014.  As

7    the IPO opportunity for Alterix came into focus, the team

8    running BioChemics decided it would be good to further insulate

9    Alterix from the issues that BioChemics was having.  So at this

10   point in time, BioChemics still owned all of Alterix.

11         For some reason, I'm quite sure that I remember it was

12   50 million shares; a lot of shares but one owner.  And so

13   BioChemics was the parent of Alterix.  And not until -- this

14   doesn't happen until January of 2015.  It's very relevant to

15   your question.  BioChemics transferred those 50 million shares

16   to the Shareholder Resolution Trust.

17         THE COURT:  Okay.

18   Q.  Mr. Barrette, I'd like to show you what is marked as P1,

19   which is in evidence, which is the Alexander engagement

20   agreement.  Do you recognize this agreement?

21   A.  Yes, I do.

22   Q.  What is this agreement?

23   A.  This is the original engagement letter that I mentioned

24   earlier in July 2014 between Alterix, Inc. and Alexander

25   Capital where Alexander says that they will act as agent on a

N6QQaqu1                    Barrette - Direct

firm commitment basis for an initial public offering of

Alterix.  It also contains other standard provisions in these

agreements like the anticipated size of the public offering and

compensation, commission, that sort of thing.

Q.  What does it mean to do the offering on a firm commitment

basis?

A.  It means that at the time that the registration statement

goes effective with the SEC, the underwriter has agreed to buy

all the shares being offered in the offering.

Q.  What does that mean for the company doing the offering?

A.  Well, it's the gold standard of public offerings that you

have an underwriter who has said that they anticipate that they

will -- that the underwriting agreement will be a firm

commitment, that they -- and that sends a message to the market

that they believe in the company.  And it's what -- you know,

all the public offerings I've done before have always been firm

commitment public offerings.  That's sort of a really a -- I'm

trying to avoid the word standard, but it's for an offering of

this size, this complexity, the firm commitment is very

important.

Q.  Do you understand the term best efforts offering?

A.  Yes.

Q.  What is the difference between a firm commitment offering

and a best efforts offering?

A.  A best efforts offering simply means that when a

1  registration statement is effective, which means in the world

2  of SEC regulation that you're now actually allowed to sell the

3  securities to an investor, that the underwriter is going to do

4  its best to sell the securities, but what it doesn't do is

5  actually buy the securities from you.

6        A firm commitment -- when the registration goes

7  effective, registration goes effective, there's actually a

8  closing in which the underwriting firm or firms, because

9  there's often a group of them in the syndicate, buy all the

10 shares in the company.  So the company knows it's going to get

11 the money for the shares on that date net of, you know,

12 commissions and fees.  And then the underwriters then take the

13 shares they bought from the company and resell them to the

14 market.  So that's a firm commitment offering.

15       In a best efforts offering, they're really brokering

16 the shares, I mean in the true sense.  Because the registration

17 statement is effective, they can now sell into the public

18 market, but they're just selling them to an investor.  They

19 haven't -- and the company doesn't know how many shares they're

20 going to be able to sell until they go out and try.

21 Q.  Was it important to Alterix that the offering be on a firm

22 base commitment basis?

23 A.  It was critical.

24 Q.  Why was it critical?

25 A.  Because the process of running a public offering takes

months and a very large amount of money.  I'll come back to

that in a second.  And to -- and so a company in Alterix's

position or any company considering going public would simply

not proceed unless they had a firm commitment engagement letter

because the chances of it succeeding are much greater in a firm

commitment scenario, and it therefore makes sense to deploy all

the resources that it would take to conduct a firm commitment

offering.

       And to maybe go back to the summary of the corporate

structure that we talked about, some other things in that

summary are the names of the professional firms.  My firm,

Holland & Knight.  So there are three key, very expensive sets

of outside professionals that get involved in a public

offering:  Company counsel, outside company counsel, and that

was my role.  And Alterix being a small company didn't have

inhouse counsel, but even if it's a good-sized company with

inhouse counsel, you essentially hire a big outside firm that

does initial public offerings frequently.  So there's company

counsel.  Then the underwriters hire their own counsel called

underwriters' counsel.  That's also typically a large firm.  In

this case Alexander engaged Greenberg Traurig, a very fine,

very large, nationwide firm.  They used the New York office, a

very good, young partner there, named Tony Marsico with a lot

of experience.  So that was the underwriters' counsel in our

deal, and that was an engagement that, you know, had to be

1    planned and undertaken.  By the way, the company is responsible

2    for paying the underwriters' counsel.  So while the

3    underwriters' counsel is representing Alexander, it's on the

4    company's nickel, another major commitment.

5           Finally, the third key professional firm that you --

6    third party firm that you engage is an outside auditor, an

7    accounting firm.  This is different from the inhouse people.

8    You know, you have -- the company will have its own chief

9    financial officer and accounting people, but the auditors play

10   a critical role because you can't file a registration statement

11   with the SEC without audited financials, often both audited and

12   sometimes quarterly unaudited financials.

13          But outside accounting -- you cannot do a public

14   offering without an outside accounting firm.  And, again, you

15   want to indicate to the market that this is a company getting

16   good advice, so you also want a name brand outside accounting

17   firm.  In this case, Alterix engaged Marcum, which is a

18   well-known, major national accounting firm.

19          Each one of those professionals is likely to have a

20   multi six-figure bill at the end of this.  This is a major

21   financial undertaking, especially for a company like Alterix.

22   And undertaking all that risk and incurring all those expenses

23   is something you just don't do unless you have a firm

24   commitment underwriting planned.

25   Q.  Was there a timeframe for the public offering?

A.   The answer is that it was -- it's always as soon as

possible.  I mean, but the process for doing a public offering

takes time.  I like to analogize it to, you know, more

straightforward people understand that if a company is having,

you know, a venture capital investment or getting a loan, the

investor and the lender does a lot of due diligence on the

company.  There are, you know, ten-page long due diligence

lists that they give the company and the company's team, the

financial team and their counsel have to answer all kinds of

questions:  Some very mundane, some very specific.  And that

happens in a public offering.

          In that case, the underwriter essentially is the

investor, and they're going to be the investor because the firm

commitment underwriter means that at the time of the

effectiveness, they're going to buy all the shares.  So they

are essentially in this case planning on writing a $20 million

check, so they act that way early on.

          So in about the January 2015 timeframe, I believe

Greenberg had been identified to us.  We reached out to Tony.

You quickly put together a calendar for the offering with all

the players.  And early on Greenberg sent to me probably, I'm

sure, a due diligence list, and we went to work answering their

due diligence questions.  And so I'm saying that because that

takes a little while.  It can take a couple of months to get

through the whole due diligence process.

1           In terms of the calendar, maybe to get into the

2     specifics, once you're through the due diligence, kind of

3     usually in parallel with that, you're beginning to draft the

4     registration statement.  And, you know, in SEC parlance, a

5     registration statement, in this case something called a form S,

6     as in Sam, hyphen one, is the document we file with the SEC

7     that authorizes you -- once the SEC declares it effective,

8     authorizes you to sell shares to the public.  And as I think

9     most people here know that an S-1 is a long document, you know,

10    often over a hundred pages long and many pages of financials at

11    the end.  So the task of writing that document is a lot of

12    work.

13          And so back to schedule.  So the plan was to go

14    through due diligence, write the S-1, and sometime in

15    relatively early 2015, you know, first quarter, early second

16    quarter, get an initial filing into the SEC.

17          And then the other big time factor is the process of

18    the SEC is you file your first draft -- or not, your first

19    registration statement, and we'll stop on some terminology

20    here.  The document you file these days is called a DRS, which

21    means draft registration statement.  This is something that

22    happened during my career.  This didn't used to be the way you

23    did it, but it's a number of years ago now, the SEC said that

24    you can file a draft registration statement confidentially.

25          Before, if you filed a registration statement with the

N6QQaqu1                    Barrette - Direct

1    SEC, it appeared on the SEC's public service called Edgar, and

2    the whole world knew you were going public because they saw

3    your first cut of the registration statement.  That's just some

4    history.

5            Back to our process.  We knew the first thing we were

6    going to file was a DRS, so I may use the terms DRS and

7    registration statement interchangeably.  But it's important

8    that all but the last one of our filings in this process was a

9    confidential DRS.

10           So in terms of schedule, once you file that first DRS,

11   you then wait because the SEC is going to give you comments on

12   it, and it's a division of the SEC called corporate finance or

13   Corp. Fin.  And getting those comments back takes awhile.  It

14   could take a couple of months.  They go through it very

15   carefully, and you get one comment letter with two big

16   headings.  One is the Corp. Fin. Department commenting on

17   essentially all the pros in your DRS, but then there's a

18   separate accounting division of the SEC, and they comment on

19   the accounting things in there.  That both includes numbers

20   that are embedded in the body, as well as financial statements

21   that are attached to it.

22           And that -- and so, you know, once you make an initial

23   filing and when the time has passed, and it's about the right

24   time to get comments, everybody is kind of on edge.  You have

25   company counsel, underwriters' counsel, inhouse counsel saying

1    what are we going to get for comments.  So the timeline we had

2    for the public offering anticipated filing, of course, we know

3    when the first one was filed was early April.  So filing in

4    early April, a couple of months you get the comments, and then

5    it's kind of an iterative process where you get comments, a few

6    more comments, and the goal typically what happens is you get

7    fewer and fewer comments to the point where the SEC says,

8    you're good, you can go effective.

9         That's the process.  So our calendar we really were

10   kind of focused on this timing question in, you know, the

11   January 2015 timeframe, and I'm sure the planning was, you

12   know, given those time frames, given -- you typically don't

13   want to go effective in the middle of the summer because people

14   are distracted by summer vacations; that we were aiming for an

15   early fall effectiveness, and we felt that we had enough time

16   to do that.

17        So you've asked about schedule.  That was the

18   anticipated schedule

19   Q.  And you said previously that BioChemics had a settlement

20   with the SEC.  Do you know if there was any timeline for

21   payments related to that?

22   A.  Yes.  And, again, I was quite focused on Alterix, but I was

23   aware of it.  I don't want to say I wasn't, because I was very

24   aware of it.  BioChemics did have a large payment due to the

25   SEC in the fall of 2015.  I think it was in November, but it

1    was definitely -- I'm quite sure it was the fall of 2015.

2    Q.  I would like to show you Plaintiff's Exhibit 36, which is

3    already in evidence.  Have you seen Plaintiff's Exhibit 36

4    before?

5    A.  Yes.

6    Q.  What is Plaintiff's Exhibit 36?

7    A.  Plaintiffs 36 is an email to me on March 30, 2015 from Ana

8    Guzman.  A-N-A.  G-U-Z-M-A-N.  She was an associate at

9    Greenberg Traurig who was working on the project.

10   Q.  What is attached to the email?

11   A.  So attached to the email is what she describes as the

12   latest draft of the S-1, and noting that Greenberg had made

13   comments on it.  So it was redlined to indicate those comments.

14   Again, this is part of the normal back-and-forth.  We would

15   have drafted this, sent it to them for their comments, and we

16   probably had done this a few times at this point, and they sent

17   it back to us.

18        I should observe that the -- she sent it to

19   essentially the sort of whole team, so me, but the officers --

20   or the people who were coming in as officers of Alterix were on

21   it as well, as well as folks at Alexander Capital.

22   Q.  If you look at the pages, at the top where it says page 5

23   of 125, it's about four pages in?

24   A.  Yes.

25   Q.  Are you on that page?

N6QQaqu1                          Barrette - Direct

1    A.   Yes.

2    Q.   You see in the middle of the page, it says:  This is a firm

3    commitment underline redlined initial public offering?

4    A.   Yes.

5    Q.   Was that language added by Greenberg?

6    A.   Yes, that's correct.  It was -- I'm sure, again, Greenberg

7    was conveying what Alexander wanted, as well as making

8    technical legal comments.  But yes, one of the redline changes

9    is to explicitly put the words "firm commitment" in some

10   introductory language on what ultimately would be the cover or

11   the prospectus, which is what most of the S-1 is.

12   Q.   What was Greenberg responsible for in the registration

13   process?

14   A.   Again, as I described, the process is the company counsel,

15   that's me and my very good team at Holland & Knight, would do

16   we do the initial -- we did the initial draft of the DRS, and

17   then, you know, immediately when we were happy with it, sent it

18   to Greenberg and Alexander, and Greenberg would be our point of

19   contact, and they would make comments on S-1 and all aspects of

20   the S-1, so -- and they would be doing this in consultation

21   with Alexander, but my major communication was with the folks

22   at Greenberg.  Very often Tony Marsico, who was the senior of

23   the team, but he had a couple good associates working with him,

24   it was all very collegial.  But they would, you know, comment

25   and, you know, a very important aspect of this business was

1   this transdermal technology.   There were a number of patents.

2   As is very typical, you know, being a Boston area corporate

3   lawyer, a lot of offerings, I worked on heavy technology

4   component.   Greenberg had its own very excellent patent

5   attorneys.   They spent a lot of time on the descriptions of the

6   intellectual property.   Greenberg and Alexander were very well

7   aware of the problems that BioChemics had had with the SEC, so

8   we went out of our way here to disclose the issues with the SEC

9   because we wanted to demonstrate to the SEC Corp. Fin. people

10  that we were weren't trying to gloss over that.   And they paid

11  a lot of attention to that.   They were well aware of those

12  issues.

13          And then finally there's a section of this document

14  called underwriting.   This is dictated by the SEC.   One of the

15  sections of your S-1 has to be about a page and a half on the

16  terms of the underwriting.   And that section is where -- you

17  know, the company counsel, my team write the bulk of the S-1,

18  that is usually a blank, and you say underwriters' counsel,

19  give me what Alexander likes to see in the underwriting

20  section.   The underwriting section has to cover certain topics

21  dictated by the SEC, but there are style differences.   If

22  Goldman Sachs is underwriting an offering, their underwriting

23  section would probably look different from an Alexander Capital

24  one.   That's not a comment on the size of the firms.   They just

25  have different styles of doing it.

1              So it was a very collaborative and collegial process,

2     but that was the sort of the flow of things.  So it would be

3     very typical that whatever boilerplate we had put in one of the

4     earlier drafts of this DRS for comment, they -- it was picked

5     up by Greenberg that we might want to say a firm commitment

6     more prominently on something what is called the cover of the

7     prospectus, which is an important element of the S1 or the DRS.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N6Q5aqu2                        Barrette - Direct

 1   BY MR. RAND:

 2   Q.  I would like to provide you Plaintiff's Exhibit 23 which is

 3   in evidence which is the DRS dated April, 2015.  Do you

 4   recognize this agreement?

 5   A.  Yes.

 6   Q.  Do you recognize this DRS?

 7   A.  Yes.

 8   Q.  What is this DRS?

 9   A.  This is the first DRS that we filed with the SEC.  As it

10   says in the very first page of the DRS at the top, it says:

11   Confidentially submitted to the Securities and Exchange

12   Commission on April 8, 2015.

13   Q.  And if you look on page 4 of 139 at the top listing?

14   A.  I have it.

15   Q.  Do you see it says:  This is a firm commitment initial

16   public offering?

17   A.  Yes.  That's consistent with the comment we saw on that

18   earlier one that we looked at, was a draft and not been

19   submitted to the SEC.  As I said the process goes on as

20   iterative, even internally, but it clearly says -- when I refer

21   to the prospectus, by the way, and S1 or a DRS, which

22   essentially looks like an S1 has a couple of pages at the

23   beginning that are pages required by the SEC but then after

24   those first couple of pages there is something called a

25   prospectus, and ultimately that prospectus is the booklet that

1    an investor would get once it is finalized.  And so, the reason

2    I keep referring to the first page of the prospectus is that is

3    important.  If an investor, if we were effective or even if we

4    were in part of the process where you were allowed to show

5    potential investors an incomplete but nearly complete

6    prospectus, you handed them a -- in the old days you handed a

7    physical copy with a glossy cover, and this page, it says page

8    4 of 139, would be that cover.  And so the first page they see

9    would see quite prominently right below where it says:

10   Alterix, this is a firm commitment public offering.  So, it was

11   an extremely important point.

12   Q.  If you turn to page 97 of this exhibit at the bottom pages?

13   A.  Are you looking at the page numbers at the bottom?

14   Q.  Yes.

15   A.  Yes; I'm on page 97.

16   Q.  Do you see the title:  Underwriting.

17   A.  I do.

18   Q.  Does it say:  Alexander Capital LLP is acting as the sole

19   manager of the offering?

20   A.  Yes, it does say that.

21   Q.  And what does that mean?

22   A.  It means that right now at this point that they're in

23   charge, so when there is a selling effort they will lead it,

24   they will -- I want to say this is my -- I have done a lot of

25   these, this is my understanding.  The company counsel typically

1    is not involved directly with the underwriters and how they

2    sell, they do something called a road show.  You are well aware

3    of that because you are kind of a student of this part of the

4    business world but you don't get directly involved so -- but my

5    understanding of the sole book running manager is when it is

6    time to sell the offering, a key thing is they're taking -- the

7    underwriters or the book running manager is taking orders for

8    their order book, it literally is an order book from people who

9    invest in these things.  Another huge reason to do a firm

10   commitment offering of this size is you are trying to have this

11   company have investors who are so-called institutional

12   investors as opposed to small people buying -- individuals

13   buying small amounts of shares, which they can do and often do

14   and it is not a bad thing, but the underwriters are going to be

15   people who are managing mutual funds and pension funds and

16   trying to interest them in taking in large blocks of stock and

17   they're doing that by taking orders and that process has to be

18   overseen and Alexander is saying we are overseeing the process.

19   Q.  Do you see below in the paragraph below it says:   The

20   underwriters are committed to purchase all the shares of common

21   stock offered by us.

22   A.  Yes.  And that is a very important sentence.  That is a

23   somewhat more technical version of a firm commitment.  So, the

24   term this is a firm commitment offering is definitely is a term

25   of art in this world, but contractually, this sentence is

describing what their obligation is.  So essentially it is just

another way of saying this is a firm commitment offering.

Q.  And can you tell me where the risk factor sections of the

DRS are?

A.  Yes.  Well, again, happily the DRS are really -- again,

this is all within the prospectus -- has a table of contents

which is in here, it is -- sorry, I'm not -- it is in this

document two pages after the cover so the page number of the

table of contents in this exhibit is actually (i).  And so,

there are two important things here.  There is a, on page 1, so

right after the table of contents there is something called the

prospectus summary and this is a fairly complete summary of

what's covered in much more detail in the rest of the

prospectus, you can tell you are in the prospectus summary

because there is a box around it.  If you see there is a box

around, it means you are in the prospectus summary.  I should

say, the SEC reads this carefully as well as other parts, and

an important thing that's always in the box is risk factors.

And so, on page 2 at the bottom, which is page 2 of the

prospectus, is the beginning of the risk factors in the summary

and so these generally call out some of the risk factors that

everyone agrees that are the most important and there is often

give and take, by the way, with underwriter's counsel about

this, what is up front, what should we say, should we edit the

ones in the more detailed prospectus section or not.  There is

give and take both because, you know, underwriter's counsel,

company counsel want to get it right and we know the SEC will

pay attention to it because, remember, this is the first

document the SEC was going to see.

So, that's one place where you find risk factors, but

then not very much further, and again, this is in the table of

contents on page 7, is the full risk factor section, and this

is a very -- this is in essentially any IPO you see because all

companies have risks.  And this -- and typically, by the way,

if you are in my seat kind of running this deal, one thing you

spend a lot of time is you find four or five registration

statements for recent deals in this case for life science

companies and you look at all their risk factors and you get

ideas and you work on them and you see what the SEC -- you can

see comment letters online, what they like, so you spend a lot

of time on the risk factors, a lot of time on it, and there is

a lot of input from underwriter's counsel and so that's the

second risk.  That is what I would call the real risk factor

section but the one in the summary is important because a lot

of people, that's the main thing they look at in the prospectus

is the summary, so you want to have some prospectus up there.

Q.  Does this DRS include risk factors related to BioChemics?

A.  Yes.

Q.  Can you explain to me where that is?

A.  Yes.  Hang on, I am just flipping through.

1          So, these pages numbers are the prospectus page

2    numbers at the bottom of the page, 5 of 10, there is a bold

3    heading called:  Risks related to our farmer parent

4    corporation.  This is a typical layout.  You have a big heading

5    and then you have some specifics risks, and then after that

6    there are two quite lengthy multi-paragraph risk factors, one

7    related to the SEC problems that BioChemics had and the other

8    one related to the fact that our intellectual property, that is

9    what we are hoping to commercialize with the funding from the

10   initial public offering, is licensed to us by BioChemics.  And

11   since we don't literally own the intellectual property in-house

12   there are always risks that something might happen to the

13   company that licenses to us.  This risk would be here, on --

14   even if BioChemics wasn't having problems with the SEC because

15   it is just a third-party that could, you know, affect how

16   things go forward.  So, those are the two main risk factors

17   about BioChemics.

18   Q.  Does it include a risk factor related to the $18 million

19   disgorgement of penalties that BioChemics was required to pay?

20   A.  Yes.  That is correct.  I should put a little more context.

21          We mentioned the fact that Mr. Lattimore, when he was

22   controlling the company back in May-June of 2014 when I first

23   came on the scene, he had engineered the settlement deal with

24   the SEC but there was supposed to be a payment, a disgorgement

25   payment and that number had been left up in the air, but in

1   March 2015, shortly before we filed this, the penalty was set

2   at $18 million.

3   Q.  If you look at page 3, which is part of the summary section

4   in the box --

5   A.  Yes.

6   Q.  -- what does that indicate regarding the BioChemics risk

7   factors?

8   A.  The second -- well, at the top of that page the second

9   bullet under the summary Risk Factors relates to both the

10  dependents on the intellectual property license from BioChemics

11  and it talks about the problems that BioChemics is having with

12  the SEC and that there is a disgorgement obligation.

13  Q.  I would like to show you Plaintiff's Exhibit 19 which is in

14  evidence which is the unreasonable letter.  Have you seen

15  Plaintiff's Exhibit 19 before?

16  A.  Yes, I have.

17  Q.  When did you first see Plaintiff's Exhibit 19?

18  A.  I had not seen this letter until a number of years after it

19  was sent.  I saw it in the context of this litigation when I

20  was told I was going to be deposed in November 2021.

21  Q.  And do you know what Exhibit 19 is?

22  A.  Yes.  I do now.  It is actually an e-mail from Tony

23  Marsico.  It is a little confusing, his e-mail handle so to

24  speak is M-A-R-S-I-C-O-A, which is Marsico, Anthony; but from

25  Tony Marsico to Jonathan Gazdak at Alexander Capital; Patrick

N6Q5aqu2                        Barrette - Direct

1    Mooney at Alexander Capital; and Chris Carlin at Alexander

2    Capital.  It also copied the two associates at Greenberg we

3    were working with, I mentioned Anna Guzman and then there was

4    another associate there whose name was I think Alexis but her

5    last name was Kleiman, K-L-E-I-M-A-N.  So, the whole Greenberg

6    team was on this e-mail.  The contents of the e-mail itself are

7    blacked out because of privilege and the letter itself is

8    attached, it is a Pimentel letter from FINRA to Greenberg,

9    attention to Tony Marsico, and it describes itself as an

10   unreasonable letter and it is talking primarily, or it is

11   talking a lot about the compensation in the offering.

12           So, to take a step back here a little bit, FINRA

13   regulates underwriters and I want to emphasize I am not a FINRA

14   expert.  I have been underwriter's counsel from time to time

15   but primarily have done public offerings as company counsel.

16   And when you file with the SEC and go through the process of

17   the SEC, which is the point person there is company counsel,

18   although as I have said, underwriter's counsel is very

19   involved, in a parallel, on a parallel track; the underwriters

20   and their counsel are filing things with FINRA telling them

21   about the offering and the compensation that the underwriters

22   are getting and FINRA can comment on that but it doesn't

23   comment on, as I understand it, on the S1 the way the SEC does,

24   it is really focused mostly on the underwriting deal because

25   that's what they're regulating.  So, this is a letter about

that and so it gets into various technical FINRA issues but the
thing that caught my eye when I finally saw it, essentially six
years later, six and a half years later, is no. 6 where they
say:  In connection with the filing received for Alexander
Capital, LLP, the sole book running manager identified in the
offering document, the department suggests that the firm
contact their district office -- "firm" there is referring to
Alexander -- to discuss their participation in this original
and obtain approval to underwrite this offering on a firm
commitment basis.

           So that caught my eye because our clear understanding
when we signed the engagement letter almost a year before in
July 2014 was that Alexander was able to do a firm commitment
offering.

Q.  And is this unreasonable letter a letter that is an
important letter that you believe you should have seen during
the process of the initial public offering?

A.  Yes.  I think that in terms of some of the back and forth
on compensation it is conceivable that Tony might have just
called me and said we have to tweak the underwriting agreement
because I have to deal with FINRA.  No reason for him not to
share the letter but -- he might or might not have, but the
fact that this calls into question their ability to do a firm
commitment underwriting, that is something that should have
been shared with me, yes.

N6Q5aqu2                         Barrette - Direct

1   Q.  Do you have any knowledge of anybody at Alterix or

2   Inpellis -- Alterix/Inpellis -- that ever had knowledge of this

3   letter?

4   A.  No.

5   Q.  How would you have reacted if you had known about this

6   letter at the time it was issued?

7   A.  Well, again, we are deal-doers.  I probably would have

8   asked to know more about what this issue was and, you know, I

9   now know because of other things I know about what was going on

10  I would have, you know, rung a very serious alarm bell that we

11  probably need a different underwriter.

12  Q.  I would like to show you what has been marked as

13  Plaintiff's Exhibit 20 which is the Alexander's application to

14  get firm commitment approval.  Have you ever seen this document

15  before?

16  A.  Yes.

17  Q.  When was it that you saw this document?

18  A.  Similar to the document we talked about in the context of

19  preparing for my deposition in November 2021.

20  Q.  Are you aware of anybody else at Alterix or Inpellis who

21  had seen this document?

22  A.  No.

23  Q.  Are you aware of anybody at Alterix or Inpellis who had any

24  knowledge of this document?

25  A.  No, I'm not.  I'm not aware.

N6Q5aqu2                    Barrette - Direct

1   Q.  And what is this document?

2   A.  Again, this is a complicated -- it is called a continuing

3   member application and it relates to Alexander changing some

4   aspects of its status with FINRA.  Again, it is not a kind of

5   thing that I have done much of but I have seen this document

6   and, as we noted in the unreasonable letter, I think the thing

7   that caught my eye here is that it says:  In addition, the

8   firm --

9          THE COURT:  Where are you reading?

10          THE WITNESS:  I'm sorry.  I apologize.  It is page 4

11   of 33 in the lower right-hand corner, there is a big long

12   paragraph that is stressing my eyes, your Honor.

13          THE COURT:  I can see it.

14          THE WITNESS:  So, it says about a quarter of the way

15   down the line begins:  Source of funding, but then the sentence

16   begins:  In addition, the firm intends to develop investment

17   banking as a major business line and will devote substantial

18   resources toward that end.  In that regard, the firm is

19   requesting that it be permitted, by its restrictive agreement,

20   to act as a managing underwriter and selling group member in

21   firm commitment underwritings.  It tells you it didn't have

22   that ability then.  It also says:  The firm anticipates that it

23   will participate in two or more public offerings per year in he

24   $3.5 to $10 million range.  So, that obviously caught my eye in

25   hindsight because, you know, the very first engagement letter

N6Q5aqu2                          Barrette - Direct

1    we signed with them, you know, this submitted date on this says

2    June 3rd on the first page, so in May 2014 they had signed an

3    engagement letter saying they were going to do firm commitment

4    of public offering expected to be in the $20 million range.  So

5    this was quite a thing to see when it was finally shown to me

6    in 2021.

7    Q.  Does it indicate they're only trying to get permission to

8    do firm commitment offerings for the $3.5 million to

9    $10 million range?

10   A.  That's what it says.

11   Q.  Is this a piece of information that would have been

12   important to you during the process of the IPO?

13   A.  Critically important.  Critically important.

14   Q.  How would you have responded if you had known this

15   information?

16   A.  Again, I would have counseled the company hard to either

17   find out that this was something that was going to happen

18   instantly or find another underwriter.

19   Q.  I would like to show you Plaintiff's Exhibit 21 which is

20   the restriction letter.  Have you seen Exhibit 121 before?

21   A.  Yes, but again, like the two we have just talked about,

22   this letter is dated June 11, 2015.  I didn't see it until over

23   six years later.

24   Q.  And what does the letter say?

25   A.  It is a letter to an attorney named Ross Carmel as

1   Sichenzia Ross, which is a securities law firm in New York,

2   well known, and it says -- it prohibits the firm, which again

3   is Alexander, from doing two things; one relates to an

4   ownership change but prohibition no. 2, the numbered paragraph

5   2 on the first page says the firm is prohibited from making any

6   changes or expansions to its business activities including the

7   addition of any associated persons and/or offices, and the

8   above restrictions are effective immediately.

9           The reason that is important is in the parlance of

10  FINRA, and you can see it in the application, expansion of its

11  business covers getting permission to do firm commitment

12  underwritings so they were being told, pretty quickly after

13  they submitted that application, do not do any firm commitment

14  underwritings.

15  Q.   Is this a document that would have been important for you

16  to see at the time you were advising the company?

17  A.   This is now getting really critical.  Now they're obviously

18  in hot water with FINRA and, you know, I'm running -- I am sort

19  of running point on a multi-hundred thousand dollar project

20  that is really dependent on them being able to do a firm

21  commitment offering.

22  Q.   And were you filing registration statements indicating the

23  offering would be on a firm commitment basis after the date of

24  this letter?

25  A.   Yes.  So just, once again, the term is firm, F-I-R-M,

1    commitment; it is definitely a term of art in the financial --

2    in the IPO business; and yes, we very much were filing

3    registration statements and they were registration statements

4    that were closely vetted by Alexander Capital and their

5    counsel.

6    Q.   And would you have filed those statements if you had

7    knowledge of this Letter?

8    A.   No.

9    Q.   Do you have any knowledge of anyone at Inpellis who had any

10   knowledge of this letter?

11   A.   No.

12   Q.   Do you have any knowledge of Dr. Mooney being hired as the

13   CEO of Inpellis?

14   A.   Yes.  I -- one of my -- we talked about putting together

15   the management team, I had been very involved, and one of the

16   things I do a lot of in general but also in this process is the

17   employment contracts with management and members of boards of

18   directors have contracts, there is a lot of paper around

19   putting together a management team and a board of directors for

20   a public company, and typically I and my team, the company

21   counsel and their team would do that.  And we did.  And during

22   the late spring, as I understood it, the folks at Alexander

23   suggested that a gentleman who was a non-practicing physician

24   named Pat Mooney might be a better choice to be CEO of the

25   company than Dr. McCoy.  And I wasn't in on the give and take

1    on that decision but the board, including I think Harry McCoy

2    and some of the other people involved in helping get Alterix

3    off the ground, decided that bringing Dr. Mooney in would be a

4    good idea.  So, I was tasked with talking to him and putting

5    together an employment agreement for him so I drafted the

6    employment agreement and I was involved in the negotiation of

7    the compensation and those sorts of things in the agreement and

8    he was represented by counsel, a friend of his, in New Jersey

9    where he is from.

10   Q.   Why was Dr. Mooney hired?

11   A.   Because Alexander advised -- I was told Alexander advised

12   the members of the board of Alterix that he would, you know, he

13   had helped to run other life science companies, he was an MD

14   even though he wasn't practicing, and that they felt he was a

15   better spokesman for the company.  As you go forward with the

16   process of taking a company public, there had to be meetings

17   with investors, there was already talk of doing a bridge loan

18   which I know we will get to, and I think that they just felt

19   that he was a better choice.  He was a close personal friend

20   going back to high school with Chris Carlin who was really the

21   main guy at Alexander on this prong.

22              MR. WARD:  Object to the testimony he said.  Not based

23   on --

24              THE COURT:  Objection to the testimony on hearsay

25   grounds; the objection is sustained.

1          THE WITNESS:  In any event, so -- but Alexander

2     definitely told the board of directors of Alterix that they

3     highly recommended that Dr. Mooney become the CEO of the

4     company and the board agreed.

5     BY MR. RAND:

6     Q.  And did you have any knowledge of any past relationship

7     between Dr. Mooney and Alexander?

8     A.  Oh.  And Alexander?  Yes.  Dr. Mooney told me himself that

9     he had been doing consulting for Alexander and in fact he was

10    part of the Alexander team that was involved -- he had been

11    working on Alterix with Alexander so he had been part of the

12    team to evaluate Alterix, evaluate Alexander getting involved

13    with Alterix.

14    Q.  Plaintiff's marked for identification Plaintiff's Exhibit

15    94, which is the employment agreement of Dr. Mooney.

16    Mr. Barrette, do you recognize this employment agreement?

17    A.  I do.

18    Q.  What is this employment agreement?

19    A.  This is the employment agreement between Alterix Inc., and

20    Patrick Mooney, Ph.D, effective June 11, 2015, and this is a

21    document that I drafted.

22    Q.  Was this agreement executed?

23    A.  Yes, it was.

24    Q.  Do you recall the terms of this agreement?

25    A.  So, first of all, I have the agreement in front of me so I

N6Q5aqu2                        Barrette - Direct

can look at the terms but I do recall this was a fairly

significant piece of work at the time and I recall that the

things discussed in this agreement were sort of classic for a

senior executive at a company, which at least at the time had a

lot of promise and was expected to be public.  So, there were

certain give and take over the Ross salary, I don't remember

the specifics, it ended up at 480 a year, but what I do

remember is that because Alterix still didn't have a lot of

capital in one of the plans was to get some, what we typically

call IPO bridge financing in place before the public offering

took place.  This has a provision, it is in Section 3(a) at the

bottom of the first page where Dr. Mooney had sort of a

two-tiered comp structure.  He was going to get $10,000 a month

until the company closed to financing -- I am paraphrasing what

it says -- of at least $3 million, and then his salary was

going to bump to $480,000 a year.  I don't know if I have done

anything exactly like that before but it was creative and that

was just an interesting thing.  And then there are other things

like an annual bonus, an IPO bonus.  Again, if you didn't have

this in front of me I might not remember the specifics but it

was a spirited give and take about different things and with

the IPO coming up it is typical to see this sort of thing.  I

don't think you can say there is a standard way to do it but it

covered that, it covered vacation, it covered stock options

which are classic things to do with a senior exec to incent

1    them to manage the company successfully.

2            Then, the other big area that is negotiated here is

3    essentially what some people might call colloquially severance,

4    in other words if his employment terminates does he get --

5    continue to get paid or get some kind of a lump sum payment

6    depending on the circumstances of that termination.  Did he get

7    fired because he was doing a terrible job or because he had

8    broken the law or did he quit because we were ignoring him.  We

9    don't have to get into the weeds but those are the sorts of

10   things that there is give and take on here and there was plenty

11   of that with this but it was a constructive professional

12   process and we ended up with a deal.

13           MR. RAND:  Plaintiff moves for the admission of

14   Plaintiff's Exhibit 94.

15           MR. WARD:  No objection.

16           THE COURT:  Received.

17           (Plaintiff's Exhibit 94 received in evidence).

18           THE COURT:  This is probably a good place to take our

19   mid-morning break so we will take a 15-minute break.

20           MR. RAND:  Thank you, your Honor.

21           THE WITNESS:  Thank you, your Honor.

22           (Recess)

23   BY MR. RAND:

24   Q.  I would like to show you Plaintiff's Exhibit 60 which is a

25   reimbursement agreement which is in evidence.

1              MS. COLE:  What was the exhibit number?

2              MR. RAND:  60.

3    BY MR. RAND:

4    Q.  Can you identify Plaintiff's Exhibit 60?

5    A.  Yes.  It is a document called a reimbursement agreement

6    dated June 1, 2015, and it is an agreement regarding Alterix

7    ultimately repaying some advances of funds from its parent

8    BioChemics.

9    Q.  What is the purpose of the agreement?

10   A.  I think pretty much what I said, which is that BioChemics

11   had been advancing money to Alterix because Alterix didn't have

12   any other money and we wanted to paper, that I was involved in

13   doing this, I recall, wanted to create a paper trail for

14   Alterix being obligated to repay the money to BioChemics.  My

15   memory isn't crystal clear on this but this very likely may

16   have been done at the request of the accounting firm who wanted

17   to see something definitive in writing about the situation with

18   that money.

19   Q.  Is it typical for a parent company to fund a wholly-owned

20   subsidiary?

21   A.  I should edit my terminology a little bit.  This is June

22   2015 so the ownership of Alterix had been transferred by

23   BioChemics to the shareholder resolution trust, but I should

24   also say the shareholder resolution trust really existed, among

25   other things, to help BioChemics resolve its issues.  So

N6Q5aqu2                          Barrette - Direct

BioChemics was not the direct parent of Alterix anymore but it
was still supporting Alterix and that was, you know, something
that made sense at the time.

Q.  I would like to show you Plaintiff's Exhibit 97 which are
notes.

          MR. WARD:  Sorry.  Which Exhibit is this?

          MR. RAND:  97.

Q.  Do you recognize Plaintiff's Exhibit 97?

A.  I do.

Q.  What is Plaintiff's Exhibit 97?

A.  It is a copy of handwritten notes that I took, I recognize
my terrible handwriting, and on it is notes on what I am quite
sure was a phone call on June 24, 2015 -- because that's
written at the top -- between me and Tony Marsico, the partner
at Greenberg, who was leading the underwriter's counsel team.

Q.  Do you recall what it meant when you wrote:  "Consultant?"

A.  Yes.  The -- we talked earlier about the fact that
underwriter's counsel leads the effort with FINRA, and Tony was
calling to tell me that there was a technical issue that FINRA
had raised.  So, the first thing on the note says Pat and
Jonathan Gazdak -- I am pretty sure that means that he had
talked to them about it, and then it says "impact FINRA," and
then it says "consultant?"  And what that all means is that the
issue was that Alexander was our underwriter in this public
offering, we had brought Pat Mooney on as our CEO a little less

1   than two weeks before.  It turns out that if he had been --

2   under Tony's understanding of the FINRA rules, if Pat had been

3   an employee of Alexander before he became an employee of ours

4   that might have raised some issues with FINRA, not necessarily

5   terrible issues but there might have been some things that had

6   to be addressed with FINRA.  But the first thing we were

7   focused on was was he an employee and so the other notes, "MD"

8   probably refers to the fact that Pat is an MD, I don't know;

9   but it mentions supplemental diligence list which may have

10  brought out some aspects of Pat's employment; D&O questionnaire

11  is the standard questionnaire you get, Anna Guzman is his

12  associate and it talks about an employment agreement and we

13  probably talked about Pat's employment agreement that we had

14  done a couple of weeks before.

15          But the bottom line is this indicated, this reflects

16  that he wanted me to talk to Pat about what his status was at

17  Alexander.

18  Q.  I would like to show you Plaintiff's Exhibit 98 in

19  evidence.  Mr. Barrette do you recognize Plaintiff's Exhibit

20  98?

21  A.  Yes, I do.

22  Q.  What is it?

23  A.  It is a series of e-mails involving both me -- well, me,

24  Patrick Mooney, and Tony Marsico.  I can go through them.  You

25  actually have to go to the last of the exhibit, the last page

1    of the exhibit is actually the earliest e-mail and it is

2    actually the very last page is just e-mail stuff but the last

3    page of the exhibit is an e-mail on June 26 at 3:24 p.m. from

4    me to Pat Mooney, and basically did Alexander treat you as an

5    employee and because as I said from my notes, that was an

6    important question and I told him an easy way to probably

7    figure that out was was he a W-2 payroll employee or a 1099,

8    did he just get 1099s, and he wrote me back a one word e-mail

9    answer, "1099." So that told me where he had our answer. Then

10   it turns into a series of e-mails between me and Tony. I

11   forwarded the response to Tony later that afternoon, Tony got

12   right back to me with a paragraph about Dr. Mooney's status as

13   a consultant and an independent contractor and that he was

14   not -- he is no longer providing consulting services. So that

15   was, in that -- the audience for that paragraph, this was not

16   going to go in the S1, this is something he wanted to give to

17   FINRA.

18           Then, I responded to that, and it actually looks like

19   a couple of days later because I think he wanted Pat to sign

20   something for him to submit to FINRA and Pat had told me that

21   he wanted to -- you might want to ask -- continue to do some

22   consulting for Alexander once in a while in the future unless

23   it raised issues with FINRA. And so, again, I was just

24   conveying Pat's request. And then Tony wrote me a fairly

25   lengthy e-mail back about why consulting was -- didn't raise

1    the FINRA issue, that Pat shouldn't be getting any compensation

2    as part of the deal and he wanted me to confirm that Pat wasn't

3    getting anything from Alexander as part of the deal.  And I

4    said I would get back to him and in that I didn't think he was

5    getting compensation from Alexander.  I think it stops there.

6         My best memory is he was not getting compensated by

7    Alexander from our IPO which I think would have raised issues.

8    But, again, and I am just trying to see whether we resolved Pat

9    wanting to continue to consult for Alexander, I don't see this

10   here, I don't quite remember how that turned out, but he did

11   make that request.

12   Q.  When Pat Mooney was hired by Inpellis, was it your

13   understanding that he was no longer going to consult with

14   Alexander after he was hired by Inpellis?

15   A.  The short answer -- yes, because that employment agreement

16   had standard language in it I think, we can look at it, that

17   says he will devote his full business, time, and attention to

18   the job when you are paying $480,000 a year, you typically

19   would put that in there.  Obviously the question he posed to

20   me, which is well after the employment agreement, indicated

21   that he might want to do it but -- so, at that point I

22   understood he might want to do it, and again I think, in

23   looking more at Tony's response now, I think he said he wants

24   to say that Pat won't be providing any more services to

25   Alexander.  I think that's the way it turned out, ultimately.

1   Q.  And do you have any knowledge as to whether Pat Mooney

2   provided services to Alexander after he entered into the

3   employment agreement?

4   A.  No, I don't know that he did.  I don't know that he didn't.

5   Sorry.

6   Q.  I would like to show you Plaintiff's Exhibit P 84, which is

7   a draft registration statement dated June 30th, 2015.  Do you

8   recall this document?

9   A.  Yes.

10  Q.  Does this document also have the firm commitment language

11  of the prior registration statement?

12  A.  Yes, it does.

13  Q.  Where does it have that language?

14  A.  In the same place -- same two places we talked about

15  before, the cover and the prospectus, which is the third page

16  of the exhibit right at the top underneath where it says

17  Alterix, and then I will give you an exact page number.  In the

18  underwriting section on page 116 -- let me make sure that is

19  correct.

20  Q.  I think it is 107.

21  A.  You are correct, it is 107.  I misread the table of

22  contents.

23          So, again, that underwriting section has the exact

24  language we talked about before where it says -- sorry, on page

25  107 of the prospectus in this exhibit is the underwriting

1   section and it, like the earlier version of this DRS we saw

2   from April, identifies Alexander Capital as the sole book

3   running manager and it says also the underwriters, which is

4   Alexander Capital, are committed to purchase all the shares of

5   common stock.  So, that's the other firm commitment language.

6   Q.  Did the risk language in this registration statement

7   change?

8   A.  Yes.  I am looking for it.

9   Q.  How did it change?

10  A.  Well, to step back for a second, we talked about the

11  process of submitting and then getting SEC comments.  In April

12  we submitted our first DRS and we did get a comment and I

13  should cover that we were very pleased with the comments

14  because we knew that the problems that BioChemics was having

15  with the SEC we would probably get a little bit of extra

16  attention, and when we got the comments they certainly had

17  noticed the BioChemics things and I will come to that in a

18  second, but it was obvious from the comments that they were

19  what I would call a regular set of comments.  The SEC always

20  has plenty to say but, again, the comment letters for other

21  deals are available on EDGAR and as soon as I saw the comments

22  I thought they seemed reasonable.  And I went and looked at

23  comment letters for similar companies that had been done

24  recently and I could tell we had a very similar set of comments

25  to what other companies were getting.  We viewed that as a

1    great accomplishment.  It meant that our plans to insulate the

2    company from the SEC problems of BioChemics but be very fulsome

3    about what those problems were had resonated with the SEC.  And

4    so -- but they did ask us to work on some of the risk factors

5    and the goal of this document was to be responsive to those

6    comments and I am just looking for the -- it appears to me -- I

7    won't make us compare the other one, the risk factors in the

8    summary don't look to me here to be that different, but again,

9    those weren't really the definitive ones.  The risk factors in

10   the regular risk factor section are on page 12 and do have more

11   disclosure, especially in the first risk factor under risks

12   related to our former parent corporation, there is more

13   disclosure in there at the request of the SEC.

14   Q.  I would like to show you e-mails marked Plaintiff's Exhibit

15   39 already in evidence.  Do you recognize this e-mail chain?

16   A.  Yes, I do.

17   Q.  Can you describe it?

18   A.  Yes.  Again, like that other exhibit of e-mails, the

19   earliest e-mail is actually the last page and that's an e-mail

20   to me on June 29 from Alexis Kleiman, one of the associates at

21   Greenberg working on the deal asking that we send her a revised

22   draft of the S1 with the changes that they sent last week.  So

23   again this is the process that I described generally of the

24   constant back and forth between underwriter's counsel and

25   company counsel and she -- the system is because the document,

by the way, is now being handled by a printer, a third-party

printing company, another major expense, by the way, a company

called R.R. Donnelly, that's D-O-N-N-E-L-L-Y.  So, if you

needed to make a change it was somewhat old fashioned, the team

at Greenberg would hand-write changes, make a PDF and e-mail it

to me, and if they were OK send them along to the printer.  If

there was a long insert like we were adding a paragraph to a

risk factor because of a SEC comment, you might type it up as a

rider.  But, pretty nitty gritty stuff.  But, she sent me

comments as you can infer from the e-mail and wanted to make

sure that we made them and then we sent her the revised draft

S1 because they knew we were looking to file soon which

resulted in the June 30th filing we just talked about.

      And then, so I did that, I sent the latest version we

had in response to her e-mail, made a comment about some

officer stuff, and then she sent some further comments.  And

then the, I think what happened, because there is no e-mail

about it, by the way, her further comments was Monday, June 29

at 4:16 in the afternoon.  So, the next e-mail is from Tony to

me -- sorry, from me to Tony on the next day.  So, what I am

quite sure happened is when I got those last comments from

Alexis on June 29 in the afternoon, I understood those to be

their last couple of comments and that we could go ahead and

file on June 30, so I did.  Then I do recall this, I don't

recall the precise phone call, but I am quite sure Tony called

1    me and said hey, you know, we hadn't told you we were clear to

2    file.  So, that occasioned me to write the e-mail saying sorry,

3    in all capital letters, I thought the e-mail string was your

4    signoff and that we made all of your changes and that I

5    apologized and I said, sincerely, he and his team had been

6    great and I had no intention of filing without his clearance so

7    I was falling on my sword a little bit.  And he got back right

8    away, which evidenced we had a good working relationship, Don't

9    worry about it, but in the future hold off on filing until you

10   get the express written approval on behalf of both Greenberg

11   Traurig and his client Alexander.  There is no doubt, by the

12   way, that Greenberg could speak for Alexander on signoffs but

13   it is important because, just to be clear, he was right.  I

14   maybe misunderstood, but in terms of the dance, the

15   relationship between underwriter's counsel and company counsel,

16   everybody has to be on board before anything goes to the SEC,

17   even those these are confidential drafts and they're probably

18   going to change, you would never do that.  So that's why I was

19   so definitive in my response to him.  I would never

20   intentionally do that.  And we continued to work together well

21   throughout the process but that's -- these e-mails just

22   indicate that and I think it is just a good illustration of

23   kind of the relationship between the company and underwriter's

24   counsel and the underwriters themselves.

25   Q.  How did you proceed going forward?

N6Q5aqu2                         Barrette – Direct

A.   Absolutely adhered to this set of rules and never had a

problem again, so -- didn't expect to because I had done it

many times.  I was right, so.

Q.   Did you ever file a registration statement without getting

the express approval of Greenberg Traurig on behalf of

Greenberg and Alexander?

A.   Definitely not.

Q.   I would like to show you Plaintiff's Exhibit 65 in

evidence, which is a BioChemics capital table.  Do you

recognize Plaintiff's Exhibit 65?

A.   Yes.

Q.   What is it?

A.   It is what we call in the corporate law business a cap

table, which is just short for capitalization table.  What that

is shorthand for is a list of all the, in a simple corporate

setting all the stockholders of the corporation but they can

get fairly complex, BioChemics had a pretty complex, what we

call capital structure.  And when people talk about capital

structure they're talking about stockholders -- again, in a

simple scenario but what would typically be included in that,

in trying to summarize the capital structure of a corporation

you would have -- you might have convertible notes which

BioChemics had, you might have non-convertible notes but which

were really in the nature it of investment, and you might have

different classes of stock.  Many financings of tech companies

1    you have preferred stock, you have common stock, you have

2    different classes of preferred stock, you can even have

3    different classes of common stock.  And so, a cap table for a

4    small company with three owners can be very simple, the

5    BioChemics one is complicated, but that's what this is.

6    Q.  Does it show any advances made by BioChemics to Inpellis?

7    A.  I don't think it does because that wouldn't go to the

8    ownership or creditors or BioChemics, it would go the owners --

9    that would be on a cap table for Inpellis but let me just flip

10   through.  Sorry, I'm not seeing that but that makes sense to

11   me.

12   Q.  I would like to show you Plaintiff's Exhibit P 62, which is

13   the confidential draft registration statement filed on August

14   5, 2013.  Do you recognize Plaintiff's Exhibit 62?

15   A.  I do.

16   Q.  What is it?

17   A.  It is another draft registration statement, this is

18   amendment no. 2 to the confidential submission that we

19   originally filed in April.  So, just to recap we filed in

20   April, got comments, we filed on June 30 and we got more

21   comments.  This is not unusual, you get one set of comments,

22   quite a few of them, you file, which we did on June 30th to

23   respond to the comments, and the SEC wants to see how you

24   handle their comments and always has some more comments.  The

25   good thing here was that, as I said, the comments that we

1    responded to in June were reasonable, we thought we did a good

2    job responding to them, a couple of things happen.  First off,

3    the pace picks up a little bit because now you are in the

4    process of SEC and they know you, you don't have to wait a

5    couple of months for the next set of comments for two reasons;

6    one, they know you and you are on track, they do care about

7    companies getting public and not interfering with kind of the

8    commerce of the United States so they pick up the pace a little

9    bit, and if you have done a good job on the comments they have

10   fewer comments to give you so it takes them less time to get

11   you the next comment letter.  And this reflects that because

12   filed on June 30, I forget when we exactly had the comments,

13   but it was at a time period where we were able to refile as

14   soon as August 5 so just a little over a month later.  This

15   document still has the firm commitment language that we have

16   talked about before in the two places we talked about before;

17   one on the first page of the prospectus and I will give you the

18   page number for the underwriting section as we have done

19   before -- sorry underwriting in this draft, in this amendment

20   is on page 109 and it continues to have Alexander Capital as

21   the sole book running manager and as the underwriters committed

22   to purchase all the shares so that language hasn't changed.

23   Q.  How has the risk language changed in this draft?

24   A.  Again, without comparing -- I will take a quick look.  My

25   recollection is that there was still some back and forth with

1    the SEC but much less, probably just some minor wordsmithing.

2    I think, again, the risk factors in the box in the summary are

3    relatively unchanged and I don't think the specifics of that

4    are important.  The first risk factor there relates to maybe

5    some updated financial information but otherwise those are not

6    remarkable, and then in the full risk factor section which

7    begins on page 9, the risks related to our former parent begin

8    on page 12 and, again, I think there was some back and forth

9    with the SEC on these and I think we also beefed up the risk

10   factor on the dependence on intellectual property because of

11   creditors that BioChemics had.  So, again, there were some

12   changes to those risk factors.

13   Q.   Does it still include the language referencing BioChemics

14   and the SEC enforcement action?

15   A.   Absolutely.  Yes.

16   Q.   I would like to show you Plaintiff's Exhibit 22 in

17   evidence.  Have you ever seen Plaintiff's Exhibit 22 before?

18   A.   Yes.  This exhibit relates to Alexander's issues with FINRA

19   and so like the other exhibits like this, I have seen it, but

20   not until six years later when I was preparing for the

21   deposition in November 2021.

22   Q.   Do you know what this document is?

23   A.   Yes.  It's a letter from Sichenzia Ross, a law firm that

24   was obviously helping Alexander with FINRA and it is responding

25   to a staff request to Alexander and a fair amount of it is

1   blacked out.

2              THE COURT:  Yes.  Let me ask counsel -- I guess

3   defense counsel, why is most of this blacked out?

4              MR. RAND:  Are you asking that of the plaintiffs?

5              THE COURT:  No, I'm asking defense counsel.

6              MR. WARD:  Your Honor, I believe this dealt with other

7   clients.

8              THE COURT:  I see.  All right.

9              Go ahead.

10              MR. WARD:  It is my understanding.

11              THE COURT:  All right.  We will leave it as is since

12   there was no objection to the redactions.  Go ahead.

13              THE WITNESS:  And again, when I finally saw this what

14   really caught my eye was on page 4 there is a section called

15   firm commitment underwriting --

16              THE COURT:  Wait a minute.

17              THE WITNESS:  Yes.  It is page 4 of the letter.

18              THE COURT:  I see.  OK, yes.  Got it.

19              THE WITNESS:  It says firm commitment.  My

20   understanding is what this is, this is the letter from

21   Sichenzia Ross to FINRA but I think it is restating what FINRA

22   asked for.  6(c) on page 4 it says staff -- that means the

23   staff of FINRA -- has received information that indicates the

24   firm -- and that's Alexander -- has already entered into

25   engagements for firm commitment underwriting.  Please provide

N6Q5aqu2                        Barrette - Direct

detailed explanation regarding these engagements including

copies of any such engagements executed.

       (Continued on next page)

1            THE COURT:  So what you're just quoting is not

2      Mr. Carmel's words, it's Mr. Francois's words.  Yes?

3            THE WITNESS:  Correct.  Or FINRA's words through

4      Mr. Francois.  Exactly right, your Honor.  That's exactly what

5      I was trying to say.  On the very next page of the exhibit,

6      which is page 5, from the letter are the responses, and they're

7      organized in the same way as Mr. Francois's questions.  In

8      response C, so it lines up with 6C from Mr. Francois, who is

9      from Schenzia Ross, presumably after consultation with their

10     client Alexander.

11           It says the following:  Enclosed here with Exhibit G

12     is a copy of the engagement agreement between Alexander and --

13     they've redacted the name of the client -- regarding firm

14     commitment underwriting.  It is important to note that this

15     agreement was entered into in error, and Alexander never

16     performed any firm commitment underwriting services for -- then

17     they redacted the name of the client again -- instead, the

18     party entered into a subsequent placement agent agreement for a

19     private placement offering private.  A copy of the placement

20     agent agreement is annexed hereto as Exhibit H.

21           So in asking in August 2015, after we had filed, let's

22     see, April, June and then August again, three draft

23     registration statements with their name on it and had an

24     engagement letter with Alexander Capital, they referred only to

25     what was obviously a different engagement where they said they

1  did firm commitment underwriting.  So they definitively omitted

2  from this communication with FINRA what they had been doing

3  with us really going back to July of 2014.

4  Q.  Do you have any knowledge that anyone at Inpellis had any

5  knowledge of this letter?

6  A.  Of this letter, no, I don't know whether anyone did or not.

7  I don't think so, by the way.

8  Q.  And in your opinion is this letter -- was this letter an

9  important piece of information that you should have seen at the

10  time you were filing the registration statements?

11  A.  Absolutely.

12  Q.  How would it have affected your decision and advice

13  regarding the transaction?

14  A.  Again, as I said before, even more so now, they're

15  definitively misleading FINRA.  And we clearly would have had

16  to get a different underwriter.

17          MR. WARD:  I'm going to object to lack -- sorry --

18  lack of personal knowledge for that testimony.

19          THE COURT:  No.  No.  What he's saying is that the

20  reason this letter would have been important to him and others

21  similarly situated in the company was because it not only --

22  because it -- if they had seen it, they would have inferred

23  that Alexander was misleading the SEC because it was not

24  disclosing -- excuse me -- was misleading FINRA because it was

25  not disclosing to FINRA the firm commitment agreement it had

1    repeatedly signed off on with Alterix/Inpellis.

2                MR. WARD:  Your Honor, the testimony though was that

3    he was testifying directly that they were intentionally

4    omitting something they had already disclosed to FINRA.  This

5    whole process started because they disclosed the firm

6    commitment offering to FINRA on the Inpellis.

7                THE COURT:  Well, that may or may not be.  That's good

8    cross-examination material, but your objection was basically

9    lack of personal knowledge.  What he is saying is from personal

10   knowledge why he would have regarded this letter as material

11   was because in his opinion it showed that Alexander was

12   misleading the FINRA authorities.

13               You're saying no, that's not a fair reading, and

14   that's fair enough, but that's for cross-examination.

15               MR. WARD:  Right.  And I have no objection to your

16   interpretation of what he said, and you're the one that's

17   making the final --

18               THE COURT:  If he's saying more, if he was stating a

19   definitive fact as opposed how he viewed it or would have

20   viewed it had it been shown to him at the time, then your

21   objection would have force, but that's not the way I understood

22   his testimony.

23               MR. WARD:  Thank you, your Honor.

24   BY MR. RAND:

25   Q.  Did you have knowledge as of the date of this letter,

N6QQaqu3                         Barrette - Direct

1    August 6, 2015, that Alexander Capital did not have a license

2    to perform firm commitment offerings?

3    A.   As of the date of the letter, no, I did not have that

4    knowledge.

5    Q.   Was that important information that you should have had?

6    A.   Yes.

7    Q.   How would that have affected your advice to Inpellis?

8    A.   I would have told them to get a different underwriter.

9    Q.   How would it affect your advice regarding any bridge loans?

10   A.   I would have told them to not take bridge loan money which

11   we were working on at the time unless they had an underwriter

12   who could actually do a firm commitment offering.

13        And maybe just to expand on the bridge loan concept,

14   it's very common in IPOs to always bring in private investors,

15   usually sophisticated, either high-net-worth individuals or

16   venture funds to -- if you have a young company without a lot

17   of working capital, but the promise of a successful IPO to

18   bring in private investors to give the company an injection of

19   working capital really because of the anticipated IPO.  And so

20   the IPO was central to the bridge loan that we were working on.

21   Q.   I would like to show you Plaintiff's Exhibit 5 in evidence,

22   which are minutes of a meeting of the board of directors of

23   Inpellis related to the bridge loan approval.  Do you recognize

24   this document?

25   A.   I do.

N6QQaqu3                     Barrette - Direct

1   Q.   What is this document?

2   A.   This -- these are typed minutes of a board of directors

3   meeting on Alterix, Inc. on August 13, 2015 at 8:30 a.m., and

4   the gist of the minutes is to approve what we were calling the

5   bridge financing, which is the kind of bridge loan that I was

6   just describing for a company in the process of getting to an

7   initial public offering.

8        And just to go on a little bit.  The minutes

9   themselves are relatively brief about approving the deal.

10  There's also a change to the certificate of incorporation,

11  which is the basic charter document filed with the state for

12  corporations.  I think it related to increasing authorized

13  shares.  It's very typical to be doing that sort of thing in

14  anticipation of a public offering.

15       And then the exhibit is long because it includes both

16  the term sheet, which is a good summary of the economic terms

17  of the bridge financing, and then something called a securities

18  purchase agreement, which is the agreement essentially a

19  purchase agreement by which the investors are buying the

20  securities that they're buying in order to put money into the

21  company.  And in this case the securities were convertible

22  notes.  So -- and you could tell the term sheet is a very good

23  summary.  It saves the trouble of slogging through the long

24  securities purchase agreement, and it speaks -- you know, it

25  totally contemplates an initial public offering.  And also, you

1    know, talks about the idea that the value of the company at the

2    time, you know, they were working on a number of about

3    $75 million before the public offering.

4    Q.  What was the duration of the notes?

5    A.  I'll have to refresh my -- 12 months.

6    Q.  Is Exhibit A on page 3, is that the term sheet?

7    A.  Yes.  I'm sorry, I should have said that.  It's Exhibit A,

8    and it's two pages long.

9    Q.  You see it says interest zero?

10   A.  Yes.

11   Q.  Is that because it's an original issued discount note?

12   A.  That is correct.

13   Q.  Do you see where it says original issue discount

14   20 percent?

15   A.  Yes.

16   Q.  Can you explain what that means?

17   A.  Yes.  It means that you're buying a note that says the

18   company has to pay you back, for example, a hundred dollars and

19   you're paying $80 for the note.  So instead of interest,

20   essentially you build it in by just paying less money for the

21   note.

22   Q.  Did Inpellis eventually enter into a bridge loan?

23   A.  Yes.  Yes.  It definitely closed this financing, yes.

24   Q.  Can you explain the amount it borrowed and the amount it

25   was going to owe back in a year?

1   A.  Yes, at a high level.  I don't think I could give you to

2   the penny accounting-type numbers, but ultimately -- and

3   there's some information about this later, I think, but they --

4   in round numbers, the stated amount that they owed back was in

5   the $5- to $6 million range, and the actual cash they got was

6   essentially 20 percent less than that.  There also was a

7   substantial fee to Alexander, which I believe was half a

8   million dollars.  I think we may have some paper on that later.

9   But as is typical, you know, the face amount of this, and the

10  net to the company were different.

11  Q.  Would you have advised Inpellis to enter into this bridge

12  loan if you had known that Alexander Capital did not have the

13  ability to do a firm commitment offering?

14  A.  No, I would not have advised them to do it.

15  Q.  I would like to show you Plaintiff's Exhibit 5-A in

16  evidence, which is a disclosure statement.  Can you if identify

17  the email on the cover of Plaintiff's 5-A?

18  A.  Yes.  It's an email dated August 13, 2015 from Patrick

19  Mooney at Alterix to Jonathan Gazdak at Alexander and Chris

20  Carlin at Alexander.  It says:  Attachments disclosure

21  schedules to securities purchase agreement.  And then it refers

22  to the date of the agreement, which is 8/13/15.

23  Q.  Do you recognize the attachment --

24  A.  I do.

25  Q.  -- of the disclosure schedules?

1    A.  I do.

2    Q.  What are they?

3    A.  First of all, I have to fall on my sword.  I probably did

4    these or was involved in doing these.  One of the associates

5    may have done them, but one of us should have spotted a typo.

6    It says:  Disclosure schedules to stock purchase agreement.

7    It's a securities purchase agreement because the securities

8    being sold her were convertible notes.  Not stock.  They were

9    convertible into stock.  That is simply a mistake.

10         And otherwise these are disclosure schedules, which

11   are typically all attached to a securities purchase agreement.

12   So the securities purchase agreement has a whole section called

13   representations and warranties where the company represents

14   that all these things are true about the company.  The company

15   is a Delaware corporation.  It's in good standing.  It has no

16   environmental -- there are, you know, representations and

17   warranties can go on for pages and pages.

18         But normally at the beginning of the representation

19   and warranty section, it says, you know, here are the

20   representations about the company.  everything in here is true

21   unless it's on a disclosure schedule, so some variation of

22   that.

23         So, for example, Schedule 3.1A attached here says:

24   Subsidiaries, none.  The representation, which we will probably

25   go back and look at, says something like, you know, all of the

1    company's subsidiaries are listed on Schedule 3.1A.  And you

2    look there, it says we don't have any subsidiaries, which was

3    the case with Alterix.  So these are typical disclosure

4    schedules.

5    Q.  Did the bridge loan lenders look at these disclosure

6    schedules?

7    A.  They surely did because this is one of the most important

8    things in the paperwork for sophisticated investors to see what

9    issues may exist with the company.  Alterix, the -- you know,

10   Alterix being itself a company that had simply been a

11   subsidiary didn't have a lot of complicated information, but

12   you'll see that it refers on page 7 of 9 in Schedule 3.1I to

13   the draft registration statements that had been filed.

14            So a couple of quick observations here.  Those draft

15   registration statements were confidential, but any investor in

16   this kind of financing would sign a confidentiality agreement

17   with the company because they need to know everything about the

18   company.  So they were under a confidentiality agreement, which

19   meant we could share the draft registration statement with

20   them, which we did, and that's what this is a reference to.

21            And in terms of making an investment, one reason

22   people like to do these pre-IPO bridge loans is they know a ton

23   of work has gone into the draft registration statement.  So

24   unlike maybe another company that is a couple years old and

25   nowhere near going public, there's -- you know, they've had

1   this huge team pointing toward a public offering, doing a

2   registration statement and putting all the relevant information

3   in there.

4           So the diligence for a bridge loan like this is a

5   little bit easier because they know all this diligence has gone

6   on for the IPO, and they can essentially read the registration

7   statement and get a very definitive picture very quickly.  So

8   that is why that's important.

9   Q.   And does the lender need to look at the registration

10  statement as a material piece of information to determine

11  whether to make a loan?

12  A.   Absolutely.  They would -- again, this was a sophisticated

13  bunch, and, you know, again, they would absolutely have gone

14  through it very carefully.

15  Q.   And at this time, these confidential registration

16  statements all indicate that the IPO would be on a firm

17  commitment offering.  Is that correct?

18  A.   They definitely did.

19  Q.   I would like to show you Plaintiff's 61 in evidence

20  entitled Termination of Reimbursement Agreement.  Do you

21  recognize this exhibit?

22  A.   I do.

23  Q.   What is this exhibit?

24  A.   As you said, it's a termination of reimbursement agreement.

25  It's dated August 13, 2015, and it refers to an agreement which

we talked about earlier this morning, under which we decided

that we needed to create some definitive legal documentation

around the fact that BioChemics had been advancing funds to

Alterix.  And so that, you know, obligation had been

definitively recorded in that earlier agreement.  As I said,

most likely because the accountants wanted to see a little bit

more definitive documentation around it.

         But then my memory -- and this is fairly clear -- the

bridge lenders did not want Alterix to continue to have that

obligation.  This shows you how carefully they were reading

things because they delved into the financial statements of the

company and had spotted this, and decided that if they were

going to put $3- to $5 million into the company, they did

not -- well, not that this was probably the plan, but the last

thing they wanted to do was have Alterix give it to BioChemics.

They could have simply forbidden that, but this is a little bit

speculative at this point eight years later.  I think they just

said, look, take it off the books.  No doubt that the

BioChemics crew especially now with the Alterix IPO and the

bridge loan looking like it's coming in, and Alterix aimed

nicely at an IPO, the last thing that BioChemics wanted to do

was hold up that process.

         And so they made what I think was the right business

judgment, and said essentially never mind, you don't have to

pay the money back, and we'll do that by -- we'll evidence that

1   by formally terminating the reimbursement agreement.

2   Q.  So at the time of the termination of the reimbursement

3   agreement, how much money approximately was owed to BioChemics

4   by Inpellis?

5   A.  I don't know if it says here.  I know the earlier agreement

6   it was something like $3.4 million.  It was over $3 million, I

7   have a pretty clear memory.  From looking at the agreement

8   eight years later, I wouldn't remember that just off the top of

9   my head.  It was a significant amount of money, but it was in

10  that ballpark.

11  Q.  And that money was no longer going to be owed to

12  BioChemics?

13  A.  Correct.

14  Q.  After the bridge loan?

15  A.  Correct.  Maybe I will just add one more thing.  There's

16  actually a "whereas" clause in the recitals on the first page.

17  That, you know, really kind of invoked the bridge financing.

18          It says:  Whereas, BioChemics has determined that it

19  is in the best interest of BioChemics, the creditors of

20  BioChemics and stockholders of BioChemics to assist Alterix in

21  obtaining third-party financing to be used to significantly

22  increase the value of Alterix.

23          The point here is not to make you read the whole

24  thing, but that the -- that that clearly links this decision to

25  the bridge loan.

1   Q.  When it says "release Alterix of its obligations to pay

2   advances," what does that mean exactly?

3   A.  I think pretty much what it says is that there was no

4   intention to revisit this later.  It's just to clean it off the

5   books of Alterix.

6   Q.  Meaning that no monies are any longer owed?

7   A.  Correct.

8   Q.  I'd like to show you what has been marked Plaintiff's 1-A

9   which is the amendment to the Alexander engagement agreement.

10  Do you see there's a cover email?

11  A.  I do.

12  Q.  It indicates it's attaching the second amendment of the

13  engagement letter?

14  A.  I see that, yes.

15  Q.  Sorry.  I misspoke.  This is the second amendment of

16  engagement letter, not engagement agreement.  Can you describe

17  what this letter does?

18  A.  Yes.  Again, I'm not talking about the email which I was

19  not on, but the amendment of engagement letter I was familiar

20  with because I would have looked at it.  And it changes one

21  section of the engagement letter in paragraph II(e).  And it

22  increased, as I recall, the placement fee, for essentially a

23  private financing to ten percent.

24          It says:  A cash placement fee of ten percent on any

25  bridge or private financing as completed by the company during

1   the term of this agreement, provided that the amount of such

2   fee for any financing completed with any person or entity

3   described in Schedule A to this agreement shall be as set forth

4   on Schedule A.

5          Schedule A just names two specific investors for whom

6   the fee will only be seven percent.  I don't think they

7   actually participated in the bridge financing to my

8   recollection.

9          It also talks about some warrants and that sort of

10  thing.  I don't recall whether those changed what was in the

11  original engagement.  They might.  But the ten percent was

12  definitely an increase.

13  Q.  And is this -- how many days after the approval of the

14  bridge loan does this amendment of engagement letter occur?

15  A.  Well, this is August 17, and I think the approval of the

16  bridge loan was August 13, so four days later.

17  Q.  Why are they increasing -- why is Inpellis increasing the

18  placement fee to Alexander?

19  A.  My best recollection is that Alexander, you know, said this

20  was -- you know, we got this done for you, and we need to get

21  paid more for it.  Remember, we had done an initial closing,

22  but there were more closings to come, so I think, frankly,

23  Alexander's leverage at this point was, if you want us to keep

24  selling this and fill out the round on it, we need a higher

25  level of compensation, so Inpellis agreed to it, still Alterix

N6QQaqu3                         Barrette - Direct

1    at the time.

2              MR. RAND:  Might this be a good time for a lunch

3    break, or what does your Honor prefer?

4              THE COURT:  No.  I'm sorry?

5              MR. RAND:  Might this be a good time for a lunch

6    break?

7              THE COURT:  Yes.  And I said no.

8              MR. RAND:  Can you give me an idea of when you would

9    like that break?

10             THE COURT:  How much longer do you have on your

11   direct?

12             MR. RAND:  Hard to tell.  40 minutes, an hour, hour

13   and a half.

14             THE COURT:  Let's go to --

15             MR. RAND:  Maybe a couple hours.  It's hard to tell

16   how long he's going to take to answer the questions.

17             THE COURT:  Let's go to 1:00.

18             MR. RAND:  Okay.

19   BY MR. RAND:

20   Q.  I'd like to mark Plaintiff's P74 already in evidence.  Do

21   you recognize this email?

22   A.  Yes.

23   Q.  What is this email?

24   A.  It's actually two emails here.  The first one is on

25   August 18 at 3:10 p.m. from Patrick Mooney.  It says:  Hi all.

N6QQaqu3                        Barrette - Direct

1   It's not entirely clear from this reproduced email who he sent

2   it to.

3           But before I get to the substance of it, but then

4   there's a response to him on the same day a few hours later

5   from Jan Schlichtmann, and the response at least goes to pretty

6   much everybody involved with Alterix, that being the officers,

7   directors, and me.

8           And what Pat's email -- Pat Mooney's email says is:

9   Hi all.  I wanted to let everyone know that investors have so

10  far funded $3 million into escrow, and we have just received

11  $2.69 million (those damned banking fees) in our account.  I

12  anticipate closing on up to an additional 2 million or so

13  throughout this week and next.

14          And then he thanks Marshall and me for helping.

15          So this gets to a couple of points.  One is that the

16  amendment of the engagement fee agreement, the fee for this

17  financing really was for this financing to ten percent happened

18  while the financing was going on, so it wasn't a done deal yet,

19  and we needed to keep Alexander motivated.  And that's pretty

20  much the most important point here.  But, you know, the

21  financing did go on as is typical here, and more money did

22  eventually come in.

23          Just to complete, I'm sorry, Jan just says:  Pat, that

24  is great news about a great effort concerning a poignant

25  moment.  Very well executed.  Thank you, Jan.

N6QQaqu3                    Barrette - Direct

1   Q.  You received this email?

2   A.  Yes.  I certainly received the Jan email, and so therefore

3   saw the Pat email.  I may have received the Pat email.  It's

4   just not clear from this the way this is reproduced.

5   Q.  Basically it's reporting on receiving monies from the

6   bridge loans?

7   A.  Correct.

8   Q.  I'd like to show you Plaintiff's Exhibit 75 in evidence.

9   Do you recognize this document?

10  A.  I do.

11  Q.  Did you receive this email?

12  A.  I did.

13  Q.  What does this email say?

14  A.  This is an email on August 27, so ten days after the one we

15  just looked at.  It's the same group, to the officers and

16  directors of Alterix, and me.  It's from Pat Mooney again.

17         Hi all.  Just a quick FYI.  We just had another

18  $1,250,000 hit our escrow account from a group in Chicago.  We

19  will break on $1,125,000 today or tomorrow, bringing net

20  proceeds to the company $3.825 million.  I expect another

21  million or so next week.  That should put us in the

22  approximately $4.725 million net proceeds range.

23         So just reporting, as I said, this was an ongoing

24  process on more significant funds coming in.  I should mention

25  that these letters refer to escrow.  That's not unusual.  I

1   believe the escrow account was -- this is a little bit of an

2   educated guess was actually at Alexander.  So the money came

3   into an escrow account at Alexander, and they would let it

4   accumulate maybe for a day or two if it was coming from

5   different investors and then cut a check to the company.  So it

6   was just a mechanical process.  That's what the escrow refers

7   to.

8   Q.  I'd like to show you Plaintiff's 76 in evidence.  Do you

9   recognize this email?

10  A.  Yes, this is a email from September 8.  It's essentially

11  very similar to the earlier email in the sense it's from Pat

12  Mooney to the same group we described, that being the officers

13  and directors of Alterix, and me.

14          The subject is another escrow break.

15          It says:  Hi all.  We have another $750,000 in escrow

16  and should break on it tomorrow.  There is the possibility of

17  another hundred thousand dollars or so.  So far we will have

18  raised $5 million with net proceeds to the company of

19  approximately $4,500,000.  I think at this point we are

20  probably done with this round, since we need to season the

21  company a bit for a bit at the $75 million valuation prior to

22  the IPO.  This will allow us to focus on the business and drive

23  a higher valuation for the IPO.

24  Q.  Did you receive this email?

25  A.  I did.

1   Q.   What did you understand Mr. Mooney to mean?

2   A.   Well, it was doing two things.  It was reporting on a nice

3   additional amount of money in recommending that we stop the

4   offering at that point that we hit the kind of number that the

5   company needed.

6        And when he talks about seasoning, that's an important

7   concept.  What's going on here is you do the bridge financing

8   to an IPO, and when sophisticated investors negotiate these

9   financial, they do talk about what they think the company is

10  worth at that time.  And as the term sheet referred to

11  75 million, and this email refers to 75 million.  And so what

12  it's telling you is that the sophisticated investors who the

13  company and Alexander was negotiating with were, you know,

14  agreed that at that moment before the public offering, Alterix

15  was worth $75 million, and they did their financing based on

16  that understanding.  It affects things like the conversion

17  price of the notes and things like that.  So that was an

18  important number.  So that's data point one.

19       The next thing that's important is when the

20  sophisticated institutional investors are going to buy a public

21  offering, they know how to read the disclosure very technically

22  in what will ultimately be the registration statement.  One of

23  the things they'll look at is there will be disclosure about

24  this deal, and they'll suss out from the deal, either because

25  it says it or from pricing, that this bridge financing was done

1   at $75 million.

2            What Pat's saying is that we need to wait at least a

3   few weeks so that when people are looking to invest in the IPO

4   and the IPO says the company is worth a hundred million

5   dollars, the sophisticated investors will say, wait a minute,

6   it was only worth $75 million three weeks ago.  So the process

7   was going to take a little bit of time anyway before the market

8   was introduced to the value of the company.  That's what he

9   meant by seasoning after, from the $75 million point we were

10  at, to the bridge financing, to the IPO.

11  Q.  I'm showing you what's been marked Plaintiff's Exhibit 77

12  in evidence.

13            MR. WARD:  Are you offering it into evidence?

14            MR. RAND:  I think it's already in evidence.  77.  I

15  forgot it was already in evidence.

16  Q.  Do you recognize this email?

17  A.  Yes.

18  Q.  What is this email about?

19  A.  It's, once again, two emails.  The more recent email is

20  from Harry McCoy, who I believe was still chairman of the board

21  of the company.  I'm not sure about that.  Don't quote me on

22  that, but who had been the original CEO of the company that we

23  had talked about.  And it's to Patrick Mooney and me.

24            But there's an earlier email from Pat Mooney, and it

25  looks like it's to the management and directors because what

1    Pat Mooney says -- and this is August 9, by the way.

2            He says:  Hi all.  We are in the process of changing

3    the company name and website.

4            By company, he means Alterix, which is about to be

5    changed to Inpellis.

6            THE COURT:  Why was it changed?

7            THE WITNESS:  Marketing.  I actually do remember this

8    conversation.  I think Pat had engaged a marketing firm, and he

9    wanted a name that conveyed a little bit better the idea that

10   we were transdermal technology, so Inpellis is, you know,

11   pellis is related to a Latin word for "skin," and in is

12   "through."  So that was the reason.  It was pure marketing.

13           THE COURT:  That certainly would have, I'm sure, a

14   material effect on the American consumer who knew his or her

15   Latin, of which there are perhaps, what, two remaining in the

16   world?

17           Anyway, go ahead.

18           THE WITNESS:  I agree, your Honor.  And funny, when I

19   was just saying that, I said Inpellis, hmm, epidermis, I

20   couldn't even quite tell you the Latin root of it, but this is

21   eight years ago.  I do have quite a clear memory of this

22   conversation with Pat that he was sort of proud of having found

23   the market.  I didn't mind it.  I didn't think it was a

24   terrible idea.  But it was a thing, basically.

25           So, anyway, what he says is:  We are in the process of

1    changing the company name and website.  Could you please review

2    the attached Word document describing the management and board

3    of directors bios to ensure accuracy.  Please let me know if

4    you have any suggested changes to your bios.  These be will be

5    on the new website just as they are on the current.

6          Then Harry replies:  Pat and Tom.  So that tells me

7    that I was probably on this original email, which I think I

8    was.

9          Attached, please find marked edits where I made some

10   updates and shortened my own bio.  I assume that we need to

11   keep the reference to my tenure of CEO of Alterix.

12   Q.  I'd like to show you Plaintiff's Exhibit 40, which are your

13   notes as of September 10.  Do you recall seeing Exhibit 40?

14   A.  Yes.

15   Q.  What is Exhibit 40?

16   A.  These are my notes.  Not only do I recall seeing it, but I

17   wrote them.  They are notes from what I'm quite sure was a

18   conference call at 11:00 in the morning on September 10, 2015.

19   Q.  Can you tell us who was on the call?

20   A.  Oh, yes.  As I typically do, I jotted down everybody who

21   was on the call.  I think it's probably a complete list.

22         So the people who were on the call were Dan, which is

23   Dan Glosband, one of the trustees of the trust.  Jan, which is

24   Jan Schlichtmann, another trustee of the trust.  Pat, which is

25   Pat Mooney, the CEO of Inpellis.  Jack C is Jack Clarke,

1    spelled C-L-A-R-K-E.  He was an experienced financial guy who

2    was chairman of the board of directors of Inpellis.  Me, Jack

3    Altshuler, who was the third trustee of the trust, and Marshall

4    Sterman, who I believe still had the role of CEO of BioChemics.

5    He is the one who brought me into the deal the year before.

6         And my memory of this call is that the trustees wanted

7    to understand the timing of things and had been alerted that

8    there might be an issue with the firm commitment underwriting.

9    And so it was sort of a status report by Pat on timing because

10   again, to recap, we had -- we filed a draft registration

11   statement in April, responded to comments in June, responded to

12   comments again in August, and felt we were in very good shape.

13   And then closed the bridge financing and felt we were in very

14   good shape for the IPO.

15        One slight side comment on the bridge financing.  The

16   bridge financing was important for at least two important

17   reasons:  One, it just gave the company working capital so that

18   it could continue hiring.  You know, it's conducting fairly

19   sophisticated research; could continued to do that kind of

20   thing.  But it's also a huge message to the market because if

21   I'm now showing the public market for the first time that I'm

22   about to conduct a public offering, and here's the story of my

23   company, and oh, by the way, a group of very sophisticated

24   investors in an arm's length negotiation have put in

25   essentially $5 million of a $75 million valuation, people like

1    to see that smart people wrote checks based on the story.

2            So It was hugely important.  There's a lot of desire

3    on the part of the trustees to get going.  So, the first thing

4    which is, again, the fall is a big time to do IPOs.  Somehow

5    the way the calendar rolls, people don't like to do them in the

6    summer.  You want to come out in the fall before you hit the

7    holidays at the end of the year.  But the one thing you do run

8    into in the fall are the high holidays on the Jewish calendar.

9    So that's why the first two things on here are Rosh Hashanah

10   and Yom Kippur, and you basically want to avoid those two

11   weeks.  That's the only reason that note is there.

12           The bridge financing, you know, essentially a summary

13   of the financing.  This talks about four and a quarter million.

14   And then, you know, with expenses like the ten percent fee,

15   3.825, the details tails, we may have done that one other small

16   thing.  This is kind of where we are now.  It's a very nice

17   chunk of cash.  Burke Ross is a high-net-worth individual who

18   has an investment company called Westray Capital.  They were

19   kind of the lead investor in the bridge financing.  This is

20   just a recap.

21           The next comment says, it something about a block or

22   something.  That may be a technical point.  I don't think it's

23   a point -- I don't fully recall.  Here is the mention of 750

24   that's still in escrow, and we're waiting for paperwork.

25   That's what was going to bump the net amount received above the

N6QQaqu3                        Barrette - Direct

3.825.

         We had -- the 6 million max means that we said to the
investors, we won't raise more than $6 million in this
financing, in the bridge financing.  And you saw from Pat's
earlier email, when we hit five, I think he decided that, you
know what, let's close this financing so that we're not raising
money, so we can season it, and focus on the public offering.
Not an unusual decision.  It mentions 20 to 25 days.  I think
that, again, it kind of gets to the seasoning, and the time it
might take to actually get effective with the offering, which
is timing.

         So -- then the next page is on the IPO.  The first
bullet is important.  It says five comments, minor.  So this is
the last set of comments -- when we had the comments in from
the August filing, we only got five comments, which means that
we're essentially ready to go.  It then mentions that the
second quarter financials are due, and this is important.  When
you make filings to the SEC of registration statements, there
are very strict rules about the financial information that has
to be in the registration statement.  You always have to have
audited financials for usually the preceding three years for
full year audits.  Those have to be audited.

         But then if you're not early in the year, in other
words, you're into a calendar year, you have to have quarterly
financial statements, so financial statements for a three-month

N6QQaqu3                    Barrette - Direct

1   period or a quarterly period that are more recent than your

2   annual ones.  There are specific day rules in there and that

3   sort of thing.

4          What this next bullet says November 12 financials

5   stale.  What that means is that the draft registration

6   statement that we had just gotten through with the SEC with

7   only five comments had financials that were through the quarter

8   end of June 30, so the first six months of calendar year 2015.

9   A slight side comment, pardon.  SEC inert.  Inpellis had a

10  fiscal year of a calendar year.  Not always the case.  Can make

11  things confusing, but happily it was a calendar year.

12         So we had June 30 financials, and the -- as of

13  November 12, if we filed anything on November 12 or later with

14  the SEC, it would have to have financials through September 30.

15  I should again say these quarterly financials or sometimes they

16  are called interim financials because they can be for multiple

17  quarters, like September 30 you'd have nine months worth, are

18  not audited, but they are vetted carefully by the accountants

19  because the accountants are going to have to ultimately audit

20  the end year ones.  so there is a lot of interplay with the

21  accountants, so it's almost as if they're being audited.  And

22  so --

23         THE COURT:  Let me, if I may, interrupt.

24         THE WITNESS:  Yes.

25         THE COURT:  I'm anxious to have you move on.

1          THE WITNESS:  Yes, I'm sorry.

2          THE COURT:  To where it says:  Alexander cannot do a

3     firm commit.  Underwriting (under FINRA).

4          THE WITNESS:  Yes.

5          THE COURT:  What was that -- who said what?

6          THE WITNESS:  Yes.  So that would have been from Pat

7     because Pat was the one that was interacting with Alexander

8     primarily.  So he was reporting to us for the first time that

9     there was a firm commitment issue with FINRA, but I think it's

10    also very important to note -- and this comes out later too --

11    it was reported in the context of a minor technical problem

12    that could be solved.  And so -- but it was definitely Pat

13    because none of the rest of us are talking to Alexander

14    directly.  My communications are 99 percent through -- well,

15    greatly through Greenberg, sometimes with Chris Carlin with Pat

16    on the phone too.

17         The immediate update I think probably was somebody

18    said, well, we're going to need an immediate update on that.

19    The -- so, again, yes, this was a significant piece of news,

20    and not a good piece of news.  But, again, it's really

21    important to understand that it was in the context of a

22    short-term solvable problem.

23         THE COURT:  What is the next --

24         THE WITNESS:  Yes.  So the next one is -- the

25    discussion then went, to the best of my recollection with the

1    notes, to other underwriters, who else might underwrite this

2    offering.

3            THE COURT:  That says names?

4            THE WITNESS:  Yeah, names of underwriters.  And I'm

5    trying to, you know, Jeffries is a well-known --

6            THE COURT:  Isn't that inconsistent with everyone

7    assuming this was a minor problem?

8            THE WITNESS:  No.  For two reasons.  No.  One is it's

9    very typical for there to be a syndicate of underwriters.  If

10    you look at many public offerings, there's a managing

11    underwriter, a book running manager, and then other

12    underwriters who participate in their syndicate, so they get in

13    on the first buy of the share, so they get to, you know,

14    sell -- get them at a discount and then sell them to the

15    market.  So a syndicate is not unusual, and the thought of, you

16    know, suggesting to Alexander that these are some people that

17    could join their syndicate would be a typical thing to do.

18        The other thing, remember, we didn't understand, these

19    letters we've been looking at, I didn't see those six years

20    later, we understood it was a minor problem, so one thought

21    process is maybe they could do it if they have company on the

22    book they can do it.  In other words, they are not just wholly

23    out of it; that they just have to have some financial support

24    from another -- we didn't know.  But our focus was on keeping

25    the momentum going and -- and understanding what sort of help

N6QQaqu3                    Barrette - Direct

1   Alexander needed to be able to continue to do it.

2           And so, again, there are at least two, probably three

3   reasons.  One is simply Alexander is going -- the one that we

4   understood to be the case, Alexander is going to be fine, but

5   we need to -- the whole thing will probably go better if

6   there's some other people on the cover of the book anyway.

7   It's the most constructive on where we were.  Remember, we were

8   in a great frame of mind.  We just closed the bridge financing,

9   so -- yep.

10          THE COURT:  So you then slightly further down the page

11  have in quotes "we will get somebody."

12          THE WITNESS:  Yes.

13          THE COURT:  Isn't that a reference to getting another

14  underwriter?

15          THE WITNESS:  I believe so, yes.

16          THE COURT:  Then someone says "time constraints a

17  problem."

18          THE WITNESS:  Yes, I think that the, again, because we

19  wanted to hit the window kind of after the Jewish holidays,

20  before the end of the year holidays, and we had some SEC

21  requirement to get the financials done, and then there's a

22  21-day period, which we can get into in a minute if you'd like.

23  We needed to keep the process moving, which meant that we

24  needed to get an underwriter who could do their follow -- what

25  we sometimes call follow-on due diligence fast enough to be

1    willing to have their name on the cover of a prospectus, you

2    know, within probably a couple of weeks, and that's --

3              THE COURT:  At the bottom of the page -- I'm not sure

4    if this is related or unrelated to what we've just been

5    discussing, says:  "Roth is out" --

6              THE WITNESS:  Stifel, S-T-I-F-E-L.

7              THE COURT:  What's that a reference to?

8              THE WITNESS:  Those are two investment banks that

9    potentially could have been underwriters or on the cover, and

10   they both had declined.

11             THE COURT:  So this is being reported by Mr. Mooney?

12             THE WITNESS:  No.  I think this -- I don't recall

13   specifically, your Honor, I'm sorry.  It could have been also

14   reported by Marshall Sterman, who has a broad network of people

15   in the financial community.  But it might have been reported by

16   Mooney, now that you mention it.

17             THE COURT:  So attempts had already been made to have

18   other underwriters, but unsuccessfully?

19             THE WITNESS:  Correct.  Correct.  And just to maybe

20   put a little flesh on it, if you indulge, above that, it says:

21   Maxim may not lead.  Co-manager book runner."  Maxim is another

22   potential underwriter, and at least they hadn't said no yet.

23             THE COURT:  Now, on the next page, it says:  Alexander

24   Capital on the cover.

25             THE WITNESS:  Right.

1              THE COURT:  No.  And then repeating, no firm

2    commitment underwriting.  So there was further discussion,

3    right?

4              THE WITNESS:  Yes.  Yep.

5              THE COURT:  And so doesn't that indicate that there

6    was unease about this?

7              THE WITNESS:  Oh, there definitely was.  Absolutely.

8              THE COURT:  Okay.  And then I don't know what the next

9    sentence says.

10             THE WITNESS:  Bad decisions for Alterix because of

11   BioChemics.  I must admit the -- you know, again this could be

12   greatly Pat.  It may be concerns about beginning to have

13   concerns, you know, from Alexander about the BioChemics

14   disclosure.  There may have been decisions made for Alterix

15   that were to benefit BioChemics, not the new investors in

16   Alterix, or something like that concerns there, but high level.

17             THE COURT:  Going down a little bit further.  You

18   quote or summarize someone:  Underwriting meetings will be

19   difficult with bridge in place.

20             THE WITNESS:  That's an important one, and I apologize

21   my hand scratches.  That word is actually different.  This is

22   Jack Clarke, the chairman of the board, who is himself an

23   experienced investment banker; not the kind that would

24   underwrite this offering, but, you know, a very impressive guy,

25   very seasoned.

N6QQaqu3                        Barrette - Direct

1              And the point he is making, which is the point I made

2       a minute ago, that wasn't the setup.  I forgot this was in

3       here, but that once you can tell potential investors or, in

4       this case, potential underwriter who are really investors in a

5       firm commitment scenario, that -- I'm sorry, Burke Ross and his

6       crew, sophisticated guys had invested in this company pre -- in

7       anticipation of a firm commitment underwriting, that it would

8       be easier to get underwriters.  That was the point he was

9       making.

10             THE COURT:  Just so I'm --

11             THE WITNESS:  Yes.

12             THE COURT:  The bridge loans were made with the

13      understanding that there was a firm commitment.  Yes?

14             THE WITNESS:  Absolutely.

15             THE COURT:  And so now you might have problems because

16      the bridge loan lenders had, in effect, been misled.

17             THE WITNESS:  Correct.

18             THE COURT:  Going to the next page, there's about six

19      lines down or so, it says:  "Fraudulent transfer."

20             THE WITNESS:  Yes.

21             THE COURT:  What's that about?

22             THE WITNESS:  So Dan Glosband, one of the trustees of

23      the trust, and the guy who was a retired partner from Goodwin

24      Procter, Dan's specialty is security lending and bankruptcy

25      law.  And the concern that he raised was that when BioChemics

1   licensed the technology to Alterix -- I'll say Inpellis from

2   now on -- that it didn't -- that BioChemics did not get

3   appropriate consideration for that license; that the royalty

4   rate was too low or they should have gotten some cash upfront.

5        And so this is essentially Dan kind of talking about

6   concepts in that area of the law.  The way we addressed it, and

7   I think we already started to address it, was in the risk

8   factors to say, look, the creditors of BioChemics might try to

9   take a run at this license.  So this is a lot of fairly

10  technical commentary by Dan, but that was the gist of what he

11  was talking about.

12       THE COURT:  So is there anything else in these notes

13  that relates to the firm commitment problem?

14       THE WITNESS:  No, I think you're right your point

15  here, and you're right we had gotten into kind of the risk of

16  some of the creditor issues in which we addressed with risk

17  factors and things, but the firm the commitment, the key firm

18  commitment is in those earlier pages that you pointed out.

19       THE COURT:  So except for one thing I need to take up

20  with counsel, we'll take our lunch break now, so you're

21  excused.  You can come back at 2:00.

22       (Witness not present)

23       THE COURT:  With respect to counsel I want to turn to

24  something different, which is the deposition transcripts that

25  you've kindly provided to me.

1          The first one is Joseph Amato.  And there, there was

2     no objection to any of plaintiff's designated offering of lines

3     of the deposition.  So those are received.

4          And so that the record will be clear, tonight or

5     sometime before the end of this trial, plaintiff's counsel

6     needs to do one of two things, either of which is fine with me:

7     Either you can just file with the Court your marked-up

8     deposition for Mr. Amato, or you can prepare and give to our

9     court reporter a typed-up page that says:  The following pages

10    and lines of Mr. Amato's deposition were offered by plaintiff

11    and were received without objection.  Either is fine, but I

12    don't want to take the time now that I have all those lines

13    mentioned in the record, which would take a lot of time.

14         Now, turning to the next deposition which is the

15    deposition of Christopher Carlin, here, there are no

16    objections, but there are a few lines offered by defense and

17    supplemental to the lines being offered by plaintiff.  So all

18    of that is received.  But, again, we need something so that the

19    record reflects exactly what was received.  Either both sides

20    can file this as a docket exhibit or -- that's probably the

21    easiest way to do it or you can prepare a page for our court

22    reporter.

23         (Continued on next page)

24

25

1           THE COURT:  (continuing)

2           The third one is -- hang on one minute.  Yes, the

3     third one is Mr. Clarke, and this is one from before,

4     defendants object to on the ground that Mr. Clarke is available

5     as a witness and so this would only be usable as impeachment

6     material.  And, in fact, Mr. Clarke is listed on defense

7     counsel's list of witnesses.  Are you going to call Mr. Clarke?

8           MR. WARD:  Yes, your Honor.  We have been given leave

9     to call him remotely.

10          THE COURT:  OK.

11          MR. WARD:  He is on vacation this week.

12          THE COURT:  So with respect to all these four cases in

13    which the objection is made, the deposition shouldn't be

14    received because the witness is available.  If the witness is

15    called, I agree, then a deposition only comes in to the extent

16    it comes in by impeachment.  If the witness is not called we

17    can revisit that issue then.

18          With respect to Mr. Gazdak, it is I think the same

19    story as two earlier ones; there is no objection, there are a

20    few lines offered by the defense in addition to the lines

21    offered by the plaintiff so those are received.  One of these I

22    can't find the references right away, made by defense, that a

23    prior page should have been included but the prior page wasn't

24    provided by either side.  Let me see if I can find that.  Hold

25    on a minute.

1                MS. COLE:  I believe that was for Mr. Gazdak.

2                THE COURT:  It was for Mr. Gazdak?  What page was it?

3                MS. COLE:  Yes, your Honor.

4                THE COURT:  What page?

5                MS. COLE:  It would have been page 57 was not

6      included.

7                THE COURT:  Yes.  There we are.  So there was an

8      objection on page 58 from defendants, objection completeness,

9      missing prior page with context for language quoted by

10     Schlichtmann in the question.

11               So, that sounds right but I don't know because no one

12     gave me page 57.  So, if someone over lunch wants to find page

13     57 and give me a hard copy, that would be appreciated.

14               MS. COLE:  I will do that, your Honor.

15               THE COURT:  Great.  I will see you all at 2:00.

16               (Luncheon recess)

17               (Continued on next page)

18

19

20

21

22

23

24

25

1                 A F T E R N O O N   S E S S I O N

2                           2:00 p.m.

3            THE COURT:  So, was defense counsel able to get ahold

4      of -- ah.  There it is.  So, which lines do you want to --

5            MS. COLE:  It would be lines 11 through 25 on page 57.

6            THE COURT:  So, had --

7            MS. COLE:  Just to be clear, we would have no

8      objection to the excerpted testimony on page 58, as long as

9      those lines on 57 --

10           THE COURT:  Yes.  So, even though ordinarily

11     plaintiffs could have objected to page 57, lines 11 through 20,

12     they instead chose to offer, on page 58, lines 3 through 25 and

13     more on to page 59, which would make no sense without the

14     reference to the previous statement from Mr. Schlichtmann and

15     his role as counsel, so 57, lines 11 through 20, are received.

16     So what you want to do is make a copy of this page with your

17     green markings, then take the whole thing and you and

18     plaintiff's counsel will file it so we will have what is on the

19     record.

20           OK.  Let's get the witness back on the stand.

21           MR. RAND:  Thank you, your Honor.  One other note?

22           THE COURT:  Yes.

23           MR. RAND:  We made a collection of all of our exhibits

24     in binders as an extra for you, if you would like them, just to

25     make your life easier.

1          THE COURT:  I actually prefer what you have been

2     doing, which is handing them up as you introduce them.

3          MR. RAND:  I will still do what I was doing before, it

4     would be in addition.

5          THE COURT:  Oh.  Well, my law clerk of course would

6     love to have them because he is in need of exercise and this

7     will be an excellent weight-lifting experience for him.

8          Let's get the witness back on the stand.

9          (Witness resumes stand)

10         THE COURT:  OK.  Counsel?

11    BY MR. RAND:

12    Q.  Mr. Barrette, do you still have your notes from the

13    September 10 meeting in front of you?

14         THE COURT:  Exhibit 40.

15         THE WITNESS:  OK.  Yes, I do.

16    Q.  Can you go to the page that says 3 of 7 at the top?

17    A.  Do you mean pages numbered -- oh I'm sorry.  I see now.

18    Yes, I am on that page.

19    Q.  Do you see in the box at the bottom left it says, "We will

20    get somebody."

21    A.  Yes.

22    Q.  Who are you referencing as saying that?

23    A.  So, I am just not sure.  There are people at the meeting

24    that had the kind of networks -- let me back up a second.

25         I am reasonably certain that was about getting another

underwriter either to join Alexander or replace them, if

necessary.  And of the people at the meeting, it could have

been Pat, it could have been Jack Clarke who, remember, was an

experienced financial guy, or Marshall Sterman who was an

experienced financial guy.  I'm just not sure.  I'm sorry.  I

remember at the meeting was well, OK, this could be an issue,

let's think about the best way to address it.  And I also want

to emphasize at the time it was brand-new news and our working

assumption was that it wasn't necessarily a major problem in

the sense that it could be fixed quickly.  So remember, one

thing was very much on the table was that it might be fixed by

simply having another underwriter on the book, we just didn't

know yet what was going on.

Q.  Do you see in the box below that it says:  21 days.  And

then I can't read the language.  What are you saying?

A.  So, it says -- I think it says 21 days behind us with

Alexander, and I'm again not a hundred percent sure why I was

so precise with the 21 days, although there is a 21-day period

involved in doing public offerings, although it might have been

two thoughts; 21 days because we could, you know, have an

effective registration statement as soon as 21 days or so from

where we were because we only had the five comments, and we had

the bridge financing.  So, we were in very good shape.  The

"behind us with Alexander" was I think a reference to something

we talked about before which is that Alexander had been working

1    on this project since January of that year, had done all of its

2    due diligence, and anybody coming in as an additional

3    underwriter or a new underwriter would need some lead time and

4    they were therefore behind where Alexander was.

5    Q.  So you mentioned before there was a 21-day waiting period

6    for some event.  What are you referencing?

7    A.  Right.

8            Remember, we at this point had only filed draft

9    registration statements confidentially.  The goal line of an

10   initial public offering is to be declared effective by the SEC.

11   In order to do that we had to file an S1 that was not a

12   confidential draft registration statement, we had to file an

13   actual S1 that was -- we didn't ask to be treated

14   confidentially so it would immediately appear on EDGAR, the

15   SEC's publicly available service.  And then, from that date we

16   would have to wait 21 days before the SEC would declare it

17   effective.  So there was kind of built-in waiting period.

18   Q.  Go to page 4 of 7 at the top.

19   A.  Yes.

20   Q.  Then you go down below and it says:  It looks like Jan has

21   something.  Is that marking --

22   A.  Well, it says Jan/Marshall/Dan talk.

23   Q.  Then it says her IPO, and then I can't really read the

24   notes.  Do you see where it says BioChemics problems?

25   A.  Yes, I see where you are.  It says something IPO.  It might

1   say auditors.  I think it probably does say auditors get closer

2   to wire.  Dan has anxiety.

3   Q.  Anxiety?

4   A.  Yes.

5   Q.  Does that say Jan has anxiety?

6   A.  No, Dan.  Dan.  Dan, as in Dan Glosband.

7   Q.  Dan Glosband; so he is having anxiety about what?

8   A.  I think about the concern that Alexander Capital has now

9   told us about through Pat.

10  Q.  So he is upset?

11  A.  Correct.

12          THE COURT:  Did Mr. Mooney indicate when he had

13  learned this?

14          THE WITNESS:  I do not recall that he did know.  My

15  best memory eight years ago was that we understood it to be new

16  news to him too but that's not a strong memory, but I don't

17  recall any discussion about when he knew one way or the other.

18          THE COURT:  All right.

19  BY MR. RAND:

20  Q.  Then you see where it says below:  Follow call with --

21  A.  Yes.

22  Q.  Jan/Dan/Marshall?

23  A.  Right.  That is what it says.  Short follow up call with

24  Jan/Dan/Marshall.

25  Q.  When was that?

1   A.  I think that it is -- at minimum the three of them planning

2   to do a follow-up call maybe as -- remember, they're the

3   trustees of the trust so they're kind of the owners of the

4   company, they might have wanted to have had their own call

5   without Pat or Jack.  I don't know why.  And that might not be

6   what it means but it says they were planning a followup call.

7   Q.  So after this meeting, did anybody contact Alexander to ask

8   them what was going on?

9   A.  Yes.  I believe that I talked to Pat, but especially to

10  Tony Marsico to find out what the situation was.

11  Q.  And what did he say?

12  A.  Again, throughout this process from this, you know,

13  information gone, we were consistently told it was a minor

14  bureaucratic SNAFU and that it was going to be resolved very

15  quickly.

16  Q.  I would like to show you Plaintiff's Exhibit 41 which are

17  Dan Glosband's notes from September 10.

18  A.  OK.

19  Q.  Have you ever seen these notes before?

20  A.  Yes, in preparation for my deposition.

21  Q.  And in looking at these notes do they refresh your

22  recollection about anything else that occurred at the meeting?

23  A.  So, just give me one minute if you would, please?  I don't

24  want to make everyone read line by line through.  I think on

25  the second page, he mentions problems with Alexander firm

1  commitment.  If they can just place the shares on -- which is

2  obviously not what we wanted but he does say in the next --

3  this is on page 2, the hand-lettered page 2 towards the top it

4  says:  Alexander trying to get there, talking to Jefferies,

5  which again which is the idea of having the company on the

6  cover.  And then it is talking about what my notes reflect

7  which is talking to other underwriters and that sort of thing.

8         So, again, I think they're consistent with my notes.

9  I know they're longer but -- no, they're not.  So, they're,

10 otherwise, I think consistent with my notes.

11 Q.  Prior to September 10, was Inpellis trying to find other

12 investment bankers to help Alexander?

13 A.  Yes.

14 Q.  Is that a usual process in an IPO?

15 A.  Yes.

16 Q.  And did they continue to try and find other investment

17 bankers to help Alexander after September 10?

18 A.  Yes.  As far as I know, yeah.  I wasn't deeply involved in

19 that effort but that was my understanding.

20 Q.  If you look at 8 of 18 at the top?

21 A.  Yes, I see that.

22 Q.  Do you see on November 2 it says:  Chris Carlin at

23 Alexander says firm commitment is before FINRA and then it says

24 something like --

25 A.  Yes, it goes on to say -- it does say that it says expect

 1   signoff by Friday, wants to go.  Then file publicly.  Has

 2   buyers lined up.

 3           So that's consistent with my very clear memory of when

 4   this issue first surfaced in September it was always presented

 5   to us as a minor issue that could be resolved quickly.

 6   Q.  And there was no change that you were moving forward on

 7   firm commitment basis?

 8   A.  Correct.

 9   Q.  I will show you an e-mail marked Plaintiff's Exhibit 78.

10           MS. COLE:  What was the exhibit number?

11           MR. RAND:  78.

12   Q.  Do you recognize this e-mail?  E-mails?

13   A.  E-mails, yes.

14   Q.  I will ask you, did you receive these e-mails?

15   A.  Yes.

16   Q.  Can you explain to us what they say?

17   A.  Yes.  Well, the first one, they are -- hang on, I am

18   checking the date, they are September 18, 2015 e-mails.  The

19   first one is like we have seen from others, from Patrick Mooney

20   to the board of directors officers and me and he says:  Hi

21   everyone.  As of this morning we have officially closed and the

22   last piece of the full $5 million receiving net proceeds to the

23   company of approximately $4.5 million.  Then he goes on to say:

24   At this point we have shifted focus to the next phase which is

25   building our banking lineup and generating interest with

1    institutional investors -- let me stop there for a second.

2            So, I mentioned institutional investors before as

3    being something that is the goal of this kind of a firm

4    commitment underwriting offering, and when he says banking

5    lineup he is talking about exactly the subject I was talking

6    about which is that adding some other underwriters to the cover

7    of the book.  But he says:  Building it, he is not saying to

8    take Alexander off.  To that end, we have had some very good

9    cause with the Friedman billings and Ramsey and Laidlaw, both

10   banking teams like the story so far, subject to more diligence.

11   We have also talked to the analysts at Laidlaw who seem to like

12   it very much.  We have a call with the FPR analyst next week

13   and am optimistic.  This process is how it is done with the

14   traditional investment banks.  Importantly, we need to make

15   sure the analyst likes the company.

16           Additionally -- I won't read the whole thing but,

17   again, this is consistent -- and actually, your Honor, he gets

18   into the Latin derivation.

19           THE COURT:  I saw that, yes.

20   A.  But, again, this is consistent with we are moving ahead, we

21   are adding, going to look to add investment banks and all

22   systems go.

23           And then the -- then the next e-mail is a response

24   from Harry McCoy:  Pat, I like the new name.  I think it is

25   good to have the name mean something related to the company's

mission.  I was never attached to the Alterix name either.  And

he offers to scan the written consent that was part of the

request and I answered telling him the scan is fine, which it

is.

Q.  And having seen Alexander's application to FINRA to get

permission for firm commitment underwriting, do you now know

that they were not close at all to getting firm commitment

license because the license they requested was only for up to

$10 million?

A.  Correct.  And again, just to be clear, I got that

information six years after this but, yeah, that was a very

different -- that situation was much worse than I understood it

to be at this time.

Q.  And if you had had that information, would it have changed

your behavior at the September 10th meeting?

A.  Yes.  I would certainly have said this is a serious

problem, I might have looked a little bit further into how long

it would take to fix it, but there were two aspects of that

information that I saw years later which is just that they

were, you know, they didn't have any ability to do an offering

and never had.  Remember, we thought maybe this was a temporary

blip.  We didn't know.  We thought it was a minor problem

because that's what we were told and that, you know, we were

slated to do a $20 million offering and then that if I had seen

that application they were only asking to be the lead

1    underwriter up to $10 million.  So, no, that would have been

2    profoundly important.  Yeah, this would have been.

3    Q.  I would like to show you an e-mail from Tom Barrette to Pat

4    Mooney on September 25, 2015 labeled Plaintiff's Exhibit 70A.

5              THE COURT:  I'm sorry.  Before you go, so with respect

6    to the previous question and answer about what the condition

7    was of in terms of Alexander which this witness only learned

8    six years later, there was no objection raised to that question

9    but in the deposition of Daniel Glosband that has been offered

10   by plaintiffs, the same kind of question was asked and at pages

11   161 and 162 and defense counsel objected to everything from

12   line 10 on page 161 to line 19 on page 162 on grounds of

13   relevance and hearsay.  So, my question to defense counsel is

14   did you waive the objection to Mr. Glosband's deposition by

15   failing to object to essentially the same question put to this

16   witness to which you would have had the same objection?

17             MR. WARD:  Your Honor, we would reserve -- we don't

18   need to -- I don't think you want to hear objections from us.

19             THE COURT:  Well, no.  I guess what I am saying, and

20   this is really more by way of a --

21             MR. WARD:  If we have to worry about preserving

22   objections there are other witnesses.

23             THE COURT:  I don't think you can have it both ways.

24   If, as you did in your objections in the Glosband deposition,

25   you objected on relevance and hearsay grounds to stuff that he

1    learned six years later I would have sustained that objection

2    on hearsay grounds, not on relevance grounds, but now you raise

3    no objection to essentially the identical question put to this

4    witness which he then answered.  So, I will, because I don't

5    want to blindside you, I will tell you right now that I will

6    allow both those positions, that is to say his testimony

7    stands, the present witness on the subject even though in my

8    view it is clearly objectionable because you didn't object.

9    But, on the other hand, I will sustain your objection to the

10   Glosband deposition which I think was a perfectly proper

11   objection.  But, I don't want to have this problem going

12   forward.

13            MR. WARD:  Understood, your Honor.

14            THE COURT:  Very good.  OK.

15            Go ahead, counsel.

16   BY MR. RAND:

17   Q.  Plaintiff's 70A, your Honor.

18            Do you recognize Plaintiff's Exhibit 70A?

19   A.  Yes.

20   Q.  Did you write this e-mail?

21   A.  Yes.

22   Q.  What is this e-mail?

23   A.  It is an e-mail to Pat Mooney.  It simply says:  Attached

24   is today's proof; and by that I meant the, that that is sort of

25   the printer lingo for a complete copy of a draft registration

N6Q5aqu4                         Barrette - Direct

statement, this had not yet been filed with the SEC, it was

amendment number three to the confidential submission and

initial filing April reasonable comments, respond to the

comments June, and then more comments relatively quickly,

respond to those comments in amendment number 2.  In August

just a handful of comments with some of notes referred to I

think five comments and so we needed to -- this was amendment

number 3, they respond to that last handful of comments from

the SEC.  Pat as the CEO of the company wanted to see the

complete picture, I'm sure, and so I sent this document to him.

Q.  And what is the date on the e-mail?

A.  The date on the e-mail is -- hang on, I'm sorry -- is

September 25.

Q.  And what is included in this draft that is similar or

different than the prior drafts?

A.  Well, again, this was a continuing flow, as we have been

describing.  So, once again, the cover of the prospectus

describes it as a firm commitment underwriting and, once again,

the underwriting section which we have now talked about a

number of times, which is I think 110 -- I will double check

that -- has the language about it to being a firm commitment

underwriting that uses slightly different words as we have

discussed but that is the way you say it in the underwriting

section.

          So again, on page 110, the underwriting section

1  continues to describe Alexander Capital as the sole book

2  running manager and continues to say the underwriters are

3  committed to purchase all the shares of stock.

4  Q.  And did the risk language regarding BioChemics remain in

5  this draft?

6  A.  Yes.  I don't think there was any significant change in the

7  risk factors.

8  Q.  I would like to show you Exhibit 70B in evidence, which is

9  your notes of September 30th, 2015.  Do you recognize this

10  document?

11  A.  Yes, I do.

12  Q.  Are these your notes?

13  A.  Yes, they are.

14  Q.  Can you explain to me what they're notes of?

15  A.  Yes.  Absolutely.  They're notes of what I am sure was a

16  phone call on September 30th, it looks like it was at 2:50 p.m.

17  and it was with Chris Carlin from Alexander Capital and Patrick

18  Mooney the CEO of Inpellis.  What this phone call was about was

19  Chris asking me to calm down the risk factors in the, quote

20  unquote, older drafts of the document.  The concern was that

21  this disclosure, which had passed muster with the SEC, might

22  give investors concern.  And so, you know, the notes reflect

23  that that point is on the second page, it says risk factor,

24  calm down older drafts.  I think leading into that we had

25  talked about Greenberg -- I think this is me mentioning to them

1    that Greenberg had been -- their lawyer had been very involved

2    in the risk factors and that Tony Marsico, the senior person on

3    the Greenberg team, had in fact advocated for very full

4    disclosure about the BioSurfaces problems and was certainly

5    very happy to work with me to even expand that disclosure a

6    little bit more in response to SEC comments.  It also talks

7    about you saw the investment bank FBR referred to by its full

8    name in some earlier notes, this is just I think Chris talking

9    about talking to FBR and some of the issues they might have,

10   but I think it was him essentially trying -- it was Chris

11   Carlin from Alexander attempting to make the case to calm down

12   the risk factors that I was not a fan of.

13   Q.  You mentioned BioServices?

14   A.  Yes, sorry.  BioServices is where I work now.  I apologize.

15   BioChemics.  I can't believe I haven't done that before.

16   Q.  Did you provide your opinion when you were asked to calm

17   down the risk factors?

18   A.  Oh, absolutely.  Remember, we were ready to go with the SEC

19   at this point and I knew that that -- we were in great shape,

20   that we had, you know, addressed very head-on the issues with

21   BioChemics and I thought we were just in a very good place to

22   file publicly a document that could -- that the SEC would be

23   happy to declare effective after Alexander had done some more

24   work to sell the deal and the 21 days had passed.

25   Q.  Can you just explain the notes regarding Margery Fischbein;

N6Q5aqu4                          Barrette – Direct

1   who she is?

2   A.  Margery Fischbein is head of healthcare banking at FBR and

3   I am just blanking, it is three names but everybody calls them

4   FBR.  FBR is an investment bank like an Alexander.  And so, the

5   bullet points under there say market timing.  I have a feeling

6   that was a reference to things like the holidays and that sort

7   of stuff.  More FDA visibility means that she might -- this

8   gets more into the substance of the business which is an

9   important thing.  Remember, what Inpellis was doing was

10  developing this transdermal ibuprofen product, among others,

11  but that was the start of the show, and it needed to have more

12  clinical trials and things like that and so she was probably

13  commenting that it is still a little bit early in the clinical

14  trial process and that might be a challenge.  And she also

15  mentioned the business risks of BioChemics.  So, the fact that

16  BioChemics had these issues with the SEC, whatever was going on

17  there, you know, we now had disclosure about their creditors

18  being unhappy and maybe interfering with the license and things

19  like that.  So, you know, then she goes on about the history

20  context, I am sure that was a reference to BioChemics in

21  fulsome which disclosure was.  So, she was talking about some

22  of the challenges of the selling the deal.

23  Q.  She is not on the call, right?

24  A.  Correct.  This is Chris Carlson reporting a conversation

25  with her.

```
 1    Q.  Chris Carlin.

 2    A.  Sorry.  Yes, Carlin.  I apologize, I should know that.

 3    Q.  Then, at the very end, after it says calm down the risk

 4    factors, what is the thing that is circled?

 5    A.  It says 2 million warrants and I honestly don't quite

 6    remember what that refers to.  Warrants are a common way to --

 7    they're commonly used as additional compensation to

 8    underwriters in these kinds of deals and there were warrants I

 9    am quite sure in the engagement letter.  I don't think

10    2 million was the right number so I honestly -- warrants being

11    discussed is not an unusual thing, I just can't quite remember

12    the exact context here.

13    Q.  Then do you understand your final note?

14    A.  I can't quite -- I'm sorry.  I just can't quite read my own

15    handwriting.  I apologize.  It looks like something million,

16    maybe 84 million in trailing something.  I just -- I could

17    guess but I am just not sure.

18    Q.  I would like to show you Plaintiff's Exhibit 2 which is the

19    amended engagement agreement with Alexander Capital.  Do you

20    recognize Plaintiff's Exhibit 2?

21    A.  I do.

22    Q.  Did you draft Plaintiff's Exhibit 2?

23    A.  No, I did not.

24    Q.  Do you know who grafted it?

25    A.  I actually don't know.  It was likely Tony Marsico who
```

1    represented Alexander Capital.  This would typically -- this

2    is, as you said, an amended restatement engagement letter with

3    Alexander, it is dated October 5, 2015, by the way, and it

4    would always be drafted by counsel to the underwriter.

5    Q.  And do you recall what amendments were in this amended

6    draft or this amended agreement?

7    A.  Yes.  We talked about the FINRA process and the more

8    routine FINRA process, as we discussed, is that FINRA would

9    evaluate the compensation being paid to the underwriters and

10   some other aspects of the offering, again not nearly the deep

11   dive that the SEC does and that is all handled by underwriter's

12   counsel.  And Tony had let me know that they wanted to reduce

13   some of the commissions and I forget, I don't have the original

14   in front of me, but they had some concerns about the level of

15   compensation and so he had to change the letter and that's

16   what -- and so that is why this was done to comply with FINRA,

17   FINRA's group talking about compensation underwriters.

18   Q.  Does this new engagement reflect the new replacement fee

19   from the letter amendment?

20   A.  Yes.  I think that other -- that's why we called it an

21   amended and restated because we had done that one-page

22   amendment to the original one, increase in the base placement

23   fee to 10 percent, so since this kind of rewrote the whole

24   agreement it incorporated the substance of that amendment so

25   the 10 percent is still in here even though we actually made

1    that change earlier.

2    Q.  Is it your understanding that the fees were reduced in

3    response to the unreasonable letter from the SEC?

4    A.  Correct, but I do not see the unreasonable letter.  Again,

5    this was the normal dance with FINRA which is that

6    underwriter's counsel reports to me that FINRA had some things

7    they wanted to change in the underwriting arrangements for the

8    IPO in that they had to make these changes to essentially get

9    FINRA approval so we would not be typical --

10            MR. WARD:  Object to hearsay and lack of personal

11   knowledge.

12            THE COURT:  Sustained.

13   BY MR. RAND:

14   Q.  At the time of this letter did you have any knowledge that

15   the unreasonable letter existed?

16   A.  No.

17   Q.  I would like to show you Plaintiff's Exhibit 85 which is a

18   confidential file registration statement on October 6, 2015.

19   Do you recognize this document?

20   A.  I do.

21   Q.  Was this filed with the SEC on October 6, 2015?

22   A.  Yes, it was.

23   Q.  And how is this document different than the prior

24   confidential filings?

25   A.  So, first of all, where it doesn't differ is it is still a

1    firm commitment in both places we have been talking about a lot

2    but in reaction to the request by Chris Carlin on the call with

3    Chris Carlin and Pat Mooney, we substantially reduced the risk

4    factors regarding BioChemics.

5              THE COURT:  So how could you put in firm commitment

6    when you knew from the earlier meeting in September that they

7    didn't have authority to make a firm commitment?

8              THE WITNESS:  Because we were told that they were

9    going to get authority and these were confidential filings, and

10   that by the time we needed to file publicly they would be all

11   set and so that was what we were anticipating would be the

12   deal.  And this wasn't just my call, obviously Greenberg

13   Traurig and Alexander were on board for that too, they knew

14   exactly what was in here.

15             THE COURT:  So, let me make sure I understand.  This

16   is a document submitted to the SEC for their approval, yes?

17             THE WITNESS:  Yes.  I might parse words a little bit,

18   your Honor.  It was submitted to the SEC for their comment on

19   all aspects of it and to me the word "approval" they only

20   really approve it when they declare it effective.

21             THE COURT:  That's fair.  That's fair.  But, in

22   response to other issues they have had or matters that have

23   come up, you amended the earlier confidential submission.

24             THE WITNESS:  Yes.

25             THE COURT:  But you didn't amend in any way, shape, or

1    form the firm commitment representation even though at least

2    three weeks, if not more, have passed since you first learned

3    that Alexander didn't have the right to offer a firm commitment

4    though they hoped to obtain it.

5            Do I have all of that right?

6            THE WITNESS:  Yes, you do, your Honor, but again, this

7    was a document that wasn't public yet.

8            THE COURT:  Well, I understand that, but why weren't

9    you alerting the SEC to the problem?

10           THE WITNESS:  Because we were under the clear

11   understanding that it was going to be fixed --

12           THE COURT:  Well --

13           THE WITNESS:  Go ahead.

14           THE COURT:  When you say you were under the clear

15   understanding it was going to be fixed, I didn't see in the

16   notes earlier -- maybe I missed it -- that there was anything

17   from Alexander directly to you saying that.  This was

18   Mr. Mooney's take on what he had heard, yes?

19           THE WITNESS:  There are -- I think the initial, when

20   we first heard the news from Mr. Mooney that was right but

21   there were later communications with both Alexander and

22   Greenberg that did say that it was going to be fixed quickly,

23   including I think in Dan Glosband' notes about a conversation

24   he heard about with Chris Carlin that it was going to be fixed.

25           MR. WARD:  I'm going to object to hearsay, your Honor.

1          THE COURT:  I think it is relevant to state of mind

2     which is I think arguably relevant to this issue.

3          MR. WARD:  But --

4          THE COURT:  Overruled.

5          But, who did Greenberg represent?

6          THE WITNESS:  Alexander.

7          THE COURT:  And counsel, maybe I have missed it, have

8     we seen anything yet from Greenberg saying it is going to be

9     fixed?

10          MR. RAND:  I think it may be coming.  I'm not sure.

11          THE COURT:  It may be coming.  Well, you know, I will

12     manage somehow to put up with the suspense.

13          Have we seen anything directly from Alexander saying

14     that?  I have seen the notes that were just referred to, that

15     is hearsay, that is the objection which I overruled on other

16     grounds because I received it for other purposes not for its

17     truth, but have we seen anything directly from Alexander?

18          MR. RAND:  It is not in yet.  We will be putting

19     something in.

20          THE COURT:  Pardon?

21          MR. RAND:  Yes.

22          THE COURT:  There will be something coming?

23          MR. RAND:  Yes.

24          THE COURT:  OK.  Let's go on then.

25          THE WITNESS:  Just going on a little bit about this

filing.  There are, in both the risk factors in the summary in

the box we have talked about in the full risk factors, just a

few pages later there was a significant reduction --

THE COURT:  Here is what I don't understand.

THE WITNESS:  Yes.

THE COURT:  On the one hand you testified earlier that

this, the failure of Alexander to reveal to you prior to

September 10th or whenever it was, that they didn't have

authority to make a firm commitment was a material, indeed

highly material omission on their part, yes?

THE WITNESS:  Yes.

THE COURT:  And you are not alerting the SEC for weeks

thereafter to the problem, based -- at least as of the date

that this document is submitted, the amendment that we have

just been looking at -- based on hearsay at that point that we

may hear about, some non-hearsay, that they're going to fix it.

If it was highly material, why didn't you think it had to be

disclosed to the SEC?

THE WITNESS:  So the important, I think, nuance here

is what was highly material -- that we looked at -- we looked

at information regarding the FINRA issues of Alexander that I

saw six years later that showed the depth of the problem, in

other words it was, what those show us is they never had the

ability to be a firm commitment underwriter.

THE COURT:  No, I know you didn't know that at the

N6Q5aqu4                    Barrette - Direct

1    time.

2                   THE WITNESS:  Right.

3                   THE COURT:  But what you did know is that the firm

4    commitment guarantee was an important material element of this

5    whole deal, right?

6                   THE WITNESS:  Yes.

7                   THE COURT:  And it was now, at least to some extent

8    however modest, in jeopardy.

9                   THE WITNESS:  Yes.

10                  THE COURT:  All right.  Go ahead, counsel.

11   BY MR. RAND:

12   Q.  Keep the prior exhibit ready but I'm going to give you a

13   new exhibit.  I would like you to see Plaintiff's Exhibit 42

14   which is an e-mail between you and Mr. Marsico and it is dated

15   October 26, 2015.

16                  Do you recognize this document?

17   A.  Yes.

18   Q.  Did you receive this e-mail?

19   A.  Yes.

20   Q.  Can you explain to me what this e-mail says?

21   A.  Yes.  And like some of the other e-mails that actually

22   start the earlier e-mails at the end, the first one is an

23   e-mail from me to Tony on October 26:  Good morning.  Hope you

24   had a good weekend.  Just checking in on the Alexander FINRA

25   situation.  And then he got back to me that day, just 35

1    minutes -- about a half hour later and his e-mail said:  Just

2    heard back.  I'm told that FINRA came back with one, quote,

3    very basic, quote, question, and then a response was submitted

4    late last week.  We hope to hear back from FINRA in the next

5    week or two.  Accordingly, we should file the DRS as is today,

6    meaning with the firm commitment still in it.  Let me know if

7    you would like to discuss.  Thanks.  And then my reply is:  Oh

8    well.  Thanks for -- I'm sorry, I must have fat-fingered the

9    keyboard, but I meant to say thanks for getting right back to

10   me I'm sure.

11   Q.  And what do you understand Mr. Marsico to mean when he sent

12   this e-mail?

13   A.  Well, this is just extremely illustrative of the constant

14   message we were getting from Alexander in terms of

15   conversations and now from their counsel that this was a minor

16   problem and that changing anything about it in the offering

17   memorandum -- I'm sorry -- in the filing was not necessary.

18            THE COURT:  By the way, when he says:  "Accordingly,

19   we should file the DRS as is today."  The DRS meaning what?

20            THE WITNESS:  Another amendment to the DRS.  Exhibit

21   P85 was a DRS filed on October 6, it was amendment no. 3, so he

22   is talking about amendment no. 4 that we were getting ready to

23   file.

24            THE COURT:  So, when he says:  Accordingly, we should

25   file the DRS as is today; in fact he doesn't mean we, he means

1    you?

2          THE WITNESS:  Yes, but this gets to some of the other

3    things we have talked about which is that this is a very

4    collaborative effort and --

5          THE COURT:  Well, last I heard, correct me if I am

6    wrong, he was lawyer for Alexander; right?

7          THE WITNESS:  Correct.

8          THE COURT:  And last I recall, when you are lawyer for

9    a client you owe your loyalty just to that client; true?

10          THE WITNESS:  True.

11          THE COURT:  So, the decision was not his, it was yours

12    whether or not to file the DRS as is, yes?

13          THE WITNESS:  I think there are a couple things.

14    First of all, we had a -- the normal understanding that I would

15    not file a DRS without his approval in his role in representing

16    Alexander.

17          THE COURT:  That's a different point, that you might

18    have given him a veto; but you understood the decision was

19    yours?

20          THE WITNESS:  Correct.

21          THE COURT:  All right.

22          Go ahead.

23    BY MR. RAND:

24    Q.  I would like to show you a letter from the SEC dated

25    October 20, 2015 labeled Plaintiff's Exhibit 49.  Do you

1   recognize this letter?

2   A.  I do.

3   Q.  And is this a comment letter?

4   A.  Yes.

5   Q.  Can you tell me what the SEC is saying about the

6   confidential registration filing?

7   A.  Yes, and this is in reference to the filing on October 6th

8   and amendment no. 3 to the DRS.  The first comment is about the

9   disclosure that we had calmed down at the request of Mr. Carlin

10  asking us to put the disclosure back in.  The rest of the

11  comments relate to the recently done bridge financing where

12  they wanted some more disclosure about it.  Not unusual, that

13  was new news in the last filing and we -- and they were, you

14  know, even though we had pretty much cleared them of all

15  comments, that was a new piece of news, it was good news, and

16  they wanted us to do some other things in the disclosure there

17  so that's what it was about.  So it was essentially two major

18  comments with some subsections on details on the bridge

19  financing but the first one was to put the disclosure back in

20  that we had taken out at the request of Mr. Carlin.

21  Q.  Does the comment letter -- in the comment letter does the

22  SEC state it appears material to an understanding of your

23  business?

24  A.  Yes, it does say that.

25          THE COURT:  I'm sorry.  You are taking out that

N6Q5aqu4                          Barrette - Direct

1    disclosure at the request of Mr. Carlin?

2              THE WITNESS:  Correct.

3              THE COURT:  And remind me why he requested that.

4              THE WITNESS:  He said that he was getting feedback

5    from possible investors that it was troubling them, that we

6    needed to calm down the disclosure.  Those were his exact

7    words.

8              THE COURT:  And who made the decision to follow his

9    request?

10             THE WITNESS:  I did.

11             THE COURT:  Why?

12             THE WITNESS:  In consultation with Dr. Mooney, the CEO

13   and that sort of thing.

14             THE COURT:  Why?

15             THE WITNESS:  Because I felt that while it was

16   aggressive, it might pass muster with the SEC and that the

17   materiality question was one that could be debated and I was

18   willing to see what the SEC thought of it.

19             THE COURT:  All right.

20   BY MR. RAND:

21   Q.  I would like to mark -- sorry.  I would like to show you

22   Plaintiff's Exhibit 43 in evidence, which is an e-mail.

23             THE WITNESS:  Your Honor, could I go back to my last

24   answer a little bit?

25             THE COURT:  Sure.

1          THE WITNESS:  I should have been a little more fulsome

2     there.

3          Obviously I did it in consultation with Dr. Mooney, he

4     was the CEO of the company and he and the board of directors

5     bear ultimate responsibility for what is in the S1, I am

6     advising them, but I did think at the time, I own this, that

7     while it was aggressive there were, you know, some reasons to

8     try to take it out and at least try to float it by the SEC.

9     And he --

10          THE COURT:  Well, as I understand it --

11          THE WITNESS:  Yes.

12          THE COURT:   -- everyone here was going to some

13     lengths, from the very outset to separate this company from

14     Mr. Masiz --

15          THE WITNESS:  Correct.

16          THE COURT:  -- because, for better or worse, his

17     reputation was not so good.

18          THE WITNESS:  Very well put, your Honor; yes.

19          THE COURT:  But to the great credit of you and the

20     company, you include, in many, many versions of the submissions

21     to the SEC, a disclosure of indirect connections that so exist;

22     true?

23          THE WITNESS:  True.

24          THE COURT:  And now you are being told by

25     Mr. Carlin -- you and Mr. Mooney, that you ought to take it out

because it is causing some concern among investors.  Isn't that

the whole point of disclosing it, because an investor would

want to know it?

            THE WITNESS:  Of course it is.  I can't disagree with

that.  You just defined the materiality perfectly.  I would

just say that as you might guess, these processes, whatever

company you are dealing with, you are trying to thread the

needle between extremely accurate -- I mean, you always have to

be truthful and material but you can say things different ways

and people can overreact to things and that sort of thing so it

is always a process.  This was a particularly aggressive one.

I advised Dr. Mooney at the time I thought it was a bad idea to

take it out because we were in such a great place with the SEC

that we were essentially playing with fire but that there was

enough in there, we still referred to BioChemics, so somebody

could go look up bio checks and find it on line.  You can kind

of get yourself there and we did in these filings.  It was that

kind of atmosphere.

            THE COURT:  OK, very good.  Go ahead.

            (Continued on next page)

N6QQaqu5                    Barrette - Direct

1    BY MR. RAND:

2    Q.  If you look at Plaintiff's 43.  Did you receive this email?

3    A.  Yes, I did.

4    Q.  What does this email say?

5    A.  Once again, it's two emails on one page this time.  So the

6    first email is on October 23 at 1:38 p.m.  It's an email from

7    Frank Manguso.  Frank was the CFO of Inpellis, a very

8    experienced financial guy who I worked with closely.

9          This email is from Frank to -- it says:  Hi Pat.  He's

10   talking to Dr. Patrick Mooney, the CEO.  I'm not sure I was on

11   this original email, but I saw it when I was forwarded it.

12         He says:  Hi Pat.  On reflection, I think we should

13   file publicly as early as possible because our Q2 financials go

14   stale on November 12.  It would not be prudent to assume the Q3

15   financials and footnotes and pro formas and necessary reviews

16   would all be completed by that date.  Regards.  Frank.

17         Just a quick reminder, we talked about the 21-day

18   period and wanting to hit that kind of sweet spot of the fall

19   after the Jewish holidays before the end of the year holidays,

20   and we also talked about the fact that we were going to have to

21   put in September 30 financials at some point.  I also mentioned

22   earlier that while what we call the interim financial

23   statements or the quarterly financial statements are not

24   audited because you are in the world of being almost a public

25   company and conducting a public offering, they go through a

N6QQaqu5                          Barrette - Direct

1    very rigorous review by the accountants.

2              And so what Frank was saying is that review for the

3    September 30 financials is going to take awhile.  Remember,

4    it's only three weeks after the end of that quarter, and that

5    he thinks we should file publicly because of the 21-day clock

6    running we talked about.  That's the point of the email.

7              THE COURT:  Mr. Mooney, says no, and for the very

8    sound reason that if the SEC wants that disclosure back in and

9    you file before then, it's really going to be the excrement

10   hitting the fan.

11             THE WITNESS:  That is exactly right, your Honor.  And

12   Pat, who is a high-energy guy says, so just go beat up the

13   accountants and get them to do it.  And so, the one thing that

14   this illustrates though -- I'm just saying this to make sure

15   it's clear, is that implicit in this is that if we somehow

16   manage to do the less full disclosure, and the SEC approves it,

17   he is assuming that no one will know about the more full

18   disclosure in the confidential filings.

19             And that unfortunately is not true.  Once you file

20   publicly, all that confidential filing automatically becomes

21   public.  So an investor -- and many savvy investors will do

22   this.  I've done it myself because it's interesting where I've

23   been helping in deciding somebody buy a company or something.

24   You look and say, okay, here are the S-1 they've filed, and

25   here are all the confidential statements.  You can see the

1    back-and-forth of the SEC and see what they were worried about

2    and can give you great insight into a company.  And Pat somehow

3    didn't realize that.  He thought they were confidential

4    forever, which they are not.  They are confidential forever if

5    you never file publicly, but as soon as you file publicly, they

6    become public.

7         THE COURT:  Actually, maybe we will -- let me talk

8    about schedule for this afternoon.

9         I have a very short matter at 4:15.  So if you'd like,

10   we can go to like 4:10, take the break for that, and then come

11   back and go to 5:00.  Or if you want to take a break sooner

12   than that, we will have to take a shorter break, but I do have

13   a to take a telephone conference that shouldn't take more than

14   five minutes, but I will have to break at 4:15.

15        MR. RAND:  I may ask the witness what he prefers it's

16   fine with me whatever he prefers.

17   A.  I'd just as soon keep going.

18   Q.  I'm going to show you Plaintiff's Exhibit 13-A, which is a

19   letter from Sichenzia Ross to FINRA.

20        Have you ever seen this document before?

21   A.  Yes.  But like many of the other documents relating to the

22   FINRA issue in preparation for my deposition in 2021.

23   Q.  As of October 27, 2015, you had no knowledge of this

24   document?

25        MR. WARD:  Objection, your Honor.

1            THE COURT:  What's the objection?

2            MR. WARD:  Relevance, your Honor.

3            THE COURT:  So this is consistent with the objections

4    you raised in one of the depositions, so congratulations.  Was

5    this exhibit one of the ones that was received earlier?

6            MR. RAND:  Yes, it's in evidence.

7            MR. WARD:  No.  We objected to this one.

8            MR. RAND:  ,Oh you did, I'm sorry.  I apologize.  I

9    must have lost track of the list.

10            MR. WARD:  And lack of personal knowledge, your Honor.

11            THE COURT:  I understand that.

12            MR. RAND:  I don't see it on your objection list.  You

13    have 13-B, you don't have 13-A.

14            THE COURT:  Let's distinguish two different

15    situations.  The document itself comes into evidence even

16    without a witness as a statement of an agent of a party

17    adversary.  But his comments about it, I think -- and that was

18    the objection made in the deposition as well to another witness

19    commenting on what they learned subsequently is I think

20    objectionable as irrelevant.  What he now thinks because of

21    what he saw six years later is neither here nor there.  So the

22    document will be received, but the objection to the testimony

23    is sustained.

24            MR. RAND:  May I make an offer of proof, your Honor?

25            THE COURT:  Sure.

1           MR. RAND:  The only question I'm asking is just to

2     show that he had no knowledge of the document.  I'm not asking

3     him --

4           THE COURT:  Yes, you can ask him that.  That you

5     certainly can ask him.  Did you ever see this document before a

6     year ago or whatever it was?  Answer:  Yes.  Or answer:  No, I

7     never saw it before then.

8           MR. RAND:  That was the question.

9           THE COURT:  That I will allow.

10    Q.  Have you ever seen Exhibit 13-A before?

11    A.  Only in preparation for my deposition in November 2021.

12    Q.  Thank you.

13          THE COURT:  And, I apologize, but I think this is a

14    good occasion to go through the other depositions so we will

15    have that all out of the way and everyone will know where they

16    stand on the depositions.  So we were up to -- we just dealt

17    with Mr. Gazdak, his deposition.

18          The next one is Mr. Glosband's deposition, which the

19    one objection is the one that is now made, and I will ask

20    defense counsel is the one most on top of this, and by that I

21    am looking right at the real party of interest to take note of

22    these rulings so you can make the proper filings so we will

23    have a proper record.

24          So on page 161, the objection is to lines 10 through

25    19.

1   "Q.  I'm sorry, but you never had any conversations with

2   Alexander Capital, correct?  You weren't getting any direct

3   communications from Alexander Capital.  Is that right?

4   "A.  No."

5         And then he goes on in great length what he learned

6   later.  So the objection is sustained except as to the answer

7   "no."  So you will have to adjust whatever you file to reflect

8   that no stays in evidence, but everything else goes out.  So

9         With respect to Mr. -- I will spell it.

10  G-U-I-D-I-C-I-P-I-E-T-R-O.

11        MS. COLE:  Guidicipietro.

12        THE COURT:  Thank you very much.  Somehow I left my

13  last night to see a revival of *Light in the Piazza*, but somehow

14  his name did not make it into the performance, though many

15  similar names did.  But thank you very much.

16        There was no objection to anything in that deposition.

17  So that you can just file as is.

18        Mr. Manguso, there the only objection was on

19  completeness grounds, and I sustained that objection.  So you

20  can add to what you file the other items that you have in your

21  submissions from this witness.

22        Then we get to Mr. McCoy.  There are a lot more

23  objections on various grounds, so we will pass over that for

24  the moment and get to it at the end of the day rather than take

25  the time now.

1          Then there is Mr. Mooney.  That falls into the same

2    category we discussed earlier of witnesses who are available.

3    If he's called, the deposition does not come in except for

4    impeachment purposes.  If he's not called, we'll revisit this.

5          Next is the deposition of Mr. Schlichtmann.  Same

6    situation as the last one.

7          And, finally, there is the deposition of Mr. Stack to

8    which there was no objection, so that is received as offered by

9    plaintiffs.  So we will come back to the one I passed over at

10   the end of the day but otherwise those are my rulings.  Okay,

11   continue with the witness.

12   BY MR. RAND:

13   Q.  I'd like to show you Exhibit P86 which is a confidential

14   registration filing dated October 28, 2015.  Do you recognize

15   what has been marked as P86?

16   A.  I do.

17   Q.  Was this filed with the SEC on October 28, 2015?

18   A.  Yes, it was.

19   Q.  How has this draft registration statement changed from the

20   prior statement filed?

21   A.  Well, you recall we got a comment letter asking that we put

22   back in some of the disclosures about the BioChemics problems,

23   and that we add disclosure regarding the bridge financing.  So

24   I haven't honestly checked recently on the bridge financing.

25   I'm sure we attempted to respond to that.

1           On risk factors, it's important to know that a step

2      occurred before this was filed, which was that we, Alterix, I'm

3      sorry -- Inpellis decided to -- let me take a step back.  I

4      think a little context might be helpful.  You recall the key

5      asset of Inpellis was the intellectual property for the

6      transdermal process in conjunction with pain killers or pain

7      treatments, and that intellectual property was owned by

8      BioChemics and had been licensed to Inpellis.

9           We -- in an effort to address the SEC's concerns a

10     different way and to get BioChemics some money it needed, quite

11     frankly, instead we created a transaction whereby Inpellis

12     bought the intellectual property from BioChemics.  So instead

13     of having a license of royalties, it literally bought ownership

14     of that intellectual property, which you can do.  It paid

15     BioChemics $750,000 to own that.  By the way, BioChemics needed

16     that $750,000 because it needed to pay it to the SEC as part of

17     the settlement.

18          So that meant that we had had a risk factor, even a

19     shortened one in the risk factors, in the summary of the

20     prospectus that we talked about a few times about Inpellis

21     relying on licensed and intellectual property.  We took that

22     risk factor out because of the purchase.

23          Similarly, in the longer respect, the full respect or

24     section a few pages later, starting with the risk factors

25     starting on page 11, we pretty much left the BioChemics

1   disclosure about their SEC problems alone, which meant there

2   still is disclosure about it, but we didn't add anything to it.

3            And then the second risk factor under BioChemics is

4   called the creditors of BioChemics could challenge certain

5   transactions between us and BioChemics.  Instead of having a

6   disclosure about the license, we now simply had a sentence that

7   said we recently acquired ownership and/or joint ownership of

8   the BioChemics intellectual property as it relates to certain

9   drugs for $750 in cash.

10  Q.  And you put back the risk language the SEC had recommended

11  and said should be put back?

12  A.  Yes, I think we attempted to respond to the comment by

13  putting it back, but also adjusting it slightly because of the

14  purchase of the intellectual property.  So we felt that was a

15  basis for not literally putting every word back.

16  Q.  I'm referencing the BioChemics risk language.

17  A.  Understood.  I think we understood the purchase affected

18  even that language.  Again, you're talking about the language,

19  the first thing under risks related to our former parent

20  corporation.  We could do a side-by-side if you want to.  We

21  did put some language back in.

22  Q.  And after this was filed, did there come a time that

23  certain directors resigned from Inpellis?

24  A.  Yes, that is correct.

25  Q.  Can you tell us why that happened?

1    A.   Yes.   I can tell you why, because Dr. Mooney came to me and

2    said that he wanted to have two of the directors leave, those

3    two directors being Janice DiPietro and Galen Grayson.

4    Dr. Grayson was an ophthalmologist, I believe, from North

5    Carolina.   Janice DiPietro was a very sophisticated person in

6    the world of accounting.   I believe she was a kind of

7    independent consultant, but had an impressive résumé truly

8    focused on accounting, not just general finance.   And my

9    reasonably good memory is that he just didn't think they were

10   contributing, and he frankly didn't like some of the hard

11   questions that Janice DiPietro was --

12             MR. WARD:   Objection, your Honor.

13             THE COURT:   Sustained.

14   A.   Anyway to go on to answer the question, so we -- I was

15   informed that they had agreed to step down from the board, and

16   there was some paperwork that needed to be done.   I forget the

17   specifics, but I believe Dr. DiPietro -- she was actually a

18   Ph.D, I'm quite sure -- needed some kind of -- we did some kind

19   of severance deal with her.   I forget the details, but they did

20   leave the board, and that obviously affected -- would

21   ultimately affect the disclosure because you obviously talk

22   about who the directors are.

23   Q.   Were they outside directors?

24   A.   Yes, they were outside directors.   One concern that always

25   raises another -- I didn't really talk about this, but another

aspect of an IPO where you really have to be a firm commitment

for it to make sense is that you want the stock to be listed on

the NASDAQ so it will trade freely and have good liquidity.

And the NASDAQ has what they call listing requirements, and

company counsel, in addition to working with the SEC, works

with NASDAQ on something called a listing application that you

want to be approved for listing on NASDAQ the day you go

effective so that your shares can then start trading on NASDAQ.

And one of the --

     MR. WARD:  Object, your Honor.  Non-responsive and

irrelevant to the case.

     THE COURT:  Well, I think it's helpful background, but

I do want to caution the witness to just answer the question

put.

     Go ahead.

Q.  Were you able to make a proper disclosure regarding the

existing outside directors?

A.  Yes, we were accurate in our disclosure of who was on the

board, who wasn't on the board, and we got comfortable that we

thought we had enough continued directors to meet the NASDAQ

requirements.  That's why I brought up NASDAQ because of the

need for independent directors.

Q.  If I could show you Plaintiff's 81, which is an email from

Clarke to the board in which you're cc'd dated November 6,

2015.  Did you receive this email?

1    A.  Yes.

2    Q.  Can you summarize this email?

3    A.  Yes.  It's an email from Jack Clarke, who was the chairman

4    of the board of Inpellis, to all the directors of Inpellis with

5    a copy to me, basically saying we needed to set up a time for a

6    board meeting, a telephonic board meeting, to authorize the --

7    he says:  We'll vote on directors' votes that you need to do as

8    you're getting ready to file publicly, and ultimately in the

9    near future you hope have an effective registration statement

10   and be a public company.  These votes do things like set up the

11   audit committee and things like that.  And it's really

12   otherwise about logistics.  This was in contemplation of filing

13   publicly.

14   Q.  So was a meeting set up for Sunday, November 9?

15   A.  Actually, Sunday was the 8th according to this email.

16   Monday, the 9th at 9:00 a.m.

17   Q.  I meant Monday, I apologize.

18   A.  The meeting did ultimately get set up, in my memory.  I

19   think there is an email coming about this shortly.  I think it

20   was at a later time, but it did happen.

21   Q.  I'd like to show you Plaintiff's Exhibit 45.  Have you ever

22   seen this exhibit before?

23   A.  I'm actually not sure I have.  Like some of these exhibits,

24   I think the earliest is Monday, November 2, and then there's a

25   series of emails that go through to Tuesday, November 3.

1    Q.  Do you have any knowledge of Alexander's continued attempts

2    to get approval for firm commitment offering as of the date of

3    this email on November 3, 2015?

4    A.  I did not at the time, no.

5    Q.  I'd like to show you Plaintiff's Exhibit 47, which is an

6    email from you to Tony Marsico.  Did you send this email?

7    A.  Yes, I did.

8    Q.  And can you summarize the email?

9    A.  Yeah.  It's an email from me to Tony Marsico in late

10   afternoon on Monday.  I think the timestamp on it is for some

11   reason Greenwich Mean Time, but it's 3:00 or 4:00 in the

12   afternoon.

13        I say:  My guys just let me know that the Alexander

14   compliance guy, who is Restrepo, thinks they will have FINRA

15   clearance before Thanksgiving.  When I say my guys, I'm talking

16   about actually Chris Carlin from Alexander and Pat.  And that

17   they have, you know, that they're still saying any day now,

18   soon.  By now it's a couple weeks, but we're going to get this

19   taken care of, but in the meantime Mr. Restrepo wants to file

20   the offer as showing that it's a best efforts offer.

21   Q.  And you understand what the time of this email is on

22   November 9?

23   A.  Yes.  As I said, I was pretty sure it's late afternoon.  It

24   says 2100 hours, which would be like 9:00 at night, but I think

25   it was earlier than that.  I think something is off about how

 1   the email was reproduced.

 2   Q.  Is that Greenwich Mean Time?

 3   A.  I believe so because of the zero zero zero.

 4   Q.  And do you know what time change occurs in Greenwich Mean

 5   Time?

 6   A.  I believe it's five hours.  So if it's 9:00, it would be

 7   more like 4:00 in the afternoon.

 8   Q.  And so you recall they were going to get the approval soon

 9   by Thanksgiving?

10   A.  Correct.

11   Q.  And you were acting on that?

12   A.  Excuse me?

13   Q.  Did you act on that?

14   A.  On the change to best efforts?  When you say "that" --

15   Q.  When you saw this, how did you react?

16   A.  Well, I was definitely not happy because, you know, we had

17   the thing ready to go and changing it to best efforts, if

18   nothing else, among other things, required a lot of wording

19   changes.  And, frankly, I wasn't even that familiar with doing

20   best efforts, so we had to do some looking into what had to

21   change.

22           And we were trying to get it in publicly quickly

23   because of that 21-day clock, still trying to hit the market.

24   So we were under a ton of time pressure, and, you know, again,

25   we still had the understanding this was a temporary thing, and

1    we would file publicly as a best efforts because of this

2    apparent situation with FINRA.  But, again, just to be clear,

3    my understanding was that it was going to get changed back in

4    the interim, so we could get the public filing.

5    Q.  I'd like to show you Plaintiff's Exhibit 51.  Did you send

6    the email on the cover?

7    A.  Yes, I did.

8    Q.  Who did you send it to?

9    A.  You can see the "to" up there.  It's to the board of

10   directors of Inpellis.

11   Q.  When did you send it?

12   A.  At 4:39 p.m., according to this, which seems right.

13   Q.  On November 9?

14   A.  Correct.

15   Q.  What were you sending?

16   A.  I was sending the materials for the meeting, which were

17   various votes that they were going to have to take at the

18   meeting that were necessary to take before we filed publicly.

19   And the latest draft of what was now an S-1, not a DRS, that we

20   were planning to file publicly.  This document existed

21   essentially right at the time that we'd gotten the word on best

22   efforts, so this document is still a firm commitment document.

23            THE COURT:  Who are the members of the board at this

24   point?

25            THE WITNESS:  They were Jack Clarke, Pat Mooney, Fred

1    Demure, who was an independent guy, Harry McCoy, the guy who

2    previously had been CEO, and David Staskin.

3    Q.   And this, what was the risk exposure language on this?

4    A.   The risk disclosure language in this is pretty consistent

5    with what had been in the most recently filed one.  We, again,

6    now that we had bought the intellectual property, we didn't

7    have the risk about needing BioChemics' intellectual property

8    in the summary, and we still had to use Mr. Carlin's phrase,

9    the calm-down disclosure about the parent.

10   Q.   I'd like to show you what has been marked as Plaintiff's

11   Exhibit 48.  Do you recognize what's marked as Plaintiff's

12   Exhibit 48?

13   A.   Yes.

14   Q.   What is Plaintiff's Exhibit 48?

15   A.   It's two things.  One is an email from me to Tony

16   Marsico where I'm forwarding an SEC comment letter.  I'll come

17   to the comment letter in a second.

18        There's an email from Tony to Chris Carlin and

19   Jonathan Gazdak at Alexander Capital.  The substance of the

20   email is blacked out with an attorney-client privilege.

21        I also said in my email to Tony:  Just starting to

22   look at it.  This is the kind of letter came in noon-ish on

23   November 10, and I knew we needed to get it to Tony right away

24   just because you always get it to your fellow counsel

25   representing the underwriter right away but also because we

1   were trying to get a public filing in.

2   Q.  And are they making comments on the October 28, 2015

3   filing?

4   A.  Correct.

5   Q.  What does it say in general comment number one?

6   A.  In general, they're telling us to add back in disclosure

7   that we had in the earlier filings.

8   Q.  Does that refresh your recollection that in the previous

9   drafts, you still had not put back the disclosure that was

10  requested?

11  A.  Correct, we did not put it back word for word.  We were

12  trying to thread the needle.  We probably massaged some of the

13  verbiage.  We did not put it back in word for word, and they

14  were saying you need to do that.

15  Q.  And when did you receive November 10 comment letter from

16  the SEC?

17  A.  As I said, I sent it to Tony a little after noon on

18  November 10, so I suspect I received it very shortly before

19  that, because I would have gotten this right to him.

20  Q.  I'd like to give you Plaintiff's Exhibit 52.  Do you have

21  P51 in front of you?

22  A.  I have P52 in front of me.

23         MR. RAND:  Your Honor, some of these I thought they

24  hadn't had an objection to, I just realized they did.  I'll

25  mark P51 for identification.

1          MR. WARD:  Sorry, I couldn't hear that.

2          MR. RAND:  You objected to P51, and I hadn't realized

3     it.  I don't know if you want to reiterate your objection or if

4     you're okay with it.

5          MR. WARD:  I am just going to raise this as relevance.

6     These issues about what the board signed off on have been

7     resolved, and I don't see any relevance to it as a continuing

8     issue in the case.

9          MR. RAND:  Your Honor, this is showing what the board

10    looked at when they approved the final live filing.

11         THE COURT:  I will accept it.  I don't think I really

12    have to in a bench trial reach a particular objection made here

13    because if it turns out to be completely irrelevant, then it's

14    immaterial as well.  So I will receive it for now in case it is

15    relevant.

16         (Plaintiff's Exhibit 51 received in evidence)

17         MR. RAND:  I also put into evidence P49, that had also

18    been objected to, which is the SEC letter to Pat Mooney dated

19    October 20, 2015.

20         MR. WARD:  Same objection, your Honor.

21         THE COURT:  Let me see it.  Same ruling.  Received.

22         (Plaintiff's Exhibit 49 received in evidence)

23         MR. RAND:  Thank you, your Honor.

24    Q.  I show you what is previously marked as P4.  Do you

25    recognize what's been marked as P4?

1    A.  Yes, I do.

2    Q.  Sorry.  Do you recognize the exhibit marked as P4 which is

3    in evidence?

4    A.  Yes, I do.

5    Q.  And what is it?

6    A.  It is the S-1.  The S-1, so not a draft registration

7    statement filed confidentially.  It is the regular Form S-1,

8    which is the baseline form for registering shares with the SEC.

9    And so it was filed in public and filed on November 10, 2015.

10   Q.  And what is the type offering that is listed as being?

11   A.  So, this now says that the underwriters are selling the

12   shares -- this is on the first page of the prospectus.  Toward

13   the bottom, the underwriters are selling of common stock in

14   this offering on a best efforts basis.

15   Q.  Did the risk language change from the previous draft?

16   A.  Bear with me for one second, please.  Sorry.  Yes.  Again,

17   I think we added some language back in per their request,

18   especially about Vaso Active, and the subject of an earlier

19   enforcement action.

20   Q.  Did you add back all the risk language that the SEC had

21   indicated you should add in its comment letter?

22   A.  So to the best of my recollection, we definitely tried to

23   add it more fulsomely.  Whether we still tried to massage the

24   language, I just can't quite remember, but we did try to comply

25   with that part.  Their specific term was Vaso Active, which was

1   a previous pharmaceutical company, and we did put back in the

2   disclosure about that.

3   Q.  Did you include all the prior language about the parent

4   corporation, I mean, BioChemics?

5   A.  Yes, again, I think we added some in, but probably not

6   everything, but their comment was more about Vaso Active, and

7   we did do that.

8   Q.  I'd like to mark for identification P50.  Do you recognize

9   P50?

10  A.  Yes.

11  Q.  It's a comment letter from the SEC regarding the filing on

12  November 12, 2015.

13  A.  Yes.

14          MR. RAND:  I would move that Plaintiff's Exhibit P50

15  be accepted into evidence.

16          MR. WARD:  Your Honor, I'm looking for P50 right now.

17  I apologize.  Same objection, your Honor.  Relevance.

18          THE COURT:  Same ruling.  Received.

19          (Plaintiff's Exhibit 50 received in evidence)

20  Q.  Do you recall this comment letter?

21  A.  Oh, yes.

22  Q.  And can you summarize the comments that came back from the

23  SEC?

24  A.  Yes.  This was a bad comment letter.  They kind of took a

25  step back, and really there's a whole bunch of comments that,

you know, a whole slew of them about the best efforts and, you

know, they just wanted us to add a lot more disclosure in about

the implication of being a best efforts offer, a lot of

mechanical stuff, which is probably not worth going into here,

but they felt that created new risks, and, you know, just

wanted a lot more disclosure about best efforts.

They were worried about risk factors, whether we'd

raise enough money, whether we'd get listed on NASDAQ, whether

we'd be a penny stock, which is just not the goal of -- in a

nutshell, an IPO isn't worth doing if you're going to come out

as a penny stock and raise a couple million dollars.

Q.   What is the very first comment that is made.

A.   We note that you have changed IPO transaction from firm

commitment to a best efforts offering.  Please revise the

prospectus throughout accordingly, including the following, and

then there are on the order of ten -- I'm sorry -- at least

half a dozen bullet points.

And then they -- they note our response to comment

one.  However, we note your response to comment one.  However,

you continue to omit disclosure that appears material to an

understanding of your business and its associated risk.  Please

address the following in your filing.  And then there's a long

list of -- there are four items, some of which are now raising

things which we thought we had addressed before.  So they are

digging in and finding other things to disagree with us about,

1  which is unusual.  Typically, they would kind of go with what

2  we'd done before.

3  Q.  In terms of the best efforts offering, aren't they making

4  comments where they're requiring you to make a huge amount of

5  additional disclosure that you may not be able to satisfy?

6          MR. WARD:  Objection.

7  A.  Well, the best efforts thing was just a wholesale --

8          MR. WARD:  Your Honor, I have an objection pending.

9          THE COURT:  So the question was:  In terms of the best

10  efforts offering aren't they making comments where they are

11  requiring you to make a huge amount of additional of disclosure

12  that you may not be able to satisfy?  I'm not quite sure I

13  understand the question.

14  Q.  I could rephrase the question.  Can you summarize the

15  additional disclosure that would be needed if it's a best

16  efforts offering?

17  A.  Yes.  In addition to what disclosure we did, and I guess

18  I'll comment here, you recall we got this comment, we got

19  the -- we had gotten comments on November 10.  We were trying

20  to meet that deadline for the 21-day clock, and then we also

21  got the word from Alexander Capital that Mr. Restrepo had said

22  had to be a best efforts, and we frankly wanted to just see

23  whether we could get it done and keep on schedule.  And so we

24  did the best we could on the best efforts.

25          MR. WARD:  Your Honor, I object as non-responsive to

1   the question.

2           THE COURT:  Sustained.

3   A.  So what the SEC is saying to us is that there needs to be

4   more disclosure about best efforts.  A number of the points in

5   here really go to the fundamental business deal, such as if

6   you're doing a best efforts offering, you don't know how much

7   money you're going to raise, and, therefore, they're looking

8   for disclosure that says, okay, essentially tell the investors

9   that, you know, you're trying to raise $20 million, but if you

10  raise $5 million, you might decide to close, and --

11          MR. WARD:  Your Honor, I'm going to object as

12  speculation.

13          THE COURT:  No, I think his understanding of it is

14  relevant.  Overruled.

15  A.  There's a comment in here says:  Revise the use of

16  proceeds -- the third bullet point on page 2 of the comment

17  letter says:  Revise the use of proceeds, capitalization and

18  dilution sections.  Assuming the sale of 100 percent,

19  75 percent, 50 percent and 25 percent of the shares offered for

20  sale by the company.

21          So what that means is because it's a best efforts

22  offering, and the company might not sell its target amount of

23  shares to raise the target amount of money, that there needs to

24  be a lot of disclosure about what will happen if it raises less

25  than that amount of money.  Will it decide not to take the

money at all?  Does it have a reduced budget because it only

raised $5 million instead of $20 million?  There's just a lot

of detail difficult to plan for disclosure there.  And that's

an example of the sort of additional disclosure they wanted if

we could proceed with the best efforts offering.

           MR. WARD:  Objection.  Speculation, your Honor.

           THE COURT:  Yes, the last sentence will be stricken.

The rest will stand.

Q.  Can you explain the next comment about how the issuance of

penny stock will affect liquidity?

A.  Yes.  Again, with the best efforts offering, they were

saying that we might not get as much price per share that we

wanted.  The price might be in cents instead of dollars.  And

if that is the case, if you look at the next bullet, they talk

about whether we could be listed on NASDAQ.  Again, if we went

forward with this offering and the market decided the stock was

not worth enough to be listed on NASDAQ, NASDAQ has minimum

price requirements, then we would have to be traded in various

smaller markets, which have evolved a lot, but some people

generally refer to them as over-the-counter markets or pink

sheets.  There are differences, but what's similar is that the

company shares are trading for usually well under a dollar, and

there aren't many buyers, and/or necessarily sellers.  And so

when the SEC mentions liquidity and price, they're talking

about the difficulty of people buying and selling shares

1   because no one wants to buy them or they want to buy them and

2   no one wants to sell.  It's a whole host of complexities.

3   Q.  Can you explain the next comment about how you expect to

4   meet the NASDAQ listing standards?

5   A.  Yes, sorry.  I tried to address that.  This again gets

6   primarily -- and again the amount of NASDAQ standards right now

7   but they have requirements like the stock can't trade below a

8   certain price and that price -- there's an aspect of that rule

9   that depends on timing, certainly a dollar is -- if you go

10  below a doll are, it's a big problem, what they're saying is

11  this he know that a best efforts offering can have a hard time

12  achieving a price over a dollar, or even over $5 or over

13  amounts that would meet the NASDAQ.

14          MR. WARD:  Objection.  Speculation.

15          THE COURT:  I think this one is more within his

16  understanding, which I think is relevant.  Overruled.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. RAND:

2    Q.  When you filed the registration statement that stated best

3    efforts, did you make any attempt to put the full best efforts

4    disclosure in that filing?

5    A.  Oh yes.  We did some research and put it in but I will

6    admit I had not done a best efforts filing and we were very

7    focused on being in that deadline.  And also, I want to be

8    clear, our understanding, still, was this is a temporary state,

9    that we were going to be able to go back to a firm commitment

10   offer.  So, the real hope here was rather than having it

11   respond to all of this disclosure, that we could file an

12   amendment that said never mind, we are going to do firm

13   commitment after all.

14          THE COURT:  Let me ask you this.  So, the underwriters

15   are telling you we are going to fix this, first they say we can

16   fix it within the original time frame, then they're saying,

17   well, there is still some stuff we have to deal with but we

18   will fix it by Thanksgiving or whenever.  Why weren't you

19   suspicious by then?

20          THE WITNESS:  Fair question, your Honor.  I was, you

21   know, we were in -- the frame of mind was this was a really

22   good situation, we had the bridge financing, we had the team in

23   place, we had had good luck with the SEC -- not just luck, we

24   had done well with the SEC.  And I think I and everybody on the

25   team was optimistic that they were going to get the deal done

1    and I guess given the constant assurance that things were OK

2    from credible people like Greenberg that, in hindsight, we

3    probably should have been more suspicious but we were giving

4    them the benefit of the doubt.

5                 THE COURT:  All right.

6                 How much longer do you have on this witness' direct?

7                 MR. RAND:  Probably another 40 minutes.

8                 THE COURT:  We are going to take a break in five

9    minutes so I can take the short matter at 4:15, then we will

10   resume.  This witness' direct testimony is going to end by 5:00

11   today.

12                MR. RAND:  Understood.

13                THE COURT:  OK.  Great.

14                Go ahead.

15   BY MR. RAND:

16   Q.  So when you see this letter, what did you do next?

17   A.  We decided that we should talk to the SEC about it.  It is

18   not unusual to call -- to set up a phone call with the person

19   called the examiner at the SEC who is a part of corporate

20   finance and talk through the issues and see how we might manage

21   the situation, including talking to her about whether we could

22   just switch it back, that we were expecting to be able to do

23   firm commitment and might we just switch it back and put a hold

24   on some of these comments, and probably to talk about some of

25   the other ones which we thought were reviving comments that we

N6Q5aqu6                       Barrette - Direct

1   thought we had addressed.  And so, we -- I probably reached out

2   and set up that call for the next day.

3   Q.  And did you have that call?

4   A.  Yes.

5   Q.  And what occurred on the call?

6   A.  We talked through things.  I don't have a point by point

7   memory of it, I am sure it was professional and cordial, but I

8   do remember clearly it was -- what's the word I'm looking

9   for -- it was a conversation.  We -- it ended up without a

10  definitive resolution of things at that point.  I think we got

11  a sense of where they were, that they were I think, you know,

12  quite concerned about the change to best efforts and, you know,

13  that there probably was room to work on some of the other

14  comments and that it was some guidance, and the plan then was

15  to go back and see, you know, push more on how quickly we could

16  go back to firm commitment and work on addressing the other

17  comments.

18          THE COURT:  All right.  Now I think we need to take

19  our break now, sorry.

20          MR. RAND:  No problem.

21          THE COURT:  So you can step down.  We will see you at

22  25 after.

23          THE WITNESS:  OK.

24          THE COURT:  And I just want to take up with counsel

25  the final deposition and then we will break.  This was the

deposition of Mr. McCoy.  There were a whole bunch of

deposition objections.  In the end I only sustained those on

page 65 lines 4 through 25; on 66, lines 1 through 16, so that

testimony will be stricken from whatever is received in

evidence.

There are a lot of other objections in that they were

not frivolous although some were not preserved.  For example,

on page 187 there was an objection, "question is vague."

Vagueness, of course, is one of those few objections that must

be made at the time of the deposition or otherwise it is waived

because it is really objection to the form.  But the only

objections I wanted to comment more on, because possibly there

is more to be said about these by counsel, there are a whole

bunch of objections, I will just read one typical, but there

are many of them, this is on page 200:  "Object to the extent

plaintiff intends to offer testimony to contradict Court's

finding on summary judgment that relevant decision makers were

aware no later than September 10, 2015, that Alexander lacked

approval for firm commitment." I agree with defense counsel

that if that's the reason this testimony is being offered at

these various places that would be objectionable, but my

understanding is it is being offered as going to defendant's

intent in the sense continuing to lull the company into going

along with not taking further action about the absence of a

firm commitment, etc., etc.

N6Q5aqu6                        Barrette - Direct

1          So, let me just double-check with plaintiff's counsel;

2     that's what you are offering here?

3          MR. RAND:  That is correct.

4          THE COURT:  Yes.  So, to that extent the objection is

5     overruled but it was a good objection otherwise and I thank you

6     for bringing it to my attention.

7          OK.  We will see you all at 25 after.

8          (Recess)

9          THE COURT:  Get the witness back on the stand.  I

10    don't know if the witness made a firm commitment to be here at

11    4:25.

12         MS. COLE:  He is just making his best efforts, Judge.

13         (Witness resumes the stand)

14         MR. RAND:  A quick record.  I missed -- I assumed that

15    P 81 and P 47 were in evidence but they had objected but now

16    they're agreeing to put them in evidence, so I just want to

17    make a request to move into evidence Plaintiff's Exhibit 81 and

18    Plaintiff's Exhibit 47.

19         THE COURT:  What is the objection?

20         MR. WARD:  No objection, your Honor.

21         THE COURT:  No objection.  Received.

22         MR. RAND:  They objected previously.

23         THE COURT:  Ah.  I've got it.

24         (Plaintiff's Exhibits 47 and 81 received in evidence)

25    BY MR. RAND:

N6Q5aqu6                    Barrette - Direct

1   Q.  What is the exhibit you were last looking at?

2   A.  I believe it was P 50, the November 23rd comment letter.

3           THE COURT:  Correct.

4   Q.  OK, so let's go to P 53.  I would like to mark P 53 for

5   identification, which is the -- do you recognize what has been

6   marked P 53.

7   A.  Sorry.  This is P 33 that you handed me.

8   Q.  No, it is P 53, it has a sticker.

9           THE COURT:  No, it's 33.

10          MR. RAND:  I apologize.  Let me take it back.  My eyes

11  are going.  I meant to give you P 53.

12  Q.  Plaintiff's Exhibit P 54 for identification?

13          MR. WARD:  What happened to 53?

14          MR. RAND:  I didn't find it, I will mark it next.

15  Actually, I will show you both.

16          THE WITNESS:  Did you take back 33?  I can't find it.

17  Q.  Here is 53 and 54.

18  A.  OK.

19  Q.  Here is Plaintiff's Exhibit 53 for identification.  Can you

20  identify Plaintiff's Exhibit 53?

21  A.  Yes.  This is a letter from the Securities and Exchange

22  Commission Boston Regional Office to the three attorneys

23  involved in the Inpellis IPO; that being me and a colleague of

24  mine add Holland & Knight, Tony Marsico at Greenberg Traurig

25  and Juan Marcelino at Nelson Mullins.  Nelson Mullins was

1   assisting Inpellis as outside counsel as well.

2              MR. RAND:  I would move into evidence Plaintiff's

3   Exhibit 53.

4              MR. WARD:  Objection, your Honor.  Relevance.

5              THE COURT:  Overruled.  Received.

6              (Plaintiff's Exhibit 53 received in evidence)

7   BY MR. RAND:

8   Q.  Can you please identify what has been marked P 54 for

9   identification?

10  A.  P 54 is a letter from the Boston Regional Office of the

11  United States Securities and Exchange Commission from the

12  associate regional director named John Dugan to Juan Marcelino

13  of the law firm Nelson Mullins which was also representing

14  Inpellis, and it is responding to a request by attorney

15  Marcelino that they send a copy of the Commission's order

16  directing private investigation and examination in the

17  above-referenced matter and the referenced matter is Inpellis

18  Inc. and it encloses the formal order.

19             MR. RAND:  I move for the admission of Plaintiff's

20  Exhibit 54?

21             MR. WARD:  Same objection, your Honor.

22             THE COURT:  Yes; same ruling.  Received.

23             (Plaintiff's Exhibit 54 received in evidence)

24  BY MR. RAND:

25  Q.  I would like to mark Plaintiff's Exhibit 99 which are

1   Holland & Knight invoices.  Do you recognize what has been

2   marked Plaintiff's Exhibit 99?

3   A.  Yes, I do.

4   Q.  Did you prepare these documents?

5   A.  Yes, with the assistance of the billing folks at Holland &

6   Knight, but yes.

7   Q.  Did you send these invoices to Inpellis?

8   A.  I did.

9        MR. RAND:  I move for the admission of P 99.

10        MR. WARD:  Objection, your Honor, to the extent that

11   it goes past what was paid to Holland & Knight.

12        THE COURT:  I think it still may be relevant.

13   Overruled.  Received.

14        (Plaintiff's Exhibit 99 received in evidence)

15   BY MR. RAND:

16   Q.  When you look at the bills do you see that it says:  Date,

17   professional description, hours, rate, amount?

18   A.  Yes.

19   Q.  And can you explain what that means?

20   A.  Yes.  We typically sent very detailed bills to the client

21   to see what we were doing and so the date, I think it is

22   self-explanatory the date the work was done, the professionals,

23   the name of the person doing it, the description as -- there

24   are many lawyers in this room, you write down what you did on a

25   specific matter regularly and we take notes and these are

1    essentially those notes from people's time sheets that are

2    submitted.  The hours are self-explanatory, the rate is the

3    rate per hour that is charged, and the amount is just times the

4    rate.

5    Q.  And the amounts under amount are the amounts that are

6    invoiced to Inpellis; is that correct?

7    A.  Yes.  They're totaled and invoiced with the cover letter.

8            THE COURT:  My understanding from several of my

9    colleagues is that the main reason they applied to be federal

10   judges was to escape having to keep records of this kind.

11           MR. RAND:  The one good benefit of being a judge.

12   Q.  I would like to mark for identification Plaintiff's Exhibit

13   100.  Do you recognize this exhibit?

14   A.  Yes.

15   Q.  What is this exhibit?

16   A.  This is a summary of invoices from Nelson Mullins, I

17   mentioned them a minute ago, just to provide a little bit more

18   context.  The gentleman there named Juan Marcelino had, I

19   believe, formerly worked at the SEC in the enforcement

20   division, so at the beginning of the IPO process we added him

21   to the team for, of Inpellis in-company counsel.  Because of

22   the BioChemics problems we wanted him to review the disclosure

23   and help us be as fulsome as possible and to just be available.

24   And so, he wasn't doing the day-to-day work that the Holland &

25   Knight team was doing but he provided some good insights and

1   this is a summary of his invoices.

2   Q.  Did Nelson Mullins provide services for Inpellis, Inc.?

3   A.  Yes, they did.

4   Q.  Do you know approximately how many months Nelson Mullins

5   provided services to Inpellis Inc.?

6   A.  The dates along the left column are consistent.  The later

7   ones I am less familiar with but I did see it starts in March

8   2015, we did our first filing in April of 2015, and so it makes

9   perfect sense that he was looking at drafts but, again, looking

10  at them with a specific assignment.  He wasn't going through

11  every single page like I was and Tony Marsico was.  So, he was

12  doing that and, you know, stayed on throughout the process.

13  Q.  And are these invoice amounts consistent with the invoices

14  for the work that they did for Inpellis, by your recollection?

15  A.  Yes.

16          MR. WARD:  Objection.  Calls for speculation.

17          THE COURT:  Are you offering this?

18          MR. RAND:  I am going to offer it subject to

19  connection.

20          MR. WARD:  The objection, your Honor, is to the

21  question.

22          THE COURT:  No, I understand that but we can short

23  circuit it because I agree that it can only be received subject

24  to connection.  How are you going to supply the connection?

25          MR. RAND:  We are going to have to name a witness to

1    come in by video and authenticate the expense record.

2              THE COURT:  Well, I really -- I think we may be able

3    to work this out with your adversary counsel but at least for

4    now I think I can't receive this and therefore the objection is

5    also sustained as to the question because the document is not

6    being received subject to connection or otherwise.

7              MR. RAND:  OK.  Procedurally, if I offer it by

8    connection I just wait until the connection?

9              THE COURT:  Yes.

10             MR. RAND:  OK.

11             THE COURT:  It is not being received now at all

12   because this witness really can't say much about it but there

13   is presumably a witness who can or maybe documents that can.

14             MR. RAND:  Understand.

15   Q.  I would like to mark for identification Plaintiff's Exhibit

16   P 3.  Do you recognize what is P 3?

17   A.  Yes.

18   Q.  What is P 3?

19   A.  It is a summary of cash disbursements by Inpellis Inc. from

20   August 2015 to June 2016, according to what it says on the top.

21   Q.  Are the statements made in the spreadsheet accurate?

22             MR. WARD:  Objection.  Calls for speculation, lack of

23   personal knowledge.

24             THE COURT:  You, from your personal knowledge, do you

25   know how this is prepared?

1        THE WITNESS:  I know that the bookkeeping and crew at

2   Inpellis was rigorous about entering this information but

3   obviously I was not part of the process of actually entering --

4        THE COURT:  To your understanding these are entries

5   made at or about the time of the transactions referred to

6   therein?

7        THE WITNESS:  Correct.

8        THE COURT:  And they were made as a regular part of

9   business of Inpellis?

10       THE WITNESS:  Correct.

11       THE COURT:  And they were kept and maintained as part

12   of the regular course of business of Inpellis, yes?

13       THE WITNESS:  Correct.

14       THE COURT:  Received.

15       MR. WARD:  Your Honor?

16       THE COURT:  Yes.

17       MR. WARD:  If I may, this also goes to our spoliation

18   argument.  We don't know where this came from but the Inpellis

19   server, we --

20       THE COURT:  Ah.  OK.  That's interesting.  Let me ask

21   plaintiff's counsel, who actually prepared this and how did you

22   get it?

23       MR. RAND:  I am pretty sure it came off the server.

24       THE COURT:  The server that now no longer exists?

25       MR. RAND:  The server that was copied and produced.

1          MR. WARD:  But, your Honor, there is no backup

2    documentation for this, for the spreadsheet that we have.

3          THE COURT:  I don't think that matters for regular

4    business record.  So, if you are a company that records receipt

5    of payment for 2 million widgets, you don't have to keep the

6    checks and money orders and cash payments and so forth, all you

7    have to do is record the entry and that is done in the ordinary

8    course of business, it is still admissible in evidence.  So it

9    sounds like that's what this is and that the spoliation was not

10   an issue as far as this is concerned.

11         MR. WARD:  Your Honor, I have not heard any testimony

12   from the witness that he was the one that entered this.

13         THE COURT:  No.  Of course.

14         MR. WARD:  Or that he improvised the entering of this.

15         THE COURT:  Nor does he have to be.  I think if you

16   insist that they might have to call someone from the accounting

17   department but it doesn't have to be the person who entered

18   every entry.  Again, that's the whole point of the business

19   record exception to the hearsay rule, that you don't have to

20   call everyone and record every, and keep every slip of paper

21   and all like that, you need to have someone who has personal

22   familiarity with the record keeping of the company.  I agree

23   with you that this gentleman really only has hearsay

24   familiarity with that so far as this document is concerned.  Do

25   you really want to insist, as is your right, that they call a

N6Q5aqu6                        Barrette - Direct

 1    custodian -- excuse me, call someone from the accounting

 2    department?

 3           MR. WARD:  Your Honor, given the server issues and the

 4    fact this may well have been created after the fact that we

 5    would be --

 6           THE COURT:  All right.

 7           MR. WARD:  -- yes.  We wouldn't normally, but there

 8    are special circumstances here.

 9           THE COURT:  So the objection is sustained but you will

10    have to call someone who can get this into evidence.

11           MR. RAND:  Thank you, your Honor.

12    Q.  I would like to mark for identification Plaintiff's Exhibit

13    101.

14           MS. COLE:  What is the exhibit number?

15           MR. RAND:  101.

16           MS. COLE:  101.

17    Q.  Are you familiar with who Marcum is?

18    A.  Yes.

19    Q.  Who is Marcum?

20    A.  Marcum, I mentioned them earlier, they're the outside

21    auditing firm that Inpellis engaged to be auditors for the

22    company in general and especially in connection with the public

23    offering.

24    Q.  Do these invoices look consistent with the work that Marcum

25    did for Inpellis?

1  A.  So this is actually a summary of invoices but they do look

2  exactly like what the --

3          THE COURT:  That's not going to get it in, counsel.

4          MR. RAND:  I know, but I am just giving a backdrop.

5          THE COURT:  OK.

6          MR. RAND:  This one, again, I will not move for it to

7  be admitted until we get a witness if we are required to.

8          THE COURT:  Very good.

9  Q.  Did Marcum do work during the months listed on this invoice

10  for Inpellis?

11  A.  Yes.

12  Q.  Was there any complaint by Inpellis for the work done by

13  Marcum?

14  A.  No.  I recall it as being a good professional relationship.

15  Q.  I would like to mark for identification P 103.  Do you

16  recognize this document?

17  A.  Yes.

18  Q.  What is this document?

19  A.  This is a summary of all the costs incurred to

20  R.R. Donnelly.  I mentioned them earlier, another significant

21  outside vendor so to speak in the IPO processes, the printer is

22  sometimes called the financial printer and that's -- and

23  R.R. Donnelly did that for the Inpellis IPO.

24  Q.  Looking at these invoices, do they appear consistent with

25  the work that was performed for Inpellis during the period?

1   A.  Oh yes.  Definitely.

2   Q.  And do you know where this document came from?

3   A.  This document was generated recently by R.R. Donnelly at

4   our request.

5   Q.  I'm sorry.  At whose request?

6   A.  In preparing for this you and other folks involved in the

7   preparation asked me if I might have a copy of the Donnelly

8   invoices; I didn't, but I know people at Donnelly so I called

9   them and got them to produce this.

10          MR. RAND:  Once again, we will have to get a witness

11   from R.R. Donnelly.

12   Q.  Do you recall the cost to Inpellis of the bridge loan?  Was

13   there a fee to Alexander of $500,000?

14   A.  Yes.  We looked at the amendment to the engagement letter

15   that established that fee and that was absolutely paid to

16   Alexander -- incurred and paid.

17   Q.  And it was a discount bridge loan.  Do you recall that

18   $6.25 million had to be paid back on the $5 million?

19   A.  Right.  We talked about this too.  They call them sometimes

20   an original discount.  So, there we are promissory notes and

21   the face amount of the note was more than the actual dollars

22   that came in and so, yes, the net amount was less than the face

23   amount of the notes.

24   Q.  I would like to mark for identification P 95.  Can you

25   identify Plaintiff's Exhibit 95?

1    A.   Yes.  This is a separation agreement entered into by

2    Inpellis Inc. and Patrick Mooney on June 3, 2016.

3              MR. RAND:  I would move P 95 into evidence.

4              MR. WARD:  Objection as to relevance.

5              THE COURT:  No, I think it is largely relevant;

6    overruled.

7              (Plaintiff's Exhibit 95 received in evidence)

8              THE WITNESS:  I might just add, I drafted this

9    agreement, too; this is my work.

10   BY MR. RAND:

11   Q.   So I will ask you, how much was paid to Mr. Mooney under

12   this separation agreement?

13   A.   The agreement kind of recites it.  It talks about the fact

14   that shortly -- during, in May the company paid Dr. Mooney

15   $40,000 and then it said that on June 10 it was going to pay

16   him an additional $310,000, which I believe it did.  The reason

17   for the seven days is there are some legal requirements that he

18   have a period of time to decide not to go forward with the

19   deal.  That was the only reason for the delay.  And then there

20   was a much larger payment due if and when the company paid back

21   ADEC Private Equity Investments which was the bridge lender

22   that we talked about earlier and that was a payment for

23   $750,000.  There was a payment to his attorney for the fees

24   incurred in doing this deal of $2,500.  And then there was

25   Dr. Mooney had moved the company during the IPO process, the

 1    sort of headquarters of the company, at least for his office,

 2    to Haddonfield, New Jersey, which is near where he lived.  He

 3    signed a lease, I forget the exact term of the lease, but I am

 4    sure it was a multi-year lease and so it was part of the

 5    cleanup effort.  The company asked the landlord to let them out

 6    of the lease and so the landlord agreed as long as the company

 7    wired $48,000 to this LLC.  I think the LLC was actually owned

 8    by Dr. Mooney, but that money was then going to be used to pay

 9    rent.

10            That's a quick summary of the dollars involved.

11    Q.  I would like to mark for identification P 96.  Can you

12    identify P 96?

13    A.  Yes.  It is an amendment to the separation agreement we

14    were just talking about and all it did was it extended the

15    time, that $750,000 payment I mentioned was due I am quite sure

16    on December 1, 2016.  This agreement extends that due date to

17    December 31, 2016 and up to the amount owed to him from

18    $750,000 by $15,000 to $765,000.

19    Q.  And this was an executed agreement; is that correct?

20    A.  Yes.  It's signed.

21            MR. RAND:  I would like to move P 96 into evidence.

22            THE COURT:  Same objection, same ruling.  Received.

23            (Plaintiff's Exhibit 96 received in evidence)

24            THE COURT:  Counsel, you have five minutes left.

25            MR. RAND:  I would like to mark for identification

1     P55.

2               MS. COLE:  What's the number?

3               MR. RAND:  P 55.

4     Q.  Have you seen this letter before?

5     A.  I'm not sure I have.  Maybe quickly in preparation for the

6     litigation but I -- it is not one that I have seen closely.

7               MR. RAND:  I would like to move into evidence P 55.

8               MR. WARD:  Your Honor, you have already ruled on this

9     in the motion *in limine* but we would just, rather than

10    reiterate those objections, raise the lack of foundation with

11    this witness in terms of introducing this.

12              THE COURT:  Yes, but on its face it is a public

13    record.  You are not challenging the authenticity, are you?

14              MR. WARD:  Well, to the extent that it says anything

15    about the -- it's being used to assert the facts asserted in

16    here on hearsay grounds are true, that this was entered into

17    only by Alexander Capital without any admission, as you are

18    well aware of --

19              THE COURT:  So, I understand it is not being offered

20    for its truth, it is being offered for the fact that this

21    agreement was reached with Alexander Capital, but as to that

22    it's a public record and unless you are claiming that this

23    piece of paper is a fraud, or a counterfeit or something like

24    that, I will receive it as a public record.

25              MR. WARD:  The objection goes to the relevance with

1    this witness and competency for him.  He hadn't seen it before.

2              THE COURT:  He has no competency as to this.  I am

3    independently receiving it as a public record.

4              MR. WARD:  Understood, your Honor.  Thank you.

5              MR. RAND:  Thank you.

6              THE COURT:  Thank you.

7              (Plaintiff's Exhibit received in evidence)

8              MR. RAND:  Thank you, your Honor.  Since it is 5:00

9    now, we are done.

10             THE COURT:  Very good.

11             So, I think we are off to a good start.  We will pick

12   up with the cross-examination tomorrow at 9:30 a.m.  See you

13   then.

14             THE WITNESS:  Thank you, your Honor.

15             MR. RAND:  Thank you.

16             THE COURT:  I have another matter at 5:30 so you will

17   need to clear off things before 5:30.

18             MR. RAND:  Are we permitted to leave things in boxes?

19             THE COURT:  Yes, you can store all of your stuff

20   against the wall or whatever, but just off the table.

21             MR. RAND:  Thank you.

22             (Adjourned to June 27, 2023 at 9:30 a.m.)

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3    THOMAS L. BARRETTE

 4   Direct By Mr. Rand . . . . . . . .6

 5                    PLAINTIFF EXHIBITS

 6   Exhibit No.                         Received

 7    P1, P2, P4, P5, P5-A, P6, . . . . . . . . . . 5

 8            P9, P10, P11, P12, P12-A,

 9            P13-A, P19, P20, P21, P22,

10            P23, P27, P28, P29, P30, P32,

11            P36, P37, P38, P39, P40, P41,

12            P42, P45, P48, P59, P60, P61,

13            P62, P63, P64, P65, P70-A,

14            P70-B, P73-A, P73-B, P73-C,

15            P73-D, P74, P75, P76, P81,

16            P83, P84, P85, P86, P87, P88,

17            P89, P97, P98

18    47 and 81   . . . . . . . . . . . . . . . 160

19         . . . . . . . . . . . . . . . . . . 175

20    49   . . . . . . . . . . . . . . . . . . 148

21    50   . . . . . . . . . . . . . . . . . . 150

22    51   . . . . . . . . . . . . . . . . . . 148

23    53   . . . . . . . . . . . . . . . . . . 162

24    54   . . . . . . . . . . . . . . . . . . 162

25    72   . . . . . . . . . . . . . . . . . . .17
```

94    . . . . . . . . . . . . . . . . . . . .48

95    . . . . . . . . . . . . . . . . . . 172

96    . . . . . . . . . . . . . . . . . . 173

99    . . . . . . . . . . . . . . . . . . 163

DEFENDANT EXHIBITS

Exhibit No.                                    Received

1-142   . . . . . . . . . . . . . . . . . . . 6