N6R5aqu1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JOHN J. AQUINO, CHAPTER 7
    TRUSTEE, By Its Assignee,
4   Convergent Distributors of
    Texas, LLC
5
                    Plaintiff
6
            v.                              21 Civ. 1355 (JSR)
7                                              Bench Trial

8   ALEXANDER CAPITA, LP, JOSEPH
    AMATO, ROCCO GUIDICIPIETRO,
9   and NESA MANAGEMENT, LLC

10                  Defendants

11  ------------------------------x
                                            New York, N.Y.
12                                          June 27, 2023
                                            10:15 a.m.
13
    Before:
14
                        HON. JED S. RAKOFF
15
                                            District Judge
16
                            APPEARANCES
17
    LAW OFFICE OF WILLIAM COUDERT RAND
18       Attorneys for Plaintiff
    WILLIAM C. RAND
19  GLENN GOODMAN

20

21  HOLCOMB WARD LLP
         Attorneys for Defendants
22  BRYAN WARD
    HOLLY COLE
23  AARON WRIGHT

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

N6QQaqu1

1          (Trial resumed)

2          THE COURT:  Good morning.  Please be seated.  I am

3    very sorry for the delay which was due, unfortunately, to very

4    heavy traffic coming in.  But, let's get the witness on the

5    stand.

6          Something you wanted to raise?

7          MR. RAND:  Yes.  Just some cleanup.

8          The parties have agreed to stipulate to entering

9    Exhibit 43, so I would move to enter Exhibit 43 into evidence.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 43 received in evidence)

12          MR. RAND:  Then we have Mr. Manguso to identify the

13    expenses of Ellis and he is available at 2:00 for -- just to

14    authenticate that document.

15          THE COURT:  OK.  So we will interrupt at 2:00 to take

16    him.

17          MR. RAND:  That would be great.  Do you need his

18    e-mail to set up the Zoom call or anything?

19          THE COURT:  Well, at the next break, take that up with

20    my law clerk.

21          MR. RAND:  OK.  Then we are also going to plan for the

22    other authentication of the other expense documents from Nelson

23    Mullins for tomorrow morning, we are trying to organize that

24    today.

25          THE COURT:  I think, by the way, just because traffic

N6QQaqu1

1    has become so terrible, instead of starting at 9:30 we will

2    start at 10:00 on a regular basis because 9:30 is not proving

3    doable and you guys shouldn't have to sit around twiddling your

4    thumbs.

5           MR. RAND:  That's wonderful.  Thank you very much,

6    your Honor.

7           THE COURT:  Yes.

8           MR. WARD:  Your Honor, we would ask with respect to

9    Mr. Manguso, there have been deposition excerpts introduced I

10   believe by both sides that the parties have stipulated that

11   those will still be allowable even though he is going to be as

12   a live witness because he is going to be here solely for

13   authentication.

14          MR. RAND:  I agree.

15          THE COURT:  OK.  So agreed, yes.

16          MR. WARD:  We have one more preliminary matter that

17   Ms. Cole is going to address with the Court.

18          THE COURT:  Yes, ma'am.

19          MS. COLE:  Good morning, your Honor.

20          As you might be aware --

21          THE COURT:  You are my hero.  You are the one who

22   handles all the deposition issues.  These guys are just, you

23   know, passers by as far as I'm concerned.

24          MS. COLE:  Yes, Judge.

25          The parties stipulated to several facts in the

N6QQaqu1

```
 1   pretrial order filed at Docket 187.  We discovered a typo in
 2   one of the stipulations.
 3             THE COURT:  Oh, I take back everything I said.
 4             MR. WRIGHT:  It was my fault.
 5             MS. COLE:  I didn't do it but plaintiffs have not
 6   agreed to withdraw or revise the stipulation.  Defendants would
 7   like to withdraw it.  It is stipulation no. 39 on page 24.
 8             THE COURT:  Hang on.  So this is in the pretrial
 9   consent order?
10             MS. COLE:  Correct; no. 39.
11             THE COURT:  39; I'm sorry, which presently reads:
12   From the second quarter of 2014 until July 11, 2015, Dr. Mooney
13   worked as a consultant for ACLP.
14             What do you propose?  To correct that?
15             MS. COLE:  Your Honor, if you would look back two
16   pages to stipulation no. 12 you will see that it says:  From
17   June 11, 2015 until March 13, 2016, Patrick Mooney was the CEO
18   and board member of Inpellis.
19             So, the "July" reference in no. 39 was a typo, it
20   should have been "June."
21             THE COURT:  So you would propose to just substitute
22   June for July?
23             MS. COLE:  Yes, and plaintiff --
24             THE COURT:  What is the objection?
25             MR. RAND:  The objection is our position is that he
```

N6QQaqu1

1    continued to work as a consultant for Alexander after he

2    started working for Inpellis.  They also put him on the

3    privilege log during that period indicating that his e-mails

4    were privileged because he was working for Alexander and

5    communicating with Alexander's lawyer.  We objected to that at

6    the time and then they produced those but it's certainly not

7    stipulated by us that he did not work for them during that time

8    period.

9            THE COURT:  Well, if the parties can't agree on a

10   stipulation they can't agree on the stipulation so you simply

11   want to withdraw the stipulation?

12           MS. COLE:  Yes, your Honor.

13           THE COURT:  So, any objection to that?

14           MR. RAND:  Yes, your Honor.  We relied on the

15   stipulation, we have already had testimony, I think we are

16   allowed to rely on the stipulated facts.

17           THE COURT:  Is Dr. Mooney going to testify?

18           MS. COLE:  Yes.

19           THE COURT:  All right.  Well, let's see what he says

20   and then we will revisit the issue then.  He is not bound by

21   the stipulation, so we will see what he says.

22           MR. RAND:  Thank you, your Honor.

23           MS. COLE:  Thank you, your Honor.

24           THE COURT:  Please get the witness back on the stand.

25           MR. WARD:  May we proceed, your Honor?

1           THE COURT:  Yes.

2    THOMAS L. BARRETTE, resumed.

3    CROSS-EXAMINATION

4    BY MR. WARD:

5    Q.  Good morning, Mr. Barrette.

6    A.  Good morning.

7    Q.  My name is Bryan Ward, counsel for defendants.  We have met

8    previously in your earlier deposition; correct?

9    A.  Correct.

10   Q.  Are you currently represented by any counsel with respect

11   to your testimony today?

12   A.  No.

13   Q.  Are you receiving any compensation related to your

14   testimony today?

15   A.  No, other than my travel expenses have been covered.

16   Q.  Have you communicated with Mr. Rand about your testimony

17   before yesterday?

18   A.  Yes.

19   Q.  Did he help you prepare for your testimony?

20   A.  Yes.

21   Q.  How long, in total, did you talk with Mr. Rand about your

22   testimony?

23   A.  I would say over about two days.  Two days; I came down

24   last week and spent a day with him and then we spent Sunday

25   together this week.

N6R5aqu1                        Barrette - Cross

1    Q.  How many hours would that be?

2    A.  I would say a total of about 16 hours.

3    Q.  Have you communicated with Jan Schlichtmann about your

4    testimony today?

5    A.  Yes.

6    Q.  Did he attend those same meetings?

7    A.  Yes.

8    Q.  Did you talk to him in addition to those meetings with

9    respect to your testimony?

10   A.  Not significantly.  Maybe a phone call or two, mostly

11   arranging logistics for travel.

12   Q.  During those conversations did you communicate back and

13   forth with Mr. Schlichtmann about the facts of the case?

14   A.  Yes.

15   Q.  I would like to start by getting some clarity as to the

16   various roles that you have had related to the different

17   players in this matter.  You started working for John Masiz in

18   May or June of 2014?

19   A.  No.  The client was BioChemics, not John Masiz

20   individually.

21   Q.  Did you ever work for John Masiz?

22   A.  No.

23   Q.  So you started work for BioChemics in that time period?

24   A.  That's my best recollection.

25   Q.  And you worked for BioChemics last July -- June or July of

N6R5aqu1                          Barrette - Cross

1    2014?

2    A.   Yes.

3    Q.   In July of 2014 you were engaged to work as a lawyer for

4    Inpellis?

5    A.   Yes.

6    Q.   From July of 2014 until September 2016 you were solely

7    employed by Inpellis?

8    A.   Just to understand, in the world of BioChemics and Inpellis

9    and the other players, that's true.  I had other clients,

10   obviously.  But, in other words they weren't my -- when I was

11   at Holland & Knight I had other clients in addition to

12   Inpellis.

13   Q.   But nobody related to any of the people we have been

14   tacking about during your testimony?

15           MR. RAND:  Objection.

16           THE COURT:  Sustained.

17   Q.   No other entity associated, to your knowledge, with John

18   Masiz?

19   A.   Correct.

20   Q.   Not BioChemics?

21   A.   Correct.  My client, when we took on the IPO in the

22   mid-summer of 2014, the client became Inpellis.

23   Q.   And not Jan Schlichtmann?

24   A.   Correct, not Jan Schlichtmann.

25   Q.   As part of the work for Inpellis you put together the

1   initial SeaChange Pharma agreement?

2   A.  Yes.

3   Q.  But you did not ever formally represent SeaChange as its

4   lawyer?

5   A.  Correct.

6   Q.  The purpose of creating SeaChange was an effort to make

7   Inpellis independent from BioChemics; correct?

8   A.  Correct.

9   Q.  SeaChange Pharma was the controlling shareholder of

10  BioChemics?

11  A.  Yes.  It became the controlling shareholder when the Masiz

12  family transferred their shares into it.

13  Q.  And when was that?

14  A.  I believe it was in mid-2014, just sort of summer/early

15  fall 2014, to the best of my recollection, early in the period

16  of time that I got involved in this.

17  Q.  So, from the summer 2014 throughout the time at issue in

18  this case SeaChange Pharma was the controlling shareholder of

19  BioChemics?

20  A.  Yes.

21  Q.  And throughout that time Jan Schlichtmann was the managing

22  member of SeaChange Pharma?

23  A.  Yes.  The technical term is he was the manager of SeaChange

24  Pharma, which is a little different from being managing member.

25  Q.  He was the manager during that time period?

1   A.  Correct.

2   Q.  You are aware of the creation of the shareholder resolution

3   trust in September 2014, correct?

4   A.  Yes.

5   Q.  You thought it was a good idea?

6   A.  Yes.

7   Q.  You understood the purpose of the trust was to distance

8   Inpellis from the problems that BioChemics and John Masiz had

9   with the SEC?

10  A.  Correct.

11  Q.  And you believed that BioChemics' handing ownership over to

12  the trust achieved that separation?

13  A.  Yes.

14  Q.  The trust was run collectively by three trustees?

15  A.  Correct.

16  Q.  Jan Schlichtmann was one of the trustees from the trust's

17  founding through at least 2016?

18  A.  I'm sorry.  I just didn't quite hear the last part of the

19  question.

20  Q.  Sure.

21          Jan Schlichtmann was one of the trustees from the

22  trust founding through at least 2016?

23  A.  Correct.

24  Q.  And then in 2014 and 2015, did you understand that

25  Mr. Schlichtmann represented Mr. Masiz as his attorney?

N6R5aqu1                          Barrette - Cross

1    A.  I honestly didn't know exactly who had formal

2    representation of whom but I have no reason to think that was

3    untrue.  It just wasn't something I was paying a lot of

4    attention to specifically.

5    Q.  Was it relevant to your work for Inpellis to have some

6    idea, given the needs for separation from John Masiz and

7    BioChemics and Inpellis, to know about this relationship

8    between Jan Schlichtmann and John Masiz?

9    A.  No.

10   Q.  So you represented Inpellis and as part of that work helped

11   create SeaChange Pharma in effort to make Inpellis independent

12   from BioChemics?

13   A.  Correct.

14   Q.  You didn't work on creating the trust but as Inpellis'

15   lawyer you thought it was a good idea?

16   A.  Correct.

17   Q.  And you knew that separating Inpellis and BioChemics was an

18   important thing for Inpellis?

19   A.  Correct.

20   Q.  Were you also working to separate Inpellis from the control

21   of John Masiz?

22   A.  Yes.

23   Q.  And that was because he was facing securities fraud action

24   by the SEC?

25   A.  Correct.

N6R5aqu1                       Barrette - Cross

1    Q.  And that SEC action related to BioChemics as well, correct?

2    A.  Correct.

3    Q.  John Masiz had previously pleaded no contest to allegations

4    from the SEC concerning another related company Vaso Active;

5    correct?

6    A.  Correct.

7    Q.  So it was very important to separate Mr. Masiz from

8    Inpellis if the IPO was to go forward?

9    A.  Correct.

10   Q.  Did you believe that you had in fact achieved the necessary

11   separation?

12   A.  Yes.

13   Q.  Starting on January 1, 2015, when the trust received all of

14   shares of Inpellis, Inpellis began holding itself out as wholly

15   independent from BioChemics, correct?

16   A.  I'm not sure -- I'm not sure I used the words wholly

17   independent because of the license of the intellectual

18   property.  I mean, they couldn't ignore that, that was a link

19   to BioChemics.  So I'm not sure I would agree with the term

20   "wholly independent" on that side; as a corporate governance

21   matter, yes, wholly independent.

22   Q.  And independent from Mr. Masiz?

23   A.  Yes.

24   Q.  This was all between July of 2014 and September of 2016

25   when you worked exclusively for Inpellis; correct?

N6R5aqu1                    Barrette - Cross

1    A.  Correct.

2    Q.  During that time frame you also helped create necessary

3    corporate documents for Montserrat Partners, correct?

4    A.  Correct.

5            MR. WARD:  Your Honor, may I approach?

6            THE COURT:  Yes.

7    Q.  I have now handed you what has been previously accepted as

8    Defendant's Exhibit 51.  Is this an e-mail you sent on

9    September 29, 2014 to Dr. Staskin, Mr. Sterman, Mr. Masiz, and

10   Mr. Schlichtmann?

11   A.  Yes.

12   Q.  In it you say I will get you all an LLC agreement from

13   Montserrat later today; correct?

14   A.  Correct.

15   Q.  Did you understand these individuals you were corresponding

16   with were involved with Montserrat?

17   A.  Yes.

18   Q.  But you never acted as a lawyer for Montserrat, correct?

19   A.  Correct.

20   Q.  And, to be clear, you understood that creating these

21   corporate documents of Montserrat was something that you did as

22   a lawyer for Inpellis?

23            MR. RAND:  Objection.

24            THE COURT:  Overruled.

25            THE WITNESS:  Frankly, at the time I don't think I was

1    thinking about it.  The gentleman with whom I talked regularly

2    asked me to do it, I knew how to do LLC agreements, and I did

3    it.  We didn't really get into who was representing whom or

4    whether it was an Inpellis project but it didn't change the

5    fact that I was representing Inpellis at the time.

6    BY MR. WARD:

7    Q.  You were representing Inpellis.  So who were you

8    representing in creating this Montserrat document?

9    A.  We didn't think about it at the time.  I didn't think about

10   who I was representing, I was trying to be helpful and get a

11   document done for that.

12   Q.  You are an attorney, you know that when you are doing work

13   for somebody that it creates an attorney-client relationship;

14   correct?

15   A.  Correct.

16   Q.  And so, when you created this Montserrat document, with

17   whom did you have an attorney-client relationship?

18   A.  I didn't think about it at the time.

19   Q.  Well, thinking about it now, on whose behalf were you

20   creating this document?

21   A.  I was doing it on behalf of the folks who asked me to do it

22   which would have been this group of people.

23   Q.  So were you their counsel for this matter?

24   A.  I didn't view myself as their counsel.

25   Q.  But you were doing work as an attorney for these

 1   individuals; correct?

 2   A.  Yes.

 3   Q.  But you don't view that as acting as their attorney?

 4   A.  I wasn't thinking about it that way at the time.

 5   Q.  How are you thinking about it now?

 6   A.  The same way.

 7   Q.  Which is that you were not representing them?

 8   A.  Correct.

 9   Q.  You did not consider the work you did in creating the LLC

10   agreement to be done in your role as representing Inpellis?

11   A.  Correct.

12   Q.  Do you recall being deposed over two days on November 1 and

13   2 of 2021?

14   A.  Yes, I do.

15   Q.  Do you recall giving testimony contrary to what you just

16   said?

17   A.  I may have.  I don't remember.

18            MR. WARD:  Your Honor, I would ask to approach.

19            THE COURT:  Yes.

20            So, here is how we work for deposition items being

21   offered for impeachment.  First, counsel needs to supply a copy

22   of the deposition transcript to the Court.  Second, counsel

23   should then say I propose to read from page X, lines Y through

24   Z.  Adversary counsel will then have a few seconds to say

25   whether there is any objection.  The most common objection

N6R5aqu1                        Barrette – Cross

1    would be it is not inconsistent.  Assuming that objection is

2    overruled, then you can read the relevant portions of the

3    deposition transcript.  OK?

4              MR. WARD:  Thank you, your Honor.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. WARD:  With your permission, I'll give you both

2     dates of depositions.

3          THE COURT:  Just hand it to my law clerk.

4          Page and line.

5          MR. WARD:  321.  It's the first day, November 1.

6          THE COURT:  Lines?

7          MR. WARD:  3 to 6, your Honor.

8          THE COURT:  Any objection?

9          MR. RAND:  No objection.

10          THE COURT:  You may read.

11     Q.  Mr. Barrette, do you recall stating on November 1 of 2021

12     under oath:

13     "Q. So you consider this to be done pursuant to your role as

14     representing Inpellis at the time?

15     "A. Yes, correct.  Correct."

16     A.  I have no doubt that the transcript is accurate, so I said

17     it.

18     Q.  And Monserrat was also run by Mr. Schlichtmann, correct?

19     A.  Correct.

20     Q.  For clarity, you've never served as lawyer for

21     Mr. Schlichtmann personally, correct?

22     A.  Correct.

23     Q.  Other than representing you as an interested third party in

24     this case earlier, has Mr. Schlichtmann ever represented you?

25     A.  No, and I'm not sure what you -- I don't understand the

1    question.

2            THE COURT:  In other words, I think the witness is

3    objecting to the first part of the question, as I understand

4    it, so let me put the question to him.

5            Has Mr. Schlichtmann ever represented you in any

6    capacity?

7            THE WITNESS:  No, he has not.

8    Q.  To make sure we're clear, your representation of Inpellis

9    ended sometime in September or October of 2016 when you became

10   general counsel for the Shareholder Resolution Trust, correct?

11   A.  Correct, that's my best recollection.

12   Q.  And you served as general counsel for the trust from

13   October 2016 through sometime in 2018?

14   A.  That's right.

15   Q.  Turning now to the relationship between Inpellis and

16   Alexander Capital, on July 29 of 2014, Alexander Capital and

17   Inpellis entered into an engagement agreement, correct?

18   A.  Correct.  I don't have the engagement agreement in front of

19   me.  The date sounds right, but they definitely did, yes.

20   Q.  You were not part of the meeting leading up to that

21   agreement, correct?

22   A.  Correct.

23   Q.  You learned about that after the fact from Mr. Sterman?

24   A.  That's right.

25   Q.  Other than what Mr. Sterman told you and what appears in

1    the July 29, 2014 engagement agreement, you have no knowledge

2    of what was or was not said at that meeting?

3    A.   I'm not sure what meeting you're talking about.

4    Q.   Any meetings prior to the engagement agreement between

5    Inpellis and Alexander Capital.

6            MR. RAND:  Objection.

7            THE COURT:  Yes, I think it's gotten a little

8    confusing.  There was a previous question:

9    "Q. You were not part of the meeting leading up to that

10   agreement, correct?

11   "A. Correct."

12           So I think that's the meeting he's referring to.  It

13   is certainly not critical.  It was not clear from the wording

14   of the question.  So let me repeat then the question that was

15   somewhat ambiguous but corrected:

16   "Q. Other than what Mr. Sterman told you and what appears in

17   the July 29, 2014 engagement agreement, you have no knowledge

18   what was or was not said at that meeting?"

19           And now we know that that meeting is the meeting that

20   was referred to two questions earlier.  Okay?  So is the answer

21   to that question yes, no, or what?

22           THE WITNESS:  Yes, I have no knowledge of what

23   happened at that meeting.

24           THE COURT:  Very good.

25   BY MR. WARD:

N6RQaqu2                    Barrette - Cross

Q.  And you didn't communicate at all with Alexander Capital

before that engagement letter had been sent, correct?

A.  Correct.

Q.  Are you reasonably certain that you reviewed the July 29,

2014 engagement agreement before it was signed?

A.  Yes, I am reasonably certain I did.

Q.  Is it accurate to say that any company considered -- strike

that.

        Is it accurate to say that any company considering

going public simply would not proceed unless they had a firm

commitment engagement letter?

        MR. RAND:  Objection.  I object to the --

        THE COURT:  I understand.  The reason I'm pausing is

normally I would sustain the objection, but it may have been

opened by what this witness volunteered on direct testimony

about the general nature of how companies view this type of

situation.

        So I think given that prior testimony on direct, the

objection is overruled.

A.  I think I remember the question.

        THE COURT:  You have a good memory.

A.  I think you said that any company thinking of a public

offering would only do it as a firm commitment.  Was that the

question, counselor?

        THE COURT:  That was the question.

N6RQaqu2                          Barrette - Cross

A.   Okay.  I think it's a little bit broad.  When you said "any

company," I can't say what any company in the whole world or

all of the United States might choose to do.  It was clear to

me that the transaction contemplated was a firm commitment

public offering, which is -- in my experience, which is just

the cases I've worked on but over many years, that was the only

kind of public offering I had seen companies proceed with was a

firm commitment public offering.

Q.   Do you recall testifying yesterday that a company in

Alterix's position or any company considering going public

would simply not proceed unless they had a firm commitment

engagement letter because the chances of it succeeding are much

greater in a firm commitment scenario and it therefore makes

sense to deploy all the resources that it would take to conduct

a firm commitment offering?

          THE COURT:  Yes, but I don't view that as inconsistent

because he never held himself out as a formal expert.  He was

saying throughout the numerous elaborations that he offered

yesterday that he was talking from his personal experience, and

I think he confirmed just now that from his personal

experience, that's the only kind of arrangement that he was

familiar with any company entering into.

          I don't think we need to get into quibble whether

there's some conceivable company in the world that would be

otherwise, and I don't think we have to worry about whether he

1    needs to be qualified as a formal expert or not.  But why don't

2    we proceed.

3              MR. WARD:  Thank you, your Honor.

4    BY MR. WARD:

5    Q.  You understand that companies can conduct IPOs and other

6    public offering on a best efforts basis, correct?

7    A.  Correct.

8    Q.  And you understand that companies can and do list on the

9    NASDAQ through best efforts underwriting?

10   A.  I have no reason to doubt that.  I've never done it, and

11   I'm not familiar with what would be involved in doing best

12   efforts on the NASDAQ in an initial public offering.  That

13   group of facts is just not familiar to me.

14   Q.  Do you understand that Inpellis could have listed on the

15   NASDAQ through a best efforts underwriting?

16             MR. RAND:  Objection.  Conditional.

17             THE COURT:  Well, is the question is his understanding

18   of what was legally available to them, or I'm not quite sure

19   what the question is.

20             MR. WARD:  Yes, legally available, practical.  Could

21   it have happened?

22   A.  So there are three elements to that question:  Legally

23   available, practical and could have happened.  It may have been

24   legally available.  I don't think it was practical, and I don't

25   think it could have happened.  What we're talking about is

1  listing on NASDAQ.  That is what you were asking, I believe,

2  correct?

3  Q.  Yes.  Setting aside the issues that led to the demise of

4  the IPO as a company with undergoing a best efforts

5  underwriting, that the best efforts underwriting would not have

6  precluded Inpellis from being listed on the NASDAQ?

7  A.  I believe that's correct.

8  Q.  You also understand that moving forward with an IPO,

9  whether it's on a firm commitment or best efforts basis, still

10  requires hiring an outside auditor, company counsel and

11  underwriters' counsel, correct?

12  A.  Correct.

13  Q.  Now I'm going to show you Defendant's Exhibit 1.  Do you

14  recognize this as the engagement agreement signed on July 29,

15  2014 we were referring to earlier?

16  A.  Yes.

17  Q.  Did you as counsel for Inpellis understand it to be a

18  binding contract?

19  A.  Yes.

20  Q.  Binding on both parties?

21  A.  Correct.

22  Q.  On page 1, beginning of section one, the engagement

23  agreement states it is an exclusive engagement agreement,

24  correct?

25  A.  Correct.

1    Q.  Further down the first page, second paragraph under the

2    Roman Numeral I, engagement agreement says that: "Alexander

3    Capital shall also be the exclusive financial adviser on all

4    financing advisory, including M&A during this engagement,"

5    correct?

6    A.  It does say that, yes.

7    Q.  Was it your understanding when you reviewed this document

8    that upon signing, Alexander Capital would become the exclusive

9    financial adviser for Alterix?

10   A.  Yes.

11   Q.  When you reviewed this document, it was not your

12   understanding that Alexander Capital is being Inpellis's

13   exclusive financial adviser meant that Inpellis was not allowed

14   to seek financial advice from other financial advisers,

15   correct?

16          MR. RAND:  Objection.

17          THE COURT:  Sustained as to form.  A question of the

18   form "it was not your understanding that" is never going to

19   survive an objection as to form.

20          MR. WARD:  Thank you, your Honor.

21   Q.  So was it your understanding that Alexander Capital's being

22   Inpellis's exclusive adviser meant that Inpellis was not

23   allowed to seek financial advice from other financial advisers?

24   A.  Yes.

25   Q.  It is it your testimony that it would not be a breach for

N6RQaqu2                        Barrette - Cross

1    Inpellis to seek financial advice -- I'm sorry, let me start

2    over.

3              Is it your testimony that it would not be a breach for

4    Inpellis to seek financial advice from entities other than

5    Alexander Capital?

6    A.   I'm sorry, I think you asked if it would not be a breach.

7    Q.   I'll restate that.  Would it -- is it your testimony that

8    it would be a breach for Inpellis to seek financial advice from

9    entities other than Alexander Capital?

10   A.   Yes, that's my testimony.

11   Q.   Do you recall testifying differently during your

12   deposition?

13   A.   I don't recall, but if you have the transcript, you can

14   correct me if I'm wrong.

15   Q.   I would identify for Court page 338.

16             THE COURT:  Lines?

17             MR. WARD:  Lines 2 through 8.

18             MR. RAND:  No objection.

19             THE COURT:  I'm sorry, did you say "no objection"?

20             MR. RAND:  Yes.

21             THE COURT:  Go ahead.  Read it.

22   Q.   On November 1 of 2021, the question was asked:

23   "Q. Did you understand that under the terms of the engagement

24   agreement, it would be a breach of Inpellis to seek or accept

25   financial advice about the IPO from an underwriter other than

1    Alexander Capital?

2    "A.  No, actually, it wouldn't really -- I wouldn't really

3    understand it quite that way you put it.  No."

4    A.  Again, the agreement says exclusive.  If I said that in my

5    deposition, I think I was trying to think about maybe some of

6    the nuances, the differences between seeking financial advice

7    and financial advice as opposed to maybe seeking another

8    investor or another underwriter.

9            I think we all know that things evolved after this,

10   but I'm not disputing what the contract says.  And if I did at

11   the time, I probably should have been more thoughtful in my

12   response, but I'm not disputing what the contract says.

13   Q.  Was it your testimony today that your understanding of the

14   agreement is that it did not allow Inpellis to talk to other

15   investment banks even in an attempt to replace Alexander

16   Capital?

17           THE COURT:  Let me -- go ahead, put your answer.

18   A.  I think that's a different question.

19   Q.  Yes.  Would you answer it?

20   A.  Yes.  If during the course of this the company decided that

21   it might want to replace Alexander Capital because, for

22   example, it was not happy with the advice it was getting, I do

23   think it was free to talk to other investment banks about

24   replacing Alexander.  If it decided it wanted to do that, it

25   would have to then go to Alexander and see if they would agree

1    to get out of the contract.

2            But there's a difference between actually taking

3    advice from somebody and talking to somebody about whether they

4    would want to take on the role of being a financial adviser.

5    That is, I guess, the distinction I was trying to draw during

6    the deposition and what I'm trying to say now.

7            THE COURT:  Let me ask a different question just for

8    my clarification.

9            So this agreement Defendant's Exhibit 1, says that

10   Alexander "will act as agent on a firm commitment basis."

11           And at some point Mr. Mooney learned and then conveyed

12   to you, as I understand it, and to other members of the board,

13   that Alexander did not have authority to act on a firm

14   commitment basis.  Do I have that right?

15           THE WITNESS:  Correct.

16           THE COURT:  So was there any discussion at that

17   point -- this is I think the meeting which we went through your

18   notes -- about whether Alexander had breached the agreement and

19   therefore the agreement was now null and void?

20           THE WITNESS:  It's a very good question, your Honor.

21   Again, at the time the focus was much more on the positive and

22   getting the deal done.  And so I honestly don't remember

23   whether we said, oh, the engagement letter contract has been

24   breached and could be void.  I just -- again, at the time the

25   idea was to --

1            THE COURT:  All right.  Now a different question.

2    There was discussion at that meeting and at subsequent meetings

3    about finding a co-underwriter, and there was even some

4    indication that some underwriting firms had been approached and

5    turned it down.  Do you remember that?

6            THE WITNESS:  Oh, yes.  Yes, absolutely.

7            THE COURT:  So at the time was Alexander aware of

8    those?

9            THE WITNESS:  I think Alexander was setting those

10   meetings up.

11           THE COURT:  All right.  What's your basis for saying

12   that?

13           THE WITNESS:  Those notes that you were talking about,

14   that was a meeting that Mr. Carlin from Alexander was at, and

15   my recollection is he was the one that was summarizing -- you

16   recall there was that somewhat detailed set of points from

17   Margery Fischbein at FBR.  My recollection is that that report

18   came from Mr. Carlin.

19           THE COURT:  Go ahead, Counsel.

20           MR. WARD:  Thank you, your Honor.

21   BY MR. WARD:

22   Q.  Is it your understanding that it would be a technical

23   breach for other entities to raise funds for Inpellis during

24   the time of this agreement?

25   A.  I think we can quibble about whether that's financial

1    advice or raising funds, but the -- but I take your point that

2    the exclusivity here for Alexander, you know, could be seen as

3    making use of somebody else to raise funds a breach of this

4    agreement.

5    Q.  Do you see it that way?  Is there any other way to see it?

6    A.  I do see it that way.  However, I also see that my

7    experience with these agreements is these provisions are in

8    here to protect their fees, and if the company went and raised

9    money from somebody else, the solution is that Alexander would

10   get paid its fee on that raise, and this is all about

11   protecting the commissions.

12   Q.  And that would be a resolution of a breach of the contract?

13   A.  Correct.

14   Q.  On January 1, 2015, is it your understanding that Inpellis

15   and BioChemics became independent entities?

16   A.  Yes.

17   Q.  That's the date on which BioChemics transferred all of its

18   shares from Inpellis to the trust, correct?

19   A.  That's correct.

20   Q.  As of January 1 of 2015, BioChemics had no legal ownership

21   of Inpellis?

22   A.  That is true.

23   Q.  And the two were held out as operating independently,

24   correct?

25   A.  Correct.

1   Q.  And representations about that independence began to appear

2   in documents sent to investors and in filings with the SEC?

3   A.  True.

4   Q.  You believe this was important to the IPO?

5   A.  I did.

6   Q.  If Inpellis was tied to BioChemics with a big judgment

7   hanging over BioChemics' head, the IPO would be challenging, to

8   say the least?

9              MR. RAND:  Objection.

10             THE COURT:  Well, it's a bit rhetorical.  You want to

11   phrase it a little more neutrally.

12   Q.  If Inpellis were tied to BioChemics, that would pose a

13   challenge to the IPO, correct?

14   A.  The terminology "tied to BioChemics" I think is simplistic.

15   There clearly were links between Inpellis and BioChemics

16   because of the intellectual property, and that was very fully

17   disclosed in the registration statement.

18             Inpellis could not completely divorce itself from

19   BioChemics.  The contribution of the shares of the trust, the

20   recruiting of the board of directors, and the management

21   committee meant that the governance, the decision-making

22   control of Inpellis was independent of BioChemics and John

23   Masiz.  So when you say could not ever be tied to BioChemics, I

24   think that glosses over a more complicated situation.

25   Q.  Well, if they were -- if John Masiz still had ties to

1   Inpellis, that would also -- that would make an IPO difficult,

2   correct?

3   A.   The answer is yes, but, again, as the disclosure showed

4   because John Masiz was involved with the technology of

5   BioChemics, there was always going to be some connection.  The

6   effort was to show that a truly independent group of people was

7   now making decisions for Inpellis, including as it related to

8   the continuing, somewhat complicated relationship with

9   BioChemics.

10  Q.   And early in January of 2015, you began to work with

11  underwriters' counsel, Alexander Capital's counsel, Greenberg

12  Traurig to provide due diligence information, correct?

13  A.   Correct.

14  Q.   And due diligence leading up to an IPO, the company's

15  counsel, that was you, provides the counsel for the

16  underwriter, for Alexander Capital, with a bunch of documents,

17  correct?

18  A.   Correct.

19  Q.   And the purpose of these is to help the underwriters'

20  counsel evaluate the company?

21  A.   Again, I don't want to quibble on terminology.  Evaluate.

22  I mean, yes, I mean, in plain English yes, it's to -- and it's

23  also to make sure that the -- as they reviewed the disclosure

24  in the S-1 that it accurately reflects what's going on in the

25  company, and the information helps them do that.

N6RQaqu2                          Barrette - Cross

1   Q.  To make sure that there aren't any issues that may impede a

2   successful IPO, correct?

3   A.  That really is not the role of underwriters' counsel.  The

4   role of underwriters' counsel is to make sure the disclosure is

5   accurate.  And obviously issues that could impede become part

6   of the discussion.

7           But their role is not to create a successful IPO.

8   That's the role of the business people and the investment bank,

9   and the underwriter.  The role of the underwriters' counsel and

10  even company counsel is to provide accurate disclosure, and

11  that's what they were doing, and that's what we were doing.

12  Q.  Part of the purpose here is to make sure that underwriters'

13  counsel can be alerted to any issues that should be disclosed

14  on an IPO?

15  A.  Correct.

16  Q.  I am now going to hand you what has been accepted as

17  Defendant's Exhibit 56.  Mr. Barrette, this is an email from

18  Mr. Marsico, counsel for the underwriter, to you dated

19  January 14, 2015, correct?

20  A.  Correct, it's also -- there are a number of other

21  recipients as well.

22  Q.  Attached to the email is a legal due diligence request

23  list, correct?

24  A.  Correct.

25  Q.  Looking at the list, do you see that underwriters' counsel

N6RQaqu2                          Barrette - Cross

1   is asking for a lot of information about BioChemics?

2   A.   Correct.

3   Q.   Does this indicate to you that Inpellis's relationship to

4   BioChemics was important to Alexander Capital and its

5   attorneys?

6   A.   Yes.

7   Q.   I'm now going to show you what has been accepted as

8   Defendant's Exhibit 57.  Is this is Defendant's Exhibit 57 a

9   January 29, 2015 email from you to Mr. Masiz?

10  A.   Yes.

11  Q.   And in this email, you write:  Hi John.  I need you to

12  print and sign and PDF to me, correct?

13  A.   Yes.

14  Q.   There are two attachments, correct?

15  A.   You just handed me a one-page copy of the email, not the

16  attachments.

17  Q.   If you look at where it says "attachments"?

18  A.   Yes.

19  Q.   You see there are two listed?

20  A.   Yes.

21  Q.   So do you have any reason to believe there were not two

22  attachments to this --

23  A.   No, I did not see the attachments line before.  I believe

24  they were there.

25  Q.   So then through this email, you were on January 29, 2015

1   asking Mr. Masiz to sign the two attachments you were sending,

2   correct?

3   A.  Yes.

4   Q.  I'm now going to hand you what has been accepted as

5   Defendant's Exhibit 60.  This is one of the two attachments to

6   the January 29, 2015 email from you to Mr. Masiz.  Do you

7   recognize that?

8   A.  I do.

9   Q.  On its face, this attachment bears a date of June 5, 2014,

10  correct?

11  A.  Correct.

12  Q.  It purports to reflect a resignation by Mr. Masiz from

13  Alterix on that date, correct?

14  A.  Correct.

15  Q.  You created this document Defendant's Exhibit 60 in your

16  capacity as counsel for Inpellis?

17  A.  Correct.

18  Q.  You did so at the same time that you were responding to due

19  diligence requests, correct?

20  A.  Correct.

21  Q.  Did Mr. Masiz sign this document to your knowledge?

22  A.  I believe so.  I believe so.

23  Q.  Once he signed it, you provided it to Alexander Capital as

24  part of the due diligence file, correct?

25  A.  I don't have a clear memory, but I'm sure I did.

1    Q.  This was also provided to Alexander Capital's counsel,

2    correct?

3    A.  Correct.

4    Q.  It was an important document, right?

5    A.  Yes.

6    Q.  And it was important because you knew the resignation of

7    Mr. Masiz would be an issue for the SEC later, correct?

8    A.  Correct.

9    Q.  And creating separation between Mr. Masiz and Inpellis was

10   a major goal of the company and the trust?

11   A.  Correct.

12   Q.  You knew that Alexander Capital would rely on the accuracy

13   of these documents, correct?

14   A.  Correct.

15   Q.  And you knew that these documents were inaccurate, right?

16   A.  No, I don't agree with that statement.

17   Q.  You knew that to the extent that this document was

18   purporting to be from the dates it was signed, that it was

19   inaccurate, correct?

20   A.  Incorrect.

21   Q.  Do you recall testifying differently during your

22   deposition --

23   A.  I don't recall, but I'm sure you have the transcript.

24            MR. WARD:  Your Honor, I would like to introduce page

25   480 of Mr. Barrette's November 2 deposition, lines 14 to 17.

1          MR. RAND:  No objection, your Honor.

2          THE COURT:  I'm sorry?

3          MR. RAND:  No objection.

4          THE COURT:  Okay.  Go ahead.

5          MR. RAND:  Do you need me to say that or should I just

6     say nothing?

7          THE COURT:  No.  No.  I do need you to say that.

8     Thank you very much.

9     Q.  Mr. Barrette, on November 2, 2021, you testified under oath

10    as follows:

11    "Q. And to the extent they were purporting to be from the dates

12    they were signed, they were inaccurate, correct?

13    "A. Correct."

14    A.  I can only say I'm not sure I necessarily understood the

15    question at the time.  These were normal cleanup things that

16    are done in preparation for an IPO.

17          My best recollection is that we knew that Mr. Masiz

18    had resigned in June.  No one could find a copy of it, so we

19    created a new one.  It was routine.

20          THE COURT:  Well, when you say routine, you're saying

21    it was backdated.

22          THE WITNESS:  I can't disagree with that in the

23    literal situation, your Honor.

24          THE COURT:  And isn't the routine way of indicating a

25    backdating to say "as of" so that anyone looking at the

N6RQaqu2                        Barrette - Cross

1   document knows that while it's being signed later, it refers

2   back.  Isn't that the normal way to do that?

3            THE WITNESS:  Totally fair point, your Honor.  In

4   hindsight, we probably should have done it that way, but that's

5   not what we chose to do.

6            THE COURT:  Go ahead, counsel.

7   BY MR. WARD:

8   Q.  So without that designation, these were inaccurate,

9   correct -- this is an inaccurate document?

10  A.  I don't like to acknowledge inaccurate.  I think it creates

11  a negative impression of the work we're doing that I don't

12  agree with.

13  Q.  Well, it may create a negative impression, but are you

14  saying that's false; this was an accurate document?

15           THE COURT:  Well, I think I understand the situation.

16  I think we might need to move on.  The reason I say that is,

17  unfortunately, given my very late arrival this morning, I have

18  an 11:15, 15-minute telephone conference in another matter that

19  I've got to take.  So why don't we go about five more minutes

20  now, but then we'll take a 15-minute break.

21           MR. WARD:  Thank you, your Honor.  Yes.

22  BY MR. WARD:

23  Q.  When Inpellis was providing due diligence to other

24  potential underwriters, you provided this document to them as

25  well?

1    A.   Correct.

2    Q.   You never told Alexander Capital or any other investment

3    bank that the document had been backdated?

4    A.   Correct.  As far as I can remember, and I should say, by

5    the way, just to clar -- purely clarification, I'm not sure we

6    did a full-blown due diligence list with another underwriter.

7    I'm just not sure how important that is, but if we had or

8    somebody got even partial due diligence, we would have had that

9    in there, so, so be it.

10             THE COURT:  I guess a different kind of question.  Did

11   Mr. Masiz continue to exercise any role as an officer or

12   director of Alterix after June 5, 2014?

13             THE WITNESS:  Not to my recollection.  I would also, I

14   guess, point out that if this was signed in January, you know,

15   that was right at the time that the ownership of Inpellis was

16   moved to the trust in the real effort to make it independent

17   happen, so...

18             THE COURT:  All right.

19   BY MR. WARD:

20   Q.   Mr. Barrette, was it accurate that he was still consulting

21   to Inpellis?

22   A.   The -- I honestly don't have a clear memory, but I think

23   likely he was; that people were still talking to him.

24             MR. RAND:  I'd like to object to the question as

25   assuming facts not in evidence.  I apologize.

1          THE COURT:  No.  Overruled.

2   Q.  I've just handed you what has been admitted as Defendant's

3   Exhibit 58.  This is the second of the two attachments to your

4   email of January 29, 2015, correct?

5   A.  Correct.

6   Q.  This is a document bearing on its face the day of the

7   November 30, 2012, correct?

8   A.  Correct.

9   Q.  And this document says it is an action of the sole director

10  of Alterix, correct?

11  A.  Yes.

12  Q.  And you are the author of this document, correct?

13  A.  Yes.

14  Q.  In November of 2012, the purported date of the document,

15  you had not heard of Alterix, correct?

16  A.  Correct.

17  Q.  You didn't start working for it until 2014?

18  A.  That is true.

19  Q.  In January of 2015, when you asked Mr. Masiz to sign it,

20  Mr. Masiz had no role at Alterix, correct?

21  A.  That is true.

22  Q.  You wrote this in your capacity as counsel for Inpellis?

23  A.  I did.

24  Q.  This document purports to authorize Alterix to enter into

25  an IP licensing agreement with BioChemics, correct?

1    A.  Correct.

2    Q.  In 2015, the only thing of substantial value that Alterix

3    owned was its alleged right to use the BioChemics IP, correct?

4    A.  That is true.

5    Q.  This was something you created for Mr. Masiz to sign in

6    2015?

7    A.  True.

8    Q.  Mr. Masiz signed it?

9    A.  Yes, to the best -- this isn't signed, but I believe that

10   he did, yes.

11   Q.  Once he signed it, you provided it to Alexander Capital as

12   part of its due diligence file?

13   A.  I did.

14   Q.  This was provided to Alexander Capital's counsel?

15   A.  It was.

16   Q.  This is also an important document, correct?

17   A.  Very important.

18   Q.  Because the BioChemics license is a key asset of Inpellis?

19   A.  True.

20   Q.  Essentially, its whole value is in this asset, correct?

21   A.  Yes.

22   Q.  You knew that Alexander Capital would rely on the accuracy

23   of these documents, correct?

24   A.  Correct.

25   Q.  And you knew that these documents had been backdated,

N6RQaqu2                         Barrette - Cross

1    correct?

2    A.   Correct.

3    Q.   Later, when Inpellis was providing due diligence to other

4    potential underwriters, you provided this to them as well,

5    correct?

6    A.   Again, I just want to be accurate.  I'm not sure we ever

7    went through this kind of rigorous diligence process with

8    another underwriter, but if they had, we would have done it, so

9    I'm not sure that that distinction makes much difference.

10   Q.   And you never told Alexander Capital or any other

11   investment bank that this document was inaccurate, did you?

12   A.   I did not.

13   Q.   You never informed them as to the backdating, correct?

14   A.   Correct.

15            THE COURT:  Okay.  So now I do have to take that

16   break, and we will resume in 15 minutes.

17            MR. WARD:  Thank you, your Honor.

18            (Recess)

19            THE COURT:  All right, counsel.

20            MR. WARD:  Thank you, your Honor.

21   BY MR. WARD:

22   Q.   Mr. Barrette, just reorienting you back to Defendant's

23   Exhibit 58.

24   A.   Yes, I have it.

25   Q.   And it's your testimony that this was a document that was

N6RQaqu2                        Barrette - Cross

1   backdated over two years by Mr. Masiz authorizing the IP

2   license that was the most important asset of Inpellis, correct?

3   A.  Correct.

4   Q.  And at the time that Mr. Masiz signed this, he had no

5   authority to act on behalf of Inpellis, correct?

6   A.  Correct.

7   Q.  As of January 29, 2015, when you sent the email, if

8   Inpellis had proper authorization to enter into a November 30,

9   2012 intellectual property license with BioChemics, the

10  authentic documentation of that had been lost, correct?

11  A.  Correct.

12  Q.  That's why you created this authorization?

13  A.  Correct.

14  Q.  I just want to go back quickly over some testimony you had

15  given just to make sure we're clear on the record.

16          With respect to Mr. Carlin's role, were you testifying

17  that Mr. Carlin was at the September 10, 2015 meeting?

18  A.  No.  There was another set of notes from a meeting that was

19  Mr. Carlin, me and Pat Mooney where Mr. Carlin went through

20  information regarding talking to investors, including Margery

21  Fischbein at FBR.

22  Q.  Mr. Carlin was never speaking directly to the board of

23  Inpellis, correct, to your knowledge?

24  A.  To my knowledge, no.  I believe the September 10 meeting

25  was with the trust, not with the board, but I would defer to

1    what the record shows.

2    Q.  But Jack Clarke was attending, he was the chairman of the

3    board of Inpellis, correct?

4    A.  Correct.

5    Q.  One other thing I just wanted to go over quickly, is you

6    mentioned with respect to a breach of the under -- the breach

7    of the engagement agreement, that it was your testimony that

8    the underwriter --

9            THE COURT:  I'm sorry.  Forgive me, counsel.

10           When you say that the original documentation of these

11   documents that were -- of the underlying events of these

12   documents that were later backdated was lost, how do you know

13   that?

14           THE WITNESS:  Because there -- I was told the

15   license -- there were other documents that predated by a couple

16   of years my involvement about the license, and so I was very

17   comfortable that the license had existed.  There were -- there

18   may have even been, and I want to be clear, I couldn't give you

19   chapter and verse, a copy of the license from the time that had

20   not been signed, but I was very comfortable the license was

21   done in whatever date is on the one that -- the backdated one.

22           THE COURT:  Who was preparing the relevant documents

23   at that time, that earlier time?

24           THE WITNESS:  Your Honor, I honestly don't know.

25   Mr. Masiz was running the company.  He had -- I believe had

1    other lawyers advising him at the time, not me.  I know he had

2    very competent intellectual property counsel.  They might have

3    done it.  I just don't know who did it, but I can tell by the

4    way it was done, that it was advice of a lawyer.

5              THE COURT:  Who told you that the documents had been

6    lost?

7              THE WITNESS:  Again, I don't have a clear memory, but

8    it very likely could have been Mr. Masiz.

9              THE COURT:  Go ahead, counsel.

10             MR. WARD:  Thank you, your Honor.

11   BY MR. WARD:

12   Q.  Mr. Barrette, your testimony is that Mr. Masiz had very

13   competence intellectual property attorneys handling that at the

14   time in 2012?

15   A.  Yes, that's my best memory.  As I was getting to know the

16   company, I have a memory of observing that, yes.

17   Q.  But that firm lost the agreement?

18   A.  I don't know who lost the agreement.  I just don't know if

19   the firm lost it.

20   Q.  The firm didn't retain it?

21   A.  Again, I'm not sure I even asked the firm.  I'm not even

22   sure what firm it was.  And I don't -- I just don't recall who

23   I asked for a signed copy of it.  I assume I did, but I just

24   don't recall.

25   Q.  You don't recall the firm that it was, but you know they

1    were very competent?

2    A.  I just don't recall the name right off the top of my head.

3    There were a couple of firms involved for the intellectual

4    property of the company.  I'm sure there's plenty of

5    information about that in documents that are available.  One of

6    them was a small firm.  I happen to remember it was in

7    Westborough, Massachusetts, because that's where I went to high

8    school.  Another was a larger Boston firm.  I'm sorry the name

9    of is escaping me.  It's a well-known intellectual property

10   boutique in Boston.

11   Q.  Neither of the documents that were attached to the January

12   29, 2015 email that you sent ever indicated they had been

13   backdated?

14   A.  Correct.

15   Q.  I would now like to hand you what has been admitted as

16   Defendant's Exhibit 7.  Mr. Barrette, up to now, the two

17   attachments we've been talking about that were backdated were a

18   purported authorization for Inpellis to license the

19   intellectual property, correct?  That was one of the two,

20   correct?

21   A.  Correct.

22   Q.  And the other document was a purported resignation of

23   Mr. Masiz, correct?

24   A.  Correct.

25   Q.  And what I've handed you -- well, would you tell me what

 1   this is.

 2   A.  It is a document -- the license agreement dated

 3   November 30, 2012.

 4   Q.  Do you recall testifying that you couldn't remember why you

 5   created this document in 2014, but that you assumed it was also

 6   to clean up the record?

 7   A.  I do recall testifying to that, yes.

 8   Q.  And your testimony was that you knew there was a license in

 9   place on November 30 of 2012?

10   A.  If I testified to that, I did, and that was my

11   understanding at the time, yes.

12   Q.  Is that still your understanding?

13   A.  Yes.

14   Q.  You assumed that this document was in the BioChemics files?

15   A.  Correct.

16   Q.  And that there was a copy in your electronic files?

17   A.  A copy of which document in my electronic files are you

18   talking about?  I'm not clear.

19   Q.  The document that we're looking at here, this was also

20   backdated, correct?

21   A.  Correct.

22           THE COURT:  And here we have on page 25, Mr. Masiz

23   signing twice, if I understand it, purportedly signing on

24   November 30, 2012 even though the first sentence on page 1 of

25   the license agreement says that it's entered into as of, so he

1   could have signed it, truthfully, on a later date and still

2   made it retroactive, but instead he chose at your behest to

3   lie.  Do I have that right?

4             THE WITNESS:  Well, obviously, your Honor, I am not

5   crazy about the term "lie" only in the sense --

6             THE COURT:  I had a feeling you might not be.

7             THE WITNESS:  It was -- as I said, I viewed it as -- I

8   want to be very clear.  I was very comfortable from looking at

9   things and talking to people that there was a license agreement

10  in November 2012.

11            If I could have been a little bit better about, you

12  know, saying these were "as of" documents, I will own that, but

13  there was no effort to mislead anybody or lie here.  It was

14  just to clean up the record, and I see what you're saying.  And

15  actually I hate the practice of putting dates under signatures

16  because it leads to the kind of thing that's happening right

17  now, which is if you have a date on the front and then you date

18  the signatures, you're always debating, well, what is the date

19  of this agreement?  And it probably should have said "as of"

20  the at the end.

21            I'm not saying -- it probably could have been handled

22  better, but the intentions were quite pure to just have a clean

23  and neat record.  And so, you know, I own it.  I did these

24  documents, but I just want to be very clear.  I was 100 percent

25  comfortable that that license did exist in November 2012.

1            THE COURT:  All right.  Go ahead, counsel.

2            MR. WARD:  Thank you, your Honor.

3    BY MR. WARD:

4    Q.  When you say your intention was pure to have a clean

5    record, that was a clean record that would evade scrutiny from

6    anybody looking at it, right?  They would not know that this

7    had been backdated, correct?

8    A.  Correct, but my intention was not to evade scrutiny.

9    Q.  And you were an attorney at the time, correct, and

10   practiced in this area?

11   A.  Correct.

12   Q.  And this document was created -- this wasn't a matter of

13   the date having passed by a couple days or something.  This is

14   years later this is backdated?

15   A.  That is true.

16   Q.  And it was signed by somebody who when he signed it had no

17   authority to act on behalf of Inpellis, correct?

18   A.  Correct.

19   Q.  So at the time that this was signed by Mr. Masiz, he had no

20   ability to cure the lack of an agreement, correct?

21            MR. RAND:  Objection.

22   A.  Correct.

23            THE COURT:  Sustained.

24   Q.  Is it your understanding that the backdating of the

25   intellectual property license by John Masiz after he was no

1    longer part of the company was not a material piece of

2    information for Greenberg Traurig to know?

3    A.  That was my understanding.

4    Q.  Is that your understanding sitting here today?

5    A.  Yes.

6    Q.  After the engagement agreement between Inpellis and

7    Alexander Capital was signed, Inpellis started to prepare for

8    the next steps towards an IPO, correct?

9    A.  Correct.

10   Q.  Do you recall who was engaged in these efforts?

11   A.  Yes.  I talked about this a little bit yesterday, but happy

12   to recap it.  The --

13   Q.  I'm just asking for names at this point.

14   A.  Okay.  Sorry.  In terms of names, in terms of the outside

15   professionals, there was me and my team at Holland & Knight.

16   There was Tony Marsico and his team at Greenberg Traurig.

17   There were the people from Alexander, primarily Chris Carlin.

18   There was -- there was the team that we were putting together

19   at the company at that point, Harry McCoy and David Staskin.

20   Also involved at the time with a lot of interest in it were the

21   trustees of the trust, especially Mr. Schlichtmann -- Jan

22   Schlichtmann and Dan Glosband.  And we did bring in a gentleman

23   named Frank Manguso to be CFO.  I forget exactly he came in,

24   but it would have been early in the process.  And I'm sure

25   there's probably an employment agreement in the record

1   somewhere.

2   Q.  I think there might be a miscommunication.  I'm actually

3   referring to the -- my question may not have been clear.

4         Immediately after the engagement agreement was signed

5   in July of 2014, was Marshall Sterman involved in raising --

6   A.  I'm sorry.  I was just trying to -- Marshal is the person

7   who introduced me to this whole, you know, opportunity.  And I

8   was -- when I hesitated, I was trying to remember because I

9   knew there was one other important name, and that was it.

10  Marshall Sterman was an important player.  And, yes, in the

11  midsummer 2014 timeframe when the engagement letter was signed,

12  Marshall was very active.

13  Q.  Because there were some things for Alexander -- sorry --

14  things for Inpellis to do in order to sort of get ready to

15  start moving towards deliberate steps towards an IPO, correct?

16  A.  That is correct.

17  Q.  Would that include Russ Brown in these efforts?

18  A.  Yes, Russ was involved but to my recollection, but not

19  extensively.

20  Q.  Jan Schlichtmann you testified was involved --

21  A.  Yes.

22  Q.  -- in this time period as well?

23  A.  Yes.

24  Q.  And you also were?

25  A.  Yes.

1   Q.  Was John Masiz?

2   A.  Yes, he was very knowledgeable about the technology, so he

3   was certainly in on conversations.

4   Q.  Dr. Staskin?

5   A.  Yes.  As well.  He was, I believe, a practicing doctor at

6   the time, but, you know, he was definitely involved.

7   Q.  So from September through December of 2014, were those

8   individuals actively seeking to raise capital for Inpellis?

9   A.  I actually -- I don't have a great recollection.  I'm not

10  saying that they weren't.  They probably were looking for

11  working capital because, as we said yesterday, Alterix did not

12  have its own money.  And, again, I don't recall being deeply

13  involved in those efforts.  I might have been, but my

14  recollection is a lot of the time a lot of the effort that was

15  going on then was working on getting the management team

16  together, but I'm not -- they very likely were looking for

17  capital.

18              (Continued on next page)

19

20

21

22

23

24

25

BY MR. WARD:

Q.  Mr. Barrette, I will direct you back to Defendant's Exhibit 51, that was the first exhibit that I handed you.

A.  I have it.

Q.  This is an e-mail that you sent about the Montserrat LLC documents; correct?

A.  Correct.

Q.  You are replying to an e-mail chain that was forwarded to you earlier, September 29 of 2014 at 8:25 a.m. from Dr. Staskin; correct?

A.  I'm sorry.  You said an e-mail from Dr. Staskin?  Yes.

Q.  And copied on the e-mail that he forwarded, Dr. Staskin forwarded were Mr. Sterman, Mr. Masiz, and Mr. Schlichtmann, correct?

A.  Correct.

Q.  And along with Dr. Staskin and Mr. Brown, this would be the Alterix team you were referring to that was raising money at this time?

A.  Correct.

Q.  And at this time, September 29, 2014, you were working for Inpellis but not BioChemics; right?

A.  Correct.

Q.  Do you see at the bottom of page 1 Dr. Staskin is forwarding an e-mail from Dr. Gary Kay; correct?

A.  Correct.

1   Q.  And in it Dr. Kay is saying he will head to the bank that

2   day and ask for documents related to Montserrat; right?

3   A.  Correct.

4   Q.  And page 2 we see the e-mail that Dr. Kay was just

5   referring to, right?

6   A.  Yes.

7   Q.  And that's an e-mail from Dr. Staskin with wire

8   instructions for Montserrat Partners; correct?

9   A.  Yes.

10  Q.  At the bottom of the page we see a previous e-mail from

11  Dr. Staskin saying he has details for the wire transfer and

12  update on the deal; correct?

13  A.  Yes.

14  Q.  As of September 29, 2014, the date you received this, were

15  you working on any other IPO related to BioChemics?

16  A.  No.

17  Q.  Or Mr. Masiz?

18  A.  I was not.

19  Q.  Anything, any IPO related to Mr. Schlichtmann?

20  A.  No.

21  Q.  On the very bottom of page 2 you see 50,000 and equal sign;

22  do you see that?

23  A.  Yes.

24  Q.  Turning to page 3 of Exhibit 51 we see terms of a deal

25  related to a $50,000 investment; correct?

1    A.   Yes.

2    Q.   Those details include 20,000 options; 10 at .8 and 10 at

3    1.0 of IPO price.  Do you see that?  It is the large formatted

4    letters in the large font in the middle of the page.

5    A.   I'm sorry.  Was there a question?

6    Q.   Yes.

7    A.   I'm sorry, I didn't understand that.

8    Q.   Do you see where it is referring to 20,000 options; 10 at

9    .8 and 10 at 1.0 of the IPO price?

10   A.   I do see that.

11   Q.   And to your understanding would that mean 10,000 options to

12   buy a share of stock at 80 percent of the IPO price and 10,000

13   options to buy a share of stock at a hundred percent of the IPO

14   price?

15   A.   Yes.

16   Q.   Since this is sent to you as counsel for Inpellis and

17   Inpellis is the only IPO you are working on related to this

18   group of people at the time, is it fair to say these are

19   warrants for shares for Inpellis?

20   A.   That would be my conclusion; yes.

21   Q.   And the details go on to say that when bridge money exceeds

22   2 million, Dr. Kay can get his money back for entering into the

23   bridge lending.

24   A.   Well, it says you can get money back or enter bridge to

25   IPO.

1  Q.  OK.  And do you not understand "enter bridge to IPO" to be

2  entering into the bridge lending that is being done?

3  A.  Yes.

4  Q.  And entering into the bridge lending would mean that 75,000

5  becomes 100,000 and then 20,000 more options; correct?  Do you

6  see that?

7  A.  Yes.  I see where it says that, yes.

8  Q.  So, to your understanding, was Dr. Staskin offering Dr. Kay

9  a chance to invest in Inpellis now with the guarantee that he

10  will be allowed to invest in the bridge lending round, if he

11  chooses?

12  A.  That is the way I would read these words, yes.

13  Q.  And the terms of the bridge lending appear to be set at

14  that point, correct?

15  A.  So, again, I think the way term sheets work, it looks like

16  Dr. Staskin was proposing the terms and later it looked like

17  Dr. Kay thought they were good terms.  But, a term sheet is not

18  a contract so whether they were set or not is not discernible

19  from this document but this certainly has very specific terms.

20  Q.  The terms that he is being offered are including 25 percent

21  discount on the money invested; correct?

22  A.  I'm just checking again.  Yes, that seems to be what he is

23  trying to say, yes.

24  Q.  So Dr. Kay only needed to pay 75,000 to be credited with a

25  hundred thousand investment along with options; correct?

N6R5aqu3                         Barrette - Cross

1    A.  So, give me a minute to read it because I know what the

2    large type, which I think was written by Dr. Staskin says.  I

3    just want to see whether the term sheet says the same thing.

4          So, again, this attachment to this e-mail does seem to

5    say -- that 50,000 note for 75,000, I think the best

6    interpretation of that is, yes, you invest $50,000 you get a

7    note back that has a face amount of $75,000.  That seems to be

8    what is trying to be conveyed.  The smaller text says type of

9    security, each unit will consist of a convertible note in the

10   face amount of 75,000 in warrants.  It doesn't -- that section

11   doesn't talk about the discount so it's inconsistent.

12   Q.  Then the 75,000 that you mentioned with the bridge lending

13   would turn into 100,000 so that 50,000 would turn into a

14   hundred thousand if the investor stuck around until the IPO;

15   correct?

16   A.  That's what this e-mail from Dr. Staskin is proposing to

17   the investor as far as I can read it.  It is not very precise,

18   it just says 75,000 becomes 100,00, it doesn't even have a

19   dollar sign.  So it is not the way I would have written it as a

20   lawyer.  It is a little vague.

21   Q.  This seems to be written by somebody who is not experienced

22   in the area, would you say?

23   A.  I would agree with that; yes.

24   Q.  And Dr. Staskin also says that part of these terms include

25   a total of -- is it 40,000 warrants?  20,000 plus 20,000?

1    A.  Well, again, there is a term sheet attached that looks more

2    professionally done and then there is his summary of it, and

3    it -- you know, taking it from the top of the third page it

4    says:  Note for 75,000, and 20,000 options; 10,000 at .8 and

5    10,000 at 1.0.  So, that would imply the total number of

6    options is 20,000.  Down below it talked about warrants which

7    are very much like an option, each will include a warrant to

8    purchase 10,000 shares of the common stock so those warrant

9    terms seem to be different from the options that he has above

10   and I am not sure which was the definitive one.

11   Q.  The difference between an option or a warrant, or a prime

12   difference, is the warrant is issued by the company itself;

13   correct?

14   A.  It doesn't have to be, as I understand the term.  They're

15   both technical terms but not definitive terms of art, so -- but

16   it could be.

17   Q.  Are you aware of any time of the issuance of warrants by a

18   third-party?

19   A.  So, I'm just one person who has done this for a long time.

20   I would agree that when you use the term "warrant," the working

21   assumption is that it will be issued by the company and I think

22   any time I have done warrants -- and I have done a lot of

23   warrants -- they have been issued by the company.

24   Q.  And in this case the company would be Inpellis; correct?

25   A.  The way I read this amalgamation of somewhat truncated

1   terms written by Dr. Staskin is, yes, it was intended to be

2   Inpellis.

3   Q.   We saw wire instructions for the money -- for the

4   investment to be sent to Montserrat; that's correct?

5   A.   Correct.

6   Q.   One of the ways the team of people you referred to before,

7   including you and Jan Schlichtmann at the time were raising

8   capital for Alterix, was by soliciting investment through

9   Montserrat; is that correct?

10  A.   A couple of things.  I was not raising money for the

11  company, that's not what the lawyer does, but I was absolutely

12  facilitating it by doing documents and things like that.  I

13  want to be clear about that, that I did not solicit funds for

14  Inpellis.  That's not my job and not what I do.

15  Q.   You facilitated it; correct?

16  A.   I facilitated it by talking about terms with people,

17  writing a term sheet, writing documents.  I absolutely was

18  involved, I'm not denying that, but I don't think it is

19  accurate to say that I was soliciting funds which is what you

20  just said.  I was not soliciting.

21  Q.   You were facilitating the solicitation of funds --

22  A.   Correct.

23  Q.   -- for Inpellis; correct?

24  A.   Correct.

25  Q.   And this is during the time that Inpellis had an engagement

1   agreement with Alexander Capital to be exclusive underwriter,

2   correct?

3   A.   It is exclusive underwriter for the IPO, correct, and it is

4   exclusive advisor for financings.

5   Q.   And, to your knowledge, was this ever raised to the

6   attention of Alexander Cap?

7   A.   I don't know whether it was or not.

8   Q.   You don't have any recollection of this being raised to the

9   attention of Alexander Capital, correct?

10  A.   Correct.

11  Q.   I'm now going to hand you what has been previously admitted

12  as Defendant's Exhibit 137.  Have you seen this document

13  before, Mr. Barrette?

14  A.   I don't think I have.

15  Q.   I will represent to you this is a document produced by Jan

16  Schlichtmann which he represented was his own record-keeping of

17  investors in Montserrat.  Is that consistent with your

18  understanding of what this might be?

19            MR. RAND:  Objection.

20  A.   Yes.  I'm sorry.

21            THE COURT:  I'm sorry.  Was this already received in

22  evidence?

23            MR. RAND:  Yes, it is in evidence.

24            THE COURT:  By agreement.

25            MR. RAND:  By agreement.

N6R5aqu3                    Barrette - Cross

1    THE COURT:  So what do the parties agree it is?
2  Because this witness has never seen it before.
3    MR. WARD:  At this point I would have it for -- well,
4  it has been entered into evidence and I wanted to ask some
5  questions about this and --
6    THE COURT:  No, no, no.  I need to know because I'm
7  going to rule it out of evidence in a nanosecond unless you
8  jointly tell me what this is as opposed to representations of
9  counsel in asking questions which are impermissible.
10    MR. WARD:  Your Honor, this was --
11    THE COURT:  So, since the parties agreed on its
12  admission they must have agreed to what this is so let me ask
13  plaintiff's counsel for example.  What is this?
14    MR. RAND:  I believe it's the summary prepared by
15  Mr. Schlichtmann of the activity at Montserrat Partners.
16    THE COURT:  OK.  So is Mr. Schlichtmann going to be
17  testifying?
18    MR. RAND:  They have asked him to testify and he has
19  agreed to come and testify.
20    MR. WARD:  Your Honor, if this hadn't already been
21  admitted we would be doing this for reference only.  He is not
22  going to testify as to the accuracy of this --
23    THE COURT:  I will continue to receive it subject to
24  connection when Mr. Schlichtmann testifies.
25    MR. WARD:  Thank you, your Honor.

1        MR. RAND:  Just to be clear, your Honor, we weren't

2    objecting to it being in evidence, I was just objecting to the

3    question to the witness about the document.

4        THE COURT:  Oh, I understand.  That's separate.  But I

5    was objecting to its being in evidence --

6        MR. RAND:  OK.

7        THE COURT:    -- because, on its face, you don't know

8    what it is.  As I understand it now it is not actually a

9    business record, it is someone's memory of what they believe

10    occurred in terms of certain transactions and activity which

11    may or may not be based on adequate personal knowledge; we will

12    find out when Mr. Schlichtmann testifies.

13        So, let's go back and put another question.

14        MR. WARD:  Yes, your Honor.

15    BY MR. WARD:

16    Q.  Mr. Barrette, do you recall all of the investments that

17    were made into Montserrat?

18    A.  No.  I was not really involved at all in Montserrat's

19    fundraising other than drafting the LLC agreement.

20    Q.  Could your recollection be refreshed by a document?

21    A.  I'm happy to have you show me a document to refresh, sure.

22        MR. WARD:  Your Honor, I would just show this to

23    refresh his recollection at this point.

24        THE COURT:  OK.

25    Q.  Mr. Barrette, do you, in looking over this document, does

1    this refresh your recollection as to any of the investors and

2    amounts of investment made into Montserrat Partners?

3    A.   Again, no.  I actually -- my recollection is I was aware of

4    Montserrat, I was aware that I drafted the LLC agreement

5    because some of the folks were using Montserrat as a vehicle to

6    raise working capital.  My understanding was it was actually

7    for BioChemics but my recollection today is that the Montserrat

8    effort was not something that I was asked about or involved in

9    much at all.

10   Q.   I'm sorry.  You said you weren't involved at all in it?

11   A.   Other than drafting the LLC agreement I don't have a memory

12   of regular meetings or people talking to me about when money

13   had come in or that sort of thing.  I don't remember being

14   involved in Montserrat.

15   Q.   I'm now going to show you what has been admitted into

16   evidence as Defendant's Exhibit 48.  Mr. Barrette, this is an

17   e-mail chain with Dr. Staskin dated January 19, 2022 after the

18   end of depositions.  Have you seen this document before?

19   A.   I'm sorry.  When you bumped your microphone I didn't hear

20   the beginning of the question.  I apologize.  Could you just

21   ask it again?

22   Q.   This was an e-mail chain that Dr. Staskin produced after

23   the end of depositions in this matter.  Have you seen this

24   document before?

25   A.   OK.  So this has a number of pages, just give me a minute

1    to flip through.  I don't think I have seen it, but.

2    Q.  Did you not believe you have seen this before?

3    A.  I do not believe I have seen this series of e-mails before,

4    no.

5    Q.  Returning to the question of Inpellis' independence from

6    BioChemics and Mr. Masiz -- I'm sorry.  Before we move on,

7    there is a subscription agreement at the back of this e-mail.

8    Do you see that?

9    A.  Yes, and I just saw that now too so go ahead and ask your

10   question but I had just been looking at the e-mails, I just got

11   to that at the end, so.

12   Q.  Did you write this subscription agreement?

13   A.  I believe I probably did.  It looks like one that I

14   typically use.

15   Q.  And this was a subscription agreement for Inpellis;

16   correct?

17   A.  Yes.  It was still -- actually, let me just look for a

18   second.  Yes, it was still Alterix at the time, but yes.

19   Q.  I am now going to show you what has been admitted as

20   Defendant's Exhibit 73.  Is this an e-mail from you to

21   Mr. Masiz dated May 1 of 2015?

22   A.  Yes.

23   Q.  As of May 1, 2015 you were counsel for Inpellis; correct?

24   A.  Correct.

25   Q.  And here you are writing Mr. Masiz for suggestions about

1   how to structure Dr. Mooney's employment contract; correct?

2   A.   Correct.

3   Q.   So by at least May 1 of 2015 you, as counsel for Inpellis,

4   were drafting an employment contract for Dr. Mooney; correct?

5   A.   Correct.

6   Q.   And you were consulting with Mr. Masiz on that?

7   A.   Correct.

8   Q.   At the time Mr. Masiz had no formal role at Inpellis;

9   correct?

10  A.   That is true.

11  Q.   And this was before the board of Inpellis had met with

12  Dr. Mooney; correct?

13  A.   I don't have a clear memory of the order of events so I

14  can't say it is correct but I can't say it is incorrect either.

15  Q.   To your knowledge Dr. McCoy delegated Dr. Mooney's

16  employment contract to Marshall Sterman and John Masiz;

17  correct?

18  A.   Again, I just don't know if I was in on that assignment of

19  that task so I don't think I can comfortably say that's

20  correct.  But, again, I don't know it to be incorrect.

21  Q.   Would it be accurate to say that -- is it your testimony

22  that you do not recall whether Dr. McCoy delegated to Marshall

23  Sterman and John Masiz the negotiation of Dr. Mooney's

24  employment contract?

25  A.   I do not recall either way.

1   Q.  And is it -- did you, on November 1, 2021, testify at a

2   deposition regarding this?  Do you recall that?

3   A.  I don't recall it but if you have a transcript we can hear

4   what I said.

5   Q.  Well, is it possible that you had a recollection at that

6   time of Dr. McCoy's delegating this to Marshall Sterman?

7   A.  Very possible.

8   Q.  And John Masiz?

9   A.  Yes; quite possible.

10  Q.  You, Mr. Masiz, and Mr. Sterman were the team that put the

11  Mooney employment contract together; right?

12  A.  Well, had input.  I certainly drafted the agreement itself

13  and took business-type comments from them if they were in the

14  loop; yes.

15  Q.  At this time did you advise Dr. McCoy that maintaining

16  separation from Mr. Masiz was important to the company?

17  A.  Well, I think we all knew that was important.

18  Q.  Did you advise Dr. McCoy of that?

19  A.  Again, I don't recall if I had a specific conversation with

20  Dr. McCoy about it but it was, at this point, it was a, you

21  know, powerful theme in the filings of the SEC so I was well

22  aware he was aware of it, I just don't know if we had a

23  conversation about it.  I don't recall doing that.

24  Q.  Did you advise Dr. McCoy against having John Masiz involved

25  in this hiring process of the Inpellis CEO?

1  A.  No, I did not.  I actually thought it was important that he

2  be involved.

3  Q.  At the time Dr. Mooney was hired you knew he had been

4  working for Alexander Capital; correct?

5  A.  Yes, I knew he -- I -- yes, I was aware that he had a

6  relationship with Alexander Capital.

7  Q.  As a consultant, correct?

8  A.  Yes.  I mean I -- I am only hesitating because, as we all

9  know, we know now that we established later that he was a

10  consultant and I just can't quite remember -- we established

11  later that he was a consultant.  I don't recall whether at the

12  time we were putting together his employment agreement if I

13  knew exactly what his relationship was.  That's all I am trying

14  to say.

15  Q.  But that was all disclosed as of -- during the process of

16  hiring Dr. Mooney, correct?

17  A.  Correct.

18  Q.  And you understood that Dr. Mooney, along with Mr. Carlin

19  and Mr. Gazdak and the team at Alexander Capital had been

20  working on the Inpellis deal; correct?

21  A.  I did have that understanding, yes.

22  Q.  Do you remember testifying yesterday that Alexander Capital

23  was requesting permission for firm commitment underwritings for

24  the $3.5 million to $10 million range?

25          MR. RAND:  Objection.  Time period.

1           THE COURT:  What is the ground of the objection?

2           MR. RAND:  He asked are you aware that Alexander was

3   trying to get the permission for a firm commitment offering but

4   he didn't say in what time period so I am objecting that it is

5   vague and may be misinterpreted.

6           THE COURT:  Do you want to be a little more specific

7   on the question, please?

8           MR. WARD:  Sure.

9   BY MR. WARD:

10  Q.  Do you recall the following exchange yesterday during your

11  testimony:

12  "Q  Does it indicate they're only trying to get permission to

13  do firm commitment offerings --"

14          THE COURT:  What is it in reference to?

15          MR. WARD:  In reference to the CMA, the initial CMA

16  that Alexander Capital filed in order to get firm commitment

17  approval.  I can now locate you within that context to recall

18  the exchange.

19          THE WITNESS:  I recall the exchange.

20          MR. WARD:  Let me finish it to make sure you

21  understand it.

22          THE WITNESS:  You asked me a question.

23          THE COURT:  No, go ahead.  Finish what the testimony

24  was.

25          MR. WARD:  (reading)

1    "Q   Does it indicate they're only trying to get permission to

2    do firm commitment offerings for the $3.5 million to

3    $10 million range?

4    "A   Yes, that's what it says."

5    A.   I recall that exchange yesterday.

6    Q.   And you find this fact to be critically important; correct?

7    A.   Correct.

8    Q.   And in fact you repeated that twice yesterday:  "Critically

9    important.  Critically important."

10   A.   Correct.

11   Q.   You testified yesterday that if you had known about this,

12   you would have counseled the company hard to either find out

13   that this was something that was going to happen instantly or

14   find another underwriter.

15           Do you remember that?

16   A.   I did say that.

17   Q.   But, to be clear, at the time Inpellis was already looking

18   for another underwriter; correct?

19   A.   You said at the time.  Could you --

20   Q.   At the time the CMA was filed in June of 2015, Inpellis was

21   already looking for other underwriters; correct?

22   A.   Correct.

23   Q.   And in fact never found one that was willing to take on

24   Inpellis; correct?

25   A.   Correct.

1   Q.  Do you recall testifying that because the license Alexander

2   Capital requested was only for up to $10 million, and you now

3   know that Alexander Capital was not close at all -- oh --

4   because the license Alexander Capital requested was for up to

5   $10 million, you now know that Alexander Capital was not close

6   at all to getting a license for firm commitment underwriting.

7   Do you recall that?

8   A.  I do.

9   Q.  Let's go back and look at the document on which you base

10  this testimony.  Now I direct you to Plaintiff's Exhibit 20.

11          MR. WARD:  This is plaintiff's exhibit so it has

12  already been admitted.

13          THE COURT:  Which means it is somewhere in this pile.

14  Do you happen to have -- does someone happen to have another

15  copy?  Or maybe my law clerk.

16          LAW CLERK:  What is the number?

17          MR. WARD:  Plaintiff's Exhibit 20.

18          LAW CLERK:  Yes.

19          THE COURT:  OK.  We have got it.  Go ahead.

20          MR. WARD:  Have a copy for the witness, your Honor?

21          THE WITNESS:  I don't have one.

22          MR. RAND:  It is in that pile there.

23          THE WITNESS:  I can look.

24          MR. WARD:  Do you have a binder?

25          MR. WRIGHT:  We have got --

1            MR. WARD:  Mr. Barrette, I have got it.

2            THE WITNESS:  Thank you.

3    BY MR. WARD:

4    Q.  So this Plaintiff's Exhibit 20 is Alexander Capital's June

5    3, 2015 continuing membership agreement application; correct?

6    A.  Correct.

7    Q.  This is a document on which you based your testimony that

8    Alexander Capital was requesting firm commitment underwriting

9    up to $10 million; correct?

10   A.  Correct.

11   Q.  So let's turn to page 4 of 33.

12   A.  I'm there.

13   Q.  OK.  Seven lines down it says:  In addition, the firm

14   intends to develop investment banking as a major business line

15   and will devote substantial resources towards that end.

16            Do you see that?

17   A.  Yes.

18   Q.  That sentence doesn't indicate that Alexander Capital was

19   requesting a license for only up to $10 million in firm

20   commitment underwriting, does it?

21   A.  That sentence does not contain those words.

22            THE COURT:  So -- I'm sorry.  Sorry.

23            MR. WARD:  Seven lines down.

24            THE COURT:  I see it but then the following, if I am

25   at the right place, a little further it says:  The firm

1    anticipates that it will participate in two or more public

2    offerings per year in the $3,500,000 to $10 million range.

3              MR. WARD:  Correct, your Honor.  I was about to get

4    there and I am going to read the other sentence in front of it

5    which is the request for the additional business line.

6              THE COURT:  All right.

7    BY MR. WARD:

8    Q.  So, do you see the next sentence in between the two

9    sentences there that we have read that:   In that regard, the

10   firm is requesting that it be permitted, by its restrictive

11   agreement, to act as managing underwriter and selling group

12   member and firm commitment underwriting.

13             Do you see that?

14   A.  I do.

15   Q.  And that particular sentence doesn't indicate that this

16   request is limited o to $10 million, does it?

17   A.  Correct.  You read the sentence accurately.

18   Q.  And now we go to the next sentence.  It says:  The firm

19   anticipates that it will participate in two or more public

20   offerings per year in the $3.5 million to $10 million range.

21             Do you see that?

22   A.  Yes.

23   Q.  And that sentence refers to a $3.5 million to $10 million

24   range; right?

25   A.  Yes.

N6R5aqu3                    Barrette - Cross

Q.  But it doesn't affirmatively say Alexander Capital will not

participate in public offerings above $10 million; does it?

A.  I think you read the sentence accurately.

Q.  And the sentence certainly doesn't say that Alexander

Capital is requesting a firm commitment license that only goes

up to $10 million, does it?

A.  I think the sentence speaks for itself.

Q.  Well, do you agree?

A.  I agree that you read the sentence accurately.

          THE COURT:  Well, I'm not quite sure, since this

document is one that was submitted asking for permission from

FINRA, is it defense counsel's position that the sentence we

have just read was cleverly designed to conceal that you wanted

permission to do much larger underwritings?

          MR. WARD:  Absolutely not, your Honor.  This is

simply --

          THE COURT:  Isn't this intended to give FINRA an idea

of the kind of underwritings you anticipated?

          MR. WARD:  And that was the kind of underwritings that

the firm did anticipate.

          THE COURT:  And so doesn't that indicate that the firm

does not anticipate larger underwritings?

          MR. WARD:  It anticipates ones in this range and two

or more a year.  That was a reasonable estimate of what they

anticipated.  This was not -- this is their first deal that

N6R5aqu3                    Barrette - Cross

1   they have had so they would anticipate other deals being in a

2   lower range, so this is a reasonable way to anticipate the

3   future and I can ask Alexander Capital people about that.

4           THE COURT:  No, no.  What I am trying to get at is how

5   would a reasonable person at FINRA have read this, and the

6   reasonable person at FINRA would have read this as saying this

7   is the level at which we are at, yes?  Yes?

8           MR. WARD:  This is what they anticipate going forward;

9   yes, your Honor.

10          THE COURT:  All right.  Go ahead.

11  BY MR. WARD:

12  Q.  There is nothing in here, nowhere in this document does

13  Alexander Capital indicate that it was requesting a license for

14  only up to $10 million in firm commitment underwriting, does

15  it?

16          MR. RAND:  Objection.

17          THE COURT:  No, I will allow that.  I mean, well, the

18  document speaks for itself, as they say, though I often wonder

19  about that objection since I have never met a speaking document

20  but I will assume that's the case.

21          MR. WARD:  Your Honor, I am asking because he

22  testified as to what he understood and what he would have done

23  based on --

24          THE COURT:  No, no.  I know you are going through what

25  the basis was.  I just think if you want to -- if where you

N6R5aqu3                        Barrette - Cross

1    were leading was -- so, do you want to reformulate your

2    position or not from yesterday?  I will ask that question.

3              THE WITNESS:  No, because I frankly think that the

4    equally or more important sentence is the one before it where

5    it is them acknowledging to FINRA that they don't currently

6    have the ability to do a firm commitment underwriting, where

7    nearly a year before they had represented to us that they had

8    that ability by saying that they were going to -- by

9    engaging -- executing an engagement letter with us.

10             MR. WARD:  Your Honor, I would ask to strike that as

11   non-responsive.

12             THE COURT:  Well, I won't strike it but I understand

13   what you are saying.

14   BY MR. WARD:

15   Q.  Let's see now whether FINRA viewed this as a request for

16   firm commitment underwriting only up to $10 million.  Let's

17   look at Plaintiff's Exhibit 21.  So you still have the

18   plaintiff's exhibits with you?

19   A.  Yes.  I have it.

20   Q.  You were testifying to yesterday the first sentence here

21   says on June 3rd, 2015, FINRA's application program (staff)

22   receive a team membership application (application) for

23   Alexander Capital LLP (the firm) which requested approval (a)

24   for an ownership change; (b) to engage in firm commitment

25   underwriting.

1              Do you see that?

2     A.   Yes.

3     Q.   In the document you testified to yesterday FINRA has not

4     indicated that Alexander Capital has put any limitation to its

5     request for firm commitment underwriting, does it?

6     A.   I'm sorry.  Could you repeat the question?  I just didn't

7     quite follow it.

8     Q.   Nowhere in this document does FINRA indicate that Alexander

9     Capital has put any limitation to its request for firm

10    commitment underwriting.

11    A.   That is true.

12    Q.   Do you recall reading another part of this document to the

13    Court yesterday?

14    A.   Yes.

15    Q.   Do you recall testifying the following about this document:

16    "The reason that is important is in the parlance of FINRA --

17    and you can see it in the application, expansion of its

18    business covers getting permission to do firm commitment

19    underwritings so they were being told pretty quickly after they

20    submitted that application:  Do not do any firm commitment

21    underwritings."

22    "Q  Is this a document that would have been important for you

23    to see at the time you were advising the company?

24    "A  This is now getting really critical.  Now they're obviously

25    in hot water with FINRA."

1          You also said, testified yesterday you are not an

2     expert on FINRA; correct?

3     A.   Correct.

4     Q.   Are you aware that this June 11, 2015 letter is a typical

5     response from FINRA to the file of a CMA?

6     A.   No, I'm not an expert on FINRA.

7     Q.   Are you aware that this is essentially a form letter from

8     FINRA that indicates to proceed to CMA application and that the

9     firm can't move forward with whatever business line changes it

10    has requested simply because it has filed a CMA?

11    A.   I wasn't aware of that but I don't doubt it.

12          THE COURT:  But I'm not understanding the relevance.

13          MR. WARD:  Your Honor, he was testifying --

14          THE COURT:  They say that the firm is prohibited from

15    effecting any portion of the aforementioned ownership change,

16    in other words you can't make a firm commitment and the firm is

17    also prohibited from affecting any additional changes in

18    ownership regardless of percentage amount.  The firm is

19    prohibited from making any changes or expansions to its

20    business activities including the addition of any associated

21    persons and/or offices.  The above and/or restrictions are

22    effective immediately and shall remain in full force and effect

23    until various things like the approval.

24          So, what does it matter whether this is a standard

25    form or not?

1          MR. WARD:  Well --

2          THE COURT:  It is a clear, unequivocal statement in

3     response to the request of Alexander to do firm commitments

4     that as of now you are forbidden to do it; right?

5          MR. WARD:  Correct, your Honor.  There is no dispute

6     that Alexander Capital at this point, it had just found out

7     that it could not move forward on a firm commitment

8     underwriting without approval.

9          THE COURT:  So.

10         MR. WARD:  That's why they filed the application.

11         THE COURT:  So I come back to questions I have sort of

12    raised before and some of which were resolved already in my

13    summary judgment opinion, but just so I understand Alexander's

14    position in this trial, there is no dispute, is there, that at

15    the time Alexander entered into the agreement with Inpellis'

16    predecessor that it would make a firm commitment offering that

17    it had no legal authority to do that?  True?

18         MR. WARD:  It had -- it didn't have current authority

19    at the time to move forward with a firm commitment underwriting

20    without approval; correct.

21         THE COURT:  And that after it applied to change that

22    situation it received this document, P 21, that said until we

23    approve you can't do a firm commitment.  True?

24         MR. WARD:  True.

25         THE COURT:  And when is it that you contend that

1    Alexander revealed to Inpellis that it did not have authority

2    to do a firm commitment?

3            MR. WARD:  Your Honor, obviously they knew by

4    September 10th.  There will be in evidence additional

5    disclosures that were made, e-mails that were sent in June of

6    2015.

7            THE COURT:  OK.  So what is your position as to why

8    the original contract, where they said we will make a firm

9    commitment, wasn't a lie?

10           MR. WARD:  A lie requires intent, your Honor.

11           THE COURT:  So we are back to the issue which is very

12   much an issue in this trial:  Intent.  Why do you say you were

13   lacking an intent?

14           MR. WARD:  Your Honor, just -- well, you have decided

15   this was a misrepresentation but we would also reserve our

16   right that in looking at the document it was only saying an

17   intent to move forward under firm commitment.

18           THE COURT:  That's preserved for any possible appeal

19   but on that I have already ruled.

20           MR. WARD:  Yes, your Honor.

21           THE COURT:  But my question is on the issue that's now

22   before me of what your intent was --

23           MR. WARD:  Yes, your Honor.

24           THE COURT:  -- what is your argument that this was

25   not an intentional lie?

1          MR. WARD:  Because the firm was unaware, they believed

2     they had authority at the time.  This was their first firm

3     commitment underwriting they engaged in and they were not aware

4     that they didn't have authority until May 15 or sometime near

5     after when it received the unreasonable letter that's been

6     referred to before.  At that point they found out and then they

7     make this application to get approval and they weren't trying

8     at any point before then because they didn't know.  They were

9     months and months, almost a year between --

10         THE COURT:  OK.  So, that's very helpful.  I'm trying

11    to get more of the context since we spent an awful lot of time

12    on just one witness and I want to get a broader picture.

13         So, what is -- this witness has indicated that

14    Alexander directly or indirectly indicated that this was a

15    routine matter that could easily be cured or words to that

16    effect.  Are you going to deny that those representations were

17    made or do you say that they were made but made in good faith?

18         MR. WARD:  Made in good faith.

19         So, the firm understood that -- and certainly this

20    letter, which was referred to by Mr. Barrette as saying they

21    were in hot water, didn't indicate anything like that.  This

22    still indicated they were in a routine process.

23         THE COURT:  I understand that is the point of your

24    cross-examination and just to move things along I don't

25    normally regard a witness' characterization of the state of

N6R5aqu3                              Barrette - Cross

1      affairs through cliches as being particularly material to my

2      determinations, but the one I am interested in is it's not that

3      you deny that the representations were made that this could

4      easily be fixed and we will fix it, it is that you believe that

5      was true.

6              MR. WARD:  There is not a strong record that they were

7      saying it easily could be fixed.  This was always clear that it

8      was in FINRA's hands and then by all parties this was out of

9      their control but they did have an understanding that they were

10     hoping to get this done soon.

11             THE COURT:  All right.  So, as usual, my schedule is,

12     to use a cliche, screwing things up, because I have another

13     matter that I have to take downstairs at 12:45.  So, why don't

14     we take our lunch break now and we will resume at -- I will try

15     very, very hard to be back by 1:45 so you will have a little

16     more than an hour for lunch and we will pick up -- let me ask

17     my law clerk, do we have anything else on this afternoon?

18             LAW CLERK:  Let me check -- no.

19             THE COURT:  No.  OK.  So we can go with -- we will

20     take a short break at some point in the afternoon but we will

21     go to 5:00 then without any problems.

22             Let me mention one other thing.  I don't know that my

23     law clerk had told counsel that, number one, we will not be

24     sitting this Friday; and number two, the court house is closed

25     next Monday on the theory that when July 4th is on a Tuesday

N6R5aqu3                          Barrette – Cross

1   one should have a sense of patriotism and take at least two

2   business days off.  So, we will have a break from Thursday

3   evening through and pick up again on July 5, so I just wanted

4   to make sure you all understood that.  I have no control over

5   that, obviously.

6               OK.  We will see you all at 1:45.

7               (Luncheon recess; continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      AFTERNOON SESSION

2                        1:45 p.m.

3              THE COURT:  How much more does defense counsel have on

4     cross?

5              MR. WARD:  I would say about 30 minutes, your Honor.

6              THE COURT:  That's great.

7     Thomas-Barrette, resumed.

8     CROSS-EXAMINATION CONTINUED

9     BY MR. WARD:

10             MR. WARD:  Your Honor, as a reminder, we will be

11    breaking in our testimony at 2:00.

12             THE COURT:  To take that other matter -- that other

13    witness, yes.  Was that for 2:00 or 2:30?

14             MR. RAND:  2:00.

15             THE COURT:  Okay.

16             MR. WARD:  May I resume?

17             THE COURT:  Yes.  I was just thinking, that requires

18    presumably the Court to have some technological expertise

19    which, as far as I know, it is unknown in the entire federal

20    judiciary, but we'll do the best we can.

21             MR. WARD:  Thank you, your Honor.

22    BY MR. WARD:

23    Q.  Mr. Barrette, you understand you're still under oath?

24    A.  I do.

25    Q.  Are you able to testify today that -- first, let me refer

1   you back to the exhibit we were discussing, which was

2   Plaintiff's Exhibit 21, the June 15 letter.

3   A.  I have it.

4   Q.  Are you able to testify today that Plaintiff's Exhibit 21,

5   the June 15, 2015 letter, is it anything other than FINRA's

6   routine response to a CMA request for a change in business

7   lines?

8   A.  I cannot.

9   Q.  You can't testify to any knowledge that FINRA even allows

10  limited requests for firm commitment approval?

11              MR. RAND:  Objection.

12              THE COURT:  Sustained.

13  Q.  Mr. Barrette, you had testified earlier it was your

14  understanding that Alexander Capital was asking for limited

15  approval for firm commitment underwriting only up to

16  $10 million, correct?

17  A.  I testified as to what I had read in the application into

18  that number, yes.

19  Q.  But you testified that they were seeking authority only up

20  to $10 million, correct?

21  A.  Yes.

22  Q.  Are you able to testify today as to any knowledge that

23  FINRA allows requests for firm commitment underwritings to be

24  limited by amount?

25  A.  No, I don't -- as I said, I'm not a FINRA expert.  I don't

1    know.

2    Q.  I'm now going to show you what has been admitted as

3    Defendant's Exhibit 70.  Mr. Barrette, is this an email from

4    Mr. Masiz to you and Dr. McCoy?

5    A.  Yes.

6    Q.  And it was sent on April 1, 2015?

7    A.  Yes.

8    Q.  As of April 1, 2015, Dr. McCoy was the CEO of Inpellis, and

9    you were the company counsel, correct?

10   A.  Correct.

11   Q.  In this email Mr. Masiz was encouraging the two of you to

12   make bylaw changes to Inpellis, correct?

13   A.  Correct.

14   Q.  Did that concern you at the time?

15   A.  No.

16   Q.  You knew keeping Mr. Masiz and Inpellis separate was

17   important to the company's future at the time, correct?

18   A.  Correct.

19   Q.  Did you inform Dr. McCoy or Mr. Masiz that this was

20   improper?

21   A.  No.

22   Q.  Did you inform either of them that this could hurt the

23   chances of Inpellis and moving forward with funding because of

24   a mixture of control between Mr. Masiz and Inpellis?

25   A.  No.

1  Q.  You testified yesterday in response to questioning by Judge

2  Rakoff that investors had been misled about a firm commitment

3  IPO, correct?

4  A.  Yes.

5  Q.  These were the bridge lenders that I'm referring to.

6  A.  Correct.

7  Q.  Do you recall the following exchange with the Court:

8       "THE COURT:  The bridge loans were made with the

9  understanding that there was a firm commitment.  Yes?

10       "THE WITNESS:  Absolutely.

11       "THE COURT:  So now you might have problems because

12  the bridge loan lenders had in effect been misled?

13                            "THE WITNESS:  Correct."

14       Do you recall that?

15  A.  I do.

16  Q.  There is nothing in the bridge loan terms themselves that

17  refer to a firm commitment IPO, correct?

18  A.  I don't have the terms in front of me, so I don't remember.

19  Q.  Do you have any recollection they did?

20  A.  I don't have a recollection either way.

21  Q.  And you went through them yesterday, correct?

22  A.  Yes, we looked at the paperwork yesterday.

23  Q.  Because at the time of the bridge loan, the registration

24  statements were in draft form and nonpublic, the only way

25  bridge lenders would access them would be through

1    confidentiality agreements, correct?

2    A.  Correct.

3    Q.  And you specifically recall any investor who took out a

4    confidentiality agreement to view the draft registration

5    statements?

6    A.  I don't recall as we sit here today specific

7    confidentiality agreements.  I assume we did ask for them.

8    Q.  And, regardless, having a firm commitment language in a

9    draft registration statement was not improper, even though

10   Alexander Capital lacked firm commitment approval because as

11   long as Alexander Capital still intended to get firm commitment

12   approval, and still handle it on a firm commitment basis, the

13   registration statement could be filed on a nonpublic basis as a

14   firm commitment underwriting up until the point of the actual

15   underwriting agreement and IPO itself.  Is that correct?

16            MR. RAND:  Objection.

17            THE COURT:  Sustained as to form.

18   Q.  Regardless, having firm commitment language in a draft

19   registration statement at the time that Alexander Capital

20   lacked firm commitment approval was not improper, correct?

21   A.  Correct.

22   Q.  Do you recall any bridge investor ever communicating with

23   you, either before or after Inpellis defaulted on the loan,

24   anything about the firm commitment underwriting representation

25   in the draft registration statements?

N6RQacu4                           Barrette - Cross

1   A.  I don't recall.

2   Q.  In fact, the bridge lenders did bring an action regarding

3   their investment, didn't they?

4   A.  Yes.

5   Q.  Who did they sue?

6            THE COURT:  Or alternatively, whom did they sue?

7   Q.  Grammatically, whom did they sue?

8   A.  I -- two things.  First of all, I was involved in that

9   matter.  I want to be clear about that.  But I honestly -- I'm

10  quite sure they sued Inpellis.  I forget the details.

11  Q.  Did they sue Alexander Capital?

12  A.  I don't recall.

13  Q.  You have no recollection they did, correct?

14  A.  Correct.

15  Q.  Do you remember the following exchange from yesterday about

16  the bridge loan:

17  "Q. Do you recall the cost to Inpellis of the bridge loan?  Was

18  there a fee to Alexander of $500,000?

19  "A. Yes.  We looked at the amendment to the engagement letter

20  that established that fee, and that was absolutely paid to

21  Alexander, incurred and paid."

22            Do you recall that?

23  A.  Yes.

24  Q.  Is that still your testimony today?

25  A.  Yes.

1    Q.  Have you heard of the firm Gilford Securities?

2    A.  No.

3    Q.  Are you aware of their role in the bridge loan?

4    A.  No.  The name is not familiar to me, at least today.

5    Q.  Are you aware of ADEC, A-D-E-C, one of the investors?

6    A.  Yes.

7    Q.  Are you aware of Burke Ross?

8    A.  Yes.

9    Q.  Are you aware that they were brought to the deal for the

10   bridge loan through Gilford Securities?

11   A.  I don't have a strong recollection of that where we sit

12   today, but I'm not saying that's wrong.  I just don't have a

13   strong recollection of it.

14   Q.  Are you aware that Gilford Securities collected eight

15   percent on the investment they brought in with the bridge loan?

16   A.  Today I don't remember that.  I may have known at the time.

17   Q.  But you can't dispute that at this point?

18   A.  I'm not disputing it.

19   Q.  Are you aware of the fact that Alexander Capital received

20   only a minority of the overall $500,000 fee?

21   A.  I was -- I do not recall that, but I'm not saying it's

22   untrue.

23   Q.  You're no longer absolutely sure that Alexander Capital was

24   paid $500,000, right?

25   A.  Correct.

1   Q.  Are you aware that Gilford's role gave rise to the request

2   for additional fees from eight to ten percent?

3   A.  I was not aware of that.

4   Q.  Just to be clear, from September 10, 2015 forward, you --

5   and this is to your personal knowledge -- you, Dan Glosband,

6   Jan Schlichtmann, Pat Mooney, Jack Clarke, Jack Altshuler and

7   Marshall Sterman all were aware that Alexander Capital lacked

8   firm commitment underwriting approval, correct?

9   A.  Correct.

10   Q.  Do you recall testifying yesterday about concerns raised

11   with the public filing of the S-1 in November of 2015 regarding

12   penny stocks?

13   A.  I'm sorry, you said November 2015?

14   Q.  Yes, in the public S-1.

15   A.  What I recall is that -- where I recall seeing the term

16   penny stock was in the SEC comment letter on the public S-1.

17   So that I do recall, yes.

18   Q.  Do you recall saying, "They were worried about risk

19   factors, whether we'd raise enough money, whether we'd get

20   listed on NASDAQ, whether we'd be a penny stock, which is just

21   not the goal of -- in a nutshell, an IPO isn't worth doing if

22   you're going to come out as a penny stock and raise a couple

23   million dollars."  Do you recall that?

24   A.  I do.

25   Q.  Do you recall me asking you at your deposition if you knew

1  the definition of a penny stock?

2  A.  I don't recall, but it was a year -- a little over a year

3  ago, but if it's in the transcript, I certainly don't deny

4  saying it.

5  Q.  Have you since your deposition looked up the definition of

6  a penny stock?

7  A.  I don't think so.

8  Q.  Do you know what a penny stock is?

9  A.  My sort of practical understanding of it is that I do know

10  what it is, yes.

11  Q.  What is it?

12  A.  It's a stock that's trading for less than a dollar.

13  Q.  Less than a dollar?

14  A.  Correct.

15  Q.  Does the SEC define a penny stock as a stock valued under

16  $5?

17  A.  It may.  I don't know that definition where I sit today.

18  Q.  But it could be possible -- you don't dispute that that is

19  a possible definition of the SEC?

20  A.  If you have an SEC regulation or other official statement

21  of the SEC that says that, I obviously would not disagree with

22  it.

23  Q.  According to every draft registration statement filed by

24  Inpellis from the start of April 2015, the Inpellis stock

25  already qualified as a penny stock.  Is that right?

1          MR. RAND:  Objection.

2     A.  I don't understand the question.  Sorry.

3     Q.  The question is, according to every draft registration

4     statement filed by Inpellis from the very start in April of

5     2015, Inpellis stock had already qualified as a penny stock?

6     A.  I'm sorry.  That question doesn't make sense to me.  When

7     you say qualified, qualified by whom?  Under what definition?

8     Who's qualifying it?  I don't understand what you mean by

9     qualified.

10    Q.  It was a penny stock.  Is that fair to say?

11         MR. RAND:  Objection.

12         THE COURT:  So I don't recall seeing anywhere in the

13    Inpellis filings the use of the term penny stock.  So the

14    question then subsumes something that is not in evidence, which

15    is how a penny stock is defined and by whom and under what

16    circumstances.

17         So I sustain the objection.  I think we're ready

18    for -- I'm sorry, we'll continue after.

19         (Witness not present)

20         THE COURT:  Please call your witness.

21         MR. RAND:  I'd like to call Mr. Frank Manguso.

22     FRANCIS ALFRED MANGUSO,

23         called as a witness by the Plaintiff,

24         having been duly sworn, testified as follows:

25         THE COURT:  Please state your full name and spell it

1    for the record.

2              THE WITNESS:  Francis Alfred Manguso.  M-A-N-G-U-S-O.

3              THE COURT:  Counsel.

4    DIRECT EXAMINATION

5    BY MR. RAND:

6    Q.  Mr. Manguso, what was your position at Inpellis?

7    A.  I was chief financial officer.

8    Q.  And how long were you in that position?

9    A.  Four years?

10   Q.  Do you recall which years?

11   A.  2014 through 2018.

12   Q.  And were you given Plaintiff's Exhibit 3 prior to this

13   deposition -- I mean, prior to this testimony?

14   A.  Yes, I was.

15   Q.  And can you identify Plaintiff's Exhibit 3?

16   A.  Does someone have the exhibit?

17   Q.  Were you not sent the exhibit?

18   A.  Yes, I was.

19             THE COURT:  So what is it?  What is the exhibit?

20             THE WITNESS:  Exhibit 3 is a spreadsheet prepared by

21   Elizabeth Russo and myself for specific dates in 2015 to 2016

22   listing all of the transactions in the cash disbursements book

23   and then spreading them across in an Excel spreadsheet by

24   appropriate category.

25   Q.  Was it prepared in -- sorry.

1    A.   And -- this was prepared contemporaneous with the

2    production of the schedule and my notes at the bottom were

3    added in 2018.

4    Q.   Was it prepared in the ordinary course of business?

5    A.   Yes, it was.

6    Q.   And was it the regular business of Inpellis to keep these

7    types of business records?

8    A.   Yes, it was.

9             MR. RAND:  I would like to move for the admission of

10   Plaintiff's Exhibit 3.

11            MR. WRIGHT:  Objection, your Honor.  We'd like to ask

12   a few followup clarifying questions.

13            THE COURT:  Go ahead.

14   VOIR DIRE EXAMINATION

15   BY MR. WRIGHT:

16   Q.   Mr. Manguso, can you hear me clearly.

17   A.   Yes.

18   Q.   You just testified that it was prepared in relation to the

19   schedule, if I heard you correctly.  Is that accurate?

20   A.   No.  It was prepared contemporaneous with the issuance of

21   checks.

22   Q.   So this was created in what year?

23   A.   This was created in 2015 and 2016.

24   Q.   If the -- if I can do this with the technology, I am going

25   to show what I'm now marking as Defendant's Exhibit 145.  This

1   is a rebuttal exhibit, so it has not been previously proffered.

2                THE COURT:  I don't understand.  You are not on cross

3   yet.  I gave you permission to voir dire this witness regarding

4   the exhibit that he is testifying about, Plaintiff's 3.

5                You can, of course, cross-examine him and perhaps in

6   that connection introduce exhibit -- Defendant's Exhibit 145,

7   but it's not proper voir dire.

8                Do you have any other questions to put to him on voir

9   dire?

10               MR. WRIGHT:  Yes, I do, your Honor.  I apologize.

11  BY MR. WRIGHT:

12  Q.  Is it your testimony that this was not created in 2018?

13  A.  Yes, it was not created in 2018.  The note was created in

14  2018.

15               THE COURT:  Which you indicated already in your

16  previous testimony?

17               THE WITNESS:  Yes, your Honor.

18  BY MR. WRIGHT:

19  Q.  And the allocations represented on Plaintiff's Exhibit 3,

20  were those created in 2018 as well?

21  A.  They were created in 2016 and 2015 as the checks were

22  issued.

23  Q.  And where would we find the contemporaneous record that

24  does not contain this note?

25  A.  Where do you -- excuse me, where do you find --

1    Q.  Where would you have stored these documents as they were

2    being created?

3    A.  They would have been in Elizabeth Russo's office.  She was

4    the controller.

5    Q.  Would they also have been stored on the Inpellis server?

6    A.  Yes, they would.

7              MS. COLE:  Thank you, I have no further questions.

8              We are going to object based on our spoliation motion.

9    We believe this document itself reflects a later creation date

10   than contemporaneous, and absent the contemporaneous records

11   that were actually created at the time, we think we are unable

12   to properly question the witness on this document.

13             THE COURT:  So those are objections that are not

14   without some force, but in the end they are overruled, except

15   the note created in 2018 will be redacted.

16             But otherwise the exhibit is received.

17             MR. RAND:  Thank you, your Honor.

18             (Plaintiff's Exhibit 3 received in evidence)

19   DIRECT EXAMINATION CONTINUED

20   BY MR. RAND:

21   Q.  Mr. Manguso, so were you also sent Plaintiff's Exhibit 101?

22   A.  Yes, I was.

23   Q.  And what is Plaintiff's 101?

24   A.  That is a request from Elizabeth Russo to Rob Radovich at

25   Marcum asking for a complete listing of Marcum's accounts

1    receivable to date.

2    Q.  Is there an attachment to that email?  Actually, at the

3    top, is there a response to her request?

4    A.  Yes, there is.  And the response is to list in detail the

5    gross amount due on every invoice that Marcum sent to us, and

6    then a listing of all items that were paid coming to a net of

7    some 40 some-odd thousand dollars.

8    Q.  Is that a document that was kept in the ordinary course of

9    business of Inpellis?

10   A.  Yes, it was.

11   Q.  Was it the ordinary business of Inpellis to keep these

12   documents?

13   A.  Yes.

14          MR. RAND:  Plaintiff's move for the admission of

15   Plaintiff's 101 into evidence.

16          MR. WRIGHT:  No objection, now that foundation has

17   been laid.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 101 received in evidence)

20          MR. RAND:  Thank you very much, Mr. Manguso.

21          THE WITNESS:  You're welcome.

22          THE COURT:  Any cross-examination?

23          MR. WRIGHT:  None, your Honor.

24          THE COURT:  Very good.  Thank you very much.  We can

25   sign you off then.  Thank you for being available.

1          (Witness excused)

2          THE COURT:  All right let's get the witness back, the

3    live witness, so to speak, and we'll continue.

4     THOMAS L. BARRETTE, resumed

5    CROSS-EXAMINATION CONTINUED

6    BY MR. WARD:

7          MR. WARD:  May I resume, your Honor?

8          THE COURT:  Yes.

9    Q.  Mr. Barrette, I've just handed you what has been admitted

10   as Defendant's Exhibit 17.  This is the April 8, 2015 S-1

11   filing by Inpellis, correct?

12   A.  Correct.

13   Q.  This is the initial filing by Inpellis?

14   A.  Correct.

15   Q.  Would you turn to page 56, please, 56 of 136.

16   A.  I am looking at it.

17   Q.  You see there's a chart in the middle?

18   A.  Yes.

19   Q.  And the second line on the chart says fair market value of

20   common shock per share, correct?

21   A.  Yes.

22   Q.  You understand that's referring to Inpellis's common stock,

23   correct?

24   A.  Let me just read the beginning of the note.  Yes.

25   Q.  You see the same line where it shows that in 2013 the fair

1   market value of the common stock was $2.98 a share as of

2   December 31, 2013?  Do you see that?

3   A.   Yes.

4   Q.   Then do you see that on December 31 of 2014, the fair

5   market value of the common shock per share was at $3.90,

6   correct?

7   A.   Yes.

8   Q.   Those are less than $5, correct?

9   A.   Correct.

10  Q.   And as a side note, yesterday you were testifying about

11  Plaintiff's Exhibit 3, which listed the cash disbursements by

12  Inpellis that we just talked about -- that's just been

13  introduced.  Do you recall testifying about that document?

14  A.   I definitely recall testifying.  I might want to see

15  Exhibit 3 again to remember what it was, or maybe you can tell

16  me what it was to jog my memory.

17  Q.   The chart was cash disbursements, and in reference to that,

18  during that discussion you said that you knew the bookkeeping

19  and crew at Inpellis was rigorous about entering this

20  information.  Do you recall that?

21  A.   I do recall that, yes.

22  Q.   And you helped draft each of Inpellis' registration

23  statements, correct?

24  A.   Correct.

25  Q.   Including this Defendant's Exhibit 17, correct?

1    A.  Correct.

2    Q.  And you filed these.  Is that right?

3    A.  Correct.  Technically, the printer RR Donnelley files, but

4    they get the clearance to file from me after consultation with

5    the rest of the team.

6    Q.  And if you turn to page 10 of 136, please.  I'm sorry, to

7    15 of 136.  You'll see this is where the risk disclosures are,

8    correct?

9    A.  Correct.

10   Q.  The draft registration statement said:  We identified -- if

11   you look at this bolded area about one-third of the way down:

12          We identified a material weakness in our internal

13   control over financial reporting, and if the remediation

14   procedures we have undertaken are unable to successfully

15   remediate the existing material weakness, then the accuracy and

16   timing of our financial reports may be adversely affected.

17          Do you see that?

18   A.  Yes.

19   Q.  Do you see where it says, the third to last line of the

20   next paragraph:

21          The material weakness is identified that we do not

22   have adequate accounting system and our accounting staff was

23   inadequate, both in terms of the number of personnel and their

24   expertise and U.S. GAAP and SEC Rules and Regulations.  As

25   such, our controls and financial reporting were not designed or

1    operating effectively.

2            Do you see that?

3    A.  Yes.

4    Q.  Is it still your testimony today that the bookkeeping and

5    crew at Inpellis was rigorous about entering information?

6    A.  Yes.

7    Q.  And -- but this statement here is also correct, right?

8    A.  Yes.

9    Q.  I just have a few more documents to go over with you.  I'm

10   going to show you now Defendant's Exhibit 4.  This the

11   October 5, 2015 amended and restated engagement agreement,

12   correct?

13   A.  Correct.

14   Q.  This agreement has the same language about firm commitment

15   underwriting as is in the original July 29, 2014 engagement

16   agreement, correct?

17   A.  Correct.

18   Q.  At the time this was being contemplated, you reviewed the

19   agreement and advised Dr. Mooney that you did not see any

20   issues with it, correct?

21   A.  Correct.  I probably asked him just to make sure that

22   the -- especially the financial terms in it were as he

23   understood them to be; just asked him to confirm that.  That is

24   typically what I do, so ...

25   Q.  At the time that you advised Dr. Mooney with respect to the

1   October 5, 2015 engagement agreement, you understood that

2   Alexander Capital lacked FINRA approval to conduct a firm

3   commitment underwriting for at least this Inpellis deal,

4   correct?

5   A.  Correct.

6   Q.  And you saw nothing inconsistent between those two things,

7   correct?

8   A.  Correct.

9   Q.  I'm going to show you what has been admitted as Defendant's

10  Exhibit 5.  Do you recognize this as a settlement agreement of

11  November 14, 2016 between Inpellis and Alexander Capital?

12  A.  Yes, I do.

13  Q.  You helped negotiate this settlement agreement, correct?

14  A.  Correct.

15  Q.  Mr. Schlichtmann signed it on behalf of Inpellis, correct?

16  A.  Correct.

17  Q.  Under the terms of the agreement, page 1, paragraph one

18  Inpellis was obligated to pay Alexander Capital $125,000,

19  correct?

20  A.  Correct.

21  Q.  Inpellis was also required by paragraph two to provide

22  Alexander Capital with a confession of judgment, correct?

23  A.  That is the title of paragraph two, yes.

24  Q.  That's also the force and effect of paragraph two, correct?

25  A.  I'm just taking to moment to read it.  I haven't seen it in

N6RQacu4                    Barrette - Cross

1    awhile.  Correct.

2    Q.  You have no memory of Alexander Capital being paid or the

3    confession of judgment being delivered, correct?

4    A.  Correct.

5    Q.  Do you recall testifying about your Holland & Knight

6    invoices yesterday?

7    A.  Yes.

8    Q.  Do you recall the following exchange:

9    "Q. Did you prepare these documents?

10   "A. Yes, with the assistance of the billing folks at Holland &

11   Knight, yes.

12   "Q. Did you send these invoices to Inpellis?

13   "A. I did."

14          Let's look at Plaintiff's Exhibit 99.  That would be

15   in the plaintiff's book.

16   A.  This book does not go to 99.  It might be over here.  I

17   have a copy now, your Honor.

18   Q.  If you look at the top of the first page of Exhibit 99 on

19   the left side?

20   A.  Yes.

21   Q.  Doesn't this indicate that this invoice -- and in fact this

22   is a summary of all the invoices, correct?

23   A.  The very first page of --

24   Q.  Yes.

25   A.  No.  This is a cover page for one invoice.

1   Q.  For one of the invoices.  And this was going to BioChemics,

2   correct?

3   A.  Correct, that's what the address says.

4           MR. WARD:  Okay.  Nothing further.

5           THE COURT:  Redirect.

6   REDIRECT EXAMINATION

7   BY MR. RAND:

8   Q.  Yes.  Looking at Plaintiff's 99, why was the first invoice

9   sent to BioChemics?

10  A.  It was a mistake.  We had already opened a matter for the

11  IPO, but because BioChemics was in the system and had a similar

12  number, it was a mistake.  I don't know quite how it was made.

13  It might have been my fault.  But if you look at the time, it's

14  all related to the S-1, and so it was a mistake.

15  Q.  And are the rest of the invoices and Plaintiff's 99

16  addressed to Inpellis?

17  A.  They are.

18  Q.  Now, you said that it was consistent to sign the second

19  engagement agreement with the firm commitment language with

20  your knowledge there was no ability of Alexander to perform a

21  firm commitment offering at the time.  Why are you saying that

22  is not an inconsistent statement?

23  A.  **Because at the time we had been repeatedly assured it was a**

24  **minor problem, on par with other kinds of FINRA issues that I**

25  **was accustomed to see getting sorted out during the pre-IPO**

1    **filing process.  So I was comfortable given my interactions,**

2    **with Greenberg especially, that it was a problem that would be**

3    **resolved.**

4    Q.  We are looking for our copies.  We have one be original

5    here the defendants have a binder and the law clerk has a

6    binder.

7              LAW CLERK:  What's the number?

8              MR. RAND:  P64.  May I approach the witness, your

9    Honor?

10             THE COURT:  Yes.

11   BY MR. RAND:

12   Q.  I would like to show the witness Plaintiff's Exhibit 64,

13   which is already in evidence which is a general ledger trial

14   balance.

15             MR. WARD:  Your Honor's, we're going outside the scope

16   of our cross.

17             THE COURT:  Yes, my long-time ruling on that in all

18   cases is the question will be allowed, but you may have recross

19   regarding.  Overruled.

20   Q.  Can you tell me what this document is?

21   A.  Yes, it's an accounting records titled General Ledger Trial

22   Balance.  If I could just have a minute.  I just want to flip

23   through it.  Sorry.

24             As of December 31, 2014, and it has three columns:

25   Consolidated, then a column that says BioChemics, and a column

1    that says Alterix.  And then has detailed entries,

2    accounting-type entries.

3    Q.  Does it list Monserrat Partners anywhere?

4    A.  I'm flipping through.

5    Q.  It's on page 2, 209-10 on page 2.

6            MR. WARD:  I'm going to object to lack of personal

7    knowledge.

8            THE COURT:  That's what it appears to be.  Sustained.

9            MR. RAND:  All I asked is if the document references

10   Monserrat Partners.

11           THE COURT:  I know that's what you asked, but have you

12   ever seen this document before?

13           THE WITNESS:  I believe in preparation, your Honor,

14   yes, and there are elements of it that I may have seen when I

15   was doing work for the company.

16           THE COURT:  Did you have anything to do with preparing

17   this document?

18           THE WITNESS:  No.

19   Q.  Do you have any understanding of what this document is?

20           THE COURT:  Sustained.

21   Q.  I would like to show you Plaintiff's Exhibit 65 in evidence

22   which has already been submitted with copies.  Can you identify

23   what is Plaintiff's Exhibit 65?

24   A.  Yes.  This I think is a document we talked about yesterday.

25   It's the BioChemics cap table, which is a summary of both stock

1   and debt.

2           MR. WARD:  Objection, your Honor, to lack of

3   foundation and lack of personal knowledge.

4           THE COURT:  Did you have anything to do with preparing

5   this document?

6           THE WITNESS:  I wouldn't have prepared it.  I would be

7   familiar with it, your Honor, because you do need to understand

8   the capital structure when you're doing work when I was

9   originally engaged to work with BioChemics.

10          THE COURT:  Is this a document you saw in that

11   connection?

12          THE WITNESS:  I don't remember if I saw it at the

13   time.

14          THE COURT:  Sustained.

15          MR. RAND:  I'm sorry.  Did you say sustained?

16          THE COURT:  I did.

17          MR. RAND:  I would like to mark for identification

18   Plaintiff's 88, which is a fair market valuation of Alterix as

19   of August 31, 2013, prepared by CBIZ Valuation Group.  C-B-I-Z.

20          MR. WARD:  Your Honor, I object to relevance.

21          THE COURT:  I can't tell yet until he puts a question.

22          MR. RAND:  I'm just marking it for identification.

23   Q.  Have you seen this document before?

24   A.  Yes, I have.

25   Q.  What is this document?

N6RQacu4                          Barrette - Redirect

1   A.   Its title is Fair Market Valuation of Alterix, Inc. as of

2   August 31, 2013, by CBIZ Valuation Group LLC.

3   Q.   And does it reference a license between Alterix and

4   BioChemics?

5   A.   Yes, it does, and I'm looking for where, but it does, I

6   know.

7            THE COURT:  I'm sorry, is there a pending question?

8   Q.   Yes, I'm asking if it mentions the license between --

9            THE COURT:  So you want to help him out by pointing

10  him to a particular page?

11           MR. RAND:  I do, but I've lost my place.  I apologize

12  your Honor.  I had this written down and I've lost the cite.

13           THE WITNESS:  I'm looking too, your Honor.

14           THE COURT:  Well, let's assume, so we don't sit here

15  while you read 25 pages, that it references the licensing

16  somewhere.

17           What's your followup question to that?

18  Q.   The followup question is, does this valuation confirm the

19  fact that there was a license between BioChemics and Alterix?

20           THE COURT:  Sustained.

21  Q.   Back in 2013?

22           THE COURT:  Sustained.  So we don't need to answer the

23  previous question.

24           MR. RAND:  I have no further questions for the

25  witness.

1          THE COURT:  Anything else?

2          MR. WARD:  Nothing, your Honor.

3          THE COURT:  Thank you so much.  You may step down.

4          (Witness excused)

5          THE COURT:  Please call your next witness.

6          MR. RAND:  I'd like to call Mr. Joseph Amato.

7          MR. WRIGHT:  Your Honor, can we have a five-minute

8   break?

9          THE COURT:  All right.

10         (Recess)

11         THE COURT:  Let's get the witness on the stand.

12   JOSEPH ANTHONY AMATO,

13      called as a witness by the Plaintiff,

14      having been duly sworn, testified as follows:

15         DEPUTY CLERK:  State your name and spell it slowly for

16   the record.

17         THE WITNESS:  Joseph Anthony Amato.  A-M-A-T-O.

18   DIRECT EXAMINATION

19   BY MR. RAND:

20   Q.  Good afternoon, Mr. Amato.  My name is William Rand.  I'm

21   the attorney for the plaintiff in this action.

22         Can you please tell me when you first started working

23   for Alexander Capital?

24   A.  I'm uncertain of the actual start date.  I believe it may

25   be in 2012, early 2012.

1   Q.  What was your position when you first started?

2   A.  I was a representative.

3   Q.  And did you ever rise to a higher position?

4   A.  At one point I was an interim CEO for approximately two,

5   three weeks, and I did hold the title of a crop and a ROP,

6   which was just a Series 4 so I able to do option approvals

7   principals.

8   Q.  What series did you have when you were interim CEO?

9   A.  I've had, my licenses were -- my brokerage licenses were --

10  my brokerage license, there's no CEO official license.  But I

11  had a Series 7, 6, I believe 9 and 10, 24, 31, insurance

12  license.

13  Q.  What is a Series 24?

14  A.  It's a gives me the right to be a supervisor if it's used.

15  Q.  When did you get a Series 24?

16  A.  I don't recall the dates.  It was well before.  It was

17  early in my career when I was with Morgan Stanley.

18  Q.  Do you still have a series 24?

19  A.  I do.

20  Q.  Have you had a Series 24 since you've worked at Morgan

21  Stanley?

22  A.  Yes, I believe so.

23  Q.  And what does a Series 4 entitle you to do?

24  A.  A Series 4 is an options license.

25  Q.  I'm sorry, I meant what does a Series 24 entitle you to do?

1    A.  It would allow me to be a supervisor.

2    Q.  What is a supervisor?

3    A.  Depends.  Every firm what they would want me to supervise,

4    oversee activities.  If utilized, like I said.

5    Q.  To supervise employees at a broker dealer?

6    A.  Possibly.

7    Q.  Is it regarding the supervision of a broker dealer?

8    A.  No, not that I understand it to be.

9    Q.  What did you believe a Series 4 entitled you to supervise?

10   A.  Series 4 --

11   Q.  Series 24.

12   A.  Series 24.  It depends what role they were asking me to

13   partake of it.  Different at every place I've been at.

14   Q.  What roles have you used your Series 24 to enable you to

15   supervise?

16   A.  Where?

17   Q.  Anywhere you choose to tell me first.

18   A.  I -- in one firm, they asked me to view emails.  Another

19   firm they asked me to be just a super -- 24 present at a

20   location but with no supervisory responsibilities.  Others, one

21   firm I reviewed some trades.

22   Q.  Have you ever supervised any employees?

23   A.  Prior firms, yes.

24   Q.  Have you ever supervised any employees at Alexander

25   Capital?

```
1    A.  I don't recall as to the -- my whole tenure there if I did.

2    I don't believe so though.  I'm not certain.

3    Q.  What does the test for a Series 24 entail?

4    A.  The STC book, you study, and you take the test like every

5    other licensing exam.

6    Q.  What types of questions do they ask you?

7    A.  I couldn't tell you today sitting here.  I have no idea.  I

8    don't remember.

9    Q.  What is a series 31?

10   A.  I believe 31 -- I believe that was my futures license.  Or

11   that might have been my 3.  I might have misspoke.  It's all on

12   my brokerage.

13              MR. RAND:  May I approach the witness?

14              THE COURT:  Yes.

15   Q.  I would like to show you a declaration that you made in

16   this case that was filed in the case on April 8, 2022 as

17   document 131.

18              MS. COLE:  Is the declaration on your exhibit list?

19              MR. RAND:  I can give you a copy.

20              MS. COLE:  Is it on your exhibit list?

21              MR. RAND:  No, I'm not making it an exhibit.

22   Q.  Do you recall making this declaration?

23              THE COURT:  You want to give me a copy?

24   A.  I do.

25   Q.  Do you see in paragraph 9, you state:  Broker check reports
```

1    are compilations of information that FINRA has obtained from

2    different sources?

3    A.   Yes.

4    Q.   Is that a true statement?

5    A.   I believe so.

6    Q.   Do you see in paragraph 10, it says:  Alexander Capital LP

7    has some ability to influence the content of a broker check

8    report, e.g., by making wired filings with FINRA but cannot

9    control the ultimate content of such report?

10   A.   I do.

11   Q.   Is that a true statement?

12   A.   I believe so, yes.

13   Q.   You see paragraph 11 where it says:  A broker check report

14   is a statement by FINRA and not by the firm, which is the

15   subject of such report?

16   A.   Yes.

17   Q.   P11.  I would like to mark as Plaintiff's 11 for

18   identification the brokerage check report of Alexander Capital.

19          Do you recognize this Alexander brokerage check

20   report?

21   A.   I do not.

22   Q.   Have you ever seen a brokerage check report?

23   A.   I've seen some over the years, yes.

24   Q.   And you don't recognize this as a brokers check report?

25   A.   That's not what you asked.  You asked if I recognized this

1    one.

2    Q.  Well, do you have any reason to believe this is not a

3    correct broker check report?

4    A.  I believe it's a broker check report.

5    Q.  Do you have any reason to believe it's not a correct

6    brokerage check report of Alexander Capital LLP?

7              MS. COLE:  Objection.

8              THE COURT:  Overruled.

9    A.  I don't create the reports, so I don't know.  I'd have to

10   look at each line through it.  If you want me to do so and then

11   you want to ask me a question, I'd be happy to answer.

12   Q.  Sure.  What -- if you look on page 3 of 23 of the brokerage

13   check report, the pages at the top.

14   A.  Okay.

15   Q.  You see where it says:  Where did this information come

16   from?

17             And it says:  The information contained in brokers

18   check comes from FINRA's central registration depository and is

19   a combination of:  (1) information FINRA and/or the Securities

20   and Exchange Commissions require brokers and brokerage firms to

21   submit as part of the registration and licensing process, and

22   information that regulators report regarding disciplinary

23   actions or allegations against firms or brokers.

24             Is that a correct statement?

25   A.  I believe so.

N6RQacu4                         Amato - Direct

1    Q.  And, therefore, is all the information in the Alexander

2    brokerage check reports from Alexander other than information

3    that regulators report regarding disciplinary actions or

4    allegations against the firm or its brokers?

5    A.  I can't answer as such, because it says I believe it comes

6    from FINRA's central registration depository or CRD, and is a

7    combination of.  So I don't know until we get into something

8    specific.  I can't give a general answer for a 23-page report

9    that I will didn't cull through and I'm not familiar with.

10   Q.  Looking back at your declaration, if you look at paragraph

11   14, it states:  At no time between July 29, 2014 and August 1,

12   2016 did Alexander Capital LP understand that its membership

13   agreement with FINRA prevented it from participating in firm

14   commitment underwritings as a member of a selling syndicate.

15   Is that a correct statement?

16   A.  Yes.

17   Q.  I would like to show you Plaintiff's 20 in evidence, which

18   is the application for permission to do firm commitment

19   offerings.  Are you familiar with Plaintiff's P20?

20   A.  I am familiar with the application, but I'm not familiar

21   with all the language with that.

22   Q.  You're familiar with the application but not familiar with

23   what?

24   A.  The language.  I know what a continuing membership

25   application is.  I know we filed some, but I'm not familiar --

1   I don't put this together.

2   Q.  Did you see this application at the time it was filed?

3   A.  I did not.

4   Q.  Were you aware of this application at the time it was

5   filed?

6   A.  I knew there was a CMA being filed.

7   Q.  What did you understand the CMA was applying for?

8   A.  I believe, but I'm not certain, if it was change of

9   ownership and firm commitment underwriting.

10  Q.  If you look at page 4 of 33, and it's kind of blocked out,

11  but if you go to 5 of 33 on the bottom right and go to the

12  left-hand side of the prior page.

13  A.  So I'm looking at 4 of 33?

14  Q.  Yes.

15  A.  Okay.

16  Q.  Then you see there's a big square block?

17  A.  Okay.

18  Q.  And do you see, it says:  In that regard the firm is

19  requesting that it be permitted by its restrictive agreement to

20  act as managing underwriter and selling group member in firm

21  commitment underwritings?

22  A.  I'm sorry, where is that?

23          MR. RAND:  May I approach the witness, your Honor?

24          THE COURT:  Yes.

25  Q.  It starts "in that regard."

N6RQacu4                        Amato - Direct

A.   These aren't my glasses.  In that regard the firm is

requesting that it be permitted by its restrictive agreement to

act as a managing underwriter and selling group member in firm

commitment underwritings.

Q.   Is that a true statement?

A.   Is this what we applied for?  Yes, that's what it says.

Q.   And is your statement in your declaration true and

accurate?

A.   It is.

Q.   I would like to show you plaintiff's 13-A in evidence,

which is a communication regarding continuing membership

application?

          THE COURT:  Before you get into that, so I'm looking

at your declaration, and you say -- this is paragraph 12 --

between July 29, 2014 and August 1, 2016, Alexander Capital LP

understood it was allowed to participate in firm commitment

underwritings as a member of a selling syndicate.  Do you see

that?

          THE WITNESS:  Yes, your Honor.

          THE COURT:  Then you say in paragraph 17:  As of

May 15, 2015, Alexander Capital LP understood it lacked the

authority to act as lead underwriter on a firm commitment

public offering.  Do you see that?

          THE WITNESS:  Yes, your Honor.

          THE COURT:  But when you entered into your initial

1    agreement with Alterix, you were -- Alexander Capital was

2    acting as lead underwriter; in fact, exclusive underwriter.

3    Yes?

4              THE WITNESS:  Yes, your Honor.  But I was a registered

5    rep at the firm.  I was not in any role of CEO, management

6    anything at this time, and that was my understanding of what we

7    were allowed to do, and what the company did continue to do is

8    syndicate firm commitment dealings.  And until that letter in

9    2015 that was pointed out, at that point I knew we couldn't

10   underwrite firm commitment deals.  But again, I was -- I didn't

11   have anything to do with the CMAs, the documents.  I was a

12   registered representative at this time of the firm.  I was just

13   a 1099 independent rep.

14             THE COURT:  All right.  Very good.

15   BY MR. RAND:

16   Q.  If you could go to page 3, footnote 1.

17   A.  Of which document?

18   Q.  Plaintiff's Exhibit 13-A.  Page 3, footnote 1.

19   A.  Okay.  13-A, which page?

20   Q.  Page 3, footnote 1.

21   A.  I'm at the bottom.

22   Q.  Do you see it states:  A share having been previously sold

23   to Mr. Figliola, who has never had any active control of any

24   aspect of Alexander Capital?

25             MS. COLE:  Objection.  He has yet to lay a foundation

N6RQacu4                          Amato - Direct

1   with this witness for knowledge about contents of this

2   document.

3              THE COURT:  Well, I think that -- let me change the

4   question for a minute, then we'll get to the objection.

5              The term "firm" refers to in this document, refers to

6   Alexander Capital, right?  Look at the first page, first

7   sentence.

8              THE WITNESS:  Myself, your Honor, or --

9              THE COURT:  So have you ever seen this document

10  before?

11             THE WITNESS:  Myself, as we prepared for this case, I

12  have.

13             THE COURT:  All right.  So you were also designated as

14  the 30(b)(6) representative?

15             THE WITNESS:  Yes.  Correct.

16             THE COURT:  Okay.  So on the first page, it says:

17  Dear Mr. Francois:  As you know, this firm represents Alexander

18  Capital LP "Alexander" or "The Firm."  You see that?

19             THE WITNESS:  Yes.

20             THE COURT:  Now if you turn to page 3, at the very

21  top, it says:  In December of 2013 a full year after the last

22  misconduct alleged by the staff, active control of the firm was

23  sold to Messrs. Amato and Guidicipietro.  You see that?

24             THE WITNESS:  I do see that, sir.

25             THE COURT:  And you're Mr. Amato?

N6RQacu4                          Amato - Direct

1              THE WITNESS:  I am.

2              THE COURT:  So you were in active control of the firm

3    at the time of the events that you were telling me about that

4    you were just acting as a registered representative or the

5    like.  Yes?

6              THE WITNESS:  No, that is not correct, sir.

7              THE COURT:  What does it mean when it says you were in

8    active control?

9              THE WITNESS:  I believe it to be inaccurate.

10             THE COURT:  You think that you didn't have active

11   control?

12             THE WITNESS:  No, I had a minority stake through an

13   entity.  I had a minority stake that I was a partner in that

14   entity, but I wasn't actively running the firm.

15             At one point I didn't even work there during my tenure

16   of the first two years.  I left and came back.  I was gone and

17   came back.  I don't know the exact dates.  It would be on my

18   CRD as well.

19             THE COURT:  I guess what I'm confused about, and you

20   anticipated my next question, the next sentence says:  This

21   Mr. Figliola, nor Messrs. Amato and Guidicipietro were owners

22   of the firm, managers of the firm or in any way in control in

23   any aspect of the firm's business at the time of the alleged

24   misconduct.  And as I understand your testimony, you agree with

25   that?

1          THE WITNESS:  Yes.

2          THE COURT:  So what did the previous sentence mean?

3          THE WITNESS:  Mr. Figliola at the time I believe owned

4    75.1 percent of the firm and NESA Management owned

5    24.9 percent.  At some point it turned over in that timeframe,

6    and like I say, I was a registered rep with the firm.  At some

7    point, I believe, I'm not sure, it was in '12 or '13, I left in

8    December and came back six weeks later.  I was not registered

9    with the firm.  So I'm uncertain as to what it means.  Like I

10   said, I didn't put the letter together.

11         THE COURT:  Did the author of this, Mr. Carmel show

12   you this letter before he filed it?

13         THE WITNESS:  I don't believe so.  It wouldn't be

14   common that I participated in any of the CMAs or language in

15   them at this time.

16         THE COURT:  All right.  Go ahead, counsel.

17   BY MR. RAND:

18   Q.  Are you familiar with Mr. Figliola?

19   A.  I am.

20   Q.  Has Mr. Figliola ever had any active control of any aspect

21   of Alexander Capital?

22   A.  I'm uncertain if he did in the beginning or when he didn't,

23   when he did or didn't.  He was a passive owner, I believe at

24   some point, but, again, he was at the firm I believe before we

25   came there.  So I can't answer that.

1   Q.  Do you have any understanding why Alexander's attorney

2   would state that Mr. Figliola has any never had any active

3   control of Alexander Capital?

4   A.  Like I said, he became a passive owner at some point, had

5   an agreement with FINRA to be a passive owner, but I don't know

6   when that went into place or took place.  Like I said, he was

7   there before myself, so I can't answer as to if he had control

8   or when he had control or when he gave it up.

9        THE COURT:  By the way, before I mangle the last name

10  of the gentleman sitting there at counsel table, how do you

11  pronounce your last name?

12       MR. GUIDICIPIETRO:  Guidicipietro.

13       THE COURT:  Thank you very much.

14  Q.  I would like to mark for identification Plaintiff's 13-B, a

15  submission on behalf of Alexander Capital LP by Scott Holcomb.

16  Do you recognize this document?

17  A.  I do not.

18  Q.  Have you ever seen this document before?

19  A.  I don't recall.  I would have to read through it and take a

20  look.  I may have seen this throughout, you know, over the

21  years, the last couple years while we were getting ready for

22  this case, but...

23  Q.  If you could turn to page 4.  First let's look a the date

24  of the document.  The date of the document is -- if you look at

25  page 17, the date of the document states September 29, 2015.

1   Is that correct?

2   A.  Yes.

3   Q.  It states at the top of page 4:  Messrs. Amato and

4   Guidicipietro, neither of whom were at the firm in 2010 to 2011

5   are now active owners and partners in the firm.  Is that a

6   correct statement?

7   A.  No, I'm sorry, where are you reading this.

8   Q.  At the top of page 4.

9           THE COURT:  The very top.  It's a carryover sentence

10  from the previous page.

11  A.  I don't believe it reads correct.

12  Q.  What do you believe it should read?

13  A.  It would say that at this -- in '15, I would say I would be

14  an indirect owner of the firm.  I wouldn't be a partner.  I

15  would be an indirect owner and still a registered rep.  I

16  believe that's what it should read.

17  Q.  So is it a false statement in this document when it says:

18  Messrs. Amato and Guidicipietro, neither of whom were at the

19  firm in 2010 to 2011, are now active owners and partners in the

20  firm?

21  A.  I think it's inaccurately written, but, again, FINRA and

22  regulators and everyone have a different way of recording how

23  they have ownership in an entity or through an entity, so I

24  believe it was just some -- not properly written.

25  Q.  If you look at the prior page 3, you see the statement, it

1   says:  In 2012, Exitus LLC, which is owned by Joseph Figliola,

2   become a silent partner in the firm?

3   A.  Where is this page 3.

4   Q.  Right at the bottom, the previous page.

5   A.  After the record?  Where was this?

6   Q.  See where it says:  During the time period covered by the

7   staff's investigation?  The bottom of page 3.

8           THE COURT:  It's the last paragraph.

9   A.  Yes.  Yes.  I'm sorry.  Let me read it, sir.  Yes, sir.  I

10  read it.  What's the question?

11  Q.  The question is, it states:  During the time period covered

12  by the staff's investigation, the firm was owned by, among

13  others, Alan Boxer CRD 27567.  In 2012, Exitus LLC, which is

14  owned by Joseph Figliolo CRD 6116157, became a silent partner

15  in the firm.  Is that a correct statement?

16  A.  I believe I said that before at some point he did.  He

17  become a passive owner, but I believe this is a 2015 document

18  you said, correct?

19          THE COURT:  Well, in any event, the sentence is

20  referring to the time period covered by the staff's

21  investigation, which is a little unclear.  So put another

22  question.

23          MR. RAND:  I would like to move into evidence

24  Plaintiff's Exhibit 13-B, as it was an attachment to

25  Plaintiff's 13-A, which is in evidence and also was filed

```
 1    publicly.

 2              THE COURT:  Any objection?

 3              MS. COLE:  Yes.  We maintain our objection to

 4    relevance and also as improper evidence under Rule 404(b).

 5              THE COURT:  So I'm not yet prepared to rule on whether

 6    or not the prior problems that Alexander Capital had with the

 7    government are admissible for their truth and, therefore, are

 8    admissible as 404(b) evidence, but I don't have to reach that

 9    with respect to the admission of this document for other

10    evidence because it seems to me it is relevant to the role of

11    the two individual defendants.  So the objection is overruled

12    with the understanding that I'm only receiving it now for those

13    limited purposes.

14              MS. COLE:  Thank you, your Honor.

15              (Plaintiff's Exhibit 13-B received in evidence)

16    Q.  I'd like to mark for identification Plaintiff's Exhibit

17    P30, which is a series of emails.

18              Mr. Amato, do you recognize these emails?

19    A.  I do not.

20    Q.  Do you see that you are a recipient of this email?

21    A.  I'm looking at the chain right now.  So it started -- I see

22    I was cc'd on the second part of the email, it appears.

23    Q.  I think it says, if you look at the top of the document,

24    are you not in the list of people that the email is to?

25    A.  I was looking at the date.  There's two dates.  The first
```

1    one is October 13.

2                THE COURT:  No, I think your point is you were only

3    copied towards the end.

4                THE WITNESS:  Correct.

5                THE COURT:  But in the part where you were copied,

6    which was on October 17, 2014, Mr. Carlin states to Mr. Mooney

7    and Mr. Gazdak that "Rocco and Joe (copied in) have asked me

8    for an update."  Joe is you.  Yes?

9                THE WITNESS:  I am Joe, correct.

10               THE COURT:  So what was the update you were asking

11   for?

12               THE WITNESS:  Subjects, I don't know.  All I see is:

13   Subject updated calendar and please see email chain below and

14   provide answers, so --

15               THE COURT:  If you go back to the original.

16               THE WITNESS:  That's what I'm looking at.

17               THE COURT:  It says -- again, you were not copied on

18   that, but that says:  I'm trying to put together a realistic

19   calendar of what deals are on the horizon."  Do you see that?

20   The second sentence in the first email.

21               THE WITNESS:  Sorry.  I was looking at the October 13

22   one.  There are two October 13 ones.

23               THE COURT:  The very first one, 2:47 p.m. on

24   October 13.  So this is from Chris Carlin to Mr. Mooney and

25   Mr. Gazdak.  "Help me fill in the blanks here.  I'm trying to

1    put together a realistic calendar of what deals are on the

2    horizon."

3              Do you see that?

4              THE WITNESS:  I do.

5              THE COURT:  Okay.  Now let's go back to where you are

6    copied, and in between, there's an email which you're not

7    copied on about -- it says things like "What about Volition?

8    Conkwest?  Medevax?"  What are they?

9              THE WITNESS:  I have no idea what the three of those

10   are or the Volition.  No idea.

11             THE COURT:  So then where you are copied:  "Rocco and

12   Joe (copied in) have asked me for an update.  Please see email

13   chain below and provide answers."  So at that point you got the

14   whole chain, right?

15             THE WITNESS:  No, well, I don't know, to be honest

16   with you.  I see it here.  I mean, I understand --

17             THE COURT:  At least the strong inference, you would

18   agree, is that you were furnished with the whole chain, right?

19             THE WITNESS:  I don't know -- possibly.

20             THE COURT:  All right.  Let's go through it again.

21   The email that you're copied in says:  "Rocco and Joe (copied

22   in) asked me for an update.  Please see email chain below."

23             THE WITNESS:  I would assume then it did cc. to me.

24   Yes, I would assume that then, correct.

25             THE COURT:  Very good.  All right.  Is this evidence?

1              MR. RAND:  Yes, your Honor.

2              THE COURT:  Go ahead.

3    BY MR. RAND:

4    Q.  Just to confirm, are you asking them for an update on their

5    efforts to find on their deals?

6    A.  Honestly, I don't recall asking Chris.  Usually Chris would

7    only tell us when a deal is coming out, and, you know, and

8    they're doing it.  So maybe that's what he was referring to.

9    He usually tells us what takes place from his department.

10   Q.  Do you know what Silver Sun is?

11   A.  Silver Sun believe was a deal.

12   Q.  What deal?

13   A.  Silver Sun.

14   Q.  I mean, what kind of deal were you doing with them?

15   A.  I don't know how it was classified or what it was.  I

16   believe it was a deal that Alexander participated in.

17   Q.  Were you raising money for Silver Sun?

18   A.  Like I said, I don't know the full details.  I don't handle

19   that department, sir.

20   Q.  When you say "deal," what kind of deals do you do?

21   A.  Banking deals.

22   Q.  What is a banking deal?

23   A.  I can't tell you what this was.  I'm uncertain.

24   Q.  Can you describe the types of deals that Alexander Capital

25   does?

1    A.  Today?  Sure.  We do firm commitments.  We do syndicate

2    deals.  I don't recall at this point in time.  I could tell you

3    on October '13 and '14 we did -- we were part of, you know,

4    what I know we participated or had the ability what we thought

5    was to do syndicate underwritings, be part of the group as the

6    syndicate.  Firm commitment underwritings, we thought we were

7    able to do at the time until we learned in '15 that has

8    changed.

9           So, again, I don't know how these were situated.  How

10   they were set up.  I don't know if they were notes.  I can't

11   answer.  You'd have to give me the deal docks.  I can't guess

12   nor will I guess.  If you give me the deal docks, I'd be happy

13   to look at it and give it my best shot then.

14   Q.  Did you do any firm commitment offerings for SMI?

15   A.  Excuse me?

16   Q.  Did you do any firm commitment offerings for SMI?

17   A.  **I just said I don't recall, I don't know.**

18   Q.  Do you recall SMI?

19   A.  I do not.

20   Q.  Do you recall Summit?

21   A.  I know the name.  Again, I don't know the details around

22   it.

23   Q.  What does the name refer to?

24   A.  Summit.  I only know it as Summit.  I know the name that's

25   listed here.  I don't know any details.  I couldn't tell you a

1    symbol.  I couldn't tell you what they do.  It's not my

2    department.  I don't oversee it.  I don't work in it.

3    Q.  Do you recognize the name Alterix?

4    A.  I do.

5    Q.  Do you recall what they do?

6    A.  I do not.

7    Q.  Do you know what they do from this case?

8    A.  I don't.

9    Q.  Have you read the complaint in this action?

10   A.  All I heard was they were a biotech company with some sort

11   of technology.  Again, I don't get involved in this part of the

12   business.  It don't matter if I like it, love it, know it, know

13   anything about it.  It doesn't change anything for the firm or

14   for me.

15   Q.  You see where it says, "Rocco and Joe have asked me for an

16   update.  Please see email chain below and provide answers."

17   Did you receive the answers to those questions?

18   A.  I don't see anything else further from this, so I can't

19   even tell you that.  Again, I --

20   Q.  I've marked Plaintiff's 31 for identification.  It's an

21   email.  Mr. Amato, do you recognize this email?

22   A.  I do not.

23   Q.  Are you listed on this email?

24   A.  Yeah, I am.

25   Q.  Do you have any reason to believe you did not receive this

1   email?

2   A.  I believe I received it if I'm cc'd on it.

3   Q.  Who is sending you this email?

4   A.  I believe Chris Carlin.

5   Q.  Why is he sending you this email?

6   A.  Probably because he was going to be out of the office, and

7   he was just giving everyone around him a heads-up that he was

8   going to be out of the office.

9   Q.  You see it says, "I am meeting with Pat"?

10  A.  Yes.

11  Q.  Do you know who Pat is?

12  A.  I do not.  From this.

13  Q.  Did you ever ask him who Pat was?

14  A.  I do not.  Like I said, Chris comes and goes, as does John

15  Gazdak.  They run their own schedules, their own times, own

16  meetings.  Sometimes he'll give a heads-up if he's not in the

17  office or going to be late or traveling, he'll give a heads-up

18  as a courtesy.

19  Q.  Isn't sit true that you are Chris Carlin's supervisor?

20  A.  That is not true.

21  Q.  Is every broker dealer required to have a registered rep as

22  a supervisor?

23  A.  Repeat that.

24  Q.  If you have a broker dealer, you have to have someone who

25  has more than a Series 7.  Isn't that correct?

N6RQacu4                          Amato - Direct

1   A.  Yes.

2   Q.  What do they have to have, what series?

3   A.  The firm?

4   Q.  Yes.

5   A.  Someone at the firm?  I don't know.  Depends what

6   department you're in.

7   Q.  A broker dealer itself cannot exist without some employee

8   at the broker dealer having more than a Series 7.  Is that

9   correct?

10  A.  Yes, correct.

11  Q.  What I'm asking you is, what is that additional series that

12  one of the employees must have for the broker dealer to be in

13  compliance?

14  A.  To be chief compliance?

15  Q.  To be in compliance.

16  A.  Maybe a 24.  I don't know what the CFO, the license they

17  hold.  I'm uncertain as to their other licenses, depending on

18  what the firm is doing, yes.

19  Q.  Who at Alexander Capital had that higher license to be in

20  compliance with NASD rules?

21  A.  24.  What timeframe was this?

22  Q.  2014.

23  A.  I'm uncertain if it was Luis Restrepo, Tim Stack.

24          MS. COLE:  Objection, your Honor.  The email is dated

25  2015, if he is referring to the time that he's been talking

1    about with this email.

2              MR. RAND:  The question isn't relating to the email.

3    It's just a general question.

4              THE COURT:  All right.  Well, with that revision, I'll

5    allow it.

6    A.  At the time there may have been -- I'm sure there were 24s

7    at the firm.  There probably was maybe 10 or 15 of them at the

8    firm with a 24 license.  May have even been more.

9    Q.  Is a broker dealer required to designate a supervising

10   person for the broker dealer?

11   A.  A chief compliance officer, yes.  So I'm confused as to

12   what structure you're asking for.

13   Q.  I believe there has to be a Series 24 supervisor of the

14   employees of the broker dealer.  Are you not familiar with that

15   rule?

16   A.  I am.  Like I said, I don't know what department you're

17   referring to and whom it may be, so it would totally differ or

18   may have.  I don't know.

19   Q.  A broker dealer has to designate an employee to be a

20   supervisor to be responsible for the broker dealer when the

21   NASD comes and asks questions?

22   A.  That's not necessarily correct.  I think you're confusing

23   the license.

24   Q.  Why do you believe all the members of a broker dealer can't

25   exist with just a Series 7?

1   A.   I said there would be a chief compliance officer which

2   would hold a 24 who would meet with the regulators as you

3   stated, or hold meetings and inquiries.   There may be someone

4   in the compliance department with a 24 under them working

5   handling state inquiries or helping with licensing or

6   registrations, taking customer complaints or reviewing emails.

7   It would depend on the person.   One person at a firm very

8   rarely I believe would handle every representative at the firm

9   in every line of business.   I think that would be -- I don't

10  know.

11  Q.   As representative at Alexander Capital, as a 30(b)(6)

12  representative, do you have any knowledge as to who that

13  supervising person was at Alexander Capital?

14  A.   At what date?

15  Q.   During 2014.

16  A.   I don't recall who the head compliance officer was of the

17  management team at that point.   I'd have to look at the total

18  records to give you an accurate answer.   I can't answer to

19  something that was almost seven eight years ago.

20  Q.   How many employees were at Alexander Capital during 2014?

21  A.   I couldn't tell you that either.

22  Q.   Were there more than 20?

23  A.   I would assume so.

24  Q.   Were there more than 50?

25  A.   I don't know.

1   Q.  Were there more than a hundred?

2   A.  I don't believe there was a hundred.

3   Q.  Do you have any idea how many employees were at Alexander

4   Capital?

5   A.  I do not at that time, no.

6   Q.  Do you know how many there were in 2015?

7   A.  I do not.  It would be on -- I'm sure you can find it on

8   FINRA's records somewhere.

9   Q.  This email references Inpellis.  Did you have any knowledge

10  of Inpellis at the time of this email on November 19, 2015?

11  A.  I don't recall when I remember Inpellis.  But again, I told

12  you what I thought of the meeting and why he sent it out.

13  Q.  Did you have any involvement in the earnings of Alexander?

14  A.  The who?

15  Q.  Earnings.

16  A.  At what time?

17  Q.  During this timeframe, November 19, 2015.

18  A.  I'm not certain if I was still a reg -- I think I was still

19  just a registered rep at this point.  I was part of it, if I

20  did business, sure.

21  Q.  Did you have any knowledge that approximately a $500,000

22  fee was earned by a bridge loan to Inpellis?

23  A.  I had nothing to do with the bridge loans or banking at

24  that time.

25  Q.  I didn't ask if you had anything to do with it.  I asked if

1   you had any knowledge of the fee.

2   A.  I don't know of the fee if I'm not working with the

3   capital.

4   Q.  How much money did Alexander Capital make in 2014?

5   A.  I couldn't answer that.  I'm not the CFO.  I don't know.

6   Q.  You have no idea?

7   A.  I have no idea.

8   Q.  How much money did you make in 2014?

9   A.  Yes.  If I made $150,000, $200, that would have been a lot

10  of money back then.

11  Q.  Did you get any percentage interest in earnings of the

12  company?

13  A.  No, just my -- whatever business I do as a representative

14  of my customers.

15  Q.  You don't get a salary?

16  A.  I don't believe so then, no.  I'm not certain when I became

17  a salaried employee.  It would have been later.

18          MR. RAND:  I would like to move into evidence

19  Plaintiff's Exhibit 31.

20          THE COURT:  Which one?

21          MR. RAND:  Plaintiff's Exhibit 31, the email we've

22  been talking about.

23          THE COURT:  Any objection?

24          MS. COLE:  No objection.

25          THE COURT:  Received.

1          (Plaintiff's Exhibit 31 received in evidence)

2     Q.  I would like to show you Plaintiff's Exhibit 19, which is

3     in evidence.  Have you seen Plaintiff's Exhibit 19 before?

4     A.  I believe I have during the connection with this case and

5     maybe a little prior.

6     Q.  What is Plaintiff's Exhibit 19?

7     A.  It says it's an unreasonable letter.

8     Q.  Isn't it true that this letter indicated that Alexander

9     Capital was not permitted to perform firm commitment

10    underwritings?

11         MS. COLE:  Objection.  Misstates the evidence.

12         THE COURT:  In what way do you think it misstates?

13         MS. COLE:  The question was:  Isn't it true that this

14    letter said that Alexander Capital is not permitted to perform

15    firm commitment underwritings.  The relevant section of the

16    letter is on page 2 under number 6 and does not contain that

17    language that Mr. Rand indicated that the letter said.

18         THE COURT:  Well, that's true.  So the objection is

19    sustained.

20         But let me ask the witness.  Did you see this letter

21    at the time -- at or about the time it was received?

22         THE WITNESS:  I don't believe I did, your Honor.

23         THE COURT:  Did there come a point in time when you

24    learned that the firm could not participate as -- in giving a

25    firm commitment where Alexander Capital was the lead?

N6RQacu4                    Amato - Direct

1          THE WITNESS:  Yes, at some point I believe we received

2     a notification from FINRA and we put in for a CMA at that

3     point, so that's when I learned of it.

4          THE COURT:  So that would have been -- do you remember

5     approximately when that was?

6          THE WITNESS:  It was sometime in '15 or '16.  I'm

7     uncertain.  I think it was sometime in '15, but I'm absolutely

8     uncertain of the exact date.

9          THE COURT:  So do I have it right that you had no role

10    in the Inpellis deal?

11         THE WITNESS:  Absolutely, your Honor, no role

12    whatsoever.

13         THE COURT:  So let me ask plaintiff's counsel.  And

14    this may be something that's already before the Court.  I have

15    a vague recollection it may have been addressed in summary

16    judgment or some other thing, but remind me of what plaintiff's

17    counsel -- what plaintiff's theory is for including Mr. Amato

18    in the defendants in this case.

19         MR. RAND:  First of all, there's general liability for

20    all the members of the partnership because it's deemed a

21    general partnership.

22         THE COURT:  I understand that.

23         MR. RAND:  Second, he is a managing member of the

24    firm.  As a managing member, he loses any ability to be a

25    limited partner because a limited partner who participates and

1   is a manager of the firm is no longer able to escape.

2           THE COURT:  So I understand both of those legal

3   theories.  Are you making any claim independent of those that

4   he personally was responsible for what you allege was the

5   misconduct of the firm?

6           MR. RAND:  Yes, because we are alleging that he was

7   reckless.  Because as a manager of the firm, he took no effort

8   to alert his employees as to the fact that there was no

9   license, and that is a reckless act.  He has a fiduciary duty

10  to alert his employees.

11          MS. COLE:  Your Honor, at this point I would just

12  object.  I don't believe that that's an allegation in the

13  complaint.  There's no allegation that Mr. Amato was

14  individually reckless.

15          MR. RAND:  Your Honor, we have an allegation directly

16  for fraud, and fraud includes recklessness.  Recklessness

17  satisfies the scienter requirement of fraud.

18          MS. COLE:  If I may, the complaint does not allege

19  that Mr. Amato participated in the fraud.  The complaint

20  alleges that Mr. Amato and Guidicipietro are liable --

21          THE COURT:  You say that, it just goes flowing off

22  your tongue.  Go ahead.  Yes.

23          MS. COLE:  Yes, I am familiar with his name.  That

24  they are liable solely on the allegation that they were

25  partners of Alexander Capital, not -- there's not a single

1  allegation in the complaint that Mr. Amato or Mr. Guidicipietro

2  directly participated in any fraud activity.

3          THE COURT:  All right.  I think we'll excuse the

4  witness for a few minutes while we discuss this issue a little

5  bit more.

6          Actually, since you're a defendant, you can stay here

7  if you want to.  Why don't you step down from the stand.

8          THE WITNESS:  Thank you, your Honor.

9          MS. COLE:  And, expressly, your Honor, I'm referring

10  to paragraph 7 of the complaint, which is the fourth amended

11  complaint document 40 on the docket.

12          THE COURT:  I was just looking at my summary judgment

13  opinion, but I don't think this issue was addressed.  So with

14  respect to the complaint --

15          MR. WARD:  Your Honor, you can have our copy if you'd

16  like.

17          THE COURT:  Yes.  On a quick look at the complaint, it

18  does not appear that there are any factual allegations against

19  Mr. Amato, and that he is named solely as set forth in

20  paragraph 7 in his capacity as a managing partner, and,

21  therefore, under Delaware law he is: "Liable for the wrongful

22  acts of the defectively formed limited partnership alleged

23  herein, and are financially responsible for the debts of and a

24  judgment that is now satisfied by the defectively formed

25  limited partnership arising out of this action."

1           So I don't see, but I will go back to plaintiff's

2    counsel because I may have missed it, any suggestion that he

3    is -- Mr. Amato or Mr. Guidicipietro are named in any other

4    capacity.

5           MR. RAND:  I guess what I'm saying is, we've sued

6    Alexander, and Alexander is liable for the omissions and

7    reckless behavior of their managing partner.  So they are

8    individually liable because there's a general partnership.

9           THE COURT:  You're saying -- you're making a different

10   point.  You're saying that part of your proof of Alexander

11   Capital's liability is the failure of whoever were the managing

12   partners to exercise proper supervision.

13          MR. RAND:  Correct, your Honor.

14          THE COURT:  Okay.  That's a different point.  But

15   that's not direct liability on the fraud claim or anything like

16   that.  It's just part of the claim against Alexander.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1           THE COURT:  OK.

2           MS. COLE:  I don't believe it is alleged in the

3    complaint either what he just stated.  He stated:  What I am

4    saying is, Alexander is liable for the omissions and reckless

5    behavior of their managing partner.  There is no allegations

6    that the managing partner made any omissions or engaged in any

7    reckless behavior.

8           THE COURT:  Well, how can you say that when, taking

9    everything as I must for purposes of this conversation, most

10   favorably to the plaintiff, why could not a reasonable

11   fact-finder conclude, if I took everything most favorably for

12   the plaintiff, that their view that they could enter into an

13   agreement where they purported to be able to act as a company

14   that was able to give firm commitment underwritings by

15   themselves and as lead, indeed exclusive underwriters, was

16   reckless?

17          MS. COLE:  I don't have the feed so I am not sure

18   exactly what you just said but --

19          THE COURT:  Well, that makes sense.  That's what my

20   law clerks usually say.  But, anyway.

21          MS. COLE:  I was trying to follow along on the

22   realtime but I don't have it.  It stopped but it is now back.

23          THE COURT:  Let me rephrase the question anyway.

24          So, Alexander Capital entered into an agreement where

25   it said that it could provide a firm commitment underwriting as

1   the exclusive underwriter for this deal, for what eventually

2   became Inpellis going forward.  Why couldn't a fact-finder

3   conclude, taking everything hypothetically most favorably to

4   the plaintiff, that that was, even if it was not a willfully

5   wrong act, that it was a reckless one?

6           MS. COLE:  I think it's a different question than what

7   Mr. Rand was arguing.  He was arguing --

8           THE COURT:  Yes, it is, and I --

9           MS. COLE:  OK.

10          THE COURT:  And you have convinced me --

11          MS. COLE:  OK.

12          THE COURT:  -- that he does not have a direct claim

13  against Mr. Amato for reckless fraud.  But then you were saying

14  that, under paragraph 7, where he alleges there Mr. Amato's and

15  others' liability and a matter of, if you will Delaware law, I

16  hate to use the term "respondeat superior" but it is that kind

17  of concept, and plaintiff's counsel then said, well, what we

18  are really saying -- he recast his allegation -- what we are

19  really saying is that even if Alexander Capital was not

20  willfully, intentionally engaged in fraud -- although they

21  think it was -- they also have the alternative that it was

22  acting recklessly and that the failure of the firm and its

23  supervisors -- and to use a real legal term:  Honchos -- to not

24  catch the fact that they had no ability to offer a firm

25  commitment as the sole and exclusive underwriter was at least

1    reckless.  That's my question.

2            MS. COLE:  So, your Honor, I guess I have a few

3    responses to that.  One is I'm not aware of any authority that,

4    at trial, that the plaintiff can recast their complaint to

5    include a claim that was not pled.  This is a case about

6    intentional fraud, fraudulent inducement.  It is not a case

7    that alleges negligent representation.

8            THE COURT:  No, I'm not talking about negligence and

9    maybe I should make clear what I mean by reckless and what I

10   assume plaintiff means, which is a knowing turning away of what

11   a reasonable person in their situation would have known.  So,

12   it is a classic part of a fraud package, if you will.

13           MS. COLE:  And is he alleging that Mr. Amato knowingly

14   turned away?

15           THE COURT:  No.  No.

16           MS. COLE:  OK.

17           THE COURT:  Well, he may be alleging that too but not

18   as the direct claim.  He is alleging, as I understood, that the

19   firm knowingly turned away and that that shown, among other

20   things, by the fact that people in positions at least nominally

21   in positions of supervision, did not exercise that supervision.

22   Something like that.

23           MS. COLE:  So I understand that you are reasonably

24   inferring things in favor of the plaintiff's complaint;

25   however --

1           THE COURT:  Only for purposes of this argument.  As

2    the fact-finder of course I may disagree factually that there

3    is any evidence of any of this.  That's another thing.

4           MS. COLE:  That would be my next point.  I understood

5    what he was trying to argue was that the firm was liable for

6    the conduct of its managing partner so I would say, one, there

7    is not any evidence, competent evidence that Mr. Amato was a

8    managing partner; and two, that there is not going to be any

9    evidence that anyone knowingly looked the other way.

10          THE COURT:  What do you say to the point which

11   Mr. Amato says is totally wrong but, nevertheless, the

12   representation was made to -- I can't remember whether it was

13   FINRA or the SEC -- I think it was FINRA -- that he was in

14   active control.

15          MS. COLE:  So that representation was made after this

16   engagement agreement was entered into.  There is no evidence

17   that Mr. Amato ever held himself out to anyone at Inpellis as

18   the managing director or partner and I do believe that some of

19   the case authority that we did cite in our summary judgment

20   briefing was that in order to be held liable as a partner the

21   individual had to hold themselves out to the injured party as

22   being a partner and that has not been established or alleged in

23   the complaint.

24          THE COURT:  Well, now that's interesting.  I am

25   surprised.  I mean, my main knowledge of partnership law

1  relates to that weird entity called a law partnership, but my

2  recollection is that if the law firm is liable all the partners

3  are liable regardless of whether the public knew they were

4  partners or they were secret partners.

5         Do you think the law is different in --

6         MS. COLE:  I believe we cited law that was different.

7         THE COURT:  Why would it be different?  It is not a

8  function of what the public knew, it is a function of, well,

9  either you are a partner or you are not a partner and you

10 assume the responsibilities of a partnership.

11        MS. COLE:  I can't speak to why the law would be

12 different, I am speaking based on my recollection.

13        THE COURT:  Well, who knows what those Delaware judges

14 will say.

15        All right.  I think we have gone as far as we can for

16 today's limited purposes so let's get the -- does anyone want a

17 break?  Otherwise we will go straight to 5:00.

18        MR. RAND:  Sure.  A break would be nice.

19        THE COURT:  We will take a 5-minute break and we will

20 go on until 5:00.

21        (Recess)

22        THE COURT:  Let's get the witness back on the stand.

23        Counsel?

24 BY MR. RAND:

25 Q.  Mr. Amato, did Alexander have any procedures for alerting

1    their employees as to whether Alexander Capital had the right

2    to perform firm commitment offerings?

3    A.  When was this?

4    Q.  Isn't it true that Alexander Capital did not have any

5    procedures at any time to alert its employees as to whether

6    Alexander Capital had the right to perform firm commitment

7    offers?

8    A.  I am uncertain at the time.  I wasn't in that role.

9    Q.  Do you have any knowledge of any procedures at any time

10   under which Alexander Capital required its employees to have

11   knowledge as to whether Alexander Capital was able to perform

12   firm commitment offerings?

13   A.  Currently, after all of this that took place going back to

14   '15 and '16 and putting in a CMA and getting licensing, I guess

15   the banking and capital markets department know our

16   capabilities.

17   Q.  When did that change occur?

18   A.  I couldn't really tell you exactly but I know today they're

19   aware of the licensing and there are -- there is more -- they

20   have more active discussions with compliance and the CFO.

21   Q.  Is that in reaction to this lawsuit?

22   A.  No.  It is just reaction into the awareness from the FINRA

23   letter going back to '15.

24   Q.  And prior to the FINRA letter, were there any policies or

25   procedures for alerting employees as to the ability of

1    Alexander Capital to perform firm commitment offerings?

2    A.  I'm unaware at that time.

3    Q.  Do you believe there is an obligation of a broker-dealer to

4    tell its employees whether it has the right or not to perform

5    firm commitment offerings?

6    A.  I don't believe so.

7    Q.  You don't believe there is any duty to, for a broker-dealer

8    to inform its employees?

9    A.  To the independent contractor as in reps?  No, I don't

10   believe so.

11   Q.  Do you believe that employees of a broker-dealer have a

12   duty to determine if the broker-dealer has a right to perform

13   firm commitment offerings before it enters into agreements

14   representing it will perform firm commitment offerings?

15   A.  The employees?  I'm sorry.  Repeat that.

16   Q.  Do you believe the employees have a duty to inform

17   themselves as to whether Alexander Capital had the right to --

18              MS. COLE:  Objection.  Relevance.

19              MR. RAND:  I didn't finish the question.

20              THE COURT:  Go ahead.  Finish the question.

21   BY MR. RAND:

22   Q.  Sorry.

23              In your opinion, do employees of Alexander Capital, at

24   all times, have a duty to determine if Alexander Capital has

25   the authorization by FINRA to perform firm commitment offerings

1   prior to entering into agreements on behalf of Alexander

2   Capital agreeing to perform firm commitment offerings?

3            MS. COLE:  Same objection.

4            THE COURT:  The objection is sustained.

5   Q.  If Alexander Capital enters into -- well, did Alexander

6   Capital have a duty to disclose to Inpellis?

7            THE COURT:  See, I have, among many other problems I

8   have with this question.  The question of whether a firm like

9   Alexander Capital has a duty to do X, Y, or Z, is a question of

10  law and therefore not a question for any witness but only for

11  the Court.  Furthermore, even if that were not true, this

12  witness was not at the time, according to at least his prior

13  testimony, in a position to form that kind of opinion or make

14  that kind of decision and, therefore, whatever may be his

15  ability as a matter of law now, I don't see the relevance.

16           Now I could go on.  It is also a compound question, it

17  is also vague, but perhaps you might want to go on to a

18  different question.

19           MR. RAND:  Yes.  I will move on, your Honor.

20           THE COURT:  All right.

21  BY MR. RAND:

22  Q.  I would like to show you Plaintiff's Exhibit 55 in

23  evidence.  Mr. Amato, have you seen what has been marked as

24  Plaintiff's Exhibit 55 before?

25  A.  I am uncertain.  I don't believe so looking at it now.

N6R5aqu5                          Amato - Direct

1    Q.  Is it a letter to the Department of Enforcement, Financial

2    Industry Regulatory Authority, regarding Alexander Capital?

3    A.  It looks like an AWC, it states.

4    Q.  Yes.  Is it a letter of acceptance, waiver, and consent?

5    A.  Yes, it is.

6    Q.  And I would like to point you to paragraph 1 on page 4 of

7    10 at the top.

8    A.  I'm sorry.  Page 1?

9    Q.  Well, page 3 at the bottom, if you are looking at the pages

10   at the bottom, and then paragraph 1 where it says:  2016 net

11   capital violations.

12   A.  Yes.

13   Q.  Do you see in the second paragraph down it states:  First,

14   between January 2016 and June 2016, Alexander Capital

15   participated in 16 firm commitment offerings.

16          Is that a true statement?

17   A.  I would assume so.  I'm not certain exactly how many but if

18   it is coming from FINRA and it is saying there were 16 it is

19   probably accurate.

20   Q.  And was Alexander Capital permitted to do firm commitment

21   offerings during that period?

22   A.  At the time we believed we were allowed to do these such

23   deals.

24   Q.  And did FINRA give you an approval at that time?

25          MS. COLE:  At what time?

1              MR. RAND:  During the period from January 2016 to June

2    2016.

3    A.  Like I stated, I believed that we had the right to do it at

4    the time going into this and they were questioning net cap, not

5    the ability.

6    Q.  And do you know what your net capital was in 2016?

7    A.  I do not.  I don't work with that.  That would be the chief

8    financial officer Thomas Sullivan, who I believe's name is all

9    over this.

10   Q.  When you work with clients do they ever ask you what your

11   net capital is?

12   A.  I have never had that to me, no.

13   Q.  Have you ever performed a firm commitment offering?

14   A.  Excuse me?

15   Q.  Have you ever been in charge of a firm commitment offering?

16   A.  Like I stated earlier, I have nothing to do with the

17   banking department whatsoever, so no.

18   Q.  What is your job at Alexander Capital?

19   A.  Today?

20   Q.  During 2016.

21   A.  At what point in '16?

22   Q.  At all points.  Can you say how it changed?

23   A.  Yes, it did change, I believe.  I believe I took -- it is

24   probably after this because it is saying June of 16, I'm not

25   sure if it was July or around that time, I did at that time

1    step into the CEO position.  That was when Mr. Feinman resigned

2    from the position, I stepped into the role.  I am not exactly

3    sure on the exact date but I believe it was sometime after this

4    in '16.

5    Q.  So you were CEO of Alexander Capital in 2016 and you are

6    stating today that have you no knowledge of '16 firm commitment

7    offers performed by Alexander during 2016?  Is that correct?

8              MS. COLE:  Objection.  Misstates the testimony.

9              THE COURT:  Well --

10             MS. COLE:  If I may, your Honor, he testified he

11   became CEO after the time frame referenced in the AWC.

12             THE COURT:  I see.

13             MS. COLE:  That is dealing expressly with these

14   alleged 16 firm commitment offerings.

15             THE COURT:  Well, I think given that representation

16   why don't you put a new question.

17   BY MR. RAND:

18   Q.  Were you the CEO between January 2016 and June 2016?

19   A.  Like I stated earlier, I didn't believe so.  I believe when

20   Mr. Feinman stepped down I think it was June or July of '16 but

21   I'm not exactly sure what that date was.

22   Q.  As CEO did you know anything about the previous business of

23   Alexander?

24   A.  I was playing catch-up at that point just coming into the

25   role, my first time in the position, but I became aware of this

N6R5aqu5                        Amato - Direct

1    I am sure at the time but I don't remember the details outside

2    of what you just handed me now.

3    Q.  As CEO were you aware of any firm commitment offerings that

4    were done while you were CEO?

5    A.  I'm sorry.  While I was CEO?

6              MS. COLE:  Objection.  Vague.

7              THE COURT:  No.  Overruled.

8              THE WITNESS:  Can you repeat the question, please?

9              THE COURT:  Yes.

10             Since you have become CEO are you aware of any firm

11   commitment offerings that have been done by the firm?

12             THE WITNESS:  I am uncertain if we did any firm

13   commitments, I believe we may have but I'm not sure of the

14   dates, but I would have been aware at that point at some point

15   in the process at the end before they went public.  For net

16   capital purposes I would have been informed but, again, it is

17   not an area I handle, would I have gotten it second hand.

18             THE COURT:  Wait.  I guess this is getting at what

19   plaintiff's counsel is getting at.

20             When you say it is not an area you handle --

21             THE WITNESS:  Correct.

22             THE COURT:  -- that's one thing if you are a

23   registered rep.  You are CEO, yes?

24             THE WITNESS:  Yes.

25             THE COURT:  Last I checked, the ultimate

1   responsibility for the day-to-day management of the firm rests

2   in the chief executive officer, does it not?

3         THE WITNESS:  No, that would be the chief compliance

4   officer at the broker-dealer level.

5         THE COURT:  Oh.  Is that right?  So just a title?

6         THE WITNESS:  Pretty much.  Year-end I go over a

7   year-end review.  That's the only requirement of the CEO, that

8   the chief compliance officer says what took place, explaining

9   what they did and their justification.  I can't even fire the

10   chief compliance officer on a one-off.  They have control.

11         THE COURT:  So you are the luckiest guy in the world.

12   You have the title of CEO and you don't have to do anything.

13         THE WITNESS:  Well --

14         THE COURT:  That was said facetiously, for the record.

15         Does Alexander Capital have bylaws?

16         THE WITNESS:  We have WSPs; Written Advisory

17   Procedures.

18         THE COURT:  This will show my ignorance; are you

19   incorporated in Delaware?

20         THE WITNESS:  Yes, the firm is, I believe.

21         THE COURT:  Pursuant to Delaware law you have bylaws

22   or some equivalent thereto, equivalent thereof, that specifies

23   the responsibilities of various officers; yes?

24         THE WITNESS:  Not to my understanding for the

25   broker-dealer.  I could be wrong but I don't believe that's --

N6R5aqu5                          Amato - Direct

```
 1   it is within -- it would be within the corporate structure of
 2   Alexander, not in Delaware, that I am aware of.
 3           THE COURT:  Let me -- maybe I should just ask counsel.
 4   Does Alexander have -- we will start with are you incorporated
 5   in Delaware?
 6           MR. WARD:  That I believe is true, but as a
 7   FINRA-regulated firm it's governed by its written supervisory
 8   procedures and they have clear lines of delineations of
 9   compliance and supervisory duties.
10           THE COURT:  No, I want to get to that because that is
11   very interesting but before I get to that, if you are
12   incorporated in Delaware I am willing to conjecture that there
13   are probably somewhere a set of bylaws that you had to submit
14   in order to obtain incorporation.
15           MR. WARD:  Nobody can testify to that, it is not on
16   the record, but the --
17           THE COURT:  Well, no, I'm not asking the witness, I am
18   just saying -- well, maybe this is something that someone can
19   provide me with by tomorrow; one, if there are a set of bylaws
20   I would like to see them because I am almost certain, as with
21   every other corporation in the United States, a company is
22   governed -- a company in a business that is subject to federal
23   regulation is subject to both state laws and federal laws.
24           MR. WARD:  And to be clear, they are a partnership
25   rather than incorporated.
```

1         THE COURT:  Ah.  So they're a partnership.  OK.  So I

2    guess what led me astray then is -- OK, they're a limited

3    partnership under Delaware law.  So they may not -- even then I

4    think Delaware requires some partnership agreement or something

5    like that.  I don't think you can file in Delaware or any other

6    state in the nation for -- to be incorporated or a partnership

7    subject to the law of the state without presenting some

8    indication of how your entity is governed.

9         MR. WARD:  There have certainly been certifications

10   which have been in dispute in this case about the status and

11   the partnership.

12        THE COURT:  That's true too.  But anyway, so I would

13   like to see whatever it is and that was filed in Delaware.

14        Secondly, with respect to the things you were

15   referring to that are approved by FINRA, what are they called

16   again?

17        MR. WARD:  There is the compliance structure and

18   supervisory structure and they are designated principles so

19   there is a clear line of who is supervising whom.

20        THE COURT:  OK, so I would like to see that as well.

21        And is it your understanding that the CEO has no

22   supervisory authority?

23        MR. WARD:  Yes, your Honor, that is my understanding;

24   that it goes through the compliance structure and that that

25   is -- it is a compliance and supervisory structure.

1          THE COURT:  So instead of calling it CEO why don't we

2     just call it gopher?

3          MR. WARD:  They do have -- I mean, there are

4     corporate, in terms of running the corporation but in terms of

5     running the entity, they have those abilities to enter into

6     agreements and that type of thing but in terms of supervising

7     its governed by FINRA.

8          THE COURT:  I will be very anxious to see that so just

9     get it to me, bring it with you tomorrow morning, I will take a

10    look.

11         OK.  So, I think we are ready for another question.

12         MR. WRIGHT:  Your Honor, may I ask a clarifying

13    question?  The WSPs likely went through several iterations

14    during that time period --

15         THE COURT:  I'm interested in right now.

16         MR. WRIGHT:  In right now?  Absolutely.

17         THE COURT:  Yes.

18         MS. COLE:  So you want the current version.

19         THE COURT:  I want the current version because I want

20    to find out whether -- how much --

21         Do you make a salary?

22         THE WITNESS:  I do.

23         THE COURT:  How much?

24         THE WITNESS:  Well, that's interesting.  I am listed

25    for 250 but years like this year I have only taken $50,000.

1         THE COURT:  OK.

2         THE WITNESS:  It varies.  And production is in there

3    as well.

4         THE COURT:  I would figure to be figurehead CEO and be

5    paid 50,000 I would understand that.  250 might raise a

6    different issue.

7         THE WITNESS:  But my commissions are in there as well.

8         THE COURT:  Clearly the Court is getting out of

9    control here.  Let's go on with another question.

10   BY MR. RAND:

11   Q.  I would like to mark for identification Plaintiff's Exhibit

12   33.  Do you recognize this document?

13   A.  I do not.  Let me look through it.  I see it is something

14   with the SEC.

15   Q.  It's labeled Order Instituting Administrative Proceedings

16   Pursuant to Section 15B of the Securities and Exchange Act of

17   1934 Making Findings Imposing Remedial Sanctions, dated June

18   29, 2018.

19   A.  OK.

20   Q.  Have you seen this document?

21   A.  I don't recall it.  It is possible I have seen it over the

22   years.

23   Q.  What was your position at Alexander on June 29, 2018?

24   A.  2018 I believe I was listed, I am still the CEO at that

25   time.

N6R5aqu5                        Amato - Direct

1    Q.   And looking at page 2, paragraph 3.

2    A.   OK.

3    Q.   It says:  From 2012 through 2014, Alexander Capital failed,

4    reasonably, to implement certain policies and procedures and

5    permitted a lax compliance environment in which these RRs were

6    not reasonably monitored or disciplined.  Procedures were not

7    followed and indications of potential misconduct were not acted

8    upon by the supervisors of the three RRs, supervisor A, and

9    supervisor B.

10            Is that a true statement?

11   A.   Those were the charges.  That wasn't the end result.

12   Q.   I believe these are findings.

13   A.   Findings, correct.

14   Q.   Is it true that that is a finding of the SEC?

15   A.   I believe this is where it started.  The settlement was

16   different from the findings.

17            MR. RAND:  I would move into evidence Plaintiff's

18   Exhibit P 33.

19            MS. COLE:  Objection; relevance, improper 404(b)

20   evidence.

21            THE COURT:  Yes.  So, as with my prior ruling, I will

22   accept it in evidence for its limited relevance to other issues

23   but not for the 404(b) purpose, although this is without

24   prejudice to whether or not I will receive it for 404(b)

25   purposes, we can argue that later, but for now it is received

1   only for more limited purposes exemplified by the questions put

2   to the witness.

3            MS. COLE:  Thank you, your Honor.

4            MR. RAND:  Thank you, your Honor.

5            (Plaintiff's Exhibit 33 received in evidence)

6   BY MR. RAND:

7   Q.  These are Mr. Amato's deposition designations.

8            Mr. Amato, did you give your deposition in this case?

9   A.  Yes, I did.

10  Q.  Did you give it on September 30th, 2021?

11  A.  I believe so.

12  Q.  And I'm going to read from your deposition transcript and

13  I'm going to ask you afterwards if you believe the statement is

14  true and accurate.

15           THE COURT:  Actually, I will allow you to do that, but

16  when I made my rulings about use of deposition transcripts that

17  were being offered for -- and I said if you are calling so and

18  so as a witness they're not coming into evidence except for

19  impeachment, but I did not focus on the fact that that ruling

20  does not apply to a party, and a party's statements are

21  admissible independently as the statement of a party adversary.

22  Therefore, while you are welcome to read all of this, I will

23  now receive the deposition of Mr. Amato's, I will receive your

24  designations in evidence.  So, I can read them all by myself is

25  my point but you are welcome to inquire about any of them you

1    want to inquire about.

2              MR. RAND:  I would not like to belabor the Court but I

3    would like to go through a few of them.

4              THE COURT:  Sure.

5              MR. RAND:

6    "Q  All right.  Is it your understanding from 2014 to 2015 that

7    Alexander Capital's restrictive agreement allowed it to be the

8    sole running manager of a firm commitment offering?

9    "A  No.

10   "Q  It did not allow that?

11   "A  I don't believe we can do firm commitment underwriting.

12   "Q  OK.  So, is it your testimony then to be clear here, it was

13   your understanding from -- it is your understanding that from

14   2014 and 2016, Alexander Capital was not allowed to conduct

15   firm commitment offerings as an underwriter; is that correct?

16   "A  As lead underwriter?

17   "Q  Right."

18             THE COURT:  By the way, a further reason to receive

19   this, which I did not know again when I made my earlier ruling,

20   he was being deposed as the 30(b)(6) witness?

21             MR. RAND:  Yes.

22             THE COURT:  So his statements are not only binding on

23   him as a statement of a party adversary, but they're binding on

24   the company as well.

25             MS. COLE:  Your Honor, I would just note that the

```
 1    30(b)(6) topic was extremely narrow, it was only for someone

 2    who could testify about Alexander's financial capability and

 3    Mr. Schlichtmann, who conducted the deposition, he would

 4    identify when he was asking a question for the 30(b)(6) or

 5    whether he was asking it for Mr.  --

 6             THE COURT:  So it is coming in for the reasons I

 7    previously said in any event but I will restrict my further

 8    ruling to where he was clearly testifying as the 30(b)(6).

 9             MS. COLE:  Thank you.

10    BY MR. RAND:

11    Q.  Was the transcript I just read true and accurate?

12    A.  So, looking at it now you are talking about '14, '15, and

13    '16 so it's accurate but not telling the whole story because in

14    '15 we learned that we couldn't do firm commitment

15    underwriting.  In '14 we were under the belief we could to a

16    certain point and we participated in deals up until '16 in the

17    syndicate level.  So, it's a tricky question because you are

18    asking multiple years but it was different knowledge that I had

19    at that time so it is not as cut and dry as a yes or no answer.

20    Q.  Did you ever get approval from FINRA to do firm commitment

21    offerings during 2014, 2015, or 2016?

22    A.  No, but we understood in 2015 that we couldn't do them.  I

23    was under the belief that we could.

24    Q.  I just want a yes or no answer.

25    A.  That's the problem, I can't give a yes or no answer to that
```

1   question.

2   Q.   Why?

3   A.   Because I don't believe it is a fair question.

4            THE COURT:  Well, I think you did give an answer.  The

5   first word out of your answer was no, and then you volunteered

6   why you understood as opposed to what you could -- whether or

7   not -- the question was did you ever get approval from FINRA to

8   do firm commitment offerings during 2014, 2015, or 2016.  Your

9   answer was, no, but we understood..., and then you went on.

10           THE WITNESS:  That's correct.

11           THE COURT:  So I think you did answer the question.

12           So, put another question, counsel.

13   BY MR. RAND:

14   Q.   Further in the transcript it reads:

15   "Q   OK, do you remember seeing this continuing membership

16   application at the time it was made on June 3 of 2015?

17   "A   No.

18   "Q   But you were made aware that an application was being made?

19   "A   Correct.

20   "Q   And do you know what, who was making the application?

21   "A   I believe it was our attorney at the time.

22   "Q   And was -- were you aware that, of the firm that was doing

23   it was the Sichenzia Ross firm?

24   "A   Correct."

25           Were those true statements that you made?

1   A.  I believe Sichenzia Ross was doing the 2015 app, I believe

2   that to be correct.

3   Q.  Next question and answer:

4   "Q  Was it your understanding, and now I am asking you

5   personally, yesterday Mr. Guidicipietro" --

6                THE COURT:  Sorry.  Where are you?

7                MR. RAND:  Page 94.

8                THE WITNESS:  Page what?

9                THE COURT:  94.

10               MR. RAND:  Sorry.  I should have said that.

11               THE WITNESS:  OK.  I'm sorry.

12               MR. RAND:

13  "Q  Was it your understanding, and now I am asking personally,

14  yesterday Mr. Guidicipietro said that Alexander Capital- -- he

15  used the phrase -- was a nickel broker?

16  "A  Nickel broker-dealer.

17  "Q  That's right.  And are you familiar with the nickel term,

18  colloquial expression nickel broker-dealer?

19  "A  I am.

20  "Q  What does it mean?  What was your answer as of 2014 to

21  2015?

22  "A  It is just a qualification level you need to keep on as an

23  excess net capital.

24  "Q  OK.  And as a nickel broker-dealer, was it your

25  understanding that a nickel broker-dealer was not authorized to

1  commit a firm commitment offering?

2  "A  Correct.  You cannot."

3        Was that testimony accurate?

4  A.  Yes.  This is what I had known when we went through this in

5  2021 or '22; yes.

6  Q.  What does it mean to be a nickel broker-dealer?

7  A.  It is a level of net capital you have to have in excess.

8  Q.  It doesn't mean you only need $5,000 of net capital?

9  A.  Yes.  In excess.

10  Q.  And is that the lowest level of net capital permitted for a

11  broker-dealer?

12  A.  Well, that's just a term.  A nickel broker-dealer can have

13  10 million in the fund but I don't know -- the nickel BD, I am

14  uncertain if that is the lowest level of BD.  I don't know.  I

15  know we were a nickel BD at the time.

16  Q.  Going on to page 105.

17        THE COURT:  I wonder whether a nickel broker dealing

18  in penny stocks has escaped inflation.

19        MR. RAND:  I have never understood why a nickel goes

20  to 5,000 but who knows.

21        MR. RAND:  (reading)

22  "Q  All right.  Are you aware, now I am asking you personally,

23  are you aware of any steps that the company took to inform

24  people who worked at Alexander Capital and whose jobs would

25  have them participate in potential underwriting that Alexander

1    Capital was participating in, were there any steps to inform

2    them of the FINRA restrictions we have just gone over?

3    "A  I don't recall if we had, no.

4    "Q  Did you take any steps?

5    "A  No, I don't recall.

6    "Q  Did you -- are you aware -- does Mr. Guidicipietro take any

7    steps?

8    "A  You would have to ask him.

9    "Q  All right.  You are not aware of any?

10   "A  I am not aware.

11   "Q  How about Mr. Feinman, CEO, are you aware of him taking any

12   steps?

13   "A  I don't know.

14   "Q  Are you aware of Mr. Stack taking any steps?

15   "A  I don't know who informed.  I do not know.

16   "Q  OK.  I am asking specifically as to these people.  So you

17   don't know whether Mr. Feinman did, correct?

18   "A  Correct.

19   "Q  You don't know whether Mr. Stack did, correct?

20   "A  Correct.

21   "Q  You don't know if Mr. Gazdak did, correct?

22   "A  Correct.

23   "Q  You don't know if Mr. Carlin did, correct?

24   "A  Correct."

25              On page 107:

1   "Q   Yes.   Based on your understanding of -- let me ask you this

2   way.   Were you aware of any practices or procedures in place at

3   Alexander Capital in 2015 that would have required the people,

4   required that people involved in any offering that Alexander

5   Capital intended to participate in to be made aware of these

6   restrictions we just went over?

7   "A   I am uncertain.

8   "Q   You are not aware of any?

9   "A   I am uncertain.

10   "Q   OK.   When you say "uncertain" does that mean you are aware

11   or not aware of any such practices or procedures?

12   "A   I am unaware.   I don't know."

13         Going on to page 119:

14   "Q   Great.   All right.   Now I am asking you, Mr. Amato, in your

15   position as the designee for Alexander Capital, what was

16   Alexander Capital's understanding after receipt of the June 11,

17   2015 FINRA letter that we have previously gone over in which it

18   imposed certain restrictions that we have gone over regarding

19   whether or not Alexander Capital could be listed as the

20   underwriter who intended to do a -- the underwriting on a firm

21   commitment basis as to whether or not Alexander Capital could

22   be listed as the underwriter who intended to do an offering on

23   a firm commitment basis after receipt of that Letter?

24   "A   It is my understanding Alexander Capital don't do the

25   filing.

1    "Q   Don't do the filing?

2    "A   We don't file it.

3    "Q   OK.  Could they be listed in any filing?  Alexander

4    Capital, what was Alexander Capital's understanding as to

5    whether it could be listed in any such filing as the

6    underwriter who intended to underwrite the offering on a firm

7    commitment basis?  Could it be listed or not be listed?

8    "A   We don't file.  The issuer does the filing and listed what

9    they choose to."

10           Moving on to page 198:

11   "Q   Not a problem.  During the time that you were CEO between

12   2013 and 2015, was it appropriate for an employee of Alexander

13   Capital, who is dealing with a potential customer of the firm

14   who is seeking its services as an underwriter, was it

15   appropriate for the Alexander Capital person interacting with

16   that potential client to tell them that Alexander Capital could

17   act as the underwriter on a firm commitment basis?

18           "MR. WARD:  Objection; vague.

19   "Q   Was that appropriate or inappropriate?

20           "MR. WARD:  Same objection.

21   "Q   Did you understand the question?

22   "A   I do.

23   "Q   Can you answer it?

24   "A   I don't believe we had to say or not say.  I don't believe

25   we had to discuss it."

1           Is that a true statement?

2   A.   No.   It was a mistake because I wasn't the CEO from 2013 to

3   2015.   I was for like two or three weeks, if that's the

4   question.   I still don't believe it would be a stated thing

5   that comes from us -- from me.   That wasn't my department, I

6   wasn't handling it, because I was nothing to do with banking.

7   Q.   So the statements you made in this transcript that I just

8   read are not correct?

9   A.   I didn't say that.   I says I don't believe that -- I don't

10  believe we would have to say it or not.   I don't think it was

11  for me to discuss.   It is exactly what I said.

12  Q.   You are agreeing with the transcript?

13  A.   No, no.   That was my answer.

14  Q.   I will just ask you a simple question.   Did you tell the

15  truth in the answers to the questions that I just --

16          THE COURT:   No.   What he is saying, as I understand it

17  and the witness will correct me if I am wrong, is the question

18  misstated the years that he was CEO --

19          THE WITNESS:   Correct.

20          THE COURT:     -- but in answer to the substance of the

21  question of whether it was appropriate for the Alexander

22  Capital person interacting with a potential client to tell them

23  if Alexander could act as the underwriter on a firm commitment

24  basis, the answer he gave is the answer he still would give,

25  namely, I don't believe we had to say or not say.

N6R5aqu5                          Amato - Direct

1          Do I have that right?

2          THE WITNESS:  Yes.  I was saying that as me answering

3     that but I think I misread his question.

4          THE COURT:  Now, the problem with this particular

5     question is that an objection was raised on grounds of

6     vagueness, an appropriate action as to form.  For reasons I

7     don't understand defense counsel did not, in their objections

8     to this transcript which had to be in the margins, indicate

9     that they were renewing their objection as to form.

10    Nevertheless, I think it is -- the question is so hopelessly

11    vague that the Court *sua sponte* will sustain that objection and

12    strike the question and answer, and this is on page 198, line

13    23, through page 199, line 18.

14         That, of course, doesn't preclude plaintiff's counsel

15    from putting a question directly to the witness on that

16    subject.  The reason it is vague, just so that the record is

17    complete, is "appropriate" is not a term that has a clear

18    meaning in any context.

19    BY MR. RAND:

20    Q.  Did the procedures of Alexander Capital, at any time during

21    the period from 2013 to 2015, require an employee of Alexander

22    Capital to tell an Alexander Capital client that they could not

23    do a firm commitment underwriting when they were agreeing to

24    perform a firm commitment underwriting?

25    A.  Can you repeat that?

N6R5aqu5                          Amato - Direct

1   Q.  Can you read it back?

2            (Record read)

3            THE COURT:  I will read it:  Did the procedures of

4   Alexander Capital, at any time during the period from 2013 to

5   2015, require an employee of Alexander Capital to tell an

6   Alexander Capital client that they could not do a firm

7   commitment underwriting when they were agreeing to perform a

8   firm commitment underwriting?

9            MS. COLE:  I would object to the question, your Honor.

10           THE COURT:  You are a little slow but the objection is

11  sustained.

12           MS. COLE:  Thank you.

13           THE COURT:  I will ask a couple questions so we can

14  move this on because we only have five more minutes.

15           As I understand your prior testimony, your

16  understanding was that while you now recognize that Alexander

17  could not do firm commitment underwritings in the situation

18  presented by Inpellis, at the time your understanding is that

19  that was not clear to the people at Alexander?

20           THE WITNESS:  Yes.  Yes, I don't believe it was.

21           THE COURT:  That's what I understood your testimony to

22  be.

23           THE WITNESS:  Thank you, your Honor.

24           MR. RAND:  I have no further questions at this time.

25           THE COURT:  Anything else for this witness?

N6R5aqu5                        Amato - Cross

1           MR. RAND:  No, your Honor; not from the plaintiff.

2           THE COURT:  No.

3           MS. COLE:  We will have some questions for him but we

4   can wait to start them until tomorrow.

5           THE COURT:  Well, how many questions do you have?

6           MS. COLE:  Not very many.

7           THE COURT:  Then why don't we do them now.  You are

8   paying the price for my tardiness.

9   CROSS-EXAMINATION

10  BY MS. COLE:

11  Q.  I think we have established --

12          THE COURT:  I will tell you what.  I just realized

13  there are some questions I wanted to put to the witness so we

14  will let you go over until tomorrow since he is going to be

15  here anyway, but a question I wanted to ask earlier and I will

16  ask now:  Where were you born?

17          THE WITNESS:  Brooklyn, New York.

18          THE COURT:  I detect a little hint of that.

19          Where did you go to school?

20          THE WITNESS:  I ended up going to Staten Island,

21  mostly.

22          THE COURT:  Before you went to work for Alexander

23  Capital, what did you do?

24          THE WITNESS:  I was in, marked for a starter with Dean

25  Witter, which was then merged with Morgan Stanley, then from

1    there my team was bought out, we went to Prudential Securities,

2    then I believe we went independent at that point with Raymond

3    James.  Then another firm that was clearing Raymond James at

4    that point, and then eventually another firm Legend where I met

5    Rocco, we became associates and partners at that point, and

6    then to Alexander.

7            THE COURT:  OK.  I think we will end for today.  We

8    will start, as I mentioned, 10:00 tomorrow but we will probably

9    go to 5:00.

10           MR. RAND:  Your Honor?

11           THE COURT:  Yes.

12           MR. RAND:  Just housekeeping.  We still have some

13   further expense items where we need to bring witnesses by

14   video.

15           THE COURT:  Yes, just as we did today.

16           MR. RAND:  I think we are trying to schedule them, I'm

17   not sure what is happening, but hopefully they'll be scheduled

18   for 10:00 tomorrow.

19           THE COURT:  OK.

20           LAW CLERK:  10:00 a.m. tomorrow?

21           MR. RAND:  Yes.  We are starting at 10:00, aren't we?

22   That will be good, we can start before the day starts.

23           LAW CLERK:  I will send you all a Teams invitation.

24           THE COURT:  Which you ought to accept, so.  All right,

25   we will see you tomorrow.

N6R5aqu5                         Amato - Cross

1          MR. RAND:  Another quick question, housekeeping.

2          THE COURT:  Sure.

3          MR. RAND:  Can we leave our stuff here?

4          THE COURT:  Yes.

5          MR. RAND:  Thank you, your Honor.

6          THE COURT:  We are only going to be able to go to 4:15

7     tomorrow, I was just reminded of another matter.

8          (Adjourned to June 28, 2023 at 10:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2  Examination of:                              Page

 3  THOMAS L. BARRETTE

 4  Cross By Mr. Ward . . . . . . . . . . . . . 183

 5  Cross By Mr. Ward . . . . . . . . . . . . . 259

 6   FRANCIS ALFRED MANGUSO

 7  Direct By Mr. Rand . . . . . . . . . . . . 269

 8   THOMAS L. BARRETTE

 9  Cross By Mr. Ward . . . . . . . . . . . . . 274

10  Redirect By Mr. Rand . . . . . . . . . . . 280

11   JOSEPH ANTHONY AMATO

12  Direct By Mr. Rand . . . . . . . . . . . . 285

13  Cross By Ms. Cole . . . . . . . . . . . . . 348

14                     PLAINTIFF EXHIBITS

15  Exhibit No.                              Received

16   3    . . . . . . . . . . . . . . . . . . 272

17   13-B   . . . . . . . . . . . . . . . . . 301

18   31    . . . . . . . . . . . . . . . . . . 313

19   33    . . . . . . . . . . . . . . . . . . 336

20   43    . . . . . . . . . . . . . . . . . . 179

21   101   . . . . . . . . . . . . . . . . . . 273

22

23

24

25
```