N6SQaqu1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

JOHN J. AQUINO, CHAPTER 7
TRUSTEE, By Its Assignee,
Convergent Distributors of
Texas, LLC

               Plaintiff

        v.                              21 Civ. 1355 (JSR)
                                 Bench Trial

ALEXANDER CAPITA, LP, JOSEPH
AMATO, ROCCO GUIDICIPIETRO,
and NESA MANAGEMENT, LLC

               Defendants

-------------------------------x

                            New York, N.Y.
                            June 28, 2023
                            10:20 a.m.

Before:

                 HON. JED S. RAKOFF

                            District Judge

                   APPEARANCES

LAW OFFICE OF WILLIAM COUDERT RAND
    Attorneys for Plaintiff
WILLIAM C. RAND
GLENN GOODMAN


HOLCOMB WARD LLP
    Attorneys for Defendants
BRYAN M. WARD
HOLLY COLE
AARON J. WRIGHT

N6SQaqu1

```
 1            (Trial continued)
 2            THE COURT:  Good morning.  Please be seated.  Let's
 3    proceed.  Do we have a witness on the video?
 4            MR. RAND:  Your Honor, there were some complications
 5    on the scheduling, so I requested that it be changed to your
 6    clerk to 12:00.
 7            THE COURT:  Okay.  Let's get Mr. Amato back on the
 8    stand.
 9            MR. WARD:  Your Honor, I'd like to address one item.
10    Our first witness on our list is Dr. David Staskin, and we were
11    going to have him come in today.  We were assured by Mr. Rand
12    on June 16 they agreed to produce in person Schlichtmann and
13    Staskin to testify as a witness called by plaintiff and
14    defendant to testify.  We had him on our list throughout as our
15    first witness, and we've been talking about scheduling as well
16    and it wasn't until last night that we got an email where he
17    said Dr. Staskin is not available tomorrow.
18            And then this morning -- and then I wrote back and
19    said, well, let's try to work around his schedule.  And this
20    morning Mr. Rand said he's no longer coming at all, and you're
21    going to have to --
22            THE COURT:  So do I need to send a U.S. Marshals out
23    to arrest him and bring him here?
24            MR. RAND:  He is beyond the summons of the court.
25            THE COURT:  Not given your assurances to your
```

N6SQaqu1

1   adversary.  You waived that objection.

2               MR. RAND:  Honestly, I communicated with him.  I asked

3   him if he would come in and be a witness.  He said he would.

4   Then I guess his schedule got very busy.  He's a doctor.

5               THE COURT:  Oh my God, a doctor.  No one ever waits

6   for a doctor.

7               MR. RAND:  I just don't control him is my problem, so

8   I can do whatever you would request me to do.

9               THE COURT:  Get his number.  We'll talk to him at the

10  next break.

11              Let's get Mr. Amato back on the stand.

12   JOSEPH ANTHONY AMATO, resumed.

13              THE COURT:  Go ahead, counsel.

14              MR. RAND:  Sorry.  Just one other thing.

15              Jan Schlichtmann, who is the witness who will be here

16  this afternoon, made a request to have a conference with the

17  Court before his testimony.

18              THE COURT:  On what subject?

19              MR. RAND:  He didn't say.

20              THE COURT:  Then I won't grant it because he didn't

21  say.

22              MR. RAND:  I think it's pertaining to the statement

23  you made about his --

24              THE COURT:  His lying?

25              MR. RAND:  Yes.

N6SQaqu1                     Amato - Cross

1          THE COURT:  I haven't forgotten that in the slightest.

2     I'm still considering whether to refer him to the grievance

3     committee, as I indicated at the time he admitted his lie.

4          MR. RAND:  Thank you, your Honor.  I just wanted to

5     relay his message.

6          THE COURT:  If he has something to say on the record,

7     I'm always happy to hear him on the record.

8          MR. RAND:  Just to be clear, I do not represent

9     Mr. Schlichtmann.

10         THE COURT:  Okay.

11    CROSS-EXAMINATION CONTINUED:

12    BY MS. COLE:

13    Q.  Good morning, Mr. Amato.  You understand you're still under

14    oath from being sworn in yesterday from your testimony?

15    A.  I do.  Good morning.

16    Q.  You testified yesterday that you were not the CEO of

17    Alexander Capital LP in July 2014.  Is that correct?

18    A.  I said I believe I wasn't at that time.  It might have been

19    slightly thereafter.  I wasn't exact on that timing, correct.

20    Q.  Do you have a direct ownership interest in Alexander

21    Capital?

22    A.  I do not.

23    Q.  Are you a partner at Alexander Capital?

24    A.  I am not.

25    Q.  Have you ever been a partner at Alexander Capital?

N6SQaqu1                    Amato - Cross

1    A.  I have not.

2    Q.  Are you an indirect owner of Alexander Capital?

3    A.  I am an indirect owner to a corporation.

4    Q.  Which corporation is that?

5    A.  Today I believe it's SENA.

6    Q.  Can you spell that?

7    A.  S-E-N-A Management LLC.

8    Q.  At the time that this lawsuit was filed, what company was

9    the -- were you an indirect owner through?

10   A.  NESA Management LLC.

11   Q.  Yesterday Mr. Rand questioned you about Exhibit P11, a

12   broker check report for Alexander Capital LP.  Do you recall

13   that?

14   A.  I do.

15   Q.  Do you still have a copy of it on the witness stand?

16   A.  I'm sure I do, if you want to give me a moment.  I believe

17   I have it.

18   Q.  On the first page of the document, do you see under the

19   term CRD number that the report states the data is current as

20   of Tuesday, January 20, 2015?

21   A.  I do.

22   Q.  Please turn to page 6 of 23 of the document.  The numbers

23   are at the top.

24   A.  Okay.

25   Q.  Do you see at the top of the text on the page where it says

N6SQaqu1                          Amato - Cross

1    firm profile?

2    A.  I do.

3    Q.  And then direct owners and executive officers?

4    A.  Yes.

5    Q.  Do you see the first entity listed is Exitus LLC?

6    A.  Yes.

7    Q.  Do you see where it says position?

8    A.  Yes.

9    Q.  And then what does it say?

10   A.  Partner.

11   Q.  Partner.  Do you see the next entity listed is NESA

12   Management LLC?

13   A.  I do.

14   Q.  Do you see where it says position?

15   A.  Yes.

16   Q.  And what does it say?

17   A.  Partner.

18   Q.  Do you see your name is next in the list of "owners and

19   officers"?

20   A.  I do.

21   Q.  Do you see where it says position?

22   A.  I do.

23   Q.  What does it say?

24   A.  President ROP and CROP.

25   Q.  This broker check report does not identify you, Joseph

N6SQaqu1                          Amato - Cross

1    Anthony Amato, as a partner of Alexander Capital, does it?

2    A.  It does not.

3    Q.  Have you ever been president of Alexander Capital?

4    A.  I have not.

5    Q.  Has Alexander Capital ever used the title president for any

6    officer?

7    A.  No, I believe it's a corporate title that wasn't part of

8    our structure in the broker dealer.

9    Q.  But you were the ROP and CROP.  Is that correct?

10   A.  That is correct.

11   Q.  And you testified yesterday what those terms mean, correct?

12   A.  I did.

13   Q.  Do you see where it states percentage of ownership less

14   than five percent?

15   A.  Yes.

16   Q.  Is it accurate that your percentage of ownership was zero

17   percent?

18   A.  That is correct.

19   Q.  And that zero is less than five percent?

20   A.  Yes.

21   Q.  As of January 20, 2015, were you a direct owner of

22   Alexander Capital?

23   A.  I was not.

24   Q.  Were you an indirect owner of Alexander Capital as of

25   January 20, 2015?

1   A.  Through NESA, yes.

2   Q.  Please turn to page 10 of 23.

3   A.  I'm there.

4   Q.  Do you see at the top of the text on the page where it says

5   firm profile?

6   A.  I do.

7   Q.  And then it says indirect owners?

8   A.  Yes.

9   Q.  Do you see in the middle of the page where it identifies

10  you, Joseph Anthony Amato, as an indirect owner?

11  A.  I do.

12  Q.  Do you see where it says company through which indirect

13  ownership is established?

14  A.  I do.

15  Q.  What does it say in the response?

16  A.  NESA Management LLC.

17  Q.  Do you see where it says percentage of ownership?

18  A.  Yes.

19  Q.  What does it say in the response?

20  A.  50 percent but less than 75 percent.

21  Q.  Could you please turn back to page 8 of 23?

22  A.  Yes.

23  Q.  Do you see in the middle of the text on the page where it

24  identifies Rocco Guidicipietro?

25  A.  Yes.

N6SQaqu1                        Amato - Cross

1    Q.  Do you see where it says position?

2    A.  Yes.

3    Q.  And what does it say in response?

4    A.  COO ROP SROP.

5    Q.  This report does not identify Rocco Guidicipietro as a

6    partner of Alexander Capital?

7    A.  It does not.

8    Q.  Do you see where it states percentage of ownership?

9    A.  Yes.

10   Q.  And it says less than five percent?

11   A.  Yes, it does.

12   Q.  To your knowledge, did Mr. Guidicipietro have any direct

13   ownership in Alexander Capital as of January 20, 2015?

14   A.  Zero percent, none.

15   Q.  So he had zero percent ownership, and the report reflects

16   an ownership percentage of less than five percent?

17   A.  That is correct.

18   Q.  Please turn back to page 10 of 23.  Do you see at the

19   bottom of the text on the page under the information about

20   you -- so under your name, there's a line, and then it says

21   Rocco Gerard Guidicipietro?

22   A.  Yes.

23   Q.  Can you please turn to the next page, page 11?

24   A.  Sure.

25   Q.  Do you see where it says company through which indirect

N6SQaqu1                           Amato - Cross

1   ownership is established?

2   A.  I do.

3   Q.  What does it say in response?

4   A.  NESA Management LLC.

5   Q.  Do you see where it says percentage of ownership?

6   A.  I do.

7   Q.  What does it say in response?

8   A.  50 percent but less than 75 percent.

9   Q.  To your knowledge, is FINRA aware of the true ownership

10  structure of Alexander Capital?

11          THE COURT:  Sustained.

12  Q.  Is Alexander Capital currently approved by FINRA to

13  underwrite IPOs on a firm commitment basis?

14  A.  Currently, you said?

15  Q.  Currently.

16  A.  Yes.

17  Q.  To the best of your recollection, Alexander Capital

18  received approval for firm commitment underwriting after

19  June 2016.  Is that correct?

20  A.  I believe so, yes.

21  Q.  To your knowledge, when did Alexander Capital decide to get

22  involved in underwriting?

23  A.  From the hiring when John and Chris joined the firm.

24  Q.  And when did Jonathan Gazdak and Chris Carlin join the

25  firm?

1           THE COURT:  I'm sorry, I think the reporter may have

2     missed -- no.  There it is.  Very good.  Sorry, my mistake.

3     Q.  Thank you.

4     A.  I'm not sure of the exact date.  It was between 2013 and

5     '14.  I'm uncertain of the exact date though.

6     Q.  Does March of 2014 sound accurate in terms of when Chris

7     Carlin came to Alexander?

8     A.  Yes, I believe so.

9     Q.  Whose idea was it that Alexander start a line of business

10    in underwriting?

11    A.  So, at the time we had a manager director, Ross Bevevino,

12    who was at the firm and had a relationship with Chris and John,

13    and he suggested introducing them to the firm and bring them

14    over because they were doing banking at another firm on the

15    street at the time and were considering a move.

16    Q.  And at that time that Mr. Bevevino made that

17    recommendation, did Alexander Capital conduct any business in

18    underwriting?

19    A.  No.

20    Q.  Or investment banking?

21    A.  Not while I was there, I don't believe so, no.

22    Q.  When did Alexander Capital bring in Jonathan Gazdak?  Was

23    it shortly after Mr. Carlin came on?

24    A.  Yes, I believe so.

25    Q.  And was it Mr. Carlin who recommended that Mr. Gazdak join

N6SQaqu1                        Amato - Cross

1   him?

2   A.   He -- I believe when the conversations were going, they

3   were brought on as a team.  So I don't know if they came, you

4   know, they came pretty much a little -- within the same time.

5   Q.   Are Mr. Carlin and Mr. Gazdak employees of Alexander

6   Capital?

7   A.   They are not.

8   Q.   What are they?

9   A.   They're independent contractors.

10  Q.   And how are they paid?

11  A.   1099.

12  Q.   Are you involved in Alexander capital markets department?

13  A.   In which department, capital markets?  No, I am not.

14  Q.   Have you ever been involved in the capital markets

15  department at Alexander?

16  A.   I have not.

17  Q.   Is the capital markets department separate from what you do

18  at Alexander?

19  A.   Absolutely.

20  Q.   Do you supervise Mr. Carlin?

21  A.   I do not.

22  Q.   How much autonomy does Mr. Carlin have with respect to the

23  deals handled by the capital markets department?

24  A.   Full.

25  Q.   Who runs Alexander's capital markets department?

1    A.  Chris Carlin.

2    Q.  Do you review or approve the deals Mr. Carlin brings in?

3    A.  I do not.

4    Q.  Is the capital markets department still subject to review

5    by the compliance department?

6    A.  Yes.

7    Q.  Are you involved in Alexander's investment banking

8    department?

9    A.  I am not.

10   Q.  Have you ever been?

11   A.  I have not.

12   Q.  Is the investment banking department separate from what you

13   do at Alexander?

14   A.  It is.

15   Q.  Do you supervise Mr. Gazdak?

16   A.  I do not.

17   Q.  How much autonomy does Mr. Gazdak have with respect to the

18   deals handled by the investment banking department?

19   A.  Full.

20   Q.  Who runs Alexander's investment banking department?

21   A.  John Gazdak.

22   Q.  Do you review or approve the deals Mr. Gazdak brings in?

23   A.  I do not.

24   Q.  Is the investment banking department subject to review by

25   the compliance department?

N6SQaqu1                          Amato - Cross

1    A.  Yes, it is.

2    Q.  Is there a necessary separation between the work capital

3    markets and investment banking do from the other business of

4    the firm?

5    A.  Yes, it's called a Chinese wall between the two.

6    Q.  Is it true that in July 2014 when Alexander entered into

7    the engagement with Inpellis, it had no prior underwriting

8    experience?

9    A.  That is correct.

10   Q.  It true that the Inpellis engagement was to be Alexander's

11   first proposed public offering as underwriter?

12   A.  I believe so.

13   Q.  Is it true that you are aware by virtue of this litigation

14   that Inpellis withdrew its S-1 public registration statement?

15   A.  I am.

16   Q.  Is it true that because of the withdrawal of the S-1, there

17   was no public offering for Inpellis?

18   A.  That is correct.

19   Q.  Is it true that because of the withdrawal of the S-1,

20   Alexander did not have the opportunity to act as underwriter on

21   any basis?

22           MR. RAND:  Objection.  Leading.

23           THE COURT:  Well, it is, of course, no more leading

24   than the last 45 questions, but since you didn't object to

25   those, I will sustain your objection to this one.

N6SQaqu1                       Amato - Cross

1    Q.  Did Alexander act as underwriter on any basis for the

2    Inpellis proposed offering?

3    A.  They did not.

4              MR. RAND:  Objection.  Leading.

5              THE COURT:  No, that's not leading.  Overruled.

6    Q.  Can you repeat your answer?

7    A.  They did not.

8              THE COURT:  How do you know that since you had nothing

9    to do with it?

10             THE WITNESS:  She asked through the case what we've

11   been brought up to speed on at this point.

12             THE COURT:  So your testimony is, what, hearsay?

13             THE WITNESS:  I wasn't part of it originally.  I

14   believe she asked me through this point from what I've learned

15   from the case and everything, if I --

16             THE COURT:  No.  The question was simply:  Did

17   Alexander act as underwriter on any basis for the Inpellis

18   proposed offering.  And your answer was, they did not.

19             Do I understand that you don't know that from your

20   personal knowledge but only from what you've seen and been told

21   subsequently?

22             THE WITNESS:  Through the -- through the filing and

23   the lawsuit, that's when the whole thing has come to --

24             THE COURT:  Okay.  Go ahead.

25             MS. COLE:  Just to be clear, your Honor, he is a named

N6SQaqu1                        Amato - Cross

1   defendant in a party to the case, and --

2            THE COURT:  So what?  So he still can only testify as

3   to his personal knowledge unless you're calling him as your --

4   as a corporate representative, which you clearly are not.

5            MS. COLE:  No.

6            THE COURT:  While we're on pause, let me see the

7   documents I asked for last night.  It was the Delaware filings.

8            MR. WARD:  We sent them to -- to your clerk,

9   electronically.  The written supervisory procedures would

10  probably stack up about that high, so you have them

11  electronically and we were working from the hotel.

12           THE COURT:  All right.  When he comes back, I'll ask

13  him to do what I would have hoped you would have done, which

14  was provide me with a hard copy.  Go ahead.

15           MR. WARD:  We offered in our email to get hard copies.

16  We sent it around 4:30 a.m. this morning and ordered for hard

17  copies.

18           THE COURT:  I can't understand why my law clerk didn't

19  respond immediately.

20           MS. COLE:  Your Honor, I did ask Mr. Larson this

21  morning to print the partnership agreement and he did print

22  extra copies of that, so I believe he has one for you.

23           THE COURT:  If I can see that now.

24           MS. COLE:  Yes.  I don't know where he has his extra

25  copies.  I only have one copy.  I know he brought in about four

1      or five copies.

2                THE COURT:  I see.  He'll be back in a minute.

3                MS. COLE:  Also, we informed him by email there are no

4      bylaws for a partnership.  A Delaware partnership is not

5      required to have bylaws.

6                THE COURT:  Interesting.  You never know what's going

7      to happen in Delaware.  I'm told even that they sometimes send

8      people to Washington.  Anyway, let's continue.

9                MS. COLE:  Thank you.

10               MR. WARD:  Your Honor, another thing we found out that

11     was interesting about Delaware law, it apparently doesn't

12     require signatures on partnership agreements.  You'll see that

13     we sent you the most recent partnership agreement.  It doesn't

14     have signatures, not -- that was because of Delaware law it

15     could have been, but we also sent the last version before that.

16               THE COURT:  What I'm trying to get at though, it may

17     have relevance to other issues, but what I was most focused on

18     is the point that defense counsel, quite rightly, brought to my

19     attention yesterday, which was the paragraph 7 of the

20     complaint, of the fourth amended complaint, limits the

21     liability or appears to limit the liability of Mr. Amato to

22     what follows from the fact that he was a "managing partner" of

23     Alexander Capital.  Quoting from paragraph 7 of the complaint.

24     And so --

25               MS. COLE:  I do intend to show him the partnership

N6SQaqu1                         Amato - Cross

1   agreement and provide you with the printed copy that Mr.  --

2                THE COURT:  Just to move things a long, is he or is he

3   not a limited partner?

4                MS. COLE:  He is not.

5                THE COURT:  Was he at the time of the underlying

6   events?

7                MS. COLE:  He has never been a general partner or a

8   limited partner.

9                THE COURT:  That's what I wanted to see the documents

10  for, to see if they indicated that he was.

11               MS. COLE:  Yes.

12               THE COURT:  If he's not, let me ask the plaintiff's

13  counsel.  So are you claiming he is a managing partner

14  notwithstanding those representations?

15               MR. RAND:  He is indirectly a partner through NESA,

16  and I don't think he gets protection because he is an active

17  manager of the firm.  So if he owns it indirectly through NESA,

18  and if he actively manages --

19               THE COURT:  I think this is a question of Delaware

20  law, and so we may -- you're going to have a nice long break,

21  and I wouldn't want you to just sit on your hands or enjoy the

22  vacation, so we'll have both sides give me some briefing on

23  this issue during that period.

24               But go ahead, counsel.

25               MS. COLE:  Your Honor, I believe the copies of the

N6SQaqu1                          Amato - Cross

1    partnership agreement are on the edge of Mr. Larson's desk

2    right there.

3              THE COURT:  Aha.  In that case -- this is the second

4    amended and restated partnership agreement.  Is that the

5    relevant one?

6              MS. COLE:  Correct, from 2020.

7              THE COURT:  So self-help is always the best.

8              Let me just take a second to look at this.

9              In the last page, there are not signatures as

10   apparently they were not required, but the agreement is signed

11   by the general partner of NESA Management LLC by Joseph Amato

12   managing member.

13             So Mr. Amato, are you the managing member of NESA

14   Management LLC?

15             THE WITNESS:  I'm a -- yes.

16             THE COURT:  Okay.  And so then I take it -- and this

17   again sounds to me like a question of law, not of fact, but I

18   take it the argument of plaintiff is that Mr. Amato is liable

19   because as managing member of NESA, which was the general

20   partner of Alexander, and which, if I'm reading this correctly,

21   held 75 percent of the ownership, he was effectively the

22   equivalent under Delaware law of a managing partner of

23   Alexander Capital.  Do I have that right?  Is that the

24   argument?

25             MR. RAND:  That is exactly correct.

1          THE COURT:  All right.  So we'll get briefing on that

2     later on.

3          Please continue.

4     BY MS. COLE:

5     Q.  As far as you know, before the Inpellis engagement in July

6     of 2014, did Alexander ever serve as lead underwriter for any

7     prior public offering?

8     A.  I don't believe so.

9     Q.  Before the Inpellis engagement agreement in July 2014, had

10    Alexander ever served as a sole book running manager for a

11    public offering?

12    A.  I don't believe so.

13    Q.  In July of 2014, did Alexander have any prior experience

14    with underwriting public offerings?

15    A.  No, I don't believe so.

16    Q.  In July of 2014 when the engagement letter was executed

17    between Inpellis and Alexander Capital, was NESA Management a

18    majority owner of Alexander Capital?

19    A.  I don't believe so.  I'm not positive on the percentage at

20    that time.  I believe it might have been 24.9, but I'm not a

21    hundred percent sure.

22    Q.  In 2014 and 2015, did you have a role with respect to the

23    firm's underwriting business?

24    A.  Absolutely not.

25    Q.  Any role in supervising it?

1    A.   No.

2    Q.   Did you have any personal experience in underwriting?

3    A.   No.

4    Q.   In connection with your being named as a defendant in this

5    litigation, are you generally familiar with the July 2014

6    engagement letter entered into with Inpellis?

7    A.   In connection with this?  Yes.

8    Q.   Were you involved in the discussions with anyone from

9    Inpellis about the engagement of Alexander Capital as

10   underwriter for their proposed IPO?

11   A.   I was not.

12   Q.   Did Mr. Gazdak or Mr. Carlin come to you for approval to

13   enter into the engagement with Inpellis?

14   A.   They did not.

15   Q.   Did you ever meet with John Masiz about the engagement of

16   Alexander Capital as underwriter for Inpellis's proposed IPO?

17   A.   Absolutely not.

18   Q.   Did you ever meet with Marshall Sterman about the

19   engagement of Alexander Capital as underwriter for Inpellis's

20   proposed IPO?

21   A.   I have not.

22   Q.   Did you ever at any point have any communications with

23   anyone at Inpellis?

24   A.   No, not that I'm aware of.

25   Q.   Did you prepare the July 2014 engagement letter for the

1   Inpellis IPO?

2   A.  I did not.

3   Q.  Did you have any input into the terms of the engagement

4   letter?

5   A.  I did not.

6   Q.  Were you aware of the engagement letter at the time it was

7   entered into in July of 2014?

8   A.  Can you repeat that?  I'm trying to read it off the screen.

9   Q.  Were you aware of the engagement letter in July of 2014?

10  A.  I was not.

11  Q.  Did you have any direct knowledge of the terms of the

12  engagement in July of 2014?

13  A.  No.

14  Q.  Would it have been one of your responsibilities in July of

15  2014 to review or approve underwriting engagement letters?

16  A.  No.

17  Q.  Did you have any idea in July 2014 that anyone at Alexander

18  had made representations to Inpellis regarding Alexander's

19  ability to handle firm commitment underwriting?

20  A.  I was not.

21  Q.  As of July 2014, did you have an understanding whether

22  Alexander could serve as lead underwriter in firm commitment

23  underwritings?

24  A.  I did not.

25  Q.  Did you understand that Alexander could participate in firm

N6SQaqu1                          Amato - Cross

1    commitment underwritings?

2    A.   Yes.

3    Q.   Was it your understanding in July of 2014 about what type

4    of -- what was your understanding, apologies, in July of 2014

5    about what type of underwriting activity Alexander Capital was

6    permitted to do as a nickel broker dealer?

7    A.   I didn't believe we had restrictions for banking.

8    Q.   As of 2014, did you understand that as a nickel broker

9    dealer Alexander Capital could not participate in firm

10   commitment underwritings?

11   A.   I believe I found that out later sometime in '15 or so.

12   I'm uncertain.  At the time I thought we were able to

13   participate and do deals and have banking.  I didn't really

14   know the distinction between it.

15   Q.   So you testified yesterday that you learned at some point

16   after Alexander entered into the July 2014 engagement letter

17   with Inpellis that Alexander could not participate in firm

18   commitment underwritings.  Do you recall that testimony?

19   A.   I do.

20   Q.   Yesterday during your testimony, Mr. Rand showed you an

21   unreasonable letter from FINRA dated May 15, 2015.  Do you

22   recall that?

23   A.   I do.

24   Q.   Did you learn for the first time that Alexander Capital did

25   not have authority to participate in firm commitment

N6SQaqu1                              Amato - Cross

1      underwriting after Alexander Capital received the May 15, 2015

2      unreasonable letter?

3      A.   I thought we couldn't be the lead, but we could still

4      participate in firm commitment dealings.

5      Q.   You testified yesterday that you did not see this letter

6      and were not aware of it when it was sent on May 15, 2015.  Do

7      you recall that testimony?

8      A.   I do.

9      Q.   And that you learned about the letter at some point later.

10     Is that accurate?

11     A.   Yeah, I thought it was the FINRA letter, so I might be

12     confusing the two documents.

13     Q.   Do you see a copy of the May 15, 2015 unreasonable letter

14     on the stand that we went over yesterday?

15              THE COURT:  What's the exhibit number?

16              MS. COLE:  I'm looking for it.  Unfortunately, I

17     didn't note it.  It's Plaintiff's 19.

18     A.   I believe I have it.

19     Q.   So the first page of Plaintiff's 19 is an email.  The email

20     is from Anthony Marsico at Greenberg Traurig.  Are you listed

21     as a recipient on this email?

22     A.   I am not.

23     Q.   Can you please turn to the second page of the letter.  It's

24     page 3 of the exhibit, but it's the second page of the letter.

25     A.   Yes.

N6SQaqu1                         Amato - Cross

1   Q.  Do you see in the middle of the page where it says other

2   and then there's a number 6?

3   A.  I do.

4   Q.  And it says here:  In connection with the filing received

5   for Alexander Capital LP, the sole book running manager

6   identified in the offering documents, the department suggests

7   that the firm contact their district office to discuss their

8   participation in this offering and obtain approval to

9   underwrite this offering on a firm commitment basis.  Do you

10  see that?

11  A.  I do.

12  Q.  As we went over yesterday with the Court during your

13  examination by Mr. Rand, the letter states:  FINRA states in

14  the letter that it had received a filing from Alexander with

15  the draft offering documents for the Inpellis IPO.  Do you see

16  that language in Section 6?

17  A.  I'm sorry, it's in the other?

18  Q.  No, same number 6.  In connection with the filing received

19  for Alexander Capital.

20  A.  Yes.

21  Q.  And according to this letter, Alexander Capital was

22  identified in the offering documents as the sole book running

23  manager.  Do you see that?

24  A.  I do.

25  Q.  What are is your understanding from this letter -- is it

N6SQaqu1                        Amato - Cross

1   your -- strike that.

2           Is it your understanding from this letter that FINRA

3   was aware as of the date of this letter, May 15, 2015, that

4   Alexander had been engaged by Inpellis to underwrite the IPO on

5   a firm commitment basis?

6           THE COURT:  So since there was no objection to the

7   question raised by plaintiff's counsel, I will allow it,

8   although it is:  (A) leading; (B) without foundation having

9   been laid; (C) probably beyond his capability to answer from

10  personal knowledge; and (D) otherwise not in accord with

11  innumerable rules set forth in the Federal Rules of Evidence.

12          But since there was no objection, I will allow the

13  answer.

14  A.  It appears that way from number 6 and the way it's stated.

15  Q.  Thank you.

16          It has been stipulated that Alexander Capital

17  submitted a continuing member application to FINRA on June 3,

18  2015 to request, among other things, approval for firm

19  commitment underwriting.  In connection with your being named

20  as a defendant in this litigation, is it true that you're aware

21  now that the continuing member application was submitted after

22  Alexander's counsel consulted with its FINRA district office in

23  response --

24          THE COURT:  Counsel, now I've tried to give you the

25  hint that these are grossly leading questions, to say the

N6SQaqu1                      Amato - Cross

1    least.  I guess my hint hasn't been fully conveyed.  So the

2    Court on its own forbids any further leading questions of this

3    witness who is allied with the defense.  You may put a

4    non-leading question if you'd like.

5              MS. COLE:  I understand, your Honor.  I appreciate

6    that.  I will just if note, however, that Mr. Rand asked

7    leading questions of Mr. Barrette.

8              THE COURT:  Because he was a hostile witness.

9              MS. COLE:  Mr. Barrette was not a hostile witness.

10             THE COURT:  Oh, yes he is.  Oh, Mr. Barrette, sorry.

11   And you chose not to object.

12             MS. COLE:  Right.

13             THE COURT:  So what, you're saying because you chose

14   not to object to their wrongful leading questions, that

15   justifies your making wrongful leading questions here?

16             MS. COLE:  I was just making a note for the record,

17   your Honor.  I'll move on.

18             THE COURT:  I mean, neither side has been very strict

19   about the rules of evidence and the Court has only intervened

20   where I thought it was really getting out of hand.

21             MS. COLE:  Understood.

22             THE COURT:  And now I think it's getting out of hand,

23   and I'm surprised because of all the lawyers in the case,

24   you're the one who's impressed me most, so don't disappoint me.

25             MS. COLE:  Understood.  Appreciate it.

N6SQaqu1                        Amato - Cross

1    Q.  Are you aware of what actions Alexander Capital took in

2    response to the May 15, 2015 letter?

3              MR. RAND:  Objection.  Foundation.

4              THE COURT:  So a note was just received from my law

5    clerk, which says that my chambers just received a call that

6    Mr. Schlichtmann is standing outside the court right now and

7    wants to know whether he should come in.  The answer is no, but

8    he can go to the witness room.  So if counsel for one side or

9    the other wants to go out and tell him that he can go to the

10   witness room, but he can't come into the Court.

11             MR. RAND:  Can I take two minutes to address that?

12             THE COURT:  Yes.

13             MR. RAND:  Where is the witness room?

14             THE COURT:  It's right between the main entrance and

15   the courtroom entrance right in front of you.

16             MR. RAND:  Thank you, your Honor.

17             MS. COLE:  Your Honor, can I be permitted to take a

18   brief restroom break?

19             THE COURT:  Sure.  Why don't we give everyone a

20   five-minute break.

21             (Recess)

22             THE COURT:  Before we resume with the witness, we were

23   going to call Dr. Staskin is.

24             MR. RAND:  I'm waiting to get his telephone number.

25             THE COURT:  You don't have his number yet?

1          MR. RAND:  No, but I've been informed he's not

2    refusing to come.  He just needs time to organize his schedule

3    so that he can come by video or in person at a time that's

4    convenient to him because --

5          THE COURT:  I assume neither side objects to his

6    appearing by video.

7          MR. WARD:  No, your Honor, that's correct.

8          THE COURT:  I mean, that's the obvious solution.  I

9    can't believe that he is not able to free up -- how long --

10         MR. RAND:  I asked to see if he could free up

11   Wednesday of next week.  That gives him time to organize his

12   schedule.

13         THE COURT:  How long is his testimony likely to take?

14         MR. RAND:  I don't know.  I don't think so long from

15   my side.

16         MR. WARD:  Probably about three hours our side.

17         THE COURT:  Three hours?

18         MR. WARD:  We could probably cut it down a little bit.

19         THE COURT:  Maybe what we should do is get him to

20   agree to a two-hour video and then you'll have to shorten your

21   examination, but of course we need to leave time for your

22   adversary as well.

23         All right.  As soon as you get his phone number, I

24   want to give him a call here in the courtroom on the record.

25   You don't have his phone number?

1           MR. RAND:  I don't.

2           THE COURT:  The other side?

3           MR. WARD:  No, your Honor.

4           THE COURT:  Okay.  Remind me, his position was?

5           MS. COLE:  He was at some point the president of

6     Inpellis.

7           THE COURT:  Yes.

8           MR. WARD:  And on the board of Inpellis.

9           THE COURT:  Right.  So the -- there is no record of

10    his phone number?

11          MR. RAND:  I just don't have it with me.

12          THE COURT:  Inpellis must prefer to operate solely by

13    email, as shown by the evidence in this case.

14          MR. RAND:  I've called the client and they are

15    supposedly supplying me.

16          THE COURT:  Anyway, hopefully -- I do want to be able

17    to reach him by telephone before the end of today.  So okay.

18    Let's get the witness back on the stand.

19    BY MS. COLE:

20    Q.  In 2014 and 2015 did you have any responsibility with

21    respect to communicating with anyone at Inpellis about the IPO?

22    A.  I did not.

23    Q.  In 2014 and 2015, did you have any responsibility

24    supervising communications with Inpellis or other underwriting

25    clients about Alexander Capital?

N6SQaqu1                          Amato – Cross

1    A.  I did not.

2    Q.  Prior to September 2015, did you have any discussions with

3    Jonathan Gazdak or Christopher Carlin about any communications

4    they might have had with Inpellis?

5    A.  I did not.

6    Q.  Prior to September 2015, did you have any idea what had

7    been communicated to Inpellis about Alexander Capital's ability

8    or inability to handle firm commitment underwriting?

9    A.  I have not.

10   Q.  As the firm's current CEO, do you believe Alexander Capital

11   is obligated to not knowingly misrepresent its licensing status

12   for firm commitment underwritings to its investment banking

13   clients?

14          MR. RAND:  Objection.

15          THE COURT:  Putting aside the leading, the question is

16   I think you're asking him in his capacity as the firm's

17   "current CEO," which he has already indicated has almost

18   nothing to do with the underwriting issues in this case, you're

19   asking him whether or not Alexander Capital is obligated to do

20   X or Y, I think that's a request for a legal opinion.  So on

21   the cleverly stated objections of leading, calls for legal

22   opinion, and not within his personal knowledge, the question

23   is -- the objections are sustained.

24          MS. COLE:  Understood.  I'll move on.  Thank you.

25          One last question for the witness.

N6SQaqu1                          Amato - Redirect

1   Q.  Are you personally aware of any procedures of Alexander

2   Capital about deactivating an email account for an associated

3   person after they have left their position with the firm?

4   A.  Yes, I have some knowledge of that.

5   Q.  Can you tell the Court?

6   A.  Sure.  At times we may keep the email on, not for the

7   ex-employee or ex-independent contractor, whomever it may be,

8   of all they had.  We may continue to have it on in case any

9   incoming emails that compliance would have the ability to

10  review and see.  So if there's anything out there, we would be

11  aware.

12          MS. COLE:  That's all I have for this witness, your

13  Honor.

14          THE COURT:  Any further examination?

15          MR. RAND:  Yes, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. RAND:

18  Q.  Regarding the email testimony you just gave, what is your

19  basis for that policy?

20  A.  Just so -- it's not my policy.  Compliance has it.  They'd

21  like to just be aware if there's anything out there.  If

22  clients are trying to reach out because the accounts are still

23  with the firm, for whatever reason, if a complaint came in on a

24  broker and he left, just to make sure there's nothing else out

25  there and the firm is aware of anything that's going on to be

1    compliant with the matter.

2    Q.  So as to keep it open for outside clients?

3    A.  Keep it open.  It's for the broker, the ex-employees

4    contractor, whatever role they had.  It just keeps open for

5    sometimes a month, three months, six months depending on if

6    it's still actively getting a lot of emails, they'll keep it

7    open and it goes to the compliance department.  It doesn't go

8    to the broker or ex-employee.

9    Q.  Would there be any reason for internal employees of

10   Alexander to continue to email and email of an ex-employee?

11   A.  They can't email.  They can't use the email.  It's just for

12   incoming for our compliance department to monitor.

13   Q.  Are you familiar with an employee named Jonathan Gazdak?

14   A.  He's not an employee.

15   Q.  What is Jonathan Gazdak?

16   A.  He's an independent contractor.

17   Q.  Has he always been an independent contractor?

18   A.  I believe so, yes.

19   Q.  So in 2015, was Mr. Gazdak an independent contractor?

20   A.  Yes, I believe so.

21   Q.  And do you know what role he had as independent contractor?

22   A.  I believe he's the head of investment banking.

23           THE COURT:  So let me just understand this:  Alexander

24   Capital engages and holds itself out as engaging in investment

25   banking activity.  Yes?

N6SQaqu1                         Amato - Redirect

1            THE WITNESS:  That is correct.

2            THE COURT:  And they delegate that to Mr. Gazdak?

3            THE WITNESS:  Yeah, Mr. Gazdak is the head banker for

4     the firm, correct.

5            THE COURT:  And where is he?  Where is he located?

6     Where is his office?

7            THE WITNESS:  Now I believe he's in Tampa Bay,

8     Florida.

9            THE COURT:  At the time of the underlying events here,

10    2015.

11           THE WITNESS:  At the time he was based out of New

12    York.

13           THE COURT:  Out of the same offices as Alexander

14    Capital?

15           THE WITNESS:  Yes.

16           THE COURT:  And so putting aside whatever the tax

17    ramifications may be for him, which is not of my concern, was

18    he not for all practical purposes the same as an employee who

19    ran your investment banking?

20           THE WITNESS:  Well, the distinction with the broker

21    dealers is the employees are W2, and the 1099 are independent

22    contractors.

23           THE COURT:  Right, that's the tax difference.  I

24    understand that.  As I say, I'm not concerned.  I'm interested

25    in the practical consequences.  It sounds to me like aside from

1    the tax situation there were no consequences.  He was your guy

2    running your investment banking.

3            THE WITNESS:  His license would be on the line, and he

4    would be open if there was something.  So being licensed in the

5    broker dealer is whether we're independent or employees,

6    however you put it, if you're utilizing your license, that

7    would be your accountability, and, you know, through regulatory

8    if there was a problem with something, it would go to them and

9    to their licensing.  It's possible --

10           THE COURT:  I see.  So you're saying -- was that the

11   purpose that this was designed?

12           THE WITNESS:  That's just how -- I know the structure

13   for the most of any of the non-big five institutions and the

14   Goldmans of the world, the Merrills, most I understand is set

15   that way.  Some they have a banker on staff among certain of

16   the structure of a lot of others, but most I understand are set

17   up this way.  I don't know why, but that's just how...

18           THE COURT:  I guess the question really, and it is not

19   a question for this witness, it's a question for counsel:  Is

20   anyone maintaining that Mr. Gazdak's activities during the

21   period covered by this case are not imputable to Alexander?

22           MS. COLE:  No, that's not our contention.

23           THE COURT:  Very good.  So we're on the same

24   wavelength then.

25           MS. COLE:  Just to note for the Court, Mr. Gazdak is a

N6SQaqu1                    Amato - Redirect

1    registered representative through FINRA and he is designated as

2    an associated person of Alexander Capital through FINRA.

3           THE COURT:  That's doubly reassuring.

4           MS. COLE:  We're done with this witness.

5           THE COURT:  I'm sorry, yes, back to plaintiff's

6    counsel.

7           MR. RAND:  Your Honor, I have now gotten the number

8    for Dr. Staskin.

9           THE COURT:  I will put him on speaker phone.

10          MR. RAND:  617-480-3411.

11          THE COURT:  How does he spell his last name?

12          MR. RAND:  S-T-A-S-K-I-N.

13          (Telephone conference)

14          DR. STASKIN:  Hello.  Dr. Staskin.

15          THE COURT:  Yes, this is Judge Rakoff.  Can you hear

16   me?

17          LAW CLERK:  Hello, can you hear us, Doctor?

18          DR. STASKIN:  Hello.

19          THE COURT:  This is Judge Rakoff calling from federal

20   court.  Can I put you on speaker phone so all the parties can

21   hear you?  Thanks a lot.

22          Can you hear me now?  It's a little faint.  Hold on.

23   Is that better?

24          DR. STASKIN:  That's okay.  I can hear.

25          THE COURT:  Good.

N6SQaqu1                         Amato - Redirect

1          So you were originally listed as a witness in this

2    trial, and my understanding is that you were initially

3    agreeable to testify, but now you've run into some scheduling

4    issues and that's right, I'm wondering whether a good

5    alternative would be to work out a time when you could testify

6    by video, which we can set up so you won't have to travel down

7    here to the court, and it would still allow us to have the

8    benefit of your testimony.  So is that a reasonable option?

9          DR. STASKIN:  Yes, sir.

10          THE COURT:  Very good.  All right.  What would be a

11    good time for you?

12          DR. STASKIN:  I'm fine with as long as I can schedule

13    the time that it's convenient for the Court, sir.  Any time

14    tomorrow would be fine.

15          THE COURT:  Why don't we do this:  Why don't we start

16    it with you at 10:00 tomorrow morning.

17          MR. WARD:  Your Honor, we have two witnesses flying in

18    tomorrow.  They are going to fill --

19          THE COURT:  We can't deal with everything, but the --

20          MR. WARD:  Would you have availability next week?

21          THE COURT:  I don't think we should schedule next week

22    if we can avoid that.  Let me ask the doctor.  Which is better

23    for you, tomorrow or next week?

24          DR. STASKIN:  Next week would be even better.  This

25    way it will give me a few days to clear out a block of time

N6SQaqu1                           Amato - Redirect

1    that might be necessary.

2              THE COURT:  So how about next Wednesday at 10:00 in

3    the morning?

4              DR. STASKIN:  That's fine.

5              THE COURT:  Good.  And my law clerk will be in touch

6    with you to set this up.  I'll go off the speaker phone and let

7    him take your contact information.  But thank you very much.

8              DR. STASKIN:  Thank you very much for making this

9    possible this way.  Thank you.

10             THE COURT:  Thanks a lot.  Bye-bye.

11             MR. WARD:  Thank you, your Honor.

12             THE COURT:  So just get his contact information.

13             LAW CLERK:  I think you have that, Judge.

14             THE COURT:  Now you'll call him separately.

15             All right.  Back to Mr. Amato.

16             MR. RAND:  Along with no billable hours, you get extra

17   persuasion.

18   BY MR. RAND:

19   Q.  Has Jonathan Gazdak ever been an employee of Alexander

20   Capital?

21   A.  I don't believe so.

22   Q.  Was Jonathan Gazdak's position head of investment banking?

23   A.  I believe so, yes.

24   Q.  Does that position require a Series 7 test?

25   A.  I believe yes, a 7.  There's another license as well, I

N6SQaqu1                          Amato - Redirect

don't know the number, so but he holds multiple licenses, I

believe.

                    (Continued on next page)

N6S5AQU2                         Amato - Redirect

1   BY MR. RAND:

2   Q.  When you hold the license, is it required to be associated

3   with a broker-dealer?

4   A.  Well, technically, no.  You can still -- you can resign

5   from a broker-dealer and still have your licenses, they just

6   won't be active.

7   Q.  And how -- sorry.

8            How long does a non-active Series 7 license last?

9   A.  I believe the license lasts two years.  There may have been

10  a rule change to five, but the last I remember is two that I'm

11  familiar with.

12  Q.  Effectively they give you a license and you have two years

13  to become affiliated with another broker-dealer?

14  A.  You have to pass exams, get a license, and then usually you

15  have to be sponsored to take a test so when you take a

16  licensing test you are with a broker-dealer.  So you pass, you

17  get your license, you get -- you are put on with that

18  broker-dealer, you are registered with them, and then if you

19  resign, leave or whatever matter, you have a two-year window to

20  join another firm and put your license back up.

21  Q.  Has Jonathan Gazdak worked as head of investment banking

22  for Alexander Capital for more than two years?

23  A.  Yes.

24  Q.  Yes.

25           Does he affiliate with any other broker-dealer?

1   A.  I don't believe so.  At this time.

2   Q.  So if he is gone more than two years and he is not

3   affiliated with another broker-dealer, does that indicate to

4   you that his Series 7 has lapsed?

5   A.  No, you are confused.  He is with Alexander Capital, his

6   license is with Alexander Capital since he has been working

7   with them from whatever his start date was.

8   Q.  So his license is with Alexander Capital but he is not an

9   employee of Alexander Capital?

10  A.  That's -- he is an independent contractor.  That's how it

11  works.  If you have a license you are associated with the BD

12  and you have a license with FINRA.

13  Q.  Do you have the BrokerCheck report in front of you which is

14  Plaintiff's Exhibit 11?

15  A.  I will look, there is a couple of them here.  I do now.

16  Q.  If you look at page 6 of 23, do you see where it indicates

17  that you are president of Alexander Capital?

18  A.  Not yet, I'm not there.

19  Q.  Oh.  Sorry.

20  A.  OK.  It says position ROP CROP.

21  Q.  Can you remind me what ROP CROP is?

22  A.  Registered options principal; and a CROP, I don't know

23  the -- it is another principal license for options, I don't

24  recall off the top what the C stands for.

25  Q.  So do you trade options?

N6S5AQU2                           Amato - Redirect

1   A.   No.   I have traded options, sure.

2   Q.   What does it mean to be a registered options principal?

3   A.   It gives me the ability to sign off on new account form

4   options.   It is principal lines and options.

5   Q.   Oh, you so you can make commissions from other people

6   trading options?

7   A.   That's not the case, no.   I can open up an account, approve

8   an account at the time but it is not stuff I have done.   It is

9   the title I hold with, like, four or five others at the firm.

10  Q.   And you indicated that despite the fact it states that you

11  are the president that you are not the president at any time?

12  A.   Yes.   The president title is not a title that the

13  broker-dealer utilizes or holds out, it is something that I

14  guess broker check or FINRA does, something that we don't have

15  control over.   BrokerCheck and FINRA run their own site so I

16  don't recall what the data is.   We have some limited input but

17  they utilize other stuff -- I think we went through that

18  yesterday -- from Database SEC, whoever they go.

19  Q.   Did you make any attempt to correct this information on the

20  BrokerCheck report?

21  A.   I don't believe we can.   It's been there.   We have

22  discussed this many times over the years.

23  Q.   And you have sent a letter to FINRA and asked them to

24  correct the BrokerCheck?

25  A.   It is not like that.   It is just like other things we would

1  like to correct, the less than 5 percent, if you don't own any

2  and it is zero why should it be on there.  It is an ownership.

3  There are so many things.  Like it says less than 5 percent, I

4  own zero, I feel that's a misleading thing, it should say no

5  ownership.

6         So I don't control, like I said, their content, so I

7  am sure compliance has tried when I have asked but I haven't

8  seen no change.

9  Q.  Have you asked compliance at any time to change this

10 misstatement on the BrokerCheck report?

11 A.  I have.

12 Q.  When did you ask?

13 A.  Over the years.

14 Q.  Did you get back to them and ask them did you make any

15 request to FINRA to change this information?

16 A.  Again, I was told it couldn't be corrected, so.

17 Q.  Did you ask them why?

18 A.  Again, they say it's not them doing it.

19 Q.  Well, as I showed you before, you realize the information

20 comes from the broker-dealer?

21 A.  Again, like I said, it is not just from the broker-dealer,

22 we are just one of a few sources that they utilize what you

23 made me read to you yesterday.

24 Q.  If you go to page 8 of 23, do you see it lists Rocco Gerard

25 Guidicipietro?

1   A.  I do.

2   Q.  What was his position at Alexander Capital at this time?

3   A.  COO ROP TROP.

4   Q.  COO meaning chief operating officer?

5   A.  Yes.

6   Q.  And do you see where it says:  Does this owner direct

7   management or policies of the firm?  And the answer is "yes."

8           Is that a correct statement?

9   A.  Is this owner direct management or policies of the firm?  I

10  don't know exactly.  It is kind of vague:  Policies,

11  management.  He is the COO so I don't know if he has financial

12  responsibilities that -- which they consider qualify him for

13  that.  I can't answer for that.

14  Q.  Do you know what his responsibilities were as chief

15  operating officer?

16  A.  I am not certain so I don't want to speculate, you have to

17  ask him.

18  Q.  Do you work with him?

19  A.  Not in the same location, no, but yes, we both work for the

20  firm, obviously.

21  Q.  Well, at this time was he an owner of NESA Management?

22  A.  He is.  Yes.

23  Q.  And he what was at this time, also, this was a January 20,

24  2015, the BrokerCheck report.  Who were the owners of NESA

25  Capital at this time?

N6S5AQU2                    Amato - Redirect

A.   I don't know NESA Capital, sir.

Q.   Sorry.

            THE COURT:  Let me go back.

            THE WITNESS:  NESA Management?

            THE COURT:  Excuse me, counsel.  I want to go back for
a minute to what is called the unreasonable letter.

            THE WITNESS:  OK.

            THE COURT:  I was unclear.  Are you saying that you
interpreted that letter or that Alexander Capital interpreted
that letter to be something other than a statement that
Alexander Capital was not authorized to make firm commitment
underwritings other than in, perhaps, as part of a syndicate?

            THE WITNESS:  So, your Honor, at that time I thought,
again, from knowing, from receiving, whatever, we gave it to
our attorneys because it seemed vague and what it stated.  I
don't believe I learned it from that, I thought it was another
FINRA letter, it might have been from that one, I might be
confusing it when we learned that we weren't able to do them.
So, at that point I know they contacted the FINRA or the
coordinator, whatever it was, I don't know who they spoke to,
the legal, to go with it, but I know I didn't follow up with
that.  So, at that time we didn't believe that that was the
full 100 percent understanding, you cannot do this.  I believe
that came at a slightly later time, I don't think it was that
moment.

1              THE COURT:  So, but within a matter of -- by slightly

2         later you mean days or at most a few weeks?

3              THE WITNESS:  Yes.  We just didn't sit there and throw

4         it in a drawer, absolutely not.  It is a regulatory notice, you

5         address that.

6              THE COURT:  After that, you understood you couldn't

7         make a firm commitment of the sort that you had contracted with

8         Inpellis to make until you got approval from FINRA?

9              THE WITNESS:  Right; to do a firm commitment

10        underwriting.

11             THE COURT:  I wanted to clarify.  The reason I ask

12        that is because I am looking at your declaration given under

13        oath and based on your personal knowledge, although it also

14        says that the declaration is made on behalf of Alexander in

15        your capacity as CEO and as its Rule 30(b)(6) designee, and you

16        say in there, Paragraph 15:  On May 15, 2015, Alexander Capital

17        LP was sent an "unreasonable letter" by FINRA.

18             Paragraph 16:  This May 15, 2015 letter indicated that

19        the firm, Alexander Capital, lacked the authority to act as

20        lead underwriter on the firm commitment public offering.

21             17:  As of May 15, 2015, Alexander Capital LP,

22        understood it lacked the authority to act as lead underwriter

23        on a firm commitment offering.

24             But I think what are you saying now -- and I don't

25        regard this as a material deviation -- but it may have been a

N6S5AQU2                        Amato - Redirect

1   few days later that Alexander Capital came to that conclusion.

2              THE WITNESS:  I'm sure.  I would believe we contacted

3   legal immediately and to remedy the process but all within a

4   24-hour period.

5              THE COURT:  By the way, who drafted this declaration?

6              MR. WRIGHT:  I did, your Honor.

7              THE COURT:  OK.  But you read it before you signed it?

8              THE WITNESS:  I did, your Honor.

9              THE COURT:  Very good.

10             Go ahead.

11  BY MR. RAND:

12  Q.  At the time of this BrokerCheck report, who were the owners

13  of NESA Management LLC?

14  A.  Rocco and myself owned NESA Management.

15  Q.  When was NESA created?

16  A.  I'm not certain.  We would have to look at the corporate

17  docs.

18  Q.  So do you own it 50/50?

19  A.  Yes.

20  Q.  And prior to this date had you always owned it 50/50 with

21  Rocco?

22  A.  Yes.

23  Q.  And after this date did that percentage ever change?

24  A.  What percentage, sir.

25  Q.  The 50/50 percentage that you and Rocco owned NESA.

N6S5AQU2                        Amato - Redirect

1    A.  That we owned NESA?  I don't believe so.

2    Q.  So at all times you and Rocco have been 50/50 owners of

3    NESA Management LLC?

4    A.  I believe so.

5    Q.  Does NESA Management LLC have any employees?

6    A.  No.

7    Q.  Has it ever had any employees?

8    A.  I don't believe so.

9    Q.  What is the purpose of NESA Management LLC?

10   A.  NESA was a holding company for our indirect ownership and

11   it held the leases, property leases.

12   Q.  What leases did it hold?  I'm not following.

13   A.  It held leases for, I believe we had the -- I'm pretty sure

14   we had the lease for our office under us.

15   Q.  For Alexander's offices?

16   A.  Yes.

17   Q.  Did it have any other function?

18   A.  No.  I don't believe so.

19   Q.  These are the documents that were produced this morning and

20   I wanted to mark and move into evidence the Second Amended and

21   Restated Limited Partnership Agreement dated January 2020 as

22   plaintiff's exhibit?

23          THE COURT:  What do you want to call this?

24   Plaintiff's Exhibit?

25          MR. RAND:  Yes, I am getting it; 104.

N6S5AQU2                        Amato - Redirect

1          THE COURT:  Pardon?

2          MR. RAND:  I would like to mark for identification

3    Plaintiff's Exhibit 104.

4          THE COURT:  104.  OK.

5          MR. RAND:  Do you have a sticker, by any chance?

6          THE COURT:  Here is a tag you can use.

7          MR. RAND:  You are ahead of me.

8    BY MR. RAND:

9    Q.  Mr. Amato, do you recognize this exhibit?

10   A.  I do now.  It looks familiar.

11         THE COURT:  Turn to page 16 and there is a signature

12   line for you, yes?

13         THE WITNESS:  Yes, there is, your Honor.

14         THE COURT:  And you authorize that to be submitted as

15   if I had signed it, right?

16         THE WITNESS:  Yes.

17         THE COURT:  So at the time you did that you made some

18   inquiry as to what it was, yes?

19         THE WITNESS:  Absolutely.

20         THE COURT:  Yes.

21         THE WITNESS:  I was just talking at this time.  It has

22   been a while.

23         THE COURT:  Very good.

24         MR. RAND:  Plaintiff's move into evidence Plaintiff's

25   Exhibit 104.

N6S5AQU2                          Amato - Redirect

1          MS. COLE:  No objection, other than I can barely hear

2     him when he is not standing in front of a microphone.

3          MR. RAND:  I will try to speak louder.  Sorry, I get

4     used to the microphone tone because when you speak loudly in

5     the microphone it is way too loud.

6          I apologize, your Honor.

7          THE COURT:  No problem.  Received.

8          (Plaintiff's Exhibit 104 received in evidence)

9     BY MR. RAND:

10    Q.  I would like to show you what plaintiffs have marked

11    Plaintiff's Exhibit 105.

12         MS. COLE:  Can we have a copy of this?  I don't know

13    what he is referring to.

14         THE COURT:  That makes two of us.

15         MR. RAND:  It is the second amended and restated

16    limited partnership agreement dated second day of October 2018,

17    which you produced this morning to the Judge.

18         THE COURT:  OK.

19         MR. RAND:  And I guess I have got the two, the

20    signature pages on the back which go with this 2018 agreement,

21    I believe.

22         MS. COLE:  OK.  I don't have a printed copy.  Do you

23    have an extra printed copy?

24         MR. RAND:  I do not, I just have the one the Court

25    printed for me this morning but I think you said that the

N6S5AQU2                         Amato - Redirect

1     recent one does not have signatures and the older one has

2     signatures that you provided?

3                 MR. WARD:  Correct, yes; 2018.

4                 MR. RAND:  Because of the signatures it is hard to

5     tell which one it goes to.

6                 MR. WARD:  Right, so we have to look at the title of

7     the file.

8                 MR. RAND:  OK.  I would move into evidence Plaintiff's

9     Exhibit 105.

10                 MS. COLE:  No objection, other than I'm having a

11     difficult time hearing him.

12                 MR. RAND:  OK.

13                 THE COURT:  I tell you what, if you are finished with

14     showing him the documents, why don't you go back to the

15     microphone so that everyone can hear your questions.

16                 MR. RAND:  The problem is I do not have a second copy

17     of this document and I only have one copy.  That's my problem.

18                 THE COURT:  So go ahead.

19                 MR. RAND:  I will try and speak very loudly.  Can you

20     hear me?  I only have a few questions.

21                 THE COURT:  I will repeat the questions.

22                 MR. RAND:  OK.

23                 THE COURT:  Let me ask the witness, this is the

24     earlier version of the same --

25     BY MR. RAND:

N6S5AQU2                          Amato - Redirect

```
 1   Q.  Are the statements made in --
 2                THE COURT:  I'm sorry.
 3                MR. RAND:  I'm going to make these questions very
 4   quick.
 5                THE COURT:  Go ahead.
 6   Q.  So, looking at Plaintiff's Exhibit 105, which is the second
 7   amended and restated limited partnership agreement of Alexander
 8   Capital LP, are the statements made in this agreement true and
 9   accurate?
10   A.  You want me to read the whole document?
11   Q.  Sure.
12                THE COURT:  You signed it, did you not?
13                THE WITNESS:  Yes.  I would assume they were but he
14   asked him -- I want to make sure if he is going to -- I would
15   assume them to be accurate.  Could there be a typo or something
16   to that?  Very possible.  But, I would assume them to be
17   accurate, with human error.
18                THE COURT:  The right to make typos is strictly
19   limited to the Court but let me ask counsel, just to move this
20   along, why are both these documents entitled Second Amended and
21   Restated Limited Partnership Agreement of Alexander Capital LP?
22   Shouldn't the later one be the third?
23                MS. COLE:  We did not draft these documents, your
24   Honor.
25                THE COURT:  OK.  Go ahead.  Must be a typo.
```

N6S5AQU2                          Amato - Redirect

1    BY MR. RAND:

2    Q.  In section 7.1 labeled management --

3               THE COURT:  This is which one?

4               MR. RAND:  Plaintiff's Exhibit 105, which is the

5    earlier one.

6               THE COURT:  Yes.

7    Q.  It states:  Due to the nature and highly regulated industry

8    ACLP operates within, its executive officers Joseph Amato, CEO,

9    and Rocco Guidicipietro, COO, shall serve as the exclusive

10   managers of the partnership and shall have all of the rights of

11   the general partner in this regard.

12              Is that a true statement?

13   A.  For NESA, yes.

14              MS. COLE:  Objection.  Calls for legal conclusion.

15              THE COURT:  No.  I think it's whether he was serving

16   as the exclusive managers of the partnership is a factual

17   issue.  There is a legal issue there too but there is certainly

18   a factual issue.  Overruled.  And he answered?

19              THE WITNESS:  As NESA --

20              THE COURT:  For NESA, the answer is yes.

21              But, let me ask you this:

22   Q.  While --

23              THE COURT:  I'm sorry.

24              MR. RAND:  I'm sorry.

25              THE COURT:  So, in the very first sentence on page 1

1   it states that the term "partnership" is used, it is referring

2   to Alexander Capital, whereas NESA is referred to as the

3   general partner.

4              Do you see that?

5              THE WITNESS:  I don't have the document.

6              THE COURT:  I'm sorry.  I will read the first sentence

7   in its entirety:  This second amended and restated limited

8   partnership agreement (this "agreement") of Alexander Capital

9   LP, a Delaware limited partnership (the"partnership"), is

10  effective as of the second day of October, 2018 (the "effective

11  date"), by and among NESA Management LLC, a Delaware limited

12  liability company as general partner (the"general partner"),

13  the limited partners listed on schedule A attached hereto (the

14  "limited partners"), and such other persons shall hereinafter

15  become partners as hereinafter provided.

16             Do you see that?  That is the first full sentence.

17  A.  I do, your Honor.

18             THE COURT:  So it defines "partnership" to refer to

19  Alexander Capital and "general partner" to refer to NESA.  Do

20  you see that?

21             THE WITNESS:  I do.

22             THE COURT:  OK.  So going back to paragraph

23  Section 7.1, that reads in the first sentence:  Except as

24  otherwise provided herein, all management powers over the

25  business and affairs of the partnership shall be vested in the

N6S5AQU2                     Amato - Redirect

1   general partner.

2            So isn't that saying that NESA is going to be managing

3   Alexander Capital?  Is that as you understand it?

4            THE WITNESS:  So, I guess that's how it reads, your

5   Honor.

6            THE COURT:  OK.  I am not asking you to give a legal

7   opinion, I'm just saying that's what the language seems to say.

8            THE WITNESS:  Right.

9            THE COURT:  Then the last sentence of that same

10  section it says:  Due to the nature of the highly regulated

11  industry ACLP operates within, its executive officers Joseph

12  Amato, CEO, and Rocco Guidicipietro, COO, shall serve as the

13  exclusive managers of the partnership and shall have all of the

14  rights of the general partner in this regard.

15           So, is that not saying, as you understand it, that

16  you -- and I guess we have been referring to the gentleman by

17  his first name, I hope that's agreeable, Rocco, although it is

18  in Philadelphia and I thought all Roccos came from

19  Philadelphia -- but, anyway, that the management powers that

20  are given to NESA to run Alexander Capital are now delegated to

21  you and Rocco.  Is that what it says?

22           THE WITNESS:  I'm not certain, your Honor, to be

23  honest.

24           THE COURT:  All right.

25           THE WITNESS:  That's why --

N6S5AQU2                          Amato - Redirect

|    |    |
|----|----|
| 1  | THE COURT:  That's fair enough.  That's fair enough. |
| 2  | You are not a lawyer and this is law talk, but you did sign the |
| 3  | agreement. |
| 4  | THE WITNESS:  Absolutely, your Honor; I signed this |
| 5  | agreement. |
| 6  | THE COURT:  All right.  Very good. |
| 7  | BY MR. RAND: |
| 8  | Q.  And if you look at Exhibit 104? |
| 9  | MS. COLE:  I can't hear him. |
| 10 | Q.  If you look at Exhibit 104, which is the January 2020 |
| 11 | Second Amended and Restated Limited Partnership Agreement; did |
| 12 | you sign this one as well? |
| 13 | A.  I did not. |
| 14 | Q.  You did not? |
| 15 | THE COURT:  This is the one we already discussed, you |
| 16 | authorized it to be treated as if you had signed. |
| 17 | THE WITNESS:  Yes, your Honor.  He just asked if I did |
| 18 | sign it. |
| 19 | THE COURT:  No. |
| 20 | MR. RAND:  Thank you.  I have no more questions for |
| 21 | the witness. |
| 22 | THE COURT:  Anything else? |
| 23 | MS. COLE:  No. |
| 24 | THE COURT:  Thank you very much.  You may step down. |
| 25 | Do we have a witness at noon, the document witness? |

N6S5AQU2                          Amato - Redirect

1          MR. RAND:  Oh yes.  We are supposed to have a Zoom

2     call.  Yes, we have three people to authenticate documents.

3          MR. WRIGHT:  Your Honor, at this time defense does

4     want to object.  We have been asking for the names of these

5     witnesses pretty consistently since we had this discussion for

6     authentication, we have only been provided one of them, we

7     still don't know who the other two witnesses are.

8          THE COURT:  Let's get at least the one who you do know

9     on the video and we will discuss the other two after that.

10          MR. WRIGHT:  Thank you, your Honor.

11          THE COURT:  All right, so call your witness.

12          MR. RAND:  I thought we were going to have Elizabeth

13     Russo, because we have Frank Russo, but I thought Elizabeth

14     Russo --

15          LAW CLERK:  Can you speak into the microphone, please?

16          MR. RAND:  Sorry.  We have frank Russo on the line.  I

17     thought we were going to have Elizabeth Russo, but Frank can

18     help us as well.

19          Frank, did you get --

20          MR. WRIGHT:  Your Honor, just for clarity, I see

21     Mr. Frank Manguso on the screen.  We were told that

22     Ms. Elizabeth Russo was called.  Mr. Manguso was called

23     previously, though, and we don't have an objection to him but

24     the only witnesses we were informed of for today were

25     Ms. Russo, who is not present --

1           THE COURT:  Let me ask, first of all, although you

2      have been previously sworn, you understand you are still under

3      oath, Mr. Russo?

4           THE WITNESS:  Manguso; and yes I understand that.

5           THE COURT:  Thank you for correcting my error.

6      FRANK MANGUSO, recalled.

7           THE COURT:  What is the story on this other person who

8      was supposed to be here?

9           MR. RAND:  You know, I don't know, but I thought

10     Elizabeth Russo, she basically received an invoice from

11     Mr. Clarke who was the chairman of the company.

12          THE COURT:  Anyway, if you think you can proceed with

13     the witness who is here, that's great.

14          MR. RAND:  Yes.

15     DIRECT EXAMINATION

16     BY MR. RAND:

17     Q.  Mr. Manguso, did you receive Plaintiff's Exhibit 100?

18     A.  I have 64 and 65, sir.

19     Q.  Oh.  Let's see.  Can we look at 65 first?  Do you recognize

20     what has been marked as Plaintiff's Exhibit 65?

21     A.  Yes.  I recognize it.  This has been produced by my staff

22     and given, ultimately, to Marcum for audit.

23          THE COURT:  Is this an ordinary business record?

24          THE WITNESS:  Yes, it is, your Honor.

25          THE COURT:  And the entries that are contained there

N6S5AQU2                         Manguso - Direct

1    were made at or about the time of the underlying transactions

2    to which they refer?

3              THE WITNESS:  Yes, they were.

4              THE COURT:  Are you offering as that a business

5    record?

6              MR. RAND:  Yes, your Honor.

7              THE COURT:  Any objection?

8              MR. WRIGHT:  Your Honor, I just want to be clear, is

9    this being offered as a business record of BioChemics or of

10   Inpellis?

11             THE COURT:  OK.  So let me ask the witness.

12             Whose business record was this?

13             THE WITNESS:  This was BioChemics'.

14             THE COURT:  OK.

15             MR. WRIGHT:  No objection.

16             THE COURT:  Received.

17             (Plaintiff's Exhibit 65 received in evidence)

18   BY MR. RAND:

19   Q.  Did you also receive, before this telephone testimony,

20   Plaintiff's Exhibit 64?

21   A.  Yes, I did.

22   Q.  And what is Plaintiff's Exhibit 64?

23   A.  That's Marcum's audit of BioChemics/Inpellis.

24   Q.  Is this an ordinary business record?

25   A.  Yes, it is.

1           MR. WRIGHT:  Objection.  Lack of personal knowledge.

2           THE COURT:  Well, all right.

3           Do you know who prepared this record?

4           THE WITNESS:  This was prepared by my staff, in the

5    ordinary course of business, to be given to Marcum.

6           THE COURT:  So any objection?

7           MR. WRIGHT:  Your Honor, again, I have a lack of

8    clarity as to whether or not this is BioChemics' or Inpellis'

9    record.

10          THE COURT:  Yes.  Good point.

11          Whose record is this?

12          THE WITNESS:  This is the audit of BioChemics and

13   Inpellis.

14          THE COURT:  Well --

15          THE WITNESS:  It's primarily the general ledger of

16   Inpellis.

17          THE COURT:  So this was an Inpellis record?

18          THE WITNESS:  Yes.

19          THE COURT:  OK.  So any objection?

20          MR. WRIGHT:  No, your Honor.

21          THE COURT:  OK.  Received.

22          (Plaintiff's Exhibit 64 received in evidence)

23          MR. RAND:  So it is in evidence?

24          THE COURT:  Yes.  Right.

25   BY MR. RAND:

1    Q.  Did you receive any other exhibits for this video?

2    A.  No, I did not.

3              MR. RAND:  Thank you very much, Mr. Manguso.

4              THE COURT:  He is a lucky fella but who knows, the

5    trial is not over, we may have to call you again, but I thank

6    you very much for your kind services.

7              THE WITNESS:  You're welcome, your Honor.

8              THE COURT:  Why don't we take him off.

9              You can leave and we will cancel you at this end as

10   well.

11             LAW CLERK:  Are we doing another video?

12             THE COURT:  We might, but cancel this one.

13             MR. RAND:  I'm not sure why the other person didn't

14   show up.

15             THE COURT:  So we can, over the lunch break you can

16   explore that and we can hear her later today.  On these, what I

17   will call document witnesses, is there anyone else that you

18   want to call in addition to her and, if so, who?

19             MR. RAND:  We are working on it for -- there are two

20   other documents; one is R.R. Donnelly and the other is a law

21   firm.

22             THE COURT:  So when you find out who they are, just

23   promptly tell your adversary.

24             MR. WRIGHT:  Your Honor, if I may?

25             LAW CLERK:  There is somebody named Bill Wood.

N6S5AQU2                              Manguso - Direct

1            THE COURT:  There is apparently a person named Bill

2     Wood --

3            MR. RAND:  I had someone searching to get someone.

4            THE COURT:  Mr. Wood, are you there?

5            LAW CLERK:  Just give me one second, Judge.

6            THE COURT:  OK.  Mr. Wood, can you hear me?  No.

7            THE WITNESS:  Yes, I can.  I can hear you, your Honor.

8            THE COURT:  Very good.  Before we place you under

9     oath, what is your position?

10           THE WITNESS:  I'm an associate general counsel for

11    Nelson Mullins Riley & Scarborough LLP, also known as the

12    ethics counsel for the firm.

13           THE COURT:  We will place you under oath.  Please

14    raise your right hand.

15    WILLIAM C. WOOD, JR.,

16         called as a witness by the Plaintiff,

17         having been duly sworn, testified as follows:

18           THE COURT:  State for the record your formal full

19    name.

20           THE WITNESS:  My name is William C. Wood, Jr.

21           THE COURT:  Counsel.

22           MR. WRIGHT:  Your Honor, I believe that we have a

23    pending objection.  I would just like a ruling on it for the

24    record.

25           THE COURT:  Yes.  So, I don't think I can rule on that

N6S5AQU2                          Wood – Direct

1    objection until I hear what he has to say, if it is -- but you

2    have lodged your objection.  I will deal with it after we take

3    his testimony.

4            MR. WRIGHT:  Thank you, your Honor.

5            THE COURT:  Worst case would be we would have to

6    recall him so it's not that any time is being lost by hearing

7    his direct testimony.  But, if we have to recall him for your

8    cross, we will deal with that.

9            MR. WRIGHT:  Thank you.

10           THE COURT:  Very good.

11   DIRECT EXAMINATION

12   BY MR. RAND:

13   Q.  Good afternoon, Mr. Wood.

14   A.  Yes.

15   Q.  Did you receive Plaintiff's Exhibit 100 in this case before

16   this?

17   A.  I do not have a marked copy of it.  My understanding is

18   that Plaintiff's 100 is an Excel spreadsheet prepared by our

19   accounting department.

20   Q.  That is correct.

21           THE COURT:  Have you looked at the --

22           THE WITNESS:  I have that spreadsheet.

23           THE COURT:  So you have the document, you just don't

24   know that it was marked or identified as Plaintiff's Exhibit

25   100; is that right?

1              THE WITNESS:  That's correct, your Honor.

2              THE COURT:  Very good.

3    BY MR. RAND:

4    Q.   And is this a business record kept by Nelson Mullins?

5    A.   This is a compilation of business records kept by –– or

6    business information kept by Nelson Mullins, prepared to show

7    the billing that was between us as lawyers for Inpellis.

8              THE COURT:  And when was this document prepared?

9              THE WITNESS:  If you give me just a moment, your

10   Honor, I can find that.  I believe it was prepared sometime at

11   the beginning of this month at the request –– we received a

12   request, our accounting department did, to appropriate a

13   document showing each of the bills, the number of the bills,

14   the amount of the bills that had been submitted and paid or not

15   paid, for our former client Inpellis.

16             THE COURT:  And that was at the request of plaintiff's

17   counsel?

18             MR. RAND:  I'm not sure who is plaintiff and who is

19   defendant in this case but it was –– I believe it was the

20   gentleman who was asking me the question just a moment ago, I

21   believe his name is Mr. Markham.

22             THE COURT:  So this is a summary of records that were

23   prepared themselves in the ordinary course of business, even

24   though this, itself, is not an ordinary course of business

25   document but a summary of documents that were prepared in the

1   ordinary course of business.  Do I have that right?

2              THE WITNESS:  Yes, you do, your Honor.  This is a

3   summary of the actual bills so what you have is a list of the

4   bills, the billing date, payments in, and then writeoffs as you

5   go across the different columns.  So it is a summary of the

6   billing and collection and writeoffs with regard to Inpellis,

7   Inc., our former client.

8              THE COURT:  OK.  So are you offering 100?

9              MR. RAND:  Yes, your Honor.

10             THE COURT:  Any objection?

11             MR. WRIGHT:  Your Honor, we have no objections to

12  authenticity.  We do, however, object that this document was

13  not provided until this month, well after the close of

14  discovery.

15             THE COURT:  So we will deal with that after we are

16  finished with Mr. Wood so we don't detain him.

17             MR. WRIGHT:  Yes, your Honor.

18             THE COURT:  So, subject to that discussion, the

19  exhibit is received, but we will revisit that after the

20  testimony.

21             (Plaintiff's Exhibit 100 received in evidence)

22             THE COURT:  Is there any cross or do you want to, now

23  that you know what is involved, do you need more time?

24             MR. WRIGHT:  No, your Honor.

25             THE COURT:  Very good.  Thank you very much, Mr. Wood.

1    You can sign off now.  We appreciate your being available.

2              MR. RAND:  Thank you, Mr. Wood.

3              THE WITNESS:  Thank you very much, your Honor.

4              THE COURT:  OK.  So let me ask plaintiff's counsel why

5    was this not something prepared long before a month ago?

6              MR. RAND:  Because we needed to find evidence of the

7    damages and we had assumed they were going to be in the

8    documents but they weren't there.  There is no dispute that

9    work was provided.  There is no dispute that bills were given

10   but I guess nobody -- I don't know.

11             THE COURT:  Let me ask defense counsel, how were you

12   prejudiced since you still had a month to inquire into this?

13             MR. WRIGHT:  Your Honor, I am looking for the exact

14   date we received this.  It was not prepared until the 5th.  I

15   think the prejudice to us is this goes back to the spoliation

16   issue in many ways.  These are documents we have been asking

17   for throughout discovery, they weren't provided, we weren't

18   able to question anyone on them.  We don't know the nature of

19   the work of the underlying documents and so on.

20             THE COURT:  So that is, I think you are right that

21   that is a spoliation issue and I haven't yet ruled on what

22   exhibits may be stricken or whatever because of the spoliation,

23   that is still something we need to discuss, but I think that's

24   different from it's not the timing of its production that is

25   the prejudice, it is the fact you can't get at the underlying

1    records that is the prejudice because of the spoliation; yes?

2            MR. WRIGHT:  I would argue that it is both because we

3    were denied the ability to question witnesses during their

4    deposition about these documents.

5            THE COURT:  All right.  I will continue to think about

6    that latter point but at least for now I will continue to

7    receive it subject to further argument on both the points, both

8    the spoliation point and prejudice point.

9            MR. WRIGHT:  Thank you.

10           THE COURT:  Please call your next witness.

11           MR. RAND:  Just so I have a plan, when is the time

12   that you would like to plan for a lunch break?

13           THE COURT:  Well, we are going today to 4:15.  Let me

14   give you the choice.  We could either break early for lunch and

15   then take a very short break in the middle of the afternoon, or

16   we could break as I normally do, at 1:00 for lunch, and then

17   when we came back we would go without a break until 4:15.  So,

18   I'm happy to do whatever you collectively want, assuming there

19   is a consensus.  So what would you like?

20           MR. WARD:  There is a consensus because I don't care

21   either way; whatever works.

22           THE COURT:  I'm sorry.

23           MR. WARD:  I'm sorry.  Whatever works for everybody.

24           MR. RAND:  So if we continue now we will take the

25   break at 1:00 and then we will get another break?

N6S5AQU2                             Wood – Direct

1          THE COURT:  No.  If we continue now we will break at

2     lunch for 1:00 to 2:00 and then we will go without a break to

3     4:15.  If we break at 12:30, then you will have your lunch

4     break now and we will resume at 1:30 and I will give you a

5     short break in the afternoon.

6          MR. RAND:  I would prefer that schedule.

7          THE COURT:  So call the witness and then we will break

8     at 12:30.

9          MR. RAND:  Sure.  I would like to call Rocco

10    Guidicipietro.

11         THE COURT:  Let me ask a different question.  You

12    wanted to call Mr. Schlichtmann at 2:00 originally is what you

13    had said.

14         MR. RAND:  Yes, this afternoon, once we finish our

15    case, but I mean if you want to --

16         THE COURT:  Who is calling Mr. Schlichtmann?  Is it

17    the defense that is calling him.

18         MR. WARD:  Yes, we are; first witness, your Honor.

19         THE COURT:  How long are you going to be with this

20    witness?

21         MR. RAND:  Maybe an hour.

22         THE COURT:  An hour.  All right.

23         MR. RAND:  I think we are OK if you want to switch the

24    order.

25         THE COURT:  So, well, I just felt if Mr. Schlichtmann

N6S5AQU2                          Guidicipietro - Direct

1    is here, it is a shame to keep him waiting in the witness room,

2    so if you would like to -- if you feel it would be OK to call

3    him out of order --

4              MR. RAND:  Can I take a second to make sure he is

5    still there and ask him.

6              MR. WARD:  Your Honor, we prefer to plaintiff to close

7    its case-in-chief.

8              THE COURT:  Very good.  So I thought I was doing

9    pretty good.  Guidicipietro, yes?

10             THE WITNESS:  Yes.

11             THE COURT:  So it just comes rolling off my lips.  OK.

12   Come on up.

13   ROCCO GERARD GUIDICIPIETRO,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16             THE COURT:  State and spell your full name for the

17   record.

18             THE WITNESS:  Rocco Gerard Guidicipietro.

19   G-U-I-D-I-C-I-P-I-E-T-R-O.

20             THE COURT:  I assume Rocco is not spelled

21   R-O-C-K-Q-U-E-O.

22             THE WITNESS:  No.  R-O-C-C-O.

23             THE COURT:  Ah.  Go ahead.

24   DIRECT EXAMINATION

25   BY MR. RAND:

1    Q.  Good morning, Mr. Guidicipietro.

2              THE COURT:  I won't bore you with the many

3    misspellings of Judge Rakoff's name.

4    Q.  What is your current position at Alexander?

5    A.  Chief operating officer.

6    Q.  And what are your duties as chief operating officer?

7    A.  I am in charge of books and records, payroll, bills.

8    Q.  What is your educational history?

9    A.  I graduated from high school.

10             THE COURT:  Where are you from originally?

11             THE WITNESS:  Brooklyn, New York.

12   Q.  Did you go to college?

13   A.  I did not.

14   Q.  Can you give me a short background of your professional

15   history?

16   A.  My professional history in the brokerage business, I

17   started in 1994, small broker-dealer, passed my Series 7 June

18   6, I believe, '94.  I was at a few small broker-dealers:  1996

19   was the first office, Paulson investments, that I managed, and

20   then I have been registered rep and principal since '96 until

21   about 2014, '13, and now I'm chief operating officer at

22   Alexander Capital.

23   Q.  When did you first become COO of Alexander Capital?

24   A.  I believe the title was given to me in 2013.

25   Q.  You have been COO ever since?

1    A.   Yes.

2    Q.   Have you always owned 50 percent of NESA Management LLC?

3    A.   Yes.

4    Q.   What is the purpose of NESA Management?

5    A.   NESA Management was a holding company to hold the ownership

6    of the broker-dealer.

7    Q.   What is the broker-dealer?

8    A.   Alexander Capital LP.

9    Q.   When you first -- when NESA Management LP first invested in

10   Alexander Capital, how much did it own?

11   A.   About 24.9.

12   Q.   Do you know when that was?

13   A.   January 2014, I believe.

14   Q.   And then did it increase its ownership at any time?

15   A.   Yes, it did.

16   Q.   When did NESA Management LLC increase its ownership of

17   Alexander Capital?

18   A.   I believe it was 2017.

19   Q.   And how much did it increase?

20   A.   It increased to own 75.1.

21   Q.   Who did you buy the additional ownership from?  Sorry.

22        Who did NESA Management LLC buy the additional

23   ownership from?

24   A.   The initial ownership, the 24.9 I'm not sure if it was from

25   the original owner, I believe.

1   Q.  From whom did you purchase the original 24.9 percent?

2   A.  I'm not sure if it was Exodus or was it the previous owner,

3   Francois Alexander Capital Holdings, I believe.

4   Q.  Do you know who own Exodus?

5   A.  Yes.

6   Q.  Who owns Exodus?

7   A.  Joe Figiolo.

8   Q.  Figiolo?

9   A.  Figiolo.

10  Q.  Has Joe Figiolo ever had any management role at Alexander

11  Capital?

12  A.  He did not.

13  Q.  Has he ever had a management role?

14  A.  He did not.

15  Q.  Has Exodus -- what is the full name for Exodus?

16  A.  I'm not sure.  I think it is LLC.  Exodus LLC.

17  Q.  Has Exodus ever had -- has Exodus ever been general partner

18  of Alexander?

19  A.  I'm not sure.

20  Q.  Do you know who Pat Mooney is?

21  A.  Briefly, yes.  I know the name.

22  Q.  Who is Patrick Mooney?

23  A.  Patrick Mooney, I met him maybe a handful of times.

24  Q.  Do you know what he does?

25  A.  I'm not sure what he does now.

1   Q.  Do you know if he has ever worked for Alexander Capital?

2   A.  Yes; as a consultant.

3   Q.  And do you know what he did for Alexander Capital as a

4   consultant?

5   A.  I don't believe he did much.  He was only with us a short

6   period of time.

7   Q.  Do you know approximately when he was with you?

8   A.  I would say early 2014.

9   Q.  Did he work for you in 2015 as well?

10  A.  I don't believe so.

11  Q.  Do you know approximately, do you have any idea what

12  services he provided Alexander Capital?

13  A.  I do not.

14  Q.  Do you know how Patrick Mooney was paid?

15  A.  I don't believe he was ever paid.

16  Q.  Did Patrick Mooney ever have a salary from Alexander

17  Capital?

18  A.  He did not.

19  Q.  Did Patrick Mooney ever have an agreement with Alexander

20  Capital regarding any compensation?

21  A.  Not that I know of in writing.

22  Q.  Why was Patrick Mooney working as a consultant for no pay?

23  A.  You would have to ask him.

24  Q.  Was there any expectation that he would be paid in certain

25  circumstances?  I mean, was he commission?

1    A.  He didn't work for me directly and I have no knowledge of

2    anything that he did.  He was working as a consulting in

3    banking.  I had no interaction with him at all, zero.

4    Q.  Who had interaction with Patrick Mooney at Alexander?

5    A.  Banking department; I would say Chris Carlin and Jonathan

6    Gazdak.

7    Q.  Did Chris Carlin report to Jonathan Gazdak?

8    A.  Yes.

9    Q.  Was Chris Carlin an employee of Alexander Capital?

10   A.  No.  He was an independent contractor.

11   Q.  What group were they both in?

12   A.  Investment banking.

13   Q.  Was anyone in investment banking an employee?

14   A.  No.

15   Q.  Were there any other departments where all the people who

16   worked in the department were outside contractors?

17   A.  There is a few in different departments, not totally.

18   Q.  How many other people were in investment banking in

19   addition to Chris Carlin and Jonathan Gazdak?

20   A.  They were the mine -- Jonathan Gazdak was head of banking;

21   Chris Carlin was the head of capital markets.

22   Q.  And who did they report to?

23   A.  Chief compliance officer.

24   Q.  Who was the chief compliance officer in 2014?

25   A.  My best guess would be Tim Stack.

1    Q.  And did he get replaced at any point in time?

2    A.  Yes.

3              THE COURT:  I'm sorry.  Do you know approximately when

4    he got replaced?

5              THE WITNESS:  No.  I'm not sure.

6    BY MR. RAND:

7    Q.  Why did they report to a compliance officer?

8    A.  That's how a broker-dealer operates.  The broker-dealer has

9    a license to do securities.  The compliance department is

10   completely separate from any other entity.  The chief

11   compliance officer is actually the person that makes policies

12   and changes.  Investment banking is its own department, they

13   also have a Chinese wall so nobody else in the firm is privy to

14   anything they're working on or any information.  It only goes

15   between compliance and banking.

16   Q.  Does the compliance officer determine the pay for the

17   people who worked for Alexander Capital?

18   A.  I don't understand what you mean.  What people?

19   Q.  Who determines how much people get paid at Alexander

20   Capital?

21   A.  What people?  Employees or 1099s?

22   Q.  Both.

23   A.  Both.  1099s only get paid if they actually do business,

24   employees have a salary.

25   Q.  Who determines the salary of the employees?

1    A.  Usually it is negotiated when they're hired.

2    Q.  But who at the firm does the negotiation?

3    A.  It depends what department is hiring an employee, they

4    would negotiate a salary.

5    Q.  So no one in investment banking has a salary?

6    A.  No.

7    Q.  Who created the outside contractor agreements for the

8    investment banking orders?

9    A.  Legal.  We had attorneys at different points.

10   Q.  And they determined how much the outside investment bankers

11   were going to be paid in those investment contracts?

12   A.  No.  To restate my answer, they only get paid if they

13   perform business.

14   Q.  And who determines the percentage of pay they get if they

15   perform business?

16   A.  It is done on whatever deal they're working on, whatever

17   they're working on.  Whatever they get paid from whatever

18   they're doing, whatever compensation.

19   Q.  Give me an example of how it works.  I'm not following.

20   A.  OK.  They have an investment banking deal, they get a 10

21   percent fee, so the firm gets a 10 percent fee, and they would

22   get a portion of that fee on this independent contractor

23   payout.

24   Q.  Who determines the portion of the fee that they would get

25   as their payout?

1   A.   It is determined at the time they are hired.

2   Q.   Who did they negotiate it with?

3   A.   Usually it is an ongoing negotiation, it depends on what

4   department; if it is banking, they would negotiate with the

5   head banker.

6   Q.   Who did Jonathan Gazdak negotiate with when he negotiated

7   his agreement for his percentage of fees?

8           MS. COLE:  Objection.  Relevance.

9           THE COURT:  No, I think it's relevant but I also think

10  that after he answers that question it is now 12:30 and we need

11  to take our lunch break.

12          So you can answer that last question.

13          THE WITNESS:  I'm not sure who he negotiated with.

14          THE COURT:  Very good.  We will resume promptly at

15  1:00.

16          MR. WRIGHT:  Your Honor did you say 1:00 or 1:30?

17          THE COURT:  1:30.  You do want a full hour for lunch,

18  don't you?

19          MR. WRIGHT:  That would be my preference.  Yes, your

20  Honor.

21          THE COURT:  I thought it might.

22          MR. WRIGHT:  But I also don't want to be late.

23          THE COURT:  No, no, no.  Being late is my prerogative.

24          MR. WRIGHT:  Exactly.

25          (Luncheon recess)

1                            AFTERNOON SESSION

2                                1:30 p.m.

3              THE COURT:  Let's get the witness back on the stand.

4              MR. RAND:  Your Honor, some housekeeping?

5              THE COURT:  Yes.

6              MR. RAND:  So our call for the RR Donnelley person,

7    they have agreed to let the RR Donnelley document into

8    evidence, which is Plaintiff's 103, subject to their objections

9    which they can list.

10             THE COURT:  What's the number again?

11             MR. RAND:  103.

12             THE COURT:  That's received.

13             MR. WRIGHT:  Just to be clear, subject to our

14   objection, this was not produced until approximately 36 hours

15   before the start of trial, and we're prejudiced by the

16   spoliation issue.

17             THE COURT:  Yes.  So the same two issues we will be

18   discussing, but you're saying even a better one for you because

19   it was only 36 hours.

20             MR. WRIGHT:  Absolutely.

21             THE COURT:  Okay.

22             (Plaintiff's Exhibit 103 received in evidence)

23   DIRECT EXAMINATION CONTINUED

24   BY MR. RAND:

25   Q.  Mr. Guidicipietro, is it okay if I call you Rocco?

N6SQaqu3                    Guidicipietro – Direct

1     A.  Yes, it is.

2     Q.  Rocco, I'm showing you a declaration of

3     Rocco Guidicipietro, which was filed as document 132 in this

4     case on April 8, 2022. Have you seen this declaration before?

5     A.  Yes.

6     Q.  Did you sign this declaration?

7     A.  Yes, I did.

8     Q.  Do you see where it states in paragraph four from July 29,

9     2014 through May 15, 2015:

10             I believe that Alexander Capital LP was licensed to

11    engage in firm commitment underwriting as the lead underwriter

12    of an IPO?

13    A.  Yes, I do.

14    Q.  Is that a true statement?

15    A.  Yes, it is.

16    Q.  You see where it says in the paragraph five:

17             Sometime on or after May 15, 2015, I became aware of a

18    letter sent by FINRA to Alexander Capital LP, indicating that

19    the firm was not licensed to engage firm commitment

20    underwritings as lead underwriter of an IPO.

21             Is that a correct statement?

22    A.  Yes, it is.

23    Q.  In paragraph six, it states:

24             After becoming aware of the letter, and only after

25    becoming aware of the letter, was I personally aware that

Alexander Capital LP was not licensed to engage in firm

commitment underwriting as the lead underwriter of an IPO.

          Is that a correct statement?

A.   Yes.

          THE COURT:  The excerpts from his deposition that were

previously marked by plaintiff's counsel are now received for

the same reason that I received Mr. Amato's deposition

statements, but you're free to question him about any

particular one that you want.

          It's a deposition of Mr. Guidicipietro on

September 29, 2021.  And, defense counsel, I'm going to prevail

on you, since you filed the other ones, to also file this with

the Clerk of the Court as an exhibit in the same way we handled

the other depositions.

          MS. COLE:  Yes, your Honor.  I've asked Mr. Rand --

I've sent him all of those, and I've asked him twice for his

consent whether we can file, and he has yes to respond.

          THE COURT:  So what sort of sanctions are you applying

for for this clearly --

          MS. COLE:  Just that you direct him to let me know if

we can file them on the record.

          THE COURT:  Let them know either later today or

tomorrow morning.

          MR. RAND:  Thank you.  It's on my list of things to do

I've just been very busy.

1    BY MR. RAND:

2    Q.  Did you testify on September 29, 2021?

3    A.  Yes, I did.

4    Q.  Were you under oath when you testified?

5    A.  Yes, I did -- yes, I was.

6    Q.  I'm going to read to you the transcript starting at page

7    220, line 22.  Then I'm going to ask you if it's a correct

8    statement.

9    "Q.  Did you have an understanding at that time as to why the

10   SEC would require Alexander Capital LP to have certain levels

11   of net capital available?

12   "A.  It depends on what type of broker dealer it is.

13   "Q.  All right.  And when you say 'what type,' what is that

14   referring to?  What types are there?

15   "A.  We, Alexander Capital LP, was a $5,000 broker dealer.

16   "Q.  Okay.  And what's a five -- what was your understand of

17   5,000 broker dealer in 2013?

18   "A.  It needed capital of 5,000 plus an aggregated debt so it

19   usually, it needed about 15, 20,000."

20            Is that correct statement?

21   A.  Yes, it's a $5,000 broker dealer.

22   Q.  Is your testimony that in 2013 Alexander Capital was a

23   nickel broker?

24   A.  Yes.

25   Q.  And in 2013 when Alexander Capital was a nickel broker,

1    isn't it true it was not permitted to perform firm commitment

2    underwriting?

3    A.   I believed it was.  I found out in '15.

4    Q.   And if you keep looking at the transcript, the next

5    question on line 15 of page 221 says:

6    "Q.   All right.  And was that -- and as a 5,000 broker dealer,

7    what was your understanding of the type of underwriting

8    activities it could engage in as a 5,000 broker dealer in 2013?

9    "A.   It could participate in syndicate selling group.

10   "Q.   For what types of underwriting?

11   "A.   For most types of underwriting.

12   "Q.   Did that involve firm commitment underwriting?

13   "A.   At a 5,000 BD, you couldn't underwrite; you could

14   participate."

15           Does that refresh your recollection -- is that a

16   correct statement?

17   A.   Well, it was the knowledge I had at that point, so I kind

18   of answered what a 5,000 BD is, not realizing going back to

19   2013.

20   Q.   So it's not a correct statement in your deposition

21   testimony?

22   A.   Well, it's a correct statement on a $5,000 broker dealer,

23   but I was giving you the knowledge that I had at that time of

24   the deposition.

25   Q.   In 2013, was Alexander a $5,000 broker dealer?

1    A.  Yes, it was, but at that time I believed we could do firm

2    commitments.

3    Q.  I'm going to show you -- I'm going to read you your

4    testimony from page 222, line 4:

5    "Q.  And how could you participate?

6    "A.  You would get stock from another broker dealer" -- wait a

7    second.

8    "A.  You would get stock from -- another broker dealer would be

9    the lead underwriter, and then you would participate.

10   "Q.  Participate in what way?  What would be -- what was your

11   understanding of the type of participation you could have in

12   such an underwriting?

13   "A.  You can, you know, buy stock, and sell it to customers.

14   "Q.  Could you be part of the -- could you be an underwriter

15   that could underwrite the firm commitment offering?  Was it

16   your understanding that you could or couldn't?

17   "A.  You couldn't underwrite.

18   "Q.  I'm sorry?

19   "A.  You could not underwrite.

20   "Q.  A firm commitment offering?

21   "A.  Right."

22           Was your testimony true and accurate?

23   A.  Yes, according to a $5,000 broker dealer.  Again, I was

24   giving you my knowledge at the point of deposition.

25   Q.  Then it continues on page 24 -- line 24, page 222:

1   "Q.  Is that correct?  I am just making clear I understand the

2   answer.  Is that --

3   "A.  You could not underwrite a firm commitment offering."

4           Did you make it clear in your deposition that in 2013

5   Alexander was a nickel broker, and a nickel broker was not

6   permitted to underwrite a firm commitment offering.

7   A.  Again, I know it started with the question in 2013.  I must

8   have lost track during the deposition.  I was giving you my

9   knowledge at the day of the deposition.

10  Q.  Did Alexander Capital ever take any steps to make anyone

11  employed at Alexander Capital aware of any restrictions that

12  FINRA had issued?

13  A.  During what timeframe?

14  Q.  2015.

15  A.  Not that I'm aware of.

16  Q.  And why did they take no steps?

17  A.  Banking handled their own issues themselves, so when we did

18  receive that letter in 2015, that was in legal and working with

19  compliance that filed the CMA that did underwriting, so there's

20  no need to tell the rest of the employees what's going on in

21  banking.

22  Q.  Did Alexander continue to do firm commitment offerings

23  before it obtained any approval from FINRA to do firm

24  commitment offerings?

25  A.  We still believed we could do firm commitment offerings in

1    a syndicate capacity.

2    Q.  And was that belief correct?

3    A.  It ended up not being correct.

4    Q.  And did you suffer any ramifications from those firm

5    commitment offerings that you performed that were not

6    permitted?

7    A.  Yes.  In fact, I notified FINRA.  I'm the one that was

8    investigating if we could or could not do it, and I'm the one

9    that initiated that investigation, and we found out that we

10   couldn't do it.  And we made a settlement with FINRA and AWC at

11   that point, and we stopped doing even syndicate, I believe, in

12   August 8 of 2016.  So I'm the one that initiated that review

13   from FINRA, personally did.

14   Q.  And when you say initiated, did you -- sorry.

15   A.  I'm sorry.

16   Q.  Did you initiate the application to get permission to do

17   firm commitment offerings?

18   A.  No, I emailed my -- my FINRA coordinator to see what we can

19   and can't do because we were looking for exemptions, and we

20   ended up having a conference with FINRA, and they explained to

21   us that they that we would have to file a CMA even to do

22   syndicate, so they advised us to stop, which was in August of

23   '16, and we filed a follow-on CMA and got approved in '17.

24   Q.  So all this happened only in 2016?

25   A.  Yes.

```
 1   Q.  Did you get the unreasonable letter in 2015?
 2   A.  No, the unreasonable letter was for the firm commitment
 3   underwriting for Inpellis.
 4   Q.  In your declaration, you say:  Sometime on or after May 15,
 5   2015, I became aware of a letter sent to FINRA indicating that
 6   the firm was not licensed to engage in firm commitment
 7   underwriting.
 8         Was that the restriction letter?
 9   A.  The restriction letter, we believed it just meant being the
10   lead underwriter.
11   Q.  All right.  So did you understand that when you received
12   the restriction letter, that you were not able to be the sole
13   underwriter on a firm commitment underwriting?
14   A.  After the restriction letter, yes.
15   Q.  And did you tell Inpellis that you could not live up to
16   your agreement to be the sole underwriter on a firm commitment
17   offering?
18         MS. COLE:  Objection.  Vague.
19         THE COURT:  No.  I'll allow it.  You may answer.
20   A.  I don't deal with banking customers.  I had no interaction
21   with Inpellis at all ever.
22   Q.  Did you have any knowledge that anyone at Alexander
23   notified Inpellis that Alexander did not have a license to do a
24   firm commitment offering at that time?
25   A.  I do not have any knowledge.
```

1    Q.  Did you make any effort to request employees to inform

2    their clients that they could not do firm commitment offerings?

3            MS. COLE:  Objection.  And the nature of my objection

4    is, is he asking Mr. Guidicipietro individually or is he

5    asking -- when he uses the word "you," is he referring to

6    Alexander Capital.

7            THE COURT:  I took it to mean he's referring to the

8    witness, not to Alexander Capital.

9            MS. COLE:  Thank you.  No objection.

10           THE COURT:  Do you want to repeat the question?

11   A.  Yes, please repeat it.

12   Q.  Did you have any knowledge that anyone at Alexander --

13           THE COURT:  The question was:  Did you make any effort

14   to request employees to inform their clients that they could

15   not do firm commitment offerings?

16           THE WITNESS:  I did not.

17   Q.  I'm going to look for P30 and 31.  I'd like to show you

18   what is in evidence as Plaintiff's Exhibit 30.

19           Rocco, did you receive this email?

20   A.  I don't recall it, but I'm on the email.

21   Q.  Do you have any reason to believe you did not receive this

22   email?

23   A.  No, I have no reason to believe I never received it.  Not

24   sure if I read it.  I know I received it.

25   Q.  Do you see where it says -- it's from Chris Carlin.  Who is

1   Chris Carlin?

2   A.   Head of capital markets.

3   Q.   Does he report to you?

4   A.   He does not.

5   Q.   Who does he report to?

6   A.   He reports to compliance.

7   Q.   Why is he emailing you?

8   A.   Just to give me an overview what he's been working on.

9   Q.   Does he say:  Rocco and Joe have asked me for an update?

10  A.   Yes, he does.

11  Q.   Did you ask Chris Carlin for an update?

12  A.   I don't recall, but I probably did if he's giving me an

13  update.

14  Q.   Have you at times asked Chris Carlin for an update on the

15  work he's performing?

16  A.   Time to time.

17  Q.   And do you recall if you received an update?

18  A.   I don't recall.  I see the email.

19  Q.   You see that Patrick Mooney is on the same email as you

20  are?

21  A.   Yes.

22  Q.   Does that refresh your recollection that you at times were

23  working with Patrick Mooney?

24  A.   Not at all.

25  Q.   Do you see lower down, there's an email that talks about

1    Volition?

2    A.  Yes.

3    Q.  Do you know what Volition is?

4    A.  I do not.

5    Q.  Do you see it also talks about Conkwest?

6    A.  Yes.

7    Q.  Know what that is?

8    A.  No idea.

9    Q.  Do you see it talks about Medevax?

10   A.  Same answer, no idea.

11   Q.  If you look at the next page, you see there's an item that

12   says -- it's got a list of entities.  The first one is SMI.  Do

13   you know what that is?

14   A.  I don't.

15   Q.  Do you know what Summit is?

16   A.  Summit, I do know what it is.

17   Q.  What company is that?

18   A.  It was a I believe a wireless -- wireless speaker company.

19   Q.  What was the work that Alexander was doing for Summit?

20   A.  I believe it was a private company at the time.

21   Q.  Were you making a -- were you raising money privately?

22   A.  I don't know.  I don't remember.

23   Q.  Do you see it says Alterix?

24   A.  Yes.

25   Q.  Did you know what Alterix was at the time?

 1   A.  I did not.

 2   Q.  And do you see it says Azur?

 3   A.  Yes.

 4   Q.  Do you know what Azur was?

 5   A.  I believe that was a biotech.

 6   Q.  And what kind of fundraising were you doing for Azur?

 7   A.  I'm not sure what they did.

 8   Q.  Do you see it says Silver Sun?

 9   A.  Yes.

10   Q.  What fundraising were you doing for Silver Sun?

11   A.  I'm not sure.

12   Q.  When did Alexander Capital start its investment banking

13   division?

14   A.  The beginning of 2014.

15   Q.  When did it do its first public offering?

16   A.  I don't know.

17   Q.  When is the first one you recall?

18   A.  I don't know.

19   Q.  You don't know?

20   A.  I don't remember which the first one was, the public

21   offering.

22   Q.  Has Alexander done any public offerings?

23   A.  Yes, in 2016 I believe, a public company.

24   Q.  Which one do you recall?

25   A.  I don't recall any of them.  I just believe in that

1   timeframe we did.

2   Q.  How do you know they occurred?

3   A.  Because I know they're in the AWC.

4   Q.  What do you mean they're in --

5   A.  They're listed in the FINRA action, so that's how I know we

6   did companies in 2016.

7   Q.  And the findings in the FINRA action are true and correct?

8   A.  We didn't admit or deny.

9   Q.  I'm sorry, what?

10  A.  We didn't admit or deny.

11          THE COURT:  Unfortunately, I just spilled a whole cup

12  of coffee.

13          (Recess)

14          THE COURT:  Please be seated.  I will attempt to be

15  seated.

16  Q.  I'm showing the witness plaintiff's 31.  Rocco, did you

17  receive this email?

18  A.  I don't recall if I'm in the email address.

19  Q.  Do you have any reason to believe you did not receive this

20  email?

21  A.  No, I'm sure it came to me.

22  Q.  Is this email from Chris Carlin to you?

23  A.  To the group, to his group, and I'm added in.

24  Q.  So why is he including you on this email?

25  A.  I guess being courteous to tell me he's not going to be in

1     the office.

2     Q.  Are you Chris Carlin's supervisor?

3     A.  I am not.

4     Q.  Does he report to you?

5     A.  He does not.

6     Q.  Why is he reporting to you on this email?

7     A.  He's letting me know he's not going to be in the office.

8     He doesn't need to; he's just letting me know.

9     Q.  Is anybody from compliance on this email?

10    A.  I don't see anybody from compliance.

11    Q.  You said before he reports to compliance.

12    A.  He's reporting that he's not going to be in the office.  I

13    don't think it needs to be reported to compliance.

14    Q.  Well, usually you tell your boss when you're going to be

15    out of the office?

16            THE COURT:  Sustained.

17    Q.  I'm looking for P20.  I'd like to show you what has been

18    marked as P20 and I will ask you if you recognize this

19    document.

20    A.  I do.  It's a CMA.

21    Q.  And did you see this document at the time it was prepared?

22    A.  I did not.

23    Q.  And when did you learn about this document?

24    A.  What do you mean learned about it?

25    Q.  Well, you've seen it before.  Isn't that what you just

1    said?

2    A.   I've seen this type of application.  It's a CMA.

3    Q.   Do you recall there was a time when Alexander applied to

4    get authority to do firm commitment public offerings?

5    A.   Yes.

6    Q.   And do you know when that was?

7    A.   My best guess would be June of '15.

8    Q.   Right.  And if I represented to you that this is the

9    application to get the firm commitment --

10            THE COURT:  No.  No.  This is a bad habit that lawyers

11   in many, many cases, apparently without being properly

12   instructed, have engaged in where they say, "I represent to you

13   X."  A lawyer questioning a witness is not him or herself a

14   witness, cannot make any representations, and, therefore,

15   that's a totally improper way to proceed.

16            Now, it is true that some courts appear to permit that

17   way to proceed, and I can only infer that they're trying to

18   move things along by permitting something that is otherwise

19   totally and completely impermissible.

20            Put another question.

21            MR. RAND:  Yes.

22   Q.   Is it your testimony that you have not seen this document

23   before?

24   A.   In the -- probably in this case, I did, I've seen it

25   before.

1  Q.  But prior to this case, and prior to this case, is it your

2  testimony that you reviewed any application to get firm

3  commitment authority from FINRA for Alexander Capital?

4          MS. COLE:  Objection to "prior to this case."  What

5  does that mean?

6          THE COURT:  Well, do you mean from the time the

7  complaint was filed?

8          MR. RAND:  Yes, your Honor.

9          THE COURT:  All right.

10          With that amendment, you can answer the question.

11  A.  No, I haven't reviewed the documents before.

12  Q.  The question was if you had been told about any application

13  to get firm commitment approval by Alexander prior to the

14  commencement of this action?

15  A.  Yes, I knew that they filed it, but I didn't see the

16  document.

17  Q.  And you were told about that filing in June of 2015?

18  A.  I don't know exactly when, but I did have knowledge that

19  they did file a CMA.

20  Q.  I'd like to show you what has been marked as P21, which is

21  a restriction letter.  Have you seen this letter from FINRA

22  dated June 11, 2015?

23  A.  Yes, I have.

24  Q.  When did you first see this letter?

25  A.  I wouldn't know exactly, sometime after the letter was sent

1    in.

2    Q.  Shortly after the letter was sent?

3    A.  Yes.

4    Q.  And do you see in paragraph two on the first page, it says:

5         The firm is prohibited from making any changes or

6    expansions to its business activities?

7    A.  Yes.

8    Q.  Did you understand that to mean that the -- that Alexander

9    was not permitted to engage in firm commitment offerings after

10   June 11, 2015?

11   A.  No.  That says the firm is prohibited from making any

12   changes or expansion.

13   Q.  Well, you were asking for an application to engage in firm

14   commitment underwriting, right?

15   A.  Yes.

16   Q.  And is that not an expansion of your business?

17   A.  Yes, I believe so.  Yes.

18   Q.  So when it says:  The firm is prohibited from making any

19   expansions to its business activities, isn't it true that FINRA

20   is telling you, you are not permitted to do firm commitment

21   offerings?  And when I say "you," I mean Alexander.

22   A.  Well, that's what we got from the previous letter.  This

23   letter is generated anytime you file a CMA.  This is a standard

24   letter.  FINRA sends you do not change your business

25   activities, do not hire, do not change any offices.  We

1    probably received three of these -- four of them over the last

2    five or six years.  It's a standard letter.

3    Q.  Because it's a standard letter, do you not obey the demands

4    of the letter?

5    A.  No.  We continued doing what we were doing previously.  We

6    didn't change business activity.

7    Q.  You didn't believe that even though FINRA directed you to

8    not do firm commitment offerings, that that was not material to

9    your business?

10           MS. COLE:  Objection.  Misstates the record.

11   Q.  I'll rephrase the question.  Did you believe that you had

12   to refrain from making any expansions to your business after

13   you received this June 11 restriction letter?

14   A.  Expansion to the business, yes.

15   Q.  And did expansion to the business include engaging in firm

16   commitment underwriting?

17   A.  That was part of the application, but at this point we

18   believed we could still do syndicate in firm commitment deals.

19   Q.  And as you sit here today, was that belief correct?

20   A.  It was not.

21   Q.  And when did you learn that that belief was not correct?

22   A.  I believe it was August 2, 2016.

23   Q.  And that's when you learned that you're not allowed to do

24   firm commitment underwritings on a syndicate basis?

25   A.  Correct.

1    Q.   Until the engagement agreement -- were you at all involved

2    in the Alexander engagement agreement with Inpellis?

3    A.   No, I was not.

4    Q.   Have you ever reviewed that agreement?

5    A.   Only I might have seen it during this proceeding.

6    Q.   Did you take any steps in 2015 to prevent Alexander Capital

7    from participating in firm commitment offerings?

8    A.   I did not.

9    Q.   I'd like to show you P19, which is the unreasonable letter.

10   Did you ever see the unreasonable letter?

11   A.   I did not.  Only I did during these proceedings but not

12   before.

13   Q.   I would like to show you Plaintiff's Exhibit 13-A.  Have

14   you seen this exhibit before?

15   A.   I don't recall this exhibit.

16   Q.   Go to page 3.

17   A.   Okay.

18   Q.   It states -- this is a letter from Sichenzia & Ross.  Do

19   you know who Sichenzia & Ross is?

20   A.   Yes, it's a law firm.

21   Q.   Do you see it says:  As you know, this firm represents

22   Alexander Capital.

23          Do you recall that Sichenzia & Ross represented

24   Alexander Capital?

25   A.   Yes, I do.

1    Q.  And do you recall that they sent a letter on or about

2    October 27, 2015 to FINRA on Alexander's behalf?

3    A.  I don't.

4    Q.  In the letter, it states on top of page 3:

5            "In December of 2013, a full year after the last

6    misconduct alleged by the staff, active control of the firm was

7    sold to Messrs. Amato and Guidicipietro."

8            Is that a true statement?

9    A.  No, it's not at that time.

10   Q.  Why is it not true?

11   A.  Because we didn't have control of the firm in '13.  We had

12   24.9 percent.

13   Q.  Did anybody ever review the letters sent by Sichenzia &

14   Ross to FINRA on behalf of Alexander?

15   A.  I can't personally say someone did.  I would assume

16   somebody in compliance did.

17   Q.  I'd like to show you what has been marked as 13-B.  Have

18   you seen the document marked as 13-B before?

19   A.  I believe so, yes.

20   Q.  What is it?

21   A.  It is a -- looks like a filing from our attorneys to FINRA,

22   I believe.

23   Q.  If you go to page 4 at the top -- actually, go to page 3 at

24   the bottom.

25           It says:  "In December 2013, two years after the

1   period covered by the staff's investigation, NESA Management

2   LLC, which is owned by Joseph Amato CRD No. 2751635 and Rocco

3   Guidicipietro CRD No. 2489732, purchased an interest in the

4   firm.  Messrs. Amato and Guidicipietro, neither of whom were at

5   the firm in 2010-'11 are now active owners and partners in the

6   firm."

7            Is that a correct statement?

8   A.  No, we were indirect owners of the firm at that time.

9   Q.  Do you know if --

10  A.  Well, in 2010 and '11, we had no ownership.  We didn't even

11  work at the firm.

12  Q.  Do you know who submitted this letter to FINRA on behalf of

13  Alexander?

14  A.  Yes, I believe it was Holcomb -- Scott Holcomb, Holcomb

15  Law.

16  Q.  Do you have any knowledge if anybody at Alexander reviewed

17  this letter before it was sent?

18  A.  I would say I probably reviewed it.

19  Q.  And did you correct that misstatement when you reviewed it?

20  A.  It -- I guess I didn't.  I didn't notice it.

21  Q.  So is it your testimony that you made a false statement in

22  your submission --

23            MS. COLE:  Objection.  Misstates the record.

24            THE COURT:  In what way?

25            MS. COLE:  This is not a statement by

1    Mr. Guidicipietro.  It's a submission on behalf of Alexander

2    Capital drafted by attorneys.

3              THE COURT:  Yes, but he just said that he reviewed it.

4    So.

5              MS. COLE:  The question was:  Is it your testimony

6    that you made a false statement?

7              Mr. Guidicipietro didn't make any statements in this

8    submission.  Even if he reviewed, they're not his personal

9    statements.

10             THE COURT:  Just so I understand your position.  So

11   supposing -- this is not this particular situation, or it may

12   be.  Supposing a lawyer prepares a document for submission to

13   the Court and asks a person with personal knowledge of some of

14   the statements to review it for accuracy, and that person in my

15   hypothetical says, yup, it's fine.  And the statement is then

16   produced to the government agency.  Are you just saying --

17   maybe all you're making is a distinction between the committer

18   of the misconduct and the aider and abetter, but why isn't

19   there an argument that after taking those steps, in effect, the

20   person with personal knowledge has authorized that false

21   statement to be made to the government?

22             MS. COLE:  So I think there are a couple of

23   distinctions from your question and this particular situation,

24   if I may point those out first.

25             THE COURT:  Yes.

1           MS. COLE:  FINRA is not a government agency.  It's a

2      self-regulatory body, in which broker dealers are voluntary

3      members and agree to be regulated by FINRA.

4           Second of all, this is -- this was not under sworn --

5      it was not a sworn statement.  Mr. Guidicipietro did not sign

6      it.  It is not the equivalent of testimony to a Court.

7           THE COURT:  So, are you saying, for example, that this

8      differs from the situation where, again, to change the hypo,

9      supposing someone authors the submission but the submission is

10      made by someone else.  So, let's say, someone drafts an

11      affidavit for someone else to submit.  That the person who

12      drafted the affidavit is not making a false statement to the

13      recipient?

14           MS. COLE:  No, your Honor, that's not what I'm saying

15      at all.

16           THE COURT:  Because that is, I think, the situation

17      with the next witness who is about to appear.

18           MS. COLE:  No.  If I recall correctly, I was present

19      at the hearing on the motion to disqualify, in which both

20      Mr. Glosband and Mr. Schlichtmann testified.  Mr. Glosband

21      admitted that Mr. Schlichtmann drafted the declaration; that he

22      reviewed it; that he knew it was a misstatement, and he signed

23      the declaration anyway.

24           THE COURT:  My recollection -- but I don't want to get

25      too far afield till the next witness testifies, but

1    Mr. Schlichtmann testified at page 9, lines 22, following of

2    the transcript of the hearing on November 30, 2021:

3               "It was a mistake, your Honor.  It's completely my

4    responsibility, and I know Mr. Glosband was relying on me to

5    get things right, and I apologize both to him and to the

6    Court."

7               So wasn't that Mr. Schlichtmann's statement that he

8    was responsible for the false statement made to the Court?

9               MS. COLE:  I understood that Mr. Schlichtmann was

10   falling on his sword at that point, your Honor.  I believe

11   there was --

12              THE COURT:  You mean when he testified under oath

13   before me he wasn't telling the truth?

14              MS. COLE:  I'm sorry?

15              THE COURT:  I'm not sure what you mean by falling on

16   his sword.

17              MS. COLE:  Yes, he was taking responsibility.

18              THE COURT:  Under oath.

19              MS. COLE:  Correct.

20              THE COURT:  So he was responsible.

21              MS. COLE:  Yes, your Honor.  I also believe that

22   Mr. Glosband also provided testimony at the hearing.

23              THE COURT:  Yes.  And Mr. Glosband said -- he began by

24   saying at page 4 in his affidavit:

25              "contains one statement that I believe is not true and

1    one statement that I believe is susceptible to interpretation

2    in a way that could make it not true and should be corrected."

3         And then the Court inquired about which was which.

4    And then the Court, after the witness -- after Mr. Glosband

5    indicated that which of the statements he regarded as false and

6    which were misleading, are, this is at page 6, line 21:

7         "THE COURT:  So why did you sign it?

8         "THE WITNESS:  I think I was careless.

9         "THE COURT:  Who prepared this?

10        "THE WITNESS:  Mr. Schlichtmann prepared it, and I

11   had -- and I reviewed it and had interaction with him about

12   it."

13        And then we went on to Mr. Schlichtmann's testimony.

14        MS. COLE:  Yes, your Honor.

15        THE COURT:  So I think we need to come back here to

16   this witness, but just to complete the picture --

17        MS. COLE:  I don't disagree with your question whether

18   the person who prepared the document is ultimately responsible.

19        I think the point that I was trying to raise is that

20   there is a material distinction between a sworn statement

21   presented to a Court and an unsworn submission that is not

22   signed by someone in a submission to a non-governmental body.

23        THE COURT:  Well, there is a difference so far as, for

24   example, prosecution for perjury is concerned.  But I hope

25   you're not saying that a person can submit a false statement to

1    a regulatory agency that is knowingly false because it's not

2    under oath and someone else prepared it.

3          MS. COLE:  No, your Honor.  That's not what I'm saying

4    at all.

5          THE COURT:  Okay.  So what are you saying?

6          MS. COLE:  I was responding to the question from

7    Mr. Rand that --

8          THE COURT:  I think your objection is to the wording

9    of the question.

10         MS. COLE:  Yes.

11         THE COURT:  I will sustain that objection.  Put

12   another question.

13         MS. COLE:  Thank you.

14   BY MR. RAND:

15   Q.  Are you testifying that Alexander Capital submitted a false

16   statement to FINRA in this Exhibit Number 13-A?

17   A.  No, I'm not.  The only word that's missing is "indirect" on

18   it.  So technically I was an owner, but I'm an indirect owner.

19   So, I mean, you can argue the point that there's one word

20   missing, and FINRA itself would know that I am an owner

21   indirectly in their own records, so they would know what the

22   attorney meant by owner and partner.

23         (Continued on next page)

24

25

N6S5aqu4                     Guidicipietro - Direct

1    BY MR. RAND:

2    Q.  Are you agreeing with the statement:  Are now active owners

3    in the firm?

4    A.  Active indirect owners.

5    Q.  So you are not a passive owner?

6    A.  No.

7    Q.  And you are not actually a partner, you are an indirect

8    partner?

9    A.  Indirect owner, partner.

10   Q.  So you agree that the submission to FINRA is not a hundred

11   percent correct?

12   A.  It is not a hundred percent accurate.  I agree.

13   Q.  Do you see 33 here anywhere?  I would like to show you

14   Plaintiff's Exhibit 33?

15           THE COURT:  Counsel, we have had numerous

16   interruptions that were not your fault but you have gone over

17   the hour that you originally estimated.  How much more do you

18   have?

19           MR. RAND:  Not much longer.

20           THE COURT:  Pardon?

21           MR. RAND:  15 minutes?  20 minutes?

22           THE COURT:  OK.

23   BY MR. RAND:

24   Q.  Have you seen what has been marked P 33 before?

25   A.  Not that I recall.

1   Q.  Do you see that it is dated June 29, 2018 and it's from the

2   SEC and it is stated that it is an order instituting

3   administrative proceedings pursuant to Section 15(B) of the

4   Securities Exchange Act of 1934 making findings and imposing

5   remedial sanctions?

6   A.  Yes, I see that.

7   Q.  Could you look at page 2, paragraph 3?

8          MS. COLE:  Your Honor, I just briefly want to note our

9   continuing objection to this document for the reasons stated

10  when it was used with Mr. Amato, but I'm not going to interrupt

11  the questioning.

12         THE COURT:  Well, I'm not quite sure what that means

13  but I think what that means is you object to its use other than

14  the uses that the Court expressly said but the only use it was

15  receiving it for.

16         MS. COLE:  Exactly.

17         THE COURT:  OK.

18  BY MR. RAND:

19  Q.  Paragraph 3 states:  From 2012 to 2014, Alexander Capital

20  failed reasonably to implement certain policies and procedures

21  and permitted a lax compliant environment.

22         Is that a true statement?

23  A.  According to the SEC it is.

24  Q.  And did you disagree with that statement?

25  A.  I do not.

1           MR. RAND:  Your Honor, I may stay here to ask the

2    questions because there is only one copy of these exhibits.

3    Thank you.

4    Q.  I would like to show you what has been marked as Exhibit

5    104.

6           MS. COLE:  Can you just make sure to speak up,

7    Mr. Rand?

8           MR. RAND:  Yes, and feel free to remind me that I am

9    not, with a microphone.

10          THE COURT:  Just for the record, 104 is the later of

11   the two documents entitled Second Amended and Restated Limited

12   Partnership Agreement of Alexander Capital LP.

13   BY MR. RAND:

14   Q.  I will ask you a question.  If you look at page 6,

15   Section 7.1 entitled Management, it states:  Due to the nature

16   of the highly regulated industry ACLP operates within, its

17   executive officers, Joseph Amato, CEO, and Rocco Guidicipietro,

18   COO, shall serve as the exclusive managers of the partnership

19   and shall have all of the rights of the general partner in this

20   regard.

21          Is that a true and accurate statement?

22   A.  I am trying to find -- what page is that?  I'm sorry.

23   Q.  Page 6.

24          THE COURT:  And plaintiff's counsel is really not

25   pronouncing the witness' name even remotely close.

1            MR. RAND:  Oh.  Is that right?  Is it Guidicipietro?

2     A.  Guidicipietro.

3     Q.  Guidicipietro.  I apologize.

4     A.  6 point which one?

5     Q.  It is where the management section is.

6     A.  See, I think I am missing that.

7     Q.  Article 7; right here, the last sentence.

8     A.  I see it.  What was the question again.

9     Q.  Is that a true statement?

10    A.  In the part of that it is a highly regulatory industry,

11    yes.  It is not as simple as running the firm being the general

12    partners.  I'm not saying we are general partners.

13    Q.  How would you correct the statement to make it true?

14            MS. COLE:  I'm sorry.  I can't hear him.

15    Q.  How would you correct the statement to make it true?

16    A.  I'm saying, true as far as that we are executives,

17    officers, and we did work for the firm, and NESA was the

18    managing partner -- I don't know what year this is --

19            THE COURT:  What it says -- we went through this with

20    your colleague before but just to review it, in the first

21    sentence of the section, you are looking at Section 7.1 it

22    says:  Except as otherwise provided herein, all management

23    powers over the business and affairs of the partnership, which

24    is earlier defined as Alexander, shall be vested in the general

25    partner, which is earlier defined as NESA.  Then, in the last

1    sentence of that same paragraph it says that due to the nature
2    of the highly regulated industry ACLP operates within, its
3    executive officers Joseph Amato, CEO, and Rocco Guidicipietro,
4    COO, shall serve as the exclusive managers of the partnership
5    and shall have all of the rights of the general partner in this
6    regard.
7              So, what it appears to say in rather straightforward
8    fashion is that the entire management of Alexander Capital is
9    vested in NESA and that NESA is delegating that entire
10   management function exclusively to you and Mr. Amato.  So,
11   accepting that that's what it says; is that correct?
12             THE WITNESS:  Yes.  That statement is correct.
13             THE COURT:  All right.
14   BY MR. RAND:
15   Q.  Is it also correct, what is stated in the Second Amended
16   and Restated Limited Partnership Agreement of Alexander Capital
17   LP dated October 2, 2018 --
18             THE COURT:  It is the same -- this is the earlier
19   version?
20             THE WITNESS:  Yes.
21             THE COURT:  Yes.
22   Q.  Do you earn money from Alexander Capital through NESA?
23   A.  No.
24   Q.  You don't receive a K-1 from NESA?
25   A.  It has nothing to do with Alexander Capital.  What time

N6S5aqu4                    Guidicipietro - Direct

1    frame are you talking about?

2    Q.  In 2015?

3    A.  In 2015 we did get a K-1 but unfortunately the company has

4    been losing money for the last few years.

5    Q.  Showing you Exhibit 104, read this paragraph.  I'll read

6    the paragraph.

7              THE COURT:  No, no.  What paragraph; page and section.

8              MR. RAND:  Three whereases from the bottom?

9              THE COURT:  What page?

10             MR. RAND:  The front page:  Whereas, pursuant to a

11   stock purchase agreement.  That paragraph?

12             THE WITNESS:  OK.

13             THE COURT:  All right.

14   BY MR. RAND:

15   Q.  This is identical in both agreements, I believe:  Whereas,

16   pursuant to a stock purchase agreement dated August 1, 2014, as

17   amended thereon, and once further on December 3, 2015, then

18   made effective by FINRA approval of the partnership's

19   consulting membership application on December 4, 2017, NESA

20   Management LLC acquired the 75.1 percent interest in the

21   partnership owned by Exodus LLC resulting in NESA Management

22   LLC owning 95 percent of the partnership.

23             Is that a correct statement?

24   A.  At that time it was.

25   Q.  Has it changed?

N6S5aqu4                           Guidicipetro - Cross

1   A.  Yes.  You see these other partners listed below and it goes

2   down to 56 percent.

3   Q.  Oh, I see.  OK.  No problem.

4          MR. RAND:  I have no further questions at this time.

5          THE COURT:  Cross-examination.

6          MS. COLE:  Direct, you mean?

7          THE COURT:  Well, yes.  I mean that effectively it is

8   correct.

9          MS. COLE:  Can I cross-examine him and ask leading

10  questions?

11         THE COURT:  You can as to -- well, no, as to something

12  that was inquired of on his testimony that was not part of what

13  you would have asked him on direct, that you can ask him

14  leading questions on.

15  CROSS-EXAMINATION

16  BY MS. COLE:

17  Q.  I have tried to limit my questions so I don't go over the

18  same questions that Mr. Rand has covered.

19         Are you a partner at Alexander Capital?

20  A.  I am not.

21  Q.  Have you ever been a partner at Alexander Capital?

22  A.  I am not.

23         THE COURT:  Can I take the liberty of interrupting

24  just because I am anxious to move things along?

25         MS. COLE:  Yes.

1              THE COURT:  Is there any disagreement that exhibits

2     104 and 105 correctly state the relationship between the two

3     individual defendants here and Alexander Capital?

4              MS. COLE:  I think the point of disagreement will be

5     the legal implications that the language --

6              THE COURT:  You read my mind.  So, this is the

7     briefing that I am going to give you to ruin your weekend but I

8     think we know the facts now.  Unless someone tells me

9     otherwise, it is just a question of what the legal consequences

10    of those facts are.

11             MS. COLE:  OK.

12             THE COURT:  True?

13             MS. COLE:  I believe so.

14             THE COURT:  All right.

15             MS. COLE:  OK.

16    BY MS. COLE:

17    Q.  You testified earlier with Mr. Rand about an agreement or

18    contract between Alexander Capital and Chris Carlin and

19    Jonathan Gazdak.  Do you recall that testimony?

20    A.  Yes.

21    Q.  Is there a written agreement between Chris Carlin, Jonathan

22    Gazdak, and Alexander Capital?

23    A.  There is not.

24    Q.  Is it an oral agreement?

25    A.  Yes, it is.

1  Q.  And I believe you said also in response to a question by

2  Mr. Rand that Chris Carlin reported to Jonathan Gazdak; is that

3  correct?

4  A.  No.  I actually misstated.  Jonathan reports to compliance

5  and Chris reports to compliance.

6          THE COURT:  And when you say compliance, at one point

7  it was Mr. Stack and you indicated subsequently he was

8  replaced?  Do I have that right?

9          THE WITNESS:  Yes.

10          THE COURT:  And who was he replaced by?

11          THE WITNESS:  There was a few people over time.  Now

12  it is Michelle Misiti is our chief compliance officer.

13  BY MS. COLE:

14  Q.  Do you review or approve the deals that Mr. Carlin brings

15  in?

16  A.  I do not.

17  Q.  What about the deals that Mr. Gazdak brings in?

18  A.  I do not.

19  Q.  Do you supervise Mr. Gazdak?

20  A.  I do not.

21  Q.  Do you supervise Mr. Carlin?

22  A.  I do not.

23  Q.  In 2014 and 2015 did you personally have a role with

24  respect to the firm's underwriting business?

25  A.  I did not.

N6S5aqu4                        Guidicipetro - Cross

1    Q.  Did you have any role supervising the underwriting

2    business?

3    A.  I did not.

4    Q.  Do you have any personal experience in underwriting?

5    A.  Not at that time.

6    Q.  Not in 2014 or 2015?

7    A.  Correct.

8    Q.  Were you involved in the discussions with anyone from

9    Inpellis about the engagement of Alexander Capital as

10   underwriter?

11   A.  I was not.

12   Q.  Did Mr. Gazdak or Mr. Carlin come to you for approval to

13   enter into the engagement with Inpellis?

14   A.  They did not.

15   Q.  Did you ever meet with any individuals from Inpellis?

16   A.  I did not.

17   Q.  Did you ever, at any point, have any communications with

18   anyone at Inpellis about the engagement agreement?

19   A.  I never had any communications about anything with

20   Inpellis.

21   Q.  Would it have been one of your responsibilities in July of

22   2014 to review or approve underwriting engagement letters?

23            MR. RAND:  Objection.  Additional.

24            THE COURT:  No, I think perhaps the use of the

25   subjunctive is uncalled for but I think the question could be

1  rephrased: *Was it one of your responsibilities...* So, with

2  that amendment, the question will be permitted.

3          THE WITNESS:  No, it was not.

4  BY MS. COLE:

5  Q.  Did you have any idea in July 2014 that anyone at Alexander

6  Capital made representations to Inpellis about Alexander

7  Capital's ability to handle firm commitment underwriting?

8  A.  I did not.

9  Q.  Sorry.  I am just trying to make sure I don't ask questions

10  that the Court is already aware of the responses.

11          To your knowledge, did Alexander Capital take any

12  action in response to FINRA's June 11, 2015 letter that you

13  were looking at a moment ago with Mr. Rand?

14  A.  They filed a CMA.

15  Q.  Did you have any responsibility with respect to

16  communications with underwriting clients such as Inpellis?

17  A.  I did not.

18  Q.  As of 2014 and 2015, did you have any responsibility

19  supervising the communications with Inpellis or other

20  underwriting clients of Alexander?

21  A.  I did not.

22  Q.  Prior to September 2015, did you have any idea of what had

23  been communications to Inpellis about Alexander Capital's

24  ability or inability to handle firm commitment underwriting?

25  A.  I did not.

1   Q.  To your knowledge, was FINRA aware that Alexander was

2   planning to underwrite the Inpellis IPO as a firm commitment

3   offering?

4            MR. RAND:  Objection.  Leading.

5            THE COURT:  Sustained.

6            When you asked that question I think what you really

7   want to ask is did Alexander bring to the attention FINRA X, Y,

8   or Z, because that he can testify.  He can't testify what's in

9   FINRA's mind.

10            MS. COLE:  Thank you, your Honor.

11   BY MS. COLE:

12   Q.  To your knowledge, did Alexander Capital bring to FINRA's

13   attention its intent to underwrite the Inpellis IPO as a firm

14   commitment offering?

15   A.  Yes.

16   Q.  I am going to show the witness Defendant's Exhibit 31,

17   which is in evidence.  Have you ever seen this document before?

18   A.  I haven't.

19   Q.  You have not?  Is that what you said?

20   A.  Yes, I haven't.

21            MR. RAND:  Objection.  Not responsive.  I wasn't

22   quite -- I don't know, I was confused by the question and

23   answer.

24            MS. COLE:  *Have you ever seen this document before?*

25   And I didn't hear his answer.

N6S5aqu4                        Guidicipetro – Cross

1            THE COURT:  His answer was I have not.

2            MR. RAND:  Thank you, your Honor.

3     BY MS. COLE:

4     Q.  Is this document a public --

5            THE COURT:  He doesn't know anything about it.

6     According to -- he just said he has not seen it before.  It is

7     in evidence so you can argue to me what it shows or whatever

8     and that's fine.

9            MS. COLE:  OK.

10    Q.  Do you still have in front of you Plaintiff's Exhibit 13B?

11           MR. RAND:  Which number is that?

12           MS. COLE:  13B.

13           MR. RAND:  13B.

14           THE WITNESS:  Yes.

15    Q.  Would you please take a look at page 3 at the bottom.

16    A.  Yes, I got it.

17    Q.  Can you read the last sentence of that last paragraph that

18    starts:  In December 2013?

19    A.  NESA Management, which is owned by Joseph Amato and Rocco

20    Guidicipietro, purchased an interest in the firm.  Amato and

21    Guidicipietro, neither of whom were at the firm between 2010

22    and 2011, are now acting owners and partners in the firm.

23    Q.  And you testified that you reviewed this document that was

24    prepared by an attorney for submission to FINRA.  Did I recall

25    that testimony correctly?

1    A.   Yes.

2    Q.   And in reviewing this document, what was your understanding

3    about as to the context of the last sentence as owners -- that

4    you are active owners of the firm?

5    A.   That we were indirect owners of the firm through NESA.

6    Q.   So, was it your understanding in context of both sentences,

7    that this was in reference to NESA Management?  Was that your

8    understanding?

9    A.   Yes, correct; because it says NESA Management which is

10   owned by us and then it follows with the active owners and

11   partners.

12   Q.   So within that context did you believe that this was a

13   misstatement?

14   A.   No, not in that context.  In that context I believe it's

15   right.

16           THE COURT:  The whole point of the sentence, as you

17   understood it, was simply to assure the reader that the firm

18   was no longer owned by or under control of those whom they had

19   focused on for conduct at an earlier time.

20           THE WITNESS:  Correct, your Honor.

21           THE COURT:  OK.

22   BY MS. COLE:

23   Q.   Do you still have Plaintiff's Exhibit 104 in front of you?

24   It is the later of the two second amended and restated limited

25   partnership agreement?

1   A.  I don't believe so.  I don't believe so.

2              THE COURT:  We are talking about the second amended --

3              MS. COLE:  Will, do you have an extra copy?

4              MR. RAND:  It is on the left on the table.  Sorry.

5   Q.  Can you please turn back to page 6?

6   A.  OK.

7   Q.  Under Article 7, Section 7.1 Management --

8   A.  Yes.

9   Q.  -- having been vested with the power, rights, and

10  responsibilities to serve as the exclusive managers of

11  Alexander Capital, what actions did you take in connection with

12  being the manager of the partnership?

13  A.  Well, the separation, too, is also we have to abide by

14  compliance.  So, even though we were active owners of the firm,

15  compliance would make a lot of the policies and procedures.

16  Q.  Did you hire other employees to serve in any capacity in

17  managing the partnership?

18  A.  Yes.

19              THE COURT:  Who?

20              THE WITNESS:  The chief compliance officer, the head

21  of banking, Fin Op to do financials, and then they have support

22  staff under them.

23  Q.  I am going to show the witness what is not yet in evidence

24  that's been marked as Defendant's Exhibit 143; it's a document

25  for rebuttal.  Do you recognize the document marked for

N6S5aqu4                        Guidicipetro - Cross

 1   identification as Defendant's Exhibit 143?

 2   A.  Yes, I do.

 3   Q.  What is this document?

 4   A.  These are e-mails that I sent to FINRA to our FINRA

 5   coordinator.

 6   Q.  And when were these e-mails sent?

 7   A.  June of 2016.

 8   Q.  Are these the e-mails communications that you were

 9   referring to in your testimony with Mr. Rand earlier?

10   A.  Yes, they are.

11           MS. COLE:  I would move to admit Defendant's Exhibit

12   143.

13           THE COURT:  Any objection?

14           MR. RAND:  I'm sorry.  I was looking at a document, I

15   wasn't listening.

16           MS. COLE:  I have moved for admission of Exhibit 143

17   into evidence.

18           MR. RAND:  We have no objection.

19           THE COURT:  Received.

20           (Defendant's Exhibit 143 received in evidence)

21   BY MS. COLE:

22   Q.  Can you tell the Court what the purpose of this e-mail was,

23   starting on the second to last page going with the first e-mail

24   in the chain?

25   A.  I am trying to get to the first one.

N6S5aqu4                        Guidicipetro - Cross

1   Q.  The one on the second to last page at the bottom that is

2   dated Wednesday, June 22nd, 2016, at 6:23 p.m.?

3   A.  Yes.  I was sending an e-mail to Jessica, I told her that

4   we need to talk and if you can call me.

5   Q.  Who is Jessica?

6   A.  Jessica is our FINRA coordinator at FINRA.

7   Q.  And what were you wanting to talk to Jessica about?

8   A.  I had questions about participating in firm commitment

9   underwriting as a syndicate member and if there was any SEC

10  exemptions.  And once I initiated that conversation, that's

11  when we learned that we weren't able to even be in syndicate

12  and we ended up having conference calls with FINRA and a couple

13  of departments in FINRA's banking division and they told us,

14  you know, you would have to file a continuing membership

15  agreement at that point.

16          But, I initiated the conversation with FINRA.

17  Q.  So, in June of 2016, is it accurate that you communicated

18  with Jessica, the FINRA representative, your belief that you

19  did have the right to participate in a syndicate?

20          MR. RAND:  Objection.

21  A.  Yes.

22          THE COURT:  Well, that certainly is leading but just

23  to move things along I will allow it.  The objection is

24  overruled.  But how much more do you have?

25          MS. COLE:  One more question.

N6S5aqu4                       Guidicipetro - Cross

1          THE COURT:  I'm sorry?

2          MS. COLE:  Sorry; two more documents, one question per

3    document.

4          THE COURT:  OK.

5          MS. COLE:  Sorry.

6    BY MS. COLE:

7    Q.  Do you have in front of you the document that has been

8    marked for identification as Defendant's Exhibit 144?

9          THE COURT:  I don't think you have handed that up yet.

10         MS. COLE:  Bryan is bringing it up.

11   Q.  Do you recognize this document?

12   A.  Yes.

13   Q.  What is this document?

14   A.  This is the continuation of the conversation with Jessica

15   from FINRA.

16   Q.  And what is the date of this document?

17   A.  June 24, 2016.

18         MS. COLE:  I move to admit Defendant's Exhibit 144

19   into evidence.

20         MR. RAND:  No objection.

21         THE COURT:  Received.

22         (Defendant's Exhibit 144 received in evidence)

23   BY MS. COLE:

24   Q.  Turning to the next to last page at the bottom, I think it

25   is 2 of 3, can you read aloud the e-mail you sent to

1    Ms. Cangiani?

2    A.   Jessica, I attached a new select dealer agreement that

3    covers both conditions.  Acting in the best efforts capacity,

4    all shares not bought will go back to the underwriter and

5    Alexander will have no obligation to purchase any shares.

6    Alexander's net cap has been over $50,000 for a year and we

7    plan to file a CMA to go to $100,000 BD in the near future.  I

8    put the rule I found, for your convenience, below.  Can you

9    please let me know if this meets the requirements to move

10   forward with Long Island Iced Tea Corp -- which was the deal.

11   I want to make sure that we are able to do this.  And I cut and

12   pasted the $50,000 requirement for a firm on the bottom.

13   Q.   What did you learn from Mr. Cangiani in response to your

14   request?

15   A.   Then she wrote back that I'm not sure that it would apply

16   to the firm's requirements, membership requirement, it is a

17   nickel BD.  The fact that the firm has maintained over $50,000

18   in net cap may not factor into the decision but I will confirm.

19   Can you tell me what the specific rule reference you are

20   referring to?  It looks like it came from a notice to members

21   that announce certain changes in the net cap requirements but,

22   again, it is referring to a firm's net cap requirements.  As

23   you are aware, the firm must complete a CMA to effect a change.

24   Q.   Was all of this syndicate activity referenced in the

25   acceptance waiver and consent that you were asked about prior

N6S5aqu4                        Guidicipetro – Cross

1   to these communications?

2   A.  Yes.

3   Q.  I have one last exhibit.

4          THE COURT:  One last exhibit.  And as with this

5   exhibit, the one question you want to ask the witness about it?

6          MS. COLE:  It might be two questions.  We have used

7   this exhibit with Mr. Barrette, Defendant's Exhibit A, what is

8   November 4, 2016 settlement agreement between Alexander Capital

9   and Inpellis.

10         THE COURT:  It is definitely in evidence.  I remember.

11  Why don't you put your question.  We will see what the

12  situation is.

13  BY MS. COLE:

14  Q.  Do you recall a settlement agreement on November 14, 2016,

15  between Alexander Capital and Inpellis?

16  A.  Yes.

17  Q.  If we had the document I would ask you to turn to page 5

18  and ask if that was your signature at the end of the document.

19  Do you recall signing the settlement agreement?

20  A.  Yes, I do.

21  Q.  Do you recall what the purpose of the settlement agreement

22  was?

23  A.  It was to pay us a fee, I believe.  I'm not -- I don't

24  remember exactly how much it was.

25  Q.  Since the document is in evidence I am going to read from

1    the document.

2           On page 1 of Defendant's Exhibit 5 under the heading

3    Recitals, the second whereas clause states:  Whereas, Alexander

4    has asserted certain claims against the company in connection

5    with the engagement letter including a claim with respect to

6    the payment of certain legal fees incurred by Alexander to

7    Greenberg Traurig, LLP, in connection with matters described in

8    the engagement letter.

9           Does that refresh your recollection as to what type of

10   fees the settlement agreement was about?

11   A.  Yes, it does.

12   Q.  Also on page 1 there is a Section 1 entitled payment and

13   that Section 1 reads:  Payment.  The company agrees to pay

14   $125,000 to Greenberg on or before December 15, 2016, the

15   payment date.  The payment shall be made by wire transfer of

16   immediately available funds according to the following

17   instructions.

18          To your knowledge, did Inpellis ever make this

19   $125,000 payment to Greenberg Traurig?

20   A.  No, they did not.

21          MS. COLE:  I have no further questions for this

22   witness.

23          THE COURT:  Anything else?

24          MR. RAND:  Yes; a short rebuttal.

25   REDIRECT EXAMINATION

N6S5aqu4                          Guidicipietro - Redirect

1    BY MR. RAND:

2    Q.   You testified that Alexander brought to FINRA a's attention

3    that it was doing a firm commitment offering with Inpellis.

4    What is the basis for that statement?

5    A.   It was in the filing that the firm filed to do the

6    investment banking deal with FINRA.

7    Q.   Do you know what filing that was?

8    A.   I'm not sure of the filing but I know we had to alert FINRA

9    that we were doing a firm commitment underwriting for

10   $20 million and that's when we received the letter that told us

11   we couldn't do it.

12   Q.   Ah.   You are talking about the confidential registration

13   filing.   Is that what you are referencing?

14   A.   Yes.

15   Q.   I would like you to turn to Defendant's Exhibit 144, and if

16   you look at the third page, the section that you read, it is

17   the FINRA representative responding to you.   She says:   I am

18   not sure that would apply as the firm's requirement, per its

19   membership agreement, is $5,000.

20          Does that indicate to you that you were a nickel

21   broker at that time?

22   A.   Yes.

23   Q.   And the date of that e-mail was June 24, 2016.   Was

24   Alexander a nickel broker at all times on and prior to June 24,

25   2016?

```
1   A.  As far as I know, yes.

2            MR. RAND:  I have no further questions.

3            THE COURT:  Anything else?

4            MS. COLE:  No.

5            THE COURT:  Thanks very much.  You may step down.

6            THE WITNESS:  Thank you.

7            (Witness excused)

8            THE COURT:  Now, anything else from plaintiff?

9            MR. RAND:  No, your Honor.

10           THE COURT:  So plaintiff rests.

11           Any motions defense counsel wants to make?

12           MS. COLE:  Yes, your Honor.  We do have a motion for

13   directed verdict under Federal Rule of Civil Procedure 52(c).

14           THE COURT:  Go ahead.

15           MS. COLE:  As the Court is undoubtedly aware, under

16   Rule 52(c), unlike at summary judgment, Rule 52(c) authorizes

17   the Court to make credibility determinations and resolve

18   disputed issue of fact applying the same standard of proof and

19   weighing the evidence as it would at the conclusion of the

20   trialing.  The Court is not required to draw any inferences in

21   favor of the non-moving party.  The Rule 52(c) standard stands

22   in contrast to the standard applicable to a motion under

23   Rule 50(a) for judgment as a matter of law for which the

24   evidence must be viewed in the light most favorable to the

25   non-moving party.  That is from your order --
```

1          THE COURT:  You have correctly stated the law.

2    Congratulations.

3          MS. COLE:  Thank you.  And I will make one caveat.  I

4    know that the Court has indicated that it would like briefing

5    on the legal issues related to the liability.

6          THE COURT:  To the extent that is implicit in the

7    motion that you are making now, I will reserve on that portion

8    until I get the briefing.

9          MS. COLE:  Would you like for me to go ahead and make

10   the arguments?

11         THE COURT:  Well, I don't think you need to.  Here is

12   what I think makes sense because I do want to, since poor

13   Mr. Schlichtmann has been waiting all day, get him on the

14   stand.  Why don't we say this:  We will set a schedule tomorrow

15   for briefing on the motion you are now making, most

16   particularly on the issue that, of Delaware law that I have

17   raised before but anything else that you want to put before the

18   Court, and I will rule on that motion no later than the close

19   of business on July 5th.  That does mean that we will go

20   forward tomorrow and the day of July 5th with some of your

21   witnesses but, of course, I will view the evidence solely as it

22   is right now as it is at the close of the plaintiff's case.

23         I think the advantage of doing it that way is it will

24   give you a chance to really spell out, in a definitive way,

25   your best arguments for the motion and of course it will -- I

1    am particularly interested in the Delaware law issue.  So,

2    unless there is any objection to that, why don't we proceed

3    that way.

4              MR. RAND:  No objection, your Honor.

5              MR. WARD:  Thank you.

6              MS. COLE:  No objection.

7              THE COURT:  Very good.  OK.

8              MS. COLE:  I do have additional arguments, though, on

9    the plaintiff's claims.

10             THE COURT:  OK.

11             MS. COLE:  So as to Count One for fraudulent

12   inducement, the sole issue remaining in the case following your

13   order on summary judgment is Alexander Capital's intent to

14   defraud in the July 2014 engagement agreement.  You held that

15   the remaining dispute was whether Alexander Capital made

16   misrepresentations of material fact regarding its ability to

17   conduct the firm commitment IPO expressly contemplated in the

18   July 2014 engagement letter with intent to defraud Inpellis.

19             THE COURT:  So, I think another thing that really

20   should be part of the parties' submissions that we will set the

21   schedule for tomorrow is the point made by plaintiff's counsel

22   earlier.  There are two, according to plaintiff, two

23   alternative ways I could find fraudulent inducement; one is if

24   I find that there was intentional fraud, and the other, if I

25   found what plaintiff's counsel has called recklessness which I

1    think in the context of fraud is more commonly referred to as

2    willful disregard.  It still involves a conscious state but the

3    conscious state is to disregard the red flags flying of fraud

4    or something like that.  So, I think that's something, again,

5    that would be, if I had to rule on your motion right this

6    second, which I am not, I would say that I am not yet persuaded

7    that there has been intentional fraud in the sense of knowingly

8    seeking but I think reckless is a much closer question.  But, I

9    am not making that finding right now, I will wait until I see

10   your briefing on both sides.  That's why I think it is

11   probably, again, a legal question that we should get briefing

12   on.

13           MS. COLE:  With that, should I proceed with the

14   factual argument or should we wait?

15           THE COURT:  No, I think just put it all in your

16   papers.  I'm going to give you as much space as you like on

17   your papers; ditto the plaintiffs.

18           MS. COLE:  Thank you.

19           So we would also move for directed verdict as to the

20   remaining issues in Count Two for breach of contract.  The

21   Court noted the following issues remaining:  Whether Alexander

22   Capital failed to act in good faith in its role as managing

23   underwriter by (a) failing to make a full and timely disclosure

24   that it was not yet approved by FINRA to conduct a firm

25   commitment underwriting leading Inpellis to retain, at

1    significant expense, attorneys and accountants suitable to

2    Alexander; and (b) inducing Inpellis to approve the filing of

3    the draft registration statements with the SEC that relevant

4    decision-makers asserted that they would not have approved had

5    they known the truth.

6             Do you want me to proceed with that argument or make

7    it in our brief?

8             THE COURT:  My preference is to have all of your

9    arguments put in the brief just so we can move along and still

10   hear the witness today.  So, unless there is any objection to

11   that, why don't you just save everything for your brief.

12            MS. COLE:  Great.  So we are going to move for

13   directed verdict as to all of the remaining claims.

14            THE COURT:  Right.  I understand.

15            MS. COLE:  And two of our affirmative defenses.

16            THE COURT:  As I say, even though we will go forward,

17   because I am reserving on the motion until I get the briefing,

18   even though we go forward today and tomorrow -- sorry, today,

19   tomorrow, and part of the 5th, I will assess your motion

20   totally on where the record stands right now.  So, with that

21   understanding, I think that's the best way to proceed and it

22   gives you, while it means you each have to proceed a little

23   bit, on the other hand it gives you the advantage of being able

24   to put your motion into written form with ample citations and

25   so forth which I think will be very helpful to the Court.

1          Maybe we should talk for one minute about that

2     schedule.  When would you like to put in your brief,

3     understanding that your adversary then has to respond to it,

4     they can't respond until they have seen your brief.

5          MS. COLE:  I am just pulling up the calendar to see

6     how many days.

7          MR. WARD:  Your Honor, is there any chance that this

8     can be ruled upon, that would save the parties from coming back

9     on the 5th?

10          THE COURT:  Well, yes, but here is the problem.  I

11     don't want to really screw up your holidays.  I mean, if I

12     could have your brief by midnight on Friday and I could have

13     plaintiff's brief by midnight on Sunday, I would then rule by

14     10:00 a.m. on the 5th.  And so, if I ruled in your favor or if

15     I even ruled partially in your favor, that would color what

16     else you had to address, if anything.

17          MS. COLE:  I can get you our brief by midnight on

18     Friday.

19          THE COURT:  OK.

20          MR. RAND:  Yes, I guess we can get you our brief on

21     Sunday night.

22          THE COURT:  Great.  OK.  How long do you want for your

23     brief?  My suggestion, though you may not need this, is 20

24     pages.

25          MS. COLE:  OK.

1          THE COURT:  And same obviously for response.

2          If I feel the need for oral argument, which I doubt I

3    will, but if I do we will have that on 10:00 a.m. on the 5th.

4    Again, so you will have my decision before you go forward on

5    the 5th, if anything else.

6          OK, let's get your witness in.  Please call your

7    witness.

8          MR. WARD:  Thank you, your Honor.  This is our first

9    witness, we call Mr. Jan Schlichtmann.

10   JAN SCHLICHTMANN,

11       called as a witness by the Defendant,

12       having been duly sworn, testified as follows:

13         THE WITNESS:  Jan Schlichtmann.

14   S-C-H-L-I-C-H-T-M-A-N-N.

15         THE COURT:  Mr. Schlichtmann, at the start of the

16   proceedings today, plaintiff's counsel said you wanted to have

17   a conference with the Court before you gave your testimony but

18   he was very unclear about what was the substance of that

19   request, and of course any conference I would have with anyone

20   would have to be on the record.

21         THE WITNESS:  Yes.

22         THE COURT:  But if is there something you wanted to

23   raise to my attention now, go ahead.

24         THE WITNESS:  Your Honor, I didn't want to take the

25   time, I know that time is precious, but it is the issue of the

1    statement that the Court made to Mr. Barrette at the beginning

2    of his testimony about me, and I would like to address it when

3    convenient for Court but I don't want to take up this precious

4    time.

5           THE COURT:  Just so the record is complete and then we

6    will proceed, and if there is anything further you want to take

7    up after your testimony we can turn to that.

8           So, after an evidentiary hearing I issued an order

9    dated November 18, 2021, which reads, as follows:  "Earlier

10   today the Court held a hearing regarding one or more false

11   statements contained in the declaration of Daniel M. Glosband,

12   Esq., submitted in support of plaintiff's opposition to

13   defendant's motion to disqualify plaintiff's counsel Jan

14   Schlichtmann, Esq.  In a written submission filed before the

15   hearing, Schlichtmann conceded that he authored the offending

16   statements in the Glosband declaration, and at the hearing both

17   Glosband and Schlichtmann conceded that at least one statement

18   in the declaration was false and that another was misleading if

19   not also false, though both Glosband and Schlichtmann

20   maintained that the making of these false or misleading

21   statements was the result of negligence and not an intent to

22   mislead.  Nevertheless, there is no doubt that the Court relied

23   on the offending statements in its August 6, 2021 denial,

24   without prejudice, of the defendant's motion to disqualify

25   Schlichtmann.

1          At the conclusion of the hearing, the Court made the

2     following rulings from the bench which it hereby restates:  The

3     Court will not refer the matter of the false statements to the

4     U.S. Attorney's office for possible criminal investigation

5     because it concludes that Schlichtmann and Glosband lacked the

6     *mens rea* necessary to support the perjury charge.  The Court

7     will, however, consider referring this matter to the Grievance

8     Committee of the U.S. District Court for the Southern District

9     of New York.  The Court now grants defendant's motion to

10    disqualify Schlichtmann as plaintiff's counsel.  This ruling

11    takes effect immediately.  And then there is some further stuff

12    about scheduling and motion practice documents and so forth.

13         So, the one question I have for you now relating to

14    that order is I learned from Mr. Barrette from a question put

15    by counsel, that in preparing his testimony he spent many hours

16    with you and another lawyer a few days before his testimony.

17              THE WITNESS:  Correct.

18              (Continued on next page)

 1              THE COURT:  Were you not acting as counsel in that
 2     regard?
 3              THE WITNESS:  I was acting as counsel for my client
 4     Convergent Distributors, and this is something that I -- has
 5     always been disclosed, was disclosed to you, your Honor, to the
 6     defendants.  There's no secret about it.
 7              I have been actively involved in this case, not as
 8     counsel of record, but I am absolutely crucial, essential for
 9     helping to prepare the counsel of record for this case, and
10     that has been fully disclosed on the record and discussed with
11     your Honor, if you remember when the other side was bringing up
12     prior to my deposition.  Plus my deposition discusses my
13     involvement.  So to answer your question.
14              THE COURT:  All right.  So now go ahead, counsel, with
15     your questions.
16     DIRECT EXAMINATION
17              MR. WARD:  Thank you, your Honor.
18     Q.  Thank you for being here today, Mr. Schlichtmann.
19     Appreciate your time.
20     A.  Thank you.
21     Q.  And we've met before, as I'm sure you remember.  I'm Bryan
22     Ward.  I represent defendants in this case.
23     A.  I do.
24     Q.  Before we get to the facts of the case, I want to cover
25     just sort of the present situation where we are.  Are you

1    represented by counsel in relation to your testimony here

2    today?

3    A.  I am not.

4    Q.  Do you currently have a current client-attorney

5    relationship with John Masiz?

6    A.  On some matters, yes.

7    Q.  Do you have --

8    A.  In the past.

9    Q.  Excuse me?

10   A.  On some matters in the past.  There is nothing presently

11   ongoing.

12   Q.  Do you not currently have an attorney/client relationship

13   with John Masiz?

14   A.  There is no matter that I'm representing him as attorney on

15   at present.

16   Q.  So you do not have an attorney-client relationship.

17   A.  Correct, at present, right.

18   Q.  When did that end?

19   A.  With the closure of the SEC matter, I don't believe there

20   were any other legal matters involving Mr. Masiz which I was

21   acting as his counsel.

22   Q.  Mr. Schlichtmann, you're saying that you were not -- you

23   don't have an attorney/client relationship with John Masiz, not

24   just that you aren't counsel of record, correct?

25   A.  So I want to try and being as complete as possible here.  I

N6SQaqu5                    Schlichtmann - Direct

1    have a -- I've represented at various times matters involving

2    the company that Mr. Masiz from time to time there are issues

3    with regulatory issues or business issues, and so in that

4    regard I represent business matters.

5              But when you're asking me about personally with

6    Mr. Masiz, I'm trying to think is there anything of a personal

7    nature in which I'm acting as his attorney, and right now off

8    the top of my head I don't believe so.  Certainly not front and

9    center.  Certainly business matters in the company that he's

10   involved with now, I certainly provide advice and counsel.  So

11   I'm making that distinction.  But I certainly talk to him

12   regarding privileged matters regarding his business, and I was

13   taking your question as personally representing him in some

14   matter.

15   Q.  It was personal, whether you had a personal attorney-client

16   -- the answer to that, to the personal attorney-client

17   relationship is no, not currently, correct?

18   A.  Yes, I believe that's true.  Yes.

19   Q.  You testified during your deposition as to having a

20   continuing fiduciary relationship with him personally.  Does

21   that continue to this day?

22   A.  So, from the -- a fiduciary relationship to the Masiz

23   family interests involved in their business, yes but there's

24   nothing currently regarding those fiduciary interests and

25   hasn't been for awhile.

1   Q.  But you currently consider yourself a fiduciary to the

2   Masiz family interests?

3   A.  I do, yes.

4   Q.  And you mentioned an ongoing attorney-client relationship

5   with entities owned by John Masiz.  What would those be?

6   A.  He had -- BioPhysics is a company that he is involved in.

7   It has also subsidiaries or related entities.  And so from time

8   to time, you know, I provide advice and counsel about those or

9   get involved in matters, business matters, rarely regulatory

10  issues, but things of that nature.

11  Q.  Would you say on a consulting basis as an attorney?

12  A.  No, I'd say that I have an ongoing relationship with him

13  because of the business, and so it's just as part of that

14  relationship from time to time an issue will come up, and I'll

15  certainly provide advice which is more of attorney-client.

16          So I guess I would say there is a -- because I'm an

17  attorney representing his -- or from time to time represents

18  representing business interests, it's hard to differentiate at

19  times about -- you know, I want to be as precise as possible,

20  but I have an ongoing relationship with him and his businesses

21  that from time to time requires me to act more formally as a

22  lawyer.

23  Q.  Are you still a trustee for the Shareholder Resolution

24  Trust?

25  A.  Certainly the trust still exists, though it has no assets.

1    The asset that it had was the ownership interest in Inpellis

2    and that went through bankruptcy.  But the trust as an entity

3    and the trustees still consider themselves trustees, although

4    there's nothing actively to work on and no assets in the trust.

5    Q.  Who are those current trustees?

6    A.  Jack Altshuler, Attorney Jack Altshuler, and Dan Glosband,

7    Attorney Daniel Glosband.

8    Q.  Along with you, correct?

9    A.  Along with me, correct.

10   Q.  And do you currently have an attorney/client relationship

11   with Mr. Tom Barrette?

12   A.  No.

13   Q.  Did you represent Mr. Barrette when the non-party witnesses

14   intervened in this case?

15   A.  I did for that special purpose, yes.

16   Q.  Okay.  And did you -- so you did represent Mr. Barrette in

17   relation to this case?

18   A.  In that discrete matter as represented on the pleadings

19   that were filed, correct.

20   Q.  So if Mr. Barrette testified that you never represented

21   him, that would be untrue?

22   A.  I don't -- I don't think it would rise to that level.  He

23   was part of the group which I was protecting because of

24   discovery issues.  So I considered myself as representing all

25   of that group.  You know, maybe we could -- if you're asking me

1   as an attorney, I filed the documents on behalf of all the

2   people I represented.

3          Whether there was a formal relationship with, you

4   know, each and every one, I think is probably a matter of, you

5   know, discussion, but I certainly thought of myself as an

6   attorney on that particular matter representing the interests

7   of all of the witnesses who we believed were being abused.

8   Q.  Did you inform Mr. Barrette that you represented him?

9   A.  He was aware of all the filings that we filed.  Everybody

10  that I -- that was part of that group was fully informed of

11  everything that was being filed and what we were trying to do.

12  Q.  Mr. Schlichtmann, I asked you a direct question.  Did you

13  inform Mr. Barrette that you represented him.

14  A.  Him as well as everyone else.

15  Q.  You have to let me finish my question, please.

16          You informed each of those individuals whom you said

17  you represented that you represented them?

18  A.  I informed them that I was filing the papers on their

19  behalf in that sense, yes, and what I was doing and the

20  contents of the pleadings, absolutely everybody is informed of

21  exactly what I was doing on their behalf.

22  Q.  Did you receive a response from each of them agreeing that

23  you represented them?

24  A.  There was no question from everyone because we discussed it

25  continuously, everyone, including Mr. Barrette, what we were

1    doing and what we were trying to accomplish with the filings.

2    Q.  Mr. Schlichtmann, I'd ask you to listen to my question.

3    I've asked you did you receive a response from each of those

4    individuals agreeing that you represented them?

5    A.  I received a response as to an acknowledgment of the

6    activities I was engaged in on their behalf, so in that way,

7    yes.

8         I was not a discussion about, well, now we're -- that

9    we're entering into a formal relationship where we have a

10   writing between us.  But certainly representing them and filing

11   the papers on their behalf, yes, so in that sense an

12   attorney/client relationship.  But we didn't have a specific

13   discussion or sign any agreements other than understanding here

14   are the pleadings, here's what we're accomplishing, and they're

15   being filed on your behalf, and the arguments are being made on

16   your behalf.

17   Q.  I don't want to belabor this, but I wasn't asking you about

18   a written agreement.

19        THE COURT:  Well, I want to ask about a written

20   agreement.

21        THE WITNESS:  Sure.

22        THE COURT:  Under the law of many states -- now I'm

23   not sure it's true of all states -- an attorney cannot

24   represent a client without at the very outset entering into a

25   written agreement.  That, for example, is the law of New York

1   State.  Was not that applicable to this representation?

2           THE WITNESS:  I don't believe so, your Honor.  I

3   believed that it wasn't compensated positions.  There was no

4   reason to put it into writing.  I wasn't being compensated.  I

5   myself was part of group, so I was doing it both on behalf of

6   myself, as the pleadings indicate, and on behalf of all the

7   other folks represented in the pleadings.

8           So, but if your question is did we enter into a formal

9   written agreement, the answer is no, I didn't think it was

10  needed.  But to be very clear, no, no formal agreement was

11  entered into.  The filings were filed on their behalf as

12  represented in the filings.

13          THE COURT:  All right.  Go ahead.

14  Q.  Mr. Schlichtmann, is it not true that the law of

15  Massachusetts requires you to get a written agreement with a

16  client in order to engage in an attorney/client relationship?

17  A.  Well, I don't believe it applied in that particular

18  situation, no.

19  Q.  I didn't ask you whether it applied in that situation.  I

20  was asking you about the law and your understanding of it

21  because you are an attorney, correct?

22  A.  Correct, that's my understanding.

23  Q.  So your understanding is that the law of Massachusetts

24  requires --

25          THE COURT:  No, what he's saying is, it's his

1   understanding that it does not require a written agreement in

2   the context of the representation he just referred to that he

3   entered into in this matter representing Mr. Barrette himself

4   and others, correct?

5           THE WITNESS:  Correct, your Honor.

6           THE COURT:  All right.

7   Q.  But you do agree that that is a requirement under

8   Massachusetts law?

9   A.  I don't believe in that situation it is.

10  Q.  In what situations -- to your understanding --

11          THE COURT:  I assume this is the subject either of

12  statute, rule or case law.  Does someone have the relevant

13  statute, rule or case law?

14          MR. WRIGHT:  I do, your Honor.

15          THE COURT:  All right.

16          MR. WRIGHT:  It is Massachusetts Rule of Professional

17  Conduct Rule 1.5.

18          THE COURT:  What does it state?

19          MR. WRIGHT:  Give me a second to find the relevant

20  portion.  It is somewhat long.

21          So subparagraph (b)(2) says:

22          The requirement of a writing shall not apply to a

23  single session legal consultation or where the lawyer

24  reasonably expects the total fee to be charged to the client to

25  be less than $500.  Where an indigent representation fee is

1  imposed by a court no fee arrangement has been entered into

2  between the lawyer and the client, and a writing is not

3  required.

4           THE COURT:  So, Mr. Schlichtmann, I take it what

5  you're saying is because you didn't charge them anything and

6  didn't intend to charge them anything, you felt you fell within

7  that exception?

8           THE WITNESS:  Correct, your Honor.  It was not a

9  compensatory relationship.  It was, I was doing it on behalf of

10  myself because I was a member of the group and the group

11  itself.  Rather than having them having to go to the

12  expenditure of having an attorney, I was doing it for myself

13  and it applied to them as well.  That was the basis and there

14  was no expectation, no desire for any fee regarding that.

15           MR. WARD:  Thank you, your Honor.

16  Q.  Do you currently have an attorney/client relationship with

17  Dr. David Staskin?

18  A.  No.

19  Q.  Did you represent Mr. Staskin at his deposition in this

20  case?

21  A.  Umm, I -- it changed for each of them.  It may be that I

22  did at the beginning -- yes, my memory is I think I was for him

23  because it changed with each of them a little bit, but I

24  believe for David, I stated that I was representing him during

25  the deposition, I believe so.

N6SQaqu5                    Schlichtmann - Direct

1   Q.  Do you have a pecuniary interest in the outcome of this

2   case?

3   A.  I do, yes, definitely.

4   Q.  What is it?

5   A.  I have a -- with my client, I have half of the fee, a

6   contingency fee arrangement with my client, which I --

7               THE COURT:  Again, your client is?

8               THE WITNESS:  Convergent Distributors, which is the

9   SNE.  It's a 20 percent recovery of the fee.

10  Q.  And you would get 20 percent of the recovery in this case?

11  A.  If there's a recovery, correct.

12  Q.  Pursuant to your agreement with Convergent?

13  A.  Correct.

14  Q.  BioPhysics Pharma, you mentioned them as a company owned by

15  Mr. Masiz, correct?

16  A.  Correct.

17  Q.  Does BioPhysics Pharma have a pecuniary interest in this

18  case to your knowledge?

19  A.  They do.  Yes, they do.  Yes.  Correct.

20  Q.  What is that?

21  A.  And I should -- the contingency arrangement I just said

22  applies to both because both BioPhysics Pharma, Inc. and

23  Convergent Distributors have an interest in the case that they

24  divide between themselves.  So I am representing both of them,

25  so that fee arrangement applies to both of them.

1   Q.   So your 20 percent interest in this case is for both

2   BioChemics Pharma and Convergent?

3   A.   Correct.

4   Q.   At the time of your deposition in this case, you were

5   providing legal services to BioPhysics Pharma in relation to

6   this case, correct?

7   A.   Yes.

8   Q.   Are you still providing legal services to BioPhysics Pharma

9   in connection with this case?

10  A.   Certainly, because they're -- as I said, they're -- they

11  share an interest in the matter along with Convergent

12  Distributors, so yes, definitely.

13  Q.   And you currently have an attorney/client relationship with

14  Convergent Distributors of Texas, correct?

15  A.   Absolutely, yes.

16  Q.   With regard to your --

17          THE COURT:  I'm unclear why you believe that this

18  Court's order disqualifying you from being counsel in this case

19  allows you to still prepare witnesses who will be testifying

20  called by the plaintiffs in this case on behalf of the

21  plaintiff, which the complaint identifies as John J. Aquino, in

22  his capacity as Chapter 7 trustee of the bankruptcy estate of

23  Inpellis, Inc. by his Assignee, Convergent Distributors of

24  Texas.

25          THE WITNESS:  Yes.  And your Honor is asking me why do

1    I believe it's appropriate?

2            THE COURT:  Yes.

3            THE WITNESS:  Because, your Honor, as I did explain to

4    you -- this matter came up during the time I was being deposed,

5    and the defendants had raised this issue, but they also raised

6    it in the papers, the action we're talking about, when I was

7    trying to protect ourselves from what we thought was discovery

8    abuse, this issue was also raised again.  So this issue has

9    continually come up.  There's been no secret whatsoever.

10           My involvement in this case is essential, as I

11   explained to your Honor when they were questioning me in my

12   deposition because counsel of record cannot master the facts as

13   I have spent all this time on it.  All of the pleadings that

14   are in this case are substantially my work product.  The

15   ability of counsel to function effectively in this case is

16   totally dependent on my participation, my financial support for

17   all of the expenses of this, all coming in due to my efforts,

18   and my clients, Convergent and BioPhysics Pharma Inc. who have

19   an interest in this case, understand that they cannot function

20   without my involvement in this case.  It's been fully

21   disclosed, so I do think --

22           THE COURT:  So what do you believe the order of this

23   Court disqualifying you disqualifies you from doing?

24           THE WITNESS:  So my understanding of the

25   disqualification, and based on my reading of your cases, your

1    Honor, the disqualification issue goes to my -- the

2    unseemliness of having a lawyer in court usually in the context

3    of a jury, but for these purposes a bench trial as well; that

4    it would be unseemly for a lawyer to appear as both advocate

5    and witness, especially if there's an issue that is adverse.

6    But it's always been in that context.

7         I am not aware of any prohibition whatsoever that

8    prevents me helping my client make sure that counsel of record

9    is fully prepared and all of the costs are covered for all the

10   things they need, whether it's bringing witnesses or whatever

11   is required in the litigation.  I'm not aware of any such thing

12   that would prevent it.  It was fully disclosed, and I believe I

13   am correct on that matter, and it would be a total deprivation

14   of my client's rights, as I've expressed to the two clients, to

15   prevent me from helping outside the courtroom.

16        I am a witness, but my -- I am essential to allowing

17   Mr. Rand to be able to come into this courtroom prepared for

18   your Honor, and I know that all the pleadings that I have sent

19   have come from Beverly, Massachusetts, my address.  There is no

20   attempt at any step along this way to somehow fool the Court.

21        I was complying with the order.  I think I am in total

22   compliance with the order.  But in the interest of my clients

23   is compelling and absolutely essential to help your Honor have

24   an efficient trial.

25        THE COURT:  So supposing the Court issues an order

N6SQaqu5                    Schlichtmann - Direct

```
1    that says:  Firm X is disqualified from representing the

2    plaintiff in this case.  This is a hypothetical.

3              THE WITNESS:  Mmm-hmm.

4              THE COURT:  Your position is that it's still totally

5    within -- consistent with that order for any member of that

6    firm to help prepare witnesses at the trial, draft pleadings or

7    motions relating to the case or take any other action other

8    than appearing in court?

9              THE WITNESS:  My -- to be very specific, I have been

10   disqualified as counsel of record in this case and was

11   terminated as counsel of record.  So, yes, your Honor, it is my

12   firmly held belief, as it has animated me throughout these

13   entire proceedings, all fully disclosed, I am not counsel of

14   record, and I have not acted as counsel of record since your

15   order, but that I have absolutely been essential to both

16   recruiting Mr. Rand and doing all the other things necessary

17   for the pleadings, the production of discovery, all of the

18   battles that we went through.  I was absolutely involved in all

19   of that all, again, fully disclosed.  And I think it was

20   totally appropriate.  And I'm not aware of any rule or

21   requirement that would otherwise end in the sense of my

22   client's absolute need to have counsel of their choice in that

23   regard, not as counsel of record in court, but everything

24   outside the courtroom, and if --

25             THE COURT:  Supposing -- and then we'll move on.
```

N6SQaqu5                    Schlichtmann - Direct

1          THE WITNESS:  No, it's all right.

2          THE COURT:  Supposing Mr. Rand had submitted,

3   subsequent to my order, an affidavit that contained -- forgive

4   me Mr. Rand, it's just a hypothetical -- a false statement.

5          THE WITNESS:  Yes.

6          THE COURT:  And that it had been drafted by you.

7          THE WITNESS:  Yes.

8          THE COURT:  And are you saying -- well, first, are you

9   saying that -- put the false part aside for a minute.  Are you

10  saying you could draft his affidavit submitted to the Court?

11         THE WITNESS:  Your Honor, I can -- yes, the answer is

12  that I can draft anything for his review and approval, which I

13  have done.  And if in fact I, you know, participate in the

14  filing of a false document, you know, with Mr. Rand, I am

15  absolutely accountable as a lawyer for doing such a thing.  If

16  I lie as a witness on the stand, if I put things in a pleading

17  which are not considered professional statements, I would

18  consider myself liable for that, but it does not disqualify me

19  from doing those things.  I absolutely feel liable for those

20  things for sure, and Mr. Rand also would take responsibility if

21  he supplies such a pleading.  But at the end of the day,

22  Mr. Rand has to exercise independent judgment but that does not

23  absolve me of my professional responsibility to act as a lawyer

24  and be truthful and professional in all my regards.

25         THE COURT:  So, in your view, although you would still

1   be legally responsible for the reasons you've indicated --

2            THE WITNESS:  Yes.

3            THE COURT:    -- you would not in your view be acting

4   as attorney of record even if, because of your much greater

5   knowledge of the case, Mr. Rand in my hypothetical simply

6   accepted and signed off on whatever you drafted for him.

7            THE WITNESS:  Absolutely, your Honor.  Mr. Rand is

8   responsible for putting his name on anything I have drafted,

9   and he understands that, as I do.  So Mr. Rand is a

10  professional attorney of record, has an obligation to be

11  satisfied that what he is signing meets all the requirements.

12           He is not relying on me to fulfill his professional

13  obligations.  However, I have an obligation to him to be as

14  helpful and professional as I can.  But we'll both suffer the

15  consequences if we should engage in such acts.

16           THE COURT:  Back to -- I remind counsel for both sides

17  we are only going until 4:15 today.

18           MR. WARD:  Yes.  Thank you, your Honor.

19  BY MR. WARD:

20  Q.  Mr. Schlichtmann, just following up on some of the things

21  you just said.  You did draft the appellate documents in this

22  case as well?

23  A.  I did.

24  Q.  And that was based simply on the court record, correct?

25  A.  I'm sorry?

```
 1   Q.  The appeal is only based on the record that's already in
 2   the court, correct?  It's not related to any outside facts?
 3   A.  If I'm understanding your question, I filed -- I am
 4   absolutely the person responsible for drafting these documents
 5   for the review and approval of Mr. Rand.  For sure I had a
 6   major hand in that.  I'm not quite sure about the not on the
 7   facts.  It was done as represented in the filings based on
 8   activities that occurred here in this record for sure.  I'm not
 9   quite sure about things that are not in the record.
10   Q.  You said you paid for travel in this case?
11   A.  Everything.
12   Q.  Is that including the travel for Mr. Barrette?
13   A.  Yes, absolutely; his hotel, his travel his meals,
14   absolutely.
15   Q.  And that was you personally paying that?
16   A.  Well, I've made the arrangements, so the answer is yes, I'm
17   responsible for making sure that the finances are available to
18   pay for all of the costs of this case, which are quite
19   extensive.
20             THE COURT:  You're suggesting that a restaurant in New
21   York could be expensive?  All right, go ahead.
22             MR. WARD:  Thank you.
23   Q.  I'm just not clear.  That means you're arranging finances.
24   Are you paying for this personally or is someone else paying
25   this and you're delivering the money?
```

1    A.  I'm responsible for making sure that the payments are made.

2    Does the Court require me to go into any further of how I'm

3    coming up with the money for that?  I don't think it's

4    appropriate, but if it is, you know, then I'll certainly

5    answer.

6    Q.  I'm asking to find out your interest in this case.

7              THE COURT:  Well, I guess the question is when you

8    reimburse these expenses or agreed to reimburse these expenses,

9    did you tell the persons, including people who have been

10   witnesses in this case or will be witnesses --

11             THE WITNESS:  Sure.

12             THE COURT:   -- who was funding it?

13             THE WITNESS:  There's no doubt in anybody's mind, your

14   Honor, when the tab comes who it goes to and the card which I

15   use, which is mine.  Nobody is unclear as to the fact that I am

16   responsible for making sure that --

17             THE COURT:  That's not quite my question.  That's

18   helpful, but, in other words, if you said to Mr. Barrette,

19   we're going to pay all your expenses.  And by "we," I mean, it

20   will be my credit card, but the money will ultimately come from

21   Mr. Masiz.

22             THE WITNESS:  No, your Honor.  It's all -- I'm

23   responsible.  I'm borrowing the money from others, if that's

24   what you're asking.  But it's my debt, my responsibility, and

25   I'll be held responsible.

Case 1:21-cv-01355-JSR   Document 199-3   Filed 06/30/23   Page 155 of 167      506

N6SQaqu5                      Schlichtmann - Direct

1              THE COURT:  All right.  Very good.

2              THE WITNESS:  Thank you.

3    BY MR. WARD:

4    Q.  With regard to your legal representations, it is not your

5    practice to enter into an engagement letter when you commence

6    an attorney/client relationship.  Is that right?

7    A.  It's not my practice -- usually it's a -- well, if it's a

8    contingency fee agreement on a case, which has been fairly rare

9    because I have been getting out of the practice over the last

10   several years, but I don't have a practice in which I am

11   routinely engaging in business matters where I'm signing

12   retainer agreements with clients because I don't really have

13   any other than the work that I do as I've described it already

14   to the Court.  I've been getting out of the practice of law

15   over the last several years.

16   Q.  I'm not asking you how often you do it.  I'm asking you

17   when you do enter into attorney-client relationships, it is not

18   your practice to enter into an engagement letter.  Is that

19   right?

20   A.  That's right, yes.

21   Q.  You have no engagement letter for the work you did for

22   Mr. Masiz regarding BioChemics.  Is that right?

23   A.  Correct.

24   Q.  You have no engagement letter for Mr. Masiz for 2014

25   through 2018?

1   A.  Correct.  Well, I do -- I'm sorry, go ahead.

2              THE COURT:  Yes.  I'm sorry.  That would presumably

3   not fit within the exception we looked at earlier where you

4   were not -- where you were doing it for free.  So how do you

5   get around, if you do, the terms of the Massachusetts law or

6   code of ethics that we've previously referred to?

7              THE WITNESS:  So I had an engagement agreement when I

8   took over the matter for the Masiz family interest, and that

9   was part of the plan that we instituted to get the family out

10  of their concerns.  So that was the engagement at that time for

11  the interest in the company of BioChemics.  That was the

12  written engagement.  And so I've just continued, you know, to

13  represent them through all these years under those terms even

14  though now the companies have expired.  I had an interest in

15  SeaChange Pharma, for instance, your Honor.  It was eleven

16  percent.  And that was my compensation for all the work that I

17  was doing.  Now, that has since over the years, the company has

18  gone into bankruptcy.  I haven't had any new or felt the need

19  to have any new engagement agreement with Mr. Masiz or his

20  businesses.

21  Q.  Mr. Schlichtmann, you did not answer the question from the

22  Judge Rakoff, if you will.

23  A.  Okay.

24  Q.  What I'm asking you, you have said that you did not have an

25  engagement letter for the work you did for Mr. Masiz regarding

1    BioChemics, correct?

2    A.  Well, I think the way -- I have to see what the sentence is

3    in the deposition, but it was SeaChange -- it was the interest

4    in SeaChange Pharma which was my compensation for doing this

5    whole plan that I did on behalf of the family.  That is

6    actually in one of the exhibits there.  Eleven percent interest

7    in SeaChange Pharma, the LLC, that has all of the family's

8    interests.

9    Q.  Mr. Schlichtmann, I didn't ask you about your compensation.

10   But I would appreciate -- if you'd please let me finish my

11   question.

12   A.  Sure.

13   Q.  You were compensated for that work through your interest --

14   receiving an interest in SeaChange Pharma, correct?

15   A.  I was not compensated, but that was my arrangement to be

16   compensated because the --

17   Q.  Are you saying that an interest in a company is not

18   compensation?

19   A.  No.  No.  I'm saying --

20            THE COURT:  He's saying he didn't get any money.

21            THE WITNESS:  Thank you.

22   Q.  I understand that, but you received compensation in the

23   interest in the form of a company?

24   A.  Yes, in that regard, sure.

25   Q.  Which is of value, correct?

1  A.   Absolutely.

2  Q.   And you had no engagement letter for that, correct?

3  A.   Except as I've described it, that was the engagement, the

4  terms LLC.  I was the managing member of the LLC, so to that

5  extent I consider that to be a written engagement as to the

6  terms of my compensation.

7  Q.   That was how you met your requirement for an engagement

8  letter in that sense?

9  A.   Yes.

10 Q.   With respect to your work for Mr. Masiz in 2014 to 2018,

11 you were compensated, correct?

12 A.   When you say "compensated," the way you're using it, was I

13 entitled to compensation as I've described it?  Yes.  Was I

14 paid under that?  No.

15       But if you're asking me what were the terms of my

16 compensation, it was the eleven percent interest in SeaChange

17 Pharma that I've testified to.

18 Q.   Is it your testimony that you did not need to get an

19 engagement letter because you were not going to receive cash

20 later on in your -- through your engagement?

21 A.   What was my thinking, is that what you're asking me?

22       THE COURT:  No, I think -- forgive me.  I thought what

23 you said was you thought that the equivalent of a retainer

24 agreement were the arrangements would show that you had eleven

25 percent interest in SeaChange.

1                THE WITNESS:  Correct, your Honor.

2                THE COURT:  Whether that, in fact, qualifies as a

3    matter of law under Massachusetts law as a retainer agreement

4    is an interesting question.

5                THE WITNESS:  Sure.

6    Q.  Mr. Schlichtmann, you have no engagement letter with

7    Inpellis either?

8    A.  Correct.

9    Q.  At no point, correct?

10   A.  Correct.

11   Q.  And you represented Inpellis, correct?

12   A.  From time to time, yes.  It was a bankruptcy, it was a

13   short period during the bankruptcy that I filed an appearance

14   for a short period, that's correct.

15   Q.  Are you saying your representation of Inpellis was limited

16   to a short period during the bankruptcy?

17   A.  I filed an appearance of -- when the bankruptcy was filed,

18   I entered an appearance as a first attorney.  We then

19   subsequently got an attorney within a few months, and I

20   withdrew my appearance and I do not believe that I ever filed

21   another appearance in a matter involving Inpellis.

22               My role after that was the role of a trustee and

23   dealing closely with the bankruptcy trustee, but I don't

24   believe after I withdrew that appearance at the beginning of --

25   in the fall of 2018 and another lawyer took over as bankruptcy

1   counsel, I don't believe that I was -- there was ever a need

2   for me to file an appearance on behalf of Inpellis.  That's my

3   memory.  I think I'm correct about that.

4   Q.  Mr. Schlichtmann, you understand you can have an

5   attorney/client relationship without filing an appearance in a

6   court record, correct?

7   A.  Sure.

8   Q.  And you had an attorney/client relationship with Inpellis

9   beyond just that bankruptcy appearance, correct?

10  A.  So I think the best way to answer that is I was a -- still

11  a trustee, and so I felt I had a fiduciary obligation.  I think

12  I've testified to that previously.  So I definitely had a

13  fiduciary obligation.  At times when -- I'm trying to think was

14  there some -- we never asserted attorney-client privilege, and

15  I don't believe there was a time when I had to formally act as

16  their counsel, and all communications we never treated as

17  attorney/client privileged communications, and they have been,

18  you know, presented.

19          So as I sit here today, I think that the -- I think

20  the most complete answer I can give is that I was not acting as

21  an attorney except for that limited part that I talked about,

22  but I most definitely believe that I had a fiduciary duty as a

23  trustee and based on all the other roles that I played, which

24  were many, that I had that obligation, but we never asserted,

25  nor did I believe it would be appropriate to assert,

1    attorney-client privilege on some matter involving Inpellis.

2    That's the best way I can answer it.

3              MR. WARD:  Your Honor, I would like to hand the --

4              THE COURT:  Well, I'm wondering whether -- I'm happy

5    to go five more minutes, but I have to break exactly at 4:15.

6    Do you prefer to start this now or start it tomorrow?

7              MR. WARD:  I'd prefer to do this exhibit right now.  I

8    can do it in less than five minutes.

9              THE COURT:  All right, go ahead.

10             MR. WARD:  Thank you, your Honor.

11   Q.  It's already in evidence.  Mr. Schlichtmann, do you

12   recognize Defendant's Exhibit 1308?

13   A.  Yes.

14   Q.  Is this an invoice that you prepared and submitted?

15   A.  Correct.

16   Q.  I want to direct your attention to the part that says Jan

17   R. Schlichtmann Esquire, correct?

18   A.  Correct.

19   Q.  That lists you as a vendor.  You see vendor?

20   A.  Yes, of course.  Yes, of course.

21   Q.  And it has esquire behind your name, indicating you were

22   using this as an attorney, correct?

23   A.  Correct.

24   Q.  And if we look under description, we see legal services for

25   Inpellis and former director and officer of Inpellis as

1  described in attached invoice.  Do you see that?

2  A.  Correct.

3  Q.  And then we see the -- that you were charging $168,750,

4  correct?

5  A.  Correct.

6  Q.  And this was -- when you created this invoice, were you

7  seeking reimbursement for legal services provided to Inpellis?

8  A.  The answer is yes.  Yes, for the services that were

9  provided by me as the attorney for BioChemics, and as the

10  former officer and director, correct, and those legal services

11  as explained to the insurance company.  And as I believe I

12  testified in my deposition, those were for the benefit of both

13  companies.  So under the global resolution that was the terms

14  under which this was done with full disclosure to the insurance

15  company.

16  Q.  I'm asking about your actual -- you did provide legal

17  services to Inpellis?

18  A.  In that regard, yes, as part of the global resolution of --

19  it was really as the attorney for BioChemics and as the former

20  officer and director of Inpellis because that was how the

21  insurance company -- the insurance policy was constructed, but

22  in the sense that the legal services were provided in gross

23  under the global resolution for both BioChemics and Inpellis,

24  that's the intent upon which that was made, again, with full

25  disclosure to the insurance company.

1    Q.   This is all prior to the bankruptcy of Inpellis, correct?

2    A.   Correct.  Yes.

3    Q.   So you did have an attorney/client relationship with

4    Inpellis prior to the bankruptcy, correct?

5    A.   No, I would not say that that's accurate that I had

6    attorney-client -- providing legal services that benefited them

7    in the context of which I'm talking about is not the same as

8    I'm understanding your question.  There was no -- I did not

9    consider I had an attorney/client relationship with Inpellis or

10   with Inpellis employees because I was a trustee at the time.

11   But the legal services during this global resolution which

12   required legal services between BioChemics and Inpellis, in

13   that context I was providing legal services that benefited

14   them.  That was the context in which this was submitted, again,

15   with full disclosure to the insurance company.

16   Q.   Okay.  So it's your testimony today that you provided legal

17   services to Inpellis prior to the bankruptcy, but you were not

18   in an attorney/client relationship when you did it?

19   A.   Correct.  Benefiting.  Legal services that benefited them

20   under, as I've expressed it again.  I think I made that -- I

21   hope I made that clear.

22        THE COURT:  All right.  So we will conclude for today,

23   and we will resume at 10:00 tomorrow with the continuation of

24   Mr. Schlichtmann's testimony.

25        Anything also we need to take up now?

1           MR. WARD:  Your Honor, I do have a -- we have two

2      witnesses tomorrow who are flying in, and I had talked to

3      Mr. Rand about starting at 10:00 with our first witness and

4      going into our second.

5           THE COURT:  Well, it's okay with me, but poor

6      Mr. Schlichtmann has had to sit around all day today, and then

7      we won't get to him till later tomorrow.  But if that's

8      agreeable to everyone including him, that's agreeable to me.

9           MR. WARD:  So this would probably need to come in

10     either next week then for us to be able to get to him.

11          THE COURT:  You think the two witnesses are going to

12     take all day?

13          MR. WARD:  Actually.  I would hope not and we could

14     get to him and finish.

15          THE COURT:  How much more do you have with

16     Mr. Schlichtmann?

17          MR. WARD:  I have a fair bit.  This took longer than I

18     anticipated.

19          THE COURT:  A fair bit?

20          MR. WARD:  Probably two hours, hour and a half.

21          THE COURT:  And how long do you have on your direct of

22     the other two witness?

23          MR. WARD:  Of the direct of the other two witnesses, I

24     would say two hours -- about an hour to an hour and a half with

25     Mr. Mooney at 10:00, and then about an hour and a half with

N6SQaqu5                      Schlichtmann – Direct

1    Mr. Gazdak.

2              THE COURT:  So let me ask, Mr. Schlichtmann, do you

3    want to wait around in the hopes we can get you on tomorrow to

4    complete your testimony and the Court would try to expedite

5    matters with the other witnesses or would you prefer to come

6    back next week?

7              THE WITNESS:  Your Honor, I will do whatever is most

8    efficient for the Court.  I'm involved in this case, so I'm

9    around.  I'm flexible.  I'm like furniture; you can move me

10   wherever you want.

11             THE COURT:  It sounds to me then that probably we will

12   continue Mr. Schlichtmann next week, and we will work that out.

13   So you're excused till then.  And you still may want to go to

14   an expensive New York restaurant.

15             THE WITNESS:  I have no choice.

16             THE COURT:  And we'll see you all at 10:00 tomorrow.

17             (Trial continued on June 29, 2023 at 10:00 a.m.)

18

19

20

21

22

23

24

25

                           INDEX OF EXAMINATION

Examination of:                                        Page

 JOSEPH ANTHONY AMATO

Cross By Ms. Cole  . . . . . . .355

Redirect By Mr. Rand . . . . . .383

FRANK MANGUSO

Direct By Mr. Rand . . . . . . .409

WILLIAM C. WOOD

Direct By Mr. Rand . . . . . . .414

ROCCO GERARD GUIDICIPIETRO

Direct By Mr. Rand . . . . . . .420

Direct By Mr. Rand . . . . . . .429

Cross By Ms. Cole  . . . . . . .462

Redirect By Mr. Rand . . . . . .477

JAN SCHLICHTMANN

Direct Mr. Ward  . . . . . . . .487

                         PLAINTIFF EXHIBITS

Exhibit No.                                      Received

 64    . . . . . . . . . . . . . . . . . . 411

 65    . . . . . . . . . . . . . . . . . . 410

 100   . . . . . . . . . . . . . . . . . . 416

 103   . . . . . . . . . . . . . . . . . . 429

 104   . . . . . . . . . . . . . . . . . . 401

                         DEFENDANT EXHIBITS

Exhibit No.                                      Received

143     . . . . . . . . . . . . . . . . . 471

144     . . . . . . . . . . . . . . . . . 473