UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ JOHN J. AQUINO,                          │
│ Chapter 7 Trustee,                       │
│ by his assignee, Convergent              │
│ Distributors of Texas, LLC,              │
│                                          │
│        Plaintiff-Counter-                │
│        Defendant,                        │
│                                          │
│        -v-                               │
│                                          │
│ ALEXANDER CAPITAL, LP, and               │
│ its Managing Partners:                   │
│ JOSEPH AMATO,                            │
│ ROCCO GUIDICIPIETRO, and                 │
│ NESA MANAGEMENT, LLC,                    │
│                                          │
│        Defendants-Counter-               │
│        Claimants.                        │
└─────────────────────────────────────────┘
```

21-cv-01355 (JSR)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

JED S. RAKOFF, U.S.D.J.:

Following three days of bench trial, after plaintiff presented its case and was fully heard as to all remaining issues, defendants moved under Federal Rule 52(c) a directed verdict on each of plaintiff's remaining claims (for fraudulent inducement, fraud, and breach of contract). For the following reasons, the Court finds plaintiff failed to introduce sufficient evidence to support its claims, such that, if this were a jury trial, the Court would likely be prepared to grant a Rule 50(a) motion for judgment as a matter of law. Ruling, as it instead must, under Rule 52(c), the Court's task is even easier, since, after finding facts and weighing credibility,

1

the Court concludes that judgment for defendants is plainly warranted as to all remaining claims.

## I.   Legal Standard

During a nonjury trial, Fed. R. Civ. P. 52(c) permits the Court to enter judgment on any issue after a party has been fully heard on that issue. If entering judgment, "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a); see id. 52(c). Unlike at summary judgment, Rule 52(c) authorizes the court to make credibility determinations and resolve disputed issues of fact, applying "the same standard of proof and weigh[ing] the evidence as it would at the conclusion of the trial." EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 272 (3d Cir. 2010); 9C Fed. Prac. & Proc. Civ. § 2573.1 (Wright & Miller 3d ed.). Moreover, "the district court is not required to draw any inferences in favor of the non-moving party." Ritchie v. United States, 451 F.3d 1019, 1023 (9th Cir. 2006); see also Cosmopolitan Interior NY Corp. v. Dist. Council 9, 2021 WL 5331538, at *1 (S.D.N.Y. Nov. 16, 2021) (same).[1]

---

[1] The Court is aware that, in a recent unpublished and non-precedential summary order, the Second Circuit recently stated that "'A district court must deny a motion for judgment as a matter of law [or a motion for a directed verdict under Rule 52(c)] unless, viewed in the light most favorable to the nonmoving party, the evidence is such that . . . there can be but one conclusion as to the verdict that reasonable persons could have reached.'" Elof Hansson v. Santiago, 2022 WL 2208266, at *2 (2d Cir. June 21, 2022) (alterations in original) (quoting Cruz v. Loc. Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994)). Elof, by its terms, is not precedent. See Second Circuit Local Rule 32.1.1(a). Nor did Elof include any discussion or analysis of the correct standard under Rule 52(c), and the authority it cited dealt exclusively with the standard a court should apply when dealing with

The Rule 52(c) standard stands in contrast to the standard applicable to a motion under Rule 50(a) for judgment as a matter of law, for which "the evidence must be viewed in the light most favorable to, and drawing all reasonable inferences in favor of, [the non-moving party]." Burger v. New York Inst. of Tech., 94 F.3d 830, 835 (2d Cir. 1996). However, Rule 50 is expressly limited to jury trials, so it is inapplicable in this bench trial, in which the Court is the sole factfinder. See Fed. R. Civ. P. 50(a)(1). The fact that the federal rules treat these two rules differently makes complete sense, since, following a bench trial, a district court will necessarily need to find facts and make credibility determinations in any event, so there would be no point in making the court wait to do so until the conclusion of all evidence to the extent a party has already been fully heard on an issue and the court finds against that same party. See Fed. R. Civ. P. 52(c). Indeed, Rule 52(c) does not even require that "the court wait until [a] party rests its case in chief to enter judgment [against that party] pursuant to Rule 52(c)," EBC, Inc., 618 F.3d at 272, although, here, defendants made a motion under Rule 52(c) only after

---

a motion for judgment as a matter of law under Rule 50(a) at the conclusion of the plaintiff's case in a jury trial. Cruz, 34 F.3d at 1154-55. Nor was this question at all important to Hanson's holding affirming the district court entry of judgment in the plaintiff's favor, since the district court plainly disagreed with the defendant in that case about the merits of plaintiff's claims. Id. In any event, while the Court believes the non-precedential dicta in Hansson is clearly erroneous, the Court would still dismiss plaintiff's remaining claims even under the standard stated in the Hansson dicta.

plaintiff had presented its entire affirmative case and had formally rested.

## II.  Findings of Fact

Several undisputed facts were previously laid out in detail in this Court's July 8, 2022 summary judgment Opinion and Order, which both discussed the facts at issue in this case at length and also significantly limited the scope of the issues remaining for trial. See generally Aquino v. Alexander Capital, 642 B.R. 106 (S.D.N.Y. 2022). Based on the trial record and testimony, exhibits, and deposition designations, the Court makes the following additional factual findings:

1.  The company known as Inpellis (previously named Alterix[2]) was created in 2012 as a wholly owned subsidiary of the company called BioChemics as part of BioChemics's strategy to commercialize transdermal technology in which it held IP rights. Inpellis was trying to create products to address pain and neuropathy. John Masiz, the founder and CEO of BioChemics, was initially the sole officer and director of Inpellis, but he resigned those positions in June 2014, shortly before the IPO preparation process began.

2.  Masiz, who had significant liabilities to the SEC and was the subject of an active SEC investigation, wanted to make it harder for the SEC to reach the assets of Inpellis. He accordingly stepped

---

[2] Although Alterix did not change its name to Inpellis until 2015, the Court, for convenience, here refers to the company as Inpellis even when discussing an earlier period.

back from management of Inpellis and took several ultimately ineffective steps to shield Inpellis's assets. In 2014, Masiz and his family transferred their ownership of Biochemics into a limited liability company called Sea Change Pharma, which was 2/3 owned by them and 1/3 owned by three other individuals. One of those, Jan Schlichtman, managed the LLC.

3.   In January 2015, ownership of Inpellis was transferred from Biochemics into a trust for the benefit of Masiz and his family called the "Shareholder Resolution Trust." While the trust had several trustees, one in particular – Jan Schlichtman – was most active in managing it.

4.   In summer 2014, Inpellis signed an engagement letter with an investment banking firm, defendant Alexander Capital LP, with the goal of moving toward an initial public offering. At the time, the parties both contemplated that any future IPO would go forward on what is called a "firm commitment," as opposed to a "best efforts," basis, meaning that, at the time of the actual IPO, the underwriter would guarantee to buy any remaining shares at a particular price in the event demand for the shares did not materialize.

5.   At the time Inpellis and Alexander Capital signed the engagement letter in summer 2014, Alexander Capital believed it had authority to underwrite firm commitment offerings.

6.   Shortly after Alexander and Inpellis signed the engagement letter, Inpellis installed a new CEO, Dr. Patrick Mooney. Before joining Inpellis, Mooney worked as a consultant for Alexander Capital

and had been involved on the Inpellis deal, a fact that Mooney disclosed to Inpellis's outside counsel Thomas Barrette prior to taking the job. Mooney was hired in order to market the company to investors prior to the anticipated IPO.

7.    Mooney's pay package was structured so that his pay would increase once the company obtained "bridge financing" -- in other words, a loan or loans designed to give the company cash to hire staff and get through the IPO. During 2014 and 2015, the company was actively seeking to obtain bridge financing, both with Alexander's help and on its own. The company required bridge financing in order to continue as a going concern in advance of the IPO.

8.    In May 2015, after Alexander notified the Financial Industry Regulatory Authority ("FINRA") of its intent to act as underwriter to Inpellis on a firm commitment basis, Alexander received an "unreasonable letter" from FINRA, notifying Alexander that it did not then have authority to conduct a firm commitment offering. Inpellis was not aware at this time of the unreasonable letter.

9.    In August 2015, Inpellis took out a $5 million loan, known as the "bridge" loan, designed to get it through an IPO. Although Inpellis had searched for other underwriters than Alexander, it had not found any, and it obtained the bridge loan with Alexander's help. Alexander received a half million dollar finder's fee in connection with this financing.

10.    In August or September 2015, Inpellis became aware that Alexander lacked firm commitment authority. In a September 10 meeting

at which both Barette, Mooney, and several others were present, Alexander's then-present inability to conduct a firm commitment IPO was discussed, and the decision was made to press forward with Alexander with the hope that it could resolve its FINRA issues and obtain the necessary authority.

11. Throughout this time, Inpellis was actively looking for other underwriters that could take the company public. It did not find any.

## III. Conclusions of Law

Following this Court's July 8, 2022 summary judgment opinion and order, the only remaining claims at issue in this case are (1) plaintiff's claim for fraudulent inducement based on the theory that Alexander fraudulently misrepresented its ability to conduct a firm commitment IPO in order to get Inpellis to sign it, (2) plaintiff's fraud claim with respect to whether Alexander's misrepresentations/omissions caused Inpellis to take on the $5 million dollar bridge loan, and (3) several breach-of-contract theories discussed in greater detail below. For the reasons that follow, the Court now finds for defendant on each of these claims.

### A. Fraudulent Inducement

"The elements of fraudulent inducement are: a false representation of a material fact and with scienter; reliance thereon by defendant to its detriment." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Worley, 257 A.D.2d 228, 690 N.Y.S.2d 57, 61 (1st Dep't 1999). The Court previously held that the July 2014 First

Engagement Agreement between Inpellis and Alexander, although basically a largely non-binding agreement to enter into a subsequent agreement, nevertheless implied that Alexander had the capacity to conduct the IPO on a firm-commitment basis, rendering Alexander's failure to disclose this fact materially misleading. Aquino, 642 B.R. at 135. However, the Court declined to grant either party summary judgment on this claim, because the issue of scienter remained disputed, and the record at that point "d[id] not support finding that [Alexander] made the misrepresentations with intent to defraud." Id. at 133. As to this claim, therefore, the only remaining issue is whether plaintiff has proved that Alexander made the misrepresentations in its July 2014 engagement letter concerning its ability to conduct a firm commitment offering with the intent to defraud Inplelis.

   The Court concludes there was no such scienter for the very simple reason that it concludes Alexander itself was not aware in July 2014, at the time it and Inpellis signed the First Engagement Letter, that it lacked firm commitment authority. The closest plaintiff came at trial to adducing any evidence that Alexander was aware in July 2014 of its inability to conduct a firm commitment offering was plaintiff's introduction of deposition testimony from Joseph Amato, an Alexander employee testifying in pertinent part, as Alexander's 30(b)(6) designee, in which he acknowledged understanding *in 2015* that Alexander lacked firm commitment authority, but then gave the following additional testimony:

Q: Was it your understanding -- and now I am asking you
personally. Yesterday, Mr. Guidicipietro said that
Alexander Capital – he used the phrase – was a 'nickel
broker.'
A: Nickel broker-dealer.
Q: That's right, okay. And are you familiar with the term,
colloquial expression, "nickel broker-dealer?"
A: I am.
Q: What does it mean? What was your understanding, as of
2014, 2015?
A: It's just a qualification level you need to keep on as
an excess net capital.
Q: Okay. And as a nickel broker-dealer, was it your
understanding that a nickle broker-dealer was not
authorized to conduct a firm commitment offering?
A: Correct, you cannot.

Amato dep. 93:8-22, 94:14-95:8 Dkt. 198-5.

The questioning is highly ambiguous, being immediately preceded
by Amato's understanding as of 2015 -- when Alexander received the
FINRA letter -- and then referring vaguely to Amato's understanding
"as of 2014, 2015." And Amato's final answer, with respect to what a
broker-dealer "cannot" do, was phrased in the present tense, further
muddying exactly what period of knowledge this testimony refers to.
The Court concludes that no reasonable factfinder could construe the
resulting exchange as admitting knowledge that Alexander lacked firm
commitment underwriting authority in 2014, which, as discussed above,
is the relevant time period for the fraudulent inducement claim.

Meanwhile, during plaintiff's case in-chief, Amato credibly
testified that Alexander did not become aware of its inability to
conduct a firm commitment offering until after it received the FINRA
letter *in 2015*. 6/27/23 Tr. 338:12-19. (Amato) ("[I]n '15 we learned
that we couldn't do firm commitment underwriting.   In '14 we were

under the belief we could to a certain point and we participated in deals up until '16 in the syndicate level."); id. 338:12-19 (Q: "Did there come a point in time when you learned that the firm could not participate as – in giving a firm commitment where Alexander Capital was the lead?" A: Yes, at some point in time, I believe we received a notification from FINRA and we put in for a CMA at that point, so that's when I learned of it." Q: "So that would have been -- do you remember approximately when that was?" A: "It was sometime in '15 or '16. I'm uncertain. I think it was sometime in '15, but I'm absolutely uncertain of the exact date."). A second Alexander associate, Rocco Guidicipietro, likewise testified that he believed in 2014 that Alexander could conduct a firm commitment underwriting until Alexander received a FINRA letter on May 15, 2015. 6/28/23 Tr. 430:8-22 (Guidicipietro).

The Court is aware that Amato and Guidicipietro, both of whom have an interest in Alexander and are individual defendants in this case, are far from disinterested witnesses, but they appeared to the Court's total satisfaction to testify credibly on this score. Moreover, their testimony is corroborated by the timing of FINRA's May 2015 unreasonable letter. It is entirely plausible and, based on the evidence adduced at trial, likely that Alexander believed it could conduct the IPO on a firm commitment basis, informed FINRA of its plans to do so, and only found out there was an issue after FINRA sent the "unreasonable letter" with respect to the proposed Inpellis offering.

It is plaintiff's burden to prove Alexander acted with fraudulent intent. Plaintiff failed to meet that burden. To the contrary, the Court is convinced that Alexander did not act with intent to defraud with respect to the July 2014 engagement letter because it was not itself aware of its FINRA issue at that date. Accordingly, the Court enters judgment in defendants' favor with respect to plaintiff's fraudulent inducement claim.

### B. Fraud

Under New York law, "[t]he elements of a cause of action for fraud [are] a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 910 N.E.2d 976 (2009).

As to plaintiff's fraud claim, the Court previously resolved all but one of plaintiff's fraud theories at the summary judgment stage. The one theory as to which the Court held there was a genuine dispute of material fact was the following:

> that [Alexander]'s allegedly fraudulent concealment of facts
> about its inability to conduct the planned IPO caused Inpellis
> to 'incur substantial financial obligations and costs.' This
> allegation specifically includes the bridge loan, for which
> Inpellis paid [Alexander]a $500,000 placement fee, and which
> Inpellis took on before it learned on September 10, 2015 that
> [Alexander] had a FINRA problem. Reviewing the record in the
> light most favorable to the plaintiff's claim, the Court
> concludes that this theory remains viable. [Alexander] advised
> Inpellis to take on the bridge loan in significant part in
> preparation for the IPO. And [Alexander] did so in its capacity
> as Inpellis's "exclusive financial advisor." But since
> [Alexander] appears to have been aware that Inpellis was
> relying on the false representation that [Alexander] could

conduct a firm commitment underwriting, a jury must determine whether [Alexander] fraudulently convinced Inpellis to take on the loan and thereby obtained the $500,000 placement fee."

Aquino, 642 B.R. at 137.

Inpellis took on the bridge loan financing in August 2015, which, notably, was after Alexander received the FINRA unreasonable letter in May 2015, 6/26/23 Tr.38-39 (Barrette), but before Inpellis (through its then-CEO Mooney and others) became aware that Alexander lacked firm commitment authority in September 2015. So, from a pure timing perspective, the fraud claim remains at least possible, since Alexander was on notice it lacked firm commitment authority at the time Inpellis took on the bridge loan but Inpellis was not.

However, the Court concludes there are two dispositive barriers to plaintiff's fraud claim that each independently merit entering judgment in defendants' favor.

First, plaintiff has introduced literally no evidence that Alexander, between learning of its FINRA issue in May 2015 and Inpellis' taking on the bridge loan in August 2015, omitted to disclose its lack of firm commitment authority to Inpellis with the intention of inducing it to take on the bridge loan. In fact, plaintiff failed to introduce any evidence that Alexander acted in any way to prod Inpellis to take on the bridge loan, undermining any inference of fraudulent intent.

Second, there is no evidence that Inpellis actually relied on Alexander's misrepresentations in taking on the bridge financing. Specifically, plaintiff has introduced no testimony from any Inpellis

officer or employee stating that Inpellis took on the bridge loan only because it believed Alexander had regulatory authority to conduct a firm commitment offering. The closest plaintiff comes is speculative and self-serving testimony from Inpellis' then outside counsel Barette that he "would have told [Inpellis] to not take bridge loan money which we were working on at the time unless they had an underwriter who could actually do a firm commitment offering." 6/26/23 Tr. 68:10-12 (Barrette). There are several problems with this testimony. For one thing, it is hypothetical advice an outside attorney claims he would have given Inpellis had he known about Alexander's FINRA issue. Even assuming Barette would have given such advice, there is no basis in the record from which the Court could conclude that Inpellis would have acted on it.

Further, the Court does not find Barette's testimony credible in this regard. As a general matter, Barette admitted under cross-examination to backdating letters on behalf of Masiz relating to Inpellis's intellectual property licenses, so that the letters would appear to have been signed at a time when Masiz had authority to sign them even though in fact they had not been. 6/27/23 Tr. 210:7-222:14 (Barrette). This casts serious doubt on Barette's respect for the truth. More specifically, Barrette's own actions belie the truthfulness of his claim that, if he had known of Alexander's misrepresentations about its ability to do a firm commitment offering, he would have advised Inpellis not to enter into the bridge loan, since once Barette did become aware of the FINRA notice issue, he

continued to file draft registration statements indicating that the
IPO would be on a firm commitment basis and advised Inpellis CEO Mooney
to sign a Second Engagement Agreement with Inpellis containing
materially the same language contemplating a firm commitment IPO.
6/26/23 Tr. 119:23-120:1, 6/27/23 Tr. 277:9-278:5 (Barrette). Finally,
Barrette testified that Inpellis was actively looking for a different
underwriter other than Alexander throughout this time and failed to
find one, casting doubt on the extent to which it was really relying
on Alexander in seeking the bridge loan. 6/27/23 Tr. 245:20-25
(Barette). In light of all this, the Court concludes that Barette's
hypothetical testimony about advice he might have given does not
demonstrate that Inpellis in fact relied on Alexander's firm commitmnet
underwriting authority in obtaining bridge financing.[3]

---

[3] Although the Court bases this conclusion on the evidence as it
stood at the close of plaintiff's case, its conclusion is reinforced
by the testiomny of former Inpellis CEO Patrick Mooney (who,
although part of defendant's case in chief, plaintiffs had a full
opportunity to cross examine), who credibly testified that finding
bridge financing was Inpellis's first priority throughout this time
period, since financing was necessary to hire employees and get the
company up and running. 6/29/23 Tr. 541:4-14, 566:11-567:7 (Mooney)
(Q: "Why did Inpellis want the bridge funding?" A. "There was no
money in the treasury of the company. We needed to raise money so
that we could become a going concern business and hire back
employees and begin to advance the technology which had sat stagnant
for some time."). In fact, when asked whether "Inpellis need[ed] the
bridge funding even if it was going to move forward on the IPO on a
best efforts basis?", Mooney responded unequivocally: "Yes. As I
said, the company needed money to bring back employees that weren't
-- that were no longer at the company to advance the technology to
bring it back into the United States. So yes, the company needed
interim funds to prepare the company for an IPO, and that included
bringing back employees and building out the team so that it was a
real going concern entity." 6/29/23 Tr. 567:8-16 (Mooney).

For all the foregoing reasons, the Court enters judgment in defendants' favor with respect to plaintiff's fraud claim.

### C. Breach of Contract

Finally, the Court previously allowed plaintiff's breach-of-contract claims to survive summary judgment, on plaintiff's theory that "defendants breached their obligations under the engagement agreements in three, interrelated ways." Aquino, 642 B.R. at 137. These three theories are:

> First, . . . that [Alexander] failed "to carry out its undertakings as managing underwriter in good faith," including by failing "to cooperate in the preparation of 'appropriate registration statement[s]' so as to expedite the successful consummation of the public offering' that Alexander Capital represented it would underwrite on a 'firm commitment' basis." Compl. ¶ 68. Second, . . . that [Alexander], in its contractually defined role as Inpellis's "exclusive financial advisor," failed "to provide Inpellis ... with independent professional advice regarding the financing of the offering, including informing Inpellis of [Alexnader's]'s inability, lack of authority and lack of intent to undertake the offering on a 'firm commitment' basis." Id. Finally, . . . that [Alexander] breached its implied duties of good faith and honest dealing by not informing Inpellis that [Alexander] was allegedly "engaging in conduct in concert with its former employee Mooney ... that was against the interests of Inpellis and undermined the integrity of the offering." Id.

Id. at 137-38.

"[A]ll contracts imply a covenant of good faith and fair dealing in the course of performance." 511 West 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002). "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Id. "While the duties of good

faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship' they do encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" Id. at 500-01.

Notably, none of these remaining theories directly alleges breach of contract based directly on Alexander's failure to go forward with a firm commitment IPO. This is largely because the Court previously held that the engagement agreements between Inpellis and Alexander were "unenforceable agreements to agree with respect to the details of a contemplated underwriting agreement and the consequent IPO." Aquino, 642 B.R. at 138; Memorandum Order Denying Motion to Dismiss at 36, Dkt. 54. Further, the Court held at summary judgment that the ultimate failure of Inpellis' IPO was not proximately caused by the failure to proceed on a firm commitment basis but rather by a stop-order from the SEC and subsequent settlement with it on behalf of Masiz and Biochemics that gave it a security interest in Inpellis's intellectual property. Aquino, 642 B.R. at 130-32.

The Court takes each of plaintiff's remaining three breach of contract theories in turn:

## 1. That Alexander did not carry out its duties as managing underwriter in good faith

Plaintiff's first breach-of-contract theory involves showing that Alexander "did not act in good faith in its role preparing for the planned IPO as managing underwriter . . . [because it] should have disclosed earlier and more fully that it was not yet approved by FINRA

to conduct the transaction as contemplated in the engagement agreement." Aquino, 642 B.R. at 139. The Court allowed this theory to proceed past summary judgment because there was a factual issue whether Alexander's "failure to make a full and timely disclosure . . . led Inpellis to retain (at significant expense) attorneys and accountants suitable to [Alexander] and induced Inpellis to approve the filing of draft registration statements with the SEC that relevant decision makers assert they would not have approved had they known the truth." Id.

Plaintiff's first theory runs aground in several ways. First, while Inpellis's outside counsel Barette testified about the expenses Inpellis incurred in terms of attorneys and accountants on the expectation it would be able to proceed with an IPO, 6/26/23 Tr. 21:9-22:24 (Barette), Alexander, as this Court has already held, did not itself know that it lacked firm commitment authority at the time it signed the engagement letter with Inpellis, putatively inducing it to incur these expenses. To show that Alexander in its role as managing underwriter caused Inpellis to take on various expenses in bad faith, plaintiff would thus have to point to obligations Inpellis incurred between when Alexander learned of the firm commitment issue in May 2015 and when Inpellis did by September 2015. Plaintiff has not done this.

Second, the Court does not believe that Alexander "induced Inpellis to approve the filing of draft registration statements with the SEC that relevant decision makers assert they would not have

approved had they known the truth." Id. at 139. To the contrary, Barrette testified that he told Mooney to proceed with further draft registration statements containing the same untrue language implying Alexander had firm commitment authority even after Barette and Mooney learned that Alexander *lacked* such authority. 6/27/23 Tr. 277:9-278:5 (Barrette).

Finally, the Court notes that, following the first engagement agreement, Inpellis was actively seeking an alternative underwriter without any success. 6/27/23 Tr. 245:20-25 (Barrette). This further reinforces the Court's conclusion that, even if Alexander had disclosed its lack of firm commitment authority some time sooner after it had learned about it in May 2015, there is no reason to think Inpellis would have behaved any differently.

For these reasons, the Court concludes that plaintiff has not established breach of contract on the basis of Alexander's not carrying out its duties as managing underwriter in good faith.

**2. That Alexander, as Inpellis's exclusive financial advisor, failed 'to provide Inpellis ... with independent professional advice" with respect to the bridge loan.**

Plaintiff's second, similar breach-of-contract theory requires showing that Alexander "in its contractually defined role as Inpellis's 'exclusive financial advisor . . . failed 'to provide Inpellis ... with independent professional advice regarding the financing of the offering, including informing Inpellis of [Alexander]'s inability, lack of authority and lack of intent to undertake the offering on a 'firm commitment' basis." Aquino, 642 B.R. at 138. The Court previously

allowed plaintiff to proceed on this theory because, "viewing the record in the light most favorable to the plaintiff, [Alexander] had not made any disclosure whatsoever of its inability to do firm commitment underwriting before it advised Inpellis to take on the bridge loan debt in preparation for the IPO (and for which Inpellis paid [Alexander] a $500,000 placement fee." Id. at 139.

However, as the Court has already now discussed with respect to plaintiff's fraud claim, the evidence clearly shows that Inpellis was independently pursuing bridge loan financing on its own, both with and without Alexander's knowledge or advice. Obtaining such financing was in fact critical to Inpellis's continued operation as a going concern. Accordingly, there is no evidence that Inpellis took on the bridge loan in reliance on Alexander's having firm commitment authority, or on the basis of any advice whatsoever by Alexander.

For these reasons, the Court concludes that plaintiff has not established breach of contract on the basis of Alexander's not carrying out its duties as exclusive financial advisor in good faith.

**3. That Alexander breached its implied duties of good faith and honest dealing by not informing Inpellis about Mooney's supposedly divided loyalties**

Finally, as to the third theory, that Alexander breached implied duties of good faith and honest dealing by failing to disclose the extent of its prior relationship with Mooney, Aquino, 642 B.R. at 130-40, plaintiff has not adduced any evidence that Mooney had any divided loyalty to disclose. To the contrary, Inpellis's outside-counsel Barrette testified that Mooney affirmatively told him about his work

at Alexander before Mooney became Inpellis CEO. 6/26/23 Tr. 46:6-13
(Q: "And did you have any knowledge of any past relationship between
Dr. Mooney and Alexander?" . . . A: "Yes. Dr. Mooney told me himself
that he had been doing consulting for Alexander and in fact he was
part of the Alexander team that was involved -- he had been working
on Alterix with Alexander so he had been part of the team to evaluate
Alterix, evaluate Alexander getting involved with Alterix."). Barrette
even testified that he discussed Mooney's exact role consulting with
Alexander with Alexander's in-house counsel. Id. 50:23- 51:17.[4]

The Court thus has little trouble concluding that Mooney's
relationship with Alexander was fully disclosed and that Mooney did
not have divided loyalties in his role as Inpellis CEO. For these
reasons, the Court concludes that plaintiff has not established breach
of contract on the basis of Alexander's not disclosing Mooney's
putatively divided loyalties.

---

[4] While it is unnecessary to the Court's decision, the Court
further notes that it finds that Dr. Mooney, called as part of
defendant's case in chief, testified credibly that his role as a
consultant to Alexander was relatively limited. 6/29/23 Tr. 521:25-
522:18, 534:10-15 (Mooney). Mooney testified he was never paid for
this work. Id. 522:21-23:5. Mooney also testified credibly that he
was approached about the CEO job by Inpellis personnel, and that
Chris Carlin, an Alexander employee whom plaintiff alleges was
involved in effectively planting Mooney at Inpellis, was in fact
"upset" when Mooney informed him he would be leaving to take over at
Inpellis since that would mean Mooney could not help further at
Alexander. 6/29/23 Tr. 536:13-539:6 (Mooney).

Because plaintiff has not established any of its three remaining theories of breach of contract, the Court enters judgment in defendants' favor with respect to plaintiff's breach of contract claim.

## Conclusion

Having entered judgment in defendants' favor on each of plaintiff's remaining claims, the Court need not reach defendant's arguments with respect to the individual liability of Amato and Guidicipietro or defendants' affirmative defenses. The Clerk is hereby directed to enter final judgment in favor of Defendants and to dismiss the case with prejudice.[5]

SO ORDERED.

New York, NY
July **6** , 2023

JED S. RAKOFF, U.S.D.J.

---

[5] As discussed on the record on 7/5/23, the Court retains jurisdiction to decide any remaining issues of attorneys' fees. Defendant indicated they would file a brief with respect to any request for fees by no later than 7/7, and plaintiff a response by 7/14.