# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| JOHN J. AQUINO, | ) | |
| CHAPTER 7 TRUSTEE | ) | Case #1:21-cv-01355-JSR |
| By Its Assignee, | ) | |
| Convergent Distributors of Texas, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALEXANDER CAPITAL, LP | ) | |
| & | ) | |
| Its Managing Partners: | ) | |
| JOSEPH AMATO, | ) | |
| ROCCO GUIDICIPIETRO, and | ) | |
| NESA MANAGEMENT, LLC | ) | |
| | ) | |
| Defendants | ) | |

_____

### MEMORANDUM IN SUPPORT OF
### MOTION BY INTERESTED PARTY SCHLICHTMANN
### For A Recusal Order Pursuant to 28 USC §455
### &
### To Strike From The Record Certain
### Inappropriate Statements

Dated:  July 25, 2023

Respectfully submitted by,

Jan Schlichtmann, Esq.
Attorney pro se
PO Box 233
Prides Crossing, MA 01965
O: 978-804-2553
Email: jan@schlichtmannlaw.com

**TABLE OF CONTENTS**

**Section**                                                                                            **Page**

I.      PRESIDING JUDGE'S CONDUCT DURING TRIAL
        WARRANTS RECUSAL……………………………………………………2

II.     INAPPROPRIATE STATEMENTS THAT SHOULD BE STRUCK

        A.      Statement During Direct Testimony of Thomas Barrette
                That Attorney Schlichtmann "*Admitted*" To "This Court"
                "*He Had Lied To Me Under Oath*"…………………………………5

        B.      Statements Prior To Schlichtmann's Testimony That
                Presiding Judge Had Not "Forgotten" About "*His Lying*"
                "Admitted His Lie" - "Still Considering Whether To *Refer
                Him To The Grievance Committee*"…………………………….....5

        C.      Statements Prior To Schlichtmann's Testimony Where
                Presiding Judge Equated Schlichtmann's "Taking
                Responsibility For A Mistake" As Equivalent To Making
                A "Knowingly False Statement" To Court………………………. 5

        D.      During Schlichtmann's Testimony Presiding Judge:
                Acknowledges Error Was The "Result Of Negligence"
                "Not Intent" & "No *Mens Rea*" But Questioned
                Schlichtmann's Participation In Case………………………… 7

        E.      Ends Trial By Stating Schlichtmann: "Authored False
                Statement To This Court"; "Can't" "Rel[y]" On His
                "Professionalism"; And Suggested He Violated
                Disqualification Order & "Spoliation" "Still In Court's Mind"..8

III.    REASONS FOR GRANTING RELIEF REQUESTED……………..8

        A.      Recusal Appropriate When Presiding Judge Displays
                A Fixed Antagonism……………………………………………9

        B.      The Presiding Judge's Statements Were Unjustified…………..12

        1.      Materially Misrepresented Schlichtmann's Accepting
                Responsibility For A Mistake Was "Admitting" That
                "He Had Lied Under Oath"…………………………………….12

**TABLE OF CONTENTS (Cont.)**

**Section**                                                                              **Page**

2.    19 Months After The Fact, Inappropriately Threatening
       To Refer Schlichtmann To The "Grievance Committee"
       For "Admitt[ing] His Lie"……………………………………………14

3.    Inappropriately Suggested Schlichtmann Was Dishonest;
       Unprofessional; And Had Violated Disqualification Order
       Despite Ruling Schlichtmann's Participation Was
       *Protected By The Attorney Work Product Privilege*…………………15

4.    Inappropriately Stated "Spoliation" Of Evidence Was
       "Still In Court's Mind" Despite The Fact That The Issue Had
       Been Resolved………………………………………………………..17

5.    Presiding Judge Maligned Schlichtmann For A Mistake While
       Turning A Blind Eye To Defendants' "Gamesmanship" &
       Filing False Declarations…………………………………………..21

IV.    **CONCLUSION**………………………………………………………..26

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Alter v. Rocky Point School Dist.,* WL 4966119 p. 12 (EDNY 2014)……………………...21fn30

*Dilworth v. Goldberg*, 3 F.Supp. 3d 198, 202 (SDNY 2014)………………………………21fn30

*In Re Basciano*, 542 F.3d 950 (2nd Cir. 2008)……………………………………………………10

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 497
(SDNY 2022)………………………………………………………………………………………21fn30

*Litekey v. US*, 510 US 540 (1994)……………………………………………………………..9,10,11

*Lopez v. Criminal Court of the City of New York*, 566 F. Supp. 792 (SDNY 1983)………..9

*Matter of Ofsink*, 166 AD 3d 97 (2018)………………………………………………………2fn1

*Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 431 (SDNY 2010)...21n30

*Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 291 (SDNY 2009)……..21fn30

*Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (SDNY 2008)…………………………………21fn30

*Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 177 (EDNY
2007)………………………………………………………………………………………………21fn30

*United States v. Amico*, 486 F. 3d 764 (2nd Cir. 2007)…………………………………………10

*United States v. Cunningham*, 672 F.2d 1064, 1074 (2nd Cir.1982)…………………………17

*US v. Orgad*, 132 F. Supp. 2d 107, 124 (EDNY 2001)………………………………………...17

*United States v. Lovaglia*, 954 F. 2d 811 (2nd Cir. 1992)…………………………………………10

**Statutes**

New York Judiciary Law §90(4)(a) and (b)……………………………………………………2fn1

18 USC §1623……………………………………………………………………………………..2fn1

28 USC §455……………………………………………………………………………………….2,9

**TABLE OF AUTHORITIES (Cont.)**

**Rules**                                                                      **Page**

Code of Conduct for United States Judges Canon 3(C)(1)(a) of Chapter 2…………………..9

FRCP Rule 26(b)(2)(C)………………………………………………………………………18

FRCP Rule 37(e)………………………………………………………………………………18
                                                                                  21fn30

FRCP Rule 37(e)(1) and (2)………………………………………………………………….21

FRCP Rule 56……………………………………………………………………………...22

FRCP Rule 56(h)……………………………………………………………………………22

SDNY Local Rule 56.1……………………………………………………………………....22

**TABLE OF EXHIBITS**

| Exhibit # | Document | Page |
|---|---|---|
| **1** | 1-6-22 3:48PM *Aquino* Conf. Tr………………………………………4,16 | |
| **2** | 12-23-21 Email From Nicholas Werle "Law Clerk to the Hon. Jed S. Rakoff" USDC SDNY………………………………………………...18 | |
| **3** | 1-5-22 Attorney Schlichtmann's email to Attorney Holly Cole………...18 | |
| **4** | 1-5-22 email by Attorney Ward to the Clerk………………………….19 | |
| **5** | 1-6-22 10:52AM *Aquino* Conference……………………………….4,19 | |
| **6** | 1-7-22 *Aquino* 11:21AM Minute Entry …………………………….19 | |
| **7** | 1-7-22 Aquino 11:31AM Minute Entry……………………………….19 | |
| **8** | 1-10-22 Email from Clerk…………………………………………….20 | |
| **9** | 1-11-22 *Aquino* Discovery Conference…………………………….4,20 | |
| **10** | 2-4-22 (Doc. #95) & 2-11-22 (Doc. #98) Defendants' "Notice"…………4,20 | |
| **11** | 5-12-22 *Aquino* Summary Judgment Hearing…………………………22 | |
| **12A** | Amato Declaration Doc. #108 ……….………………………….....22,23 | |
| **12B** | Amato Declaration Doc. #131 ……….…………………………....22,23,24 | |
| **13A** | Guidicipietro Declaration Doc. #109……………………………...22,23,25 | |
| **13B** | Guidicipietro Declaration Doc. #132………………………………22,23,24, 25, | |
| **14** | Amato Deposition Designation (Doc. #198-5)………………………...23 | |
| **15** | Guidicipietro Deposition Designation (Doc. #198-7)…………………23 | |
| **16** | **P104** 2018 ACLP "Operating Agreement"………………………...5,23,25 | |
| **17A** | **P73C** (9-28-21 Del. SOS filing by by Guidicipietro for NESA Management LLC)……………………………………………………25 | |
| **17B** | **P73D** (9-28-21 Del. SOS filing by Figliolo for Exitus)…………………25 | |

**TABLE OF EXHIBITS (Cont.)**

| Exhibit # | Document | Page |
|---|---|---|
| 18 | **P13B** (9-29-15 Holcomb & Wright ACLP *Wells* Submission filed with FINRA …………………………………………………………… | 25,26 |
| 19 | 6-26-23 *Aquino* Tr…………………………………………………………... | 5 |
| 20 | 6-28-23 *Aquino* Tr………………………………………………………… | 5,7,8,15 |
| 21 | 7-5-23 *Aquino* Tr…………………………………………………………… | 8,21 |
| 22 | 7-22-21 Glosband Declaration…………………………………………… | 13 |
| 23 | 11-15-21 Plaintiff's Response…………………………………………… | 13,14 |
| 23A | Exhibit A to 11-15-21 Plaintiff's Response………………………… | 13 |
| 24 | 11-18-21 Aquino Tr………………………………………………………… | 14,15 |
| 25 | **P13A** (10-27-15 ACLP Response to FINRA inquiry re 1017 CMA)……… | 26 |

## I.  PRESIDING JUDGE'S CONDUCT DURING TRIAL WARRANTS RECUSAL

The motion by interested party Jan Schlichtmann, Esq., pursuant to 28 USC §455(a), for an order of recusal and the striking of the inappropriate statements made by the presiding judge during the bench trial, should be granted.  As detailed in **Section II** below, the statements made in the public record and directed to the public, parties, witnesses and counsel of record served no appropriate purpose except to denigrate and disparage attorney Schlichtmann's personal and professional character.  The statements by a sitting United States Federal Judge, would lead, in the ordinary course, members of the public as well as the parties, witnesses, and counsel of record in this matter, who were not familiar with the actual facts, to believe that attorney Schlichtmann had admitted to a Federal Judge that he had committed a felony involving moral turpitude, the commission of which would support attorney Schlichtmann's disbarment.[1]  This was exacerbated by the presiding judge's repeated derogatory references in the record that continued to denigrate attorney Schlichtmann's personal and professional character.  This included statements that referred to: "his lying" and that he "admitted his lie";  that the presiding judge was still "considering," *after 19 months*, "refer[ing]" him to the "Grievance Committee"; and that attorney Schlichtmann's "professionalism" could not be "reli[ed]" on.  This repeated denigration of character was coupled with the suggestion that attorney Schlichtmann had violated the court's disqualification order ("a gentleman who authored a false statement to this Court" and who has "taken an extraordinarily narrow view of what it means to be disqualified even though

---

[1] "Lying under oath," is a felony subjecting the violator up to five years in prison.  18 USC §1623.  The felony offense involving false swearing constitutes automatic grounds for disbarment.  *Matter of Ofsink*, 166 AD 3d 97 (2018) (Petition to disbar attorney by "Attorney Grievance Committee" was granted pursuant to Judiciary Law §90(4)(a) and (b) and the Rules for Attorney Disciplinary Matters … on the grounds that the attorney was convicted of a felony … and has therefore been automatically disbarred").

this Court early on disqualified him without limitation from this case") a purported offense that was immediately tied to "spoliation" of evidence ("we don't even have to dwell on the spoliation issue attributable to the Plaintiffs, though that is very much still in the Court's mind"). Individually and cumulatively these statements displayed the presiding judge's high degree of animus towards attorney Schlichtmann necessitating the presiding judge's recusal.

As detailed in **Section III** below the derogatory statements by the presiding judge were unjustified.  In particular the presiding judge: 1) materially misrepresented that attorney Schlichtmann's taking responsibility for an obvious "mistake" in the drafting of an affidavit regarding a non-material issue, which was the basis of the Court's 11-18-21 disqualification order (Doc. #72), was, according to the presiding judge, an "admission" Schlichtmann "lied under oath"; 2) made inappropriate threats that after 19 months the presiding judge was still "considering"  "referring" attorney Schlichtmann to the "Grievance Committee";  3) made inappropriate suggestions that attorney Schlichtmann had violated the Court's 11-18-21 disqualification order (Doc. #72) by continuing to work on and support the prosecution of this matter when the Court, consistent with 2nd Circuit precedent, had previously ruled such involvement was protected by the attorney work product privilege; and 4) inappropriately suggested attorney Schlichtmann was involved in the "spoliation" of evidence when the disputes between the parties regarding Defendants' unsupportable "spoliation" charge had been resolved.

The presiding judge's inappropriate conduct apparently encouraged Defendants' filing of the 7-7-23 "sanctions" motion (Doc. #204) which is yet another in a series of improper attempts to "sanction" attorney Schlichtmann as well as the Plaintiff based on matters that were resolved

by court orders (Docket Entries 1-6-22;[2] 1-11-22;[3] and 2-14-22[4]) and a settlement between the

parties and attorney Schlichtmann on behalf of himself and the *Sterman et al* non-party

witnesses[5] (Doc. #95, #98)[6].   The persistent course of improper conduct by Defendants seeking

"sanctions" was intended to hinder, delay, and interfere with attorney Schlichtmann's essential

involvement in the prosecution of this matter.  As revealing, is the fact that the presiding judge

has chosen to malign attorney Schlichtmann for the commission of offenses that attorney

Schlichtmann has not committed while turning a blind eye to Defendants counsel's "act of

obvious gamesmanship" in the submission of 1049 R. 56.1 Statements[7] and the *actual*

commission of acts by Defendants and their counsel of record that: resulted in the drafting and

submission of sworn declarations by Defendants seeking to change previously given deposition

testimony in order to influence summary judgment;[8] and containing materially false and

---

[2] 1-6-22 3:48PM *Aquino* Conference p. 7 line 15-25; p. 8 line 1-8; p. 9 line 5-18 (Attorney Schlichtmann's "involvement" in the prosecution of this matter "would be work product" protected by the attorney work product privilege) at **Exhibit 1**.
[3] 1-6-22 10:52AM *Aquino* Conference p. 2 line 14-17 ("I've set aside some time on January 11th to try to resolve, through a telephone conference of everyone who's relevant, *all the outstanding discovery disputes in this case*") at **Exhibit 5**; 1-11-22 Discovery conference (COURT: "I'm glad we were able to *get this all resolved expeditiously*")(emphasis added) at **Exhibit 9**.
[4] 2-14-22 Docket Entry (Defendants' "spoliation" sanctions motion denied "*with prejudice*" except to "raise" "an adverse interest jury instruction")(emphasis added).
[5] The *Sterman et al* non-party witnesses included: Marshall Sterman; Frank Manguso; Dr. David Staskin; Dr. Harry McCoy; Jack Altshuler, Esq.; Daniel Glosband, Esq.; John Masiz; Thomas Barrette, Esq.; and Jan Schlichtmann, Esq.
[6] 2-4-22 & 2-11-22 Defendants Notices of Withdrawal of "sanctions" motions ("pending discovery disputes between the Plaintiff, the Defendants, the Chapter 7 Bankruptcy Trustee, and the non-party witnesses *have been resolved*")(emphasis added) at **Exhibit 10**.
[7] 7-8-22 SJ Decision (Doc. #150 p. 27 (Presiding judge orders Plaintiff to respond to Defendants' "plainly excessive … repetitive … wholly inappropriate" R. 56.1 Statement).
[8] See, 4-19-22 Plaintiff's Reply Mem. p. 8-15 (Doc. #144).

misleading statements concerning core issues in dispute that referenced fraudulent filings in the

Delaware Secretary of State's Office in order to bolster those false and misleading statements.[9]

## II.     INAPPROPRIATE STATEMENTS THAT SHOULD BE STRUCK

### A.     Statement During Direct Testimony of Thomas Barrette That Attorney Schlichtmann "*Admitted*" To "This Court" "*He Had Lied To Me Under Oath*"

THE COURT: *You're aware, I assume, that Mr. Schlichtmann admitted to this Court that he had lied to me under oath*?

THE WITNESS: *Yes.* I have not read the transcripts, but I'm aware that he has -- that he has acknowledged statements to you, yes, your Honor.

6-26-23 Aquino Tr. p. 11 line 23-25; p. 12 line 1-3 (emphasis added) at **Exhibit 19**.

### B.     Statements Prior To Schlichtmann's Testimony That Presiding Judge Had Not "Forgotten" About "*His Lying*" "Admitted His Lie" - "Still Considering Whether To *Refer Him To The Grievance Committee*"

MR. RAND: … Jan Schlichtmann, who is the witness who will be here this afternoon, made a request to have a conference with the Court before his testimony.
THE COURT: On what subject?
…
MR. RAND: I think it's pertaining to the statement you made about his --
THE COURT: *His lying*?
MR. RAND: *Yes*.
THE COURT: *I haven't forgotten that in the slightest.  I'm still considering whether to refer him to the grievance committee, as I indicated at the time he admitted his lie….*

6-28-23 *Aquino* Tr. p. 354 line 14-25; p. 355 line 1-7 (emphasis added) at **Exhibit 20**.

### C.     Statements Prior To Schlichtmann's Testimony Where Presiding Judge Equated Schlichtmann's "Taking Responsibility" For A "Mistake" As Equivalent To Making A "Knowingly False Statement" To Court

THE COURT: So, are you saying, for example, that this differs from the situation where, again, to change the hypo, supposing someone authors the submission but the submission is made by someone else. So, let's say, *someone drafts an affidavit for someone else to*

---

[9] See, 3-15-22 Guidicipietro Declaration (Doc. #109) par. 6-8, 13 at **Exhibit 13A** and **P104** at **Exhibit 16** (ACLP "Operating Agreement" acknowledging contrary to Defendants' denials: NESA Management LLC became the General Partner in December 2013 and Amato and Guidicipietro, as required by regulations, were delegated "exclusive managers of the partnership" with "all of the rights of the General Partner").

*submit. That the person who drafted the affidavit is not making a false statement to the recipient?*

MS. COLE: No, your Honor , that's not what I'm saying at all.

THE COURT: Because *that is, I think, the situation with the next witness who is about to appear.*

MS. COLE: No. If I recall correctly, I was present at the hearing on the motion to disqualify, in which both Mr. Glosband and Mr. Schlichtmann testified. Mr. Glosband admitted that Mr. Schlichtmann drafted the declaration; that he reviewed it; that he knew it was a misstatement, and he signed the declaration anyway.

THE COURT: My recollection -- but I don't want to get too far afield till the next witness testifies, but Mr. Schlichtmann testified at page 9, lines 22, following of the transcript of the hearing on November 30, 2021:

"It was a mistake, your Honor. It's completely my responsibility, and I know Mr. Glosband was relying on me to get things right, and I apologize both to him and to the Court." So wasn't that Mr. Schlichtmann's statement that *he was responsible for the false statement made to the Court*?

MS. COLE: I understood that Mr. Schlichtmann was falling on his sword at that point, your Honor. I believe there was --

THE COURT: You mean when he testified under oath before me he wasn't telling the truth?

MS. COLE: I'm sorry?

THE COURT: I'm not sure what you mean by falling on his sword.

MS. COLE: Yes, *he was taking responsibility*.

THE COURT: *Under oath*.

MS. COLE: Correct.

THE COURT: *So he was responsible*.

MS. COLE: Yes, your Honor. I also believe that Mr. Glosband also provided testimony at the hearing.

THE COURT: Yes. And Mr. Glosband said -- he began by saying at page 4 in his affidavit: "contains one statement that I believe is not true and one statement that I believe is susceptible to interpretation in a way that could make it not true and should be corrected." And then the Court inquired about which was which. And then the Court, after the witness -- after Mr. Glosband indicated that which of the statements he regarded as false and which were misleading, are, this is at page 6, line 21:

"THE COURT: So why did you sign it?"

"THE WITNESS: *I think I was careless*.

"THE COURT: Who prepared this?"

"THE WITNESS: Mr. Schlichtmann prepared it, and I had -- and I reviewed it and had interaction with him about it." And then we went on to Mr. Schlichtmann's testimony.

MS. COLE: Yes, your Honor.

THE COURT: So I think we need to come back here to this witness, but just to complete the picture --

MS. COLE: I don't disagree with your question whether the person who prepared the document is ultimately responsible. I think the point that I was trying to raise is that there is a material distinction between a sworn statement presented to a Court and an unsworn submission that is not signed by someone in a submission to a non-governmental body.

THE COURT: Well, *there is a difference so far as, for example, prosecution for perjury* is concerned. But *I hope you're not saying that a person can submit a false statement to a regulatory agency that is knowingly false because it's not under oath and someone else prepared it.*
MS. COLE: No, your Honor. That's not what I'm saying at all.

6-28-23 *Aquino* Tr. p. 452 line 16-25; p. 453 line 1-25; p. 454 line 1-25; p. 455 line 1-4

(emphasis added) at **Exhibit 20**.

> **D.      During Schlichtmann's Testimony Presiding Judge: Acknowledges Error Was The "Result Of Negligence" "Not Intent" & "No *Mens Rea*" But Questioned Schlichtmann's Participation In Case**

THE COURT: Mr. Schlichtmann, at the start of the proceedings today, plaintiff's counsel said you wanted to have a conference with the Court before you gave your testimony but he was very unclear about what was the substance of that request, and of course any conference I would have with anyone would have to be on the record.
THE WITNESS: Yes.
THE COURT: But if is there something you wanted to raise to my attention now, go ahead.
THE WITNESS: Your Honor, I didn't want to take the time, I know that time is precious, but *it is the issue of the statement that the Court made to Mr. Barrette at the beginning of his testimony about me, and I would like to address it when convenient for Court but I don't want to take up this precious time.*
THE COURT: Just so the record is complete and then we will proceed, and if there is anything further you want to take up after your testimony we can turn to that.  So, after an evidentiary hearing I issued an order dated November 18, 2021, which reads, as follows: "Earlier today the Court held a hearing regarding one or more false statements contained in the declaration of Daniel M. Glosband, Esq., submitted in support of plaintiff's opposition to defendant's motion to disqualify plaintiff's counsel Jan Schlichtmann, Esq. In a written submission filed before the hearing, *Schlichtmann conceded that he authored the offending statements in the Glosband declaration*, and *at the hearing both Glosband and Schlichtmann conceded that at least one statement in the declaration was false and that another was misleading if not also false, though both Glosband and Schlichtmann maintained that the making of these false or misleading statements was the result of negligence and not an intent to mislead.* Nevertheless, there is no doubt that the *Court relied on the offending statements in its August 6, 2021 denial, without prejudice, of the defendant's motion to disqualify Schlichtmann.*

At the conclusion of the hearing, the Court made the following rulings from the bench which it hereby restates: The Court will not refer the matter of the false statements to the U.S. Attorney's office *for possible criminal investigation because it concludes that Schlichtmann and Glosband lacked the mens rea necessary to support the perjury charge. The Court will, however, consider referring this matter to the Grievance Committee of the U.S. District Court for the Southern District of New York.* The Court

now grants defendant's motion to disqualify Schlichtmann as plaintiff's counsel. This ruling takes effect immediately. And then there is some further stuff about scheduling and motion practice documents and so forth. So, the one question I have for you now relating to that order is I learned from Mr. Barrette from a question put by counsel, that in preparing his testimony he spent many hours with you and another lawyer a few days before his testimony.

THE WITNESS: Correct.

THE COURT: Were you not acting as counsel in that regard?

THE WITNESS: *I was acting as counsel for my client Convergent Distributors, and this is something that I – has always been disclosed, was disclosed to you, your Honor, to the defendants. There's no secret about it. I have been actively involved in this case, not as counsel of record, but I am absolutely crucial, essential for helping to prepare the counsel of record for this case, and that has been fully disclosed on the record and discussed with your Honor, if you remember when the other side was bringing up prior to my deposition. Plus my deposition discusses my involvement.* So to answer your question.

THE COURT: All right. So now go ahead, counsel, with your questions.

6-28-23 *Aquino* Tr. p. 484 line 15-25; p. 485 line 1-25; p. 486 line 1-17; p. 487 line 1-15

(emphasis added) at **Exhibit 20** (also, p. 498 line 17-25; p. 499-502 line 1-25; p. 503 line 1-15).

**E.    Ends Trial By Stating Schlichtmann: "Authored False Statement To This Court"; "Can't" "Rel[y]" On His "Professionalism"; And Suggested He Violated Disqualification Order & "Spoliation" "Still In Court's Mind"**

THE COURT: And I'm interested that Mr. Schlichtmann also involved himself in the brief, though not this part, *a gentleman who authored a false statement to this Court given by Mr. Glosband, a gentleman who has taken an extraordinarily narrow view of what it means to be disqualified, even though this Court early on disqualified him without limitation from this case,* and *we don't even have to dwell on the spoliation issue* attributable to the plaintiffs, *though that is very much still in the Court's mind*.  To be frank, Mr. Rand, you were the first lawyer in this case who I thought I could have reliance on your professionalism because of the way you had conducted yourself in this trial. I *can't make any such claim as to Mr. Glosband or Mr. Schlichtmann*, but now I see that you don't hesitate to fabricate a quote.

7-5-23 *Aquino* Tr. p. 690 line 24-25; p. 691 line 1-13 (emphasis added) at **Exhibit 21**.

## III.    REASONS FOR GRANTING RELIEF REQUESTED

The statements evidence an animus compelling the presiding judge's recusal and the striking of the statements from the public record.  The statements unjustly impugned the integrity and reputation of attorney Schlichtmann and his fitness to practice law.  Unless struck from the

record, the presiding judge's statements will be available for others to note and quote to attorney

Schlichtmann's detriment.  The 19-month old threats to refer Schlichtmann's conduct for

investigation by the "Grievance Committee" and the encouragement of Defendants to seek

"sanctions" on closed issues, seeks only to hinder and interfere with attorney Schlichtmann's

participation in the case on behalf of his client and the willingness of witnesses or counsel to

work with him in that endeavor.

**A.      Recusal Appropriate When Presiding Judge Displays A Fixed Antagonism**

28 USC §455(a) provides that: "Any … judge … of the United States shall disqualify

himself in any proceeding in which his impartiality might reasonably be questioned" and "He

shall also disqualify himself … [w]here he has a personal bias or prejudice concerning a party …

."  The "Code of Conduct for United States Judges" similarly provides: "A judge shall disqualify

himself or herself in a proceeding in which the judge's impartiality might reasonably be

questioned, including … instances in which the judge has a personal bias or prejudice concerning

a party … ."  Canon 3(C)(1)(a) of Chapter 2: Code of Conduct for United States Judges.  See,

*Lopez v. Criminal Court of the City of New York*, 566 F. Supp. 792, 796 (SDNY 1983) ("Cannon

3(C) of the ABA Code of Judicial Conduct requires a judge to recuse himself or herself where

impartiality might be reasonably questioned").

The Supreme Court has ruled that disqualification under 28 USC §455(a) is appropriate

where statements by a judge "display a deep-seated … antagonism that would make a fair

judgment impossible."  *Litekey v. US*, 510 US 540, 555 (1994) (A "bias or partiality motion"

under 28 USC §455(a) is appropriate when "judicial remarks" "reveal such a high degree of …

antagonism as to make fair judgment impossible").  28 USC §455(a) "placed the obligation to

identify the existence of those grounds upon the judge himself," "requiring" the grounds "to be

evaluated on an objective basis," "so that what matters is not the reality of bias or prejudice but its appearance." Id. at 549.  "Quite simply and quite universally, recusal was required whenever 'impartiality might reasonably be questioned.'"  Id.  The 2nd Circuit has emphasized that "[T]his test deals exclusively with appearances."  *In Re Basciano*, 542 F. 3d 950, 956 (2nd Cir. 2008) (citing *United States v. Amico*, 486 F.3d 764, 775 (2d Cir.2007).  "Its purpose is the protection of the public's confidence in the impartiality of the judiciary." Id.  "In applying this test, [the Court should] consider the petitioner's allegations of bias as well as the judge's rulings on and conduct regarding them and ask whether an objective, disinterested observer fully informed of the underlying facts, would entertain significant doubt that justice would be done absent recusal." Id. (quoting *United States v. Lovaglia*, 954 F.2d 811, 815 (2nd  Cir.1992).

The statutory requirement of recusal for bias or prejudice is significant for what it does not cover.  "Judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses" which "occur[] in the course of judicial proceedings, and neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Litekey v. US, supra* at 557.  "A judge's ordinary efforts at courtroom administration—even a *stern* and *short-tempered* judge's ordinary efforts at courtroom administration—remain immune" including: "expressions of *impatience*, *dissatisfaction*, *annoyance*, and even *anger*, that *are within the bounds* of what imperfect men and women, even after having been confirmed as federal judges, *sometimes display*."  Id. at 555-556 (emphasis added).  "[J]udicial remarks during the course of a trial that are *critical* or *disapproving* of, or even *hostile* to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  Id. 555.  "They may do so if they reveal *an opinion that derives from an*

*extrajudicial source*; and *they will do so if they reveal such a high degree of* favoritism or

*antagonism as to make fair judgment impossible*." Id. "Also, not subject to deprecatory

characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they

learned in earlier proceedings" or "upon completion of the evidence." Id. 550-551. "The judge

who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed

towards the defendant who has been shown to be a thoroughly reprehensible person," so long as

the judge's "knowledge and the opinion it produced were *properly* and *necessarily* acquired in

the course of the proceedings." Id. (emphasis added).

It cannot be reasonably questioned that the presiding judge's statements at issue here do

no come within the ambit of the acceptable rough and tumble of the courtroom. The statements

regarding attorney Schlichtmann that center around the purported fact that attorney Schlichtmann

admitted to the commission of a felony that requires automatic disbarment was not "properly and

necessarily acquired in the course of the proceedings." Worse, it was coupled with other

statements made throughout the proceedings denigrating Schlichtmann's honesty and tying such

deprecatory statements to insinuations that Schlichtmann had been violating the disqualification

order and was involved in "spoliation" of evidence. This included references to Schlichtmann

such as: "his lying," and "admitted his lie," necessitated referral to the "Greivance Committee;"

that his "professionalism" "can't" be "reli[ed]" on; he "authored a false statement;" "took an

extraordinary narrow view" of the disqualification order and was involved in "spoliation" of

evidence. None of these statements can be said to have been "properly and necessarily acquired"

during the course of the bench trial or prior proceedings. They were creations by the presiding

judge of what the presiding judge wanted others to believe about Schlichtmann – others who

would not know all the relevant facts and might therefore be inclined to adopt the Federal

Judge's views on the matter.  Such extrajudicially obtained indisputably deprecatory views display the high degree of antagonism described by the Supreme Court – a high degree of antagonism that evidences "a personal bias or prejudice concerning" attorney Schlichtmann demonstrating that the presiding Judge's "impartiality might reasonably be questioned."

### B.    The Presiding Judge's Statements Were Unjustified

There was no justification for the presiding judge's statements.  Attorney Schlichtmann and the presiding judge had not engaged in an unseemly colloquy that could have provoked the statements.  The statements were not made during a heated discussion with counsel of record or concerning a witness. The statements initially came out of the blue during the testimony of Plaintiff's first witness who happened to mention attorney Schlichtmann's name.  The subsequent statements were similarly gratuitously introduced by the presiding judge during the examination of Defendants' owners called by the Plaintiff and on the eve of attorney Schlichtmann's expected appearance as a witness.  Most of the derogatory statements were made outside attorney Schlichtmann's presence.  During attorney Schlichtmann's appearance the presiding judge confined remarks to a recitation of the 11-18-21 record regarding attorney Glosband's and Schlichtmann's testimony that the error in the affidavit was the result of carelessness, not intentional.  After attorney Schlichtmann left the stand, the presiding judge continued his unprovoked attack on attorney Schlichtmann's character by suggesting that attorney Schlichtmann: was not honest ("authored false statement"), his "professionalism" could not be "reli[ed]" on; he did not comply with the disqualification order, and "spoliation" of evidence was "still in the Court's mind."

### 1.    Materially Misrepresented Schlichtmann's Accepting Responsibility For A Mistake Was "Admitting" That "He Had Lied Under Oath"

The 11-18-21 disqualification order arose out of an error in drafting a declaration for attorney Glosband in support of Plaintiff's opposition to Defendants' motion to disqualify Schlichtmann as counsel of record.  Defendants' disqualification motion was premised on the unsupported contention that "at the heart of this case is a failed scheme conceived and executed by Schlichtmann to create the Trust to make Inpellis appear independent from BioChemics … [b]ut in fact, Inpellis was not independent … ."[10]  The Trust at issue was approved by the Massachusetts Essex County Probate Court.  Attorney Schlichtmann drafted the Trust and attorney Jack Altshuler who became a Trustee in February 2015 obtained the approval in September, 2014.  Attorney Glosband was appointed as the third Trustee in July 2015.  There were no events prior to Attorney Glosband's appointment that were identified by Defendants that Defendants contended only attorney Schlichtmann could testify to or that attorney Schlichtmann's testimony would somehow be adverse to Plaintiff's claim.  Attorney Schlichtmann in drafting the Glosband declaration noted that attorney Glosband was appointed in July 2015.  In error, in paragraphs 5 and 8 attorney Schlichtmann stated Glosband had "personal knowledge" of the "events detailed in Plaintiff's 4th Amended Complaint … from July 2014 through November 10, 2015 S-1 filing that is at issue (the IPO events)" (par. 5) and that Glosband had "directly participated in each of the events identified by Defendants (other than the IPO events) and can testify regarding the SRT Trust's involvement and decision making regarding them."[11]  Obviously, as pointed out by Defendants at attorney Glosband's deposition, attorney Glosband's knowledge before he was appointed Trustee was based on "information and

---

[10] Defendants' 7-8-21 mem. in support of disqualification p. 12-13 (Doc. #50).
[11] 7-22-21 Glosband Declaration In Support of Plaintiff's Opposition to Defendants' Motion to Disqualify Counsel (Doc. #53-2) at **Exhibit 22**; See also, 11-15-21 Plaintiff's Response (Doc. #66) at **Exhibit 23** and Exhibit A (Doc. #66-1) Draft Glosband Declaration par. 5 & 8 at **Exhibit 23A**.

belief" not "personal knowledge."  And, similarly, attorney Glosband did not "directly participate" in the Trust prior to his appointment in July, 2015 and therefore his knowledge about events prior to his appointment would also be based on "information and belief."  As pointed out by attorney Schlichtmann these mistakes did not concern material issues.  There was no pre-July, 2015 event that involved the Trust except the formation of the Trust which was a matter of public record and the Trust's purpose which was stated in the Trust document.  There was no showing by Defendants that attorney Schlichtmann's testimony was either required on those issues or would be adverse to the Plaintiff.[12]

At the 11-18-21 evidentiary hearing, attorney Glosband and Schlichtmann were briefly questioned by the presiding judge and readily acknowledged the mistake was due to carelessness and was not intentional.[13]  Attorney Schlichtmann, prior to the hearing when the issue was raised by the presiding judge in a telephone conference, had taken responsibility for the errors and did so again in a pre-hearing filing,[14] and once again on the stand.  Attorney Schlichtmann admitted *to an error*.  He did _not_ admit to the presiding judge that he had "*lied under oath*."[15]  Neither Defendants nor the presiding judge, provided evidence or suggested in argument that the error was anything other than the result of a mistake, _not_ intentional.  The presiding judge found there was "no *mens rea*."[16]

  **2.      19 Months After The Fact, Inappropriately Threatening To Refer
           Schlichtmann To The "Grievance Committee" For "Admitt[ing] His Lie"**

---

[12] 11-15-21 Plaintiff's Response Regarding Erroneous Statements in 7-22-21 Glosband Declaration p. 3-4 (Doc. #66) at **Exhibit 23**.
[13] 11-18-21 *Aquino* Evidentiary Hearing p. 6 ("careless"), p. 9, 11 ("mistake") at **Exhibit 24**.
[14] 11-15-21 Plaintiff's Response p. 1-3 (Doc. #66) at **Exhibit 23**.
[15] 11-18-21 *Aquino* Hearing p. 9, 11 ("It was a mistake" "made this mistake") at **Exhibit 24**.
[16] See, 11-18-21 *Aquino* Transcript at **Exhibit 24** p. 15 line 13-15 ("it was not done with the kind of *mens rea* that would support a perjury referral").

No legitimate purpose was served by the presiding judge during the bench trial stating "I

haven't forgotten" "his lying" "in the slightest,"  and "I'm still considering whether to refer him

to the grievance committee, as I indicated at the time he admitted his lie."[17]  19 months earlier, at

the 11-18-21 Evidentiary Hearing the presiding judge stated he "will … consider whether or not

to refer this to the grievance committee":

> COURT: … I will however consider whether or not to refer this to the grievance
> committee of the Southern District of New York, which is the committee that deals with
> lawyer violations of professional conduct -- and I may want to hear further from the
> affected parties on that -- the jurisdiction of that committee, which I had the privilege of
> being the chair of for 11 years includes both members of the Southern District bar, but
> also people who are admitted pro hac vice.

11-18-21 *Aquino* Transcript p. 15 line 16-23 at **Exhibit 24**.  However, the presiding judge did

not take any further action on the "consideration" as to "whether or not" he would "refer this to

the grievance committee."  No legitimate purpose was served by threatening during the bench

trial of the Plaintiff's claims, 19 months after the fact, in remarks addressed to the public, the

parties, the witnesses, and counsel of record in this case, to "refer" Schlichtmann's "lying" to the

regulatory body policing professional conduct.  Such threats only serve to dissuade Schlichtmann

from participating in this matter and influence others not to work with him.

### 3.    Inappropriately Suggested Schlichtmann Was Dishonest; Unprofessional; And Had Violated Disqualification Order Despite Ruling Schlichtmann's Participation Was *Protected By The Attorney Work Product Privilege*

The presiding judge wrongly suggested that attorney Schlichtmann's honesty and

professionalism were in question and that he had violated the 11-18-21 disqualification order by

his continued involvement in this case.  Attorney Schlichtmann's continued participation in all

aspects of this litigation except as counsel of record and at trial were openly discussed

---

[17] 6-28-23 *Aquino* Tr. p. 354 line 14-25; p. 355 line 1-7 (emphasis added) at **Exhibit 20**.

subsequent to the disqualification order.  Despite several attempts by Defendants to make

Schlichtmann's participation an issue, the presiding judge ruled that attorney Schlichtmann's

participation and assistance to counsel of record was protected by the attorney work product

privilege.

In the 1-6-22 3:48PM *Aquino* Conference during Schlichtmann's deposition, attorney

Schlichtmann's participation in the case was raised as an issue.  In response to Attorney

Schlichtmann's statement regarding his client's constitutional right to attorney Schlichtmann's

essential participation assisting counsel of record, the presiding judge ruled that attorney

Schlichtmann's participation was protected by the attorney work product privilege:

> MR. SCHLICHTMANN:  Your Honor, again, I think I made it clear I represent them.  I have a financial interest in this case, which I answered, and that my objection was in talking about what I'm doing for Convergent in this case.  I'm no longer counsel of record, but I am most definitely, as I made it clear to the clerk, and the record shows, I am most definitely involved in this case, because, otherwise, Mr. Rand would be lost at sea and we wouldn't be anywhere.  So I am absolutely crucial.  My client knows that.  And I have every right to help my client in his interfacing with Mr. Rand.  There's no secret about that.  But I don't think it's appropriate to go into that relationship between me and Mr. Rand because that's work product and attorney/client.  And what possible relevance could [it] have to this case?  Otherwise –
> COURT: …  [H]opefully, *this guidance will be sufficient for further questions*. … Now, *the third item you've just raised, which was not referenced in the conversation with my law clerk, but which is still highly relevant, is work product.*  And it sounds like *the advice that you are giving to Convergent in relation to this case would be work product, and, therefore, I sustain the objection to that kind of question.*  I don't sustain it as to the question of are you representing Convergent in relation to this case, but I think *you've indicated the answer to that is yes*.
> MR. SCHLICHTMANN:  *Yes.*  Yes, Your Honor, I understand.
> THE COURT:  Very good.  All right.  So I think *those are the guidelines*, so go forward, and hopefully that will prevent further –

1-6-22 3:48PM *Aquino* Conf. Tr. p. 7 line 15-25; p. 8 line 1-8; p. 9 line 5-18 (emphasis added) at

**Exhibit 1**.

The applicability of the attorney work product privilege to attorney Schlichtmann's

participation in this case outside the courtroom is consistent with the 2nd Circuit's recognition

that the deprivation of a client's constitutional right to counsel of their choice in disqualification matters is "reduced considerably" by counsel's ability to "participate in all aspects of the [case] except the actual trial." See, *United States v. Cunningham*, 672 F.2d 1064, 1074 (2nd Cir.1982) cert. denied, 466 U.S. 951(1984); *US v. Orgad*, 132 F. Supp. 2d 107, 124 ("disadvantage to client in disqualification of attorney is reduced considerably by the continuing ability of counsel to participate in all aspects of the defense except the actual trial").

Under these circumstances, there was no proper basis for the presiding judge to suggest that attorney Schlichtmann was a dishonest unprofessional attorney who had been violating the disqualification order.

### 4.     Inappropriately Stated "Spoliation" Of Evidence Was "Still In Court's Mind" Despite The Fact That The Issue Had Been Resolved

The presiding judge's statements tying his comments about attorney Schlichtmann's dishonest unprofessional conduct and purported violation of the disqualification order to the "spoliation issue" "still in the Court's mind," were improper.  The presiding judge was well familiar with the history of the dispute between the parties regarding Defendants' relentless attacks seeking "sanctions" against the Plaintiff, the *Aquino* bankruptcy Trustee, the *Sterman et al* non-party witnesses, and Schlichtmann based on the unjustified claims that Defendants' discovery was being obstructed and that evidence had been "spoliated."  The spoliation charge revolved around the fact that the Alterix/Inpellis "server" was copied onto a hard drive, the server was eventually discarded, and the contents of the electronically stored information (ESI) were produced in discovery.   Despite Plaintiff's prodigious production of Inpellis' ESI which included the entire email files of the key personnel that covered every aspect of the matters at issue, and in the absence of any specific demonstration of loss, Defendants contended that preserving the Inpellis ESI by copying the contents onto a hard drive constituted "spoliation."

The dispute came to a head when Defendants in violation of the rules of discovery; the explicit dictates of FRCP Rule 37; and without affording non-party witnesses with the required notice, prevailed upon the presiding judge to issue a "Clerk's" email that both gave notice of a "telephonic oral argument on Defendants' motion to compel discovery disclosures" and "require[d] the appearance not just of counsel for the parties and Mr. Schlichtmann, but also the appearance of all persons and entities from whom Defendants seek discovery and *have not yet fully complied*."[18]  The "Clerk's" email issued on December 23, 2021, which unjustifiably cast the *Sterman et al* non-party witnesses as having "*not yet fully complied*" with their discovery obligations, was then used by Defendants during the Christmas to New Years holiday period to further abuse the non-party witnesses with threats that if they were "unwilling to appear voluntarily we will inform the Court and the Court will issue a subpoena to compel your attendance."[19]  The issuance of the "Clerk's" email and the abusive use of it by Defendants resulted in attorney Schlichtmann taking the unusual but necessary step of entering an appearance on behalf of himself and the other *Sterman et al* non-party witnesses objecting to the conduct and procedures, and demanding relief under FRCP Rule 26(b)(2)(C).[20]  In response to the Defendants' complaint to the presiding judge that attorney Schlichtmann, on behalf of himself and *Sterman et al,* had stated that Defendants' use of the "Clerk's" email was "not appropriate,"[21] the presiding judge the next day interrupted attorney Schlichtmann's deposition.

---

[18] 12-23-21 Email From Nicholas Werle "Law Clerk to the Hon. Jed S. Rakoff" USDC SDNY at **Exhibit 2**.

[19] 12-27-21 Email From Atty. Holly Cole with attached 12-23-21 Clerk's email at **Exhibit 2**.

[20] 1-7-22 Notice of Appearance by Jan Schlichtmann, Esq. (Doc. #83); 1-7-22 Motion pursuant to FRCP Rule 26(b)(2)(C) to limit discovery (Doc. #84).

[21] 1-5-22 Attorney Schlichtmann's email to Attorney Holly Cole at **Exhibit 3** ("Your email and its suggestion that there was a deadline to respond to you or we would be the subject of a subpoena was not appropriate") and the 1-5-22 email by Attorney Ward to the Clerk noting

During the short conference, the presiding judge assured attorney Schlichtmann that the conference was just a "telephone call" "to resolve … all the outstanding discovery disputes in this case":

> COURT:  I've set aside some time on January 11th to try to resolve, through a telephone conference of everyone who's relevant, all the outstanding discovery disputes in this case, and so it's very important to me that all the relevant individuals be on that call in case we need any information from them or relating to them.  I didn't think -- and since it was a telephone call, I didn't think there would be any problem, but I gathered from an email that I saw that was furnished yesterday that there may be a problem.

1-6-22 10:52AM *Aquino* Conference p. 2 line 14-23 at **Exhibit 5**.  On the basis of the presiding judge's assurance that the conference was not a compulsory evidentiary hearing, attorney Schlichtmann agreed that the *Sterman et al* non-party witnesses would attend voluntarily.

The next day the Clerk's office issued a "Minute Entry" regarding the short conference that stated "Schlichtmann represented that the third party witnesses would appear at the 1-11-22 hearing without a subpoena."[22]  Ten minutes later a "Minute Entry" regarding the privilege objections made at the Schlichtmann deposition was posted which incongruously contained the statement "Telephonic Evidentiary Hearing set for 1-11-2022 at 4:00PM before Judge Jed S. Rakoff."[23]  In response to Attorney Schlichtmann's 1-10-22 "Objection" to the scheduled compulsory proceeding, intent not to attend and, if compelled, *Sterman et al's* intent to seek review,[24] the presiding judge: expressed his "regrets" that the 1-7-22 Minute Entry's description of the conference as an "evidentiary hearing" which was done "without the knowledge of the

---

"limited time remains for the parties to serve subpoenas  on the non-parties to compel attendance at the January 11, 2022 conference" at **Exhibit 4**.
[22] 1-7-22 *Aquino* 11:21AM Minute Entry at **Exhibit 6.**
[23] 1-7-22 Aquino 11:31AM Minute Entry at **Exhibit 7**.
[24] 1-10-22 *Sterman et al* Objection (Doc. #87).

judge;" and that the 1-11-22 conference "*is simply designed to resolve, in one session, the various discovery disputes previously raised*.[25]

At the 1-11-22 discovery conference, the presiding judge dealt with all the outstanding discovery issues raised by Defendants including the "spoliation" issue and ended the conference with "I'm glad we were able to get this all resolved expeditiously."[26]  Despite the 1-11-22 Conference that "g[o]t this all resolved expeditiously," Defendants persisted in their discovery complaints seeking sanctions including for "spoliation."[27]   Subsequent to attorney Schlichtmann notifying Defendants that the *Sterman et al* non-party witnesses would be seeking relief for Defendants' incessant demands, the parties as well as the *Aquino* Bankrtuptcy Trustee and the *Sterman et al* non-party witnesses reached what the Defendants described as a settlement of all pending discovery disputes ("the pending discovery disputes … have been resolved").[28]

When the Defendants persisted yet again to seek discovery sanctions under Rule 37(e) for "spoliation" despite the Settlement, the presiding judge ruled that Defendants were barred from seeking sanctions for "spoliation" because "*this dispute was resolved by the stipulation … entered by counsel for the parties*" (citing Docket Entry 98).[29]  Although the presiding judge left open the possibility of the Defendants "raising the issue again to seek an adverse interest" finding, the Defendants made no such motion at the bench trial - A failure best explained by the fact that Defendants cannot identify, in accordance with the requirements of the rule: that they were "prejudice[d] … from loss" of electronically stored information (ESI) that was material to

---

[25] 1-10-22 Email from Clerk at **Exhibit 8**.
[26] 1-11-22 *Aquino* Discovery Conference p. 20 line 19-21 at **Exhibit 9**.
[27] See, *Aquino* Docket entries 1-19-22; #96; #97.
[28] See, 2-4-22 & 2-11-22 Defendants' "Notice" that "the pending discovery disputes … have been resolved" (Doc. #95, #96) at **Exhibit 10** .
[29] Docket Entry 2-14-22.

this case;[30] any such "loss" was not "replaced" by other information; and that the "loss" of any such information was the result of the Plaintiff's "intent to deprive [the Defendants] of the information's use in the litigation."  See, FRCP Rule 37(e)(2) ("only upon a finding that the party acted with the intent to deprive another party of the information's use in the litigation may the court "presume the information was unfavorable to the party").

Despite this history, and for reasons that are not apparent on the record, the presiding judge has chosen to tie his derogatory remarks concerning attorney Schlichtmann to the "spoliation issue … *still in the Court's mind*."[31]

### 5.   Presiding Judge Maligned Schlichtmann For A Mistake While Turning A Blind Eye To Defendants' "Gamesmanship" & Filing False Declarations

The presiding judge during the bench trial was hyper focused on Schlichtmann's mistake which was unjustly transmogrified into Schlichtmann "admitted" to the presiding judge he "lied under oath" while turning a blind eye to actual misconduct engaged in by Defendants and their

---

[30] A movant under Rule 37(e) must demonstrate with specificity, not speculation, that information that was material to the claim at issue was lost.  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 497 (SDNY 2022) ("speculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence") (citing *Dilworth v. Goldberg*, 3 F.Supp. 3d 198, 202 (SDNY 2014) (quoting *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 177 (EDNY 2007).  The movant must "set forth, with ... specificity, the materials which would have been helpful in prosecuting [their] claims."  Id. (citing *Alter v. Rocky Point School Dist.*, WL 4966119 p. 12 (EDNY 2014) ("Relevance cannot be established solely on the basis of conjecture. Nor can a finding of relevance be grounded solely on the basis that *some* evidence in the custody of key witnesses no longer exists. Each movant has the burden of articulating what that evidence is with some degree of factual detail).  "In short, sanctions are not warranted unless there is proof that some information of significance has actually been lost." Id. (citing *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 431 (SDNY 2010).  "An adverse inference instruction is an extreme sanction and should not, be imposed lightly." *In Re Keurig*, *supra* at 498 (citing *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (SDNY 2008); and, *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 291 (SDNY 2009) ("[W]ithout some proof that the [spoliating party]'s actions created an unfair evidentiary imbalance, an adverse inference is not appropriate").
[31] 7-5-23 *Aquino* Tr. p. 691 line 5-7 at **Exhibit 21**.

counsel of record in discovery, summary judgment, and the bench trial.  As detailed in **Section IIIB(4)** above, throughout the post-discovery period in which Defendants used the presiding judge's offices to threaten and abuse the *Sterman et al* non-party witnesses, the presiding judge was silent.  The presiding judge made no comment when Defendants in violation of FRCP Rule 56(h) and the 2nd Circuit's "cardinal rule" submitted post-deposition affidavits[32] from Defendants' owners Amato and Guidicipietro; Capital Markets Head Christopher Carlin; and former Inpellis Chairman Jack Clarke who Defendants had access to and prepared for his deposition.  The sworn declarations, drafted and submitted by Defendants' counsel of record, attempted to influence summary judgment by providing testimony that contradicted the witnesses' deposition testimony on key issues of liability.[33]   When Defendants in what the presiding judge deemed "an obvious act of gamesmanship" submitted, in violation of Rule 56 and Rule 56.1, a Rule 56.1 Statement consisting of 1049 redundant and contradictory statements,[34] the presiding judge chided Plaintiff for objecting to Defendants' violation of the rules.[35]  Rather than require Defendants to re-submit a Rule 56.1 Statement in compliance with the rules, the presiding judge ordered Plaintiff to Respond to each and every one of the 1049 Rule 56.1 Statements.[36]  Despite Plaintiff's compliance with the order, the presiding judge subsequently made use of Defendants' "gamesmanship" by selecting the seven hundred and eighty seventh Response by Plaintiff as an "admission" in a "Gotcha" that ignored the hundreds of Responses before and the Responses immediately thereafter that clearly evidenced Plaintiff's

---

[32] Amato (Doc. #108 (**Exhibit 12A**), #131 (**Exhibit 12B**)); Guidicipietro (Doc. #109 (**Exhibit 13A**), #132 (**Exhibit 13B**)); Carlin (Doc. #133); and Clarke (Doc. #134).
[33] See, 4-19-22 Plaintiff's Reply Memorandum p. 8-15 (Doc. #144).
[34] 7-8-22 SJ Decision (Doc. #150 p. 27-28.
[35] 5-15-22 *Aquino* Summary Judgment Hearing p. 4-11, 18-19 at **Exhibit 11**.
[36] 7-8-22 SJ Decision (Doc. #150) p. 28.

22

position that Defendants were directly responsible for the deletion of material disclosures that the presiding judge ruled was the event that led directly to Inpellis' bankruptcy.[37]

In contrast to the absence of facts supporting Defendants' "sanctions" motion, there is substantial evidence Defendants and their counsel drafted and submitted declarations on behalf of Amato[38] and Guidicipietro[39] that the Defendants and their counsel of record attorneys Scott Holcomb, Brian Ward, Aaron Wright, and Holly Cole knew for a fact contained false and misleading statements intended to obfuscate the core factual matters at issue: 1) the owners knew from the outset, as they were required to know, that a Nickel Broker dealer by definition cannot underwrite firm commitment offerings;[40] and 2) their jointly owned NESA Management LLC was the General Partner of ACLP as of December 2013 and, as required by law, the owners acted as managing partners of the partnership.[41]

**Obfuscated Owners' Knowledge ACLP's License Prohibited Firm Underwriting**.

The April, 2022 declarations of Amato (Doc. #131) and Guidicipietro (Doc. #132) prepared by

---

[37] 8-5-22 Plaintiff's reconsideration motion (Doc. #153) p. 15-18; 9-20-22 Plaintiff's Reply re reconsideration (Doc. #163) p. 3-7; 3-31-23 Mem. Decision at 2023 WL 2751541 p. 2-3 (SDNY 2023).

[38] Amato Declarations Doc. #108 and #131 at **Exhibit 12A** and **Exhibit 12B**.

[39] Guidicipietro Declarations Doc. #109 and #132 at **Exhibit 13A** and **Exhibit 13B**.

[40] Both Amato and Guidicipietro testified they knew from the outset that a Nickel Broker Dealer by definition cannot underwrite a firm commitment offering. See, Amato Dep. Designations p. 74, 89-90, 93, 94-95 (Amato's understanding "as of 2014, 2015" "a nickle broker dealer was not authorized to conduct a firm commitment offering"), p. 173, p. 175-176 (as Designee: "as of July 2014 under the terms of the [FINRA] membership [ACLP] was not authorized to act" "as the sole underwriter" on a "firm commitment offering"), p. 204 ("as of … July 2014 the membership agreement [ACLP] had with FINRA did not authorize [ACLP] to be the underwriter in a firm commitment offering") at **Exhibit 14**; Guidicipietro Dep. Designations p. 221-222 (Guidicipietro in answer to the question "what was your understanding as to the type of underwriting activities it could engage in as a $5,000 broker dealer in 2013" was "at a $5,000 BD, you couldn't underwrite"), p. 325-326 (Q: "who at [ACLP] in 2014 and 2015 would have the knowledge as to whether or not [ACLP] had the authority under its FINRA membership to conduct a firm commitment offering?" A: "… I had the knowledge") at **Exhibit 15**.

[41] Plaintiff's **P104** 5th "Whereas" clause p. 1 and Section 7.1 p. 6 at **Exhibit 16**.

Defendants' counsel in support of Defendants' summary judgment motions, gave complementary testimony intended to mislead the Court into believing that the owners did not know during the liability period, 2014-2015 that ACLP was prohibited by its membership in FINRA from underwriting firm commitment offerings.  Amato in his 4-1-22 Declaration (Doc. #131) par. 12-14 stated "Between July 29, 2014 and August 16, 2016 [ACLP] understood it was allowed to participate in firm commitment underwritings, as a member of a selling syndicate"[42] and stated that "[a]s of [receipt of the FINRA Unreasonable Letter on] May 15, 2015 [ACLP] understood it lacked the authority to act as lead underwriter on a firm commitment public offering."[43]  These statements were intended to leave the untrue impression that ACLP did not know it was prohibited from firm commitment underwriting until receipt of the May 15, 2015 FINRA Unreasonable Letter.  Guidicipietro's 4-1-22 Declaration built on the misleading picture presented by Amato by stating unequivocally that "[f]rom July 29, 2014 through May 15, 2015 [Guidicipietro] believed that [ACLP] was licensed to engage in firm commitment underwriting as the lead underwriter of an IPO"; "[s]ometime on or after May 15, 2015 [Guidicipietro] became aware of a letter sent by FINRA … indicating that the firm was not licensed to engage in firm commitment underwriting as the lead underwriter of an IPO"; and [a]fter becoming aware of the letter, and *only after becoming aware of the letter*, was [Guidicipietro] personally aware that [ACLP] was not licensed to engage in firm commitment underwriting as the lead underwriter of an IPO."[44]  These sworn statements prepared and submitted by Defendants' counsel and signed by Defendants Amato and Guidicipietro directly contradicted both gentlemen's deposition testimony and common sense that they knew from the outset, as licensed

---

[42] Amato 4-1-22 Declaration par. 12-14 at **Exhibit 12B**.
[43] Amato 4-1-22 Declaration par. 15-18 at **Exhibit 12B**.
[44] Guidicipietro 4-1-22 Declaration par. 4-6 at **Exhibit 13B** (emphasis added).

supervisors who had to pass extensive testing in order to be allowed to manage an investment bank,[45] ACLP as a "Nickel Broker Dealer" was prohibited from firm underwriting.[46]

        **Falsely Stated NESA Was Not GP In 2013 & Owners Were Not Managing Partners**. Defendants and their counsel have consistently misrepresented in this litigation that they were not the managing partners of ACLP and that their jointly owned entity NESA Management LLC did not become ACLP's general partner until December 2017. Both gentlemen in their 3-15-22 sworn Declarations (Doc. #108 and #109) prepared and submitted by Defendants' counsel expressly denied they ever held themselves out as partners of ACLP ("I have never been a partner or member of [ACLP]" (Doc. #108 par. 3 and Doc. #109 par. 3) and "I have never held myself out as a partner in [ACLP], nor have I permitted others to do so" (Doc. #108 par. 7 and Doc. #109 par. 13). Guidicipietro's declaration was even more problematic in light of the fact that his declaration, a declaration that Defendants' counsel of record drafted and submitted, referred to the September 28, 2021 filings by ACLP and Guidicipietro, on behalf of NESA Management LLC, in the Delaware Secretary of State's Office that fraudulently represented that Exitus was ACLP's General Partner from December 2013 to December 2017, and NESA was the General Partner beginning in December 2017.[47] These sworn declarations directly contradicted the filings with FINRA that Defendants and their counsel made in September and October, 2015 ("In December 2013 … NESA … owned by [Amato/Guidicipietro] purchased an interest in the

---

[45] See, Plaintiff's **P27** and **P29** (Amato & Guidicipietro 2022 BrokerCheck Reports).
[46] See, fn 40.
[47] Compare: Guidicipietro's 3-15-22 Declaration (Doc. #109) par. 6-8, 13 at **Exhibit 13A** and Plaintiff's **P73C** (9-28-21 Del. SOS filing by Guidicipietro for NESA Management LLC) at **Exhibit 17A**, **P73D** (9-28-21 Del. SOS filing by Figliolo for Exitus, LLC) at **Exhibit 17B**; with Plaintiff's **P13B** (9-29-15 Holcomb & Wright's ACLP filing with FINRA) p. 3-4 at **Exhibit 18** and Plaintiff's **P104** (2018 ACLP "Operating Agreement") p. 1, 6 at **Exhibit 16**.

firm" and Amato/Guidicipietro "are now active owners and partners in the Firm").[48]  The

knowing falsity of the misrepresentations was again made manifest with the production during

the bench trial of the ACLP "Operating Agreement" that removed any doubt that "on December

20, 2013 … NESA Management LLC was substituted as the general partner" of ACLP and:

> Due to the nature of the highly regulated industry ACLP operates within [Amato and
> Guidicipietro] shall serve as the exclusive managers of the Partnership and shall have all
> of the rights of the General Partner in this regard.

Plaintiff's **P104** 5th "Whereas" clause p. 1 and Section 7.1 p. 6 at **Exhibit 16**.

Plaintiff had brought to the Court's attention after the close of discovery that Defendants'

counsel of record was compromised by its involvement in making filings in this case and

referencing the fraudulent 9-28-21 filings in the Delaware Secretary of State's Office that were

contradicted by filings Defendants and their counsel made with FINRA in 2015.[49]  These

contradictory filings directly bore on the core issue of the ownership and management control of

ACLP.  In response to bringing these matters up, the presiding judge summarily rejected the

contentions and threatened to impose attorneys fees against Plaintiff [50] – a threat that finds its

echo in Defendants' unsupportable "sanctions" motion.[51]

## IV.    CONCLUSION

For these reasons, interested party Schlichtmann respectfully requests the presiding judge

grant the relief requested.

---

[48] Plaintiff's **P13B** (9-29-15 Holcomb & Wright ACLP Wells Submission filed with FINRA p. 3-4) at **Exhibit 18**; See also, Plaintiff's **P13A** (October 27, 2015 ACLP Response to FINRA inquiry re ACLP's 1017 CMA for firm commitment authority p. 3 which incorporated **P13B)** at **Exhibit 25** ("In December of 2013 … active control of the Firm was sold to" Amato/Guidicipietro").
[49] See, 12-7-21 Plaintiff's Mem. re disqualification (Doc. #78); fn 48; Plaintiff's **P13B** at **Exhibit 18**.
[50] 12-21-21 Order denying Plaintiff's disqualification motion (Doc. #82).
[51] 7-7-23 Defendants' "sanctions" motion (Doc. #204).

Dated:  July 25, 2023

Respectfully submitted by,

*Jan Schlichtmann*

Jan Schlichtmann, Esq.
Attorney pro se
PO Box 233
Prides Crossing, MA 01965
O: 978-804-2553
Email: jan@schlichtmannlaw.com