UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN J. AQUINO,<br>Chapter 7 Trustee,<br>by his assignee, Convergent<br>Distributors of Texas, LLC,<br><br>     Plaintiff-Counter-Defendant,<br><br>     -v-<br><br>ALEXANDER CAPITAL, LP, and its<br>Managing Partners:<br>JOSEPH AMATO,<br>ROCCO GUIDICIPIETRO, and<br>NESA MANAGEMENT, LLC,<br><br>     Defendants-Counter-Claimants. | 21-cv-1355 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

Even in this age of casual prevarication, or perhaps especially in such an age, judges still depend on lawyers to be truthful and trustworthy in their submissions to the court. Otherwise, the adversarial system becomes nothing but a cover for trickery and deception.

In this case, a clever lawyer named Jan Schlichtmann eventually admitted under oath that he had drafted a materially false declaration that had been submitted to this Court by his colleague Daniel Glosband in an effort by Schlichtmann not to be disqualified as plaintiff's counsel. The Court promptly disqualified Schlichtmann and, while determining that it did not have a sufficient basis for referring the matter to the U.S. Attorney's Office for possible criminal prosecution, deferred on whether to refer Mr. Schlichtmann's misconduct, which also

1

involved alleged spoliation of evidence, to the SDNY Grievance Committee for possible discipline. Subsequently, when the case went to a bench trial before this Court, the Court, upon learning that Schlichtmann had taken the lead in preparing plaintiff's witnesses for their trial testimony and, indeed, in supervising plaintiff's entire trial presentation, felt obliged to make brief inquiries as to whether plaintiff's counsel and witnesses had been impacted by the aforesaid events. This was necessary both to determine whether there was ongoing collusion between plaintiff's witnesses (one of whom was Schlichtmann) and to determine whether the contemplated referral to the Grievance Committee was now warranted.

Nevertheless, once the trial was over and the Court rendered its decision in defendants' favor, Schlichtmann filed as an "interested party," a post-trial motion (the "Schlichtmann motion") seeking this Court's recusal and seeking to strike from the record the aforementioned inquires of plaintiff's witnesses and others at the bench trial. *See* Schlichtmann Mot. (Dkt. 217). While (given that Schlichtmann is not himself a party to this litigation) the motion might have been subject to dismissal for lack of standing, plaintiff then formally joined in the motion. *See* Pls. Joinder (Dkt. 221). Defendants, for their part, filed a post-trial motion seeking to recover a portion of their attorneys' fees not only from plaintiff but also from Schlichtmann personally. Defs. Mot. for Sanctions (Dkt. 204). The motions having now been fully briefed, the Court, for the

reasons set forth below, denies Schlichtmann's motion in its entirety, and grants in part and denies in part defendants' motion.

**I.   Motion for Recusal and to Strike Statements**

The Court turns first to the Schlichtmann motion. The Court concludes that the motion is totally without merit.

**A. Applicable Legal Standards**

With respect to the portion of the Schlichtmann motion seeking recusal, under 28 U.S.C. § 455 a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," or "[w]here he has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(a), (b)(1). "[T]he test of impartiality is what a reasonable person, knowing and understanding all the facts and circumstances, would believe." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1309 (2d Cir. 1988). The party seeking recusal bears the burden of demonstrating that recusal is appropriate. *In re Int'l Bus. Machines Corp.*, 618 F.2d 923, 931 (2d Cir. 1980). "A judge is obligated not to recuse himself where grounds for recusal do not exist." *United States v. Ahmed*, 788 F. Supp. 196, 202 (S.D.N.Y.), *aff'd*, 980 F.2d 161 (2d Cir. 1992).

As a general matter, "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to,

counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see, e.g.*, *King v. First Am. Investigations, Inc.*, 287 F.3d 91, 96 (2d Cir. 2002) (affirming denial of recusal motion where district judge "accused [appellant] of abusing the judicial process," "referred to [appellant] as paranoid during the trial," and "accused [appellant] of 'pulling a stunt'"); *Ahmed*, 788 F. Supp. at 200-05 (finding statement critical of defendant's attorney in prior case, including that attorney was "a disgrace to the profession," did not warrant recusal in subsequent case). As the Supreme Court has explained, a judge who "upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person" is "not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings." *Liteky*, 510 U.S. at 550-51. "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Id.* at 551 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)).

With respect to the portion of the Schlichtmann motion seeking to (retroactively) strike certain statements made by the Court during the bench trial, Schlichtmann cites no case or statute permitting (let alone requiring) this Court to "strike" statements that Schlichtmann views as "inappropriate," and this Court is aware of none. To the

contrary, "[t]he public has a common law presumptive right of access to judicial documents," that may only be overcome by a "most compelling reason." *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140 (2d Cir. 2004) (quotation omitted). This presumed public right of access "to civil trials and to their related proceedings and records" flows not only from common-law, but also the First Amendment. *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 163-64 (2d Cir. 2013) (quotation omitted).

**B. Background**

The Court here presumes familiarity with the underlying facts of this case, which are laid out more fully in this Court's summary judgment Opinion and Findings of Fact and Conclusions of Law following trial. *See generally Aquino v. Alexander Cap., LP*, 642 B.R. 106 (S.D.N.Y. 2022); *Aquino v. Alexander Cap., LP*, 2023 WL 4364449 (S.D.N.Y. July 6, 2023). The case arises from the failed IPO and ultimate bankruptcy of a company called Inpellis, Inc. ("Inpellis"). The bankruptcy trustee, through its assignee, Convergent Distributors of Texas, LLC ("Convergent"), brought this action against Inpellis' financial advisor for the IPO, Alexander Capital L.P. ("Alexander Capital"), as well as two of Alexander Capital's partners and one of its affiliates, alleging that defendants engaged in fraudulent conduct surrounding the IPO that ultimately caused the IPO's failure.

Inpellis was created in 2012 as a wholly owned subsidiary of a company called BioChemics, as part of BioChemics's strategy to commercialize transdermal technology in which it held IP rights. In January 2015, ownership of Inpellis was transferred to an entity called

Shareholder Resolution Trust ("SRT"). SRT was an irrevocable trust created for the benefit of John Masiz -- the CEO and founder of BioChemics -- and his family. Following Inpellis' bankruptcy, its claims were assigned by the bankruptcy trustee to Convergent, which then brought this case.

Schlichtmann was the lead attorney for plaintiff at the time the case was filed,[1] but his involvement in this matter dates back much earlier. Schlichtmann previously served as the personal lawyer for Masiz, created SRT, and served as a trustee of SRT for the duration of the relevant events. Schlichtmann also negotiated a settlement with the U.S. Securities and Exchange Commission ("SEC") in 2016 that was the death nell for the Inpellis IPO.

Based upon their learning through discovery of Schlichtmann's deep involvement in the events underlying this case, defendants, while discovery was still ongoing, filed a motion to disqualify Schlichtmann as counsel in this case. *See* Defs. Mot. to Disqualify (Dkts. 49-50).

---

[1]   This case, which was originally filed as an adversary proceeding in the Inpellis bankruptcy, was transferred to this Court on February 16, 2021, but the trial of the case (a bench trial) did not commence until June 26, 2023, largely because the parties requested a series of extensions of discovery and adjournments of the trial, including after Schlichtmann was disqualified as counsel (discussed *infra*). *See* Amended Case Management Plan (Dkt. 61) (granting six-week extension of close of discovery); Nov. 18, 2021 Order (Dkt. 72) (disqualifying Schlichtmann and reopening discovery); Mar. 25, 2022 Minute Entry (granting request to extend summary judgment briefing schedule by one month); July 22, 2022 Minute Entry (setting trial date for January 17, 2023 to accommodate parties' schedules and allow for post-summary judgment motions); December 5, 2022 Minute Entry (granting request to adjourn trial date to June 26, 2023).

In opposing this motion, plaintiff argued -- in a brief drafted by Schlichtmann -- that there were many witnesses other than Schlichtmann who could testify to the relevant events in which Schlichtmann was involved. To support this contention, Schlichtmann drafted a declaration on behalf of Daniel Glosband, Esq. -- another trustee of SRT -- that, it was later revealed, contained at least two materially false or misleading statements. First, paragraph 5 of the Glosband Declaration stated that Glosband had "personal knowledge" of the "events complained of [by plaintiff] from July, 2014 through the November 10, 2015 S-1." Glosband Decl. (Dkt. 53-2) ¶ 5. Second, paragraph 8 of the Glosband Declaration stated that, "[p]ursuant to [Glosband's] duties as Trustee [Glosband] directly participated in each of the events identified by Defendants (other than the IPO Events) and can testify regarding the SRT Trust's involvement and decision making regarding them." *Id.* ¶ 8. Combined, these representations attested that there was no need for Schlichtmann to be a witness in the case, because Glosband could serve just as well. Indeed, this formed the primary basis for the argument set forth in plaintiff's brief that Schlichtmann should not be disqualified. *See* Opp. to Defs. Mot. to Disqualify (Dkt. 53), at 7 n.9; 13 n.24. Relying in part on these misrepresentations, the Court denied defendants' motion to disqualify Schlichtmann.

The falsity of these statements was not revealed until months later, when Glosband admitted at his deposition that he had no personal knowledge of, let alone involvement in, the events prior to his

appointment as trustee in July 2015. Apprised by defendants of these admissions, the Court convened an evidentiary hearing on November 18, 2021, at which Glosband admitted under oath that the statement in paragraph 5 was flat-out false and that the statement in paragraph 8 was misleading.[2] *See* Nov. 18, 2021 Hearing Tr. (Dkt. 75), at 4-5. At the hearing, Schlichtmann, likewise testifying under oath, acknowledged he drafted the declaration and that the error was "completely [his] responsibility," but insisted it was the result of an honest mistake and was not made with the intent to deceive the Court. *Id.* at 9. Schlichtmann made a similar statement in a written submission sent to the Court shortly prior to the hearing. *See* Dkt. 66.

At the conclusion of the hearing, the Court granted defendants' motion to disqualify Schlichtmann, as confirmed by a subsequent written Order. *See* Nov. 18, 2021 Order (Dkt. 73). The Court further concluded that it would "not refer the matter of the false statements to the U.S. Attorney's Office for possible criminal investigation, because it conclude[d] that Schlichtmann and Glosband lacked the *mens rea* necessary to support a perjury charge," but stated that the Court was still considering whether to refer the matter to the Grievance

---

[2]    At the hearing, Glosband took the position that the paragraph 8 statement was not false, but only misleading, because it was qualified by the phrase "Pursuant to my duties as Trustee," which he "intended to ... mean that it only related to things that occurred after I became trustee." Nov. 18, 2021 Hearing Tr. (Dkt. 75), at 4-5. As explained *infra,* the Court finds this distinction entirely unpersuasive.

Committee of the U.S. District Court for the Southern District of New York. *Id.*

### C. __The Court's Statements Regarding Material Misrepresentations Under Oath__

The bulk of the remarks Schlichtmann takes issue with, made during the course of trial in this case, concerned Schlichtmann's prior concoction of the forgoing false and misleading statements. For example, during the testimony of plaintiff's lead witness, Thomas Barrette, the Court inquired as to whether Barrette was "aware . . . that Mr. Schlichtmann admitted to this court that he had lied to [the Court] under oath," and "authored a false statement to this Court." Schlichtmann Mot. at 5-6. Schlichtmann argues that it was wrong for the Court to suggest that Schlichtmann "lied . . . under oath" because, according to Schlichtmann, the Court had already "found there was 'no *mens rea*'" and "acknowledged the mistake was due to carelessness and was not intentional." Schlichtmann Mot. at 14. But this is inaccurate. All that the Court actually said at the time was that Schlichtmann's submission was "not done with the kind of *mens rea* that would support a perjury referral." Nov. 18, 2021 Hearing Tr. (Dkt. 75), at 15:13-14; *accord* Nov. 18, 2021 Order (Dkt. 72), at 2. In other words, at the time of the hearing, the Court was not of the view that Schlichtmann's misconduct was of such severe intentionality as to warrant the extreme step of a criminal referral. But the very fact that the Court expressly indicated that it was still considering a referral to the Grievance Committee demonstrated that the Court was far from convinced that

Schlichtmann's misconduct was, as he alleged, just some inadvertent mistake.

In preparing some months later for the trial of this case, the Court had occasion to remember that it had left open the question of whether to refer Schlichtmann's seeming misconduct to the Grievance Committee, and as a consequence the Court undertook to review the circumstances surrounding that misconduct and arrived at the tentative conclusion that Schlichtmann's misconduct, while still not so severe as to warrant the potentially career-ending step of criminal referral, nevertheless exhibited considerable indicia of intentionality. The Court reached this conclusion for several reasons:

*First*, there was the manner in which the false statements were used in plaintiff's brief opposing disqualification. A main ground on which defendants sought Schlichtmann's disqualification was that "Schlichtmann, as the person who originated the idea for and as creator of [SRT,] will be a necessary witness regarding the nature and origins of [SRT], its purposes, and how it was presented to others, including [defendant] Alexander Capital." Defs. Mot. to Disqualify (Dkt. 50), at 18. In response, plaintiff, in a passage drafted by Schlichtmann, argued as follows:

> Defendants claim that the testimony of Plaintiff's Counsel regarding the origin and purpose of, and the decisions made by the Shareholder Resolution Trust (SRT) is important to their defense but, in doing so they concede that [Schlichtmann] was one of three Trustees and that all decisions had to be unanimous. As testified to in the Declaration of Trustee Glosband, Esq. attached at Ex. 2, all the issues flagged by Defendants for inquiry regarding the SRT Trust are matters that are all well documented and

witnessed and about which Attorney Glosband is qualified and
available to testify.

Opp. to Defs. Mot. to Disqualify (Dkt. 53), at 13 n.24. This passage
shows that Schlichtmann, in seeking to combat defendants' assertion
that Schlichtmann was a necessary witness, asserted that there was an
available alternative witness, Glosband, who was knowledgeable and
available to testify about "all the issues flagged by Defendants for
inquiry regarding the SRT Trust," citing to statements in the Glosband
Declaration. *Id.*

On the basis of Schlichtmann's representations, confirmed by
Glosband's Declaration, the Court denied defendants' motion. But
later, thanks to defendants' discovery followed by the Court's inquiry,
the Court found that, even at the time Schlichtmann submitted the
brief and Glosband Declaration (which, the Court later learned,
Schlichtmann had drafted), Schlichtmann was well aware that Glosband
had no involvement in SRT until July 2015 and was incapable of
testifying about the trust's creation. Yet, Schlichtmann expressly
relied on the aforementioned false representations in order to obtain
the initial denial of his disqualification.

*Second*, Schlichtmann had a strong personal motive to make such
misrepresentations. Not only was Schlichtmann the lead attorney on the
case who did most of the work preparing case filings (both before and
after his disqualification), but Schlichtmann had substantial personal
involvement in the events underlying this case and close ties to the
plaintiff that was allegedly wronged. Even more significantly,

Schlichtmann had a contingent fee arrangement that entitled him to 40% of any recovery in the case. Schlichtmann Dep. (Dkt. 223-1), at 114:22–119:11. As the Court later learned, his financial motive in continuing as lead counsel was further evidenced by the fact that, following his disqualification, Schlichtmann's fee entitlement was reduced to only 20% of any recovery. *Id.* The fact Schlichtmann had a strong financial motive to continue to represent plaintiff further supports the inference that his misrepresentations were intentional.

*Third*, it became even more obvious to the Court as it prepared for trial that Schlichtmann's and Glosband's aforementioned misrepresentations concerned issues that were highly material to the case. For example, defendants' motion to disqualify argued that Schlichtmann's testimony was expressly necessary to establish the origins and purposes of SRT, which were significant, according to defendants, because SRT was created as part of a strategy "to make Inpellis appear independent from BioChemics." Defs. Mot. to Disqualify (Dkt. 50), at 24. Defendants argued that this undisclosed relationship between Inpellis, BioChemics and Masiz was the cause of the failure of Inpellis's IPO, as opposed to any action by defendant Alexander Capital. *Id.* at 4. In other words, defendants argued that Schlichtmann's testimony was necessary to establish a defense to a material portion of plaintiff's claim.

In his current motion papers, Schlichtmann attempts to downplay the significance of this theory, describing it as "unsupported." Schlichtmann Mot. at 13. The fact that Schlichtmann allegedly believed

that defendants' theory was without merit would not, of course, excuse

his use of false representations to refute it. But in any event, in

the Court's review of all of this prior to trial the Court found that

the factual record already before the Court largely bore out

defendants' contention. In particular, the Court had previously

concluded on summary judgment that undisputed evidence established

that the cause of the IPO's failure was not defendants' conduct, but

rather the SEC investigation into "concern[s] with whether the S-1

sufficiently disclosed the relationships and history among Inpellis,

BioChemics, Masiz, the SRT, and the IP purchase." *Aquino v. Alexander

Cap., LP*, 642 B.R. 106, 131 (S.D.N.Y. 2022). The Court concluded

plaintiff could not recover damages stemming from the failed IPO

because of this undisclosed relationship that was directly tied to the

creation of SRT. *Id.* at 131-32.

Schlichtmann also now argues that his testimony regarding SRT was

not necessary because "the formation of the Trust . . . was a matter

of public record and the Trust's purpose . . . was stated in the Trust

document." Schlichtmann Mot. at 14. But this was not the argument

plaintiff (through Schlichtmann) had previously advanced in opposing

defendants' motion to disqualify. The argument that was then advanced

was the (false) claim that Glosband could testify to these matters.

Moreover, had Schlichtmann argued that the public record was sufficient

to demonstrate the purposes of SRT, that argument likely would have

failed: legal documents hardly constitute an adequate substitute for

the live witness who drafted and filed them when, as defendants here alleged, there was an ulterior motive behind the filing.

In his current brief, Schlichtmann also appears to suggest that the errors in Glosband's declaration (which he drafted) should have been obvious, because the declaration elsewhere disclosed the fact that Glosband was appointed as a trustee in July 2015. *See* Schlichtmann Mot. at 13-14 ("Obviously, attorney Glosband's knowledge before he was appointed Trustee was based on 'information and belief' not 'personal knowledge.'"). But there is nothing "[o]bvious[]" about this inference, for Glosband, as an attorney, could theoretically have been present at the relevant meetings, even if he was not a trustee. The fact is that the Glosband Declaration stated flatly that Glosband could testify to "each of the events identified by Defendants," Glosband Decl. (Dkt. 53-2) ¶ 8, and plaintiff's opposition expressly cited the declaration to argue Glosband could testify about the "origin and purpose" of SRT, such that Schlichtmann was not a necessary witness. Opp. to Defs. Mot. to Disqualify (Dkt. 53), at 13 n.24. If Glosband's testimony consisted of "information and belief," it would have to be excluded as hearsay and so could not possibly substitute for Schlichtmann's personal knowledge. In light of this, the far more reasonable inference, before the lie was revealed, was that Glosband *had* personal knowledge of the earlier events.

In short, plaintiff's brief opposing the disqualification of Schlichtmann (drafted by Schlichtmann) used the materially false statements in Glosband's sworn declaration (also drafted by

Schlichtmann) to advance an argument that Schlichtmann had to know was factually inaccurate, all so that Schlichtmann could continue to serve as plaintiff's counsel of record.

Focusing on all this prior to the start of trial, the Court not only reached the tentative conclusion that Schlichtmann had likely lied and/or suborned Glosband's perjury in connection with the disqualification motion, but also that some further inquiry was necessary in connection with the forthcoming bench trial because, as was already obvious, Schlichtmann was playing a major role in orchestrating plaintiff's case for trial, thus raising the possibility of continuing collusion and misconduct.

D. <u>**Violations of Disqualification Order**</u>

In this regard, Schlichtmann claims that the Court accused him of violating the Court's Order disqualifying Schlichtmann from the case. In fact, all the Court said was that Schlichtmann "has taken an extraordinarily narrow view of what it means to be disqualified, even though this Court early on disqualified him without limitation from this case." Schlichtmann Mot. at 15. While it is true that the Court's order disqualifying Schlichtmann, *see* Nov. 18, 2021 Order (Dkt. 72), arose because of the Court's conclusion that Schlichtmann could not be an in-court advocate for plaintiff when he was likely to be a witness, one might have thought that his admitted role in drafting Glosband's false affidavit (to Schlichtmann's benefit) would have suggested to him that what turned out to be his continuing role in preparing plaintiff's witnesses for trial would oblige the Court to

make inquiries into any collusion.[3] But the Court never formally barred him from continuing to advise plaintiff.[4]

**E.** **Contemplated Referral to Grievance Committee**

Schlichtmann next complains about the Court's remark at trial that the Court was "still considering whether to refer [Schlichtmann] to the Grievance Committee, as I indicated at the time he admitted his lie." Schlichtmann Mot. at 15. As explained above, the Court had by this time tentatively concluded that Schlichtmann had intentionally caused false material statements to be submitted to the Court, but was still exploring whether to refer the matter to the Grievance Committee. Schlichtmann's characterization of this remark as a "threat," *id.*, is frivolous. There was nothing threatening about this truthful observation, made in a non-jury trial, in which the Court was still exploring whether Schlichtmann's prior misconduct had carried over to

---

[3] For example, on the first day of trial, plaintiff's lead witness, Thomas Barrette, began testifying about Schlichtmann's role in the events underlying this case. At this point, the Court briefly stopped the witness and asked whether he was aware that Schlichtmann has "admitted to this court that he had lied to me under oath," to which Barrette replied "yes" he was "aware." Trial Tr. at 11-12. It later was revealed that Schlichtmann spent many hours preparing Barrette to testify at trial. *See* Trial Tr. at 183-84.

[4] Schlichtmann characterizes his right to continue to perform work on this matter as flowing from the "attorney work product privilege," Schlichtmann Mot. at 16, but that doctrine protects from disclosure information reflecting an attorney's work product, and has nothing to do with continuing to serve as counsel. The cases Schlichtmann cites concerning a criminal defendant's Sixth Amendment right to counsel are similarly inapposite here. *See United States v. Cunningham*, 672 F.2d 1064, 1074 (2nd Cir.1982) (stating that reliance on "civil case in which no Sixth Amendment rights were implicated" was "misplaced" in context of motion to disqualify criminal defendant's counsel).

the testimony he was helping plaintiff's trial witnesses to prepare. The Court had therefore elected to wait until the case was concluded before making any referral to the Grievance Committee. Schlichtmann fails to explain what about that decision to forbear was improper. On the contrary, it was incumbent on the Court to make Schlichtmann aware that the matter was still under review.

**F. Spoliation of Evidence**

Schlichtmann also takes issue with the following statement made by the Court during trial: "and we don't even have to dwell on the spoliation issue attributable to the plaintiffs, though that is very much still on the Court's mind." This remark was referencing the spoliation of certain evidence electronically stored on an old computer server of Inpellis (the "Inpellis Server"). The server was apparently in the custody of the bankruptcy trustee well after this litigation was contemplated, but at some point was lost or destroyed without the entirety of its contents ever having been copied. The Court had previously found that "plaintiff failed to take even basic steps to preserve the server, which almost certainly contained relevant evidence the destruction of which may well have prejudiced defendants." Mar. 31, 2023 Order (Dkt. 164), at 18.

It is not clear what about the Court's statement Schlichtmann finds troubling. Schlichtmann's motion describes in detail what he perceives to be misconduct by defendants surrounding the spoliation issue, without explaining what connection these events have to the

Court. Schlichtmann Mot. at 17-20.[5] As best as the Court can determine, Schlichtmann's complaint is that the Court made this critical remark about the spoliation issue even though it had already been resolved by prior rulings of the Court. If this is Schlichtmann's argument, it clearly fails. Indeed, the Court had already rejected this exact same argument, which Schlichtmann now repeats, describing such a claim as "nonsensical." *See* Mar. 31, 2023 Order (Dkt. 164), at 22 n.7. The Court at no point exonerated plaintiff of fault for the spoliation of the Inpellis server, and expressly found that plaintiff was, at a minimum, negligent in failing to take any steps to preserve the server. Nor should it be surprising that the spoliation issue was on the Court's mind when this remark was made during trial, given that defendants had filed a motion *in limine* specifically directed at this issue. *See* Mem. ISO Defs. Mot. *in Limine* (Dkt. 180).

While the remarks identified by Schlichtmann did not directly attribute fault for the spoliation of the server to Schlichtmann, it would have been entirely proper for the Court to do so. As Schlichtmann acknowledges, he has consistently been the driving force behind this litigation from its inception and accordingly was (or should have

---

[5] Indeed, most of this argument appears to have been copied verbatim from plaintiff's opposition to defendants' sanctions motion -- discussed *infra* Section II.B -- repeating the same false assertions contained therein. *Compare id.*, *with* Sanctions Opp. (Dkt. 205), at 4-7. For example, Schlichtmann repeats the inaccurate claim that the spoliation issue was entirely resolved in January/February of 2022 and that defendants never sought evidentiary sanctions relating to the spoliation of the Inpellis Server.

been) aware of the ethical and legal obligation to preserve the contents of the Inpellis Server. Schlichtmann cannot deny he was aware of the existence of the server, because he personally conducted a responsiveness review of the documents contained on the server while responding to a subpoena unrelated to this case. *See* Mar. 31, 2023 Order (Dkt. 164), at 20; John Masiz Dep. Tr. (Dkt. 155-6), at 268:1-269:1, 270:21-71:1. Indeed, it would not be unfair to say Schlichtmann was the individual most responsible for the spoliation of the server, given his role as lead counsel in this litigation, his involvement in the Inpellis bankruptcy, and his knowledge of events prior to that bankruptcy. Criticizing Schlichtmann and plaintiff for the spoliation of this server, again, does not evince judicial bias, but rather a relevant statement of the truth.

### G. Defendants' Purported Misconduct

Schlichtmann's instant motion concludes with a long list of grievances he has, not against the Court, but rather with the defendants and their conduct in this action. Schlichtmann apparently believes this demonstrates the Court's bias because the Court criticized Schlichtmann while "turn[ing] a blind eye to actual misconduct engaged in by Defendants." Schlichtmann Mot. at 21. The most glaring deficiency with this argument is that, at the time of each of the rulings he identifies, Schlichtmann had already been disqualified from the case and the Court had no material knowledge of the extent of Schlichtmann's ongoing involvement, which was not fully revealed until trial.

In any event, to the extent the Court had ruled against plaintiff in favor of defendants -- and some of the incidents noted by Schlichtmann did not even involve that -- such unfavorable rulings are insufficient to demonstrate bias. "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). "A trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias. Judicial independence cannot be subservient to a statistical study of the calls he has made during the contest." *In re Int'l Bus. Machines Corp.*, 618 F.2d 923, 929 (2d Cir. 1980).

Moreover, the Court continues to adhere to its conclusion that Schlichtmann's complaints about defendants are without merit. Schlichtmann begins by suggesting that defendants harassed Schlichtmann and certain non-parties he represented during discovery. *See* Schlichtmann Mot. at 18-19, 22. As explained in defendants' opposition, Schlichtmann appears to mischaracterize these events. *See* Opp. to Schlichtmann Mot. (Dkt. 222), at 17-19. But regardless, Schlichtmann fails to explain the relevance of these events to the instant motion. The Court was never asked to rule on this question, and while Schlichtmann filed a motion to stop this purported harassment, the parties then reached an agreement to resolve it, thus obviating the need for the Court to rule.

Schlichtmann next complains about defendants' "gamesmanship" in submitting, in connection with the cross-motions for summary judgment, a 56.1 statement containing 1049 paragraphs. But upon receiving the allegedly inappropriate 56.1 statement, plaintiff did not move to strike the statement, but instead sought, and received from the Court, additional time to respond to it. Yet, despite this extension, when plaintiff submitted its opposition to defendants' motion for summary judgment, plaintiff only responded to the first 236 paragraphs, and refused to respond to the rest. The Court said then, and confirms now, that "[t]his was not an appropriate response." *Aquino*, 642 B.R. at 124. Nonetheless, even though the Court could have deemed all of these unresponded-to allegations admitted by plaintiff, it chose not to do so.

Schlichtmann's further suggestion that the Court, in its opinion concerning summary judgment, somehow rewarded defendants' gamesmanship by picking out a single admission from plaintiff's response to this 56.1 statement and then relying on it, is also totally meritless. *See* Schlichtmann Mot. at 22-23. Plaintiff made this exact argument in its motion for reconsideration of that opinion. In denying that motion, the Court explained that (a) plaintiff failed to raise this argument in its opposition to defendants' summary judgment motion, even though defendants' motion highlighted the issue, (b) well settled law forecloses relitigating admissions in this manner, and (c) plaintiff failed to cite any evidence that actually undermined the admission the Court supposedly singled out, which was in fact supported by other

record evidence. *See* Mar. 31, 2023 Order (Dkt. 164), at 7-9. Schlichtmann expressly cites this decision, but fails to explain why it was wrong, let alone that it demonstrates bias against his client (or him).

Next, Schlichtmann claims that the Court "turned a blind eye" to two sets of purportedly false statements in declarations submitted by defendants Joseph Amato and Rocco Guidicipetro.

First, Schlichtmann argues that these individuals falsely declared that they did not know until the May 2015 FINRA letter that Alexander Capital was unable to conduct a firm commitment offering. *See* Schlichtmann Mot. at 23-25. Schlichtmann fails to mention that this Court, in its Findings of Fact & Conclusions of Law following the bench trial in this case, expressly found that Alexander Capital did not know it lacked authority to conduct a firm commitment offering until the May 2015 FINRA letter. *See* Findings of Fact & Conclusions of Law (Dkt. 202), at 7-11 ("[T]he Court is convinced that Alexander did not act with intent to defraud with respect to the July 2014 engagement letter because it was not itself aware of its FINRA issue at that date."). Schlichtmann makes literally no attempt to explain why the Court's ruling at trial on this score was incorrect. The only basis Schlichtmann identifies to establish the alleged "falsity" of the challenged portion of defendants' declarations is the purportedly inconsistent deposition testimony of these two individuals. *See* Schlichtmann Mot. at 23 n.40. But in ruling against plaintiff at trial, the Court specifically considered this deposition testimony and found

it to be ambiguous at best. *See* Findings of Fact & Conclusions of Law (Dkt. 202), at 7-10. And notably, both individuals gave credible testimony at trial that was consistent with their declarations on this score.

Second, Schlichtmann takes issue with the claims in Amato's and Guidicipetro's declarations that neither of them has ever "been a partner or member of Alexander Capital" and has "never held myself out as a partner in Alexander Capital, nor have I permitted others to do so." Guidicipetro Decl. (Dkt. 108) ¶¶ 3, 7; Amato Decl. (Dkt. 109) ¶¶ 3, 13; *see* Schlichtmann Mot. at 25. Schlichtmann suggest these statements are false because they are contradicted by certain filings Alexander Capital made to FINRA in 2015. There is no real dispute, however, that Amato and Guidicipetro did not directly own Alexander Capital, but instead did so through NESA Management LLC ("NESA"), so the first statement is literally true. To be sure, plaintiff successfully argued at both the motion to dismiss and summary judgment phases that the incorporation of Alexander Capital as a limited partnership was defective, such that NESA, and by extension Amato and Guidicipetro, could be held liable as general partners. *See Aquino*, 642 B.R. at 127-32. But the possibility that Amato and Guidicipetro would be found to be *de jure* partners of Alexander Capital hardly renders this statement misleading.[6]

_____

[6]    Schlichtmann also complains about a statement made in a corrected notice of incorporation filed by Alexander Capital in September 2021 indicating that NESA became the general partner of Alexander Capital on December 14, 2017. He claims this is false because

While it is true that Alexander Capital made a regulatory submission to FINRA that suggested that Amato and Guidicipetro were general partners of the company,[7] the Court has never relied on these statements to rule in favor of defendants. To the contrary, at both the motion to dismiss and summary judgment phases, the Court ruled in favor of plaintiff on the question of whether Amato, Guidicipetro and NESA could be held liable. *See Aquino*, 642 B.R. at 127-32. And while the Court was not required to reach this question at trial (because it ruled for defendants on other grounds), it took occasion to reprimand the defendants on this very issue, stating as follows:

> Even though in the end I found that plaintiff had failed to make out their case, I wasn't altogether blind to the fact that Alexander repeatedly and erroneously expressed its right to do a firm commitment. I wasn't so happy about the individual defendants allowing statements to be made to the authorities that they were actively managing Alexander, a statement that appears to have been false . . . .

Trial Tr. at 693.

Schlichtmann concludes his motion with the patently false claim that the Court "threatened to impose attorneys [sic] fees against

---

other record evidence indicates NESA was a general partner beginning in 2013. Whether or not, as a legal matter, this corrected filing remedied the deficiencies in the prior certificate of incorporation, the Court fails to see how this demonstrates judicial bias. The Court has consistently ruled in plaintiff's favor on the question of the direct liability of NESA, and did not reach the question at trial, and so the Court cannot be said to have ignored this inconsistency. Nor does the fact that Guidicipetro's declaration referenced the existence of this filing in any way demonstrate the declaration was improper.

[7] Schlichtmann has failed to adduce any evidence that either Amato or Guidicipetro was aware of the false statements in the FINRA submission -- which were drafted by counsel.

"[p]laintiff" after plaintiff filed a motion to disqualify defendants'
counsel. Schlichtmann Mot. at 26. The Order in question denied
plaintiff's motion to disqualify defendants' counsel, but in no way
encouraged -- let alone threatened -- the filing of an attorney's fees
motion. *See* Dec. 21, 2021 Order (Dkt. 82). Rather, the defendants had
already requested attorney's fees in defending the motion, and the
Court simply deferred ruling on that request, explaining it would
address all requests for fees and costs at the end of the case. *Id.*
The defendants have now refiled that request for attorney's fees, and
it is to that request that the Court now turns.

## II.  Motion for Attorney's Fees

### A. Motion to Disqualify Defendants' Counsel

Defendants seek to recover the attorney's fees they incurred in
litigating plaintiff's motion to disqualify defendants' counsel. They
further ask this Court to hold plaintiff's attorney, Jan Schlichtmann,
personally liable for a portion of those fees pursuant to 28 U.S.C. §
1927. The underlying motion to disqualify was filed by plaintiff
shortly after the Court granted defendants' motion to disqualify
Schlichtmann. Defendants argue that the motion was completely without
merit and was filed in retaliation for defendants' own motion to
disqualify plaintiff's counsel.

"Imposition of sanctions under a court's inherent powers requires
a specific finding that an attorney acted in bad faith." *Wolters Kluwer
Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009).
"[I]nherent-power sanctions are appropriate only if there is clear

25

evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Id.* "A claim is colorable when it reasonably *might* be successful, while a claim lacks a colorable basis when it is utterly devoid of a legal or factual basis." *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999). The same standard applies for sanctions pursuant to 28 U.S.C. § 1927. *See id* at 338; *Keung v. Patisseries Saines Corp.*, 2023 WL 4487728, at *5 (S.D.N.Y. July 12, 2023).

The Court finds that this high standard for sanctions is not met here. While plaintiff's motion to disqualify defendants' counsel lacked merit, it was not "entirely without color." Defendants' counsel did have some involvement in relevant events, which involved the filing of certain submissions to FINRA on behalf of Alexander Capital. And the filings were themselves relevant to the case because, *inter alia*, they stated that individual defendants Rocco Guidicipietro and Joseph Amato were general partners of Alexander Capital, which supported plaintiff's claim that they could be held personally liable. To be sure, plaintiff came nowhere near establishing that these attorneys had sufficient personal knowledge to warrant their disqualification, but it cannot be said the motion was "utterly devoid of . . . [a] factual basis." *Schlaifer*, 194 F.3d at 337.

Nor have defendants offered sufficient proof that plaintiff acted with an improper motive in filing this motion. While defendants speculate that plaintiff and Schlichtmann were motivated by a desire to retaliate against defendants following the disqualification of

Schlichtmann from the case, this circumstantial inference, standing alone, is insufficient to support "a specific finding" of bad faith. *Wolters Kluwer*, 564 F.3d at 114 ("A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings."). The Court therefore concludes imposition of sanctions with respect to plaintiff's motion to disqualify defendants' counsel is not warranted.

### B. Spoliation of Inpellis Server

Defendants seek, as a monetary sanction, the attorney's fees and costs they incurred as a result of plaintiff's spoliation of the Inpellis Server. This Court previously denied defendants' motion for an adverse inference instruction in connection with the spoliation of the Inpellis Server, concluding that defendants had failed to show plaintiff "acted with the intent to deprive" defendants of relevant information through the spoliation, as required by Federal Rule of Civil Procedure 37(e)(2). Mar. 31, 2023 Order (Dkt. 164), at 22-23. That ruling left open the possibility, however, that defendants might seek sanctions pursuant to Rule 37(e)(1) -- which does not require a showing of an "intent to deprive" -- and further reserved the question of whether defendants were entitled to attorney's fees until the end of the case. *Id.* at 18 n.5, 22 n.7.[8] Defendants also filed motions in

_____

[8]     Plaintiff wrongly argues that the spoliation issue was resolved by the Court's prior rulings. *See* Sanctions Opp. (Dkt. 205), at 4-8. To the contrary, the Court expressly left open the question of whether defendant was entitled to attorney's fees until the close of the case, and rejected the "nonsensical argument" that the prior ruling somehow waived defendants' right to seek sanctions. Mar. 31,

*limine in* advance of trial seeking to exclude certain evidence as a sanction for the alleged spoliation of the Inpellis Server, *see* Defs. Mot. *in Limine* (Dkt. 180), but, since the case was being tried without a jury, the Court deferred on ruling on these motions in advance of trial and ultimately did not have to resolve them because it found at trial that plaintiff had failed to make out its prima facie case even allowing the relevant evidence to be admitted.

Defendants now seek their attorney's fees in connection with the spoliation as a sanction pursuant to Rule 37(e)(1). Rule 37(e)(1) permits a court, "upon finding prejudice to another party from loss of [electronically stored] information, [to] order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). "An award of attorneys' fees for bringing a sanctions motion is an appropriate remedy for spoliation under Rule 37(e)(1) as 'measures no greater than necessary to cure the prejudice, even where a party fails to show bad faith under Rule 37(e)(2).'" *Scalia v. Cnty. of Kern*, 2023 WL 2333542, at *5 (E.D. Cal. Mar. 2, 2023) (quoting *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1241 (N.D. Cal. 2022)).

Plaintiff incorrectly suggests that there must be some showing of an "intent to deprive" to obtain attorney's fees as a sanction. *See* Opp. to Sanctions (Dkt. 205), at 7-8. To the contrary, a showing of

---

2023 Order (Dkt. 164), at 18 n.5, 22 n.7. The stipulation between the parties that purportedly resolved this issue made no mention of attorney's fees, *see* Dkt. 98, presumably because the Court had previously ordered that all requests for attorney's fees would be resolved at the end of the case, *see* Dkt. 82.

an intent to deprive is only required to impose the sanctions listed in Rule 37(e)(2) (*i.e.*, an adverse inference instruction or terminating sanctions). Since imposition of attorney's fees as a sanction for spoliation is not listed in Rule 37(e)(2), the law predating the 2015 amendments to Rule 37(e) remains in effect and a showing of negligence may suffice to impose such an award. *See Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 140 (2d Cir. 2023) ("[T]he 'culpable state of mind' for a spoliation claim need not be intentional or willful, and may be found where the spoliation occurred due to negligence."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 527 (S.D.N.Y. 2022) (awarding attorney's fees as sanction pursuant to Rule 37(e) even absent finding of intent).

The Court finds that an award of excess attorney's fees incurred as a direct result of the spoliation of the Inpellis Server, and the resulting difficulties in determining its fate, is an appropriate measure to address the spoliation. As the Court previously found, "plaintiff failed to take even basic steps to preserve the server, which almost certainly contained relevant evidence the destruction of which may well have prejudiced defendants." Mar. 31, 2023 Order (Dkt. 164), at 18. This "behavior was clearly negligent and arguably grossly negligent." *Id.* at 24. The server contained email archives for several key individuals, including John Masiz, Marshall Sterman, and Frank Manguso, as well as Inpellis's contemporaneous financial records. *See id.* at 21-22.  The Court found that the destruction of the Inpellis Server "likely prejudiced defendants." *Id.* at 22.

Plaintiff prolonged the dispute over the spoliation of the Inpellis Server by failing to disclose it during discovery. For example, the Court instructed plaintiff and the bankruptcy trustee to submit a joint letter concerning the status of the Inpellis Server. *See* January 11, 2022 Hearing Tr. (Dkt. 92), at 4. The responsive letter misleadingly suggested that the Inpellis Server had been "copied" onto a hard drive that had then been used to produce documents in the case, thereby suggesting that the entire server had been preserved and its contents produced. Joint Ltr. re Inpellis Server (Dkt. 90), at 2. In fact, only a subset of the documents on the Inpellis Server had been copied onto the hard drive. The only documents preserved were those deemed relevant to a subpoena issued in a totally unrelated case brought by John Masiz and Jan Schlichtmann. *See* Mar. 31, 2023 Order (Dkt. 164), at 19-20. Had plaintiff simply owned up to the fact that the contents of the server had been lost, much effort and expense could have been avoided litigating the issue.

Plaintiff nonetheless argues that defendants have failed to show they were prejudiced as a result of the spoliation of the Inpellis Server. While it is true that sanctions under Rule 37(e)(1) require that a party have suffered prejudice and that any relief be "no greater than necessary to cure the prejudice," Fed. R. Civ. P. 37(e)(1), the advisory committee notes make clear that "[t]he rule does not place a burden of proving or disproving prejudice on one party or the other" because "[d]etermining the content of lost information may be a difficult task in some cases, and placing the burden of proving

prejudice on the party that did not lose the information may be unfair." Fed. R. Civ. P. 37 Advisory Committee Notes to 2015 Amendment. "The rule leaves judges with discretion to determine how best to assess prejudice in particular cases." *Id.*

The Court finds this is the appropriate case to impose attorney's fees as a sanction. Based upon the probable contents of the Inpellis Server, the spoliation "likely prejudiced defendants," Mar. 31, 2023 Order (Dkt. 164), at 22, but at the same time, the very nature of the spoliation makes it difficult to assess exactly what evidence was lost and what evidentiary sanction could properly remedy the prejudice. What is clear is that, but for plaintiff's spoliation -- and the attendant litigation surrounding it -- defendants would not have incurred some subset of their overall attorney's fees. Defendants have therefore been prejudiced to the extent of those fees, and recovery of them is a remedy "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1); *see ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.,* 2023 WL 5806327, at *6 (N.D.N.Y. Sept. 7, 2023) ("[T]he record shows that Defendants expended substantial time to uncover, investigate, and litigate Plaintiff's spoliation of documents. The Court finds that this specific time is the best measure for awarding attorney's fees to address Plaintiff's destruction of documents and the purposes of the spoliation doctrine.").

## III. <u>Conclusion</u>

For the foregoing reasons, the Court hereby denies in its entirety the Schlichtmann motion (Dkt. 216), including plaintiff's joinder in

that motion (Dkt. 221), and grants in part and denies in part defendants' motion for sanctions (Dkt. 204). Specifically, the Court denies defendants' request for sanctions in connection with plaintiff's motion to disqualify defendants' counsel, but grants defendants' request for attorney's fees incurred as a result of plaintiff's spoliation of the Inpellis Server. Defendants will be required to prove the amount of these fees in a further written submission to be made no later than January 12, 2024. The fee award will be strictly limited to fees directly caused by the spoliation, and defendants' submission should include sufficient factual detail to prove this connection. Plaintiff is permitted to file a response by January 22, 2024, challenging the amount of those fees. No reply or oral argument is anticipated at this time.

Which still leaves the question of whether to refer Schlichtmann's misconduct to the SDNY Grievance Committee. Mr. Schlichtmann is an intelligent and experienced attorney, and the Court still harbors the hope that in his private moments he will come to recognize that he let his financial motivations and over-adversarial zeal lead him down a path of impropriety. But even if Mr. Schlichtmann is unable to accept this conclusion, the instant Opinion and Order sets the record straight, and therefore the undersigned (who served as Chair of the SDNY Grievance Committee for many years) concludes that no material benefit would be achieved at this point by referring the matter to the Committee. Ultimately, the imposition of any further penalty must rest with Mr. Schlichtmann's conscience.

SO ORDERED.

New York, NY
December 28, 2023

JED S. RAKOFF, U.S.D.J.